**ROB BONTA**
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
NICHOLAS ESPÍRITU
Deputy Attorneys General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  Nicholas.Espiritu@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO. 3:25-cv-04870-CRB**<br><br>**PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge:      Charles R. Breyer<br>Trial Date:<br>Action Filed: 6/9/2025 |

**PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that Plaintiffs GAVIN NEWSOM, in his official capacity as Governor of the State of California and the STATE OF CALIFORNIA (collectively, Plaintiffs) hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a temporary restraining order (TRO) and order to show cause why a preliminary injunction should not issue against Defendants PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, DOD Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a temporary restraining order and preliminary injunction prohibiting DOD Defendants from taking any of the actions described in Plaintiffs' contemporaneously-filed Proposed Order and Order to Show Cause.

This motion is based on this Ex Parte Motion, the Complaint for Declaratory and Injunctive Relief (Doc. 1), the accompanying Memorandum of Points and Authorities, the accompanying proposed Temporary Restraining Order, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

As set forth in the accompanying Memorandum of Points and Authorities, a TRO is necessary by 1:00 p.m. on June 10, 2025, to prevent immediate and irreparable harm to Plaintiffs. Absent immediate injunctive relief, Defendants' use of the military and the federalized National Guard to patrol communities or otherwise engage in general law enforcement activities creates imminent harm to State Sovereignty, deprives the State of vital resources, escalates tensions and promotes (rather than quells) civil unrest. Accordingly, the Plaintiffs seek a TRO and preliminary injunction to preserve the status quo.

Plaintiffs respectfully request leave to file excess pages pursuant to the Court's standing order. Good cause exists for leave; this case present complex and novel issues related to the proper use of the military for domestic law enforcement and comes to the Court on an emergency

1   basis.

2        Notice of this Ex Parte Motion has been and will be provided to Defendants as set forth in

3   the accompanying Certificate Regarding Notice to Defendants of Ex Parte Motion.  Defendants

4   stated in response: "Defendants oppose any ex parte proceedings in this matter and request no less

5   than 24 hours from the time that Plaintiffs file their motion for a temporary restraining order to

6   file a response brief.  Should the Court desire to rule on the temporary restraining order in the

7   absence of Defendants' written response, Defendants seek to be heard at a hearing and are

8   available at any time."

9   Dated:  June 10, 2025                          Respectfully submitted,

10                                                 ROB BONTA
                                                   Attorney General of California
11                                                 LAURA L. FAER
                                                   Acting Senior Assistant Attorney General
12                                                 MARISSA MALOUFF
                                                   JAMES E. STANLEY*
13                                                 Supervising Deputy Attorneys General
                                                   NICHOLAS ESPÍRITU
14                                                 LUKE FREEDMAN
                                                   ROBIN GOLDFADEN
15                                                 BRENDAN M. HAMME
                                                   LORRAINE LOPEZ*
16                                                 KENDAL MICKLETHWAITE
                                                   MEGAN RICHARDS
17                                                 Deputy Attorneys General

18                                                 */s/ Nicholas Espíritu*
                                                   NICHOLAS ESPÍRITU
19                                                 Deputy Attorney General
                                                     1515 Clay St.
20                                                   Oakland, CA  94612
                                                     Telephone: (510) 879-3908
21                                                   E-mail:  Nicholas.Espiritu@doj.ca.gov

22                                                 *Attorneys for Plaintiffs*

23

24

25                                                 * Admission Pending
26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Statement of Facts ....................................................................................................... 3

    I.     Federal Immigration Enforcement Actions In Los Angeles ................................. 3

    II.    Local Authorities Respond and Manage Conditions. .............................................. 4

    III.   The President, Without the Governor's Consent, Federalizes 4,000 California National Guard Troops And Mobilizes Additional U.S. Marines. ........ 4

    IV.   Current Status of Protests and National Guard Deployment. ................................. 6

Legal Standard ............................................................................................................. 7

Argument ..................................................................................................................... 7

    I.     Plaintiffs Are Likely To Succeed on the Merits, And At A Minimum, Plaintiffs Present Serious Questions Going to the Merits ..................................... 7

        A.    The Section 12406 Federalization Orders are Unlawful ............................ 7

            1.    There were no conditions in California that would allow invocation of Section 12406 ........................................................ 9

            2.    The Governor did not issue the federalization order .................... 10

        B.    The Orders are a substantial intrusion into the State of California's police powers. ............................................................................................ 11

        C.    The Military's Threatened Law Enforcement Activities Will Violate the Posse Comitatus Act ............................................................ 12

            1.    The federalized National Guard and the Marines Corps are subject to the Posse Comitatus Act ............................................... 12

            2.    There is a substantial likelihood that the National Guard and Marines will engage in activities that "amount to direct active involvement in the execution of the laws" ........................ 14

    II.    There is a Grave Risk of Imminent, Irreparable harm ........................................ 16

    III.   The Public Interest and Balance of Equities Tip Sharply in Favor of A TRO ...... 18

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
    901 F.3d 1166 (9th Cir. 2018) .................................................................... 7

*Abbott v. Biden*
    70 F.4th 817 (5th Cir. 2023) ..................................................................... 13

*Ariz. Dream Act. Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) .................................................................. 18

*Black Lives Matter D.C. v. Trump*
    544 F. Supp. 3d 15 (D.D.C. 2021) ........................................................... 14

