BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Amici Curiae
States of Iowa, et al.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gavin Newsom, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Donald J. Trump, et al.,<br><br>　　　　　Defendants. | Case No.:  3:25-cv-04870-CRB<br><br>**BRIEF OF THE STATES OF IOWA, OKLAHOMA, SOUTH CAROLINA AND 17 ADDITIONAL STATES AND COMMONWEALTHS AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date:   June 12, 2025<br>Time:  1:30 p.m.<br>Courtroom:    6 (17th Floor)<br>Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTEREST OF *AMICI CURIAE* ................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.  California Abandoned Los Angeles and Federal Law Enforcement to Violent Rioters ................................................................................................................. 2

II. President Trump Can Deploy the National Guard to Protect Los Angeles from Violent Riots ..................................................................................................................... 8

III. California Fails to Plead a Cause of Action. ..................................................................... 12

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ................................................................................................. 9

*Abbott v. v. Biden*,
   70 F.4th 817 (5th Cir. 2023) ........................................................................... 7, 9, 10

*Davis v. Passman*,
   442 U.S. 228 (1979) ................................................................................................. 9

*Farmer v. Mabus*,
   940 F.2d 921 (5th Cir. 1991) .............................................................................. 10, 11

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ................................................................................................... 10

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................................................. 9

*Gunn v. Minton*,
   568 U.S. 251 (2013) ................................................................................................. 9

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ................................................................................................. 10

*Perpich v. Dep't of Def.*,
   496 U.S. 334 (1990) ....................................................................................... 7, 8, 9

*Selective Draft Law Cases*,
   245 U.S. 366 (1918) ................................................................................................. 8

*Tarble's Case*,
   80 U.S. (13 Wall.) 397 (1872) ................................................................................. 9

*United States v. California*,
   655 F.2d 914 (9th Cir. 1980) ................................................................................... 9

**Statutes**

10 U.S.C. § 12406 ................................................................................................... 3, 6, 9, 10

**INTEREST OF *AMICI CURIAE***

For the past four years, illegal open-border immigration policies flooded the country with illegal aliens, including criminals convicted of crimes in their home country, violent international gang members, and suspected ISIS terrorists. Much of that was done in violation of federal immigration law through the assertion of executive enforcement prerogatives. Now, President Trump is executing Congress's dictates and enforcing federal immigration law—which includes valiant efforts by federal law enforcement to identify and deport alien criminals. Against that backdrop of law enforcement, activists began to gather in Los Angeles. But rather than protest peacefully, some of those protests became violent. And despite such violence, State and local officials publicly asked local law enforcement to stand down. Rather than let Los Angeles burn, again, President Trump deployed the National Guard. Such a deployment is responsible, constitutional, and authorized by statute. So this Court should not entertain the illicit attempt by California officials to arrogate to themselves the President's authority. Amici Curiae are the States and Commonwealths of Iowa, Oklahoma, South Carolina, Alabama, Arkansas, Florida, Georgia, Guam, Idaho, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, North Dakota, South Dakota, Tennessee, Texas, and Utah which submit this brief in support of Defendants.

Among the various oddities in this lawsuit is the admission by Plaintiffs that "the Adjutant General relinquished command of the 79th Infantry Brigade Combat Team" under the authority of U.S. Northern Command. *See* Dkt. 8 at 5. So this unusual *ex parte* request, made on a tight timeline against the President of the United States, seeks to cure a harm that followed the leader of the California National Guard transferring authority to the federal National Guard leadership.

This amicus brief will raise three points: *First*, that the violence present at the riots is unacceptable and the Government's role—whether local, State, or federal—is to protect the citizenry from lawlessness and violence. *Second*, that binding U.S. Supreme Court precedent analyzing similar questions shows that the President has authority, authorized by Congress consistent with the Constitution, to use the National Guard to defend federal employees engaged in their law enforcement duties. And *third*, that California failed to plead a valid cause of action.

The States here all recognize the important roles and balance played in the National Guard system by both the States and federal government. But Plaintiffs fail to respect the balance here.

