**ROB BONTA**
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NORMA FRANKLIN
ROBIN GOLDFADEN
NICHOLAS GREEN
BRENDAN M. HAMME
STEVEN KERNS
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
MEGHAN STRONG
NICHOLAS ESPÍRITU
Deputy Attorneys General
 1515 Clay St.
 Oakland, CA  94612
 Telephone: (510) 879-3908
 E-mail:  Nicholas.Espiritu@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,<br><br>Defendants. | NO. 3:25-cv-04870<br><br>**Plaintiffs' Reply Brief**<br><br>Date:      June 12, 2025<br>Time:      1:30 PM<br>Courtroom:<br>Judge:      Charles R. Breyer<br>Trial Date:<br>Action Filed: June 9, 2025 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Argument .................................................................................................................... 2

    I.    Plaintiffs Are Likely to Succeed on the Merits ...................................................... 2

        A.    The Section 12406 Federalization Orders Are Unlawful and Reviewable .......................................................................................... 2

            1.    No conditions support invocation of Section 12406 ..................... 2

            2.    The June 7 and June 9 orders were not "issued through" the governor ..................................................................................... 5

            3.    The claim that Defendants exceeded the authority granted by Congress in Section 12406 is subject to judicial review .......... 7

        B.    Defendants Are in Violation of the Posse Comitatus Act and the Tenth Amendment ............................................................................ 11

    II.    The Balance of Harms and Equities Favors Injunctive Relief ............................ 15

        A.    The Harms to California Absent a TRO Are Concrete and Outweigh Any Harm to Defendants, and the Requested TRO Is in the Public Interest .............................................................................. 16

        B.    Plaintiffs' Motion Seeks Limited Relief .................................................. 19

    III.    The Court Should Issue a Nominal Bond At Most ............................................. 20

Conclusion ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Baker v. Carr*
369 U.S. 186 (1962) ........................................................................... 8

*Barahona-Gomez v. Reno*
167 F.3d 1228 (9th Cir. 1999) ........................................................... 20

*California v. United States*
104 F.3d 1086 (9th Cir. 1997) (cited at Opp. 13) .............................. 9

*Chamber of Com. of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) ......................................................... 10

*City & Cnty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ......................................................... 15

*City of L.A. v. Barr*
929 F.3d 1163 (9th Cir. 2019) ......................................................... 18

*Dalton v. Spector*
511 U.S. 462 (1994) ......................................................................... 10

*Gilbert v. United States*
165 F.3d 470 (6th Cir. 1999) ........................................................... 13

*In re Debs*
158 U.S. 564 (1895) ......................................................................... 14

*In re Neagle*
135 U.S. 1 (1890) ............................................................................. 14

*J.G.G. v. Trump*
___ F. Supp. 3d ___ (D.D.C. Mar. 24, 2025) .................................... 8

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*
478 U.S. 221 (1986) ........................................................................... 7

*Jorgensen v. Cassiday*
320 F.3d 906 (9th Cir. 2003) ........................................................... 20

*Laird v. Tatum*
408 U.S. 1 (1972) ............................................................................. 11

*Loper Bright Enterpr. v. Raimondo*
603 U.S. 369 (2024) ..................................................................... 8, 10

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Marbury v. Madison*
    1 Cranch 137 (1803)............................................................................................ 8

4

*Martin v. Mott*
5
    25 U.S. (12 Wheat.) 19 (1827)............................................................................ 9

6

*Printz v. United States*
7
    521 U.S. 898 (1997)............................................................................................ 6

8

*R.I.L.-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................... 19
9

*Rodriguez v. Robbins*
10
    715 F.3d 1127 (9th Cir. 2012)........................................................................... 20

11

*Save Our Sonoran, Inc. v. Flowers*
12
    408 F.3d 1113 (9th Cir. 2005)........................................................................... 20

13

*Taylor-Failor v. Cnty. of Haw.*
    90 F. Supp. 3d 1095 (D. Haw. 2015) ............................................................... 20
14

*Trump v. Hawaii*
15
    585 U.S. 667 (2018).......................................................................................... 10

16

*United States v. California*
17
    921 F.3d 865 (9th Cir. 2019)............................................................................ 19

18

*United States v. Dreyer*
19
    804 F.3d 1266 (9th Cir. 2015) (en banc)..................................................... 11, 13

*United States v. Greathouse*
20
    26 F. Cas. 18 (C.C.N.D. Cal. 1863) .................................................................. 3

21

*Youngstown Sheet & Tube Co. v. Sawyer*
22
    343 U.S. 579 (1952) (Jackson, J., concurring in the judgment)........................ 15

23

*Zivotofsky ex rel. Zivotofsky v. Clinton*
    566 U.S. 189 (2012)....................................................................................... 7, 8
24

25

**STATUTES**

26

United States Code, Title 10
    § 12406...................................................................................................*passim*

27

United States Code, Title 18
28
    § 1385 ................................................................................................................ 14

PLAINTIFFS' EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

California Military and Veterans Code
§ 163 ................................................................................................................ 6

4

5

**CONSTITUTIONAL PROVISIONS**

6

United States Constitution, Tenth Amendment .................................................. 1, 7, 11

7

United States Constitution, Article I
§ 8 ........................................................................................................................ 2
§ 9 ........................................................................................................................ 3

8

9

United States Constitution, Article II
§ 3 ...................................................................................................................... 14

10

11

United States Constitution, Article IV
§ 4 ........................................................................................................................ 9

12

**OTHER AUTHORITIES**

13

14

Chronicle (June 9, 2025), https://www.sfchronicle.com/us-world/article/noem-immigration-protests-letter-20369001.php (last visited June 12, 2025) ............................... 12

15

Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018), https://irp.fas.org/doddir/dod/jp3_28.pdf (last visited June 12, 2025).................................. 11

16

17

Exec. Order No. 11519 (1970 WL 123093) ...................................................................... 5

18

Fortinsky, *Bondi Says California At "Good Point": "We're Not Scared to Go Further"* The Hill (June 11, 2025) (last visited June 12, 2025) ............................. 12

19

20

Gafni et al., *DHS Secretary Sought Military Arrests & Drones in Los Angeles in Leaked Letter* ........................................................................................................ 12

