HYDEE FELDSTEIN SOTO, SBN 106866
City Attorney
VALERIE L. FLORES, SBN 138572
MICHAEL DUNDAS, SBN 226930
200 North Main Street, City Hall East Rm 800
Los Angeles, California 90012
hydee.feldsteinsoto@lacity.org
valerie.flores@lacity.org
mike.dundas@lacity.org
Telephone: (213) 978-8100
Facsimile: (213) 978-8312
*Attorneys for* Amicus Curiae
City of Los Angeles

Norman L. Eisen*
Stephen A. Jonas SBN 542005
Joshua G. Kolb*
Diamond Brown*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Steve @statedemocracydefenders.org
Joshua@statedemocracydefenders.org
Diamond@statedemocracydefenders.org

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of the Department of Defense; DEPARTMENT OF DEFENSE, <br><br> Defendants. | Case No.   **3:25-cv-04870-CRB** <br><br> **BRIEF OF THE CITY OF LOS ANGELES AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS** <br><br> Date:   06/12/2025 <br> Time:   1:30 p.m. <br> Place   Courtroom 6-17Fr. <br> Judge:  Charles R. Breyer |

## TABLE OF CONTENTS

Page

**INTRODUCTION AND STATEMENT OF INTEREST OF *AMICUS CURIAE*** ................... 2

**ARGUMENT** ...................................................................................................... 4

    **I.**      **The Deployment of the Military Has Impeded the City's Ability to Carry out its Traditional Police Powers.** ........................................................... 4

            **A.**    **The City—not the military—has expertise in domestic law enforcement.** ............................................................................... 4

            **B.**    **There was and is no rebellion in the City, nor is there any other circumstance that authorized the unprecedented deployment of military forces without the consent of local authorities.** ....................................................................................... 6

    **II.**    **This Court May Determine that There Is No "Rebellion" in Los Angeles.** ...... 8

**CONCLUSION** ................................................................................................... 11

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.A.R.P. v. Trump,*
    145 S. Ct. 1364 (2025) ...........................................................................................8

*J.A.V. v. Trump,*
    No. 1:25-CV-072 (S.D. Tex. 2025) .......................................................................8

*J.G.G. v. Trump,*
    No. 25-5068 (D.C. Cir. Mar. 26, 2025) .................................................................8

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ...............................................................................................4

*Sterling v. Constantin,*
    287 U.S. 378 (1932) ...............................................................................................7

## Statutes

10 U.S.C. § 12406 ....................................................................................................3, 7, 8, 9

18 U.S.C. § 1385 ............................................................................................................5, 7

50 U.S.C. § 21 ....................................................................................................................8

## Other Authorities

LAPD, *Strategic Plan 2023 & Beyond* .............................................................................4

LAPD News Release (June 9, 2025) ..................................................................................6

Mark Nevitt, *The Military, the Mexican Border, and Posse Comitatus,* Just Security
    (Nov. 6, 2018) ........................................................................................................5

Noah Goldberg et al., *Bass Enacts Curfew in Downtown L.A. to Stem Chaotic
Protests,* L.A. Times (June 10, 2025) .................................................................7

Steve Vladeck, *Five Questions About Domestic Use of the Military,* One First (Apr.
    14, 2025) ................................................................................................................5

Steve Vladeck, *Five Questions About Domestic Use of the Military,* One First (Apr.
    14, 2025) ................................................................................................................5

i

**INTRODUCTION AND STATEMENT OF INTEREST OF *AMICUS CURIAE***

The actions by the federal government complained of in this litigation – unlawful activation and deployment of military personnel – are targeted at the City of Los Angeles ("City"), a charter city with its own highly trained and professional police department, with long established protocols for crowd control and for requesting and receiving mutual aid and assistance from other law enforcement agencies when the need arises. The City covers 469 square land miles and is home to nearly four million people.  The protests in the City since last Friday, June 6, 2025 occurred within one square mile of the downtown area of the City and involved, at most a few thousand and, generally, a few hundred protestors at any given time.

The response of the federal government ("Government") to this geographically and numerically limited series of protests, which, at varying times and for varying lengths of time, turned violent and destructive, was to activate or deploy, without the request or even consent of the local and state authorities, 4,000 federalized National Guard and 700 United States Marines to the City, the combined total of which is nearly equal to the size of the entire police force for the City of Houston, Texas, a city of two million people.  The result of deploying armed military personnel, skilled in warfare against external enemies, on domestic soil without the training and perspective of the LAPD and other local law enforcement agencies traditionally charged with protecting civilian populations, was predictable.  The Los Angeles Police Department ("LAPD" or "Department") is the entity, absent a request for mutual aid, with the training and the jurisdiction to manage and balance the individual rights of speech, expression, and assembly together with the commitment to protecting public safety.

