IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, et al., | Case No. 25-cv-04870-CRB |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

On June 6, 2025, the federal government initiated immigration raids across the City of Los Angeles. Protests swiftly followed, and some individuals involved in those protests were unruly and even violent. State and local law enforcement responded. The following day, President Trump ordered that members of the California National Guard be federalized, and thereupon assumed control of those forces.

At this early stage of the proceedings, the Court must determine whether the President followed the congressionally mandated procedure for his actions. He did not. His actions were illegal—both exceeding the scope of his statutory authority and violating the Tenth Amendment to the United States Constitution. He must therefore return control of the California National Guard to the Governor of the State of California forthwith.

## I.      BACKGROUND

### A.      California National Guard

The California Army National Guard and the California Air National Guard (together, the California National Guard) are part of the organized militia of the State of California and federally recognized units of the reserve components of the U.S. military. Eck Decl. (dkt. 8-3) ¶ 20. Governor Newsom is the commander-in-chief of the California

National Guard when it is under state control.  Id. ¶ 31; Cal. Const., art. V, § 7.  President Trump is the commander-in-chief of the U.S. Armed Forces, including the National Guard when it is under federal control.  U.S. Const. art. II § 2, cl. 1.  A president can call the National Guard into federal service under Title 10 of the United States Code.  Id. ¶ 27. That is what happened here.

California has the largest National Guard in the country, with 18,733 members, 12,212 of whom are currently available.  Eck Decl. ¶¶ 28, 30.  The California National Guard is "vital" in carrying out state functions such as "emergency and natural disaster response, cybersecurity, and drug interdiction."  Id. ¶ 31.  For instance, 2,500 California National Guard members were activated in response to the destructive fires in Los Angeles County in January 2025.  Id. ¶¶ 35–36.  Some serve on Taskforce Rattlesnake, the state's specialized fire combat unit.  Id. ¶¶ 14, 39–40.  Others serve on the Counterdrug Taskforce, which specializes in stopping fentanyl trafficking at the U.S.-Mexico border. Id. ¶¶ 15, 42–43.

### B. ICE Actions and Public Protest

On June 6, 2025, Immigration and Customs Enforcement began carrying out immigration raids in Los Angeles. Olmstead Decl. (dkt. 8-2) ¶ 6.  The Associated Press reported that ICE executed search warrants at multiple locations across Los Angeles. Espíritu Decl. (dkt. 8-1) Ex. F ("Federal immigration authorities have been ramping up arrests across the country to fulfill President Donald Trump's promise of mass deportations.").  Los Angeles Police Chief Jim McDonnell stated that "federal officials did not brief his department, which made it difficult to respond to the mobs of people who began to protest."  See McPhee, LAPD Chief Jim McDonnell Says, 'Violence I Have Seen Is Disgusting,' Recounting Attacks on Cops, L.A. Mag. (June 8, 2025), https://perma.cc/G24N-PZHE.  ICE reportedly targeted "several locations in downtown L.A. and its immediate surroundings" that are "known to have significant migrant populations and labour-intensive industries."  Espíritu Decl. Ex. G.  These included two Home Depot stores, a donut store, and a clothing wholesaler.  Id.  Ultimately, between 70

2

1    and 80 people were detained, and 44 arrested.  Espíritu Decl. Exs. G, H.

2         State and city leaders expressed concern and disapproval.  Governor Newsom

3    reportedly stated that the "[c]ontinued chaotic federal sweeps … to meet an arbitrary arrest

4    quota are as reckless as they are cruel."  Espíritu Decl. Ex. D.  Mayor Karen Bass told

5    reporters that she received no notice that the raids were to be conducted, and that the raids

6    "sow[] a sense of chaos in our city, and a sense of terror."  Id.  And Los Angeles County

7    Supervisor Janice Hahn reportedly said: "They aren't targeting violent criminals—they are

8    sweeping up hardworking people in our communities just trying to provide for their

9    families.  These agents are armed to the teeth and it is clear their goal is to make people

10   afraid and it's working."  Id.

11        Some members of the public gathered in protest.  A group of people assembled at

12   the site of an ICE operation in Los Angeles's Garment District and tried to prevent ICE

13   from leaving.  Santacruz Decl. (dkt. 22-1) ¶ 7; Espíritu Decl. Ex. D.  Another one of the

14   primary protests on June 6 took place at the Metropolitan Detention Center.  Olmstead

15   Decl. ¶ 6.  The protests were explicitly about the immigration raids.  See Espíritu Decl. Ex.

16   D ("Friday evening, protesters marched in downtown L.A. condemning Friday's

17   immigration raids.").  The Governor's Office of Emergency Services, which was

18   monitoring the protests, was in regular communication with representatives of the Los

19   Angeles Police Department and the Los Angeles County Sheriff's Department.  Olmstead

20   Decl. ¶ 6.  Both stated that they did not need additional resources, and LAPD reassigned

21   additional officers to the area.  Id.

22        That evening, protesters reportedly marched in downtown Los Angeles.  Espíritu

23   Decl. Ex. D.  There were about 800 protesters at two sites.  Santacruz Decl. ¶¶ 9, 10.

24   Some protesters threw "concrete chunks, bottles of liquid, and other objects at Federal

25   Protective Service officers guarding a parking lot gate; some protesters attempted "to use

26   large rolling commercial dumpsters as a battering ram."  Id. ¶ 11.  Officers protected the

27   gate entrance with pepper balls and other nonlethal force, until LAPD arrived and pushed

28   the crowd away.  Id. ¶ 13.  Some of the protesters used "chairs, dumpsters, and other items

3

as weapons." Id. ¶ 14. LAPD declared an "unlawful assembly," and while some individuals resisted, the protesters departed by 11:00 p.m. Id. ¶¶ 16, 17. Two federal buildings were vandalized and sustained minor damage. Id. ¶ 17.

On June 7, both the ICE operations and responsive protests continued. Olmstead Decl. ¶ 7. In addition to the protest at the Metropolitan Detention Center, protests also emerged in Paramount and Compton. Id. LASD provided 200 deputies to respond to the Paramount and Compton protests, including a team with specialized training in handling civil unrest. Id. Customs and Border Protection officers arrived from San Diego to assist with immigration enforcement operations. Santacruz Decl. ¶ 18.

During the evening hours of June 7, the protest at the Metropolitan Detention Center was "fairly in control," with some protesters targeting the building. Olmstead Decl. ¶ 9. Federal officers pushed protesters away while LAPD officers moved in front and declared an unlawful assembly; by 2:15 a.m., "most of the protestors had left the area." Id. In Paramount and Compton, there were about 300 to 400 protesters present. Id. ¶ 10. Some protesters threw rocks and other objects (including a Molotov cocktail), burned a vehicle, looted a gas station, and vandalized property. Id. ¶ 9. There was an extended clash between some protesters and officers, with a crowd boxing in the officers and throwing fireworks, rocks, and mangos at them, and "using shopping carts to barricade the street." Santacruz Decl. ¶ 20. One officer was briefly trapped inside her law enforcement vehicle when a crowd surrounded it, shook it, and threw stones at it. Id. A DHS fence was damaged, and three government vehicles were damaged. Id. ¶ 21. Local law enforcement brought the situation under control by 4:00 a.m. and LASD was able to demobilize its teams. Olmstead Decl. ¶ 9. About 11 people were arrested for engaging in unlawful behavior at the protests that night. Id. ¶ 10.

**C.     Federalizing of National Guard and Continued Protest**

President Trump intervened in the response to the protests on the evening of June 7, issuing a memorandum to the Secretary of Defense, Attorney General, and Secretary of Homeland Security. See June 7 Memo (Espíritu Decl. Ex. O at 108–09). Although it did

1  not name California, Los Angeles, or any other geographic area, the memo asserted that

2  "[n]umerous incidents of violence and disorder have recently occurred and threaten to

3  continue in response to the enforcement of Federal law by [ICE] and other United States

4  Government personnel." Id. It continued: "To the extent that protests or acts of violence

5  directly inhibit the execution of the laws, they constitute a form of rebellion against the

6  authority of the Government of the United States." Id. (emphasis added). The memo

7  explained that due to "these incidents and credible threats of continued violence,"

8  President Trump was calling

9  
10         into Federal service members and units of the National Guard
       under 10 U.S.C. [§] 12406 to temporarily protect ICE and other
11     United States Government personnel who are performing
       Federal functions, including enforcement of Federal law, and to
       protect Federal property, at locations where protests against
12     these functions are occurring or are likely to occur based on
       current threat assessments and planned operations.

