**ROB BONTA**
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANYA BINSACCA
JOHN D. ECHEVERRIA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
STEVEN KERNS
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
Deputy Attorneys General
  455 Golden Gate Avenue
  San Francisco, CA 94102
  Telephone: (415) 510-3877
  E-mail: Meghan.Strong@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO. 3:25-cv-04870-CRB**<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     June 20, 2025<br>Time:     10:00 a.m.<br>Courtroom: 6<br>Judge:    Charles R. Breyer<br>Trial Date: Not set<br>Action Filed: June 9, 2025 |

1

# MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that, on June 20, 2025, at 10:00 a.m., Plaintiffs GAVIN NEWSOM, in his official capacity as Governor of the State of California, and the STATE OF CALIFORNIA (together, Plaintiffs) hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants DONALD TRUMP, in his official capacity as President of the United States, PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction enjoining Defendants from effectuating President Trump's June 7 memorandum and Secretary Hegseth's June 7 and June 9 orders federalizing and deploying members of California's National Guard; ordering Defendants to return control of the federalized units of the California National Guard to Governor Newsom; and enjoining Defendants Hegseth and the Department of Defense (collectively, DOD Defendants) from ordering or permitting U.S. military forces deployed in Los Angeles or elsewhere in California to execute or assist in the execution of any federal agent or officer's enforcement of federal law or any civilian law enforcement functions, including but not limited to execution of warrants, arrests, searches, checkpoints, cordons, or patrolling communities, beyond the immediate vicinity of federal buildings or other real property owned or leased by the federal government.  This motion is based on this Motion, the Complaint for Declaratory and Injunctive Relief (ECF No. 1), the accompanying Memorandum of Points and Authorities, the accompanying Proposed Order, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

Dated:  June 16, 2025

Respectfully submitted,

**ROB BONTA**
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANYA BINSACCA
JOHN D. ECHEVERRIA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
STEVEN KERNS
JANE REILLEY
MEGAN RICHARDS

*/s/ Meghan H. Strong*

MEGHAN H. STRONG
Deputy Attorney General
 455 Golden Gate Avenue
 San Francisco, CA 94102
 Telephone: (415) 510-3877
 E-mail:  Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Statement Of Facts .............................................................................................. 2

    I.     ICE Begins Federal Immigration Enforcement Actions in Los Angeles. ............... 2

    II.    Local Authorities Respond and Manage Conditions. ............................. 3

    III.   The President, Without the Governor's Consent, Federalizes 4,000 California National Guard Soldiers and Mobilizes Additional U.S. Marines. ....................................................................................................... 4

    IV.   The Military's Presence in Los Angeles—and Alongside ICE During Enforcement Activities—Escalates Tensions. ...................................... 6

    V.    The California National Guard Is Vital to Critical State Functions. ....................... 8

Procedural History ............................................................................................. 9

Legal Standard .................................................................................................. 10

Argument .......................................................................................................... 10

    I.     Plaintiffs Are Likely to Succeed on the Merits ................................... 10

          A.    The Section 12406 Federalization Orders Are Unlawful ......................... 10

             1. The Predicate Conditions Required to Invoke Section 12406 Did Not and Do Not Exist……………………………………………..12

             2. The Federalization Orders Were Not Issued Through the Governor….15

             3. The Claim That Defendants Exceeded the Authority Granted by Congress in Section 12406 is Subject to Judicial Review………………………………………………...17

          B.    Defendants Are Violating the Posse Comitatus Act ................................ 19

          C.    Defendants Are Violating the Tenth Amendment ................................... 24

    II.    Plaintiffs Will Suffer Grave, Irreparable Harm Absent an Injunction ................. 26

    III.   The Balance of Harms and Equities Favors Injunctive Relief ............................ 28

Conclusion ........................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
    901 F.3d 1166 (9th Cir. 2018) ................................................................................. 10

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) ................................................................................. 29

*Baker v. Carr*
    369 U.S. 186 (1962) ........................................................................................ 17, 18

*Bissonette v. Haig*
    776 F.2d 1384 (8th Cir. 1985) ................................................................................. 20

*Bondi v. VanDerStok*
    604 U.S. ___ (2025) .............................................................................................. 21

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) .................................................................. 26

*Deakins v. Monaghan*
    484 U.S. 193 (1988) .............................................................................................. 17

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) ................................................................................. 10

*Hibbs v. Winn*
    542 U.S. 88 (2004) ................................................................................................ 16

*In re Saldana*
    122 F.4th 333 (9th Cir. 2024) ................................................................................. 16

*J.A.V. v. Trump*
    ___ F. Supp. 3d ____ (S.D. Tex. May 1, 2025) .................................................... 18

*J.G.G. v. Trump*
    2025 WL 914682 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) ............. 18

*M.R. v. Dreyfus*
    697 F3d 706 (9th Cir. 2012) ................................................................................... 26

*Marbury v. Madison*
    5 U.S. (1 Cranch) 137 (1803) .......................................................................... 17, 19

*Michigan v. U.S. Army Corps of Eng'rs*
    667 F3d 765 (7th Cir. 2011) ................................................................................... 26

*Murphy Co. v. Biden*
    65 F.4th 1122 (9th Cir. 2023) ................................................................................. 20

*Newsom v. Trump*
No. 25-3727 (9th Cir. June 16, 2025), Dkt. 23.1 .................................................. 22

*Patterson v. Kentucky*
97 U.S. 501 (1878) ................................................................................................. 24

*Printz v. United States*
521 U.S. 898 (1997) .......................................................................................... 16, 24

*R.I.L-R v. Johnson*
80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................... 28

*Sierra Club v. Trump*
929 F.3d 670 (9th Cir. 2019) .................................................................................. 17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*
393 U.S. 503 (1969) ............................................................................................... 13

*Trump v. J.G.G.*
145 S. Ct. 1003 (2025) ........................................................................................... 18

*United States v. Benish*
5 F.3d 20 (3rd Cir. 1993) ........................................................................................ 20

*United States v. Chon*
210 F.3d 990 (9th Cir. 2000) .................................................................................. 20

*United States v. Dreyer*
804 F.3d 1266 (9th Cir. 2015) (en banc) ...................................................... 19, 20, 21

*United States v. Hutchings*
127 F.3d 1255 (10th Cir. 1997) .............................................................................. 20

*United States v. Khan*
35 F.3d 426 (9th Cir. 1994) .................................................................................... 23

*United States v. McArthur*
419 F.Supp. 186 (D.N.D. 1975) ....................................................................... 20, 24

*United States v. Morrison*
529 U.S. 598 (2000) ............................................................................................... 24

*United States v. Yunis*
924 F.2d 1086 (D.C. Cir. 1991) .................................................................. 21, 23, 24

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ...................................................................................... 10, 26, 28

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952) ............................................................................................... 11

*Zivotofsky ex rel. Zivotofsky v. Clinton*
  566 U.S. 189 (2012) ............................................................................................... 17, 18

STATUTES

10 U.S.C.
  § 374(b)(2) ............................................................................................................ 23
  § 10106 .................................................................................................................. 20
  § 12406 ............................................................................................................ *passim*
  § 12406(2) ............................................................................................................. 12
  § 12406(3) ............................................................................................................. 13

18 U.S.C. § 1385 ........................................................................................................... 19

Alien Enemies Act ......................................................................................................... 18

Cal. Mil. & Vet. Code § 163 ......................................................................................... 16

Immigration and Nationality Act § 287(g) ................................................................. 7, 8

Militia Act of 1903 ........................................................................................................ 12

Militia Act of 1908, Chapter 204, 35 Stat. 399 (1908) ................................................ 16

Posse Comitatus Act ............................................................................................... *passim*

Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904 ................. 20

CONSTITUTIONAL PROVISIONS

Cal. Const. Article V, § 7 ................................................................................................ 8

U.S. Const.

  Article I, § 8, cls. 15-16 ....................................................................................... 11
  Article I, § 9, cl. 2 ................................................................................................ 13
  First Amendment ............................................................................................. 13, 30
  Fourth Amendment ............................................................................................... 20
  Fifth Amendment .................................................................................................. 20
  Tenth Amendment .......................................................................................... *passim*

OTHER AUTHORITIES

32 C.F.R. § 213.10(a)(3) (1982) ..................................................................................... 8

Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018) ............. 21

The Examination of Doctor Benjamin Franklin, Before an August Assembly,
  Relating to the Repeal of the Stamp Act, &c. (Feb. 13, 1766) .............................. 27

Exec. Order No. 11519 (1970 WL 123093)........................................................................ 15

*Great Postal Strike*, 133 The Postal Record 14, 19 (2020)........................................................ 15

*LAPD Chief Responds to Protests Amid ICE Raids*," ABC 7 Eyewitness News
    (June 8, 2025)........................................................................................................ 3

*Rebellion*, Am. Dictionary of the English Language (1900) ................................................ 12

*Rebellion*, Black's Law Dictionary (1st ed. 1891)........................................................ 12

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ................................................ 12

*Rebellion*, The Cyclopedic Dictionary of Law (1901).................................................. 12

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The actions of the President and the Secretary of Defense amount to an unprecedented and dangerous assertion of executive power that is sweeping in scope and upends centuries of settled practice and American tradition.  The President asserts that 10 U.S.C. § 12406 authorizes him to federalize State National Guard units and deploy armed soldiers into the streets of American cities and towns whenever he perceives "opposition" or "disobedience of a legal command" even in response to local protests and civil disobedience no different from what communities nationwide regularly experience.  He then asserts that *no court* can review that decision, assigning himself virtually unchecked power.  As the Court correctly held in granting Plaintiffs' request for a TRO, the President is wrong on both accounts.  Section 12406 grants the President the power to call forth the militia only in specific, narrow circumstances, and Congress directed that the President "shall" issue such orders only "through the governor[]" when he does so.

