BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-8659
christopher.edelman@usdoj.gov
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., <br><br> *Defendants*. | Case No. 3:25-cv-04870-CRB <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

BACKGROUND .......................................................................................................................3

I.      The National Guard System ..........................................................................................3

II.     The Riots and Violence in Los Angeles .......................................................................4

III.    President Trump Deploys the California National Guard .............................................6

IV.     Activities Following Deployment of the California National Guard ............................8

PROCEDURAL HISTORY ......................................................................................................9

LEGAL STANDARD ...............................................................................................................9

ARGUMENT ............................................................................................................................9

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ........................9

        A.      The President Lawfully Federalized the National Guard. .................................9

                1.      The President's determinations are committed to his exclusive
                        discretion by law. ..................................................................................9

                2.      The necessary conditions existed for the President's Order. ...............12

                3.      The President complied with Section 12406's procedural
                        requirements. ........................................................................................20

        B.      Defendants Have Not Violated the Posse Comitatus Act. ...............................23

        C.      The Federalization of Guardsmen Does Not Intrude on the State's Police
                Power. ..............................................................................................................26

II.     THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION....................26

III.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
        ACCOMPANY A BOND. ...........................................................................................29

CONCLUSION........................................................................................................................30

i

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Carr*,
  369 U.S. 186 (1962) ........................................................................... 10, 11

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ................................................................ 12

*Dalton v. Specter*,
  511 U.S. 462 (1994) ................................................................................ 11

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .................................................................. 26

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................ 12

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................ 17

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ................................................................................ 23

*In re Debs*,
  158 U.S. 564 (1895) ..................................................................... 12, 20, 25

*In re Neagle*,
  135 U.S. 1 (1890) ........................................................................ 12, 20, 25

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) .................................................................. 9

*Luther v. Borden*,
  48 U.S. (7 How.) 1 (1849) .................................................................. 10, 11

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) .................................................................. 11

*Martin v. Mott*,
  25 U.S. (12 Wheat.) 19 (1827) ...................................................... 2, 9, 10, 11

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .................................................................................. 12

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................ 18

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................9, 29

*NRC v. Texas*,
    No. 23-1300, slip op. (U.S. June 18, 2025) ...........................................23

*Perpich v. Dep't of Def.*,
    496 U.S. 334 (1990) ..................................................... 2, 4, 5, 20

*Seegars v. Ashcroft*,
    297 F. Supp. 2d 201 (D.D.C. 2004) ......................................................22

*United States v. Bacon*,
    851 F.2d 1312 (11th Cir. 1988) ..............................................................25

*United States v. Red Feather*,
    392 F. Supp. 916 (D.S.D. 1975) ............................................................24

*United States v. Stouder*,
    724 F. Supp. 951 (M.D. Ga. 1989) ........................................................25

*United States v. Yunis*,
    924 F.2d 1086 (D.C. Cir. 1991) .............................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................9, 23

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ...............................................................................12

**The Constitution**

U.S. Const. art. I, § 8, cl. 15 .......................................................2, 3, 9

U.S. Const. art. II, § 2, cl. 1 .................................................................12

**Federal Statutes**

10 U.S.C. § 246..........................................................................................4

10 U.S.C. § 12406.............................................................................*passim*

10 U.S.C. § 12301...................................................................................22

18 U.S.C. § 1385.....................................................................................23

18 U.S.C. § 111.......................................................................................20

**State Statutes**

Cal Mil. & Vet. Code § 141.....................................................................6

iii

3:25-cv-04870-CRB            DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

D.C. Code § 49–409 .................................................................................................22

**Rules**

Fed. R. Civ. P. 65(c) .................................................................................................30

**Other Authorities**

Act of May 2, 1792, ch. 28, 1 Stat. 264 ....................................................................15

*Authority to Use Troops*,
  1 Supp. Op. O.L.C. 343 (1971) .......................................................................20, 25

Jennifer Elsea, Cong. Research Serv.,The Posse Comitatus Act and Related Matters: The
  Use of the Military to Execute Civilian Law, R42659 (Nov. 6, 2018) ............................15, 25

*Rebellion*, American Dictionary of the English Language (1900) ................................14

*Rebellion*, Black's Law Dictionary (1st ed. 1891).......................................................14

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ............................................14, 16

*Rebellion*, The Cyclopedic Dictionary of Law (1901) ................................................14

*Rebellion*, Webster's International Dictionary of the English Language (1903) ..........14

iv

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

## INTRODUCTION

After violent protests and disorder targeting immigration law enforcement operations shocked Los Angeles, President Trump exercised his authority to call into federal service members of the National Guard to protect federal personnel and property.  Protesters had, among other violent acts: thrown objects at federal security officers; attempted to use large commercial dumpsters to breach a federal complex; used chairs and other items as weapons; attacked federal officers for hours; trapped one officer inside her vehicle while a crowd pummeled her car with stones; cut a perimeter fence that federal officials had constructed; launched incendiary devices at officers; lit fires in dumpsters and trash bins; and vandalized the federal facility at the center of the protests (leaving the building's security checkpoint in ruins).  Indeed, the Los Angeles Police Department ("LAPD") Chief admitted that the LAPD had been "overwhelmed" and that "things have gotten out of control."

On this record, President Trump determined that "[n]umerous incidents of violence and disorder" pose an unacceptable threat to the safety of "United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws."  The White House, *Dep't of Defense Security for the Protection of Dep't of Homeland Security Functions*, (Jun. 7, 2025) ("Presidential Memo"), ECF No. 8-1 at 44–45.  Based on the President's order, Secretary of Defense Pete Hegseth federalized 2,000 Guardsmen to respond to the crisis before activating an additional 2,000 Guardsmen and deploying several hundred Marines.  Sec'y of Def., *Calling Members of the Cal. Nat'l Guard into Federal Service* (Jun. 7, 2025) ("June 7 DoD Memo"), ECF No. 25-2; Sec'y of Def., *Calling Additional Members of the Cal. Nat'l Guard into Federal Service* (Jun. 9, 2025) ("June 9 DoD Memo"), ECF No. 25-3.  Their purpose is limited to the protection of federal personnel and property under siege by aggressors challenging the Nation's authority to remove illegal aliens.  Congress has required the Executive to carry out these removal operations, which are effectuated by dedicated public servants upholding their duty to enforce federal law.

The State of California and its Governor responded to this lawlessness by politicizing President Trump's protection of federal property and personnel.  Their lawsuit is meritless.  To

start, it intrudes into the President's unreviewable discretion.  The Supreme Court long ago held that when the President exercises authority vested in him by Congress to "call[] forth the Militia," U.S. Const. art. I, § 8, cl. 15, his decision to do so is committed to the President's exclusive discretion by law, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827); *see also Perpich v. Dep't of Def.*, 496 U.S. 334, 352–53 (1990).  The Court thus has no authority to second-guess the President's judgment.  But even if this determination were not committed to the President's discretion, the President has every right to mobilize the National Guard and Marines to quell violence impeding enforcement of federal law, as well as to protect federal agents and property from violent mobs that state and local authorities cannot or choose not to control.  Congress has empowered the President to deploy the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," 10 U.S.C. § 12406(2), or when "the President is unable with the regular forces to execute the laws of the United States," *id.* § 12406(3).

Both statutory elements are met here, either of which authorized the President's deployment of the National Guard.  Violent actions of uncontrolled mobs, undertaken to disrupt enforcement of immigration laws, constitute a rebellion or at least a danger of rebellion against federal authority.  And as intended, these violent actions have impeded the ability of federal officials to enforce the law.  In granting a temporary restraining order ("TRO"), this Court nonetheless concluded that neither of these statutory conditions were satisfied.  The Court's determinations—that the term "rebellion" does not encompass violent resistance to governmental action unless, among other requirements, violent protesters are "attempting to overthrow the government as a whole" as opposed to violently resisting the Government's authority related to "a single issue"—have no basis in Section 12406(2) and are inconsistent with historical practice and common sense.  As for the Court's apparent interpretation—that Section 12406(3) is inapplicable if mob violence aimed at blocking enforcement of federal law does not *entirely prevent* the federal government from engaging in *any* enforcement—likewise finds no support in the statute and would effectively paralyze the President from protecting federal property and personnel in response to mob violence.

