1  JUDY W. WHITEHURST, Chief Deputy (SBN 182855)
   jwhitehurst@counsel.lacounty.gov
2  MARGARET L. CARTER, Senior Assistant County Counsel (SBN 220637)
   mcarter@counsel.lacounty.gov
3  648 Kenneth Hahn Hall of Administration
   500 West Temple Street
4  Los Angeles, California 90012-2713
   Telephone: (213) 808-8736 · Fax: (213) 633-1915
5
   Attorneys for *Amicus Curiae* County of Los Angeles
6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12  GAVIN NEWSOM, in his official capacity as       Case No. 3:25-cv-04870-CRB
    Governor of the State of California; STATE
13  OF CALIFORNIA,                                  **BRIEF OF AMICUS CURIAE
                                                    COUNTY OF LOS ANGELES IN
14                         Plaintiffs,              SUPPORT OF PLAINTIFFS' MOTION
                                                    FOR PRELIMINARY INJUNCTION**
15           v.
                                                    Hearing Date: June 20, 2020
16  DONALD TRUMP, in his official capacity as       Time: 10:00am
    President of the United States; PETE            Place: Courtroom 6 – 17th Floor
17  HEGSETH, in his official capacity as Secretary  Judge: Charles R. Breyer
    of the Department of Defense; DEPARTMENT
18  OF DEFENSE,

19                         Defendants.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF AMICUS CURIAE ........................................................ 1

ARGUMENT ................................................................................................................................ 2

I.     THE DEPLOYMENT OF MILITARY PERSONNEL OVER THE OBJECTION OF THE GOVERNOR HAS IMPEDED LASD'S ABILITY TO CARRY OUT TRADITIONAL POLICE POWERS AND HARMED THE COUNTY ........................... 2

     A.     LASD deputies are trained to respond to protests and were equipped to respond to protests on June 6 and 7 ....................................................... 2

     B.     The presence of the military has harmed the County and its residents ................... 4

II.    THE DEPLOYMENT AND SUBSEQUENT ACTIONS OF MILITARY PERSONNEL VIOLATE SECTION 12406 AND BLUR THE BOUNDARY BETWEEN THE MILITARY AND CIVILIAN LAW ENFORCEMENT ....................... 7

     A.     There is no "rebellion" in the County that supports federalizing the National Guard ................................................................................................ 8

     B.     The military's presence blurs the line between law enforcement and military activity ............................................................................................. 9

CONCLUSION ........................................................................................................................... 11

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................ 11

5

*United States v. Dreyer*,
    804 F.3d 1266 (9th Cir. 2015) ............................................................ 9

6

**Statutes**

7

10 U.S.C. § 252 ................................................................................................ 8

8

18 U.S.C. § 1385 .............................................................................................. 9

9

**Other Authorities**

10

*200 Arrested as Cops Raid Occupy LA Camp*, CBS News (Nov. 30, 2011) ................................... 3

11

American Nurses Association California, *California Statement on National Guard
    Deployment in Los Angeles County and Impacts on Healthcare Providers*
    (June 9, 2025) ...................................................................................... 6

12

Austin Turner and Matthew Rodriguez, *L.A. Police Use Tear Gas, Flash-Bangs on
    "No Kings" Protesters in Downtown*, CBS News (June 14, 2025) ................................... 5

13

Chad de Guzman & Callum Sutherland, *Why Waymo's Self-Driving Cars Became
    a Target of Protesters in Los Angeles*, Time (June 9, 2025) ................................... 6

14

Gabe Whisnant, *National Guard Commander Backtracks on Remark About
    Detaining Civilians*, Newsweek (June 11, 2025) ................................... 10

15

Greg Wehner, *National Guard Troops Detain Anti-ICE Protesters in Los Angeles
    Under Trump's Orders*, MSN (June 12, 2025) ................................... 10

16

Helen Jeong, *How Mostly Peaceful 'No Kings' Rally in Downtown LA Suddenly
    Turned Chaotic*, NBC L.A. (June 14, 2025) ................................... 3

17

Jake Offenhartz & Jason Dearen, *Protests Intensify in Los Angeles After Trump
    Deploys Hundreds of National Guard Troops*, AP (June 8, 2025) ................................... 5

18

Jennie Taer, *Armed National Guard Troops Stand Guard for ICE Agents as They
    Make Immigration Raids in Los Angeles*, MSN (June 10, 2025) ................................... 11

