1   **ROB BONTA**
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   ANYA BINSACCA
    JOHN D. ECHEVERRIA
4   MARISSA MALOUFF
    JAMES E. STANLEY
5   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
6   STEVEN KERNS
    JANE REILLEY
7   MEGAN RICHARDS
    MEGHAN H. STRONG
8   Deputy Attorneys General
      455 Golden Gate Ave
9     San Francisco, CA 94110
      Telephone: (415) 510-3877
10    E-mail: Meghan.Strong@doj.ca.gov
    *Attorneys for Plaintiffs*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16  | | |
    |---|---|
17  **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,** |
18  | | **NO. 3:25-cv-04870-CRB**
                                Plaintiffs, |
19  | | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY**
          v. | **INJUNCTION**
20  | |
21  **DONALD TRUMP, IN HIS OFFICIAL** | Date:       June 20, 2025
    **CAPACITY AS PRESIDENT OF THE UNITED** | Time:       10:00 a.m.
22  **STATES; PETE HEGSETH, IN HIS OFFICIAL** | Courtroom:  6
    **CAPACITY AS SECRETARY OF THE** | Judge:      Charles R. Breyer
23  **DEPARTMENT OF DEFENSE; U.S.** | Trial Date: Not set
    **DEPARTMENT OF DEFENSE,** | Action Filed: June 9, 2025
24  | |
                                Defendants. |
25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 2

    I.    Plaintiffs Are Likely to Succeed on the Merits ........................................................ 2

        A.    Defendants Exceeded Their Lawful Authority Under Section 12406 ........ 2

            1.    This Case Presents a Justiciable Controversy ................................ 2

            2.    The Predicate Facts Required to Invoke Section 12406 Are Not Met ...................................................................................... 4

            3.    The Federalization Orders Were Not Issued Through the Governor ........................................................................................ 7

            4.    At a Minimum, Defendants' Orders Are Overbroad to the Point of Raising Serious Constitutional Questions ........................ 7

        B.    Defendants Are Violating the Posse Comitatus Act ................................... 8

            1.    The PCA Applies to Defendants' Use of Title 10 Forces.............. 8

            2.    Defendants Are Violating the PCA.............................................. 11

        C.    Defendants Are Violating the Tenth Amendment ................................... 13

    II.    The Balance of Harms and Equities Favors Injunctive Relief............................. 14

Conclusion .......................................................................................................................... 15

PLAINTIFFS' REPLY ISO MOTION FOR PRELIMINARY INJUNCTION

1

# TABLE OF AUTHORITIES

2

**Page**

3   CASES

4   *Baker v. Carr*
5       369 U.S. 186 (1962) ...................................................................... 2, 3

6   *Boardman v. Pac. Seafood Grp.*
        822 F.3d 1011 (9th Cir. 2016) ......................................................... 13
7
    *Chamber of Com. of U.S. v. Reich*
8       74 F.3d 1322 (D.C. Cir. 1996) .......................................................... 4

9   *City & Cnty. of San Francisco v. Trump*
        2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) .................................... 13
10
    *City of L.A. v. Sessions*
11      2018 WL 6071072 (C.D. Cal. 2018) ................................................. 13

12  *Dalton v. Specter*
        511 U.S. 462 (1994) ......................................................................... 4
13
    *Garrison v. State of La.*
14      379 U.S. 64 (1964) ............................................................................ 8
15
    *Index News. LLC v. City of Portland*,
16      480 F. Supp. 3d 1120, 1152 (D. Or. 2020) ...................................... 13

17  *In re Debs*
        158 U.S. 564 (1895) .......................................................................... 4
18
    *In re Neagle*
19      135 U.S. 1 (1890) .............................................................................. 4
20
    *J.A.V. v. Trump*
21      2025 WL 1257450 (S.D. Tex. May 1, 2025) ....................................... 4

22  *J.G.G. v. Trump*
        2025 WL 890401 (D.D.C. 2025) ........................................................ 4
23
    *Laird v. Tatum*
24      408 U.S. 1 (1972) ............................................................................ 15
25
    *Ludecke v. Watkins*
26      335 U.S. 160 (1948) ........................................................................... 4
27
    *Martin v. Mott*
28      25 U.S. (12 Wheat.) 18 (1827) ........................................................ 3, 4

**TABLE OF AUTHORITIES**
(continued)

Page

*Murphy Co. v. Biden*
    65 F.4th 1122 (9th Cir. 2023) ........................................................................ 4, 10, 11

*New York Times Co. v. Sullivan*
    376 U.S. 254 (1964) ................................................................................................. 8

*Nuclear Regulatory Comm'n v. Texas*
    605 U.S. __ (2024) ................................................................................................. 11

*Ortiz v. Comm'r of Social Sec.*
    659 F. Supp. 3d 301 (E.D.N.Y. 2023) ................................................................ 10

*Perpich v. Dep't of Def.*
    496 U.S. 334 (1990) ................................................................................................. 9

*Sterling v. Constantin*
    287 U.S. 378 (1932) ................................................................................................. 3

*Trump v. J.G.G.*
    45 S. Ct. 1003 (2025) .............................................................................................. 4

*U.S. v. Bacon*
    851 F.2d 1312 (11th Cir. 1988) ..................................................................... 12, 13

*U.S. v. Chon*
    210 F.3d 990 (9th Cir. 2000) ................................................................................. 9

*U.S. v. Dreyer*
    804 F.3d 1266 (9th Cir. 2015) ..................................................................... *passim*

*U.S. v. Morrison*
    529 U.S. 598 (2000) ............................................................................................... 13

