1   **ROB BONTA**
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   ANYA BINSACCA
    JOHN D. ECHEVERRIA
4   MARISSA MALOUFF
    JAMES E. STANLEY
5   Supervising Deputy Attorneys General
    NICHOLAS ESPÍRITU
6   STEVEN KERNS
    JANE REILLEY
7   MEGAN RICHARDS
    MEGHAN H. STRONG
8   Deputy Attorneys General
      455 Golden Gate Ave.
9     San Francisco, CA 94102
      Telephone: (415) 510-3877
10    E-mail:  Meghan.Strong@doj.ca.gov
    *Attorneys for Plaintiffs*

11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17  **GAVIN NEWSOM, IN HIS OFFICIAL
    CAPACITY AS GOVERNOR OF THE STATE OF
    CALIFORNIA; STATE OF CALIFORNIA,**          NO. 3:25-cv-04870-CRB
18
                              Plaintiffs,        **DECLARATION OF MEGAN RICHARDS
19                                               IN SUPPORT OF PLAINTIFFS' MOTION
                                                 FOR PRELIMINARY INJUNCTION**
20          **v.**
                                                 Judge:       Hon. Charles R. Breyer
21  **DONALD TRUMP, IN HIS OFFICIAL**            Trial Date:  None Set
    **CAPACITY AS PRESIDENT OF THE UNITED**      Action Filed: June 9, 2025
22  **STATES; PETE HEGSETH, IN HIS OFFICIAL**
    **CAPACITY AS SECRETARY OF THE**
23  **DEPARTMENT OF DEFENSE; U.S.**
    **DEPARTMENT OF DEFENSE,**
24
                              Defendants.
25

26

27

28

                                   1

I, Megan Richards declare under penalty of perjury that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of California, admitted to the bar of this Court, and a Deputy Attorney General in the Office of the Attorney General, California Department of Justice. The Attorney General is counsel to Plaintiffs Governor Gavin Newsom and the State of California. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of a copy of a printout of the U.S. Alcohol and Tobacco Tax and Trade Bureau's webpage entitled *The Whiskey Rebellion*, available on the Alcohol and Tobacco Tax and Trade Bureau's official website at https://www.ttb.gov/public-information/whiskey-rebellion.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of a copy of a printout of the U.S. Northern Command's webpage entitled *Update to DoD Federal Protection Mission - June 11, 2025*, available on the Northern Command's official website at https://www.northcom.mil/Newsroom/News/Article/Article/4214356/update-to-dod-federal-protection-mission-june-11-2025/.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a copy of a printout of the U.S. Executive Services Directorate webpage entitled *Department of Defense INSTRUCTION*, available on the Executive Services Directorate's official website at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of the Los Angeles Drug Enforcement Agency's June 18, 2025, post on the social media site X stating that it worked with the U.S. Army and Marine Interdiction forces available on X's official website at https://x.com/DEALOSANGELES/status/1935486892130345115.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of the Los Angeles Drug Enforcement Agency's June 18, 2025, post on the social media site X stating that it worked with the U.S. Army and Marine Interdiction forces available on X's official website at https://x.com/DEALOSANGELES/status/1935561101049209119.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of a June 18, 2025, news article authored by Ali Bradley and published by News Nation, *entitled Hundreds of DEA agents, police, National Guard raid illegal CA pot farms*, available on News Nations' official website at https://www.newsnationnow.com/us-news/immigration/raid-illegal-ca-pot-farms/.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 19, 2025, at San Francisco California.

Megan Richards

Digitally signed by Megan Richards
Date: 2025.06.19 21:44:06 -07'00'

_____

Megan Richards

**EXHIBIT** 1


Report Fraud: TTB Tips Online

Menu

**CBMA Importer Claims System** | **CBMA Import Resources** | **Tax Simplification Pilot Program**

HOME | PUBLIC INFORMATION | THE WHISKEY REBELLION

# The Whiskey Rebellion

*by Michael Hoover, Regulations & Rulings Division*

**The Distilled Spirits Tax of 1791**

As part of the compromises that led to the adoption of the United States Constitution in 1789, the new Federal government agreed to assume the Revolutionary War debts of the 13 States. In early 1791, to help pay off the resulting national debt, Congress used its new constitutional authority to "lay and collect Taxes, Duties, Imposts and Excises" and passed the first nationwide internal revenue tax — an excise tax on distilled spirits.[1] Congress took this action at the urging of the first Secretary of the Treasury, Alexander Hamilton.



*Alexander Hamilton, first Secretary of the Treasury (1789-1795).*

Unlike tariffs paid on goods imported into the United States, the excise tax on distilled spirits was a direct tax on Americans who produced whiskey and other alcohol spirits. The 1791 excise law set a varying six to 18-cent per gallon tax rate, with smaller distillers often paying more than twice per gallon what larger producers paid. All payments had to be made in cash to the Federal revenue officer appointed for the distiller's county.

Large, commercial distillers in the eastern United States generally accepted the new excise tax since they could pass its cost onto their cash-paying customers. However, most smaller producers west of the Appalachian and Allegheny Mountains, then the Nation's frontier, opposed the "whiskey tax."

**Frustration on the Frontier**

While eastern farmers could readily transport their grain to market, westerners faced the hard task of moving their crops great distances to the east over the mountains along poor dirt roads. Given this difficulty, many frontier farmers distilled their surplus grain into more easily transportable whiskey. In doing so, their grain became taxable distilled spirits under the 1791 excise law, and western farmers opposed what was, in effect, a tax on their main crop. Usually cash-poor, frontier residents also used whiskey to pay for the goods and services they needed. Naturally, many westerners quickly came to resent the new excise tax on their "currency."

Other aspects of the excise law also caused concern. The law required all stills to be registered, and those cited for failure to pay the tax had to appear in distant Federal, rather than local, courts. In Pennsylvania, for example, the only Federal courthouse was in Philadelphia, some 300 miles away from the small frontier settlement of Pittsburgh. In addition, many were upset by what they saw as the National government's inattention to continuing Indian attacks along the frontier and, with Spain's control of New Orleans, westerners were frustrated with the failure of the Government to open the Mississippi River to free American trade.



*A receipt for the whiskey tax, 1798.*

From the beginning, the Federal government had little success in collecting the whiskey tax along the frontier. While many small western distillers simply refused to pay the tax, others took a more violent stand against it. Federal revenue officers and local residents who assisted them bore the brunt of the protester's ire. Tax rebels tarred and feathered several whiskey tax collectors and threatened or beat many who offered them office space or housing. As a result, many western counties never had a resident Federal tax official.

President George Washington took notice of the resistance to the whiskey tax and issued a proclamation on September 15, 1792, condemning interference with the "operation of the laws of the United States for raising revenue upon spirits distilled within the same." [2]

**The Whiskey Rebellion Begins**

Despite the President's plea and Congressional modification of the excise law, [3] violent opposition to the whiskey tax continued to grow over the next two years. This was especially true in the four counties of southwestern Pennsylvania — Allegheny, Fayette, Washington, and Westmoreland — the location of up to one-

fourth of the Nation's stills. In the summer of 1794, U.S. Marshal David Lennon arrived in the area to serve writs ordering those who had refused to pay the whiskey tax to appear in Federal court in Philadelphia. In Washington County, Federal revenue officer John Neville acted as Lennox 's guide. On July 15th, the two men served a writ on William Miller, but, after leaving the paper with the angry frontiersman, they were met by an armed group of his neighbors. A shot was heard as Lennox and Neville rode off, but neither man was injured.

Matters came to a head on July 16th when a group of angry farmers, including members of the extended Miller family, marched on Neville's house in the belief that Marshal Lennox was there. Confronted by these armed men, Neville shot and killed Oliver Miller. A shootout ensued, and Neville's slaves joined the fight by firing on the mob from their quarters. The protesters fled, but returned to Neville's house on July 17th with a force of 500 local militiamen. The tax collector, however, had slipped away earlier with the aid of a small squad of Federal soldiers from Fort Pitt who had come to guard his property. A shootout with the soldiers left rebel leader James McFarlane dead, but the greatly outnumbered Federals later surrendered. The rebels then burnt the Neville's house and barn to the ground. Several days later, David Bradford, deputy county attorney for Washington County, took command of the rebels in the county.



*A tax collector is tarred and feathered by anti-tax frontiersmen during the Whiskey Rebellion.*

Anti-whiskey tax violence quickly spread to other counties along the frontier. Rebels burnt the home of Benjamin Wells, the Federal collector for Fayette County, and armed men stole the mail from a post rider leaving Pittsburgh.After finding letters from their opponents, the rebels returned to the town and beat the letter's authors. Anti-tax meetings were held throughout the region in late July. Despite appeals from anti-tax leaders such as newspaper publisher Hugh Henry Brackenridge and businessman and State legislator Albert Gallatin for a peaceful resolution of the crisis, calls went out for the local militia to gather at Braddock's Field near Pittsburgh.

**President Washington Responds**

After several thousand armed rebels gathered at Braddock's Field during the last week in July 1794, President Washington met on August 2nd with his Cabinet and the governor of Pennsylvania, Thomas Mifflin, to consider the situation. The President issued a proclamation on August 7th calling on the rebels" to disperse and retire peaceably to their respective abodes."[4] The proclamation also invoked the Militia Act of 1792, which, after Federal court approval, allowed the President to use State militiamen to put down internal rebellions and

"cause the laws to be duly executed."[5] The same day, Secretary of War Henry Knox sent a letter to the

governors of Maryland, New Jersey, Pennsylvania, and Virginia requesting a total of 12,950 militiamen to put down the rebellion.

In a last bid to avoid a confrontation, President Washington sent Attorney General William Bradford, Senator James Ross of Pennsylvania, and Pennsylvania Supreme Court justice Jasper Yeates to meet with rebel leaders. In late August and early September, the three Federal commissioners held talks with a 15-member committee appointed by a rebel assembly representing the four frontier counties of Pennsylvania and Ohio County in Virginia.The rebel committee included Hugh Henry Brackenridge, David Bradford, Albert Gallatin, and other prominent community leaders. Unable to find a peaceful solution to the spreading rebellion, the Federal commissioners returned to Philadelphia on September 24, 1794, where they reported that it was "absolutely necessary that the civil authority should be aided by a military force in order to secure a due execution of the laws."[6]



*President Washington, astride a white horse, reviews his troops at Carlisle, Pennsylvania in September 1794.*

In the mean time, almost 13,000 militiamen had gathered at Carlisle, Penn-sylvania, and prepared to march west to end the rebellion. On September 19, 1794, George Washington became the only sitting U.S. President to personally lead troops in the field when he led the militia on a nearly month-long march west over the Allegheny Mountains to the town of Bedford.

On September 25th, the President issued a proclamation declaring that he would not allow "a small portion of the United States [to] dictate to the whole union," and called on all persons "not to abet, aid, or comfort the Insurgents." [7] After leading the troops to Bedford, Washington returned to Philadelphia in late October and placed General Henry "Lighthorse" Lee, a Revolutionary War hero and governor of Virginia, in command. Washington left a letter with Lee with instructions to combat those "who may be found in arms in opposition to the National will and authority" and "to aid and support the civil Magistrate in bringing offenders to justice." [8] Secretary of the Treasury Alexander Hamilton also remained with General Lee and the troops.

**The End of the Whiskey Rebellion**

In late October 1794, the Federalized militia entered the western counties of Pennsylvania and sought out the whiskey rebels. By mid-November, the militia had arrested 150 rebels, including 20 prominent leaders of the

insurrection. Under the President's authority, General Lee issued a general pardon on November 29th for all those who taken part "in the wicked and unhappy tumults and disturbances lately existing" with the exception of 33 men named in the document. [9] While most of the militia returned home, a regiment occupied the area until the following spring, and organized opposition to the tax evaporated.

Of the whiskey rebels who were arrested, many were released due to a lack of evidence. Only a few men were tried and just two were convicted of treason. In July 1795, President Washington pardoned the two convicted men and those still in custody or under indictment. Several rebels sought for arrest fled the area, but most were later pardoned as well. President John Adams pardoned David Bradford, who escaped to Spanish-controlled New Orleans, in March 1799.

While violent opposition to the whiskey tax ended, political opposition to the tax continued. Opponents of internal taxes rallied around the candidacy of Thomas Jefferson and helped him defeat President John Adams in the election of 1800. By 1802, Congress repealed the distilled spirits excise tax and all other internal Federal taxes. Until the War of 1812, the Federal government would rely solely on import tariffs for revenue, which quickly grew with the Nation's expanding foreign trade.

