1 | **ROB BONTA**
Attorney General of California
2 | THOMAS S. PATTERSON
Senior Assistant Attorney General
3 | ANYA BINSACCA
JOHN D. ECHEVERRIA
4 | MARISSA MALOUFF
JAMES E. STANLEY
5 | Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
6 | STEVEN KERNS
JANE REILLEY
7 | MEGAN RICHARDS
MEGHAN H. STRONG
8 | Deputy Attorneys General
455 Golden Gate Ave.
9 | San Francisco, CA 94102
Telephone: (415) 510-3877
10 | E-mail: Meghan.Strong@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | Case No: 3:25-cv-04870-CRB<br><br>**DECLARATION OF DANIEL RANDOLPH** |

# DECLARATION OF DANIEL RANDOLPH

I, Daniel Randolph, declare as follows under 28 U.S.C. § 1746:

1. I am over the age of 18 years and a U.S. citizen. I have personal knowledge of all facts stated except for those facts specifically stated to be based on information and belief. If called as a witness, I could and would testify competently to the matters set forth below.

2. I have been employed with the Los Angeles Police Department ("LAPD" or "Department") since 1990. I am one of three Assistant Chiefs reporting directly to the Chief of Police of the LAPD and currently am the Director of Support Services, where I oversee—amongst other responsibilities—the recruitment and training of our probationary and in-service personnel, payroll and a $2 billion annual budget, 9-1-1 operations for the City of Los Angeles, the care and custody of arrestees in the largest Type-I jail facility in the nation, personnel services for approximately 8700 sworn and 2600 civilian personnel, the review and analyses of police uses of force, and a team of police psychologists responsible for the health and wellbeing of our personnel.

3. Prior to this position, I held the rank of Deputy Chief as the Chief of Staff to retired Chief of Police Michel Moore for three years. I held three different commands at the rank of Commander where I oversaw our Risk Management and Legal Affairs Group, Internal Affairs Group and was the Assistant Commanding Officer overseeing patrol operations in Operations-South Bureau. Prior to my promotion to Commander, I held the rank of Captain where I had four commands; patrol operations in Rampart Patrol Division, In-Service Training Division responsible for the continuing education of our sworn and civilian personnel, Training Division where my primary responsibility was the academy training of our newly hired Recruit Officers and the patrol/detective/management at Newton Area, one of our 21 geographic Areas

4.  As an Assistant Chief, I am aware of and familiar with LAPD's various policies and practices, including those regarding First Amendment protests, unlawful assemblies, and crowd control, and held the ancillary role as the Director of Emergency Operations within our Department Operations Center over the last week of protest activity over Immigration and Customs Enforcement.

**LAPD's Public Safety Mission and Training in First Amendment Activities**

5.  The mission of the LAPD is to safeguard the lives and property of the people it serves, to reduce the incidence and fear of crime, and to enhance public safety while working with the diverse communities of Los Angeles to improve their quality of life. The Department seeks to work in partnership with the people and organizations within the City to solve local problems that affect public safety.

6.  In light of its status as the police department of the second largest city in the nation, LAPD has great familiarity in handling large-scale pre-planned demonstrations, protests, and events, which occur regularly and with great frequency city-wide. The history of peaceful protests and demonstrations in Los Angeles has allowed the Department to form relationships with frequent protest organizers in order to facilitate peaceful demonstrations.

7.  The Department also has experience in dealing with spontaneous protests, such as the mass George Floyd protests that occurred in the City of Los Angeles ("City") and other major cities around the country in May and June, 2020. The Department learned many lessons during the ten days of those demonstrations and civil unrest, and has since trained its personnel on updated crowd management and crowd control techniques in order to facilitate peaceful protests and attempt to de-escalate tense, hostile and potentially violent situations.

