Case No. 3:25-cv-04870-CRB

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

**FILED**

**JUN 2 3 2025**

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

---

**GAVIN NEWSOM**, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA,

    Plaintiffs,

v.

**DONALD J. TRUMP**, in his official capacity as President of the United States; PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE,

    Defendants.

---

## MOTION FOR LEAVE TO FILE BRIEF OF AMICUS CURIAE MARTIN AKERMAN IN SUPPORT OF PLAINTIFFS

---

Martin Akerman
P.O. BOX 100057
Arlington, VA 22210
(202) 656-5601
makerman.dod@gmail.com
*Pro Se Amicus Curiae*

---

Pursuant to this Court's inherent authority to manage its docket and to accept filings that aid in its decisional process, as guided by the principles of Federal Rule of Appellate Procedure 29, prospective amicus curiae Martin Akerman respectfully moves for leave to file the accompanying brief in support of Plaintiffs.

District courts possess broad discretion to permit the filing of amicus curiae briefs, and that discretion is liberally applied, particularly where the legal issues "have potential ramifications beyond the parties directly involved". The sole criterion is whether the proposed brief "is useful or otherwise desirable to the court".

As this Court has already recognized by granting leave to other amici in this matter , the issues presented here are of profound public interest and warrant a wide range of perspectives.

Counsel for Plaintiffs, the State of California, have consented to this filing. Counsel for Defendants have stated they take no position on this motion.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae Martin Akerman is the tenured Chief Data Officer of the National Guard Bureau, appointed under 44 U.S. Code § 3520 by the Chief of the National Guard Bureau, on December 20, 2021 (Appendix A), and the pro se petitioner in Akerman v. The Nevada National Guard, et al., Case No. 2:24-cv-01734-RFB-DJA (D. Nev.).

The Akerman case challenges the legality of the executive branch's use of federalized National Guard troops, acting under the same statutory authority at issue here, 10 U.S.C. § 12406, to execute quintessentially domestic law enforcement functions against him. Specifically, Mr. Akerman alleges that National Guard officers from three separate states were federalized and deployed not to quell a public disturbance, but as a pretextual tool of reprisal for his protected whistleblower activity. He alleges these federalized military officers subjected him to physical detention, seized his government equipment, and effected his indefinite suspension from his tenured federal position without due process.

Mr. Akerman's interest is direct and substantial. The legal questions before this Court—concerning the scope of district court jurisdiction to enjoin military activities and the proper interpretation of the Posse Comitatus Act, 18 U.S.C. § 1385—are central to his own litigation. The resolution of these issues in this Circuit will directly inform the legal framework governing his ability to seek redress for the alleged violations of his constitutional and statutory rights.

## REASONS WHY AN AMICUS BRIEF IS DESIRABLE AND RELEVANT

The proposed amicus brief will aid the Court in two critical ways and will not duplicate the arguments of the parties.

First, the brief provides a unique and essential perspective. While the parties in Newsom will debate the facts surrounding the protests in Los Angeles, Mr. Akerman offers a starkly different, concrete fact pattern that illuminates the outer boundaries of the law. His case presents a real-world example of how emergency federalization powers can allegedly be used not for broad public order purposes, but for targeted, coercive action against a single American citizen. This perspective is particularly relevant given the Ninth Circuit's explicit refusal to opine on the application of the Posse Comitatus Act, leaving that vital issue for this Court to consider in the first instance.

Second, the brief will assist the Court in its analysis of the jurisdictional question by demonstrating the critical importance of the Posse Comitatus Act as a bulwark against executive overreach. The facts of the Akerman case serve as a powerful cautionary tale, illustrating the grave dangers of leaving the PCA's protections unenforced. By grounding the abstract jurisdictional question in the tangible reality of his own experience, Mr. Akerman's brief underscores the necessity for this Court to retain and exercise its jurisdiction to prevent the statute from becoming a nullity and to heed the very concerns about unchecked executive power this Court has already raised.

3 OF 4

## CONCLUSION

For the foregoing reasons, Martin Akerman respectfully requests that the Court grant this motion and accept for filing the accompanying Brief of Amicus Curiae.


