**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GAVIN NEWSOM, In his official capacity as Governor of the State of California; STATE OF CALIFORNIA, | No. 25-3727 |
| | D.C. No. 3:25-cv-04870-CRB |
| *Plaintiffs - Appellees*, | |
| | ORDER |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE, | |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted June 17, 2025
San Francisco, California

Filed June 19, 2025

Before: Mark J. Bennett, Eric D. Miller, and Jennifer Sung,
Circuit Judges.

## SUMMARY[*]

### 10 U.S.C. § 12406

The panel stayed pending appeal the district court's temporary restraining order (TRO) (1) enjoining the President of the United States, the Secretary of Defense, and the Department of Defense from deploying members of the California National Guard in Los Angeles; and (2) directing defendants to return control of the California National Guard to California.

In response to disturbances in Los Angeles stemming from federal enforcement of immigration laws, the President on June 7, 2025, invoked 10 U.S.C. § 12406—and only that statute—to order 4,000 members of the National Guard into federal service for 60 days to protect federal personnel performing federal functions and to protect federal property. The statute authorizes the President to "call into Federal service members and units of the National Guard of any State" whenever one or more of three conditions are satisfied.

The State of California and Governor Newsom sued defendants in federal court, and upon plaintiffs' application, the district court granted a TRO, primarily because the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court concluded that plaintiffs were likely to succeed on their claim that the President's order was ultra vires because none of the predicates to federalization required under § 12406 existed, and the order was not issued through the Governor as the statute requires. Defendants immediately appealed and filed an emergency motion to stay the TRO pending appeal.

The panel held that it had jurisdiction under the All Writs Act to grant a stay of the TRO pending appeal. Moreover, because the TRO possessed the qualities of a preliminary injunction, it was reviewable under 28 U.S.C. § 1292(a)(1).

In granting a stay pending appeal, the panel held that defendants made the required strong showing that they were likely to succeed on the merits of their appeal. Although the panel disagreed with defendants' primary argument that the President's decision to federalize members of the California National Guard under § 12406 was completely insulated from judicial review under the political question doctrine, the panel was nonetheless persuaded that, under longstanding precedent interpreting the statutory predecessor to § 12406, a court's review of that decision must be highly deferential.

Affording the President that deference, the panel concluded that it was likely that the President lawfully exercised his statutory authority under § 12406(3), which authorizes federalization of the National Guard when "the President is unable with the regular forces to execute the laws of the United States." Defendants presented evidence of protesters' interference with the ability of federal officers to execute the laws, including evidence that protesters threw objects at Immigration and Customs Enforcement vehicles, "pinned down" several Federal Protective Service officers

defending federal property by throwing "concrete chunks, bottles of liquid, and other objects," and used "large rolling commercial dumpsters as a battering ram" in an attempt to breach the parking garage of a federal building. Plaintiffs' own submissions stated that some protesters threw objects, including Molotov cocktails, and vandalized property. According to the declarations submitted by defendants, these activities significantly impeded the ability of federal officers to execute the laws. Under a highly deferential standard of review, defendants presented facts that permitted the panel to conclude that the President had a colorable basis for invoking § 12406(3).

The Secretary of Defense's transmittal of the order to the Adjutant General of the California National Guard—who is authorized under California law to "issue all orders in the name of the Governor"—likely satisfied the statute's procedural requirement that federalization orders be issued "through" the Governor. And even if there were a procedural violation, that would not justify the scope of relief provided by the district court's TRO.

The panel's conclusion that it was likely that the President's order federalizing members of the California National Guard was authorized under § 12406(3) also resolved plaintiffs' Tenth Amendment claim because the parties agreed that the Tenth Amendment claim turns on the statutory claim. The panel concluded that the other stay factors—irreparable harm to defendants, injury to plaintiffs, and the public interest—weighed in defendants' favor.

## COUNSEL

Samuel T. Harbourt (argued), Joshua Patashnik, and Christopher D. Hu, Deputy Solicitors General; Haley Amster and Cara Newlon, Associate Deputy Solicitors General; Michael J. Mongan, Solicitor General; Megan H. Strong, Megan A. Schultz Richards, Jane Reilley and Nicholas R. Green, Deputy Attorneys General; Thomas S. Patterson, Senior Assistant Attorney General Robin L. Goldfaden; James E. Stanley, Anya Binsacca and  John D. Echeveria Supervising Deputy Attorney General; Rob Bonta California Attorney General; California Department of Justice, Office of the California Attorney General, San Francisco, California; Laura L. Faer, Acting Senior Assistant Attorney General, Nicholas D. Espiritu, Deputy Attorney General; California Department of Justice Office of the Attorney General, Oakland, California;  Kendal L. Micklethwaite, Deputy Assistant Attorney General, California Department of Justice, Office of the California Attorney General, Sacramento, California; Brendan Hamme, Deputy Attorney General; Lorraine Lopez and Marissa Malouff, Deputy Attorneys General, Public Rights Division, Civil Rights Enforcement Section; California Department of Justice, Office of the California Attorney General, Los Angeles, California; for Plaintiffs-Appellees.

Brett A. Shumate (argued), Assistant Attorney General; Eric D. McArthur, Deputy Assistant Attorney General; Sharon Swingle, Anna O. Mohan and Mark R. Freeman, Attorneys; Christopher D. Edelman, Trial Attorney; United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Mack E. Jenkins, Matthew J. Craig, Susan Har, Hecker Fink LLP, Los Angeles, California; Beau Tremitiere and Kristy

Parker, Protect Democracy United, Washington, D.C.; for
Amici Curiae Former U.S. Army and Navy Secretaries and
Retired Four-Star Admirals and Generals.

Hydee F. Soto, Valerie L. Flores, Michael Dundas, and
Shaun D. Jacobs, Attorneys, Los Angeles City Attorney
Office, Los Angeles, California; Norman L. Eisen, Stephen
A. Jonas, Joshua G. Kolb, and Diamond Brown, Democracy
Defenders Fund, Washington, D.C.; for Amicus Curiae City
of Los Angeles.

