Beau Tremitiere (SBN 320074)
Jane Bentrott (SBN 323562)
PROTECT DEMOCRACY UNITED
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
beau.tremitiere@protectdemocracy.org
jane.bentrott@protectdemocracy.org

Mack E. Jenkins (SBN 242101)
Matthew J. Craig (SBN 350030)
Susan Har (SBN 301924)
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
(212) 763-0883
mjenkins@heckerfink.com
mcraig@heckerfink.com
shar@heckerfink.com

*Attorneys for Amici Curiae Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | Case No. 3:25-cv-04870-CRB<br><br>***AMICI CURIAE* BRIEF OF FORMER U.S. ARMY AND NAVY SECRETARIES AND RETIRED FOUR-STAR ADMIRALS AND GENERALS**<br><br>Date: August 11-13, 2025<br>Time: 1:30 p.m.<br>Courtroom: 6 (17th Floor)<br>Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE .................................................................................................. 1

I.      INTRODUCTION ................................................................................................. 2

II.     ARGUMENT ......................................................................................................... 3

        A.      The Posse Comitatus Act Prohibits the Military from Acting as Domestic
                Law Enforcement Absent Express Congressional Authorization ......................... 3

        B.      The Posse Comitatus Act Permits Non-Law Enforcement Uses of Military
                Personnel for National Security and Civil Support; Violations Divert Them
                from Their Primary Mission ................................................................................. 5

        C.      Consistent with the Posse Comitatus Act, Active-Duty Marines and
                National Guard Personnel Are Not Trained to Operate in the Context of
                Domestic Law Enforcement ................................................................................. 7

        D.      Consistent with the Posse Comitatus Act, Deploying Military Personnel for
                Assistance with Law Enforcement Should Be a Last Resort to Avoid
                Politicizing the Military ...................................................................................... 11

III.    CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bissonette v. Haig*,
    776 F.2d 1384 (8th Cir. 1985), *aff'd en banc*, 800 F.2d 812 (8th Cir. 1986) ........................ 7

*Greer v. Spock*,
    424 U.S. 828 (1976) ............................................................................................................. 12

*Haig v. Bissonette*,
    485 U.S. 264 (1988) ............................................................................................................... 8

*King v. Burwell*,
    576 U.S. 473 (2015) ............................................................................................................... 9

*Laird v. Tatum*,
    408 U.S. 1 (1972) ................................................................................................................... 4

*Newsom v. Trump*,
    141 F.4th 1032 (9th Cir. 2025) .............................................................................................. 2

*United States v. Allred*,
    867 F.2d 856 (5th Cir. 1989) ............................................................................................... 12

*United States v. Casper*,
    541 F.2d 1275 (8th Cir. 1976) ............................................................................................... 8

*United States v. Khan*,
    35 F.3d 426 (9th Cir. 1994) ................................................................................................. 13

*United States v. McArthur*,
    419 F. Supp. 186 (D.N.D. 1975) ........................................................................................... 8

*United States v. Red Feather*,
    392 F. Supp. 916 (D.S.D. 1975) ......................................................................................... 10

*United States v. Yunis*,
    924 F.2d 1086 (D.C. Cir. 1991) .......................................................................................... 13

**CONSTITUTIONAL PROVISIONS**

Amendment III ............................................................................................................................ 4

**FEDERAL STATUTES**

10 U.S.C. § 253 .......................................................................................................... 4

18 U.S.C. § 1385 ..................................................................................................... 3, 4

**OTHER AUTHORITIES**

2025 Incident Archive, CAL FIRE, https://www.fire.ca.gov/incidents/2025 (last visited July 27, 2025) .................................................................................................................. 7

*About the Guard: How We Began*, NAT'L GUARD, https://perma.cc/SR5H-2N2E (last visited June 11, 2025) ..................................................................................................... 6

*Active Duty Military Strength by Service*, DEF. MANPOWER DATA CTR. (Apr. 30, 2025), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports ............................ 6

Andrew Gumbel, *Troops and marines deeply troubled by LA deployment: "Morale is not great,"* THE GUARDIAN (June 12, 2025), https://perma.cc/92KQ-TCYX .......................... 14

Anumita Kaur et al., *700 active-duty Marines will withdraw from Los Angeles, Pentagon says*, WASH. POST (July 21, 2025), https://perma.cc/U5VX-S24C .................................................. 2

Brian Melley, *LA Protests far different from 92 Rodney King riots*, ASSOC. PRESS (June 10, 2025), https://perma.cc/J2FD-8CBT .................................................................................. 14

*Brief Histories*, U.S. MARINE CORPS, https://perma.cc/CYJ3-CW8X (last visited June 11, 2025) .................................................................................................................................. 6

*California farm worker injured in immigration raids dies, more than 300 arrested, feds say*, CBS NEWS (July 12, 2025), https://perma.cc/W276-EKCB .................................................. 10

Clara Harter, *150 National Guard troops returned to California command; 'Trump caved,' Newsom says*, L.A. TIMES (June 30, 2025), https://perma.cc/U3TH-GBPX ........................ 7

Clara Harter, *National Guard troops deployed to L.A. were sent to Riverside County marijuana farm raid*, L.A. TIMES (June 24, 2025), https://perma.cc/65NW-MNKJ .............................. 9

Dakota Smith et al., *Details emerge about pot-farm immigration raid as worker dies*, L.A. TIMES (July 12, 2025), https://perma.cc/6VGB-C6QP ....................................................... 10

Drew F. Lawrence, *The Marines are Leaving Los Angeles*, MILITARY.COM (July 21, 2025), https://perma.cc/HM4S-86HP ........................................................................................ 6

Elizabeth Goitein, *"The Insurrection Act" by Any Other Name: Unpacking Trump's Memorandum Authorizing Domestic Deployment of the Military*, JUST SECURITY (June 10, 2025), https://perma.cc/B6C4-RYBR ........................................................... 4

