1  **ROB BONTA**
   Attorney General of California
2  MICHAEL L. NEWMAN
   THOMAS S. PATTERSON
3  Senior Assistant Attorneys General
   ANYA M. BINSACCA
4  MARISSA MALOUFF
   JAMES E. STANLEY
5  Supervising Deputy Attorneys General
   NICHOLAS ESPÍRITU
6  LUKE FREEDMAN
   BRENDAN HAMME
7  BARBARA HORNE-PETERSDORF
   LORRAINE LOPEZ
8  KENDAL MICKLETHWAITE
   MEGHAN H. STRONG
9  MEGAN RICHARDS
   JANE REILLEY
10 Deputy Attorneys General
     455 Golden Gate Ave.
11   San Francisco, CA 94102
     Telephone: (415) 510-3879
12   E-mail: Jane.Reilley@doj.ca.gov
   *Attorneys for Plaintiffs*

13

14              IN THE UNITED STATES DISTRICT COURT

15              FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

18

19 | GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,

20                                                    NO. 3:25-cv-04870-CRB
                                          Plaintiffs,
21                                                    **PLAINTIFFS' SUPPLEMENTAL BRIEF
                                                     IN SUPPORT OF MOTION FOR
                v.                                   PRELIMINARY INJUNCTION**
22

23 DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED
24 STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
25 DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,
26
                                         Defendants.
27

28

---
PLAINTIFFS' SUPP. BRIEF ISO MTN. FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Background .................................................................................................................. 2

    I.     Defendants Have Continued to Violate the Posse Comitatus Act ......................... 2

    II.    Nearly 2,000 Federalized National Guard Troops Remain Deployed .................... 4

Argument ..................................................................................................................... 4

    I.     Defendants Have Violated and Are Violating the Posse Comitatus Act ............... 4

        A.    The Posse Comitatus Act Bars Civilian Law Enforcement by the
             Military ....................................................................................................... 4

        B.    Defendants Have Violated the Posse Comitatus Act Under Each of
             the Three Applicable Tests ......................................................................... 7

            1.    Defendants Are Making Direct, Active Use of Military
                 Personnel to Execute the Laws ...................................................... 7

                     i)     Federalized National Guard Troops Have
                            Performed Security Functions During Civil
                            Law Enforcement Operations ................................. 8

                     ii)    Federalized National Guard Troops Have
                              Formed Armed Perimeters and Blockades ........... 10

                     iii)   Task Force 51 Troops Have Apprehended
                              and Detained Civilians .......................................... 11

            2.    Defendants' Use of Military Personnel Pervades the
                 Activities of Civilian Law Enforcement ....................................... 13

            3.    Task Force 51 Troops Have Subjected Civilians to the
                 Exercise of Regulatory, Proscriptive, or Compulsory
                 Military Power ............................................................................... 16

    II.    Defendants' Responses to Plaintiffs' Claims Lack Merit ................................... 17

        A.    Plaintiffs May Pursue an Ultra Vires Claim for Violation of the
              Posse Comitatus Act ................................................................................ 17

        B.    Section 12406(3) Is Not an Exception to the Posse Comitatus Act .......... 19

Conclusion ................................................................................................................ 22

1

## TABLE OF AUTHORITIES

2

**Page**

3  CASES

4  *Bissonette v. Haig*
5      776 F.2d 1384 (8th Cir. 1985) ................................................................... *passim*

6  *Black Lives Matter D.C. v. Trump*
       544 F. Supp. 3d 15 (D.D.C. 2021) ..................................................................... 17
7
   *Gilbert v. United States*
8      165 F.3d 470 (6th Cir. 1999) ............................................................................ 16

9  *Hooper v. City of Seattle*
10     2020 WL 3100855 (W.D. Wash. June 11, 2020) ................................................ 7

11 *Laird v. Tatum*
       408 U.S. 1 (1972) ............................................................................................... 19
12
   *Murphy Co. v. Biden*
13     65 F.4th 1122 (9th Cir. 2023) ............................................................... 17, 18, 19

14 *United State v. Jaramillo*
15     380 F. Supp. 1375 (D. Neb. 1974) ..................................................................... 5

16 *United States v. Alvarado*
       2014 WL 12785138 (D.N.M. Nov. 20, 2014) ................................................... 21
17
   *United States v. Banks*
18     539 F.2d 15 (9th Cir. 1976) ............................................................................... 18

19 *United States v. Dreyer*
20     804 F.3d 1266 (9th Cir. 2015) (en banc) ...................................................... 5, 13

21 *United States v. Eleuterio*
       2024 WL 1620383 (D.V.I. Apr. 15, 2024) ....................................................... 18
22
   *United States v. Gerena*
23     649 F. Supp. 1179 (D. Conn. 1986) ............................................................... 5, 6

24 *United States v. Khan*
       35 F.3d 426 (9th Cir. 1994) ................................................................................ 5
25
   *United States v. McArthur*
26     419 F. Supp. 186 (D.N.D. 1975) .................................................................... 5, 6

27 *United States v. Red Feather*
28     392 F. Supp. 916 (D.S.D. 1975) .................................................................. 5, 18

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3
*United States v. Walden*
    490 F.2d 372 (4th Cir. 1974) .......................................................................... 1, 4, 5

4

5
*United States v. Yunis*
    924 F.2d 1086 (D.C. Cir. 1991)................................................................5, 10, 18

6

*Wrynn v. United States*
7
    200 F. Supp. 457 (E.D.N.Y. 1961) ................................................................. 5, 19

8
**STATUTES**

9
United States Code, Title 10
    §§ 251-254............................................................................................................ 21
10
    §§ 271-284............................................................................................................ 21
11
    § 275................................................................................................................ *passim*
    § 375..................................................................................................................... 18
12
    § 12405 ................................................................................................................. 19
    § 12406 ........................................................................................................... *passim*
13
    § 12406(3) ............................................................................................................ 19

14
United States Code, Title 18
15
    §112...........................................................................................................................6
    §351...........................................................................................................................6
16
    §831...........................................................................................................................6
    §1116.........................................................................................................................6
17
    § 1385 ......................................................................................................... 1, 6, 19
    §1751.........................................................................................................................6
18

