# EXHIBIT 1

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

ERNESTO SANTACRUZ JR.                                        July 24, 2025
NEWSOM vs.TRUMP                                                         1

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   GAVIN NEWSOM, in his official
     capacity as Governor of the State
 5   of California; et al.,

 6                    Plaintiffs,

 7           vs.                 Case No. 3:25-CV-04870-CRB

 8   DONALD TRUMP, in his official
     capacity as President of the
 9   United States; et al.,

10                    Defendants.
     _____
11

12

13              VIDEOTAPED DEPOSITION OF

14               ERNESTO SANTACRUZ, JR.

15

16                    July 24, 2025

17                     9:36 a.m.

18

19              300 N. Los Angeles Street
                 Los Angeles, California
20

21

22

23

24         Rebecca Delgadillo, CSR No. 7021

25
```



1    Los Angeles, which is directly relevant to whether          09:37:55

2    defendants have violated the Posse Comitatus Act.

3           Defendants hereby put a continuing objection

4    on the record for the entirety of today's deposition to

5    any question concerning what DHS personnel are doing or     09:38:06

6    the purpose of any of their missions, including ICE, CVP

7    and any other non-DOD entity.  Those questions are

8    plainly outside the scope of what the court has

9    permitted and are irrelevant to whether defendants have

10   violated the Posse Comitatus act.                           09:38:23

11          Defendants also intend to object to any

12   questions as they arise.  They are outside the scope of

13   permissible deposition testimony.

14                  ERNESTO SANTACRUZ, JR.,

15   having been first duly sworn, testified as follows:        09:38:32

16                        EXAMINATION

17   BY MS. LOPEZ:

18       Q.    Okay.  Please state your full name for the

19   record.

20       A.    Ernesto Santacruz Junior.                         09:38:50

21       Q.    My name is Lorraine Lopez.  I am the Deputy

22   Attorney General for the State of California and I will

23   be conducting the deposition today, and I would like to

24   begin by going over some ground rules.

25          Have you ever given a deposition before?             09:39:06



1   heavily in that, so I would defer to FPS on their          10:03:12

2   accounts of requesting assistance.

3           You are asking specifically for me on what I

4   requested?

5       Q.   Correct, yes.  What kind of assistance would     10:03:26

6   ICE be requesting?  What would be that process?

7       A.   When the spike in officer assaults and

8   protesters becoming violent, when ERO was conducting at

9   large operations out in public, there was an increase of

10  officer assaults and protesters becoming violent and      10:03:50

11  impeding officers making arrests.

12          At that point we made a request, ICE-ERO made

13  a request to the DOD for National Guard personnel,

14  QRF's, quick reaction forces, to protect our federal

15  officers when they are conducting at large operations.    10:04:18

16      Q.   When you say "at large operations," what do

17  you mean by that?

18      A.   What we do on a daily basis.  We are on the

19  field enforcing immigration laws on a daily basis.

20      Q.   So when you do need a request -- I'm sorry --     10:04:41

21  when you do need assistance from the National Guard, to

22  whom do you submit a request?

23      A.   It went to the DOD liaison.

24      Q.   And would you be able to identify who that DOD

25  liaison is?                                                10:04:58



1          A.    Just like I mentioned earlier, the ones I were          10:10:41

2    personally involved in were made for at large teams that

3    were out in the field that had been encountering violent

4    protesters or members of the public who were impeding or

5    interfering with our daily operations.  So that was one          10:10:59

6    request.

7          Another request that I remember making was to

8    provide additional support at one of our detention

9    centers.

10         Q.    Are those the only two that you can recall          10:11:21

11   right now?

12         A.    Those are the only two that I think I was

13   personally involved in, but follow-ups were provided,

14   you know, where I spoke with liaison personnel with the

15   DOD to insure that we still had that constant level of          10:11:41

16   service from the DOD on those same two functions.

17         Q.    Are these two requests that you personally

18   were involved in, were they both granted?

19         A.    Yes.

20         Q.    Can you tell us for the first request relating          10:12:05

21   to protesters and potential violence, what support did

22   you receive from the National Guard?

23         A.    Can you repeat it one more time, please?

24         Q.    Of course.  For the first request involving

25   protesters and potential violence, what support did you          10:12:22



1  receive from the National Guard?                    10:12:27

2      A.   So they were both for the same purpose, right,

3  for the at large operations.   If I remember correctly,

4  we received -- I don't remember the actual number from

5  DOD folks that we received, but we received support for   10:12:44

6  each team that was out conducting at large operations

7  with a group of National Guard folks to be present with

8  them.

9      Q.   Where were these at large operations taking

10  place?                                                10:13:06

11      A.   All over.

12      Q.   When you say "all over," can you provide some

13  more specifics?

14      A.   All over the area of responsibility that I

15  oversee.                                              10:13:19

16      Q.   So these were multiple operations, correct?

17      A.   Yes.   These were daily operations.

18      Q.   So as part of those operations, how, to the

19  best of your knowledge, what exactly was the National

20  Guard doing to protect those officers in at large       10:13:41

21  operations?

22      A.   Well, it is hard for me to say.   I am not

23  boots on the ground.   I am not an employee on the ground

24  to have seen or witness what they were actually doing.

25  So it is hard for me to say what they actually did.     10:13:58



1          I know they were -- the purpose was for them          10:14:01

2     to be quick reaction forces in the event something

3     became where one of our officers was in harm's way or

4     was being attacked or something along those lines.

5          Q.   This term "quick reaction force," can you        10:14:18

6     please define what that means?

7          A.   It is basically a quick reaction force, as the

8     title says, it is a team that's readily available to

9     react in the event of an incident that may occur.

10         Q.   And a quick reaction force, is this only         10:14:42

11    specific to National Guard troops, or is this something

12    that existed before they were deployed?

13         A.   I mean the quick reaction force term has been

14    around forever.   I mean anyone can be a quick reaction

15    force in the sense that if you have enough personnel to   10:14:58

16    be able to do -- have that luxury to have a team, it all

17    depends in what capacity and what instance.

18         Q.   So prior to the National Guard's deployment,

19    ICE already had some sort of system for creating a quick

20    reaction force, correct?                                   10:15:17

21         A.   No.  Let me explain and clarify.

22         Q.   Please.

23         A.   So a quick reaction force -- let's say, for

24    example, I have an operation, I'm doing an operation.  I

25    can designate, right, if it's something small.  We are    10:15:28



1  to take a break before I ask anymore questions.          10:43:10

2          MR. HARTLIEB:  That's great.

3          THE VIDEOGRAPHER:  We are off the record at

4  10:43 a.m.

5          (Recess taken.)                                   10:43:18

6          THE VIDEOGRAPHER:  We are back on the record

7  at 10:57 a.m.

8  BY MS. LOPEZ:

9      Q.   Thank you.  I will go back to our discussion

10 about perimeters.  We'll continue that discussion about   10:58:02

11 perimeters.

12         I have a couple of photos that I would like to

13 show you.  If you could please turn to tab number 16 in

14 the binder in front of you.  For the record this is a

15 photo marked as plaintiff's 9.                            10:58:28

16         (Exhibit 9 marked)

17 BY MS. LOPEZ:

18     Q.   It's a photo from Carpinteria, California

19 dated June 10, 2025.  It is a photo taken by Sergeant

20 Chase Murray and it is from DVIDS website.  Can you take  10:58:41

21 a look at that photo for me, please?

22     A.   Yes.

23     Q.   Have you ever seen this photo before?

24     A.   I have.  I don't recall seeing this photo.

25     Q.   Any reason why you would think that this photo  10:59:02



1    is not an accurate depiction of current events?                10:59:05

2            MR. HARTLIEB:   Lack of foundation.

3    BY MS. LOPEZ:

4        Q.   You may answer.

5        A.   I mean based on what you are saying, other             10:59:20

6    than what it says on here, I don't know.

7        Q.   So I will ask you a couple questions.   So this

8    is from an operation that occurred in Carpinteria,

9    California.   Do you have any knowledge of that

10   operation?                                                      10:59:37

11       A.   I have very little knowledge of that

12   operation.

13       Q.   So just from looking at the photo, can you

14   tell me are the folks in camouflage your officers, ICE

15   officers or federal officers?                                   10:59:51

16       A.   I would not, based upon this photo, I would

17   not be able to tell you who that is.

18       Q.   Would you be able to -- let me rephrase that.

19   Do these look like National Guard soldiers to you?

20       A.   Like I said, without being to able to see up          11:00:17

21   close patches, I would not -- I mean obviously you see

22   that one individual that says "police" on it.   Then the

23   individual that is taking the picture on the right, it

24   says some type of markings.   I mean who is that?   It's

25   blurry.   I cannot make out who that actually is.              11:00:35



ERNESTO SANTACRUZ JR.                                    July 24, 2025
NEWSOM vs.TRUMP                                          54

1        Q.    Well, I will move on then.   Would you say this    11:00:41

2   is an example of what a perimeter would look like at an

3   operation?

4        A.    To me this looks like a perimeter due to the

5   protesters, seems like there is some protesters there,    11:00:58

6   right.

7        Q.    Correct.

8        A.    Sorry.  I have to bring this up because of the

9   light reflecting.  It looks like they formed some type

10  of perimeter, yes.                                          11:01:16

11       Q.    And for the record you are referring to the

12  folks you are identifying as protesters as the folks

13  being in front of the line of persons in camouflage?

14       A.    Correct, from the limited view that I can see,

15  yes.                                                        11:01:32

16       Q.    Now If you could turn to tab 17, which is the

17  next tab.  For the record, again, this is marked as

18  plaintiff's 12.  It is another photo taken from the

19  DVIDS website from Carpinteria, California dated June

20  10, 2025.  Again, a photo by Chase Murray.                  11:01:55

21            (Exhibit 12 marked)

22  BY MS. LOPEZ:

23       Q.    So in this photo is this -- you say this is

24  another example of a perimeter?

25       A.    Looks like a loose perimeter.  I don't see,      11:02:12



1    you know, the same amount of folks like I saw in the          11:02:14

2    previous picture that you mentioned.   It seemed like

3    there was more people in the same uniform across that

4    row.   Here I can see them kind of like staggered.

5        Q.   Would you just define what a loose perimeter         11:02:32

6    means?

7        A.   I just see a few individuals that are kind of

8    separated between, not necessarily like the previous

9    picture you showed.

10       Q.   And in this picture do you also see anyone           11:02:46

11   that would look like a protester or civilian outside of

12   that perimeter?

13       A.   I can vaguely see some folks standing on the

14   other side of those men in uniform.

15       Q.   In this instance where you do have a loose           11:03:05

16   perimeter, is the loose perimeter designed to keep those

17   folks from passing that boundary line?

18            MR. HARTLIEB:   Calls for speculation, lack of

19   foundation, lack of personal knowledge about this photo.

20            THE WITNESS:   I was not there.   So I can't say     11:03:18

21   what was actually going on in this photo.

22   BY MS. LOPEZ:

23       Q.   So would you be able to tell us just, again,

24   based on your experience and using this as an example of

25   a perimeter, would a loose perimeter like this be set up   11:03:33



```
 1   activity?                                                    11:12:44

 2        Q.   Of federal activities.  So how do they prevent

 3   your officers from carrying out their duties?

 4             MR. HARTLIEB:  Objection, vague.

 5   BY MS. LOPEZ:                                                 11:12:57

 6        Q.   So what is the National Guard doing that

 7   allows your officers to carry out their duties

 8   unobstructed?

 9        A.   Okay.  Now I understand the question.  Sorry.

10   All right.  So I can tell you right now our officers are     11:13:07

11   not working with DOJ at the moment.  I mean with

12   Department of Defense.  I mean you guys have seen the

13   media.  Things have scaled back.

14             But when we were using them, they were having

15   that presence out there in the event of something            11:13:35

16   happening allowing our officers to safely conduct their

17   work without having to obviously worry of protesters,

18   violent protesters that may impede their ability or to

19   effect an arrest while conducting at large operations.

20        Q.   Can you recall a specific example of what this     11:13:56

21   looks like?

