BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

GAVIN NEWSOM, in his official capacity as
Governor of the State of California, et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America, et al.,

*Defendants*.

Case No. 3:25-cv-04870-CRB

**DEFENDANTS' SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

I.      California's Motion Based on the PCA Fails as a Matter of Law. .................................. 6

        A.      California has no cause of action to enforce the PCA. ............................................. 6

        B.      California cannot obtain relief on an *ultra vires* theory........................................... 8

        C.      California lacks standing to assert a PCA claim. .................................................. 11

        D.      In any event, Section 12406(3) authorizes the Guard to execute the laws. .......... 12

II.     The Federalized Guard and Marines are not Executing the Laws. .................................. 15

III.    California's Additional PCA Arguments Fail..................................................................... 22

IV.     California has identified no relief this Court could lawfully grant. .................................. 24

V.      The Equitable Factors Also Preclude Injunctive Relief. .................................................. 25

VI.     California cannot obtain relief against the President. ....................................................... 25

VII.    The Court should stay any order or judgment for California pending appeal. ................. 26

CONCLUSION.................................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*American School of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) ............................................................................................................... 6

*Applewhite v. United States Air Force,*
    995 F.2d 997 (10th Cir. 1993) ........................................................................................... 21

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) .......................................................................................................... 6-7

*Auris Health, Inc. v. Noah Med. Corp.,*
    2023 WL 7284156 (N.D. Cal. Nov. 3, 2023) .................................................................... 25

*Bissonette v. Haig,*
    776 F.2d 1384 (8th Cir. 1985) ..................................................................................... 19, 20

*Black Lives Matter D.C. v. Trump,*
    544 F. Supp. 3d 15 (D.D.C. 2021) .................................................................................... 6, 8

*Bryan v. United States,*
    524 U.S. 184 (1998) .............................................................................................................. 7

*City of Lyons v. Los Angeles,*
    461 U.S. 95 (1983) ............................................................................................................... 24

*Dalton v. Specter,*
    511 U.S. 462 (1994) ............................................................................................................ 10

*Federal Express Corp. v. United States Dep't of,*
    *Comm.,* 39 F.4th 756 (D.C. Cir. 2022) ...................................................................... 9, 10, 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................................... 10, 26

*Griffith v. FLRA,*
    842 F.2d 487 (D.C. Cir. 1988) ........................................................................................... 10

*Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) .............................................................................................................. 9

*In re Debs,*
    158 U.S. 564 (1895) ............................................................................................................ 18

*In re Neagle,*
    135 U.S. 1 (1890) ................................................................................................................ 18

ii

3:25-cv-04870-CRB                                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

*eBay, Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ............................................................................................................ 6

*Murphy Co. v. Biden,*
   65 F.4th 1122 (9th Cir. 2023) ......................................................................................... 10

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ..................................................................................... 25

*Newsom v. Trump,*
   141 F.4th 1032 (9th Cir. 2025) ......................................................................................... 5

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) .................................................................................... 9, 10

*Oestereich v. Selective Serv. System Loc. Board No. 11,*
   393 U.S. 233 (1968) ....................................................................................................... 2, 9

*Ratzlaf v. United States,*
   510 U.S. 135 (1994) ............................................................................................................ 7

*Robinson v. Overseas Military Sales Corp.,*
   21 F.3d 502 (2d Cir. 1994) ............................................................................................... 6

*Smith v. United States,*
   293 F.3d 984 (7th Cir. 2002) ........................................................................................... 6

*Nuclear Regulatory Commission v. Texas,*
   145 S. Ct. 1762 (2025) ............................................................................................ 2, 9, 11

*Trump v. CASA*, Inc.,
   145 S. Ct. 2540 (2025) ................................................................................................... 6, 9

*United State v. Jaramillo,*
   380 F. Supp. 1375 (D. Neb. 1974) .................................................................................. 8

*United States v. Allred,*
   867 F.2d 856 (5th Cir. 1989) ......................................................................................... 14

*United States v. Casper,*
   541 F.2d 1275 (8th Cir. 1976) ......................................................................................... 8

*United States v. Dreyer,*
   804 F.3d 1266 (9th Cir. 2015) ......................................................................... 3, 7, 8, 23

*United States v. Eleuterio,*
   2024 WL 1620383 (D.V.I. April 15, 2024) .................................................................... 7

iii

3:25-cv-04870-CRB               DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

*United States v. Hernandez-Garcia*,
  44 F.4th 1157 (9th Cir. 2022) ................................................................ 14

*United States v. Hitchcock*,
  286 F.3d 1064 ............................................................................................ 8

*United States v. Hutchings*,
  127 F.3d 1255 (10th Cir. 1997) ............................................................... 8

*United States v. Khan*,
  35 F.3d 426 (9th Cir. 1994) ............................................................... 8, 19

*United States v. King*,
  2022 WL 17976787 (N.D. Okla. Dec. 28, 2022) ................................... 21

*United States v. Klimavicius–Viloria*,
  144 F.3d 1249 (9th Cir.1998) .................................................................. 18

*United States v. McArthur*,
  419 F. Supp. 186 (D. N.D. 1975) .............................................................. 8

*United States v. Mendoza–Cecelia*,
  963 F.2d 1467 (11th Cir. 1992) ................................................................. 8

*United States v. Mousavi*,
  604 F.3d 1084 (9th Cir. 2010) ................................................................... 7

*United States v. Red Feather*,
  392 F. Supp. 916 (D. S.D. 1975) .............................................................. 8

*United States v. Texas*,
  599 U.S. 670 (2023) ................................................................................. 12

*United States v. Walden*,
  490 F.2d 372 (4th Cir. 1974) ..................................................................... 8

*United States v. Yunis*,
  924 F.2d 1086 (D.C. Cir. 1991) ..................................................... 8, 22, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 5, 25

*Wrynn v. United States*,
  200 F. Supp. 457 (E.D.N.Y. 1961) ............................................................ 8

### Statutes and Court Rule

10 U.S.C. § 12406 ......................................................................................... 4

iv

3:25-cv-04870-CRB                DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

10 U.S.C. § 12406(3) ............................................................................................ 5, 12

18 U.S.C. § 1385 ........................................................................................... 1, 2, 7, 12

18 U.S.C. § 111 ..................................................................................................... 13

18 U.S.C. § 136 ..................................................................................................... 13

Pub. L. No. 114-92 (2015) ...................................................................................... 14

U.S.C. § 12406(3) ........................................................................................... 2, 5, 12

Fed. R. Civ. P. 65(a)(2) ............................................................................................ 5

**Other**

Defense Support of Civilian Law Enforcement Agencies,
    https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf ................ 16

SRUF CJCSI 3121.01B,
    https://www.esd.whs.mil/Portals/54/Documents/FOID/Reading%20Room/Joint_Staff/20-F-
    1436_FINAL_RELEASE.pdf ............................................................................... 16

U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025,
    https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/ .......... 17

Department of Homeland Security, ICE, CBP Arrest at Least 361 Illegal Aliens During
    Marijuana Grow Site Operation, Rescue at Least 14 Children,
    https://www.dhs.gov/news/2025/07/13/ice-cbp-arrest-least-361-illegal-aliens-during-
    marijuana-grow-site-operation-rescue ................................................................ 19

v

3:25-cv-04870-CRB                        DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

1

## INTRODUCTION

2
3
4
5
6
7
8
9
10
11
12
13
14
15

Following a series of attacks by violent mobs targeting immigration law enforcement operations, President Trump mobilized members of the National Guard to protect federal property and federal personnel. Shortly thereafter, approximately 4,000 Guardsmen and several hundred Marines arrived in the Los Angeles area. They secured federal buildings that had been attacked or were under threat. And they acted to ensure that the public servants charged by Congress with the implementation of immigration laws could discharge their duties safely. Instead of working with the President to protect federal property and personnel from attack, California and its governor (collectively, California) filed a lawsuit in San Francisco, hundreds of miles from the scene. That suit and California's June request for emergency relief principally alleged that the President's deployment of the National Guard and Marines exceeded statutory authority and did not follow mandated procedures. After this Court entered a temporary restraining order (TRO), the Ninth Circuit stayed the TRO, holding that both arguments were likely to fail on the merits. That ruling sharply limits California's suit. The only remaining issue, also the subject of the upcoming trial, is California's argument under the Posse Comitatus Act (PCA), 18 U.S.C. § 1385.

