# EXHIBIT 1

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  BRETT A. SHUMATE
   Assistant Attorney General
2  ERIC J. HAMILTON (CA Bar No. 296283)
   Deputy Assistant Attorney General
3  ALEXANDER K. HAAS (CA Bar No. 220932)
   Branch Director
4  JEAN LIN (NY Bar No. 4074530)
   Special Litigation Counsel
5  CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
   Senior Counsel
6  GARRY D. HARTLIEB (IL Bar No. 6322571)
   BENJAMIN S. KURLAND (DC Bar No. 1617521)
7  JODY D. LOWENSTEIN (MT Bar No. 55816869)
   Trial Attorneys
8  U.S. Department of Justice
   Civil Division, Federal Programs Branch
9  1100 L Street, NW
   Washington, DC 20005
10 *Counsel for Defendants*

11                    **UNITED STATES DISTRICT COURT**
12              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
13  ────────────────────────────────
                                          Case No. 3:25-cv-04870-CRB
14
   GAVIN NEWSOM, in his official capacity as
15 Governor of the State of California, *et al.*,   **DEFENDANTS' OBJECTIONS AND**
                                                    **RESPONSES TO PLAINTIFFS' FIRST**
16                    *Plaintiffs*,                 **SET OF INTERROGATORIES TO**
                                                    **DEFENDANTS**
17              v.

18 DONALD J. TRUMP, in his official capacity as
   President of the United States of America, *et al.*,
19
                    *Defendants*.
20  ────────────────────────────────

21

22

23

24

25

26

27

28
   3:25-cv-04870-CRB
   Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories to Defendants

Pursuant to Federal Rules of Civil Procedure 26 and 33, defendants, by and through counsel, provide the following objections and responses to plaintiffs' first set of interrogatories, served on June 26, 2025.

## **OBJECTIONS APPLICABLE TO ALL INTERROGATORIES**

1.    Defendants object to plaintiffs' interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, the deliberative-process privilege, law-enforcement privilege, any form of executive privilege, or any other applicable privilege or immunity recognized under statute or applicable case law.

2.    Defendants object to plaintiffs' interrogatories to the extent they seek information unrelated to the Posse Comitatus Act ("PCA"), *see* Order re Pre-Trial Deadlines, ECF No. 117 ("[T]he only limitation that the Court will put on the content of witness testimony is that it be relevant to the Posse Comitatus Act claim."); Order Regarding Discovery as to Pls.' Mot. for a Prelim. Inj. at 8–10, ECF No. 101 ("[T]he Court will only allow discovery as to the Posse Comitatus Act."); *see also* Order Re Pre-Trial Deadlines at 2, ECF No. 117 , or related to any claim, issue, or dispute that is the subject of the ongoing appeal, *see* ECF No. 101 at 9–10.

3.    Defendants also object to plaintiffs' interrogatories to the extent they pertain to any claim brought under the Administrative Procedure Act, because resolution of any such claim should be based upon the administrative record.

4.    The following responses are based upon information currently known to defendants based on a reasonable inquiry, and defendants reserve the right to withdraw or amend their responses should additional or different information become available.

5.    Nothing contained in the following responses constitutes a waiver of any applicable objection or privilege as to the requested discovery. Defendants expressly reserve the right to object to further discovery of the subject matter of any of these interrogatories and the introduction into evidence of any response or portion thereof.

6.    Each and every response below is subject to the above objections, which apply to each and every response regardless of whether a specific objection is interposed. The making of a

specific objection in response to a particular interrogatory is not intended to constitute a waiver of any other objection not specifically referenced in that response.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.    Defendants object to plaintiffs' introductory instruction that defendants answer plaintiffs' interrogatories "on or by July 11, 2025." Federal Rule of Civil Procedure 33(b)(2) provides that a "responding party must serve its answers and any objections within 30 days after being served with the interrogatories," unless "[a] shorter or longer time" is "stipulated to under Rule 29" or "ordered by the court." The court ordered the parties to complete expedited discovery on or before July 25, 2025, *see* Order Granting Stipulated Mot. to Enlarge Time to Respond to Expedited Discovery & Set Briefing on Discovery Disputes at 1, ECF No. 105, and has not ordered an earlier deadline for the parties to serve objections or responses to any interrogatories. Therefore, consistent with their obligations under the Federal Rules of Civil Procedure and the court's order, defendants will serve their objections and responses to plaintiffs' interrogatories on or before July 25, 2025.

2.    Defendants object to plaintiffs' first instruction as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it instructs defendants to "furnish all requested information … that is known by, possessed by, or available to DEFENDANTS" in answering any and all interrogatories, because plaintiffs' definition of "DEFENDANTS" is objectionable on those same grounds. *See infra*. Defendants also object to this instruction as beyond the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it instructs defendants to "stat[e] whatever information, knowledge, or belief DEFENDANTS have concerning [an] unanswerable portion" of an interrogatory.

3.    Defendants object to plaintiff's fifth instruction as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it instructs defendants to construe any interrogatory requesting the "knowledge or information in DEFENDANTS' possession" as requesting the "knowledge of DEFENDANTS, including without limitation, agents, employees, representatives, accountants, attorneys, and all other person acting on

DEFENDANTS' behalf," because plaintiffs' definition of "DEFENDANTS" is objectionable on those same grounds. *See infra*.

4. Defendants object to plaintiffs' seventh instruction as confusing, unduly burdensome, and beyond the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it instructs defendants to identify "DOCUMENTS that are no longer in existence," and provide other information regarding any such documents, "[if] any Interrogatory asks for information that could at some time have been answered by producing, consulting, or referring to" such documents.

5. Defendants object to plaintiffs' eighth instruction regarding contention interrogatories as confusing and irrelevant, because none of plaintiffs' interrogatories "call[] upon DEFENDANTS to 'state the basis' of or for a particular claim, assertion, allegation, or contention, or to 'state all facts' or 'identify all DOCUMENTS' supporting a particular claim, assertion, allegation, or contention."

If plaintiffs intend this instruction to apply to those numbered interrogatories that ask defendants to "[s]tate all facts *related to*" a particular subject, *see* Interrogatory Nos. 3, 5, 6, 11, 12, 13, 14, 15 (emphasis added), defendants further object to this instruction because it would result in plaintiffs having served on defendants more than the 25 interrogatories that the Federal Rules of Civil Procedure permit. *See* Fed. R. Civ. P. 33(a)(1). As written, this instruction provides that any interrogatory that asks defendants to "'state the basis'" of or for a particular claim, assertion, allegation, or contention, or to 'state all facts' or 'identify all DOCUMENTS' supporting a particular claim, assertion, allegation or contention," is a compound interrogatory that contains three separate requests—(i) to "[i]dentify each and every DOCUMENT" that "forms any part of the source of the party's information regarding the alleged facts or conclusions referred to by the Interrogatory"; (ii) to "[i]dentify each and every COMMUNICATION" that "forms any part of the source of the party's information regarding the alleged facts or conclusions referred to by the Interrogatory"; and (iii) to "[s]tate separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the Interrogatory." Plaintiffs

served eight numbered interrogatories that ask defendants to "state all facts" related to a particular subject. If this instruction applied to those numbered interrogatories, each would contain three distinct subparts—*i.e.*, documents, communications, and facts—all of which are distinct interrogatories. Rule 33(a) provides that, "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, *including all discrete subparts*." Fed. R. Civ. P. 33(a)(1) (emphasis added); *see also Makaeff v. Trump Univ., LLC*, 2014 WL 3490356, at *4 (S.D. Cal. July 11, 2014) ("[E]xtensive use of subparts, whether explicit or implicit, could defeat the purposes of the numerical limit contained in Rule 33(a) by rendering it meaningless, unless each subpart counts as a separate [interrogatory].").  Rule 33(a) thus requires that "discrete subparts" "be counted as separate interrogatories." *Safeco of Am. v. Rawstron*, 181 F.R.D. 441, 443 (C.D. Cal. 1998), when they seek distinct information within a single, designated interrogatory.  *See, e.g.*, *Safeco*, 181 F.R.D. at 442–47; *Figuerola v. Nationwide Agribusiness Ins. Comopany*, 2020 WL 13866587, at *8 (C.D. Cal. Aug. 28, 2020) (counting 279 separate interrogatories within a designated interrogatory); *Johnson v. Cate*, 2014 WL 6978324, at *5 (E.D. Cal. Dec. 9, 2014) (counting at least 48 separate interrogatories within a designated interrogatory—the sum of "four discrete inquiries: facts, persons, documents, and the 'manner and method by which [the defendant] came by such information" regarding "12 different specific factual allegations"); *Jackson*, 2023 WL 8114387, at *2–3 & n.2 (counting 27 separate interrogatories within a designated interrogatory); *Hasan*, 2012 WL 569370, at *4–5 (counting 25 separate interrogatories within 8 designated interrogatories); *see also, e.g.*, *Collaboration Properties*, 224 F.R.D. at 475 (denying motion to compel responses to several interrogatories that each contained at least 26 discrete subparts because the movant exceeded the court's numerical limits on interrogatories); *Withers v. eHarmony*, 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) (denying motion to compel response to a compound interrogatory that sought seven discrete areas of information and identification of documents regarding 25 specified individuals); *Makaeff*, 2014 WL 3490356, at *3, 7 (holding that a designated interrogatory counted as 36 separate interrogatories—the sum of "3 discrete subparts" requesting the facts, documents, and witnesses

supporting the defendants' responses to 12 RFAs that were not answered with an unqualified admission). Therefore, if plaintiffs believe this instruction applies to the eight numbered interrogatories that request defendants to "state all facts relating to" a particular subject, those numbered interrogatories would consist of *21 separate interrogatories*, resulting in plaintiffs having served 33 interrogatories total on defendants. To avoid that result, defendants will construe this instruction as *not* applying to any of plaintiffs' interrogatories.

6.    Defendants object to plaintiff's eleventh instruction that "all references to the plural include the singular, and all references to the singular include the plural" as confusing, vague, and ambiguous. Similarly, defendants object on the same grounds to plaintiffs' definitions of "AND" and "OR" as having "both conjunctive and disjunctive meanings." Defendants will read and respond to plaintiffs' interrogatories with the understanding that words convey their plain and ordinary meaning.

7.    Defendants object to plaintiffs' definition of "ARREST" to mean the "use of legal authority to deprive a person of their freedom of movement" as overbroad, vague, ambiguous, and potentially misleading.  Defendants will interpret the term, consistent with its common usage, to mean "The taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law, esp. of bringing that person before a court."  ARREST, *Black's Law Dictionary* (12th ed. 2024).

