**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BRENDAN HAMME
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
Deputy Attorneys General
  455 Golden Gate Ave.
  San Francisco, CA 94102
  Telephone: (415) 510-3877
  E-mail:  Meghan.Strong@doj.ca.gov
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,**<br><br>Defendants. | **NO. 3:25-cv-04870-CRB**<br><br>**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................... 1

Argument .............................................................................................................................. 2

    I.      Defendants' Threshold Legal Arguments Fail. ....................................................... 2

          A.      California May Pursue an *Ultra Vires* Cause of Action to Enjoin
                 Defendants' Violations of the Law. .......................................................... 2

          B.      California Has Standing. .......................................................................... 4

          C.      Section 12406(3) Does Not Authorize the National Guard to
                 Violate the Posse Comitatus Act. ............................................................ 7

    II.     Defendants Have Violated and Are Violating the Posse Comitatus Act. ............. 10

    III.    The Court May Enter Prospective Injunctive Relief to Prevent Ongoing and
         Future Violations. ................................................................................................ 13

    IV.    The Court Should Not Grant A Stay. .................................................................... 15

Conclusion ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982) ........................................................................................ 4, 6, 7

*Arizona v. Yellen*
    34 F.4th 841 (9th Cir. 2022) .......................................................................... 4

*Armstrong v. Davis*
    275 F.3d 849 (9th Cir. 2001) ......................................................................... 14

*Bisonnette v. Haig*
    776 F.2d 1384 (8th Cir. 1985) ....................................................................... 11

*City of Oakland v. Lynch*
    798 F.3d 1159 (9th Cir. 2015) ....................................................................... 5

*Dep't of Com. v. New York*
    588 U.S. 752 (2019) ........................................................................................ 5, 14

*Fischer v. United States*
    603 U.S. 480 (2024) ........................................................................................ 8

*Gest v. Bradbury*
    443 F.3d 1177 (9th Cir. 2006) ....................................................................... 13

*Gibbons v. Ogden*
    22 U.S. (9 Wheat.) 1 (1824) ........................................................................... 6

*Gilbert v. United States*
    165 F.3d 470 (6th Cir. 1999) ......................................................................... 6

*Hart Book Stores, Inc. v. Edmisten*
    612 F.2d 821 (4th Cir. 1979) ......................................................................... 4

*Kentucky v. Biden*
    23 F.4th 585 (6th Cir. 2022) .......................................................................... 4

*Laird v. Tatum*
    408 U.S. 1 (1972) ............................................................................................ 2

*Marbury v. Madison*
    5 U.S. 1 (1803) ............................................................................................... 3

*Missouri v. Illinois*
    180 U.S. 208 (1901) ....................................................................................... 4

ii

1

## TABLE OF AUTHORITIES
(continued)

2

**Page**

3    *Morrisey v. U.S. Dep't of the Treasury*
      59 F.4th 1124 (11th Cir. 2023)...................................................................... 4
4

5    *Murphy Co. v. Biden*
      65 F.4th 1122 (9th Cir. 2023)........................................................................ 3
6

7    *New York v. United States*
      505 U.S. 144 (1992)..................................................................................... 6
8    *NRC v. Texas*
      145 S. Ct. 1762 (2025)................................................................................. 3
9

10   *Pennsylvania v. West Virginia*
      262 U.S. 553 (1923)..................................................................................... 4
11   *Quern v. Mandley*
      436 U.S. 725 (1978)..................................................................................... 15
12

13   *Railway Clerks v. Ass'n for Benefit of Non-contract Employees*
      380 U.S. 650 (1965)..................................................................................... 3
14

15   *Robinson v. Shell Oil Co.*
      519 U.S. 337 (1997)..................................................................................... 8
16

17   *St. Paul Fire & Marine Ins. Co. v. Barry*
      438 U.S. 531 (1978)..................................................................................... 15
18   *United States v. Allred*
      867 F.2d 856 (5th Cir. 1989)................................................................... 9, 10
19

20   *United States v. Concentrated Phosphate Export Assn.*
      393 U.S. 199 (1968)..................................................................................... 14
21   *United States v. Dreyer*
      804 F.3d 1266 (9th Cir. 2015)................................................................ 12, 13
22

23   *United States v. Eleuterio*
      2024 WL 1620383 (D.V.I. Apr. 15, 2024)................................................... 4
24

25   *United States v. Hernandez-Garcia*
      44 F.4th 1157 (9th Cir. 2022)........................................................................ 9
26   *United States v. Morrison*
      529 U.S. 598 (2000)..................................................................................... 6
27

28

PLAINTIFFS' SUPP. REPLY BRIEF ISO MTN. FOR PRELIMINARY INJUNCTION

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Texas*
    599 U.S. 670 (2023) ................................................................................ 7

*United States v. Yunis*
    681 F. Supp. 891 (D.D.C. 1988) ......................................................... 2, 10

*Vasquez Perdomo v. Noem*
    2025 WL 1915964 (C.D. Cal. July 11, 2025) ...................................... 13

*W. Virginia v. Env't Prot. Agency*
    597 U.S. 697 (2022) .............................................................................. 14

