1  **ROB BONTA**
   Attorney General of California
2  MICHAEL L. NEWMAN
   THOMAS S. PATTERSON
3  Senior Assistant Attorneys General
   ANYA M. BINSACCA
4  MARISSA MALOUFF
   JAMES E. STANLEY
5  Supervising Deputy Attorneys General
   NICHOLAS ESPÍRITU
6  LUKE FREEDMAN
   BRENDAN HAMME
7  BARBARA HORNE-PETERSDORF
   LORRAINE LOPEZ
8  KENDAL MICKLETHWAITE
   JANE REILLEY
9  MEGAN RICHARDS
   MEGHAN H. STRONG
10 Deputy Attorneys General
     300 S. Spring Street
11   Los Angeles, CA 90013
     Telephone: (213) 269-6667
12   E-mail: Barbara.HornePetersdorf@doj.ca.gov
   *Attorneys for Plaintiffs*

13

14              IN THE UNITED STATES DISTRICT COURT

15            FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

18

19 | GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | NO. 3:25-cv-04870-CRB

20

21                            Plaintiffs,   | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

22        v.

23 | DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | Hon. Charles R. Breyer
   Courtroom 6
24   Trial: August 11, 2025
   Time: 10:00 a.m.

25

26                            Defendants.

27

28

1

**TABLE OF CONTENTS**

Overview ........................................................................................................................ 1

Proposed Findings of Fact .............................................................................................. 1

I.    The facts set forth in the Stipulation of Facts (ECF No. 147), attached as Exhibit 32 to the concurrently filed Declaration of Barbara Horne-Petersdorf, are hereby incorporated by reference. ................................. 1

II.    Task Force 51 ....................................................................................... 1

III.    Application of Posse Comitatus Act to Federal Protection Mission ..................... 2

IV.    Task Force 51's Training Regarding Posse Comitatus Act ....................... 4

V.    Public Affairs Messaging .................................................................. 5

VI.    Federal Law Enforcement Agencies Submit Requests for Assistance from Task Force 51 ....................................................................................... 5

VII.    Task Force 51 Accompanies Federal Law Enforcement Agencies on Operations and Performs Law Enforcement Functions. ............................ 6

VIII.    Task Force 51 Troops Engaged in Security Functions. ......................... 9

IX.    Task Force 51 Troops Apprehended and Detained Civilians. ............... 10

X.    Federalized National Guard Troops Remain Deployed. ...................... 10

XI.    Standing ............................................................................................ 11

Proposed Conclusions of Law ...................................................................................... 12

I.    The Posse Comitatus Act Prohibits Military Personnel from Engaging in Civilian Law Enforcement Activities. .................................................. 12

II.    Task Force 51 Troops Deployed for the Federal Protection Mission Are Subject to the Posse Comitatus Act and 10 U.S.C. § 12406 Provides No Exception ............................................................................................... 13

III.    Plaintiffs Have Standing to Bring This Action. ................................... 18

IV.    Plaintiffs May Pursue an Ultra Vires Claim for Violation of the Posse Comitatus Act. ................................................................................... 20

V.    Defendants Acted Ultra Vires Because Task Force 51 Troops Directly Participated in Civilian Law Enforcement Activities. ......................... 23

VI.    Defendants Acted Ultra Vires Because They Pervaded Activities of Civilian Law Enforcement. ................................................................ 30

VII.    Defendants Acted Ultra Vires by Subjecting Civilians to Regulatory, Proscriptive, and Compulsory Military Power .................................... 34

VIII.    The Court Enters Prospective Injunctive Relief to Prevent Ongoing and Future Violations ................................................................................ 35

IX.    The Court Declines Defendants' Request for a Stay. ........................... 37

Plaintiffs Gavin Newsom, in his official capacity as Governor of the State of California, and the State of California (together, "Plaintiffs") respectfully submit the following Proposed Findings of Fact and Conclusions of Law.

### OVERVIEW

Plaintiffs seek injunctive relief to enjoin Defendants Donald Trump, in his official capacity as President of the United States, Pete Hegseth, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, "Defendants"), from violating the Posse Comitatus Act, 18 U.S.C. § 1385.  Defendants deployed federalized National Guard troops and Marines to the city of Los Angeles and surrounding regions for an initial period of sixty days and on August 6, 2025—mere days before trial—the Department of Defense issued a new activation order deploying troops for an additional 90 days, through November 6, 2025.  As detailed below, these federal troops work alongside federal civilian law enforcement agencies in operations in the field.  Even as Defendants acknowledge that the Posse Comitatus Act prohibits members of the military from engaging in civilian law enforcement activities, the military has done exactly that.  The evidence shows that Defendants violated the Posse Comitatus Act by impeding the free movement of civilians through forming perimeters and blockades on public roads and sidewalks, apprehending or detaining civilians, and participating in federal civil law enforcement activities, including Immigration and Customs Enforcement ("ICE") raids across Southern California.

### PROPOSED FINDINGS OF FACT

**I.    THE FACTS SET FORTH IN THE STIPULATION OF FACTS (ECF NO. 147), ATTACHED AS EXHIBIT 32 TO THE CONCURRENTLY FILED DECLARATION OF BARBARA HORNE-PETERSDORF, ARE HEREBY INCORPORATED BY REFERENCE.**

**II.    TASK FORCE 51**

1. Task Force 51 is the U.S. Army North's Contingency Command Post.  (Reilley Decl., Ex. 19, ECF No. 127-2, at 99[1].)

---

[1] With the exception of citations to bates numbers (i.e. DEFS_00000001) and deposition transcripts, pin cites in this filing refer to page numbers appearing in CM/ECF-generated headers of the cited document.

2.  The deployment of the National Guard and Marines under the command of Task Force 51 pursuant to the Presidential Memorandum issued June 7, 2025, and the Memoranda issued by the Secretary of Defense on June 7 and 9, 2025 (*see* Horne-Petersdorf Decl., Ex. 32) is known as the "Federal Protection Mission."  (Reilley Decl., Ex. 26, ECF No. 127-2, at 121-22.)

**III.    APPLICATION OF POSSE COMITATUS ACT TO FEDERAL PROTECTION MISSION**

3.  Task Force 51 Deputy Chief of Staff William Harrington testified that the federalized National Guard troops are subject to the Posse Comitatus Act and are not allowed to engage in civilian law enforcement.  (Sealed Reilley Decl., ECF No. 126-4, Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-65:14, ECF No. 126-10).)

4.  Mr. Harrington testified that when he raised the issue to the commanding general at a briefing, "everyone in the briefing agreed" that "as soon as California's National Guard troops were called into federal service, they would be subject to the Posse Comitatus Act" and "would lose the ability to conduct law enforcement because of the Posse Comitatus Act."  (*Id.*)

5.  ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████

6.  ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████
████████████████████████████████████
████████████████████████████████████

7.  ████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (3:25-cv-04870-CRB)

13. 

14.

15.

**IV.  TASK FORCE 51'S TRAINING REGARDING POSSE COMITATUS ACT**

16.

17.

18.

19. In this training, Task Force 51 troops were "specifically told" they could not "imped[e] vehicle or pedestrian traffic." (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18)).

20. 

21.

22.

V.   **PUBLIC AFFAIRS MESSAGING**

23.

VI.  **FEDERAL LAW ENFORCEMENT AGENCIES SUBMIT REQUESTS FOR ASSISTANCE FROM TASK FORCE 51.**

24. Federal agencies submit requests for assistance for Task Force 51 support through a Department of Defense liaison. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:12-15, 26:20-23, 31:1-19)).)



