BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
CHRISTOPHER D. EDELMAN (DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB (IL Bar No. 6322571)
BENJAMIN S. KURLAND (DC Bar No. 1617521)
JODY D. LOWENSTEIN (MT Bar No. 55816869)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: 202-305-0568
E-mail: garry.hartlieb2@usdoj.gov
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,<br><br>*Defendants*. | Case No. 3:25-cv-04870-CRB<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to this Court's orders setting pre-trial deadlines, ECF Nos. 117, 123, Defendants hereby submit their proposed findings of fact and conclusions of law as to Plaintiffs' Posse Comitatus Act (PCA) claim prior to the presentation of evidence at the trial scheduled to begin on August 11, 2025. In complying with the Court's order, Defendants respectfully reiterate their position that Plaintiffs' PCA claim fails as a matter of law on numerous grounds and that there are no material factual disputes to resolve as to that claim. *See* ECF No. 136 at 14.

## PROPOSED FINDINGS OF FACT

### I. Federalization of the National Guard and Deployment of the U.S. Marines

1. On June 7, due to numerous incidents of violence and disorder in California that threatened the security of immigration law enforcement personnel and caused significant damage to Federal property, President Trump signed a memorandum calling into federal service at least 2,000 members of the National Guard (Presidential Memorandum). ECF No. 25-2 at 3–4.

2. That same day, pursuant to the Presidential Memorandum, Secretary of Defense Pete Hegseth issued a memorandum federalizing 2,000 California National Guardsmen to respond to the crisis (June 7 DoD Memorandum). ECF No. 25-2 at 2.

3. Two days later, Secretary Hegseth issued another memorandum federalizing an additional 2,000 California National Guardsmen (June 9 DoD Memorandum). The Secretary also deployed several hundred Marines to California. ECF No. 25-3.

4. The June 7 DoD Memorandum and the June 9 DoD Memorandum state that the Guard's mission is limited to protection of federal property and federal personnel performing federal functions. ECF No. 25-2 at 2; ECF No. 25-3.

5. Both the federalized National Guardsmen and the Marines were under the command of Task Force-51, which is part of the Army North, Northern Command. ECF No. 84-3 ¶ 5.

### II. The Federal Protection Mission

6. In a memorandum to the U.S. Northern Command, the Secretary of Defense has explicitly directed that Task Force 51's active military servicemembers deployed to

California may not perform direct law enforcement activities. ECF No. 136-1, Decl. of Garry Hartlieb in Supp. of Defs.' Oppo. to Pls.' Mot. for Prelim Inj. ("Hartlieb Decl."), Ex. 10 at DEFS_00002539.

7. Military members of Task Force-51 deployed to California were charged with a Federal Protection Mission ("FPM") consisting of the protection of federal locations, personnel, and federal functions. The FPM includes setting up security perimeters around federal buildings and installations; accompanying federal law enforcement personnel in instances where their duties could bring them into confrontation with protesters; and having mobile response forces on stand-by to respond to emergent threats to federal personnel carrying out their federal functions. ECF No. 84-3 ¶ 9(A); Hartlieb Decl. Ex. 1, No. 1.

8. No military order permits Task Force 51 members deployed to California to engage in any other mission.

9. The military's Standing Rules on the Use of Force (SRUF) generally prohibit military members from conducting activities traditionally reserved for law enforcement. SRUF CJCSI 3121.01B; Hartlieb Decl. Ex. 3 at DEFS_0001072-73.

10. All Task Force 51 troops deployed to California and engaged in the Federal Protection Mission received detailed training explaining members' obligations under the SRUF. Hartlieb Decl. Exs. 4, 5, 6, Ex. 1, No. 11; Hartlieb Decl. Ex. 2 at 65:15–66:3.

11. The SRUF training covered guidance to avoid actions that could conflict with the PCA.

12. Rule 12 of the SRUF directed the federalized Guard and Marines to "IMMEDIATELY report any violation of non-compliance with the SRUF to the chain of command, Inspector General, Judge Advocate, Chaplain, or any commissioned officer with information concerning the who, what, when, where, and why." Hartlieb Decl. Ex. 7 at DEFS 0000001.

13. DoD has established requirements and procedures for reporting potential violations of the PCA and internal military rules, in the form of Commander's Critical Information

Requirements Reporting (CCIR) Procedures and Significant Incident Reports (SIRs). Hartlieb Decl. Ex. 11, Ex. 1, No. 3.

14. The CCIR reports and SIRs for Task-Force 51 from June 8, 2025 through the present include no reports of PCA violations. Hartlieb Decl. Ex. 12.