*California v. Trump*
    963 F.3d 926 (9th Cir. 2020) .................................................................... 15

*City and County of San Francisco v. U.S. Citizenship and Immigration Services*
    408 F.Supp.3d 1057 (N.D. Cal. 2019) ..................................................... 16

*City of Los Angeles v. Barr*
    941 F.3d 931 (9th Cir. 2019) ...................................................................... 8

*Clark v. United States*
    322 F.3d 1358 (Fed. Cir. 2003) ................................................................ 13

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ................................................................................. 13

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) .................................................................. 18

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) ...................................................................... 7

*Hibbs v. Winn*
    542 U.S. 88 (2004) ................................................................................... 11

*In re Saldana*
    122 F.4th 333 (9th Cir. 2024) ................................................................... 11

*in United States v. Hartley*
    796 F.2d 112 (5th Cir. 1986) .................................................................... 15

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*
    4 F.3d 819 (9th Cir. 1993) ....................................................................... 18

*Laird v. Tatum*
408 U.S. 1 (1972) .................................................................................................. 12

*M.R. v. Dreyfus*
697 F3d 706 (9th Cir. 2015) .................................................................................. 16

*Michigan v. United States Army Corps of Engineers*
667 F.3d 765 (7th Cir. 2011) ................................................................................. 16

*Mueller v. City of Joliet*
943 F.3d 834 (7th Cir. 2019) ................................................................................. 14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018) ................................................................................. 16

*Nken v. Holder*
556 U.S. 418 (2009) .......................................................................................... 7, 18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*
572 U.S. 545 (2014) ................................................................................................ 8

*Patterson v. State of Kentucky*
97 U.S. 501 (1878) ................................................................................................ 12

*Perfect 10, Inc. v. Google, Inc.*
653 F.3d 976 (9th Cir. 2015) ................................................................................. 16

*R.I.L-R v. Johnson*
80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................ 18

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) ............................................................................... 19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
240 F.3d 832 (9th Cir. 2001) ................................................................................... 7

*Trump v. Int'l Refugee Assistance Project*
582 U.S. 571 (2017) .......................................................................................... 7, 18

*United States v. Chon*
210 F.3d 990 (9th Cir. 2000) ........................................................................... 12, 13

*United States v. Dreyer*
804 F.3d 1266 (9th Cir. 2015) ......................................................................... 12, 13

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

*United States v. Hernandez-Garcia*
    44 F.4th 1157 (9th Cir. 2022) ............................................................. 15

*United States v. McArthur*
    419 F. Supp. 186 (D.N.D.1975) ......................................................... 15

*United States v. Morrison*
    529 U.S. 598 (2000) ........................................................................... 11

*United States v. Red Feather*
    392 F. Supp. 916 (D.S.D. 1975) ......................................................... 15

*United States v. Rios-Montano*
    438 F. Supp. 3d 1149 (S.D. Cal. 2020) .............................................. 12

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .................................................................... 7, 16, 18

**STATUTES**

United States Code, Title 10
    § 248 ................................................................................................... 15
    § 271 ................................................................................................... 15
    § 272 ................................................................................................... 15
    § 274 ................................................................................................... 15
    § 284 ................................................................................................... 15
    § 375 ................................................................................................... 12
    § 12405 ............................................................................................... 13
    § 12406 ........................................................................................ *passim*

United States Code, Title 18
    § 1385 ................................................................................................. 12

Act of June 18, 1878, Chapter 263, 20 Stat. 152 (1878) ......................... 12

Militia Act of 1903. Publ. l. No. 57-33, 32 Stat. 775 (1903) ................... 11

Militia Act of 1908, Chapter 204, 35 Stat. 399 (1908) ........................... 11

**CONSTITUTIONAL PROVISIONS**

United States Constituion
    First Amendment .................................................................................. 9
    Tenth Amendment ............................................................................... 12

# TABLE OF AUTHORITIES
### (continued)

**OTHER AUTHORITIES**

Code of Federal Regulations, Title 32
    § 182.6(a)(1)(iii) (2013) ................................................................................ 13
    § 213.10(a)(3) (1982) ................................................................................ 12

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In the United States, the police—and not the military—enforce the law. This bedrock principle flows from the Founding, finds expression in Acts of Congress, and lives at the core of our civil society. Ours is a Nation of laws, enforced through even-handed justice, and not ruled by military decree. But Defendants, including President Trump and Secretary of Defense Hegseth have sought to bring military personnel and a "warrior culture" to the streets of cities and towns where Americans work, go to school, and raise their families. Now, they have turned their sights on California with devastating consequences, setting a roadmap to follow across the country.

Through a June 7 Presidential Memorandum and subsequent implementing orders, Defendants have seized control of 4,000 members of the California National Guard over the express objection of California's Governor and deployed them to Los Angeles, the largest county and second largest city in the country. Unsatisfied with this excessive and unnecessary show of force, Defendants have sent another 700 active-duty Marines into Los Angeles.