## ARGUMENT

**I.     California Abandoned Los Angeles and Federal Law Enforcement to Violent Rioters.**

Recently, violence against federal immigration officials has increased. "The men and women of ICE put their lives on the line to protect and defend the lives of American citizens," ICE Assistant Secretary Tricia McLaughlin recently said in a statement. Audrey Conklin, *California sheriff says Newsom 'encouraged' LA riots as ICE arrests violent illegal aliens*, FOX NEWS (Jun. 10, 2025), https://tinyurl.com/y942z342. Yet politicians like "Mayor Bass of Los Angeles are contributing to the surge in assaults of our ICE officers through their repeated vilification and demonization of ICE. From comparisons to the modern-day Nazi gestapo to glorifying rioters, the violent rhetoric of these sanctuary politicians is beyond the pale." *Id.* Indeed, there are real-world consequences to Los Angeles' poor treatment of federal immigration officials and inaction to address violence against them.

This past weekend, parts of Los Angeles were indistinguishable from a war zone. On the morning of June 6, 2025, federal immigration officers attempted to enforce federal immigration law across multiple locations in Los Angeles. Chris Michael, *Los Angeles protests: a visual guide to what happened on the streets*, THE GUARDIAN (Jun. 9, 2025), https://tinyurl.com/5n7nmdhj. A crowd gathered to watch one of the immigration enforcement actions and among them was David Huerta, the president of California's largest labor union. *Id.* He was arrested by federal agents on suspicion of interfering with federal officers and for "deliberately obstruct[ing federal agents'] access by blocking their vehicle." *Id.*

Demonstrators gathered outside the federal detention center in downtown Los Angeles where Huerta and others were being held. *Id.* After a tense standoff with demonstrators, the LAPD declared an unlawful assembly in the area and deployed tear gas to break up the crowd. *Id.*

That night, more than 1,000 rioters reportedly surrounded a federal law enforcement building in Los Angeles and assaulted U.S. Immigration and Customs Enforcement officers, slashed tires,

and defaced buildings. Andrew Mark Miller, *GOP lawmaker demands accountability for LAPD's delayed response time helping assaulted ICE officers*, Fox News (Jun. 10, 2025), https://tinyurl.com/mr94r8nv. And it reportedly took LAPD two hours to respond. *Id.*

The following morning, federal agents were conducting an immigration enforcement action when several hundred protesters arrived due to the spread of the news of the attempted enforcement on social media. Chris Michael, *supra*. Around noon, federal vehicles left the site, with officers firing tear gas and flash grenades at protesters. *Id.* Some protesters followed the convoy of federal vehicles, throwing rocks and other objects, while others set up a roadblock near the site. *Id.*



*Id.* Later that afternoon, approximately 100 people gathered in a neighborhood west of the immigration action, where three fires were set, including a vehicle in the middle of an intersection. *Id.* Rioters threw rocks at Los Angeles County sheriff's deputies, and officers retreated to the bottom of a bridge. *Id.*

The evening of June 7, and in light of the violent protests in Los Angeles, President Trump announced he would "call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Donald J. Trump, *Presidential*

*Memorandum: Department of Defense Security for the Protection of Department of Homeland Security Functions* (Jun. 7, 2025), https://tinyurl.com/5ny52d88. The President reiterated that the deployed military personnel were authorized to perform those military protective activities that are "reasonably necessary to ensure the protection and safety of Federal personnel and property." *Id.*

Later that evening, federal agents emerged from inside the Metropolitan Detention Center to confront approximately 100 protesters, firing tear gas and using other crowd control measures. Chris Michael, *supra*. Curfews were declared across Los Angeles County overnight. *Id.*

On June 8, about 300 National Guard troops were deployed to the city. *Id.* They appeared outside the Metropolitan Detention Center to support immigration officials, and they did not appear to be engaging in active policing. *Id.*

That afternoon, the Los Angeles Police Department again declared the protest an unlawful assembly and ordered everyone to leave, but the protests continued. *Id.* The police reported that two officers were injured after being struck by motorcyclists attempting to "breach a skirmish line." *Id.* ICE officers and other federal agents used tear gas and pepper balls to disperse the crowd. *Id.*