21

Jim Vertuno, Associated Press, *Protests over immigration raids pop up across the US with more planned* (June 12, 2025) .................................................................. 18

22

23

*LA Streets 'Soon', Can Detain But Not Arrest*, The Guardian (June 11, 2025), https://tinyurl.com/uru8vdz9 (last visited June 12, 2025) ........................................ 12

24

*Los Angeles*, Time (June 10, 2025), https://time.com/7292875/trump-marines-la-immigration-protests/ (last visited June 12, 2025) .......................................... 11

25

26

Los Angeles Times (June 11, 2025). (last visited June 12, 2025) ................................. 5

27

Maggs, *Assessing the Legality of Counterterrorism Measures*, 80 Temp. L. Rev. 661, 670 (2007) .................................................................................................... 11

28

## TABLE OF AUTHORITIES
### (continued)

Page

Mirasola, *Sovereignty, Article II, and the Military During Domestic Unrest* ............................. 14

*Review of the Posse Comitatus Act After Hurricane Katrina* 1, 16 (2006),
    https://apps.dtic.mil/sti/tr/pdf/ADA448803.pdf (last visited June 12, 2025)........................ 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

President Trump and his fellow Defendants advance a breathtaking vision of unlimited, unreviewable executive power.  As they see things, 10 U.S.C. § 12406 allows the President to federalize a State's national guard and send armed soldiers onto American streets whenever the President perceives "opposition" to federal authority or "[d]isobedience of a legal command," Opp. 14; the President may do so without "consent or input" from the Governor of that State, *id.* at 17; the statutory requirement that orders "shall be issued through the governor[]" may be satisfied by the federal Secretary of Defense stamping those words on the face of the order, *id.*; and any invocation of the Section 12406 authority is "unreviewable" by an Article III court—regardless of the circumstances, *id.* at 10.

What is more, Defendants insist that "the Posse Comitatus Act does not apply" to federalized guard units once the President has unilaterally invoked Section 12406 in this way. Opp. 21.  And even if it applies, they believe the Act allows federal troops to directly participate in the enforcement of civil laws alongside civilian officials in populated communities, *see id.* at 20-22—as they have been doing on the streets of Los Angeles in the short time since the State's motion for a temporary restraining order was filed, and as they have said the United States Marines will be doing imminently.  That unfettered view of executive authority contradicts the text and history of Section 12406 and the Posse Comitatus Act, the State's reserved authority under the Tenth Amendment, and foundational American traditions.

But the State is not asking this Court to resolve all of those questions today.  The only question before the Court now is whether to grant narrow and temporary relief to avoid the immediate harms that will arise from Defendants' unprecedented decision to move federal troops beyond their initial mission to protect federal buildings, and instead to employ them to participate in civil immigration enforcement throughout our communities.  As explained in the motion and this reply, the State is likely to succeed on its claims that Defendants lack authority to use the National Guard and Marine Corps units in this way.  The tailored relief requested by the State is necessary to avoid further escalation of an already tense and perilous situation.  That relief will

not harm Defendants:  They may continue to rely on civilian law enforcement officials to protect federal personnel engaged in civil immigration enforcement—as they have consistently for decades until two days ago.  And they may use federal troops and officers to protect federal facilities, and personnel at those facilities, while this litigation proceeds.

## ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims, and the equitable factors overwhelmingly support the narrow relief sought in the motion for a temporary restraining order.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Section 12406 Federalization Orders Are Unlawful and Reviewable

The Militia Clauses of the Constitution give Congress the power to "provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions," art. I, § 8, cl. 15, as well as the power to "provide for organizing, arming, and disciplining the militia, and for governing [the militia when] employed in the Service of the United States, *id.* cl. 16. Congress has delegated its power to deploy the National Guard domestically to the President in certain specific circumstances, as set forth in statute.  One such delegation is 10 U.S.C. § 12406, which requires both that one of three predicate conditions exist and that the order calling guard units into federal service "shall be issued through the governor[]" of the State in question. Neither of those requirements is satisfied here, and Defendants' failure to comply with the requirements Congress imposed in Section 12406 is subject to review by this Court.  Plaintiffs are likely to succeed on their claim that the Defendants' June 7 and June 9 orders are *ultra vires*.

### 1.    No conditions support invocation of Section 12406

Defendants do not contend that the circumstances on June 7 or June 9 amounted to an invasion or "danger of invasion by a foreign nation."  10 U.S.C. § 12406(1).  And their arguments about the remaining predicates of Section 12406 are unpersuasive.

*Rebellion or danger of rebellion.*  The standard definition of "rebellion" means "an organized attempt to change the government or leader of a country, [usually] through violence." Rebellion, *Black's Law Dictionary* (12th ed. 2024); *see id.* ("Cf. civil war under war").  The term is closely related to the concept of treason, but generally involving "domestic rebels" rather than

2

1   "foreign public enemies." *United States v. Greathouse*, 26 F. Cas. 18, 25 (C.C.N.D. Cal. 1863).

2   That is why—as in Section 12406 itself—the term "rebellion" is often used alongside the related

3   term "invasion." *See also* U.S. Const., Art. I, § 9, cl. 2 (specifying that the writ of habeas corpus

4   "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may

5   require it"). Rebellion is not a synonym for civil unrest.

6          Defendants assert that there was rebellion or danger of a rebellion because the protests in

7   Los Angeles on June 7 and 8 entailed some degree of "violence . . . in opposition to federal

8   immigration enforcement." Opp. 14. They cite examples such as protestors "throwing rocks and

9   other objects," "vandalizing property," "blocking traffic," and "burning . . . cars." *Id.* at 15. To

10  be clear, the Governor and local elected officials repeatedly and unequivocally condemned those

11  isolated episodes of violence. ECF No. 8 at p. 4 (citing examples). And state and local law

12  enforcement responded effectively to them, including by making dozens of arrests. ECF No. 8-2,

13  Olmstead Decl. at ¶¶ 9-10, 14. These episodes of violence, while deplorable, are not

14  categorically different from those that have occurred during other periods of civil unrest in recent

15  years across the country and throughout our nation's history. Defendants cite no legal authority

16  for the sweeping proposition that primarily peaceful protests—accompanied by a degree of

17  violence that state and local law enforcement plan for as part of standard operations and were able

18  to address by implementing those plans—constitutes "rebellion" or a "danger of rebellion" within

19  the meaning of the statute.