The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve their quality of life. The Department seeks to work in

2

partnership with the people and organizations within its communities to solve local problems that affect public safety.

In keeping with its status as the police department of the second largest city in the nation, LAPD has great familiarity in handling large-scale pre-planned demonstrations, protests, and events, which occur regularly and with great frequency City-wide. The history of peaceful protests and demonstrations in the City has allowed the Department to form strong relationships with frequent protest organizers in order to facilitate peaceful demonstrations. But, even the most peaceful planned events can bring out those who would seek to commit violence. The 2024 Los Angeles Dodgers World Series Championship parade, which saw more than 200,000 joyous fans packed into the same one square mile where the current protest events that are the subject of this litigation are occurring, is instructive. That day, alongside the hundreds of thousands of celebrating fans, were some violent and hostile crowds who burned a city bus, looted stores, and threw dangerous objects at LAPD. It would be untenable to suggest that those actions of a few among so many amounted to a rebellion against the City.

The Department also has experience in dealing with spontaneous, unpermitted protests, such as the large mass protests that occurred in Los Angeles and other major cities around the country in May and June, 2020, following George Floyd's murder. There were many lessons learned during those demonstrations and civil unrest, and the Department has since further trained its personnel on updated crowd management and crowd control techniques in order to facilitate peaceful protests and attempt to de-escalate tense and even violent and hostile situations, where those who would seek to cause havoc hide under a cloak provided by so many peacefully exercising their First Amendment rights.

The protests over the past weekend are no exception. The Government's deployment of the National Guard and Marines is legally baseless and complicates the City's ability to ensure public safety. The Government's claimed authority for such a large-scale mobilization of troops was the

3

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

assertion that the violent acts amounted to a "rebellion against the authority of the Government."  But the vast majority of the violence that did occur were targeted at private property and state and local law enforcement, not the Government or its property. These incidents come nowhere close to the requisite "rebellion" under 10 U.S.C. § 12406(2)—the Government's purported statutory authorization for its actions.

The City has a critical interest in public safety within its boundaries and in preserving the constitutional rights of its residents to peacefully assemble and speak freely.  Over the last few days, the City has worked tirelessly to preserve both principles by quelling violent and destructive outbursts while maintaining a space for the exercise of First Amendment rights, even when those First Amendment rights directly criticized the City.  The Government's military presence undermines those principles and has sown chaos in Los Angeles, creating serious and potentially irreparable harm.

The National Guard, for example, has, while standing on the City's streets and sidewalks, deployed tear gas, pepper spray, and other similar munitions on protestors.  In other cases, the deployed troops have detained Los Angeles residents.  The military's unsought and dangerous deployment in downtown Los Angeles should not be allowed to stand.  The City urges the Court to grant the Governor's request for a temporary restraining order and allow the City to focus on fulfilling its duties to protect its residents and preserve their freedoms.

## ARGUMENT

### I.   The Deployment of the Military Has Impeded the City's Ability to Carry out its Traditional Police Powers.

#### A.  The City—not the military—has expertise in domestic law enforcement.

Our federalist form of government leaves local policing to local governments—not the federal government and certainly not to the military.  *See* Federalist No. 39 at 245 ("[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their

4

respective spheres, to the general authority than the general authority is subject to them, within its own sphere.").  Under the Tenth Amendment, state and local governments retain their sovereign authority to "perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few." *NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012).

Federalism "ensure[s] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Id.* at 536 (quoting The Federalist No. 45, at 293).  That is for good reason.  Consistent with the unbroken tradition of allowing local governments to police their jurisdictions, Los Angeles and the LAPD have developed an expertise in the nuisances of local policing—controlling and (when necessary) dispersing crowds, managing protests, apprehending those who break the law, and keeping people safe.  The LAPD's policies are rooted in a commitment to constitutional policing and a recognition that the City's communities are safer when officers maintain a relationship of trust, respect, and cooperation with the City's residents.

The LAPD devotes significant resources to prepare officers to respond effectively to protests that have escalated to violence, while paying due regard to constitutional freedoms.  In the last few years alone, the LAPD has launched and implemented an initiative to protect Los Angeles by conducting quarterly and yearly exercises to practice managing large-scale First Amendment assemblies.  LAPD, *Strategic Plan 2023 & Beyond* 12–13, https://t.ly/TAECl.  That initiative also includes engaging the public to inform them of best practices, and to solicit feedback to "better suit the community's stated needs." *Id.* at 12.  These measures, among many others, ensure not only that the LAPD is prepared to manage large assemblies, but also that the community feels comfortable placing its trust in the LAPD.