13  Id. President Trump further directed Secretary Hegseth "to coordinate with the Governors

14  of the States and the National Guard Bureau in identifying and ordering into Federal

15  service the appropriate members and units of the National Guard under this authority,"

16  calling for "at least 2,000" National Guard personnel to be on duty "for 60 days or at the

17  discretion of" Secretary Hegseth. Id. (emphasis added). Finally, the memo provided that

18  Secretary Hegseth could "employ any other members of the regular Armed Forces as

19  necessary." Id.

20      Secretary Hegseth issued an order that same night, attaching the June 7 Memo, and

21  announcing that 2,000 members of the California National Guard were being "called into

22  Federal service effective immediately for a period of 60 days." See June 7 DOD Order

23  (Espíritu Decl. Ex. P at 111). The top of the order read:

24          **MEMORANDUM FOR ADJUTANT GENERAL OF THE**
            **CALIFORNIA NATIONAL GUARD**
25          **THROUGH: THE GOVERNOR OF CALIFORNIA**

26  Id. The order further stated that the Commander of U.S. Northern Command would

27  control the 2,000 National Guard members. Id.

28      Defendants did not notify Governor Newsom of their intent to federalize the

California National Guard prior to issuing the June 7 Memo or the June 7 DOD Order. Espíritu Decl. Ex. K (June 8 letter from Sapp to Secretary Hegseth).[1]  Governor Newsom only learned of the June 7 DOD Order from the Adjutant General after the Adjutant General received it.  Id.  The Adjutant General relinquished command to the commander of U.S. Northern Command, and thereafter the commander of U.S. Northern Command, not the Governor, has issued all orders to the federalized National Guard.  Espíritu Decl. Ex. J.  Responding to these events, Governor Newsom issued a statement that "[t]he federal government is taking over the California National Guard and deploying 2,000 soldiers in Los Angeles—not because there is a shortage of law enforcement, but because they want a spectacle."  Espíritu Decl. Ex. Q.  On June 8, the New York Times reported that President Trump wrote on social media that he had directed his cabinet officials to "take any actions necessary to 'liberate Los Angeles from the Migrant Invasion,'" and said, "we're going to have troops everywhere."  Espíritu Decl. Ex. M.

The National Guard troops arrived in Los Angeles on June 8, but "it was not clear what role they were to play or what orders they were provided," and "there were concerns" that they "did not have the equipment or training necessary to handle the situation."  Espíritu Decl. Ex. R; Olmstead Decl. ¶ 11.  Initially that morning, the city was quiet.  Espíritu Decl. Ex. R.  That afternoon, protesters increased to about 3,500, particularly near the Metropolitan Detention Center, where the National Guard was deployed.  Olmstead Decl. ¶ 12.  "[M]any of the protestors appeared angry that the National Guard had been federalized and was now present in their city."  Id.; Espíritu Decl. Ex. M (New York Times stating that "aggressive federal response … in turn sparked new protests across the city.").  "The presence of the National Guard seemed to only inflame the protesters further."  Olmstead Decl. ¶ 12.[2]

---

[1] President Trump called Governor Newsom at some point and purportedly "directed him to take action to stop the violence."  Opp. at 5 & n.4 (citing Colton & Roberts, Trump brings receipts, Fox News (June 10, 2025), https://perma.cc/EX6D-V8Y5).  No one suggests that President Trump mentioned the National Guard.

[2] The LAPD Chief whom Defendants quote as stating that "things have gotten out of control," see Opp. (dkt. 25) at 1, n.2, made that comment on the night of June 8.

LAPD, LASD, and the California Highway Patrol deployed to the protest area as protesters, blocked Highway 101. Id. ¶ 13. Several blocks away, individuals reportedly vandalized Waymo driverless vehicles. Espíritu Decl. Ex. R. Some people "moved through downtown, setting off commercial-grade fireworks toward federal officers and throwing objects at passing law enforcement vehicles." Santacruz Decl. ¶ 26. Individuals "lit fires in dumpsters and trash bins[,] looted at least one store," and vandalized buildings. Id. At least 42 people were arrested in connection with their conduct during the June 8 protests. Olmstead Decl. ¶ 14.

That same day, Governor Newsom's office wrote to Secretary Hegseth, stating that the June 7 DOD Order did not comply with the law or even with President Trump's June 7 Memo. Espíritu Decl. Ex. K. The letter argued that "local law enforcement resources are sufficient to maintain order" and that deploying the National Guard without adequate training or orders "risks seriously escalating the situation." Id. Asserting that the deployment represented "a serious breach of state sovereignty that seems intentionally designed to inflame the situation," the letter asked Secretary Hegseth to rescind the June 7 DOD Order. Id.

Instead, on June 9, Secretary Hegseth posted on social media that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "defend federal law enforcement officers." Eck Decl. ¶ 18. Secretary Hegseth then issued a second order federalizing another 2,000 National Guard members for 60 days. June 9 DOD Order (Espíritu Decl. Ex. P at 114). Defendants did not consult with Governor Newsom in advance of the June 9 DOD Order. Espíritu Decl. Ex. S. On June 9, a thousand demonstrators gathered, and one person drove by firing paintballs at the FPS inspectors. Santacruz Decl. ¶ 28. The crowd clashed with LAPD officers, injuring five. Id. ¶ 31.

Over the course of the protests, state and local law enforcement arrests increased by the day, with over 400 individuals ultimately being arrested in total. Olmstead Supp. Decl.

(dkt. 39-3) ¶ 14.[3]  The parties have not introduced any evidence of any protesters carrying firearms, and there is no evidence of any organized (as opposed to sporadic) violence.

### D.    Procedural History

Plaintiffs Newsom and the State of California bring suit against Defendants Trump, Hegseth, and the DOD, arguing that Defendants' actions exceeded the scope of their authority.  <u>See</u> Compl. (dkt. 1).  The complaint includes causes of action for: (1) <u>ultra vires</u>, against all Defendants; (2) violation of the Tenth Amendment of the U.S. Constitution, against all Defendants; and (3) violation of the Administrative Procedures Act, against Secretary Hegseth and the Department of Defense.  <u>Id.</u>  Plaintiffs seek declaratory and injunctive relief.  <u>Id.</u> ¶ 107.  On June 10, Plaintiffs filed a Motion for a TRO, asking the Court to rein in the President's use of military force in Los Angeles.  Mot. (dkt. 8); Reply (dkt. 39).  Defendants have opposed the motion, <u>see</u> Opp., and the Court held a hearing on June 12.

## II.    LEGAL STANDARD

A party seeking a temporary restraining order must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008); <u>Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.</u>, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for temporary restraining order the same as for preliminary injunction).  Alternatively, if the party demonstrates that "the balance of hardships tips sharply in [its] favor," it need only show that "serious questions going to the merits were raised" and that the other two <u>Winter</u> elements are satisfied.  <u>All. for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citation omitted).  Either way, success on the merits "is the most important <u>Winter</u> factor."  <u>Disney Enters., Inc. v. VidAngel, Inc.</u>, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).  And when the government is a party, the last two <u>Winter</u> factors—the

---

[3] LAPD made 29 arrests on June 7.  <u>Id.</u>  LAPD, LASD, and CHP made at least 41 arrests on June 8, 135 arrests on June 9, and 297 arrests on June 10.  <u>Id.</u>

equities and the public interest—merge. <u>E. Bay Sanctuary Covenant v. Biden</u>, 993 F.3d 640, 668 (9th Cir. 2021).

## III.  DISCUSSION

The Court begins with the likelihood of success on the merits and, concluding that Plaintiffs are likely to succeed on at least some of their claims, then proceeds to the remaining <u>Winter</u> factors.