Section 12406's provisions are not suggestions that the President can ignore.  They are Congressional directives that, if not followed, render the President's actions *ultra vires*.  Because the President did not comply with Section 12406 in federalizing units of the California National Guard, Defendants' actions and orders are unlawful, and the Court should extend the relief it granted in a TRO to a preliminary injunction that orders Defendants to return control of these 4,000 soldiers to the Governor of California.

But the President and Secretary of State did not stop there, and neither should the Court.  The troops Defendants deployed to Los Angeles are currently engaged in civilian law enforcement activities that the Posse Comitatus Act categorically forbids.  Defendants cannot cast their activities under a broad umbrella of "protecting federal personnel" to justify a military occupation of the Nation's second-largest city.  The tradition of civilian, rather than military, law enforcement is a core Founding principle, and Defendants' defiance of that tradition violates the Posse Comitatus Act and the Tenth Amendment.  The Court should enjoin Defendants from ordering any federal troops to patrol the streets, to assist U.S. Immigration and Customs Enforcement ("ICE") in the field, or to engage in other law enforcement activities in Los Angeles.

1

**STATEMENT OF FACTS**

**I.    ICE BEGINS FEDERAL IMMIGRATION ENFORCEMENT ACTIONS IN LOS ANGELES.**

On Friday, June 6, 2025, ICE agents carried out enforcement actions at multiple locations within Los Angeles County and the City of Los Angeles.  ECF No. 8-2, Declaration of Brian Olmstead ("Olmstead Decl.") ¶ 6.  In addition to executing search warrants, ICE reportedly also carried out enforcement activities that departed from its usual practice of pursuing noncitizens with criminal convictions and those with final removal orders, and instead extended to places where members of immigrant communities work and conduct daily business, including a doughnut shop in Los Angeles and several Home Depot parking lots in the Westlake District, Huntington Park, and Whittier.  ECF No. 8-1, Declaration of Nicholas Espíritu in Support of Ex Parte Motion for Temporary Restraining Order ("Espíritu Decl."), Ex. F.

During these operations, ICE agents reportedly took actions that inflamed tensions and provoked protest.  In some instances, ICE agents reportedly engaged in "military-style" detention and arrest operations that sparked panic in the community.  ECF No. 8-1, Espíritu Decl., Ex. F at 1 (Los Angeles Mayor Karen Bass stating "the [ICE] activity was meant to 'sow terror' in the nation's second-largest city"); *id.*, Ex. G (legal observers and advocacy groups reported that "federal agents involved in the operations were heavily armed and dressed in tactical gear").  In all, the Department of Homeland Security reported that its enforcement activities on Friday, June 6, resulted in the arrest of approximately 44 individuals and the detention of 70 to 80 individuals.  *Id.*, Ex. H (noting 44 individuals were arrested) and Ex. G (noting that "between 70 and 80 people had been detained").

That same day, members of the public gathered at the Edward R. Roybal Federal Building and U.S. Courthouse in Los Angeles—where individuals detained during the ICE operations reportedly were being held—to protest the escalation in force and scope of immigration enforcement activities.  ECF No. 8-1, Espíritu Decl., Ex. I.  Protesters also gathered at other locations where ICE operations were reportedly happening, including in the cities of Paramount and Compton.  ECF No. 8-2, Olmstead Decl. ¶ 7.

The Los Angeles protests continued over the weekend of June 7 and 8, 2025.  *Id.* ¶¶ 6-14.

2

1   A small number of individuals engaged in violence, and state and local law enforcement agencies

2   effectively contained those instances of unlawful behavior.  *See id.* ¶¶ 9-10.  Governor Newsom

3   and other state and local officials unequivocally condemned all violence and criminal activity.

4   *See, e.g.*, ECF No. 8-1, Espíritu Decl., Ex. Q (statement from Governor Newsom on June 7, 2025:

5   "Never use violence.  Speak out peacefully"); *id.*, Ex. N at 6 (statement from LAPD Chief Jim

6   McDonnell on June 9, 2025: "There is no tolerance for criminal activity under the guise of

7   protest"); *id.*, Ex. L (Mayor Karen Bass (@MayorofLA) posted on X, on June, 7, 2025 at 6:06

8   pm: "Everyone has the right to peacefully protest, but let me be clear: violence and destruction

9   are unacceptable, and those responsible will be held accountable").

10  **II.   LOCAL AUTHORITIES RESPOND AND MANAGE CONDITIONS.**

11       State and local law enforcement agencies have responded promptly and effectively to

12  instances of unlawful activity that have occurred since the Los Angeles protests began.  Initially,

13  the Los Angeles Police Department (LAPD) and Los Angeles County Sheriff's Department

14  (LASD) quickly responded to the protests, consistent with their extensive training and experience

15  responding to both large-scale peaceful protests and civil disturbances.  ECF No. 8-2, Olmstead

16  Decl. ¶¶ 6-9, 11-12, 14; *see also* "*LAPD Chief Responds to Protests Amid ICE Raids*," ABC 7

17  Eyewitness News (June 8, 2025), *available at* https://tinyurl.com/3spkejdt (LAPD responded to

18  protests within 38 minutes).  Law enforcement officers from neighboring jurisdictions then

19  reinforced LAPD and LASD's response to the protests, as is standard practice under the

20  established mutual aid system.  ECF No. 39-3, Supplemental Declaration of Brian Olmstead

21  ("Supp. Olmstead Decl.") ¶¶ 5-8.  The California Highway Patrol also sent Special Response

22  Teams to Los Angeles, assigning approximately 800 uniformed personnel to the protests each

23  day.  *Id.;* Declaration of Joseph Zizi ("Zizi Decl.) ¶ 7.  As of June 15, local and state law

24  enforcement agencies made at least 561 arrests related to the Los Angeles protests. Declaration of

25  Meghan H. Strong ("Strong Decl."), Ex. 34.

26       Moreover, the Los Angeles protests have not, at any time since they began, prevented ICE

27  from conducting enforcement actions.  ECF No. 39, Declaration of Nicholas Espíritu in Support

28  of Reply in Support of Ex Parte Motion for Temporary Restraining Order ("Espíritu Reply

1  Decl."), Ex. 1 (ICE's social media posts announcing arrests in Los Angeles on June 7). The

2  White House confirmed as much on June 11, when it announced that ICE had arrested 330

3  individuals in Los Angeles in the course of its immigration enforcement actions since the protests

4  began. Strong Decl., Exs. 14-22 (detailing continuing ICE arrests from June 7-12). This is a 38%

5  increase from the 239 arrests ICE made in Los Angeles in early May 2025. *Id.*, Ex. 3. Secretary

6  of Homeland Security Kristi Noem personally attended an ICE raid on June 12. *Id.*, Ex. 26. The

7  U.S. Marshals and other federal agents began aiding ICE operations as part of a "whole of

8  government approach." *Id.*, Exs. 24-25.

9  **III.    THE PRESIDENT, WITHOUT THE GOVERNOR'S CONSENT, FEDERALIZES 4,000
       CALIFORNIA NATIONAL GUARD SOLDIERS AND MOBILIZES ADDITIONAL U.S.**
10     **MARINES.**

11         On the evening of Saturday, June 7, the President issued a memorandum ("Presidential

12  Memorandum"), which, without naming any particular locale, declared that "[n]umerous

13  incidents of violence and disorder" had "recently occurred and threaten to continue in response"

14  to enforcement of federal immigration laws. ECF No. 8-1, Espíritu Decl., Ex. E. The

15  Presidential Memorandum was addressed to the Secretary of Defense, the Attorney General, and

16  the Secretary of Homeland Security. *Id.* Asserting "credible threats of continued violence," the

17  Presidential Memorandum purported to "call into Federal service members and units of the

18  National Guard under 10 U.S.C. 12406" to "temporarily protect" federal government personnel

19  and federal property. *Id.* The Presidential Memorandum then directed the Secretary of Defense

20  "to coordinate with the Governors of the States and the National Guard Bureau in identifying and

21  ordering into Federal service the appropriate members and units of the National Guard under this

22  authority" which "shall," regardless, "be at least 2,000 National Guard personnel and the duration

23  of duty shall be for 60 days or at the discretion of the Secretary of Defense." *Id.* It further

24  instructed the Secretary of Defense to take measures "reasonably necessary to ensure the

25  protection and safety of Federal personnel and property" where protests were occurring or

26  "likely" to occur. *Id.*

27         At no time prior to issuing the Presidential Memorandum did the President or Department

28  of Defense ("DOD") notify or consult with Governor Newsom regarding their intent to utilize or

1   "mobilize" California's National Guard.  ECF No. 8-1, Espíritu Decl., Ex. K at 2 (June 8, 2025

2   letter from the Governor's office to the U.S. Secretary of Defense, informing the Secretary that

3   "the Department of Defense did not transmit this directive to the Office of the Governor, nor was

4   it approved or ordered by the Governor of California").  The Governor himself has publicly

5   confirmed as much.  Strong Decl., Ex. 8.