In addition, Plaintiffs' argument that the relevant orders failed to comply with Section

12406's procedural requirement that they be issued "through the Governor" has no merit.  But even if there were a procedural error, it was harmless and it would be grossly inequitable to grant a preliminary injunction based on any such error.  Plaintiffs' contention that the National Guard—and the Marines who have similarly been deployed to protect federal personnel and property—are engaged in law enforcement in violation of the Posse Comitatus Act likewise has no basis, as even Plaintiffs appear to concede that their activities have been limited to protecting federal property and providing security for law enforcement officers.  And the President's use of the National Guard and Marines to protect federal personnel and property—with express Congressional authorization—does not raise even colorable Tenth Amendment concerns.

The remaining preliminary injunction factors favor the government as well.  An injunction would irreparably harm the Executive Branch and threaten the safety of law enforcement officers, as well as the public.  Since June 6, violent criminals have assaulted federal officers and besieged federal facilities.  The deployment of the National Guard has been critical to the protection of federal personnel and property from such widespread rioting and violence.  The balance of the equities also weighs strongly in favor of the federal government.  Contrary to Plaintiffs' theory that National Guard protection has caused an escalation of violence and that removal of such protection will de-escalate the situation, removal of National Guard protection will just leave federal officials and property vulnerable.  Moreover, rioters continue to object to ICE execution of immigration laws in their communities.  They will continue to target federal officials enforcing immigration laws and attack federal property—just as they did before the President acted.  Finally, when compared to the real and substantial safety threats to federal personnel and property, California's complaints about diversion of National Guard members warrant little weight.  California has not identified any concrete harm if it is deprived temporarily of the use of 4,000 guardsmen, let alone harm that would come close to outweighing the significant federal interest in protection of federal personnel and property.

## BACKGROUND

## I.    The National Guard System

The Constitution authorizes Congress to "provide for calling forth the Militia to execute

the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. The National Guard, which is part of the "organized militia," 10 U.S.C. § 246(b)(1), consists of two overlapping, but legally distinct, organizations: the State National Guard, under command of the States, and the National Guard of the United States, a federal entity in the federal chain of command. *Perpich*, 496 U.S. at 338. "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retain[] their status as members of a separate State Guard unit." *Id.* at 345. While ordered into federal service, "members of the National Guard . . . lose their status as members of the state militia," *id.* at 347, and become federal soldiers with the President as the Commander in Chief of those forces.

Section 12406 is one authority permitting federalization of Guardsmen. The statute traces back to the First Militia Act of 1792, 1 Stat. 271 (amended in 1795, 1 Stat. 424), which, among other things, was used by President Washington to respond to the Whiskey Rebellion. Today, Section 12406 provides:

> Whenever--
>
> (1) the United States . . . is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

## II.   The Riots and Violence in Los Angeles

On Friday, June 6, 2025, officers from ICE's Enforcement and Removal Operations ("ERO") conducted operations in Los Angeles, California. *See* Decl. of Ernesto Santacruz Jr. ("First Santacruz Decl."), ECF No. 25-1 ¶ 7. A crowd gathered at an enforcement site and tried to prevent ICE officials from enforcing federal law by throwing objects at ICE vehicles. *Id.* Several

4

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

individuals were arrested in the operation and brought to ERO's federal facility in downtown Los Angeles.  *Id.*  Around 5:00 p.m. that night, a crowd gathered at the ERO facility and protests turned violent.  *Id.* ¶ 9.  The violence spread across the downtown area, threatening federal facilities and other public buildings.  *Id.* ¶ 10.  Protesters pinned down several Federal Protective Services ("FPS") officers who were left severely outnumbered while trying to defend a parking garage connected to several federal buildings.  *Id.* ¶ 11.  Protesters threw "concrete chunks, bottles of liquid, and other objects at the . . . officers."  *Id.*  They also attempted to use a large rolling commercial dumpster as a battering ram to breach the parking garage, causing damage to federal property.  *Id.*  These "protests were explicitly about the immigration raids."  Order Granting Pls.' TRO ("TRO Op.") at 3, ECF No. 64; *see also* Supp. Decl. of Ernesto Santacruz, Ex. 1 ("Supp. Santacruz Decl."), ¶ 5 (explaining that protesters began assaulting federal officials before the National Guard's deployment).

Officers feared for their safety.  First Santacruz Decl. ¶ 13.  ICE and Homeland Security Investigations ("HSI") officers responded to support the FPS officers under siege and attempted to use non-lethal force to disperse the crowd.  *Id.*  The federal officers managed to prevent a breach of the facility, but it took LAPD officers nearly 90 minutes to arrive and assist in pushing the crowd back from the parking garage gate.  *Id.*  Meanwhile, the protests turned extremely violent, with news reports showing demonstrators using chairs, dumpsters, and other weapons.  *Id.* ¶ 14.  Once on scene, LAPD declared an "unlawful assembly" around 7:00 p.m. and ordered protesters to disperse.  *Id.* ¶ 16.  Many did not and began attacking LAPD officers.  *Id.*  The scene was not clear until around 11:00 p.m., leaving extensive damage to multiple federal buildings.  *Id.* ¶ 17.

That night, President Trump called Governor Newsom to discuss the dangers to federal personnel and requested that he take action to stop the violence.[1]  But the violence intensified the next day, with large crowds congregating around an HSI office in the Paramount neighborhood of L.A. as federal officers prepared for another enforcement operation.  *Id.* ¶ 18.  The crowd blocked

---

[1] Emma Colton, John Roberts, *Trump brings receipts he called Newsom amid LA riots as California gov claims there wasn't 'even a voicemail'*, Fox News (June 10, 2025 4:15p.m. EDT), https://www.foxnews.com/politics/trump-brings-receipts-he-called-newsom-amid-la-riots-california-gov-claims-wasnt-even-voicemail.html.

traffic and began to attack ERO and Customs and Border Patrol ("CBP") officers.  *Id.* ¶ 20.  *Seven hours* of non-stop fighting between federal officers and protesters ensued.  *Id.*  The crowd boxed in federal officers, surrounded an ERO officer's vehicle (which they pummeled with stones), launched mortar-style fireworks, set at least one vehicle on fire, and threw objects of all nature. *Id.*  Rioters also breached the perimeter fence of the federal building, damaged vehicles, and aimed mortar-style fireworks capable of multiple explosions at the federal officers.  *Id.* ¶ 21.  Senator John Fetterman, among officials from both major political parties criticizing the violence, called it "anarchy and true chaos."[2]  Protests continued into the weekend.  *Id.* ¶ 24.  Protesters blocked the 101 Freeway, lit dumpsters on fire, and set off commercial-grade fireworks toward federal officers. *Id.* ¶¶ 25–26.  Rioters damaged federal buildings and ruined a federal building security checkpoint. *Id.* ¶¶ 26–27.  Rioters also severely injured various federal officers.  *Id.* ¶ 27.  Downtown LA's federal complex was operating on significantly restricted access, *id.* ¶ 29, and has been severely damaged and vandalized, *id.* ¶¶ 26–27.

### III.    President Trump Deploys the California National Guard

In response to the violence, the President federalized 2,000 members of the California National Guard on Saturday, June 7.  Presidential Memo at 44–45.  The President invoked Section 12406 to "temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property."  *Id.* at 44.  The Department of Defense ("DoD") and State of California coordinated the Guard's possible mobilization before the President signed his memorandum.  DoD coordinated through the Chief of the National Guard Bureau ("CNGB"), a senior military official who serves on the Joint Chiefs of Staff.  Decl. of Gen. Steven Nordhaus, Ex. 2 ("Nordhaus Decl.") ¶ 2.  California coordinated through its adjutant general, who by statute serves on "the staff of the Governor," is "chief of staff to the Governor," and a direct report to the Governor.  Cal Mil. & Vet. Code §§ 141, 160.