19

Jonathan Lloyd & Lauren Coronado, *Apple and Adidas Stores Among Businesses
    Looted and Damaged in Downtown LA*, NBC L.A. (June 10, 2025) ................................... 6

20

Jonathan Lloyd, *What to Know About 'No Kings' Protests in Los Angeles*, NBC
    L.A. (June 14, 2025) ................................... 5

21

Kaitlyn Schallhorn, *With Downtown LA Under Curfew, Here's a Sampling of
    What is Open, Closed, or Postponed*, Daily News (June 11, 2025) ................................... 7

22

*L.A. County Sheriff Robert Luna Explains Deputies' Use of Less-Lethal Munitions*,
    KCAL News (June 15, 2025) ................................... 3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Mary A. Fischer, *Occupy L.A.: Where the 99% Get an Assist From Hollywood's 1%*, The Atlantic (Oct. 12, 2011) ................................................................. 3

Matt Hamilton, *Protestors with Black Lives Matter Shut Down 405 Freeway in Inglewood*, L.A. Times (July 10, 2016) ........................................................ 3

Memorandum from President Donald J. Trump to Attorney General Pam Bondi and Secretary of Homeland Security Kristi Noem, Security for the Protection of Department of Homeland Security Functions (June 7, 2025) ........................... 8

Michel R. Moore, Ret. Police Chief of L.A. Police Department, *I Ran the L.A.P.D. I Know What Happens When Troops Are Sent to American Cities*, N.Y. Times (June 13, 2025) ...................................................................................... 9

Missael Soto, *LASD: Over 100 Deputies Dispatched to Paramount as Protest Declared Unlawful*, NBC L.A. (June 7, 2025) .............................................. 2

Nancy Rommelmann, *ICE Raids and Protests Empty Out Santee Alley: Dispatch from L.A.*, Reason (June 16, 2025) ............................................................... 7

Nicholas Slayton, *Marines Detain Civilian in Los Angeles, in First Such Case*, Task & Purpose (June 13, 2025) .................................................................. 10

*Officials Prepared to Respond if Occupy LA Came on County Premises After Camp Dispersal, Emails Show*, Met News (Dec. 1, 2011) ............................... 3

PARS Public, *5-03/030.00 – Crowd and Riot Control*, Manual of Policy and Procedures ............................................................................................... 2

PARS Public, *5-06/030.12 – Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations*, Manual of Policy and Procedures ............................................................................. 2

Patricia Kime, *As National Guard Arrived in Los Angeles, VA Docs Scrambled to Make Sure Veteran Patients Received Care*, Military.com (June 11, 2025) ........... 6

Rebecca Schneid, *Is L.A. Still Under Curfew Amid Mass Protests? Here's What You Need to Know*, Time (June 15, 2025) .................................................. 7

Safiyah Riddle, Charlotte Kramon, & Matt Brown, *National Guard Troops in LA, the Latest in Long History of Deployments During Civil Rights Protests*, AP (June 10, 2025) ..................................................................................... 4

Sarah Rumpf-Whitten, Ashley Papa & FOX News, *California Looters Now Face 'Hard Charging' Consequences After Blue State Abandoned Soft-On-Crime Approach*, N.Y. Post (June 12, 2025) ....................................................... 6

Simon Corlett & Mike Heuer, *Marines Detain U.S. Citizen Entering LA Federal Building Amid Protests,* MSN (June 15, 2025) ........................................... 10

Solcyré Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment There in 1992*, Time (June 9, 2025) .................................... 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Stephanie Breijo & Mark E. Potts, *Immigration Protest Curfews Wallop
    Downtown Restaurants*, L.A. Times (June 11, 2025)................................................. 7

Tim Caputo, *LASD Throws Flash Bangs, Tear Gas At Crowd in LA*, ABC 7 News
    (June 14, 2025)............................................................................................................ 3

U.S. Northern Command Public Affairs, *Update to DoD Federal Protection
    Mission – June 11, 2025*, U.S. Northern Command (June 11, 2025) ...................... 10

Will Conybeare, *Los Angeles Mayor Karen Bass Speaks to KTLA on ICE Raids,
    Protests and Federal Response: 'This is Just Political'*, KTLA (June 8, 2025) ...................... 2

Will Conybeare, *More Than 500 Arrests Made Over 8 Days of Protests in Los
    Angeles: LAPD*, KTLA5 (June 15, 2025) ................................................................. 9

**INTRODUCTION AND INTEREST OF AMICUS CURIAE**

Amicus Curiae County of Los Angeles (the "County") has a strong interest in building communities where all residents feel safe and empowered to participate in civic life. Local governments, at their core, exist to protect and promote the health, safety, and welfare of their residents. The deployment of military personnel to the County is harming residents and hindering the ability of the Los Angeles County Sheriff's Department ("LASD") to protect County residents and property, preserve peace and public safety, and control law enforcement efforts in its jurisdiction. Amicus therefore has a strong interest in ending the deployment.