*U.S. v. Stouder*
    724 F. Supp. 951 (M.D. Ga. 1989) ..................................................................... 13

*U.S. v. Yunis*
    924 F.2d 1086 (D.C. Cir. 1991) ....................................................................... 9, 12

*Whitman v. Am. Trucking Assns., Inc.*
    531 U.S. 457 (2001) ................................................................................................. 9

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) .......................................................................................... 1, 10

iii

1

### TABLE OF AUTHORITIES
(continued)

2

Page

3

*Zivotofsky ex rel. Zivotofsky v. Clinton*
    566 U.S. 189 (2012) ................................................................................... 2, 3

4

5

**CONSTITUTIONAL PROVISIONS**

6

United States Constitution
    First Amendment ..................................................................................... 8, 15

7

    Tenth Amendment ............................................................................ 1, 13, 14
    Fourteenth Amendment ................................................................................. 8

8

**STATUTES**

9

United States Code, Title 10
    § 251 ............................................................................................................ 9

10

    § 252 ............................................................................................................ 9
    § 253 ............................................................................................................ 9

11

    § 254 ............................................................................................................ 9
    § 375 .......................................................................................................... 10

12

    §§ 12401-12408 .......................................................................................... 9

13

    § 12406 ................................................................................................ *passim*
    § 12406(2) ................................................................................................... 4

14

    § 12406(3) ................................................................................................ 4, 5

15

16

Alien Enemies Act ............................................................................................ 4

17

Posse Comitatus Act ................................................................................ 1, 8, 10

18

Insurrection Act ................................................................................................ 9

19

Militia Act of 1903 (Dick Act), ch. 196, 32 Stat. 775, §§2-3 ......................... 9

20

**OTHER AUTHORITIES**

21

Exec. Order No. 11519 (1970 WL 123093) ..................................................... 9

22

Handbook available online at https://tile.loc.gov/storage-
    services/service/ll/llmlp/2024_DOPLAW_Handbook/2024_DOPLAW_Handb
    ook.pdf ...................................................................................................... 10

23

24

*Emergency Power and the Militia Acts*, Stephen I. Vladeck, 114 Yale L.J. 149
    (2004) .......................................................................................................... 9

25

26

27

28

# INTRODUCTION[1]

As Defendants see it, the President may federalize the National Guard under 10 U.S.C. § 12406 by edict alone, without any evidence that the law's requirements are met and over the Governor's objection.  And he may then deploy those federalized troops, along with U.S. Marines, to the streets of the Nation's second-largest city or wherever a protest is occurring or likely to occur, to engage in whatever actions Defendants deem necessary to "protect" federal property and personnel, including by routinely assisting in civil immigration enforcement to advance the President's domestic agenda.  And then, in Defendants' view, the President may order those troops to remain, indefinitely, if he believes there is any degree of objection to his agenda that might threaten his goals or prompt constitutionally protected activity protesting those goals that could escalate to violence by one or more bad actors.  To make matters worse, Defendants contend that all of these actions may be taken without *any* judicial review.  But the President's "power is at its lowest ebb" when he takes actions incompatible with the express terms of a statute.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  And Defendants' defenses of the President's actions are unsupported at every turn.

The Court should follow the reasoning of its TRO order to again find that Plaintiffs are likely to succeed on their claims that Defendants exceeded their authority under Section 12406 and violated the Tenth Amendment.  And it should go further to hold that Defendants are violating, or pose an imminent risk of violating, the Posse Comitatus Act (PCA).  Plaintiffs ask that the Court issue a preliminary injunction ordering Defendants to return control of the California National Guard to the Governor and, to the extent any federal troops remain, enjoining Defendants from enabling U.S. military forces deployed in Los Angeles—or elsewhere in California—to execute or assist in the execution of federal law or any civilian law enforcement functions by any federal agent or officer.

---

[1] On June 19 at 7:15 p.m., the Ninth Circuit Court of Appeals granted Defendants' motion to stay the Court's TRO order pending appeal.  Because Plaintiffs received that order after this reply was already substantially drafted, Plaintiffs submit this reply today, consistent with the Court-ordered deadline.  Plaintiffs will be prepared to address the order at the June 20 hearing.

**ARGUMENT**

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

**A.    Defendants Exceeded Their Lawful Authority Under Section 12406**

**1.    This Case Presents a Justiciable Controversy**

Defendants take the extraordinary position—first at the TRO hearing, again before the Ninth Circuit, and now in their opposition—that the Court is categorically barred from reviewing the President's invocation of Section 12406, even if the President gives *no reasons or support* and there is *no apparent justification* for that invocation.  TRO Hrg. Tr. 25:23-28:4; [9th Cir. OA at 4:30-5:22]; Opp. 10-11.  Defendants even claimed the President need not comply with the statute at all.  TRO Hrg. Tr. 6:20-7:18.  That position is not only a boundless view of executive authority; it is wrong as a matter of law.  If the President can ignore the factual predicates required to invoke Section 12406, that would effectively read that language out of the statute and entitle the President to federalize the National Guard *whenever* he chooses.  But Congress did not grant the President such broad authority in Section 12406.  Rather, it enacted Section 12406 to give the President the authority to federalize the National Guard in only narrow and extreme circumstances, as listed in subparts (1), (2), and (3) of the statute.  And while the President may be entitled to some deference in his determination that a factual predicate is met, the "Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared."  *Baker v. Carr*, 369 U.S. 186, 214 (1962).  "[D]eference rests on reason, not habit," and the Court may "inquire whether the exigency still existed upon which the continued operation of the law depended."  *Id.* at 213-14.