**The Whiskey Rebellion's Legacy**

Most whiskey rebels returned to their previous lives and occupations, and some rose to prominence in their communities and the Nation. Hugh Henry Brackenridge, already a leading author and founder of the Pittsburgh Gazette, wrote a book on the uprising and would become a Pennsylvania Supreme Court justice.[10] William Findley, who urged peaceful protest of the whiskey tax, also wrote a book on the rebellion, and was elected repeatedly to Congress.[11]



*Albert Gallatin, Secretary of the Treasury (1801-1814).*

Albert Gallatin, a leading Pennsylvania businessman, land developer, and State legislator long opposed internal Federal taxes. Given the opposition, his Fayette county neighbors elected him to the rebel assembly during the Whiskey Rebellion. While in the assembly, however, Gallatin spoke out against an open, violent break with the National government, and he also served on the 15-member committee that met with President Washington's

three commissioners in an attempt to end to the crisis peacefully. Gallatin 's name appeared on a list of rebel leaders, but he was never arrested for his role in the Whiskey Rebellion.

Elected to Congress after the rebellion, Gallatin worked for a more exact accounting of the Federal government's finances, leading President Thomas Jefferson to appoint him Secretary of the Treasury, a post he also held under President James Madison. In 1802, Gallatin oversaw the ending of all direct, internal Federal taxes, including the distilled spirits tax. During the War of 1812, however, the rising costs of fighting Great Britain forced Gallatin to seek and win Congressional approval of new Federal excise taxes on carriages, sugar refining, and distilled spirits in 1813.

In 1814, Gallatin left the Department of the Treasury and helped negotiate the Treaty of Ghent, which ended the War of 1812. He later served as ambassador to France and to Great Britain. After retiring from Government service, he was president of the National City Bank of New York, and he helped found New York University. Gallatin later wrote that his participation in the Whiskey Rebellion was his "only political sin."[12]

In the end, the Whiskey Rebellion served as one of the first tests of the new Constitution and the Federal government's authority. It was also the greatest domestic crisis of President Washington's administration. The successful suppression of the Whiskey Rebellion helped to confirm the supremacy of Federal law in the early United States and the right of Congress to levy and collect taxes on a nation-wide basis.

### Visiting Whiskey Rebellion-Related Sites Today

Historical markers throughout southwestern Pennsylvania identify sites, homes and other buildings associated with the Whiskey Rebellion. A searchable list of historical markers can be found on the Pennsylvania Historical and Museum Commission Web site at http://www.phmc.state.pa.us/.

For example, historical markers note important meeting sites of whiskey rebels at Braddock's Field, as well as Bonnet Tavern and Mingo Creek Church, both of which still stand today. Markers also note the location of a Miller family farmstead and the home of rebel leader David Bradford, both of which are now museums and open to the public.

In addition, plaques mark the location of the homes of whiskey tax collectors John Neville in Allegheny County and Benjamin Wells in Fayette County. Rebels burned both houses in 1794. In addition, several sites associated with President George Washington's march west from Carlisle are marked as well, including the still-standing Espy House, his headquarters in Bedford, Pennsylvania.

Alexander Hamilton's house in New York City is now the Hamilton Grange National Memorial, a unit of the National Park Service. For information on visiting the house, see the Memorial's Web site at https://www.nps.gov/hagr/index.htm for details.

Albert Gallatin's house, "Friendship Hill," near Point Marion, Pennsylvania, is also a National Park Service site, and the house and grounds are open to visitors. For details, including information on Gallatin 's role in the Whiskey Rebellion, see the Friendship Hill National Historic Site Web site at https://www.nps.gov/frhi/index.htm.

### For Further Reading

*On the Internet*

Short biographies of Secretaries of the Treasury Alexander Hamilton and Albert Gallatin are posted on the Department of the Treasury's Web site at https://www.treasury.gov/about/history/Pages/edu_history_secretary_index.aspx.

Visit the University of Virginia's George Washington Papers Project Web site for information about viewing President Washington's diary entries for September and October 1794.

*Books*

Henry Adams, *The Life of Albert Gallatin* (Philadelphia: J.B. Lippincott & Co., 1879); reprinted as *The Life of Albert Gallatin, Selections,* intro. by Raymond Walters, Jr., (New York: Chelsea House, 1983).

Leland D. Baldwin, *Whiskey Rebels: The Story of a Frontier Uprising* (Pittsburgh: University of Pittsburgh, 1939).

H.H. Brackenridge, *Incidents of the Insurrection in the Western Parts of Pennsylvania in the Year 1794* (Philadelphia : John M'Culloch, 1795); reprint, Daniel Marder, *Incidents of the Insurrection, Edited for the Modern Reader* (New Haven, Conn.: College & University Press, 1972).

Richard Brookhiser, *Alexander Hamilton, American* (New York: Free Press, 1999).

Jerry A. Clouse, *The Whiskey Rebellion: Southwestern Pennsylvania 's Frontier People Test the American Constitution* (Harrisburg, Penn.: Pennsylvania Historical and Museum Commission, 1994).

William Findley, *History of the Insurrection in the Four Western Counties of Pennsylvania in the Year 1794* (Philadelphia : Samuel Harrison Smith, 1796); reprint, Reprint Co., Spartanburg, S.C., 1984).

Marie B. Hecht, *Odd Destiny, the Life of Alexander Hamilton* (New York: Macmillan, 1982).

Thomas P. Slaughter, *Whiskey Rebellion: Frontier Epilogue to the American Revolution* (New York: Oxford University Press, 1986).

Raymond Walter, Jr., *Albert Gallatin, Jeffersonian Financier and Diplomat* (New York: Macmillan, 1957).

[1] See U.S. Constitution, article I, section 8; and the Excise Act of March 3, 1791, in Richard Peters, ed., *The Public Statutes at Large of the United States of America* (Boston, 1845-46, 8 vols.), vol. 1, pgs. 199-214. The act is officially titled "An Act repealing, after the last day of June next, the duties heretofore laid upon Distilled Spirits imported from abroad, and laying others in their stead; and also upon Spirits distilled within the United States, and for appropriating the same."

[2] The proclamation appeared in the *National Gazette* on September 29, 1792.

[3] To address some of the westerners' concerns, Congress modified the excise act in May 1792 and again in June 1794. See "An Act concerning the Duties on Spirits distilled within the United States," passed May 8, 1792, in Peters, *The Public Statutes at Large,* vol. 1, pgs. 267-271; and "An Act making further provision for securing and collecting the Duties on foreign and domestic distilled Spirits, Stills, Wines and Teas" passed June 5, 1794, in *ibid,* pgs. 378-381.

[4] Proclamation by the President, August 7, 1794, *Pennsylvania Archives,* 2nd series, vol. 4, pgs.105-08. The proclamation was published in *Claypoole's Daily Advertiser* on August 11, 1794.

*[5]* Under the Militia Act of 1792, before the President could use State militia to repress an internal rebellion, a Federal judge had to rule that the laws of the United States were "opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act." See "An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions," passed May 2, 1792, in Peters, *The Public Statutes at Large,* vol. 1, pgs. 264-266.

Associate Supreme Court Justice James Wilson authorized the use of the militia when he ruled on August 4, 1794, that the evidence presented to him showed a rebellion was underway in western Pennsylvania that could not be suppressed by normal judicial proceedings or by the area's U.S. Marshal. See the letter, Wilson to Washington, *National Archives, Record Group 46, President's Messages.*

*[6]* See the Commissioner's report, in the *Pennsylvania Archives,* 2nd series, vol. 4, pgs. 293-302.

*[7]* President Washington's proclamation was published in the *Gazette of the United States* ( Philadelphia ), September 25, 1794.

*[8]* George Washington to Henry Lee, October 20, 1794, *George Washington Papers at the Library of Congress, 1741-1799,* Series 2 Letterbooks, Letterbook 40. General Lee also published the letter in his orders of October 21, 1794.

*[9]* Proclamation by Henry Lee, November 29, 1794, New Jersey Historical Society Archives, Manuscript Group 938, Henry Lee (1758-1818), Major General, General Orders, 1794, Call Number: MG 938.

*[10]* See H.H. Brackenridge, *Incidents of the Insurrection in the Western Parts of Pennsylvania in the Year 1794* ( Philadelphia : John M'Culloch, 1795); reprint, Daniel Marder, *Incidents of the Insurrection, Edited for the Modern Reader* (New Haven, Conn.: College & University Press, 1972).

*[11]* See William Findley, *History of the Insurrection in the Four Western Counties of Pennsylvania in the Year 1794* ( Philadelphia, Samuel Harrison Smith, 1796).

*[12]* See Henry Adams, *The Life of Albert Gallatin,* (Philadelphia, J.B. Lippincott & Co., 1879), vol. 3, pgs. 6-7; reprinted *Life of Albert Gallatin, Selections,* with and introduction by Raymond Walters, Jr. (New York: Chelsea House, 1983).

Last updated: January 9, 2020

**Filing & Payments**

Permits Online

COLAs Online

Tax Returns

Permit Applications

**About TTB**

Contact Us

Offices

Careers

EXHIBIT 2



# Update to DoD Federal Protection Mission - June 11, 2025

**By U.S. Northern Command Public Affairs** /
Published June 11, 2025



250610-M-YN654-1043
U.S. Marines with 2nd Battalion, 7th Marine Regiment, 1st Marine Division, who were placed in an alert status over the weekend to support U.S. Northern Command's mission, rehearse nonlethal tactics in the greater Los Angeles area, June 10, 2025. Approximately 700 Marines from Marine Corps Air-Ground Combat Center Twentynine Palms, California, will seamlessly integrate with the Title 10 forces under Task Force 51 who are protecting federal personnel and federal property in the greater Los Angeles area. (U.S. Marine Corps photo by Cpl. Jaye Townsend)

**Summary:** By direction of Secretary of Defense and in coordination with U.S. Northern Command (USNORTHCOM), approximately 4,000 California Army National Guard soldiers were placed under federal command and control in a Title 10 status. Additionally, approximately 700 Marines are augmenting the force.  All are serving under the command of Task Force 51 (TF 51).

TF 51 is U.S. Army North's Contingency Command Post.  It is commanded by Maj. Gen. Scott M. Sherman.

The mission of TF 51 is to protect federal personnel conducting federal functions and federal property in the greater Los Angeles area. They can and have accompanied ICE on missions, but they are not a part of the operations. Title 10 forces do not do law enforcement functions. They protect; they don't participate.

**Task Force 51**

As of today, approximately 2,800 service members are deployed to the greater Los Angeles area. This includes:

- 2,100 National Guard soldiers from the 79th Infantry Brigade Combat Team, who are actively deployed.

- 700 Marines with 2nd Battalion, 7th Marines, 1st Marine Division

- ~2,000 to be identified National Guardsmen in Title 10 status

**Status of the 700 Marines.**

The Marines will be employed seamlessly alongside the National Guard forces in Title 10 status, who also comprise TF 51. Their activation and inclusion in the task force was intended to provide adequate numbers of forces to provide continuous coverage of the area in support of the Lead Federal Agency.

The Marines have completed required training and will be employed by TF 51 within the next 48 hours conducting the same missions being performed by the National Guardsmen in Title 10 status.

**Training.**

2nd Battalion, 7th Marines had just completed a pre-deployment work-up. They are a ready battalion – a battalion recently trained and certified in all their mission essential tasks. When called up for this mission, the battalion underwent additional training specific to this mission. This training included de-escalation, crowd-control, and understanding the Standing Rules for the Use of Force (SRUF). Training was both academic and practical.

In addition to the training, the battalion is augmented with legal and law enforcement expertise.

**Authorities.**

Title 10 forces do not conduct civilian law enforcement functions. Title 10 forces may temporarily detain an individual in specific circumstances such as to stop an assault, to prevent harm to others, or to prevent interference with federal personnel performing their duties. Any temporary detention will end immediately when the individual(s) can be safely transferred to the custody of appropriate civilian law enforcement personnel.

**Taking Care of Troops.**

The Soldiers and Marines have contracting for billeting, latrines, showers, handwashing stations, food service, full laundry service, bulk ice, and bulk fuel. While awaiting fulfillment of the contract, Soldiers and Marines have adequate shelter, food, and water.

EXHIBIT 3



# Department of Defense
# INSTRUCTION

**NUMBER** 3025.21
February 27, 2013
Incorporating Change 1, Effective February 8, 2019

USD(P)

SUBJECT:    Defense Support of Civilian Law Enforcement Agencies

References:    See Enclosure 1

1. <u>PURPOSE</u>.  In accordance with the authority in DoD Directive (DoDD) 5111.1 and Deputy Secretary of Defense Memorandum (References (a) and (b)), this Instruction:

   a.  Establishes DoD policy, assigns responsibilities, and provides procedures for DoD support to Federal, State, tribal, and local civilian law enforcement agencies, including responses to civil disturbances within the United States, including the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States or any other political subdivision thereof in accordance with DoDD 3025.18 (Reference (c)).

   b.  Prescribes the regulations required by section 275 of title 10, United States Code (U.S.C.) (Reference (d)).

   c.  Incorporates and cancels DoDDs 3025.12, 5525.5, and 5030.46 (References (e), (f), and (g)).