8.  The LAPD is a highly trained and professional department, accustomed to protests, adept at crowd control, and well versed in managing public safety, with long established protocols for requesting and receiving mutual aid and assistance from, and providing mutual aid and assistance to, other law enforcement

agencies when the need arises. The LAPD regularly trains its officers to handle situations that require balancing individual rights of speech, expression, and assembly with the need to protect public safety, residents, and property.

9. In the last few years alone, the LAPD launched and implemented an initiative to protect Los Angeles by conducting quarterly and yearly exercises to practice managing large-scale First Amendment assemblies. That initiative also includes engaging the public to help inform best practices, and to solicit feedback to better suit the community's stated needs. These measures, among many others, ensure not only that the LAPD can manage large assemblies, but also that the community feels comfortable placing its trust in the LAPD.

**Details of Protest Activity and the Use of the National Guard**

10. On June 6, federal agents began a series of immigration enforcement actions both in the City and around the County of Los Angeles. As a result of these actions, a series of protests occurred, primarily focused on an area of approximately 10 blocks (less than a square mile) in Downtown Los Angeles. I received no notice of the intended federal immigration enforcement actions. I have made due inquiry of all others to whom such notice might be directed, including the other Assistant Chiefs, the Deputy Chiefs for LAPD Bureaus, and the Chief of Police. Based on that inquiry, and to the best of my personal knowledge, these immigration enforcement actions were undertaken without any advance notice to the LAPD.

11. In the past, LAPD has received notice of large-scale, federal enforcement efforts. Advance notice allows, and would have allowed in this instance, LAPD the opportunity to plan and be prepared for potential protests in response. While the strategic deployment in anticipation of unrest varies according to individual circumstances, the LAPD would have been in a position to prepare, deploy, and focus its resources and better prevent the violence and criminal activity that occurred as a result of the protests.

12. Los Angeles is a charter city that covers 469 square miles and is home to nearly four million people. With the sole exception of the national "No Kings" day protests on June 14, 2025, the recent immigration-related protests occurred in a small section of the City. As noted above, the protests occurred mostly within one square mile of the civic area of downtown and varied in size from a few dozen people to upward estimates in the tens of thousands.

13. The vast majority of the protestors have been peaceful, such that, on more than one occasion, the Department issued a news release stating that these demonstrations were "peaceful" and "concluded without incident." One news release also "commended all those who exercised their First Amendment rights responsibly."

14. There has been criminal behavior during this time, including violence against first responders and peaceful protestors, vandalism of public and private property, looting of businesses, and failure to follow the lawful dispersal orders of the Department. LAPD has proactively responded to these violent incidents throughout the relevant time period, and will continue to do so. None of the incidents were beyond the capacity of the LAPD, working with our state and local law enforcement counterparts, to handle.

15. On June 10, the Mayor imposed a curfew from 8:00 pm to 6:00 am in the civic area of downtown. This curfew was an additional tool for the Department to use to control any incidents of unlawful behavior. Within days, the curfew achieved its intended purpose in reducing the number of violent and criminal incidents. As a result, on June 16, 2025, the start time of the curfew was pushed back to 10:00 pm. Over the course of that same night, the department made zero arrests and, the following day, the Mayor rescinded the curfew. It is my understanding that the federal building at 300 N. Los Angeles in downtown Los Angeles reopened on June 17 to the general public for services, and it has remained open since, without incident.

16. In my experience, when large groups gather, whether in celebration or protest, the gathering often draws in a criminal element of people who use the cover of the crowd to engage in violence, damage and deface public and private property, loot and steal, assault police officers, destroy vehicles, set fires, and otherwise engage in violence and commit crimes.

17. The 2024 Los Angeles Dodgers World Series Championship parade is one example of a celebratory gathering that attracted those bent on violence and committing crimes. The parade saw more than 200,000 fans pack themselves into the same one square mile of downtown Los Angeles where the current protests are taking place. That day, alongside the hundreds of thousands of peaceful, celebrating fans, some violent and hostile crowds burned a city bus, looted stores, and threw dangerous objects at the LAPD. The Department was well equipped to handle the situation and did so without mutual aid, the National Guard, or any other assistance.