Dated: June 20, 2025


Respectfully submitted,

Martin Akerman
Chief Data Officer
National Guard Bureau
Pro Se Amicus Curiae



**NATIONAL GUARD BUREAU**
1636 DEFENSE PENTAGON
WASHINGTON DC 20301-1636

**DEC 2 0 2021**

MEMORANDUM FOR ALL NATIONAL GUARD PERSONNEL

Subject: Appointment of a National Guard Bureau Chief Data Officer and Creating Competitive Advantage by positioning Data as a Strategic Asset

Reference: National Guard Strategic Data Management Framework, 08 June 2021

1. In accordance with the reference, I hereby designate Mr. Martin Akerman as the National Guard Bureau (NGB) Chief Data Officer (CDO).

2. The NGB CDO will lead the utilization and governance of data across the National Guard.

3. The NGB CDO, in coordination with the Army National Guard and the Air National Guard, will lead the National Guard's Implementation Plan of the Department of Defense Data Strategy. See the attached "Supporting Department of Defense Data 'Decrees'" for more information.

4. The point of contact is Mr. Martin Akerman; NGB-J6; 703-607-7125.

DANIEL R. HOKANSON
General, USA
Chief, National Guard Bureau

Attachment:
As stated

ATTACHMENT

## SUPPORTING DEPARTMENT OF DEFENSE DATA 'DECREES'

1. The Department of Defense (DoD) released a memorandum, on 05 May 2021, outlining the importance of data management in establishing information superiority and enabling better decision-making. The National Guard plays a key role in the globally integrated and partnered Joint Force, designed and able to out-think, out-maneuver, and out-fight any adversary under conditions of disruptive change.

2. National Guard Bureau is adopting the five DoD Data 'Decrees' as outlined in the DoD memorandum by:

   a. Maximizing data sharing and rights for data use: all DoD data is an enterprise resource.

   b. Publishing data assets in the DoD federated data catalog along with common interface specifications.

   c. Using automated data interfaces that are externally accessible and machine-readable; ensure interfaces use industry-standard, non-proprietary, preferably open-source, technologies, protocols, and payloads.

   d. Storing data in a manner that is platform and environment-agnostic, uncoupled from hardware or software dependencies.

   e. Implementing best practices for secure authentication, access management, encryption, monitoring, and protection of data at rest, in transit, and in use.

3. The Joint Force will rapidly integrate, evaluate, and interpret data with artificial intelligence, machine language, and big data analytics. The National Guard Bureau Chief Data Officer will ensure the necessary data assets and expert resources are ready and empowered to help the National Guard achieve Joint All-Domain Operations, Senior Leader Decision Support and Executive Analytics while positioning our data to be visible, accessible, understandable, linked, trusted, interoperable, and secure (VAULTIS).

4. The National Guard will leverage better and faster human and machine-aided decision making to accelerate its response to changes in the operational environment (in collaboration with allies and partners), while adopting a rapid, iterative, and modular approach to capability development that will reduce costs, technology obsolescence, and acquisition risk.

Case No. 3:25-cv-04870-CRB

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

---

**GAVIN NEWSOM,** in his official capacity as Governor of the State of California; STATE OF CALIFORNIA,

    Plaintiffs,

v.

**DONALD J. TRUMP,** in his official capacity as President of the United States; PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE,

    Defendants.

---

### BRIEF OF AMICUS CURIAE MARTIN AKERMAN
### CHIEF DATA OFFICER OF THE NATIONAL GUARD BUREAU
### IN SUPPORT OF PLAINTIFFS

---

Martin Akerman
P.O. BOX 100057
Arlington, VA 22210
(202) 656-5601
makerman.dod@gmail.com
*Pro Se Amicus Curiae*

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................... 2

STATEMENT OF INTEREST OF AMICUS CURIAE........................ 3

SUMMARY OF ARGUMENT........................................... 4

ARGUMENT...................................................... 6

I.    UNDER THE PLAIN TEXT
      OF FEDERAL RULE OF CIVIL PROCEDURE 62(d),
      THIS COURT RETAINS JURISDICTION
      TO GRANT OR MODIFY AN INJUNCTION
      PENDING AN INTERLOCUTORY APPEAL........................ 6

II.   THE POSSE COMITATUS ACT
      IS A FUNDAMENTAL, ENFORCEABLE CHECK
      ON EXECUTIVE POWER
      THAT THIS COURT HAS JURISDICTION TO UPHOLD............. 9

   A. The PCA's Prohibition on
      Using the Military "to Execute the Laws"
      is a Clear Statutory and Criminal Command............. 9

   B. Judicial Deference to Executive Action
      is Not Absolute and Must Yield
      to the PCA's Clear Prohibition,
      Particularly in the Face of Alleged Bad Faith........ 11