Yvonne R. Mere, David Chiu, Mollie M. Lee, Sara J.
Eisenberg, Nancy E. Harris, and Karun A. Tilak, Attorneys,
San Francisco City Attorney Office, San Francisco,
California; Alexandra Kliger, Jonathan Miller, and Jenny
Ma, Public Rights Project, Oakland, California; Cody S.
Harris, Sophie Hood, Anjali Srinivasan, Ian Kanig, Cara R.
Meyer, and Eliane Holmund, Keker, Van Nest & Peters
LLP, San Francisco, California; Yibin Shen, City Attorney,
Alameda, California; Lauren Keefe, City Attorney,
Albuquerque, New Mexico; Ebony M. Thompson, City
Solicitor, Baltimore City Department of Law, Baltimore,
Maryland; Megan B. Bayer, City Solicitor, Cambridge,
Massachusetts; Mary B. Richardson-Lowry, Corporation
Counsel, City of Chicago, Chicago, Illinois; Carlos
Pabellon, Corporation Counsel; David R. Gault, Deputy
Corporation Counsel, County of Dane Wisconsin, Madison,
Wisconsin; Alexandra B. Ruggie, Corporation Counsel, City
of Evanston, Evanston, Illinois; Leesa Manion, Prosecuting
Attorney for Martin Luther King, Jr. County, Seattle,
Washington; Kristyn Anderson, City Attorney, Minneapolis,
Minnesota; John P. Markovs, Montgomery County
Attorney, Rockville, Maryland; Patricia King, Corporation
Counsel, Office of New Haven Corporation Counsel, New
Haven, Connecticut; Krysia Kubiak, City Solicitor and Chief

Legal Officer, City of Pittsburgh, Pittsburgh, Pennsylvania; Susana A. Wood, City Attorney, Sacramento, California; John D. Nibbelin, County Attorney for the County of San Mateo, Redwood City, California; Tonry Lopresti, County Counsel; Kavita Narayan, Chief Assistant County Counsel; Meredith A. Johnson, Lead Deputy County Counsel for the County of Santa Clara, San Jose, California; Douglas T. Sloan, City Attorney, Santa Monica, California; Lauren Langer, City Attorney for the City of West Hollywood, Best Best & Krieger LLP, Los Angeles, California; for Amici Curiae Local Governments and Local Government Leaders.

Patricio A. Marquez, Emily Nelson, Andrew Hughes, Alexia Diorio, Assistant Attorneys General; Nicholas W. Brown, Washington Attorney General; Office of the Attorney General, Seattle, Washington; Rose E. Gibson, Assistant Attorney General; Ian R. Liston, Director of Impact Litigation; Kathleen Jennings, Delaware Attorney General; Office of the Delaware Attorney General, Wilmington, Delaware; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Anne E. Lopez, Hawai'i Attorney General, Hawai'i Office of the Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith

Ellison, Minnesota Attorney General, Office of the
Minnesota Attorney General, St. Paul, Minnesota; Aaron D.
Ford, Nevada Attorney General, Office of the Nevada
Attorney General, Carson City, Nevada; Matthew J. Platkin,
New Jersey Attorney General, Office of the New Jersey
Attorney General, Trenton, New Jersey; Letitia James, New
York Attorney General, Office of New York Attorney
General, New York, New York; Jeff Jackson, North
Carolina Attorney General, Office of the North Carolina,
Raleigh, North Carolina; Dan Rayfield, Oregon Attorney
General, Office of Oregon Attorney General, Salem,
Oregon; Peter F. Neronha, Rhode Island Attorney General,
Office of Rhode Island Attorney General, Providence,
Rhode Island; Charity R. Clark, Vermont Attorney General,
Office of the Vermont Attorney General, Montpelier,
Vermont; Joshua L. Kaul, Wisconsin Attorney General,
Office of the Wisconsin Attorney General, Madison,
Wisconsin; Justin Whitten, Attorney for Governor Kelly,
Office of the Governor of Kansas, Topeka, Kansas; for
Amici Curiae Washington, Delaware, Arizona, Colorado,
Connecticut, Hawai'i, Illinois, Maine, Maryland, Michigan,
Minnesota, Nevada, New Jersey, New York, North Carolina,
Oregon, Rhode Island, Vermont, Wisconsin, and the Office
of the Governor of Kansas.

Brandon V. Stracener Sr. and David A. Carrillo, University
of California, Berkeley School of Law, Berkeley, California,
for Amicus Curiae California Constitution Scholars.

Andrew G. Watters, Redwood City, California, for Amicus
Curiae Blue Eagle Coalition.

PER CURIAM:

In 10 U.S.C. § 12406, Congress authorized the President of the United States to "call into Federal service members and units of the National Guard of any State" whenever one or more of three conditions are satisfied. In response to disturbances in Los Angeles stemming from federal enforcement of immigration laws, the President invoked § 12406—and only that statute—to order 4,000 members of the National Guard into federal service for 60 days to protect federal personnel performing federal functions and to protect federal property.

The State of California and its Governor, Gavin Newsom, sued the President, the Secretary of Defense, and the Department of Defense in federal court. Plaintiffs alleged that Defendants' actions were ultra vires and violated the Tenth Amendment to the United States Constitution. They also alleged that the Secretary of Defense and the Department of Defense violated the Administrative Procedure Act (APA).

Plaintiffs applied for a temporary restraining order (TRO), and, after a hearing, the district court issued a TRO enjoining Defendants "from deploying members of the California National Guard in Los Angeles" and directing Defendants "to return control of the California National Guard to Governor Newsom." The district court issued the TRO primarily because it concluded that Plaintiffs are likely to succeed on their claim that the President's order federalizing members of the California National Guard is ultra vires because none of the predicates to federalization required under § 12406 exist and because the federalization order was not issued "through the governor[]" of California, as the statute requires. Notably, Plaintiffs conceded that

National Guard members, if validly federalized, may be deployed to protect federal personnel and property. The district court determined that Plaintiffs presented no evidence at the TRO hearing that National Guard members were engaged in any other activities, and Plaintiffs do not contest that determination.

Defendants immediately appealed the TRO and filed an emergency motion to stay the TRO pending appeal. We issued an administrative stay of the district court's order pending our adjudication of Defendants' emergency motion for a stay.