*Governor Newsom calls for immediate withdrawal of all soldiers in Los Angeles*, GOV. GAVIN NEWSOM (July 21, 2025), https://perma.cc/G9L4-86A3........................................ 14

Hailey Branson-Potts et al., *Veterans' advocates warn of low morale amid L.A. deployment: "This is not what we signed up for"*, L.A. TIMES (June 24, 2025), https://perma.cc/KY47-J75U ........................................................................................................................... 14

Hamed Aleaziz et al., *Armed National Guard Troops Aid Immigration Agents on Raids in Los Angeles*, N.Y. TIMES (June 10, 2025), https://perma.cc/2FXC-DAC2 ................................. 9

INFORMATIONAL HEARING – CHANGING LANDSCAPE OF VETERANS BENEFITS IN CALIFORNIA, CALIFORNIA STATE ASSEMBLY (March 25, 2025), https://perma.cc/527W-U6FQ............... 7

Irene Cruz et al., *Mayor Bass pushes to remove all remaining National Guard troops from Los Angeles*, ABC7 (July 21, 2025), https://perma.cc/QP3M-WGW5 ..................................... 14

Jaimie Ding et al., *Residents still shaken a day after federal authorities march through Los Angeles' MacArthur Park*, ASSOC. PRESS (July 8, 2025), https://perma.cc/MG57-CVCX ................................................................................. 13

Jennifer K. Elsea, CONG. RSCH. SERV., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018), https://perma.cc/TT67-NVE3 ...................................................................... 5, 12

Jennifer K. Elsea, CONG. RSCH. SERV., RS22266, *The Use of Federal Troops for Disaster Assistance: Legal Issues*, available at https://perma.cc/L2KC-TJYV .................................. 6

Jenny Jarvie et al., *National Guard Came to LA to Fight Unrest. Troops Ended Up Fighting Boredom*, MILITARY.COM (July 17, 2025), https://perma.cc/35PF-TU7B..................... 13, 14

Jim Absher, *What's the Difference Between Title 10 and Title 32 Mobilization Orders?*, MILITARY.COM (January 27, 2022), https://perma.cc/F8JT-KYRN....................................... 6

Joseph Nunn, *The Posse Comitatus Act Explained*, BRENNAN CENTER FOR JUSTICE (October 14, 2021), https://perma.cc/5QUY-6GH4.......................................................... 12

Julie Watson et al., *Pentagon ends deployment of 2,000 National Guard troops in Los Angeles*, ASSOC. PRESS (July 15, 2025), https://perma.cc/9K4U-F9B3 ............................................. 13

Konstantin Toropin et al., *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, MILITARY.COM (June 11, 2025), https://perma.cc/Y9PC-SLVW ................................................................. 15

*LA Mayor Bass worried National Guard deployment could escalate tensions*, NBC L.A. (June 7, 2025), https://www.nbclosangeles.com/video/on-air/la-mayor-bass-worried-national-guard-deployment-could-escalate-tensions/3718167/ .......................................... 14

Melissa Gomez et al., *Heavily armed immigration agents descend on L.A.'s MacArthur Park*, L.A. TIMES (July 7, 2025), https://perma.cc/Y2UF-V728 ............................................... 9, 13

*Memorandum from President Donald Trump to Attorney General Pam Bondi and Secretary of Homeland Security Kristi Noem, Security for the Protection of Department of Homeland Security Functions*, WHITE HOUSE (June 7, 2025), https://perma.cc/3BNK-SPFW ........ 2, 11

Mike Levine, *An Interview with Trump's Border Czar, Thom Homan*, N.Y. TIMES (June 19, 2025), https://www.nytimes.com/2025/06/19/podcasts/the-daily/tom-homan-ice-immigration-trump.html ....................................................................................... 13

Nicholas Slayton, *Guardsmen sent to LA are 130 miles east of the city doing drug busts*, TASK & PURPOSE (June 24, 2025), https://perma.cc/78ZT-QWQ8 ................................................ 11

Omar Younis et al., *Exclusive: US Marines carry out first known detention of civilian in Los Angeles, video shows*, REUTERS (June 13, 2025), https://perma.cc/9HBX-AFXB ............... 9

*Our History*, ARMY NAT'L GUARD, https://perma.cc/2JMD-R4FM (last visited June 11, 2025)... 6

Retired Army Gen. Joseph Votel, *An Apolitical Military in Essential to Maintaining Balance Among American Institutions*, MILITARY TIMES (June 8, 2020), https://perma.cc/5MT8-JFYQ ...................................................................................................................................... 12

Ruben Vives et al., *200 arrested in chaotic immigration raid at cannabis farm, one worker critically hurt in fall*, L.A. TIMES (July 10, 2025), https://perma.cc/EN35-KJW6 .............. 10

Ryan P. Cruz, *How It Happened: Timeline of Immigration Raid in Carpenteria*, THE INDEPENDENT (July 16, 2025), https://perma.cc/SAK7-5T5H .............................................. 10

Saranac Hale Spencer et al., *Q&A on Federalizing the National Guard in Los Angeles*, FACTCHECK.ORG (June 13, 2025), https://perma.cc/E7HW-ZRHM ..................................... 2

Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. TIMES (July 16, 2025), https://perma.cc/SZ65-SHPJ ......................................................... 14

Tara Copp et al., *Tensions rise as National Guard aids federal raid in Los Angeles*, ABC7 (July 7, 2025), https://perma.cc/H2RD-QHZJ .................................................................... 9, 10

*The Corps*, U.S. MARINE CORPS, https://perma.cc/LC77-JM6E (last visited June 11, 2025) ........ 5

TIMES RADIO, *LIVE: U.S. Major General Scott Sherman talks about deployment of Marines to L.A.* (June 11, 2025), https://perma.cc/R2VV-6A93 ............................................................... 8