19
Posse Comitatus Act (PCA) ................................................................................. *passim*

20
**CONSTITUTIONAL PROVISIONS**

21
United States Constitution
    Fourth Amendment ................................................................................................ 19
22
    Article I § 8, cl. 15-16 .............................................................................................. 1

23

24

25

26

27

28

**INTRODUCTION**

"The policy that military involvement in civilian law enforcement should be carefully restricted has deep roots in American history."  *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974).  In drafting the Declaration of Independence in 1776, Thomas Jefferson specifically criticized King George III for "render[ing] the Military independent of and superior to the Civil Power" and objected to the king's orders that "kept among us, in Times of Peace, Standing Armies without the consent of our Legislatures."  The Declaration of Independence paras. 13-14 (U.S. 1776).  The Nation's Founders memorialized that objection in several provisions of the Constitution, including the Militia Clauses, which reserve for Congress the authority to call forth the militia.  U.S. Const. art. I, § 8, cl. 15-16.  And in 1878, Congress further codified these principles in passing the Posse Comitatus Act and prohibiting the military from engaging in civilian law enforcement or executing the law domestically.  18 U.S.C. § 1385.

Defendants' stationing of federal troops—the federalized National Guard and, until recently, the Marines—in the Nation's second-largest city flies in the face of these founding principles.  For nearly 60 days, the residents of Los Angeles and its surrounding regions have been subjected to a form of military occupation, with federal troops working alongside federal civilian law enforcement agents, often indistinguishable from each other, including while civilian law enforcement agents are engaged in operations in communities.  Even as Defendants acknowledge that the Posse Comitatus Act prohibits members of the military from engaging in civilian law enforcement activities, the military has done exactly that by impeding the free movement of civilians by forming perimeters and blockades on public roads and sidewalks, apprehending or detaining civilians, and participating in ICE raids across Southern California.

Defendants have violated the Posse Comitatus Act and will continue to do so absent judicial intervention.  This Court should therefore grant injunctive relief.

**BACKGROUND**

Plaintiffs incorporate by reference the Statement of Facts set forth in their motion for preliminary injunction.  ECF No. 77 at 2-9.

**I.    DEFENDANTS HAVE CONTINUED TO VIOLATE THE POSSE COMITATUS ACT.**

At the time that Plaintiffs filed their motion for preliminary injunction, Task Force 51[1] troops were already pervading civilian law enforcement activities by accompanying Immigration and Customs Enforcement officers on as many as 75 percent of their at-large daily enforcement missions in Los Angeles (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7)),

████████████████████████████████████████████████████████████████; ECF No. 39-1, Espíritu Decl., Exs. 2, 3), ████████████████████████████████████████████████████████████████████████████, and ████████████████████████████████████████. See also Reilley Decl., Exs. 5-10 (showing federalized National Guard soldiers participating in federal law enforcement operations in Los Angeles).

Since Plaintiffs filed their motion for preliminary injunction, the evidence of Task Force 51's direct and active involvement in civilian law enforcement operations has only grown more extensive.  On June 19, 2025, Defendants deployed ███████████ federalized National Guard troops to Mecca, California—over 100 miles east of Downtown Los Angeles—███████ ██████████████ during a law enforcement operation at a cannabis farm. ████████████ ████████████████████████████; *Id.*, Exs. 14-18.  The federalized National Guard troops engaged in civil law enforcement activity by forming a "security perimeter" around the marijuana farm where the operation was taking place, thereby preventing civilians from entering and exiting.  *Id.*, Exs. 14-18.

_____

[1] Task Force 51 is the U.S. Army North's Contingency Command Post.  All military personnel that have been deployed to Los Angeles—including federalized National Guard soldiers and Marines—are under the command and control of Task Force 51.  Reilley Decl., Ex. 19.

1    Then, on July 7, 2025, Defendants ordered ████████████ federalized National Guard

2    troops to Los Angeles's MacArthur Park in support of an operation ████████████████

3    ████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ██████████████████████████████. Defendants deployed these federalized National Guard

6    troops to MacArthur Park ████████████████████████████████████████████████

7    ████████████████████████████████████████████ This deployment of

8    federal troops occurred ████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   And most recently, on July 10, 2025, federalized National Guard troops ████████████

13   ██████████ during law enforcement operations at cannabis farms in Camarillo, California (which

14   is over 50 miles from Downtown Los Angeles) and Carpinteria, California (which is over 80

15   miles north of Downtown Los Angeles). ████████████████████████████████████████

16   ██████████████████████. Like that at MacArthur Park, ██████████████████████, yet

17   Defendants nevertheless ordered the federalized National Guard troops to participate. ████████

18   ████████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████

21   ██████████████████████████████████████████. During both operations,

22   federalized National Guard troops engaged in civilian law enforcement activities by forming

23   "security perimeters" on public property, thereby impeding the free movement of civilians, and

24   were stationed immediately adjacent to federal law enforcement agents also engaged in perimeter

25   control. *Id.*, Exs. 22-23; Solorzano Decl., Exs. A and B; Flores-Haro Decl., Exs. A-P.

26   On at least two occasions, the federal troops have gone even further in their law

27   enforcement activities by apprehending and detaining civilians. During the Carpinteria operation,

28   federalized National Guard troops apprehended a protestor, restraining her movement and

3

1  attempting to physically move her across the perimeter that the troops had established on a public

2  road.  Solorzano Decl., Ex. B.  And early in the deployment, on June 13, 2025, a Task Force 51

3  Marine detained a civilian ███████ at the Wilshire Federal Building in Los Angeles. ███████

4  ███████████.  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  **II.    NEARLY 2,000 FEDERALIZED NATIONAL GUARD TROOPS REMAIN DEPLOYED.**

8        In recent weeks, Task Force 51 has released approximately half of the federalized National

9  Guard troops, as well as all of the Marines, who had been deployed to Los Angeles.  Reilley

10  Decl., Ex. 13 (Harrington Dep. Tr. 31:11-32:3, 33:10-17).  However, nearly 2,000 federalized

11  National Guard troops remain in Los Angeles, and the federal military commanders of those

12  troops continue to respond to requests for assistance from federal law enforcement agencies.  *Id.*,

13  211:19-212:7.  At the time Plaintiffs' preliminary injunction motion was filed, Defendants'

14  deployment of Task Force 51 had already caused serious harm to Plaintiffs by escalating tensions

15  within the city and reigniting protests.  ECF No. 77 at 26-27.  The damage continues.