22        A.   Can you be more specific?

23        Q.   Can you provide a specific example based on an

24   operation that has been completed as to what it looks

25   like when the National Guard prevents obstruction of ICE     11:14:10
```



1    officer's duties?                                          11:14:14

2         A.    Like I mentioned before, I am not on the

3    ground to see what took place or how it happened as, of

4    course, the position and level I am in, I sit at the

5    command center, so I don't have firsthand knowledge of    11:14:27

6    how that looks like.

7              But I know it provided a safety blanket for

8    our folks that were conducting these operations, at

9    large operations, and knowing that they had someone

10   available in the event that something turned violent.     11:14:46

11        Q.    Have any of your ERO personnel reported that

12   the mere presence of the National Guard has deterred any

13   sort of violent activity?

14        A.    I have had first account officers come to me

15   and say that they have been a tremendous help in the      11:15:13

16   sense of not only while protecting the federal

17   properties, but also from folks that are out in the

18   field.  That statement I made to a previous question is

19   an example of what they have mentioned to me.

20        Q.    All right.  So now let's move to tab three.    11:15:42

21   For the record we will be marking this as plaintiff's 3.

22              This is a document entitled Supplemental

23   Declaration of Ernesto Santacruz Junior.  Do you see the

24   document?

25        A.    Yes.                                            11:16:04



1    <u>And so having the National Guard there readily</u>    11:31:02

2    <u>available and when they were present, it was a huge</u>

3    <u>deterrent for the public.</u>  The protesters that were

4    violent in previous days, when we didn't have them, made

5    a huge difference, that they were readily available vs.    11:31:26

6    when we experienced some of the other events with L.A.

7    County Sheriffs and the LAPD where it was more of a

8    delayed response.

9         That delayed response caused significant

10   damage to not only our building but to some of our    11:31:49

11   officers as well.  Like I said, I can't speak on behalf

12   of those other local law enforcement agencies on the

13   delay, but I can attest that the National Guard being

14   there readily available during this period of time where

15   there was that civil unrest there for that period of    11:32:12

16   time helped out.

17        Q.   Would you say having the National Guard again

18   readily available, has that also assisted in field

19   operations outside of protecting federal buildings?

20        A.   It allowed for our officers to safely conduct    11:32:33

21   the work that they normally do on a daily basis in light

22   of the spike and increase of assaults on our federal

23   work force.

24        Q.   And how are the National Guard's protection

25   capabilities better than those of ICE or other federal    11:32:53



1    A.   No, not that I can recall.  I mean they just        11:34:33

2  pretty much, hey, we are here to protect federal

3  property, we are here to protect federal persons, which

4  includes federal personnel.

5    Q.   And I know we have been talking a lot about         11:34:44

6  the National Guard, but have the Marines had any

7  involvement in protecting federal officers during these

8  operations?

9         MR. HARTLIEB:  Lack of foundation.

10        THE WITNESS:  I don't recall.  I can't, like I      11:34:58

11  said, I wasn't on the ground or have oversight of the

12  DOD, so I would not know.

13  BY MS. LOPEZ:

14    Q.   So to your knowledge you are not sure if there

15  has been any involvement by the Marines in any of your    11:35:10

16  immigration enforcement operations?

17    A.   Not at large enforcement operations, no.

18    Q.   Thank you.  We have also talked a lot about

19  the role that the National Guard has played in

20  protecting your officers.  Have the National Guard        11:35:31

21  accompanied your officers on all operations at large?

22    A.   No, that is not a hundred percent accurate.

23    Q.   What percentage would you say they have

24  accompanied?

25    A.   I would say most.  I mean I don't know if I        11:35:50



ERNESTO SANTACRUZ JR.                                    July 24, 2025
NEWSOM vs.TRUMP                                                        77

1   <u>could put a percentage to that, but I would say most</u>          11:35:53

2   <u>during a certain period of time.</u>

3        Q.   <u>We are getting into estimation territory here,</u>

4   <u>okay.  When you say "most" would you say that's</u>

5   <u>75 percent or more?</u>                                             11:36:08

6        A.   <u>Taking a wild guess, I would say that's</u>

7   <u>accurate, about 75 percent.</u>

8        Q.   Thank you.  And what types of operations are

9   more likely to have National Guard support?

10       A.   Well, I know that, like I say, not speaking          11:36:38

11  for other ICE components that led their own operations

12  or any of the federal partners.

13           What I can say is I know that we had them for

14  protection of federal property, and then for ERO, which

15  also obviously encompasses FPS, because they are the          11:37:00

16  ones in charge of federal building protection.  And also

17  our at large operations.

18       Q.   At large operations would be field operations,

19  right?

20       A.   Field operations, correct.                          11:37:16

21       Q.   Would that include large scale operations?

22       A.   It has included large scale operations, yes.

23       Q.   Does that also include smaller scale

24  operations such as apprehending individuals?

25       A.   Those are field operations.  So those are all       11:37:31



ERNESTO SANTACRUZ JR.                                    July 24, 2025
NEWSOM vs.TRUMP                                                      84

1        Q.   Did your receive reports from any ERO          11:46:45
2    personnel as to what the National Guard did to protect
3    them?
4        A.   I did not receive any information regarding
5    that.                                                   11:46:54
6        Q.   Did ERO receive any guidance prior to that
7    operation as to the actions that the National Guard
8    troops could or could not take during the operation?
9        A.   Not to my knowledge.
10       Q.   So no other guidance was provided to ERO or    11:47:13
11   ICE as far as you know as to the limitations on the
12   troops?
13       A.   No.  The only thing I can say is that I know
14   they were there as a QRF.
15       Q.   So I will show you some photos from that       11:47:26
16   operation.  So let's go to tab 10.  So I will apologize
17   for the quality.  But in this photo it is marked as
18   plaintiff's --
19       A.   One?
20       Q.   It is marked as plaintiff's one but we already 11:48:04
21   have plaintiff's one.  So let's do plaintiff 5 for this
22   photo.
23            (Exhibit 5 marked)
24            MR. HARTLIEB:  Counsel, just to clarify the
25   record, I believe the last question said that operation, 11:48:11



1   but we were discussing two.  Can you identify and                11:48:14

2   provide some information about this?

3            MS. LOPEZ:  Yes, counsel.  So this photograph

4   is from the Camarillo operation.  So this would have

5   been the operation in Ventura County.                            11:48:25

6            THE WITNESS:  Okay.

7   BY MS. LOPEZ:

8       Q.   So have you ever seen this photograph before?

9       A.   I have.

10      Q.   Where have you seen it before?                          11:48:34

11      A.   I saw it at -- I'm not sure.  They all look

12  familiar obviously on social media and on platforms and

13  on websites.  I also saw it yesterday.

14      Q.   So fair to say you have seen it in the public

15  domain?                                                          11:48:51

16      A.   Correct, but I don't know if it is this exact

17  same photograph per se, but you see a lot of

18  photographs.

19      Q.   But to the best of your knowledge is there any

20  reason not to believe that this is an accurate              11:49:01

21  photograph?

22      A.   I mean I am just going on face value of what I

23  have in front of me, it is an open area, an open field.

24      Q.   Thank you.

25      A.   With a two lane road.                                   11:49:13



```
 1        Q.    And there are actually three photos here.    So    11:49:19

 2   if you take a quick look at all three photos, can you

 3   identify any ICE officers in these photos?

 4        A.    ICE officers?   That would be very hard to

 5   identify any ICE officers on here just because you see    11:49:41

 6   no patches.   It's hard to tell based on the photo, the

 7   quality of the photo, the patches.   I can only make out

 8   one agency.

 9        Q.    What agency is that?

10        A.    Border Patrol.                                     11:49:56

11        Q.    Do you see anyone that appears to be a

12   National Guard in these photos?

13             MR. HARTLIEB:   Object to lack of foundation as

14   to his knowledge what the National Guard looks like.

15             THE WITNESS:   It is hard to tell based on this    11:50:10

16   photo.   Like I said, we do have officers that have the

17   same uniforms as the National Guard or similar in

18   camouflage pattern, which is called multi-cam.

19   BY MS. LOPEZ:

20        Q.    So your counsel actually brought up a great       11:50:30

21   point, so I do want to ask you, before we go any further

22   with these photos, how are you able to identify between

23   federal agents and the military?

24        A.    Based on this photo?

25        Q.    Based on your experience.                         11:50:47
```



1    federal buildings.  That would be a question for them.      01:42:56
2    Did they make a difference.  And I am sure they would
3    agree it did make a difference for them.
4        Q.   Just to be clear, FPS would still be present
5    even if the National Guard is there to provide            01:43:08
6    protection, correct?
7        A.   I would defer that to them, but that's my
8    understanding, yes, they are present.
9        Q.   I know you had testified earlier that you had
10   heard from some of your officers that having the          01:43:19
11   National Guard present during operations has been
12   extremely helpful.
13           Can you provide more details as to what was it
14   about their presence that made them feel more secure in
15   doing their job?                                           01:43:32
16       A.   Just having that -- what they relayed to me
17   was just knowing that they didn't necessarily need to
18   look over their shoulders when effecting an arrest,
19   knowing they had someone that had their backs in a sense
20   while they are conducting enforcement action vs. during   01:43:49
21   a time when they didn't have them, and next thing you
22   know they have the public on them impeding or assaulting
23   our officers trying to pull the person that we are
24   trying to make an arrest of in a safe manner obviously
25   by having that mere presence, that deterrent factor       01:44:07



1  would make someone from the public think twice of        01:44:11

2  intervening in a law enforcement capacity when an arrest

3  is taking place.

4       Q.   For those officers that have made those kinds

5  of reports of feeling supported by the National Guard,    01:44:24

6  what did that support look like while they were out on

7  the field?

8       A.   Just what I mentioned, it was our QRF teams

9  that were out there.  I was not on the ground.  It is

10 hard for me to explain or give you a vision of something  01:44:41

11 I did not firsthand witness while being on the ground.

12      Q.   So just in hearing what you have described, it

13 seems the biggest benefit that your officers have said

14 is pretty much keeping the public away from them while

15 they do their, job correct?                               01:44:59

16      A.   Just keeping folks that have assaulted our

17 officers.

18      Q.   Let's see.  I want to focus obviously on

19 information that you know or at least should know,

20 right.  Again, focus on the safety of your officers.  Do  01:45:19

21 you know if there have been -- if the National Guard has

22 placed officers -- where they have placed officers in

23 order to provide that protection for your officers?

24      A.   The National Guard doesn't tell our officers

25 what to do, if I am reading your question correctly.      01:45:47



```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No.:  J13199804

 4    Case Caption:  Newsom vs. Donald Trump

 5

 6            DECLARATION UNDER PENALTY OF PERJURY

 7         I declare under penalty of perjury that I have

 8    read the entire transcript of my deposition taken in the

 9    above captioned matter or the same has been read to me,

10    and the same is true and accurate, save and except for

11    changes and/or corrections, if any, as indicated by me

12    on the deposition errata sheet hereof, with the

13    understanding that I offer these changes as if still

14    under oath.

15

16

17       Signed on the  28    day of  July             ,

18    2025.

19

20

21        ERNESTO M        Digitally signed by ERNESTO M
                           SANTACRUZ
22        SANTACRUZ        Date: 2025.07.28 16:19:06
                           -07'00'
23                       ERNESTO SANTACRUZ, JR.

24

25
```



1                    REPORTER'S CERTIFICATION

2

3        I, Rebecca Delgadillo, Certified Shorthand Reporter,

4    in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7    that the deposition was then taken before me at the time

8    and place herein set forth; that the testimony and

9    proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   That the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name this

15   26th day of July, 2025.

16

17

18

19                    *Rebecca Delgadillo*

20       _____

21              Rebecca Delgadillo, CSR No. 7021

22

23

24

25



# EXHIBIT 2

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 3

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 4

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 5

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**



# Soldiers provide protection for federal law enforcement in the greater Los Angeles area&#xA; [Image 8 of 9]



**LOS ANGELES, CALIFORNIA, UNITED STATES**

**06.11.2025**

**Photo by Sgt. Chase Murray** 🔊

**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe     5

U.S. Army Soldiers, assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in east Los Angeles, Calif., June 12, 2025. California National Guardsmen in their title 10 duty status shall not conduct traditional civilian law enforcement activities including arrest and search and seizure in connection with enforcement of the law.

U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.11.2025 |
| Date Posted: | 06.13.2025 09:56 |
| Photo ID: | 9107929 |
| VIRIN: | 250612-A-LV861-4738 |
| Resolution: | 1787x1048 |
| Size: | 925.23 KB |
| Location: | LOS ANGELES, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 107 |
| Downloads: | 5 |

**PUBLIC DOMAIN** 

This work, *Soldiers provide protection for federal law enforcement in the greater Los Angeles area [Image 9 of 9]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS




# EXHIBIT 6

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



Search DVIDS...

# Soldiers provide protection for federal law enforcement in the greater Los Angeles area&#xA; [Image 7 of 9]



**LOS ANGELES, CALIFORNIA, UNITED STATES**

**06.11.2025**

**Photo by Sgt. Chase Murray** 🔊

**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe       5

U.S. Army Soldiers, assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in east Los Angeles, Calif., June 12, 2025. California National Guardsmen in their title 10 duty status shall not conduct traditional civilian law enforcement activities including arrest and search and seizure in connection with enforcement of the law. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.11.2025 |
| Date Posted: | 06.13.2025 09:56 |
| Photo ID: | 9107928 |
| VIRIN: | 250612-A-LV861-5052 |
| Resolution: | 1548x681 |
| Size: | 840.27 KB |
| Location: | LOS ANGELES, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 116 |
| Downloads: | 6 |

**PUBLIC DOMAIN** 

This work, *Soldiers provide protection for federal law enforcement in the greater Los Angeles area [Image 9 of 9]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



## KEYWORDS

*No keywords found.*

## TAGS

U.S. Northern Command (USNORTHCOM)    U.S. customs and border protection

United States Department of Homeland Security
United States Immigration and customs enforcement

## OPTIONS

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662

dma.enterprise-customer-
services@mail.mil

FEATURES

UNITS

CONTENT

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts
Series

 



Version: aa8fc278e6d9f45b64bc8ea9b9bba482fdbd6908_2025-07-14T17:30:03

# EXHIBIT 7

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**





# California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 2 of 10]



**CALIFORNIA, UNITED STATES**
**06.13.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe    5

U.S. Army Soldiers assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in Los Angeles, June 13, 2025. California National Guardsmen in their Title 10 duty status shall not conduct traditional civilian law enforcement activities including arrest and search and seizure in connection with enforcement of the law. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.13.2025 |
| Date Posted: | 06.16.2025 12:47 |
| Photo ID: | 9111369 |
| VIRIN: | 250613-A-OX940-1087 |
| Resolution: | 3028x4209 |
| Size: | 5.22 MB |
| Location: | CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 65 |
| Downloads: | 3 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 10 of 10]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS



## ASSOCIATED NEWS

California Guard's 79th IBCT activated as brigade for first time in history

## CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

## TAGS

U.S. Northern Command (USNORTHCOM)    U.S. Customs and Border Protection

United States Department of Homeland Security
United States Immigration and Customs Enforcement

## OPTIONS

⤓ Register/Login to Download

DVIDS CONTROL CENTER
404-282-1450

WEB SUPPORT
dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE
1-888-743-4662
dma.enterprise-customer-
services@mail.mil

CONTENT
Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts
Series

UNITS

 



Version: aa8fc278e6d9f45b64bc8ea9b9bba482fdbd6908_2025-07-14T17:30:03

# EXHIBIT 8

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



Search DVIDS...

# California National Guard Soldiers provide protection for federal law enforcement [Image 3 of 10]



**CALIFORNIA, UNITED STATES**
**06.13.2025**
**Photo by Sgt. Chase Murray**
**Title 10 support to Department of Homeland Security**

Subscribe    5

U.S. Army Soldiers assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in Los Angeles, June 13, 2025. California National Guardsmen in their Title 10 duty status shall not conduct traditional civilian law enforcement activities including arrest and search and seizure in connection with enforcement of the law. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.13.2025 |
| Date Posted: | 06.16.2025 12:47 |
| Photo ID: | 9111370 |
| VIRIN: | 250613-A-OX940-1082 |
| Resolution: | 7008x2932 |
| Size: | 14.59 MB |
| Location: | CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 52 |
| Downloads: | 2 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers provide protection for federal law enforcement [Image 10 of 10]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# EXHIBIT 9

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



## California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 10 of 10]



**CALIFORNIA, UNITED STATES**
**06.13.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** Q 🔊

Subscribe    5

U.S. Army Soldiers, assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in Los Angeles, June 13, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.13.2025 |
| Date Posted: | 06.16.2025 13:51 |
| Photo ID: | 9111387 |
| VIRIN: | 250613-A-OX940-1075 |
| Resolution: | 4220x5626 |
| Size: | 12.11 MB |
| Location: | CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 50 |
| Downloads: | 4 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 10 of 10]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

## TAGS

U.S. Northern Command (USNORTHCOM)    U.S. Customs and Border Protection

United States Department of Homeland Security
United States Immigration and Customs Enforcement

## OPTIONS

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662
dma.enterprise-customer-
services@mail.mil

FEATURES

UNITS

CONTENT

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts
Series

 



Version: aa8fc278e6d9f45b64bc8ea9b9bba482fdbd6908_2025-07-14T17:30:03

# EXHIBIT 10

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



Search DVIDS...

# California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 5 of 10]



**CALIFORNIA, UNITED STATES**
**06.13.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe    5

U.S. Army Soldiers assigned to 1st Battalion, 160th Infantry Regiment, 79th Infantry Brigade Combat Team, 40th Infantry Division, California Army National Guard, provide protection to federal law enforcement personnel, property, and function during a federal operation in Los Angeles, June 13, 2025. California National Guardsmen in their Title 10 duty status shall not conduct traditional civilian law enforcement activities including arrest and search and seizure in connection with enforcement of the law. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.13.2025 |
| Date Posted: | 06.16.2025 12:47 |
| Photo ID: | 9111374 |
| VIRIN: | 250613-A-OX940-1057 |
| Resolution: | 7008x2932 |
| Size: | 13.48 MB |
| Location: | CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 55 |
| Downloads: | 5 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers provide protection for federal law enforcement in federal operation [Image 10 of 10]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 11

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 12

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 13

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)
# REDACTED

Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 54 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                      1

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5   GAVIN NEWSOM, in his        )
    official capacity as        )
6   Governor of the State of    )
    California, et al.,         )
7                               )
              Plaintiffs,        )
8                               )
         vs.                    )   No. 3:25-cv-04870-CRB
9                               )
    DONALD J. TRUMP, in his     )
10  official capacity as        )
    President of the United     )
11  States of America, et al.,  )
                                )
12            Defendants.        )
    _____ )
13

14

15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16             VIDEOTAPED DEPOSITION OF

17                WILLIAM HARRINGTON

18            LOS ANGELES, CALIFORNIA

19                 JULY 22, 2025

20

21

22

23
    Reported by:
24  LINDSAY JAGICH,
    CSR NO. 13889
25  JOB NO. J13199799



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 55 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                      2

1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5   GAVIN NEWSOM, in his          )
    official capacity as          )
6   Governor of the State of      )
    California, et al.,           )
7                                 )
              Plaintiffs,          )
8                                 )
           vs.                    )   No. 3:25-cv-04870-CRB
9                                 )
    DONALD J. TRUMP, in his       )
10  official capacity as          )
    President of the United       )
11  States of America, et al.,    )
                                  )
12            Defendants.          )
    _____)
13

14

15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17        VIDEOTAPED DEPOSITION OF WILLIAM

18     HARRINGTON, a witness herein, taken on

19     behalf of the Plaintiffs at 300 North Los

20     Angeles Street, 7th Floor, Los Angeles,

21     California, at 9:53 a.m. on Tuesday,

22     July 22, 2025, before Lindsay N. Jagich,

23     CSR No. 13889.

24

25