16
17
18
19
20
21
22

The PCA issue before the Court is thus limited—whether the deployed National Guard (as California acknowledges, the Marines have been recalled) are conducting law enforcement activities and if so, whether such activities violate the PCA. The parties' dispute is even narrower because California does not contend that the mission on the whole violates the PCA. California never alleges that either the Presidential memorandum or the Department of Defense (DoD) memoranda deploying the Guard themselves direct conduct forbidden by the PCA. Nor does it argue that any DoD Instructions or guidance documents violate the PCA.

23
24
25
26
27
28

California's PCA claim fails *as a matter of law* for four reasons. First, the PCA provides no cause of action. Rather, it is a *criminal* statute that imposes criminal penalties for *willful* violations. California cannot use a criminal statute with a mens rea requirement offensively in a civil action to prospectively enjoin the federal government's operations. Indeed, California has not identified a single case providing analogous relief in the nearly 150 years since the PCA's

enactment, and the Government is unaware of any such case either.

Second, California's claim that the troops are acting *ultra vires* because their actions are inconsistent with the PCA similarly fails. That claim is categorically unavailable here. And this aside, relief for such a claim—"essentially a Hail Mary pass," *Nuclear Regulatory Commission v. Texas* (*NRC v. Texas*), 145 S. Ct. 1762, 1776 (2025) (quotation marks omitted)—is available only when an agency, in the words of the Supreme Court, engages in "blatantly lawless" action, *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 (1968), or has clearly misconstrued a statute. California cannot meet that standard. California does not even challenge any action of the President or any agency action that could even theoretically be subject to *ultra vires* review. Nor does California's complaint hinge on any purported misconstruction of the PCA by DoD. Rather, it is limited to the assertion that certain on-the-ground operations have involved the Guard and Marines in law enforcement activities. As to those operations, California's arguments are wrong but, in any event, fall far short of a meritorious *ultra vires* claim.

Third, California lacks standing to assert this claim. Even assuming that California had demonstrated PCA violations, California never explains how it is injured by such violations or how any relief this Court could lawfully order would redress any such alleged injury.

Fourth, even if California could assert a PCA claim, the PCA's general bar on willfully using the federalized National Guard to execute the laws would not apply because another statute expressly authorizes law-execution activities. The PCA provides that the bar applies only to activities not "expressly authorized by . . . Act of Congress." 18 U.S.C. § 1385. Section 12406(3) allows the President to federalize the Guard where he "is unable with the regular forces *to execute the laws of the United States*." 10 U.S.C. § 12406(3) (emphasis added). And the statute further authorizes the President to federalize Guardsmen "in such numbers as he considers necessary to . . . *execute those laws*." *Id.* § 12406 (emphasis added). The plain text of this provision and Ninth Circuit precedent establish that this language qualifies as an express authorization to conduct law enforcement for PCA purposes. None of California's contrary arguments has any merit.

Putting aside these dispositive legal defects, California has not established that the Guard

or Marines have or are executing the laws in purported violation of the PCA—let alone that they are willfully doing so. As Supreme Court precedent makes clear, the PCA does not prohibit the President from using troops to protect federal personnel and property. California faults the Guard and Marines for performing security functions during law enforcement investigations. The Marines are not accompanying law enforcement on at-large missions and, instead, were stationed to guard three federal buildings. *See* Decl. of Garry Hartlieb (Hartlieb Decl.) Ex 1, Nos. 2, 8; Ex. 2 at 106:8–10. And in terms of the National Guard, accompanying federal law enforcement officials for their protection as those officials enforce federal immigration laws does not mean that the troops are themselves engaging in law enforcement. Indeed, multiple decisions from the Ninth Circuit establish that providing security for civilian law enforcement does not violate the PCA.

California also alleges that the Guard and Marines are establishing "perimeters" and "blockades" but cites no authority that establishing security perimeters and blockades to protect federal property and officials violates the PCA, and there is none. California suggests Defendants have made unauthorized detentions. It points to one instance where a U.S. Marine briefly detained an individual who was attempting to enter protected federal property. It also highlights an incident that did not result in detention and where the individual was free to leave. The PCA permits temporary detention in protection of federal personnel and property, and despite the discovery the Court permitted California to conduct over Defendants' objection, California can point to no activities that plausibly "subject[ed] civilians to the use of military power that is regulatory, prescriptive, or compulsory." *United States v. Dreyer*, 804 F.3d 1266, 1275–76 (9th Cir. 2015).

California's failure to establish any basis for its claim is dispositive. But there is also no relief this Court could lawfully order; nor has California identified any such relief. And to the extent the remaining permanent injunction factors are relevant, they preclude relief as well.

## BACKGROUND

This Court is familiar with the background of this case, and Defendants therefore incorporate by reference their previous summaries of the facts and relevant legal framework, *see,* ECF Nos. 25, 84, 95, 99, except to highlight the following facts.

On June 6, 2025, Immigration and Customs Enforcement (ICE) officers conducting federal enforcement operations in Los Angeles were met with widespread and perilous violence.  *See* ECF No. 84 at 4–6.  Violent mobs besieged federal facilities, assaulted federal officers, "pinned down" federal officials, and threw "concrete chunks" and other dangerous objects at officers.  ECF No. 25-1 ¶¶ 7–28.  They used "commercial dumpsters" as "battering ram[s]" to breach a federal building and "heavily vandalized" federal properties.  *Id.*  They engaged in "seven hours of non-stop fighting," fired potentially lethal "commercial-grade fireworks" and "mortar-style fireworks" at them, as well as trapped an ICE officer in her vehicle, among other mayhem.  *Id.*

In response, on June 7, President Trump signed a memorandum calling into federal service at least 2,000 members of the California National Guard.  ECF No. 25-2 at 3–4.  Based on the President's order, Secretary of Defense Pete Hegseth federalized 2,000 Guardsmen to respond to the crisis before activating an additional 2,000 Guardsmen and deploying several hundred Marines.  ECF No. 25-2 (June 7 DoD Memo); ECF No. 25-3 (June 9 DoD Memo).  As California acknowledges, the Marines have since left.  Supp. Br. 1.  As of today, about 300 Guardsmen remain assigned to the mission, less than 10 percent of the 4,000 deployed in June.  *See infra* note 10.

California filed suit on June 9, 2025, alleging that Defendants' actions exceeded the President's authority under 10 U.S.C. § 12406, violated the Tenth Amendment, Compl. ¶¶ 93–101, and that the Secretary's federalization orders were procedurally defective, *id.* ¶¶ 102–06.  Apparently as an afterthought, the Complaint mentions in conclusory fashion that "[v]iolation of the Posse Comitatus Act is imminent, if not already underway."  Compl. ¶ 91.