8.    Defendants object to plaintiffs' definition of "CBP" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent it includes all "managers and supervisors, sworn PERSONNEL, rank and file employees, representatives, agents, and any other persons or entities purporting to act on its behalf." This definition is unduly burdensome, as it would encompass tens of thousands of personnel that work for the U.S. Customs and Border Protection ("CBP"), and any request seeking information across CBP's entire workforce would not be proportionate to the needs of this case. This definition is also overbroad to the extent it

encompasses individuals outside of defendants' control, including those who merely "*purport[]*" to act on CBP's behalf. Additionally, this definition is vague and ambiguous to the extent that it does not specify who may be considered, *e.g.*, a "representative[]," "agent[]," or "any other persons or entities purporting to act on" CBP's behalf. The plain and ordinary meaning of those terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition insofar as it implicitly includes CBP's attorneys and would call for information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from CBP to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

9.    Defendants object to plaintiffs' definition of "COMMUNICATION" because it would encompass each and every conversation regarding a given subject—*e.g.*, any "spoken" "transmittal … of information"—thus making the definition overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure.

10.    Defendants object to plaintiffs' definition of "DEFENDANTS" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent it includes "any and all employees, agents, representatives, attorneys, and any person acting on [defendants'] behalf." This definition is unduly burdensome because it would encompass millions of personnel, across hundreds of agencies and sub-agencies, serving within the Executive Branch, and thereby acting on behalf of the President of the United States, the head of the Executive Branch, and those millions of personnel serving within the Department of Defense ("DoD") specifically. Any request seeking information across the entire Executive Branch's workforce, or even just the Department of Defenses' workforce, would not be proportionate to the needs of this case. This definition also is overbroad because it encompasses individuals outside of defendants' control. Additionally, this definition is vague and ambiguous insofar as it does not specify who may be considered, *e.g.*, a

"representative[]," "agent[]," or "person acting on" defendants' "behalf." The plain and ordinary meaning of those terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition to the extent it includes defendants' attorneys and would call for production of information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from "DEFENDANTS" to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

12.    Defendants object to plaintiff's definition of "DEPARTMENT" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure to the extent that it includes "any and all of [DoD's] employees, agents, representatives, and attorneys; and any person acting on [its] behalf." This definition is unduly burdensome because it would encompass the millions of personnel who work within DoD or otherwise act on its behalf, and any request seeking information across DoD's entire workforce would not be proportionate to the needs of this case. This definition also is overbroad because it encompasses individuals outside of defendants' control. Additionally, this definition is vague and ambiguous to the extent that it does not specify who may be considered, *e.g.*, a "representative[]," "agent[]," or "person acting on" the DoD's "behalf." The plain and ordinary meaning of such terms includes non-party individuals and entities that are distinct from and beyond the control of defendants. Defendants further object to this definition to the extent it includes DoD's attorneys and would call for production of information protected from disclosure by the attorney-client privilege, the work product doctrine, and other applicable privileges. Therefore, defendants will construe each request for information from the "DEPARTMENT" to request non-privileged information that defendants can access and obtain after a reasonable inquiry of appropriate staff.

13.    Defendants object to plaintiffs' definition of "DESCRIBE" as confusing, vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond

the scope of defendants' obligations under the Federal Rules of Civil Procedure insofar as it would require defendants to not only "provide a complete description" of an interrogatory's subject matter, but also provide any and all "information RELATING TO th[at] subject matter."

14. Defendants object to plaintiffs' definition of "DETENTION" as vague, ambiguous, overbroad, and potentially misleading insofar as it includes "words or conduct that would result in a reasonable person believing that they are not free to leave or otherwise disregard the order." Defendants will interpret this term, consistent with its common usage, to mean "The act or an instance of holding a person in custody; confinement or compulsory delay." DETENTION, Black's Law Dictionary (12th ed. 2024).

15. Defendants object to plaintiffs' definition of "DOCUMENT" as vague, ambiguous, overbroad, unduly burdensome, disproportionate to the needs of this case, and beyond defendants' obligations under the Federal Rules of Civil Procedure insofar as it includes "all non-identical copies and drafts" of a document. Defendants also object to this definition to the extent it includes information covered by the deliberative-process privilege, attorney-client privilege, the work-product privilege, or any other applicable privilege.

16. Defendants object to plaintiffs' definition of "FIELD OPERATIONS" as vague and ambiguous insofar as it uses the term "enforcement operations."

17. Defendants object to plaintiffs' definition of "ORDER" as vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of this case insofar as it includes "official directives regarding the scope, purpose, and nature of operations." In the military context, an order constitutes any directive given from a superior to a subordinate, whether written or oral. Therefore, an interrogatory regarding all "ORDERS" on a particular subject may implicate hundreds of thousands of directives given to every military official throughout the chain of command, all the way to individual Guardsmen or Marines. Defendants will therefore interpret that term to mean written commands and directives of general applicability across the mission.

18.     Defendants object to plaintiffs' definition of "POLICIES AND PROCEDURES" as overbroad, vague, and ambiguous insofar as it includes the term "informal practices" and phrase "any other guidance issued to or adopted by the Defendants."

19.     Defendants object to plaintiffs' definition of "POSSE COMITATUS ACT" to the extent that it attempts to construe or otherwise paraphrase the text of 18 U.S.C. § 1385.

20.     Defendants object to plaintiffs' definitions of "RELATING TO" and "RELATED TO" as confusing, vague, ambiguous, overbroad, unduly burdensome, and beyond defendants' obligations under the Federal Rules of Civil Procedure. This definition is so convoluted as to render meaningless any interrogatory that uses the phrases "RELATING TO" or "RELATED TO." Defendants will therefore read and respond to such interrogatories with the understanding that these phrases convey their plain and ordinary meaning.

21.     Defendants object to plaintiffs' definition of "SUPPORT OPERATION" as "any military SUPPORT OPERATION for civilian law enforcement agencies further defined by 10 U.S.C. §§ 271–284" as vague and ambiguous.

22.     Defendants object to the inclusion of definitions for any term not relied on in plaintiffs' interrogatories. Any requirement that defendants respond to such definitions in the abstract is not proportional to the needs of this case and the burden of such a response outweighs its likely benefit, which is none. Defendants do not waive any future objections to the definition of those terms or waive the right to use defendants' own definitions for them.

## OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES

**Interrogatory No. 1:** DESCRIBE the activities that have been engaged in by FEDERALIZED NATIONAL GUARD who have been called in to service or deployed pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM. This description should include, but is not limited to, types of activities (e.g., forming perimeters, detaining individuals) and limitations placed by federal law, POLICIES AND PROCEDURES, rules for use of FORCE, rules of engagement, or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the term "activities." Additionally, defendants object to this interrogatory insofar as it requests information unrelated to the PCA.

**Response:** Military members of Task Force-51 ("TF-51") have been engaged in a Federal Protection Mission ("FPM") consisting of the protection of federal locations, personnel, and federal functions. Federal locations include buildings and installations owned or used by the United States government, including, but not limited to, the Edward R. Roybal Federal Building, the United States Courthouse in downtown Los Angeles, the Immigration and Customs Enforcement ("ICE") Office in Santa Ana, and the Federal Building at 11000 Wilshire Blvd. Federal personnel include employees of several government agencies. The FPM consists of setting up security perimeters around federal buildings and installations; accompanying federal law enforcement personnel in instances where their duties could bring them into confrontation with protesters; and having mobile response forces ("MRFs") on stand-by to respond to emergent threats to federal personnel carrying out their federal functions. Federal law enforcement agencies have made multiple requests for TF-51 personnel to respond to emergent situations where protests materialized and disrupted federal personnel trying to carry out their federal functions or threatened federal property and personnel. TF-51 activities are done in accordance with guidance issued by higher headquarters (*i.e.*, U.S. Northern Command and Army North) and applicable laws (*e.g.*, the PCA) and applicable DoD regulations (*e.g.*, DoD Instruction No. 3025.21, Defense Support of Civilian Law Enforcement Agencies, Change 1, dated February 8, 2019).

\*　　\*　　\*

**Interrogatory No. 2:** DESCRIBE the activities that have been engaged in by the NON-NATIONAL GUARD MILITARY deployed to Los Angeles on or after June 7, 2025. This description should include, but is not limited to, types of activities (e.g., forming perimeters,

detaining individuals) and limitations placed by federal law, POLICIES AND PROCEDURES, rules for use of FORCE, rules of engagement, or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the term "activities." Additionally, defendants object to this interrogatory insofar as it requests information unrelated to the PCA.

**Response:** Non-National Guard Military members deployed to Los Angeles on or after June 7, 2025, have engaged in the planning, oversight, and support of the FPM, *see* Response to Interrogatory No. 1, and in the case of the U.S. Marines, conducted roving patrols around Federal buildings. All TF-51 personnel activities are done in accordance with guidance, laws, and regulations referenced above. *See* Response to Interrogatory No. 1.

\*    \*    \*

**Interrogatory No. 3:** State all facts RELATED TO how DEFENDANTS have been monitoring the conduct of NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD personnel called in to service or deployed pursuant to the PRESIDENTIAL MEMO, JUNE 7 DOD MEMO, and/or JUNE 9 DOD MEMO or otherwise deployed in California since June 7, 2025, including for purposes of determining whether there is engagement in actions prohibited by the POSSE COMITATUS ACT.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS," and "POSSE COMITATUS ACT." Defendants also object to this interrogatory insofar as it requests information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at \*3 (N.D. Cal.

Apr. 13, 2017) (emphasis added and citation omitted); *accord, e.g.*, *O'Brien v. Gularte*, 2020 WL 583976, at *2 (S.D. Cal. Feb. 6, 2020) ("Courts will generally find interrogatories overly broad and unduly burdensome on their face to the extent they ask for *every fact* which supports identified allegations." (cleaned up)); *Aldapa v. Fowler Packing Co.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) ("'Each and every fact' interrogatories pose problems for a responding party and a reviewing court. Parties are not tasked with laying out every jot and tittle of their evidentiary case in response to interrogatories." (citation omitted)); *Safeco*, 181 F.R.D. at 447–48 (holding that interrogatories requiring "a party to specify *all facts* … that support the denial of a statement or allegation of fact" were "unduly burdensome and oppressive" (emphasis added).[1] Defendants recognize, though, that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter. *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014). Accordingly, courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *accord, e.g.*, *Santillan v. Verizon Connect, Inc.*, 2022 WL 428170, at *2 (S.D. Cal. Feb. 10, 2022) (instructing party to construe interrogatories seeking "all facts" supporting specific contentions "as requesting all the principal or material facts"); *Kilby v. CVS Pharmacy, Inc.*, 2019 WL 977874, at *3 (S.D. Cal. Feb.