STATUTES

United States Code, Title 10
    § 806(d)(1) ............................................................................................ 10
    § 12406 .......................................................................................... *passim*
    § 12406(3) ............................................................................................... 1

United States Code, Title 18
    § 1385 ...................................................................................................... 8

United States Code, Title 28
    § 515 ...................................................................................................... 10
    § 543 ...................................................................................................... 10

Posse Comitatus Act (PCA) ........................................................................ *passim*

CONSTITUTIONAL PROVISIONS

United States Constitution
    Tenth Amendment .................................................................................. 6
    Article III ............................................................................................ 5, 7

iv

**INTRODUCTION**

Defendants continue to attempt to place their actions entirely beyond the Court's review and, when that fails, to take the broadest and most extreme view of executive power possible. But it simply is not the law that Defendants may deploy standing armies to the streets of California while California is powerless to do anything about that clear violation of the most fundamental principles of our Nation's founding. Defendants' view reads the Posse Comitatus Act out of the law, leaving the military free to take any action so long as they claim it is remotely tied to a desire to protect federal personnel and property. And it ignores both the clear tests that courts have established over decades for interpreting the Posse Comitatus Act and determining what conduct violates the law as well as Defendants' own career officers' understanding of that law.

Defendants maintain that Plaintiffs' action is "unprecedented," Opp.[1] 8. But the reason there is no precedent governing this scenario is that never before, in the history of the Nation, has the federal government utilized the military for domestic law enforcement in this manner. What is unprecedented is this federal government's decision to embed federalized National Guard members and Marines with a domestic law-enforcement agency—the federal Department of Homeland Security (DHS) and its Immigration and Customs Enforcement (ICE) unit—and deploy them widely throughout the State, all while asserting there are no limits on what those federal troops can do.

Plaintiffs meet all the threshold legal requirements to bring their claim. They may bring an *ultra vires* action to challenge Defendants' disregard of a statutory provision, and they have standing to do so as the State in which Defendants actions are occurring and their harms being felt. Nor can Defendants avoid application of the Posse Comitatus Act to their conduct—a fact none of their own leaders dispute—through a strained reading of 10 U.S.C. § 12406(3). Plaintiffs' opening supplemental brief presented substantial evidence of incidents that both separately and cumulatively violate the Posse Comitatus Act, and Defendants' attempts to recast these violations as acceptable execution of the laws lack merit. The Court should rule for

---

[1] Citations to Opp. all refer to the pagination in Defendants' Corrected Opposition.

1    Plaintiffs and issue a permanent injunction prohibiting Defendants from continuing to engage in

2    such violations.

3                                          **ARGUMENT**

4    **I.    DEFENDANTS' THRESHOLD LEGAL ARGUMENTS FAIL.**

5         **A.    California May Pursue an *Ultra Vires* Cause of Action to Enjoin
             Defendants' Violations of the Law.**
6

7         As discussed in Plaintiffs' opening brief and *infra*, Defendants have consistently violated

8    the Posse Comitatus Act in their orders to the federalized National Guard and Marines to engage

9    in activities that the PCA prohibits.  Plaintiffs are entitled to challenge that disregard of the PCA's

10   prohibitions via an *ultra vires* action, and none of Defendants' arguments to the contrary are

11   availing.

12        Defendants are wrong in asserting that there is no historical basis for Plaintiffs' action.  As

13   established in Plaintiffs' opening supplemental brief, the PCA's history makes clear that Congress

14   intended, in passing the PCA, to bar all use of the military as a posse comitatus, not just to protect

15   defendants in the criminal context but in *all* contexts.  Supp. PI Br. 18; *see also United States v.*

16   *Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988) ("Legislative history indicates that the immediate

17   objective of the Act was to end the use of federal troops in former confederate states where civil

18   power had been reestablished.  Many southerners believed the troops altered the outcome of state

19   elections by actively supporting reconstruction candidates in disputed elections."); *Laird v.*

20   *Tatum*, 408 U.S. 1, 15-16 (1972) ("Nothing in our Nation's history . . . can properly be seen as

21   giving any indication that actual or threatened injury by reason of unlawful activities of the

22   military would go unnoticed or unremedied.").

23        And though the unprecedented nature of Defendants' *ultra vires* actions means there is no

24   clear precedent for an *ultra vires* action of this exact nature in this exact context, what Plaintiffs

25   ask the Court to do here is not so extraordinary.  As discussed *infra*, most of the parties' disputes

26   regarding Plaintiffs' PCA claim are not factual but, rather, center on the boundaries of the PCA

27   and what activity crosses those lines.  Simply put, Plaintiffs' PCA claim "asks only that we apply

28   our familiar tools of statutory construction and fulfill our enduring 'duty . . . to say what the law

                                             2

1  is.'"  *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (quoting *Marbury v. Madison*, 5

2  U.S. 1, 26 (1803)); *see also id.* at 1130-31 (concluding that *ultra vires* challenges that raise core

3  separation of powers principles are reviewable).  As the Court already held, Plaintiffs may seek to

4  end Defendants' unlawful activity, which defies the separation of powers, through an *ultra vires*

5  action.[2]  *See id.*; ECF No. 64 at 27.