**VII.  TASK FORCE 51 ACCOMPANIES FEDERAL LAW ENFORCEMENT AGENCIES ON OPERATIONS AND PERFORMS LAW ENFORCEMENT FUNCTIONS.**

28. At the time that Plaintiffs filed their motion for preliminary injunction on June 16, 2025 (ECF No. 77), Task Force 51 troops had participated in federal law enforcement operations in Los Angeles.  (Reilley Decl., Exs. 5-10.)

29. Task Force 51 troops were accompanying ICE officers on as many as 75 percent of their at-large daily enforcement operations in Los Angeles.  (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19; 76:18-77:7).)

30.

31.

32. ███████████████████████████████████
███████████████████████

33. ████████████████████████████████
██████████████████████████

34. ██████████████████████████████
█████████████████████████████████
██████████████████████████████████
█████████████████████████████████
████████████████████████████
███████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████

35. The Department of Defense's Defense Visual Information Distribution Service—the

mission of which is to "provide an accurate, reliable source for media organizations to

access U.S. service members" (Reilley Decl., Ex. 27)—described the conduct of the

federalized National Guard troops as "establishing" and "providing" "security perimeter[s]"

where the operation was taking place (id., Exs. 14-15).

36. ████████████████████████████████████
███████████████████████████████████████
███████████████████████████████
████████████████████████████████████
███████████████████

37. ██████████████████████████████████
██████████████████████████████
████████████████████

38. ████████████████████████████████████
██████████████████████████████████████



1

2

3

4

5    39.

6

7

8

9

10

11    40.

12

13

14    41.

15

16

17

18    42.

19

20

21

22

23    43. In both the Camarillo and Carpinteria operations, federalized National Guard troops formed

24        "security perimeters" on public property and were stationed immediately adjacent to federal

25        law enforcement agents also engaged in perimeter control.  (Reilley Decl., Exs. 22-23;

26        Solorzano Decl., ECF No. 127-3; Solorzano Decl. Ex. A, ECF No. 127-4, at 2; Solorzano

27        Decl., Ex. B, ECF No. 127-4, at 4; Flores-Haro Decl., ECF No. 127-5; Flores-Haro Decl.,

28        Exs. A-P, ECF No. 127-6.)

44. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

45. ███████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████

**VIII. TASK FORCE 51 TROOPS ENGAGED IN SECURITY FUNCTIONS.**

46. Since the outset of the deployment, Task Force 51 has been "protecting federal personnel performing official functions . . . at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings" and "continue[s] to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal Bureau of Investigations Special Agents performing official functions so that such federal personnel may carry out their assigned duties").)  (Knell Decl., ECF No. 25-4 ¶¶ 7-8.; *see* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7); ████████████████████ ████████████████████████████; Horne-Petersdorf Decl., Ex. 40 at DEFS 00005036 ("If necessary, this support may include crowd control and establishment of security perimeters to ensure federal personnel are protected from harm or threat of bodily injury while those they protect perform their federal duties.")

47. ████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████

48. ████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

9

████████████████████████████████████████████████████████

████████████████████████████████████████████████

**IX. TASK FORCE 51 TROOPS APPREHENDED AND DETAINED CIVILIANS.**

49. During the Carpinteria operation, federalized National Guard troops apprehended a protestor, restraining her movement and attempting to physically move her across the perimeter that the federalized troops had established on a public road. (Solorzano Decl., Ex. B.)

50. The protestor whom the federalized National Guard troops apprehended was standing with a megaphone on public property, on the side of a public road (which Defendants have presented no evidence they had lawful authority to limit access to). (*Id.*)

51. The federalized National Guard troops directly engaged in this apprehension, even though a Homeland Security Investigations police officer stood only a few feet away and did not engage with the individual. (*Id.*)

52. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

53. ████████████████████████████████████████████
████████████████████████████████████

54. ██████████████████████████████████████████
████████████████████████

**X. FEDERALIZED NATIONAL GUARD TROOPS REMAIN DEPLOYED.**

55. In recent weeks, Task Force 51 stated it would release approximately half of the Federalized National Guard troops, as well as all of the Marines, who had been deployed to Los Angeles. (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 31:11-32:3; 33:10-17).)

56. On August 1, 2025, Task Force 51 announced its intent to "release[] the majority of the 49th Military Police Brigade from the Federal Protection Mission. There are now approximately 300 total service members conducting the Federal Protection Mission, all from the California National Guard in a Title 10 status." (Horne-Petersdorf Decl., Ex. 41.)

57. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

58. On August 6, 2025 DoD issued a new activation order deploying troops for an additional 90 days, through November 6, 2025.  (Pls' Suppl. Reply Br., ECF No. 140, Strong Decl., ECF No. 140-1, Ex. 31, Activation Order.)

**XI.    STANDING**

59. The deployment of Task Force 51 troops has escalated tensions within the city of Los Angeles and reignited protests.  (*See Amici Curiae* Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals, ECF No. 124-1, at 9.)  Protesters only arrived at the scene of immigration enforcement operations in Camarillo, Carpinteria, and Macarthur Park in Los Angeles to protest the massive show of force.  (*Id.* at 9-10.)

60. From June 7 through June 14, 2025, CHP's costs over and above normal operating expenses in connection with the protests surrounding Task Force 51's deployment are estimated to have totaled approximately $7 million.  (Zizi Decl., ECF No. 77-3, at ¶ 8.)

61. CHP's largest expenditures came on June 9, 10, and 11 after the National Guard was deployed.  (*Id.*)

62. The number of arrests made by CHP and other law enforcement agencies increased following deployment of the National Guard on June 8.  (*Id.* ¶ 12.)

63. Restaurants, farmers' markets, and festivals, including July 4th celebrations, have shut down and economic activity has been stifled, as individuals are afraid to leave their homes due to the immigration enforcement operations supported by Task Force 51.  (Horne-Petersdorf Decl., Exs. 42-43.)

64. The Los Angeles Chamber of Commerce recently explained that "[r]ather than pursue more reasonable and orderly means to implement its immigration policy, the Administration's recent enforcement actions undermine public safety, harm our communities, and destabilize our economy."  (Horne-Petersdorf Decl., Ex. 44.)

**PROPOSED CONCLUSIONS OF LAW**

I.    **THE POSSE COMITATUS ACT PROHIBITS MILITARY PERSONNEL FROM ENGAGING IN CIVILIAN LAW ENFORCEMENT ACTIVITIES.**

1.  The Court's "interpretation of the scope and importance of the letter and spirit of the Posse Comitatus Act . . . is influenced by the traditional American insistence on exclusion of the military from civilian law enforcement." *United States v. Walden*, 490 F.2d 372, 376 (4th Cir. 1974).

2.  The Posse Comitatus Act preserves that tradition by barring the military from engaging in "direct active involvement in the execution of the laws" or other conduct that "pervade[s] the activities of civilian authorities." *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc) (citation omitted).

3.  First enacted in 1878, the Posse Comitatus Act now provides:

    > Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this this title or imprisoned not more than two years, or both.

    18 U.S.C. § 1385.

4.  "'Posse comitatus (literally "power of the county") was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder.'" *Dreyer*, 804 F.3d at 1272 (quoting H.R.Rep. No. 97–71, pt. 2, at 4 (1981) (citing 1 William Blackstone, Commentaries 343–44)).

5.  In its simplest form, the Posse Comitatus Act prohibits military personnel from directly engaging in civilian law enforcement activities. *See Dreyer*, 804 F.3d at 1272.

6.  Courts apply three tests to determine whether particular activities run afoul of the law. *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991) (adopting tests set out in *United States v. Yunis*, 681 F. Supp. 896, 892 (D.D.C. 1988)).

7.  "If any one of these tests is met, the assistance is not indirect," and the Posse Comitatus Act has been violated. *Dreyer*, 804 F.3d at 1275 (quoting *United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994)).