15. DoD instruction 3025.21, entitled Defense Support of Civilian Law Enforcement Agencies delineates permissible and impermissible forms of assistance to Federal, State, tribal, and local civilian law enforcement agencies. Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies, https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf.

### III. Marines' Activities During the Federal Protection Mission in California

16. U.S. Marines under the control of Task Force 51 were assigned to protecting federal property, and they provided security for three federal buildings in downtown Los Angeles: The Roybal, the Wilshire, and the Paramount. They did not accompany law enforcement on at-large operations. Hartlieb Decl. Ex. 1, Nos. 2, 8; Hartlieb Decl. Ex. 2 at 106:8-10.

17. While performing the FPM, the Marines did not engage in any law enforcement activities.

18. The Marines have left Los Angeles and are no longer supporting the FPM. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

### IV. National Guard Activities During the Federal Protection Mission in California

19. During their time with the FPM, the federalized Guard's activities have been limited to protection of federal property, federal personnel, and federal functions. ECF No. 84-3 ¶ 9(A)–(C); Hartlieb Decl. Ex. 1, No. 1.

20. Specifically, as to protection of federal property, the Guard has set up outside perimeters, observation posts, and presence patrols for federal property at locations targeted by protests. ECF No. 84-3 ¶ 9(A)–(C); Hartlieb Decl. Ex. 1, No. 1.

21. As to protection of federal personnel, the Guard has accompanied federal law

enforcement agents to enable them to conduct their federal functions safely and with minimal interference from bystanders. For example, while other federal law enforcement personnel execute their duties, federalized Guard members may provide perimeter protection against third parties and such crowd control measures as are reasonably necessary to ensure the execution of federal functions and safety of federal personnel. ECF No. 84-3 ¶ 9(A)–(C); Hartlieb Decl. Ex. 1, No. 1.

22. The Guard engaged in the Federal Protection Mission has not engaged in any direct law enforcement activities, such as searches, seizures, evidence collection, or arrest.

23. There is no evidence that Defendants intended to violate the PCA.

## V. Temporary Detention of a Civilian

24. On June 13, a U.S. Marine temporarily detained a civilian who repeatedly attempted to enter a restricted area on federal property. ECF No. 84-3 ¶ 9(D).

25. Before temporarily detaining him, the Marines had warned the civilian not to enter the restricted area. ECF No. 84-3 ¶ 9(D)

26. After a detention of no more than 30 minutes, the Marine turned the individual over to the Department of Homeland Security (DHS), which is a federal law-enforcement agency. ECF No. 84-3 ¶ 9(D)

27. Military officials determined that the detention did not violate the PCA. Hartlieb Decl. Ex. 13.

## VI. Withdrawal of Marines and De-Federalization of National Guard

28. Since July 1, DoD has drawn down the number of U.S. Marines and National Guard deployed to Los Angeles, including returning operational control of various components of the National Guard to California. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

29. On July 1, Task Force 51 released approximately 150 members of the California National Guard from the Federal Protection Mission to California state control to assist in wildfire fighting operations. U.S. Northern Command, Federal Protection Mission

Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

30. On July 19, Task Force 51 released the California National Guard's 79th Infantry Brigade Combat Team from the FPM, comprising approximately 2,000 troops. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

31. On July 22, Task Force 51 released all active-duty Marines from the FPM. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

32. On August 1, Task Force 51 released the majority of the 49th Military Police Brigade from the California National Guard from the FPM. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

33. There are now approximately 300 total service members conducting the FPM. All are federalized National Guard under the command of U.S. Army North. U.S. Northern Command, Federal Protection Mission Updates, August 1, 2025, https://www.northcom.mil/Missions/Homeland-Defense/Federal-Protection-Mission/.

## PROPOSED CONCLUSIONS OF LAW

I. **Plaintiffs lack a cause of action to enforce the Posse Comitatus Act.**

34. The PCA provides as follows: "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1385.

35. The PCA does not create a private civil cause of action for damages. *See, e.g., Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Black Lives Matter D.C. v. Trump*, 544

F. Supp. 3d 15, 40 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).

36. Federal courts have authority to issue equitable relief, but "the statutory grant" empowering federal courts to issue equitable remedies "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025).

37. There is no tradition, either at our country's inception or since, for a court to enjoin the federal government to comply with a criminal statute that protects the public at large, let alone enjoin compliance with a federal criminal statute that contains a willfulness requirement.

38. Plaintiffs do not assert that the PCA itself provides for an equitable cause of action against Defendants.

39. But additionally and alternatively, the Court concludes that the PCA does not provide for an equitable cause of action to enforce its requirements against Defendants.