All of this was unlawful. The President purported to federalize the California National Guard under 10 U.S.C. § 12406, which authorizes him to call the Guard into federal service in only very narrow circumstances, none of which is present. To put it bluntly, there is no invasion or rebellion in Los Angeles; there is civil unrest that is no different from episodes that regularly occur in communities throughout the country, and that is capable of being contained by state and local authorities working together. And nothing is stopping the President from enforcing the laws through use of ordinary, civilian mechanisms available to federal officers. True enough, many Californians—and many Angelenos—oppose the Administration's immigration enforcement policies. They have expressed that view through largely peaceful protest. In the isolated instances of more significant disturbance, Los Angeles-area law enforcement has quickly and professionally responded, with support from the California Highway Patrol and with additional resources available through the State's well-established law enforcement mutual aid system. What is more, even in circumstances where the statutory predicates are present, Section 12406

1

requires orders to federalize the National Guard to be "issued through the governors of the States," and here the Governor never issued such an order or gave consent.

The Marine Corps' deployment for law enforcement purposes is likewise unlawful. For more than a century, the Posse Comitatus Act has expressly prohibited the use of the active duty armed forces and federalized national guard for civilian law enforcement. And the President and Secretary Hegseth have made clear—publicly and privately—that the Marines are not in Los Angeles to stand outside a federal building.

Instead, as established in the attached declarations, Defendants intend to use unlawfully federalized National Guard troops and Marines to accompany federal immigration enforcement officers on raids throughout Los Angeles. They will work in active concert with law enforcement, in support of a law enforcement mission, and will physically interact with or detain civilians. These unlawful deployments have already proven to be a deeply inflammatory and unnecessary provocation, anathema to our laws limiting the use federal forces for law enforcement, rather than a means of restoring calm. Federal antagonization, through the presence of soldiers in the streets, has already caused real and irreparable damage to the City of Los Angeles, the people who live there, and the State of California. They must be stopped, immediately.

To preserve the peace, Plaintiffs respectfully urge the Court to grant the circumscribed emergency relief requested through this motion for a temporary restraining order, which will prevent the use of federalized National Guard and active duty Marines for law enforcement purposes on the streets of a civilian city. This motion does not seek to prevent any of those forces from protecting the safety of federal buildings or other real property owned or leased by the federal government, or federal personnel on such property. It instead seeks narrow relief tailored to avoid irreparable harm to our communities and the rule of law that is likely to result if Defendants are allowed to proceed with their plans to use Marines and federalized National Guard to enforce immigration laws and other civil laws on the streets of our cities.

**STATEMENT OF FACTS**

I.    FEDERAL IMMIGRATION ENFORCEMENT ACTIONS IN LOS ANGELES

On Friday, June 6, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. Declaration of Brian Olmstead ("Olmstead Dec.") ¶ 6. ICE officers were executing search warrants at various locations around Los Angeles. Declaration of Nicholas Espíritu ("Espíritu Dec."), Ex. F. ICE reportedly also carried out enforcement activities that included detentions and arrests at a doughnut shop in Los Angeles and several Home Depot parking lots in the Westlake District in Los Angeles. *Id.*

During the course of these operations in places where members of immigrant communities work and go about daily business, ICE and its agents reportedly took actions that inflamed tensions and provoked protest. Agents engaged in military-style operations while conducting these detentions and arrests that sparked panic in the community. *See id.* at 1 (Los Angeles Mayor Karen Bass stating "the [ICE] activity was meant to 'sow terror' in the nation's second-largest city"). For example, in some instances, ICE agents were reportedly observed conducting "military-style" operations. Espíritu Dec., Ex. G. In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained. Espíritu Dec., Ex. H. (noting 44 individuals were detained); Espíritu Dec, Ex. G (noting that "between 70 and 80 people had been detained").

That same day, members of the public gathered at the Edward R. Roybal Federal Building and U.S. Courthouse in Los Angeles to protest the escalation in force and scope of immigration enforcement activities. Espíritu Dec., Ex. I. Protestors gathered at this location based on reports that individuals who were detained during the ICE operations were being held there. *Id.* Protesters also gathered at other locations where ICE operations were reportedly happening, including in the cities of Paramount and Compton. Olmstead Dec. ¶ 7.

The Los Angeles protests continued into Saturday June 7, and Sunday, June 8, 2025. Olmstead Dec. ¶¶ 6-14. While some protestors began to engage in unlawful behavior, the majority did not, and state and local law enforcement agencies contained the situation. *See id.*

¶¶ 9, 10. Governor Newsom and other state and local officials have unequivocally condemned all violence and other conduct that damages or threatens people and property. *See, e.g.*, Espíritu Dec., Ex. Q (statement from Governor Newsom on June 7, 2025: "Never use violence. Speak out peacefully"); Espíritu Dec., Ex. N at 6 (statement from LAPD Chief Jim McDonnell on June 9, 2025: "There is no tolerance for criminal activity under the guise of protest"); Espíritu Dec., Ex. L (Mayor Karen Bass (@MayorofLA) posted on X, on June, 7, 2025 at 6:06 pm: "Everyone has the right to peacefully protest, but let me be clear: violence and destruction are unacceptable, and those responsible will be held accountable").

## II. LOCAL AUTHORITIES RESPOND AND MANAGE CONDITIONS.

Consistent with their extensive training and experience responding to both large-scale peaceful protests and civil disturbances, the Los Angeles Police Department (LAPD) and Los Angeles Sheriff Department (LASD) responded promptly and effectively to the events in Los Angeles. Olmstead Dec. ¶¶ 6-9, 11-12, 14. For instance, LAPD responded to protests at Los Angeles' Metropolitan Detention Center and LASD responded to protests in the cities of Paramount and Compton. *Id.* ¶¶ 6-7, 9-10, 12. And even though both LAPD and LASD are able to request aid from nearby California law enforcement agencies under the state's Mutual Aid System during civil disturbances, *id.* ¶¶ 2-5, neither needed to take even that step at first. *Id.* ¶¶ 6-11. That is because the unlawful aspects of the disturbances were not different in scale or kind than that which occurs periodically throughout the country and is eventually brought under control by civilian authorities.