Rioters smashed windows of the Los Angeles Police Department's headquarters. Audrey Conklin, *Rioters smash windows at LAPD headquarters as anti-ICE agitators clash with authorities*, Fox News (Jun. 9, 2025), https://tinyurl.com/mw6b6fwd. The LAPD declared an "unlawful assembly" as protesters failed to disperse in the downtown area. *Id.* And the LAPD's Central Division posted on social media site X that: "Agitators have splintered into and through out [sic] the Downtown Area." *Id.*

LAPD chief Jim McDonnell called the violence "disgusting" and said officers were pelted with rocks and shot at with commercial grade fireworks. Chris Michael, *supra*. He noted that the people engaging in violence were "people who do this all the time." *Id.*

That afternoon, rioters set more cars on fire and graffitied buildings and vehicles. *Id.*



Hundreds of protestors also blocked the 101 Freeway. *Id.*



On June 9, business owners reported looting at their stores. Karina Tsui, *Police investigate reported looting in LA's Financial District CNN* (Jun. 9, 2025), https://tinyurl.com/mpntc8ec. The tensions showed no sign of slowing as a mystery donor was seen dropping off tactical war-time face shields for protesters. Natasha Anderson & Rachel Bowman, DAILYMAIL, *Mystery donor distributes 'tactical gear' to LA rioters* (Jun. 10, 2025), https://tinyurl.com/2p8ydsb6.

In the early morning hours of June 10, after a night of looting and riots, a dead body was found on the Los Angeles sidewalk. Ronny Reyes, *Body discovered on LA sidewalk near looted stores in the wake of anti-ICE riots*, N.Y. Post (June 10, 2025), https://perma.cc/4772-B7GJ. The violent protests in Los Angeles have inspired similar protests against immigration enforcement across the country. Jessie Yeung, *The anti-ICE protests aren't limited to Los Angeles. Here's where else they're taking place*, CNN (Jun. 10, 2025), https://tinyurl.com/4sh85ucx. On June 10, there were protests ongoing in Santa Ana and San Francisco, along with New York City, Atlanta, Louisville, and Dallas. *Id.* Separately, demonstrations for the release of a union leader who was detained in the Los Angeles protests and later released on bond took place in Boston, Pittsburgh, Charlotte, Seattle, Washington, D.C., Connecticut, and New York. *Id.*

Given the prevalence of violence aimed at federal law enforcement, it is unsurprising that the President deployed National Guard resources to protect them from obstructions in their attempts to follow the law.

## II. President Trump Can Deploy the National Guard to Protect Los Angeles from Violent Riots.

Given the volatile situation, it is no surprise that President Trump called in federal service members and units of the National Guard to protect federal law enforcement and other officials that execute the laws of the United States. Indeed, given the violent reaction, the President was "unable with the regular forces" of ICE and other law enforcement to "execute the laws of the United States." 10 U.S.C. § 12406(3). And as described above, many of the protesters seem to be challenging the very basis of the legitimacy of the federal government and its law enforcement efforts. 10 U.S.C. § 12406(2). While Governor Newsom contends that he and Los Angeles Mayor Karen Bass "had sufficient resources to respond to any potential unrest or threats to safety or property," Dkt. 1 ¶ 90, the Los Angeles Police Department's contemporaneous cries for help indicate otherwise. *See* Tim Hains, *LAPD Chief: "We are Overwhelmed" by Riots, "No Limit to What They're Doing to Our Officers*, RealClearPolitics (June 9, 2025), https://tinyurl.com/56wyz4um.

While there have not been many disputes between the President and Governors in deploying State National Guards, the most recent seminal case to adjudicate such a dispute found that the President had authority to deploy the National Guard over the Governor's objection. *See Perpich v. Dep't of Def.*, 496 U.S. 334, 339–340 (1990) ("In the end, we conclude that the plain language of Article I of the Constitution, read as whole, requires" allowing the President to deploy the National Guard abroad); *accord Abbott v. Biden*, 70 F.4th 817, 821–23 (5th Cir. 2023) (describing the "complex" relationship between the National Guard, the States, and the federal military). That case also arose, albeit indirectly, from the Governor of California's refusal to allow the President to deploy the National Guard. *Perpich*, 496 U.S. at 346. After that dispute with California's Governor, Congress acted to give more authority to the President. That authority—subject to the constitutional challenge in *Perpich* —should inform this Court today.