20         Instead, Defendants invoke the secondary and tertiary dictionary definitions of the term

21  "rebellion" as "[o]pen resistance or opposition to an authority or tradition" or "[d]isobedience of a

22  legal command or summons." Opp. 14 (quoting *Black's Law Dictionary*). But it is not remotely

23  plausible that Congress intended Section 12406 to authorize the federalization of state national

24  guard units whenever a civilian or group of civilians expressed open opposition to federal

25  authority or disobeyed a legal command. The only reasonable reading of Section 12406(2) is that

26  it demands the type of violent and organized attempt to change the Government of the United

27  States that would warrant a militarized response.

28

3

Defendants fare no better when they contend that Plaintiffs' evidentiary submission establishes, "[a]t a minimum, . . . a '*danger* of a rebellion' against federal authority." Opp. 16; *see id.* at 14-16. Plaintiffs do not concede that there was "unchecked violence in Los Angeles." Opp. 13. To the contrary, Plaintiffs' evidence shows that local and state law enforcement agencies have responded promptly and appropriately to the isolated incidents of unlawful activity that occurred in recent days—as they have in similar circumstances in the past. Since the protests began on June 6, thousands of officers from state and local law enforcement agencies have responded to the incidents—first from local Los Angeles agencies, and later from neighboring jurisdictions under the established mutual aid system to bring in reinforcements, as is standard practice. Supp. Olmstead Decl. ¶¶ 5-8. The California Highway Patrol has had 800 uniformed personnel on the ground. *Id.* ¶ 10. These state and local agencies made more than 400 arrests related to protests in Los Angeles since June 7. *Id.* ¶ 14. Defendants also argue that evidence of "demonstrators 'blocking traffic on [a] busy thouroughfare'" or "'spray-paint[ing] anti-ICE slogans on [a] building's exterior walls'" establishes conduct "that rises to the level of rebellion." Opp. 15. By that logic, every President has seen dozens of "rebellions" come and go while failing to deploy the National Guard to "suppress the rebellion."

*Unable to execute the laws.* Nor can Defendants establish that any of the protests in Los Angeles have rendered the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). According to news reports based on statements from the U.S. Department of Homeland Security, on Friday, June 6, when the protests began, Immigration and Customs Enforcement (ICE) officers carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles. ECF No. 8-1, Ex. G. In all, the Department of Homeland Security reported that its enforcement activities that day resulted in the arrest of approximately 44 individuals and 70-80 people detained. *Id.* Despite the protests, ICE announced arrests in Los Angeles on June 7 and officers have continued to carry out enforcement

actions since that date.[1]  Espíritu Decl., Ex. 1.  Those facts foreclose any argument that federal

officials are unable to execute federal laws.

Defendants do not dispute that ICE has continued to execute federal immigration laws

throughout the period of protests.  They instead cite a declaration from a federal official stating

that there were "threats to the safety of federal law enforcement personnel," which "the President

could reasonably have determined [were] intolerable."  Opp. 16.  But Section 12406(3) does not

say that the President may federalize the national guard whenever there is some degree of threat

to federal personnel.  At a minimum, for the President to be "unable" to "execute the laws of the

United States," the threats must be of such a magnitude that ordinary security measures using

"regular forces" are insufficient to enable the enforcement of federal law.  10 U.S.C. § 12406(3).

The situation here plainly does not rise to that level.  And it is a far cry from the only other time

in our nation's history that a President has relied on the exclusive authority of Section 12406 to

federalize the National Guard:  when President Nixon called the National Guard into service to

deliver the mail during a postal strike that involved over 210,000 postal workers and over 670

locations nationwide, *i.e.*, where federal personnel who otherwise executed the relevant function

were unavailable due to being on strike.  ECF No. 8 at 10.[2]

### 2.    The June 7 and June 9 orders were not "issued through" the governor

Defendants also cannot establish that the federalization orders here were "issued through

the governor[]" of California. 10 U.S.C. § 12406.  That language did not appear in the original

version of Section 12406, and Congress's decision to add it to the statute must be given effect.

*See* ECF No. 8 at 11.  At an absolute minimum, the statute must be understood to afford the

Governor an opportunity for consultation and to voice objections to a federalization order before

an order can be "issued through" him over his objection.  After all, governors are in the best

position to understand the public safety needs of the communities in their States, and the status

---

[1] *See also* Summer Lin, et al, *Immigration raids intensify, with hundreds of arrests and tense moments across L.A. area*, Los Angeles Times (June 11, 2025), https://www.latimes.com/california/story/2025-06-11/los-angeles-immigration-protest-curfew. (last visited June 12, 2025).

[2] *See also* Exec. Order No. 11519 (1970 WL 123093) (executive order issued by President Nixon invoking the predecessor to section 12406).

and capabilities of state and local law enforcement, as well as state national guard units.  But

Defendants' reading of Section 12406 would render the language surplusage by denying

governors any opportunity even for consultation before their national guard units are federalized.

Opp. 19 ("Nothing in the statute requires consultation").

Defendants contend they may satisfy the "shall be issued through the governor[]"

requirement merely by inserting "the label 'THROUGH: THE GOVERNOR OF

CALIFORNIA'" on the cover of the order.  Opp. 17.  That argument strains credulity.

Defendants offer no textual or historical explanation for why Congress would have seen fit to add

such a meaningless procedural provision.  And principles of constitutional avoidance also weigh

against adopting Defendants' strained understanding of Section 12406.  Among other things, it

would "diminish the accountability of state [and] federal officials," *Printz v. United States*, 521

U.S. 898, 930 (1997), to require the Governor to issue an order whose contents were dictated

entirely by federal officials, without an opportunity even for input or consultation—

commandeering his stature and office while reducing him to a mere messenger.  Here, for

example, had Defendants consulted with the Governor, they could have discussed not only

whether the California National Guard should be called into federal service at all, but also, if so,

which and how many service members should be called, and for what purposes and time period,

in what locations and with what equipment, and potential alternatives such as mobilization under

state command via Title 32 or utilization of additional non-military, law enforcement personnel to

maintain peace.  Defendants' failure to consult violates both the letter and purpose of Section

12406.