5

The military, in contrast, is trained in combat and warfare. Mark Nevitt, *The Military, the Mexican Border, and Posse Comitatus*, Just Security (Nov. 6, 2018). And the "domestic use of the military can . . . be corrosive—to the moral of the troops involved, all of a sudden, in policing their own; to the relationship between local/state governments and the federal government; and to the broader relationship between the military and civil society." Steve Vladeck, *Five Questions About Domestic Use of the Military*, One First (Apr. 14, 2025). That is why Congress has prohibited the use of the military "as a posse comitatus or otherwise to execute the laws" except in extraordinary circumstances. 18 U.S.C. § 1385.

**B. There was and is no rebellion in the City, nor is there any other circumstance that authorized the unprecedented deployment of military forces without the consent of local authorities.**

Starting on June 6, the Government launched a series of immigration raids in the City and County of Los Angeles without providing any notice to the LAPD or local officials. Rather than allow LAPD to keep the peace from the very start of those raids, the Government chose not to notify the Department of even the possible need to prepare for protests that would predictably result from their escalation of immigration raids in the City to targeting immigrants without criminal histories for detention and arrest. Instead, the Government fanned the flames of unrest and fabricated a story about the Department's failure to respond to a call for assistance in a timely manner, which became the President's basis, in part, for the federalization of the National Guard.

The President then issued a memorandum authorizing the deployment of the California National Guard—over the objections of the Governor. In it, the President declared that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."

6

Unsurprisingly, after the Government's militarization in downtown Los Angeles, tensions between demonstrators and law enforcement rose dramatically on June 8. As noted above, the National Guard moved onto a public City street to deploy tear gas, pepper spray, and other similar munitions on nearby protestors. The presence of armed forces stationed outside federal buildings and on the streets and sidewalks of the City precipitated skirmishes between law enforcement and demonstrators. Over the course of that day, LAPD deployed 580 officers to the one-square mile area for crowd control and crime suppression. Even at the peak of the unrest, in the early evening, on June 8 the consistent efforts of the Department, with those of the California Highway Patrol and the Los Angeles County Sheriff, put an end to the day's unlawful assemblies, looting, vandalism, and other violence, all without intervention by the federal troops.

Nevertheless, on the morning of June 9, the President posted on social media that his administration "made a great decision in sending the National Guard to deal with the violent, instigated riots in California." He claimed that if the Government "had not done so, Los Angeles would have been completely obliterated." But contrary to the President's assertions, the National Guard did not provide *any* operational support to LAPD with respect to the June 8 demonstrations.

Adding insult to injury, the Government—again without providing any notice to the City—posted on social media that it would deploy 700 Marines and an additional 2,000 members of the National Guard to Los Angeles. After learning about the possible deployment through news sources and social media, the LAPD issued a press statement stating that "the possible arrival of federal military forces in Los Angeles—absent clear coordination—presents a significant logistical and operational challenge for those of us charged with safeguarding the city." LAPD News Release (June 9, 2025), https://t.ly/_U7vP. The Department also explained that, unlike the military, the LAPD and its local law enforcement partners "have decades of experience managing large-scale public

7

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

demonstrations." *Id.*  The lack of "open and continuous lines of communication" only added to the confusion and escalation of the situation.  *Id.*

Since the Government's deployment of the military, the City and the LAPD have been using effective policing tools to prevent protests from escalating any further.  Among other things, on June 10, the City imposed a curfew between 8 PM and 6 AM for its downtown area.  As the Department explained, the curfew is necessary to protect lives and safeguard property after days of escalating violence and unlawful behavior.  That curfew has been largely successful, quelling protests and calming tempers inflamed by the Government's arrival.  *See* Noah Goldberg et al., *Bass Enacts Curfew in Downtown L.A. to Stem Chaotic Protests*, L.A. Times (June 10, 2025).  But the risk of further chaos is unlikely to abate until the Government withdraws the military from the City. That, in turn, is unlikely to happen without this Court's grant of relief.

## II.    This Court May Determine that There Is No "Rebellion" in Los Angeles.

Because the President's invocation of 10 U.S.C. § 12406 is unprecedented, no court has adjudicated the bounds of the statute and its meaning, or the meaning of its predecessor statutes. The Government's Opposition cites to *Martin v. Mott*, a United States Supreme Court decision from 1827, arguing that courts should defer to a President's determinations in this area. But such deference is not unlimited,[1] and this Court may review whether the predicate conditions set forth in the statute the President has invoked, 10 U.S.C. § 12406, have been met. Judicial review is especially warranted when courts are confronted with the extraordinary and dangerous action of engaging the military on domestic soil and for domestic issues under 10 U.S.C. § 12406.

---

[1] For example, the Supreme Court made it clear that judicial review may be required to determine whether the Executive deploys troops in bad faith, whether an emergency had been declared or declared properly and whether the deployment was required to address the emergency. *Sterling v. Constantin*, 287 U.S. 378, 400 (1932) ("Such measures, *conceived in good faith, in the face of the emergency, and directly related to the quelling of the disorder or the prevention of its continuance*, fall within the discretion of the executive in the exercise of his authority to maintain peace.") (emphasis added).