### A.  Likelihood of Success on the Merits

Plaintiffs bring three claims—an <u>ultra vires</u> claim, a Tenth Amendment claim, and an APA claim—but rely only on the first two for purposes of their motion for a temporary restraining order.  Mot. at 7–11, 12–15 (ultra vires), 11–12 (Tenth Amendment).  As part of their <u>ultra vires</u> claim, Plaintiffs contend that President Trump exceeded his lawful authority in three ways:  <u>First</u>, although he cited 10 U.S.C. § 12406, which permits the President to federalize the National Guard, none of the three statutory conditions for invoking that statute were met.  <u>Second</u>, he failed to comply with § 12406's procedural requirement that any order issued under that statute "shall be issued through the governors of the States."  <u>Third</u>, he federalized the National Guard for an unlawful purpose in violation of the Posse Comitatus Act, 18 U.S.C. § 1385.  The Court addresses these three arguments before turning to Plaintiffs' Tenth Amendment claim.

### 1.  Section 12406's Conditions for Federalization

Through the Militia Act of 1903, Congress authorized the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary," but only if

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

Pub. L. No. 57-33, § 4, 32 Stat. 775, 776 (codified at 10 U.S.C. § 12406).  Neither

President Trump nor Secretary Hegseth specified by a citation to the statute which of these conditions justified federalizing the National Guard, though President Trump's memorandum suggests that he relied on the second, the third, or both. June 7 Memo ( "To the extent that the protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States."). Defendants confirm in their opposition brief and at the June 12 hearing that they rely on the second and third conditions.[4] Opp. at 13–16.

Defendants also challenge whether the Court can even properly evaluate whether these conditions were met, asserting that § 12406 reserved this determination to the President's discretion alone. Id. at 10–13. This presents a preliminary question for the Court to resolve before addressing the merits of the § 12406 conditions for federalizing the National Guard.

### a.     Justiciability

"It is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Thus, federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821). The Supreme Court has recognized only limited exceptions to this general rule—one of which is known as the "political question" doctrine. Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 195 (2012). This doctrine recognizes that certain "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." Marbury, 5 U.S. at 170. The political question doctrine is, however, a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" Zivotofsky, 566 U.S. at 195 (quoting Cohens, 19 U.S. at 404).

---

[4] To be sure, nothing in the June 7 Memo, the June 7 DOD Order, or the June 9 DOD Order remotely suggested that the United States or California had been "invaded or [was] in danger of invasion by a foreign nation." 10 U.S.C. § 12406 (emphasis added).

Baker v. Carr is the canonical case examining this doctrine. 369 U.S. 186 (1962). In Baker, the Court proposed six ways in which a case might present a political question and thus be unfit for judicial review: (1) if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) if there is "a lack of judicially discoverable and manageable standards for resolving it," (3) if it would be impossible to decide the issue "without an initial policy determination of a kind clearly for nonjudicial discretion," (4) if it would be impossible for a court to "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government," (5) if there is "an unusual need for unquestioning adherence to a political decision already made," or (6) if there is "potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id. at 217. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." Id.

Defendants contend that the third Baker formulation—the existence of a policy question "clearly for nonjudicial discretion"—applies here to render nonjusticiable the question whether § 12406's conditions for federalization of the National Guard were met. Opp. at 12–13. They rely on the language of § 12406 itself, stating that the statute gives sole and exclusive discretion to the President to determine whether "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or whether he "is unable with the regular forces to execute the laws of the United States." Id. at 10–13. Indeed, at the hearing Defendants contended that the President could invoke § 12406 on no evidence whatsoever and remain immune from judicial review. And to be sure, when the "executive possesses a constitutional or legal discretion, … their acts are only politically examinable." Marbury, 5 U.S. at 166; see also Dalton v. Specter, 511 U.S. 462, 477 (1994) ("Where a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available.").

Defendants misconstrue the plain language of § 12406, however. The statute permits the President to federalize the National Guard "[w]henever" one of the three

enumerated conditions are met, not whenever <u>he determines that</u> one of them is met.  10

U.S.C. § 12406.  Defendants point to the language providing that "the President may call

into Federal service members and units of the National Guard of any state in such numbers

<u>as he considers necessary</u> to repel the invasion, suppress the rebellion, or execute those

laws." <u>Id.</u> (emphasis added).  But their argument puts the cart before the horse.  For the

President to exercise his discretion (as to how many National Guard members or units to

federalize), there must first be an invasion, rebellion, or inability to execute the laws.

Consider, as an analogy, 5 U.S.C. § 3345, which applies "[i]f an officer of an Executive

agency … whose appointment to office is required to be made by the President … dies,

resigns, or is unable to perform the functions and duties of the office." <u>Id.</u> § 3345(a).  The

President's discretion in what to do next, <u>see</u> <u>id.</u> § 3345(a)(2)–(3), does not mean that the

President can unilaterally and without judicial review declare that a vacancy exists in order

to fill it.  That is classic <u>ipse dixit</u>.

Defendants assert that, despite the plain language of the statute, the Supreme

Court's 1827 <u>Martin v. Mott</u> decision compels a different outcome.  25 U.S. (12 Wheat.)

19 (1827).  <u>Martin</u> arose from a militiaman's refusal to enter federal service to fight in the

War of 1812 after President Madison had ordered the New York militia into federal service

pursuant to a predecessor statute to the Militia Act of 1903.  <u>See</u> <u>id.</u> at 28.  That statute

provided that "whenever the United States shall be invaded, or be in imminent danger of

invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the

United States to call forth such number of the militia of the state, or states, most

convenient to the place of danger, or scene of action, as he may judge necessary to repel

such invasion."  Act of Feb. 28, 1795, ch. 36, 1 Stat. 424, 424.  <u>Martin</u> thus presented the

question: "Is the President the sole and exclusive judge whether the exigency has arisen, or

is it to be considered as an open question, upon which every officer to whom the orders of

the President are addressed, may decide for himself, and equally open to be contested by

every militia-man who shall refuse to obey the orders of the President?"  25 U.S. at 29–30.

The Supreme Court held "that the authority to decide whether the exigency has arisen,

belongs exclusively to the President, and that his decision is conclusive upon all other persons." Id. at 30.  It stated that the President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts." Id. at 31.  And so the Court concluded that "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." Id. at 31–32.

In J.A.V. v. Trump, a challenge to President Trump's actions under the Alien Enemies Act, the federal government relied on Martin to make a similar argument to the one they make here.  --- F. Supp. 3d ----, 2025 WL 1257450 (S.D. Tex. May 1, 2025).  The plaintiffs in that case were Venezuelan citizens who alleged that President Trump's removal of Venezuelan citizens had exceeded the terms of the AEA, which allows the President, in his discretion, to remove certain noncitizens when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." Id. at *2, 5; 50 U.S.C. § 21; see also Ludecke v. Watkins, 335 U.S. 160, 164 (1948) (the AEA "confers on the president very great discretionary powers").  President Trump argued there, as he does here, that the political question doctrine shielded his attempt to remove Venezuelan citizens from the United States because "whether the AEA's preconditions are satisfied is a political question committed to the President's discretion." J.A.V., 2025 WL 1257450, at *7.  And he cited Martin for the same proposition as he does here.  See Opp. to Mot. for Prelim. Inj. at 12, J.A.V., No. 25-cv-72 (filed Apr. 23, 2025), ECF No. 45.

Judge Rodriguez rejected President Trump's attempt to preclude judicial review. He emphasized that "'questions of interpretation' fall within the Judiciary's responsibility" and that this can involve "analyzing whether a government official has impermissibly crossed statutory boundaries" by "determining the meaning of statutory terms and gauging the government's actions against those determined parameters." J.A.V., 2025 WL 1257450, at *9.  Accordingly, he went on to define "invasion" and "predatory incursion"

13

1   before concluding that President Trump had not adequately established the existence of

2   either.  J.A.V., 2025 WL 1257450, at *14–18.

3       The Court agrees with Judge Rodriguez's thoughtful reasoning in J.A.V. and finds

4   it applicable here.  To start, J.A.V. is in line with other recent decisions rebuffing efforts

5   from Defendants to skirt judicial review of their alleged statutory violations.  See, e.g.,

6   J.G.G. v. Trump, --- F. Supp. 3d ----, 2025 WL 890401, at *9 (D.D.C. 2025) ("Simply

7   because a legal claim implicates foreign affairs or national security, however, does not

8   mean that the political-question doctrine places it 'beyond judicial cognizance.'" (citation

9   omitted)).  It is also consistent with a long line of precedent recognizing the judiciary's

10  role in interpreting statutory text.  See, e.g., Zivotofsky, 566 U.S. at 196 (determining

11  whether federal officials' "interpretation of [a] statute is correct" is "a familiar judicial

12  exercise"); Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)

13  ("[O]ne of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk

14  this responsibility merely because our decision may have significant political overtones.");

15  El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 842 (D.C. Cir. 2010) ("[T]hat a

16  case may involve the conduct of the nation's foreign affairs does not necessarily prevent a

17  court from determining whether the Executive has exceeded the scope of prescribed

18  statutory authority or failed to obey the prohibition of a statute or treaty."); Stark v.