6         Later in the evening of June 7, Secretary Hegseth sent an order ("June 7 DOD Order")

7   addressed to the Adjutant General of California, who serves in dual roles as the leader of the

8   California National Guard and as a reservist in the U.S. Army.  ECF No. 8-1, Espíritu Decl., Ex.

9   O.  The June 7 DOD Order attached the Trump Memo and called into federal service 2,000

10  members of the California National Guard for a period of 60 days and ordered the Chief of the

11  National Guard Bureau to coordinate the details of the mobilization with the Adjutant General of

12  the California National Guard.  *Id.*  The Governor never consented to the mobilization of the

13  National Guard, nor was the Governor given an opportunity to provide input on the mobilization;

14  the Governor only learned of the June 7 DOD Order from the Adjutant General after it was

15  received from DOD.  *See* ECF No. 8-1, Espíritu Decl., Ex. K at 1-2 (June 8, 2025 letter from the

16  Governor's office to the U.S. Secretary of Defense noting that the Adjutant General of California,

17  but not the Governor of California, received the June 7 DOD Order).  The Adjutant General

18  relinquished command of the 79th Infantry Brigade Combat Team to General Michael Guillot,

19  commander of U.S. Northern Command, which has issued all orders to that federalized unit since

20  that time.  *See* ECF No. 8-1, Espíritu Decl. Ex. J (June 8, 2025 Press Release from

21  USNORTHCOM noting its command over federalized California National Guard units deployed

22  in the greater Los Angeles area).  The President then stated over media channels that DOD and

23  other federal agencies must take all action necessary to  "liberate Los Angeles from the Migrant

24  Invasion" and that "[w]e're going to have troops everywhere."  ECF No. 8-1, Espíritu Decl., Ex.

25  M.

26        On June 9, 2025, at 3:24 p.m., Secretary Hegseth posted on X that "approximately 700

27  active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore

28  order" and "to defend federal law enforcement officers."  ECF No. 8-3, Declaration of Paul S.

5

Eck ("Eck Decl.") ¶ 18.  The same day, Secretary Hegseth issued a second memorandum ("June 9 DOD Order," and collectively with the June 7 DOD Order, the "DOD Orders") ordering the federalization of 2,000 additional California National Guard members, again without providing any opportunity for Governor Newsom to review or consent to that mobilization.  ECF No. 8-1, Espíritu Decl., Ex. S at 1 (June 10, 2025 letter from the Governor's office to the U.S. Secretary of Defense noting that "the Governor of California was given no opportunity to provide or withhold his consent, nor, at a minimum, to consult with the President or [the Secretary of Defense] as to which service members and in what number should be called, and for what purposes and what period of time").

## IV.    THE MILITARY'S PRESENCE IN LOS ANGELES—AND ALONGSIDE ICE DURING ENFORCEMENT ACTIVITIES—ESCALATES TENSIONS.

When the first California National Guard soldiers and armored vehicles arrived in Los Angeles on the morning of Sunday, June 8, the city was quiet.  *See* ECF No. 8-1, Espíritu Decl., Ex. R.  But the arrival of the National Guard in Los Angeles reignited the protests.  "Many of the protestors appeared angry that the National Guard had been federalized and was now present in their city," and "[t]he presence of the National Guard seemed to only inflame the protesters further."  ECF No. 8-2, Olmstead Decl. ¶ 12; ECF No. 8-1, Espíritu Decl., Ex. M (New York Times reporting that the "aggressive federal response . . . in turn sparked new protests across the city").  However, the protests remained largely peaceful and civilian law enforcement ably responded to the disturbances and violence that did occur.  *See* ECF No. 8-1, Espíritu Decl., Ex. R.  Accordingly, on June 8, Governor Newsom's office sent a letter to Secretary Hegseth objecting to the federalization and deployment of California National Guard soldiers to Los Angeles and requesting that DOD rescind the June 7 DOD Order.  ECF No. 8-1, Espíritu Decl., Ex. K.

Instead, on Monday, June 9, Secretary Hegseth announced that mobilized federalized California National Guard units would provide for immigration enforcement operations beyond federal buildings, including by "holding a secure perimeter in communities around areas where immigration enforcement activities would take place, and securing routes over public streets

6

1   where immigration enforcement officers would travel."  Eck Decl. ¶ 19.

2          Since Secretary Hegseth's announcement, military forces have joined ICE agents in the

3   field as they carry out enforcement actions.  The federal government has issued public statements

4   confirming that "[t]roops on the ground in Los Angeles are providing perimeter and personnel

5   protection for [ICE] facilities and officers who are out on daily enforcement operations."  Strong

6   Decl., Ex. 10.  ICE has posted photographs on social media that show heavily armed federalized

7   troops accompanying ICE agents during arrests.  ECF No. 39, Espíritu Reply Decl., Exs. 2, 3.

8   United States National Guard Major General Scott Sherman announced that approximately 500

9   federalized National Guard soldiers have thus far been trained to help ICE agents carry out

10  immigration operations.  Strong Decl., Ex. 12.  And there has been at least one instance of armed

11  Marines detaining a civilian, although that detention was reportedly brief and on the grounds of a

12  federal building.  *Id*., Ex. 29.  Federal officials have expressed their approval of such actions and

13  indicated that even more expansive involvement by military forces is forthcoming.  *Id.*, Ex. 9

14  (Secretary of Homeland Security Noem's request that Defense Secretary Hegseth order the

15  military "to either detain . . . or arrest" "lawbreakers"); *id.*, Ex. 13 (Attorney General Bondi

16  statement that "[b]y bringing in the National Guard, by bringing in the Marines, right now, to

17  back them up, to protect our federal buildings, to protect highways, to protect the citizens."); *id.*

18  ("We're not scared to go further. We're not frightened to do something else if we need to.").  On

19  June 12, Secretary Noem confirmed that the operation, including the "military," will continue

20  until they have "liberate[d]" Los Angeles from the leadership of the democratically elected

21  Governor and Mayor.  Strong Decl., Ex. 28.  And just yesterday, the President expressed his

22  intention to have federal agencies, including the "Pentagon," "expand efforts to detain and deport

23  Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York," and

24  "other such Cities" that "are the core of the Democrat Power Center."  *Id*., Ex. 33.

25         Indeed, even before the Los Angeles protests began, the federal government expressed its

26  intention to actively involve the military in immigration enforcement activities.  For example, the

27  federal government has sought to enter into agreements with states under section 287(g) of the

28  Immigration and Nationality Act, under which the state National Guard soldiers, operating under

the command of their governors in Title 32 status, perform the duties of immigration officers (California has not entered into any such section 287(g) agreement).  Strong Decl. Ex. 38.  DHS also has a pending request with the Pentagon for 20,000 National Guard soldiers to assist in immigration enforcement. *Id*., Ex. 4.  The federal government's long-held plans to use the military for ICE enforcement activities are coming to fruition in Los Angeles.

The presence of the military has only exacerbated tensions in Los Angeles.  As noted above, the arrival of the National Guard in Los Angeles on June 8 caused a new wave of protests, after the initial June 6 and June 7 protests had largely subsided.  ECF No. 8-2, Olmstead Decl. ¶ 12; ECF No. 8-1, Espíritu Decl., Ex. M (New York Times reporting that the "aggressive federal response . . . in turn sparked new protests across the city").  And although the protests have largely been peaceful, there has been an increase in unlawful activity in Los Angeles since the National Guard was deployed.  Based on data available through June 12, nearly 95% of the arrests made by LAPD related to the protests that occurred *after* federalized National Guard members arrived in Los Angeles on the morning of June 8.  Strong Decl., Ex. 32 (Wall Street Journal report showing that 510 out of 539 arrests by LAPD occurred on or after June 8, with the greatest number occurring on June 10); ECF No. 39-3, Supp. Olmstead Decl. ¶ 14 ("After deployment of the National Guard on June 8 the number of arrests increased day-by-day."); Zizi Decl., ¶ 12.  Similarly, the California Highway Patrol's expenditures related to its response to the Los Angeles protests increased significantly after the National Guard's arrival.  Zizi Decl. ¶ 8.

**V.    THE CALIFORNIA NATIONAL GUARD IS VITAL TO CRITICAL STATE FUNCTIONS.**

The California National Guard is ordinarily under the command of the Governor, Cal. Const. art. V, § 7, and it is "vital" to carrying out state functions such as "emergency and natural disaster response, cybersecurity, and drug interdiction."  ECF No. 8-3, Eck Decl. ¶¶ 20, 31.  For example, National Guard soldiers play a crucial role in responding to wildfires; 2,500 National Guard members were activated in response to the devastating fires in Los Angeles County in January 2025, and guardsmen serve on Taskforce Rattlesnake, California's specialized fire combat unit.  ECF No. 8-3, Eck Decl. ¶¶ 14, 35-40.  Members of the National Guard also serve on the State's Counterdrug Taskforce, which specializes in stopping fentanyl trafficking at the

southern border.  ECF No. 8-3, Eck Decl. ¶¶ 15, 42-43.  Each member of California's National Guard plays a "critical role," and "[p]ulling those members away from [their] assignments may imperil the State's ability to protect its residents."  *Id.* ¶ 30.