At 5:51 p.m. ET on June 7, the CNGB informed the Adjutant General that the President

---

[2]    John Fetterman (@SenFettermanPA), X (June 9, 2025, 8:32 p.m. EDT), https://x.com/SenFettermanPA/status/1932234335425323417.

intended to mobilize the California National Guard.  Nordhaus Decl. ¶ 8.  Thirty minutes later, the Adjutant General told the CNGB "that he had relayed news of the intended mobilization to his Governor and that the Governor was not going to push back on the mobilization."  *Id.* ¶ 10.  The two spoke again after another half hour, and the Adjutant General "confirmed . . . that the State of California would comply when the orders . . . came through."  *Id.* ¶ 11.  At 8:13 p.m. ET, Governor Newsom announced that "[t]he federal government is moving to take over the California National Guard and deploy 2,000 soldiers."[3]  The Governor criticized the President's decision as "the wrong mission" but did not state any objection to the President's authority.  *Id.*

The CNGB and Adjutant General spoke twice more to coordinate deployment before orders were formally relayed.  Nordhaus Decl. ¶ 13.  Late that night, the CNGB transmitted to the Commander and Deputy Commander of USNORTHCOM and the California Adjutant General and Assistant Adjutant General the President's memorandum as well as a memorandum from the Secretary of Defense.  *Id.* ¶ 15.  The Secretary's memorandum bore the label "THROUGH: THE GOVERNOR."  Sec'y of Def., *Calling Members of the Cal. Nat'l Guard into Federal Service* (Jun. 7, 2025) ("June 7 DoD Memo") at 2, ECF No. 25-2.  Based on the President's invocation of Section 12406, it directed the California Adjutant General to effectuate the call into federal service of the National Guard.  *Id.*  The Adjutant General responded to the group stating "'consider our forces mobilized.'"  Nordhaus Decl. ¶ 15; Decl. of Major General Scott M. Sherman, Ex. 3 ("Sherman Decl.") ¶ 3.  The Adjutant General's staff sent the memoranda to the Governor's office the same day.  Nordhaus Decl. ¶ 15.  DoD also transmitted the signed memoranda to the Governor's office on Monday.  *Id.* ¶ 16.[3]

On Monday, June 9, the Secretary of Defense issued a second memorandum to the Adjutant General activating an additional 2,000 National Guardsmen.  Sec'y of Def., *Calling Additional Members of the Cal. Nat'l Guard into Federal Service* (Jun. 9, 2025) ("June 9 DoD Memo"), ECF No. 25-3.  That memorandum was also transmitted to the Adjutant General and the Governor's office.  Nordhaus Decl. ¶ 16.  Separately, the Secretary ordered the mobilization of about 700

---

[3] Governor Gavin Newsom (@CAgovernor), X (Jun. 7, 2025, 8:13 p.m. EDT), https://x.com/CAgovernor/status/1931504803487879617.

active-duty Marines from Camp Pendleton to Los Angeles.  *See* Decl. of Paul S. Eck ¶ 18, ECF No. 8-3; *see also* Sherman Decl. ¶ 2.

## IV.    Activities Following Deployment of the California National Guard

Since the call to federal action, Guardsmen and Marines have protected Federal personnel and property from threats in Los Angeles.  The Guardsmen and Marines (1) establish outside perimeters, observation posts, and presence patrols for federal property at locations targeted by protests; and (2) provide personnel protection for DHS and FBI agents conducting operations in Los Angeles County, "to enable Federal Law Enforcement officers to conduct their Federal functions safely and with minimal interference from bystanders."  Sherman Decl. ¶ 9(A)–(C). National Guard members have not detained any individuals.  *Id.* ¶ 9(D).  The Marines temporarily detained one individual as a protective measure after that individual attempted to enter a restricted area on federal property multiple times; they turned him over to the LAPD minutes later.  *Id.* Guardsmen and Marines do not perform law enforcement or other functions.  Sherman Decl. ¶ 8.

The violence has since continued at federal facilities in various locations in California. Supp. Santacruz Decl. ¶ 6.  On June 14, a crowd of 1,000 gathered outside of the Federal Building and U.S. Courthouse and some assaulted law enforcement officers with rocks, bricks, bottles, fireworks, and other objects.  *Id.*  Some protesters threw red paint on FPS and National Guard members.  *Id*.  Protesters at the Los Angeles Federal Building also blocked the parking garage exits, preventing ICE vehicles from exiting.  *Id.* ¶ 8.

But importantly, the presence of the National Guard and Marines has played an essential role in protecting federal property and personnel from the violent mobs.  In the above-described incident, the National Guard cleared a path for unmarked vans to remove detainees in small groups, which allowed ICE officials to continue immigration enforcement operations.  *Id.* ¶ 9.  The National Guard's presence has also prevented other incidents such as the one described above (where violent rioters engaged in hours-long fights with law enforcement).  *Id.* ¶ 10.  And the approximately 900 National Guard troops "assigned to protect federal buildings, has also been instrumental in enhancing the ability to protect federal property from damage or breach attempts." *Id.* ¶ 13.  Unsurprisingly, Plaintiffs present no evidence that violent protests have increased since

8

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

the National Guard and Marines were deployed or that such personnel prevented peaceful protesters' exercise of their First Amendment rights. Nor is there any coherent basis for any such claim since, consistent with President Trump's directive and as General Sherman's declaration explains, the Guard and Marines perform purely protective functions.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 9, 2025, raising among other things, *ultra vires* and Tenth Amendment claims. ECF No. 1 ("Compl."). They moved for a TRO, which the Court granted. TRO Op. at 35. Defendants immediately appealed and moved for a stay pending appeal. The Ninth Circuit administratively stayed the TRO, and Defendants' stay motion remains pending.

## LEGAL STANDARD

To obtain the "extraordinary and drastic" remedy of a preliminary injunction, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

### A.    The President Lawfully Federalized the National Guard.

The decision to invoke Section 12406 is committed to the President's sole discretion. Moreover, both of Plaintiffs' objections to the federalization of the National Guard—that the necessary conditions for invoking Section 12406 authority were not present and that the activation of the Guardsmen was procedurally defective—are unlikely to succeed. *See* PI Mot. at 12–17.

#### 1.    The President's determinations are committed to his exclusive discretion by law.

Plaintiffs' challenge to the President's decision to mobilize the Guard is not subject to judicial second-guessing. The Supreme Court long ago established that when the President exercises authority vested in him by Congress to "call[] forth the Militia," U.S. Const. art. I, § 8,

9

cl. 15, his decision to do so is committed to his exclusive discretion.  In *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19 (1827) (Story, J.), a member of the militia of New York challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812.  *See id.* at 20–23 (statement of the case).  President Madison had activated the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (opinion of the Court).  The Supreme Court refused to entertain the member's contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons."  *Id.* at 30.

That conclusion, the Court explained, "necessarily results from the nature of the power itself," which is "to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union." *Martin*, 25 U.S. at 30.  To be effective, the President's authority to activate the militia must command "unhesitating obedience" from his subordinates, consistent with "command of a military nature." *Id.* The Court emphasized that the law "confided" the power to call up the militia "to the Executive of the Union," as Commander in Chief, and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; *cf. Baker v. Carr*, 369 U.S. 186, 213 (1962) (citing *Martin*, 25 U.S. at 30, as an example of treating "calling up of [the] militia" as an unreviewable decision committed to the political branches); *Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right," and observing that extending the judicial power so far would be "a guarantee of anarchy").