As this Court is aware, on June 7, 2025, the President issued a memorandum invoking 10 U.S.C. § 12406 to federalize and deploy 2,000 members of the National Guard to the County of Los Angeles. On June 9, 2025, Defendants deployed 700 Marines to the County. The Secretary of Defense then mobilized more National Guard members, raising the total number of soldiers in the County to 4,800.

The deployment of the military has impeded local law enforcement's ability to address the ongoing protests, an assignment that—unlike military personnel—local law enforcement is specially trained to perform and uniquely situated to carry out due to its familiarity with the community. The deployment is not only unnecessary and disruptive but also unlawful. The events in the County do not constitute a "rebellion," which is a prerequisite for the President to lawfully invoke Section 12406 and justify sending military personnel to do what Los Angeles law enforcement is already capably doing. Additionally, the actions of military personnel in the County have blurred the line between military and civilian law enforcement responsibilities. The erasure of that boundary contravenes this country's long-held tradition of keeping the military out of civilian law enforcement absent extraordinary circumstances not present in the County.

The County will continue to suffer from Defendants' unlawful mobilization of military forces unless they are enjoined. Amicus therefore respectfully requests that this Court grant Plaintiffs' motion for a preliminary injunction.

BRIEF OF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-04870-CRB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ARGUMENT

**I.     THE DEPLOYMENT OF MILITARY PERSONNEL OVER THE OBJECTION OF THE GOVERNOR HAS IMPEDED LASD'S ABILITY TO CARRY OUT TRADITIONAL POLICE POWERS AND HARMED THE COUNTY.**

**A.     LASD deputies are trained to respond to protests and were equipped to respond to protests on June 6 and 7.**

The presence of the National Guard is unnecessary in the County because local law enforcement is specially trained to address the ongoing protests and has the capacity to do so effectively. LASD trains its deputies to protect both people and property, while respecting the right of people to assemble peaceably.[2] Deputies learn tactics for containing crowds, isolating disorderly protestors, and dispersing unlawful assemblies, while minimizing the use of force and firearms.[3]

Local law enforcement's response to recent protest activity demonstrates the preparedness. When protests first broke out in response to ICE enforcement activity on June 6, 2025, local law enforcement swiftly assembled a tactical team that successfully responded to the protests within "about an hour."[4] The following day, when protests emerged in suburban Los Angeles County on June 7, LASD helped control a crowd of approximately 400 people and dispersed the crowd when it became violent towards federal agents.[5] On June 14, when more than 200,000 people gathered at a "No Kings" protest in downtown Los Angeles, deputies helped to ensure the protests remained peaceful. In preparation for the "No Kings" protest, LASD implemented enhanced staffing, pre-

---

[2] PARS Public, *5-06/030.12 – Use of Kinetic Energy Projectiles and Chemical Weapons to Disperse Assemblies, Protests, or Demonstrations*, Manual of Policy and Procedures, https://pars.lasd.org/Viewer/Manuals/10008/Content/19517?searchQuery=crowd%20control.

[3] PARS Public, *5-03/030.00 – Crowd and Riot Control*, Manual of Policy and Procedures, https://pars.lasd.org/Viewer/Manuals/10008/Content/12057?Source=TextSearch&searchQuery= %22crowd%20control%22.

[4] Will Conybeare, *Los Angeles Mayor Karen Bass Speaks to KTLA on ICE Raids, Protests and Federal Response: 'This is Just Political'*, KTLA (June 8, 2025), https://ktla.com/news/local-news/los-angeles-mayor-karen-bass-speaks-to-ktla-on-ice-raids-protests-and-federal-response/ (statement by Los Angeles City Mayor that criticism of LAPD Chief was unfair because "if the Chief does not know when ICE is going to come to town, where they are going to be and why, then you can't come into town and expect LAPD to amass hundreds of officers in a few minutes").

[5] Missael Soto, *LASD: Over 100 Deputies Dispatched to Paramount as Protest Declared Unlawful*, NBC L.A. (June 7, 2025), https://www.nbclosangeles.com/news/local/lasd-over-100-deputies-dispatched-to-paramount-as-protest-declared-unlawful/3718062/.

BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION CASE NO. 3:25-CV-04870-CRB

staged personnel in key locations to enable swift deployment as needed, and utilized specialized resources and a uniform command structure to maintain peace.[6]  Later in the day, when some protestors began engaging in unlawful activity, LASD deployed non-lethal tactics, including flash bangs and tear gas, to clear crowds that violated dispersal orders.[7]

LASD deputies are trained to respond to crowds because the County has a long history of large-scale protests.  Local law enforcement has developed the capacity to handle them consistently and successfully.[8]  In 2011, the Occupy L.A. Movement gathered crowds of up to 1,000 protestors and up to 400 individuals camped out on public park grounds.[9]  LASD diverted resources to monitor the protests and protect County structures.[10]  When certain protestors refused to disperse, law enforcement disassembled the encampments, arresting at least 200 individuals.[11]  Between 2013 and 2016, thousands of Black Lives Matter demonstrators took to Los Angeles streets, with hundreds of protesters closing a major Southern California freeway in July 2016 to protest fatal police shootings in Minnesota and Louisiana.[12]  Local law enforcement successfully managed the protest activity without a military presence.  From Dodgers World Series wins to Lakers NBA

---

[6] *L.A. County Sheriff Robert Luna Explains Deputies' Use of Less-Lethal Munitions*, KCAL News (June 15, 2025), https://www.youtube.com/watch?time_continue=126&v=IrsyjrTdBoI&embeds_referring_euri=https%3A%2F%2Fwww.bing.com%2F&embeds_referring_origin=https%3A%2F%2Fwww.bing.com&source_ve_path=MjM4NTE.

[7] Helen Jeong, *How Mostly Peaceful 'No Kings' Rally in Downtown LA Suddenly Turned Chaotic*, NBC L.A. (June 14, 2025), https://www.nbclosangeles.com/news/local/how-mostly-peaceful-no-kings-rally-in-downtown-la-suddenly-turned-chaotic/3724550/; Tim Caputo, *LASD Throws Flash bangs, Tear Gas at Crowd in LA*, ABC 7 News (June 14, 2025), https://abc7.com/live-updates/tensions-flare-downtown-la-anti-ice-protesters-clash-agents-live-updates/16692645/entry/16752673/.

[8] *See* Amicus Curiae Br. of City of Los Angeles, ECF No. 52-1, at 3.

[9] Mary A. Fischer, *Occupy L.A.: Where the 99% Get an Assist From Hollywood's 1%*, The Atlantic (Oct. 12, 2011), https://www.theatlantic.com/business/archive/2011/10/occupy-la-where-the-99-get-an-assist-from-hollywoods-1/246561/.

[10] *Officials Prepared to Respond if Occupy LA Came on County Premises After Camp Dispersal, Emails Show*, Met News (Dec. 1, 2011), http://www.metnews.com/articles/2011/occu120111.html.

[11] *200 Arrested as Cops Raid Occupy LA Camp*, CBS News (Nov. 30, 2011), https://www.cbsnews.com/news/200-arrested-as-cops-raid-occupy-la-camp/.

[12] Matt Hamilton, *Protestors with Black Lives Matter Shut Down 405 Freeway in Inglewood*, L.A. Times (July 10, 2016), https://www.latimes.com/local/lanow/la-me-ln-protest-inglewood-20160710-snap-story.html.

BRIEF OF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-04870-CRB

Championship celebrations, LASD is no stranger to large street parties, addressing sometimes riotous crowds without military assistance. The protests in response to ICE's enforcement activities on June 6 were no different—law enforcement employed its unique understanding of the community and adequately responded, just as it has countless times.

Notably, when state and local officials need additional support, they know how to ask for it. In 2020, when protests related to the death of George Floyd devolved into looting and required mass arrests, Governor Newsom did not hesitate to call the California National Guard for backup.[13] He did so with the support of the mayor and city officials, and the scale of the 2020 protests was larger than the protest activities on June 6 and 7.[14]

**B.      The presence of the military has harmed the County and its residents.**

When local law enforcement has adequate capacity to respond to protest activity, as is the case right now in the County, an unrequested military deployment is counterproductive. Rather than helping LASD achieve its law enforcement objectives, the presence of the military has exacerbated civil unrest in the County. Additionally, the presence of the military has diverted significant resources and impeded the County's ability to provide critical services to residents. The unrequested military deployment has also harmed local businesses.