Nor does the political question doctrine bar judicial review.  That doctrine provides only "a narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012), and that exception is simply not met here.  ECF 64 at 10-16; ECF 77 at 17-19.  Defendants try to cast the cases on which they rely as somehow outside this doctrine and suggested to the Ninth Circuit that they need not meet the standard for applying the political question doctrine.  Opp. 11; [9th Cir. OA at 10:42-11:00].  But *Martin v. Mott*, 25 U.S. (12 Wheat.) 18 (1827), and Defendants' other

2

cited cases—most of which are more than a century old—cannot be read in a historical vacuum divorced from the many Supreme Court cases that have developed this doctrine since 1827 or the many subsequent Congressional enactments that have defined and limited the President's authority in this area. These cases make clear that if *Martin* came before the Court today, it would be analyzed under the modern political question doctrine, and so too must this case. *See Baker*, 369 U.S. at 213 (citing *Martin* in context of determining whether political questions exist where there is a need for finality).[2]  Defendants must therefore establish that a political question "is inextricable from the case at bar" to support a finding of non-justiciability. *Baker*, 369 U.S. at 217. They cannot avoid review by arguing they meet some different standard articulated by *Martin* two centuries ago where they fail to meet the modern political-question standard in *Baker*, *Zivotofsky*, and their progeny. And even if *Martin* set forth the proper standard here, it would be distinguishable for the reasons that this Court recognized in its TRO order. ECF 64 at 12-13

Defendants' reliance on *Martin* also fails to the extent they argue that Section 12406 confers unreviewable discretion on the President.[3]  Under the relevant modern standard, a statute confers unreviewable discretion only where it "contains no limitations on the President's exercise of . . . authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996)

---

[2] The Court's discussion of *Martin* in the context of the "need for finality in the political determination" and the final *Baker* factor further emphasizes the factual distinctions between *Martin* and this case that Plaintiffs highlighted in their TRO Reply, ECF 38 at 9. As the Court in *Martin* emphasized, there was a need for "prompt and unhesitating obedience" by militiamen in the context of a foreign invasion, and Mott's refusal to respond when he was called to the militia ran afoul of that principle. *Martin*, 25 U.S. at 30. Not so here. Plaintiffs are not members of the National Guard who object to and seek review of their own federalization. Plaintiffs here are the Governor and State of California, who seek to remedy the unlawful wresting of control of the California National Guard from the Governor. No questions of military obedience are it issue in this case.

[3] Defendants' position also fails even if the Court were to adopt a highly deferential standard that allows review only in instances of bad faith where the executive does not exercise his "honest judgment." *See Sterling v. Constantin*, 287 U.S. 378, 399 (1932). To be clear, that would be the wrong standard; even in *Sterling*, which confronted an issue of a state governor's exercise of executive authority over private parties, not the President's over another sovereign, the Court merely recognized there was a substantial public interest to support the governor's actions for purposes of a federal due process challenge. *Id.* at 398-400. And its ultimate holding was that the public interest was *not* weighty enough to justify upholding the governor's conduct. *Id.* at 401-04. The Court held that there was "no room for doubt that there was *no military necessity* which, from any point of view, could be taken to justify the action of the Governor." *Id.* at 403 (emphasis added). The President's broad and unlimited mobilization order has no more justification than the Governor's did in *Sterling*.

(discussing *Dalton v. Specter*, 511 U.S. 462 (1994)); *see also Murphy Co. v. Biden*, 65 F.4th 1122, 1128-31 (9th Cir. 2023). But Section 12406 contains meaningful limits on the President's exercise of authority, permitting the President to exercise militia authority in only the narrowest of circumstances and requiring that specific factual predicates be met *before* he has any discretion to determine the number of National Guard members to be federalized.[4]

Finally, recent cases—including Supreme Court precedent—interpreting the Alien Enemies Act support the Court's review of the President's invocation of Section 12406. Courts have recently rejected the contention, in reliance on *Martin*, that the Alien Enemies Act conveys unreviewable discretion on the President. *J.A.V. v. Trump*, 2025 WL 1257450 (S.D. Tex. May 1, 2025); *J.G.G. v. Trump*, 2025 WL 890401 (D.D.C. 2025). Indeed, in *Trump v. J.G.G.*, 45 S. Ct. 1003 (2025), the Supreme Court stopped short of concluding the Alien Enemies Act precludes *all* judicial review, even while recognizing that it "*largely* 'preclude[s] judicial review.'" 145 S. Ct. at 1005 (quoting *Ludecke v. Watkins*, 335 U.S. 160 (1948) (emphasis added)). This was because the Court had previously held in *Ludecke* that individuals subject to detention and removal under the Alien Enemies Act are "entitled to 'judicial review' as to 'questions of interpretation and constitutionality of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* at 1006 (quoting *Ludecke*, 335 U.S. at 163, 172 n.17). Similarly, here, Plaintiffs are entitled to review of questions of interpretation regarding Section 12406 and whether a factual predicate necessary to invoke it is met.

### 2.    The Predicate Facts Required to Invoke Section 12406 Are Not Met

The events in Los Angeles constitute neither a rebellion or danger of rebellion, nor do they render the President "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3).

*Rebellion or danger of rebellion.* Defendants do not explain how the facts on the ground

---

[4] Defendants' reliance on the "'inherent' protective and emergency power derived from the Take Care Clause" also fails. Opp. 12. As explained in Plaintiffs' TRO reply, ECF 38 at 14, *In re Neagle*, 135 U.S. 1 (1890), and *In re Debs*, 158 U.S. 564 (1895), are legally and factually distinguishable. But more fundamentally, Defendants ignore that part of the President's duty to "take Care that the Laws be faithfully executed" includes the duty to execute Section 12406 faithfully.