2. <u>APPLICABILITY</u>.  This Instruction:

   a.  Applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff (CJCS) and the Joint Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (hereinafter referred to collectively as the "DoD Components").

   b.  Applies to the Office of the Inspector General of the Department of Defense (IG, DoD) only to the extent that this Instruction does not conflict with any of the duties and responsibilities assigned to the IG, DoD pursuant to section 8(g) of Appendix, title 5, United States Code (U.S.C.) (also known as "The Inspector General Act of 1978, as amended" (Reference (h))).

c. Governs all DoD Component planning for and participation in Defense support of civilian law enforcement activities, including domestic emergencies and civil disturbance operations (CDO) (formerly referred to as "military assistance for civil disturbances").

d. Applies to National Guard (NG) personnel in Reference (d) status only.

e. Applies to civilian employees of the DoD Components and the activities of DoD contractors performed in support of the DoD Components.

f. Does not apply to:

(1) Counternarcotics activities.

(2) Assistance to foreign law enforcement officials.

(3) The Defense Intelligence and Counterintelligence Components, when providing intelligence assistance to civilian law enforcement activities in accordance with paragraph 2.6. of Executive Order 12333 (Reference (i)) and Procedure 12 of DoD 5240.1-R (Reference (j)).

(4) Requests for sensitive support, which are governed by DoDD S-5210.36 (Reference (k)).

(5) NG personnel in State active duty or title 32, U.S.C. (Reference (l)), status.

(6) Maritime Homeland Security Operations, defined as time-critical requests by the United States Coast Guard for short duration (less than 48 hours) DoD support in countering an immediate maritime security threat, that are governed by the DoD-Department of Homeland Security Memorandum of Agreement for Department of Defense Support to the United States Coast Guard for Maritime Homeland Security (Reference (m)).

(7) Aircraft piracy operations conducted pursuant to Reference (d).

3. <u>DEFINITIONS</u>.  See Glossary.

4. <u>POLICY</u>.  It is DoD policy that:

a. DoD shall be prepared to support civilian law enforcement agencies consistent with the needs of military preparedness of the United States, while recognizing and conforming to the legal limitations on direct DoD involvement in civilian law enforcement activities.

b. Support of civilian law enforcement agencies by DoD personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385 (also known and hereinafter referred to as "The Posse Comitatus Act, as amended") of title 18, U.S.C. (Reference (n)); chapter 18 of Reference (d); section 1970 of title 2, U.S.C. (Reference (o)) (for support to the

U.S. Capitol Police); and other Federal laws, including those protecting the civil rights and civil liberties of individuals, as applicable.

c. The restrictions in paragraph 1.c. of Enclosure 3 of this Instruction shall apply to all actions of DoD personnel worldwide.

d. Exceptions, based on compelling and extraordinary circumstances, may be granted to the restrictions in paragraph 1.c. of Enclosure 3 of this Instruction for assistance to be provided outside the United States; only the Secretary of Defense or Deputy Secretary of Defense may grant such exceptions.

e. Requests for law enforcement support shall be evaluated using the criteria in Reference (c).

f. The ASD(HD&GS) may approve requests for DoD support of civilian law enforcement actions in accordance with Paragraph 4.s above the signature of Reference (c).

5. <u>RESPONSIBILITIES</u>.  See Enclosure 2.

6. <u>PROCEDURES</u>.  See Enclosures 3 through 9.  See Enclosure 4 for specific guidance for CDO.

7. <u>RELEASABILITY</u>.  UNLIMITED.  This Instruction is approved for public release and is available on the DoD Issuances Website at https://www.esd.whs.mil/DD/.

8. <u>SUMMARY OF CHANGE 1</u>.  The changes to this issuance are administrative and:

a. Update organizational titles and references for accuracy.

b. Align policy with the existing policy in Reference (c).

c. Update permissible direct assistance (see Enclosure 3) in accordance with DoD Instruction (DoDI) 5505.03 (Reference (p)).

*DoDI 3025.21, February 27, 2013*

9.  <u>EFFECTIVE DATE</u>.  This Instruction is effective February 27, 2013.



James N. Miller
Under Secretary of Defense for Policy

Enclosures
    1.  References
    2.  Responsibilities
    3.  Participation of DoD Personnel in Civilian Law Enforcement Activities
    4.  DoD Support of CDO
    5.  Domestic EOD Support of Civilian Law Enforcement Agencies
    6.  Domestic Terrorism Incident Support
    7.  Use of Information Collected During DoD Operations
    8.  Use of DoD Equipment and Facilities
    9.  Funding
Glossary

Change 1, 02/08/2019

## TABLE OF CONTENTS

ENCLOSURE 1:  REFERENCES ...........................................................................................7

ENCLOSURE 2:  RESPONSIBILITIES ..............................................................................10

    UNDER SECRETARY OF DEFENSE FOR POLICY (USD(P)) ..........................................10
    ASSISTANT SECRETARY OF DEFENSE FOR HOMELAND DEFENSE
        AND GLOBAL SECURITY (ASD(HD&GS)) .................................................................10
    USD(I) ...................................................................................................................................11
    IG, DoD .................................................................................................................................11
    UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
        (USD(P&R)) ......................................................................................................................11
    ASD (M&RA) .......................................................................................................................12
    HEADS OF THE DoD COMPONENTS ...............................................................................12
    SECRETARIES OF THE MILITARY DEPARTMENTS.......................................................12
    CJCS .....................................................................................................................................13
    COMMANDERS OF THE COMBATANT COMMANDS WITH DSCA
        RESPONSIBILITIES .........................................................................................................13
    COMMANDERS OF UNITED STATES NORTHERN COMMAND (USNORTHCOM),
        UNITED STATES INDO-PACIFIC COMMAND (USINDOPACOM), AND UNITED
        STATES SPECIAL OPERATIONS COMMAND (USSOCOM) ....................................14
    CHIEF, NGB..........................................................................................................................14

ENCLOSURE 3:  PARTICIPATION OF DoD PERSONNEL IN CIVILIAN LAW
    ENFORCEMENT ACTIVITIES .........................................................................................16

    GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES .................16
        Statutory Restrictions........................................................................................................16
        Permissible Direct Assistance ...........................................................................................16
        Restrictions on Direct Assistance .....................................................................................18
        Use of DoD Personnel to Operate or Maintain Equipment ..............................................19
        Expert Advice ....................................................................................................................22
        Training..............................................................................................................................22
        Other Permissible Assistance............................................................................................23
    EXCEPTIONS BASED ON STATUS ..................................................................................23
    EXCEPTIONS BASED ON MILITARY SERVICE ............................................................24
    MILITARY READINESS .....................................................................................................24
    APPROVAL AUTHORITY ..................................................................................................24

ENCLOSURE 4:  DoD SUPPORT OF CDO ......................................................................26

    GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES .................26
    DoD REQUIREMENTS ........................................................................................................27
    CDO PLANNING.................................................................................................................27

5

ROLE OF THE NG ..............................................................................................................28
COOPERATION WITH CIVIL AUTHORITIES..............................................................28
APPROVAL AUTHORITY ...............................................................................................29

ENCLOSURE 5:  DOMESTIC EOD SUPPORT OF CIVILIAN LAW ENFORCEMENT
    AGENCIES.......................................................................................................................30

GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES.................30
DoD REQUIREMENTS.....................................................................................................30
PLANNING AND EXECUTION .......................................................................................32
COOPERATION WITH CIVIL AUTHORITIES..............................................................34

ENCLOSURE 6:  DOMESTIC TERRORISM INCIDENT SUPPORT .....................................35

DoD GUIDANCE..............................................................................................................35
REQUIREMENT FOR VOCAL ORDERS TO BE PUBLISHED ....................................35

ENCLOSURE 7:  USE OF INFORMATION COLLECTED DURING MILITARY
    OPERATIONS...................................................................................................................36

ACQUISITION AND DISSEMINATION..........................................................................36
MILITARY READINESS ..................................................................................................37

ENCLOSURE 8:  USE OF DoD EQUIPMENT AND FACILITIES .........................................38

EQUIPMENT AND FACILITIES .....................................................................................38
LIMITATIONS ON THE USE OF PERSONNEL .............................................................38
MILITARY READINESS ..................................................................................................38

ENCLOSURE 9:  FUNDING.....................................................................................................40

GENERAL..........................................................................................................................40
PROCEDURAL REQUIREMENTS...................................................................................40
PERSONNEL DUTY STATUS .........................................................................................41

GLOSSARY ...............................................................................................................................42

PART I:  ABBREVIATIONS AND ACRONYMS ............................................................42
PART II:  DEFINITIONS...................................................................................................43

ENCLOSURE 1

REFERENCES

(a)   DoD Directive 5111.1, "Under Secretary of Defense for Policy (USD(P))," December 8, 1999

(b)   Deputy Secretary of Defense Memorandum, "Delegations of Authority," November 30, 2006

(c)   DoD Directive 3025.18, "Defense Support of Civil Authorities (DSCA)," December 29, 2010, as amended

(d)   Sections 251-254, 271-282 (chapter 15), 2576, 2667, and 9442 and chapters 47[1] and 1011 of title 10, United States Code

(e)   DoD Directive 3025.12, "Military Assistance for Civil Disturbances (MACDIS)," February 4, 1994 (hereby cancelled)

(f)   DoD Directive 5525.5, "DoD Cooperation with Civilian Law Enforcement Officials," January 15, 1986 (hereby cancelled)

(g)   DoD Directive 5030.46, "Assistance to the District of Columbia Government in Combating Crime," March 26, 1971 (hereby cancelled)

(h)   Section 8[2] of Appendix and section 552a[3] to title 5, United States Code

(i)   Executive Order 12333, "United States Intelligence Activities," as amended

(j)   DoD 5240.1-R, "Procedures Governing the Activities of DoD Intelligence Components that Affect United States Persons," December 1982, as amended

(k)   DoD Directive S-5210.36, "Provision of DoD Sensitive Support to DoD Components and Other Departments and Agencies of the U.S. Government (U)," November 6, 2008, as amended

(l)   Section 502 of title 32, United States Code

(m)   Memorandum of Agreement Between the Department of Defense and the Department of Homeland Security for Department of Defense Support to the United States Coast Guard for Maritime Homeland Security, April 5, 2006

(n)   Title 18, United States Code

(o)   Section 1970 of title 2, United States Code

(p)   DoD Instruction 5505.03, "Initiation of Investigations by Defense Criminal Investigative Organizations," February 13, 2017, as amended.

(q)   DoD Directive 5111.13, "Assistant Secretary of Defense for Homeland Defense and Global Security (ASD(HD&GS))," March 23, 2018

(r)   DoD Directive 5106.01, "Inspector General of the Department of Defense (IG DoD)," April 20, 2012, as amended

(s)   DoD Directive 1322.18, "Military Training," January, 13, 2009, as amended

(t)   DoD Directive 5105.77, "National Guard Bureau (NGB)," October 30, 2015, as amended

(u)   DoD Instruction 5525.07, "Implementation of the Memorandum of Understanding (MOU) Between the Departments of Justice (DoJ) and Defense Relating to the Investigation and Prosecution of Certain Crimes," June 18, 2007

---

[1] Also known as "the Uniform Code of Military Justice"
[2] Also known as "the Inspector General Act of 1978, as amended"
[3] Also known as "The Privacy Act of 1974, as amended"

(v)   Memorandum of Agreement Between the Attorney General and the Secretary of Defense, "Agreement Governing the Conduct of Defense Department Counterintelligence Activities in Conjunction with the Federal Bureau of Investigation," April 5, 1979, and its supplement, "Coordination of Counterintelligence Matters Between FBI and DoD," June 3 and June 20, 1996

(w)   Sections 23, 78, 593, and 1861(a)[4] of title 16, United States Code

(x)   Public Law 94-524, "The Presidential Protection Assistance Act of 1976," October 17, 1976, as amended

(y)   Sections 408 and 461-462 of title 22, United States Code

(z)   Section 180 of title 25, United States Code

(aa)   Sections 97, 1989, and 5121-5207[5] of title 42, United States Code

(ab)   DoD Instruction 6200.03, "Public Health Emergency Management Within the Department of Defense," March 5, 2010, as amended

(ac)   Section 1065 of title 43, United States Code

(ad)   Sections 1418, 1422, and 1591 of title 48, United States Code

(ae)   Section 220 of title 50, United States Code

(af)   Secretaries of the Departments of Defense, Interior, and Transportation; Administrator of the National Aeronautics and Space Administration; and Chair of the Federal Communications Commission; "National Search and Rescue Plan of the United States," January 2007, as amended

(ag)   DoD Instruction 3003.01, "DoD Support to Civil Search and Rescue (SAR)," September 26, 2011

(ah)   DoD Instruction 5525.13, "Limitation of Authority to Deputize DoD Uniformed Law Enforcement Personnel by State and Local Governments," September 28, 2007

(ai)   DoD Directive 5210.56, "Arming and the Use of Force," November 18, 2016

(aj)   Chairman of the Joint Chiefs of Staff Instruction 3121.01B, "Standing Rules of Engagement/Standing Rules for the Use of Force for U.S. Forces," June 13, 2005

(ak)   DoD Instruction 4515.13, "Air Transportation Eligibility," January 22, 2016, as amended

(al)   Sections 801-904 and 951-971 of title 21, United States Code

(am)   Sections 1324-1328 of title 8, United States Code

(an)   Section 1401 of title 19, United States Code

(ao)   Chapter 705 of title 46, United States Code

(ap)   Deputy Secretary of Defense Memorandum, "DoD Training Support to U.S. Civilian Law Enforcement Agencies," June 29, 1996[6]

(aq)   Deputy Secretary of Defense Memorandum, "Request for Exception to Policy," November 12, 1996[7]

(ar)   DoD Directive 5240.01, "DoD Intelligence Activities," August 27, 2007, as amended

(as)   DoD Directive 5111.10, "Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict (ASD(SO/LIC))," March 22, 1995, as amended

---

[4] Section 1861(a) is part of "The Fishery Conservation and Management Act of 1976, as amended" -- Public Law 94-265, approved April 13, 1976; 16 U.S.C. 1801-1882; 90 Stat. 331; as amended.