18. Sending in the National Guard to provide support in local crowd control and protest situations is a decision the LAPD usually makes as a local law enforcement agency with incident command, our local law enforcement partners, and our state counterparts. Over the 35 years I have been with the Department, LAPD has requested only six times that the State of California provide support from the National Guard under the Governor's control to perform discrete and limited tasks, for the limited purpose of freeing up local law enforcement personnel and resources to perform core policing and public safety functions.

19. Most recently, during the George Floyd demonstrations in May-June 2020, LAPD coordinated with the State of California to deploy the National Guard to perform discrete tasks – such as securing critical infrastructure and protecting other fixed posts – which allowed LAPD to free up its officers and deploy them to facilitate demonstrations and undertake crowd control functions. During these demonstrations, I was assigned to the Risk Management and Legal Affairs Group and helped receive the deployment of the National Guard as they arrived in our

Operations-West Bureau. To the best of my personal knowledge, and on information and belief, there has been no situation in the last 35 years where the National Guard or any other military unit has been deployed without a request from or advance notice to the LAPD.

20. Even when the National Guard is there in a cooperative function with LAPD, their presence can present challenges. For example, during the May-June 2020 demonstrations, the LAPD documented some of the difficulties in maintaining clear communications and unified command with the National Guard, including that their members were not familiar with the rules of engagement, the laws of arrest, or rules and policy regarding the use of force in policing and domestic law enforcement.

21. To minimize these challenges, it is important for local law enforcement to coordinate in advance any deployment by the National Guard, and to have the discretion to determine where, when, and in what capacity they should be deployed. When the National Guard remains under the Governor's control, well established lines of coordination with the Governor's Office facilitate communications, constitutional policing, and a unified command. These, in turn, reduce the likelihood of escalation, better protect lives and property, and provide a framework for the arrest and prosecution of criminals and restoration of public safety and order.

22. LAPD has seen firsthand that deploying the National Guard in coordination with the Governor's Office can be advantageous. For example, during the Palisades Fire recovery, approximately 155 National Guard personnel were deployed daily alongside the LAPD officers, Los Angeles Sheriff's Department deputies, and California Highway Patrol officers, working in concert to combat the devastating consequences of the worst natural disaster in Southern California's history, the January 2025 wildfires. The National Guard staffed the Traffic Control

1  Points leading into the area, had a liaison assigned to the incident for seamless
2  communication, and followed the unified command for coordination.
3       23.   Outside of the obvious differences in mission and overall purpose of
4  the local law enforcement and our nation's military, the LAPD relentlessly trains its
5  personnel on the tenets of constitutional policing, use of force, and crowd
6  management and control, as well as historical perspective of the local communities
7  and police relations. To ensure the adherence to Department policies, as well as
8  state and federal laws, the LAPD officers' response to protests and demonstrations
9  are guided by, among other documents and training, six directives on less-lethal use
10 of force and options, two training bulletins covering crowd control and crowd
11 management, as well as two tactical concepts documents. The LAPD personnel is
12 versed on all of the aspects of the Incident Command System, a standardized
13 approach that provides a common framework for command, control, and
14 communication while managing emergency response, and regularly practices it
15 with our local law enforcement and fire partners.
16      24.   Since June 6, 2025, the Department has: deployed a total of 10,196
17 personnel (counted in days of deployment, not individual officers); spent an
18 estimated $27.8 million in total cost; and arrested or cited 556 people.
19      25.   I declare under penalty of perjury under the laws of the United States
20 that the foregoing is true and correct and that this declaration is executed this 16
21 day of June, in Los Angeles, California.

23 Executed on June 19, 2025, at Los Angeles, California.

_____
Assistant Chief Daniel Randolph

55271542.1

Declaration of Danial Randolph (3:25-cv-04870-CRB)