III.  AMICUS'S PENDING LITIGATION
      PROVIDES A CRITICAL, REAL-WORLD ILLUSTRATION
      OF WHY THIS COURT'S JURISDICTION
      OVER THE POSSE COMITATUS ACT
      IS ESSENTIAL TO PREVENT ABUSE........................ 13

      Table 1: Comparison of Factual Predicates
               and Alleged Military Actions................ 14

CONCLUSION................................................... 16

1

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

Akerman v. The Nevada National Guard, et al.,
Case No. 2:24-cv-01734-RFB-DJA (D. Nev.).................. passim

Griggs v. Provident Consumer Discount Co.,
459 U.S. 56 (1982)............................................. 6

Newsom, et al. v. Trump, et al.,
No. 25-3727 (9th Cir. 2025).............................. passim

Sterling v. Constantin,
287 U.S. 378 (1932)................................... 5, 11, 15

U.S. v. Rodriguez-Rosado,
909 F. 3d 472 (1st Cir. 2018)................................. 7


**Statutes**                                                 **Page(s)**

10 U.S.C. § 12406........................................ passim

18 U.S.C. § 1385........................................ passim


**Rules**                                                    **Page(s)**

Fed. R. App. P. 8(a)........................................ 4, 8

Fed. R. Civ. P. 62(d)................................... 4, 6, 8

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus curiae Martin Akerman is the tenured Chief Data Officer of the National Guard Bureau, appointed under 44 U.S. Code § 3520 by the Chief of the National Guard Bureau, on December 20, 2021 (Appendix A), and the pro se petitioner in Akerman v. The Nevada National Guard, et al., Case No. 2:24-cv-01734-RFB-DJA (D. Nev.).

Amicus was retaliated against after making protected disclosures related to an investigation initiated by the Chief of the National Guard Bureau, Gen. Daniel Hokanson, and the Vice Chief of the National Guard Bureau, Lt. Gen. Marc Sasseville, in an effort to proactively address an unusually high rate of suicides across several of the States.

Akerman's case challenges the use of federalized National Guard troops under 10 U.S.C. § 12406—the same statute invoked here—to effect his physical detention and seizure of his property, as a bad-faith act of reprisal for protected whistleblowing.

The legal principles at issue in this Court's inquiry—namely, the scope of judicial power to enforce the Posse Comitatus Act against federalized troops—are therefore of direct and vital interest to amicus and he offers this brief to provide the Court with a unique, non-duplicative perspective on the grave dangers of unchecked executive power in this domain, informed by his own pending litigation and concern for the wellbeing of the members of the United States military, including guardsmen of the many states and territories of these United States.

3

## SUMMARY OF ARGUMENT

This Court retains primary jurisdiction to grant or modify an injunction relating to the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, notwithstanding the pending interlocutory appeal. The government's potential argument for jurisdictional divestiture fails for three independent reasons.

First, the plain text of Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a) creates an affirmative grant of jurisdiction to the district court to manage injunctive relief while an appeal is pending. The judge-made divestiture doctrine, a prudential rule of judicial economy, is inapplicable because the issue before this Court (the legality of troop activities under the PCA) is distinct from the issue on appeal (the legality of the federalization order under 10 U.S.C. § 12406). The Ninth Circuit's stay of the Temporary Restraining Order (TRO) did not, and could not, extinguish this Court's separate, text-based authority.

Second, the Posse Comitatus Act is a cornerstone of American liberty. It is not a policy guideline but a criminal statute that establishes a firm prohibition on the use of the military to "execute the laws."

This Court's jurisdiction is essential to enforce that prohibition and to act as a vital check on executive power.

4

Third, while deference to the President's national security judgments is appropriate in some contexts, it is not a blank check.

Deference must yield where a clear criminal statute is implicated and, as the Ninth Circuit itself recognized by citing Sterling v. Constantin, where there is a substantial showing that the executive has acted in bad faith.

Fourth, amicus's pending case in the District of Nevada provides a stark, factual illustration of why this Court's jurisdiction is so critical. The allegations in that case—that federalization authority was used as a pretext to deploy a multi-state military force to detain a single civilian whistleblower—demonstrate the grave potential for abuse.

This real-world example moves the analysis from the hypothetical to the actual, showing that without a robust judicial check on the activities of federalized troops, the PCA risks becoming a dead letter, and the military risks becoming a tool of domestic coercion.

This Court should affirm its jurisdiction and stand ready to enforce the law.