We now grant the stay. Defendants have made the required strong showing that they are likely to succeed on the merits of their appeal. We disagree with Defendants' primary argument that the President's decision to federalize members of the California National Guard under 10 U.S.C. § 12406 is completely insulated from judicial review. Nonetheless, we are persuaded that, under longstanding precedent interpreting the statutory predecessor to § 12406, our review of that decision must be highly deferential. Affording the President that deference, we conclude that it is likely that the President lawfully exercised his statutory authority under § 12406(3), which authorizes federalization of the National Guard when "the President is unable with the regular forces to execute the laws of the United States." Additionally, the Secretary of Defense's transmittal of the order to the Adjutant General of the California National Guard—who is authorized under California law to "issue all orders in the name of the Governor," CAL. MIL. & VET. CODE § 163—likely satisfied the statute's procedural requirement that federalization orders be issued "through" the Governor. And even if there were a procedural violation, that would not justify the scope of relief provided by the district court's

TRO.  Our conclusion that it is likely that the President's order federalizing members of the California National Guard was authorized under § 12406(3) also resolves the Tenth Amendment claim because the parties agree that the Tenth Amendment claim turns on the statutory claim.

We also conclude that the other stay factors—irreparable harm to Defendants, injury to Plaintiffs, and the public interest—weigh in Defendants' favor.  Thus, we grant the motion for a stay pending appeal.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On June 6, 2025, a group of protesters tried to prevent Immigration and Customs Enforcement (ICE) officials from operating in Los Angeles by throwing objects at ICE vehicles.  Later that evening, protesters gathered at ICE's Enforcement and Removal Operations (ERO) building in downtown Los Angeles.  Protesters "pinned down" several Federal Protective Service (FPS) officers and threw "concrete chunks, bottles of liquid, and other objects" at the officers.  The protesters used "large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage[] federal property."  The Los Angeles Police Department arrived on the scene about an hour after being called by federal officers.  The protesters eventually dispersed at law enforcement's direction, but the federal building had been heavily vandalized.

The next day, on June 7, protesters continued to interfere with federal enforcement operations by a Homeland Security Investigations Office in Paramount, California, and continued to damage federal property.  In a confrontation that lasted over seven hours, the protesters blocked traffic and used shopping carts to barricade the street.  Some attacked ERO and Customs and Border Patrol (CBP) officers

by "box[ing] in" the officers and "throwing mortar-style fireworks with multiple explosions" at them.    Other protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies," "burning a vehicle," and "vandalizing property."    One ERO officer was trapped in her law enforcement vehicle while protesters surrounded it, violently pounded and shook it, and threw stones at it.    One CBP officer suffered a shattered wrist caused by a thrown object. Protesters also damaged the perimeter fence of a federal building and three government vehicles.

In response to these incidents, the President signed a memorandum on June 7, 2025, calling into federal service at least 2,000 members of the National Guard pursuant to his authority under 10 U.S.C. § 12406.    The memorandum explained that the service members were needed "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property."    The President's memorandum directed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard."

Later that evening, the Secretary of Defense sent a memorandum to California's Adjutant General to effectuate the President's memorandum.    This memorandum was titled, "Memorandum for Adjutant General of the California National Guard Through: The Governor of California," and it enclosed a copy of the President's memorandum.    The Secretary's memorandum called into service 2,000 California National Guard members for 60 days.    The

Adjutant General forwarded both memoranda to Governor Newsom.

Protests against federal officers continued into the following days.  For example, during the night of June 8, protesters in downtown Los Angeles "set[] off commercial-grade fireworks toward federal officers and thr[ew] objects at passing law enforcement vehicles."  They lit fires in dumpsters and "vandalized dozens of buildings with graffiti, including the Federal Courthouse."  On June 9, a crowd of 1,000 protesters gathered near a federal building.  One protester drove by the building and fired paintballs at FPS officers, hitting at least one in the head and neck.  At another federal building, protesters attacked a federal van carrying multiple non-citizens and officers, rocking the vehicle and smashing its windows.  The building had to be closed for most of the day and remained closed the next day, disrupting the operations of many federal agencies working in the building.

On June 9, in response to these events, the Secretary issued a second memorandum, calling into service an additional 2,000 members of the California National Guard for 60 days.  That day, Plaintiffs filed suit against Defendants.  The complaint asserts ultra vires, Tenth Amendment, and APA claims, all primarily based on the allegation that Defendants unlawfully called into federal service members of the California National Guard.  The complaint seeks declaratory and injunctive relief.

On June 10, Plaintiffs moved for a TRO.  Plaintiffs asserted that they were "likely to suffer several types of irreparable harm in the absence of temporary relief," highlighting as a "stand[] out" harm "the very high risk of substantial civil unrest as a direct result" of Defendants'

deployment of the National Guard.  Plaintiffs argued that the use of the National Guard "serves only to spread fear and heighten tensions in Los Angeles" and would "further *de*-stabilize the community."  Plaintiffs also urged that the deployment of the National Guard "diverts necessary state resources" because National Guard members help fight forest fires, stop drug trafficking, and protect against cyber threats.

Defendants opposed the motion, and the district court held a hearing on June 12.  The district court granted the TRO that same day.  Responding to Defendants' argument that the President's decision to federalize members of the California National Guard was not justiciable, the district court concluded that neither the political question doctrine nor § 12406 itself precluded judicial review, but that it must give deference to the President's factual assertions.  On the merits of Plaintiffs' ultra vires claim, the parties agreed that the questions presented were whether the President had statutory authority to federalize National Guard members under either § 12406(2) or (3).[1]  The district court then determined that Plaintiffs were likely to succeed on their ultra vires claim because the conditions for federalization under those subsections were not satisfied, and because the federalization order was not issued "through the governor[]" of California, as the statute requires.  Based on its conclusion that the President acted without statutory authority, the district court also concluded that Plaintiffs were likely to succeed on their Tenth Amendment claim.[2]  The district court declined to address Plaintiffs' ultra vires claim based

---

[1] Plaintiffs have not argued that the President invoked only one subsection or the other.

[2] Plaintiffs did not rely on their APA claim in seeking the TRO.

on the Posse Comitatus Act, *see* 18 U.S.C. § 1385, because Plaintiffs conceded that using federal forces to protect federal personnel and property would not violate the Posse Comitatus Act and because Plaintiffs presented no evidence that National Guard members were engaged in any other activities.    The district court underscored that "Plaintiffs d[id] *not* [yet] contend that National Guard members have in fact participated in any arrests" in violation of the Posse Comitatus Act but noted that Plaintiffs could continue to pursue that claim, including by presenting any additional evidence at the upcoming preliminary injunction hearing.