*Troops in Los Angeles can detain but not arrest individuals, military official says*, REUTERS (June 11, 2025), https://perma.cc/FG93-WXAN ................................................................. 7

*Trump Warns Protests at Military Parade Will Be Met with Force*, REUTERS (June 11, 2025), https://perma.cc/YW6Q-XRDC ......................................................................... 15

U.S. DEP'T OF DEF., DIRECTIVE 1344.10, POLITICAL ACTIVITIES BY MEMBERS OF THE ARMED FORCES (2008), https://perma.cc/6E6Y-CCSE ................................................................. 12

Will Conybeare, *More than 500 arrests made over 8 days of protests in Los Angeles: LAPD*, KTLA5 (June 15, 2025), https://perma.cc/2KAK-WMK4 .................................................. 14

# INTEREST OF AMICI CURIAE

*Amici* are former secretaries of the United States Army and Navy and retired four-star admirals and generals. Collectively, they served under each president from John F. Kennedy to Barack H. Obama.

*Amici* are acutely interested in this case because deploying National Guard and active-duty military personnel in the context of domestic law enforcement should be a rare and carefully considered occurrence that strictly complies with the Posse Comitatus Act and its exceptions. Domestic deployments that fail to adhere to these long-established guardrails threaten the Guard's and the active-duty military's core national security and disaster relief missions; place deployed personnel in uncommon situations for which they lack appropriate training, thus posing safety concerns for personnel and the public alike; and risk inappropriately politicizing the military, leading to additional risks to recruitment, retention, morale, and cohesion of the force.

This submission is based on *amici*'s collective experience serving in and leading our military, their direct experience commanding active-duty service personnel, and their interest in preserving our military's apolitical role in safeguarding national security.

*Amici are* **Admiral Steve Abbot, United States Navy (Retired)**; **Admiral Thad Allen, United States Coast Guard (Retired)**; **Former Secretary of the Army Louis Caldera**; **General Carlton W. Fulford, Jr., United States Marine Corps (Retired)**; **General Michael Hayden, United States Air Force (Retired)**; **Admiral Samuel Jones Locklear, III, United States Navy (Retired)**; **Former Secretary of the Navy Sean O'Keefe**; and **Admiral Bill Owens, United States Navy (Retired)**. *Amici*'s short biographies, which are included in the accompanying Appendix, capture a measure of their distinguished service to our country, as well as their expertise on matters encompassing the mission of the National Guard and armed services and the well-being of all those who serve in uniform.

## I.    INTRODUCTION

On June 7, 2025, President Trump issued a Memorandum for the Secretary of Defense authorizing the domestic deployment of active-duty military forces and the federalization and deployment of National Guard troops, with the broad authority to protect federal property and personnel where protests against actions by federal officials may occur.[1] By June 10, 2025, pursuant to the President's authorization, approximately 700 active-duty members of the United States Marine Corps ("USMC")[2] and 4,000 California National Guard troops had been deployed or mobilized for deployment to the Los Angeles area in response to protests against U.S. Immigration and Customs Enforcement (ICE) enforcement activities.[3] The governor of California and mayor of Los Angeles objected to these deployments, warning they could instead escalate tensions, and the Los Angeles Police Department expressly represented that it is capable of controlling the protests without federal intervention. Following proceedings in this Court and the Ninth Circuit, the Ninth Circuit held "that the President likely has authority *to federalize* the National Guard," but expressly noted that "nothing in [the] decision addresses *the nature of the activities in which the federalized National Guard may engage*." *Newsom v. Trump*, 141 F.4th 1032, 1055 (9th Cir. 2025) (emphasis added).

That question is governed by the Posse Comitatus Act. This law limits the nature of the activities in which the military may engage domestically, as the United States military is *not* a federal law enforcement organization. Specifically, the Posse Comitatus Act prohibits the military

---

[1] *Memorandum from President Donald J. Trump to Attorney General Pam Bondi and Secretary of Homeland Security Kristi Noem, Security for the Protection of Department of Homeland Security Functions*, WHITE HOUSE (June 7, 2025), https://perma.cc/3BNK-SPFW.

[2] As of July 22, 2025, it was announced that the deployment of approximately 2,000 of the National Guard troops and all of the Marines was ending; approximately 2,000 California National Guard troops remain federalized in California pursuant to the President's authorization. *See* Anumita Kaur et al., *700 active-duty Marines will withdraw from Los Angeles, Pentagon says*, WASH. POST (July 21, 2025), https://perma.cc/U5VX-S24C.

[3] Saranac Hale Spencer et al., *Q&A on Federalizing the National Guard in Los Angeles*, FACTCHECK.ORG (June 13, 2025), https://perma.cc/E7HW-ZRHM.

from acting as a domestic police force unless doing so is "expressly authorized by the Constitution or Act of Congress."[4] As the mission of the Marines and federalized National Guard has taken shape in California following their initial deployments, public reporting has raised concerns that the troops' activities may not have been limited to the narrow, permissible roles.

Any domestic deployment that fails to comply with the strict terms of the Posse Comitatus Act poses multiple risks to the core mission of the force, and to the well-being of the troops. *First*, deploying military personnel in the context of domestic law enforcement diverts them from their primary mission, which is to fight and win the nation's wars and—in the case of the National Guard—protect communities after disasters. Accordingly, such domestic diversions come at the expense of local, state, and national safety. *Second,* active-duty Marines and National Guard personnel are not trained or qualified to conduct domestic law enforcement operations, which poses a danger to the safety of both the troops and the public. *Third,* use of federal military personnel in the context of law enforcement operations should be a last resort to avoid the politicization of the military, which inevitably erodes public trust, impacts recruitment, and undermines troop morale.

*Amici* submit this brief to more fully explain these risks and assist the Court in assessing whether activities of the troops deployed in California have violated the Posse Comitatus Act.