16  Defendants' ongoing use of federalized troops to conduct civil law enforcement sows chaos and

17  fear daily throughout Southern California.

18                              **ARGUMENT**

19        Plaintiffs are likely to succeed on the merits of their *ultra vires* claim based on Defendants'

20  violations of the Posse Comitatus Act.  And as set forth in Plaintiffs' motion for preliminary

21  injunction, the remaining equitable factors also favor injunctive relief.  ECF No. 77 at 26-30.

22  Accordingly, the Court should grant Plaintiffs' motion and issue an injunction.

23  **I.    DEFENDANTS HAVE VIOLATED AND ARE VIOLATING THE POSSE COMITATUS ACT.**

24        **A.    The Posse Comitatus Act Bars Civilian Law Enforcement by the Military.**

25        The Court's "interpretation of the scope and importance of the letter and spirit of the Posse

26  Comitatus Act . . . is influenced by the traditional American insistence on exclusion of the

27  military from civilian law enforcement."  *United States v. Walden*, 490 F.2d 372, 376 (4th Cir.

28  1974).  In its simplest form, the Posse Comitatus Act prohibits military personnel from directly

4

engaging in civilian law enforcement activities. *See United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (en banc). Courts apply three tests to determine whether particular activities run afoul of the law. *United States v. Yunis*, 924 F.2d 1086 (D.C. Cir. 1991) (adopting tests set out in *Yunis*, 681 F. Supp. at 892). "If any one of these tests is met, the assistance is not indirect," and the PCA has been violated. *Dreyer*, 804 F.3d at 1275 (quoting *United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994).

**First**, courts consider "whether civilian law enforcement agents made 'direct active use' of military personnel to execute the laws." *Yunis*, 681 F. Supp. at 892 (quoting *United States v. Red Feather*, 392 F. Supp. 916, 921 (D.S.D. 1975)); *see Dreyer*, 804 F.3d at 1275. Under this test, mere use of military equipment does not violate the Posse Comitatus Act, but active use of military *personnel* does. *Yunis*, 681 F. Supp. at 892. For example, the use of Marines as undercover agents actively investigating crime or the active direct participation of Air Force helicopter pilots flying an Air Force helicopter to search for an escaped civilian prisoner both violated the Posse Comitatus Act. *Red Feather*, 392 F. Supp. at 924 (citing *United States v. Waldern*, 490 F.2d 372 (4th Cir. 1974) and *Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y. 1961)).

**Second**, courts consider "whether 'use of any part of the Army or Air Force pervaded the activities' of the civilian law enforcement agents." *Yunis*, 681 F. Supp. at 892 (quoting *United State v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974)). For example, in *Dreyer*, the court found that the Naval Criminal Investigative Service's investigation "pervaded the actions of civilian law enforcement" where an NCIS agent conducted an investigation that extended statewide and "was not reasonably tied to military bases, military facilities, military personnel, or military equipment." 804 F.3d at 1275-76.

**Third**, courts consider "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *Yunis*, 681 F. Supp. at 892 (citing *United States v. McArthur*, 419 F. Supp. 186 (D.N.D. 1975)); *see Dreyer*, 804 F.3d at 1275. "A power regulatory in nature is one which controls or directs." *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986). "A power proscriptive in nature is one that

prohibits or condemns." *Id.* And a "power compulsory in nature is one that exerts some coercive force." *Id.* As with the use of equipment, "[t]he borrowing of highly skilled personnel . . . for a specific, limited, temporary purpose" is permissible. *Id.* (quoting *McArthur*, 419 F. Supp. at 194). But the use of military personnel to establish "roadblocks" and "an armed perimeter" is "regulatory, proscriptive, or compulsory" because "these activities directly restrain[] plaintiffs' freedom of movement," thereby violating the Posse Comitatus Act. *Bissonette v. Haig,* 776 F.2d 1384, 1391 (8th Cir. 1985).

The Department of Defense has itself issued statutorily mandated guidance regarding what specific activities violate the Posse Comitatus Act and would meet these tests. Via 10 U.S.C. § 275, Congress ordered the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter [which includes § 12406] does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps, in a search, seizure, arrest, or other similar activity." The Department of Defense duly issued 3025.21 Defense Support of Civilian Law Enforcement Agencies, Change 1, dated February 18, 2019 ("DoDI 3025.21"), which states that "DoD shall be prepared to support civilian law enforcement agencies . . . while recognizing and conforming to the legal limitations on direct Department of Defense involvement in civilian law enforcement activities." DoDI 3025.21 states that "[s]upport of civilian law enforcement agencies by Department of Defense personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385 (also known and hereinafter referred to as 'The Posse Comitatus Act, as amended') of title 18, U.S.C." And it prohibits Department of Defense personnel from providing forms of direct civilian law enforcement assistance, including arrests, apprehensions, security functions, crowd and traffic control, and operating, manning, or staffing checkpoints. DoDI 2035.21, Encl. 3 at 1.c.(1).

Consistent with the restrictions imposed by DoDI 2035.21, ████████████████

6

1 ██████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ████████████████████████████████████████ █ ████████

4 ██████, Task Force 51 troops were "specifically told" they could not "imped[e] vehicle or

5 pedestrian traffic."  Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18).

6      Thus, to the extent they engage in any of the above-described prohibited conduct,

7 Defendants violate the Posse Comitatus Act—not to mention their own regulations and 10 U.S.C.

8 § 275.

9      **B.**    **Defendants Have Violated the Posse Comitatus Act Under Each of the**
          **Three Applicable Tests.**

10

11      Defendants' activities have violated the Posse Comitatus Act when analyzed under each of

12 the three applicable tests.[3]  And they have shown that they will continue to violate the Posse

13 Comitatus Act for as long as they are allowed to keep military personnel stationed in Los Angeles

14 unchecked by judicial review.

15      **1.**    **Defendants Are Making Direct, Active Use of Military Personnel to**
          **Execute the Laws.**

16

17      Since the time they were deployed to Los Angeles, Task Force 51 troops have continually

18 played a direct, active role in civilian law enforcement activities, in violation of the Posse

19 Comitatus Act.  Specifically, Task Force 51's direct, active involvement in law enforcement

20

21    [2] Despite the fact that both DoDI 2035.21 ████████████████████████████
████████████████████ prohibit crowd control, arrests, and apprehensions,

22 ██████████████████████████████████████████████████

23 ████████████████████████████████████.