```
 1          THE VIDEOGRAPHER:  We are back on the record at

 2    9:55 a.m.

 3          THE REPORTER:  Counsel on Zoom, could you please

 4    restate your appearances.

 5          MS. STRONG:  Yes.  Good morning.  Meghan Strong     09:55:41

 6    with the California Department of Justice for Plaintiffs.

 7          MS. LOPEZ:  Lorraine Lopez, California

 8    Department of Justice for Plaintiffs.

 9          MS. LIN:  Jean Lin for the United States

10    Department of Justice for Defendants.                     09:56:01

11          MR. KURLAND:  Benjamin Kurland, Trial Attorney,

12    U.S. Department of Justice for Defendants.

13          THE REPORTER:  Good morning.  My name is Lindsay

14    Jagich, CSR Number 13889.

15          Would you please raise your right hand to be

16    sworn.

17    ///

18                    WILLIAM HARRINGTON,

19    a witness herein, having been duly sworn, was examined

20    and testified as follows:                                 09:56:28

21          THE WITNESS:  I do.

22          THE REPORTER:  Thank you.

23    ///

24    ///

25    ///
```



WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                              9

```
 1   ///
 2                        -EXAMINATION-
 3   BY MS. REILLEY:
 4       Q    Good morning, Mr. Harrington.
 5       A    Good morning, ma'am.                        09:56:30
 6       Q    To begin, would you please state and spell your
 7   full name for the record.
 8       A    William Harrington, W-I-L-L-I-A-M;
 9   H-A-R-R-I-N-G-T-O-N.
10       Q    My name is Deputy Attorney General Jane Reilley,  09:56:45
11   and I'll be taking your deposition today.
12            Have you ever given a deposition before?
13       A    No, ma'am.
14       Q    All right.  I'm sure your attorneys have briefed
15   you on the procedures; but before we get started, I would  09:56:57
16   just like to go over the ground rules for a deposition to
17   make sure we're all on the same page.
18            The most important thing to keep in mind today
19   is the oath you just took carries the same force and
20   effect as an oath you would take in a court of law, so   09:57:09
21   even though we're not in front of a judge or a jury
22   today, you have sworn to tell the truth to the best of
23   your ability.
24            And you understand that oath?
25       A    Yes, ma'am.                                 09:57:19
```



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 58 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    31

1    Brigade; and then the 2/7 Marines; and then since they've

2    been replaced, the 3/7 Marines.  So those three unit

3    headquarters -- the four total, but one's gone.  But

4    those headquarters input the information.

5        Q    Do you know specifically who from the          10:21:09

6    headquarters of each division is uploading this

7    information?

8        A    I do not.

9        Q    Do you know what their rank is?

10       A    I do not.                                        10:21:17

11       Q    Are all of the units that you just named, the

12   79th, the -- you said the 49th, and then the 3/7

13   Marines -- are all of those units still present in Los

14   Angeles today?

15       A    They are not.                                   10:21:38

16       Q    Which units are still present?

17       A    Well, the -- the 79th IBCT is still physically

18   present in -- in part because they're going through

19   what's called the demobilization process, but they are no

20   longer a subordinate headquarters of Task Force 51.  We   10:21:51

21   released OPCON, which is operational control, of them --

22   it was Thursday or Friday this past week.

23            The 3/7 Marines we released tactical control.

24   We did not have operational control over them because

25   they're a sister service.  They're Marines, and we're     10:22:10



Case 3:25-cv-04870-CRB   Document 127-2   Filed 07/30/25   Page 59 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                      32

1    <u>Army, so we have tactical control.  And we released</u>

2    <u>TACON -- it was Saturday or Sunday.  I think it was -- I</u>

3    <u>think it was -- it may have been Saturday</u>.

4    ███

5    ████████████████████████████                          10:22:31

6    ████████

7    ███

8    █████████████████████████████████

9    █████████████████████████████████

10   ███                                                   10:22:45

11   ███

12   ███

13   ████████████

14       Q    Do you have any estimate as to how long --

15       A    I think it can take up to two weeks.          10:22:57

16       Q    And the 3/7 Marines -- you said you released

17   TACON.

18            That's T-A-C-O-M for tactical control?

19       A    T-A-C-O-N.

20       Q    T-A-C-O-N.                                    10:23:08

21            And that's tactical control?

22       A    Yes, ma'am.

23       Q    ████████████████████████

24       A    █████████████████████

25   ████████████████████████████                          10:23:17



WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    33

1   ███████████████████ -- ███████████
2   █████████████████ -- ███████████
3   ████████████
4   █ ████████████████████████
5   ████████████                                   10:23:31
6   █ ███████████████████
7   ████████████████████████████
8   ████████ -- ████████████████
9   █████████████████

10      Q     Is it correct to say that the only troops who      10:23:46
11  are still subject to the operational or tactical control
12  of Task Force 51 at this point are the 49th Military
13  Brigade?
14      A     The 49th Military Police Brigade, yes, ma'am.
15      Q     And those are federalized National Guard troops;   10:24:04
16  correct?
17      A     Yes, ma'am.
18      Q     Okay.  All right.
19                ███████████████████
20  ████████████████████████████                               10:24:14
21  ████████████████████████████
22  █████████████ --
23      A     Yes, ma'am.
24      Q     -- is that correct?
25            And you do that on a daily basis?                 10:24:25



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 61 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                      41

1   for those facilities, functions, and personnel.

2       Q      During that June 7th briefing, was there any

3   mention of the Posse Comitatus Act?

4       A      Yes, ma'am.

5       Q      And in -- who --                              10:32:57

6       A      Bless you.

7       Q      -- mentioned the Posse Comitatus Act?

8              MR. EDELMAN:   Objection.   And I'm not sure what

9   the witness is going to answer -- answer will be, but if

10  any sort of description was provided by lawyers, then I    10:33:07

11  instruct the witness not to answer the question as being

12  attorney-client privileged.

13             Otherwise, you can go ahead and answer the

14  question.

15             THE WITNESS:   Okay.   No, I brought it up.   I    10:33:17

16  brought it up to the commanding general.   I mentioned the

17  fact that once -- if any National Guards were

18  federalized, that they would lose the ability to conduct

19  law enforcement because of the Posse Comitatus Act.

20             And he specifically said that the -- the -- any    10:33:32

21  soldiers that are sourced against the mission would not

22  be performing law enforcement functions.

23  BY MS. REILLEY:

24      Q      All right.   So suffice it to say you understood

25  what the Posse Comitatus Act was prior to this briefing;    10:33:42



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 62 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    42

1    is that correct?

2        A    Yes, ma'am.

3        Q    And you understood that as soon as

4    federalized -- excuse me -- as soon as California's

5    National Guard troops were called into federal service,    10:33:50

6    they would be subject to the Posse Comitatus Act?

7        A    Yes, ma'am.

8        Q    And everyone in the briefing agreed with you?

9        A    Yes, ma'am.

10        Q    And you were reassured that federalized National    10:33:59

11    Guard troops would not engage in any actions that would

12    violate the Posse Comitatus Act?

13        A    Correct.

14        Q    Was there any discussion at this June 7th

15    briefing about what specific activities NORTHCOM believed    10:34:14

16    federalized National Guard troops could engage in without

17    violating the Posse Comitatus Act?

18        A    No.  No, because we were the supporting agency.

19    The lead federal agency was DHS, so we didn't have an

20    understanding of what specifically they would be asking    10:34:35

21    us for until we -- until we were here.

22        Q    You mentioned DHS a moment ago.

23            Is DHS the lead federal agency for the entire

24    Federal Protection Mission?

25        A    Yes, ma'am.                                         10:34:50



WILLIAM HARRINGTON  Highly Conf. AEO                July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                64



1    Q

2    A                    --

3                         --

4

5                                              11:21:28

6

7

8

9

10                                             11:21:44

11

12

13

14

15                                             11:21:56

16

17

18

19

20                                             11:22:09

21

22

23

24

25   Q    All right.   And you mentioned before the break    11:22:23



Case 3:25-cv-04870-CRB     Document 127-2     Filed 07/30/25     Page 64 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                          July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                        65

1  that in Task Force 51's view, federalized National Guard

2  troops under the command of Task Force 51 are subject to

3  Posse Comitatus; is that correct?

4      A    Correct.

5      Q    So those federalized troops are not allowed to          11:22:46

6  engage in civilian law enforcement; correct?

7      A    They're not allowed to engage in law enforcement

8  activities, no.

9      Q    And that -- based on your role as a chief of

10  staff, you haven't seen any objections to that viewpoint     11:23:01

11  within Task Force 51 leadership; is that correct?

12     A    Well, first, I'm the deputy chief of staff.

13          But second, no, I've not seen anybody object to

14  that.

15     Q    All right.  Did the federalized National Guard      11:23:14

16  troops receive any training on which activities they are

17  not allowed to engage in because of the Posse Comitatus

18  Act?

19     A    Yes.

20     Q    And what sort of training did they receive?        11:23:27

21     A    ████████████  --  ██████████████████████

22  ████████████████████████████████████████

23  ██████████████████  ████████████████████████

24  ████████████████████████████████████

25  ██████████████████████                                       11:23:45



1  was -- we are not to impede vehicle or pedestrian

2  traffic.  That's a law enforcement function, and that has

3  to be done by either the local or the federal law

4  enforcement.

5      Q    To your knowledge, has there been any occasion          11:26:29

6  since June 7th where federalized National Guard troops

7  have blocked a public road?

8      A    Not that I know of.

9      Q    All right.  Turning your attention to Tab 7 of

10  the binder -- and I'm sorry.                                     11:26:50

11         As a housekeeping matter, I don't believe I

12  marked the last exhibit.  All right.

13  ████████████████████████████████

14  ████████████████████████████████████

15  ████████                                                         11:27:13

16  ████████████████████████████████████

17  ██████████████

18  ██████████████  ████████████████████

19  ██████████████████████████████████████

20  ██████████████████████████████████████              11:27:23

21  ████████████████████████████████████

22  ██████████████

23      MR. EDELMAN:  What tab are you at, counsel?

24      MS. REILLEY:  I'm at Tab 7.

25      MR. EDELMAN:  Just quick housekeeping matter.              11:27:43



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 66 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    69

 1          What do you have as Exhibit 3?

 2          MS. REILLEY:  I believe Exhibit 3 is the Sherman

 3   declaration.

 4          MR. EDELMAN:  Okay.  I have that as Exhibit 2,

 5   but we can --                                          11:27:55

 6          MS. REILLEY:  Exhibit 2 are your objections --

 7          MR. EDELMAN:  Okay.

 8          MS. REILLEY:  -- to the RFA's.

 9          MR. EDELMAN:  Okay.  Got it.

10          MS. REILLEY:  Okay.                             11:28:01

11          MR. EDELMAN:  Yeah.

12   ████████████  ████████████████████████

13   ████████████████████████

14   ████████████

15     ██  ████████████████████████████                    11:28:09

16     ██  ████

17     ██  ████████████████████

18     ██  ████████████████████

19     ██  ████████  ████████ ██ ██████████

20   ██████████████████████████████████                    11:28:18

21     █  ████████

22     ██  ██████████████████████████████

23   ████████████████████████████

24   ████████████████████

25     █  ████                                             11:28:30



```
1   BY MS. REILLEY:

2       Q    Not including federal property for the purposes

3   of this question.