On June 12, this Court entered a TRO, ECF No. 64, finding that California was likely to succeed on its claims that the federalization of the Guard was not authorized by Section 12406 and did not meet the statute's procedural requirements.  ECF No. 64 at 16–26.  The Court discussed but did not reach the merits of the PCA claim.  *Id.* at 26–29.  After granting a short administrative stay, a unanimous panel of the Ninth Circuit stayed the TRO pending appeal, which the Ninth Circuit characterized as "effectively a preliminary injunction."  *Newsom v. Trump*, 141 F.4th 1032, 1044 (9th Cir. 2025) (per curiam).  The Ninth Circuit held that the President "likely acted within

4

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

his authority in federalizing the National Guard under 10 U.S.C. § 12406(3)," *id.* at 1052, and "likely complied with § 12406's procedural requirement," *id.* at 1054.[1]  Defendants' appeal remains pending; Defendants filed their opening brief on July 22.

Following the Ninth Circuit's stay order, California for the first time asked the Court to authorize expedited discovery, which the Court granted—albeit limiting the discovery to only the PCA claim—over Defendants' objection.  ECF Nos. 94, 97, 98.  Thereafter, the Court consolidated the hearing on the preliminary injunction with the trial on the merits, pursuant to Fed. R. Civ. P. 65(a)(2).  By the time of the trial, currently scheduled for August 11 to 13, California will have conducted three depositions, and received interrogatory responses as well as more than 19,000 pages of documents from Defendants.  As discussed further below, it is irrelevant what the record shows because California's PCA claim fails on multiple legal grounds.  But even if the Court were to proceed further, the record reflects that the federalized Guard and U.S. Marines have in fact limited their activities to protecting federal officers and property, consistent with the President and DoD memoranda.  We discuss the facts as developed through discovery in the argument section.

## LEGAL STANDARD

To obtain a preliminary injunction, California must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Since the Court has advanced the trial on the merits and consolidated it with the preliminary injunction hearing, ECF No. 109; *see also* Supp. Br. 22 (requesting permanent injunction), California must meet the standards for obtaining a permanent injunction, which requires the movant to demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

---

[1] The panel also addressed California's Tenth Amendment claim, observing that the district court's holding "rested, at least in part," on its conclusion as to section 12406 and that California had not pressed any alternative Tenth Amendment arguments.  *Newsom*, 141 F.4th at 1054 n.5.

5

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**ARGUMENT**

**I.    California's Motion Based on the PCA Fails as a Matter of Law.**

California's PCA claim—and its motion for injunctive relief based on that claim—fails as a matter of law.  California (A) lacks a cause of action under the PCA, (B) cannot seek relief under an *ultra vires* theory, (C) lacks standing, and (D) cannot proceed on any PCA claim as to the Guard because Section 12406 authorizes the Guard to engage in law enforcement.  Each of these points independently suffices for the Court to rule for Defendants on the PCA claim without a trial.

**A.    California has no cause of action to enforce the PCA.**

As this Court previously recognized at the TRO stage, "[t]he [PCA] does not provide a private cause of action for damages."  ECF No. 64 at 27.  Numerous other courts have similarly found that the PCA does not create a private civil cause of action.  *See, e.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).  Those decisions are correct.  The PCA is a criminal statute with no express cause of action.  As Judge Friedrich observed in *Black Lives Matter*, "[c]riminal statutes like the PCA do not always—or even generally—create a cause of action for civil damages."  544 F. Supp. 3d at 40.

Nor does California have any equitable cause of action to enforce compliance with the PCA.  "[T]he statutory grant" empowering federal courts to issue equitable remedies "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception."  *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025).  Where courts have enjoined federal or state governments in equity, it has typically been for civil violations on behalf of plaintiffs subject to a relevant regulatory scheme.  *See, e.g.*, *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S.

6

3:25-cv-04870-CRB                                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

320 (2015).  By contrast, there is no historical basis, and thus no implied *equitable* cause of action, for a court to enjoin the federal government to comply with a criminal statute that protects the public at large, even if at the behest of a State purportedly on behalf of its residents.

The PCA's willfulness requirement further underscores that it cannot be the source of an equitable cause of action against the federal government.  The statute provides that, absent express authorization, anyone who "*willfully* uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 1385 (emphasis added).  In the context of a criminal statute like the PCA, "the word 'willful' generally indicates a requirement of specific intent."  *United States v. Mousavi*, 604 F.3d 1084, 1092 (9th Cir. 2010).  Although the specific "construction is often dependent on the context in which it appears," *Bryan v. United States*, 524 U.S. 184, 191 (1998), willfulness at least requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).  Such an inquiry is nonsensical as applied to an equitable cause of action against the federal government.  To state the obvious, when Congress intends to provide for judicial review of Presidential and federal agency action, it very rarely (if ever) makes the outcome of that review depend on questions of governmental scienter.

Given this, the appropriate remedy for a PCA violation, if any, is criminal prosecution of individuals who willfully violate the PCA—*or at most* and under highly limited circumstances, suppression of evidence[2] seized in violation of the Act or other defensive use of the statute by defendants in a criminal prosecution.  Virtually all the relevant PCA caselaw (including virtually

---

[2] Even suppression is highly disfavored.  As one court recently observed, "federal courts have overwhelmingly refused to impose the extraordinary remedy of the exclusionary rule for a violation of the PCA." *United States v. Eleuterio*, 2024 WL 1620383, *3 (D.V.I. April 15, 2024); *see also id.* at *3 n.7 (collecting cases); *Dreyer*, 804 F.3d at 1277–80 (en banc) (suppression of evidence held unwarranted remedy for the asserted PCA violations there but suggesting that remedy could be available for "widespread and repeated violations" of the PCA).  The consistent reluctance of courts to allow use of the PCA even for this much more modest purpose simply underscores that California's attempt to use it offensively to assert an equitable cause of action against Defendants has no legal basis.

7

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

all of the cases California cites) has emerged in these contexts or a closely related context.[3]

Indeed, the remedy California seeks in this case is unprecedented.  In the nearly 150-year history of the PCA, the Government has not located (and California has not cited) any case in which a court prospectively enjoined the federal government's operations based on the PCA in a civil action—let alone done so to enjoin operations undertaken pursuant to directives (like the Presidential Memo and DoD Memos here) that are concededly *lawful*.  Because California cannot enforce the PCA against Defendants, it is entitled to no relief on its PCA claim.

**B. California cannot obtain relief on an *ultra vires* theory.**

Despite the absence of a cause of action to enforce the PCA that is expressly provided or implicitly authorized in equity, this Court previously suggested that California may be able to bring an *ultra vires* claim if the "agency has disregarded a specific and unambiguous statutory directive" or "has violated some specific command of a statute."  ECF No. 64 at 27 (quoting *Black Lives Matter*, 544 F. Supp. 3d at 41).  California's brief confirms that this is the sole theory under which they pursue relief as to the PCA.  Supp. Br. 17–19.  But that route is also unavailable.