---

[1] *See also, e.g.*, *Alfaro v. City of San Diego*, 2018 WL 4562240, at *2 (S.D. Cal. Sept. 21, 2018) (holding that interrogatories "seeking 'all facts' supporting" specific contentions were "overly broad and unduly burdensome as worded"); *Largan Precision Co. v. Samsung Electronics Co.*, 2015 WL 11251730, at *3 (S.D. Cal. May 5, 2015) (holding that interrogatories were "overbroad and unduly burdensome, due to [their] use of the terms 'all facts', 'all facts and circumstances', and 'all documents'"); *Hernandez*, 2014 WL 5454505, at *6 (similar); *King v. Cnty. Of L.A.*, 2012 WL 13124268, at *1 (C.D. Cal. Aug. 24, 2012) (similar); *Bovarie*, 2011 WL 719206, at *1 (similar); *Mancini v. Ins. Corp. of N.Y.*, 2009 WL 1765295, at *3 (S.D. Cal. June 18, 2009) (similar); *In re eBay Seller Antitrust Litig.*, 2008 WL 5212170, at *2 (N.D. Cal. Dec. 11, 2008) (similar).

28, 2019) (same).[2] Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** All FPM activities are closely monitored by the chain of command and any conduct that deviates from established standards is addressed by the chain of command at the appropriate level. Units conducting FPM missions are required to complete an After-Action Review debrief after every mission to identify areas of success and those requiring improvements. Post-mission debriefs are submitted through the chain of command to the TF-51 commander. Additionally, the TF-51 commander holds a daily command update brief with the TF-51 staff and brigade level commanders of assigned units to maintain situational awareness of ongoing missions, discuss emergent issues, and provide guidance. Serious incidents are reported to the TF-51 Commander as a serious incident report ("SIR") or Commander Critical Information Requirement ("CCIR"). As of this date, no SIR or CCIR has been submitted for actions prohibited by the PCA, nor has TF-51 otherwise identified any actions prohibited by the PCA. Further, under Rule 12 of the Standing Rules for The Use of Force as provided on the U.S. Army North "SRUF Card" (DEFS 0000001), troops are ordered to "IMMEDIATELY report any violation of non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning the who, what, when, where, and why." No reports of any SRUF violation have been made by any troop.

\*        \*        \*

**Interrogatory No. 4:** DESCRIBE what activities DEFENDANTS understand are prohibited for the NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD to engage in under the POSSE COMITATUS ACT.

---

[2] *See also, e.g.*, *Alfaro*, 2018 WL 4562240, at \*2 (limiting interrogatories "seeking 'all facts' supporting" specific contentions "to the principal, or material, facts"); *Largan Precision*, 2015 WL 11251730, at \*3 (same); *Amgen*, 2017 WL 1352052, at \*3 (same); *Hernandez*, 2014 WL 5454505, at \*6 (same); *King*, 2012 WL 13124268, at \*1 (same); *Mancini*, 2009 WL 1765295, at \*3 (same).

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE," "DEFENDANTS," and "POSSE COMITATUS ACT."

Defendants further object to this interrogatory because it impermissibly calls for a pure legal conclusion. *See Larson v. Trans Union, LLC*, 2017 WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (explaining that a party "need not respond to questions of 'pure law'" in answering an interrogatory); *accord, e.g.*, *Everest Nat'l Ins. Co. v. Santa Cruz Cty. Bank*, 2016 WL 6311876 (N.D. Cal. Oct. 28, 2016); *Foster Poultry Farms v. AISLIC*, 2005 WL 8176421 (E.D. Cal. Aug. 22, 2025). Because defendants are "not required to write [a legal] brief" in response to plaintiffs' interrogatories, *see Larson*, 2017 WL 1540710, at *1, they will not recite their arguments regarding the scope of the PCA or how its provisions interact with 10 U.S.C. § 12406, *see, e.g.*, Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. at 23–24, ECF No. 84; Defs.' Suppl. Br. in Opp'n to Pls.' Mot. for a Prelim. Inj. at 1, ECF No. 95, which are decidedly legal questions.

**Response:** Except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, the PCA generally prohibits traditional law enforcement functions. While military personnel may provide support to civilian law enforcement activities, Enclosure 3 of DoD Instruction No. 3025.21, cited above, explains what constitutes permissible direct assistance and what direct assistance is generally prohibited. Under the SRUF, temporary detention and searches are authorized in instances where an individual has gained access to unauthorized areas (such as inside a security perimeter), refuses to depart or continues to attempt entry into a secured area after being denied access, or otherwise presents a threat to the safety of DoD forces or those under DoD protection. Temporarily detained persons, and any property secured from such persons, will be released to civilian law enforcement agents at the earliest opportunity. Further, Enclosure L to Chairman of the Joint Chief of Staff Instruction (CJCSI) 3121.01B, Standing Rules for the Use of Force for US Forces, dated 13 June 2005 "provide operational guidance and establish fundamental policies and procedures governing actions taken by DOD forces performing civil support missions (e.g., military assistance to civil authorities and

military support for civilian law enforcement agencies) and routine Service functions (including [Anti-Terrorism / Force Protection] duties) within U.S. territory (including U.S. territorial waters). Further explanation of the SRUF is contained in training packages (*see*, DEFS 00001095).

*    *    *

**Interrogatory No. 5:** State all facts RELATED TO instances DEFENDANTS have identified since June 7, 2025, of NON-NATIONAL GUARD MILITARY PERSONNEL conduct not in compliance with the POSSE COMITATUS ACT and for each instance identified, please DESCRIBE whether remedial action was taken to address such conduct, what action was taken, and by whom.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS," "POSSE COMITATUS ACT," and "DESCRIBE."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** As of this date, defendants have not identified any instance in which NON-NATIONAL GUARD MILITARY PERSONNEL has engaged in actions not in compliance with the PCA.

\*      \*      \*

**Interrogatory No. 6:** State all facts RELATED TO instances DEFENDANTS have identified since June 7, 2025, of FEDERALIZED NATIONAL GUARD PERSONNEL engaging in law enforcement activities covered by the POSSE COMITATUS ACT, should that act apply, and for each instance identified, please DESCRIBE whether remedial action was taken to address such conduct, what action was taken, and by whom.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO," "DEFENDANTS," "POSSE COMITATUS ACT," and "DESCRIBE.".

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at \*3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at \*6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at \*2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** As of this date, Defendants have not identified any instance in which FEDERALIZED NATIONAL GUARD PERSONNEL have engaged in actions not in compliance with the PCA.

\*     \*     \*

**Interrogatory No. 7:** DESCRIBE all SUPPORT OPERATIONS engaged in by the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY, including those RELATED TO FIELD OPERATIONS, during any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "SUPPORT OPERATIONS."

**Response:** From June 7, 2025, to the date of this document, TF-51 has provided use of base facilities under 10 U.S.C. § 272 to Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) agents for general parking, storage, and staging operations, in Southern California.

\*     \*     \*

**Interrogatory No. 8:** DESCRIBE what actions and activities the NON-NATIONAL GUARD MILITARY may take RELATED TO any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "actions and activities." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The NON-NATIONAL GUARD MILITARY deployed pursuant to the Presidential Memorandum, and has engaged in activities that are consistent with the FPM. For example, TF-51 has provided command and control over assigned units and has been responsible

for the planning, oversight, and support of the FPM.  Meanwhile, the US Marines supporting the FPM have provided fixed site security at various locations around the Los Angeles area.  All actions undertaken by the NON-NATIONAL GUARD MILITARY have been consistent with guidance issued by the Office of the Secretary of Defense, higher headquarters, and applicable laws and regulations such as the PCA and SRUF.

\*       \*       \*

**Interrogatory No. 9:** DESCRIBE what actions and activities the FEDERALIZED NATIONAL GUARD may take RELATED TO any deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "actions and activities." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The actions and activities the FEDERALIZED NATIONAL GUARD may take pursuant to the Presidential Memorandum, the June 7 DOD Memorandum, and/or the June 9 DOD Memorandum, are those consistent with the FPM.

\*       \*       \*

**Interrogatory No. 10:** IDENTIFY what factors, if any, DEFENDANTS considered in adopting rules for use of FORCE, rules of engagement, or POLICIES AND PROCEDURES for the current FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY deployments relating to interactions with MEMBERS OF THE PUBLIC in dense urban settings.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DEFENDANTS" and "POLICIES AND PROCEDURES." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants are following the most recent version of Enclosure L to Chairman of the Joint Chief of Staff Instruction (CJCSI) 3121.01B, Standing Rules for the Use of Force, dated 13 June 2005, for the current FPM in Southern California.

*    *    *

**Interrogatory No. 11:** State all facts RELATED TO any and all training given to the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY RELATED TO their roles and responsibilities prior to deployment in Los Angeles.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** All military units under the control of TF-51 have gone through Joint Reception, Staging, Onward Movement, and Integration ("JRSOI")—a process meant to ensure

that units are operationally ready to undertake assigned missions. This process is primarily focused on ensuring that personnel files and unit training status are up-to-date and include such things as training on the PCA and SRUF, general situational awareness of the environment in which they will be operating, and briefings on how to carry out their assigned duties in a professional manner. SRUF training is conducted by military attorneys with training materials prepared by ARNORTH that includes vignettes reflecting situations that may arise during the conduct of operations. Further, unit SRUF training levels and SRUF refresher are a mandatory reporting requirement to the TF-51 commander.

*    *    *

**Interrogatory No. 12:** State all facts RELATED TO any and all DETENTION(S) of individuals in California by FEDERALIZED NATIONAL GUARD troops on or after June 7, 2025, including for each occurrence:

      a.      The number of individuals detained;

      b.      The date of the DETENTION;

      c.      The geographic location of the DETENTION(S);

      d.      Whether the individuals remain in DETENTION; and

      e.      A description of the basis for the DETENTION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO" and "DETENTION."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts

routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** As of this date, Defendants are not aware of any detentions of individuals by the FEDERALIZED NATIONAL GUARD in California.