6       Defendants' reliance on *NRC v. Texas*, Opp. 9, does not change this.  That case concerned

7  the availability of *ultra vires* review where a statute *precludes* judicial review of a particular

8  agency action—for example, the Hobbs Act in *NRC*.  *See NRC v. Texas*, 145 S. Ct. 1762 (2025).

9  Defendants identify no statute that precludes Plaintiffs from enforcing the PCA.  In those

10  circumstances, Ninth Circuit precedent affords a broad right to bring *ultra vires* claims.  *See, e.g.*,

11  *Murphy*, 65 F.4th at 1131.[3]

12       Finally, to be clear, Plaintiffs continue to challenge Defendants' initial federalization of the

13  National Guard at this stage of the proceedings and their challenge to the federalization order

14  itself is currently on review before the Ninth Circuit.  But consistent with the Court's order

15  regarding the limited focus of the upcoming trial, Plaintiffs focus now instead on the activities

16  and orders directed by DoD pursuant to that federalization, which independently violate the PCA,

17  both as separate actions and via their cumulative effect.  To the extent Plaintiffs' PCA claims

18  merely underscore why federalization of the National Guard was improper in the first place, that

19  is only because the PCA was passed in part to stop what had become "common practice" for "the

20  military to quell riots and rebellion," not because Plaintiffs are asking this Court to adjudicate

21         _____

22      [2] Defendants also assert that the PCA has a willfulness requirement that Plaintiffs must
prove to bring an *ultra vires* claim.  Opp. 7.  Plaintiffs dispute that this requirement here, let

23  alone that they must demonstrate it as a threshold matter to bring a cause of action.  But in any
event, such a requirement is satisfied by ████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████.
    In any event, *NRC* re-affirmed that *ultra vires* review is permitted "when an agency has

26  taken actions entirely 'in excess of its delegated powers and contrary to a specific prohibition' in
a statute."  145 S. Ct. at 1176 (quoting *Railway Clerks v. Ass'n for Benefit of Non-contract

27  *Employees*, 380 U.S. 650, 660 (1965)).  Such is the case here, and because no other "statutory
review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for

28  judicial review'" or otherwise forecloses "all other forms of judicial review," this case satisfies
the requirements for *ultra vires* review.  *Id.*

1    their § 12406 claim in this trial. *United States v. Eleuterio*, 2024 WL 1620383, at *2 (D.V.I. Apr.

2    15, 2024).

3         These PCA violations cannot be dismissed as mere mistakes at the individual level of

4    soldiers on the ground, as Defendants seems to suggest. Opp. 10. Rather, they stem directly from

5    DoD Defendants' orders and a pattern and practice that is part of a concerted and intentional

6    effort to achieve military occupation of Southern California.

7         **B.    California Has Standing.**

8         California has standing to pursue its Posse Comitatus Act claim. "[S]tates have a variety of

9    sovereign and quasi-sovereign interests that they validly may seek to vindicate in litigation."

10   *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). Where a State articulates "sufficiently

11   concrete and particularized harms to its ability to exercise its sovereign prerogatives," that is

12   sufficient to establish standing. *Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022); *see also*

13   *Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023) ("States are not

14   normal litigants for the purposes of invoking federal jurisdiction and may suffer injuries to their

15   sovereignty that private parties do not." (quotation marks omitted)). As the Supreme Court has

16   recognized, there are two general categories of state interests, "[f]irst, a State has a quasi-

17   sovereign interest in the health and well-being—both physical and economic—of its residents in

18   general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its

19   rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.,*

20   *Barez,* 458 U.S. 592, 607 (1982). Defendants' violation of the PCA infringes on both interests.

21        As relevant here, Plaintiffs have a "recognized quasi-sovereign interest" in the "comfort[]

22   and welfare of its citizens." *Biden*, 23 F.4th at 599 (quotation marks omitted) (citing

23   *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923)); *see also Missouri v. Illinois*, 180 U.S.

24   208, 241 (1901) (similar). That includes a "substantial" interest in "maintaining a stable,

25   healthful environment in its cities." *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 828 (4th

26   Cir. 1979). At the time that the preliminary injunction motion was filed, Defendants' deployment

27   of Task Force 51 had already caused serious harm to Plaintiffs by escalating tensions within the

28   city of Los Angeles and reigniting protests. This damage continues, as Defendants' ongoing use

4

of federalized troops to conduct civil law enforcement sows chaos and fear daily throughout Southern California.  *See* Supp. PI Br. 4.  For example, in an event that caused widely reported panic and harm, on July 7, Defendants deployed "[a]bout 90 National Guard troops," "dozens of federal officers," and "17 Humvees [and] four tactical vehicles" to a Los Angeles park in "a densely populated immigrant neighborhood."[4]  These harms to the "comfort[] and welfare" of the citizens of California, and the ongoing damage to the "stable, healthful environment" of California communities, establish standing for California's PCA claim.  Indeed, as amici curiae former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals have explained, there is a serious risk that Posse Comitatus Act violations will "escalate tensions" with civilians.  ECF No. 124-1 at 9; *see also id.* at 9-10 (noting that protesters only arrived at the scene of immigration enforcement operations in Camarillo and Carpinteria "to protest the massive show of force" that was described as "like a war scene," and that in MacArthur Park, "[p]rotesters arrived in response to the intimidating, militarized presence in a community park typically full of civilians").