8.  Pursuant to 10 U.S.C. § 275, the Department of Defense issued 3025.21 Defense Support of Civilian Law Enforcement Agencies, Change 1 ("DoDI 3025.21") regarding what specific activities violate the Posse Comitatus Act and would meet these tests.  *See* DoDI 3025.21, Encl. 3, §§ 1.a.(1), 1.g.(3).  DoDI 3035.21 states that "DoD shall be prepared to support civilian law enforcement agencies . . . while recognizing and conforming to the legal limitations on direct Department of Defense involvement in civilian law enforcement activities."  DoDI 3035.21 at 4.(b).  "Support of civilian law enforcement agencies by DoD personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385 (also known and hereinafter referred to as 'The Posse Comitatus Act, as amended') of title 18, U.S.C."  *Id.*

## II. TASK FORCE 51 TROOPS DEPLOYED FOR THE FEDERAL PROTECTION MISSION ARE SUBJECT TO THE POSSE COMITATUS ACT AND 10 U.S.C. § 12406 PROVIDES NO EXCEPTION.

9.  The Posse Comitatus Act applies both to National Guard troops federalized under 10 U.S.C. § 12406 ("Section 12406") and the Marine Corps.  In 2021, Congress revised the Posse Comitatus Act to provide that the law's prohibitions apply to all of the United States armed forces, including the Marine Corps.  Pub.L. 117-81, Div. A, Title X, § 1045(a), Dec. 27, 2021, 135 Stat. 1904.

10. The Posse Comitatus Act also applies to the National Guard when it is federalized under Title 10, because, once federalized, National Guard soldiers become a component of the regular armed forces.  *See e.g.,* 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army.").

11. Accordingly, courts have uniformly found that the Posse Comitatus Act applies to National Guard soldiers in Title 10 status.  *United States v. Hutchings*, 127 F.3d 1255, 1257-58 (10th Cir. 1997); *United States v. Benish*, 5 F.3d 20, 25-26 (3rd Cir. 1993); *see also United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000) (recognizing that naval policies exempt National Guard members "when not" in Federal Service), *cited in Dreyer*, 804 F.3d at 1273.

12. The Posse Comitatus Act is "a statute that is absolute in its command and explicit in its exceptions."  *Wrynn v. United States*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961).

13

13. It applies to all conduct by the military "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress."  18 U.S.C. § 1385; *see also* 10 U.S.C. § 275 (prohibiting "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law).

14. Section 12406 does not provide an exception such that federalized National Guard soldiers are not bound by the Posse Comitatus Act.

15. The statute immediately preceding Section 12406 specifies that "[m]embers of the National Guard called into Federal service are, from the time when they are required to respond to the call, subject to the laws and regulations governing the Army," which include the Posse Comitatus Act.  10 U.S.C. § 12405.

16. Section 12406 makes no mention of the Posse Comitatus Act or civilian law enforcement. *See generally* 10 U.S.C. § 12406.

17. Defendants argue that the phrase "execute the laws" in Section 12406(3) could authorize the broad scope of conduct they now seek to justify.  (Defs' Corrected Opp'n, ECF No. 136, at 18.)  However, "execute the laws" can be read to encompass all manner of activities, some of which would violate the PCA while others would not.  That is why, in the example of the 1970 Postal Strike (*id.*), the federalized National Guard were able to lawfully deliver the mail—because their actions in doing so did not violate the Posse Comitatus Act.  They could execute the laws without engaging in civilian law enforcement, revealing precisely why the words "execute the laws," on their own, cannot be read as an affirmative authorization for the National Guard to engage in conduct prohibited by the Posse Comitatus Act.  Unlike delivering the mail, the actions of the military here—embedding with federal law-enforcement agents, not minding the U.S. Mail—fall within the ambit of the Posse Comitatus Act.

18. Moreover, by limiting their argument to subsection (3) of Section 12406, Defendants apparently believe that Congress—without explicitly recognizing or acknowledging that it was doing so—sought to pass in a single statute two federalization scenarios in which the

14

National Guard is bound by the Posse Comitatus Act and one in which it is not. That defies both common sense and the norms of statutory interpretation. *See Fischer v. United States*, 603 U.S. 480, 486 (a court must consider a statute's subpart both in "'the specific context' in which [it] appears 'and the broader context of the statute as a whole.'" (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

19. The cases Defendants cite regarding other statutorily authorized PCA exceptions are not persuasive. (Defs' Corrected Opp'n 20 (citing *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1164 (9th Cir. 2022); *United States v. Allred*, 867 F.2d 856, 870-71 (5th Cir. 1989)). In *Hernandez-Garcia*, the court found that the Marines did not violate the PCA when they used a night vision scope to detect the defendant entering the United States at the southern border because another law expressly authorized exactly that: Congress had directed the Secretary of Defense to "provide assistance to [Border Patrol] by deploying military use of 'ground-based surveillance systems to support continuous surveillance of the southern land border of the United States.'" 44 F.4th at 1164 (quoting Pub. L. No. 114-92 129 Stat. 729 § 1059 (2015)). Congress thus explicitly authorized a specific activity in a specific place, *i.e.*, specific "cases and circumstances," 18 U.S.C. § 1385, and that is exactly the activity and place the Marines were engaged in. Similarly, in *Allred*, the court found that a judge advocate's role as a Special Assistant to the United States Attorney and participation in grand jury and other proceedings did not violate the Posse Comitatus Act because Congress had authorized exactly that appointment and those activities via statute. 867 F.2d at 871 (citing 28 U.S.C. §§ 515, 543 and 10 U.S.C. § 806(d)(1)). These express and specific congressional authorizations are in stark contrast to the passing, non-specific reference in Section 12406 to executing the laws generally.

20. Because Congress did not expressly exclude Section 12406 from the restraints of the Posse Comitatus Act, the Court declines Defendants' invitation to read an exception into the law.

21. Defendants' litigation position that Section 12406(3) is an exception to the Posse Comitatus Act is contradicted by the views of Department of Defense leadership, who concede that that the Posse Comitatus Act applies to the current deployment of federal troops. Task Force 51

1   ████████████████████████████ Deputy Chief of Staff Harrington testified that the

2   federalized National Guard troops are subject to the Posse Comitatus Act and are not allowed

3   to engage in civilian law enforcement.  (████████████████████████████████

4   ██████████   Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-

5   65:14).)  Mr. Harrington also testified that when he raised the issue to the commanding

6   general and at a briefing, "everyone in the briefing agreed" that "as soon as California's

7   National Guard troops were called into federal service, they would be subject to the Posse

8   Comitatus Act."  (Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 41:2-42:13, 64:25-

9   65:14).)  There was no equivocation or confusion among the career military personnel

10  executing the federalization.  (*Id*.)

11  22. ███████████████████████████████████████

12  ███████████████████████████████████████████

13  ████████████████████████████████████████

14  ██████████████████████████████████

15  ███████████████████████████████████████████

16  █████████████████████████████████████

17  ████████████████████████████████████████████

18  ███████████████████████████████████████████

19  ███████████████████████████████

20  23. Moreover, Defendants' own guidance belies their litigation position.  As required by 10

21  U.S.C. § 275, the Department of Defense issued DoDI 3025.21, which acknowledges that

22  "[t]he primary restriction on Department of Defense participation in civilian law enforcement

23  activities is the Posse Comitatus Act" and provides guidance to ensure military activities do

24  not violate the Posse Comitatus Act.  DoDI 3025.21, Encl. 3, § 1.a.(1) (Feb. 18, 2019).