II. **Plaintiffs may not obtain relief under an *ultra vires* theory.**

40. The Court also concludes that Plaintiffs may not seek equitable relief for alleged PCA violations under an *ultra vires* theory.

41. Federal courts may only issue "those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *CASA*, 145 S. Ct. at 2551 (quoting *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).

42. Thus, where a plaintiff seeks equitable relief of the sort that was traditionally accorded by courts of equity but is subject to some other preclusion of review, *ultra vires* relief may be available.

43. But *ultra vires* review does not authorize a court to entertain claims for equitable relief where there is no traditional equitable jurisdiction to enjoin the federal government's activities.

44. The parties have not cited, and the Court has not located, any case in which a court has prospectively enjoined the federal government's operations based on the PCA in a civil action, notwithstanding that the statute has been in force since 1878.

45. Nor have Plaintiffs demonstrated that the relief they seek here—an injunction compelling the federal government to comply with a criminal statute that contains a willfulness requirement and provides for no express or implied cause of action—is the sort of equitable relief that was traditionally entertained by courts of equity at the Nation's founding.

46. The Court therefore concludes that Plaintiffs may not bring an *ultra vires* claim to enforce the PCA against Defendants.

47. Additionally and alternatively, Plaintiffs do not satisfy the demanding standards for obtaining relief under an *ultra vires* theory.

48. Under an *ultra vires* theory, "[t]he agency overstep must be 'plain on the record and on the face of the [statute].'" *Federal Express Corp. v. United States Dep't of Comm.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (quoting *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 n.7 (1968)) (second alteration supplied by D.C. Circuit). That overstep must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless" agency action. *Oestereich*, 393 U.S. at 238.

49. That standard is not met here.

50. Plaintiffs do not identify any misconstruction of the PCA by DoD, let alone a "clear departure" by DoD from its statutory mandate.

51. Even assuming Plaintiffs could challenge individual operations as contrary to the PCA under an ultra vires theory, and even if Plaintiffs' challenges had arguable merit, Plaintiffs fall far short of demonstrating the sort of clear, blatant, and obvious violation of law that could give rise to an *ultra vires* claim. *See NRC v. Texas*, 145 S. Ct. 1762, 1776 (2025) (noting that D.C. Circuit had previously rejected Texas's statutory

argument and stating that "[e]ven if one were to disagree with the D.C. Circuit's conclusion, the statutory argument falls well shy of a meritorious" ultra vires claim).

### III. Section 12406(3) Expressly Authorizes the Federalized Guard to Enforce Federal Immigration Laws as Well as Laws Prohibiting Interference with Federal Functions and Prohibiting Assaults on Federal Officers and Property.

52. Section 12406(3) of Title 10 authorizes the President to federalize the Guard where he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3).

53. Section 12406 also authorizes the President to federalize Guardsmen "in such numbers as he considers necessary to . . . execute those laws." *Id.* § 12406.

54. The Court finds that, even if Plaintiffs could assert a claim under the PCA (either directly under the statute or as part of an *ultra vires* cause of action), the claim necessarily would fail because Section 12406(3) qualifies as express statutory authorization for purposes of the PCA.

55. Section 12406(3) is limited to "laws *of the United States*"—that is, federal law. But Plaintiffs presented no evidence that the federalized Guard is enforcing some other source of law, such as state law.

56. The Court assumes without deciding that a Guard properly federalized under Section 12406(3) may only enforce the federal laws that the President determined could not be enforced with the regular forces.

57. The federal laws that President Trump determined could not be enforced with the regular forces encompasses, at the very least, federal immigration laws as well as laws forbidding interference with federal functions or assaults on federal officers and property.

58. Even if Defendants were enforcing the law, Plaintiffs have presented no evidence that the federalized Guard are enforcing any other laws unrelated to the President's determination.

59. The Court therefore concludes that Section 12406(3) precludes any claim for relief under the PCA, even if Plaintiffs could assert such a claim.

### IV. Plaintiffs Lack Standing.

60. In light of the Court's conclusion that multiple dispositive legal barriers prevent it from entertaining the merits, the Court need not determine whether Plaintiffs lack standing. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (Federal courts may choose among threshold grounds for dismissing a case, even if some of those grounds are not jurisdictional, so long as they do not reach the merits.).

61. But additionally, and alternatively, the Court finds that Plaintiffs do not have standing to assert a PCA claim.

62. Plaintiffs have not carried their burden of proving an injury in fact.

63. In addition, Plaintiffs' claim that the Guard and Marines have engaged in past PCA violations is not judicially redressable.

64. Even if Plaintiffs had shown some otherwise redressable injury, "the alleged injury must be legally and judicially cognizable," which "requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 599 U.S. 670, 676 (2023).