## III. THE PRESIDENT, WITHOUT THE GOVERNOR'S CONSENT, FEDERALIZES 4,000 CALIFORNIA NATIONAL GUARD TROOPS AND MOBILIZES ADDITIONAL U.S. MARINES.

That evening, the President issued a memorandum ("June 7 Trump Memo"), which, without naming any particular locale, declared that "[n]umerous incidents of violence and disorder" had "recently occurred and threaten to continue in response" to enforcement of federal immigration laws. Espíritu Dec., Ex. E. Asserting "credible threats of continued violence," the June 7 Trump Memo purported to "call into Federal service members and units of the National Guard under 10 U.S.C. 12406" to "temporarily protect" federal government personnel and federal

4

property. *Id.* The June 7 Trump Memo then directed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority" which "shall," regardless, "be at least 2,000 National Guard personnel and the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." *Id.* It further instructed the Secretary of Defense to take measures "reasonably necessary to ensure the protection and safety of Federal personnel and property" where protests were occurring or "likely" to occur. *Id.*

At no time prior to issuing the June 7 Trump Memo to federalize the California National Guard did DOD notify or seek approval from Governor Newsom to utilize or "mobilize" California's National Guard. Espíritu Dec., Ex. K at 2 (June 8, 2025 letter from the Governor's office to the U.S. Secretary of Defense, informing the Secretary that "the Department of Defense did not transmit this directive to the Office of the Governor, nor was it approved or ordered by the Governor of California").

Later in the evening of June 7, Secretary Hegseth sent an order ("First DOD Order") to the Adjutant General of California, who serves in dual roles as the leader of the California National Guard and as a reserve of the U.S. Army. Espíritu Dec., Ex. O. The First DOD Order attached the June 7 Trump Memo and called into federal service 2,000 members of the California National Guard for a period of 60 days. *Id.* Neither the Governor nor his office ever consented to the mobilization of the National Guard nor were presented with an opportunity to provide input on the mobilization; the Governor only learned of the First DOD Order from the Adjutant General after it was received from DOD. *See* Espíritu Dec., Ex. K at 1-2 (June 8, 2025 letter from the Governor's office to the U.S. Secretary of Defense noting that the Adjutant General of California, but not the Governor of California, received the First DOD Order). Nevertheless, the Adjutant General relinquished command of the 79th Infantry Brigade Combat Team to General Guillot, commander of U.S. Northern Command, which has issued all orders to the National Guard Unit since that time. *See* Espíritu Dec., Ex. J (June 8, 2025 Press Release from USNORTHCOM noting its command over California National Guard units deployed in the greater Los Angeles area). Commenting on the situation on June 8, the President stated over media channels that DOD

and other federal agencies must "take all action necessary to liberate Los Angeles from the Migrant Invasion" and that "[w]e're going to have troops everywhere." Espíritu Dec., Ex. M.

On June 9, 2024 at 3:24 p.m., Secretary Hegseth posted on X that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "to defend federal law enforcement officers." Declaration of Paul S. Eck ("Eck. Dec.") ¶ 18. The same day, Secretary Hegseth issued a second memorandum ("Second DOD Order," and collectively with the First DOD Order, the "DOD Orders") ordering the federalization of 2,000 additional California National Guard members, again without providing any opportunity for Governor Newsom to review or consent to that mobilization. Espíritu Dec., Ex. S at 1 (June 10, 2025 letter from the Governor's office to the U.S. Secretary of Defense noting that "[T]he Governor of California was given no opportunity to provide or withhold his consent, nor, at a minimum, to consult with the President or [the Secretary of Defense] as to which service members and in what number should be called, and for what purposes and what period of time.").

## IV. CURRENT STATUS OF PROTESTS AND NATIONAL GUARD DEPLOYMENT.

Only about 325 California National Guard troops and armored vehicles were initially deployed, with the remaining 1700 under federal command but not deployed. When the California National Guard troops first arrived in Los Angeles on the morning of June 8, the city was quiet. *See* Espíritu Dec., Ex. R ("The situation appeared calm to start on Sunday, with CBS News Los Angeles reporters at the scene reporting no signs of conflict until about 3 p.m., when a large group of demonstrators marched from the steps of L.A. City Hall to the federal building, where the detention center is located."). Protests remain largely peaceful and civilian law enforcement has ably responded to isolated disturbances. *Id.* Accordingly, Governor Newsom's office sent a letter to Secretary Hegseth objecting to the federalization and deployment of California National Guard troops to Los Angeles and requesting that DOD rescind the First DOD Order. Espíritu Dec., Ex. K.