Over time, Congress has also authorized the President to deploy State National Guards—even outside of Congressionally declared states of emergency. Looking through the history going back to the Founding, the Court identified two "conflicting themes, developed at the Constitutional Convention and repeated in debates over military policy during the next century" that "led to a compromise in the text of the Constitution and in later statutory enactments." *Perpich*, 496 U.S. at 340. That said, President Theodore Roosevelt declared the original militia law "obsolete and worthless." *Id.* (citing Theodore Roosevelt, *First Annual Message to Congress,* 14 Messages and Papers of the Presidents 6672 (Dec. 3, 1901)). That is why Congress began reforming the militia law to ensure that the "National Guard of the several States" and the "reserve militia" would be viable fighting forces for the United States. *Id.* at 342.

Yet the reforms were only the first step toward delegating more authority and autonomy to the President in authorizing the National Guard. Shortly after the early twentieth century reforms, Attorney General Wickersham opined that the "Militia Clauses" precluded deploying the National Guard outside the territory of the United States. *Id.* at 343 & n.13 (citing 29 Op. Atty. Gen. 322, 323–324 (1912)). Congress responded by "federaliz[ing]" the National Guard—including for the first time requiring "every guardsman to take a dual oath—to support the Nation as well as the States

and to obey the President as well as the Governor—*and authorized the President to draft members of the Guard into federal service.*" *Id.* at 343 (emphasis added).

Until 1952, the National Guard could only be ordered to active duty during limited "periods of national emergency." *Perpich*, 496 U.S. at 346. That year Congress authorized broader deployments—but contingent on "gubernatorial consent." *Id.* That consent was routinely obtained until 1985, when "the Governor of California refused to consent to a training mission" and, following California's lead, "the Governor of Maine shortly thereafter refused to consent to a similar mission." *Id.* That defiance by California's Governor—then lawful—led Congress to enact the "Montgomery Amendment" which further shifted the balance of authority over the National Guard from the Governor to the President. *Id.*

Underlying the logic in affirming Congress's authority to delegate the President power to deploy the National Guard is the understanding that all members of the National Guard "ha[ve] voluntarily enlisted, or accepted a commission as an officer, in the National Guard of the United States and thereby become a member of the Reserve Corps of the Army" directly under the President's Commander-in-Chief authority. *Id.* at 347.

Assessing the history, the Supreme Court unanimously explained that the pre-1952 norm that "[National] Guard members were traditionally not ordered into active service in peacetime" was "at least partially the product of political debate and political compromise" and perhaps not even constitutional. *Id.* at 348–49. But even were such a restriction constitutional, the post-1952 Montgomery Amendment created "a wholly different situation" in which the State affiliation that Governor Newsom relies on to avoid deployment "is suspended in favor of an entirely federal affiliation during the period of active duty." *Id.*

And just as the Supreme Court cautioned the Governor in *Perpich* not to read its earlier precedent narrowly (confined to "the context of an actual war"), *Perpich* should not be read only to allow for overseas peacetime deployments. *Id.* at 349 (citing *Selective Draft Law Cases*, 245 U.S. 366 (1918)). The Court explained how the Militia Clauses gave more power to Congress to determine how the National Guard may be constituted, trained, and deployed. *See id.* at 349–51

(explaining the expansive powers the Militia Clauses gave to Congress); *see also id.* at 350 n.21 (citing to the authority of the President to call forth the National Guard through what is now codified at 10 U.S.C. § 12406); *Abbott*, 70 F.4th at 835–42 (describing the original public meaning of the Constitution's Militia Clauses). Indeed, the Constitution itself structurally implies strong federal oversight over control over the Armed Forces. *See Perpich*, 496 U.S. at 353 (citing *Tarble's Case*, 80 U.S. (13 Wall.) 397 (1872)).