To justify their strained interpretation, Defendants invoke (Opp. 17) the responsibilities of

the California Adjutant General, to whom Secretary Hegseth's June 7 order was issued.  *See* Cal.

Mil. & Vet. Code § 163 (Adjutant General "shall issue all orders in the name of the Governor").

They reason that "[o]rders going 'through' the . . . the Governor's Adjutant General" are

sufficient to satisfy Section 12406.  Opp. 18.  That argument runs headlong into the plain text of

the statute, which allows direct orders to the commanding general *only* for the District of

Columbia.  Orders for these purposes "shall be issued through the governors of the States or, *in*

6

*the case of the District of Columbia*, through the *commanding general* of the National Guard of the District of Columbia."  10 U.S.C. § 12406 (emphasis added).  Congress knew how to identify a national guard general as the official whom orders must be "issued through."  When it came to sovereign States like California, however, Congress chose to require a role for the governor.

Finally, Defendants argue that "even if Plaintiffs' interpretation of the statute were correct, the only party acting unlawfully would be Governor Newsom" because he "should have issued the order himself."  Opp. 19; *see id.* ("Section 12406 uses the mandatory 'shall,' depriving the Governor of any possible discretion in whether to issue an order.")  But Section 12406's "shall" clause imposes a requirement that the *President* must ensure is satisfied before National Guard units are federalized.  It does not dragoon a governor into issuing such an order where, as here, none of the statutory predicates is satisfied, attempting to do so would raise significant concerns under the anti-commandeering principle of the Tenth Amendment, and the constitutional avoidance doctrine therefore counsels against such an interpretation.  And in any event, Governor Newsom was never given an opportunity to issue any orders or consult as to their advisability. Defendants unilaterally issued the orders themselves.

### 3.    The claim that Defendants exceeded the authority granted by Congress in Section 12406 is subject to judicial review

Defendants also contend (Opp. 10-13) that this Court is powerless to review whether their unprecedented federalization orders violated the requirements imposed by Section 12406.  Opp. 10-13.  That is not correct.  While a court should afford respect and an appropriate level of deference to the Executive's judgment, Section 12406 is—and must be—subject to judicial interpretation and review.

The political-question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine is "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it, even those that it 'would gladly avoid.'"  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012).  The doctrine

1  comes into play only "when there is 'a textually demonstrable constitutional commitment of the

2  issue to a coordinate political department; or a lack of judicially discoverable and manageable

3  standards for resolving it.'"  *Id.* at 195; *accord Baker v. Carr*, 369 U.S. 186, 217 (1962).

4        As another district court recently explained, "[s]imply because a legal claim implicates

5  foreign affairs or national security . . . does not mean that the political-question doctrine places it

6  'beyond judicial cognizance.'"  *J.G.G. v. Trump*, ___ F. Supp. 3d ___, 2025 WL 290401, at *9

7  (D.D.C. Mar. 24, 2025).  "To the degree that a claim requires the court to interpret a statutory

8  provision," the political-question doctrine generally "is not implicated," because "deciding such

9  questions 'is a familiar judicial exercise.'"  *Id.* (quoting *Zivotofsky*, 566 U.S. at 196); *cf. Loper*

10 *Bright Enterpr. v. Raimondo*, 603 U.S. 369, 385 (2024) ("'[I]t is emphatically the province and

11 duty of the judicial department to say what the law is.'" (quoting *Marbury v. Madison*, 1 Cranch

12 137, 177, 2 L.Ed. 60 (1803)).  That is the case here:  California simply seeks a judicial

13 interpretation and application of the terms of Section 12406.  It is not asking the Court to

14 "supplant a foreign policy decision of the political branches" or make an "unmoored

15 determination of what United States policy" regarding immigration or military deployment should

16 be.  *Zivotofsky*, 566 U.S. at 196. And while the political question doctrine supports the separation

17 of powers between the Executive and Judicial Branches when it comes to questions confined to

18 the Executive Branch's domain, the question here itself involves a vertical separation-of-powers

19 dispute—between the federal Executive and a sovereign State—that only the Judiciary can

20 resolve.

21       There is no "textually demonstrable" indication that Congress intended to preclude

22 judicial review here.  *Zivotofsky*, 566 U.S. at 195.  Defendants characterize Section 12406 as

23 "authoriz[ing] 'the President' to activate Guardsmen 'in such numbers *as he considers necessary*

24 to repel the invasion, suppress the rebellion, or execute those laws."  Opp. 10 (emphasis in

25 defendant's opposition).  But the phrase "as he considers necessary" is a textual commitment of

26 discretion with respect to the President's decision about the "numbers" of members of the

27 National Guard called into service.  10 U.S.C. § 12406 (emphasis added).  Congress pointedly did

28 not include that language when describing the predicate conditions that must be satisfied before

8

1    federalization of the National Guard is statutorily authorized.  And here, California is not seeking

2    review of the President's determination regarding the *number* of members of the National Guard

3    to call into service, but rather of whether one of the three predicate conditions is satisfied in the

4    first place, and whether the provision's respect for the independent role of the Governor was

5    honored.  There is no textual indication that *that* threshold question is committed to the

6    President's discretion and beyond judicial review.

7         Nor do the cases Defendants cite suggest that the interpretation of Section 12406 presents a

8    political question.  Defendants rely heavily (Opp. 10-11) on *Martin v. Mott*, 25 U.S. (12 Wheat.)

9    19 (1827).  But that decision long predates the modern political-question doctrine, and it arose in

10   a markedly different factual setting from this one:  a national guardsman faced a court-martial for

11   refusing to comply with an order to report for service during the War of 1812.  *Id.* at 20-22.  The

12   Supreme Court rejected the guardsman's argument that the President's order calling the militia

13   into service was unlawful.  It emphasized that military service requires "prompt and unhesitating

14   obedience," and the validity of the President's order was not "open to be contested by every

15   militia-man who shall refuse to obey" it.  *Id.* at 30.  That reasoning does not suggest that the

16   present-day political-question doctrine extends to a vertical separation-of-powers dispute between

17   a State and federal officials regarding whether one of the three statutorily enumerated predicate

18   conditions to federalization of the State's National Guard is satisfied.