8

Recent jurisprudence surrounding President Trump's use of the Alien Enemies Act ("AEA") is instructive.  As with 10 U.S.C. § 12406, the AEA grants extraordinary powers to the President when certain conditions are present. The AEA allows the President to apprehend and remove all "alien enemies" when there is an "invasion or predatory incursion … against the territory of the United States by any foreign nation or government."  50 U.S.C. § 21. In a spate of cases challenging the President's invocation of the AEA, courts—including the Supreme Court—have acknowledged the necessity of judicial review, and in particular scrutinizing the predicate terms, including "invasion" or "predatory incursion," that trigger the statute. *See, e.g., A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025); *J.A.V. v. Trump*, No. 1:25-CV-072, at *10 (S.D. Tex. 2025). Indeed, "conditional questions—the legal meaning of war, invasion and predatory incursion—are well within courts' bailiwick." *J.G.G. v. Trump*, No. 25-5068, at 13 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring).

Here, this Court faces a straightforward question: Has the President met the specific requirements necessary to invoke 10 U.S.C. § 12406? The answer is clearly no.

Using standard tools of statutory interpretation — including textual analysis, historical context, and common usage at the time of drafting — it is plain that the President's memorandum does not establish the predicates required to deploy the National Guard under this provision. Again, the AEA cases are illustrative: Federal district and appellate courts throughout the country have relied on contemporaneous understanding, dictionary definitions, and common usage to define "invasion" and "predatory incursion." In doing so, courts have found that the President's assertions did not meet the definitions of those terms. *See, e.g. J.A.V. v. Trump* (evaluating ordinary and historical meaning of "predatory incursion" under the 1798 Act). This Court may engage in the same process—analyzing the meaning of "rebellion," and determining whether the President's memorandum sufficiently satisfies the requirements of 10 U.S.C. § 12406.  As previously demonstrated, the President's memorandum and the protests on the ground in Los Angeles did not meet the legal definition of "rebellion."

9

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

The Government's Opposition attempts to misdirect the Court away from a straightforward review of whether the statutory prerequisite is met by selectively and misleadingly quoting the statute to argue that it grants the President the power to "consider" whether there is a "rebellion" to warrant calling upon the National Guard.  See Opp. Br. at 11 ("today's Section 12406 vests the President with statutory authority to *call forth the National Guard 'as he considers necessary* to repel the invasion, suppress the rebellion, or execute [the] laws' of the United States.") (emphasis added).  But that is not what the statute says.  Rather, the statute allows the President to "call into Federal service members and units of the National Guard of any States *in such numbers as he considers necessary* to…suppress the rebellion." 10 U.S.C. § 12406 (emphasis added).  The discretion the President enjoys is to determine how many troops are needed to quell a rebellion.  The President *does not* have the unchecked power to determine that a rebellion, or even the danger of a rebellion, exists where it obviously does not.  That is an objective condition precedent that must exist for 10 U.S.C. § 12406 for the President to exercise discretion under this provision.

Section 12406 cannot be invoked on speculation, political expediency, or rhetorical flourish.  It demands a showing of actual rebellion—a high threshold that was simply not met in this instance, even as a prima facie matter.  The Trump memorandum presented no identification of actual rebellion; its language was rhetorical, not legal or factual; and does not represent the realm of "honest judgment" where deference is appropriate. To the contrary, even the memorandum itself failed to reach a definitive conclusion on the predicate conditions needed for the state to apply.  The Court should therefore reaffirm that § 12406 demands evidence of an actual rebellion that requires the military, not a mere response to civil protest, and reject this egregious use of federalization as a legally unfounded action that caused immense injury to the City of Los Angeles and continues to harm the City and its residents.

BRIEF OF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

# CONCLUSION

For the reasons stated above, the City of Los Angeles supports the State of California's application for a temporary restraining order.

DATED: June 12, 2025                          Respectfully submitted,

HYDEE FELDSTEIN SOTO, SBN 106866
City Attorney
VALERIE L. FLORES, SBN 138572
MICHAEL DUNDAS, SBN 226930
200 North Main Street, City Hall East Rm 800
Los Angeles, California 90012
hydee.feldsteinsoto@lacity.org
valerie.flores@lacity.org
mike.dundas@lacity.org
Telephone: (213) 978-8100
Facsimile: (213) 978-8312
*Attorneys for* Amicus Curiae
City of Los Angeles


Norman L. Eisen*
Stephen A. Jonas SBN 542005
Joshua G. Kolb*
Diamond Brown*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Steve @statedemocracydefenders.org
Joshua@statedemocracydefenders.org
Diamond@statedemocracydefenders.org

*PHV Forthcoming


*Attorneys for the City of Los Angeles
as* Amicus Curiae

11