19  Wickard, 321 U.S. 288, 310 (1944) ("The responsibility of determining the limits of

20  statutory grants of authority … is a judicial function entrusted to the courts by Congress by

21  the statutes establishing courts and marking their jurisdiction.").  Finally, even though the

22  AEA and § 12406 are different statutes, they both grant the President discretion in some

23  respects while still containing important statutory conditions that must be met for that

24  discretion to be exercised.  See Ludecke, 335 U.S. at 164, 171.  Accordingly, the Court

25  concludes that § 12406 does not preclude judicial review of whether a rebellion has

26  occurred or is in danger of occurring, or whether the President is unable to execute federal

27  law.

28      To be sure, based on longstanding deference to the President on matters of national

14

security and foreign policy, courts cannot second-guess a President's <u>factual</u> determinations in support of a proclamation under the AEA that an invasion or predatory incursion had occurred or was threatened. <u>J.A.V.</u>, 2025 WL 1257450, at *10 (citing <u>Holder v. Humanitarian L. Project</u>, 561 U.S. 1, 34 (2010), <u>Chi. & S. Air Lines v. Waterman S. S. Corp.</u>, 333 U.S. 103, 111 (1948), and <u>Martin</u>, 25 U.S. at 31[5]); <u>see also</u> <u>Trump v. Hawaii</u>, 585 U.S. 667, 708 (2018) ("[T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" (quoting <u>Humanitarian L. Project</u>, 561 U.S. at 33–34)). As discussed below, the Court here—like Judge Rodriguez in <u>J.A.V.</u>—does not question Defendants' factual assertions. The Court considers only whether those factual assertions, if true, constitute a rebellion or make the President unable to execute federal law.

That said, the Court points out that this case is not one involving the kind of foreign policy or national security questions that traditionally are left to the President. It instead implicates the President's <u>domestic</u> use of military force, a matter on which the courts can certainly weigh in. As the Supreme Court stated over fifty years ago:

> The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities … reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. Indeed, when presented with claims of judicially cognizable

---

[5] <u>Martin</u>, like other cases that Defendants cite (for example, <u>California v. United States</u>), involved issues of foreign policy and national security not presented in this case. <u>See</u> <u>Martin</u>, 25 U.S. at 31 ("[T]he evidence upon which the President might decide that there is imminent danger of invasion, might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment."); <u>California v. United States</u>, 104 F.3d 1086, 1091 (9th Cir. 1997) ("In this case, the issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches.").

> injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Laird v. Tatum, 408 U.S. 1, 15–16 (1972) (emphasis added).[6]  Between the unique concerns raised by federal military intrusion into civilian affairs and the fact that federal officials are not uniquely positioned to ascertain what is happening on the ground (as compared to, say, state and local officials), the Court is not convinced that the judiciary cannot question presidential assertions about domestic activities leading to military action. See Myers v. United States, 272 U.S. 52, 177 (Holmes, J., dissenting) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.").

At bottom, § 12406 does not reserve to sole presidential discretion the determination of whether a rebellion has or is in danger of occurring or whether the President is unable to execute federal law.  Accordingly, the Court now turns to the questions whether (1) "there [was] a rebellion or danger of a rebellion against the authority of the Government of the United States" or (2) "the President [was] unable with the regular forces to execute the laws of the United States."

### b.    Rebellion

Section 12406 does not define the term "rebellion," so the Court must interpret the term "consistent with [its] 'ordinary meaning at the time Congress enacted the statute.'" Wis. Cent. Ltd. v. United States, 585 U.S. 274, 277 (2018) (cleaned up) (citation omitted). In this endeavor, the Court may turn to contemporary dictionary definitions for insight. See, e.g., id. (relying on dictionary definitions of "money"); Lackey v. Stinnie, 145 S. Ct.

---

[6] In Laird, the plaintiffs challenged federal military action taken pursuant to the Insurrection Act, which grants certain presidential discretion. Id. at 3 & n.2.  The Court did not reject the lawsuit on justiciability grounds, though, but for lack of any injury to the plaintiffs. Id. at 13.  Indeed, as quoted above, the Court strongly insisted that judicial review remained available for any claim "of judicially cognizable injury." Id. at 16.

659, 667 (2025) (relying on dictionary definitions of "prevailing party"); <u>City of Los Angeles v. Barr</u>, 941 F.3d 931, 940 (9th Cir. 2019) ("We give Congress's words their ordinary and everyday meaning, and may consult dictionary definitions to ensure a plain interpretation."). And where there are multiple dictionary definitions, the Court must apply "the contextually appropriate ordinary meaning, unless there is reason to think otherwise." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 70 (2012). Part of understanding context involves recognizing that statutes "should be construed so that effect is given to all [their] provisions, so that no part will be inoperative or superfluous, void or insignificant." <u>Hibbs v. Winn</u>, 542 U.S. 88, 101 (2004) (citation omitted).

Both parties quote the definition of "rebellion" from the current edition of <u>Black's Law Dictionary</u>, which is:

> 1. Open, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence.
>
> 2. Open resistance or opposition to an authority or tradition.
>
> 3. Hist. Disobedience of a legal command or summons.

<u>Rebellion</u>, <u>Black's Law Dictionary</u> (12th ed. 2024). The Court's own research has turned up the following definitions from the late 1800s and early 1900s—the relevant time period for understanding what Congress meant when they passed the Militia Act of 1903:

> Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject.

<u>Rebellion</u>, <u>Black's Law Dictionary</u> (1st ed. 1891).

> 1. An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt. Rebellion differs from insurrection and from mutiny. Insurrection may be a rising in opposition to a particular act or law, without a design to renounce wholly all subjection to the government. Insurrection may be, but is not necessarily, rebellion. Mutiny is an insurrection of soldiers or seamen against the authority of their officers.
>
> 2. Open resistance to lawful authority.

17

Rebellion, <u>American Dictionary of the English Language</u> (1900).

> The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed. If the rebellion amounts to treason, it is punished by the laws of the United States with death. If it be a mere resistance of process, it is generally punished by fine and imprisonment.

Rebellion, <u>The Cyclopedic Dictionary of Law</u> (1901).

> 1. The act of rebelling; open and avowed renunciation of the authority of the government to which one owes obedience, and resistance to its officers and laws, either by levying war, or by aiding others to so; an organized uprising of subjects for the purpose of coercing or overthrowing their lawful rule or government by force; revolt; insurrection.
>
> 2. Open resistance to, or defiance of, lawful authority.

Rebellion, <u>Webster's International Dictionary of the English Language</u> (1903)

Where dictionaries list multiple definitions of "rebellion," the first definition is the one demanded by context here. The first definition of "rebellion" in each dictionary is political in nature, as opposed to the more open-ended concept of "rebellion" that some dictionaries provide as a secondary definition. Indeed, dictionaries' examples of the secondary usage of the term <u>never</u> apply in the political arena. <u>See, e.g.</u>, <u>Rebellion</u>, <u>Oxford English Dictionary</u> (rev. 2009).[7] And if there were any room for doubt, the language of § 12406 (requiring that the rebellion be "against the authority of the Government of the United States") resolves the question in favor of the political definition of "rebellion."

From there, the Court observes that the dictionary definitions from the turn of the century share several key characteristics. <u>First</u>, a rebellion must not only be violent but

_____

[7] The <u>Oxford English Dictionary</u>'s secondary definition of "rebellion" is "[o]pen or determined defiance of or resistance to any authority, controlling power, or convention; an instance of this." Examples of this usage include spiritual rebellion ("The event of this evening has reconciled me to God and humanity! I had risen in angry rebellion against providence." (quoting Brontë, <u>Wuthering Heights</u>, 87 (New York, Harper & Bros. 1858) (1847))) and familial rebellion ("He had forgotten that he had it, but told me when he saw it that he remembered it as the first thing that made him begin to rise against his father in a rebellion which he recognized as righteous." (quoting Butler, <u>The Way of All Flesh</u>, 178 (New York, E.P. Dutton & Co. 1917) (1903)))).