Thus, the federalization and deployment of California's National Guard has impaired—and continues to impair—the National Guard's ability to perform these vital functions for the State of California.  *Id.* ¶ 16.  Thousands of California National Guard members—constituting nearly one-third of the Guard's available strength—have been diverted to Los Angeles.  ECF No. 39-2, Supplemental Declaration of Paul S. Eck ("Supp. Eck Decl.") ¶ 4.  Over half of the members of Task Force Rattlesnake have been moved to Los Angeles, just as "[t]he likelihood of above-normal significant fire potential is projected to increase in Southern California from late spring into summer," Strong Decl., Ex. 30, and the State braces for a summer with "a higher probability of more large wildfires than usual."  *Id.*, Ex. 36.

## PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on June 9, 2025.  ECF No. 1.  Plaintiffs moved for a temporary restraining order the following day to prevent irreparable harm from the use of the federalized National Guard and Marines to enforce civil laws in the nation's second-largest city.  ECF No. 8.

After affording Defendants the opportunity to oppose Plaintiffs' motion and holding a hearing, the Court granted Plaintiffs' motion for a temporary restraining order on June 12, 2025.  ECF No. 64.  Specifically, the Court held that President Trump's actions in deploying California's National Guard "were illegal—both exceeding the scope of his statutory authority and violating the Tenth Amendment to the United States Constitution."  ECF No. 64 at 1.  The Court further held that "Plaintiffs have demonstrated that the balance of equities tips in their favor and that an injunction restraining the President's use of military force in Los Angeles is in the public interest."  *Id.* at 35.  Accordingly, the Court temporarily enjoined Defendants from deploying federalized members of the California National Guard in Los Angeles and ordered Defendants to return control of the California National Guard to the Governor of California.  *Id.* The Court further ordered Defendants to show cause why a preliminary injunction should not issue, setting a preliminary injunction briefing schedule and a hearing for June 20, 2025.  *Id.* at

9

36.

Defendants immediately appealed this Court's order to the Ninth Circuit and filed an emergency motion for a stay pending the appeal. The Ninth Circuit granted a temporary administrative stay and will hear oral argument on Defendants' motion for a stay pending appeal on June 17, 2025.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

## ARGUMENT

The Court rightly found at the TRO stage that Plaintiffs are likely to succeed on the merits of their claims, that Plaintiffs will suffer irreparable harm absent injunctive relief, and that the balance of harms and equities favors Plaintiffs. The same is true now at the preliminary injunction stage. Plaintiffs are likely to succeed on the merits of their claims, both as to Defendants' unlawful federalization of the State National Guard under 10 U.S.C. § 12406 and Defendants' violation of the Posse Comitatus Act and the Tenth Amendment. Plaintiffs are still suffering irreparable harm, and the balance of the harms and equities supports granting a preliminary injunction.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   The Section 12406 Federalization Orders Are Unlawful

The Constitution gives Congress, not the President, the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," as well as the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for

10

governing such Part of them as may be employed in the Service of the United States."  U.S.
Const. art. I, § 8, cls. 15-16 (the "Militia Clauses").  The President therefore may only call forth
the militia as permitted by Congress.

Congress exercised that power by authorizing the President to deploy the National Guard
domestically, but only in limited circumstances set forth in statute.  One of these statutes is 10
U.S.C. § 12406, which provides that:

> Whenever—
>
>> (1) the United States, or any of the Commonwealths or possessions, is
>> invaded or is in danger of invasion by a foreign nation;
>
>> (2) there is a rebellion or danger of a rebellion against the authority of the
>> Government of the United States; or
>
>> (3) the President is unable with the regular forces to execute the laws of the
>> United States;
>
> the President may call into Federal service members and units of the National
> Guard of any State in such numbers as he considers necessary to repel the
> invasion, suppress the rebellion, or execute those laws.  Orders for these purposes
> shall be issued through the governors of the States or, in the case of the District of
> Columbia, through the commanding general of the National Guard of the District
> of Columbia.

10 U.S.C. § 12406.  Congress thus imposed two requirements that must be satisfied for the
President to lawfully federalize units or members of a State's National Guard under Section
12406.  First, one or more of the three predicate conditions in subsections (1) through (3) must
exist.  Second, the federalization order must be "issued through the governor[]" of the State.  *Id.*
Neither requirement was satisfied here.  Because the President did not act in compliance with
Congress's statute when he federalized the guard on June 7, his actions were unlawful.  *See
generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,
concurring in the judgment) (the President's "power is at its lowest ebb" when he takes actions
incompatible with the express terms of a statute).

Section 12406's text sets forth mandatory conditions that must be satisfied and which the
Court must review when the Executive's reliance on the statute is challenged.

1.    **The Predicate Conditions Required to Invoke Section 12406 Did Not and Do Not Exist**

Section 12406 authorizes the President to federalize the National Guard in just three situations: (1) a foreign invasion; (2) a rebellion or danger of rebellion; or (3) when "the President is unable with the regular forces to execute the laws of the United States."  Defendants do not contend that the first condition, a foreign invasion, is present here.  Instead, Defendants rely exclusively on subparts (2) and (3) of Section 12406, but neither predicate is supported by the facts on the ground in Los Angeles.  There was and is no rebellion nor any danger of rebellion.  And the federal government was and is still able to execute the laws.  Indeed, ICE has continued to make arrests throughout the duration of the events at issue and at a higher rate than it did before the protests began.  Strong Decl., Exs. 14-22 (detailing operations that led ICE to arrest 330 immigrants).

*Rebellion or danger of rebellion*.  Defendants cannot show that the record establishes "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2).  The ordinary meaning of "rebellion" is "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence."  *Rebellion*, Black's Law Dictionary (12th ed. 2024).  Historical definitions, including those from the time period when Congress passed the Militia Act of 1903, accord with this definition.  *E.g.*, *Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject."); *Rebellion*, Am. Dictionary of the English Language (1900) ("An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed.").

Together, these definitions make clear that a "rebellion" must be violent, armed, organized, and open defiance of the government as a whole, not merely isolated incidents of

1    disruption.  That is why the term "rebellion" is often used alongside the related term "invasion,"

2    as in Section 12406 itself.  *See, e.g.*, U.S. Const. art. I, § 9, cl. 2 (specifying that the writ of habeas

3    corpus "shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety

4    may require it").  "Rebellion" is not a synonym for protest, civil disobedience, civil unrest, or

5    riots.  *See* ECF No. 25 at 18-19.  The events in Los Angeles come nowhere close to a "rebellion"

6    or a "danger of rebellion."  As the Court properly found at the TRO stage, "there can be no debate

7    that most protesters demonstrated peacefully."  ECF No. 64 at 19.  Plaintiffs acknowledge that

8    bad actors engaged in instances of violence and destruction, and the Governor, the State Attorney

9    General, and local elected officials have repeatedly and unequivocally condemned violence and

10   illegality.  But these incidents do not rise to the level of rebellion.  Indeed, they are not

11   categorically different from other periods of protest and civil unrest that have occurred in recent

12   years and were handled effectively by local law enforcement, without the need to involve federal

13   troops.  Strong Decl., Exs. 1, 2 (detailing local unrest following Dodger and Laker wins).

14       Defendants offer no authority to the contrary.  Instead, they insist that burned cars,

15   blocked roads, and a crowd's refusal to comply with local authorities' orders *must* be a rebellion,

16   but they do not explain how these acts—which are, in fact, the picture of *dis*organization, not

17   organized resistance—meet the definition of rebellion.  Nor do Defendants offer any evidence or

18   meaningful argument to explain how any of these acts establish a *danger* of rebellion.

19       Moreover, Defendants' suggestion that any measure of protest or expression of resistance

20   to the President's agenda or government action creates a rebellion (or the danger of one) raises

21   serious concerns under the First Amendment, as the Court rightly noted in its TRO Order, ECF

22   No. 64 at 20.  Protest and the right to speak out against the government is a core civil liberty,

23   protected by the First Amendment.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503,

24   508 (1969).  A finding here that incidents of violence alongside protests can constitute a rebellion

25   or a danger thereof would seriously inhibit or chill the lawful exercise of the right to free speech.

26       *Unable with the regular forces to execute the laws.*  Nor do the recent events in Los

27   Angeles render President Trump "unable with the regular forces to execute the laws of the United

28   States."  10 U.S.C. § 12406(3).  At oral argument on Plaintiffs' TRO, Defendants took the

13

1   position that "regular forces" in this context means "everything other than the State National

2   Guard."  TRO Hrg. Tr. 24:2-5.  There can be no meaningful dispute that the law can be executed

3   by and through the vast array of local, state, and federal law enforcement available to respond to

4   any violence in Los Angeles, without the need to federalize California's National Guard.  Nor

5   have Defendants shown that even just federal law enforcement agencies—those subject to the

6   President's direct command—are so insufficient as to render the President *unable* to execute the

7   laws.  Indeed, ICE has since relied on U.S. Marshals to aid them to continue successfully

8   enforcing the law.  Strong Decl., Exs. 26, 27.