Those same principles apply here.  Like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" those statutory prerequisites are satisfied "exclusively to the President," whose decision must be treated as

"conclusive." *Martin*, 25 U.S. at 30. The statute authorizes "the President" to activate Guardsmen "in such numbers *as he considers necessary* to repel the invasion, suppress the rebellion, or execute those laws." 10 U.S.C. § 12406 (emphasis added). There is no textual basis in the statute for either the Court or Plaintiffs to second-guess the President's determination that the violence rises to the level of "a rebellion" against the federal government's "authority" to enforce the immigration laws and that the violence has left the President sufficiently "unable" to ensure faithful "execut[ion]" of those laws. *Id.* §§ 12406(2), (3). Any needed "remedy" resides in "the frequency of elections, and the watchfulness of the representatives of the nation, [which] carry with them all the checks which can be useful to guard against usurpation or wanton tyranny." *Martin*, 25 U.S. at 32.

This Court previously discounted *Martin*, TRO Op. at 12–14, and found more persuasive a district court decision addressing judicial review of illegal aliens' claims for relief from removal under the Alien Enemies Act. But *Martin* is directly on point as it concerned the similarly structured statutory antecedent to Section 12406. And *Martin* hardly stands alone. In *Dalton*, the Supreme Court emphasized that when a valid statute "commits [a] decision to the discretion of the President," "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Dalton v. Specter*, 511 U.S. 462, 474, 476 (1994); *id.* at 474 ("where claims "concern[] not a want of Presidential power, but a mere excess or abuse of discretion in exerting a power given," they are not subject to judicial review). While a court should "always be ready to meet any question confided to it by the Constitution, it is equally its duty not to pass beyond its appropriate sphere of action." *Luther*, 48 U.S. at 1.

Additionally, Plaintiffs' claims implicate the political question doctrine, which equally precludes judicial review. Certain "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Thus, if the act of an official is one in which the "executive possesses a constitutional or legal discretion, nothing can be more perfectly clear . . . that their acts are only politically examinable." *Id.* at 166; *see also Baker*, 369 U.S. at 217 (setting forth the test for political question doctrine).

That is the case here. Decisions related to the deployment of militias are firmly entrusted

11

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

to the political branches.  Congress is granted the "Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."  U.S. Const. art. I, § 8, cl. 15.  And "[t]he President shall be Commander in Chief . . . of the Militia of the several States, when called into the actual Service of the United States."  U.S. Const. art. II, § 2, cl. 1.  The President also has an "inherent" protective and emergency power derived from the Take Care Clause.  *See In re Neagle*, 135 U.S. 1, 69 (1890); *In re Debs*, 158 U.S. 564, 582 (1895).  Moreover, the deployment decision here implicates immigration and national security matters into which courts will intrude only with the greatest reluctance.  *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (immigration); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) (national security).  Finally, there are no "judicially discoverable and manageable standards for resolving" whether riots rise to the level of rebellion, or whether the regular forces are adequate to execute federal law.  *Cf. California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases for proposition that determination of an "invasion" presents a political question).  These facts independently render aspects of Plaintiffs' claims non-justiciable.

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012), upon which Plaintiffs rely, PI Mot. at 17–19, is not to the contrary.  That case concerned the constitutionality of a statute, a question the Judiciary is clearly competent to decide.  *Zivotofsky*, 566 U.S. at 201.  But the constitutionality of Section 12406 is not in issue, only the President's discretionary judgment that the statutory conditions were met.  In short, the challenged Presidential decision is unreviewable and that alone warrants denying Plaintiffs' motion as to Plaintiffs' challenges to conditions.

### 2.  The necessary conditions existed for the President's Order.

Even if some deferential judicial review were permissible, the President had ample grounds for invoking Section 12406.  "[T]he President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary" to address any of three circumstances.  10 U.S.C. § 12406.  Those circumstances are: (1) a "danger of invasion by a foreign nation"; (2) "a rebellion or danger of a rebellion against the authority of the Government of the United States"; or (3) "the President is unable with the regular forces to execute the laws of the United States."  *Id.* §§ 12406(1)–(3).

12

3:25-cv-04870-CRB                DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

President Trump explained that recent acts of violence directed against ICE officials and other federal personnel impede "the faithful execution of Federal immigration laws," and that the ongoing violence and disorder "threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." Presidential Memo at 1. He further explained that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws" by federal immigration authorities, those acts "constitute a form of rebellion against the authority of the Government of the United States." *Id.*

As set forth above, there can be no serious dispute that the President accurately described the dangerous conditions in Los Angeles. Indeed, before the Guard was deployed, LAPD Chief Jim McDonnell publicly acknowledged that the LAPD had been "overwhelmed," that "things have gotten out of control," and that "somebody could easily be killed."[4] And in addition to the evidence discussed above, *see supra* Background Section II, California's Complaint similarly *admits* the critical facts: (1) protesters have specifically targeted ICE agents, agents from other agencies, as well as federal property, including a federal courthouse; (2) they have done so in "opposition to the manner in which the Trump Administration has executed its immigration agenda"; and (3) the protests have turned lawless and violent, with protesters, for example, "throwing objects at law enforcement officers and damaging property, including by setting fires." *See* Compl. ¶¶ 25, 26, 29. One of Plaintiffs' TRO declarants further highlighted the severity of the situation: "[S]ome protesters unfortunately began to engage in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies damaging vehicles, burning a vehicle, looting a gas station, and vandalizing property." Decl. of Brian Olmstead, ECF No. 8-2 ¶ 9. "Two deputies

---

[4] Michele McPhee, *LAPD Chief Jim McDonnell Says, 'Violence I Have Seen is Disgusting,' Recounting Attacks on Cops*, Los Angeles Magazine (June 8, 2025), https://lamag.com/news/lapd-chief-jim-mcdonnell-says-violence-i-have-seen-is-disgusting-recounting-attacks-on-cops; *see* NBC Los Angeles, *LAPD 'overwhelmed' with violent protesters in downtown LA* (June 8, 2025), https://www.nbclosangeles.com/local/lapd-overwhelmed-with-violent-protesters-in-downtown-la/3718685/ (video of press conference). The Court noted that this press conference occurred on June 8, after the Guard deployed. TRO Op. at 6 n.2. The context of the press conference shows, however, that the Police Chief was referring to violence that occurred on Friday and Saturday *before* the Guard deployed. And, as the article notes, the widespread violence the Police Chief was discussing was in response to immigration enforcement, not the later arrival of the National Guard to protect federal officials and property.

were injured during the incident." *Id.*[5]

Plaintiffs' TRO submission also reflects the crowd's refusal to comply with local authorities' orders. "The crowd of demonstrators . . . moved through the city despite the area-wide dispersal order, again lighting fireworks and throwing projectiles at police vehicles driving by." ECF No. 8-1 at 121. "Several fires were set in dumpsters and trash bins and at least one store had windows shattered by alleged looters." *Id.* It also reflects local authorities' inability to adequately respond. An article submitted by Plaintiffs reports that "[a] federal law enforcement official with knowledge of the operations told CBS News that ICE requested assistance from LAPD multiple times over the course of Friday night." ECF No. 8-1 at 123. "[A] senior city official in L.A. told CBS News that it took LAPD 55 minutes to respond." *Id.*

**Rebellion or danger of a rebellion.**    Given these undisputed facts, Section 12406's rebellion prong is readily satisfied. "[T]here [was] a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2).