**1.      Increased civil unrest**

As this Court observed, the presence of the military has encouraged protestors to continue protesting and incites further protest activities.[15] Indeed, while the protests have remained mostly peaceful, "there has been an increase in unlawful activity in Los Angeles" since military personnel arrived.[16] LASD has observed this increase in protest activity firsthand, seeing only a handful of protests on June 6 and 7 before the military deployment, compared to many more since, including

---

[13] Safiyah Riddle, Charlotte Kramon, & Matt Brown, *National Guard Troops in LA, the Latest in Long History of Deployments During Civil Rights Protests*, AP (June 10, 2025), https://apnews.com/article/los-angeles-national-guard-protests-watts-riots-ce79302269291672444e34ab8ab4563a.

[14] *Id.*

[15] Order granting Pl.'s App. For TRO, ECF No. 64, at 6.

[16] Pls.' Mot. for Prelim. Inj., ECF No. 77, at 8 (noting that "nearly 95% of LAPD arrests occurred *after* federalized National Guard members arrived").

BRIEF OF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-04870-CRB

dozens of events around the County for "No Kings" day alone.[17]  The size of the protests also dramatically increased after the deployment, with an estimated 200,000 protestors gathered for the "No Kings" protest in downtown Los Angeles.[18]

Increased civil unrest due to the military's arrival is predictable because it gives demonstrators two things to protest—the ICE enforcement activity *and* the presence of the military itself.  As this Court noted, "many of the protestors appeared angry that the National Guard had been federalized and was now present in their city," and the "aggressive federal response . . . in turn sparked new protests across the city."[19]  In one protest outside the Metropolitan Detention Center in downtown Los Angeles, protestors yelled at National Guard troops "shame" and "go home."[20]

## 2.    Expenditures and public services

The County has had to expend significant resources to control protests inflamed by the military presence.  LASD in particular has incurred costs for enhanced staffing, overtime, equipment, and munitions to address the protests.

The unrequested deployment of the military also impacts the County's ability to provide critical services to residents.  Many available resources are contingent on trust, safety, and access to care.  For example, it is well known in the medical field that the "presence of military personnel in civilian spaces during mass demonstrations can create unintended barriers to health services, especially for undocumented and marginalized populations," because "[i]ncreased fear and mistrust may prevent individuals from seeking emergency care or follow-up treatment, even in life-

---

[17] Jonathan Lloyd, *What to Know About 'No Kings' Protests in Los Angeles*, NBC Los Angeles (June 14, 2025), https://www.nbclosangeles.com/news/local/what-to-know-about-no-kings-protests-in-los-angeles/3724171/.
[18] Austin Turner and Matthew Rodriguez, *L.A. Police Use Tear Gas, Flash-Bangs on "No Kings" Protesters in Downtown*, CBS News (June 14, 2025), https://www.cbsnews.com/losangeles/news/no-kings-downtown-los-angeles-protest/.
[19] TRO Order, *supra* note 15, at 6.
[20] Jake Offenhartz & Jason Dearen, *Protests Intensify in Los Angeles After Trump Deploys Hundreds of National Guard Troops*, AP (June 8, 2025), https://apnews.com/article/immigration-protests-raids-los-angeles-78eaba714dbdd322715bf7650fb543d7.

BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION CASE NO. 3:25-CV-04870-CRB

threatening situations."[21]  Indeed, County hospitals have experienced decreased emergency room encounters since the unrequested military deployment.  And at a time when the federal Veterans Affairs office in downtown Los Angeles is closed as a result of the protests, the County is doubly responsible for providing important healthcare to its residents.[22]

### 3.    Harms to local businesses

The instability caused by the unrequested military presence is harming businesses in the County.  More and bigger protests increases the risk that crowds will become violent and create opportunities for vandalism and looting.  Local businesses have suffered since the military deployment:  In the downtown Los Angeles area, multiple stores have been burglarized, resulting in stolen merchandise, damage to private property, and spraypainted slogans.[23]  Paramount, a city within the County targeted by ICE enforcement activities, also experienced looting and vandalism.[24]  In addition, several self-driving Waymos were set on fire and destroyed during the protests.[25]

Local businesses also were harmed by a curfew imposed to quell the unrest that the

---

[21] American Nurses Association California, *California Statement on National Guard Deployment in Los Angeles County and Impacts on Healthcare Providers* (June 9, 2025), https://www.anacalifornia.org/post/ana-california-statement-on-national-guard-deployment-in-los-angeles-county-and-impacts-onhealthcare.