1    in Los Angeles meet any definition of rebellion that Congress could have plausibly intended.

2    Instead, they attack aspects of the definition the Court adopted in its TRO order, but none of these

3    complaints establishes that there is a rebellion in Los Angeles.  For example, Defendants

4    emphasize that it would be "wholly uncontroversial" to call the Whiskey Rebellion a "rebellion."

5    Opp. 15.  But if that is so, it is because the Whiskey Rebellion lasted three *years* and involved far

6    more organized and open resistance to the whiskey tax, spanned multiple counties, and led to acts

7    of violence far mor abhorrent than any that have occurred in Los Angeles, such as the tarring and

8    feathering of a tax collector.  Richards Decl., Ex. 1.  If anything, the long-term, organized, and

9    more violent resistance of the Whiskey Rebellion proves that the recent sporadic, unorganized

10   violence in Los Angeles—most of which was isolated to a few days—is no rebellion.

11        Similarly, Defendants' insistence that "[a] rebellion can take place against the

12   Government's authority without seeking its end," Opp. 15, does not establish that there is any

13   limited-scope rebellion in Los Angeles.  Nor can mere violence and makeshift "arms" alone

14   constitute a rebellion (*see* Opp. 16); if that were the case, "rebellions" regularly follow significant

15   sporting events each year, and any FBI raid involving multiple armed suspect is itself a rebellion.[5]

16   That is why the Court found that a rebellion only exists when the common elements of a

17   rebellion, as defined, exist together.  ECF 64 at 18-19.

18        *Unable with the regular forces to execute the laws.*  Defendants also cannot show that "the

19   President is unable with the regular forces to execute the laws of the United States."  10 U.S.C.

20   § 12406(3).  Indeed, President Trump never even *tried* to execute the law with regular forces,

21   such as bringing in additional ICE officers or other federal law enforcement.  At the first sign of

22   resistance, the President immediately jumped to federalize the National Guard.  But Defendants

23   have not even established that the protests and violence in Los Angeles impeded their execution

24   of the law, let alone that any impediment could not be overcome with "regular forces."

25        Defendants protest that the Court's TRO order imposed too high a burden on them

26   because, according to Defendants, the Court held that "so long as *some* amount of execution of

---

[5] Defendants' reliance on social media posts and alleged "attempt[s] to dox, threaten, and obstruct federal law enforcement personnel" also bear no tie to Los Angeles, so Defendants cannot rely on them to establish a "rebellion" there.  *See* Opp. 17.

1    the laws remains possible, the statute cannot be invoked." Opp. 19. The Court's order actually

2    found that Defendants' suggestion that it "could have detained more people in the absence of the

3    protests is mere conjecture." ECF 64 at 23. This was the main reason the Court rejected

4    Defendants' argument on this front. It was only in considering Defendants' conjecture that the

5    Court found that the President must be "unable" to execute the laws; merely alleging risk

6    executing the laws is insufficient. *Id.* That is different from finding that any nominal execution

7    of the law defeats this predicate. Regardless, the facts clearly show that Defendants have been

8    able to execute the laws. As established in Plaintiffs' motion, between June 6 and June 11, ICE

9    arrested 330 immigrants, a 38% increase from the 239 arrests made in a similar week-long period

10   in early May. ECF 77 at 4; ECF 77-1, Strong Decl., Exs. 3, 14-22. Increasing arrest numbers is

11   simply inconsistent with an inability to execute the laws.

12          Defendants also dispute the availability of other federal forces because "[t]he President is

13   not required to call up the United State Park Police from Yosemite National Park to respond to

14   the threat against ICE ERO officers before activating the National Guard." Opp. 19. This, too, is

15   a strawman. Plaintiffs are not suggesting Defendants rely on Park Police here; rather, Defendants

16   have regular forces available to them much closer to home, most notably in the form of the

17   *thousands* of LAPD, LASD, and CHP officers, to say nothing of federal law enforcement

18   officers, who have responded to incidents in the past weeks. *See* ECF 77-3, Zizi Decl. ¶¶ 5, 7;

19   Randolph Decl. ¶ 24. Even in the category of Defendants' preferred enforcers, Defendants

20   contend the Department of Homeland Security's ICE ERO is "responsible for alien removal,"

21   Opp. 19, but seemingly overlook that ERO has "6,100 deportation officers and more than 750

22   enforcement removal assistants" available to them nationwide. Defendants also ignore law

23   enforcement personnel from federal agencies, who have been conducting joint operations with

24   ICE, available within the broader region. Finally, Defendants for the first time suggest the laws

25   they need to execute go beyond immigration laws and "may include laws forbidding interference

26   with federal functions or assaults on federal officers and property," but Defendants similarly do

27   not lack personnel for these purposes, such as FBI agents stationed in Los Angeles and beyond.