[5] Also known as "The Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988, as amended" ("the Stafford Act")

[6] Available from OASD(HD&GS)/Room 3D247, 2600 Defense Pentagon, Washington, D.C. 20301

[7] Available from OASD(HD&GS)/Room 3D247, 2600 Defense Pentagon, Washington, D.C. 20301

(at)  Parts 260-270 of title 40, Code of Federal Regulations, Hazardous Waste Management System: General

(au)  DoD Manual 6055.09, Volume 3, "DoD Ammunition and Explosives Safety Standards: General Quantity-Distance Criteria for Accidental Detonations," February 29, 2008, as amended

(av)  DoD Directive 3025.13, "Employment of DoD Capabilities in Support of the U.S. Secret Service (USSS), Department of Homeland Security (DHS)," October 8, 2010, as amended

(aw)  DoD Manual 5100.76, "Physical Security of Sensitive Conventional Arms, Ammunitions, and Explosives (AA&E)," April 17, 2012, as amended

(ax)  National Telecommunications and Information Administration, Manual of Regulations and Procedures for Federal Radio Frequency Management, May 2012 Revision of the January 2008 Edition[8]

(ay)  DoD Instruction 5160.68, Single Manager for Conventional Ammunition (SMCA): Responsibilities of the SMCA, the Military Services, and the United States Special Operations Command (USSOCOM), December 29, 2008, as amended

(az)  DoD Instruction 6055.17, "DoD Emergency Management (EM) Program," February 13, 2017, as amended

(ba)  DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

(bb)  DoD Directive 5200.27, "Acquisition of Information Concerning Persons and Organizations not Affiliated with the Department of Defense," January 7, 1980

(bc)  DoD Directive 5400.11, "DoD Privacy Program," October 29, 2014

(bd)  Sections 1535[9] and 6501-6508[10] of title 31, United States Code

(be)  Title 40, United States Code (also known as "The Federal Property and Administrative Services Act of 1949, as amended")

(bf)  Title 41, United States Code

(bg)  Chapters 21, 25, 29, and 31 of title 44, United States Code

(bh)  DoD Instruction 4165.70, "Real Property Management," April 6, 2005, as amended

(bi)  DoD Directive 5410.12, "Economic Adjustment Assistance to Defense-Impacted Communities," July 5, 2006

(bj)  DoD 7000.14-R, "Department of Defense Financial Management Regulations (FMRs)," Volumes 1-15, date varies per volume

(bk)  Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

---

[8] http://www.ntia.doc.gov/page/2011/manual-regulations-and-procedures-federal-radio-frequency-management-redbook
[9] Also known as "The Economy Act of 1932, as amended"  ("the Economy Act")
[10] Also known as "The Intergovernmental Cooperation Act of 1968, as amended"

ENCLOSURE 2

RESPONSIBILITIES

1. <u>UNDER SECRETARY OF DEFENSE FOR POLICY (USD(P))</u>.  The USD(P) shall establish DoD policy governing defense support of civilian law enforcement agencies and facilitate the coordination of that policy with Federal departments and agencies; State, local, and tribal agencies; and the DoD Components, as appropriate.

2. <u>ASSISTANT SECRETARY OF DEFENSE FOR HOMELAND DEFENSE AND GLOBAL SECURITY AFFAIRS (ASD(HD&GS))</u>.  The ASD(HD&GS), under the authority, direction, and control of the USD(P) and in accordance with DoDD 5111.13 (Reference (q)), shall develop, coordinate, recommend, and supervise the implementation of policy for defense support of civilian law enforcement agencies and defense support of civil authorities (DSCA), including law enforcement support activities.  In executing this responsibility for DoD law enforcement support activities, the ASD(HD&GS) shall:

   a.  Develop procedures and issue appropriate direction as necessary for defense support of civilian law enforcement agencies in coordination with the General Counsel of the Department of Defense, and in consultation with the Attorney General of the United States (AG), as appropriate, and in accordance with responsibilities assigned in References (c) and (q).  This includes tasking the DoD Components to plan for and commit DoD resources in response to requests from civil authorities for CDO (such a commitment of DoD resources for CDO must be authorized by the President of the United States and directed by the Secretary of Defense).

   b.  Serve as the principal point of contact between DoD and the Department of Justice for planning and executing CDO.

   c.  Coordinate with civilian law enforcement agencies on policies to further DoD cooperation with civilian law enforcement agencies.

   d.  Provide guidance for the use of Reserve Component personnel in support of civilian law enforcement agencies, in coordination with the Secretaries of the Military Departments and the Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)), and with the Chief, National Guard Bureau (NGB), as appropriate.  This will include guidance for use by approving authorities in evaluating the effect on military preparedness of requests for civilian law enforcement assistance that may involve use of the Reserve Components.

   e.  Assist in the development of policy regulating plans, procedures, and requirements of the DoD Components with authority over defense resources that may be employed to provide law enforcement support.

   f.  Inform the ASD(M&RA) of all requests for assistance by civilian law enforcement agencies that may be met using Reserve Component personnel and resources.

(1)  Inform the Chief, NGB of all requests for assistance by civilian law enforcement agencies that may be met using NG personnel.

(2)  Coordinate with the ASD(M&RA) and others as appropriate regarding duty status policies (e.g., performance of duty pursuant to sections 251-254 and 271-282 of Reference (d)).

g.  Coordinate with the CJCS in advance of the commitment of any Federal military forces.

h.  Coordinate with the Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of Defense, when providing assistance to civilian law enforcement agencies to ensure an appropriate funding approach in accordance with Enclosure 9 of this Instruction.

i.  In coordination with the Under Secretary of Defense for Intelligence (USD(I)), the CJCS, the Commanders of the Combatant Commands with DSCA responsibilities, and the Secretaries of the Military Departments, establish protocols and guidance for ensuring that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.

j.  Ensure, in coordination with the ASD for Special Operations and Low-Intensity Conflict (SO/LIC), the proper use of electronic counter-measures (ECM) by or in support of DoD explosive ordnance disposal (EOD) personnel when supporting civil authorities is addressed in interagency agreements and contingency plans.

k.  Approve requests for DoD support of civilian law enforcement agencies in accordance with Reference (c).

3.  <u>USD(I)</u>.  The USD(I) shall:

a.  Establish DoD processes and procedures to provide support to civilian law enforcement officials with Defense Intelligence Component resources in accordance with appropriate statutory authorities and DoD and Intelligence Community policy.

b.  Facilitate consultation on DoD policy regarding intelligence support of law enforcement officials, with appropriate Federal departments and agencies; State, local, and tribal agencies; and the DoD Components.

4.  <u>IG, DoD</u>.  The IG, DoD, shall issue guidance on cooperation with civilian law enforcement officials with respect to audits and investigations conducted, supervised, monitored, or initiated pursuant to DoDD 5106.01 (Reference (r)).

5.  <u>UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R))</u>.  The USD(P&R) shall monitor and oversee the development of integrated training

capabilities related to defense support to civilian law enforcement officials and the integration of these training capabilities into exercises and training to build, sustain, and assess readiness in accordance with DoDD 1322.18 (Reference (s)).

6. <u>ASD(M&RA)</u>.  The ASD(M&RA), under the authority, direction, and control of the USD(P&R), shall assist the ASD(HD&GS*)* in the development of guidance for use by approving authorities in evaluating the effect on military preparedness of requests for civilian law enforcement assistance that may involve use of the Reserve Components.

7. <u>HEADS OF THE DoD COMPONENTS</u>.  The Heads of the DoD Components shall:

   a.  Strictly comply with and disseminate throughout their Components the guidance issued by the ASD(HD&GS) pursuant to section 2 of this enclosure.

   b.  Identify appropriate resources for civilian law enforcement support that are consistent with law and DoD policy to carry out the intent of this Instruction.

   c.  Review training and operational programs to determine how and where assistance can best be provided to civilian law enforcement officials, consistent with the responsibilities established in this enclosure.  This review should include recommendations regarding activities for which reimbursement could be waived in accordance with section 2 of Enclosure 9.

   d.  Issue implementing guidance, in coordination with the ASD(HD&GS), incorporating the procedures in this Instruction, including:

      (1)  Procedures for prompt transfer of relevant information to law enforcement agencies.

      (2)  Procedures for establishing local contact points in subordinate commands for purposes of coordination with Federal, State, tribal, and local civilian law enforcement officials.

      (3)  Guidelines for evaluating requests for assistance in terms of effect on military preparedness of the United States.

   e.  Inform the CJCS of all requests requiring approval of the ASD(HD&GS) or the Secretary of Defense, in accordance with this Instruction.

8. <u>SECRETARIES OF THE MILITARY DEPARTMENTS</u>.  The Secretaries of the Military Departments, in addition to the responsibilities in section 7 of this enclosure, shall:

   a.  Provide resources to the DoD Components, consistent with DoD policies, goals, and objectives, to carry out the purpose of this Instruction.

b.  Coordinate with the Commanders of the Combatant Commands with DSCA responsibilities to ensure that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.


9.  <u>CJCS</u>.  The CJCS, in addition to the responsibilities in section 7 of this enclosure, shall:

a.  Assist the ASD(HD&GS) in developing recommendations for responding to requests for CDO and developing interagency policies on CDO.

b.  Develop processes to evaluate the effect of requests for civilian law enforcement assistance on military preparedness of the United States.

c.  Advise the Secretary of Defense, ASD(HD&GS), or Heads of the DoD Components, upon request, on the effect on military preparedness of the United States of any request for defense assistance with respect to CDO.


10.  <u>COMMANDERS OF THE COMBATANT COMMANDS WITH DSCA RESPONSIBILITIES</u>.  The Commanders of the Combatant Commands with DSCA responsibilities, through the CJCS, shall, in addition to the responsibilities in section 7 of this enclosure:

a.  Provide support of civilian law enforcement authorities as directed by the Secretary of Defense.

b.  Implement the provisions of this Instruction in appropriate training and exercises.

c.  When designated as a supported commander, coordinate with supporting DoD Components all reimbursement for assistance provided under the provisions of this Instruction.

d.  When designated as a supported commander, coordinate with the CJCS, the ASD(HD&GS), and the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict (ASD(SO/LIC)) (for the employment of special operations forces) for all military preparations and operations, including the employment of Federal military forces as requested by the AG and approved by the Secretary of Defense, as a result of any domestic emergency, including a terrorist incident, civil disturbance, or a natural disaster.  Commanders shall observe all such law enforcement policies as the AG may determine appropriate.

e.  For a terrorist incident having the potential for a request for military assistance by mutual agreement of DoD and the Federal Bureau of Investigation (FBI), designated Combatant Commanders may dispatch observers to the incident site to evaluate the situation.  Any dispatch of DoD counterterrorism forces must be specifically authorized by the Secretary of Defense through the CJCS.

f.  Coordinate with the Secretaries of the Military Departments to ensure that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.


11.  <u>COMMANDERS OF UNITED STATES NORTHERN COMMAND (USNORTHCOM), UNITED STATES INDO-PACIFIC COMMAND (USINDOPACOM), AND UNITED STATES SPECIAL OPERATIONS COMMAND (USSOCOM)</u>.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, through the CJCS and in addition to the responsibilities in sections 7 and 10 of this enclosure, shall:

a.  Serve as the DoD planning agents for support of civilian law enforcement activities, including CDO, following the guidance of the ASD(HD&GS) and in coordination with the CJCS.

b.  Lead planning activities for support of civilian law enforcement activities, including CDO, of the DoD Components in accordance with section 3 of Enclosure 4.  Serve as the DoD financial managers for their respective CDO operations in accordance with section 2 of Enclosure 9.