**ARGUMENT**

I. <u>UNDER THE PLAIN TEXT
OF FEDERAL RULE OF CIVIL PROCEDURE 62(d),
THIS COURT RETAINS JURISDICTION
TO GRANT OR MODIFY AN INJUNCTION
PENDING AN INTERLOCUTORY APPEAL.</u>

The threshold question posed by this Court—whether it "retain[s] primary jurisdiction to modify or grant an injunction under the Posse Comitatus Act" following the Ninth Circuit's stay—can be answered by a straightforward reading of the Federal Rules of Civil Procedure. The answer is yes.

The notion that the filing of a notice of appeal acts as a jurisdictional kill switch, rendering the district court powerless, is a common oversimplification of a nuanced, prudential doctrine that does not apply here. More importantly, the Rules themselves provide an affirmative grant of authority that empowers this Court to act.

The so-called "divestiture rule" provides that a notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982).

6

This is a judge-made rule of comity and efficiency, not a statutory mandate. Its purpose is to avoid the "confusion and inefficiency that would inevitably result if two courts at the same time handled the same issues in the same case." It is therefore "not a hard-and-fast jurisdictional rule" and its application "isn't mandatory." U.S. v. Rodriguez-Rosado, 909 F. 3d 472, 477-78 (1st Cir. 2018).

Here, the "aspects of the case involved in the appeal" are narrow. The Ninth Circuit is reviewing the grant of a TRO that was based on this Court's conclusion that Plaintiffs were likely to succeed on their claim that the President's federalization order was ultra vires under 10 U.S.C. § 12406. The appellate court's stay was based on its own preliminary assessment of that same narrow question. The issue this Court now considers—whether the

activities of the federalized Guard violate the Posse Comitatus Act—is a separate legal question under a different statute. The Ninth Circuit explicitly walled off this issue, stating it expressed "no opinion on it". Thus, there is no risk of two courts handling the "same issue," and the divestiture rule does not apply.

7

More fundamentally, Federal Rule of Civil Procedure 62(d) provides an independent source of jurisdiction. It states unequivocally:

> *"While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction."*

This is a direct, textual grant of authority. It empowers the district court—the court most familiar with the facts on the ground and best positioned to manage the parties' ongoing conduct—to continue its supervision of injunctive matters during the pendency of an appeal.

Federal Rule of Appellate Procedure 8(a) confirms this understanding. It mandates that a party seeking to grant or modify an injunction pending appeal "must ordinarily move first in the district court". The rules thus establish a clear presumption that the district court is the forum of first resort. The Ninth Circuit's stay of the TRO on the § 12406 issue cannot logically be read to have repealed this Court's separate, textually explicit power under Rule 62(d) to address potential violations of the Posse Comitatus Act. This Court retains full authority to hear and decide a motion for injunctive relief based on that distinct legal ground.

8

## II. THE POSSE COMITATUS ACT
## IS A FUNDAMENTAL, ENFORCEABLE CHECK
## ON EXECUTIVE POWER
## THAT THIS COURT HAS JURISDICTION TO UPHOLD.

The jurisdictional question is not merely academic; it is the gateway to enforcing one of the most fundamental principles of American law: the strict separation of military and civilian authority. The Posse Comitatus Act (PCA) is the primary guardian of that principle. The gravity of the PCA and the profound threat posed by its violation compel the conclusion that this Court must retain and, if necessary, exercise its jurisdiction to enjoin criminal conduct and protect civil liberty.


**A. The PCA's Prohibition on**
   **Using the Military "to Execute the Laws"**
   **is a Clear Statutory and Criminal Command.**

The PCA, 18 U.S.C. § 1385, makes it a federal crime to "willfully use any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," unless expressly authorized by the Constitution or another Act of Congress.[8] The phrase "execute the laws" is not ambiguous. It refers to the exercise of coercive, sovereign power over civilians—actions such as arrest, search, seizure, detention, and criminal investigation. It is the work of police, sheriffs, and marshals, not soldiers.

9

This prohibition is a direct legacy of the Founders' fear of standing armies being used as instruments of domestic oppression, a fear born from the abuses of the British Crown and enshrined in the Constitution itself. The PCA gives teeth to this tradition. When National Guard members are called into federal service under Title 10, as they were here, they become subject to the PCA's criminal prohibition.

The government's stated purpose for the deployment in Los Angeles—the protection of federal personnel and property—may fall outside the PCA's prohibition if it is limited to a defensive military posture.