The district court then found that Plaintiffs had suffered irreparable injury and that the public interest and balance of the equities tipped in their favor.    The district court concluded that while "Defendants no doubt have an 'interest in protecting federal agents and property'" (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020)), "[f]ederal agents and property may actually well be served by de-militarization and a concurring de-escalation of the situation."    The district court concluded that the deployment of the National Guard "inflames tensions with protesters" and "deprives the state for two months of its own use of thousands of National Guard members to fight fires, combat the fentanyl trade, and perform other critical functions."     The district court's order temporarily enjoined—with no end date—Defendants "from deploying members of the California National Guard in Los Angeles" and directed Defendants "to return control of the California National Guard to Governor Newsom."    The district court stayed its order until noon on June 13, 2025, and set a preliminary injunction hearing for June 20, 2025.

Defendants immediately filed a notice of appeal and moved for an emergency stay pending appeal.  As noted, we

issued an administrative stay of the TRO.  We held oral argument on June 17, 2025.**[3]**

## II.  APPELLATE JURISDICTION

Ordinarily, we lack jurisdiction over the appeal of a TRO.  *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762 (9th Cir. 2018).  At this time, however, we are not considering an appeal of a TRO, but rather, Defendants' motion for a stay of the TRO pending appeal.  We have jurisdiction to grant such a stay under the All Writs Act, 28 U.S.C. § 1651.

Nonetheless, Plaintiffs argue that we should not grant the stay because there are "serious questions" as to whether we would have jurisdiction to review the district court's issuance of a TRO.  Although Plaintiffs' argument goes to the merits of Defendants' motion for a stay, not our jurisdiction, we address it here.

As noted, we generally lack jurisdiction over the appeal of a TRO.  But when a TRO "possesses the qualities of a preliminary injunction," it is reviewable under 28 U.S.C. § 1292(a)(1).  *Serv. Emps. Int'l Union v. Nat'l Union of Healthcare Workers*, 598 F.3d 1061, 1067 (9th Cir. 2010); *see Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).

In assessing whether a TRO is best construed as an appealable preliminary injunction, we evaluate whether "an adversary hearing has been held, and [whether] the court's basis for issuing the order [was] strongly challenged."  *E. Bay*, 932 F.3d at 762 (quoting *Bennett v. Medtronic, Inc.*,

---

[3] We grant amici curiae's motions for leave to file amicus briefs.  Dkt. Nos. 17, 18, 20, 21, 22, 24.

285 F.3d 801, 804 (9th Cir. 2002)). "Likewise, where the duration of the order exceeds the ordinary duration for TROs as set forth in the Federal Rules of Civil Procedure, classification as a TRO is unlikely." *Serv. Emps.*, 598 F.3d at 1067. A TRO may also be appealable when it "has the 'practical effect' of granting or denying an injunction." *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981)).

The TRO here "possesses the qualities of a preliminary injunction." *Serv. Emps.*, 598 F.3d at 1067. The district court issued the TRO after an adversarial hearing at which Defendants challenged the basis for the order. That hearing came after the parties filed extensive written materials challenging the district court's basis for the order. Plaintiffs moved for a TRO, Defendants filed an opposition, and Plaintiffs filed a reply. Moreover, while the district court has scheduled a hearing for June 20, 2025, to determine whether it should issue a preliminary injunction, the TRO does not automatically expire on that date, so it could be in force for more than 14 days.

The TRO also has the practical effect of a preliminary injunction. It enjoined Defendants from deploying members of the National Guard in Los Angeles and directed return of control of the National Guard to Plaintiffs. President Trump determined that he could not "ensure the protection and safety of Federal personnel and property" without using the National Guard. If Defendants are not allowed to appeal the TRO, they "would be effectively foreclosed from pursuing further interlocutory relief" because the National Guard could not be used to protect federal property and agents. *Env't Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980).

On these facts, we conclude that the district court's order is effectively a preliminary injunction. Consequently, issues of appellate jurisdiction do not affect the likelihood of Defendants' success on their appeal from the TRO.

## III.  STANDARD OF REVIEW

We review Defendants' request for a stay pending appeal using the "traditional stay factors." *Nken v. Holder*, 556 U.S. 418, 426 (2009). Thus, we consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical." *Id.* at 434.

## IV.  DISCUSSION

### A.  Likelihood of Success

In determining whether Defendants have made a strong showing that they are likely to succeed on the merits of their appeal of the TRO, we address only the issues that the district court resolved in granting the TRO. Defendants argue the district court erred in concluding that Plaintiffs' ultra vires claim is justiciable. Defendants also argue that the district court erred in concluding that Plaintiffs were likely to succeed on the merits of their claim that the President's order federalizing California National Guard members was not authorized under § 12406. The parties agree that Plaintiffs' Tenth Amendment claim, at this stage, rises and falls with their ultra vires claim based on § 12406. In opposing the stay, Plaintiffs do not press their claims based on the Posse Comitatus Act or the APA.

Consequently, the parties' disputes about how federal forces are being deployed are not before us.

### 1. The President's Authority Under § 12406

#### a. Political Question Doctrine

Defendants argue that the claim challenging the President's order federalizing members of the National Guard under § 12406 is not justiciable under the political question doctrine. We disagree.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). There is "a narrow exception to that rule, known as the 'political question' doctrine." *Id.* at 195. "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962).

Because the political question doctrine is grounded in the constitutional separation of powers, it has traditionally been limited to constitutional cases. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment) ("[T]he Supreme Court has invoked the political question doctrine only in cases alleging violations of the Constitution."). It has not been available in statutory cases. Applying it in statutory cases would "systematically favor" the President over Congress by ignoring the limitations that the latter placed on the former's authority, threatening the very separation of powers that the doctrine is meant to protect. *Id.* at 857. Thus, to determine whether the political question doctrine precludes judicial review, we must first determine whether

the President's authority to federalize National Guard members is constitutional or statutory. We conclude it is statutory.

The Constitution provides that "[t]he President shall be Commander in Chief . . . of the Militia of the several States, *when called into the actual Service of the United States*." U.S. CONST. art. II, § 2, cl. 1 (emphasis added). But the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States: pursuant to the "Militia Clauses," Congress has the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," as well as the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." *Id.* art. I, § 8, cls. 15–16. Congress has delegated some of its power to call forth the militia to the President by statute, including 10 U.S.C. § 12406, which authorizes the President to "call into federal service members and units of the National Guard of any state" under specified exigent circumstances. Both parties agree that calling members of a state's National Guard "into federal service" is the legal equivalent of "calling forth the Militia."