## II.    ARGUMENT

A. *The Posse Comitatus Act Prohibits the Military from Acting as Domestic Law Enforcement Absent Express Congressional Authorization*

The general expectation that the military will not engage in domestic civilian law enforcement is foundational to American civil-military relations. Long before Congress enacted the Posse Comitatus Act in 1878, the U.S. Constitution and American tradition aimed to avoid repeating the British military's police state-like presence in pre-Revolutionary War society. *See,*

---

[4] Posse Comitatus Act, 18 U.S.C. § 1385.

*e.g.*, U.S. Const. amend. III, VI; *Laird v. Tatum*, 408 U.S. 1, 15 (1972) (discussing the "traditional and strong resistance of Americans to any military intrusion into civilian affairs," a "tradition [that] has deep roots in our history . . . ."). This tradition was later codified in the Posse Comitatus Act, which now reads: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."[5]

Notably, the Posse Comitatus Act permits U.S. military engagement in domestic law enforcement activities when expressly authorized by an Act of Congress. This, too, is consistent with experience and tradition, as the country has at times relied on the military to lawfully intercede during periods of internal crisis or insurrection. For example, President Eisenhower federalized National Guard troops to enforce the Supreme Court's order in *Brown v. Board of Education* to desegregate schools, wherein the Guard played a rare but critical role in upholding the Constitution. Consistent with this need, a significant exception to the Posse Comitatus Act is the Insurrection Act. When invoked, the Insurrection Act gives limited authority to the President to deploy federal troops to quell "any insurrection, domestic violence, unlawful combination, or conspiracy" against the United States government and to execute federal civil rights laws when they are obstructed.[6] That authority has been used sparingly throughout this country's history, and rightfully so in a democracy governed by civilians elected by the American people.

Significantly, federalized National Guard troops under the president's command and control are legally equivalent to active-duty military forces and therefore are subject to the Posse Comitatus

---

[5] Posse Comitatus Act, 18 U.S.C. § 1385.

[6] 10 U.S.C. § 253. For background on the Insurrection Act, *see generally* Elizabeth Goitein, *"The Insurrection Act" by Any Other Name: Unpacking Trump's Memorandum Authorizing Domestic Deployment of the Military*, Just Security (June 10, 2025), https://perma.cc/B6C4-RYBR.

Act. In the rare cases where a President lawfully invoked the Insurrection Act to address civil unrest, the condition of the Posse Comitatus Act that activities be "expressly authorized by an Act of Congress" was satisfied. This was the case, for instance, when President George H.W. Bush invoked the Insurrection Act and federalized Guard troops—upon California Governor Pete Wilson's request—to quell the widespread Los Angeles riots in 1992.

Significantly, however, President Trump has *not* invoked the Insurrection Act or other comparable statutory authority in relation to the events that underlie this lawsuit. As such, and as acknowledged by the Ninth Circuit, the conduct of the Marines and the federalized National Guard troops deployed in California should conform to the prohibitions on civilian law enforcement activities set forth in the Posse Comitatus Act. Indeed, "the military has a long-standing practice of avoiding involvement in civilian affairs which it believes are contrary to the [Posse Comitatus] act."[7] As discussed further *infra*, several important civil-military values reinforce the guardrails imposed by the Posse Comitatus Act.

B. *The Posse Comitatus Act Permits Non-Law Enforcement Uses of Military Personnel for National Security and Civil Support; Violations Divert Them from Their Primary Mission*

Both the USMC and the National Guard play critical roles in protecting national security. These core missions do not typically involve domestic law enforcement activities and therefore rarely implicate the Posse Comitatus Act.

The USMC is "America's expeditionary force in readiness," prepared to respond rapidly to threats against the nation with "innovative and agile warfighting capabilities in all domains."[8] As one of the six armed forces of the United States, USMC serves as the maritime land force

---

[7] Jennifer K. Elsea, CONG. RSCH. SERV., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* (2018), https://perma.cc/TT67-NVE3 (internal citations omitted).

[8] *The Corps*, U.S. MARINE CORPS, https://perma.cc/LC77-JM6E (last visited June 11, 2025).

component of the U.S. military and has approximately 167,000 active-duty members.[9] Marines are primarily trained for overseas conflict zones and have fought in every major international U.S. conflict since their founding in 1775.[10] Domestic deployment of USMC is extremely rare and typically occurs under extraordinary circumstances, with the vast majority of USMC operations conducted overseas. Reporting has indicated that the deployment of active-duty Marines to California pulled resources from USMC's "operational accounts as it juggles global instability."[11]

The National Guard, founded in 1636 as a citizen-soldier force, has a dual mission: (1) to serve as a reserve component of the active-duty military, and (2) to protect life and property within communities at home.[12] The Guard primarily provides domestic civil support, natural disaster relief, border security, election support, and other support as requested by governors and/or the president, including law enforcement support in the event of civil unrest. However, the "civil unrest" response component has historically been narrowly construed, especially in situations calling for the performance of core law enforcement functions, which the Guard is neither trained nor primarily intended to execute. The Guard is unique within the U.S. military as a dual-status force with state *and* federal responsibilities, allowing it to be activated under the authority of either state or federal leadership, pursuant to strict limitations set forth in federal law.

The California National Guard (which is part of the National Guard) is vital to the state's disaster preparedness and emergency response.[13] As one of the largest National Guard forces in the

---

[9] *Active Duty Military Strength by Service*, DEF. MANPOWER DATA CTR. (Apr. 30, 2025), https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports (select "Strength Summary").

[10] *Brief Histories*, U.S. MARINE CORPS, https://perma.cc/CYJ3-CW8X (last visited June 11, 2025).

[11] Drew F. Lawrence, *The Marines are Leaving Los Angeles*, MILITARY.COM (July 21, 2025), https://perma.cc/HM4S-86HP.