24     As noted in the parties' joint response to consolidation, Plaintiffs have had limited
opportunity to engage in discovery in this action and therefore object to consolidation to the

25 extent they are prejudiced in presenting their case on the expedited discovery set by the Court and
without full discovery.  *See Hooper v. City of Seattle*, 2020 WL 3100855, at *2 (W.D. Wash. June

26 11, 2020).  Plaintiffs note that the best evidence of Defendants own actions is in Defendants', not
Plaintiffs', possession, and that the expedited timeline for trial has limited their ability to obtain

27 testimony from third-party eyewitnesses.  However, Plaintiffs submit that even the expedited
discovery they have obtained to date supports a finding that Defendants have violated the PCA.

28 To the extent the Court finds otherwise, Plaintiffs renew their request that they be permitted leave
to seek fulsome discovery before the Court rules on the merits of their claim.

7

1    activities has thus far fallen into three categories: (1) performing security functions during federal

2    law enforcement operations, (2) forming armed perimeters and blockades that restrict the free

3    movement of civilians, and (3) apprehending and detaining civilians.  Each of these violates the

4    Posse Comitatus Act.

5                    **i)        Federalized National Guard Troops Have Performed Security**
                                **Functions During Civil Law Enforcement Operations.**
6

7           First, Task Force 51 troops have played an active, direct role in federal law enforcement

8    activities since the outset of the deployment by performing security functions during federal law

9    enforcement operations.  See ECF No. 25-4, Knell Decl. ¶¶ 7-8 (attesting that Task Force 51

10   troops are "protecting federal personnel performing official functions . . . at designated locations

11   through security patrols, observation posts, and outer cordon security perimeter of buildings" and

12   listing assignments, including "continu[ing] to provide protection for ICE Officers, Customs and

13   Border Protection Officers, and Federal Bureau of Investigations Special Agents performing

14   official functions so that such federal personnel may carry out their assigned duties").  By their

15   own statutorily mandated guidance, Defendants acknowledge that directly providing "security

16   functions" for civilian law enforcement agents is a violation of the Posse Comitatus Act.  DoDI

17   2035.21, Encl. 3 at 1.c.(1).  Yet by their own admissions, Defendants have ordered Task Force 51

18   troops to actively provide security during civil law enforcement operations on a near-continuous

19   basis since the deployment began.  See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-

20   77:7); *Id.*, ███████████████████████████████████████████

21   ████████████████████████████; ECF No. 39-1, Espíritu Decl., Exs. 2, 3.

22   ████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ███████████████████████████████████████████, this is a distinction

26   without a difference.  Regardless of whether Defendants' activities are characterized as providing

27   "protection" or "security," Defendants violate the Posse Comitatus Act by directly and actively

28   engaging in such activities.

                                                    8

Defendants have previously attempted to draw an artificial distinction between providing security for law enforcement agents and participating in law enforcement activity. See ECF No. 84 at p. 24. But Defendants' argument ignores the fact that, but for the current deployment, the security functions that Task Force 51 troops are performing would otherwise be performed by federal law enforcement agents themselves. See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 33:10-17) ("I mean anyone can be a quick reaction force in the sense that if you have enough personnel to be able to do – have that luxury to have a team, it all depends in what capacity and what instance."); see also ECF No. 8-1, Espíritu Decl., Ex G at 53 (describing ICE military-style actions). This fact is fatal to Defendants' position. Activities conducted by military personnel that could and would otherwise be performed by law enforcement agents do not cease to be "civil law enforcement" by recharacterizing them as "force protection" of a less-than-desired number of available civilian law enforcement personnel. Defendants' effort to minimize the use of the federalized National Guard to their law enforcement mission is also flatly contradicted by prior testimony. Ernesto Santacruz, ICE's Enforcement and Removal Operations Field Office Director for Los Angeles, attested under oath that "[t]he National Guard has been extremely helpful . . . by protecting federal property and personnel during immigration enforcement operations" and that "[h]aving the National Guard at our fingertips as a Quick Reaction Force is key to maintain officer safety and continuing our immigration enforcement operations." ECF No. 84-1, Santacruz Decl. ¶ 9. [4] Having so heavily emphasized the use of the federalized troops to their mission, Defendants' contrived, paper-thin distinction between protecting law enforcement and engaging in law enforcement activities is not credible. As Defendants asserted, the security functions

---

[4] Despite his repeated attestations before this Court and the Ninth Circuit about the importance of the federalized troops to ICE operations and officer safety, Santacruz repeatedly disavowed any knowledge of what the National Guard actually did to protect ICE officers or assist operations. See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 31:20-32:24 ("What exactly was the National Guard doing to protect those officers in at large operations?" "Well, it is hard for me to say. I am not boots on the ground. I am not an employee on the ground to have seen or witness what they were actually doing"); id., at 62:23-63:10 ("Can you provide a specific example based on the operation that has been completed as to what it looks like when the National Guard precents obstruction of ICE officer's duties?" "Like I mentioned, before, I am not on the ground to see what took place or how it happened as, of course, the position and level I am in, I sit at the command center, so I don't have firsthand knowledge of how that looks like."). Santacruz's most recent testimony calls into question the veracity of his prior statements.

1    engaged in by Task Force 51 troops are an integral part of the law enforcement operations being

2    carried out by federal agents.

3         Defendants' other attempts to characterize Task Force 51's involvement in security

4    functions as passive are also unavailing and contradicted by the evidence.  See, e.g., Reilley

5    Decl., Exs. 5-10, 14-18, 22-23; Solorzano Decl., Ex. B; ECF No. 39-1, Espíritu Decl., Exs. 2, 3

6    (depicting active involvement by Task Force 51 troops in civil law enforcement operations).

7    Providing security for federal law enforcement officers necessarily involves participating in law

8    enforcement operations planning, accompanying law enforcement officers on field operations,

9    conducting continuous surveillance, apprehending civilians, and controlling crowds, all which

10   amount to direct and active participation in law enforcement activities.  See *Yunis*, 681 F. Supp.

11   At 892 (noting that courts have found Posse Comitatus Act violations where military personnel

12   are "both visible and involved" in a law enforcement operation).

13        There is no dispute that Task Force 51 troops have continuously partaken in security

14   functions since the deployment began.  Because these security activities constitute direct and

15   active law enforcement activity, Defendants have violated the Posse Comitatus Act.