4       A    Okay.  So -- okay.  Now that we've got all

5   the -- you know, it's clarified, can you repeat the        12:12:21

6   question one more time, please.  I'm sorry.

7       Q    Sure.

8            If federalized National Guard troops who are not

9   on federal property created any sort of perimeter or

10  barricade that prevented civilians from moving from one    12:12:34

11  place to another, would that violate the Posse Comitatus

12  Act?

13           MR. EDELMAN:  And I'll repeat the same

14  objections and in particular the vagueness regarding what

15  a "barricade" is.                                          12:12:45

16           THE WITNESS:  Well, that's impeding vehicle or

17  pedestrian traffic, which we've been specifically told

18  that we could not do.

19  BY MS. REILLEY:

20      Q    To your knowledge have any federalized National   12:12:57

21  Guard troops impeded vehicular or pedestrian traffic in

22  the course of this deployment to Los Angeles?

23      A    Not that I'm aware of.

24      Q    If that had taken place, would that have been

25  reported through the channel that you mentioned earlier?   12:13:12
```



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 68 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    125

1  BY MS. REILLEY:

2      Q    That is right, that you didn't receive the

3  memorandum until your attorney provided it to you?

4      A    Until Sunday.  Yes, ma'am.

5           The one we were just looking at?                    13:37:27

6      Q    Uh-huh.

7      A    Yes, ma'am.

8      Q    Okay.  All right.

9           Do you see the two pages that are at Tab -- Tab

10  15 of your exhibit binder, which will be Exhibit 8 to    13:37:46

11  this deposition?

12      A    Yes, ma'am.

13      Q    Do you recognize the first page of Exhibit 8?

14      A    No, ma'am.  I've never seen these photos before.

15      Q    And that's true of the second page as well?      13:37:59

16      A    Yes, ma'am.

17      Q    You've not seen those photos either?

18      A    I have not.

19      Q    All right.  Do you have any reason to believe

20  that these photographs are not accurate depictions?      13:38:08

21      A    As in they were fabricated?

22      Q    Correct.

23      A    I have no reason to believe that, no.

24      Q    Are you able to identify on the -- looking at

25  the first page of Exhibit 8, are you able to identify any   13:38:24



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 69 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    126

1    of the individuals shown in this photograph as Task Force

2    51 troops?

3        A    Definitively, no.  I mean, I see someone that

4    looks like a soldier, but I can't tell you.  You know,

5    he's kind of far away, so I can't see what his unit          13:38:42

6    patches are.  I don't -- I can't definitively say that's

7    someone in Task Force 51 or not.  I can't even read the

8    bumper numbers on this vehicle.  So no.

9        Q    With regard to the vehicle, are you able to

10   identify that as a Task Force 51 armored vehicle?           13:38:58

11       A    No, not definitively because the bumper numbers

12   are not clearly visible.  I don't know -- I mean, it's a

13   Humvee, but I don't know -- I can't say definitively

14   whose Humvee that is.

15       Q    Other than being unable to identify the bumper     13:39:22

16   numbers, is there anything about the appearance of the

17   vehicle that leads you to believe it's not a Task Force

18   51 vehicle?

19       A    Again, I can't say whose vehicle that is.  I

20   mean, I looked up just yesterday purchasing Humvees          13:39:40

21   online for personal use.  So, I mean, it's a Humvee.

22   Whose Humvee I can't definitively say.

23       Q    All right.  And you said you also can't

24   definitively say whether the -- the third individual from

25   the left is the -- the figure who appears to be wearing      13:40:00



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 70 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    127

1  fatigues -- you can't identify whether or not he or she

2  is a Task Force 51 troop?

3      A     No, ma'am, I cannot definitively say that.

4      Q     All right.  Turning to the next page, and

5  focusing on the picture on the left-hand side, are you          13:40:21

6  able to identify any of the photographs in this

7  left-hand -- excuse me -- any of the individuals in this

8  left-hand photo as a Task Force 51 troop?

9      A     No, ma'am.

10     Q     How about the individual on the right-hand          13:40:40

11 margin who appears to be wearing fatigues?

12           MR. EDELMAN:   And for clarity, counsel, you're

13 still referring to the picture on the left?

14           MS. REILLEY:   Correct.

15           MR. EDELMAN:   Okay.                                 13:40:51

16 BY MS. REILLEY:

17     Q     So this would be the individual, left-hand

18 photo, right-hand margin, who appears to be wearing

19 fatigues and holding an assault rifle.

20     A     I can't definitively say he's part of Task Force     13:41:04

21 51 either, and I don't recognize that unit patch that's

22 on his left shoulder.

23           And for -- for clarification, his weapon is an

24 M4.

25     Q     Is that the same -- you said "an M4"?                13:41:15



1    A    Yes, ma'am.

2    Q    Are Task Force 51 soldiers armed with M4's?

3    A    Yes, ma'am.

4    Q    And you said that you could not tell from the

5  unit patch; is that correct?                              13:41:29

6    A    I don't recognize the unit patch, no, ma'am.

7    Q    All right.  How about the photograph on the

8  right side, where it appears to show two individuals in

9  fatigues?  Are you able to identify whether either of

10 those two individuals are Task Force 51 troops?           13:41:51

11   A    No, ma'am.

12   Q    What about the individual in the foreground?  It

13 appears that there's a unit patch on his arm; correct?

14   A    Yes, ma'am.

15   Q    Are you able to identify that unit patch?          13:42:05

16   A    Yes, ma'am.

17   Q    And what unit patch is that?

18   A    That's the 25th Infantry Division, headquartered

19 in Hawaii.

20   Q    Okay.  And is there any reason why a troop from   13:42:16

21 the 25th Infantry Division headquartered in Hawaii would

22 be in Los Angeles on an ICE immigration enforcement

23 operation, to your knowledge?

24   A    Well, first, the soldier is not -- I mean, he

25 may or may not be assigned to the 25th Infantry Division  13:42:37



1  because the patch is on his right arm.  A patch on the

2  right arm is the unit you went to combat with.

3          So he -- I can definitely say he went to

4  combat with the 25th Infantry Division; but the unit

5  patch is on the left arm, which I can't see, so I don't          13:42:52

6  know which unit he's assigned to definitively.

7      Q    All right.  So if I'm understanding you

8  correctly, it's possible that the individual shown in the

9  right-hand photograph could be a Task Force 51 soldier?

10          MR. EDELMAN:  Objection.  Misstates prior          13:43:08

11  testimony.

12  BY MS. REILLEY:

13      Q    You can correct me if I'm -- if that's not true.

14          But is it -- my question is, is it possible that

15  this individual is a Task Force 51 soldier?          13:43:17

16      A    It is possible.

17      Q    Despite the fact that the patch on their right

18  arm indicates they're from a division headquartered in

19  Hawaii?

20      A    Yes, ma'am.          13:43:28

21      Q    Okay.

22      A    But I can't definitively say that he is or

23  isn't.  I can't see what unit patch he has.

24      Q    And is this individual shown in the right-hand

25  photograph also holding an M4?          13:43:40



WILLIAM HARRINGTON  Highly Conf. AEO
GAVIN NEWSOM vs DONALD J. TRUMP

July 22, 2025

134





WILLIAM HARRINGTON  Highly Conf. AEO
GAVIN NEWSOM vs DONALD J. TRUMP

July 22, 2025
147





WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                   148





WILLIAM HARRINGTON  Highly Conf. AEO
GAVIN NEWSOM vs DONALD J. TRUMP

July 22, 2025
159





Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 77 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                177

1  standing in a doorway where they are lawfully allowed to

2  be, but federal law enforcement agents need to go through

3  that doorway in order to execute an arrest warrant.

4        Would Task Force 51 forces under those

5  circumstances be able to temporarily detain that civilian      15:07:41

6  standing in the doorway?

7        MR. EDELMAN:  Objection.  Form.  Incomplete

8  hypothetical.  Calls for legal conclusion.

9        THE WITNESS:  I mean, I -- I think that the

10 answer is no.                                                  15:07:55

11        Is that person preventing the federal agents

12 from performing their function?  And are the federal

13 agents able to conduct their own detention and arrest of

14 that individual?  Is he threatening the -- the federal

15 agents?  I don't know.  The scenario isn't -- I don't        15:08:11

16 think it's fully developed.

17 BY MS. REILLEY:

18    Q    Can you conceive -- and this is, again, based on

19 your training and experience as a deputy chief of staff.

20        Can you conceive of any scenario where a Task           15:08:23

21 Force 51 soldier would be able to temporarily detain a

22 civilian who is not committing any criminal act without

23 violating Posse Comitatus?

24        MR. EDELMAN:  Objection.  Incomplete

25 hypothetical.  Calls for legal conclusion.                     15:08:43



1              THE WITNESS:  Can you repeat the question,

2      please, ma'am.

3              MS. REILLEY:  Would you mind reading the

4      question back.

5              (Record read)                               15:09:13

6              THE WITNESS:  No, ma'am.

7      BY MS. REILLEY:

8      Q     All right.  And, again, you're not aware of any

9      instance where a Task Force 51 soldier has detained any

10     individual with respect to this deployment in Los        15:09:28

11     Angeles; correct?

12     A     Soldier, no, ma'am.  But a Marine did detain one

13     individual temporarily, and I think it was the Wilshire

14     building, like we discussed earlier, and turned them over

15     to FPS.                                                  15:09:42

16     Q     And other than that instance with the Marine at

17     the Wilshire building, you're not aware of any other

18     temporary detentions by any Task Force 51 troop?

19     A     No, ma'am.

20     Q     Okay.  I'd like to -- this will take me one        15:09:54

21     moment, but I'd like to show you a video.

22             No.  Want to make sure your counsel can see this

23     as well.

24             MR. EDELMAN:  Yeah.  Objection.  We'd like to

25     see the video before you show it to the deponent, given  15:10:33



WILLIAM HARRINGTON  Highly Conf. AEO
GAVIN NEWSOM vs DONALD J. TRUMP

1

2   --

3

4

5                                                    16:04:37

6

7

8

9

10                                                   16:04:49

11

12

13

14

15                                                   16:05:09

16

17

18

19   --

20                                                   16:05:26

21

22

23

24

25                                                   16:05:38



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 80 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    212

1       <u>Today we have 1,893 -- no, 1,930 under Task</u>
2    <u>Force 51 as of last night.</u>
3       <u>At the time of this E-mail, we had, you know,</u>
4    <u>close to 20 active RFA's.  Now we have 4.</u>
5       <u>So significantly reduced the soldier footprint.</u>    16:06:09
6    <u>Significantly reduced the number of RFA's that we're</u>
7    <u>supporting.</u>
8       Q    All right.  Could you describe for me or
9    identify by number which RFA's are currently still
10   ongoing?                                                      16:06:26
11       A    We have --
12          MR. EDELMAN:  Objection.  The answer to that
13   question calls for law enforcement privileged
14   information, and I'm going to instruct the witness not to
15   answer.                                                       16:06:38
16          MS. REILLEY:  To be clear, I'm not asking about
17   pending requests that haven't been approved or denied
18   yet.  I'm just asking for requests that have already been
19   approved -- which I believe are set forth in the
20   documents -- that are still underway.                         16:06:52
21          Does that change your instruction?
22          MR. EDELMAN:  Well, to the extent that there are
23   missions that are discussed in the documents, the
24   documents would refer to things that have already
25   happened, and you're free to ask about any documents we      16:07:05



Case 3:25-cv-04870-CRB    Document 127-2    Filed 07/30/25    Page 81 of 152

WILLIAM HARRINGTON  Highly Conf. AEO                         July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                        250

1          I, WILLIAM HARRINGTON, declare under penalty of

2    perjury under the laws of the State of California that

3    the foregoing is true and correct.

4          Executed at Joint Force Training Base - Los

5 Alamitos, California,   on 29 June, 2025.

6

7

8          HARRINGTON.        Digitally signed by
                              HARRINGTON.WILLIAM.B
9          WILLIAM.BREN       RENT.1121500694
                              Date: 2025.07.29
10         T.1121500694       16:04:20 -07'00'

11         WILLIAM HARRINGTON

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    REPORTER'S CERTIFICATE

2

3          I, LINDSAY JAGICH, a Certified Shorthand Reporter

4    of the State of California, do hereby certify:

5          That the foregoing proceedings were taken before

6    me at the time and place herein set forth; that any

7    witnesses in the foregoing proceedings, prior to

8    testifying, were administered an oath; that a record of

9    the proceedings was made by me using machine shorthand

10   which was thereafter transcribed under my direction; that

11   the foregoing transcript is a true record of the

12   testimony given.

13         Further, that if the foregoing pertains to the

14   original transcript of a deposition in a federal case,

15   before completion of the proceedings, review of the

16   transcript [  ] was [  ] was not requested.

17         I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or any party to this action.

20         IN WITNESS WHEREOF, I have this date subscribed

21   my name.

22

23   DATED:  JULY 23, 2025

24                                 _____

25                                 LINDSAY JAGICH, CSR No. 13889



# EXHIBIT 14

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



# California National Guard Soldiers Support Federal Operation in Southern California [Image 7 of 8]



**MECCA, CALIFORNIA, UNITED STATES**

**06.17.2025**

**Photo by Sgt. Chase Murray** 🔊

**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe          5

Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title 10 status, establish a security perimeter in Mecca, Calif., June 18, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.17.2025 |
| Date Posted: | 06.20.2025 14:14 |
| Photo ID: | 9123834 |
| VIRIN: | 250618-A-OX940-1628 |
| Resolution: | 4608x2592 |
| Size: | 4.33 MB |
| Location: | MECCA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 634 |
| Downloads: | 6 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 15

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



Search DVIDS...

# California National Guard Soldiers Support Federal Operation in Southern California [Image 2 of 8]



**MECCA, CALIFORNIA, UNITED STATES**
**06.18.2025**
**Photo by Sgt. Chase Murray**
**Title 10 support to Department of Homeland Security**

Subscribe    5

Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title 10 status, establish a security perimeter in Mecca, Calif., June 18, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.18.2025 |
| Date Posted: | 06.20.2025 14:14 |
| Photo ID: | 9123829 |
| VIRIN: | 250618-A-OX940-1604 |
| Resolution: | 4209x2368 |
| Size: | 3.94 MB |
| Location: | MECCA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 445 |
| Downloads: | 6 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 16

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