For starters, *ultra vires* review simply is not available to grant a type of injunction that is not available in equity at all.  Again, federal courts may only issue "those sorts of equitable

---

[3] *See Dreyer*, 804 F.3d at 1275 (appeal from denial of motion to suppress following criminal conviction); *United States v. Hitchcock*, 286 F.3d 1064, 1067 (9th Cir.) (same), *opinion amended and superseded on unrelated grounds*, 298 F.3d 1021 (9th Cir. 2002); *United States v. Hutchings,* 127 F.3d 1255, 1257–58 (10th Cir. 1997) (same); *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974) (same); *United States v. Khan,* 35 F.3d 426, 431 (9th Cir. 1994) (claim by criminal defendant that prosecution was outside United States' jurisdiction); *United States v. Yunis,* 924 F.2d 1086, 1094 (D.C. Cir. 1991) (defendant arguing that indictment should have been dismissed because the government seized him in violation of the PCA); *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1478 (11th Cir. 1992) (similar); *United States v. McArthur*, 419 F. Supp. 186, 192 (D. N.D. 1975) (criminal defendant arguing that element of crime—that law enforcement officers defendant interfered with were engaged in lawful activities—was not met because they received assistance in violation of the PCA), *aff'd sub nom. United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976); *United States v. Red Feather*, 392 F. Supp. 916, 921 (D. S.D. 1975) (similar); *United State v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974) (similar); *see also Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y. 1961) (suit for money damages under Federal Tort Claims Act for injuries sustained as a result of operation of an Air Force helicopter to search for an escaped civilian prisoner in violation of the PCA).

8

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

remedies 'traditionally accorded by courts of equity' at our country's inception." *CASA*, 145 S. Ct. at 2551 (quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).   Thus, for example, *ultra vires* review allows a plaintiff (who satisfies *very* demanding standards) to bring an otherwise-appropriate equitable claim that is subject to some preclusion of review.  *NRC v. Texas*, for example, considered the availability of an *ultra vires* claim where petitioners were barred from challenging a decision of the Nuclear Regulatory Commission under the Hobbs Act because they were not properly joined as parties to the Commission proceedings.  But *ultra vires review* is not available where, as here, there is simply no traditional equitable jurisdiction to enjoin the federal government's activities based on a criminal statute with a willfulness requirement that the federal government is charged with enforcing.  Were it otherwise that fundamental defect would be evaded just by using the term "*ultra vires*" and contending that the asserted violation is purportedly egregious—all with no basis in equity to issue an injunction.

But even putting that threshold defect aside, *ultra vires* review, even where available, requires a plaintiff to satisfy among the most demanding standards known in the law.  As then-Judge Kavanaugh memorably put it, *ultra vires* review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009); *see also NRC v. Texas*, 145 S. Ct. at 1776 (repeating this). Under an *ultra vires* theory, "[t]he agency overstep must be 'plain on the record and on the face of the [statute].'"  *Federal Express Corp. v. United States Dep't of Comm.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (quoting *Oestereich*, 393 U.S. at 238 n.7) (second alteration supplied by D.C. Circuit). That overstep must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless" agency action.  *Oestereich*, 393 U.S. at 238.  A plaintiff seeking to challenge agency action via a nonstatutory *ultra vires* action "must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review."  *Federal Express Corp.*, 39 F.4th at 765 (quotation marks omitted).  "In other words, ultra vires claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand."  *Id.*

California obviously does not meet this demanding standard.  For starters, California is not challenging any Executive action of the sort that could even theoretically be subject to *ultra vires* review, such as an Executive Order, *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994), other presidential action, *see Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023), or an agency action that would ordinarily be reviewable under the APA but that Congress has precluded from APA review, *see Nyunt*, 589 F.3d at 448–49.

Indeed, *that* is the sort of challenge this Court had in mind when it suggested that California might have an *ultra vires* claim insofar as it challenged President Trump's federalization order and Secretary Hegseth's memoranda.  *See* ECF No. 64 at 27 ("So if Plaintiffs are correct that President Trump and Secretary Hegseth's federalization of the National Guard requires National Guard members to violate the Posse Comitatus Act, such a violation may provide a basis for their ultra vires claim.").  California is incorrect in stating that this Court already decided that the arguments as framed in its supplemental brief can be asserted under an *ultra vires* theory.  Supp. Br. at 17.

Unlike the type of challenge that this Court posited in its TRO opinion might be available, California does not challenge the legality of the Presidential and DoD memoranda, or even the DoD's subsequent guidance regarding the PCA, and for good reason: nothing in them even plausibly *directs* the federalized National Guard members or the Marines to undertake activities that would violate the PCA, let alone does so "plainly and openly."  *Federal Express Corp.*, 39 F.4th at 765.  California instead contends that certain operations the Guard and Marines have undertaken since their deployment to Los Angeles involve execution of the laws in violation of the PCA.  Supp. Br. 8–12.  But the "Hail Mary pass" provided by *ultra vires* review is available only where "the *agency's* error is patently a misconstruction of the Act, or when the *agency* has disregarded a specific and unambiguous statutory directive, or when the *agency* has violated some specific command of a statute."  *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal quotation marks omitted, citations omitted, emphases added).  That "demanding standard for judicial intervention," *Federal Express Corp.*, 39 F.4th at 765, does not permit review of on-the-ground operational decisions.

10

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

But even assuming California could challenge individual operations as contrary to the PCA under an *ultra vires* theory, any such challenge is a nonstarter. California asserts that the military is engaged in execution of law by providing security to law enforcement officials, by setting up security perimeters, and by, on two occasions, allegedly "apprehending and detaining civilians," Supp. Br. 3 (one of which, as discussed further below, was not a detention). As discussed further below, none of these activities (even if all true) violates the PCA, let alone constitutes "blatantly lawless" agency action sufficient to support an *ultra vires* claim. And for the reasons set forth in Part D, none of this matters anyway because Section 12406(3) expressly authorizes the Guard to execute the law. But in any event, even if the Court were to *agree* with some of California's arguments—which it should not—that is simply not enough to support relief under an *ultra vires* theory. *See NRC v. Texas*, 145 S. Ct. at 1776 (noting that D.C. Circuit had previously rejected Texas's statutory argument and stating that "[e]ven if one were to disagree with the D. C. Circuit's conclusion, the statutory argument falls well shy of a meritorious" *ultra vires* claim).

**C. California lacks standing to assert a PCA claim.**

California also lacks standing to pursue a PCA claim. California previously framed its alleged injury principally as "the diversion of California National Guard members from their vital roles within the State," as well as "continued injury to their sovereign interests, through an unlawful commandeering of the state militia." ECF No. 77 at 26. But those alleged injuries are not redressable through a PCA claim: California does not and cannot contend that a PCA violation, even if proven, would require the President or Secretary of Defense to return control of the California National Guard to Governor Newsom. As to California's remaining claim of injury— that "the continued presence of the military in Los Angeles [] risks worsening, not improving, tensions on the ground," *id.* (quotation marks omitted)—we have explained at length why that is wrong. ECF No. 84 at 27–28. And even if it were an irreparable harm for *Winter* purposes, it is not a *judicially redressable* injury in fact.

But even if California had shown some otherwise redressable injury, the Supreme Court has "also stressed that the alleged injury must be legally and judicially cognizable," which

"requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 599 U.S. 670, 676 (2023).  As the Court noted in *United States v. Texas*, states suing to compel the federal government to enforce federal criminal laws is not part of that tradition: "The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions." *Id.* at 677.  Similarly here, California has presented no precedent of a state—or indeed, *of any litigant*—obtaining a prospective injunction requiring federal governmental compliance with a federal criminal statute, with a willfulness requirement, that the Executive Branch is charged with enforcing.  Since California lacks standing, for this reason as well its claim fails as a matter of law.