* * *

**Interrogatory No. 13:** State all facts RELATED TO any and all DETENTION(S) of individuals in California by NON-NATIONAL GUARD MILITARY PERSONNEL on or after June 7, 2025, including for each occurrence:

    a.    The number of individuals detained;

    b.    The date of the DETENTION;

    c.    The geographic location of the DETENTION;

    d.    Whether the individuals remain in DETENTION; and

    e.    A description of the basis for the DETENTION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "RELATED TO" and "DETENTION."

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter,

*Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** As of this date, Defendants are aware of only ONE temporary detention by the NON-NATIONAL GUARD MILITARY PERSONNEL in California. On June 13, 2025, at approximately 12:45pm local time, a U.S. Marine conducting security operations outside of the Wilshire Federal Building temporarily detained a male near the intersection of Wilshire and Veteran in West Los Angeles. The individual was temporarily detained on federal property after he attempted to enter the restricted portions of the federal property being secured, despite being advised to get off the property multiple times after crossing into restricted areas. The individual was placed in flexi-cuffs and turned over to a DHS agent approximately 30 minutes later and eventually to the Los Angeles Police Department when they arrived a few minutes later. Various news stories reported that the detained man crossed past the yellow caution tape because he was trying to get to a Veterans Affairs appointment. However, there is no direct route across the federal property in question to the nearby West Los Angeles VA Medical Center because it is separated by the 405 Freeway, a very busy multi-lane highway.

\*    \*    \*

**Interrogatory No. 14:** State all facts RELATED TO any and all perimeters or cordons by the FEDERALIZED NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025, including for each occurrence:

    a.    The date of the perimeter or cordon; and

    b.    The location of the FIELD OPERATION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory's use of the terms "perimeters" and "cordons" as vague and ambiguous. Defendants will construe the term "perimeter" to mean a physical barrier that completely encompasses an object and will construe the term "cordon" to mean a physical barrier that prevents entry or exit from a particular area. Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:.** Defendants have no knowledge of any perimeters or cordons by the FEDERALIZED NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025.

*        *        *

**Interrogatory No. 15:** State all facts RELATED TO any and all perimeters or cordons by the NON-NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025, including for each occurrence:

      a.     The date of the perimeter or cordon; and

      b.     The location of the FIELD OPERATION.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined term "RELATED TO." Defendants also object to this interrogatory's use of the terms "perimeters" and "cordons" as vague and ambiguous. Defendants will construe the term "perimeter" to mean a physical barrier that completely encompasses an object and will construe the term "cordon" to mean a physical barrier that prevents entry or exit from a particular area. Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants further object to this interrogatory to the extent that it asks defendants to state "*all* facts" related to its subject matter. Interrogatories like this are "overly broad and unduly burdensome" when they require "a party to state '*every* fact' or '*all* facts'" regarding an interrogatory's subject matter. *Amgen Inc. v. Sandoz Inc.*, 2017 WL 1352052, at *3 (N.D. Cal. Apr. 13, 2017) (emphasis added and citation omitted); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants recognize that in appropriate circumstances interrogatories may "ask for the 'principal or material' facts" regarding an interrogatory's subject matter, *Hernandez v. Best Buy Co.*, 2014 WL 5454505, at *6 (S.D. Cal. Oct. 27, 2014), and that courts routinely instruct responding parties to construe an interrogatory's request for "all facts" or "every fact" to require only those facts that are "material" or "principal." *See Folz v. Union Pacific R.R. Co.*, 2014 WL 357929, at *2 (S.D. Cal. Jan. 31, 2014) ("[W]hen [an interrogatory] require[s] a party to state 'every fact' or 'all facts,'" "'all facts' is generally construed as those facts which are material." (citation omitted)); *see also* Objections to Interrogatory No. 3 (citing cases in accord). Defendants will therefore construe this interrogatory to request only those material or principal facts regarding the relevant subject matter.

**Response:** Defendants have no knowledge of any perimeters or cordons by the NON-NATIONAL GUARD MILITARY PERSONNEL during FIELD OPERATIONS on or after June 7, 2025.

\*     \*     \*

**Interrogatory No. 16:** IDENTIFY and DESCRIBE any and all activities that have been engaged in by the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY PERSONNEL related to FIELD OPERATIONS near or inside private civilian residences and private civilian businesses. This description should include, but is not limited to, types of activities, location, and limitations placed by federal law or other operating instructions.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE" and "RELATED TO." Defendants also object to this interrogatory as vague and ambiguous insofar as it uses the phrase "near or inside private civilian residences and private civilian business." Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants are unable to provide a response to this item due to lack of clarity of the phrase, "near or inside private civilian residences and private civilian businesses." TF-51 military forces have not entered private residences or businesses as part of their missions.

\*     \*     \*

**Interrogatory No. 17:** Describe each official ORDER given to the FEDERALIZED NATIONAL GUARD RELATED TO their deployment in Los Angeles on or after June 7, 2025, including what the ORDER was, the date it was given, and who issued the ORDER.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "ORDER" and "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The FPM is being carried out in accordance with guidance issued by the President of the United States in a memorandum directed to the Secretaries of Defense, Homeland Security and the Attorney General dated June 7, 2025, entitled "Department of Defense Security

for the Protection of Department of Homeland Security Functions." This memorandum triggered the Federalization of California National Guard Members under 10 U.S.C. § 12406 by the Secretary of Defense in memoranda routed through the Governor of California to the Adjutant General of the California National Guard on June 7 and June 9, 2025. These memoranda were followed by orders placing the 79th Infantry Brigade Combat Team ("79th IBCT") and the 49th Military Police Brigade ("49th MP BDE") in a Title 10 status under NORTHCOM. NORTHCOM then transferred operational control ("OPCON") to Army North ("ARNORTH"), which in turn transferred tactical control ("TACON") to its contingency command post, TF-51.  TF-51 has been in charge of the day-to-day operations of the FPM since approximately June 8, 2025, and directly tasks the 79th IBCT and 49th MP BDE with mission assignments in support of the FPM. There are three main sets of military orders that impact the 79th IBCT and 49th MP BDE. First, NORTHCOM Fragmentary Order ("FRAGO") series 039.F.001 which commenced on or about June 8, 2025, provides combatant command level (*i.e.*, strategic) guidance to subordinate units, in particular ARNORTH, to plan and carry out the FPM in the vicinity of Los Angeles, CA.  Second, ARNORTH FRAGORD series 25-501.000, which commenced on or about June 8, 2025, provides service component level (i.e. operational) guidance to ARNORTH staff and TF-51 to deploy and carry out the FPM consistent with Presidential, the Secretary of Defense, and NORTHCOM guidance.  Finally, TF-51 began issuing daily operational orders ("OPORDS") on or about June 9, 2025, 25-001 series, which provide direct guidance and mission taskings to the 79th IBCT and 49th MP BDE. Many of these orders may have attachments, annexes, or accompanying administrative messages that support the base order and provide additional information or references that clarify matters within the order (*e.g.*, references to the Standing Rules for the Use of Force, the PCA, funding and contracting support).

*    *    *

**Interrogatory No. 18:** Describe each official ORDER given to the or NON-NATIONAL GUARD MILITARY RELATED TO their deployment in Los Angeles on or after June 7, 2025, including what the ORDER was, the date it was given, and who issued the ORDER.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "ORDER" and "RELATED TO." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** The FPM is being carried out in accordance with guidance issued by the President of the United States in a memorandum directed to the Secretaries of Defense, Homeland Security and the Attorney General dated June 7, 2025, entitled "Department of Defense Security for the Protection of Department of Homeland Security Functions." This memorandum triggered the Secretary of Defense to place an active duty (*i.e.*, Title 10) United States Marine Corps Battalion, 2nd Battalion, 7th Marine Regiment ("2/7 Marines") based in Twenty-Nine Palms, CA on prepare to deploy orders ("PTDO")—essentially a standby status. NORTHCOM assumed OPCON of the 2/7 Marines and transferred TACON to ARNORTH, which in turn transferred TACON to its contingency command post, TF-51. TF-51 has overseen the day-to-day operations of the FPM since approximately June 8, 2025, and directly tasked the 2/7 Marines with mission assignments in support of the FPM. Note that the 2/7 Marines were replaced by the 3rd Battalion, 7th Marine Regiment ("3/7 Marines") in early July 2025, and both Marine units were only used to provide fixed site security at various Federal property locations around the Los Angeles area. There are three main sets of military orders that impacted the 2/7 and 3/7 Marines. First, NORTHCOM FRAGO series 039.F.001 which commenced on or about June 8, 2025, provides combatant command level (i.e. strategic) guidance to subordinate units, in particular ARNORTH, to plan and carry out the FPM in the vicinity of Los Angeles, CA.  Second, ARNORTH FRAGORD series 25-501.000, which commenced on or about June 8, 2025, provides service component level (*i.e.*, operational) guidance to ARNORTH staff and TF-51 to deploy and carry out the FPM consistent with Presidential, the Secretary of Defense, and NORTHCOM guidance. Finally, TF-51 began issuing daily OPORDS on or about June 9, 2025, 25-001 series, which provide direct guidance and mission taskings to the 2/7 and 3/7 Marines. Note that many of these orders may have attachments, annexes, or accompanying administrative messages that support the base order and

provide additional information or references that clarify matters within the order (*e.g.*, references to the Standing Rules for the Use of Force, the PCA, funding and contracting support).

*     *     *

**Interrogatory No. 19:** DESCRIBE all POLICIES AND PROCEDURES issued by DEFENDANTS RELATED TO the submission, investigation, and processing of internal and public complaints, reports, or questions, RELATED TO the permissibility of NON-NATIONAL GUARD MILITARY and FEDERALIZED NATIONAL GUARD PERSONNEL activities in California under the POSSE COMITATUS ACT, rules for use of FORCE, rules of engagement, or any other legal or internal limitation on PERSONNEL's involvement in law enforcement activities.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "DESCRIBE," "POLICIES AND PROCEDURES," "DEFENDANTS," "RELATED TO," and "POSSE COMITATUS ACT." Defendants also object to this interrogatory insofar as it seeks information unrelated to the PCA.