California has also suffered fiscal harms as a result of the military's unlawful actions which are sufficient to confer standing.  *See City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (an "expected loss of tax revenue can constitute a sufficient injury" to confer Article III standing*); see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (loss of funding sufficient to confer standing).  Defendants' violations of the Posse Comitatus Act have increased civil unrest, requiring diversion of state law enforcement and state resources.  "From June 7 through June 14, 2025, CHP's tactical alert expenditures in connection with the Los Angeles Protest Incidents (costs over and above normal operating expenses) are estimated to have totaled approximately $7 million, with the largest expenditures coming on June 9, 10, and 11," after the National Guard was deployed.  ECF No. 77-3, Zizi Decl., at ¶ 8.  These costs are directly attributable to the increased presence of the National Guard in Los Angeles.  Indeed, the number of arrests made by CHP and other law enforcement agencies "increased following deployment of

---

[4] Watson & Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://tinyurl.com/mvsjm34m.

the National Guard on June 8." *Id.* ¶ 12.   Moreover, Defendants' actions have cost the California economy dearly by chilling economic activity in Los Angeles.  Restaurants, festivals, and farmers' markets have shut down and economic activity has been stifled, as individuals are afraid to leave their homes due to the militarized raids.[5]  As the LA Area Chamber of Commerce recently explained, "[r]ather than pursue more reasonable and orderly means to implement its immigration policy, the Administration's recent enforcement actions undermine public safety, harm our communities, and destabilize our economy."  *L.A. Area Chamber Urges Calm and Calls for De-escalation Amid Immigration Raids* (June 9, 2025), https://tinyurl.com/3y3krbcz.

California also has a quasi-sovereign interest in "securing observance of the terms under which it participates in the federal system."  *Snapp*, 458 U.S. at 607-608.  The PCA is animated by concerns of federalism, as "[t]he purpose of this statute is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws."  *Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999).[6]  As a sovereign State, California is a proper plaintiff to seek redress for federalism-related harms—and federal courts have traditionally provided a forum for States to do so.  *See, e.g.*, *Snapp*, 458 U.S. at 607-608; *New York v. United States*, 505 U.S. 144 (1992).  Indeed, Defendants' PCA violations pose a profound threat to the State's police power guaranteed by the Tenth Amendment to the U.S. Constitution.  *United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1,

---

[5] *See, e.g.*, Jill Cowan and Mimi Dwyer, *Federal Agents March Through L.A. Park, Spurring Local Outrage*, N.Y. Times (July 7, 2025), https://tinyurl.com/ye6dvrec (noting convenience store owner closed his store near MacArthur park due to military show of force there); Anabel Munoz, *Bystanders confront federal immigration agents as they descend on MacArthur Park*, ABC 7 News (July 7, 2025), https://tinyurl.com/4pcr4smp (describing "chaos and fear in the area" caused by National Guard and ICE in MacArthur Park); Levi Sumagaysay & Lauren Hepler, *From San Diego to the Bay Area, California restaurants are on edge over immigration raids*, CalMatters (June 19, 2025), https://tinyurl.com/3mavha59; Suhauna Hussain and Md Fazlur Rahman, *California's economy is already getting hit by immigration raids*, LA Times (July 30, 2025), https://tinyurl.com/2ukukjdd.

[6] *See also, e.g.*, Felicetti & Luce, *The Posse Comitatus Act: Setting the Record Straight on 124 Years of Mischief and Misunderstanding Before Any More Damage Is Done*, 175 Mil. L. Rev. 86, 167 (2003) ("[T]he Posse Comitatus Act can be viewed as Congress's expression of constitutional law regarding federalism."); Schneider, *Military Spying in the United States: When It Is Not Your Neighbor Knocking at Your Door, Where Do You Turn?*, 7 Cardozo J. Conflict Resol. 199, 211 (2005) ("The Posse Comitatus Act can be seen as limiting the federal government's ability to interfere with the states and its capacity to enforce the law.").

1    203–04 (1824) ("No direct general power over these objects is granted to Congress; and,

2    consequently, they remain subject to State legislation.").  As California has explained, the

3    prolonged, pervasive entanglement of military forces with civilian law enforcement activities

4    would allow "the military's role [to] grow to include activities that are practically

5    indistinguishable from urban policing operations."  Supp. PI Br. 13.  In this unprecedented

6    circumstance, where the military's law enforcement activities result in the direct usurpation of the

7    State's traditional law enforcement activity rather than a mere incidental burden or

8    inconvenience, the State has a sovereign interest in retaining its authority to "exercise . . .

9    sovereign power over individuals and entities" within its borders, including to enforce its own

10   state laws.  *Snapp,* 458 U.S. at 600-02.