25  Defendants have confirmed that they are required to follow DoDI 3025.21 with respect to

26  Task Force 51's deployment to Los Angeles.  (Reilley Decl., Ex. 26 (Defs' Responses to

27  Interrogatories Nos. 1, 4, and 19).)

28

24. DoDI 3025.21 identifies the limited categories of exceptions to the Posse Comitatus Act when "active participation in direct law-enforcement-type activities" is permitted. DoDI 3025.21, Encl. 3, § 1.a.(1). Section 12406 is not found among those categories. Actions in "specified circumstances with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State or Federal law" are permitted, but only when taken pursuant to 10 U.S.C. §§ 251-254, not Section 12406. *Id*. § 1.b.(4).

25. Similarly, Center for Law and Military Operations, Domestic Operational Law: 2024 Handbook for Legal Personnel 96-97 (2024) lists authorities that allow for direct DOD participation in civil law enforcement, omitting Section 12406. Thus, not only do Defendants' own regulations confirm that no exception to the Posse Comitatus Act could be read into Section 12406, but also Defendants would be acting in violation of their own regulations and the law that required they promulgate them, 10 U.S.C. § 275, in ordering Section 12406 troops to engage in civilian law enforcement activities.

26. Defendants' acknowledgement in DoDI 3025.21 that Section 12406 does not create an exception to the Posse Comitatus Act comports with other statutes, and with principles of statutory interpretation. Other acts of Congress creating an exception to the Posse Comitatus Act do so by "expressly grant[ing] authority for military assistance to civilian law enforcement." *United States v. Alvarado*, 2014 WL 12785138, at *3 (D.N.M. Nov. 20, 2014); *see, e.g.*, 10 U.S.C. §§ 271-284 (Chapter 15, Military Support for Civilian Law Enforcement). Section 12406 contains no reference to civilian law enforcement, let alone an express congressional authorization for federalized National Guard members to engage in civilian law enforcement activities.

27. The Court accepts Defendants' admissions and own regulatory guidance on the exceptions to the Posse Comitatus Act and looks to the plain text of and the lack of any express authorization in Section 12406 creating an exception to the Posse Comitatus Act. The Posse Comitatus Act applies to the National Guard even when they are federalized under Section 12406. And all their activities must strictly abide by its restrictions.

1    28. Defendants do not, and cannot, assert that Section 12406, which concerns only the

2        federalization of the National Guard, applies to the Marines.  Thus, regardless of whether

3        Section 12406 is an exception to the Posse Comitatus Act, all Marines deployed to Los

4        Angeles were bound by the Posse Comitatus Act and will remain bound during any future

5        deployment.

6    III.    **PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.**

7    29. "[S]tates have a variety of sovereign and quasi-sovereign interests that they validly may seek

8        to vindicate in litigation." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022).  Where a

9        State articulates "sufficiently concrete and particularized harms to its ability to exercise its

10       sovereign prerogatives," that is sufficient to establish standing. *Arizona v. Yellen*, 34 F.4th

11       841, 852 (9th Cir. 2022); *see also Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136

12       (11th Cir. 2023) ("States are not normal litigants for the purposes of invoking federal

13       jurisdiction and may suffer injuries to their sovereignty that private parties do not."

14       (quotation marks omitted)).

15   30. As the Supreme Court has recognized, there are two general categories of state interests,

16       "[f]irst, a State has a quasi-sovereign interest in the health and well-being—both physical and

17       economic—of its residents in general.  Second, a State has a quasi-sovereign interest in not

18       being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp &*

19       *Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607 (1982).

20   31. California has a "recognized quasi-sovereign interest" in the "comfort[] and welfare of its

21       citizens." *Id.* at 599 (quotation marks omitted) (citing *Pennsylvania v. West Virginia*, 262

22       U.S. 553, 592 (1923)); *see also Missouri v. Illinois*, 180 U.S. 208, 241 (1901) (similar).  That

23       includes a "substantial" interest in "maintaining a stable, healthful environment in its cities."

24       *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 828 (4th Cir. 1979).

25   32. ███████████████████████████████████████████████████████

26       ███████████████████████████████████████████████████

27       ██████████████████████████████████████████████).

28

18

33. Indeed, the *Amici Curiae* Brief of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals flagged the escalation of tensions caused by the increased presence of military personnel as a serious concern contributing to violations of the PCA, rather than providing a permissible justification for the involvement of federal military personnel in traditional law enforcement operations, stating "Amici are concerned about the unintended consequences of interpreting the Posse Comitatus Act to license the deployment of the military in ways that escalate tensions, thereby creating the need for the military's protection of federal functions, perversely satisfying the Posse Comitatus Act." (ECF No. 124-1 at 9; *see also id.* at 9-10 (noting that protesters only arrived at the scene of immigration enforcement operations in Camarillo and Carpinteria "to protest the massive show of force" that was described as "like a war scene," and that in MacArthur Park, "[p]rotesters arrived in response to the intimidating, militarized presence in a community park typically full of civilians").)

34. The economic well-being of the people of California has suffered as well. Defendants' actions have negatively impacted the California economy by chilling economic activity in Los Angeles. Restaurants, festivals, including July 4th celebrations, and farmers' markets have shut down and economic activity has been stifled, as individuals are afraid to leave their homes due to the militarized raids. (Horne-Petersdorf Decl., Exs. 42-43.) As the LA Area Chamber of Commerce recently explained, "[r]ather than pursue more reasonable and orderly means to implement its immigration policy, the Administration's recent enforcement actions undermine public safety, harm our communities, and destabilize our economy." (*Id.*, Ex. 44.) California's fiscal harms as a result of the military's unlawful actions are sufficient to confer standing. *See City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (an "expected loss of tax revenue can constitute a sufficient injury" to confer Article III standing); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (loss of funding sufficient to confer standing).

35. Defendants' violations of the Posse Comitatus Act have increased civil unrest, requiring diversion of state law enforcement and state resources, including through an increase in the

19

number of arrests made by CHP.  (ECF No. 77-3, Zizi Decl., at ¶¶ 8, 12.)  These costs are directly attributable to the increased presence of the National Guard in Los Angeles.  Moreover, Defendants' actions have chilled economic activity in Los Angeles in restaurants, festivals, and farmers' markets, which have shut down, stifling economic activity, as individuals are afraid to leave their homes due to the militarized raids.

36. California further has a quasi-sovereign interest in "securing observance of the terms under which it participates in the federal system."  *Snapp*, 458 U.S. at 607-608.  The Posse Comitatus Act is animated by concerns of federalism, as "[t]he purpose of this statute is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws."  *Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999).  As a sovereign State, California can seek redress for federalism-related harms and federal courts have traditionally provided a forum for States to do so.  *See, e.g.*, *Snapp*, 458 U.S. at 607-608; *New York v. United States*, 505 U.S. 144 (1992).  Defendants' conduct threatens the State's police power guaranteed by the Tenth Amendment to the U.S. Constitution.  *United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation.").

## IV.    PLAINTIFFS MAY PURSUE AN ULTRA VIRES CLAIM FOR VIOLATION OF THE POSSE COMITATUS ACT.

37. As the Ninth Circuit has held, "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—i.e., ultra vires actions—are reviewable."  *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) ("plaintiffs advancing ultra vires claims must plead 'plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority'").

38. The Posse Comitatus Act's history confirms that this case involves exactly the type of conduct Congress sought to prevent in passing it.  The Posse Comitatus Act is "not just any act of Congress. It is the embodiment of a long tradition of suspicion and hostility towards the

1    use of military force for domestic purposes." *Bissonette v. Haig*, 776 F.2d 1384, 1389 (8th

2    Cir. 1985).

3    39. Congress passed the Posse Comitatus Act "in response to the use of military personnel to

4    enforce laws in the South during the reconstruction period following the Civil War." *Yunis*,

5    681 F. Supp. at 892; *see also United States v. Banks*, 539 F.2d 15, 16 (9th Cir. 1976).