65. Plaintiffs have presented no precedent establishing that the injury they allege here— alleged harm to a State purportedly caused by the federal government not complying with a federal criminal statute that the federal government is charged with enforcing— is traditionally thought to be capable of resolution through the judicial process.

### V. The Federalized Guard and U.S. Marines' Activities During the Federal Protection Mission in Los Angeles Do Not Involve Execution of the Laws Within the Meaning of the PCA.

66. Additionally, and alternatively, Plaintiffs have not demonstrated that the Guard and Marines deployed for the Federal Protection Mission have engaged in execution of the laws within the meaning of the PCA.

67. The Court rejects Plaintiffs' argument that providing security and protection for federal officers conducting law enforcement operations *itself* amounts to forbidden execution of the laws.

68. Supreme Court and Ninth Circuit precedent preclude this argument. The President has an inherent constitutional power to protect federal functions. *See In re Neagle*, 135 U.S. 1, 65 (1890); *United States v. Klimavicius–Viloria,* 144 F.3d 1249, 1259 (9th Cir. 1998); *United States v. Khan*, 35 F.3d 426, 432 (9th Cir. 1994).

69. This argument is also contrary to the Executive Branch's longstanding interpretation of the PCA. *See Authority to Use Troops*, 1 Supp. Op. O.L.C. 343, 343 (1971).

70. Consistent with these authorities, the Court concludes that, when the federalized Guard protects law enforcement agents who are engaged in immigration enforcement actions, it is the law enforcement agents who are executing federal immigration laws.

71. Plaintiffs do not appear to assert that protection of federal property, as opposed to the Guard accompanying federal officials on law enforcement operations, violates the PCA. To the extent Plaintiffs make such an argument, the Court rejects it for the same reasons.

72. The Court also rejects Plaintiffs' argument that two alleged detentions by the Marines and Guard violated the PCA.

73. The Court agrees with Defendants that one of the incidents on which Plaintiffs rely—a July 10 incident involving Monica J. Solorzano—did not involve a detention at all. Plaintiffs have not established that Ms. Solorzano was taken into custody or otherwise apprehended or restrained.

74. As to the June 13 incident, the Court agrees with Defendants that this brief temporary detention lasting no more than thirty minutes, at which point the detainee was promptly turned over to law enforcement, did not violate the PCA. *Cf. United States v. King*, 19-CV-0712, 2022 WL 17976787, at *4 (N.D. Okla. Dec. 28, 2022) (recognizing in appropriate circumstances, "civilians may be detained [by military personnel] for a limited period of time until they can be referred for prosecution by civilian law

enforcement"); *Applewhite v. United States Air Force*, 995 F.2d 997, 1001 (10th Cir. 1993) (same).

75. Indeed, the SRUF, the legality of which Plaintiffs do not dispute, allows the military to temporarily detain an individual who has gained unauthorized access into secured areas, provided that the individual is released to civilian law enforcement at the earliest possible opportunity consistent with the military's mission. This detention was consistent with those directives.

76. The Court also agrees with Defendants that, even if one or both of these incidents constituted a PCA violation, Plaintiffs have not demonstrated that these past incidents grant Plaintiffs standing to seek prospective injunctive relief, *see City of Lyons v. Los Angeles*, 461 U.S. 95, 105–06 (1983), particularly since the Marines have since left the Los Angeles area and the Guard's footprint has been reduced by more than 90 percent since the initial deployment to just 300 remaining.

77. Nor have Plaintiffs established the PCA's "willfulness" state-of-mind requirement.

78. The Court also rejects Plaintiffs' argument that "the formation of armed perimeters and blockades" violates the PCA.

79. A perimeter or blockade intended to protect federal property or federal personnel does not violate the PCA.

80. Finally, the Court also rejects Plaintiffs' argument that "the most concerning PCA violation is the one that results from the cumulative conduct of all of these actions." An aggregation of multiple actions, none of which themselves violate the PCA, does not state a PCA violation.

\*   \*   \*

[*Signature page follows.*]

Dated: August 9, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director, Federal Programs Branch

JEAN LIN
(NY Bar No. 4074530)
Special Litigation Counsel
Federal Programs Branch

*/s/ Garry D. Hartlieb*
CHRISTOPHER D. EDELMAN
(DC Bar No. 1033486)
Senior Counsel
GARRY D. HARTLIEB
(IL Bar No. 6322571)
BENJAMIN S. KURLAND
(DC Bar No. 1617521)
JODY D. LOWENSTEIN
(MT Bar No. 55816869)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: 202.305.0568
E-mail: garry.hartlieb2@usdoj.gov

*Counsel for Defendants*