Instead, the State became aware on June 9, 2025 that mobilized federalized California National Guard units would be providing support for counter-immigration operations and not only at federal buildings. Eck Dec. ¶ 19. Specifically, these activities—scheduled to begin today,

June 10, 2025—will include "holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel." *Id.*

## LEGAL STANDARD

The purpose of interim injunctive relief is "not to conclusively determine the rights of the parties," but instead to balance the equities as litigation moves forward." *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, 579, 137 S.Ct. 2080 (2017). The standard for a temporary restraining order is generally the same as for a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). When the government is a party, the last two *Winter* factors (the equities and public interest) merge. *E. Bay Sanctuary Covenant,* 993 F.3d at 668 (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, AND AT A MINIMUM, PLAINTIFFS PRESENT SERIOUS QUESTIONS GOING TO THE MERITS

#### A. The Section 12406 Federalization Orders are Unlawful

Both the Constitution and federal law strictly limit the domestic use of the National Guard. Article I, § 8, Cls. 15-16 ("the Militia Clauses") of the Constitution give *Congress* the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions," as well as the power "to provide for organizing, arming, and disciplining, the

7

militia, and for governing [the militia when] employed in the Service of the United States."

However, Congress has delegated its power to deploy the National Guard domestically to the

President in certain specific circumstances, set forth in statute. One of these instances is 10 U.S.C.

§ 12406, which provides that:

> Whenever—
>
>> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>>
>> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>>
>> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. The President's June 7 memorandum that purports to federalize California's

National Guard relies on Section 12406 for its authority.

Section 12406 means what it says: it is applicable only when **both** the requisite conditions

exist **and** the federalization order is "issued through the" Governor. *See Octane Fitness, LLC v.

ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) ("As in all contested questions of

statutory interpretation, "[o]ur analysis begins and ends with the text."); *see also City of Los

Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) ("We give Congress's words their ordinary

and everyday meaning, and may consult dictionary definitions to ensure a plain interpretation.").

If either condition is not satisfied, the President may not use this statute to call members of the

National Guard into federal service. Here, neither condition was met at the time the California

National Guard was purportedly federalized and, as a consequence, Plaintiffs have a high

likelihood of prevailing on their claims.

**1. There were no conditions in California that would allow invocation of Section 12406.**

The Trump Memo does not (and cannot) assert that California is being invaded or is in danger of invasion by a foreign power, so that ground in inapposite. 10 U.S.C. § 12406(1). There is also plainly no "rebellion" under 10 U.S.C. § 12406(2). "Rebellion" means "an organized attempt to change the government or leader of a country, [usually] through violence," something far beyond anything that has occurred or is likely to occur in Los Angeles. *Rebellion, Black's Law Dictionary* (12th ed. 2024). The Trump Memo asserts that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States," but simply saying so doesn't make it true. Primarily peaceful protests that include some level of civil disturbance do not rise to the level of a rebellion. Indeed, nothing about the scale of the protests or acts of violence set these events apart from other recent periods of significant social unrest.

On June 7 and June 8, members of the public gathered to protest immigration enforcement activities in their communities, to express their opposition to the manner in which the Trump Administration has executed its immigration agenda, and to stand in solidarity with the individuals and families most directly impacted by the actions. Most protesters have exercised their First Amendment rights in a peaceful, non-violent, and legally compliant manner. While incidents of unrest and violence have been reported, those incidents are the exception. And when protests have crossed the line from peaceful to destructive or violent, Governor Newsom and other state and local officials have unequivocally condemned that conduct and called for prosecution. And state and local law enforcement agencies have quickly and effectively responded to these limited incidents, including by making dozens of arrests. Indeed, Los Angeles Police Department (LAPD) and Los Angeles Sheriff Department (LASD) have substantial training and experience responding to protests and riots on even larger scales than what Los Angeles has experienced in recent days.

These resources and training have proved sufficient to address the issue. Governor Newsom and Mayor Karen Bass both reported on June 7, 2025, that they had sufficient resources

9

to respond to any potential unrest or threats to safety or property. In a June 8 letter to Secretary Hegseth, Governor Newsom's Office affirmed that the "robust law enforcement response [] to protect federal facilities" demonstrated "local law enforcement resources are sufficient to maintain order." At no time have these serious but limited incidents of violence, let alone the peaceful protests, overwhelmed local law enforcement or come close to an event that could be considered "an organized attempt to change the government or leader of a country." Indeed, these protests have not even risen to the level of protests or riots that Los Angeles and other major cities have seen in recent years—and dealt with entirely without federalization of National Guard troops.

Finally, Defendants have not shown that any of the protests have rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). According to news reports that rely on statements from the Department of Homeland Security, on Friday, June 6, 2025 and Saturday, June 7, 2025, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and 70-80 people detained in total. This ability to carry out enforcement activities with regular Department of Homeland Security officers does not amount to an inability to execute federal laws. *See* 10 U.S.C. § 12406(3)*.* And it is a far cry from the only other time in our nation's history that a President has relied on the exclusive authority of Section 12406 to federalize the National Guard. There, President Richard Nixon called upon the National Guard to deliver the mail during the 1970 Postal Service Strike, which involved over 210,000 postal workers and over 670 locations throughout the country, virtually crippling the distribution of mail in the country. Here, DHS officials were able to engage in enforcement activities, and continue to be able to do so throughout the country including in Los Angeles.

### 2. The Governor did not issue the federalization order.

Section 12406 requires that orders pursuant to that section be "issued through the governors of the States." 10 U.S.C. § 12406. The Governor did not do so, and that is an

independent, free-standing reason for the Court to conclude that the federalization orders are unlawful.