In short, Congress has authorized the President to call up the National Guard in certain circumstances—including defending ICE agents from rioters in Los Angeles. *See* 10 U.S.C. § 12406. This Court should not on the pleaded facts issue a preliminary injunction purporting to enjoin the President of the United States and Secretary of Defense from engaging in their lawful constitutional duties.

### III.     California Fails to Plead a Cause of Action.

California has brought nonjusticiable claims for which this Court cannot grant relief. As a fundamental matter, any plaintiff—governmental or otherwise—must show it has a cause of action before it can demonstrate any likelihood of success on its claims. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979); *see also United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980) (to sue in federal court, a government "must first have a cause of action," just "like any other plaintiff"). And "[f]ederal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (cleaned up); *see Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (requested relief "depend[s] on traditional principles of equity jurisdiction" and must have been "traditionally accorded by courts of equity"). While a cause of action may exist in equity, no such cause is pleaded here.

A federal court's power to enjoin executive action "is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Here, California seeks immediate relief under 12 U.S.C. § 12406, but that statute plainly does not authorize an independent cause of action.

And courts are understandably leery of "judicial intrusion into military matters." *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991). "This perception is the product of the profound realization that the judicial process is manifestly ill-suited for resolution of most of the myriad disputes which arise in that field." *Id.*; *see Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence."). That is especially true when the object of the proposed temporary restraining order is the President of the United States himself. *See generally Mississippi v. Johnson*, 71 U.S. 475 (1866).

Again, California has not pointed to anything in 10 U.S.C. § 12406 that authorizes a cause of action for a Governor to challenge the President's mobilization of the National Guard in the face of an executive finding of rebellious conduct or obstruction to federal purpose. No cause of action is present in the text of the statute. Nor has California pointed to a traditional equity rule authorizing such suit. And whatever the scope of equitable causes of action generally, the cases above show that they cannot extend to enjoining the President's use of the military—a core Article II power.

Instead, California has sought to bootstrap a cause of action by repeating their faulty claims on the merits. This is the antithesis of the "cautious[] . . . approach" required by courts. *Farmer*, 940 F.2d at 923.

Nor can California's Administrative Procedure Act cause of action supply the missing link. "[T]he APA explicitly carves out from its coverage 'a military or foreign affairs function of the United States.'" *Abbott*, 70 F.4th at 825 (quoting 5 U.S.C. § 553(a)(1)). It likewise "carves out decisions that are 'committed to agency discretion by law.'" *Id.* (quoting 5 U.S.C. § 701(a)(2)). Both categories apply fully here.

Without first pleading a valid cause of action, California is asking this Court to barge immediately—and in an emergency posture—into an area where this Court is most deferential

toward the President's exercise of his Commander-in-Chief powers. *See Farmer*, 940 F.2d at 923–24. That cannot be the correct approach.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: June 11, 2025

BENBROOK LAW GROUP, PC

By  s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
STEPHEN M. DUVERNAY

BRENNA BIRD
Attorney General of Iowa

GENTNER DRUMMOND
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

Counsel for *Amici Curiae* States

### ADDITIONAL ATTORNEYS GENERAL IN SUPPORT

STEVE MARSHALL
Attorney General of Alabama

TIM GRIFFIN
Attorney General of Arkansas

JAMES UTHMEIER
Attorney General of Florida

CHRIS CARR
Attorney General of Georgia

DOUGLAS B. MOYLAN
Attorney General of Guam

RAÚL R. LABRADOR
Attorney General of Idaho

THEODORE E. ROKITA
Attorney General of Indiana

KRIS KOBACH
Attorney General of Kansas

LIZ MURRILL
Attorney General of Louisiana

ANDREW T. BAILEY
Attorney General of Missouri

LYNN FITCH
Attorney General of Mississippi

AUSTIN KNUDSEN
Attorney General of Montana

MICHAEL T. HILGERS
Attorney General of Nebraska

MARTY JACKLEY
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

DEREK E. BROWN
Attorney General of Utah