19        Moreover, *Martin* arose in the context of a war between sovereigns, not a dispute

20   regarding whether domestic civil unrest constituted a "rebellion."  That consideration also

21   distinguishes *California v. United States*, 104 F.3d 1086, 1090 (9th Cir. 1997) (cited at Opp. 13),

22   where the court of appeals held that a State's claim that the Federal Government had violated the

23   Invasion Clause of the Constitution (Art. IV, § 4) by failing to stop illegal immigration presented

24   a "nonjusticiable political question."  This case, in contrast, presents the question whether

25   domestic civil unrest constitutes a "rebellion" for purposes of Section 12406, sufficient to

26   displace a state's police powers and sovereign authority.  That question bears a far more

27   tangential relationship than the issues in *Martin* and *California* to the kinds of "foreign policy

28   concerns which have been constitutionally committed to the political branches."  *California*, 104

9

1    F.3d at 1091.  Defendants' position that the President possesses sole and unreviewable discretion

2    to deem domestic civil unrest a "rebellion" for purposes of federalizing the National Guard would

3    disrupt the delicate balance the Framers and Congress have struck between empowering the

4    President to respond to genuine national emergencies while circumscribing his power to call the

5    militia into service for domestic law enforcement purposes or to override State authority.[3]

6         To be sure, "the Executive's evaluation of the underlying facts is entitled to appropriate

7    weight." *Trump v. Hawaii*, 585 U.S. 667, 708 (2018).  But the basic facts here regarding what

8    has occurred on the ground in Los Angeles are largely undisputed; the question is whether those

9    facts satisfy one or more of the predicate conditions for federalization of the National Guard.

10   That determination, which entails determining "the meaning of a statute," is the "'solemn duty' of

11   the Judiciary." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

12                              *    *    *

13        Cumulatively, Defendant's arguments about Section 12406 would require the Court to read

14   that provision as an astonishingly broad grant of executive authority.  The President would be

15   empowered to unilaterally federalize a State's National Guard, without any input or consultation

16   from the Governor, based on levels of civil unrest or disobedience that occur throughout our

17   Nation on a regular basis.  Indeed, under Defendants' construction, the President could determine

18   that interference with the duties of, or a physical assault upon, a single federal employee—or the

19   threat thereof, including via large-scale peaceful protests—is sufficient to trigger federalization.

20   And even if the President plainly did not satisfy Defendants' minimalist interpretation of the

21   statutory predicates for federalizing National Guard units, the Courts would be powerless to

22   review that abuse of power.  That unchecked power could be deployed in any context—not just

23   where civilians are protesting immigration enforcement, but also where they are protesting other

24   policies of the federal administration, or rallying in support of a political cause, or in advance of a

25   _____

26        [3] Defendants also invoke (Opp. 12) *Dalton v. Spector*, 511 U.S. 462, 474 (1994).  But
     "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific
27   decision to the President *and contains no limitations* on the President's exercise of that authority,
     judicial review of an abuse of discretion claim is not available."  *Chamber of Com. of U.S. v.
28   Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) (emphasis added).  Here, Section 12406 contain clear
     limitations on the President's authority.

hotly contested federal election in select disfavored states.  That is a frightening vision that finds no basis in the text of Section 12406.

**B.    Defendants Are in Violation of the Posse Comitatus Act and the Tenth Amendment**

Our Nation's history and laws reflect "a traditional and strong resistance . . . to any military intrusion into civilian affairs."  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (quoting *Laird v. Tatum,* 408 U.S. 1, 15 (1972)); *see also* Amicus Br. of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, ECF No. 31-1 at 4, 8-10.  The Posse Comitatus Act (PCA) preserves that tradition by barring the military from engaging in "direct active involvement in the execution of the laws" or other conduct that "pervade[s] the activities of civilian authorities."  *Dreyer*, 804 F.3d at 1275 (internal quotation marks omitted).  Under 2018 guidance from the Joint Chiefs of Staff on implementing the PCA, the list of prohibited "direct civilian law enforcement activities" includes "search, seizure, arrest, apprehension, stop and frisk, surveillance, pursuit, interrogation, investigation, evidence collection, security functions, [and] traffic or crowd control."[4]  The PCA also "preserves federalism" and serves the Tenth Amendment by making "state and local governments responsible for most law enforcement."  Maggs, *Assessing the Legality of Counterterrorism Measures*, 80 Temp. L. Rev. 661, 670 (2007); *see also* ECF No. 8 at 11-12 ("policing and crime control remain one of the most basic rights reserved to the states").

When the State and Governor Newsom sought a restraining order two days ago, there was an imminent threat of PCA violations on the streets of Los Angeles.  That threat has already become reality.  For example, photos posted on social media by ICE depict heavily armed members of the National Guard standing alongside ICE agents during arrests.  *See, e.g.*, Espíritu Decl., Exs. 2, 3.  And the federal government has issued public statements confirming that "[t]roops on the ground in Los Angeles are providing perimeter and personnel protection for [ICE] facilities and officers who are out on daily enforcement operations."  *E.g.*, Popli et al., *Federal Judge to Hear California's Case Against Trump's Deployment of Troops to Los Angeles*,

---

[4] Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018), https://irp.fas.org/doddir/dod/jp3_28.pdf (last visited June 12, 2025).

Time (June 10, 2025), https://time.com/7292875/trump-marines-la-immigration-protests/ (last visited June 12, 2025); *see also* Opp. 22 (acknowledging that troops are "providing security patrols, observation posts, and outer cordon security perimeter of buildings").

There is also an imminent risk of further PCA violations as hundreds of Marines and thousands more National Guard members arrive and deploy in Los Angeles.  When those troops accompany ICE agents on arrest operations and raids in dense, urban communities—especially in tense environments where protesters are present—military forces are virtually certain to be drawn into a variety of law enforcement activities, such as confronting, interrogating, detaining, or searching civilians perceived as security threats.  Indeed, high-ranking federal officials have publicly signaled that military forces will soon engage in these forms of law enforcement.  For example, Major General Scott Sherman said that the troops deployed in Los Angeles are "there to detain" demonstrators.[5]  Similarly, Secretary of Homeland Security Noem requested that Defense Secretary Hegseth order the military "to either detain . . . or arrest" "lawbreakers."[6]  *See also, e.g.*, Fortinsky, *Bondi Says California At "Good Point": "We're Not Scared to Go Further"* The Hill (June 11, 2025), https://thehill.com/homenews/state-watch/5344237-pam-bondi-los-angeles-protests-insurrection-act/ (last visited June 12, 2025) (statement of Attorney General Bondi) ("By bringing in the National Guard, by bringing in the Marines, right now, to back them up, to protect our federal buildings, to protect highways, to protect the citizens."); *id.* ("We're not scared to go further.  We're not frightened to do something else if we need to.").