18

also be <u>armed</u>. <u>Second</u>, a rebellion must be organized. <u>Third</u>, a rebellion must be open and avowed. <u>Fourth</u>, a rebellion must be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue.

The protests in Los Angeles fall far short of "rebellion." Defendants refer repeatedly to "violent rioters," and "mobs," <u>see, e.g.</u>, Opp. at 1, and so the Court pauses to state that there can be no debate that most protesters demonstrated peacefully. Nonetheless, it is also beyond debate that some individuals used the protests as an excuse for violence and destruction. Some bad actors on June 6 threw "concrete chunks, bottles of liquid, and other objects at … officers," Santacruz Decl. ¶ 11, and used "chairs, dumpsters, and other items as weapons," <u>id.</u> ¶ 14. Others threw rocks and other objects, including a Molotov cocktail, on June 7. Olmstead Decl. ¶ 9. A "violent crowd" boxed in officers, threw fireworks, rocks, and mangos, and trapped one officer in her car, surrounding it, shaking it, and throwing stones at it. Santacruz Decl. Ex. 20. Some people on June 8 set off fireworks toward officers and threw objects at their vehicles. Santacruz Decl. ¶ 26. Someone on June 9 fired paintballs, <u>id.</u> ¶ 28, and a crowd injured five LAPD officers, <u>id.</u> ¶ 31.

Violence is necessary for a rebellion, but it is not sufficient. Even accepting the questionable premise that people armed with fireworks, rocks, mangoes, concrete, chairs, or bottles of liquid are "armed" in a 1903 sense—the Court is aware of no evidence in the record of actual firearms—there is little evidence of whether the violent protesters' actions were "open or avowed." Some presumably engaged violently with officers at close quarters in the daylight, while many others threw items under cover of darkness, protected by a crowd, identities concealed. Certainly, the <u>peaceful</u> protesters were "organized" to some degree, in that people knew generally knew where to go to participate in protests, <u>see, e.g.</u>, Espíritu Decl. Ex. F ("Dozens of protesters gathered Friday evening outside a federal detention center in Los Angeles where lawyers said those arrested had been taken, chanting 'set them free, let them stay!'"), but there is no evidence of organized, as apart

from sporadic or impromptu, violence.[8]  Nor is there evidence that any of the violent protesters were attempting to overthrow the government as a whole; the evidence is overwhelming that protesters gathered to protest a single issue—the immigration raids. See, e.g., Espíritu Decl. Ex. D ("Friday evening, protesters marched in downtown L.A. condemning Friday's immigration raids.").  While Defendants have pointed to several instances of violence, they have not identified a violent, armed, organized, open and avowed uprising against the government as a whole.  The definition of rebellion is unmet.

Moreover, the Court is troubled by the implication inherent in Defendants' argument that protest against the federal government, a core civil liberty protected by the First Amendment, can justify a finding of rebellion.  The U.S. Reports are chock-full of language explaining the importance of individuals' right to speak out against the government—even when doing so is uncomfortable, even when doing so is provocative, even when doing so causes inconvenience.  See, e.g., Cohen v. California, 403 U.S. 15, 24–25 (1972) ("To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance.  …  That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength."); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508 ("But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.  Any departure from absolute regimentation may cause trouble.  …  Any word spoken … that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk."); Cox v. Louisiana, 379 U.S. 536, 550–51 (rejecting the argument that a conviction for breach of the peace "should be sustained because of fear expressed by some [onlookers] that 'violence was about to erupt' because of the demonstration" and explaining "that constitutional rights may not be denied simply because of hostility to their assertion or

---

[8] To the contrary, the record suggests that the violent individuals might not have been bona fide protesters.  See McPhee, supra ("McDonnell said of the most violent protestors … 'many come in from other places just to hurt people and cause havoc.'").

exercise" (quoting <u>Watson v. City of Memphis</u>, 373 U.S. 526, 535 (1963))); <u>Texas v. Johnson</u>, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); <u>Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.</u>, 515 U.S. 557, 574 (1995) ("[T]he point of all speech protection [] is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.").

Applying these principles, courts have repeatedly reaffirmed that peaceful protest does not lose its protection merely because some isolated individuals act violently outside the protections of the First Amendment:

> Moreover, although defendants make much of the fact that some demonstrators had allegedly violated the law, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that "the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."

<u>Jones v. Parmley</u>, 465 F.3d 46, 57 (2d Cir. 2006) (cleaned up) (quoting <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886, 908 (1982)); <u>see also</u> <u>Black Lives Matter Seattle-King Cnty. v. City of Seattle</u>, 466 F. Supp. 3d 1206, 1213 (W.D. Wash. 2020) (finding that instances of protesters "launch[ing] objects at the police, ranging from rocks, bottles, fireworks, traffic cones, traffic flares, and more," warranted only "ensur[ing] an adequate police presence" and "arrest[ing] those who engage in such conduct" rather than "suppress[ing] legitimate First Amendment conduct as a prophylactic measure" (quoting <u>Collins v. Jordan</u>, 110 F.3d 1363, 1372 (9th Cir. 1996))); <u>Index Newspapers LLC v. City of Portland</u>, 480 F. Supp. 3d 1120, 1143 (D. Or. 2020) ("The fact that there are some violent offenders [] does not give the Federal Defendants carte blanche to attack journalists and legal observers and infringe their First Amendment rights."). In short, individuals' right to protest the government is one of the fundamental rights protected by the First Amendment, and just because some stray bad actors go too far does not wipe out that right for everyone. The idea that protesters can so quickly cross the line between protected

1    conduct and "rebellion against the authority of the Government of the United States" is

2    untenable and dangerous.

3        In a short paragraph, Defendants suggest that even if there was no rebellion that

4    would justify federalizing the National Guard, there was still a "danger of a rebellion,"

5    which would satisfy § 12406.  Opp. at 16.  This argument cannot withstand scrutiny.  For

6    starters, President Trump and Secretary Hegseth did not rely on a "danger of a rebellion"

7    when issuing the memorandum and orders that federalized the National Guard under s

8    12406.  See June 7 Memo; June 7 Order; June 9 Order.[9]  It is concerning, to say the least,

9    to imagine that the federal executive could unilaterally exercise military force in a

10    domestic context and then be allowed to backfill justifications for doing so, especially

11    considering how wary courts are of after-the-fact justifications even where the stakes are

12    lower.  Cf. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

13    29, 50 (1983) ("[C]ourts may not accept appellate counsel's post hoc rationalizations for

14    agency action.").  But in any event, Defendants do not even explain how the Court should

15    determine whether there is a "danger of a rebellion."  "Rebellion" remains the operative

16    word, and so any difference between a "rebellion" and a "danger of a rebellion" must be a

17    difference of degree, not one of kind, with respect to the conduct of the alleged rebellion.

18    With that in mind, Defendants have still not established a factual basis—again, even

19    assuming their factual assertions to be correct—from which this Court can conclude that

20    there is a danger of an organized, violent, armed uprising with the goal of overthrowing the

21    lawful government of the United States.

22        Accordingly, Defendants do not satisfy the "rebellion" condition.

23           **c.**      **Execution of the Laws**

24        The third condition justifying the federalization of the National Guard, and the

25    second advanced by Defendants, is that "the President [was] unable with the regular forces

26

27    [9] At the hearing, Defendants contended that President Trump's use of the phrase "[t]o the
extent" in the June 7 Memo means that he relied on the "danger of a rebellion" clause.  But

28    the June 7 Memo states: "To the extent that protests or acts of violence directly inhibit the
execution of the laws, they constitute a form of rebellion," not a danger of rebellion.

to execute the laws of the United States." 10 U.S.C. § 12406; Opp. at 16–17. Defendants

argue that they satisfy this condition because the Los Angeles protests threatened the

safety of federal law enforcement personnel and interfered with the sites where ICE agents

were enforcing alien removal laws. Opp. at 16. Defendants concede that ICE succeeded

in arresting 44 people on June 6, but insist that "that limited success came with the risk of

danger," and that, had the protests not interfered with their operations, ICE "would have

been able to carry out additional execution-of-the-laws activity." Id.