9        To begin, the evidence shows that nothing happening in Los Angeles has prevented the

10  President from enforcing immigration laws on June 6 or since.  On Friday, June 6, when the

11  protests began, ICE officers carried out enforcement actions at multiple locations within Los

12  Angeles County and the City of Los Angeles.  ECF No. 8-1, Ex. G.  In all, the Department of

13  Homeland Security reported that its enforcement activities that day resulted in the arrest of

14  approximately 44 individuals and 70-80 people detained.  *Id.*  In the week since, ICE's activities

15  have continued.  Since June 6, ICE arrested 330 immigrants in Los Angeles.  Strong Decl., Ex.

16  14.  Far from being impeded by the protests in Los Angeles, this represents an *increase* in ICE's

17  arrest rate as compared with last month.  *Id.*, Ex. 3 (reporting just 239 arrests made in a week-

18  long operation in May 2025).  Moreover, ICE has engaged in successful law-enforcement efforts

19  without the presence of military personnel.  *Id.*, Ex. 35.  And on June 12, Secretary Noem deemed

20  conditions safe enough that she accompanied agents on a raid and arrest, without support from

21  federalized military personnel.  *Id.*, Ex. 26.

22        Defendants do not dispute that they are still able to enforce immigration laws.  Instead,

23  they maintain (1) that these successful arrests came with a "risk of danger" and (2) that they could

24  have increased their activities absent the unrest in Los Angeles.  ECF No. 25 at 15.  But whether

25  they can conduct their work absent risk of danger or can be more productive with the assistance

26  of federalized troops is hardly enough; neither of these arguments establishes that ICE, let alone

27  the President more broadly, was "unable" to execute the laws.  Nor does the Defendants' risk of

28  danger argument establish that even if additional law enforcement were required to protect ICE

14

from incidents of violence, such resources could not be found in available local, state, and federal law enforcement, without resorting to federalizing the National Guard.  Indeed, Defendants put nothing in the record confirming that they requested assistance from other federal law enforcement that was unable to assist on June 6 and Defendants' own declaration at the TRO stage confirmed that LAPD and LASD have been adequately responding to and handling incidents as they arise.  *E.g.*, ECF No. 25-1, Santacruz Decl. ¶¶ 11-13 (LAPD responded to incident at Roybal Courthouse and federal employees were able to "h[o]ld the line" until LAPD arrived); *id.* ¶¶ 18-22, 25-26, 32 (LASD and LAPD responded to incidents and declared them unlawful assemblies); *id.* ¶ 24 (when protesters confronted federal agents outside Los Angeles City Hall, LAPD issued a dispersal order and made arrests); *id.* ¶ 30 (mobilization of additional LAPD officers).  And since June 6, "thousands of officers from LAPD, LASD, CHP, and local law enforcement agencies from Los Angeles and neighboring counties have responded to the incidents," and made hundreds of arrests.  ECF No. 39-3,  Espíritu Reply Decl. ¶¶ 8, 14.

The only other time in our Nation's history that a President relied on the exclusive authority of Section 12406 to federalize the National Guard is a far better illustration of a time when a President was truly "unable with the regular forces to execute the laws."  When President Nixon called the National Guard into service to deliver the mail in 1970, it was in response to a postal strike involving over 210,000 postal workers at over 670 locations nationwide.[1]  In other words, hundreds of thousands of federal personnel who otherwise executed the relevant function were unavailable due to being on strike.  Here, those personnel remain available, on the job, and executing the laws.

### 2.    The Federalization Orders Were Not Issued Through the Governor

The President's invocation of Section 12406 is unlawful for the additional and independent reason that the federalization orders were not "issued through the governor[]" of California, as required by Congress.  10 U.S.C. § 12406.  As originally enacted, Section 12406

---

[1] *The Great Postal Strike*, 133 The Postal Record 14, 19 (2020), https://tinyurl.com/29a8dw38; *see also* Exec. Order No. 11519 (1970 WL 123093) (order issued by President Nixon invoking section 12406's predecessor).

1  did not contain those words.  Congress amended the statute to add them in 1908, *see* Militia Act

2  of 1908, ch. 204, 35 Stat. 399 (1908), and that "significant change in language" must be

3  "presumed to entail a change in meaning," *In re Saldana*, 122 F.4th 333, 341 (9th Cir. 2024)

4  (quoting Scalia & Garner, Reading Law 256-60 (2012)).  At an absolute minimum, the text

5  contemplates a procedure by which a governor is consulted about an order, receives it, and then

6  issues the order to the relevant guard units.  That did not happen here.  ECF No. 8-1, Espíritu

7  Decl., Exs. K, S.

8       Defendants contend that the federalization orders here satisfied the "issued through the

9  governor" requirement because the June 7 and 9 DOD Orders from Secretary Hegseth "bore the

10  label 'THROUGH: THE GOVERNOR OF CALIFORNIA.'"  ECF No. 25 at 16.  But it "strains

11  credibility" for Defendants to contend that merely stamping those words "at the top of a

12  document that the President never sends to the governor" satisfies the process demanded by

13  Congress.  ECF No. 64 at 25.

14       Indeed, that interpretation would contravene multiple canons of statutory construction.  It

15  would render the "issued through the governor" requirement "inoperative[,] superfluous, void

16  [and] insignificant."  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  And it would needlessly present

17  constitutional concerns:  to allow the President to federalize a State's National Guard in a public

18  document that was never received by the Governor but purports to be issued "through" the

19  Governor would "diminish the accountability of state [and] federal officials."  *Printz v. United*

20  *States*, 521 U.S. 898, 930 (1997).

21       Finally, Defendants contend that this requirement is satisfied because Secretary Hegseth's

22  June 7 DOD Order was issued to California's Adjutant General, who is authorized under state law

23  to issue orders in the name of the governor.  ECF No. 25 at 16; Cal. Mil. & Vet. Code § 163

24  (Adjutant General "shall issue all orders in the name of the Governor").  But whatever the

25  Adjutant General's authority is under state law, Congress allowed the President to give direct

26  orders to a commanding general *only* for the District of Columbia:  Orders "shall be issued

27  through the governors of the States or, *in the case of the District of Columbia*, through the

28  *commanding general* of the National Guard of the District of Columbia."  10 U.S.C. § 12406

(emphasis added).  Congress knew how to identify a National Guard general as the official whom orders must be "issued through."  When it came to sovereign States like California, however, Congress chose to require a role for the governor.  It did not leave room for the President to circumvent this requirement by issuing the orders through someone else.  TRO Hrg. Tr. 14:22-15:11 (noting that, unlike the adjutant general, the Governor is elected as a representative of the people).

Accordingly, the President's invocation of Section 12406 is unlawful for the additional reason that he failed to follow Congress's command that any orders be issued "through the governor[]."

### 3.    The Claim That Defendants Exceeded the Authority Granted by Congress in Section 12406 is Subject to Judicial Review

In opposing Plaintiffs' TRO, Defendants took the extraordinary position that the Court has no ability to review the President's invocation of Section 12406.  ECF No. 25 at 9.  The Court correctly rejected this position in granting Plaintiffs' TRO.  Federal courts have a "'virtually unflagging obligation' to exercise [the] jurisdiction" given them, *e.g.*, *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (citation omitted), and to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  And the ability to bring an *ultra vires* action to "enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action."  *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (citation omitted).

The political-question doctrine provides only "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012).  Political questions have "several formulations which vary slightly according to the settings in which the questions arise" and include, for example, "a textually demonstrable constitutional commitment of the issue to a coordinate political department."  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground

17

1    of a political question's presence."  *Id.*  The political-question doctrine "is one of 'political

2    questions,' not one of 'political cases.'"  *Id.*

3         The modern trend has been to treat cases as justiciable even where they implicate questions

4    of foreign affairs or national security.  *See, e.g.*, *Zivotofsky*, 566 U.S. at 201.  In recent months,

5    for example, courts have repeatedly rejected the President's request to treat questions under the

6    Alien Enemies Act—in particular, whether there has been an "invasion"—as non-justiciable.  *See,*

7    *e.g.*, *J.A.V. v. Trump*, ___ F. Supp. 3d ____, 2025 WL 1257450, at \*7-\*11 (S.D. Tex. May 1,

8    2025); *J.G.G. v. Trump*, 2025 WL 914682, at \*5-\*7 (D.C. Cir. Mar. 26, 2025) (Henderson, J.,

9    concurring); *cf. Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025).