Rebellion means "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons." *Rebellion*, Black's Law Dictionary 1522 (12th ed. 2024). Dictionary definitions from the 1890s and 1900s (on which the Court previously relied and which Plaintiffs repeat, *see* PI Mot. at 12) define "rebellion" similarly. *See Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject."); *Rebellion*, American Dictionary of the English Language (1900) ("Open resistance to lawful authority."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("the forcible opposition and resistance to the laws and process lawfully installed"); *Rebellion*, Webster's International Dictionary of the English Language (1903) ("Open

---

[5] The articles previously submitted by Plaintiffs also describe the dangerous conditions in Los Angeles, including images of burning or burnt cars and an unidentified burning object. ECF No. 8-1 at 47, 93, 102, 121, 123, 104. Other images show demonstrators "blocking traffic on [a] busy thoroughfare" and a "massive crowd" pushing to a wall barrier. ECF No. 8-1 at 120, 122. And the articles say that "[d]emonstrators blocked entrances and exits to [the Federal Building in downtown Los Angeles]," "spray-painted anti-ICE slogans on [a] building's exterior walls," and "attempted to physically stop ICE vehicles." ECF No. 8-1 at 54. *Id.* "Dozens of buildings were tagged with graffiti, including the LAPD Headquarters, the U.S. Courthouse and the old Los Angeles Times building." ECF No. 8-1 at 121.

14

resistance to, or defiance of, lawful authority.").

Plaintiffs ignore these definitions but highlight a separate and narrower definition of rebellion as "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence." *Id.* Congress did not limit this prong of the statute to efforts to overthrow the government. That would senselessly make the President's authority to mobilize the National Guard turn on a mob's state of mind. It also would exclude perhaps the most well-known rebellion in American history, the Whiskey Rebellion, which was suppressed when President Washington called up the militia under a predecessor statute. *See, e.g.*, Jennifer Elsea, Cong. Research Serv., The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law, R42659, at 8 (Nov. 6, 2018) ("CRS Report"). The Whiskey Rebellion's object was to oppose collection of a particular tax—not to overthrow the United States Government. To be sure, President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." *See id.* at 7–8 & n.40; Act of May 2, 1792, ch. 28, §§ 1–2, 1 Stat. 264. But it would have been wholly uncontroversial in 1792 and in 1903 (just as it is uncontroversial today) to refer to the Whiskey Rebellion as a "rebellion." And it is implausible that Congress's reference to the term "rebellion" intended a narrow definition that would not cover this extremely well-known historical precedent of the President calling up the militia in response to violent opposition.

The Court similarly held that to qualify as a rebellion for purposes of Section 12406(2), a rebellion must be, among other things, "political in nature" and "be against the government as a whole—often with an aim of overthrowing the government—rather than in opposition to a single law or issue." TRO Op. at 18–19. This interpretation is also wrong. First, it conflicts with Section 12406, which is triggered by a "rebellion or danger of a rebellion against *the authority* of the Government of the United States." 10 U.S.C. § 12406 (emphasis added). A rebellion can take place against the Government's authority without seeking its end. For example, a rebellion might resist the government's taxation, alien removal, or conscription authority. Second, this interpretation conflicts with even the definitions on which the Court relied. One of the definitions—the 1891 Black's Law Dictionary—contains no "political" component, but includes

15

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

all "[d]eliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject." The 1901 Cyclopedic Dictionary of Law definition the Court cited (and which Plaintiffs selectively quote) likewise does not support the Court's interpretation. It *distinguishes* between a "rebellion amount[ing] to treason" and "mere resistance of process" by punishment but makes clear that *both* are rebellions. The first definition in Webster's 1903 International Dictionary of the English Language includes "levying war or by aiding others to do so" but also encompasses "[t]he act of rebelling," "revolt," and "insurrection." Indeed, even Plaintiffs' cherry-picked first definition from Black's Law Dictionary does not *require* an aim to overthrow or change the government. *Rebellion*, Black's Law Dictionary (12th ed. 2024).

Regardless, under almost any of the definitions of "rebellion," the conditions in Los Angeles met Section 12406's requirement of "a rebellion or danger of a rebellion to the authority of the United States." Rioters were violent and armed. The Court recounted that bad actors were "armed with fireworks, rocks, mangoes, concrete, chairs, or bottles of liquid," "[o]thers threw rocks and other objects, including a Molotov cocktail," "[s]ome people on June 8 set off fireworks toward officers and threw objects at their vehicles," and "[s]omeone on June 9 fired paintballs." TRO Op. at 19. Violent mobs have besieged federal facilities, assaulted federal officers, "pinned down" federal officials, used "commercial dumpsters" as "battering ram[s]" to breach a federal building, "heavily vandalized" federal properties, engaged in "seven hours of non-stop fighting" with federal officials, trapped an ICE officer in her vehicle, set fire to vehicles and a propane tank, engaged in looting, and injured "[n]umerous federal officers and agents." First Santacruz Decl. ¶¶ 7–28. The presence of non-violent sympathizers does not subtract from the threat presented by violent demonstrators.

The demonstrators' resistance was open. They collected themselves in public. And the rioters' graffiti on federal buildings included messages like "Kill ICE," "Death to ICE," and "Hang Trump," leaving no ambiguity as to the purpose of their actions. Supp. Santacruz Decl. ¶ 5. They were organized in their interference with lawful federal operations. They organized themselves through social media, "posting the locations of federal law enforcement employees conducting

immigration enforcement operations to obstruct their work." First Santacruz Decl. ¶ 33. They have also "post[ed] the location, images, and family information of federal law enforcement employees online in an attempt to dox, threaten, and obstruct federal law enforcement personnel and their families and impede lawful federal activity." *Id.*

At the TRO phase, the Court stated that "there is little evidence of whether the violent protesters' actions were 'open or avowed'" because "[s]ome presumably engaged violently with officers at close quarters in the daylight, while many others threw items under cover of darkness, protected by a crowd, identities concealed." TRO Op. at 19. But it is unsurprising that many if not most violent rioters would seek to avoid detection and apprehension for their crimes, and it would be perverse to read Section 12406(2) to prevent the President from protecting federal officials and property from all attacks except those where the perpetrators *expect* to be identified and caught. While some (though by no means all) definitions of rebellion state that resistance to authority should be "open," this at most excludes defiant activities undertaken in secret without the Government's knowledge. It does not mean the Government cannot protect its officials against violent assailants who, for example, attack federal officials "under cover of darkness" or do so while seeking to blend into a crowd.

Even if the situation in Los Angeles had not risen to the level of a rebellion, the circumstances described above at a minimum presented a *danger* of a rebellion. Congress sensibly did not require the President to wait for an actual rebellion to materialize before federalizing Guardsmen where the risk for a rebellion exists. Violent rioters' use of force (including with weapons) creating life-threatening dangers to federal officers enforcing federal law (as well as bystanders) and their messages targeting federal employees for their work performing federal functions indicate a risk of rebellion. The Court dismissed this argument by asserting that neither the President's nor Secretary Hegseth's memoranda identified a risk of a rebellion. But nothing in Section 12406 requires the President to make written factual conclusions before activating Guardsmen. There is no magic words requirement for the Commander in Chief to address exigent threats. For support, the Court cited a case applying the Administrative Procedure Act, but that form of review does not apply to presidential decisionmaking. *Franklin v. Massachusetts*, 505

17

3:25-cv-04870-CRB                 DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

U.S. 788, 800 (1992). And in any event, the President's memorandum did gesture towards the risk of a rebellion. It noted that "[t]o the extent that protests or acts of violence directly inhibit the execution of laws, they constitute a form of rebellion . . . ." Presidential Memo at 1.

Finally, the Court was "troubled by the implication inherent in Defendants' argument that protest against the federal government, a core civil liberty protected by the First Amendment, can justify a finding of rebellion." TRO Op. at 20. That is not Defendants' position. Defendants are not concerned by peaceful protests whether they relate to ICE's operations or otherwise. Nor does the National Guard's deployment prevent any particular peaceful protest. The National Guard is needed to protect federal agents who are enforcing immigration law as well as federal property from violent rioters. "The First Amendment does not protect violence." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982). And "throwing concrete chunks" and launching fireworks at federal officers—to take just a few of the violent activities set forth above—actually threaten the officers' safety; the officers are not merely "inconvenienc[ed]" or merely made to feel "uncomfortable." TRO Op. at 19–20.