[22] Patricia Kime, *As National Guard Arrived in Los Angeles, VA Docs Scrambled to Make Sure Veteran Patients Received Care*, Military.com (June 11, 2025), https://www.military.com/daily-news/2025/06/11/national-guard-arrived-los-angeles-va-docs-scrambled-make-sure-veteran-patients-received-care.html.

[23] Jonathan Lloyd & Lauren Coronado, *Apple and Adidas Stores Among Businesses Looted and Damaged in Downtown LA*, NBC L.A. (June 10, 2025), https://www.nbclosangeles.com/news/local/looting-la-protests-apple-adidas-vandalism/3720135/.

[24] Sarah Rumpf-Whitten, Ashley Papa & FOX News, *California Looters Now Face 'Hard Charging' Consequences After Blue State Abandoned Soft-On-Crime Approach*, N.Y. Post (June 12, 2025), https://nypost.com/2025/06/12/us-news/california-looters-now-face-hard-charging-consequences-after-blue-state-abandoned-soft-on-crime-approach/.

[25] Chad de Guzman & Callum Sutherland, *Why Waymo's Self-Driving Cars Became a Target of Protesters in Los Angeles*, Time (June 9, 2025), https://time.com/7292652/waymo-self-driving-cars-vandalized-fire-protests-los-angeles-why/.

- 6 -

military's unrequested presence provoked.[26]   Downtown Los Angeles is known for its creative restaurants, iconic gathering spots, and energetic nightlife.  But foot traffic has plummeted in response to the protests, the presence of military personnel, and the curfew.[27]   Business owners within the curfew zone have struggled to stem losses.[28]   Some restaurant owners report having lost up to 60% of their revenue since the deployment of the National Guard.[29]   Bars have been particularly hard hit since the curfew effectively halted all nighttime business.[30]   Other restaurants and bars have decided to close indefinitely, waiting for the tense environment downtown to ease.[31] Entertainment venues, tourist attractions, and gyms also have been affected.[32]   For a city that thrives on visitors from around the world, the closure of tourist attractions and accommodations—and the general fear of gathering in one of the busiest parts of the County—will have a prolonged economic effect on private businesses and the tax revenue they would otherwise generate.

## II.    THE DEPLOYMENT AND SUBSEQUENT ACTIONS OF MILITARY PERSONNEL VIOLATE SECTION 12406 AND BLUR THE BOUNDARY BETWEEN THE MILITARY AND CIVILIAN LAW ENFORCEMENT.

Defendants' deployment of military personnel is also unlawful.  First, the situation in the County is not a "rebellion" for purposes of Section 12406, which Defendants have invoked as authority.  Second, military personnel in the County have engaged in conduct normally left to civilian enforcement, which breaches our nation's long-held tradition of firmly separating the

---

[26] Rebecca Schneid, *Is L.A. Still Under Curfew Amid Mass Protests? Here's What You Need to Know*, Time (June 15, 2025), https://time.com/7293512/la-curfew-parameters-locations-what-to-know/.

[27] Nancy Rommelmann, *ICE Raids and Protests Empty Out Santee Alley: Dispatch from L.A.*, Reason (June 16, 2025), https://reason.com/2025/06/16/ice-raids-and-protests-empty-out-santee-alley-dispatch-from-l-a/ (reporting that part of LA's Fashion District normally packed shoulder to shoulder is empty, and up to 95% decline in business).

[28] Stephanie Breijo & Mark E. Potts, *Immigration Protest Curfews Wallop Downtown Restaurants*, L.A. Times (June 11, 2025), https://www.latimes.com/00000197-61b6-d79b-adff-edb748eb0000-123.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] Kaitlyn Schallhorn, *With Downtown LA Under Curfew, Here's a Sampling of What is Open, Closed, or Postponed*, Daily News (June 11, 2025), https://www.dailynews.com/2025/06/11/with-downtown-la-under-curfew-heres-a-sampling-of-what-is-open-closed-or-postponed/.

1    military from state and local law enforcement.