28

### 3.    The Federalization Orders Were Not Issued Through the Governor

Even if Section 12406's predicates were satisfied, the final requirement of the statute is not. Congress directed that "[o]rders for these purposes shall be issued through the governors of the States." While Defendants cite to various alleged communications they had with others in California regarding their orders, even they cannot dispute that neither President Trump, nor Secretary of Defense Hegseth, nor General Nordhaus communicated directly with or took any other steps to issue their orders through the *Governor*. The Court already held that issuing orders through the California Adjutant General is not the same, and certainly Congress cannot have meant for Defendants to merely label their orders as "through the governor." ECF 64 at 24-25. Congress intentionally added this requirement, and Defendants cannot avoid it by reducing it to a mere procedural requirement, with which the failure to comply constitutes a mere "foot fault" not necessary to remedy. Opp. 22-23. Indeed, DOD Defendants violate not just Section 12406 in failing to coordinate with the Governor; they violate President Trump's own directive. June 7 Mem. (directing "the Secretary of Defense to coordinate with the Governors of the States").

### 4.    At a Minimum, Defendants' Orders Are Overbroad to the Point of Raising Serious Constitutional Questions

Defendants' opposition reveals one serious and overarching problem with their orders: they have no temporal or geographic limits. President Trump stated that the National Guard would be federalized "for 60 days or at the discretion of the Secretary of Defense" wherever protests are occurring, or are "likely" to occur. ECF 8-1, Espíritu Decl., Ex. E. Neither the President's nor Secretary Hegseth's memoranda, limit the mobilization to responding to the protests of June 6 and 7 in Los Angeles. Rather, Defendants use these facts to grant whole cloth discretion to the Secretary of Defense to mobilize the National Guard *anywhere* that protests are not just occurring but are likely to occur. Indeed, far removed from any protest in Los Angeles, on June 18, the National Guard deployed to the Coachella Valley to assist with a raid of a marijuana farm. Richards Decl., Exs. 4-6.

Nor do any of the orders articulate any definite end to the mobilization or criteria for determining when the mobilization is no longer required. Though President Trump's memo

1    suggests "60 days," it also provides the Secretary of Defense with unlimited discretion to change

2    that timeline.  And Defendants' opposition makes clear they have no intention of withdrawing

3    troops from Los Angeles in 60 days or any time soon thereafter.  Defendants assert that "rioters

4    continue to object to ICE execution of immigration laws in their communities" and that "[t]hey

5    will continue to" do so absent the presence of the National Guard.  Opp. 3.  Thus, Defendants

6    apparently contend that it remains necessary to keep federal troops in Los Angeles for as long as

7    there is any "objection" to ICE's activities.  That cannot be the standard.  If it were, the President

8    could use any fleeting moment of unrest as a ground to deploy federal troops to occupy any city

9    or town, in any state, anywhere in the country *indefinitely*.[6]  Such a broad view cannot be

10   reconciled with the Constitution.  *Garrison v. State of La.*, 379 U.S. 64, 75 (1964) ("The First and

11   Fourteenth Amendments embody our 'profound national commitment to the principle that debate

12   on public issues should be uninhibited, robust, and wide-open, and that it may well include

13   vehement, caustic, and sometimes unpleasantly sharp attacks on government and public

14   officials.'" (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))).

15         **B.    Defendants Are Violating the Posse Comitatus Act**

16             **1.    The PCA Applies to Defendants' Use of Title 10 Forces**

17        Both the Marines and the federalized National Guard called forth under Section 12406 are

18   controlled by the PCA.  ECF 77 at 20.  Indeed, there is no history of Section 12406 being used as

19   an exception to the PCA, and even the Department of Defense's own guidance does not treat

20   Section 12406 as an exception to the PCA.

21        Defendants claim that "if Section 12406 authorizes the deployment here . . . that satisfies

22   the Posse Comitatus Act's express authorization requirement."  Not so.  A "posse comitatus" was

23   defined at common law as all those over the age of 15 upon whom a sheriff could call for

24   assistance in preventing any type of civil disorder.  *U.S. v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir.

25   2015) (en banc).  The PCA prohibits "direct active use of Federal troops by civil law authorities"

26   and bans the military "from participating in civilian law enforcement activities."  *Id.* at 1272.

---

27        [6] Notably, President Trump's June 7 memorandum is not limited geographically to Los
    Angeles.  ECF 8-1, Espíritu Decl., Ex. E.  In fact, the memo does not mention the city of Los
28   Angeles or the State of California by name.

1    The section originated within the 1903 Dick Act, which organized the States' militias into

2    an "organized militia" (e.g., the National Guard) and the "unorganized militia," which it defined

3    as "every able-bodied male citizen . . . and every able-bodied male of foreign birth who has

4    declared his intention to become a citizen who is more than eighteen and less than forty-five years

5    of age."  Militia Act of 1903 (Dick Act), ch. 196, 32 Stat. 775, §§ 2-3; *see also Perpich v. Dep't*

6    *of Def.*, 496 U.S. 334, 342 (1990).  The Dick Act created the procedures and rules for the newly

7    organized militia.

8    Even today, the sections preceding and following Section 12406 all concern nuts and bolts

9    for mobilizing National Guard personnel.  10 U.S.C. §§ 12401-12408 (all involving call-up

10    procedures, pay, service length, and other personnel concerns).  The Insurrection Act, which the

11    President has not invoked, authorizes the President to use troops domestically, in certain

12    situations, but with more guardrails.  *See* 10 U.S.C. §§ 251-53, 254 (requiring the President issue

13    an order to disperse).  If Congress intended Section 12406 to increase the authority already

14    granted to the President by the Insurrection Act, it would be odd to hide that authority within the

15    above minutia of personnel concerns.  Congress "does not, one might say, hide elephants in

16    mouseholes."  *Whitman v. Am. Trucking Assns., Inc.,* 531 U.S. 457, 468 (2001).