12.  <u>CHIEF, NGB</u>.  The Chief, NGB, shall:

a.  Implement the procedures in this Instruction.

b.  Assist the ASD(HD&GS) in accordance with DoDD 5105.77 (Reference (t)) in developing policy guidance regarding the use of NG personnel for DoD support of civilian law enforcement agencies.

c.  Assist the ASD(HD&GS) in the development of policy guidance for use by approving authorities in evaluating the effect on military preparedness if NG personnel are used to fulfill requests for civilian law enforcement assistance.

d.  Serve as an advisor to the Commanders of the Combatant Commands on NG matters pertaining to Combatant Command responsibilities under this Instruction, and support planning and coordination for such activities as requested by the CJCS or the Commanders of other Combatant Commands.

e.  On all matters pertaining to the NG, serve as the channel of communications between:  the Secretary of Defense, the CJCS, and the DoD Components (other than the Department of the Army and the Department of the Air Force); and the States.  The Chief, NGB, shall keep the Secretaries of the Army and the Air Force informed of all communications unless otherwise directed by the Secretary of Defense.

f.  Coordinate the sharing of State contingency plans for the use of non-federalized NG forces in CDO roles between the responsible State Adjutants General and the responsible Combatant Commander.

15

ENCLOSURE 3

PARTICIPATION OF DoD PERSONNEL IN CIVILIAN LAW ENFORCEMENT
ACTIVITIES

1. <u>GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES</u>

    a. <u>Statutory Restrictions</u>

    (1)  The primary restriction on DoD participation in civilian law enforcement activities is the Posse Comitatus Act.  It provides that whoever willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute U.S. laws, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, shall be fined under Reference (n), or imprisoned not more than 2 years, or both.

    (2)  Section 275 of Reference (d) provides that the Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under chapter 15 of Reference (d) does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

    b. <u>Permissible Direct Assistance</u>.  Categories of active participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest) that are not restricted by law or DoD policy are:

    (1)  Actions taken for the primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civil authorities.  This does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of the Posse Comitatus Act.  Actions under this provision may include (depending on the nature of the DoD interest and the authority governing the specific action in question):

        (a)  Investigations and other actions related to enforcement of chapter 47 of Reference (d) (also known as "the Uniform Code of Military Justice").

        (b)  Investigations and other actions that are likely to result in administrative proceedings by the DoD, regardless of whether there is a related civil or criminal proceeding. (See DoDI 5525.07 (Reference (u)) and Memorandum of Agreement Between the AG and the Secretary of Defense (Reference (v)) with respect to matters in which the DoD and the Department of Justice both have an interest.)

        (c)  Investigations and other actions related to a commander's inherent authority to maintain law and order on a DoD installation or facility.

(d)  Protection of classified defense information or equipment or controlled unclassified information (e.g., trade secrets and other proprietary information), the unauthorized disclosure of which is prohibited by law.

(e)  Protection of DoD personnel, equipment, and official guests.

(f)  Such other actions that are undertaken primarily for a military or foreign affairs purpose.

(2)  Audits and investigations conducted by, under the direction of, or at the request of the IG, DoD, pursuant to the Inspector General Act of 1978, as amended.

(3)  When permitted under emergency authority in accordance with Reference (c), Federal military commanders have the authority, in extraordinary emergency circumstances where prior authorization by the President is impossible and duly constituted local authorities are unable to control the situation, to engage temporarily in activities that are necessary to quell large-scale, unexpected civil disturbances because:

(a)  Such activities are necessary to prevent significant loss of life or wanton destruction of property and are necessary to restore governmental function and public order; or.

(b)  When duly constituted Federal, State, or local authorities are unable or decline to provide adequate protection for Federal property or Federal governmental functions.  Federal action, including the use of Federal military forces, is authorized when necessary to protect Federal property or functions.

(4)  DoD actions taken pursuant to sections 251-254 of Reference (d) relating to the use of Federal military forces in specified circumstances with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State or Federal law.

(5)  Actions taken under express statutory authority to assist officials in executing the laws, subject to applicable limitations.  The laws that permit direct DoD participation in civilian law enforcement include:

(a)  Protection of national parks and certain other Federal lands consistent with sections 23, 78, and 593 of title 16, U.S.C. (Reference (w)).

(b)  Enforcement of the Fishery Conservation and Management Act of 1976, as amended, pursuant to section 1861(a) of Reference (w).

(c)  Assistance in the case of crimes against foreign officials, official guests of the United States, and other internationally protected persons pursuant to sections 112 and 1116 of Reference (n).

(d)  Assistance in the case of crimes against Members of Congress, Members-of-Congress-elect, Justices of the Supreme Court and nominees, and certain senior Executive Branch officials and nominees in accordance with section 351 of Reference (n).

(e)  Assistance in the case of crimes involving nuclear materials in accordance with section 831 of Reference (n).

(f)  Protection of the President, Vice President, and other designated dignitaries in accordance with section 1751 of Reference (n) and Public Law 94-524 (Reference (x)).

(g)  Actions taken in support of the neutrality laws in accordance with sections 408 and 461-462 of title 22, U.S.C. (Reference (y)).

(h)  Removal of persons unlawfully present on Indian lands in accordance with section 180 of title 25, U.S.C. (Reference (z)).

(i)  Execution of quarantine and certain health laws in accordance with section 97 of title 42, U.S.C. (Reference (aa)) and DoDI 6200.03 (Reference (ab)).

(j)  Removal of unlawful enclosures from public lands in accordance with section 1065 of title 43, U.S.C. (Reference (ac)).

(k)  Protection of the rights of a discoverer of an island covered by section 1418 of title 48, U.S.C. (Reference (ad)).

(l)  Support of territorial governors if a civil disorder occurs, in accordance with sections 1422 and 1591 of Reference (ad).

(m)  Actions in support of certain customs laws in accordance with section 220 of title 50, U.S.C. (Reference (ae)).

(n)  Actions by Defense Criminal Investigative Organizations in support of internet crimes against children having a DoD nexus in accordance with Reference (p).

(6)  Actions taken to provide search and rescue support domestically under the authorities provided in the National Search and Rescue Plan (Reference (af)) and DoDI 3003.01 (Reference (ag)).

c.  Restrictions on Direct Assistance

(1)  Except as authorized in this Instruction (e.g., in Enclosures 3 and 4), DoD personnel are prohibited from providing the following forms of direct civilian law enforcement assistance:

(a)  Interdiction of a vehicle, vessel, aircraft, or other similar activity.

(b)  A search or seizure.

      (c)  An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity.

      (d)  Using force or physical violence, brandishing a weapon, discharging or using a weapon, or threatening to discharge or use a weapon except in self-defense, in defense of other DoD persons in the vicinity, or in defense of non-DoD persons, including civilian law enforcement personnel, in the vicinity when directly related to an assigned activity or mission.

      (e)  Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints.

      (f)  Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators.

      (g)  Forensic investigations or other testing of evidence obtained from a suspect for use in a civilian law enforcement investigation in the United States unless there is a DoD nexus (e.g., the victim is a member of the Military Services or the crime occurred on an installation under exclusive DoD jurisdiction) or the responsible civilian law enforcement official requesting such testing declares in writing that the evidence to be examined was obtained by consent. Requests for exceptions to this restriction must be made through channels to the ASD(HD&GS), who will evaluate, in coordination with the General Counsel of the Department of Defense, whether to seek Secretary of Defense authorization for an exception to policy.

    (2)  The use of deputized State or local law enforcement powers by DoD uniformed law enforcement personnel shall be in accordance with DoDI 5525.13 (Reference (ah)).

    (3)  Except as otherwise directed by the Secretary of Defense, the rules for the use of force and authority for the carrying of firearms by DoD personnel providing authorized support under this Instruction shall be in accordance with DoDD 5210.56 (Reference (ai)) and any additional Secretary of Defense-approved rules for the use of force contained in CJCS Instruction 3121.01B (Reference (aj)).

    (4)  Exceptions to these restrictions for assistance may be granted when the assistance is to be provided outside the United States.  Only the Secretary of Defense or Deputy Secretary of Defense may grant such exceptions, based on compelling and extraordinary circumstances.

   d.  <u>Use of DoD Personnel to Operate or Maintain Equipment</u>.  The use of DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment shall be limited to situations when the use of non-DoD personnel for operation or maintenance of such equipment would be unfeasible or impractical from a cost or time perspective and would not otherwise compromise military preparedness of the United States.  In general, the head of the civilian law enforcement agency may request a DoD Component to provide personnel to operate or maintain, or to assist in operating or maintaining, equipment for the civilian agency.  This assistance shall be subject to this guidance:

*DoDI 3025.21, February 27, 2013*

(1)  Such assistance may not involve DoD personnel directly participating in a law enforcement operation (as described in paragraph 1.c. of this enclosure.)

(2)  The performance of such assistance by DoD personnel shall be at a location where there is not a reasonable likelihood of a confrontation between law enforcement personnel and civilians.

(3)  The use of DoD aircraft to provide transportation for civilian law enforcement agencies may be provided only in accordance with DoD 4515.13-R (Reference (ak)).

(4)  A request for DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment must be made pursuant to section 274 of Reference (d) or other applicable law that permits DoD personnel to provide such assistance to civilian law enforcement officials.  A request that is made pursuant to section 274 of Reference (d) must be made by the head of a civilian agency empowered to enforce any of these laws:

(a)  Sections 801-904 and 951-971 of title 21, U.S.C. (Reference (al)).

(b)  Sections 1324-1328 of title 8, U.S.C. (Reference (am)).

(c)  A law relating to the arrival or departure of merchandise, as defined in section 1401 of title 19, U.S.C. (Reference (an)), into or out of the customs territory of the United States, as defined in Reference (an), or any other territory or possession of the United States.

(d)  Chapter 705 of title 46, U.S.C. (Reference (ao)).

(e)  Any law, foreign or domestic, prohibiting terrorist activities.

(5)  In addition to the assistance authorized by subparagraph 1.b.(1) of this enclosure:

(a)  DoD personnel may be made available to a Federal law enforcement agency to operate or assist in operating equipment, to the extent the equipment is used in a supporting role, with respect to:

1.  A criminal violation of the laws specified in subparagraph 1.d.(4) of this enclosure.

2.  Assistance that the Federal law enforcement agency is authorized to furnish to a State, local, or foreign government that is involved in the enforcement of laws similar to those in subparagraph 1.d.(4) of this enclosure.

3.  A foreign or domestic counter-terrorism operation, including support of FBI Joint Terrorism Task Forces.

4.  Transportation of a suspected terrorist from a foreign country to the United States to stand trial.

(b)  DoD personnel made available to a civilian law enforcement agency pursuant to section 274 of Reference (d) may operate equipment for:

$\underline{1}$.  Detection, monitoring, and communication of the movement of air and sea traffic.

$\underline{2}$.  Detection, monitoring, and communication of the movement of surface traffic outside of the geographic boundary of the United States and, if the initial detection occurred outside of the boundary, within the United States, not to exceed 25 miles of the boundary.

$\underline{3}$.  Aerial reconnaissance (does not include satellite reconnaissance).

$\underline{4}$.  Interception of vessels or aircraft detected outside the land area of the United States for the purposes of communicating with such vessels and aircraft to direct such vessels and aircraft to go to a location designated by appropriate civilian officials.

$\underline{5}$.  Operation of equipment to facilitate communications in connection with the law enforcement programs specified in subparagraph 1.d.(4) of this enclosure.

$\underline{6}$.  The following activities that are subject to joint approval by the Secretary of Defense and the AG (and the Secretary of State in the case of a law enforcement operation outside of the land area of the United States):

$\underline{a}$.  The transportation of civilian law enforcement personnel along with any other civilian or military personnel who are supporting, or conducting, a joint operation with civilian law enforcement personnel.

$\underline{b}$.  The operation of a base of operations for civilian law enforcement and supporting personnel.

$\underline{c}$.  The transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting Federal law enforcement agency provides all security for such transportation and maintains custody over the suspect through the duration of the transportation).

$\underline{7}$.  The detection, monitoring, and tracking of the movement of weapons of mass destruction under the circumstances described above, when outside the United States.

(6)  DoD personnel made available to operate equipment for the purposes in subparagraphs 1.d.(5)(b)$\underline{1}$ and $\underline{4}$ of this enclosure may continue to operate such equipment in cases involving the pursuit of vessels or aircraft into the land area of the United States where the detection began outside such land area.

(7)  With the approval of the Secretary of Defense, DoD personnel may be made available to any Federal, State, or local civilian law enforcement agency to operate equipment for purposes other than described in section 2 of this enclosure, only to the extent that such support

21

does not involve direct assistance by such personnel in a civilian law enforcement operation unless such direct participation is otherwise authorized by law and is authorized by the Secretary of Defense.