However, should those activities cross the line from protection to direct law enforcement—patrolling streets, detaining protestors, or conducting investigations—they would trigger the PCA. This Court's jurisdiction is the essential mechanism to police that line. An interpretation of the law that would leave a federal court powerless to enjoin ongoing federal crimes pending an appeal on a separate issue would be an abdication of the judicial function.

**B. Judicial Deference to Executive Action**
   **is Not Absolute and Must Yield**
   **to the PCA's Clear Prohibition,**
   **Particularly in the Face of Alleged Bad Faith.**

In its ruling on the stay, the Ninth Circuit correctly noted that the President's determination of a public exigency under 10 U.S.C. § 12406 is subject to a "highly deferential" standard of review, rooted in the 1827 case of Martin v. Mott. However, the panel was equally clear that this deference is not absolute. Citing the landmark case of Sterling v. Constantin, 287 U.S. 378 (1932), the court affirmed that deference is unwarranted where executive action is not "conceived in good faith" or is an "act of mere oppression, an arbitrary fiat that overleaps the bounds of judgment".

This Court should apply that crucial distinction here. While the initial decision to federalize the Guard may receive deference, the subsequent decision to use those troops in a manner that potentially violates a criminal statute does not. Determining whether specific actions constitute "executing the laws" under the PCA is a matter of statutory interpretation, which is "emphatically the province and duty of the judicial department." Marbury v. Madison, 5 U.S. 137, 177 (1803).

This Court itself has recognized the limits of executive power in this very case.

11

As Judge Breyer aptly stated during the TRO hearing,

> *"the president is of course limited to his authority. That's the difference between a constitutional government and King George... It's not that a leader can simply say something and it becomes it. It's a question of a leader... following the law"*

The PCA is the law. The potential for a President to invoke emergency powers under a pretext or in bad faith—a possibility the Ninth Circuit explicitly acknowledged—makes the judicial check provided by the PCA all the more vital. If the executive could immunize any military action from review simply by making a threshold finding of "rebellion," the PCA would be rendered meaningless. This Court's jurisdiction is the only backstop against such an outcome.

12

### III. AMICUS'S PENDING LITIGATION
### PROVIDES A CRITICAL, REAL-WORLD ILLUSTRATION
### OF WHY THIS COURT'S JURISDICTION
### OVER THE POSSE COMITATUS ACT
### IS ESSENTIAL TO PREVENT ABUSE.

The legal principles discussed above are not abstract. Amicus curiae Martin Akerman is currently living their consequences. His pending lawsuit in the District of Nevada, Akerman v. Nevada National Guard, provides this Court with a powerful and timely cautionary tale, demonstrating in concrete terms the precise abuses the PCA was enacted to prevent and why this Court's jurisdiction to enforce it is indispensable.

In his Nevada case, Mr. Akerman alleges that the executive branch invoked the same emergency statute at issue here, 10 U.S.C. § 12406, not to respond to a large-scale public crisis, but as a pretext to retaliate against him for his protected whistleblowing activities as a civilian federal employee.

He alleges that instead of using standard civil service procedures, the government deployed federalized National Guard officers from Arizona, Arkansas, and Nevada to carry out what can only be described as law enforcement actions against him. These actions included his "physical detention" and the "seizure of his equipment," culminating in his indefinite suspension from his tenured position.

13

The contrast between the facts alleged in Newsom and those alleged in Akerman could not be more stark, and it powerfully illustrates the need for the two-step judicial check described above.

**Table 1: Comparison of Factual Predicates**
         **and Alleged Military Actions**

| Feature | Newsom v. Trump (N.D. Cal.) | Akerman v. Nevada National Guard (D. Nev.) |
|---|---|---|
| **Stated Public Exigency** | Large-scale civil unrest and protests against federal immigration enforcement in Los Angeles. | None stated beyond an alleged "emergency" to effectuate a personnel action against a single civilian federal employee. |
| **Statutory Authority Invoked** | 10 U.S.C. § 12406. | 10 U.S.C. § 12406. |
| **Alleged Military Activities** | Protection of federal personnel and property. | Physical detention of a civilian; seizure of his government equipment; execution of an adverse personnel action (indefinite suspension). |
| **Alleged Purpose of Action** | To "execute the laws of the United States" by protecting federal functions. | To retaliate against a protected whistleblower for disclosures of waste and mismanagement, constituting a "bad faith" and "pretextual" use of emergency power. |

14

This comparison crystallizes the danger. The Newsom case presents a scenario where deference to the President's finding of an exigency may be plausible. The military's mission, as described, is arguably defensive and tailored to a military purpose—protecting federal assets. The Akerman case, however, alleges a "grotesque abuse" of that same authority. It alleges the use of military force not to protect property from a mob, but to detain an individual, seize his effects, and strip him of his livelihood—the very definition of "executing the laws."