At various points in this litigation, Defendants have referred to the President's "inherent constitutional authority." But Defendants represented to the district court that they are not arguing that President Trump exercised "some other independent Article II authority"—rather, as Defendants acknowledged, "[t]he only authority the president invoked was this particular statute," that is, § 12406. Defendants thus do not argue that the President's inherent authority, whatever its scope, would allow him to

"take[] measures incompatible with the expressed or implied will of Congress" reflected in that statute. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The source of the President's power to federalize the National Guard is statutory, not constitutional.

Consequently, the political question doctrine does not bar judicial review.

### b. Statutory Scope of Review

The question we must answer is: To what extent has Congress, in § 12406, committed the challenged decision to the President's discretion? This question is purely a matter of statutory interpretation, and it is justiciable. *See, e.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) (explaining that "questions of interpretation" of statutes fall within our purview (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163 (1948))). After all, it remains "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This includes "determining the limits of statutory grants of authority," *Stark v. Wickard*, 321 U.S. 288, 310 (1944), and "determin[ing] whether [a government official] did exceed his powers" granted by the statute, *Harmon v. Brucker*, 355 U.S. 579, 582 (1958) (per curiam).

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

The statute provides:

> Whenever—
>
> > (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
> >
> > (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
> >
> > (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

Defendants argue that this language precludes review. They rely on *Dalton v. Specter*, 511 U.S. 462 (1994), for the proposition that whenever a statute "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477. In *Dalton*, the Act in question, concerning the closure of military bases, "authorized unfettered discretion by the

President to either approve or disapprove the package of base closures" proposed by an independent commission. *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019); *see* Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, § 2903(e)(1), 104 Stat. 1808, 1812 ("The President shall . . . transmit to the Commission and to the Congress a report containing the President's approval or disapproval of the Commission's recommendations."). Because "the Act . . . d[id] not by its terms circumscribe the President's discretion to approve or disapprove the Commission's report," the Court concluded that the President's decision was "not reviewable" for abuse of discretion. 511 U.S. at 470; *see id.* at 474–76.

Unlike in *Dalton*, the statute here enumerates three predicate conditions for the President's decision to call forth the National Guard. As the district court explained, the text of the statute does not make the President the sole judge of whether one or more of the statutory preconditions exist. *See* 10 U.S.C. § 12406. Thus, we disagree with Defendants' contention that § 12406 completely precludes judicial review of the President's determination that a statutory precondition exists.

However, that leaves the question whether we owe that determination deference, and if so, how much? Again, that is a question of statutory interpretation. And if we were considering the text of § 12406 alone, we might conclude that the President's determination is subject to review like certain other factual findings that are preconditions for executive action under a statute. *See Doe #1 v. Trump*, 957 F.3d 1050, 1066–67 (9th Cir. 2020).

But we are not writing on a blank slate. The history of Congress's statutory delegations of its calling forth power,

and a line of cases beginning with *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), interpreting those delegations, strongly suggest that our review of the President's determinations in this context is especially deferential.

Congress first delegated its constitutional calling forth power to the President in the Militia Act of 1792, *see* ch. 28, §§ 1–2, 1 Stat. 264, 264 (repealed 1795). Congress renewed that delegation in the Militia Act of 1795, *see* ch. 36, § 1, 1 Stat. 424, 424. The 1795 Act was a precursor to the Militia Act of 1903, *see* Pub. L. No. 57-33, §§ 1, 4, 32 Stat. 775, 775–76, which is a precursor to § 12406. *See* Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 HARV. L. REV. 181, 186–88 (1940).

And like § 12406, the 1795 Act contained a predicate "invasion" condition: "[W]henever the United States shall be invaded, or be in imminent danger of invasion . . . , it shall be lawful for the President of the United States to call forth such number of the militia . . . as he may judge necessary to repel such invasion." Militia Act of 1795, ch. 36, § 1, 1 Stat. 424, 424; *cf.* 10 U.S.C. § 12406 ("Whenever[] . . . the United States . . . is invaded or is in danger of invasion . . . , the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion . . . .").

The Supreme Court interpreted the Militia Act of 1795 in *Martin*, which arose out of President Madison's decision to call the New York militia into federal service during the War of 1812. *See* 25 U.S. at 28. Jacob Mott, a New York militiaman, refused to turn up for service. He was court-martialed and fined, and the State seized his property to satisfy the debt. Mott then brought an action for replevin in

state court, arguing that the seizure was illegal because President Madison's order federalizing the militia was invalid. *See id.*

The Supreme Court rejected that argument. The Court began by explaining that the Constitution gave the calling forth power to Congress, but Congress "confided" that power to the President when the "exigency" of an invasion "has arisen." *Id.* at 29. The Court first recognized that the delegated power was, "in its terms, a limited power, confined to cases of actual invasion, or of imminent danger of invasion." *Id.* The Court then framed the issue presented as:

> If it be a limited power, the question arises, by whom is the exigency to be judged of and decided?    Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which every officer to whom the orders of the President are addressed, may decide for himself, and equally open to be contested by every militia-man who shall refuse to obey the orders of the President?

*Id.* at 29–30.    The Court answered that question by stating that "the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30.    In reaching that conclusion, the Court relied in part on the nature of a foreign invasion and the need for military subordinates to follow orders. *See id.*    In particular, because "[t]he power itself is to be exercised upon sudden emergencies, upon great occasions of state, and under circumstances which may be vital to the existence of the Union," the Court reasoned that

"every delay, and every obstacle to an efficient and immediate compliance, necessarily tend[s] to jeopard[ize] the public interests." *Id.*

The Court then explained that "the language of the act of 1795" supported its "conclusion drawn from the nature of the [delegated] power itself." *Id.* at 31. The Court followed the "sound rule of construction" that "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, . . . the statute constitutes him the *sole and exclusive* judge of the existence of those facts." *Id.* at 31–32 (emphasis added). The Court further explained that although the power delegated to the President under the Militia Act is "susceptible of abuse," the "remedy for this" is political: "in addition to the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests," it is "the frequency of elections, and the watchfulness of the representatives of the nation" that "carry with them all the checks which can be useful to guard against usurpation or wanton tyranny." *Id.* at 32.