[12] *About the Guard: How We Began*, NAT'L GUARD, https://perma.cc/SR5H-2N2E (last visited June 11, 2025); *Our History*, ARMY NAT'L GUARD, https://perma.cc/2JMD-R4FM (last visited June 11, 2025).

[13] When the Guard is operating under state control, for example in response to wildfires or other natural disasters, the Posse Comitatus Act does not apply. *See* Jennifer K. Elsea, CONG. RSCH. SERV., RS22266, *The Use of Federal Troops for Disaster Assistance: Legal Issues* at 4, available at https://perma.cc/L2KC-TJYV; Jim Absher, *What's the Difference Between Title 10 and Title 32 Mobilization Orders?*, MILITARY.COM (January 27, 2022), https://perma.cc/F8JT-KYRN.

*AMICI CURIAE BRIEF OF FORMER U.S. ARMY AND NAVY SECRETARIES AND RETIRED FOUR-STAR ADMIRALS AND GENERALS*

6

country—with more than 18,000 troops[14]—it serves California's population of 39 million people, providing essential support during crises. The California National Guard is routinely deployed for wildfire suppression, search and rescue, and emergency response during earthquakes, floods, and other natural disasters. California relies heavily on its Guard's rapid response capabilities, particularly during wildfire season, and spent recent months engaged in response and recovery operations resulting from the catastrophic January 2025 fires in the Los Angeles area. Forecasters are expecting unusually high fire activity to increase throughout the summer across California,[15] while the National Guard unit assigned to combatting wildfires is at just 40% of its regular staffing levels.[16] The diversion of California Guard personnel from these critical missions risks degrading the state's emergency preparedness.

C. *Consistent with the Posse Comitatus Act, Active-Duty Marines and National Guard Personnel Are Not Trained to Operate in the Context of Domestic Law Enforcement*

The USMC and National Guard personnel deployed in and around Los Angeles have, according to public reports, received limited instruction and training on how to handle civil disturbances.[17] This training pales in comparison to the in-depth and ongoing education provided to civilian law enforcement officers. Domestic law enforcement—particularly in emotionally charged situations and instances of civil unrest—requires a specialized skill set for which law enforcement officers train extensively and continually. Personnel in the U.S. military, on the other hand, do not receive extensive training on how to operate safely and effectively in the context of domestic law enforcement. *See Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985) ("[M]ilitary

---

[14] Informational Hearing – Changing Landscape of Veterans Benefits in California, California State Assembly (March 25, 2025), https://perma.cc/527W-U6FQ.

[15] 2025 Incident Archive, CAL FIRE, https://www.fire.ca.gov/incidents/2025 (last visited July 27, 2025).

[16] Clara Harter, *150 National Guard troops returned to California command; 'Trump caved,' Newsom says*, L.A. Times (June 30, 2025), https://perma.cc/U3TH-GBPX.

[17] *Troops in Los Angeles can detain but not arrest individuals, military official says*, Reuters (June 11, 2025), https://perma.cc/FG93-WXAN.

enforcement of the civil law leaves the protection of vital Fourth and Fifth Amendment rights in the hands of persons who are not trained to uphold these rights.") *aff'd en banc*, 800 F.2d 812 (8th Cir. 1986), *aff'd as if by an equally divided court for want of a quorum*, 485 U.S. 264 (1988); *United States v. McArthur*, 419 F. Supp. 186, 193–94 (D.N.D. 1975) ("It is the nature of their primary mission that military personnel must be trained to operate under circumstances where the protection of constitutional freedoms cannot receive the consideration needed in order to assure their preservation. The posse comitatus statute is intended to meet that danger."), *aff'd sub nom.; United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976). Our longstanding tradition of entrusting domestic law enforcement to local, state, and federal law enforcement personnel has, unlike other countries around the world, allowed the U.S. military to remain focused on its core mission.

The commanding officer of the National Guard deployment, U.S. Army Major General Scott Sherman, has stated that "[t]hese soldiers do not conduct law enforcement operations like arrests or search and seizure. They are strictly used for the protection of the federal personnel as they conduct their operations and to protect them to allow them to do their federal mission."[18] In practice, however, the distinction between force protection and law enforcement operations is not always clear, as modern operational realities and unanticipated circumstances invite uncertainty and potential disagreement over the scope and nature of appropriate and authorized conduct. These ambiguities risk miscalculations in the heat of the moment, especially among military personnel who have not received thorough training in de-escalation tactics and the intricacies of the constitutional protections afforded to civilians in the U.S. Lacking clear, detailed guidance consistent with settled legal principles, these troops are placed in an operationally difficult position if ordered to act against their fellow Americans.

---

[18] TIMES RADIO, *LIVE: U.S. Major General Scott Sherman talks about deployment of Marines to L.A.*, at 4:45 (June 11, 2025), https://perma.cc/R2VV-6A93.

For example, troops in Los Angeles have accompanied U.S. Immigration and Customs Enforcement (ICE) officials on their immigration enforcement raids throughout California, even where there was little to no protest activity reported.[19] On June 13, the Department of Defense confirmed that Marines had apprehended and detained a civilian reported to be an Army veteran who had crossed a yellow tape boundary on his way to the local Veterans Affairs office located in the Wilshire Federal Building in Los Angeles.[20] Video footage shows Marines restraining the civilian's hands with zip ties. On June 18, about 315 National Guard troops were mobilized to protect federal agents enforcing immigration laws, as well as Drug Enforcement Administration (DEA) agents, on marijuana farms in the Coachella Valley.[21]

On other occasions, protesters were reportedly not present at enforcement operations in which troops participated except in response to an overwhelming and militarized show of force. *Amici* are concerned about the unintended consequences of interpreting the Posse Comitatus Act to license the deployment of the military in ways that escalate tensions, thereby creating the need for the military's protection of federal functions, perversely satisfying the Posse Comitatus Act. *Cf. King v. Burwell*, 576 U.S. 473, 476 (2015) (courts should interpret statutes "to avoid the type of calamitous result that Congress plainly meant to avoid"). Public reporting gives rise to such concerns here. For example, on July 7, approximately 90 armed National Guard troops entered MacArthur Park alongside immigration agents in the heart of Los Angeles, bringing military weapons, 17 Humvees, four military cargo trucks, and two military ambulances.[22] Protesters

---

[19] Hamed Aleaziz et al., *Armed National Guard Troops Aid Immigration Agents on Raids in Los Angeles*, N.Y. TIMES (June 10, 2025), https://perma.cc/2FXC-DAC2.