16              ii)    **Federalized National Guard Troops Have Formed Armed
                       Perimeters and Blockades.**
17

18        Similarly, Task Force 51 troops have routinely actively and directly engaged in the

19   formation of armed perimeters and blockades, both within and beyond the city limits of Los

20   Angeles, in violation of both the Posse Comitatus Act and the Department of Defense's own

21   guidance.  See *Bissonette*, 776 F.2d at 1391 (the formation of armed perimeters by military

22   personnel violates the Posse Comitatus Act); DoDI 2035.21 (prohibiting "security functions" and

23   "crowd and traffic control"); ███████████████████████

24   ████████████████████████████

25        Defendants have conceded that the Posse Comitatus Act prohibits Task Force 51 troops

26   from taking any action that "imped[es] vehicle or pedestrian traffic," Reilley Decl., Ex. 13

27   (Harrington Dep. Tr. 105:8-18) and have denied any knowledge of federalized National Guard

28   troops forming perimeters during field operations (*Id.*, Ex. 26 (Response to Interrogatory No.

14)); *see Bissonette*, 776 F.2d at 1391 ("direct[] restrain[t]" of pedestrians' "freedom of movement" violates the Posse Comitatus Act). But Defendants' denial is belied by numerous photographs and videos that clearly show federalized National Guard troops forming perimeters on public roads and sidewalks in Los Angeles (*Id.*, Exs. 5-10), forming a perimeter around a marijuana farm in Mecca, California (*Id.*, Exs. 14-18), and forming perimeters on public roads in Carpinteria, California (*Id.*, Exs. 22-23; Solorzano Decl., Exs. A and B) and Camarillo, California (Flores-Haro Decl., Exs. A-P). Indeed, even the Department of Defense's own Defense Visual Information Distribution Service—the mission of which is to "provide an accurate, reliable source for media organizations to access U.S. service members" (Reilley Decl., Ex. 27)—describes the conduct of the federalized National Guard troops as "establishing" and "providing" "security perimeter[s]" (*Id.*, Exs. 14-17, 22-23). And Defendants' own declarant, Ernesto Santacruz, who has significant law enforcement experience, further confirmed at his deposition that multiple of the above-cited images show federalized National Guard troops forming a perimeter. *Id.*, Ex. 1 (Santacruz Dep. Tr. 52:18-54:6, 54:16-55:4). Although Defendants may attempt to avoid conceding these Posse Comitatus Act violations by calling these perimeters by a different name, they cannot avoid the conclusion that the activities engaged in by the federalized National Guard troops are precisely the sort of "security function" and "crowd and traffic control" that the Department of Defense's own guidelines explicitly forbid. ██████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████.

Because federalized National Guard troops have actively and directly engaged in forming perimeters and barricades that impede the free movement of civilians, Defendants have violated the Posse Comitatus Act.

### iii) Task Force 51 Troops Have Apprehended and Detained Civilians.

Task Force 51 troops have also directly and actively engaged in the apprehension and detention of civilians, in violation of both DoDI 2035.21 (which prohibits "arrests," "apprehensions," and "other similar activities") ██████████████████████████████

1    ████████████████████████████████████████████████. *See also*

2    Reilley Decl., Ex. 13 (Harrington Dep. Tr. 177:20-178:6 (testifying that he cannot conceive of

3    "any scenario" where a Task Force 51 soldier would be able to temporarily detain a civilian who

4    is not committing any crime without violating the Posse Comitatus Act)).  Thus far, Plaintiffs

5    have identified two such apprehensions and detentions.

6         First, on June 13, 2025, a Task Force 51 Marine detained ███████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ██████████████████████████████  Defendants have attempted to downplay

10   this detention by claiming that it was temporary and noting that it took place on federal property,

11   but none of this changes the fact that a Task Force 51 Marine directly and actively engaged in the

12   quintessential law enforcement activity of detaining ████████████ a civilian—██████████

13   ████████████████████████████████████████████████████

14   ██████████████████

15        Second, on July 10, 2025, federalized National Guard troops apprehended a protestor in

16   Carpinteria, California, restraining her movement and attempting to physically move her across

17   the perimeter that the troops had established on a public road.  Solorzano Decl., Ex. B.  ████████

18   ████████████████████████████████████  the protestor whom the

19   federalized National Guard troops apprehended did not pose a threat to anyone and was not

20   committing any crime; rather, she was simply standing with a megaphone on the side of a *public*

21   road (which Defendants have presented no evidence they had lawful authority to limit access to).

22   *Id.*  And remarkably, the federalized National Guard troops directly engaged in this apprehension,

23   even though a Homeland Security Investigations police officer—who is authorized to conduct

24   civilian law enforcement activities and presumably would have apprehended the protestor himself

25   if he believed he had a justification for doing so—stood only a few feet away and did nothing.  *Id.*

26        Faced with the foregoing evidence, Defendants cannot credibly deny that the federalized

27   National Guard soldiers and Marines deployed to Los Angeles have engaged in the direct, active

28   apprehension and detention of civilians.  Such conduct violates the Posse Comitatus Act.

1

**2.    Defendants' Use of Military Personnel Pervades the Activities of Civilian Law Enforcement**

2

3      Defendants' conduct also violates the Posse Comitatus Act under the second test, because

4    the federalized National Guard soldiers have pervaded the activities of civilian law enforcement.

5    As explained by the Ninth Circuit in *Dreyer,* the military pervades the activities of civilian law

6    enforcement when it participates in law enforcement activities that are not "reasonably tied to

7    military bases, military facilities, military personnel, or military equipment."  804 F.3d at 1275-

8    76.

9      Defendants have pervaded the activities of civilian law enforcement by ordering federalized

10    National Guard soldiers to participate in law enforcement operations that have nothing to do with

11    the military.  Defendants' principal response is that the military is merely providing "security"

12    and "protection" that "is distinct from the military members' own engagement in ordinary law

13    enforcement."  ECF No. 25 at 20-21; *see* ECF No. 84 at 30.  Defendants appear to view that form

14    of assistance as an "indirect," rather than a "direct," form of law enforcement.  *See id.*  But that

15    characterization is inaccurate.  *See supra* pp. 7-9 (explaining why the security assistance provided

16    by deployed troops is an impermissible form of direct law enforcement); DoDI 2035.21 (defining

17    "direct civilian law enforcement activities" to include "security functions").