# California National Guard Soldiers Support Federal Operation in Southern California [Image 4 of 8]



**MECCA, CALIFORNIA, UNITED STATES**
**06.17.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe    5

Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title 10 status, establish a security perimeter in Mecca, Calif., June 18, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.17.2025 |
| Date Posted: | 06.20.2025 14:14 |
| Photo ID: | 9123831 |
| VIRIN: | 250618-A-OX940-1670 |
| Resolution: | 7008x2932 |
| Size: | 10.56 MB |
| Location: | MECCA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 169 |
| Downloads: | 2 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# TAGS

# EXHIBIT 17

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY**
**INJUNCTION**



## California National Guard Soldiers Support Federal Operation in Southern California [Image 3 of 8]



**MECCA, CALIFORNIA, UNITED STATES**
**06.18.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

| Subscribe | 5 |

Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title 10 status, establish a security perimeter in Mecca, Calif., June 18, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.18.2025 |
| Date Posted: | 06.20.2025 14:14 |
| Photo ID: | 9123830 |
| VIRIN: | 250618-A-OX940-1669 |
| Resolution: | 7008x3944 |
| Size: | 8.3 MB |
| Location: | MECCA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 216 |
| Downloads: | 3 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 18

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



Search DVIDS...

# California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]



**COACHELLA, CALIFORNIA, UNITED STATES**
**06.17.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe    5

Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title 10 status, prepare for the federal mission at the staging area in Coachella, Calif., June 18, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 06.17.2025 |
| Date Posted: | 06.20.2025 14:14 |
| Photo ID: | 9123835 |
| VIRIN: | 250618-A-OX940-1465 |
| Resolution: | 7008x3944 |
| Size: | 13.06 MB |
| Location: | COACHELLA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 280 |
| Downloads: | 7 |

**PUBLIC DOMAIN** 

This work, *California National Guard Soldiers Support Federal Operation in Southern California [Image 8 of 8]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 19

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**



# USNORTHCOM statement on additional military personnel in the Los Angeles Area

/ Published June 9, 2025

**PETERSON SPACE FORCE BASE, Colo.** – U.S. Northern Command has activated the Marine infantry battalion that was placed in an alert status over the weekend. Approximately 700 Marines with 2nd Battalion, 7th Marines, 1st Marine Division will seamlessly integrate with the Title 10 forces under Task Force 51 who are protecting federal personnel and federal property in the greater Los Angeles area.

**UPDATE** As of June 10th 2025, there are approximately 2,100 soldiers from the 79th Infantry Brigade Combat Team, a California National Guard unit in a Title 10 status, in the greater Los Angeles Area.

The activation of the Marines is intended to provide Task Force 51 with adequate numbers of forces to provide continuous coverage of the area in support of the lead federal agency.

Task Force 51 is U.S. Army North's Contingency Command Post, which provides a rapidly deployable capability to partner with civil authorities and DoD entities in response to a Homeland Defense and Homeland Security Operations. It is commanded by Maj. Gen. Scott M. Sherman.

Task Force 51 is comprised of approximately 2,100 National Guard soldiers in a Title 10 status and 700 active-duty Marines. Task Force 51 forces have been trained in de-escalation, crowd control, and standing rules for the use of force.

–30–

**Note to Editors:**
For additional information, please contact U.S. Northern Command Public

Affairs:
Email: n-ncpa.omb@mail.mil
Phone: (719) 554-6889
After duty hours: (719) 217-3716

**Follow U.S. Northern Command:**
Facebook: facebook.com/USNORTHCOM
X (formerly Twitter): x.com/USNorthernCmd
Instagram: instagram.com/usnortherncmd

# EXHIBIT 20

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 21

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 22

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**



Search DVIDS...

# Soldiers support federal operation in Southern California [Image 2 of 5]



**CARPINTERIA, CALIFORNIA, UNITED STATES**
**07.10.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe      5

Soldiers assigned to 870th Military Police Company, 185th Military Police Battalion, 49th Military Police Brigade, California National Guard, serving under Title 10 status, provide a security perimeter for federal personnel conducting law enforcement activities at Carpinteria, Calif., July 10, 2025. U.S. Northern

Command is supporting federal agencies by providing military forces to protect federal functions, personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 07.10.2025 |
| Date Posted: | 07.14.2025 16:02 |
| Photo ID: | 9177507 |
| VIRIN: | 250710-A-OX940-1588 |
| Resolution: | 3474x2316 |
| Size: | 5.33 MB |
| Location: | CARPINTERIA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 145 |
| Downloads: | 2 |

**PUBLIC DOMAIN**  

This work, *Soldiers support federal operation in Southern California [Image 5 of 5]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS



# EXHIBIT 23

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**



Search DVIDS...

# Soldiers support federal operation in Southern California [Image 3 of 5]



**CARPINTERIA, CALIFORNIA, UNITED STATES**
**07.10.2025**
**Photo by Sgt. Chase Murray** 🔊
**Title 10 support to Department of Homeland Security** 🔍 🔊

Subscribe    5

Soldiers assigned to 870th Military Police Company, 185th Military Police Battalion, 49th Military Police Brigade, California National Guard, serving under Title 10 status, provide a security perimeter for federal personnel conducting law enforcement activities at Carpinteria, Calif., July 10, 2025. U.S. Northern Command is supporting federal agencies by providing military forces to protect federal functions,

personnel, and property in the greater Los Angeles area. On June 7, the Secretary of Defense directed USNORTHCOM to establish Task Force 51 to oversee Title 10 forces supporting this mission. (U.S. Army photo by Sgt. Chase Murray)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 07.10.2025 |
| Date Posted: | 07.14.2025 16:02 |
| Photo ID: | 9177508 |
| VIRIN: | 250710-A-OX940-1595 |
| Resolution: | 3504x1968 |
| Size: | 3.95 MB |
| Location: | CARPINTERIA, CALIFORNIA, US |

| | |
|---|---|
| Web Views: | 318 |
| Downloads: | 3 |

PUBLIC DOMAIN 

This work, *Soldiers support federal operation in Southern California [Image 5 of 5]*, by SGT Chase Murray, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# EXHIBIT 24

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 25

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 26

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

1  BRETT A. SHUMATE
   Assistant Attorney General
2  ERIC J. HAMILTON (CA Bar No. 296283)
   Deputy Assistant Attorney General
3  ALEXANDER K. HAAS (CA Bar No. 220932)
   Branch Director
4  JEAN LIN (NY Bar No. 4074530)
   Special Litigation Counsel
5  CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
   Senior Counsel
6  GARRY D. HARTLIEB (IL Bar No. 6322571)
   BENJAMIN S. KURLAND (DC Bar No. 1617521)
7  JODY D. LOWENSTEIN (MT Bar No. 55816869)
   Trial Attorneys
8  U.S. Department of Justice
   Civil Division, Federal Programs Branch
9  1100 L Street, NW
   Washington, DC 20005
10 *Counsel for Defendants*

11
                  **UNITED STATES DISTRICT COURT**
12           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
13

14                                          | Case No. 3:25-cv-04870-CRB

15 GAVIN NEWSOM, in his official capacity as
   Governor of the State of California, *et al.*,     **DEFENDANTS' OBJECTIONS AND**
16                                                    **RESPONSES TO PLAINTIFFS' FIRST**
                      *Plaintiffs*,                   **SET OF INTERROGATORIES TO**
17                                                    **DEFENDANTS**
                         v.
18
   DONALD J. TRUMP, in his official capacity as
19 President of the United States of America, *et al.*,

20                    *Defendants*.

21

22

23

24

25

26

27

28

Pursuant to Federal Rules of Civil Procedure 26 and 33, defendants, by and through counsel, provide the following objections and responses to plaintiffs' first set of interrogatories, served on June 26, 2025.

### OBJECTIONS APPLICABLE TO ALL INTERROGATORIES

1.       Defendants object to plaintiffs' interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, the deliberative-process privilege, law-enforcement privilege, any form of executive privilege, or any other applicable privilege or immunity recognized under statute or applicable case law.

2.       Defendants object to plaintiffs' interrogatories to the extent they seek information unrelated to the Posse Comitatus Act ("PCA"), *see* Order re Pre-Trial Deadlines, ECF No. 117 ("[T]he only limitation that the Court will put on the content of witness testimony is that it be relevant to the Posse Comitatus Act claim."); Order Regarding Discovery as to Pls.' Mot. for a Prelim. Inj. at 8–10, ECF No. 101 ("[T]he Court will only allow discovery as to the Posse Comitatus Act."); *see also* Order Re Pre-Trial Deadlines at 2, ECF No. 117 , or related to any claim, issue, or dispute that is the subject of the ongoing appeal, *see* ECF No. 101 at 9–10.

3.       Defendants also object to plaintiffs' interrogatories to the extent they pertain to any claim brought under the Administrative Procedure Act, because resolution of any such claim should be based upon the administrative record.

4.       The following responses are based upon information currently known to defendants based on a reasonable inquiry, and defendants reserve the right to withdraw or amend their responses should additional or different information become available.

5.       Nothing contained in the following responses constitutes a waiver of any applicable objection or privilege as to the requested discovery. Defendants expressly reserve the right to object to further discovery of the subject matter of any of these interrogatories and the introduction into evidence of any response or portion thereof.

6.       Each and every response below is subject to the above objections, which apply to each and every response regardless of whether a specific objection is interposed. The making of a

specific objection in response to a particular interrogatory is not intended to constitute a waiver of any other objection not specifically referenced in that response.

**OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

1.     Defendants object to plaintiffs' introductory instruction that defendants answer plaintiffs' interrogatories "on or by July 11, 2025." Federal Rule of Civil Procedure 33(b)(2) provides that a "responding party must serve its answers and any objections within 30 days after being served with the interrogatories," unless "[a] shorter or longer time" is "stipulated to under Rule 29" or "ordered by the court." The court ordered the parties to complete expedited discovery on or before July 25, 2025, *see* Order Granting Stipulated Mot. to Enlarge Time to Respond to Expedited Discovery & Set Briefing on Discovery Disputes at 1, ECF No. 105, and has not ordered an earlier deadline for the parties to serve objections or responses to any interrogatories. Therefore, consistent with their obligations under the Federal Rules of Civil Procedure and the court's order, defendants will serve their objections and responses to plaintiffs' interrogatories on or before July 25, 2025.

2.     Defendants object to plaintiffs' first instruction as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it instructs defendants to "furnish all requested information … that is known by, possessed by, or available to DEFENDANTS" in answering any and all interrogatories, because plaintiffs' definition of "DEFENDANTS" is objectionable on those same grounds. *See infra*. Defendants also object to this instruction as beyond the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it instructs defendants to "stat[e] whatever information, knowledge, or belief DEFENDANTS have concerning [an] unanswerable portion" of an interrogatory.

3. Defendants object to plaintiff's fifth instruction as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it instructs defendants to construe any interrogatory requesting the "knowledge or information in DEFENDANTS' possession" as requesting the "knowledge of DEFENDANTS, including without limitation, agents, employees, representatives, accountants, attorneys, and all other person acting on

DEFENDANTS' behalf," because plaintiffs' definition of "DEFENDANTS" is objectionable on those same grounds. *See infra*.

4.      Defendants object to plaintiffs' seventh instruction as confusing, unduly burdensome, and beyond the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it instructs defendants to identify "DOCUMENTS that are no longer in existence," and provide other information regarding any such documents, "[if] any Interrogatory asks for information that could at some time have been answered by producing, consulting, or referring to" such documents.

5.      Defendants object to plaintiffs' eighth instruction regarding contention interrogatories as confusing and irrelevant, because none of plaintiffs' interrogatories "call[] upon DEFENDANTS to 'state the basis' of or for a particular claim, assertion, allegation, or contention, or to 'state all facts' or 'identify all DOCUMENTS' supporting a particular claim, assertion, allegation, or contention."

If plaintiffs intend this instruction to apply to those numbered interrogatories that ask defendants to "[s]tate all facts *related to*" a particular subject, *see* Interrogatory Nos. 3, 5, 6, 11, 12, 13, 14, 15 (emphasis added), defendants further object to this instruction because it would result in plaintiffs having served on defendants more than the 25 interrogatories that the Federal Rules of Civil Procedure permit. *See* Fed. R. Civ. P. 33(a)(1). As written, this instruction provides that any interrogatory that asks defendants to "'state the basis'" of or for a particular claim, assertion, allegation, or contention, or to 'state all facts' or 'identify all DOCUMENTS' supporting a particular claim, assertion, allegation or contention," is a compound interrogatory that contains three separate requests—(i) to "[i]dentify each and every DOCUMENT" that "forms any part of the source of the party's information regarding the alleged facts or conclusions referred to by the Interrogatory"; (ii) to "[i]dentify each and every COMMUNICATION" that "forms any part of the source of the party's information regarding the alleged facts or conclusions referred to by the Interrogatory"; and (iii) to "[s]tate separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the Interrogatory." Plaintiffs

served eight numbered interrogatories that ask defendants to "state all facts" related to a particular subject. If this instruction applied to those numbered interrogatories, each would contain three distinct subparts—*i.e.*, documents, communications, and facts—all of which are distinct interrogatories. Rule 33(a) provides that, "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, *including all discrete subparts*." Fed. R. Civ. P. 33(a)(1) (emphasis added); *see also Makaeff v. Trump Univ., LLC*, 2014 WL 3490356, at *4 (S.D. Cal. July 11, 2014) ("[E]xtensive use of subparts, whether explicit or implicit, could defeat the purposes of the numerical limit contained in Rule 33(a) by rendering it meaningless, unless each subpart counts as a separate [interrogatory].").  Rule 33(a) thus requires that "discrete subparts" "be counted as separate interrogatories." *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 443 (C.D. Cal. 1998), when they seek distinct information within a single, designated interrogatory.  *See, e.g.*, *Safeco*, 181 F.R.D. at 442–47; *Figuerola v. Nationwide Agribusiness Ins. Comopany*, 2020 WL 13866587, at *8 (C.D. Cal. Aug. 28, 2020) (counting 279 separate interrogatories within a designated interrogatory); *Johnson v. Cate*, 2014 WL 6978324, at *5 (E.D. Cal. Dec. 9, 2014) (counting at least 48 separate interrogatories within a designated interrogatory—the sum of "four discrete inquiries: facts, persons, documents, and the 'manner and method by which [the defendant] came by such information" regarding "12 different specific factual allegations"); *Jackson*, 2023 WL 8114387, at *2–3 & n.2 (counting 27 separate interrogatories within a designated interrogatory); *Hasan*, 2012 WL 569370, at *4–5 (counting 25 separate interrogatories within 8 designated interrogatories); *see also, e.g.*, *Collaboration Properties*, 224 F.R.D. at 475 (denying motion to compel responses to several interrogatories that each contained at least 26 discrete subparts because the movant exceeded the court's numerical limits on interrogatories); *Withers v. eHarmony*, 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) (denying motion to compel response to a compound interrogatory that sought seven discrete areas of information and identification of documents regarding 25 specified individuals); *Makaeff*, 2014 WL 3490356, at *3, 7 (holding that a designated interrogatory counted as 36 separate interrogatories—the sum of "3 discrete subparts" requesting the facts, documents, and witnesses