**D.  In any event, Section 12406(3) authorizes the Guard to execute the laws.**

Even if California could challenge the Guard's operations under the PCA—it cannot—the PCA's criminal prohibition on using the specified components of the military to "execute the laws" does not apply "in cases and circumstances expressly authorized by the Constitution or Act of Congress."  18 U.S.C. § 1385.  Section 12406(3) qualifies as express Congressional authorization for purposes of the PCA.[4]  Using language identical to that in the PCA, Section 12406(3) authorizes the President to federalize the Guard where he "is unable with the regular forces *to execute the laws* of the United States."  10 U.S.C. § 12406(3) (emphasis added).  If that were not express enough, the statute further makes clear that, once federalized, the Guard *can in fact execute* the laws.  It authorizes the President to federalize Guardsmen "in such numbers as he considers necessary to . . . *execute those laws*."  *Id.* § 12406 (emphasis added).  It is difficult to imagine a more explicit authorization for execution of law.  And that is why, for example, in the case of the 1970 Postal Service strike, it was permissible for the National Guard to execute the laws on

---

[4] California is correct that this argument does not apply to the Marines.  Supp Br. 19 n.6.  Notably, the Marines' mission was limited to protecting federal property, not accompanying law enforcement on at-large operations.  *See* Hartlieb Decl. Ex. 1, Nos. 2, 8; Hartlieb Decl. Ex. 2 at 106:8–10 ("The Marines remained strictly at the three buildings: The Roybal, the Wilshire, and the Paramount.").  And the Marines have since left Los Angeles.

12

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

delivery of mail when President Nixon invoked Section 12406 in response to the strike.

In ordering expedited discovery, the Court deemed this argument "premature," ECF No. 101 at 3, but none of the reasons the Court then identified provides a legal basis for rejecting the Government's express authorization argument now. The Court observed that Section 12406 is limited to "laws *of the United States*"—that is, federal law. *Id.* But California's supplemental brief does not contend—let alone establish—that the federalized Guard is enforcing some other source of law, such as state law. The Court also stated that "a narrower reading of Defendants' argument— that § 12406 operates as an exception to the Posse Comitatus Act only to the extent that the federalized National Guard is enforcing the federal laws that the President determined could not be enforced with the regular forces—has not yet been tested by the adversarial process." ECF No. 101 at 4. But President Trump's memorandum makes clear the Guard's mission falls squarely within section 12406. The memorandum stated that "incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws," and that "violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." ECF No. 25-2 at 3. Thus, the federal laws that the President determined could not be enforced with the regular forces encompasses, at the very least, federal immigration laws as well as laws forbidding interference with federal functions or assaults on federal officers and property. *See* 18 U.S.C. §§ 111, 136. Again, California does not allege—let alone establish—that the Guard is enforcing *other laws* unrelated to the President's determination.[5]

Finally, the Court also previously suggested that this argument was premature because "the argument has not been fully briefed—Defendants make this argument in just a few sentences, and Plaintiffs have not even had a chance to respond." ECF No. 101 at 3. Defendants respectfully

---

[5] California references the Guard's presence at two operations at cannabis farms. Supp. Br. 2, 3. We have explained that such presence is for the protection of law enforcement officials conducting immigration enforcement. ECF No. 95 at 4–5. California does not contend otherwise.

13

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

disagree.  Defendants made this argument in their preliminary injunction opposition.  ECF No. 84 at 23–24.  California had a chance to respond, and did so.  ECF No. 87 at 8–9.  In any event, the argument has now been fully briefed, and it bars California's motion as a matter of law.

Nor do any of California's contrary arguments have merit.  Contrary to California's contentions, Defendants do not seek an "exception" to the PCA; the PCA itself directs that its criminal prohibition on the military executing the laws does not apply where Congress has expressly authorized such execution.  California also notes that the federalized Guard is "'subject to the laws and regulations governing the Army,' which includes the Posse Comitatus Act."  Supp. Br. 19.  True, but irrelevant.  The PCA *allows* the Army to execute the laws so long as there is a statute expressly authorizing them to do so; and Section 12406 is such a statute.

California next contends that "Section 12406 makes no mention of the Posse Comitatus Act or civilian law enforcement."  Supp. Br. 19–20.  As an initial matter, Section 12406 *does* mention civilian law enforcement because it expressly authorizes execution of the "laws of the United States."  Moreover, it is irrelevant that section 12406 does not mention the PCA.  Although the PCA requires express authorization, there is no requirement that the statute providing the authorization mention the PCA.  Indeed, courts—including the Ninth Circuit—have repeatedly found express authorization even when the statute providing that authorization makes no mention of the PCA.  *See, e.g.*, *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022); *United States v. Allred*, 867 F.2d 856, 870–71 (5th Cir. 1989).  In *Hernandez-Garcia*, the provision the Ninth Circuit considered not only made no mention of the PCA, but was buried within an approximately 800-page omnibus authorization act.  *See* National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, §§ 1059(a), (c)(2), 129 Stat. 726, 986 (2015).  Neither the district court nor the unanimous Ninth Circuit panel had any difficulty concluding that the provision constituted express authorization for PCA purposes.  There is no question that Section 12406 allows the President to authorize execution of the laws, as has been the case with its predecessor statutes since the Washington Administration, *see* First Militia Act of 1792, 1 Stat. 271—nearly 100 years *before* Congress enacted the PCA.  For this reason too, California's PCA

14

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

claim against the Guard fails.[6]  Given this and the three other independent bases for judgment as a matter of law for Defendants on California's PCA claim, Defendants respectfully submit that next week's trial should be cancelled and Plaintiffs' motion denied.

## II.    The Federalized Guard and Marines are not Executing the Laws.

For the reasons explained above, California's PCA claim and motion based on the PCA both fail as a matter of law, and there is no need to resolve any perceived factual disputes.  But even if the PCA claim turns on the facts, there are no material factual issues to be resolved at trial—it is clear that the Guard and Marines are not executing the laws.

For starters, the Secretary of Defense's June 7 and 9 memos mobilizing the Guard and Marines all make clear that the mission is protection of federal property and personnel performing federal functions—not law enforcement.  The June 7 and June 9 DoD memoranda repeat these explanations.  ECF No. 25-2 at 2; ECF No. 25-3 at 2.  Similarly, as the Commanding General of Task Force 51[7] has explained, the Guard's and Marines' activities consist of: (1) establishing outside perimeters, observation posts, and presence patrols for federal property at locations targeted by protests; and (2) providing personnel protection for DHS and FBI agents conducting operations in Los Angeles County, "to enable Federal Law Enforcement officers to conduct their Federal functions safely and with minimal interference from bystanders."  ECF No. 84-3 ¶ 9(A)–(C); *see also* Hartlieb Decl. Ex. 1, No. 1 (describing Task Force 51's mission).

In addition, DoD has developed standards and guidelines to ensure compliance with the PCA for soldiers serving in active military service of the United States.  The military's Standing Rules on the Use of Force (SRUF) prohibit military members from conducting activities traditionally reserved for law enforcement, except in limited permissible circumstances.  *See*

---

[6] California's expansive discussion of DoD guidance and statements for the proposition that the military has assumed that the PCA's prohibition on law execution applies here, Supp. Br. 20–21, is irrelevant.  None of those sources has the force of law or determines the outer limits of the PCA, which is ultimately a question of law.

[7] Task Force 51 is a component within U.S. Army Northern Command, U.S. Army North, and has been delegated control of mobilized and federalized members of the California National Guard as well as the Marines deployed to Los Angeles.  ECF No. 84-3 ¶ 5.