**Response:** Defendants have not issued specific guidance related to the submission, investigation, and processing of public complaints regarding the FPM. Public queries for information regarding the FPM are handled by the TF-51 Public Affairs Office consistent with guidance provided by NORTHCOM. Internal queries are handled via the chain of command. Finally, NORTHCOM has established a public webpage that provides basic information about the FPM at the following link: https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/. Defendants follow DoD Instruction No. 3025.21, cited above, regarding the PCA, and Enclosure 3 of that Instruction explains what constitutes permissible direct assistance and what direct assistance is prohibited. Further, defendants are following the most recent version of Enclosure L to  Chairman of the Joint Chief of Staff Instruction ("CJCSI") 3121.01B, SRUF, dated June 13, 2005, for the current FPM in Southern California.

*     *     *

**Interrogatory No. 20:** IDENTIFY all COMMUNICATIONS between the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS RELATED TO during their deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM.

**Objections:** Defendants incorporate by reference the general objections asserted above, including defendants' objections to the defined terms "COMMUNICATIONS" and "RELATED TO." Defendant also object to this interrogatory as confusing and vague, as it is unclear whether plaintiffs are seeking communications "RELATED TO" the deployment of "FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS," or just those communications that were made "during" that deployment. Additionally, defendants object to this interrogatory insofar as it seeks information unrelated to the PCA.

Defendants also object to this interrogatory insofar as it asks defendants to identify "*all* COMMUNICATIONS" between the "FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS" related to or during the relevant deployment. Requiring defendants to find and identify each and every communication during this time would be virtually impossible, unduly burdensome, and disproportionate to the needs of this case, *see* Fed. R. Civ. P. 26(b)(1), and would produce an unreasonably cumulative list of communications (assuming such an endeavor were possible), *see* Fed. R. Civ. P. 26(b)(2)(C)(i). Therefore, defendants will identify relevant, non-privileged, and non-cumulative communications that they can collect after a reasonable search of appropriate staff.

**Response:** Communications between the FEDERALIZED NATIONAL GUARD and NON-NATIONAL GUARD MILITARY and CIVILIAN LAW ENFORCEMENT OFFICIALS RELATED TO during their deployment pursuant to the PRESIDENTIAL MEMORANDUM, JUNE 7 DOD MEMORANDUM, and/or JUNE 9 DOD MEMORANDUM are being provided in response to Request for Production Nos. 1 and 13 in plaintiffs' first set of requests for production

*        *        *

As to Interrogatory Answers, *see* Verification page *infra*.

As to objections:

Dated: July 25, 2025                     Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General
                                         Federal Programs Branch
                                         (CA Bar No. 296283)

                                         ALEXANDER K. HAAS
                                         (CA Bar No. 220932)
                                         Director, Federal Programs Branch

                                         JEAN LIN
                                         (NY Bar No. 4074530)
                                         Special Litigation Counsel
                                         Federal Programs Branch

                                         */s/ Jody D. Lowenstein*

                                         CHRISTOPHER D. EDELMAN
                                         (DC Bar No. 1033486)
                                         Senior Counsel
                                         GARRY D. HARTLIEB
                                         (IL Bar No. 6322571)
                                         BENJAMIN S. KURLAND
                                         (DC Bar No. 1617521)
                                         JODY D. LOWENSTEIN
                                         (MT Bar No. 55816869)
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, N.W.
                                         Washington, DC 20005
                                         Tel.: (202) 598-9280
                                         Email: jody.d.lowenstein@usdoj.gov

                                         *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2025, I served the foregoing document via email to designated counsel of record for plaintiffs:

| | |
|---|---|
| Nicholas David Espiritu | nicholas.espiritu@doj.ca.gov |
| Laura L. Faer | laura.faer@doj.ca.gov |
| Luke Freedman | luke.freedman@doj.ca.gov |
| Robin L. Goldfaden | robin.goldfaden@doj.ca.gov |
| Nicholas Reiss Green | nicholas.green@doj.ca.gov |
| Brendan Hamme | brendan.hamme@doj.ca.gov |
| Lorraine Lopez | lorraine.lopez@doj.ca.gov |
| Marissa Suzanne Malouff | marissa.malouff@doj.ca.gov |
| Kendal Leigh Micklethwaite | kendal.micklethwaite@doj.ca.gov |
| Jane Reilley | jane.reilley@doj.ca.gov |
| Megan Richards | megan.richards@doj.ca.gov |
| James Edward Stanley | james.stanley@doj.ca.gov |
| Meghan Strong | meghan.strong@doj.ca.gov |

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
U.S. Department of Justice

1

## **VERIFICATION OF INTERROGATORY ANSWERS**

2      I certify under penalty of perjury that the foregoing answers to plaintiffs' interrogatories

3  are true and correct to the best of my knowledge, information, and belief, with the understanding

4  that defendants reserve the right to further supplement their answers.

5

6      DATED: July 25, 2025

HARRINGTON.WIL
LIAM.BRENT.11215
00694

Digitally signed by
HARRINGTON.WILLIAM.BRENT.
1121500694
Date: 2025.07.25 14:54:45 -07'00'

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# REDACTED VERSION

# OF DOCUMENT SOUGHT

# TO BE SEALED

**In the Matter Of:**

GAVIN NEWSOM vs DONALD J. TRUMP

3:25-cv-04870-CRB

---

**WILLIAM HARRINGTON**

*July 22, 2025*

---

*Highly Conf. AEO*



800.211.DEPO (3376)
EsquireSolutions.com

Case 3:25-cv-04870-CRB    Document 136-2    Filed 08/05/25    Page 37 of 64

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                      1

1                    UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4

5    GAVIN NEWSOM, in his          )
     official capacity as         )
6    Governor of the State of     )
     California, et al.,          )
7                                  )
                Plaintiffs,        )
8                                  )
          vs.                      )    No. 3:25-cv-04870-CRB
9                                  )
     DONALD J. TRUMP, in his       )
10   official capacity as         )
     President of the United      )
11   States of America, et al.,   )
                                   )
12              Defendants.        )
     _____ )
13

14

15         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16                 VIDEOTAPED DEPOSITION OF

17                    WILLIAM HARRINGTON

18                  LOS ANGELES, CALIFORNIA

19                     JULY 22, 2025

20

21

22

23
     Reported by:
24   LINDSAY JAGICH,
     CSR NO. 13889
25   JOB NO. J13199799



Case 3:25-cv-04870-CRB   Document 136-2   Filed 08/05/25   Page 38 of 64

WILLIAM HARRINGTON  Highly Conf. AEO                          July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                          65

1   that in Task Force 51's view, federalized National Guard

2   troops under the command of Task Force 51 are subject to

3   Posse Comitatus; is that correct?

4        A    Correct.

5        Q    So those federalized troops are not allowed to         11:22:46

6   engage in civilian law enforcement; correct?

7        A    They're not allowed to engage in law enforcement

8   activities, no.

9        Q    And that -- based on your role as a chief of

10   staff, you haven't seen any objections to that viewpoint     11:23:01

11   within Task Force 51 leadership; is that correct?

12        A    Well, first, I'm the deputy chief of staff.

13             But second, no, I've not seen anybody object to

14   that.

15        Q    All right.  Did the federalized National Guard       11:23:14

16   troops receive any training on which activities they are

17   not allowed to engage in because of the Posse Comitatus

18   Act?

19        A    Yes.

20        Q    And what sort of training did they receive?          11:23:27

21        A    They received -- 100 percent of the personnel

22   receive what's called the "SRUF brief," the Standing

23   Rules for the Use of Force.  And that has to -- you know,

24   and they may have received some type of SRUF training

25   prior to Task Force 51's arrival.                             11:23:45



Case 3:25-cv-04870-CRB    Document 136-2    Filed 08/05/25    Page 39 of 64

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                              66

 1          But 100 percent of the soldiers and Marines were
 2   required to receive the NORTHCOM's approved version of
 3   the SRUF, and that included Posse Comitatus.
 4      Q    And that NORTHCOM-approved version of the
 5   standing rules of force -- is that correct?              11:24:07
 6      A    Standing Rules for the Use of Force, yes.
 7      Q    Standing Rules for Use of Force -- did that
 8   document exist before the deployment order to Los Angeles
 9   on June 7th?
10      A    Yes.                                             11:24:22
11      Q    Okay.  Were there any training materials that
12   were created after the federalization order was issued on
13   June 7th --
14      A    Not that I'm aware of.
15      Q    -- that were specific to this mission?           11:24:34
16      A    For training, no.
17      Q    Okay.  And did the training materials mention
18   traffic control with respect to the Posse Comitatus Act?
19          MR. EDELMAN:  Objection.  Lack of foundation.
20   I'm not sure if Mr. Harrington has reviewed each and      11:24:51
21   every one of the materials that all the troops did.
22          But if you can answer that question, go ahead.
23          THE WITNESS:  Well, all of the troops received
24   the same SRUF briefing, so the slides did not deviate.
25          Whether traffic control points are specifically    11:25:06





1

2

3

4

5                                                                     12:04:21

6

7

8

9

10                                                                    12:04:39

11

12

13

14

15                                                                    12:04:54

16     Q    Why is it important for federal law enforcement

17 agents to create a buffer between Task Force 51 troops

18 and the civilian population?

19     A    Well, you -- you don't want DOD interacting, you

20 know, directly with US citizens.  So we were there to        12:05:12

21 protect the agents while they were performing their

22 functions.  They were able to perform that law

23 enforcement function of -- of, you know, keeping the --

24 the population away from the building -- you know,

25 because you had the road, and then the building.            12:05:26



Case 3:25-cv-04870-CRB    Document 136-2    Filed 08/05/25    Page 41 of 64

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                        105

 1  BY MS. REILLEY:

 2     Q    Not including federal property for the purposes

 3  of this question.

 4     A    Okay.  So -- okay.  Now that we've got all

 5  the -- you know, it's clarified, can you repeat the          12:12:21

 6  question one more time, please.  I'm sorry.

 7     Q    Sure.

 8         If federalized National Guard troops who are not

 9  on federal property created any sort of perimeter or

10  barricade that prevented civilians from moving from one      12:12:34

11  place to another, would that violate the Posse Comitatus

12  Act?

13         MR. EDELMAN:  And I'll repeat the same

14  objections and in particular the vagueness regarding what

15  a "barricade" is.                                            12:12:45

16         THE WITNESS:  Well, that's impeding vehicle or

17  pedestrian traffic, which we've been specifically told

18  that we could not do.

19  BY MS. REILLEY:

20     Q    To your knowledge have any federalized National     12:12:57

21  Guard troops impeded vehicular or pedestrian traffic in

22  the course of this deployment to Los Angeles?