11       Despite these harms, Defendants contend (Opp. 11) that the PCA relief would not redress

12   the injuries from federalization of the National Guard troops.  But Plaintiffs need not rely on the

13   same injuries for each of their claims.  Here, Plaintiffs are suffering substantial sovereign,

14   proprietary, and quasi-sovereign injuries that would be redressed by an injunction against

15   continued PCA violations.  And in light of the longstanding tradition of asserting claims based on

16   federalism-related harms and quasi-sovereign interests, there is no merit to Defendants' assertion

17   (Opp. 12) that Plaintiffs' PCA claim is unmoored from historical tradition and practice.[7]

18       **C.    Section 12406(3) Does Not Authorize the National Guard to Violate the
19             Posse Comitatus Act.**

20       Defendants continue to insist that the federalized National Guard is not bound by the Posse

21   Comitatus Act at all because, they say, the language in one subsection of § 12406 implies a PCA

---

22   [7] Defendants' citation to *United States v. Texas*, 599 U.S. 670 (2023), for the notion that
     the federal government cannot be forced to comply with federal law (Suppl. PI Opp. 12) misses
23   the mark entirely.  As the majority cautioned in *Texas*, that case addressed a "discrete standing
     question" involving "both a highly unusual provision of federal law and a highly unusual lawsuit"
24   in which the State of Texas sought to force the federal government to "take enforcement action
     against violators of federal law" in the exclusively federal immigration-enforcement arena.  *Id.* at
25   684-85.  And the majority also cautioned that its "Article III decision" regarding Texas's attempt
     to force the federal government to arrest more immigrants "should in no way be read to suggest or
26   imply that the Executive possesses some freestanding or general constitutional authority to
     disregard statutes requiring *or prohibiting* executive action," emphasizing that "the Federal
27   Judiciary of course routinely and appropriately decides justiciable cases involving statutory
     requirements *or prohibitions* on the Executive."  *Id.* at 684 (emphasis added).  There is simply no
28   reason why the State may not challenge the federal government's repeated PCA violations.

7

1    exception.  That contention lacks merit.  To begin, Defendants' argument on this front is limited

2    only to subsection (3) of § 12406.  *See* Opp. 12.  Defendants apparently believe that Congress—

3    without explicitly recognizing or acknowledging that it was doing so—sought to pass in a single

4    statute two federalization scenarios in which the National Guard is bound by the PCA and one in

5    which it is not.  That defies both common sense and the norms of statutory interpretation.  *See*

6    *Fischer v. United States*, 603 U.S. 480, 486 (2024) (a court must consider a statute's subpart both

7    in "'the specific context' in which [it] appears 'and the broader context of the statute as a

8    whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

9         Defendants try to read too much into too little in arguing that the broad phrase "execute the

10   laws" in § 12406(3) could authorize the broad scope of conduct they now seek to justify.  The fact

11   is that "execute the laws" can be read to encompass all manner of activities, some of which would

12   violate the PCA while others would not.  That is why, in Defendants' example of the 1970 Postal

13   Strike, Opp. 12, the National Guard were able to lawfully deliver the mail—because their actions

14   in doing so did not violate the Posse Comitatus Act.  They could execute the laws without

15   engaging in the type of civilian law enforcement prohibited by the Posse Comitatus Act, revealing

16   exactly why the words "execute the laws," on their own, cannot be read as an affirmative

17   authorization for the National Guard to engage in PCA-prohibited conduct.  Unlike delivering the

18   mail, the actions of the military here—embedding with federal law-enforcement agents, not

19   minding the U.S. Mail—clearly fall within the ambit of the PCA.

20        Defendants' other responses are similarly misplaced.  Defendants assert that "President

21   Trump's memorandum made clear the Guard's mission falls squarely within section 12406"

22   because it stated that "incidents of violence and disorder have recently occurred and threaten to

23   continue in response to" DHS's "execution of Federal immigration laws," and that "violent

24   protests threaten the security of and significant damage to Federal immigration detention facilities

25   and other Federal property."  Opp. 13.  To begin, the President cannot override the PCA or any

26   other federal law via a memorandum.  Moreover, Defendants once again rely on an implied

27   authorization by searching for it in the President's memorandum when the PCA clearly requires

28   an express authorization by *Congress*.  18 U.S.C. § 1385.  Thus, the Court need not even consider

8

1    President Trump's memorandum, as it is irrelevant to this issue.  But even if it were, the

2    suggestion in President Trump's memorandum that the federalization was necessary to support

3    the execution of federal immigration laws would, *at most*, support a finding that PCA-prohibited

4    activities are authorized and excepted to the extent necessary to protect federal property and

5    personnel enforcing federal immigration laws.  It still would not authorize the military to enforce

6    those laws directly.  And while Plaintiffs continue to assert that the circumstances in Los Angeles

7    never justified deployment in the first place, even Defendants do not dispute that there is no

8    longer any existing threat of violence to federal personnel or property, Opp. 17 & n.10, so there

9    would be no further justification for engaging in PCA-prohibited activities.  And yet National

10   Guard members remain federalized and deployed.  What's more, the activities Defendants have

11   engaged in to date are clearly not limited to activities meant to protect federal personnel and

12   property from violence.  ████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████

18        Finally, the cases Defendants cite regarding other statutorily authorized PCA exceptions

19   only prove Plaintiffs' point.  Opp. 14 (citing *United States v. Hernandez-Garcia*, 44 F.4th 1157,

20   1164 (9th Cir. 2022); *United States v. Allred*, 867 F.2d 856, 870-71 (5th Cir. 1989)).  In