6    40. "Although relying on the military to quell riots and rebellion had become common practice in

7    the United States, Congress grew concerned that military personnel trained to fight wars

8    would not be especially concerned with upholding and enforcing the constitutional rights of

9    civilians." *United States v. Eleuterio*, 2024 WL 1620383, at *2 (D.V.I. Apr. 15, 2024).

10   "Consequently, Congress set out in the Posse Comitatus Act to create a bright line separation

11   between military duties and the duties of civilian law enforcement personnel." *Id*.

12   41. The Posse Comitatus Act's "immediate objective . . . was to end the use of federal troops in

13   former confederate states" and "to preclude the military from assisting local law enforcement

14   officers in carrying out their duties." *Yunis*, 681 F. Supp. at 892; *see also United States v. Red*

15   *Feather*, 392 F. Supp. 916, 922-23 (D.S.D. 1975).

16   42. Later, Congress ordered the Secretary of Defense "to issue regulations prohibiting 'direct

17   participation' by military personnel in a civilian 'search, seizure, arrest, or other similar

18   activity' unless expressly authorized by law." *Yunis*, 924 F.2d at 1094 (quoting 10 U.S.C.

19   § 375 (1988), renumbered at 10 U.S.C. § 275)).

20   43. Congress's intent was not merely to prevent the use of the military as a posse comitatus in the

21   criminal context, but to broadly bar military involvement in civilian law enforcement. And

22   because Defendants have disregarded that statutory command, Plaintiffs may seek to put an

23   end to their unlawful activity through an ultra vires cause of action. *See Murphy Co.*, 65 F.4th

24   at 1131; *see also Bissonette*, 776 F.2d at 1388-91 (holding plaintiffs in civil action stated a

25   claim for relief based on the Posse Comitatus Act and Fourth Amendment where they alleged

26   that the federal government and military personnel maintained roadblocks and an armed

27   perimeter that seized and confined them against their will).

28

21

1    44. Plaintiffs' Posse Comitatus Act claim "asks only that we apply our familiar tools of statutory
2        construction and fulfill our enduring 'duty . . . to say what the law is.'" *Murphy Co.*, 65 F.4th
3        at 1130 (quoting *Marbury v. Madison*, 5 U.S. 1, 26 (1803)); *see also id.* at 1130-31
4        (concluding that *ultra vires* challenges that raise core separation of powers principles are
5        reviewable).

6    45. The Supreme Court has made clear that "when presented with claims of judicially cognizable
7        injury resulting from military intrusion into the civilian sector, federal courts are fully
8        empowered to consider claims of those asserting such injury." *Laird v. Tatum*, 408 U.S. 1,
9        15-16 (1972). "Nothing in our Nation's history . . . can properly be seen as giving any
10       indication that actual or threatened injury by reason of unlawful activities of the military
11       would go unnoticed or unremedied." *Id.*

12   46. Defendants rely on *Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025) to claim
13       that Plaintiff's ultra vires claim is categorically unavailable. (Defs' Corrected Suppl. Opp'n
14       8.) However, this reliance is unavailing. There, the Court rejected the specific *ultra vires*
15       claim because—unlike here—the plaintiffs had an alternative path to judicial review. *NRC*,
16       145 S. Ct. at 1176. But in doing so, the Court re-affirmed that ultra vires review is permitted
17       "when an agency has taken actions entirely 'in excess of its delegated powers and contrary to
18       a specific prohibition' in a statute." *Id.* (quoting *Railway Clerks v. Ass'n for Benefit of Non-*
19       *contract Employees*, 380 U.S. 650, 660 (1965)). Such is the case here, and because no other
20       "statutory review scheme provides aggrieved persons 'with a meaningful and adequate
21       opportunity for judicial review'" or otherwise forecloses "all other forms of judicial review,"
22       this case satisfies the requirements for ultra vires review. *Id.*

23   47. Defendants assert that the Posse Comitatus Act has a willfulness requirement that Plaintiffs
24       must prove here to bring an ultra vires claim. (Defs' Corrected Suppl. Opp'n 7.) The Court
25       disagrees. The intent requirement is inapplicable to the threshold question of whether
26       Plaintiffs may bring an ultra vires claim for violation of the Posse Comitatus Act.
27       Additionally, Plaintiffs assert that Defendants' willfulness is shown by ████████████
28       ████████████████████████████████████████████

1  ████████████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  █████████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  ████████████████████████████████ The Court agrees that

6  Defendants' willfulness is revealed through their ████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████

9  ████████████

10  48. Accordingly, Plaintiffs may proceed to bring an ultra vires claim against Defendants for

11  violation of the Posse Comitatus Act.

## V. DEFENDANTS ACTED ULTRA VIRES BECAUSE TASK FORCE 51 TROOPS DIRECTLY PARTICIPATED IN CIVILIAN LAW ENFORCEMENT ACTIVITIES.

14  49. Under the first test, courts consider "whether civilian law enforcement agents made 'direct

15  active use' of military personnel to execute the laws." *Yunis*, 681 F. Supp. at 892 (quoting

16  *Red Feather*, 392 F. Supp. at 921); *see Dreyer*, 804 F.3d at 1275.

17  50. Congress ordered the Secretary of Defense to "prescribe such regulations as may be necessary

18  to ensure that any activity . . . under this chapter [which includes § 12406] does not include or

19  permit *direct participation* by a member of the Army, Navy, Air Force, or Marine Corps, in a

20  search, seizure, arrest, or other similar activity." 10 U.S.C. § 275 (emphasis added). DoDI

21  3035.21 prohibits Department of Defense personnel from providing forms of direct civilian

22  law enforcement assistance, including arrests, apprehensions, security functions, crowd and

23  traffic control, and operating, manning, or staffing checkpoints. DoDI 2035.21, Encl. 3 at

24  1.c.(1).

25  51. The mere use of military equipment does not violate the Posse Comitatus Act, but active use

26  of military personnel does. *Yunis*, 681 F. Supp. at 892.

27  52. For example, the use of Marines as undercover agents actively investigating crime or the

28  active direct participation of Air Force helicopter pilots flying an Air Force helicopter to

search for an escaped civilian prisoner both violated the Posse Comitatus Act. *Red Feather*, 392 F. Supp. at 924 (citing *United States v. Waldern*, 490 F.2d 372 (4th Cir. 1974) and *Wrynn v. United States*, 200 F. Supp. 457 (E.D.N.Y. 1961)).

53. Here, Task Force 51's direct, active involvement in law enforcement activities has thus far fallen into three categories: (a) performing security functions during federal law enforcement operations; (b) forming armed perimeters and blockades that restrict the free movement of civilians, and (c) apprehending and detaining civilians. Each of these activities violates the Posse Comitatus Act.

    a.    **Federalized National Guard Troops Performed Security Functions During Law Enforcement Operations.**

    i.    Task Force 51 troops have played an active, direct role in federal law enforcement activities since the outset of the deployment by performing security functions during federal law enforcement operations. (*See* ECF No. 25-4, Knell Decl. ¶¶ 7-8 (attesting that Task Force 51 troops are "protecting federal personnel performing official functions . . . at designated locations through security patrols, observation posts, and outer cordon security perimeter of buildings" and listing assignments, including "continu[ing] to provide protection for ICE Officers, Customs and Border Protection Officers, and Federal Bureau of Investigations Special Agents performing official functions so that such federal personnel may carry out their assigned duties").)

    ii.    By their own statutorily mandated guidance, Defendants acknowledge that directly providing "security functions" for civilian law enforcement agents is a violation of the Posse Comitatus Act. DoDI 2035.21, Encl. 3 at 1.c.(1).

    iii.    Yet by their own admissions, Defendants have ordered Task Force 51 troops to actively provide security during civil law enforcement operations on a near-continuous basis since the deployment began. (*See* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7); ████████████

24

1 ██████████████████████████████████████████

2 ████████████

3 iv. ████████████████████████████████████████

4 █████████████████████████████████████████ █

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ███████████████████████████████████████

8      Regardless of whether Defendants' activities are characterized as providing

9      "protection" or "security," Defendants violate the Posse Comitatus Act by

10      directly and actively engaging in such activities.