Section 12406 originated as part of the Militia Act of 1903. Publ. L. No. 57-33, 32 Stat. 775 (1903). The original section did not include this provision, but the statute was subsequently amended to include the requirement that orders be issued through the governor. Militia Act of 1908, ch. 204, 35 Stat. 399 (1908). "'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting Singer, STATUTES AND STATUTORY CONSTRUCTION § 46.06, pp. 181-86 (rev. 6th ed. 2000)). "'[A] significant change in language is presumed to entail a change in meaning' even when legislative history is silent as to Congress's intent." *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256-60 (2012)). Here, Congress chose to include language that affirmatively required orders under § 12406 be issued by the Governor, who is in the best position to understand the public safety and other needs of the communities in that state. Any order not issued in compliance with that requirements is unlawful.

As discussed *supra*, the DOD Defendants did not issue their orders through the Governor as the statute directs. This violates both the letter of the law and its spirit by depriving the Governor of the opportunity to consult with the President or other federal officials. Given the chance, the Governor could have discussed with the President not only whether the California National Guard should be called into federal service at all, but if so, which and how many service members should be called, and for what purposes and time period.

Defendants' failure to issue the orders through Governor Newsom, as required by § 12406, renders the orders ultra vires to the statute.

### B. The Orders are a substantial intrusion into the State of California's police powers.

Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National

11

Government and reposed in the States, than the suppression of violent crime and vindication of its victims"); *Patterson v. State of Kentucky*, 97 U.S. 501, 503 (1878) ("[T]he power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government"). Deploying over 4,000 federalized military personnel absent proper invocation Section 12406 to quell a protest or prevent future protests despite the lack of evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State Power that is at the heart of the Tenth Amendment. For this reason, Plaintiffs are substantially likely to prevail on their Tenth Amendment claim as well.

### C. The Military's Threatened Law Enforcement Activities Will Violate the Posse Comitatus Act

#### 1. The federalized National Guard and the Marines Corps are subject to the Posse Comitatus Act

"Posse comitatus (literally 'power of the county) was defined at common law [for those] upon whom a sheriff could call for assistance in preventing any type of civil disorder." *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (citations omitted). The general prohibition against the use of the military in civilian law enforcement activities have been codified under the Posse Comitatus Act ("PCA") since 1878. *Id.* (citing Act of June 18, 1878, ch. 263, 20 Stat. 152 (1878)). The current version, codified under 18 U.S.C. § 1385, forbids the willful use of "any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws." *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000). The prohibition has been extended to include the Marine Corps. *Id.*, *cited in Dreyer*, 804 F.3d at 1272; *United States v. Rios-Montano*, 438 F. Supp. 3d 1149, 1151 (S.D. Cal. 2020) (citing *Laird v. Tatum*, 408 U.S. 1, 15 (1972)).

Further, the Secretary of Defense, pursuant to 10 U.S.C. § 375, issued regulations that prohibited the use of military personnel "as a posse comitatus or otherwise to execute the laws." 32 C.F.R. § 213.10(a)(3) (1982), *cited in Dreyer*, 804 F.3d at 1272-73. The prohibited actions include search or seizure, arrest, stop and frisk, or "surveillance of pursuit of individuals." *Id.* The Department of Defense issued a near-identical policy in 1986, explicitly applicable to the Marine

Corps. *Id*. at 1273. Although the regulations were removed in 1993, substantively similar regulations were reissued in 2013. *See* 32 C.F.R. § 182.6(a)(1)(iii) (2013).

The restrictions apply equally to National Guard members in Federal Service. *See Chon*, 210 F.3d at 993 (recognizing the naval policies exempt National Guard members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273; *see also Clark v. United States*, 322 F.3d 1358, 1357 (Fed. Cir. 2003) (holding National Guard members can only be used for civilian law enforcement when they are not in federal service). Section 12406 is *not* a statutory exception to the Posse Comitatus Act. *See, e.g.*, 10 U.S.C. § 12405; Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21, Enclosure 3 ¶ 1.b.(5) (Feb. 27, 2013) (Incorporating Change 1, Effective Feb. 8, 2019) (regulations implementing Posse Comitatus Act); Center for Law and Military Operations, Domestic Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) (listing, without inclusion of 10 U.S.C. § 12406, the statutes and authorities that allow for direct DOD participation in civil law enforcement in defined circumstances).

Restricting the military and National Guard – the modern-day militia – from enforcing civilian law domestically, has been an essential principle since this Nation's founding and should undergird its application here. The Founding Fathers supported militias but feared "that professional soldiers would imperil the promises of a free government." *Abbott v. Biden*, 70 F.4th 817, 840 (5th Cir. 2023) (citing Akhil R. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 53-56 (1998)) (addressing National Guard in Title 32 status). Tyrants, including from within the federal government, could eliminate a militia "simply by taking away the people's arms, enabling a *select militia* or standing army to suppress political opponents." *District of Columbia v. Heller*, 554 U.S. 570, 598 (2008) (citations omitted) (emphasis added). The Anti-Federalists feared that the United States might "cow the militia, destroy it, or convert it into a tool of oppression." *Abbott*, 70 F.4th at 840. Most poignantly, John Marshall noted at Virginia's ratification debate, "[u]nited we are strong, divided we fall. Will you prevent the general government from drawing the militia of one state to another, when the consequence would be, that every state must depend on itself?" 3 Debates in the Several State Conventions on

13

the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836)) at 420 (emphasis added).