Defendants' principal response is that the military is merely providing "security" and "protection" that "is distinct from the military members' own engagement in ordinary law enforcement."  Opp. 22-23.  Defendants appear to view that form of assistance as an "indirect," rather than a "direct," form of law enforcement.  *See id.*  But even if that characterization were accurate, *but see* Joint Publication 3-28, *supra*, p. III-I (defining "direct civilian law enforcement

---

[5] *Marines on LA Streets 'Soon', Can Detain But Not Arrest*, The Guardian (June 11, 2025), https://tinyurl.com/uru8vdz9 (last visited June 12, 2025).

[6] Gafni et al., *DHS Secretary Sought Military Arrests & Drones in Los Angeles in Leaked Letter*, SF. Chronicle (June 9, 2025), https://www.sfchronicle.com/us-world/article/noem-immigration-protests-letter-20369001.php (last visited June 12, 2025).

1    activities" to include "security functions"), it would not avoid a PCA violation.  As discussed

2    above, assistance provided by the miliary "must not 'amount to direct active involvement in the

3    execution of the laws,' *and* must not 'pervade the activities of civilian authorities.'"  *Dreyer*, 804

4    F.3d at 1275 (emphasis added).  If either "one of these tests is met," the PCA is violated.  *Id.*

5    Here, military forces are pervasively intertwined with civilian law enforcement activities:  Armed

6    troops are working side by side with ICE agents in conducting arrests and raids in the streets,

7    homes, and workplaces of Los Angeles.  And because that substantial level of involvement makes

8    increasing contact between the military and civilians unavoidable, there is a significant risk that

9    the military's role will grow to include detention, interrogation, and other activities that are

10   practically indistinguishable from urban policing operations.

11         Defendants' contrary view of the PCA would usher in a vast and unprecedented shift in the

12   role of the military in our society.  If the PCA allowed military forces to accompany ICE agents

13   on raids and arrests in the manner unfolding across the Los Angeles area, there would be no

14   logical basis to preclude members of the Armed Forces from accompanying other law

15   enforcement agents when performing their duties.  Armed troops could, for example, accompany

16   FBI agents, food safety inspectors with the Department of Agriculture, Fish and Wildlife agents,

17   or Medicare fraud investigators when those civilian officials conduct searches, field interviews,

18   interrogations, or other law enforcement operations; or accompany federal voting rights officials

19   to "monitor" polling places during elections.  Virtually every federal agency has an investigative

20   or enforcement arm.  And many might welcome armed support from the military.  Providing that

21   support would magnify the ability of officials at every level of government to coerce and control

22   individuals subject to their jurisdiction.  The PCA was designed as a bulwark against that kind of

23   erosion of individual liberty.  *See generally Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir.

24   1999) ("The [PCA] reflects a concern, which antedates the Revolution, about the dangers to

25   individual freedom and liberty posed by use of a standing army to keep civil peace.").

26         Defendants assert (*see* Opp. 21) that the PCA is inapplicable in this case because the

27   President has invoked 10 U.S.C. § 12406.  But that provision at most allows the President to

28   federalize National Guard troops.  *See supra* p. 2.  It does not exempt those troops from the

PCA's restrictions on engagement in law enforcement activities.  The PCA applies to military forces, including federalized members of the National Guard, "except in cases and under circumstances *expressly authorized* by the Constitution or Act of Congress."  18 U.S.C. § 1385 (emphasis added).  Nothing in Section 12406 "expressly authorize[s]" members of the National Guard to engage in civilian law enforcement.  *See, e.g.*, ECF No. 8 at 13 (collecting authorities recognizing that section 12406 does not operate as an exception to the PCA).

For similar reasons, Defendants' reliance on the "protective power" is unavailing.  The "protective power" is a legal theory devised by executive-branch lawyers—but never squarely endorsed by the judiciary—to give the President authority to act in ways that Congress has neither authorized nor prohibited.  *See, e.g.*, Mirasola, *Sovereignty, Article II, and the Military During Domestic Unrest*, 15 Harv. Nat'l Sec. J. 199, 207-208, 219-223 (2023).  Even assuming that theory is valid as a general matter, *but see id.* at 219-223, 254-256 (raising serious questions about its validity and scope), it does not provide "express authoriz[ation]" for military forces to engage in civilian law enforcement.  18 U.S.C. § 1385.  The "protective power" theory appears nowhere in the text of the Constitution.  Those who defend its existence have grounded the theory in inferences from abstract clauses, such as the President's general duty to "take Care that the Laws be faithfully executed."  U.S. Const., art. II, § 3; *see, e.g.*, Mirasola, *supra*, at 216, 222.

The two nineteenth-century cases invoked by Defendants (*see* Opp. 21-22) do not show otherwise.  Neither *In re Neagle*, 135 U.S. 1 (1890), nor *In re Debs*, 158 U.S. 564 (1895), addressed the federal government's compliance with the PCA.  In the former, the Court merely upheld the authority of the U.S. Marshal's Service—not the military—to provide protective services to a member of the Supreme Court.  *See Neagle*, 135 U.S. at 60.  In the latter, the Court recognized the authority of the federal government to maintain the orderly administration of the U.S. *postal* system, *i.e.*, delivering the mail—including, if necessary, through reliance on the military.  *See In re Debs*, 158 U.S. at 582.  Defendants provide no basis for viewing protection of the orderly flow of mail as a form of civilian law enforcement activity that would fall within the PCA's scope.  And Defendants certainly provide no basis for viewing *In re Debs* as a license for

1    the unprecedented, pervasive form of military entanglement with law enforcement on display in

2    Los Angeles today.

3         Finally, to the extent Defendants think that their theory of "protective power" can override

4    the express terms of the PCA, *cf.* Opp. 21-22, that view is irreconcilable with settled separation of