A classic example of a president being "unable with the regular forces to execute

Whether ICE could have detained more people in the absence of the protests is mere

conjecture—Defendants provide no support for that assertion. Even assuming that

Defendants are correct, however, the statute does not allow for the federalizing of the

National Guard when the President faces obstacles that cause him to underperform in

executing the laws. Nor does the statute allow for the federalizing of the National Guard

when the President faces some risk in executing the laws, though of course federal

employees should never have to fear danger when performing their jobs. The statute

requires that the President be "unable" to execute the laws of the United States. That did

not happen here. See Espíritu Decl. Exs. G, H (between 70 and 80 people were detained,

and 44 arrested by ICE).

A classic example of a president being "unable with the regular forces to execute

the laws"—indeed, the only other time in this Country's history that a president has

exclusively relied on § 12406 to federalize the National Guard—is the 1970 Postal Service

Strike. See Opp. at 3 (drawing parallel to Postal Service Strike). Frustrated by low pay

and poor working conditions, letter carriers voted on March 17, 1970 to strike,

"threaten[ing] to bring the nation to a standstill." Pope, Operation Graphic Hand,

Smithsonian Nat'l Postal Museum (Mar. 23, 2017), https://postalmuseum.si.edu/operation

-graphic-hand. By March 19, 1970, the mail service was "paralyzed," the areas affected by

the strike were growing, and "[b]ills, dividend checks, income-tax returns, advertising

brochures, credit cards, bank statements, sales flyers and personal mail lay uncollected in

thousands of mail drops." Bigart, Mail Service Here is Paralyzed by Postal System's First

Strike; Business Beginning to Feel Pinch, N.Y. Times (March 19, 1970), https://perma.cc/8VYB-CT32.  On March 23, 1970, President Nixon declared a state of national emergency, ordering 25,000 personnel from the National Guard and other military branches into New York City "to get some mail moving."  Pope, supra; see also Bigart, Troops Welcomed as Mail Carriers, N.Y. Times (March 26, 1970), https://perma.cc/9A9N-PLHD; Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 23, 1970).  In that case, the mail system was incapacitated—the "regular forces" of letter carriers were on strike, and there was no other way to deliver the mail.  In this case, the regular forces were and are still very much on duty.  While ICE was not able to detain as many people as Defendants believe it could have, ICE was nonetheless able to execute the federal immigration laws.  Indeed, ICE continues to carry out enforcement actions, executing those laws.  See Espíritu Supp. Decl. (dkt. 39-1).

Accordingly, Defendants do not satisfy the "execution of the laws" condition.

## 2. Section 12406's Procedural Requirements

Shortly after enacting the Militia Act of 1903, Congress amended the Act to require that any orders issued under § 12406 be issued "through the governor of the respective State … from which State … such troops may be called."  Militia Act of 1908, Pub. L. No. 60-145, § 3, 35 Stat. 399, 400.  Section 12406 maintains this requirement: "Orders for these purposes shall be issued through the governors of the States … ."

Plaintiffs assert that President Trump failed to comply with this procedural requirement.  They explain that Governor Newsom first learned that President Trump had called 2,000 of California's National Guard members into federal service when California's adjutant general forwarded him the June 7 DOD Order.  See Espíritu Decl. Ex. K.  From that point on, the commander of U.S. Northern Command, not the Governor, has issued all orders to the federalized National Guard.  See Espíritu Decl. Ex. J.  Similarly, Secretary Hegseth—not Governor Newsom—issued the June 9 order calling another 2,000 National Guard members into federal service.  See Espíritu Decl. Ex. S.

Defendants assert that they complied with § 12406 because written at the top of the

June 7 and June 9 DOD Orders was the label "THROUGH: THE GOVERNOR OF CALIFORNIA." Opp. at 17. True enough. But an interpretation of § 12406 that permits the President to federalize a state's National Guard by typing the phrase "Through the Governor of [insert state here]" at the top of a document that the President <u>never sends to the governor</u> strains credibility, especially given that Congress specifically amended the statute to add the requirement that orders "shall be issued through the governors." <u>See</u> Militia Act of 1908 § 3.

Defendants also argue that they complied with this requirement by sending the order to California's adjutant general, who is tasked with issuing orders "in the name of the Governor." Opp. at 17 (citing Cal. Mil. & Vet. Code § 163). But § 12406 specifically requires that orders federalizing the National Guard be issued "through <u>the governor</u> of the respective State," not through a different state official (even one who can issue orders in the governor's name). Indeed, when Congress has wanted to accommodate other state officials, it has done so expressly. For example, the Secretary of Defense may "order a member of a reserve component under his jurisdiction to active duty" except that members "may not be ordered to active duty … without the consent of the governor <u>or other appropriate authority of the State concerned</u>." 10 U.S.C. § 12301(d) (emphasis added). And, in fact, § 12406 specifically provides for, "in the case of the District of Columbia," orders to issue "through the commanding general of the National Guard of the District of Columbia."

As a final point, Plaintiffs emphasize that Defendants did not provide Governor Newsom "an opportunity to provide or withhold his consent" or even "to consult … as to which service members and in what number should be called, and for what purposes and what period of time." Mot. at 6. Defendants respond that § 12406 says nothing about obtaining a governor's <u>consent</u> as a prerequisite for federalizing the National Guard. They are correct: section 12406 does not expressly require consent or approval of a governor to federalize that state's National Guard, unlike similar statutes. <u>Cf.</u> 10 U.S.C. § 12301(d) (allowing the Secretary of Defense to "order a member of a reserve component under his

jurisdiction to active duty" only with "the consent of the governor or other appropriate authority of the State concerned" (emphasis added)). That said, the June 7 Memo specifically ordered Secretary Hegseth to "coordinate with the Governors of the States" in the process of calling National Guard members to federal service, and Defendants do not claim to have done so. And in any case, the instant motion does not require the Court to determine whether or how § 12406 would operate if Secretary Hegseth had attempted to issue his orders through Governor Newsom and he had refused, as the President and Secretary circumvented the Governor (and thus, the procedure mandated by statute) from the outset.[10]

Regardless of whether Defendants gave Governor Newsom an opportunity to consult with them or consent to the federalization of California's National Guard, they did not issue their orders through him, and thus failed to comply with § 12406.

### 3. The Posse Comitatus Act

Plaintiffs' third argument for why President Trump's federalization of the National Guard exceeds his legal authority rests not on § 12406 but a different statute—the Posse Comitatus Act. First enacted in 1878, the Act prohibits military personnel from acting as a "posse comitatus," or those "upon whom a sheriff could call for assistance in preventing any type of civil disorder." United States v. Dreyer, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (citation omitted); Act of June 18, 1878, ch. 263, § 14, 20 Stat. 145, 152. The current version of the Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

---

[10] Where Presidents have federalized the National Guard against a state governor's wishes, they have used other statutes to do so. See Exec. Order No. 11,207, 30 Fed. Reg. 3743 (Mar. 23, 1965) (relying on the Insurrection Act, then codified at 10 U.S.C. §§ 332–334, and now codified at 10 U.S.C. §§ 252–254). It seems that this would be the proper course if a governor refused to issue an order, as forcing a governor to do so would raise serious anti-commandeering problems. See Printz v. United States, 521 U.S. 898, 935 (1997).

18 U.S.C. § 1385.  The Act reflects "'a traditional and strong resistance of Americans to any military intrusion into civilian affairs' that 'has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military.'"  Dreyer, 804 F.3d at 1272 (quoting Laird, 408 U.S. at 15).

The Posse Comitatus Act does not provide a private cause of action for damages. Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), aff'd sub nom. Buchanan v. Barr, 71 F.4th 1003 (D.C. Cir. 2023).  But a plaintiff can still bring an ultra vires claim where, as Plaintiffs assert is the case here, an "agency has disregarded a specific and unambiguous statutory directive" or "has violated some specific command of a statute."  Id. at 41 (quoting Griffith v. FLRA, 842 F.2d 487, 493 (D.C. Cir. 1988)).  So if Plaintiffs are correct that President Trump and Secretary Hegseth's federalization of the National Guard requires National Guard members to violate the Posse Comitatus Act, such a violation may provide a basis for their ultra vires claim.