10        Here, Plaintiffs' *ultra vires* claim based on Section 12406 does not raise an unreviewable

11   political question because there is no "textually demonstrable constitutional commitment" of this

12   issue to the President's discretion.  Defendants have suggested that invocation of Section 12406 is

13   committed entirely to the President's discretion because it authorizes the President to activate the

14   National Guard "in such numbers as he considers necessary."[2]  ECF No. 25 at 9.  But the phrase

15   "as he considers necessary" is a textual commitment of discretion only with respect to the

16   President's decision about the "numbers" of members of the Guard called into service.  10 U.S.C.

17   § 12406.  Congress pointedly did not include that language when describing the predicate

18   conditions that must be satisfied *before* federalization of the National Guard is authorized under

19   Section 12406.  That provision of the statute states only "Whenever"—clearly indicating that

20   Section 12406's authority may be invoked only when one of the three predicate requirements is

21   met as a matter of fact.  Nor is any discretionary language incorporated into the requirement that

22   orders be issued through the Governor.  Indeed, that provision of the statute uses the mandatory

23   "shall" to *command* the President to issue orders through the Governor.  Here, Plaintiffs are not

24   seeking review of the President's determination regarding the *number* of members of the National

25   Guard to call into service.  Rather, Plaintiffs challenge whether one of the three predicate

26   ───────────
     [2] At the TRO hearing, Defendants went a step further, arguing that, apparently with these
27   words alone, Congress granted the President authority so broad that even if there was no evidence
     to support a finding that Section 12406's predicate conditions were met—even if the President
28   made no such finding *at all*—the Court still could not review the challenge because it would be
     categorically barred from looking at the basis for those findings.  TRO Hrg. Tr. 25:23-28:4.

1  conditions was satisfied in the first place, and whether the resulting order was "issued through the

2  governor[]." There is no textual indication that those questions are committed to the President's

3  discretion and thus beyond judicial review.[3]

4       Section 12406 contains clear and explicit limitations on the President's authority. As it

5  did in granting Plaintiffs' TRO, the Court should reject Defendants' expansive view of executive

6  authority and exercise its "duty . . . to say what the law is" here. *Marbury*, 5 U.S. (1 Cranch) at

7  177.

8       **B.    Defendants Are Violating the Posse Comitatus Act**

9       Pursuant to the orders they are acting under, federalized National Guard servicemembers

10  and the Marines are engaging in civilian law enforcement in Los Angeles in violation of the Posse

11  Comitatus Act (PCA). This is contrary to our Nation's history and laws, which reflect "a

12  traditional and strong resistance of Americans to any military intrusion into civilian affairs."

13  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc) (quoting *Laird v. Tatum*,

14  408 U.S. 1, 15 (1972); *see also* ECF No. 31-1, Amicus Br. of Former U.S. Army & Navy

15  Secretaries & Retired Four-Star Admirals & Generals, at 4, 8-10. The PCA preserves that

16  tradition by barring the military from engaging in "direct active involvement in the execution of

17  the laws" or other conduct that "pervade[s] the activities of civilian authorities." *Dreyer*, 804

18  F.3d at 1275 (citation omitted). First enacted in 1878, the PCA now provides:

19          Whoever, except in cases and under circumstances expressly
20          authorized by the Constitution or Act of Congress, willfully uses
            any part of the Army, the Navy, the Marine Corps, the Air Force, or
21          the Space Force as a posse comitatus or otherwise to execute the
            laws shall be fined under this this title or imprisoned not more than
22          two years, or both.

23  18 U.S.C. § 1385.

24       Use of military forces for law enforcement threatens democratic norms: "The use of

25  military forces to seize civilians can expose civilian government to the threat of military rule and

26  the suspension of constitutional liberties," and "military enforcement of the civil law leaves the

27  _____
     [3] Nor do the cases Defendants cited in their opposition to the TRO suggest that the
28  interpretation of Section 12406 presents a political question. *See* ECF No. 38 at 9-10
     (distinguishing Defendants' cited cases).

protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) (holding that plaintiffs stated a cause of action for unreasonable seizure in violation of the Fourth Amendment where the military's confinement of plaintiffs within an armed perimeter violated the PCA). Military execution of laws may also "chill the exercise of fundamental rights, such as the rights to speak freely and to vote, and create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Id.* "It is the nature of their primary mission that military personnel must be trained to operate under circumstances where the protection of constitutional freedoms cannot receive the consideration needed in order to assure their preservation.  The posse comitatus statute is intended to meet that danger." *United States v. McArthur*, 419 F.Supp. 186, 194 (D.N.D. 1975).

As a general matter, the PCA applies both to National Guard troops federalized under Section 12406 and the Marine Corps.  In 2021, Congress revised the PCA to provide that the law's prohibitions apply to all of the United States armed forces, including the Marine Corps. Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904.  The PCA also applies to the National Guard when it is federalized under Title 10, because, once federalized, National Guard soldiers become a component of the regular armed forces.  *See e.g.* 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army.").  Accordingly, courts have uniformly found that the PCA applies to National Guard soldiers in Title 10 status.  *United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3rd Cir. 1993); see also *United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000) (recognizing the naval policies exempt National Guard members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273.

The National Guard was not lawfully deployed under Section 12406, but even if it were, Section 12406 does not expressly authorize members of the National Guard to engage in civilian law enforcement.  *See, e.g.*, ECF No. 8 at 13 (collecting authorities recognizing that section 12406 does not operate as an exception to the PCA).  Accordingly, Defendants remain subject to a claim for acting *ultra vires* of the confines of the PCA.  *See Murphy Co. v. Biden*, 65 F.4th

20

1122, 1131 (9th Cir. 2023) ("plaintiffs advancing *ultra vires* claims must plead 'plausible factual

allegations identifying an aspect of the designation that exceeds the President's statutory

authority'" (citation omitted)).

Three tests determine if military assistance to civilian law enforcement violates the

PCA. *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). If any one of the three tests

is met, the activity is prohibited by the PCA. *Id.* First, the military activity must not "constitute[]

the exercise of regulatory, proscriptive, or compulsory military power.'" Second, it must not

"amount to 'direct active involvement in the execution of the laws." *Id.* (citation omitted). Direct

forms of involvement include: interdiction of a vehicle; a search or seizure; an arrest, stop and

frisk, or similar activity; and use of military personnel for surveillance or pursuit of individuals,

or as informants, undercover agents, investigators, or interrogators. *Dreyer*, 804 F.3d at 1272-73

(citing 32 C.F.R. § 213.10(a)(3) (1982)).[4] And third, the activity must not "pervade the activities

of civilian authorities." *Yunis*, 924 F.2d at 1094.

The military, including the federalized National Guard, is already engaging in law

enforcement activities that violate the PCA. Indeed, the President's June 7 memorandum, and the

subsequent DOD Orders by the Secretary Hegseth, call for these forces to be integrated with ICE

personnel in such a way that entanglement into law enforcement functions is unavoidable by

requiring them to protect "ICE and other United States Government personnel who are

performing Federal functions, including enforcement of Federal law, and to protect Federal

property, at locations where protests against these functions are occurring or are likely to occur."

ECF No. 8-1, Espíritu Decl. Ex. E; *see also* ECF No. 64 at 4-5; ECF No. 25-4, Knell Decl. ¶ 6

("ARNORTH published Operational Order (OPORD) 01-23 and Fragmentary Order

---

[4] Further examples of prohibited activities can be found in 2018 guidance from the Joint Chiefs of Staff on implementing the PCA, which lists prohibited "direct civilian law enforcement activities" to include "search, seizure, arrest, apprehension, stop and frisk, surveillance, pursuit, interrogation, investigation, evidence collection, security functions, [and] traffic or crowd control. Defense Support of Civil Authorities, Joint Publication 3-28, p. III-I (2018), https://irp.fas.org/doddir/dod/jp3_28.pdf (last visited June 16, 2025). "[W]hile 'courts must exercise independent judgment in determining the meaning of statutory provisions,' the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning." *Bondi v. VanDerStok*, 604 U.S. ___, 145 S.Ct. 857, 874 (2025), citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

1    (FRAGORD) 25-501.000 to direct federalized members of the California National Guard and

2    members of the 2/7 USMC to temporarily protect federal property, as well as ICE and other US

3    Government personnel who are performing federal functions, where protests are occurring in Los

4    Angeles County, California"); ECF No. 25-2 (June 7 DOD Order calling up 2,000 soldiers); ECF

5    No. 25-3 (June 9 DOD Order calling up an additional 2,000 soldiers for the same purpose);

6    Strong Decl., Ex. 7 (USNORTHCOM communication, June 9, 2025).  Federal officials who are

7    leading the deployment of the 4,700 troops have stated that 500 National Guard troops have been

8    trained to support immigration operations, with many receiving instruction to accompany federal

9    agents on enforcement missions.  *See e.g.*, Strong Decl., Ex. 11.  These memorandums,

10   statements by the administration, and records of the Defendants' use of the federalized troops

11   embedded with ICE over the last week show that Defendants' use of the military as a show of

12   force to augment and reinforce its federal agents has violated the PCA.

13       The federal government has confirmed that soldiers are providing the intended perimeter

14   and personnel protection while ICE carries out immigration enforcement.  ECF No. 25-4, Knell

15   Decl. ¶¶ 7-8 (describing the services as "protecting federal personnel performing official

16   functions as well as property at designated locations through security patrols, observation posts,

17   and outer cordon security perimeter of buildings" and listing assignments, including "continu[ing]

18   to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal

19   Bureau of Investigations Special Agents performing official functions so that such federal

20   personnel may carry out their assigned duties").[5]  In an ICE social media post, federalized Guard

21   soldiers can be seen standing guard while civilian law enforcement agencies detain three different

22   suspects.  ECF No. 39-1, Espíritu Decl., Exs. 2, 3; Strong Decl., Ex. 23.  These pictures are

23   consistent with the Department of Defense's statement that it intended to use the federalized units

24   for support for holding a secure perimeter in communities around areas where immigration

---

[5] In a declaration that Defendants submitted for the first time on appeal, filed with the
Ninth Circuit earlier today, but have not yet submitted to this Court, Defendants asserted that "the
guards have assisted on most operations that ICE and its federal partners conducted this week.
The guards are acting as a security element, accompanying federal officers and agents during
operations to ensure the safety of all involved." *Newsom v. Trump*, No. 25-3727 (9th Cir. June 16,
2025), Dkt. 23.1, Santacruz Decl. ¶ 7.