Relatedly, the Court's observation "that peaceful protest does not lose its protection merely because some isolated individuals act violently outside the protections of the First Amendment," *id.* at 21, is beside the point. The President has not directed the National Guard to suppress peaceful protests, nor have they have done so. The National Guard are "to temporarily protect ICE and other United States Government personnel who are performing Federal functions . . . and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Presidential Memo at 1. And as set forth in General Sherman's declaration, the National Guard and Marines are engaged in purely protective activity. *See supra* Background, Section IV.

***Unable with the regular forces to execute the laws.*** The President's action was independently warranted because he is "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). Violence materialized in Los Angeles in response federal law enforcement personnel's carrying out of federal immigration law. And the threat rose to a level that made it impossible for the regular personnel responsible for that task to execute the laws

18

of the United States.  *See* Supp. Santacruz Decl. ¶¶ 10–12.

Plaintiffs assert that Section 12406(3) is not satisfied because agents were still able to carry out *some* immigration enforcement activities.  *See* PI Mot. at 3–4, 14–15.  The Court previously agreed, finding that the President must demonstrate he is completely "unable . . . to execute the laws of the United States" to invoke Section 12406(3).  TRO Op. at 22–23.  Section 12406(3), however, cannot plausibly be read to mean that, so long as *some* amount of execution of the laws remains possible, the statute cannot be invoked, regardless of how much execution of the laws remains thwarted or how much danger federal personnel face during their constrained operations.

This Court also pointed to the 1970 Postal Service strike as a "classic example" of permissible use of Section 12406(3).  *Id.* at 23–24.  But there is no reason to think that event set the statute's outer boundaries.  Moreover, it is not clear that even a strike would satisfy the Court's standard:  the strike was initially localized, some postal employees continued to work, and some mail service continued.  *See* "The Strike That Stunned the Country," TIME (Mar. 30, 1970), https://perma.cc/NNY9-C5GH.  And even if the mail laws could not be executed at all before President Nixon deployed the Guard, many other laws still could.  So this Court's absolute reading of "unable to execute the laws" is inconsistent with what the Court itself described as a paradigm application.  The statute is better read to authorize the President to call up the National Guard when he is unable to ensure to his own satisfaction the faithful execution of federal laws by the federal officers who regularly enforce them, without undue harm or risk to officers.  10 U.S.C. § 12406(3).

Plaintiffs also suggest that this prong cannot apply because Defendants have not exhausted all other "federal law enforcement agencies—those subject to the President's direct command[]" before federalizing Guardsmen.  PI Mot. at 14.  This reads "regular forces" out of the context of the laws that those forces assist the President in executing.  Congress has made the Department of Homeland Security's ICE ERO—not other law enforcement agencies—responsible for alien removal.  The President is not required to call up the United States Park Police from Yosemite National Park to respond to the threat against ICE ERO officers before activating the National Guard.

In addition, "the laws of the United States" for purposes of Section 12406(3) are not limited

19

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

to immigration laws but may include laws forbidding interference with federal functions or assaults on federal officers and property. *See* 18 U.S.C. §§ 111, 136. Indeed, the protests directly threatened the entire federal complex located at 300 Los Angeles Street, which includes the Edward R. Roybal Federal Building, the seat of this Court's sister court, the U.S. District Court for the Central District of California, which remained on significantly restricted access from June 9 to June 16, 2025. Supp. Santacruz Decl. ¶ 4. The President was entitled to conclude that activation of the National Guard was necessary to ensure the faithful execution of federal laws.

***

Finally, interpreting Sections 12406(2) and (3) in the way Plaintiffs propose would raise serious constitutional concerns. The President has inherent Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops*, 1 Supp. Op. O.L.C. 343, 343 (1971); *see id.* at 344 (discussing decisions in *In re Neagle*, 135 U.S. 1 (1890), and *In re Debs*, 158 U.S. 564 (1895)). On Plaintiffs' reading, the President is without authority to deploy troops to protect federal officers and property from violent mobs—and must instead rely on protection from state and local officials who may or may not support the relevant federal operations and may even sympathize with the political aims of the rioters—unless, among other requirements, the rioters intend to oppose the Government as a whole, and unless the Government is wholly unable to enforce federal law. That is not a reasonable reading of the statute but, if it were, the canon of constitutional avoidance militates against interpreting it in this way.

### 3. The President complied with Section 12406's procedural requirements.

The Government complied with the requirement that federalization orders be "issued through the governor[]" of California. 10 U.S.C. § 12406. The Secretary of Defense caused two orders to be transmitted to the "Adjutant General of the California National Guard Through: The Governor of California." June 7 DoD Memo; June 9 DoD Memo. These orders notified California leadership that in total 4,000 members of the State National Guard were being "called into Federal service effective immediately." That is all that the statute required.

Though not required by law, the memoranda were issued after multiple discussions with the Governor's staff and after the Governor's military chief of staff indicated that the Governor

would not push back against federalization of Guardsmen. Thus, even if Section 12406 imposed a consultation or consent requirement (it does not), those requirements would have been satisfied. As explained in the background, before the President signed his memorandum, the CNGB advised the California Adjutant General that the President intended to mobilize the California National Guard. Nordhaus Decl. ¶¶ 9–10. That was a direct communication to the Governor's staff. Under California law, "[t]he Adjutant General is chief of staff to the Governor," serves on "[t]he staff of the Governor," and is a direct report to the Governor. Cal. Mil. & Vet. Code §§ 141, 160. He is also authorized to "issue all orders in the name of the Governor." *Id.* § 163.

"It is common practice that the [CNGB] communicates directly with the adjutant general of a state . . . including where coordination with the governor is needed." Nordhaus Decl. ¶ 4. The California Adjutant General "presents himself as a representative of the governor in dealings with the [DoD National Guard Bureau] on issues like federal mobilizations." *Id.* ¶ 5. The CNGB "do[es] not interact directly with other state officials unless specifically requested, relying instead on the adjutant generals to relay communications to their state leadership." *Id.* ¶ 8. And California had not previously told him "to communicate with the California Governor directly or through someone other than the adjutant general." *Id.*

Thirty minutes after the CNGB alerted the Adjutant General to the likely federalization of Guardsmen, the Adjutant General told the CNGB "that he had relayed news of the intended mobilization to the Governor and that the Governor was not going to push back on the mobilization." *Id.* ¶ 10. The two spoke again after another half hour, and the Adjutant General "confirmed . . . that the State of California would comply when the orders . . . came through." *Id.* ¶ 11. Following that confirmation, the CNGB transmitted to the Adjutant General the formal activation orders bearing the "THROUGH: THE GOVERNOR" label. *See id.* ¶ 15. And consistent with Adjutant General's position on the Governor's staff, those papers were passed to the Governor by the Adjutant General on the night of June 7, shortly after the Adjutant General received them. *Id.* ¶ 16. Following receipt, the Adjutant General treated the orders as valid and transitioned control of the federalized Guardsmen to the DoD chain of command. *Id.* ¶ 15.

Plaintiffs read the statute to impose a consultation requirement and perhaps even require

21

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

the Governor's consent.  *See* PI Mot. at 16.  The Court rightly did not endorse this strained reading of the statute.  *See* TRO Op. at 25–26.  When a commander issues an order "through" a third party, that is not an invitation for the third party to debate whether the order should have been issued in the first place.  As to any purported consent requirement, the language of Section 12406 stands in marked contrast to other related provisions that *do* require the Governor of a state to concur before the activation of specified federal troops.  *See* 10 U.S.C. §§ 12301(d), 12304a(a).  Section 12406 omits any similar consent requirement, and there is no basis to insert it.  Indeed, if Plaintiffs were correct, the President would need to obtain the Governor's approval even before deploying the National Guard to respond if "the United States . . . is invaded."  10 U.S.C. § 12406.