2    **A.    There is no "rebellion" in the County that supports federalizing the National**
3    **Guard.**

4         To lawfully federalize the National Guard pursuant to 10 U.S.C. § 12406 for protests that

5    "constitute a form of rebellion against the authority of the Government of the United States,"[33]

6    there must actually *be* a "rebellion."[34]   The President's memorandum does not identify a rebellion,

7    nor do the facts on the ground establish one.   As this Court explained, while the statute does not

8    define the term "rebellion," the statute's text and history suggest a "rebellion" must be (1) "not only

9    violent but also . . . armed"; (2) "organized"; (3) "open and avowed"; and (4) "against the

10   government as a whole—often with an aim of overthrowing the government—rather than in

11   opposition to a single law or issue."[35]   And as this Court noted, "the protests in Los Angeles fall

12   far short" of this definition.[36]

13        Even under a less stringent definition of "rebellion"—like the contemporary definition in

14   Black's Law Dictionary of "open resistance or opposition to an authority or tradition"—the

15   circumstances in the County do not amount to a "rebellion."   Prior examples of National Guard

16   deployment in Los Angeles make that clear.   For example, when President George H. W. Bush sent

17   National Guard personnel to Los Angeles during the 1992 riots, he did so in response to unrest that

18   caused more than 60 deaths, led to 12,000 arrests, and inflicted approximately $1 billion in property

19   damage.[37]   Notably, he also did so at the request of the California Governor, who, in his capacity

20

21   ─────────────
     [33] Memorandum from President Donald J. Trump to Attorney General Pam Bondi and Secretary of
22   Homeland Security Kristi Noem, Security for the Protection of Department of Homeland Security
     Functions (June 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/department-
23   of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.
     [34] TRO Order 9-10, 22.
24   [35] *Id.* at 18-19.
     [36] *Id.* at 19.
25   [37] Solcyré Burga, *Why Trump Sending the National Guard to L.A. Is Different From Its Deployment*
26   *There in 1992*, Time (June 9, 2025), https://time.com/7292493/trump-national-guard-la-1992-
     riots/.   While President Bush invoked the Insurrection Act to deploy the National Guard, rather than
27   Section 12406, the Insurrection Act similarly requires that there be "unlawful obstructions,
     combinations, or assemblages, *or rebellion* against the authority of the United States" for
28   mobilization to be lawful.   10 U.S.C. § 252 (emphasis added).

BRIEF OF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-04870-CRB

as the state's commander-in-chief, was able to recognize when local law enforcement required support.  By contrast, as of earlier this week, 561 protestors have been arrested, no deaths have been reported, and few law enforcement officers have been injured as a result of the protests.[38]  The vast majority of protestors have exercised their First Amendment rights unarmed, and their ability to cause significant physical damage is minimal.  Both Los Angeles Mayor Bass and Governor Newsom have actively opposed the military's deployment, further underscoring that there is no "rebellion."[39]

### B.  The military's presence blurs the line between law enforcement and military activity.

The military and civilian law enforcement have distinct purposes and responsibilities.  The military primarily protects national security and, in the case of the National Guard, has some limited domestic duties.[40]  It is "designed for combat operations" and its training and equipment are "optimized for warfare."[41]  State and local law enforcement, on the other hand, are tasked with protecting civilian populations.  Police officers and sheriff's deputies "operate within a legal framework grounded in probable cause and community trust."[42]

The clear boundaries between the military and civilian law enforcement reflect "'a traditional and strong resistance of Americans to any military intrusion into civilian affairs' that 'has deep roots in our history and found early expression[.]'"  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc); *see* Posse Comitatus Act, 18 U.S.C. § 1385 (severely restricting the use of the armed forces for law enforcement).  But since their arrival in the County, the National Guard and the Marines have engaged in civilian law enforcement activity, blurring the

---

[38] Will Conybeare, *More Than 500 Arrests Made Over 8 Days of Protests in Los Angeles: LAPD*, KTLA5 (June 15, 2025), https://ktla.com/news/local-news/more-than-500-arrests-made-over-8-days-of-protests-in-los-angeles/.

[39] *See supra* note 8.

[40] Amici Curiae Br. of Former U.S. Army & Navy Secretaries and Retired Four-Star Admirals and Generals, ECF No. 31-1, at 6.

[41] Michel R. Moore, Ret. Police Chief of L.A. Police Department, *I Ran the L.A.P.D.  I Know What Happens When Troops Are Sent to American Cities*, N.Y. Times (June 13, 2025), https://www.nytimes.com/2025/06/13/opinion/lapd-troops-la-protests.html.

[42] *Id.*

1

2    line between the two missions.