17    Section 12406 has been on the books for over 120 years, but there is no history of Section

18    12406 being used as an exception to the PCA.  Contrary to Defendants' assertions, Section 12406

19    was not invoked for the Whiskey Rebellion.  *See Note: Emergency Power and the Militia Acts*,

20    Stephen I. Vladeck, 114 Yale L.J. 149 at 161-62 (2004).  President Nixon's use of Section 12406

21    during the Postal Strike is the only time it was used to call forth militias on a large scale.  Exec.

22    Order No. 11519 (1970 WL 123093).  Notably, when the troops came forth to "execute the Postal

23    laws," they delivered the mail, a task that does not involve "regulatory, proscriptive, or

24    compulsory military power."  *See U.S. v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991).

25    DOD's own guidance also does not treat Section 12406 as an exception to the PCA.  *U.S.*

26    *v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000) (relying on similar guidance).  DOD Instruction,

27    Defense Support of Civilian Law Enforcement Agencies 3025.21, Enclosure 3 ¶ 1.b.(5) (Feb. 27,

28    2013) (Incorporating Change 1, Effective Feb. 8, 2019), at 16-17, lists categories where military

9

1    personnel are not prohibited from active participation in direct law-enforcement.  Richards Decl.,

2    Ex. 3.  It omits section 12406.  Similarly, Center for Law and Military Operations, Domestic

3    Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) lists authorities that allow for

4    direct DOD participation in civil law enforcement, omitting 10 U.S.C. § 12406.[7]

5        Defendant's protective-power theory is overbroad and has not been endorsed by the

6    judiciary.  *Ortiz v. Comm'r of Social Sec.*, 659 F. Supp. 3d 301 n. 2 (E.D.N.Y. 2023) (OLC

7    memos lack binding force).  Even if the federal government has some inherent power to use

8    troops to protect federal property and federal functions in certain circumstances, Defendants' use

9    of troops here goes far beyond that purpose.  It is plain that Defendants intend to use the over-

10   4,000 troops they have amassed and assigned as a reserve force to increase immigration

11   enforcement, not merely to protect federal property or federal personnel.  This view is

12   irreconcilable with settled separation of powers principles.  "When the President takes measures

13   incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."

14   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in

15   judgment).

16       Finally, Plaintiffs have a cause of action for their *ultra vires* claim based on the DOD

17   defendants' actions that violate the Posse Comitatus Act.  The PCA and the bedrock principal

18   underlying that act that civilians should not be subject to military force applies to Defendants

19   through the plain terms of the statute as well as 10 USC 375, and DOD's internal regulations and

20   guidance.  As the Ninth Circuit has held, "actions by subordinate Executive Branch officials that

21   extend beyond delegated statutory authority—i.e., *ultra vires* actions—are reviewable."  *Murphy*

22   *Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("plaintiffs advancing *ultra vires* claims must

23   plead 'plausible factual allegations identifying an aspect of the designation that exceeds the

24   President's statutory authority'").[8]

25   _____
         [7] Handbook available online at https://tile.loc.gov/storage-
26   services/service/ll/llmlp/2024_DOPLAW_Handbook/2024_DOPLAW_Handbook.pdf (last
     visited June 18, 2025).
27       [8] *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. __ (2024), does not suggest that Plaintiffs lack
     a cause of action to enforce the PCA.  That case concerned the availability of ultra vires review
28   where a statute *precludes* judicial review of a particular agency action—for example, the Hobbs
                                                                                    (continued…)

1            2.    **Defendants Are Violating the PCA**

2         As the Ninth Circuit has recognized sitting en banc, the PCA prohibits the military from

3    engaging in "direct active civilian law enforcement activities by military forces. *U.S. v. Dreyer*,

4    804 F.3d 1266, 1275 (9th Cir. 2015) (en banc). The PCA also prohibits assistance that involves

5    any of the following: (1) the exercise of regulatory, proscriptive, or compulsory military power;

6    (2) direct active involvement in the execution of the laws, or (3) other conduct that "pervade[s]

7    the activities of civilian authorities." *Id.* (internal quotation marks omitted). "If any one of these

8    tests is met, the assistance is not indirect." *Id.*

9         Defendants fail to address that standard in any meaningful way. Federal military forces are

10   participating in ICE enforcement efforts across Los Angeles. ECF 77 at 19-21. Defendants'

11   declarations confirm this. ECF 84-3, Sherman Decl. ¶¶ 5-7, 9; Richards Decl., Ex. 2. DHS

12   Director Santacruz reports that the Department of Defense is using Title 10 forces as a "Quick

13   Reaction Force" that is "available 24/7 to federal law enforcement officers conducting operations

14   in the Los Angeles area[.]" ECF 84-1, Santacruz Decl. ¶ 9 "[T]he Guards have assisted on most

15   operations that ICE and its federal partners conducted this week . . . . The Guards are acting as a

16   security element, accompanying federal officers and agents during operations to ensure safety of

17   all involved." ECF 84-1, Santacruz Decl. ¶ 7. Federal troops have even participated in a large

18   marijuana grow bust in Riverside County. Richards Decl. Exs. 4-6.

19        The task force performs "protection duties such as fixed observation posts, perimeter

20   security of federal property, and escorts for Government personnel conducting federal law

21   enforcement duties[.]" *Id.* ¶¶ 8, 9B. This protection detail, where military forces come into

22   contact with the public, comes after little training in how to interact with and police civilians.

23   Sherman Decl. ¶¶ 7, 9C. Marines were assigned to Task Force 51 on June 10, and June 14, 2025,

24   and "assumed protection duties" on June 13. *Id.* ¶¶ 7, 9C. A Marine has already detained one

25   individual for 30 minutes before turning him over to a DHS agent. *Id.* ¶ 9D.