(8)  Nothing in this Instruction restricts the authority of Federal military commanders to take emergency action to prevent loss of life or wanton destruction of property as provided in subparagraph 1.b.(3) of this enclosure.

(9)  When DoD personnel are otherwise assigned to provide assistance with respect to the laws specified in subparagraph 1.b.(5) of this enclosure, the participation of such personnel shall be consistent with the limitations in such laws, if any, and such restrictions as may be established by policy or the DoD Components concerned.

e.  Expert Advice.  DoD Components may provide, subject to section 5 of this enclosure, expert advice to Federal, State, or local law enforcement officials in accordance with section 273 of Reference (d).  This does not permit direct assistance by DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure.

f.  Training

(1)  The DoD Components may provide, subject to section 5 of this enclosure, training to Federal, State, and local civilian law enforcement officials.  This does not permit large-scale or elaborate DoD training, and does not permit regular or direct involvement of DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure.

(2)  Training of Federal, State, and local civilian law enforcement officials shall be provided according to this guidance:

(a)  Assistance shall be limited to situations when the use of non-DoD personnel would be unfeasible or impractical from a cost or time perspective and would not otherwise compromise military preparedness of the United States.

(b)  Assistance may not involve DoD personnel participating in a law enforcement operation, except as otherwise authorized by this Instruction.

(c)  Assistance of DoD personnel shall be provided at a location where there is not a reasonable likelihood of a confrontation between law enforcement personnel and civilians, except as otherwise authorized by law.

(3)  This paragraph does not apply to advanced military training, which is addressed in Deputy Secretary of Defense memorandums (References (ap) and (aq)).  Additional exceptions to the policy in Reference (ap) may be requested on a case-by-case basis.  Requests for such exceptions shall be forwarded through the ASD(HD&GS).  Advanced military training:

(a)  Includes advanced marksmanship training, including sniper training, military operations in urban terrain (MOUT), advanced MOUT, close quarters battle/close quarters combat, and similar training.

(b)  Does not include basic military skills such as basic marksmanship, patrolling, mission planning, medical, and survival.

g.  <u>Other Permissible Assistance</u>.  These forms of indirect assistance are not prohibited by law or DoD policy:

(1)  Transfer to Federal, State, or local law enforcement officials of information acquired in the normal course of DoD operations that may be relevant to a violation of any Federal or State laws.

(2)  Information obtained through procedures, means, or devices authorized by Federal law exclusively for use in gathering, obtaining, or acquiring national intelligence or military intelligence may be transferred unless specifically prohibited by law.  Information shall not be transferred if it meets any of the following criteria:

(a)  The acquisition of that information violates applicable law protecting the privacy or constitutional rights of any person, including rights protected by section 552a of Reference (h) (also known as "The Privacy Act of 1974, as amended").

(b)  It would have been illegal for those civilian law enforcement officials to have obtained the information or employ the procedures, means, or devices used by the DoD Component to obtain the information.

(3)  Such other actions, approved in accordance with procedures established by the DoD Components concerned, that do not subject civilians to the use of DoD power that is regulatory, prescriptive, proscriptive, or compulsory.


2.  <u>EXCEPTIONS BASED ON STATUS</u>.  The restrictions in section 1 of this enclosure do not apply to:

a.  A member of a Reserve Component when not on active duty, active duty for training, or inactive duty for training.

b.  A member of the NG when not in Federal service.

c.  A civilian employee.  If the civilian employee is under the direct control of a military officer, assistance will not be provided unless it is permitted by section 3 of this enclosure.

d.  A member of a Military Service when off duty and in a private capacity.  A Service member is acting in a private capacity when he or she responds on his or her own volition to

assist law enforcement officials instead of acting under the direction or control of DoD authorities.

e. A member of the Civil Air Patrol, except when performing missions pursuant to section 9442(b) of Reference (d).

3. <u>EXCEPTIONS BASED ON MILITARY SERVICE</u>. By policy, Posse Comitatus Act restrictions (as well as other restrictions in this Instruction) are applicable to the Department of the Navy (including the Marine Corps) with such exceptions as the Secretary of Defense may authorize in advance on a case-by-case basis.

a. Such exceptions shall include requests from the AG for assistance pursuant to section 873(b) of Reference (al).

b. Requests for approval of other exceptions should be made by a senior official of the civilian law enforcement agency concerned, who verifies that:

(1) The size or scope of the suspected criminal activity poses a serious threat to the interests of the United States and enforcement of a law within the jurisdiction of the civilian agency would be seriously impaired if the assistance were not provided because civilian assets are not available to perform the mission; or

(2) Civilian law enforcement assets are not available to perform the mission, and temporary assistance is required on an emergency basis to prevent loss of life or wanton destruction of property.

4. <u>MILITARY READINESS</u>. Assistance may not be provided if such assistance could adversely affect military preparedness. Implementing documents issued by the Heads of the DoD Components shall ensure that approval for the disposition of equipment is vested in officials who can assess the effect of such disposition on military preparedness.

5. <u>APPROVAL AUTHORITY</u>. Requests by civilian law enforcement officials for use of DoD personnel to provide assistance to civilian law enforcement agencies shall be forwarded to the appropriate approval authority.

a. The Secretary of Defense is the approval authority for requests for direct assistance in support of civilian law enforcement agencies, including those responding with assets with the potential for lethality, except for the use of emergency authority as provided in subparagraph 1.b.(3) of this enclosure and in Reference (c), and except as otherwise provided below.

b. Requests that involve Defense Intelligence and Counterintelligence entities are subject to approval by the Secretary of Defense and the guidance in DoDD 5240.01(Reference (ar)) and Reference (j).

c.  The Secretaries of the Military Departments and the Directors of the Defense Agencies may, in coordination with the ASD(HD&GS), approve the use of DoD personnel:

(1)  To provide training or expert advice in accordance with paragraphs 1.e. and 1.f. of this enclosure.

(2)  For equipment maintenance in accordance with paragraph 1.d. of this enclosure.

(3)  To monitor and communicate the movement of air and sea traffic in accordance with subparagraphs 1.d.(5)(b) 1 and 4 of this enclosure.

d.  All other requests, including those in which subordinate authorities recommend disapproval, shall be submitted promptly to the ASD(HD&GS) for consideration by the Secretary of Defense, as appropriate.

e.  The views of the CJCS shall be obtained on all requests that are considered by the Secretary of Defense or the ASD(HD&GS), that otherwise involve personnel assigned to a unified or specified command, or that may affect military preparedness.

f.  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of Reserve Component personnel or equipment shall be coordinated with the ASD(M&RA).  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of NG personnel also shall be coordinated with the Chief, NGB.  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of NG equipment also shall be coordinated with the Secretary of the Military Department concerned and the Chief, NGB.

ENCLOSURE 4

DoD SUPPORT OF CDO

1. <u>GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES</u>

    a.  The President is authorized by the Constitution and laws of the United States to employ the Armed Forces of the United States to suppress insurrections, rebellions, and domestic violence under various conditions and circumstances.  Planning and preparedness by the Federal Government, including DoD, for civil disturbances is important due to the potential severity of the consequences of such events for the Nation and the population.

    b.  The primary responsibility for protecting life and property and maintaining law and order in the civilian community is vested in State and local governments.  Supplementary responsibility is vested by statute in specific agencies of the Federal Government other than DoD.  The President has additional powers and responsibilities under the Constitution of the United States to ensure that law and order are maintained.

    c.  Any employment of Federal military forces in support of law enforcement operations shall maintain the primacy of civilian authority and unless otherwise directed by the President, responsibility for the management of the Federal response to civil disturbances rests with the Attorney General.  The Attorney General is responsible for receiving State requests for Federal military assistance, coordinating such requests with the Secretary of Defense and other appropriate Federal officials, and presenting such requests to the President who will determine what Federal action will be taken.

    d.  The employment of Federal military forces to control civil disturbances shall only occur in a specified civil jurisdiction under specific circumstances as authorized by the President, normally through issuance of an Executive order or other Presidential directive authorizing and directing the Secretary of Defense to provide for the restoration of law and order in a specific State or locality in accordance with sections 251-254 of Reference (d).

    e.  Planning by the DoD Components for CDO shall be compatible with contingency plans for national security emergencies, and with planning for DSCA pursuant to Reference (c).  For example:

        (1)  Guidelines concerning the use of deputized State or local law enforcement powers by DoD uniformed law enforcement personnel are outlined in Reference (ah).

        (2)  Guidelines concerning the use of deadly force and/or the carrying of firearms by DoD personnel while engaged in duties related to security or law and order, criminal investigations, or counterintelligence investigations; protecting personnel; protecting vital Government assets; or guarding Government installations and sites, property, and persons (including prisoners) are outlined in Reference (ai) and any additional Secretary of Defense-approved rules for the use of force contained in Reference (aj).

2. <u>DoD REQUIREMENTS</u>

a.  Federal military forces shall not be used for CDO unless specifically authorized by the President, except under emergency authority as provided in Reference (c) and subparagraph 1.b.(3) of Enclosure 3.

b.  Federal military forces shall be made available for CDO as directed by the President.  The Secretary of Defense or other authorized DoD official may, where authorized and consistent with the direction of the President, establish the source and composition of those forces to achieve appropriate balance with other national security or DoD priorities.

c.  Federal military forces employed in CDO shall remain under Secretary of Defense command and control at all times.

d.  The pre-positioning of Federal military forces for CDO shall not exceed a battalion-sized unit in a single location unless a larger force is authorized by the President.

e.  DoD Components shall not take charge of any function of civil government unless absolutely necessary under conditions of extreme emergency (e.g., when using emergency authority as described in Reference (c) and subparagraph1.b.(3) of Enclosure 3).  Any commander who is directed, or undertakes, to control such functions shall strictly limit DoD actions to emergency needs and shall facilitate the reestablishment of civil responsibility at the earliest time possible.


3. <u>CDO PLANNING</u>

a.  To ensure essential control and sound management of all Federal military forces employed in CDO, centralized direction from the Secretary of Defense, through the ASD(HD&GS), shall guide planning by the DoD Components, whether alone or with civil authorities.  Execution of CDO missions shall be decentralized through the Commanders of USNORTHCOM, USINDOPACOM, or USSOCOM, or through joint task force commanders, and only when specifically directed by the Secretary of Defense or as described in subparagraph 1.b.(3) of Enclosure 3.

b.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, as the DoD planning agents for CDO in accordance with section 11 of Enclosure 2, shall lead the CDO planning activities of the DoD Components in these areas:

(1)  <u>USNORTHCOM</u>.  The 48 contiguous States, Alaska, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands.

(2)  <u>USINDOPACOM</u>.  Hawaii and the U.S. possessions and territories in the Pacific area.

    (3) <u>USSOCOM</u>.  CDO activities involving special operations forces.

    c.  CDO plans and readiness measures shall foster efficient employment of Federal equipment controlled by NG forces, whether employed under State or Federal authority, and other resources of the DoD Components.


4.  <u>ROLE OF THE NG</u>

    a.  NG forces in a State active duty status have primary responsibility to support State and local Government agencies for disaster responses and in domestic emergencies, including in response to civil disturbances; such activities would be directed by, and under the command and control of, the Governor, in accordance with State or territorial law and in accordance with Federal law.

    b.  NG forces may be ordered or called into Federal service to ensure unified command and control of all Federal military forces for CDO when the President determines that action to be necessary in extreme circumstances.

    c.  Federal military forces shall conduct CDO in support of the AG or designee (unless otherwise directed by the President) to assist State law enforcement authorities.  Federal military forces will always remain under the command and control of the President and Secretary of Defense.  Federal military forces also could conduct CDO in concert with State NG forces under the command of a dual-status commander, if determined to be appropriate by the Secretary of Defense and the Governor(s) concerned, or in close coordination with State NG forces using direct liaison.

    d.  Chief, NGB, will coordinate the sharing of State contingency plans for the use of non-federalized NG forces in CDO roles between the responsible State Adjutants General and the responsible Combatant Commander.


5.  <u>COOPERATION WITH CIVIL AUTHORITIES</u>

    a.  The AG shall receive and coordinate preliminary requests for CDO from civil authorities pursuant to sections 251-254 of Reference (d).

    (1)  Formal requests for CDO shall be addressed to the President.

    (2)  The AG may assign a component law enforcement agency of the Department of Justice, such as the FBI or Bureau of Alcohol, Tobacco, Firearms, and Explosives, to lead the operational response to a civil disturbance incident.

    (3)  The President may provide, through the AG or other Federal official, a personal representative to communicate the President's policy guidance to the military commander conducting CDO.  That representative may augment, but shall not replace, the military chain of

command.  In addition, an individual may be designated by the AG as the Senior Civilian Representative of the AG.

b.  The ASD(HD&GS) shall represent DoD in coordinating CDO planning and execution with the Department of Justice, and other Federal and State law enforcement agencies, as appropriate.