Mr. Akerman's allegations of bad-faith retaliation directly implicate the Sterling v. Constantin exception to deference that the Ninth Circuit highlighted.

His case serves as a living exhibit of how emergency powers can be twisted into "an act of mere oppression". It demonstrates that even if a court affords deference to the initial federalization decision, it must retain jurisdiction to scrutinize the subsequent actions of the troops.

To do otherwise would be to grant the executive a license to use the armed forces as a domestic police force, accountable to no one, so long as it utters the magic word "emergency." That is a result the Constitution, the Posse Comitatus Act, and two centuries of American tradition forbid.

15

## CONCLUSION

This Court has both the authority and the solemn duty to adjudicate the application of the Posse Comitatus Act in this case. The plain text of the Federal Rules, the prudential nature of the divestiture doctrine, and the Ninth Circuit's own careful delineation of the issues on appeal all confirm that this Court retains primary jurisdiction to grant or modify an injunction. The profound importance of the PCA as a bulwark of liberty, and the tangible threat of its erosion as illustrated by the experience of amicus, compel the exercise of that jurisdiction. Amicus curiae Martin Akerman respectfully urges this Court to affirm its authority and to stand ready to enforce the vital separation between military and civilian power that is the bedrock of a free society.

Dated: June 20, 2025

Respectfully submitted,

Martin Akerman
Chief Data Officer
National Guard Bureau
Pro Se Amicus Curiae

16



**NATIONAL GUARD BUREAU**
1636 DEFENSE PENTAGON
WASHINGTON DC 20301-1636

**DEC 2 0 2021**

MEMORANDUM FOR ALL NATIONAL GUARD PERSONNEL

Subject:  Appointment of a National Guard Bureau Chief Data Officer and Creating
Competitive Advantage by positioning Data as a Strategic Asset

Reference:  National Guard Strategic Data Management Framework, 08 June 2021

1.  In accordance with the reference, I hereby designate Mr. Martin Akerman as the
National Guard Bureau (NGB) Chief Data Officer (CDO).

2.  The NGB CDO will lead the utilization and governance of data across the National
Guard.

3.  The NGB CDO, in coordination with the Army National Guard and the Air National
Guard, will lead the National Guard's Implementation Plan of the Department of
Defense Data Strategy.  See the attached "Supporting Department of Defense Data
'Decrees'" for more information.

4.  The point of contact is Mr. Martin Akerman; NGB-J6; 703-607-7125.

DANIEL R. HOKANSON
General, USA
Chief, National Guard Bureau

Attachment:
As stated

ATTACHMENT

SUPPORTING DEPARTMENT OF DEFENSE DATA 'DECREES'

1. The Department of Defense (DoD) released a memorandum, on 05 May 2021, outlining the importance of data management in establishing information superiority and enabling better decision-making. The National Guard plays a key role in the globally integrated and partnered Joint Force, designed and able to out-think, out-maneuver, and out-fight any adversary under conditions of disruptive change.

2. National Guard Bureau is adopting the five DoD Data 'Decrees' as outlined in the DoD memorandum by:

   a. Maximizing data sharing and rights for data use: all DoD data is an enterprise resource.

   b. Publishing data assets in the DoD federated data catalog along with common interface specifications.

   c. Using automated data interfaces that are externally accessible and machine-readable; ensure interfaces use industry-standard, non-proprietary, preferably open-source, technologies, protocols, and payloads.

   d. Storing data in a manner that is platform and environment-agnostic, uncoupled from hardware or software dependencies.

   e. Implementing best practices for secure authentication, access management, encryption, monitoring, and protection of data at rest, in transit, and in use.

3. The Joint Force will rapidly integrate, evaluate, and interpret data with artificial intelligence, machine language, and big data analytics. The National Guard Bureau Chief Data Officer will ensure the necessary data assets and expert resources are ready and empowered to help the National Guard achieve Joint All-Domain Operations, Senior Leader Decision Support and Executive Analytics while positioning our data to be visible, accessible, understandable, linked, trusted, interoperable, and secure (VAULTIS).

4. The National Guard will leverage better and faster human and machine-aided decision making to accelerate its response to changes in the operational environment (in collaboration with allies and partners), while adopting a rapid, iterative, and modular approach to capability development that will reduce costs, technology obsolescence, and acquisition risk.