Plaintiffs correctly note that some of the *Martin* Court's reasoning addressed factual circumstances of that case that are not present here: particularly the Court's consideration of the nature of a foreign invasion and concerns about militiamen disobeying orders. *See id.* at 29 (explaining that the 1795 Act considers an "invasion from any foreign nation or Indian tribe"); *id.* at 30 ("A prompt and unhesitating obedience to orders is indispensable to the complete attainment of the object."). Still, for the following reasons, we conclude that, under *Martin* and its progeny, we must give a great level of deference to the President's determination that a predicate condition exists.

First, much of the Court's reasoning in *Martin* appears equally applicable regardless of the case's particular facts. *See, e.g.*, *id.* at 30 (explaining that the President's power to command the militia "in times of insurrection and invasion, are . . . natural incidents to the duties of superintending the common defence, and of watching over the *internal peace of the confederacy*" (emphasis added) (quoting THE FEDERALIST NO. 29 (Alexander Hamilton))).

Second, if Congress had disagreed with the *Martin* Court's interpretation of the 1795 Act, it could have amended the statute to provide for greater judicial review of the existence of a predicate condition. Congress did not do so at the time, and since then, Congress has modified the statutory delegations of the calling forth power in various ways, but the text of § 12406 is, in several material respects, the same as the text quoted in *Martin*. *See* 10 U.S.C. § 12406 ("Whenever[] . . . the United States . . . is invaded or is in danger of invasion . . . , the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion . . . ."). "We presume that Congress is aware of pre-existing judicial interpretations of statutory language it replicates in later statutes, and that it seeks to import those interpretations into the new statute." *United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 696–98 (1979)). Of course, Congress still has the prerogative to change the delegation of the calling forth power, and the nature of judicial review of any exercise of that statutory authority.

Third, the Supreme Court has not understood *Martin* to be a narrow decision addressing only the military chain of command. In *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), the Supreme Court evaluated an action for trespass that

turned on which of two factions was the legitimate government of Rhode Island. *Id.* at 34–35. During the dispute, President Tyler concluded that there was enough unrest to invoke the promise of federal protection against "domestic Violence" in the Guarantee Clause. *See* Stephen I. Vladeck, Note, *Emergency Power and the Militia Acts*, 114 YALE L.J. 149, 172 (2004); U.S. CONST. art. IV, § 4. The President's ability to call forth the militia to offer that protection came from the Militia Act of 1795, which permitted him to do so "in case of an insurrection in any State against the government thereof." *Luther*, 48 U.S. at 43 (quoting Militia Act of 1795, ch. 36, § 1, 1 Stat. 424, 424). And, relying on *Martin*, the Court explained that the 1795 Act gave "the power of deciding whether the exigency had arisen . . . to the President." *Id.*; *see id.* at 44–45 (citing *Martin*, 25 U.S. at 29–31). The Court made clear that the President's authority was preclusive. *See id.* at 43 ("After the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right? . . . If the judicial power extends so far, the guarantee contained in the Constitution of the United States is a guarantee of anarchy, and not of order.").

That view of *Martin* has remained the settled understanding of the Supreme Court and among legal scholars. *See Zivotofsky*, 566 U.S. at 205–06, 206 n.1 (Sotomayor, J., concurring in part and concurring in the judgment) (citing *Martin* for the proposition that "courts are particularly ill suited to intervening in exigent disputes necessitating unusual need for 'attributing finality to the action of the political departments'" (quoting *Coleman v. Miller*, 307 U.S. 433, 454 (1939))); Vladeck, *supra*, at 172 ("Per the *Mott* Court, then, the 1795 Militia Act granted broad power to the Executive to determine, for himself,

when circumstances necessitated the calling forth of the militia, and such a determination was not subject to judicial review."); Elizabeth Goitein & Joseph Nunn, *An Army Turned Inward: Reforming the Insurrection Act to Guard Against Abuse*, 13 J. NAT'L SEC. L. & POL'Y 355, 394 (2023) (citing *Martin* and explaining that "[i]n cases involving the Insurrection Act's precursor laws [including the Militia Act of 1795], the Supreme Court held that courts could not review the president's determination that an exigency existed that required the deployment of military troops"). Given the closely related nature of the statutes, *Martin* requires that the President's determination that an exigency exists be given significant deference.

Fourth, we recognize that *Martin* concerned a question that directly implicated foreign policy, while this case implicates the President's domestic use of military force, and that as a general rule, we afford the President greater latitude in the former context.  *Cf. Doe*, 957 F.3d at 1066–67 (explaining, for example, that the President's "power is more circumscribed when he addresses a purely domestic economic issue").  However, § 12406 is not limited to the domestic use of military force.  Rather, the statute also permits the President to federalize the National Guard "[w]henever[] . . . the United States . . . is invaded or is in danger of invasion by a foreign nation." 10 U.S.C. § 12406. We see no reason that Congress would have intended for the President to receive significant deference when he invokes the first precondition in § 12406, but not when he invokes the other two.  Moreover, California's contention is undercut by *Luther*, which relied heavily on *Martin* when evaluating the deference due to the President when he invoked the 1795 Act in a purely domestic dispute.  *See* 48 U.S. at 44–45 (citing *Martin*, 25 U.S. at 29–31).

California emphasizes that *Martin* is nearly 200 years old, and that it is in some tension with more recent decisions about the reviewability of executive determinations—even determinations about questions such as the existence of an invasion. *See J.G.G.*, 145 S. Ct. at 1006 ("[W]e have held that an individual subject to detention and removal under [the Alien Enemies Act] is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act . . . ." (quoting *Ludecke*, 335 U.S. at 163)); *Kucana v. Holder*, 558 U.S. 233, 251 (2010) ("When a statute is 'reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995))). But *Martin*'s continuing viability is not for us to decide. The Supreme Court has admonished that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *accord Tenet v. Doe*, 544 U.S. 1, 10–11 (2005).