[20] Omar Younis et al., *Exclusive: US Marines carry out first known detention of civilian in Los Angeles, video shows*, REUTERS (June 13, 2025), https://perma.cc/9HBX-AFXB.

[21] Clara Harter, *National Guard troops deployed to L.A. were sent to Riverside County marijuana farm raid*, L.A. TIMES (June 24, 2025), https://perma.cc/65NW-MNKJ. .

[22] Melissa Gomez et al., *Heavily armed immigration agents descend on L.A.'s MacArthur Park*, L.A. TIMES (July 7, 2025), https://perma.cc/Y2UF-V728; Tara Copp et al., *Tensions rise as National Guard aids federal raid in Los Angeles*, ABC7 (July 7, 2025), https://perma.cc/H2RD-QHZJ.

arrived in response to the intimidating, militarized presence in a community park typically full of civilians; a few protesters who were chasing a Humvee on foot reported being shot with an irritant from the Humvee.[23] On July 10, National Guard troops were identified accompanying federal officers at immigration enforcement operations at farms in Camarillo and Carpinteria, California—over an hour north of Los Angeles. When the operations first commenced, there were no protestors present; as it continued, a crowd gathered to protest the massive show of force, with one witness describing it "like a war scene."[24] A witness reported seeing Homeland Security personnel and National Guard troops together firing tear gas and rubber bullets at the protesters during these raids.[25] Another witness described a low-flying military helicopter that swung over the fields to flush out anyone hidden amongst the crops at the same time that troops fired tear gas canisters at protesters along the nearby road.[26] As a result of the operation, at least twelve civilians were injured, eight of whom were hospitalized.[27]

Amici are concerned that service members deployed on these missions are not being set up for success, with potentially grave risk of escalation, confusion, or involvement in traditional law enforcement activities in potential violation of the Posse Comitatus Act. See, e.g., United States v. Red Feather, 392 F. Supp. 916, 925 (D.S.D. 1975) ("Activities which constitute an active role in direct law enforcement are: arrest; seizure of evidence; search of a person; search of a building; investigation of crime; interviewing witnesses; pursuit of an escaped civilian prisoner; search of an area for a suspect and other like activities.").

---

[23] Id.

[24] Ryan P. Cruz, How It Happened: Timeline of Immigration Raid in Carpenteria, THE INDEPENDENT (July 16, 2025), https://perma.cc/SAK7-5T5H.

[25] Ruben Vives et al., 200 arrested in chaotic immigration raid at cannabis farm, one worker critically hurt in fall, L.A. TIMES (July 10, 2025), https://perma.cc/EN35-KJW6.

[26] Dakota Smith et al., Details emerge about pot-farm immigration raid as worker dies, L.A. TIMES (July 12, 2025), https://perma.cc/6VGB-C6QP.

[27] California farm worker injured in immigration raids dies; more than 300 arrested, feds say, CBS NEWS (July 12, 2025), https://perma.cc/W276-EKCB.

Operational difficulties faced by the troops may be compounded by the breadth and vagueness of their mission. The President's authorization to deploy the regular Armed Forces and federalize the National Guard states that they will be used "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations."[28] The scope of this mission is sweeping and vague: as written, it appears to authorize the deployment of active-duty military personnel anywhere in the country to "protect" any federal property or personnel wherever protests against any government function are likely to occur. The sweeping and vague authorization has been interpreted expansively by federal forces. A NORTHCOM spokesperson confirmed: "The catalyst of this order [federalizing the California National Guard] was related to events occurring in Los Angeles; however, the president's order and NORTHCOM's mission is not constrained by the geography of Southern California. Recently, Title 10 forces supported a Drug Enforcement Agency operation a few hours outside of Los Angeles."[29] When the mission itself is ambiguous—as it is here—there is even greater risk that the forces will be unprepared for what they are ordered to do.

D. *Consistent with the Posse Comitatus Act, Deploying Military Personnel for Assistance with Law Enforcement Should Be a Last Resort to Avoid Politicizing the Military*

A bedrock principle of American democracy is that our military is apolitical. That principle is reflected in the legislative and judicial history of the Posse Comitatus Act, which Congress passed in 1878 to restore the traditional separation between the federal military and civilian authorities in

---

[28] *Trump Mem., supra* note 1.

[29] Nicholas Slayton, *Guardsmen sent to LA are 130 miles east of the city doing drug busts*, TASK & PURPOSE (June 24, 2025), https://perma.cc/78ZT-QWQ8.

domestic affairs that had come undone during the politically turbulent Reconstruction era.[30] *See United States v. Allred*, 867 F.2d 856, 870 (5th Cir. 1989) (explaining that the "legislative and judicial history of the Act . . . indicates that its purpose springs from an attempt to end the use of federal troops to police state elections in ex-Confederate states."). Efforts to establish new governments in ex-Confederate states were particularly contentious during the decade following the Civil War, with Presidents receiving more requests for military aid from state governors in those years than all previous decades combined, and sometimes even receiving simultaneous requests from two rival governors claiming legitimacy in the same state after an election. Courts and military scholars alike have recognized the American tradition and need to keep the military apolitical. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828. 839 (1976) (upholding military regulation prohibiting partisan political activity and recognizing the need for the military to be "insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates. Such a policy is wholly consistent with the American constitutional tradition of a politically neutral military establishment under civilian control. It is a policy that has been reflected in numerous laws and military regulations throughout our history.").[31]

Accordingly, United States military personnel are not permitted to engage in political conduct while on duty or to use their military status to endorse political candidates or political causes.[32] Critical to the military's ability to carry out its core functions is retaining the public's

---

[30] Elsea, *supra* note 7. *See also* Joseph Nunn, *The Posse Comitatus Act Explained*, BRENNAN CENTER FOR JUSTICE (October 14, 2021), https://perma.cc/5QUY-6GH4.