18      In any case, that characterization would not avoid a PCA violation.  As discussed above, if

19    any "one of [three] tests is met"—including pervasive entanglement— the PCA is violated.

20    *Dreyer*, 804 F.3d at 1275.  Here, military forces are pervasively intertwined with civilian law

21    enforcement activities.  Armed troops are working side by side with ICE agents in conducting

22    arrests and raids in the streets, homes, and workplaces of Los Angeles.  Until approximately two

23    weeks ago, federalized National Guard troops were involved in as many as 75 percent of the

24    Immigration and Customs Enforcement's at-large daily law enforcement operations in Los

25    Angeles, ██████████████████████████████████████████.  Reilley Decl., Ex.

26    1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7, 133:17-24); ████████████████████

27    ████████████████.  Indeed, beyond mere pervading, ████████████████

28    █████████████████████████████████████████████

1    ███████████████████████████████████████████████████████████████

2    ███████████████.  That substantial level of involvement makes increasing contact between the

3    military and civilians unavoidable, and there is a significant risk that the military's role will grow

4    to include other activities that are practically indistinguishable from urban policing operations.

5           The core mission of the federal military personnel, and the actions the federal troops have

6    taken to carry out that mission, has nothing to do with "military bases, military facilities, military

7    personnel, or military equipment," as they have had no plausible connection to the purpose of the

8    federalization order, which was "to temporarily protect" federal agents and federal property "at

9    locations where protests…are occurring or are likely to occur."  ECF No. 8-1, Espíritu Decl., Ex.

10   E.  For example, federalized National Guard troops have partaken in operations involving the

11   execution of search warrants on private property in Mecca, Camarillo, and Carpinteria, each of

12   which is over 50 miles away from the locations of the initial protests that gave rise to the

13   federalization order.  █████████████████████████████████████

14   █████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   █████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████ yet federalized National Guard soldiers were

19   nevertheless ordered to participate in this operation.

20          Similarly, on July 7, 2025, federalized National Guard troops mobilized to Los Angeles's

21   MacArthur Park in support of an operation ██████████████████████

22   ███████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████.  The federalized troops participated

25   in this operation ████████████████████████████████

26   ████████████████████████████████████████████████████████

27   █████████████████████████████████████████████████████

28   ████████████████████████.

1    These operations establish that Defendants are not placing any meaningful limitations on

2   the federalized National Guard troops' involvement in law enforcement activities.  To the

3   contrary, Defendants appear to be ordering federalized National Guard troops to participate in any

4   sizeable federal law enforcement operation that takes place within the greater Southern California

5   area. ███████████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████████████

7   ████████████  or simply to make continued use of the federalized Guard to justify the

8   continued federalization.  Either rationale, however, underscores a use of military personnel that

9   flies in the face of our nation's tradition of limiting military involvement in civil domestic law

10  enforcement and the purpose behind the Posse Comitatus Act.  Defendants are using the

11  federalized troops as a force multiplier to conduct their civil law enforcement aims, completely

12  unattached from the alleged purpose of the original federalization (concerning protests at federal

13  facilities in downtown Los Angeles), even setting aside the staleness of that initial invocation.  By

14  routinely partaking in such operations, the federalized National Guard troops are pervading the

15  activities of civilian law enforcement.

16    Moreover, when federalized National Guard soldiers do participate in federal law

17  enforcement operations, it is extremely difficult to differentiate the soldiers from the federal law

18  enforcement agents present.  This is due in large part to the fact that many federal agents wear

19  camouflage uniforms that are virtually identical to those worn by the federalized National Guard

20  troops.  Indeed, at their depositions, both Task Force 51 Deputy Chief of Staff Harrington and

21  Enforcement and Removal Operations Field Office Director Santacruz were unable to confirm

22  whether certain photographs taken of uniformed individuals throughout the deployment showed

23  federalized National Guard soldiers, ICE agents, or other federal agents.  Reilley Decl., Ex. 1

24  (Santacruz Dep. Tr. 84:20-86:18); Ex. 13 (Harrington Dep. Tr. 125:24-129:23).  Additionally, the

25  federalized National Guard troops and federal agents are often so thoroughly intermingled that it

26  is not readily apparent who is military and who is not. See, e.g., Reilley Decl., Exs. 22-23; Flores-

27  Haro Decl., Exs. A-P.  Because of this, when carrying out an operation together, the federalized

28  National Guard troops and federal law enforcement agents often appear to be part of one large,

amorphous force—a dynamic that further underscores Defendants' pervasion of law enforcement activities.

Defendants' contrary view of the Posse Comitatus Act would usher in a vast and unprecedented shift in the role of the military in our society.  If the Act allowed military forces to accompany ICE agents on raids and arrests in the manner unfolding across the Los Angeles area, there would be no logical basis to preclude members of the Armed Forces from accompanying other law enforcement agents when performing their duties.  Armed troops could, for example, accompany FBI agents, food safety inspectors with the Department of Agriculture, Fish and Wildlife agents, or Medicare fraud investigators when those civilian officials conduct searches, field interviews, interrogations, or other law enforcement operations; or accompany federal voting rights officials to "monitor" polling places during elections.  Virtually every federal agency has an investigative or enforcement arm.  And many might welcome armed support from the military.  Providing that support would magnify the ability of officials at every level of government to coerce and control individuals subject to their jurisdiction.  The Posse Comitatus Act was designed to protect against that kind of erosion of individual liberty.  *See generally Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999) ("The [PCA] reflects a concern, which antedates the Revolution, about the dangers to individual freedom and liberty posed by use of a standing army to keep civil peace.").

### 3.    Task Force 51 Troops Have Subjected Civilians to the Exercise of Regulatory, Proscriptive, or Compulsory Military Power.

Finally, Defendants have violated the Posse Comitatus Act by virtue of Task Force 51 troops' exercise of regulatory, proscriptive, or compulsory military power upon civilians.  As set forth above, Task Force 51 troops have repeatedly performed security functions for federal agents during field operations, formed perimeters and blockades on public roads and sidewalks, and apprehended and detained civilians.  See Section IV(A), *supra.*  These law enforcement activities "directly restrain" civilians' "freedom of movement" and therefore violate the Posse Comitatus Act.  *Bissonette*, 776 F.2d at 1391.