supporting the defendants' responses to 12 RFAs that were not answered with an unqualified admission). Therefore, if plaintiffs believe this instruction applies to the eight numbered interrogatories that request defendants to "state all facts relating to" a particular subject, those numbered interrogatories would consist of *21 separate interrogatories*, resulting in plaintiffs having served 33 interrogatories total on defendants. To avoid that result, defendants will construe this instruction as *not* applying to any of plaintiffs' interrogatories.

6.      Defendants object to plaintiff's eleventh instruction that "all references to the plural include the singular, and all references to the singular include the plural" as confusing, vague, and ambiguous. Similarly, defendants object on the same grounds to plaintiffs' definitions of "AND" and "OR" as having "both conjunctive and disjunctive meanings." Defendants will read and respond to plaintiffs' interrogatories with the understanding that words convey their plain and ordinary meaning.

7.      Defendants object to plaintiffs' definition of "ARREST" to mean the "use of legal authority to deprive a person of their freedom of movement" as overbroad, vague, ambiguous, and potentially misleading.  Defendants will interpret the term, consistent with its common usage, to mean "The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law, esp. of bringing that person before a court."  ARREST, *Black's Law Dictionary* (12th ed. 2024).

8.      Defendants object to plaintiffs' definition of "CBP" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent it includes all "managers and supervisors, sworn PERSONNEL, rank and file employees, representatives, agents, and any other persons or entities purporting to act on its behalf." This definition is unduly burdensome, as it would encompass tens of thousands of personnel that work for the U.S. Customs and Border Protection ("CBP"), and any request seeking information across CBP's entire workforce would not be proportionate to the needs of this case. This definition is also overbroad to the extent it

encompasses individuals outside of defendants' control, including those who merely "*purport[]*" to act on CBP's behalf. Additionally, this definition is vague and ambiguous to the extent that it does not specify who may be considered, *e.g.*, a "representative[]," "agent[]," or "any other persons or entities purporting to act on" CBP's behalf. The plain and ordinary meaning of those terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition insofar as it implicitly includes CBP's attorneys and would call for information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from CBP to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

9.    Defendants object to plaintiffs' definition of "COMMUNICATION" because it would encompass each and every conversation regarding a given subject—*e.g.*, any "spoken" "transmittal … of information"—thus making the definition overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure.

10.    Defendants object to plaintiffs' definition of "DEFENDANTS" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent it includes "any and all employees, agents, representatives, attorneys, and any person acting on [defendants'] behalf." This definition is unduly burdensome because it would encompass millions of personnel, across hundreds of agencies and sub-agencies, serving within the Executive Branch, and thereby acting on behalf of the President of the United States, the head of the Executive Branch, and those millions of personnel serving within the Department of Defense ("DoD") specifically. Any request seeking information across the entire Executive Branch's workforce, or even just the Department of Defenses' workforce, would not be proportionate to the needs of this case. This definition also is overbroad because it encompasses individuals outside of defendants' control. Additionally, this definition is vague and ambiguous insofar as it does not specify who may be considered, *e.g.*, a

"representative[]," "agent[]," or "person acting on" defendants' "behalf." The plain and ordinary meaning of those terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition to the extent it includes defendants' attorneys and would call for production of information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from "DEFENDANTS" to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

12.    Defendants object to plaintiff's definition of "DEPARTMENT" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent that it includes "any and all of [DoD's] employees, agents, representatives, and attorneys; and any person acting on [its] behalf." This definition is unduly burdensome because it would encompass the millions of personnel who work within DoD or otherwise act on its behalf, and any request seeking information across DoD's entire workforce would not be proportionate to the needs of this case. This definition also is overbroad because it encompasses individuals outside of defendants' control. Additionally, this definition is vague and ambiguous to the extent that it does not specify who may be considered, *e.g.*, a "representative[]," "agent[]," or "person acting on" the DoD's "behalf." The plain and ordinary meaning of such terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition to the extent it includes DoD's attorneys and would call for production of information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from the "DEPARTMENT" to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

13.    Defendants object to plaintiffs' definition of "DESCRIBE" as confusing, vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond

1    the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it would

2    require defendants to not only "provide a complete description" of an interrogatory's subject

3    matter, but also provide any and all "information RELATING TO th[at] subject matter."

4        14.    Defendants object to plaintiffs' definition of "DETENTION" as vague, ambiguous,

5    overbroad, and potentially misleading insofar as it includes "words or conduct that would result in

6    a reasonable person believing that they are not free to leave or otherwise disregard the order."

7    Defendants will interpret this term, consistent with its common usage, to mean "The act or an

8    instance of holding a person in custody; confinement or compulsory delay." DETENTION,

9    Black's Law Dictionary (12th ed. 2024).

10        15.    Defendants object to plaintiffs' definition of "DOCUMENT" as vague, ambiguous,

11    overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants'

12    obligations under the Federal Rules of Civil Procedure insofar as it includes "all non-identical

13    copies and drafts" of a document. Defendants also object to this definition to the extent it includes

14    information covered by the deliberative-process privilege, attorney-client privilege, the work-

15    product privilege, or any other applicable privilege.

16        16.    Defendants object to plaintiffs' definition of "FIELD OPERATIONS" as vague and

17    ambiguous insofar as it uses the term "enforcement operations."

18        17.    Defendants object to plaintiffs' definition of "ORDER" as vague, ambiguous,

19    overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it includes

20    "official directives regarding the scope, purpose, and nature of operations." In the military context,

21    an order constitutes any directive given from a superior to a subordinate, whether written or oral.

22    Therefore, an interrogatory regarding all "ORDERS" on a particular subject may implicate

23    hundreds of thousands of directives given to every military official throughout the chain of

24    command, all the way to individual Guardsmen or Marines. Defendants will therefore interpret

25    that term to mean written commands and directives of general applicability across the mission.

26

27

28

18.     Defendants object to plaintiffs' definition of "POLICIES AND PROCEDURES" as overbroad, vague, and ambiguous insofar as it includes the term "informal practices" and phrase "any other guidance issued to or adopted by the Defendants."

19.     Defendants object to plaintiffs' definition of "POSSE COMITATUS ACT" to the extent that it attempts to construe or otherwise paraphrase the text of 18 U.S.C. § 1385.

20.     Defendants object to plaintiffs' definitions of "RELATING TO" and "RELATED TO" as confusing, vague, ambiguous, overbroad, unduly burdensome, and beyond defendants' obligations under the Federal Rules of Civil Procedure. This definition is so convoluted as to render meaningless any interrogatory that uses the phrases "RELATING TO" or "RELATED TO." Defendants will therefore read and respond to such interrogatories with the understanding that these phrases convey their plain and ordinary meaning.

21.     Defendants object to plaintiffs' definition of "SUPPORT OPERATION" as "any military SUPPORT OPERATION for civilian law enforcement agencies further defined by 10 U.S.C. §§ 271–284" as vague and ambiguous.

22.     Defendants object to the inclusion of definitions for any term not relied on in plaintiffs' interrogatories. Any requirement that defendants respond to such definitions in the abstract is not proportional to the needs of this case and the burden of such a response outweighs its likely benefit, which is none. Defendants do not waive any future objections to the definition of those terms or waive the right to use defendants' own definitions for them.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

**Interrogatory No. 1:** DESCRIBE the activities that have been engaged in by FEDERALIZED NATIONAL GUARD who have been called in to service or deployed pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM. This description should include, but is not limited to, types of activities (e.g., forming perimeters, detaining individuals) and limitations placed by federal law, POLICIES AND PROCEDURES, rules for use of FORCE, rules of engagement, or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the term "activities." Additionally, defendants object to this interrogatory insofar as it requests information unrelated to the PCA.

**Response:** Military members of Task Force-51 ("TF-51") have been engaged in a Federal Protection Mission ("FPM") consisting of the protection of federal locations, personnel, and federal functions. Federal locations include buildings and installations owned or used by the United States government, including, but not limited to, the Edward R. Roybal Federal Building, the United States Courthouse in downtown Los Angeles, the Immigration and Customs Enforcement ("ICE") Office in Santa Ana, and the Federal Building at 11000 Wilshire Blvd. Federal personnel include employees of several government agencies. The FPM consists of setting up security perimeters around federal buildings and installations; accompanying federal law enforcement personnel in instances where their duties could bring them into confrontation with protesters; and having mobile response forces ("MRFs") on stand-by to respond to emergent threats to federal personnel carrying out their federal functions. Federal law enforcement agencies have made multiple requests for TF-51personnel to respond to emergent situations where protests materialized and disrupted federal personnel trying to carry out their federal functions or threatened federal property and personnel. TF-51 activities are done in accordance with guidance issued by higher headquarters (*i.e.*, U.S. Northern Command and Army North) and applicable laws (*e.g.*, the PCA) and applicable DoD regulations (*e.g.*, DoD Instruction No. 3025.21, Defense Support of Civilian Law Enforcement Agencies, Change 1, dated February 8, 2019).

\*        \*        \*

**Interrogatory No. 2:** DESCRIBE the activities that have been engaged in by the NON-NATIONAL GUARD MILITARY deployed to Los Angeles on or after June 7, 2025. This description should include, but is not limited to, types of activities (e.g., forming perimeters,

detaining individuals) and limitations placed by federal law, POLICIES AND PROCEDURES, rules for use of FORCE, rules of engagement, or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the term "activities." Additionally, defendants object to this interrogatory insofar as it requests information unrelated to the PCA.

**Response:** Non-National Guard Military members deployed to Los Angeles on or after June 7, 2025, have engaged in the planning, oversight, and support of the FPM, *see* Response to Interrogatory No. 1, and in the case of the U.S. Marines, conducted roving patrols around Federal buildings. All TF-51 personnel activities are done in accordance with guidance, laws, and regulations referenced above. *See* Response to Interrogatory No. 1.

*          *          *

**Interrogatory No. 3:** State all facts RELATED TO how DEFENDANTS have been monitoring the conduct of NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD personnel called in to service or deployed pursuant to the PRESIDENTIAL MEMO, JUNE 7 DOD MEMO, and/or JUNE 9 DOD MEMO or otherwise deployed in California since June 7, 2025, including for purposes of determining whether there is engagement in actions prohibited by the POSSE COMITATUS ACT.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS," and "POSSE COMITATUS ACT." Defendants also object to this interrogatory insofar as it requests information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal.

Apr. 13, 2017) (emphasis added and citation omitted); *accord, e.g.*, *O'Brien v. Gularte*, 2020 WL 583976, at *2 (S.D. Cal. Feb. 6, 2020) ("Courts will generally find interrogatories overly broad and unduly burdensome on their face to the extent they ask for *every fact* which supports identified allegations." (cleaned up)); *Aldapa v. Fowler Packing Co.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories." (citation omitted)); *Safeco*, 181 F.R.D. at 447–48 (holding that interrogatories requiring "a party to specify *all facts* … that support the denial of a statement or allegation of fact" were "unduly burdensome and oppressive" (emphasis added).[1] Defendants recognize, though, that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter. *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014). Accordingly, courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *accord, e.g.*, *Santillan v. Verizon Connect, Inc.*, 2022 WL 428170, at *2 (S.D. Cal. Feb. 10, 2022) (instructing party to construe interrogatories seeking "all facts" supporting specific contentions "as requesting all the principal or material facts"); *Kilby v. CVS Pharmacy, Inc.*, 2019 WL 977874, at *3 (S.D. Cal. Feb.

---

[1] *See also, e.g.*, *Alfaro v. City of San Diego*, 2018 WL 4562240, at *2 (S.D. Cal. Sept. 21, 2018) (holding that interrogatories "seeking 'all facts' supporting" specific contentions were "overly broad and unduly burdensome as worded"); *Largan Precision Co. v. Samsung Electronics Co.*, 2015 WL 11251730, at *3 (S.D. Cal. May 5, 2015) (holding that interrogatories were "overbroad and unduly burdensome, due to [their] use of the terms 'all facts', 'all facts and circumstances', and 'all documents'"); *Hernandez*, 2014 WL 5454505, at *6 (similar); *King v. Cnty. Of L.A.*, 2012 WL 13124268, at *1 (C.D. Cal. Aug. 24, 2012) (similar); *Bovarie*, 2011 WL 719206, at *1 (similar); *Mancini v. Ins. Corp. of N.Y.*, 2009 WL 1765295, at *3 (S.D. Cal. June 18, 2009) (similar); *In re eBay Seller Antitrust Litig.*, 2008 WL 5212170, at *2 (N.D. Cal. Dec. 11, 2008) (similar).