1   SRUF CJCSI 3121.01B.[8]  For example, under the SRUF, members of the military may only

2   temporarily detain an individual who has gained unauthorized access into secured areas, refuses

3   to depart, or threatens DoD personnel, or others in the vicinity.  *See* Hartlieb Decl. Ex. 3 at

4   DEFS_0001072.  They must then release the detained individual to civilian law enforcement "at

5   the earliest opportunity consistent with mission accomplishment."  *See id.* at DEFS_00001073.

6   The SRUF contains similar limitations on the use of force, inspections, and recovery of property,

7   all tied to accomplishing the DoD's mission, rather than enforcing civilian laws.

8       The military, moreover, has ensured that the federalized Guard and Marines understand

9   and comply with these instructions.  DoD and Task Force 51 have provided detailed trainings

10  explaining members' obligations under the PCA to all National Guardsmen and U.S. Marines

11  involved in the Federal Protection Mission (FPM) in Los Angeles.  Hartlieb Decl. Ex. 4; Hartlieb

12  Decl. Ex. 5; Hartlieb Decl. Ex. 6; *see also* Hartlieb Decl. Ex. 1, No. 11 (describing training received

13  by all military units under TF-51's control, which includes training on the PCA and SRUF, with

14  vignettes reflecting situations that may arise during the conduct of operations).  All members of

15  the Guard have in fact received that training.  Hartlieb Decl. Ex. 2 at 65:15–66:3 (noting this).  The

16  military has distilled these rules into cards for members to carry with them while deployed.  *See*

17  Hartlieb Decl. Ex. 7; Hartlieb Decl. Ex. 3; Hartlieb Decl. Ex. 8.  There is also a QR code version

18  military members can use to pull up the SRUF on their phones.

19      DoD has also published extensive instructions, entitled Defense Support of Civilian Law

20  Enforcement Agencies, 3025.21,[9] which "[e]stablishes DoD policy, assigns responsibilities, and

21  provides procedures for DoD support to Federal, State, tribal, and local civilian law enforcement

22  agencies, including responses to civil disturbances within the United States," *id.* at 1.  The guidance

23  delineates permissible and impermissible assistance, the latter including, for example, interdiction

24  of a vehicle, vessel, or aircraft; search or seizure; arrest; apprehension; stop and frisk; engaging in

25  ─────────────

26  [8] *Available at*
    https://www.esd.whs.mil/Portals/54/Documents/FOID/Reading%20Room/Joint_Staff/20-F-
    1436_FINAL_RELEASE.pdf.

27  [9] *Available at* https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf.

28

interviews, interrogations, canvassing, and questioning of potential witnesses or suspects.  *Id.* at Enclosure 3, 18–19.  DoD has tightly adhered to these standards.  *See* Hartlieb Decl. Ex. 9.  Further, the Secretary of Defense has explicitly directed that active military servicemembers cannot participate in law enforcement activities.  *See* Hartlieb Decl. Ex. 10 at DEFS_00002539 ███████ ███████████████████████████████████████████████████████████████████████████ ██████████████     DoD has also established requirements and procedures for reporting potential violations of the PCA and internal military rules, in the form of Commander's Critical Information Requirements Reporting (CCIR) Procedures.  *See* Hartlieb Decl. Ex. 11; *see also* Hartlieb Decl. Ex. 1, No. 3 (discussing the close monitoring of all Federal Protection Mission activities by the chain of command and the reporting requirements).  Consistently, under Rule 12 of the Standing Rules for The Use of Force as provided on the U.S. Army North "SRUF Card" (Hartlieb Decl. Ex. 7 at DEFS 0000001), troops are ordered to "IMMEDIATELY report any violation of non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning the who, what, when, where, and why."

Defendants have produced the CCIR reports for the Task Force 51's Federal Protection Mission in California, which include no reports of PCA violations.  Hartlieb Decl. Ex. 12.  And in the one instance where the Marines briefly detained a civilian (discussed further below), the record shows that it complied with the PCA and that this was confirmed when officials immediately and thoroughly investigated the incident.  Hartlieb Decl. Ex. 13.

While the Guard and Marines have adhered to all applicable legal requirements, their presence has played an essential role in protecting federal property and personnel from violent mobs.  ECF No. 84 at 8–9.  And as the lawlessness in Los Angeles that gave rise to the need for protection has subsided, DoD has reduced the National Guard's and Marines' presence; as of August 1, 1990, only 300 Guard members remain assigned to the protection mission.[10]

---

[10]  *See* U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025
https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/

1      Notwithstanding all of this, California identifies three supposed ways the Guard and

2 Marines are impermissibly executing the laws: (1) allegedly detaining civilians on two occasions;

3 (2) forming perimeters and blockades; and (3) performing security functions during federal law

4 enforcement operations. Supp. Br. 8. As we have said, Section 12406 constitutes express

5 authorization for the Guard to engage in law enforcement so these arguments fail at the outset. In

6 any event, none of these contentions constitutes otherwise forbidden execution of the laws.

7      *Security functions*: California first makes the argument that providing security and

8 protection for federal officers conducting law enforcement operations *itself* amounts to forbidden

9 execution of the laws. Supp. Br. 8–10. This is wrong. The Guard does not engage in law

10 enforcement merely because they protect those who do. When the Guard protects ICE agents who

11 are engaged in immigration enforcement actions, it is the ICE agents who are executing federal

12 immigration laws. More importantly, California's argument is contrary to binding precedent. The

13 President has an "inherent" protective and emergency power derived from the Take Care Clause.

14 *See In re Neagle*, 135 U.S. 1, 69 (1890). Indeed, the Court in *Neagle* viewed it *as obvious* that

15 protection of federal officials enforcing the laws was within the President's authority:

16         So, if the president . . . is advised that the mails of the United States, possibly

17         carrying treasure, are liable to be robbed, and the mail carriers assaulted and
        murdered, in any particular region of country, who can doubt the authority of the

18         president . . . to make an order for the protection of the mail, and of the persons and
        lives of its carriers, by . . . providing a sufficient guard, whether it be by soldiers of

19         the army or by marshals of the United States, with a posse comitatus properly armed
        and equipped, to secure the safe performance of the duty of carrying the mail
        wherever it may be intended to go?"

20 *Id.* at 65. Similarly, as then-Assistant Attorney General Rehnquist explained more than half a

21 century ago, the President has inherent Article II authority "to use troops for the protection of

22 federal property and federal functions." *Authority to Use Troops*, 1 Supp. Op. O.L.C. 343, 343

23 (1971); *see id.* at 344 (discussing decisions in *Neagle* and *In re Debs*, 158 U.S. 564 (1895)).

24      More recently, the Ninth Circuit has twice rejected the argument that providing security

25 for law enforcement operations violates the PCA (even where, unlike here, that security was

26 combined with additional support). *See United States v. Klimavicius–Viloria,* 144 F.3d 1249, 1259

27 (9th Cir. 1998) (no violation where "the Navy supplied equipment, logistical support and backup

28

security"); *United States v. Khan*, 35 F.3d 426, 432 (9th Cir. 1994) ("logistical support and backup security").  California's contrary argument has no basis in law.