23     A    Not that I'm aware of.

24     Q    If that had taken place, would that have been

25  reported through the channel that you mentioned earlier?     12:13:12



Case 3:25-cv-04870-CRB    Document 136-2    Filed 08/05/25    Page 42 of 64

WILLIAM HARRINGTON  Highly Conf. AEO                    July 22, 2025
GAVIN NEWSOM vs DONALD J. TRUMP                                    106

1    A    The operations channels, yes, ma'am.

2    Q    And how about Marines?

3    A    Yes.

4    Q    Are -- are you aware of any Marines under the

5  tactical control of Task Force 51 who have impeded          12:13:25

6  pedestrian or vehicular traffic in the course of this

7  deployment?

8    A    No, ma'am.  The Marines remained strictly at the

9  three buildings:  The Roybal, the Wilshire, and the

10 Paramount.                                                  12:13:43

11   Q    And they're -- the Marines are no longer at any

12 of those buildings; correct?

13   A    That's correct.

14   Q    And that's true as of yesterday?

15   A    We released tactical control, TACON, of the        12:13:49

16 Marines.  I think it was Friday or Saturday.  It was just

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████████

19   Q    On enforcement operations where Task Force 51

20 troops are alongside federal law enforcement officers,      12:14:08

21 how can you tell the difference between troops and law

22 enforcement officers?

23        MR. EDELMAN:  Objection.  Form.

24        THE WITNESS:  Well, the soldiers have

25 identifying markers on them, for example, unit patches.     12:14:26



# EXHIBIT 3

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*The SecDef has approved the following 13 SRUF for use in all DSCA and land homeland defense operations. Commanders at all levels have the responsibility to teach and train on these rules. Units will be briefed on these rules prior to deployment from home station for any mission. RUF for unmanned aircraft countermeasures is classified and found in Attachment 2 to DepSecDef memorandum, dated 5 July 2017, Subject: (U) Policy Memorandum 17-00X, Supplemental Guidance for Countering Unmanned Aircraft (UA). This trifold brochure is version 11.*

### RULE 1:  LIMITATIONS ON THE USE OF FORCE
A SOLDIER will use force of any kind only as a last resort and, if used, the force should be the minimum necessary to control the situation, to accomplish the mission, or in self-defense or defense of others/designated property.

Rule 1.1:  <u>Reasonable</u> - Any use of force must be reasonable in intensity, duration, and magnitude to counter the threat based on all of the circumstances.

Rule 1.2:  <u>Safety</u> - Exercise due regard for the safety of innocent bystanders when using any type of force.

Rule 1.3:  <u>Warning Shots</u> - Are NOT authorized.

### RULE 2:  DE-ESCALATION
When time and circumstances permit, a SOLDIER will give a threatening force verbal warnings and an opportunity to withdraw or stop the threatening actions before using any force.  Other de-escalation options are:
- Withdraw or take cover, if mission allows
- Explain mission and request cooperation
- Increase number of personnel/defensive posture
- Show of force, weapons, military working dogs
- Use of riot control agents
- Use of non-lethal weapons

Rule 2.1:  <u>Avoid Confrontation</u> - Avoid confrontation with individuals who pose no threat to the unit, non-DOD persons in the vicinity, property secured by DOD forces.

Rule 2.2:  <u>Notify CLEA</u> - Increase self-defense posture and notify civilian law enforcement authorities (CLEA) or security agency personnel as soon as practicable if confrontation appears likely, civilians are acting in a suspicious manner, or immediately after a confrontation.

### RULE 3:  INDIVIDUAL SELF-DEFENSE
A SOLDIER may exercise individual self-defense in response to a hostile act or demonstrated hostile intent.

<u>Hostile act</u> is an attack or other use of force against the US, US forces, or other designated persons or property.

<u>Hostile intent</u> is the threat of imminent use of force against the US, US forces, or other designated persons or property.  Both also include either force used directly or the threat of force, respectively, to preclude or impede the

mission and/or duties of US forces, including the recovery of US personnel or vital USG property.

Rule 3.1:  <u>Limit on Self-Defense</u> - A COMMANDER may limit individual self-defense by members of his unit.

### RULE 4:  UNIT SELF-DEFENSE
A COMMANDER always has the inherent right and obligation to exercise unit self-defense in response to a hostile act or demonstrated hostile intent.

### RULE 5:  USE OF NON-DEADLY FORCE
A SOLDIER may use non-deadly force based on the totality of circumstances to counter a threat when it appears reasonably necessary:
- to control a situation and accomplish the mission,
- to provide protection for himself and other DOD personnel,
- to defend non-DOD persons in the vicinity, but only IF directly related to the assigned mission *(paragraph 2 of the unit's mission order)*, or
- to defend designated protected property.

### RULE 6:  USE OF DEADLY FORCE IN SELF-DEFENSE, DEFENSE OF OTHERS, AND DEFENSE OF DESIGNATED PROPERTY
A SOLDIER may use deadly force only when all lesser means have failed or cannot reasonably be employed AND it reasonably appears necessary:
- to protect DOD forces when a commander reasonably believes a person poses an imminent threat of death or serious bodily harm (DSBH),
- to protect yourself and other DOD forces from the imminent threat of DSBH,
- to protect non-DOD persons in the vicinity from the imminent threat of DSBH, but only IF directly related to the assigned mission,
- to prevent actual theft or sabotage of assets vital to national security or inherently dangerous property, and
- to prevent sabotage of national critical infrastructures.

<u>Asset vital to National Security</u> is designated by the President, the actual theft or sabotage of which would seriously jeopardize the fulfillment of a national defense mission and would create an imminent threat of DSBH, e.g. nuclear weapons and C2 facilities, restrictive areas containing strategic operational assets, sensitive codes, and transportation nodes.

<u>Inherently dangerous property</u> is designated by the on-scene commander that, if in the hands of an unauthorized individual, would create an imminent threat of DSBH, e.g. weapons, ammo, explosives, rockets, chemical agents, special nuclear material, and portable missiles.

<u>National critical infrastructure</u> is designated by the President, the damage to which would create an imminent

threat of DSBH, e.g. public utilities and dams.

Rule 6.1:  <u>Use of Deadly Force NOT Authorized</u> – Deadly force is not authorized to disperse a crowd, to stop looting, to enforce a curfew, or to protect non-designated property.

### RULE 7:  USE OF DEADLY FORCE AGAINST A SERIOUS OFFENSE
A SOLDIER may use deadly force, but only IF it is directly related to the assigned mission AND it reasonably appears necessary:
- to prevent a serious crime against any person that involves imminent threat of DSBH (murder, armed robbery, aggravated assault, or arson),
- to prevent the escape of a prisoner where probable cause indicates he has committed or attempted to commit a serious offense and would pose an imminent threat of DSBH to DOD forces or others in the vicinity,
- to arrest or apprehend a person who, there is probable cause to believe, has committed a serious offense that involved imminent threat of DSBH.

### RULE 8:  USE OF DEADLY FORCE AGAINST A VEHICULAR THREAT
A SOLDIER may fire his weapon at a moving land or water vehicle when he reasonably believes the vehicle poses an imminent threat of DSBH to DOD forces or to non-DOD persons in the vicinity, but only IF doing so is directly related to the assigned mission.

### RULE 9:  INSPECTION OF PERSONNEL ENTERING AND EXITING AREA
A SOLDIER may inspect individuals and property, per command security guidance, prior to granting that person or property entry inside a DOD perimeter or secured area and upon leaving such an area.

Rule 9.1:  <u>Denied Access</u> - An individual or property that does not meet the command security requirements for entry inside a DOD perimeter or secured area.

### RULE 10:  TEMPORARY DETENTION OF THREATENING PERSONNEL
A SOLDIER, using the minimum force necessary, may temporarily detain an individual:
- who has gained unauthorized access inside perimeters or other secured areas,
- who refuses to depart such an area after being denied access,
- who otherwise threatens the safety and security of DOD forces, property secured by DOD forces, or non-DOD persons in the vicinity but only IF their defense is directly related to the assigned mission.

**Rule 10.1:** Search **- Detained individuals, vehicles, and property may be searched as a force protection measure.**

**Rule 10.2:** Released to CLEA **- Detained individuals and any property will be released to CLEA at the earliest opportunity consistent with mission accomplishment.**

**RULE 11:** PURSUIT/RECOVERY OF PROPERTY
**A SOLDIER may pursue and recover stolen assets vital to national security or inherently dangerous property if: CLEA or security forces are not reasonably available to recover them, and CDR, USNORTHCOM, has pre-authorized the pursuit and recovery mission, and the pursuit is immediate, continuous, and uninterrupted. The CDR, USNORTHCOM may delegate this authority.**

**Rule 11.1:** Contact CLEA **- DOD forces will contact CLEA ASAP to inform them of the theft/pursuit.**

**RULE 12:** VIOLATIONS OF THE SRUF
**A SOLDIER will not allow another Soldier to violate the SRUF, and if the other Soldier does, will report the violation immediately to the chain of command, IG, Judge Advocate, CID, or any commissioned officer with information on who, what, when, where, and why.**

**RULE 13:** UAS COUNTERMEASURES
See Commander's RESPONSIBILITY 5.

*Commander's 10 SRUF Responsibilities*

**RESPONSIBILITY 1:** TEACH AND TRAIN
**A COMMANDER must teach, train, and implement the SRUF to his/her Soldiers prior to deployment from home station for any mission.**

**RESPONSIBILITY 2:** UNIT SELF-DEFENSE
**A COMMANDER retains the inherent right and obligation of unit self-defense and defense of other DOD forces in the vicinity in response to a hostile act or demonstrated hostile intent.**

**RESPONSIBILITY 3:** INDIVIDUAL SELF-DEFENSE
**A COMMANDER may limit right of individual self-defense.**

**RESPONSIBILITY 4:** COORDINATE SRUF
**A COMMANDER will coordinate the SRUF with civilian law enforcement authorities (CLEA) or contract security forces when operating in conjunction with them to ensure a common understanding. Any RUF issues that cannot be resolved will be forwarded to the SECDEF thru the chain of command and CJCS.**

**RESPONSIBILITY 5:** UAS COUNTERMEASURES
**A COMMANDER with responsibility for "covered facilities or assets," as defined by Title 10 USC § 130i, will evaluate the totality of the circumstances to determine whether a UA or UAS poses a threat and if so, may use countermeasures approved in DepSecDef Policy Memo 17-00X, 5 July 2017 (CLASSIFIED), to mitigate the threat.**