21   *Hernandez-Garcia*, the court found that the Marines did not violate the PCA when they used a

22   night vision scope to detect the defendant entering the United States at the southern border

23   because another law expressly authorized exactly that: Congress had directed the Secretary of

24   Defense to "provide assistance to [Border Patrol] by deploying military use of "ground-based

25   surveillance systems to support continuous surveillance of the southern land border of the United

26   States."  44 F.4th at 1164 (quoting Pub. L. No. 114-92 129 Stat. 729 § 1059 (2015)).  Congress

27   thus explicitly authorized a specific activity in a specific place, and that is exactly the activity and

28   place the Marines were engaged in.  Similarly, in *Allred*, the court found that a judge advocate's

9

role as a Special Assistant to the United States Attorney and participation in grand jury and other proceedings did not violate the Posse Comitatus Act because Congress had authorized exactly that appointment and those activities via statute.  867 F.2d at 871 (citing 28 U.S.C. §§ 515, 543 and 10 U.S.C. § 806(d)(1)).  These express and specific authorizations are in stark contrast to the passing, non-specific reference in § 12406(3) to executing the laws generally.

To be clear, the military can execute the laws under § 12406(3) while also abiding by the PCA, as it did in 1970.  But as discussed in Plaintiffs' opening brief and *infra*, they are not.  Section 12406's reference to the Guard "execut[ing] the laws" does not mean the military has carte blanche to do whatever they wish to serve that vague end.  They must do so within the PCA's congressionally set and reasoned limits.

## II.    DEFENDANTS HAVE VIOLATED AND ARE VIOLATING THE POSSE COMITATUS ACT.

In arguing that they have not violated the Posse Comitatus Act, Defendants largely do not dispute the facts and evidence presented in Plaintiffs' opening supplemental brief.  Rather, they dispute whether those actions violate the PCA as a matter of law.  Defendants present an exceedingly narrow view of the PCA which, coupled with their strained reading of § 12406, would authorize them, through the National Guard, the Marines,[8] and other military personnel, to engage in any activity so long as they believe it is designed to "execute the laws."  That is wrong.  Defendants repeatedly invoke boundaries on the PCA without offering any support or authority for the lines they draw, insisting that because they have determined no PCA violations occurred, Plaintiffs' claim must fail.  But it is for the Court to decide where the PCA sets the boundaries and whether the actions taken by Defendants and the military personnel in their command satisfy one of the PCA's three tests and therefore show a PCA violation.

The facts and evidence presented in Plaintiffs' opening supplemental brief make clear that PCA violations have occurred because those facts and evidence satisfy the three tests set forth in *Yunis.*  Supp. PI Br. 7-17.  Defendants do not meaningfully engage with the *Yunis* tests, preferring

---

[8] Defendants are wrong to the extent they suggest that the Marines' conduct is not within the scope of the upcoming trial or the relief Plaintiffs seek simply because the Marines have been withdrawn.  There is nothing to stop Defendants from re-deploying the Marines whenever they choose, including to replace and fulfill the role of the withdrawn National Guard members.  And, as discussed *infra*, the imminent risk of this violation justifies injunctive relief.

10

1   instead to focus broadly on the PCA's prohibition on "execut[ing] the law" and assigning their

2   own, unsupported meaning to that phrase.  But Defendants' interpretation of what violates the

3   PCA is wrong for at least three reasons.

4       *First*, the existence of guidance and training materials that discourage PCA violations and

5   directions to troops not to violate the PCA (*see* Opp. 15-17) do not, in fact, prove that no

6   violations have occurred.[9]  Nor are Defendants' own internal analyses of whether a PCA violation

7   has occurred conclusive proof of that fact.  *See* Opp. 17.  The Court should reject these surface-

8   level, conclusory characterizations of Defendants' orders and actions and instead analyze their

9   actual orders and conduct to determine whether the actions described run afoul of the PCA. ███

10  ████████████████████████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████ Thus, if the Court

13  concludes that those activities violate the PCA, Defendants have conceded they ordered the

14  National Guard to engage in prohibited activities.  Plaintiffs need show nothing more.

15      *Second*, there is no authority to support Defendants' view that perimeters and blockades are

16  only prohibited if they exceed a certain size.  Opp. 19.  Unable to deny that they have, in fact,

17  ordered the military to create armed perimeters, Defendants insist that their perimeters do not

18  violate the PCA as the one in *Bisonnette* did because *their* perimeters aren't big enough.[10]  *Id.*;

19  *see also Bisonnette v. Haig*, 776 F.2d 1384, 1390-91 (8th Cir. 1985).  Defendants cite *no*

20  authority to justify their novel size-based theory.  And such a rule would raise significant

21  administrability concerns.  What size perimeter would satisfy Defendants' invented test?  A city

22  _____

23      [9] Defendants' reliance on their own guidance is inconsistent and contradictory.  On the
    one hand, they argue that this guidance is irrelevant and non-binding to the extent it contradicts

24  their argument that § 12406(3) authorizes the National Guard to violate the PCA.  Opp. 14 n.6.
    On the other hand, just pages later, they argue the Court should conclude there are no PCA