11    v. Defendants have previously attempted to draw a distinction between providing

12      security for law enforcement agents and participating in law enforcement activity.

13      (*See* ECF No. 84 at 24.)  But Defendants' argument ignores the fact that, but for

14      the current deployment, the security functions that Task Force 51 troops are

15      performing would otherwise be performed by federal law enforcement agents

16      themselves.  (*See* Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 33:10- 17) ("I mean

17      anyone can be a quick reaction force in the sense that if you have enough

18      personnel to be able to do – have that luxury to have a team, it all depends in what

19      capacity and what instance.").)

20    vi. This fact is fatal to Defendants' position.  Activities conducted by military

21      personnel that could and would otherwise be performed by law enforcement

22      agents do not cease to be "civil law enforcement" by recharacterizing them as

23      "force protection" of a less-than-desired number of available civilian law

24      enforcement personnel.  Moreover, ███████████████████

25 ████████████████████████████████████

26 █████████████████████████████████████

27 ██████████████████████████████████████████

28 ████████████████████████████████████████ .

25

1       What Defendants describe as "force protection" is no more than the

2    ordinary organizing of law enforcement personnel into pairs or teams for their

3    mutual protection.

4  vii. Defendants' effort to minimize the use of the federalized National Guard to their

5    law enforcement mission is also flatly contradicted by prior testimony.  Ernesto

6    Santacruz, ICE's Enforcement and Removal Operations Field Office Director for

7    Los Angeles, testified at deposition that "[t]he National Guard has been extremely

8    helpful . . . by protecting federal property and personnel during immigration

9    enforcement operations" and that "[h]aving the National Guard at our fingertips

10   as a Quick Reaction Force is key to maintain officer safety and continuing our

11   immigration enforcement operations."  (ECF No. 84-1, Santacruz Decl. ¶ 9.)

12  viii. Having so heavily emphasized the use of the federalized troops to their mission,

13   Defendants' distinction between protecting law enforcement and engaging in law

14   enforcement activities is not credible.  As Defendants asserted, the security

15   functions engaged in by Task Force 51 troops are an integral part of the law

16   enforcement operations being carried out by federal agents.

17  ix. Defendants' other attempts to characterize Task Force 51's involvement in

18   security functions as passive are also unavailing and contradicted by the evidence.

19   (*See, e.g.,* Reilley Decl., Exs. 5-10, 14-18, 22-23; Solorzano Decl., Ex. B.)

20  x. Providing security for federal law enforcement officers necessarily involves

21   participating in law enforcement operations planning, accompanying law

22   enforcement officers on field operations, conducting continuous surveillance,

23   apprehending civilians, and controlling crowds, all of which amount to direct and

24   active participation in law enforcement activities. *See Yunis*, 681 F. Supp. at 892

25   (noting that courts have found Posse Comitatus Act violations where military

26   personnel are "both visible and involved" in a law enforcement operation).

27  xi. There is no dispute that Task Force 51 troops have continuously engaged in

28   security functions since the deployment began.  Because these security activities

26

1    constitute direct and active law enforcement activity, Defendants have violated

2    the Posse Comitatus Act.

3    b.    **Federalized National Guard Troops Formed Armed Perimeters and**
            **Blockades.**

4

5    xii.    Task Force 51 troops have routinely actively and directly engaged in the

6    formation of armed perimeters and blockades, both within and beyond the city

7    limits of Los Angeles, in violation of both the Posse Comitatus Act and the

8    Department of Defense's own guidance. *See Bissonette*, 776 F.2d at 1391 (the

9    formation of armed perimeters by military personnel violates the Posse Comitatus

10    Act); DoDI 2035.21, Encl. 3., at 1.(c)(1) (prohibiting "security functions" and

11    "crowd and traffic control"); ██████████████████████████████████████

12    ████████████████████████████████████████ ).

13    xiii.    Defendants have conceded that the Posse Comitatus Act prohibits Task Force 51

14    troops from taking any action that "imped[es] vehicle or pedestrian traffic,"

15    (Reilley Decl., Ex. 13 (Harrington Dep. Tr. 105:8-18)) and have denied any

16    knowledge of federalized National Guard troops forming perimeters during field

17    operations (*id.*, Ex. 26 (Response to Interrogatory No. 14)).

18    xiv.    But Defendants' denial is belied by numerous photographs, videos, and

19    deposition testimony that clearly show federalized National Guard troops forming

20    perimeters on public roads and sidewalks in Los Angeles (Reilley Decl., Exs. 5-

21    10), forming a perimeter and outer cordon around a marijuana farm in Mecca,

22    California (*id.*, Exs. 14-18; ████████████████████████ ), forming

23    perimeters on public roads in Carpinteria, California (*id.*, Exs. 22-23; Solorzano

24    Decl., Exs. A-B) and Camarillo, California (Flores-Haro Decl., Exs. A-P), and

25    ████████████████████████████████████████████████████████

26    ███████████████████████████████████

27    xv.    ████████████████████████████████████████████

28    ████████████████████████████████████████████████████████

27

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███

4     xvi.   Indeed, even the Department of Defense's own Defense Visual Information

5            Distribution Service—the mission of which is to "provide an accurate, reliable

6            source for media organizations to access U.S. service members" (Reilley Decl.,

7            Ex. 27)—describes the conduct of the federalized National Guard troops as

8            "establishing" and "providing" "security perimeter[s]" (*id.*, Exs. 14-17, 22-23).

9            And Defendants' own declarant, Ernesto Santacruz Jr., who has significant law

10           enforcement experience, further confirmed at his deposition that multiple of the

11           above-cited images show federalized National Guard troops forming a perimeter.

12           (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 52:18-54:6, 54:16-55:4).)

13    xvii.   Although Defendants may call these perimeters by a different name, they cannot

14            avoid the conclusion that the activities engaged in by the federalized National

15            Guard troops are precisely the sort of "security function" and "crowd and traffic

16            control" that the Department of Defense's own guidelines explicitly forbid. ███

17 ██████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████

20   xviii.   Because federalized National Guard troops have actively and directly engaged in

21            forming perimeters and barricades that impede the free movement of civilians,

22            Defendants have violated the Posse Comitatus Act.  *See Bissonette*, 776 F.2d at

23            1391 ("direct[] restrain[t]" of pedestrians' "freedom of movement" violates the

24            Posse Comitatus Act).

25    **c.    Task Force 51 Troops Apprehended and Detained Civilians.**

26    xix.    Task Force 51 troops have also directly and actively engaged in the apprehension

27            and detention of civilians, in violation of both DoDI 2035.21 (which prohibits

28            "arrests," "apprehensions," and "other similar activities") and the Department of

28

1    Defense's training on the Standing Rules for the Use of Force (which prohibits

2    "arrests" and "apprehensions").  (*See also* Sealed Reilley Decl., Ex. 13

3    (Harrington Dep. Tr. 177:20-178:6 (testifying that he cannot conceive of "any

4    scenario" where a Task Force 51 soldier would be able to temporarily detain a

5    civilian who is not committing any crime without violating the Posse Comitatus

6    Act)).)

7    xx.    Plaintiffs have identified two such apprehensions and detentions. ███████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████    Defendants have attempted to downplay this detention by

13   claiming that it was temporary and noting that it took place on federal property,

14   but none of this changes the fact that a Task Force 51 Marine directly and actively

15   engaged in the quintessential law enforcement activity of detaining and

16   restraining a civilian—who, as it happens, was neither threatening anyone nor

17   breaking any law, and who had every right to be on the federal property in

18   question.