While the PCA does not create a private civil cause of action for damages, *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F. 4th 1003 (D.C. Cir. 2023), a plaintiff may nonetheless present an ultra vires claim where there is a showing an agency "has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute," *id*. at 41.

In *Black Lives Matter D.C.*, the plaintiffs alleged members of the District of Columbia National Guard contributed to "unprovoked violence" as they were clearing peaceful protesters from Lafayette Park in June 2020. 544 F. Supp. 3d 26-27. Among their arguments was an ultra vires claim that the D.C. National Guard violated the PCA. *See id.* at 41. Plaintiffs claimed the National Guard unit from D.C. was inherently a federal entity and should have been considered perpetually in federal service, "such that the Posse Comitatus Act would apply to it at all times." *Id*. The Government argued, and the court agreed, that the PCA only applies to members of the D.C. National Guard "when they have been ordered to active duty pursuant to Title 10." *Id*. (citing *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019)).

By contrast, there is no dispute that the National Guard members in the present matter have purportedly been ordered to active duty pursuant to Title 10. An ultra vires claim is therefore viable upon a showing that National Guard members – or other active-duty military – have "disregarded" a specific and unambiguous directive of the PCA or "violated some specific command" of the PCA. *Id.* at 41.

**2.     There is a substantial likelihood that the National Guard and Marines will engage in activities that "amount to direct active involvement in the execution of the laws"**

The evidence strongly indicates that the federalized National Guard and active duty Marines deployed in Los Angeles will engage in quintessential law enforcement activity in violation of the PCA. The State became aware on June 9, 2025 that mobilized federalized California National Guard united would be providing support for counter-immigration operations and not only at federal buildings. Eck Dec. ¶ 19. Specifically, these activities—scheduled to begin

14

today, June 10, 2025—will include "holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets where immigration enforcement officers would travel." *Id.* Indeed, the military, including National Guard members, have already been deployed with federal law enforcement agents conducting law enforcement activity. On June 8, National Guard members arrived to work with the LAPD and LASD. Olmstead Dec. ¶ 11. The National Guard members were there to respond to protestors, but it was not clear what role they were to play or what equipment or training necessary they had. *Id*. National Guard members were also present at the Metropolitan Detention Center on June 8. *Id*. at ¶ 12.

The apparent mission of the troops at issue here is very different from the types of indirect support that Congress contemplates federal military assets may provide to state and local agencies. 10 U.S.C. § 248(b), for example, provides a list of supportive activities the active military can provide to other agencies, including maintenance and repair, transportation, training facilities, counterdrug and counter-transnational organized crime training, and surveillance support. *See* 10 U.S.C. § 284(b); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1163-64 (9th Cir. 2022); *California v. Trump*, 963 F.3d 926, 946 (9th Cir. 2020). The military may also share information and equipment with civilian law enforcement officials in certain instances. *See* 10 U.S.C. §§ 271, 272, *cited in United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986). Relatedly, military personnel may use civilian equipment to "monitor[ ] and communicate[ ] the movement of air and sea traffic." 10 U.S.C. §§ 271, 272, 274(a), (b). Courts have previously confirmed that such activities do not constitute direct military involvement that would be violate the PCA. *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975); *see also United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D.1975), *aff'd sub nom., United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976).

But here, the evidence indicates that Defendants plan to use soldiers to directly support law enforcement activity—immigration enforcement raids by ICE. *See* Eck Dec. ¶ 19. By ordering Marines and National Guard soldiers to accompany ICE on immigration enforcement raids in the community and engaging in supportive activities such as cordoning off populated

15

areas, Defendants will create a substantial likelihood that the military will physically confront, detain, or search civilians whom they perceive are posing a security threat, thereby actively executing civil laws. Accompanying law enforcement officers will place soldiers in situations that have already resulted in tense interactions with civilians. For example, on June 7, federal officers pushed protesters away from the Metropolitan Detention Center. Olmstead Dec. ¶ 9. The crowd at the Metropolitan Detention Center doubled in size on June 8 and included protestors apparently angry that the National Guard had been federalized. *Id*. ¶ 12. The National Guard's presence "seemed to only inflame the protestors further." *Id*.

These activities are strong evidence that the federalized National Guard and active duty Marines in Los Angeles will engage in law enforcement activity in direct violation of the PCA. Plaintiffs have therefore demonstrated—at a minimum—substantial questions going to the merits of their ultra vires claim on this basis as well. *See* Compl., ECF No. 1 at 6, 91.

## II.  THERE IS A GRAVE RISK OF IMMINENT, IRREPARABLE HARM

Plaintiffs will suffer irreparable injury in the absence of an injunction. *Winter,* 555 US at 20. Defendants' conduct need not be the exclusive cause of Plaintiffs' injury. *M.R. v. Dreyfus*, 697 F3d 706, 728-729 (9th Cir. 2015). Nor must the alleged harm be certain to occur before a court can grant a preliminary injunction. *Michigan v. United States Army Corps of Engineers* 667 F3d 765, 788 (7th Cir. 2011). Plaintiffs show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction. *City and County of San Francisco v. U.S. Citizenship and Immigration Services,* 408 F.Supp.3d 1057, 1121 (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 745 (9th Cir. 2015)).