5    powers principles.  "When the President takes measures incompatible with the expressed or

6    implied will of Congress, his power is at its lowest ebb."  *Youngstown Sheet & Tube Co. v.*

7    *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment).  "Courts can sustain

8    exclusive Presidential control in such a case only by disabling the Congress from acting upon the

9    subject."  *Id. at* 637-638.  And a "Presidential claim to a power at once so conclusive and

10   preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by

11   our constitutional system."  *Id.* at 638; *see City & Cnty. of San Francisco v. Trump*, 897 F.3d

12   1225, 1233 (9th Cir. 2018).  Here, Defendants have not identified any plausible justification for

13   wielding extraordinary, unilateral power to violate the PCA—a statute that has long embodied our

14   Nation's commitment to limiting military intrusion into civilian affairs.  *See, e.g.*, Amicus Br. of

15   Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals, ECF No. 31-1,

16   at 2 ("deploying National Guard and active-duty military personnel in the context of domestic law

17   enforcement should be a rare and carefully considered occurrence that strictly complies with the

18   Posse Comitatus Act and its exceptions").

19   **II.    THE BALANCE OF HARMS AND EQUITIES FAVORS INJUNCTIVE RELIEF**

20        The remaining *Winter* factors weigh in favor of granting the limited, temporary relief that

21   the State and California's Governor seek.  Plaintiffs have shown significant, irreparable harm, and

22   the equities and public interest similarly weigh in Plaintiffs' favor.  Indeed, the requested TRO is

23   for the benefit of all—it is narrowly drawn; it does not bar Defendants from protecting their

24   property or personnel stationed there; and it in no way inhibits ICE from carrying out its ordinary

25   functions.  The TRO will merely guard against a match igniting the powder keg that Defendants

26   have assembled across Los Angeles over the past several days.

27

28

**A.    The Harms to California Absent a TRO Are Concrete and Outweigh Any Harm to Defendants, and the Requested TRO Is in the Public Interest**

Plaintiffs have furnished evidence of significant harms—and a serious threat of further imminent harms—to California if a temporary restraining order is not issued.  Plaintiffs have also shown that a TRO will benefit the public.  First, deployment of the National Guard and other armed forces has already caused, and will continue to exacerbate, risk of escalating tension and violence in Los Angeles.  Far from being hypothetical, as Defendants suggest, this harm is *already* playing out, and the risks increase the longer the military is deployed to the streets.  ECF No. 8-2, Olmstead Decl. ¶ 12.  Deploying troops with inadequate crowd control and civil unrest training is bad enough.  Marrying them to contentious, unprecedented civil immigration law enforcement activities in communities across Los Angeles (and potentially statewide) will only increase the risk of harm to all involved, including the National Guard members themselves.  Indeed, on the first day of the National Guard's deployment to the federal building in Los Angeles, their presence *attracted* more protestors, and order was restored only when local law enforcement arrived at the scene—an episode that belied the entire theory of the federalization orders here.  ECF No. 8-2, Olmstead Decl. ¶¶ 9, 12.

Second, the deployment of California's National Guard impairs the National Guard's ability to perform critical functions for the State of California, including providing urgent responses to natural disasters and wildfires and drug interdiction, among other imperative missions.  ECF No. 8-3, Eck Decl. ¶ 16.  By diverting *thousands* of California National Guard member—32% of its available strength, Eck Supp. Decl. ¶ 4—to Los Angeles without any legitimate need, Defendants are compounding and extending harm to the rest of the State.  California relies on the experience and expertise of its National Guard members to respond to real emergencies.  This is not theoretical.  As of yesterday, there were 13 fires actively burning in California, including the Ranch Fire in San Bernardino County, which has consumed over 4,200 acres.  Eck Supp. Decl. ¶ 10.  If the Ranch Fire continues to grow at its current rate, it will require the response of Task Force Rattlesnake—a segment of California's National Guard that has been depleted by *more than half* because Defendants have moved its members to Los Angeles.  *Id.* ¶¶

16

6-10.  Without a substantial segment of its National Guard, the State cannot reliably protect itself from emergencies.  *Id.* ¶ 15.

Defendants suggest that the situation in Los Angeles is a more pressing "emergency" than any other situation the National Guard could be called to address, *see* Opp. 27, but they offer no evidence to substantiate their claim.  By contrast, Plaintiffs have offered substantial evidence that federalization is actively pulling National Guard members away from other critical work.  *See, e.g.*, Eck. Decl. ¶¶ 41-43 (describing the California National Guard's Counterdrug Task Force, which operates year-round to prevent drug trafficking); *id.* ¶ 47-48 (explaining that members of the Counterdrug Task Force have been federalized as part of the DOD June 7 Order); *id.* ¶ 49 (deployment is pulling away highly trained fire mitigation and prevention and direct fire suppression CMD specialists at the start of California's wildfire season).  Because Defendants have ordered troops to be deployed for a full 60 days, *see* ECF No. 8-1, Exs. O & P, the deleterious impact on the Guard's critical work is likely to grow considerably.

Defendants' opposition invokes hypothetical exposure of "federal employees and property to violence and vandalism," but they provide no evidence that National Guard troops are necessary to prevent those harms, nor that such harms would result from Plaintiffs' requested TRO.  The evidence Plaintiffs provided established that state and local law enforcement already have the situation well in hand.  *See* ECF No. 8-2, Olmstead Decl. ¶¶ 6-15.  Indeed, state and local law enforcement are *better* equipped to handle this situation as they have received specialized training for handling civil unrest, while National Guard troops and the Marines have not.  *Id.* ¶¶ 8, 11.  As scholars and military experts have long recognized, "[t]he direct involvement of the military in law enforcement has serious potential for infringement on individual rights" because "[t]he character of law enforcement de-escalates to use lesser forms of force while the military escalates to use deadly force in accomplishing the mission."  *E.g.*, Lt. Col. Weston, U.S. Army War College Strategy Research Project, *Review of the Posse Comitatus Act After Hurricane Katrina* 1, 16 (2006), https://apps.dtic.mil/sti/tr/pdf/ADA448803.pdf (last visited June 12, 2025); *see id.* ("Simply put, law enforcement personnel search and capture, while the military search and destroy.").