At present, Plaintiffs contend that that the federalized National Guard troops and the Marines are "likely" to engage in "active involvement in the execution of the laws" in violation of the Posse Comitatus Act.  See Mot. at 14; see also United States v. Khan, 35 F.3d 426, 431 (9th Cir. 1994) (quoting United States v. Yunis, 924 F.2d 1086, 1094 (D.C. Cir. 1991)).  They concede that there are a number of "supportive activities" in which the military can engage without running afoul of the Act, such as "maintenance and repair, transportation, training facilities, counterdrug and counter-transactional organized crime training, and surveillance support."  Mot. at 15.  But Plaintiffs note that the federalized National Guard members will soon provide support during immigration enforcement operations and not only at federal buildings.  Id. at 14 (citing Eck Decl. ¶ 19).  And they suspect that such support will lead to the military "physically confront[ing], detain[ing], or search[ing] civilians," which would constitute "executing civil laws."  Id. at 15–16.  By the time they filed a reply brief, Plaintiffs asserted that "that threat has already become a

1  reality," because heavily armed National Guard members have been photographed

2  standing near ICE agents during arrests.  Reply (dkt. 38) at 11 (citing Espíritu Reply Decl.

3  Exs. 2, 3).  While the sight of an armed National Guard member no doubt has the potential

4  to intimidate, Plaintiffs do <u>not</u> contend that National Guard members have in fact

5  participated in any arrests.

6          Defendants respond that they have not violated the Act, and will not, as the June 7

7  Trump Memo and the June 7 and June 9 DOD Orders do not direct the federalized

8  National Guard members to undertake activities that would violate the Act.  <u>See</u> Opp. at

9  20–23; <u>see also</u> Knell Decl. (dkt. 22-4) ¶ 7 ("Since Saturday, June 7, federalized California

10  National Guard personnel have conducted operations in Los Angeles strictly consistent

11  with the directions of the President's June 7 memorandum ... .  They are protecting federal

12  personnel performing official functions as well as property at designated locations.").  Of

13  course, federal officials do not only act through official documents.  President Trump

14  reportedly wrote on social media that he had directed his cabinet officials to "take any

15  actions necessary to 'liberate Los Angeles from the Migrant Invasion,'" and said, "we're

16  going to have troops everywhere," which certainly differs from the circumscribed role

17  professed in the opposition brief.  <u>See</u> Espíritu Decl. Ex. M; <u>see also</u> <u>id.</u> ("Tom Homan, the

18  president's border czar, suggested in an interview with NBC News that the administration

19  would arrest anyone, including public officials, who interfered with immigration

20  enforcement activities, which he said would continue in California and across the

21  country."); Fortinsky, <u>Bondi Says California at 'Good Point': 'We're Not Scared to Go</u>

22  <u>Further'</u>, The Hill (June 11, 2025), https://perma.cc/G6HR-Q5M8 (quoting Attorney

23  General Bondi: "We're not scared to go further. We're not frightened to do something else

24  if we need to."); Bowden, <u>Noem Asks Hegseth to Exceed Trump's Order and Force the</u>

25  <u>Military to Arrest LA Citizens to Protect ICE Agents</u>, The Independent (June 11, 2025)

26  ("DHS chief Kristi Noem wants the US military directly involved in detaining and

27  arresting protesters in Los Angeles, according to a letter sent to Defense Secretary Pete

28  Hegseth."), https://perma.cc/XG9F-EQF9.

The Court has already concluded that Defendants exceeded their lawful authority by violating 10 U.S.C. § 12406. The Court therefore need not reach this additional basis for Plaintiffs' ultra vires claim at this early moment in the litigation. When the Court has before it Plaintiffs' motion for a preliminary injunction, the record will be more complete as to any and all military activities, and whether, as Plaintiffs contend, the presence of troops near ICE agents during raids "in dense, urban communities" indeed results in "military forces [being] drawn into a variety of law enforcement activities, such as confronting, interrogating, detaining, or searching civilians perceived as security threats." See Reply at 12. At that point—just a week from now—the parties will be free to make whatever arguments they wish in connection with the Posse Comitatus Act.

As of now, the Court only has counsel's speculation of what might happen.

### 4. Tenth Amendment

Plaintiffs' second claim in their complaint is that President Trump's federalization of the National Guard "infringes on Governor Newsom's role as Commander-in-Chief of the California National Guard and violates the State's sovereign right to control and have available its National Guard in the absence of a lawful invocation of federal power." Compl. ¶ 95. Plaintiffs' argument rests in part on their assertion that President Trump acted ultra vires when he federalized the National Guard, see id. ¶ 100, and in part on their allegation that using National Guard members to "quell" or "prevent" protests is an exercise of police power, which is traditionally reserved to the states, see id. ¶¶ 96–98.

Focusing on the first piece of Plaintiffs' argument, Defendants argue that the Tenth Amendment issue "is wholly derivative" of whether President Trump lawfully invoked § 12406. Opp. at 20. And because Defendants assert that they did not violate § 12406, they contend that there is no Tenth Amendment problem. Id.

Yet the Court has concluded that Defendants did violate § 12406, so their argument against Plaintiffs' Tenth Amendment claim starts from a flawed premise. And even if that were not the case, Defendants fail to grapple with the second part of Plaintiffs' Tenth Amendment claim—that their use of the National Guard and the Marines comes into

conflict with California's police power. It is well-established that the police power is one of the quintessential powers reserved to the states by the Tenth Amendment. E.g., United States v. Morrison, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation.").

Although Defendants identify some stray violent incidents relating to the protests against ICE raids in Los Angeles, and from there boldly claim that state and local officials were "unable to bring rioters under control," Opp. at 19–20, it is not the federal government's place in our constitutional system to take over a state's police power whenever it is dissatisfied with how vigorously or quickly the state is enforcing its own laws. Quite the contrary, the Founders reserved that power, and others, to the states in the Tenth Amendment. See Patterson v. Kentucky, 97 U.S. 501, 504 (1878) ("Whether the policy thus pursued by the State is wise or unwise, it is not the province of the national authorities to determine. That belongs to each State, under its own sense of duty, and in view of the provisions of its own Constitution.").

Of course, federal authority extends to protecting legitimate federal interests, such as protecting federal personnel and facilities. Plaintiffs do not contest this. See Mot. at 2. As discussed above, the parties vigorously dispute whether the National Guard and the Marines were deployed to Los Angeles merely to protect federal personnel and facilities or to engage in more routine law enforcement, and the Court does not at this point reach any conclusion on this issue. But with respect to the Tenth Amendment claim, that is not the only consideration at play; there is also the fact that the federalization of 4,000 members of California's National Guard necessarily prevents Governor Newsom, as the commander-in-chief of his state's National Guard, from deploying them as needed. Had Defendants complied with the substantive and procedural requirements of § 12406, the federal interests reflected by that statute may well override Governor Newsom's interest in

30

1    retaining his National Guard members.  But they did not.  So whether or not the National

2    Guard is exercising <u>illegitimate</u> federal police power in Los Angeles, the unlawful

3    federalization of those members has interfered with the state's <u>legitimate</u> police power, and

4    thus it violates the Tenth Amendment.

5        For the above reasons, the Court concludes that Plaintiffs are likely to succeed on

6    their Tenth Amendment claim.

7        **B.    Likelihood of Irreparable Harm**

8        A party seeking preliminary injunctive relief must "demonstrate that irreparable

9    injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22 (emphasis in

10   original); <u>see also</u> <u>Michigan v. U.S. Army Corps of Eng'rs</u>, 667 F.3d 765, 788 (7th Cir.

11   2011) (harm need not be certain to occur for injunctive relief to issue).  The party must

12   show a "sufficient causal connection" between the defendant's conduct and their

13   anticipated injury.  "Irreparable harm is traditionally defined as harm for which there is no

14   adequate legal remedy, such as an award of damages." <u>Ariz. Dream Act Coal. v. Brewer</u>,

15   757 F.3d 1053, 1068 (9th Cir. 2014).

16       Plaintiffs identify two types of harm that they claim to be likely to suffer in the

17   absence of a temporary restraining order.  <u>First</u>, they assert that there is a "very high risk of

18   substantial civil unrest as a direct result of Defendants' inflammatory and confrontational

19   deployment of the military in a large, civilian population center."  Mot. at 16.  <u>Second</u>,

20   they contend that "Defendants' unlawful federalization of 4,000 California National Guard

21   members … diverts necessary state resources" from addressing serious problems facing

22   California, such as wildfires and drug trafficking.  <u>Id.</u> at 17–18.  Defendants respond that

23   these harms are "speculative" and "unsubstantiated."  Opp. at 26.