22

1  enforcement activities would take place and securing routes over public streets where

2  immigration enforcement officers would travel.  ECF No. 8-3, Eck Decl. ¶ 18; Strong Decl., Ex.

3  23.  Providing perimeter and personnel protection to augment ICE's operations in a civilian-

4  populated area, "constitute[s] the exercise of regulatory, proscriptive, or compulsory military

5  power."  *See Yunis*, 924 F.2d at 1094.[6]  As is clear from Defendants' orders and the images of

6  actions implementing such orders, soldiers are not being used merely to erect a protective barrier

7  around federal real property, but are being deployed alongside civil enforcement agents to control

8  the actions of civilians.  This is "regulatory, proscriptive, and compulsory" because it subjects

9  civilians in the vicinity of any planned immigration enforcement to mandatory and proscriptive

10  control of their right to move freely, under threat of military force.

11        Defendants cannot cast their activities under a broad umbrella of "protecting federal

12  personnel," even if there were such an atextual exception from the PCA.  Assisting federal

13  officers who are feet away making arrests or securing perimeters in an urban environment

14  constitute direct law enforcement activities, even if done with the purpose of protecting federal

15  personnel.  These activities, which otherwise would be performed by the federal law enforcement

16  agents themselves, *see* ECF No. 8-1, Espíritu Decl., Ex G at 53 (describing ICE military-style

17  actions), are an integral part of the law enforcement operation.  Involving the military in the

18  operation in this way necessarily entangles military with civilian enforcement, subjecting

19  civilians to "compulsory military power."  *Yunis*, 924 F.2d at 1094.  It is difficult to see how this

20  would not also lead to the military "pervad[ing] the activities of civilian authorities."  *Id.*  Indeed,

21  maintaining a perimeter in urban areas and providing security for officers performing their duties

22        [6] In *United States v. Khan*, 35 F.3d 426, 431-32 (9th Cir. 1994), the Court held that the
23  Navy did not violate the PCA when, acting under the supervision of civilian law enforcement, it
   intercepted a ship in international waters.  The Navy "provid[ed] ships, communication on the
   [intercepted ship's] position, aerial reconnaissance and interception."  *Id.  Khan* is distinguishable
24  from the situation here because 10 U.S.C. § 374(b)(2) expressly provides that Department of
   Defense may participate in civilian law enforcement by detecting, monitoring, and
25  communicating the movement of sea traffic, by providing aerial reconnaissance, and by
   intercepting vessels.  Citing *Yunis*, the court also found that "where the Navy provides backup
26  support in a Coast Guard operation and does not participate in the search of the ship or the arrest
   or interrogation of the suspects, the military assistance is not direct, not an exercise of military
27  power, and not pervasive of the activities of civilian authorities."  *Id.* at 432.  Here, military
   forces are controlling the movement of civilians in an urban area, facts not addressed in *Khan*.

28

1   necessarily involves participating in law enforcement operations planning, conducting

2   surveillance, apprehending civilians, controlling crowds, and threatening or using force against

3   civilians.  Marines have already briefly detained at least one civilian.  Strong Decl., Ex. 29.  This

4   stands in stark contrast to actions like "borrowing of highly skilled personnel, like pilots and

5   highly technical equipment like aircraft and cameras, for a specific, limited temporary purpose,"

6   which were found to not violate the PCA.  *United States v. McArthur*, 419 F.Supp. 186, 194

7   (D.N.D. 1975), *aff'd sub nom. United States v. Casper*, 542 F.2d 1275 (8th Cir. 1976).  These

8   activities, in short, will amount to direct active law enforcement and will also necessarily

9   "pervade the activities of civilian authorities."  *Yunis*, 924 F.2d at 1094.

10          Because the military personnel Defendants have ordered to Los Angeles are currently

11   engaged in law enforcement activities in violation of the Posse Comitatus Act, the Court can

12   enjoin the activities of the National Guard for this additional reason, and it should additionally

13   extend relief to bar law-enforcement activities by the Marines as well.

14          **C.    Defendants Are Violating the Tenth Amendment**

15          The Defendants' use of federal soldiers also intrudes on the State's police power,

16   constituting an independent violation of the Tenth Amendment.  "It is incontestible that the

17   Constitution established a system of 'dual sovereignty.'"  *Printz v. United* States, 521 U.S. 898,

18   918 (1997).  Under our system of federalism, policing and crime control remain one of the most

19   basic rights reserved to the States.  *United States v. Morrison*, 529 U.S. 598 (2000) ("Indeed, we

20   can think of no better example of the police power, which the Founders denied the National

21   Government and reposed in the States, than the suppression of violent crime and vindication of its

22   victims."); *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878) ("[T]he power to establish the

23   ordinary regulations of police has been left with the individual States, and cannot be assumed by

24   the national government.") (internal citation omitted).

25          The President, Secretary of Defense, Secretary of Homeland Security, and Attorney

26   General have made no secret of their intent to exploit federalization under Title 10 to usurp state

27   authority, including by "liberat[ing]" cities from their elected leaders.  *See* Strong Decl., Ex. 28.

28   Deploying over 4,000 federal soldiers absent proper invocation of Section 12406 to quell a protest

24

1   or prevent future protests despite the lack of evidence that local law enforcement was incapable of

2   asserting control and ensuring public safety during such protests represents the exact type of

3   intrusion on State power that is at the heart of the Tenth Amendment.  *See* Strong Decl., Ex. 27

4   (Former LAPD Chief explaining LAPD's capabilities and the harm that 1992 military

5   deployment had on policing efforts due to military's distinct role).

6          The Constitution generally reserves to the States the authority to exercise police power

7   with respect to local protests and unrest, and for good reason.  States and their local officials are

8   closer to the people, more aware of local customs and practices, and in the case of elected

9   officials, more directly accountable to the people impacted by law enforcement decisions.  And

10  here, the record shows that local law enforcement had and have sufficient resources to police the

11  demonstrations and isolated incidence of property damage and violence that occurred.  ECF No.

12  8-2, Olmstead Decl. ¶¶ 6-10; Zizi Decl. ¶¶ 9-13.  These resources include law enforcement teams

13  with specialized training in and experience with handling civil unrest.  ECF No. 8-2, Olmstead

14  Decl. ¶ 7; ECF No. 51-1, Amicus Br. of Los Angeles, at 3; Strong Decl., Ex. 27; Zizi Decl., ¶¶ 9-

15  11.

16         Where federalization of these National Guard soldiers has no constitutional or statutory

17  authorization, and where the troops have been used to usurp and disrupt California's own ability

18  to ensure the safety and welfare of its people, the State has shown a Tenth Amendment violation.

19                                        *  *  *

20         Considered individually, defendants' legal arguments are meritless.  Considered in the

21  aggregate, they are terrifying.  Defendants' interpretation of Section 12406 would empower the

22  President to commandeer a State's National Guard based merely on evidence that some civilians

23  opposed his authority, disobeyed his commands, or presented operational difficulties for civil

24  law-enforcement officials—and without any input from (or even notice to) the Governor.  Courts

25  would be powerless to enforce the limits Congress imposed on the President's exercise of that

26  authority.  And, as defendants see things, the Posse Comitatus Act would "not apply" to any of

27  the troops federalized via the President's unreviewable exercise of his Section 12406 authority, a

28  position no court has ever endorsed.  That unchecked power could be deployed in any context—

25

not just where civilians are protesting immigration enforcement, but also where they are protesting other policies of a federal administration, or protesting in advance of a hotly contested federal election.  Collectively, defendants' arguments would sideline the Judiciary, ignore Congress's limitations, and trample over the States' sovereign interest in their own militias.  This Court should again reject those arguments.

## II.  PLAINTIFFS WILL SUFFER GRAVE, IRREPARABLE HARM ABSENT AN INJUNCTION

Plaintiffs have already suffered significant injuries as a result of Defendants' conduct, and those injuries will only continue without an injunction.  A party seeking preliminary injunctive relief must "demonstrate that irreparable harm is likely in the absence of an injunction," *Winter*, 555 U.S. at 22, but need not show that such irreparable harm is certain to occur, *Michigan v. U.S. Army Corps of Eng'rs*, 667 F3d 765, 788 (7th Cir. 2011).  Nor must Plaintiffs show that Defendants' conduct is the exclusive cause of Plaintiffs' injury.  *M.R. v. Dreyfus*, 697 F3d 706, 728-29 (9th Cir. 2012).  Instead, Plaintiffs may show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,* 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 981-82 (9th Cir. 2011)).

In granting Plaintiffs' motion for a temporary restraining order, the Court correctly found that Plaintiffs are likely to suffer at least two forms of serious harm in the absence of injunctive relief: (1) the continued presence of the military in Los Angeles that "risks worsening, not improving, tensions on the ground"; and (2) the diversion of California National Guard members from their vital roles within the State, which impedes California's ability to respond to emergencies and other pressing concerns.  ECF No. 64 at 31-33.  Plaintiffs also risk continued injury to their sovereign interests, through an unlawful commandeering of the state militia. These harms are no less grave now, nor are they any less likely to occur absent further injunctive relief.