In any event, Governor Newsom and the President discussed the situation in Los Angeles the day before the President issued his memorandum.  *See supra* Background, Section II.  And the CNGB repeatedly discussed the mobilization of Guardsmen with the Adjutant General before ordering them mobilized.  Nordhaus Decl. ¶¶ 8–11.  The Adjutant General represented in those discussions that the Governor "was not going to push back" before formal orders were transmitted. *Id.* ¶ 10.   Plaintiffs' consultation argument would thus fail on factual grounds even if there were such a requirement.

Shorn of their atextual attempt to impose a consultation/consent requirement, Plaintiffs' procedural argument amounts to a formalistic claim that Secretary Hegseth erred by submitting the Order through the Governor's statutory designee rather than to the Governor directly.  But this was not a legal error, let alone a consequential one.  Plaintiffs claim support for this meaningless distinction in Section 12406's use of "commanding general" for the District of Columbia.  PI Mot. at 16–17.  That is of no relevance.  The obvious reason for this is that the District of Columbia is a federal enclave that has no equivalent Executive authority separate from the federal government.  "What is unique about the District of Columbia militia statutory scheme is that . . . the District of Columbia Code vests control of the District of Columbia's organized militia (*i.e.*, the national guard) almost exclusively with the Executive Branch of the federal government."  *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004) (citing D.C. Code § 49–409).

But relatedly, even if Plaintiffs were right, they have at most identified a procedural foot

22

fault.  Any error in issuing the Order to the Governor's military Chief of Staff rather than the Governor himself was harmless and would not warrant the extraordinary relief of a preliminary injunction.  *See, e.g.*, *Winter*, 555 U.S. at 12, 26 (finding that alleged procedural violations based on the National Environmental Policy Act did not warrant an injunction against military exercises). That is especially true in the context of the President's use of authority necessary to respond to urgent threats to the security of federal personnel and property.  California does not dispute that Governor Newsom received and was fully aware of the Secretary's orders.  *See* ECF No. 8-1, Exs. K and S.  The Complaint recites that, on the afternoon of June 7, the Governor took to social media to complain *in advance* about the President's impending activation of the National Guard.  Compl. ¶ 53.  To the extent the statute requires action by the Governor, he has a purely ministerial and non-discretionary role.  The statute uses the mandatory "shall" in discussing the issuance of orders "through the Governor."  10 U.S.C. § 12406.

### B.  Defendants Have Not Violated the Posse Comitatus Act.

The Posse Comitatus Act makes it a federal crime to "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except "in cases and circumstances expressly authorized by the Constitution or Act of Congress."  18 U.S.C. § 1385.

This argument fails at the outset for at least two threshold reasons.  First, Plaintiffs have no cause of action to enforce the statute.  The Posse Comitatus Act is a criminal statute with no express cause of action.  And there is no historical basis, and thus no implied equitable cause of action, for a court to enjoin the federal to comply with a criminal statute that protects the public at large, let alone on behalf of *a state*.  *See NRC v. Texas*, No. 23-1300, slip op. at 14 (U.S. June 18, 2025) (holding that courts historically "recognized a right to equitable relief" only where allegedly "ultra vires" action was "in violation of the rights *of the individual*" (emphasis added)); *see also Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999).  In any event, Section 12406 of course is an "Act of Congress."  Thus, if Section 12406 authorizes the deployment here—which it does—that satisfies the Posse Comitatus Act's express authorization requirement.  That is why, to take the mail strike example, it was permissible for the National

23

Guard to execute the laws on delivery of mail when President Nixon invoked Section 12406 in response to the strike.

Even putting aside these threshold defects, the argument would fail because neither the National Guard nor the Marines are engaged in law enforcement. As the Court correctly noted, the President's Memorandum and DoD memoranda, "do not direct the federalized National Guard members to undertake activities that would violate the Act." TRO Op. at 28; *see also* Sherman Decl. ¶¶ 6–8 (explaining the combined Armed Forces' operational orders and actions since June 7). Rather, the National Guard is protecting federal law enforcement, consistent with longstanding practice and the inherent executive power to protect federal personnel and property.

Plaintiffs' Preliminary Injunction Motion is, again, devoid of evidence to the contrary. Plaintiffs note that the Marines "briefly detained" one civilian. But that isolated act was in protection of federal property (the individual had attempted to enter a restricted area on federal property multiple times) and the Marines turned that individual over to the LAPD minutes later. *See supra* Background, Section IV. The gravamen of Plaintiffs' argument is thus that providing protection to federal officials executing federal laws and security for federal property itself involves forbidden enforcement of the laws. *See* PI Mot. at 22–24. But the National Guard and Marines do not engage in law enforcement merely because they protect those who do. When the National Guard and Marines protect ICE agents who are engaged in immigration enforcement actions, it is the ICE agents—not the protective cordon of soldiers—who are executing federal immigration laws. By analogy, when the Secret Service protects the President, no one thinks that the Secret Service is thereby executing the President's authorities; or when the U.S. Marshals protect the judiciary, no one thinks that they are exercising the judicial power of the United States.

Nor does *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991), help Plaintiffs. *See* PI Mot. at 23–24. In that case, the D.C. Circuit affirmed that "indirect assistance" by the Navy in law enforcement activity did not offend the Posse Comitatus Act, as the Navy only acted "passive[ly]" in the underlying FBI operation. *Yunis*, 924 F.2d at 1094; *see also United States v. Red Feather*, 392 F. Supp. 916, 924 (D.S.D. 1975) (Posse Comitatus Act does not apply to federal troops playing "a passive role in civilian enforcement activities"). Indeed, "[t]he vast majority of cases called

24

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

upon to [determine whether the Armed Forces have been improperly used as a police force] have found that the assistance provided civilian law enforcement did not constitute 'execution of the law' in violation of Posse Comitatus Act requirements.'"  CRS Report at 57 (collecting cases). This includes cases where the Armed Forces played a much more active role than the protective functions here.  *See, e.g.*, *United States v. Bacon*, 851 F.2d 1312, 1313–14 (11th Cir. 1988) (per curiam); *United States v. Stouder*, 724 F. Supp. 951, 953 (M.D. Ga. 1989) (finding that Air Force personnel who investigated defense contractor's possible fraudulent conduct, assisted FBI in executing court-authorized search, and preserved seized evidence for use at trial, were not engaged in law enforcement).

Further, that the Posse Comitatus Act does not prohibit the President from using troops to protect federal personnel and property has deep roots in Executive practice.  The Department of Justice has consistently "taken the position that the Posse Comitatus Act . . . does not impair the President's inherent authority to use troops for the protection of federal property and federal functions."  *Authority to Use Troops*, 1 Supp. Op. O.L.C. at 343; *see also id.* at 343 n.1 (citing examples).  Moreover, in upholding the Executive's inherent authority to deploy a deputy marshal to protect Justice Field from a would-be assassin, the Court contemplated that the President could use "soldiers of the army" to provide such when necessary:

> So, if the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed, and the mail carriers assaulted and murdered, in any particular region of country, who can doubt the authority of the president, or of one of the executive departments under him, to make an order for the protection of the mail, and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice Field, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a *posse comitatus* properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

*In re Neagle*, 135 U.S. at 65; *see also In re Debs*, 158 U.S. at 582 (upholding President Cleveland's use of federal troops to protect the mails and observing that, "[i]f [an] emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws").

25

3:25-cv-04870-CRB          DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

### C.  The Federalization of Guardsmen Does Not Intrude on the State's Police Power.

At the TRO stage, the Court found that Plaintiffs were likely to succeed on their Tenth Amendment claim because the Court determined that the President violated Section 12406 in calling up the Guard.  *See* TRO Op. at 29.  Plaintiffs largely reiterate the same arguments.  *See* PI Mot. at 24–25.  But as detailed above, this determination was in error.  *See supra* Argument, Section I(A)(3).  As the President's invocation of Section 12406 was proper, Plaintiffs' derivative Tenth Amendment claim on those same grounds fails.  The Court, however, went further in treating the Tenth Amendment as a separate basis for relief on the theory that "even if" Section 12406 authorizes the call-up, the activation purportedly may still "conflict with California's police power."  TRO Op. at 29–30.  Plaintiffs do not make any such argument in their PI Motion: they do not argue that deployment of the National Guard would violate the Tenth Amendment even if consistent with Section 12406.

Forfeiture aside, the Tenth Amendment is simply not implicated here.  For one, as discussed, the National Guard and Marines are not exercising police power.  *See supra* Background, Section IV.  The National Guard and Marines are protecting federal personnel and property, which the Court recognized is within the Executive's constitutional authority.  TRO Op. at 30.  The President's use of the National Guard and Marines to perform this protective function, consistent with express Congressional authorization, raises no Tenth Amendment concerns.  And even if the Guard and Marines were going beyond protection to execution (which they are not), they would be engaging in *immigration enforcement*, which is a quintessential *federal* power. Again, the Guard and Marines are not enforcing immigration law or any other law.  But even if they were, Plaintiffs would be raising at most a dispute over *which* federal officials will enforce federal law (ICE or a properly federalized National Guard).  The Tenth Amendment has nothing to say about that issue.

### II.    THE BALANCE OF EQUITIES CUTS AGAINST ANY INJUNCTION.

Because Plaintiffs are unlikely to succeed on the merits, the Court should deny the motion and need not consider the remaining preliminary injunction factors.  *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  In any event, these factors too strongly favor

26

the Federal government.  Plaintiffs' requested injunction would significantly harm the federal government and the public at large.  As discussed above, since June 6, 2025, violent mobs have besieged federal facilities, assaulted federal officers, "pinned down" federal officials, thrown "concrete chunks" and other dangerous objects at officers, used "commercial dumpsters" as "battering ram[s]" to breach a federal building, "heavily vandalized" federal properties, engaged in "seven hours of non-stop fighting" with federal officials, fired potentially lethal "commercial-grade fireworks" and "mortar-style fireworks" at them, trapped an ICE officer in her vehicle, "shattered the wrist of a CBP officer," set fire to vehicles and a propane tank, engaged in looting, and injured "[n]umerous federal officers and agents," among other mayhem.  First Santacruz Decl. ¶¶ 7–28.  The National Guard has played an indispensable role in protecting the safety of federal officials, allowing these officials to enforce federal law and otherwise do their jobs, as well as in protecting federal property.  *See supra* Background, Section IV.  Pulling Guardsmen and Marines would pose a substantial risk to federal personnel and property, as well as to federal officials' ability to enforce federal law.

At the TRO stage, the Court stated that Plaintiffs "have established that the continued presence of National Guard members and Marines in Los Angeles risks worsening, not improving, tensions on the ground," TRO Op. at 31, and that "Federal agents and property may actually well be served by de-militarization and a concurring de-escalation of the situation," *id.* at 35.  This speculation is unwarranted.  The cause of the violent riots is the enforcement of immigration laws in Los Angeles—not National Guard protection for officials enforcing immigration laws in Los Angeles.  Indeed, prior to deployment of the National Guard, state and local officials as well as elected federal officials representing California criticized ICE enforcement operations, often in harsh terms.

The Court's supposition is also contrary to the record.  There had been multiple documented instances of violence or attempted violence against federal officials before the President's activation of the National Guard.  For example, on Friday, June 6, 2025, protesters threw "concrete chunks, bottles of liquid, and other objects at the [federal security] officers," and attempt[ed] to use large rolling commercial dumpsters as a battering ram to breach the parking

27

3:25-cv-04870-CRB                    DEFS.' OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

garage gate" of a federal building complex.  First Santacruz Decl. ¶ 11.  The rioters were "using chairs, dumpsters, and other items as weapons."  *Id.* ¶¶ 14–15, 17.  The next day, a crowd once again became violent and attacked federal officers for seven continuous hours.  *Id.* ¶ 20.  One officer was trapped inside her law enforcement vehicle, which the crowd surrounded and violently pummeled with stones; a perimeter fence that federal officials had constructed was cut; vehicles were damaged; and incendiary devices—including potentially lethal "mortar-style" and "commercial-grade fireworks"—were launched at federal officers.  *Id.* ¶¶ 20–22, 26.  The next day, despite LAPD declaring the downtown area an unlawful assembly, protesters set off fireworks, threw objects at law enforcement, lit fires in dumpsters and trash bins, looted stores, and vandalized a federal facility.  *Id.* ¶ 26.  The building's security checkpoint was left "in ruins."  *Id.* ¶ 27.

But even if removing National Guard protection would in some modest respect de-escalate tensions in Los Angeles—and there is no evidence for this—it would do so only at the expense of *removing protections* for federal officials and property.  That is unacceptable, particularly since California can offer no reliable assurance that state authorities will fill the security void that the proposed injunction would create.  The LAPD and other state and local law enforcement officers have not been able to eliminate the ongoing disorder.  In fact, their inaction has already resulted in threats and injuries to federal personnel, which has hindered the federal government's ability to safely carry out its mandates.  *See supra* Background Section II.  This concern about state and local protection is underscored by California's express opposition to the federal government's immigration enforcement, including using language that inflames would-be violent protesters, such as that ICE "activity was meant to 'sow terror' in the nation's second-largest city."  PI Mot. at 2 (citation omitted).  It is implausible that, absent federal protection for federal officials and federal property, violent mobs opposed to immigration enforcement would stand down.

Against the federal government's serious harm if an injunction is issued, California cites only two highly speculative harms: (1) the National Guard and Marine presence purportedly "risks worsening" tensions; and (2) the federalizing the National Guard diverts Guard members from potential tasks for the state.  Neither of these harms acknowledge the reality on the ground.  As to the first purported harm, as previously explained, there is no evidence that the Guard's presence

28

itself—as opposed to ideologically based opposition to immigration enforcement in Los Angeles—is the cause of tensions.  But even if California were correct that deployment of the National Guard had somehow inflamed tensions by increasing riots and violence, that would not justify an injunction.  Rather, state officials could play a constructive role in addressing those tensions, such as by unequivocally making clear that violence and obstruction of ICE's operations will not be tolerated and will be harshly punished, directing local and state law enforcement to aggressively combat such violence, publicly making clear that violence will be harshly punished, and backing those declarations by arresting and prosecuting offenders.  That is, the solution is not to give violent mobs what they demand, which is to prevent the federal government from providing protection to federal officials lawfully executing federal laws.

As for Plaintiffs' complaint that the federalization of Guardsmen subtracts from resources available to the California National Guard, California has not identified any specific harm that will flow to the State if it is deprived temporarily of the use of 4000 guardsmen.  The State has argued, for example, that it relies on members of the National Guard to assist in fighting wildfires, but it does not claim to have any immediate need for these particular individuals.  PI Mot. at 27 (citing of "likelihood of above-normal significant fire potential").  Nor does California claim that these servicemembers were performing any emergency duties for the State when they were activated into federal service.  But even if the State suffers some diversion-related injury, any such injury is far outweighed by the injury to the federal government discussed above.  And in any event, this claimed irreparable harm does not even apply to the deployment of Marines.

## III.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek emergency relief if appeal is authorized.  Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken v. Holden*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap"

between that standard and "the factors governing preliminary injunctions"). And the Court of Appeals' previous grant of an administrative stay underscores that Court's view that the gravity of the relief granted by Court's previous TRO—like the injunction requested here—should be meaningfully reviewed by the Court of Appeals before it is allowed to go into effect. The Defendants also respectfully request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c).

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director
Federal Programs Branch

JEAN LIN
(NY Bar 4074530)
Special Litigation Counsel
Federal Programs Branch


*/s/ Christopher D. Edelman*
CHRISTOPHER EDELMAN
(DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB
(IL Bar No. 6322571)
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: 202-305-8659
Email: christopher.edelman@usdoj.gov

*Attorneys for Defendants*