3        First, military personnel have reportedly detained protestors. The Task Force under which

4    the National Guard and Marines have been deployed claims the authority to "detain an individual

5    in specific circumstances such as to stop an assault, to prevent harm to others, or to prevent

6    interference with federal personnel performing their duties."[43] Invoking that stated authority, the

7    National Guard has already detained multiple protestors,[44] and the Marines, which were first seen

8    in downtown Los Angeles on June 13, also have begun detaining civilians, with the first report of

9    a detention by the Marines occurring on June 14.[45] As part of these detentions, military personnel

10   zip tie and retain custody of detained individuals until they are handed off to local law

11   enforcement.[46] The practical effect of these detentions is akin to an arrest: even if not charged with

12   a particular offense, individuals are physically restrained and unable to leave custody.[47]

13       Second, military personnel are supplanting the traditional role of local law enforcement by

14   accompanying federal immigration officers on immigration missions. Major General Sherman has

15   claimed authority to send the National Guard along with ICE agents when they carry out

16   immigration enforcement.[48] Despite there being no nearby threats, ICE agents are conducting

17

18

19   [43] U.S. Northern Command Public Affairs, *Update to DoD Federal Protection Mission – June 11, 2025*, U.S. Northern Command (June 11, 2025), https://www.northcom.mil/Newsroom/News/Article/Article/4214356/update-to-dod-federal-protection-mission-june-11-2025/.

20

21   [44] Greg Wehner, *National Guard Troops Detain Anti-ICE Protesters in Los Angeles Under Trump's Orders*, MSN (June 12, 2025), https://www.msn.com/en-us/news/us/national-guard-troops-detain-anti-ice-protesters-in-los-angeles-under-trumps-orders/ar-AA1GxIWL?ocid=BingNewsSerp.

22

23   [45] Simon Corlett & Mike Heuer, *Marines Detain U.S. Citizen Entering LA Federal Building Amid Protests,* MSN (June 15, 2025), https://www.msn.com/en-us/news/us/marines-detain-us-citizen-entering-la-federal-building-amid-protests/ar-AA1GIboc?ocid=BingNewsSerp.

24

25   [46] Nicholas Slayton, *Marines Detain Civilian in Los Angeles, in First Such Case*, Task & Purpose (June 13, 2025), https://taskandpurpose.com/news/marines-detain-civilian-los-angeles/.

26   [47] Gabe Whisnant, *National Guard Commander Backtracks on Remark About Detaining Civilians*, Newsweek (June 11, 2025), https://www.msn.com/en-us/news/us/national-guard-commander-backtracks-on-remark-about-detaining-civilians/ar-AA1GxfPE?ocid=BingNewsSerp.

27

28   [48] U.S. Northern Command Public Affairs, *Update to DoD Federal Protection Mission – June 11, 2025*, *supra* note 42.

- 10 -

arrests alongside multiple National Guard members at the ready with rifles.[49]  Such a show of force coerces compliance with ICE agents when compliance otherwise would be voluntary.

The blurring of the line between the military and civilian law enforcement sets a dangerous precedent.  As former LAPD Chief Michel Moore explains, "blurring these lines" can lead to "escalation, tragic error, and lasting damage to public confidence."[50]  It also presents an organizational problem: when military personnel begin engaging in civil law enforcement, there ceases to be a "unified command structure," "accountability mechanisms," and "clear rules of engagement."[51]  Ours is a country with a deep tradition of "insistence on limitations on military operations in peacetime," and this tradition is rooted in the concern that "unlawful activities of the military [c]ould go unnoticed or unremedied."  *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972).  Such "unlawful activities" are much more likely to go "unnoticed or unremedied" when rules, responsibilities, and leadership become unclear.

## **CONCLUSION**

For the reasons stated above, Amicus respectfully requests that the Court grant Plaintiffs' motion and preliminarily enjoin Defendants.

Dated:  June 19, 2025                    JUDY W. WHITEHURST
                                         MARGARET L. CARTER


                                         By:    Margaret L. Carter
                                         _____

                                         Margaret L. Carter
                                         Attorney for Amicus Curiae
                                         Los Angeles County

---

[49]  Jennie Taer, *Armed National Guard Troops Stand Guard for ICE Agents as They Make Immigration Raids in Los Angeles*, MSN (June 10, 2025), https://www.msn.com/en-us/news/us/armed-national-guard-troops-stand-guard-for-ice-agents-as-they-make-immigration-raids-in-la/ar-AA1GrObA?ocid=BingNewsSerp.

[50] *Supra* note 39.

[51] *Id.*

BRIEF OF AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:25-CV-04870-CRB