26

27   Act in *Nuclear Regulatory Comm'n*. *See* slip op. at pp. 14-16. Defendants identify no statute that
     precludes Plaintiffs from enforcing the PCA. In those circumstances, Ninth Circuit precedent
28   affords a broad right to bring ultra vires claims. *See, e.g.*, *Murphy*, 65 F.4th at 1131.

Defendants maintain that Title 10 troops are not performing law enforcement functions, and that they are providing only "personnel protection." *Id.* ¶¶ 8, 9B; Opp. 8. But what they describe goes beyond personnel protection. When Defendants use military forces to create perimeters for enforcement actions, or use their presence as a show of force, they are necessarily using the threat of force to control the movement and actions of civilians. And if civilians do not comply with their force, they risk being detained. This subjects civilians to the proscriptive and compulsory military power. *Dreyer*, 804 F.3d at 1275. When troops routinely go on civil law enforcement missions, their actions also "pervade the activities of civilian authorities." *Dreyer*, 804 F.3d at 1275. That is because when members of the military patrol the streets of a dense city in large numbers—especially when protesters are likely to be present—they will unavoidably confront the need to engage in law enforcement activities, such as conducting surveillance, controlling crowds, apprehending civilians or using force against them. Erecting perimeters or protecting personnel in these urban environments will also entail the military's compulsory force over civilians, who will be required to obey military authorities, under actual or implied threat of force or detention. Accordingly, it violates the PCA, even if military officers are joining federal enforcement officers purportedly for the purpose of "personnel protection" or as a "security element." As Plaintiffs discussed in their opening brief, providing perimeter and personnel protection to augment ICE's operations in a civilian-populated area will invariably lead to the "exercise of regulatory, proscriptive, or compulsory military power" over civilians. Opp. 23; *see also Yunis*, 924 F.2d at 1086, 1094; *see also* Sherman Decl. ¶¶ 7, 9C. Indeed, DOD's public releases confirm that their actions are already subjecting the public to proscriptive and compulsory military power. Richards Decl., Ex. 2.

The cases cited by the Defendants are distinguishable. *U.S. v. Bacon*, 851 F.2d 1312, 1313-1314 (11th Cir. 1988) involved an Army Special Agent who participated in a drug investigation as an undercover purchaser. The Court found no PCA violation because the agent did not pervade the activities of civilian officials and did not subject the citizenry to the regulatory exercise of military power. *Id.* 1313. Unlike here, the military officer's involvement was limited to one case, and as his role was an undercover drug buyer, his action did not involve any

1  proscriptive or compulsory power over civilian activities. *U.S. v. Stouder*, 724 F. Supp. 951, 953

2  (M.D. Ga. 1989) also determined that there was no PCA violation.  In that case the military had

3  investigated fraud, executed a search pursuant to a warrant, and preserved seized evidence.

4  Contrary to the law in this Circuit, the court looked only to one test—whether the action was

5  regulatory, proscriptive, or compulsory in nature—and found no violation because his actions did

6  not "proscrib[e] any person's conduct" and "were not compelling anything of anybody." *Id.* at

7  953.  The Court did not apply the remaining tests. *See Dreyer*, 804 F.3d at 1275.

8         Given this evidence, Plaintiffs should not be "required to wait until new and additional

9  irreparable injury is inflicted on Plaintiffs to issue prospective injunctive relief." *Index News.*

10  *LLC v. City of Portland*, 480 F. Supp. 3d 1120, 1152 (D. Or. 2020); *Boardman v. Pac. Seafood*

11  *Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *see also City & Cnty. of San Francisco v. Trump*,

12  2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025), *opinion clarified*, 2025 WL 1358492 (N.D.

13  Cal. May 9, 2025) (threat of harm was clear from executive orders, memos, legal actions, and

14  official statements); *City of L.A. v. Sessions*, 2018 WL 6071072, at *1 (C.D. Cal. 2018) (Attorney

15  General's "announcement" was enough for a preliminary injunction).

16         **C.    Defendants Are Violating the Tenth Amendment**

17         The Defendants' actions violate the Tenth Amendment.  Defendant's Tenth Amendment

18  violations do not derive solely from the President's unlawful invocation of Section 12406 to

19  federalize the State's National Guard, but also arise because they invade the State's police power.

20  Opp. 24-25.  Under our system of federalism, policing and crime control are reserved to the

21  States. *U.S. v. Morrison*, 529 U.S. 598 (2000).  This police power includes the right of the State

22  to facilitate the right of its residents to freely engage in protest, and to address and prosecute those

23  who commit crimes against people or property under cover of crowds.  The Constitution

24  generally reserves to the States the authority to exercise police power with respect to civil

25  disturbances and unrest, and for good reason: States and their local officials are closer to the

26  people, more aware of local customs and practices, and in the case of elected officials, more

27  directly accountable to the people impacted by their decisions.  Opp. 25.

28         Here, Defendants overstepped the Tenth Amendment when they determined that they

13

1   would use Title 10 troops to police California's political demonstrations. State and local officials

2   had sufficient resources and experience to police demonstrations and isolated incidents of

3   property damage and violence that had occurred. ECF 8-2, Olmstead Decl. ¶¶ 6-10; Zizi Decl. ¶¶

4   9-1; 3; ECF 51-1, Amicus Br. of Los Angeles at 3; Randolph Decl. ¶ 21. Defendants' actions

5   impaired the ability of California officials to handle a delicate situation in a way that comports

6   with local knowledge and experience. Their action has also made the situation in Los Angeles

7   worse, causing the State additional harms that it would not have incurred if the federal defendants

8   had not taken that action. For these reasons, the Defendants' actions violate the Tenth

9   Amendment.

10  **II.     THE BALANCE OF HARMS AND EQUITIES FAVORS INJUNCTIVE RELIEF**

11          The final *Winter* factors weigh in favor of granting a preliminary injunction because the

12  vast majority of harms and injuries Defendants invoke happened between June 6 and 9.

13  Santacruz Decl. ¶¶ 13, 16, 17, 20-22, 26-29, 32. Conditions have improved significantly since,

14  thanks in large part to the efforts of local law enforcement. ECF 77-3, Zizi Decl. ¶ 12; Crist Decl.

15  ¶¶ 44-46, 48-52. Even if the current threat of violence to federal property and personnel were as

16  severe as Defendants assert, local law enforcement are *better* suited to that role than the military,

17  thanks to their expertise and training in this area—something the military notably lacks. ECF 8-2,

18  Olmstead Decl. ¶¶ 8, 11; *see also* Randolph Decl. ¶¶ 7-9, 17, 20, 23; Duryee Decl. ¶¶ 5, 6, 8, 9.

19          Plaintiffs, on the other hand, have identified numerous harms that are likely to occur and

20  are already occurring. Plaintiffs suffer an injury to their fundamental sovereign interests through

21  the unlawful commandeering of the state militia, an injury that Defendants never address in their

22  opposition. In addition, Plaintiffs suffer harms in the form of (1) escalated tensions and a risk of

23  increased violence based on military occupation of Los Angeles of an indefinite duration and

24  (2) the diversion of California National Guard members from their vital roles within the State.

25          Defendants first contend that the presence of the military in Los Angeles did not escalate

26  the situation because there were "multiple documented instances of violence . . . before the

27  President's activation of the National Guard." Opp. 27. Plaintiffs do not dispute this. Rather,

28  Plaintiffs show that the presence of the Guard made matters *worse*. ECF 8-2, Olmstead Decl. ¶¶

1    12-14; ECF 77-1, Strong Decl., Ex. 31.  This is not surprising, given the "'traditional and strong

2    resistance of Americans to any military intrusion into civilian affairs' that 'has deep roots in our

3    history.'"  *Dreyer*, 804 F.3d at 1272 (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)).  And while

4    local law enforcement's response has improved conditions, the continued presence of the military

5    could reignite tensions at any moment.  This risk only increases as the days of military occupation

6    stretch into weeks. Defendants' position has created a Catch-22 for Plaintiffs and citizens of Los

7    Angeles.  If citizens try to voice their objection to the military occupation of their city,

8    Defendants use it as a basis for lengthening that occupation.  But Defendants completely ignore

9    the relative improvement in conditions in Los Angeles since the initial protests on June 6 and,

10   even if they did, Defendants would surely claim any decrease in violence is attributable only to

11   the presence of troops.  This self-fulfilling justification for maintaining a military presence,

12   coupled with the issues discussed *supra* regarding the orders' lack of any temporal or geographic

13   limitations, can only serve to increase the risk of further escalation.

14          Second, Defendants belittle the important and valuable work that California's National

15   Guard perform on a daily basis by suggesting they lack other important work to do in response to

16   ongoing emergencies.  Opp. 29.  As Plaintiffs' numerous declarations on this topic have made

17   clear, the National Guard are essential to protecting Californians every day.  *See generally* ECF 8-

18   3, Eck Decl.; ECF 39-2, Supp. Eck Decl.; ECF 77-2, Eck PI Decl.; Eck Reply Decl. ¶¶ 6-12.

19          Defendants make no attempt to demonstrate they represent the public interest.  They do

20   not respond to Plaintiffs' declaration establishing that Defendants' actions have already chilled

21   citizens' lawful exercise of their First Amendment rights.  *See* ECF 77-4, Arp Decl.  That harm to

22   the public interest will only grow the longer Los Angeles remains occupied by the military.

23          Given the balance of the parties' relevant harm and harms to the public interest, the

24   remaining *Winter* factors justify an injunction.[9]

25                              **CONCLUSION**

26          The Court should grant Plaintiffs' motion and issue a preliminary injunction.

27   _____

       [9] Defendants assert that any injunctive relief should be accompanied by a bond.  Opp. 30.
28   Plaintiffs already paid a $100 bond, as ordered in the Temporary Restraining Order, and do not
       object to the Court maintaining that bond for the duration of any preliminary injunction.

1

2    Dated:  June 19, 2025                        Respectfully submitted,

3                                                ROB BONTA
                                                Attorney General of California
4                                               THOMAS S. PATTERSON
                                                Senior Assistant Attorney General
5                                               ANYA BINSACCA
                                                JOHN D. ECHEVERRIA
6                                               MARISSA MALOUFF
                                                JAMES E. STANLEY
7                                               Supervising Deputy Attorneys General
                                                NICHOLAS ESPÍRITU
8                                               STEVEN KERNS
                                                JANE REILLEY
9                                               MEGAN RICHARDS

10                                              */s/ Meghan H. Strong*

11                                              MEGHAN H. STRONG
                                                Deputy Attorney General
12                                                455 Golden Gate Avenue
                                                  San Francisco, CA 94110
13                                                Telephone: (415) 510-3877
                                                  E-mail:  Meghan.Strong@doj.ca.gov
14
                                                *Attorneys for Plaintiffs*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY ISO MOTION FOR PRELIMINARY INJUNCTION