6. <u>APPROVAL AUTHORITY</u>

a.  The President is the approval authority for requests for assistance for CDO, except for emergency authority as provided in subparagraph 1.b.(3) of Enclosure 3 and in Reference (c).

b.  If the President directs the use of Federal military forces for CDO, the ASD(HD&GS) and the CJCS shall provide advice to the Secretary of Defense regarding the employment of DoD personnel and resources to implement the direction of the President.  Secretary of Defense approval of such employment shall be communicated to the Combatant Commanders through the CJCS.

c.  The ASD(HD&GS) shall provide any request, contingency plan, directive, or order affecting the employment of special operations forces to the ASD(SO/LIC), who supervises the activities of those forces on behalf of the Secretary of Defense in accordance with DoDD 5111.10 (Reference (as)).

d.  Additionally, the ASD(HD&GS), in coordination with the ASD(SO/LIC) for the employment of special operations forces, shall provide overall policy oversight of the employment of DoD personnel and resources for CDO responding to terrorist incidents and other similar events in coordination with the CJCS.

ENCLOSURE 5

DOMESTIC EOD SUPPORT OF CIVILIAN LAW ENFORCEMENT AGENCIES

1. <u>GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES</u>.  DoD EOD personnel may provide immediate response for EOD support in support of civil authorities, when requested, in accordance with Reference (c) and may provide for disposition of military munitions in accordance with parts 260-270 of title 40, Code of Federal Regulations (Reference (at)).

2. <u>DoD REQUIREMENTS</u>

    a.  DoD personnel will not participate in search or seizure of ordnance as part of a civilian law enforcement investigation.  DoD personnel may, as described in this enclosure, render safe military munitions and take possession of military munitions for appropriate disposition at the request of civilian law enforcement officials when such military munitions have already been discovered and seized by civilian law enforcement personnel.

    b.  DoD officials, including local military commanders, may provide EOD and explosive detection dog support to local civil authorities to save lives, prevent human suffering, and mitigate great property damage under imminently serious conditions in accordance with Reference (c).  Guidance for planning and execution requirements for Combatant Commanders and the Military Departments in responding to DoD military munitions is found in DoD 6055.09-M-V7 (Reference (au)).

    c.  Such an immediate response may include actions to provide advice and assistance to civil authorities, when requested, in the mitigation, rendering safe, and disposition of suspected or detected presence of unexploded ordnance (UXO), damaged or deteriorated explosives or munitions, an improvised explosive device (IED), other potentially explosive material or device, or other potentially harmful military chemical munitions or device, that creates an actual or potential imminent threat.

    d.  Military munitions, discarded military munitions, and UXO in an unauthorized location under the jurisdiction of public officials potentially present an imminent and substantial danger to public safety and health and to the environment, and may require an immediate EOD response.

        (1)  These conditions include:

            (a)  Items that were illegally removed from military installations.

            (b)  Military munitions that land off range.

    (c)  Munitions located on property formerly leased or owned by DoD (including manufacturing areas, pads, pits, basins, ponds, streams, burial sites, and other locations incident to such operations).

    (d)  Transportation accidents involving military munitions.

    (e)  Unauthorized public possession of military munitions.

    (2)  Military munitions found in the conditions in paragraph 2.d. should be considered extremely hazardous and should not be disturbed or moved until technically qualified EOD personnel assess and determine the hazard.

    (3)  DoD officials, including local military commanders:

    (a)  Will provide EOD support for military munitions, discarded military munitions, and UXO that have (or appear to have) DoD origins.

    (b)  May, in accordance with Reference (c), provide EOD support for military munitions or foreign ordnance that do not appear to have DoD origins found in the United States under the conditions in paragraph 2.d.

    e.  Rendering safe and disposing of improvised devices, non-military commercial explosives, or similar dangerous articles reported or discovered outside of DoD installations are primarily the responsibility of civil authorities.  However, due to the potential lethality and danger to public safety, DoD EOD personnel may provide assistance upon request in accordance with Reference (c).

    f.  When responding to requests for assistance from civil authorities under immediate response authority pursuant to Reference (c), the closest capable EOD unit regardless of Military Service will provide support.

    g.  Requests from civil authorities for non-immediate DoD EOD support are subject to approval by the Secretary of Defense.  Examples of non-immediate DoD EOD support include, but are not limited to, post-blast analysis, use of DoD material and equipment, and support of pre-planned events.  Exceptions include those activities in support of the U.S. Secret Service that, in accordance with DoDD 3025.13 (Reference (av)), do not require Secretary of Defense approval and those activities undertaken in response to requests for technical assistance or assessment of military munitions that are performed solely for safety purposes.

    h.  DoD EOD forces providing support under immediate response authority under Reference (c) will also comply with Reference (at) and other applicable local, State, and Federal laws and regulations, including environmental laws and regulations.

    i.  The National Joint Operations and Intelligence Center (NJOIC) and the FBI's Strategic Information Operations Center shall be advised immediately of the recovery and disposition of military munitions, as well as responses to non-military munitions and explosives.  DoD

Components also shall ensure that reports are submitted within 72 hours, in accordance with section 846 of Reference (n) and DoD Manual 5100.76 (Reference (aw)), to:

> Bureau of Alcohol, Tobacco, Firearms, and Explosives
> U.S. Bomb Data Center
> 99 New York Ave., N.E., 8S 295
> Washington, DC  20226

3.  <u>PLANNING AND EXECUTION</u>

   a.  Combatant Commanders will:

   (1)  Maintain situational awareness of all EOD elements in support of civil authorities, consolidate Service EOD incident reports, and provide to the ASD(HD&GS) and the ASD(SO/LIC) a monthly consolidated report highlighting:

      (a)  DoD EOD support of civil authorities, resources, and work-hours expended.

      (b)  Final determination of the item and the agency supported.

      (c)  Final disposition of the hazard and a cost estimate of the support provided.

      (d)  A status of reimbursement by the supported entity.  Reimbursement will not be sought for EOD response to military munitions that have (or appear to have) DoD origins.

   (2)  Coordinate with the DoD Explosives Safety Board and the Executive Manager for EOD Training and Technology to ensure information sharing.

   b.  In situations where DoD EOD personnel are asked to provide support to the Department of Justice (DOJ)/FBI in conducting ECM, such personnel may only employ ECM in the United States if approved by the Secretary of Defense and in accordance with the DOJ program for applying ECM in the United States in response to threats of radio-controlled improvised explosive devices (DOJ Federal ECM Program) approved by the National Telecommunications and Information Administration (NTIA) (see Section 7.25 of the NTIA Manual of Regulations and Procedures for Federal Radio Frequency Management (Reference (ax))).  NTIA has approved the use of DoD military ECM assets in support of the DOJ Federal ECM Program; however, only those DoD military ECM assets/systems that have been approved by NTIA for employment in the United States under the DOJ Federal ECM Program may be used by DoD EOD personnel in providing the requested support to DOJ/FBI.

   (1)  DoD officials may provide ECM equipment, and expert advice regarding the FBI's use of the equipment, in accordance with section 2 of this enclosure when the FBI has approved use of ECM and when there is insufficient time to obtain Secretary of Defense approval.

(2)  All use of ECM equipment or devices while conducting EOD operations supporting civil authorities will be coordinated with and follow procedures established by the FBI's Strategic Information Operations Center and reported to the NJOIC.

c.  In consideration of the Military Departments' and the Combatant Commanders' planning requirements and in consultation with appropriate local civilian agencies, installation commanders will identify off-installation critical infrastructure and key resources, such as nuclear power stations, power plants, communications hubs, and water treatment plants. Combatant Commanders and other responsible DoD officials will assist in developing priorities for EOD support of civil authorities.  Installations without resident EOD forces will develop plans to seek support from the nearest DoD EOD organization.

d.  Combatant Commanders, as appropriate, will maintain situational awareness of all EOD elements in support of civil authorities, coordinate and de-conflict Military Services' EOD domestic areas of response, and develop consolidated reporting procedures to permit accurate and timely collection of data from the supporting Services.

e.  Service EOD reports shall be used to indicate that DoD is reclaiming accountability of DoD military munitions that were found outside the custody of DoD.  The Military Departments will forward reports of reclaimed military munitions to installations for ammunitions logistics management and submission to the DoD Explosives Safety Board in accordance with References (au) and (aw), and DoDI 5160.68 (Reference (ay)).

f.  Reimbursement is not required for EOD support involving military munitions, discarded military munitions, and UXO that have DoD origins or appear to have DoD origins.  Combatant Commanders will coordinate with the DoD Explosives Safety Board and the Executive Manager for EOD Training and Technology to ensure information sharing.

g.  In accordance with DoDI 6055.17 (Reference (az)) and applicable Military Department issuances, commanders of EOD organizations will:

(1)  Coordinate with installation emergency managers to:

(a)  Establish local processes and procedures to respond to and report military and non-military munitions support requests from civilian law enforcement agencies.

(b)  Determine priorities of EOD support for protecting critical infrastructure and key resources when requested.

(2)  Participate in installation emergency response exercises.

(3)  Determine training requirements for conducting DSCA response missions.

4. <u>COOPERATION WITH CIVIL AUTHORITIES</u>

　　a.  DoD EOD forces will maintain relationships with local, State, tribal, and other Federal bomb disposal and other law enforcement agency assets near their geographical locations.  Such relationships may include conferences and training exercises to increase the interoperability and integration with local bomb squad agencies, to improve the response capabilities to civil authorities when requested, and to enhance the consolidated response capabilities.

　　b.  DoD EOD personnel may conduct UXO and explosive ordnance awareness and education programs that inform and promote public safety of the hazards associated with military munitions and explosive items.

ENCLOSURE 6

DOMESTIC TERRORIST INCIDENT SUPPORT

1.  <u>DoD GUIDANCE</u>.  Only the Secretary of Defense may authorize the use of DoD personnel in support of civilian law enforcement officials during a domestic terrorism incident, except as described in paragraph 1.b. of this enclosure.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, in coordination with the CJCS, ASD(HD&GS), and ASD(SO/LIC), have primary responsibility for all military preparations and -- when authorized by the Secretary of Defense -- operations, including the employment of armed Federal military forces at the scene of any domestic terrorist incident.

    a.  In discharging those functions, the Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM shall operate in a manner consistent with law enforcement policies established by the AG.

    b.  When a terrorist incident develops that has a potential for military involvement, the Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM may dispatch military observers to the incident site, with the concurrence of the senior FBI official at the site, to appraise the situation before any decision is made by the Secretary of Defense to commit Federal military forces.  Any dispatch of U.S. counterterrorism forces as observers must be specifically authorized by the Secretary of Defense through the CJCS.

2.  <u>REQUIREMENT FOR VOCAL ORDERS TO BE PUBLISHED</u>.  When the Secretary of Defense authorizes U.S. counterterrorism forces to assist with the resolution of a domestic terrorist incident, the CJCS shall issue the appropriate order on behalf of the Secretary of Defense.  That order shall designate the command relationships for the deploying forces.

ENCLOSURE 7

USE OF INFORMATION COLLECTED DURING DoD OPERATIONS


1. <u>ACQUISITION AND DISSEMINATION</u>.  DoD Components are encouraged to provide to Federal, State, or local civilian law enforcement officials any information collected during the normal course of military operations that may be relevant to a violation of State or Federal law within the jurisdiction of such officials, except as described in subparagraph 1.g.(2) of Enclosure 3 of this Instruction.  The DoD Components shall prescribe procedures for releasing information upon reasonable belief that there has been such a violation.

   a.  The assistance provided shall be in accordance with DoD 5400.11-R (Reference (ba)) and with section 271 of Reference (d) and other applicable laws.

   b.  The acquisition and dissemination of information under this enclosure shall be in accordance with DoDD 5200.27 (Reference (bb)), Reference (ar), and, for DoD intelligence components, Reference (j).

   c.  The DoD Components shall establish procedures for "routine use" disclosures of such information in accordance with Reference (ay) and DoDD 5400.11 (Reference (bc)).

   d.  Under guidance established by the DoD Components concerned, the planning and execution of compatible DoD training and operations shall, to the maximum extent practicable, take into account the needs of civilian law enforcement officials for information when the collection of the information is an incidental aspect of training or operations performed by Federal military forces consistent with section 271 of Reference (d).

   e.  The needs of civilian law enforcement officials shall, to the maximum extent practicable, be considered when scheduling routine training missions, consistent with section 271 of Reference (d).  This does not permit the planning or creation of missions or training for the primary purpose of aiding civilian law enforcement officials, and it does not permit conducting training or missions for the purpose of routinely collecting information about U.S. citizens.

   f.  Civilian law enforcement agents may accompany routinely scheduled training flights as observers for the purpose of collecting law enforcement information.  This provision does not authorize the use of DoD aircraft to provide point-to-point transportation and training flights for civilian law enforcement officials.  Such assistance may be provided only in accordance with Reference (ak).

   g.  Intelligence information held by the DoD Components and relevant to drug interdiction or other civilian law enforcement matters shall be provided promptly to appropriate civilian law enforcement officials, unless sharing that information is determined by the head of that DoD Component to be inconsistent with national security.  Under procedures established by the DoD Components concerned, information concerning illegal drugs that is provided to civilian law

enforcement officials under provisions of Reference (j) shall also be provided to law enforcement officials at the El Paso Intelligence Center.

h.  Nothing in this section modifies DoD procedures for dissemination of information for foreign intelligence or counterintelligence purposes.

i.  The DoD Components are encouraged to participate in the Department of Justice law enforcement coordinating committees situated in each Federal judicial district.

j.  The assistance provided under this enclosure may not include or permit direct participation by DoD personnel in the interdiction of a vessel, aircraft, or land vehicle, or in a search, seizure, arrest, or other similar activity, unless the member's participation in such activity is otherwise authorized by law in accordance with paragraph 1.b. of Enclosure 3 of this Instruction.

2.  <u>MILITARY READINESS</u>.  Information shall not be provided under this enclosure if it could adversely affect military preparedness of the United States.

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 8

USE OF DoD EQUIPMENT AND FACILITIES

1. <u>EQUIPMENT AND FACILITIES</u>.  The DoD Components may make equipment, base facilities, or research facilities available to Federal, State, or local civilian law enforcement officials for law enforcement purposes in accordance with the guidance in this enclosure.

   a.  The ASD(HD&GS) shall issue guidance to ensure that the assistance provided under this enclosure is in accordance with applicable provisions of law, including:

      (1)  Sections 272, 277, 2576, and 2667 of Reference (d).

      (2)  Section 1535 of title 31, U.S.C. (also known and referred to in this Instruction as "The Economy Act, as amended" (Reference (bd))) and sections 6501-6508 of title 31, U.S.C. (also known as "The Intergovernmental Cooperation Act of 1968, as amended" (Reference (bd))).

      (3)  Title 40, U.S.C. (Reference (be)).

      (4)  Sections 102-103, 105-115, 151-153, 3101, 3105, 3301, 3303-3305, 3509, 3901, 3905-3906, 4501-4506, 4701, and 6101 of title 41, U.S.C. (Reference (bf)).

      (5)  Chapters 21, 25, 29, and 31 of title 44, U.S.C. (Reference (bg)).

   b.  The ASD(HD&GS) guidance shall also ensure compliance with DoDI 4165.70 and DoDD 5410.12 (References (bh) and (bi)), and other guidance that may be issued by the Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of Defense.

2. <u>LIMITATIONS ON THE USE OF PERSONNEL</u>.  The DoD Components shall follow the guidance in paragraph 1.d. of Enclosure 3 of this Instruction in considering requests for DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment made available according to section 1 of this enclosure.

3. <u>MILITARY READINESS</u>.  Assistance may not be provided under this enclosure if such assistance could adversely affect military preparedness.  Each request shall be evaluated using the criteria provided in Reference (c) for evaluating legality, lethality, risk, cost, appropriateness, and readiness.  The implementing documents issued by the DoD Components shall ensure that approval for the disposition of equipment is vested in officials who can assess the effect of such disposition on military preparedness.

4. <u>APPROVAL AUTHORITY</u>

a.  Requests by civilian law enforcement officials for DoD assistance for the use of DoD equipment and facilities shall be forwarded to the appropriate approval authority under the guidance in this section.  All requests, including those in which subordinate authorities recommend denial, shall be submitted promptly to the approving authority.  Requests will be forwarded and processed according to the urgency of the situation.

(1)  Requests for the use of equipment or facilities outside the United States, other than for arms, ammunition, combat vehicles, vessels, and aircraft, shall be considered in accordance with procedures established by the applicable DoD Component.

(2)  Requests from other Federal agencies to purchase equipment (permanent retention) from a DoD Component, that are accompanied by appropriate funding documents, may be submitted directly to the DoD Component concerned.

(3)  Requests for training, expert advice, or use of personnel to operate or maintain equipment shall be forwarded in accordance with section 5 of Enclosure 3 of this Instruction.

(4)  For loans pursuant to Reference (bd), which are limited to agencies of the Federal Government, and for leases pursuant to section 2667 of Reference (d), which may be made to entities outside the Federal Government, this guidance applies:

(a)  Requests for arms, ammunition, combat vehicles, vessels, and aircraft shall be submitted to the Secretary of Defense for approval.

(b)  Requests for loan or lease or other use of equipment or facilities are subject to approval by the heads of the DoD Components, unless approval by a higher official is required by statute or DoD issuance applicable to the particular disposition.

b.  The Heads of the DoD Components shall issue implementing policy and direction for taking action on requests for loan, lease, or other use of equipment or facilities that are not governed by subparagraphs 4.a.(4)(a) and 4.a.(4)(b) of this enclosure.  Such implementing policy and direction shall ensure compliance with applicable law and DoD issuances, including requiring specific levels of approval with respect to particular dispositions.

ENCLOSURE 9

FUNDING

1. <u>GENERAL</u>.  Reimbursement is required when equipment or services are provided to agencies outside DoD.

a.  The primary sources of reimbursement requirements are the Economy Act, as amended, for provision of equipment or services to Federal departments and agencies and section 2667 of Reference (d).  Section 277 of Reference (d) requires reimbursement unless the Secretary of Defense elects to waive reimbursement using the criteria described in subparagraph 2.c. of this enclosure.

b.  Other statutes may apply to particular types of assistance or may apply to assistance to specific civilian law enforcement agencies.  Payment of fair market value under section 2667 of Reference (d) may only be waived under the provisions of section 2667 of Reference (d).

c.  A requirement for reimbursement does not apply when DoD Components provide information, collected during the normal course of military training or operations, to Federal, State, or local civilian law enforcement officials pursuant to section 271 of Reference (d).


2. <u>PROCEDURAL REQUIREMENTS</u>

a.  Defense support of civilian law enforcement agencies is normally an unprogrammed requirement for DoD.  DoD 7000.14-R (Reference (bj)) prescribes procedures for financing and reporting costs.  DoD Components shall comply with these procedures and shall consider the factors presented in paragraph 2.c. of this enclosure to determine or recommend whether financing is to be accomplished on a reimbursable or non-reimbursable basis.

b.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM shall serve as the financial managers responsible for DoD oversight of all operations executed in their areas of responsibility in accordance with section 11 of Enclosure 2 of this Instruction.

c.  The Secretary of Defense may waive reimbursement for DoD support to civilian law enforcement agencies provided pursuant to chapter 15 of Reference (d), or support provided by NG personnel performing duty pursuant to section 502(f) of Reference (l), in accordance with section 277 of Reference (d), if such support:

(1)  Is provided in the normal course of DoD training or operations; or

(2)  Results in a benefit to the DoD element or the NG personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

   d.  The ASD(HD&GS) may waive reimbursement of NG in Title 32 status up to $500,000 in accordance with Reference (c).


3.  <u>PERSONNEL DUTY STATUS</u>.  Funding for State active duty of NG personnel is the responsibility of the State involved.

*DoDI 3025.21, February 27, 2013*

<u>GLOSSARY</u>

<u>PART I.  ABBREVIATIONS AND ACRONYMS</u>

| | |
|---|---|
| AG | Attorney General of the United States |
| ASD(HD&GS) | Assistant Secretary of Defense for Homeland Defense and Global Security |
| ASD(SO/LIC) | Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict and Interdependent Capabilities |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| | |
| CDO | civil disturbance operations |
| CJCS | Chairman of the Joint Chiefs of Staff |
| | |
| DoDI | DoD Instruction |
| DoDD | DoD Directive |
| DOJ | Department of Justice |
| DSCA | defense support of civil authorities |
| | |
| ECM | electronic counter measures |
| EOD | explosive ordnance disposal |
| | |
| FBI | Federal Bureau of Investigation |
| | |
| IED | improvised explosive device |
| IG, DoD | Inspector General of the Department of Defense |
| | |
| MOUT | military operations in urban terrain |
| | |
| NG | National Guard |
| NGB | National Guard Bureau |
| NJOIC | National Joint Operations and Intelligence Center |
| NTIA | National Telecommunications and Information Administration |
| | |
| U.S.C. | United States Code |
| USD(I) | Under Secretary of Defense for Intelligence |

| | |
|---|---|
| USD(P) | Under Secretary of Defense for Policy |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |
| USNORTHCOM | United States Northern Command |
| USINDOPACOM | United States Indo-Pacific Command |
| USSOCOM | United States Special Operations Command |
| UXO | unexploded explosive ordnance |

## PART II. DEFINITIONS

Unless otherwise noted, these terms and their definitions are for the purpose of this Instruction.

civil authorities.  Defined in the DoD Dictionary of Military and Associated Terms (Reference (bk)).

civil disturbance.  Defined in Reference (bk).

civilian law enforcement official.  An officer or employee of a civilian Federal, State, local, and tribal law enforcement agency with responsibility for enforcement of the laws within the jurisdiction of that agency.  This term and its definition are proposed for inclusion in Reference (bk).

DoD personnel.  Federal military officers and enlisted personnel and civilian employees of the Department of Defense.

domestic emergencies.  Defined in Reference (bk).

emergency authority.  Defined in Reference (c).

explosives or munitions emergency.  A situation involving the suspected or detected presence of UXO, damaged or deteriorated explosives or munitions, an IED, other potentially explosive material or device, or other potentially harmful military chemical munitions or device, that creates an actual or potential imminent threat to human health, including safety, or the environment, including property, as determined by an explosives or munitions emergency response specialist. Such situations may require immediate and expeditious action by an explosives or munitions emergency response specialist to control, mitigate, or eliminate the threat (Reference (at)).

law enforcement agency.  Defined in Reference (bk).

EXHIBIT 4

← **Post**

 **DEALosAngeles**
@DEALOSANGELES

2) Due to the magnitude and topography of this operation, DEA has requested support from multiple federal partners. @NationalGuard @CBP @LosAngelesATF @ICEgov @FBILosAngeles @USArmy @IRSnews #BORTAC #MarineInterdiction @DEAHQ #DEARiversideDO @USMSLosAngeles



▶ 0:12

4:56 PM · Jun 18, 2025 · **23.7K** Views

💬 35          ⟲ 75          ♡ 212          🔖 15          ⬆

**EXHIBIT 5**



**EXHIBIT 6**

LIVE TV | CUOMO

# Hundreds of DEA agents, police, National Guard raid illegal CA pot farms

- 3 massive grow operations were targeted

- The illegal farms often come with illegal labor

- Roughly 100 armored vehicles were involved in the operation



Ali Bradley
Updated: JUN 18, 2025 / 11:08 PM CDT

RIVERSIDE COUNTY, Calif. (NewsNation) — NewsNation cameras were the only ones on the ground as a massive surge of law enforcement gathered in Southern California to dismantle three massive illegal marijuana grow operations on federal land, with one of them stretching more than 250 acres.

The U.S. Drug Enforcement Administration says the grow operations are located on federal land and not controlled, as they're operating outside of the law despite the drug's legality in California. As with many illegal grow operations, employing those with undocumented U.S. legal status is also rampant.

### Operation Tequila Sunset rips into prison gang started by deported Mexicans

"Crime follows crime. So in order to get these criminal grows productive, they have to reach out to undocumented workers in order to get it done," said DEA agent Anthony Chrysanthis. "So we are anticipating there being some undocumented workers on scene. We have plenty of resources here available to interview them, find out their story, find out how they got here, see how they were trafficked, and then pass those leads on."

CA: #EXCLUSIVE multiple arrests made as three illegal marijuana grow operations are dismantled in Riverside County—Agents, officers and soldiers went in 500 strong to thwart the illegal activity which included the employment of illegal immigrants.

Deputy Special Agent in Show more

Watch on X

3:17 PM · Jun 18, 2025

❤️ 6.6K    💬 Reply    🔗 Copy link

Read 208 replies

Just about every federal agency was on the scene, and the DEA says it's the largest law enforcement collaboration in recent history in the region, with upwards of 500 agents, officers, and soldiers — 325 of them from the California National Guard. Roughly 100 armored vehicles were also involved in the operation.

Preliminary numbers show 70-75 illegal immigrants were detained in the operation, according to law enforcement sources.

**IMMIGRATION**

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

CONTENT CONTINUES BELOW SURVEY

**WHAT DO YOU THINK?**    🏳 ⋮

To what extent do you support or oppose the California proposal to ban law enforcement officers from covering their faces when interacting with the public?

○ Strongly support

○ Somewhat support

○ Somewhat oppose

○ Strongly oppose

○ Other / No opinion

* By clicking "NEXT" I submit my answers and consent to the use of cookies for research and advertising purposes; I have read and agree to the CivicScience Privacy Policy and Terms of Service

NEXT *

## TRENDING ON NEWSNATION

1

Lauren Steele survived human trafficking then disappeared

2

What was said in 911 call after Anne Burrell's death