All that said, *Martin* does not compel us to accept the federal government's position that the President could federalize the National Guard based on no evidence whatsoever, and that courts would be unable to review a decision that was obviously absurd or made in bad faith. In *Martin*, the Court addressed the argument that "the power confided to the President is a limited power" that "can be exercised only in the cases pointed out in the statute," and the Court explained that "[w]hen the President exercises an

authority confided to him by law, the presumption is that it
is exercised in pursuance of law." *Id.* at 32–33. As the Court
noted in *Martin*, a "public officer is presumed to act in
obedience to his duty" only "until the contrary is shown."
*Id.* at 33. Moreover, discussing *Martin*, the Supreme Court
has observed that "[t]he nature of the power also necessarily
implies that there is a *permitted range of honest judgment* as
to the measures to be taken in meeting force with force, in
suppressing violence and restoring order," and that "[s]uch
measures, *conceived in good faith*, in the face of the
emergency and directly related to the quelling of the disorder
or the prevention of its continuance, fall within the discretion
of the Executive in the exercise of his authority to maintain
peace." *Sterling v. Constantin*, 287 U.S. 378, 399–400
(1932) (emphases added); *see Panama Refin. Co. v. Ryan*,
293 U.S. 388, 446 (1935) (Cardozo, J., dissenting) ("A court
will not revise the discretion of the Executive, sitting in
judgment on his order as if it were the verdict of a
jury. *Martin v. Mott, supra*. On the other hand, we have
said that his order may not stand if it is an act of mere
oppression, an arbitrary fiat that overleaps the bounds of
judgment."). Consistent with *Martin*, courts may at least
review the President's determination to ensure that it reflects
a colorable assessment of the facts and law within a "range
of honest judgment." *Sterling*, 287 U.S. at 399.

At this preliminary stage of the litigation, we need not
further specify the precise standard that governs our review.

### c. Application

With those principles in mind, we consider whether the
President exceeded the limits of his statutory grant of
authority under § 12406. We start with § 12406(3): "the
President is unable with the regular forces to execute the

laws of the United States." 10 U.S.C. § 12406(3). Because that provision is sufficient to allow us to conclude that Defendants are likely to prevail in this litigation, we do not reach the other condition invoked by the President, § 12406(2), concerning "rebellion."

The district court interpreted § 12406(3) as requiring total or near total interference. It stated:

> [T]he statute does not allow for the federalizing of the National Guard when the President faces obstacles that cause him to underperform in executing the laws. Nor does the statute allow for the federalizing of the National Guard when the President faces some risk in executing the laws. . . . The statute requires that the President be "unable" to execute the laws of the United States. That did not happen here.

But as Defendants correctly argue, "Section 12406(3) cannot plausibly be read to mean that so long as some amount of execution of the laws remains possible, the statute cannot be invoked, regardless of how much execution of the laws remains thwarted or how much personal danger federal personnel face during operations," or that "so long as any quantum of federal law enforcement could be accomplished in the face of mob violence," "the President would be unable to call up the Guard to respond." Section 12406 does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States in order to call members of the National Guard into federal service, nor does it suggest that activation is

inappropriate so long as any continued execution of the laws is feasible.

On the other hand, we do not think that any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3). The statutory context confirms that. Subsections one and two of the statute discuss unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government. If we were to adopt the federal government's reading of subsection three, it would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws. *See Fischer v. United States*, 603 U.S. 480, 490 (2024) ("Congress would not go to the trouble of spelling out [a list of terms] if a neighboring term swallowed it up . . . ."); *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) (relying "on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress'" (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995))).

Under a highly deferential standard of review, Defendants have presented facts to allow us to conclude that the President had a colorable basis for invoking § 12406(3). They presented evidence, detailed above, of protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard on June 7. There is evidence that the day before, protesters threw objects at ICE vehicles trying to complete a law enforcement operation, "pinned down" several FPS officers defending federal property by throwing "concrete chunks, bottles of liquid, and other objects," and

used "large rolling commercial dumpsters as a battering ram" in an attempt to breach the parking garage of a federal building.  Plaintiffs' own submissions state that some protesters threw objects, including Molotov cocktails, and vandalized property.  According to the declarations submitted by Defendants, those activities significantly impeded the ability of federal officers to execute the laws.

Affording appropriate deference to the President's determination, we conclude that he likely acted within his authority in federalizing the National Guard under 10 U.S.C. § 12406(3).

### 2.  Procedural Requirement of § 12406

Under § 12406, the President's "[o]rders . . . shall be issued through the governors of the States."  The district court determined that Defendants failed to comply with this procedural requirement and that such failure meant that Defendants exceeded the scope of their lawful statutory authority.

Defendants argue that they complied with the procedural requirement because (1) the President called Governor Newsom about the situation in Los Angeles on June 6; and (2) the Secretary of Defense sent the President's memorandum to California's Adjutant General, along with the Secretary's memorandum that contained "Through: The Governor of California" in its title, and the Adjutant General forwarded both memoranda to Governor Newsom. Defendants also argue that even if they erred as a technical matter, any procedural error cannot justify the district court's injunction because the President is not legally required to obtain the consent of the Governor, or to consult with him, before calling the National Guard into federal service.

Defendants' actions likely met the procedural requirement because the federalization order was issued through an agent of the Governor in the Governor's name. Under California law, the Adjutant General "is chief of staff to the Governor, subordinate only to the Governor and is the commander of all state military forces." CAL. MIL. & VET. CODE § 160. The Adjutant General's duties include "issu[ing] all orders in the name of the Governor." *Id.* § 163. Plaintiffs do not dispute that California's Adjutant General received the memoranda from the Secretary of Defense, relinquished command to the federal military accordingly, and forwarded the memoranda to Governor Newsom. Although Governor Newsom did not personally issue the order relinquishing state command, § 12406 requires that the President's order be issued *through* the Governor, not *directly by* the Governor. Nothing in § 12406 prevents the State from delegating to a subordinate, such as the Adjutant General, the Governor's authority to issue such orders. *See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1075–76 (9th Cir. 2024) (explaining that express statutory authority is not required for delegation to subordinates).

Even if the statute contemplated strict adherence to a process that did not allow for delegation, the President's failure to issue the federalization order directly "through" the Governor of California does not limit his otherwise lawful authority to call up the National Guard. *See Dolan*, 546 U.S. at 486 ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis.").

First, the text of § 12406 does not give governors any veto power over the President's federalization decision.**4** The omission of an express consent requirement is telling, as Congress provided governors with veto power in another section of Title 10. *See* 10 U.S.C. § 12301(d) ("However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection *without the consent of the governor* or other appropriate authority of the State concerned." (emphasis added)); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Similarly, Plaintiffs' argument that the text requires, "[a]t a minimum," that the Governor be "consulted about an order" is not supported by the language of § 12406. Rather, the decision to activate the National Guard under § 12406 is textually committed to the President alone. *See* 10 U.S.C. § 12406 ("[T]he *President* may call into Federal service members and units of the National Guard . . . ." (emphasis added)). Even with the requirement that such orders be issued "through the governor[]," *id.*, that provision does not grant the governor any "consulting" role. It simply delineates the procedural mechanisms through which the President's orders are issued.

---

4 The district court correctly acknowledged that nothing in § 12406 requires the President to obtain a governor's consent or approval before lawfully calling in the National Guard.

Second, the purpose and context of § 12406 suggest that the statute's procedural requirement does not affect the President's authority to federalize the National Guard.  As discussed above, § 12406 delegates to the President part of Congress's constitutional authority to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."  U.S. CONST. art. I, § 8, cl. 15.  The President's power under § 12406 is similar to his authority under the statute analyzed in *Martin*, which described the necessity of "prompt and unhesitating obedience" to fulfill the statute's purpose.  25 U.S. at 30.  In that context, we think it unlikely that Congress would have enacted a procedural requirement giving the Governor effective veto power over the President's otherwise lawful orders.

In any event, even if Defendants failed to comply with the statute's procedural requirement, such failure would not justify the injunctive relief imposed by the district court.  Assuming arguendo that Plaintiffs were likely to prevail on their claim that Defendants violated the statute's procedural requirement, the proper remedy would be injunctive relief tailored to Defendants' failure to issue the order through the Governor—not an injunction prohibiting the President from exercising his lawful authority to call up the National Guard.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32–33 (2008) (explaining that injunctive relief must be tailored to the alleged violation).  At most, such tailored relief would be an injunction directing the President to send the relevant memoranda directly to the Governor.

In sum, Defendants likely complied with § 12406's procedural requirement because California's Adjutant General exercised delegated authority under state law and issued the order in the Governor's name.  Even if Defendants

failed to comply with § 12406's procedural requirement, Governor Newsom had no power to veto or countermand the President's order. Thus, Defendants are likely to prevail on this claim because the alleged procedural violation has no effect on President Trump's authority under § 12406 and does not justify the current scope of the injunction imposed by the district court.[5]

## B. Remaining Stay Factors

In addition to the merits, we consider three other factors in assessing a motion for a stay: "whether the applicant will be irreparably injured absent a stay"; "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and "where the public interest lies." *Nken*, 556 U.S. at 426 (quoting *Hilton*, 481 U.S. at 776). The last two factors "merge when the Government is the opposing party." *Id.* at 435.

Both irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property and the faithful execution of law. *See Index Newspapers*, 977 F.3d at 838. The undisputed facts demonstrate that before the deployment of the National Guard, protesters "pinned down" several federal officers and threw "concrete chunks, bottles

---

[5] As noted, the district court's determination that Plaintiffs were likely to succeed on their Tenth Amendment claim rested, at least in part, on its conclusion that the President exceeded his scope of authority under § 12406. Because we conclude that it is likely that the President properly exercised his authority under § 12406(3) based on the circumstances before us, and Plaintiffs do not make any alternative Tenth Amendment arguments in response to the stay motion, we also conclude Defendants have made a strong showing that the TRO could not issue based on Plaintiffs' likelihood of succeeding on their Tenth Amendment claim.

of liquid, and other objects" at the officers.  Protesters also damaged federal buildings and caused the closure of at least one federal building.  And a federal van was attacked by protesters who smashed in the van's windows.  The federal government's interest in preventing incidents like these is significant.  *See United States v. Bader*, 698 F.2d 553, 555 (1st Cir. 1983) ("It is well established that the need to safeguard the normal functioning of public facilities is a 'substantial government interest' . . . ."); *United States v. Shiel*, 611 F.2d 526, 528 (4th Cir. 1979) ("The legitimacy of the government's interest, in the abstract, of insuring the public's compliance while in or on government property with proper directions of law enforcement officers . . . [is] apparent."); *cf. In re Neagle*, 135 U.S. 1, 59 (1890).

Plaintiffs argue that the public interest weighs against issuing a stay because permitting the use of the National Guard here would upset the constitutional balance of power between federal and state government.  While we recognize that significant interests of Plaintiffs are implicated here, Plaintiffs' argument is, in essence, a merits argument that we have already resolved.  The Constitution assigns the power to "call[] forth the Militia" to Congress, and Congress has delegated portions of that power to the President.  U.S. CONST. art. I, § 8, cl. 15.  As discussed, under the facts before us, we disagree that Defendants have clearly exceeded the scope of their statutory authority, so they are acting in accordance with the constitutional federal-state balance.

Expressing concern about what they describe as "defendants' nearly limitless conception of Section 12406," Plaintiffs argue that this case "marks the first time that a President has invoked Section 12406 to order troops to patrol the streets of a major American city in support of routine civil law enforcement activities—while civil law

enforcement officials at the local, state, and federal level all remain available and are doing that work." We emphasize, however, that our decision addresses only the facts before us. And although we hold that the President likely has authority to federalize the National Guard, nothing in our decision addresses the nature of the activities in which the federalized National Guard may engage. Before the district court, Plaintiffs argued that certain uses of the National Guard would violate the Posse Comitatus Act, 18 U.S.C. § 1385. The district court found that claim to be premature, and Plaintiffs have not renewed it before us. We express no opinion on it.

Plaintiffs also urge that the public interest is in their favor because the "continued presence of National Guard members" in Los Angeles "risks worsening, not improving, tensions on the ground" and the federalization of the National Guard "impairs the Guard's ability to perform critical functions for the State," including support for fighting forest fires and combatting drug trafficking. These concerns are counterbalanced by the undisputed fact that federal property has been damaged and federal employees have been injured, and the evidence presented in the TRO hearing showed that the federalized National Guard members were engaged only in protecting federal personnel and property. Additionally, at least with respect to the issues presented here, Plaintiffs' concerns have more bearing on the question of whether the President should have federalized the California National Guard, not whether he had the authority to do so under § 12406. We also note that California's concerns about escalation and interference with local law enforcement, at present, are too speculative. We do not know whether future protests will grow due to the deployment of the National Guard. *Cf. Murthy v. Missouri*,

603 U.S. 43, 72 (2024) ("In these circumstances, [Plaintiffs] cannot rely on 'the predictable effect of Government action on the decisions of third parties'; rather, [they] can only 'speculat[e] about the decisions of third parties.'" (third alteration in original) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019))). And we do not know what emergencies may occur in California while the National Guard is deployed. Accordingly, at this time and on these facts, the remaining stay factors weigh in favor of Defendants.

## V.  CONCLUSION

For the reasons above, we GRANT Defendants' motion for a stay pending appeal.