[31] *See also* Retired Army Gen. Joseph Votel, *An Apolitical Military in Essential to Maintaining Balance Among American Institutions*, MILITARY TIMES (June 8, 2020), https://perma.cc/5MT8-JFYQ. Gen. Votel explains: "That the legitimacy of the military depends upon its ability to remain apolitical is a principle that is instantiated in the Posse Comitatus Act (PCA). A cornerstone of civil-military relations, the act concisely establishes a strong presumption for keeping the military out of local law enforcement . . . Together, our U.S. military and civilian leaders must work to keep our military apolitical—as our founding fathers intended. This is not a 'nice to do' thing; it is an absolute necessity in our constitutional system. When the military is viewed as having been politicized, it . . . diminishes trust and confidence in our democratic form of government."

[32] U.S. DEP'T OF DEF., DIRECTIVE 1344.10, POLITICAL ACTIVITIES BY MEMBERS OF THE ARMED FORCES 3 (2008), https://perma.cc/6E6Y-CCSE.

respect and maintaining cohesion and unity within its ranks—regardless of the political leanings of individual citizens or soldiers. Particular caution is therefore necessary if the U.S. military is to be deployed domestically in the context of a politically charged situation. It is essential that such deployments be a last resort, especially in the context of protests, other constitutionally protected activities, or activities likely to be perceived as partisan intimidation tactics.

For example, the Guard troops that accompanied federal agents as they reportedly entered MacArthur Park were on horses and in armored vehicles in a heavily militarized show of force.[33] Prior to the arrival of federal and military personnel, civilians—including a group of children in summer camp—had been enjoying the park until armored vehicles arrived and troops marched in formation and on horseback across the width of the park. *Cf. United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994) (to be lawful under the PCA, the involvement of the military in domestic law enforcement "must not 'pervade the activities of civilian authorities'") *quoting United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). No arrests were made and DHS has refused to disclose the purpose of the operation, describing it as part of "ongoing enforcement operations."[34] These circumstances—along with comments by the White House "Border Czar" about the administration's desire to "send a message to the whole world"—have raised questions as to the true purpose of the mission.[35] *Amici* are concerned that service members deployed on these missions could be perceived as entangled with policy and personnel on a partisan undertaking, thereby risking the trust of all Americans.

---

[33] Jenny Jarvie et al., *National Guard Came to LA to Fight Unrest. Troops Ended Up Fighting Boredom*, MILITARY.COM (July 17, 2025), https://perma.cc/35PF-TU7B; Julie Watson et al., *Pentagon ends deployment of 2,000 National Guard troops in Los Angeles*, ASSOC. PRESS (July 15, 2025), https://perma.cc/9K4U-F9B3.

[34] Jaimie Ding et al., *Residents still shaken a day after federal authorities march through Los Angeles' MacArthur Park*, ASSOC. PRESS (July 8, 2025), https://perma.cc/MG57-CVCX.

[35] Mike Levine, *An Interview with Trump's Border Czar, Thom Homan*, N.Y. TIMES (June 19, 2025), https://www.nytimes.com/2025/06/19/podcasts/the-daily/tom-homan-ice-immigration-trump.html; Gomez et al., *supra* note 22.

In line with the need to avoid politicizing the military, federal deployments on U.S. soil have been rare, serious, and legally clear. The last major deployment of federal troops domestically occurred during the 1992 Los Angeles riots, at the request of California Governor Pete Wilson and pursuant to the Insurrection Act. That deployment followed dozens of civilian fatalities, the burning of entire blocks of homes and businesses, and widespread violence and looting of businesses. Public reporting from Los Angeles suggests that, notwithstanding troubling incidents of property damage and violence, the recent and current situation appears to be different in kind. As of the filing of this brief, there have been no reported deaths, there no longer appears to be widespread protest activity, and public reporting suggests that most arrests have been for low-level offenses.[36]

Deployments over the objections of state officials have been even more rare and occurred in situations where state and local officials openly defied court orders or refused to protect citizens exercising their constitutional rights. Yet here, the City of Los Angeles and the State of California have not asked for outside assistance to control the protests and have suggested that the deployment of military troops would be more likely to escalate, rather than lessen, the public safety risk.[37] Moreover, isolated reports of the troops' low morale have surfaced, including discomfort with being drawn into domestic policing, which is outside their normal field of operations, and concerns that much of the public views the deployments through a political lens.[38]

---

[36] Brian Melley, *LA Protests far different from '92 Rodney King riots*, ASSOC. PRESS (JUNE 10, 2025), https://perma.cc/J2FD-8CBT; Jarvie, *supra* note 33 ("[I]n recent days the only thing many U.S. Marines and California National Guard troops seemed to be fighting was tedium."); Will Conybeare, *More than 500 arrests made over 8 days of protests in Los Angeles: LAPD*, KTLA5 (June 15, 2025), https://perma.cc/2KAK-WMK4.

[37] *See, e.g.*, *LA Mayor Bass worried National Guard deployment could escalate tensions*, at 2:12 - 2:50, NBC L.A. (June 7, 2025), https://www.nbclosangeles.com/video/on-air/la-mayor-bass-worried-national-guard-deployment-could-escalate-tensions/3718167/; Irene Cruz et al., *Mayor Bass pushes to remove all remaining National Guard troops from Los Angeles*, ABC7 (July 21, 2025), https://perma.cc/QP3M-WGW5; *Governor Newsom calls for immediate withdrawal of all soldiers in Los Angeles*, GOV. GAVIN NEWSOM (July 21, 2025), https://perma.cc/G9L4-86A3.

[38] Andrew Gumbel, *Troops and marines deeply troubled by LA deployment: "Morale is not great,"* THE GUARDIAN (June 12, 2025), https://perma.cc/92KQ-TCYX; *see also* Hailey Branson-Potts et al., *Veterans' advocates warn of low morale amid L.A. deployment: "This is not what we signed up for"*, L.A. TIMES (June 24, 2025), https://perma.cc/KY47-J75U; Shawn Hubler, *Trump's National Guard Troops Are Questioning Their Mission in L.A.*, N.Y. TIMES (July 16, 2025), https://perma.cc/SZ65-SHPJ.

The risks of politicization under these circumstances are profound and not speculative, especially where the President has, in his official capacity, overtly pitted the military against his professed political opponents. In a recent speech before U.S. Army personnel at Fort Bragg, President Trump repeatedly referred to the Los Angeles protests and denounced the governor, while encouraging service personnel to cheer as if at a political rally.[39] Speaking about a military parade to be held in observance of the Army's 250th birthday, President Trump said, "For those people that want to protest, they're going to be met with very big force."[40] While the President is entitled to criticize his opponents in political terms, involving the military in domestic political controversies risks harming the military's ability to recruit and retain servicemembers and garner broad public support for its budgets and programs, therefore undermining its ability to achieve its core mission of protecting the nation. It is precisely for this reason that the military should be kept out of domestic law enforcement whenever possible.

## III.    CONCLUSION

We appreciate the Court's due consideration of these critical factors in adjudicating the issues before it.

Dated: July 30, 2025

 /s/ Beau Tremitiere                              /s/ Susan Har

Beau Tremitiere                                  Susan Har
Jane Bentrott                                    Mack E. Jenkins
PROTECT DEMOCRACY UNITED                          Matthew J. Craig
                                                 HECKER FINK LLP

*Attorneys for Amici Curiae Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals*

---

[39] Konstantin Toropin et al., *Bragg Soldiers Who Cheered Trump's Political Attacks While in Uniform Were Checked for Allegiance, Appearance*, MILITARY.COM (June 11, 2025), https://perma.cc/Y9PC-SLVW.

[40] *Trump Warns Protests at Military Parade Will Be Met with Force*, REUTERS (June 11, 2025), https://perma.cc/YW6Q-XRDC.

## APPENDIX

*Amici are:*

**Admiral Steve Abbot, United States Navy (Retired),** graduated from the U.S. Naval Academy in 1966, after which he was deployed to Vietnam and began a 34-year career with the U.S. Navy. His final active-duty tour was as Deputy Commander-in-Chief, U.S. European Command from 1998 to 2000. Following his retirement, Admiral Abbot served as Deputy Homeland Security Advisor to President George W. Bush from 2001 to 2003.

**Admiral Thad Allen, United States Coast Guard (Retired),** retired in 2010 as the 23rd Commandant of the U.S. Coast Guard. Admiral Allen led the federal responses to Hurricanes Katrina and Rita and the Deepwater Horizon oil spill. He led Atlantic Coast Guard forces in response to the 9/11 attacks and coordinated the Coast Guard response to the Haitian Earthquake of 2010.

**Former Secretary of the Army Louis Caldera** graduated from the U.S. Military Academy at West Point and served in the Army on active duty from 1978 to 1983. He served in two Senate-confirmed positions in the Clinton Administration, including Secretary of the Army, and as an Assistant to the President and Director of the White House Military Office in the Obama Administration.

**General Carlton W. Fulford, Jr., United States Marine Corps (Retired),** received his commission in June 1966, following graduation from the U.S. Naval Academy. He served as a platoon and company commander in Vietnam. Over the next four decades, he served as Commanding Officer, Task Force Ripper during Operations Desert Shield and Desert Storm; Commanding General, First Marine Expeditionary Force; Commanding General, Third Marine Expeditionary Force; Commander, U.S. Marine Forces Pacific; and Director, The Joint Staff. General Fulford retired as the Deputy Commander-in-Chief, United States European Command in 2002.

**General Michael Hayden, United States Air Force (Retired),** entered active military service in 1969. During his career, he rose to the rank of four-star general and served as Director of the Central Intelligence Agency and the National Security Agency. General Hayden also served as Commander of the Air Intelligence Agency and held senior staff positions at the Pentagon, Headquarters U.S. European Command, and the National Security Council.

**Admiral Samuel Jones Locklear, III, United States Navy (Retired),** graduated from the U.S. Naval Academy in 1977. He served for 39 years and retired as commander of U.S. Pacific Command. His prior commands include Commander, U.S. Naval Forces Europe, U.S. Naval Forces Africa, and Allied Joint Force Command Naples; Commander, U.S. 3rd Fleet; and Commander, Nimitz Strike Group.

**Former Secretary of the Navy Sean O'Keefe** began his public service career in 1978 at the Department of Defense and as U.S. Senate staff until his appointment as the Department of Defense Comptroller and Chief Finance Officer in 1989. President George H.W. Bush later named him the 69th Secretary of the Navy. Secretary O'Keefe also served in President George W. Bush's Administration as Deputy Director of the Office of Management and Budget and the 10th Administrator of NASA.

**Admiral Bill Owens, United States Navy (Retired),** retired in 1996 as the Vice Chairman of the Joint Chiefs of Staff. He began his career as a nuclear submariner, spending a total of 4,000 days—or more than ten years—aboard submarines, including duty in Vietnam. Admiral Owens was a senior military assistant to two Secretaries of Defense and served as commander of the U.S. 6th Fleet during Operation Desert Storm.