16

In addition, the very presence of the Task Force 51 troops in Los Angeles has had, and will continue to have, a proscriptive effect on the on the city's civilian population. Indeed, as admitted by the testimony of Defendants' own declarant, deterrence to "the public" is the point. See Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 74:1-3; 122:25-123:3) (testifying that "having the National guard there readily available . . . it was a huge deterrent for the public" and "the mere presence, that deterrent factor, would make someone from the public think twice of intervening"). This proscriptive effect is what prompted the concern raised by Thomas Jefferson about King George III's standing armies, *supra* p. 1, and it is the precise result that the Posse Comitatus Act was designed to prevent. Our nation's foundational principle of keeping the military out of civilian affairs has long served as a bulwark against the coercive control over civilians that is inherent to military rule. Each day that the federalized National Guard troops remain deployed erodes that bulwark and violates the Posse Comitatus Act.

## II. DEFENDANTS' RESPONSES TO PLAINTIFFS' CLAIMS LACK MERIT.

### A. Plaintiffs May Pursue an Ultra Vires Claim for Violation of the Posse Comitatus Act.

As a threshold matter, the Court should find, as it already recognized in granting Plaintiffs' TRO motion, that Plaintiffs may pursue an *ultra vires* claim based on Defendants' violation of the Posse Comitatus Act. ECF No. 64 at 27.[5] As they did with § 12406, Defendants seek to place their conduct entirely beyond the Court's review rather than engage with their compliance (or lack thereof) with the law, and they assert that Plaintiffs may not seek injunctive relief based on a violation of the Posse Comitatus Act because it is a criminal statute with no express cause of action. ECF No. 84 at 23. But Plaintiffs do not seek to find a private cause of action in the Posse Comitatus Act. Rather, they bring an *ultra vires* claim based on Defendants' failure to abide by the Posse Comitatus Act's specific prohibition on the use of the military to perform civil law

---

[5] At the TRO stage, Plaintiffs and the Court relied on out-of-circuit authority, see, e.g., *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 41 (D.D.C. 2021), but after further research and examination, that authority does not set out the appropriate standard for *ultra vires* claims in the Ninth Circuit. See, e.g., *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023). But even under the standard set forth in *Black Lives Matter*, Plaintiffs would have a valid ultra vires claim. ECF No. 64 p. 27.

enforcement functions.  As the Ninth Circuit has held, "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—i.e., *ultra vires* actions—are reviewable."  *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("plaintiffs advancing *ultra vires* claims must plead 'plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority'").

The Posse Comitatus Act's history confirms that this case involves exactly the type of conduct Congress sought to prevent in passing the Posse Comitatus Act.  The Posse Comitatus Act is "not just any act of Congress.  It is the embodiment of a long tradition of suspicion and hostility towards the use of military force for domestic purposes."  *Bissonette*, 776 F.2d at 1389. Congress passed the Posse Comitatus Act "in response to the use of military personnel to enforce laws in the South during the reconstruction period following the Civil War."  *Yunis*, 681 F. Supp. at 892; *see also United States v. Banks*, 539 F.2d 15, 16 (9th Cir. 1976).  "Although relying on the military to quell riots and rebellion had become common practice in the United States, Congress grew concerned that military personnel trained to fight wars would not be especially concerned with upholding and enforcing the constitutional rights of civilians."  *United States v. Eleuterio*, 2024 WL 1620383, at *2 (D.V.I. Apr. 15, 2024).  "Consequently, Congress set out in the Posse Comitatus Act to create a bright line separation between military duties and the duties of civilian law enforcement personnel."  *Id.*  The Posse Comitatus Act's "immediate objective . . . was to end the use of federal troops in former confederate states" and "to preclude the military from assisting local law enforcement officers in carrying out their duties."  *Yunis*, 681 F. Supp. at 892; *see also United States v. Red Feather*, 392 F. Supp. 916, 922-23 (D.S.D. 1975).  Later, Congress ordered the Secretary of Defense "to issue regulations prohibiting 'direct participation' by military personnel in a civilian 'search, seizure, arrest, or other similar activity' unless expressly authorized by law."  *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (quoting 10 U.S.C. § 375 (1988), renumbered at 10 U.S.C. § 275)).

Thus, Congress's intent was not merely to prevent the use of the military as a posse comitatus in the criminal context but to broadly bar military involvement in civilian law enforcement.  And because Defendants have disregarded that statutory command, Plaintiffs may

1    seek to put an end to their unlawful activity through an *ultra vires* cause of action.  *See Murphy*

2    *Co.*, 65 F.4th at 1131; *see also Bissonette*, 776 F.2d at 1388-91 (holding Plaintiffs in civil action

3    stated a claim for relief based on the Posse Comitatus Act and Fourth Amendment where they

4    alleged that the federal government and military personnel maintained roadblocks and an armed

5    perimeter that seized and confined them against their will).  The Supreme Court has made clear

6    that "when presented with claims of judicially cognizable injury resulting from military intrusion

7    into the civilian sector, federal courts are fully empowered to consider claims of those asserting

8    such injury." *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972).  "Nothing in our Nation's history . . . can

9    properly be seen as giving any indication that actual or threatened injury by reason of unlawful

10    activities of the military would go unnoticed or unremedied."  *Id.*  Plaintiffs rightfully seek to

11    remedy such an injury here.

12        **B.    Section 12406(3) Is Not an Exception to the Posse Comitatus Act.**

13        The Posse Comitatus Act is "a statute that is absolute in its command and explicit in its

14    exceptions." *Wrynn v. United States*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961).  It applies to all

15    conduct by the military "except in cases and under circumstances *expressly* authorized by the

16    Constitution or Act of Congress."  18 U.S.C. § 1385 (emphasis added); *see also* 10 U.S.C. § 275

17    (prohibiting "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in

18    a search, seizure, arrest, or other similar activity unless participation in such activity by such

19    member is otherwise authorized by law).  Defendants assert that 10 U.S.C. § 12406 provides an

20    exception such that federalized National Guard soldiers are not bound by the Posse Comitatus

21    Act, ECF Nos. 95 at 1 & 99 at 2-3, but no such express authorization can be found in that law.[6]

22    To the contrary, the statute immediately preceding section 12406 specifies that "[m]embers of the

23    National Guard called into Federal service are, from the time when they are required to respond to

24    the call, subject to the laws and regulations governing the Army," which includes the Posse

25    Comitatus Act.  10 U.S.C. § 12405.  Section 12406 makes no mention of the Posse Comitatus Act

26    _____

27        [6] Defendants do not, and cannot, assert that section 12406, which concerns only the
    federalization of the National Guard, applies to the Marines.  Thus, regardless of whether section

28    12406 is an exception to the PCA, all Marines deployed to Los Angeles were bound by the PCA
    and will remain bound during any future deployment.

1   or civilian law enforcement.  Because Congress did not expressly exclude section 12406 from the

2   restraints of the Posse Comitatus Act, the Court should decline Defendants' invitation to read an

3   exception into the law.

4       Defendants' litigation position that section 12406 is an exception to the Posse Comitatus

5   Act is directly contradicted by the views of Department of Defense leadership, who uniformly

6   concede that that the Posse Comitatus Act applies to the current deployment of federal troops.

7   Task Force 51 Deputy Chief of Staff Harrington testified that the federalized National Guard

8   troops are subject to the Posse Comitatus Act and are not allowed to engage in civilian law

9   enforcement.  Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14).  Not only

10  that, Harrington testified that when he raised the issue to the commanding general and at a

11  briefing, "everyone in the briefing agreed" that "as soon as California's National Guard troops

12  were called into federal service, they would be subject to the Posse Comitatus Act."  *Id.*  There

13  was no equivocation or confusion among the career military personnel executing the

14  federalization.  █████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████.

19      Moreover, Defendants' own guidance belies their litigation position.  As required by 10

20  U.S.C. § 275, the Department of Defense issued DoDI 3025.21, which acknowledges that "[t]he

21  primary restriction on Department of Defense participation in civilian law enforcement activities

22  is the Posse Comitatus Act" and provides guidance to ensure military activities do not violate the

23  Posse Comitatus Act.  DoDI 3025.21, Encl. 3, § 1.a.(1).  Defendants have confirmed that they are

24  required to follow DoDI 3025.21 with respect to Task Force 51's deployment to Los Angeles.

25  See Reilley Decl., Ex. 26 (Defendants' Responses to Interrogatories Nos. 1, 4, and 19).  DoDI

26  3025.21 identifies the limited categories of exceptions to the Posse Comitatus Act when "active

27  participation in direct law-enforcement-type activities" is permitted.  DoDI 3025.21, Encl. 3, §

28  1.a.(1).  Section 12406 is not found among those categories.  Actions in "specified circumstances

with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State or Federal law" are permitted, but only when taken pursuant to 10 U.S.C. §§ 251-254, *not* 10 U.S.C. § 12406. *Id.* § 1.b.(4). Similarly, Center for Law and Military Operations, Domestic Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) lists authorities that allow for direct DOD participation in civil law enforcement, omitting 10 U.S.C. § 12406. Thus, not only do Defendants' own regulations confirm that there is no exception to the Posse Comitatus Act could be read into § 12406 , but also Defendants would be acting in violation of their own regulations and the law that required they promulgate them, 10 U.S.C. § 275, in ordering § 12406 troops to engage in civilian law enforcement activities.

Defendants' acknowledgement in DoDI 3025.21 that § 12406 does not create an exception to the Posse Comitatus Act comports with other statutes, and with principles of statutory interpretation. Other acts of Congress creating an exception to the Posse Comitatus Act do so by "expressly grant[ing] authority for military assistance to civilian law enforcement." *United States v. Alvarado*, 2014 WL 12785138, at *3 (D.N.M. Nov. 20, 2014); *see, e.g.*, 10 U.S.C. §§ 271-284 (Chapter 15, Military Support for Civilian Law Enforcement). Section 12406 contains no reference to civilian law enforcement, let alone an express congressional authorization for federalized National Guard members to engage in civilian law enforcement activities.

The Court should accept Defendants' admissions and own regulatory guidance on the exceptions to the Posse Comitatus Act and should look to the plain text of and the lack of any express authorization in § 12406 creating an exception to the Posse Comitatus Act. The Posse Comitatus Act applies to the National Guard even when they are federalized under § 12406. And all of their activities must strictly abide by its restrictions.

///

///

///

PLAINTIFFS' SUPP. BRIEF ISO MTN. FOR PRELIMINARY INJUNCTION

1

**CONCLUSION**

2     The Court should grant Plaintiffs' motion and issue an injunction restraining Defendants

3  from continuing to violate the Posse Comitatus Act.  Because the Court has consolidated

4  Plaintiffs' motion for a preliminary injunction with a trial on the merits, that injunction should be

5  permanent.

6

7  Dated:  July 30, 2025                                    Respectfully submitted,

8                                                           **ROB BONTA**
                                                           Attorney General of California
9                                                          THOMAS S. PATTERSON
                                                           Senior Assistant Attorney General
10                                                         ANYA M. BINSACCA

11                                                         MARISSA MALOUFF
                                                           JAMES E. STANLEY
12                                                         Supervising Deputy Attorneys General
                                                           NICHOLAS ESPÍRITU
13                                                         BRENDAN HAMME
                                                           BARBARA HORNE-PETERSDORF
14                                                         LORRAINE LOPEZ
                                                           KENDAL MICKLETHWAITE
15                                                         MEGHAN H. STRONG
                                                           MEGAN RICHARDS

16
                                                           */s/ Jane Reilley*
17
                                                           JANE REILLEY
18                                                         Deputy Attorney General
                                                             455 Golden Gate Avenue
19                                                           San Francisco, CA 94110
                                                             Telephone: (415) 510-3879
20                                                           E-mail:  Meghan.Strong@doj.ca.gov

21                                                         *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

22

# CERTIFICATE OF SERVICE

Case Name:   _Newsom v. Trump_                              No.   **3:25-cv-04870-CRB**

I hereby certify that on <u>July 30, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**[REDACTED] PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**[REDACTED] DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (with Exhibits 1-30)**

**DECLARATION OF MONICA J. SOLORZANO (with Exhibits A-B)**

**DECLARATION OF GENEVIEVE FLORES-HARO (with Exhibits A-P)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 30, 2025</u>, at San Francisco, California.


<table>
<tr><td>M. Paredes</td><td>/s/ M. Paredes</td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SF2025303707
44735661.docx