28, 2019) (same).[2] Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** All FPM activities are closely monitored by the chain of command and any conduct that deviates from established standards is addressed by the chain of command at the appropriate level. Units conducting FPM missions are required to complete an After-Action Review debrief after every mission to identify areas of success and those requiring improvements. Post-mission debriefs are submitted through the chain of command to the TF-51 commander. Additionally, the TF-51 commander holds a daily command update brief with the TF-51 staff and brigade level commanders of assigned units to maintain situational awareness of ongoing missions, discuss emergent issues, and provide guidance. Serious incidents are reported to the TF-51 Commander as a serious incident report ("SIR") or Commander Critical Information Requirement ("CCIR"). As of this date, no SIR or CCIR has been submitted for actions prohibited by the PCA, nor has TF-51 otherwise identified any actions prohibited by the PCA. Further, under Rule 12 of the Standing Rules for The Use of Force as provided on the U.S. Army North "SRUF Card" (DEFS 0000001), troops are ordered to "IMMEDIATELY report any violation of non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning the who, what, when, where, and why." No reports of any SRUF violation have been made by any troop.

\*        \*        \*

**Interrogatory No. 4:** DESCRIBE what activities DEFENDANTS understand are prohibited for the NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD to engage in under the POSSE COMITATUS ACT.

---

[2] *See also, e.g.*, *Alfaro*, 2018 WL 4562240, at \*2 (limiting interrogatories "seeking 'all facts' supporting" specific contentions "to the principal, or material, facts"); *Largan Precision*, 2015 WL 11251730, at \*3 (same); *Amgen*, 2017 WL 1352052, at \*3 (same); *Hernandez*, 2014 WL 5454505, at \*6 (same); *King*, 2012 WL 13124268, at \*1 (same); *Mancini*, 2009 WL 1765295, at \*3 (same).

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE," "DEFENDANTS," and "POSSE COMITATUS ACT."

Defendants further object to this interrogatory because it impermissibly calls for a pure legal conclusion. *See Larson v. Trans Union, LLC*, 2017 WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (explaining that a party "need not respond to questions of 'pure law'" in answering an interrogatory); *accord, e.g.*, *Everest Nat'l Ins. Co. v. Santa Cruz Cty. Bank*, 2016 WL 6311876 (N.D. Cal. Oct. 28, 2016); *Foster Poultry Farms v. AISLIC*, 2005 WL 8176421 (E.D. Cal. Aug. 22, 2025). Because defendants are "not required to write [a legal] brief" in response to plaintiffs' interrogatories, *see Larson*, 2017 WL 1540710, at *1, they will not recite their arguments regarding the scope of the PCA or how its provisions interact with 10 U.S.C. § 12406, *see, e.g.*, Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. at 23–24, ECF No. 84; Defs.' Suppl. Br. in Opp'n to Pls.' Mot. for a Prelim. Inj. at 1, ECF No. 95, which are decidedly legal questions.

**Response:** Except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, the PCA generally prohibits traditional law enforcement functions. While military personnel may provide support to civilian law enforcement activities, Enclosure 3 of DoD Instruction No. 3025.21, cited above, explains what constitutes permissible direct assistance and what direct assistance is generally prohibited. Under the SRUF, temporary detention and searches are authorized in instances where an individual has gained access to unauthorized areas (such as inside a security perimeter), refuses to depart or continues to attempt entry into a secured area after being denied access, or otherwise presents a threat to the safety of DoD forces or those under DoD protection. Temporarily detained persons, and any property secured from such persons, will be released to civilian law enforcement agents at the earliest opportunity. Further, Enclosure L to Chairman of the Joint Chief of Staff Instruction (CJCSI) 3121.01B, Standing Rules for the Use of Force for US Forces, dated 13 June 2005 "provide operational guidance and establish fundamental policies and procedures governing actions taken by DOD forces performing civil support missions (e.g., military assistance to civil authorities and

military support for civilian law enforcement agencies) and routine Service functions (including [Anti-Terrorism / Force Protection] duties) within U.S. territory (including U.S. territorial waters). Further explanation of the SRUF is contained in training packages (*see*, DEFS 00001095).

*    *    *

**Interrogatory No. 5:** State all facts RELATED TO instances DEFENDANTS have identified since June 7, 2025, of NON-NATIONAL GUARD MILITARY PERSONNEL conduct not in compliance with the POSSE COMITATUS ACT and for each instance identified, please DESCRIBE whether remedial action was taken to address such conduct, what action was taken, and by whom.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS," "POSSE COMITATUS ACT," and "DESCRIBE."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

1    **Response:** As of this date, defendants have not identified any instance in which NON-

2    NATIONAL GUARD MILITARY PERSONNEL has engaged in actions not in compliance with

3    the PCA.

4                                    *       *       *

5    **Interrogatory No. 6:** State all facts RELATED TO instances DEFENDANTS have

6    identified since June 7, 2025, of FEDERALIZED NATIONAL GUARD PERSONNEL engaging

7    in law enforcement activities covered by the POSSE COMITATUS ACT, should that act apply,

8    and for each instance identified, please DESCRIBE whether remedial action was taken to address

9    such conduct, what action was taken, and by whom.

10   **Objections:** Defendants incorporate by reference the general objections asserted above,

11   including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS,"

12   "POSSE COMITATUS ACT," and "DESCRIBE.".

13   Defendants further object to this interrogatory to the extent that it asks defendants to state

14   "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly

15   burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an

16   interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal.

17   Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3

18   (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories

19   may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter,

20   *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts

21   routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every

22   fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R.

23   Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a

24   party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are

25   material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord).

26   Defendants will therefore construe this interrogatory to request only those material or principal

27   facts regarding the relevant subject matter.

28

**Response:** As of this date, Defendants have not identified any instance in which FEDERALIZED NATIONAL GUARD PERSONNEL have engaged in actions not in compliance with the PCA.

*       *       *

**Interrogatory No. 7:** DESCRIBE all SUPPORT OPERATIONS engaged in by the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY, including those RELATED TO FIELD OPERATIONS, during any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "SUPPORT OPERATIONS."

**Response:** From June 7, 2025, to the date of this document, TF-51 has provided use of base facilities under 10 U.S.C. § 272 to Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) agents for general parking, storage, and staging operations, in Southern California.

*       *       *

**Interrogatory No. 8:** DESCRIBE what actions and activities the NON-NATIONAL GUARD MILITARY may take RELATED TO any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "actions and activities." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The NON-NATIONAL GUARD MILITARY deployed pursuant to the Presidential Memorandum, and has engaged in activities that are consistent with the FPM. For example, TF-51 has provided command and control over assigned units and has been responsible

for the planning, oversight, and support of the FPM.  Meanwhile, the US Marines supporting the FPM have provided fixed site security at various locations around the Los Angeles area.  All actions undertaken by the NON-NATIONAL GUARD MILITARY have been consistent with guidance issued by the Office of the Secretary of Defense, higher headquarters, and applicable laws and regulations such as the PCA and SRUF.

*        *        *

**Interrogatory No. 9:** DESCRIBE what actions and activities the FEDERALIZED NATIONAL GUARD may take RELATED TO any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "actions and activities." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The actions and activities the FEDERALIZED NATIONAL GUARD may take pursuant to the Presidential Memorandum, the June 7 DOD Memorandum, and/or the June 9 DOD Memorandum, are those consistent with the FPM.

*        *        *

**Interrogatory No. 10:** IDENTIFY what factors, if any, DEFENDANTS considered in adopting rules for use of FORCE, rules of engagement, or POLICIES AND PROCEDURES for the current FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY deployments relating to interactions with MEMBERS OF THE PUBLIC in dense urban settings.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DEFENDANTS" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants are following the most recent version of Enclosure L to Chairman of the Joint Chief of Staff Instruction (CJCSI) 3121.01B, Standing Rules for the Use of Force, dated 13 June 2005, for the current FPM in Southern California.

\*        \*        \*

**Interrogatory No. 11:** State all facts RELATED TO any and all training given to the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY RELATED TO their roles and responsibilities prior to deployment in Los Angeles.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** All military units under the control of TF-51 have gone through Joint Reception, Staging, Onward Movement, and Integration ("JRSOI")—a process meant to ensure

that units are operationally ready to undertake assigned missions. This process is primarily focused on ensuring that personnel files and unit training status are up-to-date and include such things as training on the PCA and SRUF, general situational awareness of the environment in which they will be operating, and briefings on how to carry out their assigned duties in a professional manner. SRUF training is conducted by military attorneys with training materials prepared by ARNORTH that includes vignettes reflecting situations that may arise during the conduct of operations. Further, unit SRUF training levels and SRUF refresher are a mandatory reporting requirement to the TF-51 commander.

\*       \*       \*

**Interrogatory No. 12:** State all facts RELATED TO any and all DETENTION(S) of individuals in California by FEDERALIZED NATIONAL GUARD troops on or after June 7, 2025, including for each occurrence:

a.      The number of individuals detained;

b.      The date of the DETENTION;

c.      The geographic location of the DETENTION(S);

d.      Whether the individuals remain in DETENTION; and

e.      A description of the basis for the DETENTION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO" and "DETENTION."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at \*3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at \*6 (S.D. Cal. Oct. 27, 2014), and that courts

routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** As of this date, Defendants are not aware of any detentions of individuals by the FEDERALIZED NATIONAL GUARD in California.

*          *          *

**Interrogatory No. 13:** State all facts RELATED TO any and all DETENTION(S) of individuals in California by NON-NATIONAL GUARD MILITARY PERSONNEL on or after June 7, 2025, including for each occurrence:

      a.     The number of individuals detained;

      b.     The date of the DETENTION;

      c.     The geographic location of the DETENTION;

      d.     Whether the individuals remain in DETENTION; and

      e.     A description of the basis for the DETENTION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO" and "DETENTION."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter,

1  *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts

2  routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every

3  fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R.*

4  *Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a

5  party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are

6  material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord).

7  Defendants will therefore construe this interrogatory to request only those material or principal

8  facts regarding the relevant subject matter.

9      **Response:** As of this date, Defendants are aware of only ONE temporary detention by the

10  NON-NATIONAL GUARD MILITARY PERSONNEL in California. On June 13, 2025, at

11  approximately 12:45pm local time, a U.S. Marine conducting security operations outside of the

12  Wilshire Federal Building temporarily detained a male near the intersection of Wilshire and

13  Veteran in West Los Angeles. The individual was temporarily detained on federal property after

14  he attempted to enter the restricted portions of the federal property being secured, despite being

15  advised to get off the property multiple times after crossing into restricted areas. The individual

16  was placed in flexi-cuffs and turned over to a DHS agent approximately 30 minutes later and

17  eventually to the Los Angeles Police Department when they arrived a few minutes later. Various

18  news stories reported that the detained man crossed past the yellow caution tape because he was

19  trying to get to a Veterans Affairs appointment. However, there is no direct route across the federal

20  property in question to the nearby West Los Angeles VA Medical Center because it is separated

21  by the 405 Freeway, a very busy multi-lane highway.

22                                    *      *      *

23      **Interrogatory No. 14:** State all facts RELATED TO any and all perimeters or cordons by

24  the FEDERALIZED NATIONAL GUARD MILITARY PERSONNEL during FIELD

25  OPERATIONS on or after June 7, 2025, including for each occurrence:

26      a.    The date of the perimeter or cordon; and

27      b.    The location of the FIELD OPERATION.

28

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory's use of the terms "perimeters" and "cordons" as vague and ambiguous. Defendants will construe the term "perimeter" to mean a physical barrier that completely encompasses an object and will construe the term "cordon" to mean a physical barrier that prevents entry or exit from a particular area. Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:**. Defendants have no knowledge of any perimeters or cordons by the FEDERALIZED NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025.

*     *     *

**Interrogatory No. 15:** State all facts RELATED TO any and all perimeters or cordons by the NON-NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025, including for each occurrence:

       a.      The date of the perimeter or cordon; and

       b.      The location of the FIELD OPERATION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory's use of the terms "perimeters" and "cordons" as vague and ambiguous. Defendants will construe the term "perimeter" to mean a physical barrier that completely encompasses an object and will construe the term "cordon" to mean a physical barrier that prevents entry or exit from a particular area. Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** Defendants have no knowledge of any perimeters or cordons by the NON-NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025.

\*      \*      \*

**Interrogatory No. 16:** IDENTIFY and DESCRIBE any and all activities that have been engaged in by the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY PERSONNEL related to FIELD OPERATIONS near or inside private civilian residences and private civilian businesses. This description should include, but is not limited to, types of activities, location, and limitations placed by federal law or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "near or inside private civilian residences and private civilian business." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants are unable to provide a response to this item due to lack of clarity of the phrase, "near or inside private civilian residences and private civilian businesses." TF-51 military forces have not entered private residences or businesses as part of their missions.

\*      \*      \*

**Interrogatory No. 17:** Describe each official ORDER given to the FEDERALIZED NATIONAL GUARD RELATED TO their deployment in Los Angeles on or after June 7, 2025, including what the ORDER was, the date it was given, and who issued the ORDER.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "ORDER" and "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The FPM is being carried out in accordance with guidance issued by the President of the United States in a memorandum directed to the Secretaries of Defense, Homeland Security and the Attorney General dated June 7, 2025, entitled "Department of Defense Security

for the Protection of Department of Homeland Security Functions." This memorandum triggered the Federalization of California National Guard Members under 10 U.S.C. § 12406 by the Secretary of Defense in memoranda routed through the Governor of California to the Adjutant General of the California National Guard on June 7 and June 9, 2025. These memoranda were followed by orders placing the 79th Infantry Brigade Combat Team ("79th IBCT") and the 49th Military Police Brigade ("49th MP BDE") in a Title 10 status under NORTHCOM. NORTHCOM then transferred operational control ("OPCON") to Army North ("ARNORTH"), which in turn transferred tactical control ("TACON") to its contingency command post, TF-51. TF-51 has been in charge of the day-to-day operations of the FPM since approximately June 8, 2025, and directly tasks the 79th IBCT and 49th MP BDE with mission assignments in support of the FPM. There are three main sets of military orders that impact the 79th IBCT and 49th MP BDE. First, NORTHCOM Fragmentary Order ("FRAGO") series 039.F.001 which commenced on or about June 8, 2025, provides combatant command level (*i.e.*, strategic) guidance to subordinate units, in particular ARNORTH, to plan and carry out the FPM in the vicinity of Los Angeles, CA. Second, ARNORTH FRAGORD series 25-501.000, which commenced on or about June 8, 2025, provides service component level (i.e. operational) guidance to ARNORTH staff and TF-51 to deploy and carry out the FPM consistent with Presidential, the Secretary of Defense, and NORTHCOM guidance. Finally, TF-51 began issuing daily operational orders ("OPORDS") on or about June 9, 2025, 25-001 series, which provide direct guidance and mission taskings to the 79th IBCT and 49th MP BDE. Many of these orders may have attachments, annexes, or accompanying administrative messages that support the base order and provide additional information or references that clarify matters within the order (*e.g.*, references to the Standing Rules for the Use of Force, the PCA, funding and contracting support).

*     *     *

**Interrogatory No. 18:** Describe each official ORDER given to the or NON-NATIONAL GUARD MILITARY RELATED TO their deployment in Los Angeles on or after June 7, 2025, including what the ORDER was, the date it was given, and who issued the ORDER.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "ORDER" and "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The FPM is being carried out in accordance with guidance issued by the President of the United States in a memorandum directed to the Secretaries of Defense, Homeland Security and the Attorney General dated June 7, 2025, entitled "Department of Defense Security for the Protection of Department of Homeland Security Functions." This memorandum triggered the Secretary of Defense to place an active duty (*i.e.*, Title 10) United States Marine Corps Battalion, 2nd Battalion, 7th Marine Regiment ("2/7 Marines") based in Twenty-Nine Palms, CA on prepare to deploy orders ("PTDO")—essentially a standby status. NORTHCOM assumed OPCON of the 2/7 Marines and transferred TACON to ARNORTH, which in turn transferred TACON to its contingency command post, TF-51. TF-51 has overseen the day-to-day operations of the FPM since approximately June 8, 2025, and directly tasked the 2/7 Marines with mission assignments in support of the FPM. Note that the 2/7 Marines were replaced by the 3rd Battalion, 7th Marine Regiment ("3/7 Marines") in early July 2025, and both Marine units were only used to provide fixed site security at various Federal property locations around the Los Angeles area. There are three main sets of military orders that impacted the 2/7 and 3/7 Marines. First, NORTHCOM FRAGO series 039.F.001 which commenced on or about June 8, 2025, provides combatant command level (i.e. strategic) guidance to subordinate units, in particular ARNORTH, to plan and carry out the FPM in the vicinity of Los Angeles, CA.  Second, ARNORTH FRAGORD series 25-501.000, which commenced on or about June 8, 2025, provides service component level (*i.e.*, operational) guidance to ARNORTH staff and TF-51 to deploy and carry out the FPM consistent with Presidential, the Secretary of Defense, and NORTHCOM guidance. Finally, TF-51 began issuing daily OPORDS on or about June 9, 2025, 25-001 series, which provide direct guidance and mission taskings to the 2/7 and 3/7 Marines. Note that many of these orders may have attachments, annexes, or accompanying administrative messages that support the base order and

provide additional information or references that clarify matters within the order (*e.g.*, references to the Standing Rules for the Use of Force, the PCA, funding and contracting support).

*    *    *

**Interrogatory No. 19:** DESCRIBE all POLICIES AND PROCEDURES issued by DEFENDANTS RELATED TO the submission, investigation, and processing of internal and public complaints, reports, or questions, RELATED TO the permissibility of NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD PERSONNEL activities in California under the POSSE COMITATUS ACT, rules for use of FORCE, rules of engagement, or any other legal or internal limitation on PERSONNEL's involvement in law enforcement activities.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE," "POLICIES AND PROCEDURES," "DEFENDANTS," "RELATED TO," and "POSSE COMITATUS ACT." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants have not issued specific guidance related to the submission, investigation, and processing of public complaints regarding the FPM. Public queries for information regarding the FPM are handled by the TF-51 Public Affairs Office consistent with guidance provided by NORTHCOM. Internal queries are handled via the chain of command. Finally, NORTHCOM has established a public webpage that provides basic information about the FPM at the following link: https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/. Defendants follow DoD Instruction No. 3025.21, cited above, regarding the PCA, and Enclosure 3 of that Instruction explains what constitutes permissible direct assistance and what direct assistance is prohibited. Further, defendants are following the most recent version of Enclosure L to Chairman of the Joint Chief of Staff Instruction ("CJCSI") 3121.01B, SRUF, dated June 13, 2005, for the current FPM in Southern California.

*    *    *

1    **Interrogatory No. 20:** IDENTIFY all COMMUNICATIONS between the

2    FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and

3    CIVILIAN LAW ENFORCEMENT OFFICIALS RELATED TO during their deployment

4    pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or

5    JUNE 9 DOD MEMORANDUM.

6    **Objections:** Defendants incorporate by reference the general objections asserted above,

7    including defendants' objections to the defined terms "COMMUNICATIONS" and "RELATED

8    TO." Defendant also object to this interrogatory as confusing and vague, as it is unclear whether

9    plaintiffs are seeking communications "RELATED TO" the deployment of "FEDERALIZED

10   NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and CIVILIAN LAW

11   ENFORCEMENT OFFICIALS," or just those communications that were made "during" that

12   deployment. Additionally, defendants object to this interrogatory insofar as it seeks information

13   unrelated to the PCA.

14   Defendants also object to this interrogatory insofar as it asks defendants to identify "*all*

15   COMMUNICATIONS*" between the "FEDERALIZED NATIONAL GUARD and NON-

16   NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS" related

17   to or during the relevant deployment. Requiring defendants to find and identify each and every

18   communication during this time would be virtually impossible, unduly burdensome, and

19   disproportionate to the needs of this case, *see* Fed. R. Civ. P. 26(b)(1), and would produce an

20   unreasonably cumulative list of communications (assuming such an endeavor were possible), *see*

21   Fed. R. Civ. P. 26(b)(2)(C)(i). Therefore, defendants will identify relevant, non-privileged, and

22   non-cumulative communications that they can collect after a reasonable search of appropriate staff.

23   **Response:** Communications between the FEDERALIZED NATIONAL GUARD and

24   NON-NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS

25   RELATED TO during their deployment pursuant to the PRESIDENTIAL MEMORANDUM,

26   JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM are being provided in

27   response to Request for Production Nos. 1 and 13 in plaintiffs' first set of requests for production

28

1                                        *        *        *

2      As to Interrogatory Answers, *see* Verification page *infra*.

3      As to objections:

4      Dated: July 25, 2025                    Respectfully submitted,

5                                              BRETT A. SHUMATE
6                                              Assistant Attorney General
                                               Civil Division
7
8                                              ERIC J. HAMILTON
                                               Deputy Assistant Attorney General
                                               Federal Programs Branch
9                                              (CA Bar No. 296283)

10                                             ALEXANDER K. HAAS
11                                             (CA Bar No. 220932)
                                               Director, Federal Programs Branch
12
13                                             JEAN LIN
                                               (NY Bar No. 4074530)
14                                             Special Litigation Counsel
                                               Federal Programs Branch
15
16                                             */s/ Jody D. Lowenstein*

17                                             CHRISTOPHER D. EDELMAN
18                                             (DC Bar No. 1033486)
                                               Senior Counsel
19                                             GARRY D. HARTLIEB
                                               (IL Bar No. 6322571)
20                                             BENJAMIN S. KURLAND
                                               (DC Bar No. 1617521)
21                                             JODY D. LOWENSTEIN
                                               (MT Bar No. 55816869)
22                                             Trial Attorneys
                                               U.S. Department of Justice
23                                             Civil Division, Federal Programs Branch
24                                             1100 L Street, N.W.
                                               Washington, DC 20005
25                                             Tel.: (202) 598-9280
                                               Email: jody.d.lowenstein@usdoj.gov
26
27                                             *Counsel for Defendants*

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2025, I served the foregoing document via email to designated counsel of record for plaintiffs:

| | |
|---|---|
| Nicholas David Espiritu | nicholas.espiritu@doj.ca.gov |
| Laura L. Faer | laura.faer@doj.ca.gov |
| Luke Freedman | luke.freedman@doj.ca.gov |
| Robin L. Goldfaden | robin.goldfaden@doj.ca.gov |
| Nicholas Reiss Green | nicholas.green@doj.ca.gov |
| Brendan Hamme | brendan.hamme@doj.ca.gov |
| Lorraine Lopez | lorraine.lopez@doj.ca.gov |
| Marissa Suzanne Malouff | marissa.malouff@doj.ca.gov |
| Kendal Leigh Micklethwaite | kendal.micklethwaite@doj.ca.gov |
| Jane Reilley | jane.reilley@doj.ca.gov |
| Megan Richards | megan.richards@doj.ca.gov |
| James Edward Stanley | james.stanley@doj.ca.gov |
| Meghan Strong | meghan.strong@doj.ca.gov |

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
U.S. Department of Justice

## <u>VERIFICATION OF INTERROGATORY ANSWERS</u>

I certify under penalty of perjury that the foregoing answers to plaintiffs' interrogatories are true and correct to the best of my knowledge, information, and belief, with the understanding that defendants reserve the right to further supplement their answers.

DATED: July 25, 2025

HARRINGTON.WIL
LIAM.BRENT.11215
00694

Digitally signed by
HARRINGTON.WILLIAM.BRENT.
1121500694
Date: 2025.07.25 14:54:45 -07'00'

# EXHIBIT 27

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY**
**INJUNCTION**



🔍 Search DVIDS...

# ABOUT DVIDS

## MISSION STATEMENT

### DVIDS MISSION

To provide an accurate, reliable source for media organizations to access U.S. service members and commanders deployed in support of military operations worldwide.

### DVIDS

Is a state-of-the-art, 24/7 operation owned by DMA (Defense Media Activity) that provides a timely, accurate and reliable connection between the media around the world and the military serving at home and abroad.

Through a network of portable Ku-band satellite transmitters' located in-theater, robust IP connections, and a distribution hub DVIDS makes available real-time broadcast-quality video, still images and print products as well as immediate interview opportunities with service members, commanders and subject matter experts.

### DMA (Defense Media Activity)

Defense Media Activity keeps Department of Defense audiences around the world informed, collects and preserves the Department's visual information records and trains the Department's Public Affairs and Visual Information professionals.

DMA is the DoD's direct line of communication for news and information to U.S. forces deployed worldwide, on land, sea and air. It presents news, information and entertainment through media outlets, including radio, TV, Internet, print media and emerging media technologies. DMA broadcasts radio and television to forces in 177 countries and 279 Navy ships at sea with Department-specific news and information programming.

### BENEFITS OF DVIDS

- Enables media outlets to receive immediate, first-hand information and interviews with commanders and subject matter experts directly involved with fast-breaking news.
- Provides requested products to media organizations in a timely manner via internet distribution and satellite broadcasts.
- Allows embedded storytellers to transmit broadcast- quality video from the field.
- Maintains a searchable archive of video, photo, print and audio products for interested media and military communities.
- Coordinates holiday greetings and special event programming from deployed Soldiers, Sailors, Airmen and Marines.
- Delivers customized subscription emails and text alerts instantly.
- Makes content available on a variety of external platforms including social media channels, apps and podcasts.
- Allows smaller markets to routinely report on local units when deployed.
- 24-hour access to service members deployed in Iraq, Kuwait, Afghanistan, Qatar and locations worldwide.

## PRESS RELEASES

📄 DefenseTV Launches on Amazon Fire TV

- Valor 24 Release
- DVIDS Hometown News Map Release
- New DVIDS Tool Achieves 508 Compliance for Military Units
- DVIDS Facebook App Highlights Military Unit Pages
- DVIDS Opens Up Comments on Site
- DVIDS Content Available on iMediaShare
- Latest News Straight From the Frontlines to Your iPad
- DVIDS premiers HD live from Afghanistan during Super Bowl XLV on FOX
- DVIDS Partners with iTunes
- Instant YouTube Uploads Via DVIDS
- DVIDS Partners with Gray Television

**DVIDS CONTROL CENTER**

404-282-1450

**WEB SUPPORT**

dvidsservicedesk@dvidshub.net

**CUSTOMER SERVICE**

1-888-743-4662

dma.enterprise-customer-services@mail.mil

**FEATURES**

**UNITS**

**CONTENT**

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts
Series



Version: aa8fc278e6d9f45b64bc8ea9b9bba482fdbd6908_2025-07-14T17:30:03

# EXHIBIT 28

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 29

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 30

**TO DECLARATION OF JANE REILLEY IN SUPPORT OF PLAINTIFFS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION**

# (FILED UNDER SEAL)