California also contends that "but for the current deployment, the security functions that Task Force 51 troops are performing would otherwise be performed by federal law enforcement agents themselves," which they characterize as "fatal to Defendants' position."  Supp. Br. 9.  This makes no sense.  On that theory, the security provided by the Navy in *Klimavicius–Viloria* and *Khan*—or indeed, all of the other forms of indirect assistance courts have held are permissible under the PCA—would be unlawful simply because civilian law enforcement would have to and could perform those tasks if the military did not.  Relatedly, California notes the statements of Mr. Ernesto Santacruz, Jr. that "[t]he National Guard has been extremely helpful . . . by protecting federal property and personnel during immigration enforcement operations" and "[h]aving the National Guard at our fingertips as a Quick Reaction Force is key to maintain officer safety and continuing our immigration enforcement operations."  Supp. Br. 9 (quoting ECF No. 84-1 ¶ 9).  These statements confirm that the Guard and Marines' role is limited to protection of federal property and personnel, which is not law enforcement for PCA purposes.

Indeed, California's own examples confirm the necessity of this protection.  For example, California references the Guard's presence during law enforcement operations at cannabis farms in Camarillo, California and Carpinteria, California.  Supp Br. 3.  During those operations, ICE agents "arrested at least 361 illegal aliens—including criminals with convictions for rape, serial burglary, hit and run and DUIs."  *See* https://www.dhs.gov/news/2025/07/13/ice-cbp-arrest-least-361-illegal-aliens-during-marijuana-grow-site-operation-rescue.  The Guard's presence was necessary because *500 rioters* attempted to disrupt these operations, including one violent agitator who fired a gun at law enforcement officers.  *Id.*

"*Perimeters and Blockades*": California next argues that "the formation of armed perimeters and blockades" violates the PCA.  Supp. Br. 10.  California cites an Eighth Circuit case for the proposition that "the formation of armed perimeters by military personnel violates the" PCA.  *Id.* (citing *Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985)).  But in that case, the court

19

3:25-cv-04870-CRB                               DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

held that plaintiffs stated a claim upon which relief could be granted where they alleged "that the defendants seized and confined plaintiffs within an 'armed perimeter,'" and where an entire village was sealed off for *ten weeks*. *Id.* at 1385. That underscores that "perimeter" and "blockade" are capacious terms. The action in *Bissonette* was a "perimeter." But that is very different from "forming a perimeter around a marijuana farm" to provide security for immigration enforcement operations. Supp. Br. 11. The latter does not violate the PCA. Similarly, the Berlin Blockade was a blockade. But blocking access to federal property in response to attacks from a violent mob or to prevent such attacks is also a blockade. Again, the latter does not violate the PCA.

Relatedly, California's arguments conflate the action with the underlying purpose for the action. The military is allowed to establish a perimeter around (or a "blockade" of) federal property if they are doing so to protect the property. They are also allowed to establish perimeters around ongoing federal enforcement operations if necessary to protect federal officials executing federal law, including blocking traffic and people if necessary for the safety of such officials. That is because, as noted above, providing protection and security to those performing federal functions is not law enforcement for PCA purposes. Again, California cites no authority to the contrary.[11]

--------

[11] California instead extensively relies on military documents and deposition testimony, but that reliance is misplaced. For one, these sources do not actually support California's position. To the extent DoD documents and SRUF training materials prohibit "crowd and traffic control" as standalone objectives, Supp. Br. 10, that does not mean the Guard's protection of federal facilities and federal officials is prohibited whenever it has *the effect* of impeding vehicle or pedestrian traffic. And again, even if California's interpretation of these documents is correct, the documents do not have the force of law, nor do they set the outer limits of the PCA as a matter of law. As for the deposition testimony of Task Force 51's Deputy Chief of Staff, Mr. William Harrington, both Mr. Harrington and Defendants' counsel noted that terms like "perimeter" and "barricade" were vague and confusing. Hartlieb Decl. Ex. 2 at 98:1–15, 105:7–18. And indeed, the Memorandum from the Secretary of Defense to the commander of the U.S. Northern Command makes clear that the Guard "may take reasonable measures to prevent the destruction or defacement of Federal Government property including crowd control, temporary detention, cursory search . . . measures to ensure the safety of persons on the property, and the establishment of security perimeters reasonably necessary to protect the property" and, as to protection of federal law enforcement efforts, "may provide perimeter protection against third parties and such crowd control measures as are reasonably necessary to ensure the execution of Federal functions and the safety of Federal personnel." Hartlieb Decl. Ex. 10 at DEFS_00002539. In any event, Mr. Harrington is not a

20

3:25-cv-04870-CRB                DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

"*Detentions*": Finally, California purports to identify two "apprehensions and detentions." Supp. Br. 12.  In the first incident, a Marine temporarily detained one individual after that individual attempted to enter a restricted area on federal property multiple times, despite being warned to stop.  After a brief detention of approximately thirty minutes, the Marine turned the individual over to the Department of Homeland Security.  ECF No. 84-3 ¶ 9(D).  That was lawful. *Cf. United States v. King*, 2022 WL 17976787, at *4 (N.D. Okla. Dec. 28, 2022) (recognizing in appropriate circumstances, "civilians may be detained [by military personnel] for a limited period of time until they can be referred for prosecution by civilian law enforcement"); *Applewhite v. United States Air Force*, 995 F.2d 997, 1001 (10th Cir. 1993) (same).  This brief detention was also consistent with the SRUF, which allows the military to temporarily detain an individual for specified reasons, including if the individual has gained unauthorized access to secured areas and/or refuses to depart, if any detained individuals are released to civilian law enforcement at the earliest opportunity.  *See supra* p. 16.

California's contrary position is untenable.  California disputes that this detention was warranted but nothing turns on this dispute; and California deems it irrelevant that the detention was temporary and the individual was promptly turned over to civilian officials in accordance with military guidance whose lawfulness California does not dispute.  Supp. Br. 12.  As California sees things, all that matters is that "a Task Force 51 Marine directly and actively engaged in the quintessential law enforcement activity of detaining ██████████ a civilian." *Id.*  But there is no evidence that the Marine detained this individual *for the purpose of law enforcement or criminal prosecution*, rather than for the protection of federal property and the federal employees therein. And more fundamentally, under California's absolutist theory, the Marines and Guard could not restrain—to take just a couple hypothetical examples—individuals throwing Molotov cocktails at

_____

lawyer, and any attempts on his part to explain what he understands the permissible scope of the PCA to be is irrelevant to the Court's resolution of that legal question.

21

3:25-cv-04870-CRB                                     DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

1  federal property, or planting bombs, even if, as here, the restraint lasted only a matter of minutes.

2  That is not the law.

3        California's reliance on a second "detention" is similarly misplaced.  The video provided

4  by California confirms that no "detention" occurred.  California characterizes this incident as

5  "federalized National Guard troops apprehended a protestor in Carpinteria, California, restraining

6  her movement and attempting to physically move her across the perimeter that the troops had

7  established on a public road."  Supp. Br. 12.  But the video makes clear that the individual was not

8  "detained."  Although two Guard members directed her back towards other protesters, they in no

9  way seized or constrained her, and she remained free to walk away during the entire interaction.

10                                              ***

11       As discussed above, DoD has established requirements and procedures for reporting even

12 potentially problematic incidents through the CCIR procedures and Defendants have produced all

13 the CCIR reports.  The lone Marine detention incident was itself the subject of a report that was

14 produced to California.  Hartlieb Decl. Ex. 13.  (And as that report makes clear, the incident was

15 investigated to confirm that the Marines' action was consistent with the PCA).  That *this* is the

16 best supposed evidence of illegality California can muster following discovery simply underscores

17 the military's rigorous compliance with the PCA.  Because the federalized Guard and Marines are

18 not engaged in law enforcement, California's PCA claim fails for lack of factual basis as well.

19 **III.    California's Additional PCA Arguments Fail.**

20       California also argues that "whether civilian law enforcement agents made direct active

21 use of military personnel to execute the laws" is only one of three tests to determine PCA

22 violations.  Supp. Br. 5 (quoting *Yunis*, 681 F. Supp. at 892).  Courts have articulated three tests

23 to determine whether the PCA was violated: "whether civilian law enforcement agents made direct

24 active use of military personnel to execute the laws," "whether use of any part of the Army or Air

25 Force pervaded the activities of the civilian law enforcement agents," and "whether the military

26 personnel subjected citizens to the exercise of military power which was regulatory, proscriptive,

27 or compulsory in nature."  *Yunis*, 681 F. Supp. at 892.  But these are not distinct tests in the sense

28

22

3:25-cv-04870-CRB                          DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

of covering different conduct; rather, they simply reflect that "the proscriptions of the Act have been relied upon in various situations." *Id.*

More to the point, under any of the three, a PCA violation requires a showing that military officials are actually engaged in execution of the laws. *Dreyer*, on which California relies, is instructive. There, a military official, among other things, "initiated an operation to search for individuals sharing child pornography online," prepared a report that "formed the basis of the state warrant to search [the criminal defendant's] home, [ ] execution of that warrant yielded the evidence that led to the charges against [the defendant]," and conducted an "investigation" that was "active." 804 F.3d at 1275. That is worlds apart from this case.

California also misunderstands how the second and third tests are conducted. As to the "pervaded the activities" test, California describes *Dreyer* as standing for the proposition that the military violates the PCA "when it participates in law enforcement activities that are not 'reasonably tied to military bases, military facilities, military personnel, or military equipment.'" Supp. Br. 13 (quoting 804 F.3d at 1275–76); *see also id.* (contending that it does not matter whether the military is providing indirect assistance or direct support for law enforcement). But in the passage California quotes, *Dreyer* explained that certain types of law execution activities with a sufficiently close nexus to military matters are *excepted* from the PCA's restrictions. 804 F.3d at 1275–76 ("Properly executed, investigations of possession or distribution of child pornography by military personnel could be excepted from PCA-like restrictions."); *id.* at 1275 ("We have recognized that PCA-like restrictions allow an exception to the general prohibition on direct involvement where the military participation is undertaken for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities." (quotation marks omitted)). The activities of the official in *Dreyer* violated the PCA because his investigative efforts constituted direct involvement in law execution *and* were not closely tied enough to military bases, military facilities, military personnel, or military equipment

1  to be excepted. California cites no authority for the proposition that that simply accompanying

2  federal personnel on law enforcement operations to protect such personnel violates the PCA.[12]

3  California also provides no support for the proposition that the Guard and Marines'

4  activities subject Los Angeles residents to regulatory, proscriptive, or compulsory military power.

5  In addition to repeating their arguments about security functions, perimeters, blockades, and

6  detentions (which we addressed above), California contends that "the very presence of the Task

7  Force 51 troops in Los Angeles has had, and will continue to have, a proscriptive effect on the

8  city's civilian population." Supp Br. 17. California also quotes Mr. Santacruz's deposition

9  testimony to suggest that the military's presence is intended to deter the public. But Mr.

10  Santacruz's point, which he also made in his declarations, is that their presence is intended to deter

11  people *from attacking federal officials and property*. ECF No. 84-1 ¶¶ 7–13. That protection does

12  not subject the citizenry to regulatory, proscriptive, or compulsory military power in any sense.

13  **IV.    California has identified no relief this Court could lawfully grant.**

14  Finally, California also identifies no lawful injunction this Court could enter. Since

15  California's PCA claim does not challenge the Guard or Marines' deployment or the Guard's

16  continued presence in California, California does not suggest that this Court could require removal

17  of the Guard, or direct return of control of the California National Guard to Governor Newsom.

18  And even if the Court determines that the on-the-ground operational decisions of Task Force 51

19  violated the PCA (which they did not), it is well established that past injury cannot be the basis for

20  future injunctive relief. *See City of Lyons v. Los Angeles*, 461 U.S. 95, 105–06 (1983). California

21  must establish a "real and immediate threat of repeated injury demonstrated by more than past

22  exposure to illegal conduct." *Id.* at 102. California makes no attempt to establish that any of the

23  alleged individual PCA violations (such as one-off detentions) present current adverse effects or

24  are likely to recur with the sort of immediacy required to obtain prospective relief. California is

25  12 ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28

24

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

thus left with requesting an injunction "restraining Defendants from continuing to violate the Posse Comitatus Act." Supp. Br. 22. Although such "obey the law" injunctions "are not categorically barred in the Ninth Circuit," injunctions are "required to provide sufficient specificity to give fair notice of enjoined conduct." *Auris Health, Inc. v. Noah Med. Corp.*, 2023 WL 7284156, at *7 (N.D. Cal. Nov. 3, 2023). California's proposed injunction does not do that.

California's failure to propose a specific injunction underscores that its PCA arguments are meritless. If an injunction were to track California's arguments, it would presumably prohibit the Guard from providing protection for officials during enforcement operations, Supp. Br. 8–10, prohibit them from forming "perimeters and blockades," *id.* at 10–11, and from detaining anyone for any reason for even a *de minimus* period of time, *id.* at 12. That California has not proposed an injunction tracking its own legal theories underscores that those theories have no merit.

## V. The Equitable Factors Also Preclude Injunctive Relief.

California's failure to establish a basis for its PCA claim is dispositive. To the extent the Court proceeds further to consider the remaining factors, they too preclude relief. California seeks an order that would interpose the Judiciary between active military servicemembers in the field who are protecting federal officials and property. The Ninth Circuit already held that similar harms far outweigh California's asserted harms. Indeed, California's speculative harms are even weaker on the present record, where California's claim is far more limited, and now that all but approximately 300 Guard soldiers have been released from the mission. The Ninth Circuit's assessment of the equities precludes, or at least tilts heavily against, injunctive relief here. *Cf Winter*, 555 U.S. at 32 (noting that, considering the Supreme Court's assessment of the equities, "it would be an abuse of discretion to enter a permanent injunction, after final decision on the merits, along the same lines as the preliminary injunction"). But in any event, the Court need not reach these issues because California's PCA claim plainly fails, both legally and factually.

## VI. California cannot obtain relief against the President.

At the very least, the Court should not enter an order or judgment against the President. Federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his

25

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992).[13]

## VII.    The Court should stay any order or judgment for California pending appeal.

Defendants reiterate their request that the Court stay any injunction entered pending appeal authorized by the Solicitor General and at a minimum administratively stay any such order for seven days.  ECF No. 84 at 29–30.  Defendants likewise request the same relief as to any judgment entered against Defendants for all the same reasons.  *See id.*

### CONCLUSION

The Court should deny California's motion for a preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel
Federal Programs Branch


*/s/ Garry D. Hartlieb*
CHRISTOPHER D. EDELMAN
Senior Counsel
GARRY D. HARTLIEB
BENJAMIN S. KURLAND
JODY D. LOWENSTEIN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW

---

[13] *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief.").

26

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.

Washington, DC 20005
Telephone:  202-305-0568
E-mail: Garry.Hartlieb2@usdoj.gov
*Counsel for Defendants*

27

3:25-cv-04870-CRB                    DEFS.' SUPP. OPPO. TO PLS.' MOT. FOR A PRELIM. INJ.