**RESPONSIBILITY 6:** INHERENTLY DANGEROUS PROPERTY
**A COMMANDER may designate DOD property or property having a DOD connection as inherently dangerous. This includes weapons, ammo, explosives, portable missiles, rockets, chemical agents, and special nuclear materials.**

**RESPONSIBILITY 7:** PURSUE AND RECOVER
**A COMMANDER may not authorize forces to pursue and recover stolen assets vital to national security or inherently dangerous property, unless delegated this authority by the CCDR, USNORTHCOM. Any pursuit must be immediate, continuous, and uninterrupted.**

**RESPONSIBILITY 8:** MISSION-SPECIFIC RUF
**A COMMANDER may request SECDEF-approval of mission-specific RUF based on mission requirements through the chain of command and CJCS. A COMMANDER of a unit detailed to another Federal agency will ensure his/her unit is operating under a common mission-specific RUF approved by the SECDEF and the Federal agency.**

**RESPONSIBILITY 9:** IMPOSE RESTRICTIONS
**A COMMANDER may impose restrictions to the SECDEF-approved SRUF or mission-specific RUF, but must notify SECDEF through the chain of command and CJCS of imposing the restrictions and why as soon as practicable.**

**RESPONSIBILITY 10:** VIOLATIONS
**A COMMANDER will IMMEDIATELY report any suspected violation of or non-compliance with the SRUF through the chain of command to CDR, USNORTHCOM, ATTN: SJA; investigate any suspected violation of or non-compliance with the SRUF; and preserve all evidence.**

1 November 2020 (V. 12)

# STANDING RULES FOR USE OF FORCE (SRUF)

## Title 10 Forces



## CJCSI 3121.01B
### 13 June 2005

Legal Advisor: _____

Phone: _____

E-mail: _____

DEFS_00001073

DEFS_00001074

# EXHIBIT 4

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 5

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 6

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 7

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**




# SRUF Card
## (TITLE 10)

**RULE 1:** <u>LIMITATIONS ON THE USE OF FORCE</u> - A SOLDIER will use force of any kind only as a last resort and, if used, the force should be the minimum necessary to accomplish the mission.

> **Rule 1.1:** <u>Reasonable</u> - Any use of force must be reasonable in intensity, duration, and magnitude to counter the threat based on all of the circumstances.
>
> **Rule 1.2:** <u>Safety</u> - Exercise due regard for the safety of innocent bystanders when using any type of force.
>
> **Rule 1.3:** <u>Warning Shots</u> - Warning shots are NOT authorized.

**RULE 2:** <u>DE-ESCALATION</u> - When time and circumstances permit, a SOLDIER will give a threatening force warnings and an opportunity to withdraw or stop the threatening actions before using force.

> **Rule 2.1:** <u>Avoid Confrontation</u> - Avoid confrontation with individuals who pose no threat to the unit, to non-DOD persons in the vicinity, or property secured by DOD forces.
>
> **Rule 2.2:** <u>Notify CLEA</u> - Increase self-defense posture and notify civilian law enforcement authorities (CLEA) or security agency personnel as soon as practicable if confrontation appears likely, civilians are acting in a suspicious manner, or immediately after a confrontation.

**RULE 3:** <u>INDIVIDUAL SELF-DEFENSE</u> - A SOLDIER may exercise individual self-defense in response to a <u>hostile act</u> or <u>demonstrated hostile intent</u>.

> **Rule 3.1:** <u>Limit on Self-Defense</u> - A COMMANDER may limit individual self-defense by members of his unit.

**RULE 4:** <u>UNIT SELF-DEFENSE</u> - A COMMANDER always has the inherent right and obligation to exercise unit self-defense in response to a <u>hostile act</u> or <u>demonstrated hostile intent</u>.

**RULE 5:** <u>USE OF NON-DEADLY FORCE</u> - A SOLDIER may use non-deadly force to stop a threat and it is reasonably necessary:

> to control a situation and accomplish the mission,
> to provide protection for himself and other DOD personnel,
> to defend non-DOD persons in the vicinity, but only IF directly related to the assigned mission, or
> to defend designated protected property.

**RULE 6:** <u>USE OF DEADLY FORCE IN SELF-DEFENSE, DEFENSE OF OTHERS, AND DEFENSE OF PROPERTY</u> - A SOLDIER may use deadly force only when all lesser means have failed or cannot reasonably be employed AND it reasonably appears necessary:

> to protect DOD forces when a commander reasonably believes a person poses an imminent threat of death or serious bodily harm,
> to protect yourself and other DOD forces from the imminent threat of death or serious bodily harm,
> to protect non-DOD persons in the vicinity from the imminent threat of death or serious bodily harm, but only IF directly related to the assigned mission,
> to prevent the actual theft or sabotage of assets vital to national security or inherently dangerous property, and
> to prevent the sabotage of a national critical infrastructure.

> **Rule 6.1:** <u>Use of Deadly Force NOT Authorized</u> – Deadly force is not authorized to disperse a crowd, to stop looting, to enforce a curfew, or to protect non-designated property.

24 June 2024

# SRUF Card



**RULE 7:**  <u>USE OF DEADLY FORCE AGAINST A SERIOUS OFFENSE</u> - A SOLDIER may use deadly force, but only IF it is directly related to the assigned mission AND it reasonably appears necessary:

    to prevent a serious crime against any person that involves imminent threat of death or serious bodily harm,

    to prevent the escape of a prisoner where probable cause indicates he has committed or attempted to commit a serious offense and would pose an imminent threat of death or serious bodily harm to DOD forces or others in the vicinity,

    to arrest or apprehend a person who, there is probable cause to believe, has committed a serious offense that involved imminent threat of death or serious bodily harm.

**RULE 8:**  <u>USE OF DEADLY FORCE AGAINST A VEHICULAR THREAT</u> - A SOLDIER may fire his weapon at a moving land or water vehicle when he reasonably believes the vehicle poses an imminent threat of death or serious bodily harm to DOD forces or to non-DOD persons in the vicinity, but only IF doing so is directly related to the assigned mission.

**RULE 9:**  <u>INSPECTION OF PERSONNEL ENTERING AND EXITING AREA</u> - A SOLDIER may inspect individuals and property, per command security guidance, prior to granting that person or property entry inside a DOD perimeter or secured area and upon leaving such an area.

    **Rule 9.1:**  <u>Denied Access</u> - An individual or property that does not meet the command security requirements for entry may be denied access inside a DOD perimeter or secured area.

**RULE 10:**  <u>TEMPORARY DETENTION OF THREATENING PERSONNEL</u> - A SOLDIER may temporarily detain an individual:

    who has gained unauthorized access inside perimeters or other secured areas,

    who refuses to depart such an area after being denied access,

    who otherwise threatens the safety and security of DOD forces, property secured by DOD forces, or non-DOD persons in the vicinity but only IF their defense is directly related to the assigned mission.

    **Rule 10.1:**  <u>Search</u> - Detained individuals, vehicles, and property may be searched as a force protection measure.

    **Rule 10.2:**  <u>Released to CLEA</u> - Detained individuals and any secured property will be released to CLEA at the earliest opportunity consistent with mission accomplishment.

**RULE 11:**  <u>PURSUIT AND RECOVERY OF STOLEN PROPERTY</u> - A SOLDIER may pursue and recover stolen assets vital to national security or inherently dangerous property if:

    CLEA or security forces are not reasonably available to recover them, and

    Commander, USNORTHCOM, has pre-authorized the pursue and recovery mission, and

    the pursuit is immediate, continuous, and uninterrupted.

    **Rule 11.1:**  <u>Contact CLEA</u> - DOD forces will contact CLEA as soon as practicable to inform them of the theft/pursuit.

**RULE 12:**  <u>REPORT VIOLATIONS OF THE SRUF</u> - A SOLDIER will IMMEDIATELY report any violation of or non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning who, what, when, where, and why.

**24 June 2024**

# EXHIBIT 8

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**



## Standing Rules for the Use of Force (SRUF) [1,2]




1. First, do no harm. We are here to protect, not provoke.
2. De-escalate.
3. Defend yourself, your unit, and designated people or property.
4. Sturdy professionalism.
5. No comments, no cameras.

**RULE 1: LIMITATIONS ON THE USE OF FORCE** - A MARINE will use force of any kind only as a last resort, and, if used, the force should be the minimum necessary to accomplish the mission.

**RULE 1.1: Reasonable** - Any use of force must be reasonable in intensity, duration, and magnitude to counter the threat based on all of the circumstances.

**RULE 1.2: Safety** - Exercise due regard for the safety of innocent bystanders when using any type of force.

**RULE 1.3: Warning Shots** - Warning shots are NOT authorized.

**RULE 2: DE-ESCALATION** - When time and circumstances permit, a MARINE will give a threatening force a warnings and an opportunity to withdraw or stop the threatening actions before using force.

**RULE 2.1: Avoid Confrontation** - Avoid confrontation with individuals who pose no threat to the unit, to non-DOD persons in the vicinity, or property secured by DOD forces.

**RULE 2.2: Notify CLEA** - Increase self-defense posture and notify civilian law enforcement authorities (CLEA) or security agency personnel as soon as practicable if confrontation appears likely, civilians are acting in a suspicious manner, or immediately after a confrontation.

**RULE 3: INDIVIDUAL SELF-DEFENSE** - A MARINE may exercise individual self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 3.1: Limit on Self-Defense** - A COMMANDER may limit individual self-defense by members of their unit.

**RULE 4: UNIT SELF-DEFENSE** - A COMMANDER always has the inherent right and obligation to exercise unit self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 5: USE OF NON-DEADLY FORCE** - A MARINE may use non-deadly force to stop a threat, and it is reasonably necessary:

  to control a situation and accomplish the mission,

  to provide protection for themselves and other DOD personnel,

  to defend non-DOD persons in the vicinity, but only IF directly related to the assigned mission, or

  to defend designated protected property.

**RULE 6: USE OF DEADLY FORCE IN SELF-DEFENSE, DEFENSE OF OTHERS, AND DEFENSE OF PROPERTY** - A MARINE may use deadly force only when a) lesser means have failed or cannot reasonably be employed, AND it reasonably appears necessary:

  to protect DOD forces when a commander reasonably believes a person poses an imminent threat of death or serious bodily harm,

  to protect yourself and other DOD forces from the imminent threat of death or serious bodily harm,

  to protect non-DOD persons in the vicinity from the imminent threat of death or serious bodily harm, but only IF directly related to the assigned mission,

  to prevent the actual theft or sabotage of assets vital to national security or inherently dangerous property, and

  to prevent the sabotage of a national critical infrastructure.




## Standing Rules for the Use of Force (SRUF) [1,2]

1. First, do no harm. We are here to protect, not provoke.
2. De-escalate.
3. Defend yourself, your unit, and designated people or property.
4. Sturdy professionalism.
5. No comments, no cameras.

**RULE 1: LIMITATIONS ON THE USE OF FORCE** - A MARINE will use force of any kind only as a last resort, and, if used, the force should be the minimum necessary to accomplish the mission.

**RULE 1.1: Reasonable** - Any use of force must be reasonable in intensity, duration, and magnitude to counter the threat based on all of the circumstances.

**RULE 1.2: Safety** - Exercise due regard for the safety of innocent bystanders when using any type of force.

**RULE 1.3: Warning Shots** - Warning shots are NOT authorized.

**RULE 2: DE-ESCALATION** - When time and circumstances permit, a MARINE will give a threatening force a warnings and an opportunity to withdraw or stop the threatening actions before using force.

**RULE 2.1: Avoid Confrontation** - Avoid confrontation with individuals who pose no threat to the unit, to non-DOD persons in the vicinity, or property secured by DOD forces.

**RULE 2.2: Notify CLEA** - Increase self-defense posture and notify civilian law enforcement authorities (CLEA) or security agency personnel as soon as practicable if confrontation appears likely, civilians are acting in a suspicious manner, or immediately after a confrontation.

**RULE 3: INDIVIDUAL SELF-DEFENSE** - A MARINE may exercise individual self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 3.1: Limit on Self-Defense** - A COMMANDER may limit individual self-defense by members of their unit.

**RULE 4: UNIT SELF-DEFENSE** - A COMMANDER always has the inherent right and obligation to exercise unit self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 5: USE OF NON-DEADLY FORCE** - A MARINE may use non-deadly force to stop a threat, and it is reasonably necessary:

  to control a situation and accomplish the mission,

  to provide protection for themselves and other DOD personnel,

  to defend non-DOD persons in the vicinity, but only IF directly related to the assigned mission, or

  to defend designated protected property.

**RULE 6: USE OF DEADLY FORCE IN SELF-DEFENSE, DEFENSE OF OTHERS, AND DEFENSE OF PROPERTY** - A MARINE may use deadly force only when a) lesser means have failed or cannot reasonably be employed, AND it reasonably appears necessary:

  to protect DOD forces when a commander reasonably believes a person poses an imminent threat of death or serious bodily harm,

  to protect yourself and other DOD forces from the imminent threat of death or serious bodily harm,

  to protect non-DOD persons in the vicinity from the imminent threat of death or serious bodily harm, but only IF directly related to the assigned mission,

  to prevent the actual theft or sabotage of assets vital to national security or inherently dangerous property, and

  to prevent the sabotage of a national critical infrastructure.



## Standing Rules for the Use of Force (SRUF) [1,2]

1. First, do no harm. We are here to protect, not provoke.
2. De-escalate.
3. Defend yourself, your unit, and designated people or property.
4. Sturdy professionalism.
5. No comments, no cameras.

**RULE 1: LIMITATIONS ON THE USE OF FORCE** - A MARINE will use force of any kind only as a last resort, and, if used, the force should be the minimum necessary to accomplish the mission.

**RULE 1.1: Reasonable** - Any use of force must be reasonable in intensity, duration, and magnitude to counter the threat based on all of the circumstances.

**RULE 1.2: Safety** - Exercise due regard for the safety of innocent bystanders when using any type of force.

**RULE 1.3: Warning Shots** - Warning shots are NOT authorized.

**RULE 2: DE-ESCALATION** - When time and circumstances permit, a MARINE will give a threatening force a warnings and an opportunity to withdraw or stop the threatening actions before using force.

**RULE 2.1: Avoid Confrontation** - Avoid confrontation with individuals who pose no threat to the unit, to non-DOD persons in the vicinity, or property secured by DOD forces.

**RULE 2.2: Notify CLEA** - Increase self-defense posture and notify civilian law enforcement authorities (CLEA) or security agency personnel as soon as practicable if confrontation appears likely, civilians are acting in a suspicious manner, or immediately after a confrontation.

**RULE 3: INDIVIDUAL SELF-DEFENSE** - A MARINE may exercise individual self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 3.1: Limit on Self-Defense** - A COMMANDER may limit individual self-defense by members of their unit.

**RULE 4: UNIT SELF-DEFENSE** - A COMMANDER always has the inherent right and obligation to exercise unit self-defense in response to a hostile act or demonstrated hostile intent.

**RULE 5: USE OF NON-DEADLY FORCE** - A MARINE may use non-deadly force to stop a threat, and it is reasonably necessary:

  to control a situation and accomplish the mission,

  to provide protection for themselves and other DOD personnel,

  to defend non-DOD persons in the vicinity, but only IF directly related to the assigned mission, or

  to defend designated protected property.

**RULE 6: USE OF DEADLY FORCE IN SELF-DEFENSE, DEFENSE OF OTHERS, AND DEFENSE OF PROPERTY** - A MARINE may use deadly force only when a) lesser means have failed or cannot reasonably be employed, AND it reasonably appears necessary:

  to protect DOD forces when a commander reasonably believes a person poses an imminent threat of death or serious bodily harm,

  to protect yourself and other DOD forces from the imminent threat of death or serious bodily harm,

  to protect non-DOD persons in the vicinity from the imminent threat of death or serious bodily harm, but only IF directly related to the assigned mission,

  to prevent the actual theft or sabotage of assets vital to national security or inherently dangerous property, and

  to prevent the sabotage of a national critical infrastructure.



# Standing Rules for the Use of Force (SRUF)

**RULE 6.1: Use of Deadly Force NOT Authorized** - Deadly force is not authorized to disperse crowd, to stop looting, to enforce curfew, or to protect non-designated property.

**RULE 7: USE OF DEADLY FORCE AGAINST A SERIOUS OFFENSE** - A MARINE may use deadly force, but only IF it is directly related to the assigned mission AND it reasonably appears necessary:

to prevent a serious crime against any person that involves the imminent threat of death or serious bodily harm,

to prevent the escape of a prisoner where probable cause indicates he/she has committed or attempted to commit a serious offense and would pose an imminent threat of death or serious bodily harm to DOD forces or others in the vicinity,

to arrest or apprehend a person who there is probable cause to believe has committed a serious offense that involved the imminent threat of death or serious bodily harm or sabotage of designated protected property.

**RULE 8: USE OF DEADLY FORCE AGAINST A VEHICULAR THREAT** - A MARINE may fire their weapon at a moving land or motor vehicle when they reasonably believe the vehicle poses an imminent threat of death or serious bodily harm to DOD forces or to non-DOD persons in the vicinity, but only IF doing so is directly related to the assigned mission.

**RULE 9: INSPECTION OF PERSONNEL ENTERING AND EXITING AREA** - A MARINE may inspect individuals and property, personnel and security guidance, prior to granting that person or property entry inside a DOD perimeter or secured area and upon leaving such an area.

**RULE 9.1: Denied Access** - An individual or property that does not meet the command and security requirements for entry may be denied access inside a DOD perimeter or secured area.

**RULE 10: TEMPORARY DETENTION OF THREATENING PERSONNEL** - A MARINE may temporarily detain an individual:

who has gained unauthorized access inside perimeter or other secured areas,

who refuses to depart such an area after being denied access,

who otherwise threatens the safety and security of DOD forces, property secured by DOD forces, or non-DOD persons in the vicinity, but only IF their defense is directly related to the assigned mission.

**RULE 10.1: Search** - Detained individuals, vehicles, and property may be searched as a force protection measure.

**RULE 10.2: Released to CLEA** - Detained individuals and any secured property will be released to CLEA at the earliest opportunity consistent with mission accomplishment.

**RULE 11: PURSUIT AND RECOVERY OF STOLEN PROPERTY** - A MARINE may pursue and recover stolen assets vital to national security or inherently dangerous property if:

CLEA or security forces are not reasonably available to recover them, and

Commander, USNORTHCOM, has pre-authorized the pursuit and recovery mission, and

the pursuit is immediate, continuous, and uninterrupted.

**RULE 11.1: Contact CLEA** - DOD forces will contact CLEA as soon as practicable to inform them of the theft/pursuit.

**RULE 12: REPORT VIOLATIONS OF THE SRUF** - A MARINE will IMMEDIATELY report any violation of or non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning who, what, when, where, and why.

Card No. _____

 

# Standing Rules for the Use of Force (SRUF)

Card No. _____

 

# Standing Rules for the Use of Force (SRUF)

Card No. _____



# EXHIBIT 9

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN - 9 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Additional Members of the California National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. Also on June 7, 2025, I implemented that order by directing 2,000 members of the California National Guard be called into Federal Service for a period of 60 days (see attached memorandum).

This memorandum further implements the President's direction. An additional 2,000 members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachments:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
                THE ATTORNEY GENERAL
                THE SECRETARY OF HOMELAND SECURITY

SUBJECT:         Department of Defense Security for the Protection
                 of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

DEFS_00000007

2

of the regular Armed Forces as necessary to augment and support
the protection of Federal functions and property in any number
determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may
perform those military protective activities that the Secretary
of Defense determines are reasonably necessary to ensure the
protection and safety of Federal personnel and property  The
Secretary of Defense shall consult with the Attorney General and
the Secretary of Homeland Security prior to withdrawing any
personnel from any location to which they are sent.  The
Secretaries of Defense and Homeland Security may delegate to
subordinate officials of their respective Departments any of the
authorities conferred upon them by this memorandum.


                        DONALD J. TRUMP



SECRETARY OF DEFENSE
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

JUN 0 7 2025

MEMORANDUM FOR ADJUTANT GENERAL OF THE CALIFORNIA NATIONAL GUARD
THROUGH: THE GOVERNOR OF CALIFORNIA

SUBJECT: Calling Members of the California National Guard into Federal Service

The President of the United States has called forth at least 2000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to temporarily protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum today to effectuate the calling forth of these Service members.

This memorandum implements the President's direction. Two thousand members of the California National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with the Adjutant General of the California National Guard, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment:
As stated

cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy

# EXHIBIT 10

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 11

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 12

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)

# EXHIBIT 13

**TO DECLARATION OF GARRY HARTLIEB IN SUPPORT OF
DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# (FILED UNDER SEAL)