25  violations based on this guidance alone.  Opp. 15-17.  Defendants cannot have it both ways.
        [10] Even if this were the test, Defendants offer no facts to support their claim that the

26  perimeters in this case are meaningfully smaller.  In fact, the farms at issue are quite large, with
    the facility in Carpinteria spanning "almost ten football fields" and the one in Camarillo

27  stretching more than *five million* square feet.  Javier Hasse, *Glass House Shows Us Its New,
    Massive 355k Square Feet Cannabis Greenhouse*, Forbes (Feb. 11, 2020),

28  https://tiny4t.com/407BNa; Mark Madler, *Camarillo Tomato Farm Sells for $93 Million*, Los
    Angeles Business Journal (Oct. 11, 2021), https://tiny4t.com/8XzmxN.

block?  A square mile?  And how many people would have to be contained within that perimeter or blockade?  Defendants answer none of these questions, simply insisting that wherever the line is, their perimeters must be acceptable.  Notably, they justify this based on the assertion that their perimeters constituted the "blocking [of] access to federal property in response to attacks from a violent mob," but ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  And, if anything, it was Defendants' show of force through military blockades that instigated crowds.  ECF No. 124-1 at 9-10 (expressing concern about the "consequences of interpreting the Posse Comitatus Act to license the deployment of the military in ways that escalate tensions," creating a "need" for "protection of federal functions").  Defendants offer no supportable reason for this Court to find their use of armed perimeters to restrict lawful civilian movement is anything other than the obvious: an armed perimeter that violates the PCA.

*Third*, engaging in PCA-prohibited activities in furtherance of a military mission does not excuse the PCA violation.  *Contra* Opp. 19-20, 22-23.  Defendants contend that *Dreyer* stands for the proposition that "certain types of law execution activities with a sufficiently close nexus to military matters are *excepted* from the PCA's restrictions," Opp. 22-23 (citing *United States v. Dreyer*, 804 F.3d 1266, 1275-76 (9th Cir. 2015)), but their reliance on *Dreyer* is misplaced. *Dreyer* recognized an exception to the PCA only where the military activity is taken "for the *primary purpose* of furthering a military or foreign affairs function of the United States," 804 F.3d at 1275 (emphasis added), but the military in Los Angeles are not furthering any military or foreign affairs function.  Rather, at most, their only purpose is to protect federal property and personnel which, even if it was authorized by § 12406, is clearly not a *military* purpose.  Even on the facts of *Dreyer*, in which the NCIS agent may have had a colorable military purpose of investigating possession of child pornography by military personnel at the start, the Court concluded that his actions violated the PCA where his investigation broadly encompassed

12

civilian-owned computers, noting that such an investigation "was not reasonably tied to military bases, military facilities, military personnel, or military equipment." *Id.* at 1275-76.  The same is true here.  Nothing the military has done in and around Los Angeles is tied to "military bases, military facilities, military personnel, or military equipment." *Id.*  And Defendants cannot manufacture a nexus to military matters by claiming that their conduct furthers a military "mission."  If that were the rule, the military could excuse any PCA-prohibited conduct merely by claiming it accomplished their mission, no matter how unlawful that mission may be.[11]

Ultimately, Defendants' fine parsing of individual incidents and arguments misses the forest for the trees.  While each incident is of course a PCA violation on its own, as explained in Plaintiffs' opening supplemental brief, the most concerning PCA violation is the one that results from the cumulative conduct of all of these actions.  Taken together, the evidence paints a picture of military activity that pervades civilian life in Southern California and that is exactly the sort of outcome the PCA was meant to prevent.  Defendants may not recharacterize their actions after the fact to avoid that conclusion.

### III.  THE COURT MAY ENTER PROSPECTIVE INJUNCTIVE RELIEF TO PREVENT ONGOING AND FUTURE VIOLATIONS.

Prospective injunctive relief is warranted to prevent ongoing and future violations of the Posse Comitatus Act.  This Court should rule as to what military conduct violates the PCA and enjoin Defendants from engaging in it.

Continued violations of the PCA are realistically threatened, justifying injunctive relief. *See Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006); *cf. Vasquez Perdomo v. Noem*, 2025 WL 1915964 (C.D. Cal. July 11, 2025), stay pending appeal denied by 2025 WL 2181709 (9th Cir. Aug. 1, 2025).  Plaintiffs can demonstrate a likelihood of recurring injury "where the harm alleged is directly traceable to a written policy," or "the harm is part of a 'pattern of officially

---

[11] The extreme examples Defendants cite as being left unprotected by Plaintiffs' reading of the PCA, Opp. 21, are not at issue here.  The Court need not decide whether and to what extent the military could respond and protect federal personnel when they are under direct and active assault.  Here, Defendants have preemptively created perimeters and blockades and engaged in PCA-prohibited activities even when Defendants acknowledged there was no active threat to federal personnel.

sanctioned . . . behavior.'" *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 504–05 (2005)) (citations omitted).  Here, both conditions are met.

First, the President's June 7, 2025 memorandum places no temporal or geographical limits on the use of troops, and so there is an enduring threat of repeated injury in the form of re-deployment of troops who will engage in continued violations.  ECF No. 25-2 at 3 (indicating that the duration of duty is "60 days *or at the discretion of the Secretary of Defense*" and the location is wherever protests "are *likely to occur*… .") (emphasis added).  That threat is real and immediate.  Indeed, just last night—mere days before trial—DoD, undeterred by the sustained calm in Los Angeles, issued a *new* activation order deploying troops for an additional 90 days, through November 5, 2025.  Strong Ex. 31, Activation Order.  Moreover, Defendants' policies and trainings explicitly authorize violations of the Posse Comitatus Act, making the need for injunctive relief particularly marked.  ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████  And Defendants' actions are part of a pattern of officially sanctioned behavior.  As argued above, the military's involvement in operations pervades the activities of civil law enforcement.

Defendants' insistence that perimeters, blockades, and other security functions are permissible makes clear they will continue to engage in these activities unless enjoined by the Court.  *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719-20 (2022).[12]  Defendants, in fact, continue to vigorously defend their ongoing actions and have never indicated any willingness to cease the challenged activities.

---

[12] Similarly, the withdrawal of some troops does not change or moot California's need for or entitlement to injunctive relief.  Even if Defendants withdrew all troops, voluntary cessation of challenged action will only moot a case "if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968).

14

1      The Court should, therefore, grant injunctive relief that prohibits Defendants from ordering

2  or allowing the military to engage in activities that the PCA prohibits.  *See* ECF No. 8-4,

3  Proposed Order Granting Temporary Restraining Order (proposing injunction on ordering or

4  permitting military to enforce federal law; to execute or assist in federal agents' enforcement of

5  federal law, including but not limited to all law-enforcement functions such as execution of

6  warrants, arrests, searches, checkpoints, or cordons; and to patrol communities or otherwise

7  engage in general law enforcement activities beyond the immediate vicinity of federal buildings

8  or other real property owned or leased by the federal government).[13]

9  **IV.    THE COURT SHOULD NOT GRANT A STAY.**

10     The Court should decline Defendants' request for a stay.  If the Court finds that Defendants

11  have violated or are violating the Posse Comitatus Act, those violations should not be permitted

12  to continue for even one day to ensure no further harm comes to the State.  Nor do Defendants

13  suffer any risk of harm from an injunction.  Defendants have begun withdrawing the majority of

14  the troops from Los Angeles, and while that does not moot this case or obviate the need for relief,

15  it does affirm that even Defendants agree that any risk to federal personnel and property—to the

16  extent one ever existed—has passed.  Moreover, as Defendants continue to insist they are not

17  violating the PCA, they can hardly claim injury from an injunction requiring them to abide by it.

18  There is no good cause for staying any injunction or judgment this Court may issue.

19                                  **CONCLUSION**

20     The Court should grant Plaintiffs' motion and issue a permanent injunction identifying

21  Defendants' actions to date that have violated the Posse Comitatus Act and restraining them from

22  engaging in the same or similar activity in violation of the Posse Comitatus Act in the future.

23

24

---

25      [13] If, however, the Court were to conclude that additional irreparable harm is not
sufficiently imminent to justify injunctive relief, the appropriate remedy would *not* be a refusal to
26  grant any relief whatsoever.  The proper relief would be a declaration that Defendants have
violated the Posse Comitatus Act.  *Cf. Quern v. Mandley*, 436 U.S. 725, 734 n.7 (1978) (even if
27  cessation of unlawful conduct "might properly have led the District Court to deny injunctive
relief," "it could not operate to deprive the successful plaintiffs, and indeed the public of a final
28  and binding determination of the legality of the old practice"); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 538 n.7 (1978) (similar).

1   Dated:  August 6, 2025                    Respectfully submitted,

2                                             ROB BONTA
                                              Attorney General of California
3                                             MICHAEL L. NEWMAN
                                              THOMAS S. PATTERSON
4                                             Senior Assistant Attorneys General
                                              ANYA M. BINSACCA
5                                             MARISSA MALOUFF
                                              JAMES E. STANLEY
6                                             Supervising Deputy Attorneys General
                                              NICHOLAS ESPÍRITU
7                                             LUKE FREEDMAN
                                              BRENDAN HAMME
8                                             BARBARA HORNE-PETERSDORF
                                              LORRAINE LOPEZ
9                                             KENDAL MICKLETHWAITE
                                              JANE REILLY
10                                            MEGAN RICHARDS

11                                            /s/ Meghan H. Strong

12                                            MEGHAN H. STRONG
                                              Deputy Attorney General
13                                               455 Golden Gate Avenue
                                                 San Francisco, CA 94102
14                                               Telephone: (415) 510-3877
                                                 E-mail:  Meghan.Strong@doj.ca.gov
15
                                              Attorneys for Plaintiffs
16

17

18

19

20

21

22

23

24

25

26

27

28

16

# CERTIFICATE OF SERVICE

Case Name: **_Newsom v. Trump_**          No.   **3:25-cv-04870-CRB**

I hereby certify that on August 6, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION [REDACTED]**

**DECLARATION OF MEGHAN H. STRONG IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (with Exhibit 31)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 6, 2025, at San Francisco, California.

|                    M. Paredes                    |                    _/s/ M. Paredes_                    |
| :---: | :---: |
| Declarant | Signature |

SF2025303707
44747720.docx