19   xxi.    Second, on July 10, 2025, federalized National Guard troops apprehended a

20   protestor in Carpinteria, California, restraining her movement and attempting to

21   physically move her across the perimeter that the troops had established on a

22   public road.  (Solorzano Decl., Ex. B.)  Like the veteran who was detained and

23   physically restrained by the Marines, the protestor whom the federalized National

24   Guard troops apprehended did not pose a threat to anyone and was not

25   committing any crime; rather, she was simply standing with a megaphone on the

26   side of a public road (which Defendants have presented no evidence they had

27   lawful authority to limit access to).  (*Id.*)

28

xxii.  And the federalized National Guard troops directly engaged in this apprehension even though a Homeland Security Investigations police officer—who is authorized to conduct civilian law enforcement activities and presumably would have apprehended the protestor himself if he believed he had a justification for doing so—stood only a few feet away and did nothing.  (*Id*.)

xxiii.  The federalized National Guard soldiers and Marines deployed to Los Angeles have engaged in the direct, active apprehension and detention of civilians.  Such conduct violates the Posse Comitatus Act.

## VI.  DEFENDANTS ACTED ULTRA VIRES BECAUSE THEY PERVADED ACTIVITIES OF CIVILIAN LAW ENFORCEMENT.

54.  Courts consider "whether 'use of any part of the Army or Air Force pervaded the activities' of the civilian law enforcement agents." *Yunis*, 681 F. Supp. at 892 (quoting *United States v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974)); s*ee Red Feather*, 392 F. Supp. at 922 (explaining that Congress intended to prohibit the use of federal military troops to execute the laws "whatever size or designation to include one single soldier or large units").

55.  For example, in *Dreyer*, the court found that the Naval Criminal Investigative Service's investigation "pervaded the actions of civilian law enforcement" where an NCIS agent conducted an investigation that extended statewide and "was not reasonably tied to military bases, military facilities, military personnel, or military equipment."  804 F.3d at 1275-76.

56.  Defendants have pervaded the activities of civilian law enforcement by ordering federalized National Guard soldiers to participate in law enforcement operations that have nothing to do with the military.  Defendants' principal response is that the military is merely providing "security" and "protection" that "is distinct from the military members' own engagement in ordinary law enforcement."  (ECF No. 25 at 20-21; *see* ECF No. 84 at 30.)  Defendants appear to view that form of assistance as an "indirect," rather than a "direct," form of law enforcement.  (*See id*.)  That characterization is inaccurate.  *See* DoDI 2035.21, Encl. 3, § 1.c.(1) (defining "direct civilian law enforcement activities" to include "security functions").

57. In any case, that characterization would not avoid a Posse Comitatus Act violation. As discussed above, if any "one of [three] tests is met"—including pervasive entanglement— the Posse Comitatus Act is violated. *Dreyer*, 804 F.3d at 1275.

58. Here, military forces are pervasively intertwined with civilian law enforcement activities. Armed troops are working side by side with ICE agents in conducting arrests and raids in the streets, homes, and workplaces of Los Angeles. Until approximately two weeks ago, federalized National Guard troops were involved in as many as 75 percent of ICE'S at-large daily law enforcement operations in Los Angeles, including immigration-related arrests and search warrant operations. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 26:5-19, 76:18-77:7, 133:17-24); ███████████████████████████

59. Indeed, beyond mere pervading, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .) That substantial level of involvement makes increasing contact between the military and civilians unavoidable, and there is a significant risk that the military's role will grow to include other activities that are practically indistinguishable from urban policing operations.

60. The core mission of the federal military personnel, and the actions the federal troops have taken to carry out that mission, has nothing to do with "military bases, military facilities, military personnel, or military equipment," *Dreyer*, 804 F.3d at 1275-76, as they have had no plausible connection to the purpose of the federalization order, which was "to temporarily protect" federal agents and federal property "at locations where protest . . . are occurring or are likely to occur." (Horne-Petersdorf Decl., Ex. 32, ECF No. 147-1, at 2.)

61. For example, federalized National Guard troops have participated in operations involving the execution of search warrants on private property in Mecca, Camarillo, and Carpinteria, each of which is over 50 miles away from the locations of the initial protests that gave rise to the federalization order. These operations did not pose any particular risk to the federal agents who were executing the search warrants. For instance, ███████████████████ ████████████████████████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11    .)

12    62.

13

14

15

16

17

18

19

20

21    63.  These operations establish that Defendants are not placing any meaningful limitations on the

22    federalized National Guard troops' involvement in law enforcement activities.  To the

23    contrary, Defendants appear to be ordering federalized National Guard troops to participate in

24    any sizeable federal law enforcement operation that takes place within the greater Southern

25    California area.  In the absence of any actual need,

26

27    ) or simply to make continued use of the

28    federalized Guard to justify the continued federalization.

32

64. Either rationale, however, underscores a use of military personnel that flies in the face of our Nation's tradition of limiting military involvement in civil domestic law enforcement and the purpose behind the Posse Comitatus Act.  Defendants are using the federalized troops as a force multiplier to conduct their civil law enforcement aims, completely detached from the alleged purpose of the original federalization (concerning protests at federal facilities in downtown Los Angeles), even setting aside the staleness of that initial invocation.  By routinely participating in such operations, the federalized National Guard troops are pervading the activities of civilian law enforcement.

65. Moreover, when federalized National Guard soldiers do participate in federal law enforcement operations, it is extremely difficult to differentiate the soldiers from the federal law enforcement agents present.  This is due in large part to the fact that many federal agents wear camouflage uniforms that are virtually identical to those worn by the federalized National Guard troops.  Indeed, at their depositions, both Task Force 51 Deputy Chief of Staff Harrington and Enforcement and Removal Operations Field Office Director Santacruz were unable to confirm whether certain photographs taken of uniformed individuals throughout the deployment showed federalized National Guard soldiers, ICE agents, or other federal agents. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 84:20-86:18); Sealed Reilley Decl., Ex. 13 (Harrington Dep. Tr. 125:24-129:23).)

66. Additionally, the federalized National Guard troops and federal agents are often so thoroughly intermingled that it is not readily apparent who is military and who is not.  (*See, e.g.*, Reilley Decl., Exs. 22-23; Flores-Haro Decl., Exs. A-P.)  Because of this, when carrying out an operation together, the federalized National Guard troops and federal law enforcement agents often appear to be part of one large amorphous force—a dynamic that further underscores Defendants' pervasion of law enforcement activities.

67. Defendants' view of the Posse Comitatus Act would usher in a vast and unprecedented shift in the role of the military in our society.  If the Act allowed military forces to accompany ICE agents on raids and arrests in the manner unfolding across the Los Angeles area, there would be no logical basis to preclude members of the Armed Forces from accompanying other law

enforcement agents when performing their duties.  Armed troops could, for example, accompany FBI agents, food safety inspectors with the Department of Agriculture, Fish and Wildlife agents, or Medicare fraud investigators when those civilian officials conduct searches, field interviews, interrogations, or other law enforcement operations; or accompany federal voting rights officials to "monitor" polling places during elections. Virtually every federal agency has an investigative or enforcement arm.

68. Providing that support would magnify the ability of officials at every level of government to coerce and control individuals subject to their jurisdiction.  The Posse Comitatus Act was designed to protect against that kind of erosion of individual liberty.  *See generally Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999) ("The [Posse Comitatus] Act reflects a concern, which antedates the Revolution, about the dangers to individual freedom and liberty posed by use of a standing army to keep civil peace.").

## VII.  DEFENDANTS ACTED ULTRA VIRES BY SUBJECTING CIVILIANS TO REGULATORY, PROSCRIPTIVE, AND COMPULSORY MILITARY POWER.

69. Under the third test, courts consider "whether the military personnel subjected citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." *Yunis*, 681 F. Supp. at 892 (citing *United States v. McArthur*, 419 F. Supp. 186 (D.N.D. 1975)); *see Dreyer*, 804 F.3d at 1275.

70. "A power regulatory in nature is one which controls or directs." *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986).

71. "A power proscriptive in nature is one that proscribes or condemns."  *Id.*

72. And a "power compulsory in nature is one that exerts some coercive force."  *Id.*

73. As with the use of equipment, "[t]he borrowing of highly skilled personnel . . . for a specific, limited, temporary purpose" is permissible.  *Id.* (quoting *McArthur*, 419 F. Supp. at 194).

74. But the use of military personnel to establish "roadblocks" and "an armed perimeter" is "regulatory, proscriptive, or compulsory" because "these activities directly restrain[] plaintiffs' freedom of movement," thereby violating the Posse Comitatus Act.  *Bissonette*, 776 F.2d at 1391.

75. Here, by performing security functions for federal agents during field operations, forming perimeters and blockades on public roads and sidewalks, and apprehending and detaining civilians, Task Force 51 has engaged in law enforcement activities that "directly restrain" civilians' "freedom of movement" and therefore violate the Posse Comitatus Act. *Id*.

76. Moreover, Plaintiffs have shown that the presence of the Task Force 51 troops in Los Angeles has had, and will continue to have, a proscriptive effect on the on the city's civilian population. Indeed, as admitted by the testimony of Defendants' own declarant, deterrence to "the public" is the point. (Reilley Decl., Ex. 1 (Santacruz Dep. Tr. 74:1-3; 122:25-123:3) (testifying that "having the National guard there readily available . . . it was a huge deterrent for the public" and "the mere presence, that deterrent factor, would make someone from the public think twice of intervening").)

77. This proscriptive effect is what prompted the concern raised by Thomas Jefferson about King George III's standing armies, and it is the precise result that the Posse Comitatus Act was designed to prevent.

## VIII. THE COURT ENTERS PROSPECTIVE INJUNCTIVE RELIEF TO PREVENT ONGOING AND FUTURE VIOLATIONS.

78. Prospective injunctive relief is warranted to prevent ongoing and future violations of the Posse Comitatus Act.

79. Continued violations of the Posse Comitatus Act are realistically threatened, justifying injunctive relief. *See Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006). Plaintiffs can demonstrate a likelihood of recurring injury "where the harm alleged is directly traceable to a written policy," or "the harm is part of a 'pattern of officially sanctioned . . . behavior.'" *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 504-05 (2005)) (citations omitted). Here, both conditions are met.

80. Our nation's foundational principle of keeping the military out of civilian affairs has long served as a bulwark against the coercive control over civilians that is inherent to military rule.

81. Each day that the federalized National Guard troops remain deployed erodes that bulwark and violates the Posse Comitatus Act.

82. First, the President's June 7, 2025 Memorandum places no temporal or geographical limits on the use of troops, and so there is an enduring threat of repeated injury in the form of re-deployment of troops who will engage in continued violations.  ECF No. 25-2 at 3 (indicating that the duration of duty is "60 days *or at the discretion of the Secretary of Defense*" and the location is wherever protests "are *likely to occur… .*") (emphasis added).  That threat is real and immediate.

83. Indeed, on August 6, 2025—mere days before trial—DoD issued a new activation order deploying troops for an additional 90 days, through November 5, 2025.  (Pls' Suppl. Reply Br., ECF No. 140, Strong Decl., ECF No. 140-1, Ex. 31, Activation Order.)  Moreover, Defendants' policies and trainings explicitly authorize violations of the Posse Comitatus Act, making the need for injunctive relief particularly marked.  ███████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████████████ ██████████████████████████████████████  And Defendants' actions are part of a pattern of officially sanctioned behavior.  As shown above, the military's involvement in operations pervades the activities of civil law enforcement.

84. Defendants' insistence that perimeters, blockades, and other security functions are permissible suggests they will continue to engage in these activities unless enjoined by the Court.  *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719-20 (2022).  Defendants, in fact, continue to vigorously defend their ongoing actions and have never indicated it any willingness to cease the challenged activities.

85. The Court therefore grants injunctive relief that prohibits Defendants from ordering or allowing the military to engage in activities that the Posse Comitatus Act prohibits.  *See* ECF No. 8-4, Proposed Order Granting Temporary Restraining Order (proposing injunction on ordering or permitting military to enforce federal law; to execute or assist in federal agents'

enforcement of federal law, including but not limited to all law-enforcement functions such as execution of warrants, arrests, searches, checkpoints, or cordons; and to patrol communities or otherwise engage in general law enforcement activities beyond the immediate vicinity of federal buildings or other real property owned or leased by the federal government).

## IX.    THE COURT DECLINES DEFENDANTS' REQUEST FOR A STAY.

86. The Court finds that Defendants violated and are violating the Posse Comitatus Act, and those violations should not be permitted to continue for even one day to ensure no further harm comes to the State.  Nor do Defendants suffer any risk of harm from an injunction. Defendants have begun withdrawing the majority of troops from Los Angeles, which affirms that even Defendants agree that any risk to federal personnel and property—to the extent one ever existed—has passed.  Moreover, as Defendants continue to insist they are not violating the Posse Comitatus Act, they can hardly claim injury from an injunction requiring them to abide by it.  There is no good cause for staying any injunction or judgment issued by the Court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

1    Dated:  August 9, 2025                    Respectfully submitted,

2                                             ROB BONTA
                                             Attorney General of California
3                                             THOMAS S. PATTERSON
                                             Senior Assistant Attorney General
4                                             ANYA M. BINSACCA
                                             MARISSA MALOUFF
5                                             JAMES E. STANLEY
                                             Supervising Deputy Attorneys General
6                                             NICHOLAS ESPÍRITU
                                             LUKE FREEDMAN
7                                             BRENDAN HAMME
                                             LORRAINE LOPEZ
8                                             KENDAL MICKLETHWAITE
                                             MEGHAN H. STRONG
9                                             MEGAN RICHARDS

10                                           */s/ Barbara Horne-Petersdorf*
                                             BARBARA HORNE-PETERSDORF
11                                           Deputy Attorneys General
                                                300 S. Spring Street
12                                              Los Angeles, CA 90013
                                                Telephone: (213) 269-6667
13                                              E-mail:
                                                Barbara.HornePetersdorf@doj.ca.gov
14                                           *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (3:25-cv-04870-CRB)

# CERTIFICATE OF SERVICE

Case Name:  **_Newsom, et al. v. Trump, et al._**    Case No.    **3:25-cv-04870-CRB**

I hereby certify that on <u>August 9, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **[REDACTED] PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2. **[REDACTED] DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

3. **EXHIBIT 32 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

4. **[REDACTED] EXHIBITS 33 THROUGH 39 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

5. **EXHIBITS 40 THROUGH 44 TO DECLARATION OF BARBARA HORNE-PETERSDORF IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>August 9, 2025</u>, at San Francisco, California.

|  Melissa Mendiola  |  |
| --- | --- |
| Declarant | Signature |

SF2025303707
44751688.docx