Plaintiffs are likely to suffer several types of irreparable harm in the absence of temporary relief, but one stands out among the rest: the very high risk of substantial civil unrest as a direct result of Defendants' inflammatory and confrontational deployment of the military in a large, civilian population center. Indeed, the presence of soldiers on the streets of Los Angeles, including their actual or perceived support and aid in the execution of ICE duties, has *already* created significant civil unrest and is likely to result in increased civil unrest in the future. This

16

week, the presence of National Guard soldiers deployed to Los Angeles became the focus of protests and led to civil unrest, requiring intervention by state and local law enforcement to protect the National Guard soldiers. In the absence of immediate injunctive relief, there is a real risk of significant and widespread civil disturbance.

Put simply, soldiers patrolling the streets of Los Angeles have not made anyone safer; indeed, the opposite is true. Defendants' confrontational decision to deploy the military in a civilian city serves only to spread fear and heighten tensions in Los Angeles. If anything, the presence of the military threatens to further *de*-stabilize the community and escalate a situation that calls for cool heads and steady hands. *See* Olmstead Dec. ¶ 12 ("The presence of the National Guard seemed to only inflame the protesters further."). What is more, federalization of the National Guard and the deployment of active duty Marines aims to solve a problem that does not exist: since Fiscal Year 2024, ICE operated in the Los Angeles Area of Responsibility, making 4,741 arrests, and has continued to operate unimpeded, arresting approximately 44 individuals and detaining 70-80 people in total since Friday, June 6. Espíritu Dec., Exs. B, G.

Moreover, Defendants' unlawful federalization of 4,000 California National Guard members, over the repeated objections of Governor Newsom, diverts necessary state resources. *See* Eck Dec. ¶ 32 (noting the California Military Department has "has identified and committed 4,600 service members to achieve state specific missions, which is 38% of the available strength"); *id.* ¶ 33 ("In 2025, there have already been 3,332 services members activated for 89,061 duty days, indicating the state will need every available service member to meet the State's operational needs."). Most members of the California National Guard serve in a reserve capacity, meaning they work in civilian roles when not serving as part-time militia forces, often in specialized positions. Eck Dec. ¶¶ 21, 37. As one pertinent example, 2,500 California National Guard members were activated in response to some of the most destructive fires in Los Angeles County that occurred in early January 2025. Eck Dec. ¶¶ 35-36. Likewise, the federalized force includes elements of the 79th Infantry Brigade Combat Team that serve in Taskforce Rattlesnake, the State's specialized fire combat unit. Eck Dec. ¶¶ 14, 39-40. The 79th Infantry Brigade Combat Team also includes Counterdrug Taskforce members that specialize in providing support

to stop the trafficking of fentanyl at the U.S.-Mexico Border. *Id.* ¶¶ 15, 42-43. Members of the California National Guard also serve key roles in a variety of functions, from defending the state from cyber threats to conducting emergency traffic control. *Id.* ¶¶ 44-46. In short, Defendants' federalization of the California National Guard jeopardizes vital resources on which the State depends to protect itself from emergencies, including the 79th Infantry Brigade Combat Team's specialized fire suppression and drug interdiction teams. *Id.* ¶¶ 47-50.

In short, Defendants' unlawful federalization of a significant subset of the California National Guard for 60 days at the expense of state resources jeopardizes the safety and welfare of the state's citizens on two fronts: ***first***, it removes these servicemembers from their vital roles combating drug trafficking in California's border zones and fighting wildfires and ***second***, their deployment risks inflaming an unstable and dangerous situation of Defendants' own making, putting property and countless lives at unnecessary risk. *See id.* ¶¶ 13-16.

## III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF A TRO

Lastly, a preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. When the federal government is a party, these last two factors merge. *Nken*, 556 U.S. at 435; *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014). When evaluating the balance of hardships, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993). Among other things, "by establishing a likelihood of success on the merits," a plaintiff "establish[es] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. at 580. Moreover, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)

18

(quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Here, the balance of equities tips sharply in Plaintiffs' favor. Plaintiffs seek to preserve (in part) the status quo by temporarily enjoining Defendants from ordering or deploying the active-duty members of the military and federalized National Guard soldiers to patrol communities or otherwise engage in general law enforcement activities beyond the immediate vicinity of federal buildings or other federal real property. As outlined above, Defendants' use of the military and the federalized National Guard deprives the State of vital resources, escalates tensions and promotes (rather than quells) civil unrest. By contrast, the public interest is served if the Court enjoins Defendants from further militarizing California's communities to allow State and local law enforcement to fulfill their duties to enforce State law. Moreover, a preliminary injunction will not harm Defendants: the Department of Homeland Security can continue to enforce immigration law and the DOD Defendants will merely be ordered to comply with the PCA and statutes governing the federalization of the National Guard.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully urge the Court to help the State keep the peace in Los Angeles and enter a temporary restraining order that prevents federal troops from enforcing the laws in a civilian city.

| | |
|---|---|
| Dated: June 10, 2025 | Respectfully submitted, |

**ROB BONTA**
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY*
Supervising Deputy Attorneys General
LUKE FREEDMAN
ROBIN GOLDFADEN
BRENDAN M. HAMME
LORRAINE LOPEZ*
KENDAL MICKLETHWAITE
MEGAN RICHARDS
Deputy Attorneys General

*/s/ Nicholas Espíritu*

NICHOLAS ESPÍRITU
Deputy Attorney General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  Nicholas.Espiritu@doj.ca.gov

*Attorneys for Plaintiffs*

* Admission Pending