17

1    Defendants' arguments and declarations refute none of this.  They rely on inflammatory

2    descriptions of the incidents of violence that have occurred, but as Defendants acknowledge,

3    LAPD and LASD responded to each of these incidents, as they regularly do, according to their

4    training, when faced with urban riots and unrest.  *E.g.*, ECF No. 22-1, Santacruz Decl. ¶¶ 11-13

5    (LAPD responded to incident at Roybal Courthouse and federal employees were able to "h[o]ld

6    the line" until LAPD arrived); *id.* ¶¶ 18-22, 25-26, 32 (LASD and LAPD responded to incidents

7    and declared them unlawful assemblies); *id.* ¶ 24 (when protesters confronted federal agents

8    outside Los Angeles City Hall, LAPD issued a dispersal order and made arrests); *id.* ¶ 30

9    (mobilization of additional LAPD officers).  The mere existence of unrest does not automatically

10   require the intervention of federal troops.  Indeed, if that were the bar there would be federal

11   troops in seven other States today. *See* Jim Vertuno, Associated Press, *Protests over immigration*

12   *raids pop up across the US with more planned*, (June 12, 2025) (mapping protests).

13   In addition, most if not all of the harms Defendants invoke involve activities on federal

14   property.  *See* Opp. at 24-25 (discussing harms to federal building complex and federal

15   courthouse).  But the limited relief Plaintiffs seek in this TRO does not prohibit Defendants from

16   using federal forces to protect federal property or the personnel stationed there.  Plaintiffs'

17   Proposed Order asks the Court to make that limitation unambiguous:  "This Order does not

18   prohibit any of the Title 10 Force at issue from providing indirect assistance to federal officials by

19   protecting federal immigration detention facilities and other federal buildings or real property

20   owned or leased by the government, or by defending federal officials or employees from

21   threatened physical harm at such buildings or real property."  ECF No. 8-4 at 5.  Defendants may

22   continue to rely on federalized troops to defend federal real property and personnel stationed

23   there as this case proceeds, and they will not be harmed by a requirement that they simply rely on

24   local law enforcement when they are out in the community.

25   Defendants suggest that "Los Angeles 'has made a longstanding decision' not

26   'participat[e] in federal civil immigration enforcement'" and that the City therefore cannot be

27   trusted to respond to incidents of violence related to ICE's enforcement of those laws.  Opp. at

28   25-26 (quoting *City of L.A. v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019)).  That sorely

18

1    misrepresents the law and the facts.  Nothing in California law forbids state and local law

2    enforcement agencies from keeping ICE agents—or anyone else—safe from harm during

3    episodes of civil unrest or other emergencies.  *See generally United States v. California*, 921 F.3d

4    865 (9th Cir. 2019) (describing California's laws regarding state and local involvement in

5    immigration enforcement).  And as a factual matter, local law enforcement officials have worked

6    tirelessly to quell violence and unrest and keep Los Angeles safe, including—as Defendants' own

7    declarants concede—by protecting federal property and personnel.

8        **B.    Plaintiffs' Motion Seeks Limited Relief**

9        Defendants cast Plaintiffs' TRO as a broad and dangerous order, but they fail to

10    meaningfully engage with the relief Plaintiffs actually request, which is quite narrow.  Plaintiffs

11    request a TRO that:  (1) enjoins DOD Defendants from ordering or deploying the Title 10 Force

12    to enforce or aid federal agents in enforcing federal law or to take any action beyond those that

13    are required to ensure the protection and safety of federal buildings and other real property owned

14    or leased by the federal government and federal personnel on such property; (2) enjoins DOD

15    Defendants from ordering or permitting the Title 10 Force to execute or assist in the execution of

16    any federal agent or officer's enforcement of federal law, including but not limited to all law-

17    enforcement functions such as execution of warrants, arrests, searches, checkpoints, or cordons;

18    and (3) enjoins DOD Defendants "from ordering or permitting the Title 10 Force to patrol

19    communities or otherwise engage in general law enforcement activities beyond the immediate

20    vicinity of federal buildings or other real property owned or leased by the federal government."

21    ECF No. 8-4.

22        Plaintiffs do not seek, at this stage, an order that fully invalidates the federalization of the

23    National Guard.  Instead, they seek more limited relief aimed at preventing federalized troops and

24    the Marines Corps from patrolling the streets of Los Angeles and engaging in activities that

25    pervasively entangle military forces with civilian law enforcement.  This requested relief is

26    narrowly tailored to prevent further escalation of tensions and is designed to prevent activities

27    that the PCA prohibits in any event.  *See supra* pp. 13-15; *see generally R.I.L.-R v. Johnson*, 80 F.

28    Supp. 3d 164, 191 (D.D.C. 2015) (federal government "cannot suffer harm from an injunction

1   that merely ends an unlawful practice" (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th

2   Cir. 2012))).

3   **III.    THE COURT SHOULD ISSUE A NOMINAL BOND AT MOST**

4         "Rule 65(c) invests the district court 'with discretion as to the amount of security required,

5   *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v.*

6   *Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (emphasis in original)).  "The district court may

7   dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

8   defendant from enjoining his or her conduct." *Id.*  It is also appropriate to order no bond or a

9   nominal bond in cases implicating constitutional rights or involving the public interest.  *Taylor-*

10  *Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our Sonoran,*

11  *Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)).  Because this is such a case, and

12  Defendants have not offered any evidence they will be harmed by the limited, temporary relief

13  Plaintiffs seek, the Court should issue, at most, a nominal bond of $100, as requested in Plaintiffs'

14  Proposed Order

15                                    **CONCLUSION**

16        The motion for a temporary restraining order should be granted.

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  June 12, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA L. FAER
Acting Senior Assistant Attorney General
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NORMA FRANKLIN
ROBIN GOLDFADEN
NICHOLAS GREEN
BRENDAN M. HAMME
STEVEN KERNS
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
MEGAN RICHARDS
MEGHAN STRONG

*/s/ Nicholas Espíritu*

NICHOLAS ESPÍRITU
Deputy Attorney General
  1515 Clay St.
  Oakland, CA  94612
  Telephone: (510) 879-3908
  E-mail:  Nicholas.Espiritu@doj.ca.gov

*Attorneys for Plaintiffs*

21