24       As for Plaintiffs' first asserted harm, they have established that the continued

25   presence of National Guard members and Marines in Los Angeles risks worsening, not

26   improving, tensions on the ground.  "The presence of the National Guard seemed only to

27   inflame the protesters further."  Olmstead Decl. ¶ 12.  Indeed, local law enforcement

28   arrests jumped after the National Guard was deployed.  Olmstead Supp. Decl. ¶ 14 (29

arrests on June 7, 41 arrests on June 8, 135 arrests on June 9, and 297 arrests on June 10). Defendants reiterate that civil unrest began before President Trump nationalized the National Guard, Opp. at 26, but that does not address Plaintiffs' point that military presence in a civilian population center will worsen—and has worsened—the situation. And contrary to Defendants' assertion, Plaintiffs have provided evidence backing up their concern, so it is not merely "hypothetical or possible." Id. (citing Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975)).

In fact, it is common sense that President Trump and Secretary Hegseth's unilateral exercise of federal power risks doing more harm than good. That is the very point that Justice Jackson made in his renowned concurrence in Youngstown Sheet & Tube Co. v. Sawyer:

> The appeal, however, that we declare the existence of inherent powers [out of necessity] to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted. They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies.

343 U.S. 579, 649–50 (1952) (Jackson, J., concurring) (emphasis added). Indeed, as Justice Jackson explained using examples from Weimar Germany, the French Republic, and World War II–era Great Britain, "emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them." Id. at 651–62. The issue presented in Youngstown (whether the President had implied constitutional authority to seize steel production plants during wartime) is admittedly different than that presented here (whether the President can federalize the National Guard over the objection of a state governor and without evidence of a rebellion). But Justice Jackson's lesson remains poignant: federal overreach risks instigating the very behavior that the federal government fears. To put a finer point on it, the federal government cannot be permitted to exceed its bounds and in doing so create the very emergency conditions that it then relies on to justify federal intervention.

32

Turning now to Plaintiffs' second asserted harm, Plaintiffs explain that California's National Guard provides important state services, including by fighting wildfires, see Eck Decl. ¶¶ 35–36, 39–40, and drug trafficking enforcement, id. ¶¶ 42–43. Plaintiffs have also shown that National Guard members are often relied upon to their fullest capacity and, indeed, are likely to be so relied upon in 2025. Id. ¶¶ 32–33. Defendants respond that "Plaintiffs do not identify any type of exigency that they would direct these resources [to] that approaches the seriousness of the situation in Los Angeles." Opp. at 27. But this overstates the violence in Los Angeles, which even by Defendants' own account is limited to isolated actors and is primarily damage to property, and vastly understates the risks to property and human life caused by wildfires and trafficked drugs like fentanyl.[11] Perhaps Defendants simply mean that there is not an immediate (as in today) need for California's National Guard to be deployed, but even that is untrue. As Plaintiffs point out, as of June 11 there were 13 fires over 10 acres, including one that has consumed over 4,200 acres, burning in California. Eck Suppl. Decl. (dkt. 39-2) ¶ 10. And in any case, Defendants' myopic focus on whether there is currently an exigency misunderstands the nature of emergencies, which are inherently unplanned for.

The Court finds that Plaintiffs have established that they are likely to suffer at least these two forms of harm in the absence of immediate injunctive relief.

**C.     Balance of Equities and Public Interest**

A party seeking injunctive relief must also demonstrate that the balance of equities tips in its favor, and that an injunction is in the public interest. See Winter, 555 U.S. at 20. "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Because the government is a

---

[11] Indeed, President Trump has officially recognized that fentanyl trafficking is a "national emergency" and a "public health crisis," Fact Sheet: President Donald J. Trump Proceeds with Tariffs on Imports from Canada and Mexico, White House (Mar. 3, 2025), and called the January 2025 Los Angeles wildfires a "tragedy [that] affects the entire Nation," Emergency Measures to Provide Water Resources in California and Improve Disaster Response in Certain Areas, White House (Jan. 24, 2025).

party, the last two <u>Winter</u> factors merge. <u>E. Bay Sanctuary Covenant</u>, 993 F.3d at 668.

The Court begins by observing that significant harm has already occurred. President Trump's June 7 Memo marks the first time that a President has invoked § 12406, lawfully or not, against the wishes of a state governor. Regardless of the outcome of this case or any other, that alone threatens serious injury to the constitutional balance of power between the federal and state governments, and it sets a dangerous precedent for future domestic military activity.[12] There is a reason that § 12406 and other similar statutes, such as the Insurrection Act, apply only in the narrowest and most extreme of circumstances— they jeopardize the delicate federalism that forms the basis of our very system of government. <u>See Youngstown</u>, 343 U.S. at 638 (Jackson, J., concurring) ("Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."). The continued deployment of federal troops in Los Angeles[13] for 60 days would further entrench this harm.

Moreover, Plaintiffs have shown a likelihood of prevailing in their argument President Trump's invocation of § 12406 was in fact <u>not lawful</u>, both exceeding the scope of his authority and violating the Tenth Amendment. When Plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor [injunctive relief]." <u>See Arizona Dream Act Coalition</u>, 757 F.3d at 1069. Defendants are not harmed by "an injunction that merely ends an unlawful practice or reads a statute as required to

_____

[12] Defendants argue that the separation of powers cuts against judicial intervention, <u>see</u> Opp. at 2, but they focus exclusively on the separation between the Executive and the Judiciary, missing entirely the important balance between federal and state power.
[13] And potentially nationwide, as the June 7 Memo invoking 10 U.S.C. § 12406 <u>does not name Los Angeles</u> or California or any other geographical area and purports to apply to "the Governors of the States," not just California. Indeed, amici from Washington, Delaware, Arizona, Colorado, Connecticut, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Vermont, Wisconsin, Rhode Island, and the Office of the Governor of Kansas contend that they "are implicated by the unlimited scope of" the June 7 Memo. <u>See</u> States Amici (dkt. 30-1) at 2. Whether the memo adequately satisfies any of the conditions of § 12406 as to jurisdictions beyond Los Angeles is not before this Court.

avoid constitutional concerns." <u>See</u> <u>R.I.L.-R v. Johnson</u>, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). They may continue to enforce the immigration law, even without the assistance of the National Guard.

Defendants no doubt have an "interest in protecting federal agents and property." <u>See</u> <u>Index Newspapers LLC v. U.S. Marshals Serv.</u>, 977 F.3d 817, 831 (9th Cir. 2020). But they have no legitimate interest in doing so beyond the bounds of their authority. <u>See</u> <u>R.I.L-R</u>, 80 F. Supp. 3d at 191. Federal agents and property may actually well be served by de-militarization and a concurring de-escalation of the situation. Regardless, Plaintiffs and the citizens of Los Angeles face a greater harm from the continued unlawful militarization of their city, which not only inflames tensions with protesters, threatening increased hostilities and loss of life, but deprives the state for two months of its own use of thousands of National Guard members to fight fires, combat the fentanyl trade, and perform other critical functions. As discussed above, Defendants' actions also threaten to chill legitimate First Amendment expression.

Accordingly, the Court concludes that Plaintiffs have demonstrated that the balance of equities tips in their favor and that an injunction restraining the President's use of military force in Los Angeles is in the public interest.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a temporary restraining order.

- Defendants are temporarily ENJOINED from deploying members of the California National Guard in Los Angeles.
- Defendants are DIRECTED to return control of the California National Guard to Governor Newsom.
- The Court further STAYS this order until noon on June 13, 2025.
- Plaintiffs are ORDERED to post a nominal bond of $100 within 24 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court. If said bond is not posted by the aforementioned date and time, this

Order shall be dissolved.

- Defendants are further ORDERED TO SHOW CAUSE why a preliminary injunction should not issue. A hearing on this order to show cause will be held on **June 20, 2025 at 10 a.m.** Plaintiffs' moving papers shall be filed no later than **June 16, 2025**; Defendants' opposition shall be due no later than **June 18, 2025**, and Plaintiffs' reply shall be due on **June 19, 2025**.

**IT IS SO ORDERED.**

Dated: June 12, 2025

CHARLES R. BREYER
United States District Judge