As to the first harm, Plaintiffs have established that the deployment of the National Guard in Los Angeles "seemed only to inflame the protests further" and caused local law enforcement arrests to increase exponentially.  ECF No. 8-2, Olmstead Decl. ¶¶ 12-14.  Indeed, as recently as

26

1    Saturday, June 14, local law enforcement was required to use force to disperse a large protest in

2    Downtown Los Angeles that was, at least in large part, a reaction to the military's presence within

3    the city.  Strong Decl., Ex. 31.  Thus, Defendants' actions have already caused significant civil

4    unrest and are likely to continue to increase civil unrest in the future.  And as the Court aptly

5    noted in granting Plaintiffs' motion for a temporary restraining order, the risk of future civil

6    disturbance is consistent not only with the factual record, but with "common sense."  ECF No. 64

7    at 32 (quoting Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343

8    U.S. 579, 651-52, for proposition that "emergency powers are consistent with free government

9    only when their control is lodged elsewhere than the Executive who exercises them."); *see also*

10   The Examination of Doctor Benjamin Franklin, Before an August Assembly, Relating to the

11   Repeal of the Stamp Act, &c. (Feb. 13, 1766)  ("Suppose a military force sent into America . . .

12   They will not find a rebellion; they may indeed make one."), *available at*

13   https://tinyurl.com/577emuzh.  A preliminary injunction is necessary to ensure that Defendants'

14   actions do not cause any further escalation of tensions within Los Angeles.

15          As to the second harm, as outlined above, Defendants' unauthorized requisitioning of

16   California's National Guard severely impacts the State's use of those forces.  *See* ECF No. 8-3,

17   Eck Decl. ¶¶ 13-16.  Four thousand soldiers constitutes a large portion of California's total

18   available militia force.  *Id.* ¶¶ 32-33.  Furthermore, the troops federalized from California's

19   National Guard include a large number of members who have specialized training in wildland fire

20   mitigation and suppression, and serve in the State's specialized fire combat unit.  *See* ECF No. 8-

21   3, Eck Decl. ¶¶ 13-16.  While this diversion of resources would gravely injure California at any

22   time, it especially does so now, at the outset of fire season in a year when Southern California

23   faces a "likelihood of above-normal significant fire potential."  Strong Decl., Ex. 30; ECF No. 39-

24   2, Supp. Eck Decl. ¶ 10 (13 fires over 10 acres, including one that has consumed over 4,200

25   acres, have already occurred in California in June); Declaration of Paul S. Eck in Support of

26   Plaintiffs' Preliminary Injunction Motion ("Eck PI Decl.") ¶¶ 3-9 (forecasts are for "above

27   normal significant fire danger for California for the next several months" and the "most critical

28   work is done before any fire ignites").  Without a significant segment of its National Guard, the

27

1   State cannot reliably protect itself from these, and other, emergencies.  Eck PI Decl. ¶ 11; ECF

2   No. 39-2, Supp. Eck Decl. ¶ 15. Moreover, with the 60-day federalization, the State has also lost a

3   significant part of its Counterdrug Taskforce, which specializes in providing support to stop

4   trafficking of fentanyl at the U.S.-Mexico Border.  ECF No. 39-2, Supp. Eck Decl. ¶ 15.  The

5   federal deployment impairs the California National Guard's ability to perform these critical

6   functions. ECF No. 8-3, Eck Decl. ¶¶ 16, 31-33, 47-50.  It also impairs California's ability to be

7   ready to address any new emergencies.  And, as the Governor made clear in a letter to Secretary

8   Hegseth after his *second* order federalizing another 2,000 National Guard soldiers, Defendants'

9   order was "even more egregious given that [the Secretary] had not even committed at least 1600

10  of the 2000 service members [he] unlawfully federalized only two days earlier."  *See* No. 8-1,

11  Espíritu Decl., Ex S at 129.

12       Thus, Plaintiffs have satisfied the second *Winter* factor.

### III.    THE BALANCE OF HARMS AND EQUITIES FAVORS INJUNCTIVE RELIEF

14       The remaining *Winter* factors weigh heavily in favor of granting further injunctive relief.

15  A preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the

16  applicants; and (2) an injunction is in the public interest.  *Winter*, 555. U.S. at 20.  "In exercising

17  their sound discretion, courts of equity should pay particular regard for the public consequences

18  in employing the extraordinary remedy of injunction."  *Winter*, 555. U.S. at 20 (quoting

19  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  Moreover, the federal government

20  "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as

21  required to avoid constitutional concerns."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C.

22  2015).

23       Here, the balance of equities tips sharply in Plaintiffs' favor.  As outlined above, Plaintiffs

24  have already suffered serious harm in the form of escalated tensions, heightened civil unrest, and

25  the diversion of critical state resources, and these injuries will continue absent an injunction.  By

26  contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct.  First,

27  Defendants have not shown that local law enforcement is incapable of responding to the Los

28  Angeles protests.  To the contrary, local law enforcement is better equipped than the military to

1  address the situation in Los Angeles, given their specialized training and experience.  Strong

2  Decl., Ex. 27; Zizi Decl., ¶ 9-11.

3        At the TRO stage, Defendants described certain episodes of unlawful conduct

4  characteristic of the kind of civil unrest that occurs periodically in this country—such as

5  vandalism, individuals throwing objects, and a vehicle being set on fire.  But the evidence shows

6  that state and local law enforcement have responded effectively to that misconduct—and remain

7  on the scene in substantial numbers today to enforce the law and prevent further violence.  *E.g.*,

8  ECF No. 22-1, Santacruz Decl. ¶¶ 11-13 (federal security agents "held the line" at the federal

9  building until LAPD arrived on scene to control the crowd); Strong Decl., Ex. 13 (LAPD

10  dispersed the crowd within four hours); ECF No. 22-1, Santacruz Decl. ¶ 24 ("LAPD issued a

11  dispersal order and made multiple arrests"); Zizi Decl. ¶¶ 5, 12, 14 (describing operations on June

12  6-8); *Id*.  ¶¶ 5, 7, 12, 15 (describing work of thousands of state and local officers, including

13  hundreds of arrests); Zizi Decl. ¶ 13.

14        Second, as the Court noted in its prior order, Defendants "may continue to enforce the

15  immigration law, even without the assistance of the National Guard."  ECF No. 64 at 35.  To the

16  extent Defendants feel they need more personnel to achieve their immigration enforcement goals,

17  they have additional agents and resources at their disposal that can address these needs, without

18  the military's involvement.  And to the extent Defendants assert an interest in protecting federal

19  agents and property, that interest "may actually well be served by de-militarization and a

20  concurring de-escalation of the situation."  *Id*.; Strong Decl., Ex. 27.  Finally, Defendants cannot

21  be harmed by an order requiring them to cease unlawful activity, and Plaintiffs have established a

22  likelihood of prevailing on their claims that President Trump's federalization of California's

23  National Guard was unlawful.

24        Additionally, entering an injunction would serve the public interest.  When, as here,

25  Plaintiffs establish "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs

26  have also established that both the public interest and the balance of the equities favor [injunctive

27  relief]."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  Moreover, as the

28  Court previously noted, the fact that the federal government responded to largely peaceful

protests in Los Angeles by deploying the military "threaten[s] to chill legitimate First Amendment expression." ECF No. 64 at 35.[7] Enjoining the continued militarization of Los Angeles would restore the public's confidence in their fundamental First Amendment right to peacefully protest, without fearing that the government will deploy the military in response.

Accordingly, the balance of the equities favors injunctive relief.

## CONCLUSION

The Court should grant Plaintiffs' motion and issue a preliminary injunction.

---

[7] That chilling effect has already started to have an impact. For example, the Mexican American Bar Association, in planning the route for its march this past weekend, deviated from its usual practice of passing by the federal building downtown because of the presence of military at the federal building and fears that the presence of the military "could result in participants in our march, including children, being exposed to unnecessary risk arrest and/or injury" or "subject to arrest for the lawful exercise of their First Amendment rights." Declaration of Diego Alejandro Arp ¶¶ 10-11

1    Dated:  June 16, 2025                          Respectfully submitted,

2                                                   ROB BONTA
                                                    Attorney General of California
3                                                   THOMAS S. PATTERSON
                                                    Senior Assistant Attorney General
4                                                   ANYA BINSACCA
                                                    JOHN D. ECHEVERRIA
5                                                   MARISSA MALOUFF
                                                    JAMES E. STANLEY
6                                                   Supervising Deputy Attorneys General
                                                    NICHOLAS ESPÍRITU
7                                                   STEVEN KERNS
                                                    JANE REILLEY
8                                                   MEGAN RICHARDS

9                                                   */s/ Meghan H. Strong*

10                                                  MEGHAN H. STRONG
                                                    Deputy Attorney General
11                                                    455 Golden Gate Avenue
                                                      San Francisco, CA 94102
12                                                    Telephone: (415) 510-3877
                                                      E-mail:  Meghan.Strong@doj.ca.gov

13                                                  *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION