**Volume 1**

**Pages 1 - 207**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

GAVIN NEWSOM, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA,

Plaintiffs,

VS.

**NO. 3:25-CV-04870 CRB**

DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE,

Defendants.

San Francisco, California
Monday, August 11, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102

**BY: JANE E. REILLEY**
**LORRAINE A. LOPEZ**
**MEGHAN STRONG**
**KENDAL MICKLETHWAITE**
**DEPUTY ATTORNEYS GENERAL**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**: (CONTINUED)

For Plaintiffs:

CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Room 11000
San Francisco, California 94102
**BY: ANYA M. BINSACCA**
**MARISSA MALOUFF**
**SUPERVISING DEPUTY ATTORNEYS GENERAL**

For Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
**BY: GARRY D. HARTLIEB, TRIAL ATTORNEY**
**JODY D. LOWENSTEIN, TRIAL ATTORNEY**
**JEAN LIN, SPECIAL LITIGATION COUNSEL**
**BENJAMIN S. KURLAND, TRIAL ATTORNEY**
**ANDREW BERNIE, TRIAL ATTORNEY**
**ABIGAIL STOUT, TRIAL ATTORNEY**

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
**BY: ERIC J. HAMILTON**
**JOHN BAILEY**
**DEPUTY ASSISTANT ATTORNEYS GENERAL**

Also Present:

**Kimberly Knight, Paralegal**
**Noel Garcia, Legal Analyst**
**Major General Scott Sherman**

**I N D E X**

Monday, August 11, 2025 - Volume 1


| | PAGE | VOL. |
|---|---|---|
| Plaintiffs Rest | 202 | 1 |

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **HARRINGTON, WILLIAM** | | |
| (SWORN) | 14 | 1 |
| Direct Examination by Ms. Reilley | 14 | 1 |
| Cross-Examination by Mr. Lowenstein | 43 | 1 |
| Redirect Examination by Ms. Reilley | 47 | 1 |
| **SHERMAN, SCOTT MARSHALL** | | |
| (SWORN) | 49 | 1 |
| Direct Examination by Ms. Reilley | 50 | 1 |
| Cross-Examination by Ms. Lin | 112 | 1 |
| Redirect Examination by Ms. Reilley | 143 | 1 |
| **SANTACRUZ, ERNESTO** | | |
| (SWORN) | 147 | 1 |
| Direct Examination by Ms. Lopez | 147 | 1 |
| Cross-Examination by Mr. Hartlieb | 179 | 1 |


**E X H I B I T S**


| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 5 | | 58 | 1 |
| 10 | | 24 | 1 |
| 12 | | 66 | 1 |
| 15 | | 53 | 1 |
| 28 | | 36 | 1 |
| 31 | | 85 | 1 |

# I N D E X

## E X H I B I T S


| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 38 | | 73 | 1 |
| 41 | | 81 | 1 |
| 53 | | 71 | 1 |
| 54 | | 72 | 1 |
| 64 | | 77 | 1 |
| 66 | | 78 | 1 |
| 68 | | 79 | 1 |
| 69 | | 83 | 1 |
| 75 | | 91 | 1 |
| 76 | | 92 | 1 |
| 79 | | 86 | 1 |
| 80 | | 86 | 1 |
| 83 | | 93 | 1 |
| 86 | | 94 | 1 |
| 87 | | 95 | 1 |
| 92 | | 96 | 1 |
| 94 | | 96 | 1 |
| 95 | | 97 | 1 |
| 96 | | 98 | 1 |
| 114 | 110 | 111 | 1 |

**Monday - August 12, 2025** **10:00 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Calling Civil Action C 25-4870, Newsom vs. Trump.

Counsel, please state your appearances for the record.

**MS. STRONG:** Good morning, Your Honor. Meghan Strong of the California Department of Justice for plaintiffs. With me at counsel table are Jane Reilley, Lorraine Lopez, Kendall Micklethwaite, Anya Binsacca, and Marissa Malouff.

**THE COURT:** Good morning.

**MR. HAMILTON:** Good morning, Your Honor. Eric Hamilton for the defendants. With me at counsel table is John Bailey, Garry Hartlieb, Jean Lin, Jody Lowenstein, Ben Kurland, Andrew Bernie, Abby Stout.

**THE COURT:** Good morning.

**MR. HAMILTON:** Thank you.

**THE COURT:** Well, let me thank the parties, first of all, for complying with the many orders that we've issued in the last two or three weeks concerning preparation, discovery, and so forth. It's extremely helpful to have an order to things, especially in cases that are high-profile cases and where there are deadlines to be met, and the parties did meet the deadlines and I'm grateful for that.

So I thought I would make a brief statement as to what I

understand - when I say "I," I mean the Court -- understand this process to be, where we are as of today.

The trial that is going to commence this morning is about a single factual issue to which a number of legal challenges have been asserted.

First, the factual issue. The factual issue is as follows: Did the military, in this case the Marines and the federalized National Guard, violate the Posse Comitatus Act? Now, that act, which is a statute, which means it's a law, reads as follows, and it's rather brief. It's 18 U.S.C., Section 1385, and it's entitled "Use of Army, Navy, Marine Corps, Air Force, and Space Force as Posse Comitatus." It reads [as read]:

> "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned . . . ."

And it goes on to discuss the penalty.

Now, the first question, obviously, is it doesn't say "National Guard"; however, I think it's recognized by the parties that with the federalization of the National Guard, they then would be included within this prohibition, which is

listed as -- which is contained in the Posse Comitatus Act.

So it means, in the Court's view, in other words, the military, as defined, cannot be used to enforce domestic laws unless expressly authorized by the Constitution or act of Congress. The factual question which the Court must address is whether the military was used to enforce domestic law and, if so, whether there continues to be a threat that it would be done again. Evidence will be presented on this issue today and tomorrow.

On Wednesday, the Court will hear argument on the major legal issues that have -- that the federal government has raised in connection with the implementation of this statute, and the major issues are as follows:

One, the Posse Comitatus Act provides no civil cause of action for relief. The Posse Comitatus Act is a criminal statute and, therefore, to bring it in a civil context is not permitted under the law. That's number one.

Number two, California, the State of California, cannot bring a claim that the military was acting *ultra vires* under these circumstances.

Number three, California lacks standing to bring the claim.

And, number four, that there is another statute, which is 12406, under which the National Guard was federalized, and that statute constitutes federal authorization for exempting this

conduct under the Posse Comitatus Act because, remember, when I read the Posse Comitatus Act, it's not a blanket, it's not a blanket statute. It says "unless expressly authorized by act of Congress or by the Constitution." And the federal government takes the position that 14604 -- I'm sorry -- 12406 -- I'm getting my numbers transposed. That's a little dangerous when I do that -- it's 12406, expressly constitutes that exception to the Posse Comitatus Act.

We'll have that discussion, and I promise you we'll have it, on Wednesday after the evidentiary issues have been -- have been presented to the Court.

So I also want to point out, to anybody who's interested, is that the parties have written extensively on this subject. This is not the first time these issues have been raised in this Court, and both sides have addressed it. I will give you another opportunity to address those issues, but I want you to be assured that I actually have considered it, I have read your briefs, and I understand -- at least I believe I understand what the issues are.

So thank you. That is my opening. I gave the opening statement here today. So I think that we should move right into the evidentiary portions because we have a number of witnesses. I want to make sure that they're heard and go through it and there's ample time for cross-examination of the witnesses.

So I turn to the State of California. They are the plaintiff in this case.

And you may call your first witness.

**MS. STRONG:** Thank you, Your Honor.

Before we call our first witness, I just have one housekeeping item and one exhibit-related item I want to bring the Court's attention to.

**THE COURT:** Okay.

**MS. STRONG:** So, first, the parties have already discussed and agreed that the witnesses shall be sequestered during respective testimony, except that I understand that defendants are designating a party representative. I believe they designated Major General Sherman as their party representative.

**THE COURT:** Okay. And he may attend.

**MS. STRONG:** In addition, Your Honor, as you may have seen if you've had the chance review --

**THE COURT:** Let me clarify the sequestration.

What we've done is we've put the witnesses in a secure location, in a courtroom actually, but they're there. They're not here to hear the evidence, but they have -- they are with each other. It's unrealistic to assume that they would never talk to each other. It may be a good idea that they do talk to each other. I don't know. But they're sequestered in that sense.

**MS. STRONG:** Yes, Your Honor.

**THE COURT:** They're not sequestered one from the other.

**MS. STRONG:** Yes, Your Honor, that's my understanding, and they don't have access to the audio feed or otherwise ability to --

**THE COURT:** I believe that's correct.

**MS. STRONG:** -- hear the testimony.

**THE COURT:** I believe that's correct.

**MS. STRONG:** So the second item, Your Honor, is on our exhibit list, you may have seen the parties have stipulated to the admissibility and to admit the vast majority of the exhibits on the exhibit list; and in order to streamline trial today and enable free use of these exhibits during the exams, we'd like to go ahead and admit all of the stipulated exhibits now.

**THE COURT:** So admitted.

**MS. STRONG:** Thank you. Would Your Honor like me to individually address each exhibit or can we reference them?

**THE COURT:** No. I would like you not to have to address it.

**MS. STRONG:** Thank you, Your Honor. That's my preference as well.

In that case, that's all from me. I'm going to turn it over to my colleague to call our first witness.

**THE COURT:** Okay. Is there anything from the federal government that you want to address? Good morning.

**MS. LIN:** Good morning, Your Honor.

**THE COURT:** And you have to give me your name again, please.

**MS. LIN:** Jean Lin on behalf of the Department of Justice.

**THE COURT:** Thank you.

**MS. LIN:** So one housekeeping that the defendants have is that we have a pending motion to seal two types of information, and one is a small redaction -- redaction to certain exhibits that the parties either have stipulated to or not; and then the -- and the other is we have one document that we wanted to seal in entirety, and we have that motion pending. And if Your Honor would like to hear arguments about the sealing motion because it would affect portions that are redacted as well as one document that we're withholding, we're hoping to withhold in full.

**THE COURT:** Well, I don't want to hear it now unless it's necessary for me to hear it now in light of the order of evidence.

But, I mean, the problem, quite practically speaking, is clearing the courtroom, having the hearing. I mean, if it's under seal, it's under seal. But is it necessary for me to adjudicate that now?

**MS. LIN:** So for defendants, we don't intend to talk about any portions of the exhibits that have been redacted or withheld in full. That's one.

And when we filed the motion yesterday, the defendants -- the plaintiffs represented that they do not oppose --

**THE COURT:** Well, let me --

**MS. LIN:** -- the motion.

**THE COURT:** -- see what the plaintiff says.

**MS. STRONG:** We don't take a position on the sealing itself, Your Honor. We'll defer to the Court on that.

We do intend to use the exhibits that are redacted. However, we think that the easiest way to address this is for us to simply put the redacted versions up. If we display anything on the public screen, we'll use the redacted versions. Your Honor and the witness will, of course, have the under-seal, unredacted issues, but we think that would reasonably address this issue during the trial.

**THE COURT:** Okay. Let's do it that way, and let's proceed.

Thank you.

**MS. STRONG:** Thank you, Your Honor.

**MS. LIN:** Okay. Thank you, Your Honor.

**THE COURT:** Thank you very much.

Okay. Good morning.

**MS. REILLEY:** Good morning, Your Honor. Deputy

Attorney General Jane Reilley for the plaintiffs.

Plaintiffs call Deputy Chief of Staff William Harrington as their first witness.

**THE COURT:** Thank you. Now, is the witness in the --

**MS. REILLEY:** I believe he's one of the witnesses who's been sequestered.

**THE COURT:** Okay. Well, maybe the marshals can...

**MS. REILLEY:** And his name is William Harrington.

**THE COURT:** Thank you.

(Pause in proceedings.)

**THE COURT:** By the way, I might as well address, while we're waiting, the -- as the parties know, the sound is being broadcast. So there is a link. The link is a public link, anyone can access it, and so they will hear, if they're interested, these proceedings.

In terms of the video, I issued an order, I think on Saturday, granting the federal government -- I've got to talk about federal government and state government -- the federal government's request, and therefore, there is no video of these proceedings.

However, the Court is a public court. It's open. People come in. They can look at the witnesses as the witnesses testify. Okay? So we just understand that.

And I've now filled the necessary time because the witness is here.

(Witness enters the courtroom and steps forward to be sworn.)

**THE COURT:** Would you come forward, please.

**THE COURTROOM DEPUTY:** Good morning. Step up. Watch your step.

Please raise your right hand.

**WILLIAM HARRINGTON**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** Yes, ma'am.

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

Please state your full name for the record and spell your last name.

**THE WITNESS:** William Harrington, H-a-r-r-i-n-g-t-o-n.

**THE COURTROOM DEPUTY:** Thank you.

**THE COURT:** You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Good morning, Mr. Harrington.

**A.** Good morning, ma'am.

**Q.** It's nice to see you again.

Do you recall that I deposed you in this matter approximately two weeks ago?

**A.** I do remember.

**Q.** All right. And --

**THE COURT:** And could you go a bit closer to the microphone and keep your voice up?

**THE WITNESS:** Yes, sir.

**THE COURT:** Thank you.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, you are a civilian who's employed by the U.S. Army; is that right?

**A.** Yes, ma'am.

**Q.** Would you please state your rank and current assignment with the Army?

**A.** GS-13, Deputy Chief of Staff, Task Force 51.

**Q.** What is Task Force 51?

**A.** Task Force 51 is U.S. Army North's deployable contingency command post.

**Q.** Task Force 51 was involved in the deployment of federalized California National Guard soldiers and Marines to Los Angeles that began in June of this year; is that correct?

**A.** Yes, ma'am.

**Q.** And specifically Task Force 51 had operational control over all of the federalized California National Guard soldiers who were deployed to Los Angeles?

**A.** Yes, ma'am.

**Q.** That was approximately 4,000 soldiers in total; correct?

**A.** Yes, ma'am.

**Q.** Task Force 51 also had tactical control over all of the

Marines who were deployed to Los Angeles?
**A.** Yes, ma'am.
**Q.** And that was approximately 700 Marines in total?
**A.** Correct.
**Q.** If today I use the phrase "Task Force 51 troops," do you understand that I'm referring to all of the federalized California National Guard soldiers and all of the Marines who are under Task Force 51's command during the deployment to Los Angeles?
**A.** Yes, ma'am.
**Q.** And the U.S. Department of Defense oversees the entire Army, including Task Force 51; is that right?
**A.** Correct.
**Q.** During the deployment to Los Angeles, Task Force 51 worked with and provided assistance to members of the Department of Homeland Security?
**A.** Yes, ma'am.
**Q.** And the Department of Homeland Security has several divisions, including Immigration and Customs Enforcement, Enforcement and Removal Operations, Customs and Border Protection, and Homeland Security Investigations?
**A.** Yes, ma'am.
**Q.** But the Department of Homeland Security is not part of the military; right?
**A.** No, ma'am.

**Q.** The Department of Homeland Security is a federal law enforcement agency?
**A.** Correct.
**Q.** And the Department of Defense, which includes Task Force 51 and is made up of military, is separate from the Department of Homeland Security, which is made up of federal law enforcement agents; is that right?
**A.** Yes, ma'am.
**Q.** How long have you served as the deputy chief of staff for Task Force 51?
**A.** For about two and a half years.
**Q.** In that role, you're responsible for managing the staff of Task Force 51; is that correct?
**A.** Correct.
**Q.** You also carry out any tasks that are assigned to you by the chief of staff for Task Force 51?
**A.** Yes, ma'am.
**Q.** Previously you were an instructor for the U.S. Army Northern Command's Defense Support for Civil Authorities course?
**A.** It wasn't U.S. Army. North Com is a joint headquarters, so it's not underneath the Department of the Army.
**Q.** All right. But it was underneath the Department of Defense; is that correct?
**A.** Yes, ma'am.

**Q.** And that course applied to all of the military branches, not just the Army?
**A.** Yes, ma'am.
**Q.** All right. And the course was entitled "Defense Support to Civil Authorities"; is that right?
**A.** Yes, ma'am, the Phase 2 course.
**Q.** The Phase 2 course?
**A.** Yes.
**Q.** All right. And you were the instructor of that Phase 2 course for two years?
**A.** Yes, ma'am.
**Q.** And that course covers how the Department of Defense provides security to federal law enforcement agencies when the need arises; is that right?
**A.** Well, there is a legal brief and part of that legal brief includes Posse Comitatus.
**Q.** All right. And in June you deployed to Los Angeles with Task Force 51; is that correct?
**A.** Yes, ma'am.
**Q.** One of your responsibilities during that deployment was to write a nightly report for the commanding general of Task Force 51?
**A.** Yes, ma'am.
**Q.** At the beginning of the deployment, Major General Scott Sherman was the commanding general of Task Force 51 with

respect to that deployment; is that correct?
**A.** Yes, ma'am.
**Q.** And Major General Scott Sherman was in command until July 10th?
**A.** Yes, ma'am.
**Q.** And from July 10th onward, is it correct that Major General Neve Nell was the commanding general?
**A.** Yes, ma'am.
**Q.** In your nightly reports to the commanding general, you included information about the daily activities of Task Force 51; correct?
**A.** Yes.
**Q.** And that included information about Task Force 51's activities in response to requests for assistance from the Department of Homeland Security?
**A.** Yes, ma'am.
**Q.** And the information you included in your nightly reports came from information uploaded to a centralized network by each of Task Force 51 units; is that right?
**A.** Yes, ma'am.
**Q.** And you also received real-time reports from the units via email, phone calls, and Microsoft Team messages?
**A.** Correct.
**Q.** But you never personally were present during any of Task Force 51's field operations during the deployment; is that

right?
**A.** Correct.
**Q.** So the information you included in your nightly reports was received secondhand from the units?
**A.** I don't know if it was secondhand. It was direct reporting from the units; but, yes.
**Q.** Okay. So but all the -- you didn't personally witness any of the actions that you included in your report; is that right?
**A.** Correct.
**Q.** All right. You first received orders in connection with Task Force 51's deployment to Los Angeles on June 7th; is that correct?
**A.** Yes, ma'am.
**Q.** And on that day you received a phone call ordering you to come to Army North headquarters for a briefing?
**A.** Yes, ma'am.
**Q.** You attended that June 7th briefing; correct?
**A.** I did.
**Q.** And the commanding general of Army North was also present at that briefing?
**A.** Yes, ma'am.
**Q.** The chief of staff for Army North was also present?
**A.** Yes, ma'am.
**Q.** So was the G3?
**A.** Yes, ma'am.

**Q.** And the G3 is the operations officer; correct?
**A.** Correct, ma'am.
**Q.** And the Task Force 51 lawyer was present at the briefing?
**A.** I don't remember.
**Q.** All right. What about the staff judge advocate? Was that individual present at the briefing?
**A.** I think they're the same person, ma'am. I don't -- I don't remember if she was there or not.
**Q.** All right. At the June 7th briefing, you were told that Task Force 51 would be deployed to Los Angeles; is that right?
**A.** Yes, ma'am.
**Q.** And you were told that Task Force 51 would serve as the command and control headquarters for the deployment?
**A.** Yes, ma'am.
**Q.** And at the time you attended that briefing, you already knew what the Posse Comitatus Act was; correct?
**A.** Correct, ma'am.
**Q.** And your knowledge of the Posse Comitatus Act comes from trainings that you've received during your time at the Department of Defense; is that right?
**A.** Yes, ma'am.
**Q.** And it also comes from your time as an instructor of the Defense Support to Civil Authorities Phase 2 course?
**A.** Correct, ma'am.
**Q.** I believe you mentioned earlier that course included a

legal brief that addressed the Posse Comitatus Act?
**A.** Yes, ma'am.
**Q.** And you during your time as instructor, you received that legal briefing 28 times?
**A.** About 28 times. I've sat through it about that number.
**Q.** Okay. So during the June 7th briefing, you raised the issue of the Posse Comitatus Act; correct?
**A.** I did, ma'am.
**Q.** Specifically you said that any -- if any National Guard troops were federalized as part of the deployment, they would lose the ability to conduct law enforcement activities because of the Posse Comitatus Act; correct?
**A.** Correct, ma'am.
**Q.** And when you said that, the commanding general of U.S. Army North specifically said that federalized National Guard troops involved in the mission would not be performing law enforcement functions; is that right?
**A.** Correct, ma'am.
**Q.** And everyone in the briefing agreed that as soon as California National Guard troops were called into federal service, they would be subject to the Posse Comitatus Act; is that right?
**A.** Yes, ma'am.
**Q.** And because of the Posse Comitatus Act, those federalized National Guard troops would not be able to engage in law

enforcement activities?

**MR. LOWENSTEIN:** Objection, Your Honor. This is improper opinion testimony under 701.

**THE COURT:** Overruled.

**BY MS. REILLEY:**

**Q.** You may answer the question.

**A.** Can you repeat the question, please.

**Q.** Certainly. And this goes back to the --

**THE COURT:** You're asking him what his understanding is, what his state of mind is, as distinct from a legal opinion; but his legal opinion may very well govern his state of mind. But he can testify as to what his beliefs were, what he thought of the law, and so forth.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, the question was: Because of the Posse Comitatus Act, it's your understanding that those federalized troops would not be allowed to engage in civilian law enforcement activities --

**A.** Correct.

**Q.** -- during their deployment?

Thank you.

And during the June 7th briefing, you were reassured that federalized National Guard troops would not engage in any actions that would violate the Posse Comitatus Act during the

deployment; right?
**A.** Correct, ma'am.
**Q.** And you're not aware of anyone within the U.S. Northern chain of command who ever believed that the federalized National Guard troops in Los Angeles were not subject to the Posse Comitatus Act; is that right?
**A.** Okay. There was like a double negative in there, so I think you're saying that everyone knew that Posse Comitatus applied; is that correct?
**THE COURT:** To your knowledge.
**THE WITNESS:** Yes, sir. Yes, ma'am.
**BY MS. REILLEY:**
**Q.** You never heard anyone express an opinion that they thought Posse Comitatus did not apply; is that correct?
**A.** Correct.
**Q.** All right. Thank you.
Task Force 51 troops received training on which specific activities they are not allowed to engage in because of Posse Comitatus; is that correct?
**A.** Yes, ma'am.
**Q.** And this training included a slideshow presentation?
**A.** Yes, ma'am.
(Trial Exhibit 10 received in evidence.)
**BY MS. REILLEY:**
**Q.** Mr. Harrington, in front of you there's a binder. I'll

ask you to turn to Tab 10 of that binder. This is a document that's been previously admitted as Exhibit 10.

Mr. Harrington, do you recognize this document?

**A.** I do.

**Q.** This is a copy of the slide deck that was used during the training that Task Force 51 troops received during the deployment to Los Angeles; is that correct?

**A.** Yes, ma'am.

**Q.** Do you know who created this slide deck?

**A.** I do not.

**Q.** And you did not attend any of the training sessions where these slides were presented to the Task Force 51 troops; is that correct?

**A.** That's correct.

**Q.** You're not aware of any transcripts or recordings that show what was said during the training sessions?

**A.** Correct.

**Q.** So apart from what's included in these slides, you do not know what information, if any, was provided to the troops during the training sessions?

**A.** Correct.

**Q.** If you could please turn to what's been marked as page DEFS00001100, and we'll publish that page to the screen in front of you.

**A.** Okay. I'm on the page, ma'am.

**Q.** All right. And do you recognize this training slide?

**A.** Yes, ma'am.

**Q.** At the top of the page, it says "PCA," and that refers to the Posse Comitatus Act; correct?

**A.** Yes, ma'am.

**Q.** And the slide goes on to read [as read]:

"PCA prohibits active direct pursuit, arrest, apprehension, search and seizure, security patrols, traffic control, crowd control, riot control, evidence collection, and interrogation."

**A.** Yes, ma'am.

**THE COURT:** One moment, please.

Lashanda, it's not on the screen.

Is it on the screen? Is the audience able to see it? No.

**THE COURTROOM DEPUTY:** Noel has it. The tech person will need to display it.

**THE COURT:** The tech. Okay. Can you explain to --

**THE COURTROOM DEPUTY:** We tested on Thursday, so he just needs to publish.

**THE COURT:** Okay. Let's wait just a minute because you're going through these, and I think it's useful for everybody to be able to see the exhibit.

**MS. REILLEY:** Thank you, Your Honor.

**THE COURT:** So let's wait till your tech person...

(Pause in proceedings.)

**THE COURT:** It's very important to have a tech person under the age of 50.

(Pause in proceedings.)

**THE COURT:** All right. I now see it on the screen.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, do you see that?

**THE COURT:** Can you see it as well?

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. Thank you.

**BY MS. REILLEY:**

**Q.** All right. And the page that's shown on the screen in front of you, that is the same document we were just discussing; is that correct?

**A.** Yes, ma'am.

**Q.** Thank you.

While he was the commander of Task Force 51 with respect to the deployment to Los Angeles, Major General Sherman made it very clear that the troops were not to impede vehicle or pedestrian traffic; is that right?

**A.** Yes, ma'am.

**Q.** And that's because impeding vehicle or pedestrian traffic is a law enforcement function?

**A.** Yes, ma'am.

**Q.** And the troops were told that they were not allowed to block public roads under the Posse Comitatus Act?

**A.** Yes, ma'am.
**Q.** Task Force 51 troops were trained that they could detain civilians, though; is that correct?
**A.** Yes, ma'am.
**Q.** But there's no scenario that you can conceive of where a Task Force 51 soldier would be able to detain a civilian who is not committing any criminal act without violating Posse Comitatus; is that right?
**A.** No, ma'am. I do not agree with that statement.
**Q.** All right. You gave a deposition in this matter two weeks ago. Do you recall that testimony from earlier?
**A.** Yes, ma'am.
**Q.** All right. If you could, please, turn to Volume 4 of the binder. If you could please turn to Tab 98.
Do you recognize this as the transcript of the deposition that you gave in this matter?
**A.** (Witness examines document.) Yes, ma'am.
**Q.** When you were deposed in this matter, you gave testimony under oath; correct?
**A.** Yes, ma'am.
**Q.** And as part of that oath, you swore to tell the truth as completely and accurately as you could; right?
**A.** Yes, ma'am.
**Q.** And after the deposition, you had a chance to review your transcript and make any changes to it?

**A.** Yes, ma'am.

**Q.** Then you signed the transcript under oath; is that correct?

**A.** Yes, ma'am.

**Q.** Could you please turn to page 177 of your deposition. Let me know when you're at that page.

**A.** (Witness examines document.) Okay. I'm there, ma'am.

**MS. REILLEY:** May I have one moment, Your Honor.

**THE COURT:** Yes.

(Pause in proceedings.)

**BY MS. REILLEY:**

**Q.** All right. And do you recall at your deposition when I asked you [as read]:

"Can you conceive of any scenario where a Task Force 51 soldier would be able to temporarily detain a civilian who is not committing any criminal act without violating Posse Comitatus?"

**THE COURT:** Well, are you referring to a particular page? Are you referring to a particular page?

**MS. REILLEY:** Yes, Your Honor. We are pulling that cite.

**THE COURT:** Okay. Let's wait a moment and see if we can find the page.

If not, you can return to this; but I think in fairness to the witness, the witness should be able to look at --

**MS. REILLEY:** Yes, Your Honor, and I apologize for the delay.

**THE COURT:** That's all right.

**MS. REILLEY:** We're pulling the cite now.

**BY MS. REILLEY:**

**Q.** Oh, if I could please have you turn to page 179, I apologize, of your deposition transcript, and if I could direct your attention to line 18.

Do you see where I asked you [as read]:

"Can you conceive --

And this is, again, based on your training and experience as a deputy chief of staff.

[As read]:

"Can you conceive of any scenario where a Task Force 51 soldier would be able to temporarily detain a civilian who is not committing any criminal act without violating Posse Comitatus?"

Do you see where I asked you that question?

**A.** Yes, ma'am.

**Q.** If you could please turn to the following page, page 180, of your deposition.

Do you see at line 6 where you responded [as read]:

"No, ma'am"?

**A.** (Witness examines document.) Yes, ma'am.

**Q.** And you did not change that testimony when you reviewed

and signed your transcript; correct?
**A.** Yes, ma'am.
**Q.** During the deployment to Los Angeles, Task Force 51 responded to requests for assistance from federal law enforcement agencies; is that right?
**A.** Correct.
**Q.** And that included requests for assistance from the Department of Homeland Security and its subdivisions?
**A.** Yes, ma'am.
**Q.** During the deployment, Task Force 51 received a total of 64 requests for assistance from federal law enforcement agencies; is that right?
**A.** Yes, ma'am.
**Q.** Some of those requests for assistance involved Task Force 51 guarding federal buildings?
**A.** Protecting federal buildings, yes, ma'am.
**Q.** And many of the other requests for assistance asked for Task Force 51 troops to provide force protection to federal law enforcement agents while they were conducting search warrant operations?
**A.** While they were providing -- while they were executing federal functions, yes, ma'am.
**Q.** All right. And those federal functions were search warrant operations?
**A.** Those are some of the federal functions.

**Q.** All right. And Task Force 51 approved and responded to the majority of the 64 requests for assistance it received; correct?
**A.** Yes, ma'am.
**Q.** And whenever they responded to a request for assistance during the deployment, Task Force 51 troops carried weapons with live ammunition in their magazines?
**A.** Yes, ma'am.
**Q.** One of the requests for assistance asked for Task Force 51 troops to be involved in a law enforcement operation near Mecca, California; is that correct?
**A.** Yes, ma'am.
**Q.** That law enforcement operation took place in mid-June?
**A.** Yes, ma'am.
**Q.** And that law enforcement operation involved a marijuana farm; is that correct?
**A.** Yes, ma'am.
**Q.** Task Force 51 approved and responded to the request for assistance related to the Mecca operation; is that right?
**A.** Yes, ma'am.
**Q.** Approximately 300 Task Force 51 troops participated in that operation?
**A.** Correct, ma'am.
**Q.** And approximately 20 of Task Force 51's military vehicles were also involved in the Mecca operation; correct?

**A.** I don't know the number of vehicles, but probably a little more than that to carry 300 troops.

**Q.** All right. So probably 20 or more vehicles; correct?

**A.** Yes, ma'am.

**Q.** And those military vehicles were Humvees?

**A.** Well, they were Humvees; LMTVs, which are large cargo vehicles; and probably JLTVs, which is -- you know, it's -- it's an updated version. It's kind of like a Humvee but it's slightly larger.

**Q.** If you know, could you please state the full term of the acronyms you just gave in your prior response?

**A.** Oh. Let's see. LMTV is a light medium transportation vehicle. You know, it's a cargo vehicle. It can also carry soldiers.

JLTV, I think it stands for joint land tactical vehicle. Some- -- you know, something to that effect. It's -- it carries a handful of soldiers in it.

**Q.** During the Mecca operation, federal agents did not require any force protection from the Task Force 51 troops; is that right?

**A.** Correct, ma'am.

**Q.** And there was also a request for assistance for Task Force 51 troops to be involved in a law enforcement operation in Camarillo, California; is that right?

**A.** Yes, ma'am.

**Q.** That law enforcement operation also involved a marijuana farm?

**A.** Yes, ma'am.

**Q.** And Task Force 51 approved and responded to that request for assistance; correct?

**A.** Well, I think it was in the approval process and then the requesting federal agency canceled the request.

**Q.** All right. Was there ever an occasion where Task Force 51 troops participated in a law enforcement operation in Camarillo?

**A.** Yes, ma'am.

**Q.** All right. That was not in response to a standalone request for assistance? That's your testimony?

**A.** Correct.

**Q.** All right. Was that -- were the Task Force 51 troops' involvement in that operation as a mobile response force?

**A.** Yes, ma'am.

**Q.** All right. And there were approximately 80 Task Force 51 soldiers who were on site in Camarillo during that operation; correct?

**A.** Yes, ma'am.

**Q.** And Task Force 51 military vehicles were also involved in the Camarillo operation?

**A.** Yes, ma'am.

**Q.** Those military vehicles were Humvees and transportation

vehicles?
**A.** Yes, ma'am.
**Q.** There's also a request for assistance that asked Task Force 51 troops to be involved in a law enforcement operation in Los Angeles' MacArthur Park on July 7th; is that correct?
**A.** Yes, ma'am.
**Q.** And Task Force 51 approved and responded to that request for assistance?
**A.** Well, we -- Task Force 51 did not approve that one. That one went up to a higher level authority for approval.
**Q.** Did the Secretary of Defense ultimately approve the MacArthur Park operation?
**A.** I believe so, ma'am.
**Q.** So Task Force 51 troops did participate in the MacArthur Park operation?
**A.** Yes, ma'am.
**Q.** Thank you.
And there were approximately 80 Task Force 51 troops who participated in the MacArthur Park operation; correct?
**A.** Yes, ma'am.
**Q.** And military vehicles from Task Force 51 were involved in that operation as well?
**A.** Yes, ma'am.
**Q.** And those were Humvees and tactical vehicles?

**A.** Yes, ma'am.

(Trial Exhibit 28 received in evidence.)

**BY MS. REILLEY:**

**Q.** All right. If you could please turn to Tab 28 of Volume 1 of the binder in front of you. This has been previously admitted as Exhibit 28.

**A.** (Witness examines document.)

**Q.** And, Mr. Harrington --

**THE COURT:** Let's see if we can get it up on the screen.

**MS. REILLEY:** We were going to -- Your Honor, we were going to publish two pages of the document.

**THE COURT:** Okay. So identify those, and they can -- they can go on the screen.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** So the first page we were going to publish is 2875.

Mr. Harrington, first I want to ask you about all of the documents that -- pages that are included within Exhibit 28, and that's labeled 2872 through 2893. Do you recognize those documents?

**A.** Yes, ma'am.

**Q.** These are Task Force 51 documents related to the July 7th MacArthur Park operation; correct?

**A.** Yes, ma'am.

**Q.** All right. If I could please have you turn to page 2875, and this has also been published on the screen in front of you.

And, Mr. Harrington, this page is entitled "Operation Excalibur Executive Summary." Does Operation Excalibur refer to the MacArthur Park operation?

**A.** It does, ma'am.

**Q.** Could you please read aloud the paragraph that's written under the header "Mission"? And if it's helpful, we've zoomed in on that portion on the screen in front of you.

**A.** Okay. It says [as read]:

> "On Order 118 CAF Squadron provides static interagency site protection, mounted mobile security, and joint force land component command reserve support to Customs and Border Patrol and supporting federal agencies whose intent at MacArthur Park is to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles joint operations area."

**Q.** That is your understanding of the mission of the MacArthur Park operation; correct?

**A.** Well, I don't know what the lead federal agencies' intent was. That's what -- this is what our slide says; but, yes, ma'am.

**Q.** And you don't have any reason to dispute the description you just read; correct?

**A.** No, ma'am.
**Q.** If you could please read aloud the section that's written under the header "Purpose," and we will zoom in on that section on the screen in front of you.
**A.** Okay.
[As read]:
"The purpose of this operation is to enable and protect the execution of joint federal law enforcement missions in a high-visibility urban environment while preserving public safety and demonstrating federal reach and presence."
**Q.** That is your understanding of the purpose of the MacArthur Park operation; correct?
**A.** Yes, ma'am.
**Q.** If you could please turn to page 2892 of the document? And we will publish that page to the screen now.
Mr. Harrington, that page is entitled "Operation Excalibur Executive Summary Risk Assessment." Do you see that's written?
**A.** Yes, ma'am.
**Q.** And you recognize this page; correct?
**A.** Yes, ma'am.
**Q.** Do you see where -- near the bottom of the page, where it says "Risk of inaction low"?
**A.** Yes, ma'am.
**Q.** Could you please read aloud the four lines immediately

below the statement "Risk of inaction low"?

**A.** [As read]:

"Current intelligence does not indicate a high-value target or threat to federal functions at this location. No indication that failure to act would result in loss of life or significant property damage. Expected law enforcement action is limited in scale, with few detainees anticipated and no high-risk warrants involved. Operation not informed by time-sensitive intelligence or part of an integrated targeting cycle."

**Q.** You watched the MacArthur Park operation live on television; is that right?

**A.** Yes, ma'am.

**Q.** And other members of Task Force 51 watched the broadcast with you?

**A.** Yes, ma'am.

**Q.** When you watched the broadcast, you saw that the federal agents in the park walked through the park uninhibited; correct?

**A.** Yes, ma'am.

**Q.** And it wasn't necessary for Task Force 51 troops to provide any force protection during the MacArthur Park operation; is that right?

**A.** Correct, ma'am.

**Q.** And federal law enforcement agents ultimately didn't end up making any arrests during the MacArthur Park operation; is that right?
**A.** Correct, ma'am.
**Q.** Mr. Harrington, do you currently have any involvement with the Los Angeles deployment?
**A.** What do you mean? I don't understand the question.
**Q.** As of the time I took your deposition, you were still deployed to Los Angeles; correct?
**A.** Yes, ma'am.
**Q.** Are you still deployed to Los Angeles?
**A.** No, ma'am.
**Q.** When did your involvement with the deployment in Los Angeles end?
**A.** Friday the 8th of August.
**Q.** How did you learn that your involvement in the deployment was ending on August 8th?
**A.** I was told that I was coming here.
**Q.** After the trial in this matter concludes, are you going to return to Los Angeles?
**A.** No, ma'am.
**Q.** Will you be going back to Fort Sam Houston?
**A.** I will.
**Q.** All right. Do you have any knowledge of what the remaining federalized National Guard soldiers in Los Angeles

are doing?

**A.** Yes, ma'am.

**Q.** What is your understanding of what those federalized troops are doing?

**A.** They're supporting the requests for assistance from the lead federal agency.

**Q.** So federalized National Guard soldiers are continuing to assist federal law enforcement agents in Southern California; is that correct?

**A.** Well, they're -- they are still supporting requests for assistance, yes, ma'am.

**Q.** At the time that your involvement in the deployment ended on August 8th, how many requests for assistance was Task Force 51 continuing to respond to?

**A.** Four, ma'am.

**Q.** Are you aware that this morning Secretary of Defense Hegseth announced the deployment of National Guard troops in Washington, D.C.?

**MR. LOWENSTEIN:** Objection. Scope. Relevance.

**THE COURT:** Well, the relevance, I would assume, is the likelihood -- is whether or not it's likely that this deployment or kind of deployment will occur in the future. I mean, that's one of the tests for injunctive relief; right? Right?

**MR. LOWENSTEIN:** That's correct.

**THE COURT:** Right. So it's relevant to -- present conduct may be relevant on that issue. The extent to which it's relevant, how it's the same, how it's different, those are all factors to be considered obviously, but I think it's relevant. So on that basis, the objection is overruled.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** And, Mr. Harrington, did -- you testified that you are aware of that announcement that was made this morning?

**A.** No, I was not aware.

**Q.** All right. Secretary Hegseth said in his announcement that the D.C. National Guard will, quote, "stand with their law enforcement partners," closed quote, and that, quote, "we did the same thing in Los Angeles," closed quote. Did you hear that statement?

**A.** No, ma'am.

**MR. LOWENSTEIN:** Objection. Foundation. He wasn't aware of this.

**THE COURT:** Well, the question is did he -- I assume if he's unaware of it, he didn't hear it. I mean, that generally is the case.

Did he say he didn't hear the announcement? Somebody may have said something to him and so forth. So I'll allow the question is he aware of it; however, the fact that the statement is made or what was contained in the statement is not

evidence in and of itself by virtue of the question that's asked.

So to the extent it may assume facts not in evidence, it would be granted, but I don't have the statement in front of me to know whether it's attributed to the Secretary or not. Okay? Satisfied?

**MR. LOWENSTEIN:** Yes. Thank you.

**THE COURT:** Great.

Go ahead.

**BY MS. REILLEY:**

**Q.** Mr. Harrington, you said that you were not aware of that statement that Secretary Hegseth made this morning?

**A.** Correct, ma'am.

**Q.** Do you have any involvement with the deployment of National Guard troops in the D.C. area?

**A.** No, ma'am.

**MS. REILLEY:** At this time, plaintiffs have no further questions for Mr. Harrington.

**THE COURT:** Any cross?

**MR. LOWENSTEIN:** Yes, Your Honor.

**THE COURT:** Okay.

**CROSS-EXAMINATION**

**BY MR. LOWENSTEIN:**

**Q.** Jody Lowenstein for defendants.

Good morning, Mr. Harrington.

**A.** Good morning, sir.
**Q.** I just have a few questions for you.
You're testifying here today based on your personal knowledge; correct?
**A.** Yes, sir.
**Q.** You've testified a bit about your background earlier. Do you recall that?
**A.** Yes, sir.
**Q.** Are you a lawyer?
**A.** No, sir.
**Q.** Do you have a law degree?
**A.** No, sir.
**Q.** Your understanding of the Posse Comitatus Act is not informed by any specialized legal training; is that right?
**A.** Correct, sir.
**Q.** Do you recall testifying just a moment ago about Task Force 51's involvement in the Mecca operation?
**A.** Yes, sir.
**Q.** And you testified in response to counsel's question that they were involved in that operation. Do you recall that?
**A.** Yes, sir.
**Q.** Can you explain what you mean by "they were involved in that operation"?
**A.** Well, they were asked to provide force protection for the agents while they were performing their federal functions. The

soldiers actually did not engage in any activity other than they were located near the facility, several hundred yards away. There was actually a canal between where the soldiers were and the facility that the agents were performing their law enforcement functions.

Soldiers had no interactions with any civilians. They were -- they were near the facility, did not go in the facility, did not interact with any civilians. So they were there to -- you know, prepared to provide force protection but did not actually get employed to do that.

**Q.** In your view, did Task -- any Task Force 51 troops perform law enforcement functions at the Mecca operation?

**A.** No, sir.

**Q.** Do you recall receiving questions regarding an operation in Camarillo?

**A.** Yes, sir.

**Q.** And in response to counsel's questions, you testified that Task Force 51 troops were involved in and participated in that operation. Do you recall testifying to that?

**A.** Yes, sir.

**Q.** Can you explain what you mean when you testified that Task Force 51 was involved in and participated in the Camarillo operation?

**A.** Yes, sir. So the federal agents, CBP, and I think there was ICE and ERO as well, were already executing their law

enforcement functions at the facility in Camarillo. And as I stated before, they had canceled the request for assistance to Task Force 51, which was RFA Number 48. They canceled it.

And as they were executing the operation, crowds formed on the roads near the facility, so we received a request for a mobile response force to provide force protection of those agents.

**Q.** Do you recall or do you know what kind of conduct those crowds were engaging in at the Camarillo operation?

**A.** Yes, sir. They were -- they were throwing rocks at the agents. They were throwing rocks at the vehicles. They had damaged the vehicles. They had built -- they had taken sections of garden hose and run nails through the hoses as spike strips, and they were popping the tires of the federal law enforcement vehicles. So they were -- it was an unruly crowd.

**Q.** Did Task Force -- any Task Force 51 troops engage in any law enforcement functions during the Camarillo operation?

**A.** No, sir.

**Q.** Do you recall receiving questions regarding the MacArthur Park operation?

**A.** Yes, sir.

**Q.** In response to counsel's questions, do you recall testifying that Task Force 51 participated in that operation?

**A.** Yes, sir.

**Q.** Can you please explain what you meant by Task Force 51 participated in the MacArthur Park operation?

**A.** So we had approximately 80 soldiers, I think it was 19 vehicles, and they were there to provide force protection of the federal agents who were -- they had established four separate traffic control points around the park and two separate blocking positions. Our soldiers were near those positions to provide force protection of the agents.

And, again, they were not employed, did not interact with the civilians at any of those locations, and the operation took about 20 minutes total. It actually took more time to drive there than it took the agents to walk through the park. And then our soldiers returned back to joint force training base Los Alamitos around noon that day.

**Q.** Did Task Force 51 -- did any Task Force 51 troops engage in any law enforcement functions during the MacArthur Park operation?

**A.** No, sir.

**MR. LOWENSTEIN:** No further questions, Your Honor, for the witness.

**THE COURT:** Okay. Redirect or recross?

**MS. REILLEY:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Mr. Harrington, Mr. Lowenstein just asked you a moment ago

about your knowledge of the activities that troops participated in during the Mecca operation. Do you recall that testimony?
**A.** Yes, ma'am.
**Q.** You were not present at the Mecca operation; correct?
**A.** Correct.
**Q.** So any information that you have about activities performed during that operation came from the units who were present; is that right?
**A.** Yes, ma'am.
**Q.** All right. And as to the Camarillo operation, you also were not present for that operation; correct?
**A.** Correct.
**Q.** So any information that you have about the activities that were engaged in at that operation you received from the troops; correct?
**A.** Not all of it, ma'am. Some of it, received from reports from the unit. The rest of the information, we watched it live on TV in the Operations Center.
**Q.** All right. And as to MacArthur Park, the only information that you have about what actually happened on the ground during MacArthur Park came from watching the news broadcasts and hearing from the troops who were present; correct?
**A.** No, ma'am. There was -- we had the Deputy Secretary of DHS in our Operations Center who had a feed to -- so an aircraft that also showed footage of the operation.

**Q.** Was that a DHS aircraft?
**A.** Yes, ma'am.

**MS. REILLEY:** All right. No further questions.

**THE COURT:** Anything further?

**MR. LOWENSTEIN:** Nothing further, Your Honor.

**THE COURT:** Thank you. You're excused. Thank you for coming.

(Witness excused.)

**THE COURT:** Call your next witness.

**MS. REILLEY:** Thank you, Your Honor.

Plaintiffs call Major General Scott Sherman.

**THE COURT:** Okay.

(Witness enters the courtroom and steps forward to be sworn.)

**THE COURTROOM DEPUTY:** Good morning.

**THE WITNESS:** Good morning.

**SCOTT MARSHALL SHERMAN**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** I do.

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

Please state your full name for the record and spell your last name.

**THE WITNESS:** Sure. Scott Marshall Sherman, last spelling, S-h-e-r-m-a-n.

**THE COURTROOM DEPUTY:** Thank you.

**DIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Good morning, Major General Sherman.

**A.** Good morning.

**Q.** Do you recall giving a deposition in this matter last Wednesday?

**A.** I do.

**Q.** And you remember me from that deposition, don't you?

**A.** I do.

**Q.** Nice to see you again.

**A.** Nice to see you.

**Q.** Would you please state your rank and current assignment with the U.S. Army?

**A.** Sure. I'm a major general in the United States Army. I am the deputy commanding general support for U.S. Army North, and I'm also the commander of Task Force 51, which is the contingency command post for U.S. Army North.

**Q.** You've held these positions for approximately two years; is that correct?

**A.** That's correct. Since September of 2023.

**Q.** For how many years have you been a soldier in the U.S. Army?

**A.** I've been a soldier for 33 years.

**Q.** In June of this year, you deployed to Los Angeles with Task Force 51; correct?

**A.** Correct.
**Q.** And from June 9th until June 10th, you served as the commanding general of Task Force 51 with respect to that deployment; is that right?
**A.** That is correct.
**Q.** And today if I use the phrase "Task Force 51 troops," do you understand that I'm referring to the federalized California National Guard soldiers and Marines who were under Task Force 51's control and command during that deployment?
**A.** I do.
**Q.** As commanding general, is it true that one of your responsibilities during the deployment was to ensure Task Force 51 troops were properly trained?
**A.** That is correct.
**Q.** And another of your responsibilities was to ensure Task Force 51 troops were prepared for their operations?
**A.** Correct.
**Q.** You were also responsible for ensuring Task Force 51 troops followed the law; is that right?
**A.** Correct.
**Q.** You never personally accompanied any Task Force 51 troops during any field operations; is that right?
**A.** That's correct. Only at -- only at the positions where we were doing protection of federal property.
**Q.** All right. So in any operations that took place off of

federal property, you did not personally attend; is that fair?
**A.** That's correct.
**Q.** All right. You would receive briefings on the field operations after they took place, though; is that right?
**A.** Before and after, yes, that's correct.
**Q.** All right. So your knowledge of what took place during Task Force 51's field operations was received from the briefings you received before and after the fact; correct?
**A.** Correct, and reports from commanders.
**Q.** All right. Prior to deploying to Los Angeles in June, you were aware of the Posse Comitatus Act; correct?
**A.** Correct.
**Q.** And your knowledge of the Posse Comitatus Act is based on trainings and legal guidance you've received throughout your 33 years as a soldier?
**A.** That is correct.
**Q.** And as commanding general, it's important that you have a clear understanding of the Posse Comitatus Act so you can ensure that your troops are complying with it; is that right?
**A.** That is correct.
**Q.** Based on your training and experience, it's your understanding that Task Force 51 troops who are deployed to Los Angeles are subject to the Posse Comitatus Act; right?
**A.** That is correct.
**Q.** And based on your training and experience, it's your

understanding that because Task Force 51 troops are subject to the Posse Comitatus Act, they cannot engage in civil law enforcement activities; correct?

**A.** That is correct.

(Trial Exhibit 15 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 15 of the binder that's in front of you.

**A.** (Witness examines document.)

**Q.** And we are going to publish page 2532 of this document to the -- to the screen.

**THE COURT:** All right.

**BY MS. REILLEY:**

**Q.** Major General Sherman, do you recognize the document at Tab 15? And this has been previously admitted as Exhibit 15.

**A.** I do recognize it.

**Q.** And this is a memorandum from Undersecretary of Defense Elbridge Colby to Secretary of Defense Hegseth; is that right?

**A.** That is correct.

**Q.** And this memorandum includes the Undersecretary of Defense's assessment of what Task Force 51 soldiers and Marines could legally do during the deployment to Los Angeles?

**A.** That was in line with the Posse Comitatus Act, that is correct.

**Q.** And you reviewed this memorandum during the deployment in

or around mid-June?

**A.** That is correct.

**Q.** And if you could please turn to page 2532, and this will be published to the screen.

**A.** (Witness examines document.) I'm there. I'm sorry.

**Q.** It's all right. We're just getting it queued up on the --

**A.** Okay.

**Q.** -- on the screen.

(Pause in proceedings.)

**THE COURT:** With technology, one has to have a great deal of hope. You see, we hope it will arrive in due course, but...

**MS. REILLEY:** Yes, Your Honor.

(Pause in proceedings.)

**BY MS. REILLEY:**

**Q.** Major General Sherman --

**THE COURT:** Let's just wait a second and see. He seems to be on to something here. We can also use the Elmo.

(Pause in proceedings.)

**MS. REILLEY:** Your Honor, I understand from our team that there's an HDMI disconnect with the --

**THE COURT:** Well, what about the Elmo? Will that work?

**THE COURTROOM DEPUTY:** Do you have a hard copy that you can show?

**THE COURT:** Or we could take a recess if that's --

**MS. REILLEY:** If we could take a brief recess to attempt to address --

**THE COURT:** Yeah, okay. We'll be in recess for ten minutes.

**MS. REILLEY:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

(Recess taken at 11:03 a.m.)

(Proceedings resumed at 11:17 a.m.)

**THE COURT:** The record will show all parties are present.

My understanding is the federal government is able to show these exhibits; is that correct?

**MS. LIN:** Yes, Your Honor.

**THE COURT:** So I want to thank the federal government for accommodating the state government. It's a wonderful example of federal-state cooperation.

(Laughter.)

**THE COURT:** Thank you so much, and we'll proceed.

**MS. REILLEY:** Thank you, Your Honor.

**BY MS. REILLEY:**

**Q.** And we will publish at this time page 2532 of Exhibit 15.

Major General Sherman, do you see the header in this document that reads "Detention/Arrest Authority"?

**A.** I do.

**Q.** Can you please read aloud the paragraph immediately below that header?

**A.** [As read]:

"CUI" -- which is just unclassified material but -- "DHS has requested service members' direct assistance in detaining and/or arresting individuals observed to be committing a crime. Use of military personnel in a Title X duty status to enforce the law, such in the arrest or detention of civilians for violations of the federal criminal code, would be a violation of the Posse Comitatus Act, 18 U.S. Code paragraph 1385, which prohibits the use of military for domestic law enforcement purposes."

**Q.** You agreed with this portion of the Undersecretary's memorandum when you read it in June; correct?

**A.** I agree with part of it. It's not the full document but, yes.

**Q.** All right. But as to the portion you just read, you agree with that; correct?

**A.** I would.

**Q.** At the outset of the deployment, did you ever hear from any source that there was a rebellion in Los Angeles?

**A.** No, not a rebellion, but there were there people that were preventing federal officials and federal law enforcement from doing their job and also threatening federal buildings, that is

correct.

**Q.** But no one that you spoke with from the Department of Defense ever used the term "rebellion"; correct?

**A.** That is correct.

**Q.** All right. And even though the Posse Comitatus Act applies to Task Force 51 troops, you also believe that there is an exception to the Posse Comitatus Act that also applies to the troops; correct?

**A.** Through my training -- I'm not a lawyer, but through my training I've gotten that there are constitutional exceptions.

**Q.** And specifically with respect to this deployment, it's your understanding that Task Force 51 troops are allowed to protect federal property and personnel as they do their federal law enforcement functions; is that correct?

**A.** That is correct, in accordance with the second paragraph here, under detention and arrest authority.

**Q.** All right. And you learned about this exception by reading the operations order that was issued by the U.S. Army Northern Command at the outset of the deployment; is that right?

**A.** And also the training that we received on the standing rules on the use of force, which were provided by our legal personnel.

**MS. REILLEY:** All right. If you could please turn to Tab 5 of the binder in front of you. This has been previously

introduced as Exhibit 5.

(Trial Exhibit 5 received in evidence.)

**THE WITNESS:** (Witness examines document.)

**BY MS. REILLEY:**

**Q.** You recognize this document; correct?

**A.** Yes. This is General Order Number 1 signed by Lieutenant General Allan Pepin, the commander of U.S. Army North.

**Q.** And it's your understanding that this order set forth the exception to the Posse Comitatus Act that applied to the Task Force 51 troops?

**A.** I don't know that to be fact. I'd have to read it.

**Q.** If you could please read it.

**A.** Can you help me -- where it is? This is a three-page document.

**Q.** You testified at your deposition that this general order was the document that, in your view, set forth the exception to the Posse Comitatus Act; correct?

**A.** Well, this order is established. Any General Order 1 is your baseline personnel conduct that's expected of any personnel, any DOD personnel that are under the command.

**Q.** So it is your testimony that this General Order Number 1 does not set forth the exception to the Posse Comitatus Act that applied to the troops in Los Angeles?

**A.** This is more about Code of Conduct, personal Code of Conduct, what they're allowed to do. It talks about what we

expected of them as far as what their -- what we expect of soldiers to do, how they should be treating everybody, how they should be treating anybody that they encounter. And it talks right here in 5(b) about follow and adhere to the standing rules in the use of force.

**Q.** Was there a different order that was issued with respect to the Los Angeles deployment that you believe set forth the exception to the Posse Comitatus Act that applied to the troops?

**A.** It was strictly briefed to them when they got the standing rules on the use of force that is in line with the memorandum that the Secretary signed to his guidance to the commander of U.S. Northern Command that our mission was to protect federal facilities, allowing federal personnel that were there and federal law enforcement to do their job; and then outside federal facilities, to support federal law enforcement strictly to protect them to allow them to do their federal law enforcement job.

**Q.** And that exception that you just testified about, that was written in Secretary Hegseth's memorandum at the outset of the deployment?

**A.** It's not written directly, but it is the guidance that we were given. It was -- it was discussed with the soldiers in the standing rules and the use of force of why the Secretary's memo and why their guidance is that they're allowed to protect

federal facilities and then also protect federal law enforcement as they do their federal law enforcement duties.
**Q.** So you never saw the exception to the Posse Comitatus Act that you just testified about written down in any of the materials in this deployment; is that your testimony?
**A.** It was written down in the standing rules on the use of force brief that was given by our legal personnel that was given to every soldier and Marine that went on the mission.
**Q.** All right. So other than those training slides, that was the only place where this exception was written; correct?
**A.** That is correct.
**Q.** All right. And under that exception, Task Force 51 troops were trained that they could set security perimeters; is that correct?
**A.** They could set security perimeters around the federal facility on the federal property if there was a crowd demonstrating that was threatening the facility. They could get -- even with the federal law enforcement that was there in the facility to protect the facility.
And then, the federal law enforcement, as they were doing the federal law enforcement job, if they encountered any kind of crowds or any kind of -- anyone or even a vehicle that was presenting any kind of threat to them, they could get in front of those personnel to protect them.
**Q.** So it's your testimony that Task Force 51 troops were

trained they could set security perimeters on federal property if there was a threat; correct?

**A.** Correct, and they could guard the property like they did all the time they were there.

**Q.** Was there any standardized definition of threat that was used by Task Force 51?

**A.** No. It made a decision on the ground by both the -- if you're talking about facilities that were guarded by the Marines on the ground or by the commanders or their platoon leaders even that were there on the ground, witnessing what was happening in front of them.

**Q.** So if the commander on the ground felt threatened, they could order Task Force 51 troops to set a perimeter on federal property; correct?

**A.** That is correct, if they felt that they were threatened.

**Q.** And directing your attention to field operations that took place off federal property, Task Force 51 troops were trained that they could set security perimeters off of federal property; correct?

**A.** Only to protect federal law enforcement, allowing them to do their federal law enforcement job.

**Q.** So, again, Task Force 51 troops could set security perimeters off federal property as long as the commander on the ground felt threatened; right?

**A.** As long as there was a group there that was some kind of

event happening that they felt there was a threat to the federal law enforcement or a threat to the soldiers that were there, correct.

**Q.** But Task Force 51 didn't have any standardized definition of what constituted a threat for purposes of forming a security perimeter off of federal property; right?

**A.** No. That's within commander's guidance within -- they're allowed to make a decision on the ground, because every situation is different, that they're allowed to take in what's happening, understand what's happening; if they feel it's a threat to either the soldiers or to federal law enforcement, then they could.

**Q.** So even if the crowd wasn't making physical threats towards anyone, a commander on the ground could still order troops to form a security perimeter if that commander felt the crowd was a threat; is that right?

**A.** It was also a feeling. If the federal law enforcement was not allowed to do their job, if he had -- if he or she had that feeling on the ground that they were being not able to do their job because a crowd was reacting with them or that they felt unsafe, then they could.

**Q.** All right. So even if no one in the crowd was committing any criminal act, Task Force 51 commanders could order their troops to set a security perimeter; correct?

**A.** In line with the explicit guidance they were given, that

if they felt there was any kind of threat or was not allowing federal law enforcement to do their job, in that particular incident, whatever it was, then they could.

**Q.** That's a "yes" to my question, Major General Sherman?

**A.** Yes.

**Q.** Thank you.

Task Force 51 troops have set security perimeters around federal buildings during the deployment; correct?

**A.** That is correct.

**Q.** And Task Force 51 troops also set security perimeters during field operations that took place off the federal property; correct?

**A.** Yes.

**Q.** Including at private residences?

**A.** Only of -- one time that I know of right offhand, that's correct.

**Q.** And Task Force 51 troops were also trained that they were not allowed to set traffic blockades unless there was a hostile vehicle coming towards a federal law enforcement agent; correct?

**A.** That is correct. It needed to be something hostile that was threatening federal law enforcement.

**Q.** And that's because setting up a traffic control point is considered a law enforcement function; right?

**A.** That is correct.

**Q.** Task Force 51 troops were trained that they could temporarily detain civilians; correct?

**A.** They could if they deemed that that -- it was a threat -- that person was a threat to either the soldiers or to the federal law enforcement.

**Q.** And on June 12th of 2025, a Task Force 51 Marine did detain a civilian; correct?

**A.** That is correct.

**Q.** That took place at the Wilshire federal building?

**A.** That is correct.

**Q.** And the civilian in question was a veteran who was going to the VA; right?

**A.** That is correct.

**Q.** And the Marines told the veteran to stop, but he didn't because he was wearing headphones; right?

**A.** That is correct.

**Q.** And at some point you learned that the Marines told the veteran to leave the property and come back in the correct way, and it was only after the civilian came back in the correct way that he was detained; right?

**A.** The only --

**MS. LIN:** Objection. Foundation.

**THE COURT:** Overruled.

**BY MS. REILLEY:**

**Q.** You may answer the question.

**A.** The only time I've seen that, and I don't know it to be correct, is an email that you showed me during my deposition.

**Q.** All right. So -- and that email came from a Department of Homeland Security area commander; correct?

**A.** I believe it came from, yes, Federal Protective Service, some individual.

**Q.** So prior to when I showed you that email at deposition, you never were informed about the civilian coming back in the correct way before he was detained; is that correct?

**A.** That person -- that is not correct. That person did not come in the correct way even when they came in. Even if that person did cross the yellow line, which is what -- or cross underneath the tape barrier, which is what that email said, even when that person came to the right location to be entered into the facility, that person did not stop, did not provide identification, did not identify themselves and why their business was supposed to be on the federal -- or why they were there on the Wilshire building.

**Q.** Would you please turn to Tab 12 of the binder in front of you. This is a document that's been produced by the federal government as DEFS00001212 through '14.

Major General Sherman, is this the email that you were just testifying about?

**A.** I believe it is.

**Q.** All right. And we're going to publish page 1213 at this

time.

**MS. LIN:** Objection. This is not in evidence and this is a hearsay, out-of-court statement --

**THE COURT:** Okay.

**MS. LIN:** -- that's being offered for the truth of the matter asserted, and we move to exclude this piece of evidence.

**THE COURT:** I think the question -- I think the question is whether he heard about this.

**MS. REILLEY:** Correct, Your Honor.

**THE COURT:** So it goes to his state of mind. It's not being introduced for the truth of the matter. It's being introduced for other than the truth of the matter, so it's not hearsay.

**MS. REILLEY:** Correct, Your Honor.

So at this time, we will publish page 1213, and we will move Tab 12 into evidence as Exhibit 12.

**THE COURT:** Okay. But not being introduced for the truth of the matter.

**MS. REILLEY:** Correct.

**THE COURT:** Admitted.

(Trial Exhibit 12 received in evidence.)

**BY MS. REILLEY:**

**Q.** All right. Major General Sherman, do you see the document that's labeled 1213 on the screen in front of you?

**A.** I do.

**Q.** Do you see where it reads [as read]:

"Summary: FPS advise the subject will be released and not cited per guidance from on-duty AUSA. The subject is a veteran and came under yellow tape to come into the VA. After the USMC told him to leave, he did so and came back in the correct way. The USMC detained him for repeat offense. The individual has departed property and will return another day"?

Do you see where that's written?

**A.** I do.

**Q.** Is this the email that I showed you at your deposition that you were just testifying about?

**A.** It is.

**Q.** All right. And "FPS" stands for Federal Protective Service; is that right?

**A.** That is correct.

**Q.** USMC is the United States Marine Corps?

**A.** It is.

**Q.** And that refers to members of the U.S. Marine Corps who were under Task Force 51's control during the deployment; correct?

**A.** That's correct.

**Q.** All right. And you did not learn any of the information that's contained in this email while you were the commanding

general of Task Force 51; correct?

**A.** I did not.

**Q.** And if you ever heard from any source that the veteran who was detained was detained after he came back onto federal property the correct way, you would have asked the battalion commander to investigate that detention; correct?

**A.** Yes. If he came in the wrong -- if he did not come in the right way, if he did not stop and have himself identified, that is correct.

**Q.** All right. And because you did not hear this information, you did not order any investigation of the detention; correct?

**A.** That is correct.

**Q.** And while he was detained by the Marines, the civilian's hands were restrained in flex cuffs; correct?

**A.** That is correct. For his safety and for the Marines' safety, that is correct.

**Q.** And the Marines detained the veteran for approximately 25 minutes?

**A.** That is correct. While they were waiting for law enforcement to come and take control of him, that is correct.

**Q.** And the Marine who detained the veteran never determined that the veteran was threatening federal agents or any other person; correct?

**A.** No, because the questioning that needed to happen then would have to be done by law enforcement. That's a law

enforcement action. So they flex cuffed that person just for his safety and for their safety, sat him down on a picnic table, covered, and waited for federal law enforcement to come and take control of him.

**Q.** But prior to the detention actually taking place, the Marines who were at the federal Wilshire building never saw the veteran partake in any action they considered to be a threat; correct?

**A.** Well, they didn't know because he came through the stop. He did not stop. He had his headphones on, got told quite a few times -- I don't know the number, at least two -- to stop, "You need to stop." He did not. He went right through, barreled right through the checkpoint, and then that's when they stopped him.

**Q.** And other than not stopping because he was wearing his headphones, there is no other conduct that that veteran was engaging in that was cited for the -- as a reason for the detention; correct?

**A.** That's correct.

**Q.** During the deployment to Los Angeles, federal law enforcement agencies would submit requests for assistance to Task Force 51; right?

**A.** That is correct.

**Q.** And as commanding general, you had primary responsibility for approving those requests for assistance?

**A.** I did once they were -- they went through the staffing process and were legally reviewed, that's correct.
**Q.** And as part of the staffing process's review, there was a legal review performed; correct?
**A.** That is correct.
**Q.** All right. And whenever they responded to requests for assistance, Task Force 51 troops were armed with weapons that had live ammunition in the magazine; right?
**A.** In the magazine but not in the chamber.
**Q.** Based on their training, the average Task Force 51 soldier/Marine could load an active round into a chamber in a matter of about two seconds?
**A.** That is what I said in my deposition, correct.
**Q.** And that's correct?
**A.** That is.
**Q.** And Task Force 51 troops were also armed with batons whenever they went out into the field; correct?
**A.** That was part of what they were also with. That was part of the civil disturbance operations kit.
**Q.** All right. And Task Force 51 wore face shields whenever they went out in the field; right?
**A.** That is correct.
**Q.** They also had body armor?
**A.** That is correct.
**Q.** They wore helmets?

**A.** They did.

**Q.** Task Force 51 troops accompanied federal law enforcement agents on warrant service operations; right?

**A.** They did.

**Q.** And they also accompanied Immigrations and Customs Enforcement agents as those agents made arrests?

**A.** They did.

(Trial Exhibit 53 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 53, and this is included in Volume 2 of the evidence binder. And this has been previously admitted as Exhibit 53, and we'll publish it to the screen now.

**THE COURT:** Okay.

**BY MS. REILLEY:**

**Q.** And, Major General Sherman, you've seen these photographs before; correct?

**A.** I have during the deposition.

**Q.** And you don't know when these photographs were taken?

**A.** I do not.

**Q.** Directing your attention to the left-hand photograph, the individual shown in that photograph who's wearing a camouflage uniform, that's a Task Force 51 soldier; right?

**A.** It is.

**Q.** And you don't know what the soldier in this photograph is

doing?

**A.** I do not.

**Q.** Looking now at the right-hand photograph, you are not able to tell if the two individuals wearing camouflage uniforms in that photograph are Task Force 51 soldiers; right?

**A.** I cannot.

(Trial Exhibit 54 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you can please turn to Tab 54, and this has been previously admitted as Exhibit 54, and we'll publish it to your screen now.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And the individual who's shown on the right-hand side of the photograph who's wearing a camouflage uniform, that's a Task Force 51 soldier; right?

**A.** Well, I can't tell from that, but I can tell from the vehicle, when it says "79th IBTC 143rd MP."

**Q.** All right. So the Humvee shown on the right side of the vehicle is a Task Force 51 vehicle; correct?

**A.** It could be, depending on when the date of this picture was.

**Q.** Do you see the date on this photograph is June 10th, 2025?

**A.** Yes. So with that, it would be.

**Q.** All right. And you don't know where this photograph was

taken; right?
**A.** I do not.
**Q.** And you can't explain what the soldier in this photograph is doing; yes?
**A.** I cannot.
(Trial Exhibit 38 received in evidence.)
**BY MS. REILLEY:**
**Q.** All right. If you could please turn to Tab 38 of your binder, and we'll publish this. This is an exhibit that's been previously admitted as Exhibit 38.
Major General Sherman, you recognize this document; correct?
**A.** Only -- yes. You showed me in the deposition.
**Q.** Prior to your deposition when I showed you this document, you never saw it while you were the commanding general of Task Force 51?
**A.** No. This is at a platoon level. I never saw it.
**Q.** And this was drafted by a second lieutenant of the Third Platoon, Company Bravo, First Battalion, 160th Infantry? That's correct?
**A.** That is correct.
**Q.** This document is dated June 13th, 2025?
**A.** Yes. I'm sorry. Yes.
**Q.** And at that time, the Third Platoon, Company Bravo, First Battalion, 160th Infantry was under Task Force 51's command;

correct?
**A.** It was.
**Q.** And under "Patrol Narrative," do you see where it reads, quote [as read]:

"On 13 June 2025, at approximately 0500, soldiers from COB 1160N attended an FBI briefing IVO" -- there's an address that's been redacted -- "in the city of Carson, California, to execute the arrest of" --

And there's an individual's name who's been redacted.

Do you see where that's written?
**A.** I do.
**Q.** And you were aware that Task Force 51 troops were involved in this operation on or around June 13th; correct?
**A.** I can't recall the exact operation, no.
**Q.** All right. Did you -- do you recall testifying at your deposition that you vaguely recalled this operation?
**A.** Yeah. I vaguely recall. I don't know the exact specifics.
**Q.** You were not personally present during this operation; right?
**A.** I was not.
**Q.** You did not receive any briefing on this operation after it took place; correct?
**A.** I did not.

**Q.** So you don't have any information about what actually happened during this operation other than what's written in this report; right?
**A.** Correct.
**Q.** Directing you to the bottom of the page, where it says "Patrol Narrative," do you see that box?
**A.** I do.
**Q.** Could you please read aloud the three paragraphs written in that box.
**A.** The three paragraphs here?
**Q.** Yes.
**A.** [As read]:

"On 13 June '25 at approximately 0500, soldiers from Bravo Company, 1" -- "First Battalion 160th Infantry attended an FBI briefing in the vicinity of this address, 21356 Avalon Boulevard, in the city of Carson, California, to execute an arrest of an individual."

Can I ask a question real quick? You want me to read here the stuff that's been redacted?
**Q.** No. Please read the version off the screen, if you would.
**A.** Yeah, okay.
**Q.** Thank you.

**MS. LIN:** Your Honor, one moment. The screen document is the unredacted.

**THE COURT:** Sorry?

**MS. LIN:** If you could please read off the redacted version.

**MS. REILLEY:** The version on the screen is redacted.

**MS. LIN:** Okay. Just to make sure. Thank you.

**THE COURT:** Yes. So you should read it off the screen rather than that.

**THE WITNESS:** Yes, Your Honor.

[As read]:

"Videos of this person surfaced on 7 June 2025 when it was reported he was throwing rocks and injuring federal officers on the 6400 block of Alondra Boulevard in the city of Paramount. Soldiers arrived at the briefing site today and learned the objective would be at" -- that's PII -- "in the city of Long Beach. They were tasked to cordon the southbound lanes of Long Beach Boulevard from East Ellis Street and East 55th Street. One van with 12 packs was set up to block on the south side of the objective along with" -- or -- "along Long Beach Boulevard, and one van with 12 packs was set up to block on the north side of the objective.

"When National Guard, DEA, and FBI elements arrived at the objective, blockades were established, and each blockade was accompanied by a marked

Los Angeles Sheriff's vehicle. Both blockades were also accompanied by DEA SWAT and armed with less than lethal munitions such as pepper ball guns.

"National Guard soldiers established their blocking positions at approximately 0600, and the DEA" -- and that's 0600 hours -- "and the DEA and FBI began their operation at the target residence. PII was not located, but his brother was detained. It is known" -- "It is unknown if his brother was arrested. The motorcycle that this person was riding during the assault on the federal officers was recovered and stored for evidence."

**BY MS. REILLEY:**

**Q.** And you do not know or have any information as to whether Task Force 51 soldiers prevented any civilians from using the public road as part of this operation; right?

**A.** I do not.

**MS. REILLEY:** Thank you.

(Trial Exhibit 64 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 64 of the binder. And this has been previously admitted as Exhibit 64, and we'll publish that exhibit to the screen.

And, Major General Sherman, you recognize this document as a printout from the DVIDS website; correct?

**A.** I do.
**Q.** And "DVIDS" stands for Defense Visual Information Distribution Service?
**A.** That is correct.
**Q.** And this is a website run by the Department of Defense?
**A.** That is correct.
**Q.** The photograph shown here was taken by Sergeant Chase Murray; correct?
**A.** That is correct.
**Q.** And Sergeant Murray was a part of Task Force 51 when this photograph was taken?
**A.** He was a member of the public affairs section, that is correct.
**Q.** Attached to Task Force 51?
**A.** That is correct.
**Q.** And the four individuals standing behind the yellow caution tape in this photograph are all Task Force 51 soldiers; right?
**A.** It appears so, yes.
**Q.** And you don't know what the soldiers in this photograph are doing; correct?
**A.** I do not.

(Trial Exhibit 66 received in evidence.)

**BY MS. REILLEY:**
**Q.** If you could please turn to Tab 66 of the binder, which

has been previously admitted as Exhibit 66, and we'll publish this document to the screen.

**A.** (Witness examines document.)

**Q.** Showing you another photograph that was taken by Sergeant Murray that was published on the DVIDS website, the five individuals in the foreground of this photograph who are wearing camouflage uniforms and holding shields are also Task Force 51 soldiers; correct?

**A.** They are.

**Q.** And you can't explain what those soldiers in this photograph are doing; right?

**A.** I cannot.

(Trial Exhibit 68 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 68, which has been previously admitted as Exhibit 68, and we'll publish that to the screen.

This is another photograph taken by Sergeant Murray that was published on the DVIDS website.

And the four individuals in this photograph who are holding shields are also Task Force 51 soldiers; correct?

**A.** The four holding the shields are Task Force 51 soldiers.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

**Q.** And you don't know where this photograph was taken; right?
**A.** I do not, except the buildings look similar to the last photograph you showed me.
**Q.** All right. And while you were the commanding general of Task Force 51, you approved two requests for assistance that involved search warrant operations at cannabis farms; correct?
**A.** Correct.
**Q.** The first was an operation in Mecca, California?
**A.** Correct.
**Q.** And Mecca is a long way from the center of Los Angeles; right?
**A.** It is.
**Q.** You didn't have any specific knowledge of any particular threat related to the Mecca operation; correct?
**A.** No, we did not.
**Q.** And you didn't have any specific information that there were going to be riots during the Mecca operation; right?
**A.** We did not.
**Q.** There were approximately 300 Task Force 51 soldiers who participated in the Mecca operation; correct?
**A.** That is correct.
**Q.** And there were only about 200 federal law enforcement agents involved in that operation; right?
**A.** That is correct.
**Q.** So during the Mecca operation, Task Force 51 troops

outnumbered federal law enforcement agents by over a hundred?
**A.** That is correct.
**Q.** The Mecca operation involved approximately 50 military vehicles?
**A.** That is correct.
**Q.** And those military vehicles included Humvees?
**A.** They did.
**Q.** And 5-ton trucks?
**A.** They did.
**Q.** During the Mecca operation, neither the Task Force 51 troops nor the federal law enforcement agents faced any resistance; right?
**A.** I do not know about the federal law enforcement. I know that our soldiers did not face any resistance on the outside.
**Q.** And no Task Force 51 soldier was required to provide force protection to any federal agent during the Mecca operation; correct?
**A.** No. Not inside the perimeter, that is correct.
(Trial Exhibit 41 received in evidence.)
**BY MS. REILLEY:**
**Q.** All right. If you could please turn to Tab 41 of your binder. This has been previously admitted as Exhibit 41, and we'll publish this document to the screen.
You recognize this document; correct?
**A.** I do.

**Q.** This is a storyboard of the Mecca operation that was made by the 143rd Military Police Battalion?

**A.** That is correct.

**Q.** And the 143rd Police Battalion was part of Task Force 51 at the time of the Mecca operation; correct?

**A.** That is correct.

**Q.** Could you please read aloud the paragraph under the header "End State," which is in the bottom left corner of the document?

**A.** [As read]:

"Joint federal and military companies, headquarters and headquarters company, 143rd MP Battalion, 40th Military Police Company, 330th Military Police Company, and 670th Military Police Company established outer cordons and secured designated sites, enabling safe entry for DEA personnel.

"Actions resulted in the seizure of narcotics, approximately 87 suspected human trafficking victims, and disruption of illegal marijuana cultivation" -- I can't read that last one -- "tied to organized criminal activity."

**Q.** And you saw this slide shortly after the Mecca operation took place; correct?

**A.** I did.

(Trial Exhibit 69 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 69 of your binder. This has been previously admitted as Exhibit 69, and we'll publish that document to the screen.

You recognize this photograph that was published on the DVIDS website?

**A.** I do.

**Q.** This photograph is also taken by Sergeant Murray?

**A.** That is correct.

**Q.** And this photograph shows Task Force 51 troops during the Mecca operation; correct?

**A.** I believe so, correct. Yes.

**Q.** And if you look at the description under the photograph, do you see where it reads [as read]:

> "Soldiers from the 143rd Military Police Company, 49th Military Police Brigade, California National Guard, serving under Title X status, established a security perimeter in Mecca, California, June 18th, 2025"?

**A.** Correct.

**Q.** All right. And the second request for assistance that you approved while you were the commanding general of Task Force 51 that involved a search warrant at a cannabis farm was an operation in Carpinteria, California?

**A.** Correct.

**Q.** And is it correct that you approved the Carpinteria operation while you were still commanding general; but by the time the operation actually took place, you were no longer in command?

**A.** That is correct.

**Q.** During the Carpinteria operation, Task Force 51 troops were tasked with protecting federal agents who had set up traffic control blocks?

**A.** They had set up traffic control points east and west on -- for Carpinteria; that is correct.

**Q.** All right. And Task Force 51 troops were given that assignment because without the troops, the federal agencies involved in the operation would have had to station more of their personnel at the traffic control points; right?

**A.** Correct.

**Q.** And if the federal agencies had had to station more of their personnel at the traffic control points, the operation would have taken longer; correct?

**A.** That's what they told me, that's correct.

**Q.** And the Carpinteria operation involved approximately 100 to 120 Task Force 51 troops?

**A.** I believe that's correct.

**Q.** And there were approximately 20 to 25 Task Force 51 military vehicles involved in that operation as well?

**A.** Correct.
**Q.** And those military vehicles were Humvees and 5-ton trucks?
**A.** Correct.
(Trial Exhibit 31 received in evidence.)
**BY MS. REILLEY:**
**Q.** Could you please turn to Tab 31 of your binder. This has been previously admitted as Exhibit 31, and we're going to show a page of that document that's labeled 3519 on the screen.
**THE COURT:** What page?
**MS. REILLEY:** We'll be publishing 3519.
**THE COURT:** Thank you.
**BY MS. REILLEY:**
**Q.** Major General Sherman, you recognize this document; correct?
**A.** I do.
**Q.** This is a brief that battalion staff prepared in advance of the Carpinteria operation?
**A.** That is correct.
**Q.** And directing you to page 3519, which is shown on the screen in front of you, do you see where it reads "Risk of inaction low"?
**A.** Yes.
**Q.** Could you please read the section that immediately follows that statement "Risk of inaction low"?
**A.** [As read]:

"The Assessment: No indication that failure to act would result in loss of life or significant property damage to federal personnel at both traffic control points given the volume of HSI" -- so Homeland Security Investigations -- "personnel on scene."

(Trial Exhibit 79 received in evidence.)

**BY MS. REILLEY:**

**Q.** Could you please turn to Tab 79 of your binder. This has been previously admitted as Exhibit 79.

Major General Sherman, you recognize this photograph; correct?

**A.** You showed it to me at my deposition, yes.

**Q.** And this is a photograph that was taken by Monica Solorzano, who's the vice mayor of Carpinteria, during the Carpinteria operation. And you recall during your deposition that I asked you to label this photograph?

**A.** Yes.

**Q.** And at your deposition you labeled the individual who was wearing sunglasses and a mask as a federal agent?

**A.** That is correct.

**Q.** And you also labeled the individuals who were wearing camouflage uniforms and hats as Task Force 51 soldiers?

**A.** They all appear to be, yes.

(Trial Exhibit 80 received in evidence.)

**MS. REILLEY:** All right. At this time, I'm going to show you a video that's been previously admitted as Exhibit 80.

And for the record, this is a video that was taken by Vice Mayor Solorzano during the Carpinteria operation.

**THE COURTROOM DEPUTY:** One moment, Judge.

(Pause in proceedings.)

(Video was played but not reported.)

**MS. REILLEY:** Your Honor, were you able to see the entire video, or did that start partway through?

**THE COURT:** Do you want to reshow it?

**MS. REILLEY:** Could we? Thank you. I just want to make sure we see the entire video.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** Major General Sherman, you've seen this video before; right?

**A.** I have.

**Q.** And the two individuals who are wearing camouflage uniforms in that video are Task Force 51 soldiers; correct?

**A.** They are.

**Q.** In fact, all the individuals who are wearing camouflage uniforms in that video are Task Force 51 soldiers; correct?

**A.** Yes.

**Q.** And you don't have any information indicating that the woman in this video who is holding the megaphone threatened

anyone, including any federal agents; right?

**A.** No, I don't have the context of this.

**Q.** Thank you.

If you could please turn to Tab 70 --

**THE COURT:** Wait. Before we do that, could you go back on this for a minute?

**MS. REILLEY:** Yes.

**THE COURT:** Okay. Maybe show it again. I want to ask the general a question.

(Video was played but not reported.)

**THE COURT:** Freeze it there. Freeze it there. Stop it.

Okay. So I see three law en- -- what I'll call law enforcement people; that is, people either in military gear or in other gear. And my question is: The military people, the people in camouflage, they are part of Task Force 51; is that correct?

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** Okay. There's a third person there. And do you have any information as to who that person -- what force that person belongs to?

**THE WITNESS:** I can't tell off the video. I can't -- I'm not close enough to see the badge. They do have "Police" on there, and there's usually "Federal Police" on their uniform. It says that too, Your Honor, but I can't tell. But

there is a "Police" -- it says "Police" on the left-hand side there.

**THE COURT:** Okay. So you don't know whether that's federal or state?

**THE WITNESS:** It would be federal, Your Honor.

**THE COURT:** It would be federal?

**THE WITNESS:** Yes.

**THE COURT:** Okay. My question is: I assume the Task Force camouflage-dressed officers have identification on them; is that correct?

**THE WITNESS:** That is correct.

**THE COURT:** So it's Army regulation that they have their name above their lapel or at some place prominently displayed on their uniform?

**THE WITNESS:** It is correct -- that's correct, Your Honor. It is blocked here by the body armor that they're wearing. You can see the rank. Like this is a sergeant right here who's got the glasses, facing right here. She's -- you can tell that it's an Army patch she has on, but her name -- her name is covered by the body armor.

**THE COURT:** Okay. So she is -- for intents and purposes, she's anonymous in terms of whether an individual who is not part of the operation can identify that particular person; is that correct?

**THE WITNESS:** That's correct, Your Honor. They can

tell what unit she's in by the unit patch.

**THE COURT:** Her rank?

**THE WITNESS:** And her rank, yes, sergeant E5.

**THE COURT:** Right. Now, the person who you believe to be a federal law enforcement officer but not sure what branch they belong to or what department they belong to, that person is wearing a mask; is that correct?

**THE WITNESS:** That is correct.

**THE COURT:** Okay. So nobody could -- it would be difficult to identify who that person is by virtue of the fact that the person is wearing a mask. Is that person identified in any other way?

That is to say, if somebody was standing there, would they be able, after the fact, to say, "Officer X," identifying Officer X, who's masked, can make that identification?

**THE WITNESS:** Your Honor, they could tell that it's police. And now that I look at it, it says "HSI" under the "Police." They can tell.

**THE COURT:** HSI?

**THE WITNESS:** Yes. It says it. That's a "Police" -- that the body vest that he's wearing, which is body armor, says "Police" and it says "HSI" under it.

**THE COURT:** And HSI is?

**THE WITNESS:** I think Homeland Security Investigations I believe, Your Honor.

**THE COURT:** Okay. All right. Thank you so much.

**THE WITNESS:** Yes, Your Honor.

**BY MS. REILLEY:**

**Q.** Major General Sherman, you stated a moment ago that even though you can't see the soldier's name, you would be able to tell she was a sergeant; is that right?

**A.** That is correct.

**Q.** And you would know that from the chevrons on her hat?

**A.** Both on her hat and right there right above her body armor, right there it says -- it shows her rank too. Same thing.

**Q.** But if you were not familiar with military insignia, you would not know that those two chevrons denoted a sergeant; correct?

**A.** Those three. There are actually three, but that's correct.

(Trial Exhibit 75 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 75 of your binder. This has been previously admitted as Exhibit 75, and we will publish this to the screen now.

This is another photograph that was published on the DVIDS website, again taken by Sergeant Murray. You recognize this photograph; correct?

**A.** I do.

**Q.** At least some of the individuals in this photograph who are wearing camouflage are Task Force 51 troops; correct?

**A.** Yes, with a lot of federal agents in there -- mixed in there too.

**Q.** And below the picture, do you see where it reads [as read]:

"Soldiers assigned to the 870th Military Police Company, 185th Military Police Battalion, 49th Military Police Brigade, California National Guard, serving under Title X status, provide a security perimeter for federal personnel conducting law enforcement activities in Carpinteria, California, July 10th, 2025"?

**A.** I do.

(Trial Exhibit 76 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 76 of your binder. This has been previously admitted as Exhibit 76, and it's being published to the screen now.

Showing you another photograph that was published on the DVIDS website, taken by Sergeant Murray during the Carpinteria operation, you recognize this photograph; correct?

**A.** I do.

**Q.** At least some of the individuals in this photograph who are wearing camouflage are Task Force 51 troops?

**A.** Yes.
**Q.** And beneath this photograph is the same description as the previous photograph; correct?
**A.** That is correct.
**Q.** While you were commanding general, there was also an occasion where a mobile response force of Task Force 51 troops assisted in a federal law enforcement operation at a cannabis farm in Camarillo, California; correct?
**A.** That was after I left, correct.
**Q.** Okay. But you do have knowledge of Task Force 51's involvement in that operation?
**A.** I have knowledge from what I read from General Nell's report and talking to General Nell, but that would be it.
**Q.** So you don't have any knowledge about what specifically took place during the Camarillo operation; correct?
**A.** I do have knowledge that about 48 hours ahead of time before the operation, they canceled -- the CVP canceled the request for assistance. So there would not be any soldiers on that mission with federal law enforcement.
**Q.** All right. So that's -- to my question, that's a "yes"? You don't -- because you were no longer commanding general, you don't know specifically what took place during the Camarillo operation; right?
**A.** I don't. I was actually flying at the time this happened.
(Trial Exhibit 83 received in evidence.)

**BY MS. REILLEY:**

**Q.** Okay. If you could please turn to Tab 83 of your binder. And this has been previously admitted as Exhibit 83, and we'll publish that to the screen now.

And for the record, this is a photograph of the Camarillo operation that was taken by Genevieve Flores-Haro of the Mixteco/Indigena Community Organizing Project.

Major General Sherman, you've seen this photograph before; correct?

**A.** I have.

**Q.** And the eight individuals in this photograph who are wearing face shields are Task Force 51 soldiers; right?

**A.** The ones that are wearing clear face shields -- I don't know that federal agent that's there in the middle, if that's a face shield. I can't tell. But it appears, yes, the ones that are wearing clear face shields are soldiers, members of, I believe, Task Force 51. I can't see the patches, but I assume so.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

(Trial Exhibit 86 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 86 of your binder, and we'll publish this. This is Exhibit 86, another photograph

taken by Ms. Flores-Haro during the Camarillo operation.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And the four individuals in this photograph who are wearing clear face shields and shin guards are Task Force 51 soldiers; correct?

**A.** Yes. I can't see the patches, but this is gear that they were issued, yes.

**Q.** And you can't explain what the soldiers are doing in this paragraph; correct?

**A.** I cannot.

(Trial Exhibit 87 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 87, which we will publish now. This is another photograph taken by Ms. Flores-Haro during the Camarillo operation.

You've seen this photograph before; correct?

**A.** Yes, I have.

**Q.** And the five individuals in this photograph who are wearing face shields -- clear face shields and shin guards are Task Force 51 soldiers; right?

**A.** They are Task Force 51 soldiers behind the federal agent there, that's correct.

**Q.** And you can't explain what the soldiers in this photo are doing; correct?

**A.** I cannot.

(Trial Exhibit 92 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab ninety- -- turn to Tab 92, which is Exhibit 92. We'll publish this now.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And the three individuals in this photograph who are wearing face shields and shin guards are Task Force 51 soldiers; correct?

**A.** I see -- well, there's two that are cut off that have, appears to be, face shields and then two more of that face shields; and then the other ones are not 51, Task Force 51, that's correct.

**Q.** So the two individuals on the left-hand side of the photograph who are wearing shin guards and holding batons, those are Task Force 51 soldiers; right?

**A.** They appear so, yes.

**Q.** And you can't explain what the soldiers in this photograph are doing; right?

**A.** I cannot.

(Trial Exhibit 94 received in evidence.)

**BY MS. REILLEY:**

**Q.** If you could please turn to Tab 94. This is Exhibit 94, another photograph taken by Ms. Flores-Haro during the

Camarillo operation.

You've seen this photograph before; correct?

**A.** I have.

**Q.** And we're zooming in on the photograph now.

The individuals in this photograph who are standing next to the field and holding shields are Task Force 51 soldiers; right?

**A.** They are.

**Q.** And you don't know what the soldiers in this photograph are doing; correct?

**A.** I do not.

(Trial Exhibit 95 received in evidence.)

**MS. REILLEY:** At this time, I'm going to show you a video that's been admitted as Exhibit 95. This was also taken by Ms. Flores-Haro during the Camarillo operation.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** You've seen that video before; correct?

**A.** I have.

**Q.** And the individuals in this video who are wearing the clear face shields and holding shields are Task Force 51 soldiers; right?

**A.** That is correct.

**Q.** And you don't know what the soldiers in this video are doing?

**A.** No. I could make -- I wasn't there, so I'm not going to make a decision but -- or make a statement on that. No, I do not. I don't have context.

(Trial Exhibit 96 received in evidence.)

**MS. REILLEY:** All right. Now I'm going to show you a video that's been admitted as Exhibit 96. Again, this was taken by Ms. Flores-Haro during the Camarillo operation.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** You've seen this video before; correct?

**A.** I have.

**Q.** And the individuals in this video who are wearing camouflage uniforce -- uniforms and gas masks are Task Force 51 troops?

**A.** Not necessarily.

**Q.** When the video panned to the right and it showed individuals in camouflage uniforms who are wearing gas masks and clear face shields, those are Task Force 51 soldiers; correct?

**A.** Yes, but there are also federal agents wearing gas masks on that one too.

**Q.** But the federal agents are wearing solid green, not camouflage; correct?

**A.** I believe so. I'd have to take a better look. I don't -- I don't know.

**Q.** We could replay the video if you'd like.
**A.** Sure.
(Video was played but not reported.)
**BY MS. REILLEY:**
**Q.** Having seen the video for a second time, it's correct that the individuals wearing camouflage are Task Force 51 soldiers; correct?
**A.** Correct. Behind the federal agents, that's correct.
**Q.** And you can't explain what these soldiers in this video are doing; correct?
**A.** Well, with the crowd there, it appears like they're doing a traffic control point, holding people back, but I don't have any other information.
**Q.** And you were not present for this operation; correct?
**A.** I was not.
**Q.** And you were not commanding general at the time this operation took place; correct?
**A.** Which operation is this one?
**Q.** Camarillo.
**A.** Oh, no, I was not.
**Q.** All right. Task Force 51 soldiers also participated in a law enforcement operation at MacArthur Park on July 7th, 2025; correct?
**A.** Correct.
**Q.** And the original request for assistance that related to

the MacArthur Park operation called for the operation to take place on Father's Day?

**A.** That is correct.

**Q.** And it also called for Task Force 51 military vehicles to be on the section of Wilshire Boulevard that runs through MacArthur Park; correct?

**A.** It did. It had them going through the middle, yes.

**Q.** You objected to that original request for assistance related to the MacArthur Park operation; correct?

**A.** That is correct.

**Q.** And Chief Gregory Bovino of the Department of Homeland Security criticized you for objecting to that request; correct?

**A.** He did. He did.

**Q.** And specifically Chief Bovino questioned your loyalty to the country for objecting to that original MacArthur Park operation?

**A.** He did.

**MS. LIN:** Objection. Relevance.

**THE COURT:** Sorry? The objection.

**MS. LIN:** Objecting to relevance of this line of questioning of the conversations that counsel is --

**THE COURT:** Why is it irrelevant? I mean, if somebody is making decisions and then people who are part of the decision-making process turn to the person who makes a decision based upon his judgment and calls him disloyal, why is that

irrelevant?

**MS. LIN:** The only question before the Court today is the scope of the Posse Comitatus Act.

**THE COURT:** Yes. We're talking about -- it's in an operation; isn't it? Isn't this related to the MacArthur Park?

**MS. LIN:** Yes, yes, it is, but the discussion about loyalty or disloyal, that's not part of --

**THE COURT:** But wasn't that -- I'm sorry. Was that not part of the discussion? Are you saying that wasn't part of the discussion, Counsel?

**MS. LIN:** It was, but --

**THE COURT:** Well, so if it's part of the discussion, why isn't it then related to the decision that was made in that context? Why isn't it?

I'm actually asking you these questions because you're the one objecting, so you have to explain it to me.

**MS. LIN:** Yes, Your Honor. The scope --

**THE COURT:** Why don't you come up to the microphone so I can hear you.

**MS. LIN:** The scope of the issue before the Court is simply about whether there have been violations of the Posse Comitatus Act. What a law enforcement agency's view about the military's loyalty or disloyalty is not relevant, in our view, to that narrow question of whether a violation --

**THE COURT:** But why isn't it relevant?

**MS. LIN:** -- of law has occurred.

**THE COURT:** If, in fact, a person is making a decision, who's a military officer, who's had 33 years of experience and I assume -- we haven't gone through the decorations, but I assume there was least one decoration over your career -- is told by civilian authorities that he is disloyal to the United States of America, why isn't that relevant to whatever decisions are made in connection with this officer, the general?

I'm just trying to understand your objection. You say it's not -- it's not relevant because of what?

**MS. LIN:** Because that question of loyalty does not directly go to the issue of whether violations of the Posse Comitatus Act has occurred and is --

**THE COURT:** Well, maybe it goes to his state of mind. Maybe it goes to the fact he's now being -- he's exercising his military judgment in connection with the Posse Comitatus Act; and in doing so, in doing so, he is told that he is disloyal to the United States of America.

Why is it any different from turning, as an example, to an attorney who makes an argument and then you say to the arguer, "You can't make that argument. You're disloyal"? Why isn't it relevant?

**MS. LIN:** Your Honor has ruled.

**THE COURT:** Okay.

**MS. LIN:** My objection remains the same.

**THE COURT:** Thank you. Overruled.

Okay. Go ahead.

**BY MS. REILLEY:**

**Q.** Major General Sherman, your answer to my last question was, yes, Chief Bovino did question your loyalty to the United States of America; correct?

**A.** Yes.

**Q.** You did not ultimately approve the MacArthur Park operation that took place on July 7th; right?

**A.** That's correct.

**Q.** That request for assistance was actually approved by the Secretary of Defense?

**A.** It was not approved by the Secretary of Defense. Or I don't really understand your question.

**Q.** So my question relates to the operation that, in fact, took place on July 7th.

**A.** Oh, okay, yes.

**Q.** Was -- that operation was pursuant to a request for assistance; correct?

**A.** It was. It was the third time we have -- we had planned MacArthur Park. Because of the high risk, it went to the commander of U.S. Northern Command for his approval; and from there, it did go to the Secretary of Defense for the approval.

**Q.** And when you say "high risk," you are referring to the

high risk it posed to your Task Force 51 troops; correct?

**A.** It could be Task Force 51 troops. It could also be federal law enforcement. It was both a risk just to the operation.

**Q.** And there were approximately 120 to 150 Task Force 51 soldiers involved in the MacArthur Park operation?

**A.** I believe that's too high. I believe it's more like 90 that were there on the site. We had some Mobile Response Force people that were outside if they needed to respond, but I think there was about 90 on the ground right there.

**Q.** Do you recall at your deposition when you testified that there were approximately 120 to 150 Task Force 51 soldiers?

**A.** I think if you're including the MRP, that's probably -- or the Mobile Response Force, that's a correct number.

**Q.** And the Mobile Response Force was stationed near MacArthur Park during the operation; correct?

**A.** They were at -- we had them at Roybal, at Wilshire, and Los Angeles Air Force base.

**Q.** All right. And there were approximately 40 Task Force 51 military vehicles that were involved in the MacArthur Park operation?

**A.** I believe that's correct, yes.

**Q.** And those military vehicles included Humvees; right?

**A.** They did.

**Q.** It also included transport vehicles?

**A.** It did. It had LMTVs and I also believe there were some JLTVs involved in that too.
**Q.** It included 5-ton trucks as well; right?
**A.** Yes. Those are the LMTVs, that's correct.
**Q.** If you could please turn to Tab 28 of your binder. This has been previously admitted as Exhibit 28. And of this document, we are going to publish page 2892.
Major General Sherman, you recognize this document; correct?
**A.** I do. I don't know the date of which when this was published, but, yes, I do.
**Q.** And this relates to the MacArthur Park operation; correct?
**A.** I assume so, yes.
**Q.** Operation Excalibur --
**A.** Yes.
**Q.** -- refers to MacArthur Park?
**A.** Yes, you're right. That's correct.
**Q.** And this relates to the July 7th operation; correct?
**A.** If these are a full slide set, I could tell you by looking at one.
(Witness examines document.) Yes, that's correct.
**Q.** If you could please turn to page 2892.
Do you see where it reads "Risk of inaction low"?
**A.** Yes.
**Q.** And can you please read aloud the section that immediately

follows that header?

**A.** Yes. [As read]:

"So risk of inaction low assessment. Current intelligence does not indicate a high-volume or high-value target to federal function at this location. No indication that failure to act would result in loss of life or significant property damage. Expected law enforcement action is limited in scale, with few detainees anticipated and no high-risk warrants involved. Operation not informed by time-sensitive intelligence or part of an integrated targeting cycle."

**Q.** And the MacArthur Park operation took place on July 7th, which was a Monday morning; correct?

**A.** Correct.

**Q.** And given that it took place on a Monday morning, that summary you just read is an accurate assessment of the risk presented by the MacArthur Park operation; correct?

**A.** That is correct. It was changed because of the -- of an operation that did take place on Monday, the 7th, after the Fourth of July holiday.

**Q.** All right. So even if Task Force 51 troops had not been involved in the MacArthur Park operation on July 7th, the risk to the federal law enforcement officers would have been low; correct?

**A.** That was our assessment.
**Q.** Do you have any current involvement with the Los Angeles deployment?
**A.** I do not.
**Q.** In fact, you have not had any involvement with the deployment since July 10th; correct?
**A.** That is correct.
**Q.** You are aware, though, that there are 300 federalized California National Guard soldiers who are still deployed; right?
**A.** I am.
**Q.** And 300 soldiers is a full battalion?
**A.** No, it's not. It's like three-quarters of a battalion.
**Q.** All right.
**A.** It depends on the type of battalion that you're talking about. If this is an MP battalion, it's about three-quarters of it.
**Q.** And to your knowledge, those 300 federalized California National Guard troops are still providing assistance to federal law enforcement agencies; correct?
**A.** They are conducting four requests for assistance as of last night.
**Q.** And what are those four requests for assistance? What operations are you assisting?
**A.** They have personnel at the Roybal building in case it

needs defended, they have personnel at the Paramount facility in case that needs defended, and then two Mobile Response Forces.

**Q.** And the Mobile Response Forces can be called upon to engage in field operations; correct?

**A.** Yes, they could.

**Q.** Are you aware that this morning, Secretary of Defense Hegseth announced the deployment of National Guard troops in Washington, D.C.?

**A.** I read it on the news.

**Q.** Did you watch any news coverage of Secretary Hegseth's announcement?

**A.** I did not.

**Q.** Are you aware that Secretary Hegseth said in his announcement that the D.C. National Guard will, quote, "stand with their enforcement partners," closed quote, and that, quote, "We did the same thing in Los Angeles"?

**A.** I do not -- I did not read that. That's what he said. I did not see that.

**MS. REILLEY:** At this time, Your Honor, we would like to play that footage given that this is the party opponent representative and the Secretary's statement is a party opponent statement.

**THE COURT:** Okay. You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

**MS. LIN:** Your Honor, objection from us. This is not on the exhibit list. This is not --

**THE COURT:** You actually have to -- it's important we have a record, so that's why you should come forward.

And also --

**MS. LIN:** Apologies, Your Honor.

**THE COURT:** -- I must tell you -- don't apologize. It's perfectly all right.

**MS. LIN:** I thought --

**THE COURT:** I have a hard time hearing you when you're at counsel table. So I do want to hear what you have to say.

**MS. LIN:** Okay. That this particular, I believe it was characterized as a press statement or video, is not part of the exhibits list. It's not part of the evidence of this case. We were not informed that they were going to use this, even as of this morning.

**THE COURT:** Okay. So how could it have been part of the exhibit list when it occurred today?

**MS. LIN:** We were not informed this morning either.

**THE COURT:** Okay. Well, now you're informed, and it comes in subject to a motion to strike.

**MS. LIN:** And, Your Honor, is it being offered for the truth of the matter?

**THE COURT:** It's being offered as a statement by a party opponent. The Secretary of Defense is a party opponent,

isn't he?

**MS. LIN:** Yes. Understood.

**THE COURT:** Okay. Thank you.

It may be played --

**THE COURTROOM DEPUTY:** The exhibit number?

**THE COURT:** -- subject to a motion to strike.

**MS. REILLEY:** This will be the next exhibit in order, which I believe is 114. Thank you.

(Trial Exhibit 114 marked for identification.)

(Pause in proceedings.)

**THE COURT:** Do we have an estimate as to how long this is going to take?

**MS. REILLEY:** Your Honor, I was going to propose we could try to download it if we took a recess.

**THE COURT:** Yes, let's do that.

Well, do you have any other questions other than this?

**MS. REILLEY:** No. This will be my last one.

**THE COURT:** Okay. So let's do this: Let's take our noon recess, and we will resume at 1 o'clock sharp, and you may play this at 1 o'clock sharp.

**MS. REILLEY:** Thank you, Your Honor.

**THE COURT:** And you may step down. Thank you, General.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Okay. We're in recess till 1:00.

(Luncheon recess taken at 12:27 p.m.)

**Afternoon Session** **1:02 p.m.**

**THE COURT:** Let the record show all parties are present. The witness has returned to the witness stand.

You may proceed.

**MS. REILLEY:** Thank you, Your Honor.

(Trial Exhibit 114 received in evidence.)

**MS. REILLEY:** At this time, we are going to play what's been admitted as Exhibit 114, which is the Secretary of Defense Hegseth's statement from this morning.

**THE COURT:** Okay. You may proceed.

(Video was played but not reported.)

**BY MS. REILLEY:**

**Q.** Major General Sherman, you have not seen that video clip before just now; correct?

**A.** That's correct.

**Q.** And you were not aware that Secretary of Defense Hegseth made those statements before just now?

**A.** That's correct.

**MS. REILLEY:** At this time, the plaintiffs have no further questions for Major General Sherman.

**THE COURT:** Thank you.

Any examination?

(Pause in proceedings.)

**THE COURT:** Why don't you come over here.

**MS. LIN:** Oh.

**THE COURT:** It will be easier.

**CROSS-EXAMINATION**

**BY MS. LIN:**

**Q.** Good afternoon, General Sherman.

**A.** Good afternoon.

**Q.** Earlier today you were asked to look at several photographs that were published by DVIDS. Do you recall that?

**A.** I do.

**MS. LIN:** So if we could have maybe the same photograph -- at least one of the photographs, 64, that was discussed this morning, Exhibit 64.

**BY MS. LIN:**

**Q.** And then there were others as well that you were asked questions about. And just for the record, if I got them correctly, the DVIDS photos included Exhibit 66, 68, 75, and 76, and these were represented as being taken by Sergeant Chase Murray?

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Overruled.

**MS. LIN:** I'm sorry. I didn't hear, Your Honor.

**THE COURT:** I said overruled.

**BY MS. LIN:**

**Q.** And just to get an understanding of these photos, I think you testified that you were not there and you did not know what

the circumstances were when the photos were taken?

**A.** Correct.

**Q.** Okay. As the commander of Task Force 51, do you have an understanding of what Sergeant Chase Murray's responsibility was in taking these photographs?

**A.** Sure. So Sergeant Chase Murray was attached to Task Force 51 in our public affairs section. By him taking photos and for him posting on DVIDS, his whole purpose was to show the Army, the military side of the operation. He was a member of Task Force 51, so he was able to be inside the actual interior lines, if you will, taking pictures. And his focus was really taking pictures of soldiers or Marines, highlighting what DOD was doing for the operation.

**Q.** So was there any guidance to photographers, such as Sergeant Chase Murray, about whether they were to also include federal law enforcement personnel if they were there?

**A.** It was much -- it was because federal personnel were starting to get doxed. They were starting to have real issues there. His guidance, given by our head public affairs officer, is to avoid as much as possible taking any pictures of federal law enforcement that were any kind of facial recognition or names could be used in those -- those federal law enforcement being doxed.

**Q.** And so do you believe that the photos that were -- that you were asked questions about from DVIDS fall within that

general guidance that was given to photographers attached to Task Force 51?

**A.** They were.

**MS. REILLEY:** Objection. Calls for speculation.

**THE COURT:** I'll allow it.

**THE WITNESS:** There are some photos in here, not all, but there are some where he's gotten into position where he makes sure that he hasn't taken pictures of federal law enforcement; he's taken pictures of DOD personnel.

**BY MS. LIN:**

**Q.** And if I could focus your attention on the first photograph that I mentioned, Exhibit 64.

**A.** Correct.

**Q.** I think you were asked questions about this particular photograph.

Do you see there's a yellow caution tape in front of the -- I think you said the Task Force -- Task Force 51 soldiers?

**A.** That's correct.

**Q.** Is this yellow caution tape the type of equipment standard issued for Task Force 51 troops?

**A.** No. Only federal law enforcement had that type of tape.

**Q.** What other equipment were the Task Force 51 troops issued for part of -- for this federal protection mission?

**A.** So they had -- they had -- so for the civil disturbance,

beyond their typical uniform, which was just a standard uniform, was boots, camouflage uniform. They did have on their armored vests -- they're what we call IOTV, but they're vests that carried their armor plates -- and their ballistic helmet. And then part of it was their civil disturbance kit, which included kneepads, a body shield, a face shield, and a baton. And then they also had their personal weapon that was slung across their back.

**Q.** To your knowledge, was any Task Force 51 soldiers used the issued batons during the federal protection mission?

**A.** I do not know of any instance where they actually used it to hit anybody. That never happened.

**Q.** And does your knowledge extend beyond -- I think you discussed earlier you left California on July 10th.

**A.** Correct.

**Q.** Do you have knowledge, after you left on July 10th, as to what -- whether that was -- whether any soldiers used a baton --

**A.** No. I was --

**Q.** -- during their mission?

**A.** I was still on the distribution for the nightly reports, and I did not see any reports where batons were ever used.

**Q.** When you mentioned that you were on the distribution, this is the distribution from, I believe you testified, General Nell?

**A.** Correct. General Nell would send her usual -- same thing I did, send a nightly report to General Pepin and to General Guillot, the commander of U.S. Northern Command.

**Q.** And when you talk about the civil disturbance equipment, did it include non-lethal munition?

**A.** It did not include non-lethal munitions. We considered that a law enforcement action, so only civilian law enforcement had any of that equipment.

**Q.** And you mentioned that you were asked questions about the personal weapons. Can you let us know whether any soldiers, pursuant to Task Force 51's federal protection mission, used their personal weapons?

**A.** They did not. No -- no rounds were ever -- well, a term we use -- "lock and loaded," which was putting a round into the chamber. They did have -- they did have magazines that were loaded, but they never -- nobody ever chambered a round, never were in a position that they thought that their life was in jeopardy that they needed to do that.

**Q.** And why is it that they were able to carry lethal weapons but not non-lethal munitions?

**A.** So strictly for self-defense. If they thought their life was in peril, that was the only time they were allowed to use their personal weapon, is strictly for self-defense or defense of another soldier or any lethal protection or any -- if they saw some lethal force put against a federal law enforcement.

**Q.** Thank you.

And if I can direct your attention to the discussion earlier about Exhibit 38 that was -- you were asked questions about it.

**A.** Yes.

**Q.** Do you have it in front of you on the screen?

**A.** I don't see it on the screen, but I have it in front of me.

**Q.** I believe you were asked questions -- or I'm sorry.

I believe you were asked to read the last paragraph of the "Patrol Narrative" section?

**A.** I was.

**Q.** Can I direct your attention to the third paragraph that began with "National Guard soldiers establish their blocking positions at approximately 0600," and the sentence continued?

**A.** Yes.

**Q.** Were National Guard soldiers attached to Task Force 51 permitted to establish blocking positions as part of the federal protection mission?

**A.** No. It had to be -- because we considered that a law enforcement action. They could establish a blocking position perimeter, if you will, if there was -- any time that they thought law enforcement -- there was -- either preventing them from doing their job or some kind of -- they saw as an imminent threat of anything on that. But in this --

**Q.** So --
**A.** Oh, I'm sorry.
**Q.** So the reference here about National Guard soldiers establishing their blocking positions, is that contrary to what they were trained to do? Or I guess I'm trying to get an understanding of --
**A.** Well, so --
**Q.** -- why is it they established --
**MS. REILLEY:** Objection.
**THE COURT:** Well, wait, wait, wait.
What is your question? You started asking two questions at the same time.
**MS. LIN:** Okay. My apologies, Your Honor.
**BY MS. LIN:**
**Q.** So I'm asking whether you can explain to me if what you're saying is that they are not permitted to establish blocking positions, but the paragraph here is talking about National Guard soldiers establishing their blocking positions.
**MS. REILLEY:** Objection. Calls for speculation.
**THE COURT:** I'll allow it.
**THE WITNESS:** So on the previous paragraph, where it talks about -- where it started with "National Guard, DEA, and FBI arrived at the objective. Blockades were established and each blockade was accompanied by a marked Los Angeles Sheriff's vehicle."

The sheriffs were used in this operation because this person had already been -- saw that they had -- had caused significant -- they'd hurt a federal agent. So, actually, this was a time when Los Angeles Sheriff's Department was allowed; they were actually part of this operation. So not only were they there on the checkpoint -- they call it blockade in this case. I don't like his wording here, but this is a very young, 22-year-old officer here.

But both blockades were also accompanied by DEA SWAT, so Drug Enforcement Agency SWAT teams that were also at those blockades, which are traffic control points, with less than lethal munitions. So it was law enforcement in the lead, with our soldiers behind them.

**BY MS. LIN:**

**Q.** So pursuant to the federal protection mission, are the soldiers permitted to be establishing blocking positions if the law enforcement personnel were the lead at that operation?

**A.** They're allowed to be behind the federal law enforcement or, in this case, L.A. County Sheriff were the ones establishing the traffic control point, the blocking position, and our soldiers were behind them strictly to protect them if there was any threat.

**Q.** So I think you testified that you were not at this operation. So I guess my question to you then is: What are the soldiers trained to do with respect to blocking positions

as part of the federal protection mission?

**A.** So this is my number one priority -- or my number two priority. My number one priority was always the welfare and safety of soldiers and Marines, but Number 2 was to ensure that they followed the standing rules on the use of force exactly as was written.

And for these operations, when battalion commanders and their staffs would brief me on the operations, that was the first question I asked: What's your mission? What are you allowed to do? What are you not allowed to do? And what are you doing?

It's standard, but it's something -- especially when you're talking something as early as the first week of this operation, the 13th, it was making sure they fully understood because these are soldiers that had done previous riot operations in a Title 32 state active duty status, which is different, I wanted to make sure they fully understood under Title X what they were allowed to do.

And then part of this was they weren't allowed to do any law enforcement actions. Law enforcement had to do it themselves. This is, we were strictly there to protect federal law enforcement, allowing them to do their law enforcement job.

**Q.** Okay. And so, to your knowledge, no Task Force 51 soldiers acting pursuant to the federal protection mission established blocking positions that were just by themselves,

not connected with law enforcement personnel on the scene?

**A.** That's correct. The only time they got out in front and established a blocking position is if there was some kind of risk posed to the federal law enforcement, not allowing them to do their job.

**Q.** And I think you mentioned earlier about the risk posed and the feeling of the commander, if I'm remembering your testimony correctly. I think you mentioned that if the commander felt threatened.

Can you explain a little bit more when you are describing if a commander felt threatened? What is that -- what does that entail, as far as you know, as the commander --

**A.** Well, we use a --

**Q.** -- of Task Force 51?

**A.** Sure. We use a thing in the military called mission command. That means the commander knows what their left and right boundaries are. They understand the mission. They understand the reason they were there: either they were at a facility to protect a federal facility or they were out on a mission to protect federal law enforcement, allowing them to do their job.

They have the ability on the ground to make decisions, depending on how they sense how things are going. And that's a sense if they're feeling a threat, do they feel like the crowd is hostile, do they feel like the law enforcement is prevented

from doing their job, or that it could be a dangerous enough -- something could be happening that they could actually hurt or endanger the law enforcement, then they had the ability to react.

**Q.** Okay. So this is, from your description, you're talking -- am I correct to say that you're talking about they can conduct a risk assessment on the ground?

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Sustained.

**MS. LIN:** Let me ask the question differently.

**BY MS. LIN:**

**Q.** So when you say they felt threatened, I think you gave me some explanation as to what that meant. My question is: Did that -- what did it entail if you have to identify them?

**A.** It was them on the ground, gauging from their own sense, doing assessment, if you will, of how they felt the crowd was reacting. If they thought it was endangering the federal agents, one, or preventing them from doing their job, then they could act.

**Q.** And did it actually -- did it have to be an actual threat or was it -- that's my question. Did it have to be an actual threat?

**A.** No. It could be -- there could be a crowd that's pushing up against the federal law enforcement, not allowing them to do their job. It's a preventive measure too.

**Q.** Preventive measure?

**A.** Sure.

**Q.** So when you say "preventive measure," does that mean that if there were no crowd, would it still be permissible?

**A.** No.

**Q.** -- as a preventive measure?

**A.** So if there was no crowd, they wouldn't be going forward. They'd be -- still the federal law enforcement have their traffic control point. There would be no reason. They'd just be standing behind them. Very similar to some of the pictures we saw.

**Q.** I see. So they would still be permitted to be standing next to or behind -- I'm sorry -- standing behind law enforcement?

**A.** Correct. Somewhere within a -- you know, a distance where they could react quickly if the situation -- if something happened and they deemed it necessary, they needed to react.

**THE COURT:** I'm sorry. I want to make sure I understand that.

If there's no threat and there was never an expectation of a threat, is it your testimony you could still have military out on the operation? If there was no threat.

**THE WITNESS:** Well, the only -- Your Honor, the threat we had, so that -- like those threat assessments that were put up there as --

**THE COURT:** So let's say you got a threat assessment which said it was low or non-existent.

**THE WITNESS:** Sure.

**THE COURT:** Can you send out military?

**THE WITNESS:** Absolutely, Your Honor, because that's just an assessment of what we thought would happen on the ground, but it could -- it could get much worse.

**THE COURT:** So it's your testimony that whenever there is local law enforcement carrying out an operation, and even if there is no threat, you can send the military out?

**THE WITNESS:** Yes, sir, that's correct. With this mission, with the federal law enforcement -- because it was just an assessment that they didn't think anything would happen; but if something did happen, take, for instance, they had a low -- a low assessment, there was one time we didn't -- we didn't have any force there, we actually had to respond. They had a low threat assessment. There was -- they didn't think anything was going to happen, but they started to -- they went to a house to -- to act on a warrant, and there was actually a construction site across the street and that crowd, actually the people from the construction site, came down and started harassing the federal law enforcement officers.

**THE COURT:** So that's a case in which a threat developed.

**THE WITNESS:** Yes, sir.

**THE COURT:** Okay. But my question is a different question. My -- and maybe it was anticipated that that's a possibility, but if it's not -- if it's not seen as a situation in which there is a threat, then is it your testimony you can still deploy the military because there may be a threat in carrying out the operation?

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** So, in other words, if you have -- let's say you are executing the laws of the immigration -- the immigration laws, which are, in certain circumstances, unpopular, in certain contexts, unpopular --

**THE WITNESS:** Right.

**THE COURT:** -- but you have no evidence that there's a threat or that people would constitute a threat. Is it your testimony you can send out the military on that operation?

**THE WITNESS:** Yes, and we did, Your Honor.

**THE COURT:** Okay. Now, let's say you had cases involving low compliance with the tax laws and you have a person who is a tax protestor but there's no evidence that that person constitutes a dangerous situation -- constitutes a dangerous situation. Send out military in that?

**THE WITNESS:** Well, we never had a situation like that, Your Honor. We never supported the IRS on any type of operation as far as going and anybody who was evading taxes.

**THE COURT:** But it's a federal law. I'm just trying

to figure out, if you are enforcing -- if there is a federal law, such as the tax law or the immigration law or the drug laws, which are co-terminus federal and state, if you're enforcing these laws and there's some indication that the law is unpopular among the public or among the group that is the subject of the enforcement, is it your view you can send out the military in the -- that you can send out the military to support the operation?

**THE WITNESS:** Your Honor, if it was -- if it was in line with the direction that we've gotten with both the President's memo and the Secretary's memo and it was supporting federal agencies or federal law enforcement beyond DHS, that was performing functions and it was legally reviewed and they deemed it a valid mission, we could do that.

**THE COURT:** Well, I'm actually not asking you whether the lawyers looked at it.

**THE WITNESS:** Right.

**THE COURT:** But maybe they would. I assume that.

But I'm trying to figure out really what boundaries there are established by the Posse Comitatus Act.

And I looked through the file, and I saw a very helpful slide presentation of: You can't do this. You can't do that. You can't do a third thing. You can't do a fourth thing. So -- and there are a number of things you can't do.

And essentially I'm trying to figure out whether you can

do any of those things when what the -- what the law enforcement -- not the military -- the law enforcement is trying to enforce an unpopular law. Can you then, because it's an unpopular law, use the Posse Comitatus -- I mean, use federal forces?

**THE WITNESS:** Well, I'm not a lawyer.

**THE COURT:** Well, your judgment. You're the one who's telling me --

**THE WITNESS:** Well, in my judgment, if it's -- if it's in line and it also fits, according to the brief that you saw, our standing rules on the use of force brief, which actually had constitutional exceptions in there that's showing that we're protecting federal property and enforcing federal law or allowing personnel to enforce law, then we deemed it that it was legally appropriate.

**THE COURT:** Do you draw any distinction between enforcing federal law and protecting federal property?

**THE WITNESS:** No. The -- well, so federal property was -- part of that, Your Honor, was to protect federal property from defacement, from being damaged, and to allow the federal employees that were there, allow them to do their job.

**THE COURT:** Well, but my question is a little different. I understand -- at the Roybal building, I understand. You know, I understand what -- this building. I understand federal property.

**THE WITNESS:** Right.

**THE COURT:** And I understand that there is -- there may be a particular role in protecting federal property, but I'm not talking about federal property. I'm now talking about federal law, which, in some cases, obviously, involve federal property, but I'm talking about those cases in which it's not involved, MacArthur Park or some marijuana farm somewhere. Though there may be federal laws that are implicated, there's not federal property.

So if there are federal laws that are implicated and those laws are unpopular laws and there is no threat, known threat, to the military that there's going to be force used in connection with the implementation of the law, is it your view that you can send out the military?

**THE WITNESS:** Yes, Your Honor, we could because it was our view, because it was just an assessment that we had of the situation on the ground, it could turn out to be differently, happen very different.

**THE COURT:** And that's true, isn't it, always the case? In other words, it's always the case you have an assessment, a preincident assessment, and then you have the reality of what happened.

Now, it doesn't -- the reality doesn't tell us what the alternatives are, and I appreciate that. But assessments that are preincident or predeployment are done in advance, aren't

they?

**THE WITNESS:** They are, Your Honor.

**THE COURT:** They may turn out to be inaccurate in the sense that actually circumstances develop different from what the assessment would have been.

**THE WITNESS:** Absolutely, Your Honor. Could I further explain on that?

**THE COURT:** You sure can. You go right ahead.

**THE WITNESS:** So in the military --

**THE COURT:** I don't want to cut you off.

**THE WITNESS:** In the military, we develop plans. We tell very comprehensive plans. You can see inside these books. These are -- these -- all of these detailed plans, these were all done by military planners because it's kind of the detail planning that we need because we're very much -- we're very much an NFL team, if you will. We make sure that we plan in detail both offense and defense, that we fully understand the situation on the ground and that we're able to react.

In this case, we know that a plan only is good enough until you actually -- it actually commences because we always say the opposition has a vote. Some things happen; and while I wasn't there, we saw that at Camarillo. We had had an operation planned in RFA and two days before it happened, the Border Patrol or CBP had canceled that RFA because the assessment was that there wasn't going to be military needed at

that location.

Well, after the -- after the operation that happened at Carpinteria and all that being on the -- on the news and with the helicopters there, that's when a lot of people showed up. And then there was one instance where they actually -- well, at that instance at Camarillo, they actually had more illegal aliens than they originally thought was going to be there. It was actually 300, which overwhelmed them right then. And then they started having large crowds come to their traffic control points; and right from there, that's when they -- yeah, they had large crowds that came to their traffic control points. And then from there, they knew they had a situation that they needed extra help, and that's when they called Task Force 51 to bring personnel in from our Mobile Response Force to help them with the situation on the ground. Because they knew they had a very -- they had a crowd that was very upset, somewhat hostile, and they needed help because they got overwhelmed.

**THE COURT:** But they were called in when there was a demonstrable threat.

**THE WITNESS:** Correct.

**THE COURT:** Okay.

**THE WITNESS:** That's correct, Your Honor.

**THE COURT:** Thank you.

**THE WITNESS:** Yes.

**THE COURT:** Thank you very much.

**BY MS. LIN:**

**Q.** General Sherman, I think the judge posed the question about if a law is unpopular, how does that factor into your decision as the commander of Task Force 51.

My question to you is: Who makes the law enforcement determination as to whether the law is unpopular or whether that law enforcement operation is a valid law enforcement operation?

**A.** So that's happened at the IEC. We don't have any part in that part of it. The actual law enforcement operation, that was decided at the interagency coordination cell, along with the Attorney General that's there for that district, along with the FBI, along with all the federal agencies, they go through the process.

With our mission that we were given, we were there to go on the federal -- on their law enforcement missions to protect them when and if needed.

**Q.** So you're not concerned, as part of your federal protection mission, as to whether the law is popular or unpopular? That's not part of your consideration; is that correct?

**A.** It was not.

**MS. REILLEY:** Objection. Leading.

**THE COURT:** Sorry?

**MS. REILLEY:** I objected to the question as leading.

**THE COURT:** I'll allow it.

Go ahead.

**THE WITNESS:** No, that wasn't with our mission. That wasn't a part of -- we certainly don't do federal law enforcement functions. It's not our -- it is not our place to make any determination. That's federal law enforcement. On whether a law is popular or unpopular, they're enforcing federal law. It was our mission in this case to go along with them, to partner with them, to be there to protect them if they did encounter any hostile crowds or actions.

**BY MS. LIN:**

**Q.** And the judge asked you earlier about the list of activities, and you also -- in response, you mentioned the standard -- standing rules for the use of force, and I believe counsel also asked you about that.

Can I have you look at that exhibit, which has already been admitted into evidence and is Exhibit Number 10?

**THE COURT:** And the page is?

**BY MS. LIN:**

**Q.** And the page number on that, if I could direct your attention to page 1101; or to be more accurate, DEFS 00001101.

Do you see the section that's entitled "Constitutional Exceptions"?

**A.** I do.

**Q.** Do you see if one of these items listed here -- and

there's one, two, three, four, five -- whether that describes what you believe to be your current federal protection mission?

**A.** Well, number two is from the protection of federal property functions and personnel.

**Q.** So in carrying out this -- in trying to protect federal property functions and personnel, is it your view that you are conducting law enforcement activities?

**A.** No, not conducting law enforcement; protecting federal property, functions, and personnel, allowing them to -- federal personnel to do their job.

**Q.** So just so I'm understanding your answer correctly, when you're protecting federal personnel, does that involve the federal personnel being on law enforcement missions that's not -- that's at large?

**A.** No. They could be -- actually be federal personnel not on mission. That would be at the federal property, doing their job. But certainly, yes, if they were doing their federal law enforcement job, it's protecting them, allowing them to do their function, to do their federal law enforcement job, and to protect them.

**Q.** And so the judge asked you questions about the threat assessment. I think you gave one example or two examples. One was a search warrant and the other one was the Camarillo.

Is this the type of anticipated threat or actual threat that is part of your consideration as whether to grant a

request for assistance? Or is it --
**A.** No. No. So I --
**THE COURT:** I'm sorry. I don't understand the question.
**MS. LIN:** Let me rephrase it. That was --
**THE COURT:** Is the existence of a search warrant part of the witness's consideration? Is that your question?
**MS. LIN:** No, I'm sorry. Your Honor, let me strike my question.
**THE COURT:** Okay.
**MS. LIN:** I'll ask a better question.
**BY MS. LIN:**
**Q.** So we were talking earlier about the example of a search warrant being carried out and also the Camarillo situation.
In both instances, I gather from your testimony was that you didn't anticipate that there was going to be any threat, but threat developed during the operation. Am I correct?
**A.** That's correct.
**Q.** And so I think the judge's question to you was if there were no such -- if you had no knowledge whether any threat was going to occur, how does that factor into your decision whether to grant the request for assistance?
**A.** It really didn't. It -- it came to -- it was really determined that threat assessment that we did, those were actually our staff that did that, that was what we thought was

going to happen at the operation.

It -- it played into -- especially with high risk, if that's where we -- that's where it needed to go up higher than me. I approved everything moderate and below. But anything of high risk or extremely high risk, it went to a higher commander just because we thought it was either a very risky operation to either federal law enforcement and/or our soldiers in this case, if it was an operation outside the federal facilities.

But those -- that assessment was strictly our own. It played into just our risk we thought the operation was. What didn't play in, if we were going to protect them for an operation. They had the request. They believed -- federal law enforcement believed they wanted to have law enforcement -- or they wanted to have military there to protect them in case. It was their belief that something could happen there. So it was -- and the operation totally abided by the law, as we saw it, and that it was legal, then we went ahead and -- went ahead and approved the operation.

**THE COURT:** Well, General, let's take your example. You said that there was a risk assessment which showed that it was low, and that it didn't -- that the information that you had, which was developed internally or developed by your forces or the people who advise you --

**THE WITNESS:** Correct.

**THE COURT:** -- your staff, they said there's a low

risk of force or violence. That's what you're told. And I think you gave two examples of it, or maybe one. It escapes me at the present time. Forgive me. But that you were told by somebody that the forces should be employed, notwithstanding the risk assessment that you were given. As I understand, that's your testimony.

**THE WITNESS:** Yeah. As part of the risk --

**THE COURT:** Okay.

**THE WITNESS:** -- the request for assistance, the law enforcement still would like military.

**THE COURT:** And who told you -- who told you, in those cases? Who said to you, "General, I know you're the commander of Task" -- what is it? -- "Task Force 51. I know you're the commander and I know you've received an assessment of no danger, but I'm advising you that I want you, nevertheless, to employ troops"? Who told you that?

**THE WITNESS:** Nobody talked to me directly if you say it that way, for most operations, Your Honor, because it was a request that they sent up. They had gone through the interagency coordination cell, through our personnel there and had come to Task Force 51. The law enforcement was asking for military support.

**THE COURT:** I understand, but the Task -- you say the law enforcement. The law enforcement is local; is that right? When I say "local" --

**THE WITNESS:** No.

**THE COURT:** Pardon me. The law enforcement is non-military that you're referring to?

**THE WITNESS:** Correct. That's correct.

**THE COURT:** So non-military -- non-military people told you that they wanted your -- the military force to be present, notwithstanding the information you got from the military people?

**THE WITNESS:** Correct. That -- well, they were requesting. They didn't tell me. They requested. They were asking for military support. Even if our assessment was low, they had a belief or even if -- even if they thought it was low, it was -- it was a safety measure for them to ensure that if something did happen at that location, they had protection.

**THE COURT:** And, General, wouldn't that always be the case? Whenever -- if it's even a low risk, if the civilian -- what I'm calling the civilian as distinct from the military --

**THE WITNESS:** Yes, sir.

**THE COURT:** -- the civilian may tell you, "You know, we want military just in case" --

**THE WITNESS:** Absolutely.

**THE COURT:** -- "something happens."

**THE WITNESS:** Absolutely, Your Honor. They always wanted military there, and we had plenty of capacity to do that.

**THE COURT:** All right. Okay. I think that answers the question. Thank you, General.

**THE WITNESS:** Yes, Your Honor. Thank you.

**THE COURT:** Anything further?

**MS. LIN:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MS. LIN:** Just a couple more points in relation to what was discussed earlier.

**BY MS. LIN:**

**Q.** I think if I could turn your attention to Exhibit 41 that you were asked questions about.

Do you have it?

**A.** I do.

**Q.** I believe you were asked to read the last paragraph earlier by counsel, and in this paragraph it mentions establishing outer cordon. Do you see that?

**A.** I do.

**Q.** Were Task Force 51 troops permitted to establish outer cordon?

**A.** Well, so you see there where the "End State. Joint federal and military companies," why -- I think it's poorly written, poorly worded. But joint federal and military companies, when they say "federal," they meant joint federal law enforcement and military companies.

In this case, military police companies established the

outer cordons, secured designated sites, enabling safe entry for DEA personnel.

**Q.** And you do not recall this particular operation or did you?

**A.** Oh, no, I know this operation. This is the -- this is the Mecca operation, yes.

**Q.** So to be clear, what were the soldiers trained to do with respect to the ability to establish outer cordons?

**A.** So they were there -- so I think -- so there was a large irrigation ditch, canal, outside this grow operation. So they were actually outside, lined up along the road there, and they got out of their vehicle to watch the operation that was happening inside the -- inside the grow area that was there.

There was only one place that they had a traffic control point, and that was actually a bridge that crossed from the canal over into the grow area. We had soldiers there, but it was run by federal law enforcement. I don't know if it was DEA or not. But federal law enforcement ran that traffic control point.

There was a news crew there. There wasn't any -- they didn't -- they didn't encounter any resistance at all or anything. It was one news crew because they had seen all the vehicles coming down the road because they had come in from March Air Reserve Base. So it was about an hour and a half drive, so there was plenty of people to see them and call.

**Q.** I see. But as far as you know, do you whether law enforcement -- sorry -- whether Task Force 51 troops conducted any law enforcement activities?

**A.** They did not. They didn't -- they just stayed on the outside. They were not needed. They were there to first protect the traffic control point; but if they did encounter -- federal law enforcement encountered resistance inside of this large grow operation, their job was to go in to help them, protect them, break contact, if you will, if they were receiving any kind of fire, and break contact and get them out safely.

**Q.** So, in your view, their activities were consistent with what they were charged to do, which is the federal protection mission?

**A.** That's correct, yeah. They were there to -- they were there strictly to protect federal law enforcement as they did their law enforcement jobs.

**Q.** And just one last question also about the photographs that we were talking about earlier. If I can refer you to Exhibit 69. This is another picture that you were asked questions about.

**A.** Yes.

**Q.** And just -- and this is another photograph I believe --

**A.** I don't think it's up on the screen yet, but...

**Q.** Oh.

**A.** Yes.

**Q.** So you were asked to -- or you were read to -- the caption was read to you, and the second sentence of this caption references establishing a security perimeter in Mecca, California?

**A.** Correct.

**Q.** Is this reference to a security perimeter in Mecca, California, consistent with the federal protection mission that the Task Force 51 troops were charged with carrying out?

**A.** No. Is it a perimeter? It's a perimeter because they have their vehicles lined up right there because they're actually down -- they're lined up on a road that actually -- you see right there in front of them is actually a canal. You can see that little part, which that means nobody could get across -- anybody coming out of the grow operation couldn't get across that canal unless they were swimming.

But they were there, lined up, just watching what was going on inside the actual grow operation itself. They had the vehicles lined up. If they did need to drive in from there, it was just a lot of vehicles. I think over 40 -- 40, 50 vehicles. It was -- you know, precisely it was 314 soldiers. So it was a lot of vehicles, a lot of soldiers there that were lined up on both sides of the traffic control point there. They were outside their vehicles, on alert.

There's another photo in here where you see them talking

on -- there's some leaders talking on a radio. So they were all in contact finding -- you know, just keeping up-to-date what was happening inside the grow operation.

You're talking about, as I understand it, it was -- it was a land that was about 800 acres. It was a very large operation. And, you know, they heard everything going on the radios. There was contact. All the company commanders and above did have radios, so they could hear what law enforcement was talking about.

But -- and we did have intelligence -- I wouldn't call it intelligence. They just had -- law enforcement told us that they had -- they thought that there were people inside this operation, human smuggling, enslavement, if you will. They found I believe it was about 87 Chinese nationals that were handcuffed inside -- inside buildings that were there not on their own free will.

**Q.** Okay. So, to your knowledge, though, looking at this photograph, it does not -- does it indicate to you whether this is consistent with the federal protection mission?

**A.** Yeah, with what this operation was because there was just one small little area they could actually get across the canal into the grow operation. Yes, this was consistent.

Were they doing a cordon here? No. They were lined up, ready to go if they needed to get called in. They just happened to be lined up that way.

**MS. LIN:** I have no further questions, Your Honor, but we do have General Sherman as our case-in-chief tomorrow.

**THE COURT:** Yes. However, I assume the testimony he will give tomorrow will not be cumulative to what he gave today.

**MS. LIN:** We'll certainly attempt to do that other than to bring in the topic or the background.

**THE COURT:** I'll aid you in that endeavor, I promise.

**MS. LIN:** We appreciate that, Your Honor.

**THE COURT:** Okay. All right.

You may cross.

**MS. REILLEY:** Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. REILLEY:**

**Q.** Major General Sherman, you were not present when Sergeant Murray took any of the photographs that were published to the DVIDS website; correct?

**A.** I was not.

**Q.** All right. And so you don't have any information about where Sergeant Murray was standing relative to the troops when he took those photographs?

**A.** No, I wouldn't say that. Did I know his directions that he was given by the public affairs officer of Task Force 51 to make sure that he got soldiers -- or he got pictures of soldiers? I know that for a fact because I was -- I was, like,

"Where are the pictures of soldiers? We need pictures of them doing their duty."

**Q.** So you know what the instructions he was given were, but you don't know physically where he was standing when he took the photographs; correct?

**A.** No, I don't. I could make an assumption, but I don't know.

**Q.** You testified a moment ago that Task Force 51 troops never used their batons to hit during the deployment, but you were not present during any of the field operations; correct?

**A.** That's correct.

**Q.** And you do not know if batons were used for any other purpose, such as to block pedestrian foot traffic; correct?

**A.** There was no report ever brought up to me on that.

**Q.** All right. Again, you weren't present on those operations, so unless a report was brought to you, you would not have heard about it; correct?

**A.** Correct.

**Q.** You testified a moment ago about Exhibit 38, which was the briefing from the Long Beach operation, and you testified that law enforcement was in the lead on that operation. Do you recall that testimony?

**A.** I do.

**Q.** You were not present at that operation; correct?

**A.** I was not.

**Q.** And you testified earlier today that you did not receive any briefing after that operation; correct?
**A.** I did not.
**Q.** So you do not know for a fact that the troops did actually stay behind federal law enforcement agents during that operation; correct?
**A.** That is correct.
**Q.** And you also don't know for a fact that the individual who drafted that report is 23 years of age; correct?
**A.** He's a young second lieutenant, so he could be -- I don't know his exact age, but he's young. I remember him. He's a very young officer.
**Q.** And you testified with Ms. Lin a moment ago that there are constitutional exceptions to the Posse Comitatus Act; is that your understanding?
**A.** That's what we've been trained, yes, with the standard rules on the use of force briefing, correct.
**Q.** And, again, you're not a lawyer; correct?
**A.** That is correct, I'm not a lawyer.
**Q.** So you could not point me to the portion of the Constitution that sets forth the exception you've been testifying about today; correct?
**A.** I cannot.
**Q.** And you testified about the training slides that Task Force 51 reviewed. That was Exhibit 10. Those slides

were drafted by the staff judge advocate for Task Force 51; correct?

**A.** For, I believe, Army North. Army North did the slides.

**Q.** And that individual who drafted the slides, the staff judge advocate is a lawyer; correct?

**A.** Correct.

**MS. REILLEY:** Plaintiffs do not have any further questions at this time.

**THE COURT:** Thank you.

Anything further?

**MS. LIN:** No, Your Honor.

**THE COURT:** Okay. Thank you very much, General, and you're excused from this portion, but you may remain in the courtroom.

**THE WITNESS:** Thank you, Your Honor.

(Witness excused.)

**THE COURT:** All right. Call your next witness.

**MS. LOPEZ:** Good afternoon, Your Honor. Lorraine Lopez, Deputy Attorney General, for the plaintiffs.

We would like to call Ernesto Santacruz Jr. as our next witness.

**THE COURT:** Okay. And let's see. Yes, please would you bring him in?

(Pause in proceedings.)

**THE COURT:** And is this your third and final witness,

or do you have four?

**MS. LOPEZ:** Yes, Your Honor.

**THE COURT:** Okay. Thank you.

(Pause in proceedings.)

(Witness enters the courtroom and steps forward to be sworn.)

**ERNESTO SANTACRUZ**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

**THE WITNESS:** Yes.

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

Please state your full name for the record and spell your last name.

**THE WITNESS:** Ernesto Santacruz. Last name S-a-n-t-a-c-r-u-z.

**MS. LOPEZ:** Thank you.

**DIRECT EXAMINATION**

**BY MS. LOPEZ:**

**Q.** And nice to see you again, Mr. Santacruz.

You are currently employed by U.S. Immigration and Customs Enforcement; correct?

**A.** That is correct.

**Q.** And you are employed in Enforcement and Removal Operations specifically; correct?

**A.** Yes, that is correct.

**Q.** And that is sometimes referred to as ERO; correct?

**A.** That is correct.
**Q.** And ICE is a U.S. federal law enforcement agency; correct?
**A.** That is correct.
**Q.** And it is overseen by the Department of Homeland Security?
**A.** That is correct.
**Q.** You previously provided two separate declarations in support of the defendants' case; correct?
**A.** I provided three. You're talking about for this specific case?
**Q.** For this specific case.
**A.** I believe it was three.
**Q.** And when you say "three," do you mean your two declarations and a deposition?
**A.** I provided the initial declaration and I believe it was two supplementals.
**Q.** Okay. And you also had a deposition in this case; correct?
**A.** That is correct.
**Q.** Okay. And that occurred on July 24th, 2025?
**A.** I don't recall exactly the date. I'm sorry.
**Q.** It's okay. However, since then, you have had an opportunity to review your testimony; correct?
**A.** Yes, I have.
**Q.** Okay. And, to your knowledge, no changes have been made to the substance of your testimony; correct?

**A.** I think there were just a few minor changes that were made on there, if I remember correctly.

**Q.** Thank you.

And you are currently the field office director for Enforcement and Removal Operations in Los Angeles; correct?

**A.** That is correct.

**Q.** And you've been in this position since April 6, 2025?

**A.** That is correct.

**Q.** You've held several other positions at ICE and its predecessor, Immigration and Naturalization Services, since 2002; correct?

**A.** Yes, that is correct.

**Q.** Okay. And you were previously the deputy field office director for Enforcement and Removal Operations in L.A.?

**A.** Yes.

**Q.** You were the assistant or acting assistant field office director for Enforcement and Removal Operations?

**A.** Yes.

**Q.** You were also a supervisory detention and deportation officer?

**A.** Yes.

**Q.** And you were also a deportation officer in Los Angeles?

**A.** Yes.

**Q.** And you were an immigration enforcement agency [sic] also in Los Angeles?

**A.** Can you repeat that? I'm sorry.
**Q.** You were also an immigration enforcement agent in Los Angeles?
**A.** Yes.
**Q.** And you were a detention enforcement officer for INS?
**A.** Yes.
**Q.** So overall, you've had approximately how many years of experience?
**A.** With?
**Q.** With ICE.
**A.** This current agency?
**Q.** Yes.
**A.** With this current agency, along with legacy Immigration and Naturalization Service, slightly over 23 years.
**Q.** And you have served in the military; correct?
**A.** That is correct.
**Q.** And you served in the U.S. Army?
**A.** That is correct.
**Q.** How long did you serve for?
**A.** Three years.
**Q.** And what was the highest rank you held?
**A.** E4, specialist.
**Q.** All right. Enforcement and Removal Operations is a unit of U.S. Immigration and Customs Enforcement; correct?
**A.** Correct.

**Q.** And you are familiar with Homeland Security Investigations, also referred to as HSI; correct?
**A.** That is correct.
**Q.** Okay. Are they also a unit of Immigration and Customs Enforcement?
**A.** Yes.
**Q.** Homeland Security Investigations also engages in immigration-related law enforcement?
**A.** Yes.
**Q.** Los Angeles Enforcement and Removal Operations is responsible for immigration enforcement within a specific region; correct?
**A.** That is correct.
**Q.** And that is referred to as Enforcement and Removal Operations area of responsibility; correct?
**A.** Can you repeat that one more time, please.
**Q.** This is referred to as Enforcement and Removal Operations area of responsibility?
**A.** Area of responsibility is just an area that a specific field office covers. Enforcement and Removal Operations is an agency that deals with enforcing the immigration laws within the interior of the United States.
**Q.** So the area of responsibility for your office encompasses the Central District of California; correct?
**A.** Yes, that is correct.

**Q.** And that is an area of 36,000 square miles?
**A.** Approximately, yes.
**Q.** And it includes seven counties; correct?
**A.** That is correct.
**Q.** It includes San Luis Obispo County?
**A.** Yes.
**Q.** Ventura County?
**A.** Yes.
**Q.** Santa Barbara County?
**A.** Yes.
**Q.** San Bernardino County?
**A.** Yes.
**Q.** Riverside County?
**A.** Yes.
**Q.** Los Angeles County?
**A.** Yes.
**Q.** And Orange County; correct?
**A.** Correct.
**Q.** Okay. You also oversee suboffices in San Bernardino, Camarillo, and Santa Ana; correct?
**A.** Correct.
**Q.** And you oversee just over 500 personnel?
**A.** No. It's approximately --
**Q.** Oh, sorry. Just under 500 personnel?
**A.** Yes.

**Q.** And you oversee two detention centers as well?
**A.** Correct.
**Q.** And both of those are in Adelanto?
**A.** That is correct.
**Q.** As part of your responsibilities as Los Angeles field office director, you oversee all Enforcement and Removal Operations immigration enforcement actions that take place in the area of responsibility; correct?
**A.** In the Central District, yes, that is correct.
**Q.** And your office is in Los Angeles?
**A.** Yes.
**Q.** As the field office director, you are kept informed of all Enforcement and Removal Operations immigration enforcement operations taking place in the area of responsibility; correct?
**A.** Correct.
**Q.** And that includes being informed of joint operations with other federal law enforcement agencies even if Enforcement and Removal Operations isn't the lead agency; correct?
**A.** I have some knowledge to it, yes.
**Q.** You were first told on the morning of June 8th, 2025, that the federalized National Guard and Marines would be deployed to Los Angeles; correct?
**A.** That is correct.
**Q.** Okay. And you were first informed by Homeland Security Investigations' counterpart, named John Pasciucco, over

telephone; correct?
**A.** That is correct.
**Q.** You understood that the deployed troops were there to protect federal property or to protect federal officers in the event something went wrong; correct?
**A.** That is correct.
**Q.** The information that you received is that the federalized National Guard and Marines were in Los Angeles to protect federal property and to protect personnel and that was it; correct?
**A.** Initially it was just the National Guard when I was informed.
**Q.** And the Department of Defense did not explain what "protect" means?
**A.** Protect?
**Q.** Yes.
**A.** They did not specify as far as what protection. I know that they mentioned that they were there to protect federal property and federal personnel.
**Q.** And you were not told what the Department of Defense can and cannot do to protect Enforcement and Removal Operations officers; correct?
**A.** Not to my knowledge.
**Q.** And you do not know what the federalized troops did to protect federal officers related to that request; correct?

**A.** That is correct.
**Q.** And you did not witness what the federalized troops actually did to protect federal officers; correct?
**A.** Not personally. I wasn't on the ground to oversee that.
**Q.** ICE Enforcement and Removal Operations request assistance from the federalized National Guard through a request for assistance, known as an RFA; correct?
**A.** Correct.
**Q.** There is required information you must include in these requests; correct?
**A.** That is correct.
**Q.** You had to include the purpose and the need for the protection -- I'm sorry -- for the request?
**A.** Correct.
**Q.** And those requests are submitted to a Department of Defense liaison?
**A.** That is correct.
**Q.** If a request was denied, are you provided with an explanation?
**A.** I have never received any denials from any requests that I personally made.
**Q.** And you personally only submitted two requests for assistance; correct?
**A.** I provided, yes, that is correct, two and then just follow-ups.

**Q.** Okay. And you would be made aware of any request for assistance originating from Enforcement and Removal Operations even if you were not the person submitting the request for assistance; correct?
**A.** Correct.
**Q.** And you do not know how many requests for assistance were submitted by Enforcement and Removal Operations; correct?
**A.** I do not have the number of that.
**Q.** You do not know how many requests for assistance by Enforcement and Removal Operations were granted in total; correct?
**A.** My understanding is the requests that we made -- I'm not sure exactly how many were -- were all granted. I've never received any information of any being denied.
**Q.** Okay. But you don't know the exact number; correct?
**A.** I do not.
**Q.** As the field officer -- sorry -- field director for ICE Enforcement and Removal Operations for this region, you oversee the personnel making the request for assistance; correct?
**A.** Correct.
**Q.** And you also oversee the planning and operations for immigration operations conducted by your office; correct?
**A.** Regarding for ERO? Correct.
**Q.** Yes.
On or about June 8th, 2025, you submitted a request for

assistance to the Department of Defense; correct?
**A.** I don't recall exactly what the date was, but I do recall making requests.
**Q.** Would it refresh your recollection if you took a look at your deposition transcript?
**A.** Yes.
**Q.** Okay. So I'm going to -- there is a binder and it's the third one at the bottom there.
**A.** This one?
**Q.** Yes. And that is Volume 7 -- I'm sorry -- Volume 5, Exhibit 99. So turn -- once you're ready, let me know.
**A.** Can you repeat what --
**Q.** Sure. So you're going to turn to Tab 99.
**THE COURT:** What page?
**MS. LOPEZ:** The very first page, Your Honor, of Tab 99.
**BY MS. LOPEZ:**
**Q.** All right. So, again, you took this deposition on July 24th. And when you took the deposition, you took an oath; correct?
**A.** Yes.
**Q.** And you took an oath to tell the truth; correct?
**A.** Correct.
**Q.** And since taking your deposition, you reviewed the transcript; correct?

**A.** Correct.

**Q.** And you signed it to show you approved of what was in it; correct?

**A.** Say that one more time.

**Q.** You -- I'm sorry.

You reviewed the transcript and signed it to show that you approved of what was in it; correct?

**A.** Correct.

**Q.** All right. Okay. So now if you can turn -- apologies.

Okay. If you can turn to page 27. All right. And starting at line 3, I ask [as read]:

"You are" --

Sorry. You say [as read]:

**"ANSWER:** You are asking specifically for me on what I requested?

**"QUESTION:** Correct, yes. What kind of assistance would ICE be requesting? What would be that process?"

So the question is [as read]:

**"QUESTION:** Correct, yes. What kind of assistance would ICE be requesting? What would be that process?"

**THE COURT:** What is your question?

**MS. LOPEZ:** I'm sorry, Your Honor. I think I have the wrong page on here.

Actually, strike that, Your Honor. That is the wrong citation and wrong page.

Actually, turn to page 149.

**THE COURT:** 149?

**MS. LOPEZ:** Yes.

**THE COURT:** Okay.

**MS. LOPEZ:** Apologies for that.

**BY MS. LOPEZ:**

**Q.** Are you on page 149?

**A.** I'm getting there.

**Q.** Okay. Let me know when you get there.

**A.** (Witness examines document.) Okay.

**Q.** Okay. So if we go to line 7, the question reads [as read]:

"**QUESTION:** Now, as far as the request that you do remember making, you said it was early on. How early on was it?"

And the answer is [as read]:

"**ANSWER:** Shortly after June 8. If not on June 8, shortly after that."

Is what I read accurate?

**A.** That is correct.

**Q.** Okay. Does that refresh your recollection?

**A.** Yes.

**Q.** Okay. So the request for federalized National Guard personnel to protect federal officers conduct -- is for protecting federal officers conducting at-large operations;

correct?

**A.** Correct.

**Q.** And "at-large operations" means Enforcement and Removal Operations everyday routine arrests in the field; correct?

**A.** Correct.

**Q.** This includes immigration raids and arrests of individuals who are not the targets but are apprehended during an operation; correct?

**A.** Well, we don't do immigration raids. We do at-large operations.

**Q.** Does at-large operations sometimes include joint operations with other federal law enforcement agencies?

**A.** Yes.

**THE COURT:** What do you mean "at-large operations"?

**THE WITNESS:** Your Honor, at-large operations means that we are conducting and going after criminal aliens or any individual that has violated immigration law out into the field.

**THE COURT:** So the distinction you draw between an immigration raid, which you say you don't do, and an at-large operation, which you say you do --

**THE WITNESS:** Right.

**THE COURT:** -- is what exactly?

**THE WITNESS:** So a raid would be, in my opinion, somewhere where you would go and just start raiding a certain

location versus you're going after different individuals that you are having some known or idea or intelligence that they are in the country illegal or maybe a certain target. So it's targeted operations where we go after a specific individual.

**THE COURT:** So the defining line between the two types of operations are, in an immigration raid, you don't have information that any individuals who would be subject to that operation are illegal or undocumented aliens, whereas an at-large operation, you have received information of some kind that individuals are undocumented? Is that the -- I'm just trying to figure out the distinction because you said you don't do one; you do another. So I want to make sure I understand what it is that defines the difference between the two.

**THE WITNESS:** No, I understand, Your Honor.

So at-large operations, whether it be targeted enforcement operations, is someone that we do have information on that's either in the country illegally or has a final order of deportation or is in some type of process that an immigration judge has already deemed them unfit to be in the country.

**THE COURT:** Specific information.

**THE WITNESS:** Specific information.

As far as raids, we don't conduct raids. What raids, in my opinion, would be something along the lines if we were just to go to a specific area and just raid a -- let's say, for example, like a worksite enforcement ERO.

**THE COURT:** Pardon me?

**THE WITNESS:** A worksite enforcement, for example, would not be a -- something that ERO does, Enforcement and Removal Operations, because we typically just deal with targeted or at-large operations, is what we've known it to be.

**THE COURT:** Okay. Thank you.

**BY MS. LOPEZ:**

**Q.** So just to be clear, ERO does not conduct raids; correct?

**A.** That is correct.

**Q.** Who does conduct those?

**A.** I don't know anyone who actually conducts raids.

**Q.** And going back to your June 8th request, was that request accepted?

**A.** The one that I personally made, yes.

**Q.** And the same day that the request you made on June 8th was approved, was there a meeting?

**A.** Just so -- to clarify, I'm not exactly sure if it happened on June 8th or shortly after June 8th, but the ones that I did make shortly after were approved. And I didn't get the last part of the question. I'm sorry.

**Q.** Was there a meeting after the one that you believe to have been requested on June 8th? There was a meeting; correct?

**MR. HARTLIEB:** Objection. Vague as to whether there was a meeting.

**THE COURT:** I'm sorry. You say the term "meeting" is

vague?

**MR. HARTLIEB:** Yes, Your Honor.

**THE COURT:** Okay. So can you clarify -- fine.

Can you clarify what you mean by "meeting" in the question? Just be more specific.

**MS. LOPEZ:** Yes.

**BY MS. LOPEZ:**

**Q.** There was a follow-up meeting about the request; correct?

**A.** I don't believe there was a follow-up meeting right there and then. I'm sure there may have been a follow-up meeting the very next day. I can't -- I would defer to DOD if they had any internal meetings on that.

**Q.** So let's go back to your deposition transcript then. So if you can go to page 26, and let me know when you get there.

**A.** (Witness examines document.) Okay.

**Q.** All right. And I'm going to bring your attention to line 7. The question posed was [as read]:

"**QUESTION:** When did you find out the purpose of the deployment to Los Angeles?"

And on line --

**MR. HARTLIEB:** Your Honor, if I may just interject. I'm not sure that we are working on the same deposition transcript. My line 7 on page 26 does not contain that language.

**THE COURT:** Mine does. Well, let's clarify. I mean,

counsel is entitled to --

**MS. LOPEZ:** Yes, Your Honor.

**THE COURT:** -- to have the correct version. Is there another version of the deposition?

**MS. LOPEZ:** So there was a corrected version, Your Honor, and it is labeled --

**THE COURT:** Okay. Let's just take a moment. Everybody get on the same page. And if you'd like, Counsel, you can just stand right next to her and look at it. That's fine.

So it's Exhibit -- Exhibit 99?

**MS. LOPEZ:** Exhibit 99.

**THE COURT:** Page 26, line 7.

**THE WITNESS:** Your Honor? Can I get some water, Your Honor?

**THE COURT:** Pardon me?

**THE WITNESS:** Can I get some water?

**THE COURT:** Oh, absolutely. Help yourself.

**THE WITNESS:** Thank you.

**THE COURT:** It's Hetch Hetchy. It's very good water we have in San Francisco.

**MR. HARTLIEB:** Thank you, Your Honor.

**THE COURT:** It's designer water.

**MR. HARTLIEB:** Thank you for the indulgence. I'm on track.

**THE COURT:** Okay. Question, line 7 [as read]:
"**QUESTION:** When did you find out the purpose of deployment to Los Angeles?"
You were about to give the answer.
**MS. LOPEZ:** Yes.
**BY MS. LOPEZ:**
**Q.** And the answer was [as read]:
"**ANSWER:** I think after the morning, they showed up. In a meeting, we were told that they were going to be here to protect and assist Federal Protective Service and the security of federal property."
What I read, is that accurate?
**A.** Yes.
**Q.** Okay. Thank you.
So at that meeting, you were told the purpose of the deployment; correct?
**A.** Correct.
**Q.** But you were not given full information as to the activities that the National -- the federalized National Guard could engage in to fulfill the request; correct?
**A.** For what specific reason?
**Q.** For -- you were not given information as to the activities that the federalized National Guard could engage in to fulfill your request?
**A.** My personal request for at-large operations?

**Q.** Correct.
**A.** Yes. They were told that they were there to provide protection for the federal officers that were conducting at-large operations.
**Q.** But you were not provided any other information aside from that; correct?
**A.** That is correct.
**Q.** Okay. And troops accompanied your ERO officers on the majority of operations; correct?
**A.** That is correct.
**Q.** Roughly about 75 percent; correct?
**A.** That was an approximate estimate that I gave during my deposition, yes.
**Q.** Thank you.
This was the case up until about four weeks ago; correct?
**A.** In terms of what?
**Q.** In terms of having federalized National Guard troops accompany your ERO officers?
**A.** Approximately, yes.
**Q.** Okay. And at that time, their participation started to decrease in Enforcement and Removal Operations, at-large operations; correct?
**A.** Regarding the National Guard of --
**Q.** The federalized National Guard.
**A.** Yes.

**Q.** So your request for assistance, did that cover all Enforcement and Removal Operations, at-large operations, from the date you made the request up until the time their participation started to decrease?
**A.** No.
**Q.** What time period did the request for assistance cover?
**A.** I'm not sure exactly what period it covered. There was a period there where I took leave; and upon my return from leave, it had already scaled down.
**Q.** To your knowledge, was your personal request for assistance still ongoing before you went on leave?
**A.** Yes, I believe so.
**Q.** And requests for assistance are typically made in advance of each non-at-large Enforcement and Removal Operations operation; correct?
**A.** So just to clarify, any request that I made was for an ongoing period. Any other requests that needed to be made, please keep in mind that there's other federal law enforcement agencies that made their own requests, and I would defer to those specific agencies.
**Q.** And just for continuing questions, I will only be asking you about Enforcement and Removal Operations --
**A.** Okay. Understood.
**Q.** -- requests. Okay?
So going back to your request for assistance for at-large

operations, you do not know what the federalized National Guard did during those operations to provide protection; correct?
**A.** I don't have that firsthand knowledge as I was not on the ground during those daily at-large operations.
**Q.** And you do not know what activities the federalized National Guard engaged in on the ground to protect Enforcement and Removal Operations agents; correct?
**A.** I do not know specifically how they did it.
**Q.** Okay. And you also made a request for assistance for the Adelanto facility; correct?
**A.** That is correct.
**Q.** Okay. And this request was in response to reports of potential protests at the Adelanto facility; correct?
**A.** That is correct.
**Q.** And that request was approved as well?
**A.** Yes, it was.
**Q.** And the protesters didn't yield as expected at the Adelanto facility; correct?
**A.** We did have protesters, but not to the scale where we anticipated.
**Q.** And you don't know what the federalized National Guard troops actually did in response to that request; correct?
**A.** I do not know what they actually did there. I would defer to DOD or FPS, who oversees that portion of protecting federal properties.

**Q.** And you're going to have an opportunity to add anything else you'd like during direct, but for my questions, a lot of this is going to be "yes" or "no." Okay?

**A.** Okay.

**Q.** You have not received any information regarding Department of Defense staff intervening and protecting Enforcement and Removal Operations agents during any request for assistance; correct?

**A.** Intervening?

**Q.** Yes.

**A.** Is that how I understood it?

Okay. I have no reports or any knowledge to that.

**Q.** The federalized troops provide a safety blanket for Enforcement and Removal Operations officers conducting operations; correct?

**A.** Correct.

**Q.** And the federalized National Guard troops served as a quick reaction force during immigration enforcement operations; correct?

**A.** Correct.

**Q.** Prior to the federalized National Guard deployment, a quick reaction force to provide protections for Enforcement and Removal Operations agents was staffed with your own personnel; correct?

**A.** It depends on what type of operation we were conducting.

**Q.** And it also depended on whether you had the capacity; correct?

**A.** Correct, depending on the specific operation that we were conducting.

**Q.** In that case, a quick reaction force could be anybody; correct?

**A.** It can be anybody, yes.

**Q.** And you do not know what the quick reaction force engages in because you were not on the ground during enforcement operations during the National Guard deployment; correct?

**A.** Specifically to National Guard?

**Q.** Yes.

**A.** They were there to protect federal officers and federal property.

**Q.** But you do not know the specifics of what they were doing during those deployments; correct?

**A.** No. As I mentioned before, I was not on the ground.

**Q.** Having the federalized National Guard serve in this role was helpful to Enforcement and Removal Operations; correct?

**A.** Correct.

**Q.** And it helped to ensure that Enforcement and Removal Operations were not impeded by the public or protests; correct?

**A.** Correct.

**Q.** And it helped your Enforcement and Removal Operations officers to be able to conduct -- or make arrests without

having the public or anyone else hinder or impede or assault them during at-large operations; correct?

**A.** That is correct.

**Q.** Okay. And having their presence out there in the event of something happening, allowing your officers to safely conduct their work without having to worry about protesters, violent protesters, that might impede their ability to effect an arrest while conducting at-large operations; correct?

**A.** That is correct.

**Q.** Having the federalized National Guard present during operations at large was a huge deterrent to the public; correct?

**A.** Yes.

**Q.** The mere presence of the federalized National Guard could be a deterrent to members of the public considering hindering an arrest; correct?

**A.** Correct.

**Q.** At this time, I would like to reintroduce what has been previously admitted and marked as Exhibit 53. So if you can go to Volume 3 of the binders.

**THE COURT:** 53?

**MS. LOPEZ:** Yes, Your Honor.

(Pause in proceedings.)

**MS. LOPEZ:** And we will be displaying that document shortly.

**BY MS. LOPEZ:**

**Q.** So you're going to go to Tab 53.

**A.** (Witness examines document.)

**Q.** Okay. And you see the photo on the page there?

**A.** Yes.

**Q.** You've seen this photograph before; correct?

**A.** Yes.

**Q.** In the photo on the right side of the two individuals in camouflage, they look like they're protecting the officers conducting the arrest; correct?

**A.** Based on this photo that I have in front of me, it looks like they're standing and looking at something that is out of my view, to the right side.

**Q.** But they do look like they're protecting the officers conducting the arrest; right?

**A.** I would say so, yes.

**Q.** And based on what you see, the way these two individuals were standing in front of that officer, that would be considered a contingent perimeter; correct?

**A.** A contingent perimeter? It's hard to say what it is just based on this photo. I have a very narrow scope of what I have in front of me. It's hard to see what's to the left or to the right. If they're just -- if there's no one on the right side of them in front of them, then they would just be kind of just posting versus if there was a group of folks that were looking,

then at that point then it would be some type of protection from those folks from intervening or any potential bad actors.

**Q.** So, again, we did discuss this at your deposition, so let's go back to Exhibit 99.

**A.** Tab 99?

**Q.** Tab 99, yes.

**THE COURT:** Page?

**MS. LOPEZ:** Page 73. Thank you, Your Honor.

**THE COURT:** 73?

**MS. LOPEZ:** Page 73.

**BY MS. LOPEZ:**

**Q.** Let me know when you get there.

**A.** Is that in the other book?

**Q.** Yes. That's in Volume 5.

**A.** What page again? I'm sorry.

**Q.** Page 73.

**A.** (Witness examines document.) Okay.

**Q.** All right. So I'm going to take you down to line --

**THE COURT:** I think this testimony is consistent with what he said on the stand, isn't it?

**MS. LOPEZ:** It is somewhat consistent, Your Honor.

**THE COURT:** I don't think it's inconsistent.

Okay. Move on.

**MS. LOPEZ:** We'll move on then, Your Honor. Thank you.

**BY MS. LOPEZ:**

**Q.** And as you just mentioned, if there was a threat on the other side of the camouflaged individuals, you would expect these camouflaged individuals to protect the ICE officers; correct?

**A.** That is correct.

**Q.** And you have not received any reports from your Enforcement and Removal Operations officers about instances where the federalized National Guard intervened to protect them; correct?

**A.** No, I did not.

**Q.** Enforcement and Removal Operations agents wear uniforms; correct?

**A.** Repeat that one more time. I'm sorry.

**Q.** Enforcement and Removal Operations agents wear uniforms; correct?

**A.** Not necessarily.

**Q.** What do you mean by "not necessarily"?

**A.** So the only uniforms that we do have involve our special response team. All of our other agents -- excuse me -- are plainclothes, plainclothes agents.

**Q.** And the special response team, these agents wear camouflage uniforms?

**A.** That is correct.

**Q.** And the special response team for Enforcement and Removal

Operations are not the only law enforcement agency with a camouflage uniform; correct?

**A.** That is correct.

**Q.** Other federal law enforcement agencies also have camouflage uniforms; correct?

**A.** Correct.

**Q.** And these camouflage uniforms are similar to the camouflage for military uniforms; correct?

**A.** Correct.

**Q.** Enforcement and Removal Operations special response team wears a brownish-greenish camouflage uniform; correct?

**A.** Correct.

**Q.** And the military wears a green or a multicamouflage uniform; correct?

**A.** Correct.

**Q.** And you have knowledge of the different types of uniforms as well because of your previous military service; correct?

**A.** Correct.

**Q.** So you know what identifying features to look for on a military uniform; correct?

**A.** Correct.

**Q.** For example, you know how to look for patches; correct?

**A.** Correct.

**Q.** And someone without knowledge of the different types of military and law enforcement uniforms wouldn't be able to

differentiate between the two; correct?
**A.** I could only speculate, but I know what I know as far as how to be able to identify that.
**Q.** How -- or even for someone like you, who has experience, it's not easy to tell who is military and who isn't without being up close and personal to see patches; correct?
**A.** That is correct.
**Q.** So at this time, I'd like to reintroduce Exhibit 54, which has previously been admitted as Exhibit 54. So you're going to go back to Volume 3.
**A.** (Witness examines document.)
**Q.** Ready?
**A.** Yes.
**Q.** Tab 54.
Okay. And for the record, again, this is a photo from the U.S. Immigration and Custom Enforcement's X account dated June 10th, 2025, at 11:56 a.m.
You've seen this photo before; correct?
**A.** That is correct.
**Q.** And from this photo, given that they have similar uniforms, you cannot tell who is military and who is federal law enforcement; correct?
**A.** Well, I can tell that this person right in front of us -- or in front of the picture is DEA. It's hard to make out the person in the back, who that actually is.

**Q.** And the person in the back, just for the record, is wearing camouflage; correct?
**A.** Based on this, in the book picture, yes.
**Q.** And based on that camouflage uniform and in that photo, you cannot tell if that is military or federal law enforcement; correct?
**A.** I cannot.
**Q.** Okay.
All right. So we're going to stick with Volume 3, and if you can go to Tab 92. And this has been previously admitted as Exhibit 92, and this is a photo from Camarillo.
**A.** Okay.
**Q.** You've seen this photo before as well; correct?
**A.** That is correct.
**Q.** Okay. And from this photo, you cannot tell who is military and who is federal law enforcement; correct?
**A.** I can tell who's federal law enforcement on one specific person.
**Q.** And which person is that?
**A.** The person in the center of this photograph.
**Q.** How about the individuals in the back?
**A.** It's hard to tell. I think I mentioned this before. The picture is kind of grainy, and the distance is kind of pushed back, so it's hard to tell who that actually is.
**Q.** And you can't identify any of the patches on those

uniforms; correct?

**A.** I can identify the individual in the front just based on my experience and knowledge that -- who that agency is.

**Q.** But for the individuals in the back, you can't identify any of the patches; correct?

**A.** I can't make them out, no.

**Q.** Okay. And based on this photo, the individuals in the camouflage in the back, they are forming a perimeter; correct?

**A.** It looks like they're standing in a line behind this federal officer, and it looks like a loose perimeter, in my perception, based on my experience.

**Q.** Thank you.

And you heard about the cannabis farm raids in Camarillo and Carpinteria; correct?

**A.** Correct.

**Q.** And Enforcement and Removal Operations was not the lead agency on that operation; correct?

**A.** That is correct.

**Q.** And Enforcement and Removal Operations, although not the lead agency, was one of several federal agencies participating in the operation; correct?

**A.** That is correct.

**Q.** Okay. And in your 23 years of experience with ICE, has the military ever accompanied ICE in a security function on non-border immigration enforcement operations?

**A.** Not that I can recall.

**MS. LOPEZ:** At this time, I have no more questions, Your Honor.

**THE COURT:** Cross or whatever.

**CROSS-EXAMINATION**

**BY MR. HARTLIEB:**

**Q.** Good afternoon. Garry Hartlieb for the defendants. And good afternoon to you, Mr. Santacruz.

I would like to follow up on certain topics that you discussed with opposing counsel just now.

And before we delve into some of those specifics, I'd like to better understand the scope of responsibilities that you held as field office director.

Can you describe what you did and how you kept yourself informed of ERO's personnel and their activities?

**A.** During this specific time?

**Q.** In general, as field office director, how do you supervise 490 personnel?

**A.** Well, our chain of command structure encompasses me as the field office director. I have two deputy field office directors that work right below me. I also have a chief of staff and approximately 12 assistant field office directors. Those assistant field office directors have various responsibilities or portfolios that cover every facet that ERO, Enforcement and Removal Operations, enforces.

I also have approximately -- each of those assistant field office directors have about six or seven first-line supervisors who then oversee the various programs within ERO that cover the seven counties within the Central District of California.

On top of the two detention populations or detention centers that I have regarding detainees, we have two different portfolios that two deputy field office directors oversee, which is -- one portfolio is the enforcement portfolio, and the other portfolio is the detention portfolio.

**Q.** How do you stay apprised of all of the activities encompassed by those portfolios?

**A.** Well, we do have countless meetings. We have daily meetings with my core management staff. We do have weekly meetings. Then we do have -- every month we do have an assistant field office director meeting where everyone comes together and discuss the various topics.

We do have ad hoc meetings where any information or pertinent information that needs to be relayed that comes from the very top or any pivot changes or mission changes, we have discussions, whether it be MS Teams, whether it be phone calls, or whether it be in-person meetings.

**Q.** You mentioned pertinent information. What is the type of pertinent information that comes up to your attention?

**A.** There's various types of information that we receive. Anything from a use-of-force incident, anything from an officer

assault incident, employees getting injured, detainees being injured, the health and welfare of detainees that may go to the hospital. Any -- any type of serious misconduct, various information that we receive, to include any pivot changes or mission changes that may come from our headquarters' component.

**Q.** Do you receive that information only in meetings or also in written reports?

**A.** Written reports. We do have situational reports that we do have. We also have significant incident reports any time, for example, there is an officer assault, any use-of-force incidents, any time a detainee or a law enforcement officer has to go to the hospital for whatever reason, but there's various reports and different type of formats that we receive those in.

**Q.** Did anything about your responsibilities in day-to-day work change after the National Guard was federalized?

**A.** Yes.

**Q.** How did it change?

**A.** It changed more now that we have -- the DOD representative now is something that we had to encompass in terms of making sure that everyone was on the same page, whether it be just coordinating or having discussions regarding the day-to-day activities.

**Q.** You mentioned the DOD representative. Did you work with that representative in a particular place?

**A.** Yes.

**Q.** What was that place?

**A.** It was at the Federal Command Center, the Incident Command Center. It has a lot of terms; right? Incident Command Center, Federal Command Center, and then the Interagency Command Center, but that's where all the different federal heads sat, to include DOD representatives.

**Q.** What is your understanding of what the function of the Interagency Command Center was?

**A.** Well, it's basically a funnel point with all the federal partners that are working together on Immigration Title 8 at-large operations. That's where all the information and that's where all the federal heads sit to discuss any ongoing or any potential operations that come up. And it's -- all the information gets relayed from each component, and from there it gets filtered out to each headquarters component from that point.

**Q.** How specifically did you work with Task Force 51 representatives in the Interagency Command Center?

**A.** Well, as I mentioned previously, I have worked closely with them in the sense of me, personally, I had to make a couple of requests for assistance, and that was for protection of federal property or federal personnel.

**Q.** How would you submit those requests for assistance?

**A.** The ones that I personally made were in person. Since they're in the same room as we were in the command center, I

would have a conversation with the DOD representative and pretty much provide the specifics on what we needed.

**Q.** What type of information would you provide when making requests for assistance?

**A.** So it was basically the who, where, what, and why type of situation. They needed to know what the -- what type of assets were going to be required, what location, when, why. And we would provide that information, and then they ran it up their chain of command.

**Q.** When you made a request for assistance, did you ever request the specific function that members of Task Force 51 were to perform?

**A.** No. It was a general request. It was a request -- for example, when I made the request to provide additional support at the Adelanto facility, we requested personnel to go out there to assist in the protection of that federal property.

**Q.** Now, you said that you didn't make a specific request about the function that Task Force 51 members were to perform. Was there a reason that you didn't specify what those members should be doing?

**A.** Well, from the very beginning, their purpose there was to protect federal property and federal personnel. As far as the policies and procedures regarding that, I would defer to DOD as I am not sure how or what instructions they would be receiving from their chain of command.

**Q.** Did you ever request that Task Force 51 or the National Guard help assist in the performance of ERO's law enforcement functions?
**A.** No.
**Q.** Why not?
**A.** Like I mentioned before, DOD is only there to protect federal personnel or protect federal property.
**Q.** How did you learn that DOD was only protecting personnel or property?
**A.** Early on, that was the discussion that we had in our meeting, is that they were here to protect federal property and federal personnel.
**Q.** And who is the "we" in that last sentence?
**A.** Everyone in that Interagency Command Center.
**Q.** And who was it that communicated that DOD's role would be restricted to protecting federal personnel and property?
**A.** I can't remember exactly who that was. I mean, there were various DOD representatives. It's a -- initially it was a 24-hour operation where there was different folks there.
**Q.** But it was -- is it fair to say that it was a DOD employee that communicated the restriction that DOD was there --
**A.** That's correct.
**Q.** -- to protect?
Okay. What would happen after you submitted a request for assistance?

**A.** I could only assume that they -- the DOD would send it up their chain of command.
**Q.** Do you have any visibility into how DOD evaluated your request?
**A.** I do not.
**Q.** I want to talk about a couple of the specific requests that were discussed that you made. How many requests did you personally make to Task Force 51?
**A.** I believe I made two requests that also required follow-up requests.
**Q.** What was the first request that you made?
**A.** I believe the first one that I made was for additional personnel to be assigned to at-large teams that were conducting field operations for protection of federal officers due to the increase in, spike of officer assaults.
**Q.** And what was the second request?
**A.** The second request was when we received information that they were -- there was going to be a potential large protest at one of our detention facilities, at the Adelanto detention facility. We requested additional DOD personnel to assist and protect the federal property.
**Q.** With respect to at-large operations, did you ever request that DOD execute arrests on behalf ERO?
**A.** No, I did not.
**Q.** With respect to at-large missions, did you ever request

that DOD assist with detentions?

**A.** No, I did not.

**Q.** With respect to at-large missions, did you ever request that DOD execute search warrants?

**A.** No, I did not.

**Q.** Do you have a general understanding of what Task Force was doing to assist on at-large operations?

**A.** I was not there, present on the ground. As a field office director, I was in the command center. So I have no knowledge of how each team operated independently within those specific DOD teams that were assigned to them.

**Q.** Well, let me ask it this way: Do you know if DHS and Task Force 51 were performing the same functions with respect to your requests for assistance?

**A.** They were not performing the same functions.

**Q.** How were they different?

**A.** Well, the federal officers that have Title 8 authority have arrest powers to arrest individuals that are here, you know, breaking the immigration laws or having some type of immigration order. DOD is only here to protect federal property and only to protect federal personnel.

**Q.** In terms of these at-large operations, would DHS and Task Force 51 personnel ride in the same vehicles?

**A.** No, they do not.

**Q.** Do you recall prior questioning by plaintiffs' counsel

about deterrence?

**A.** Can you repeat that one more time? I'm sorry.

**Q.** Do you recall a question about the presence of the National Guard having a deterrent effect?

**A.** Yes.

**Q.** When you made the statement that having the National Guard provided a deterrent effect, who was being deterred?

**A.** I would say any potential bad actors out there that previously, prior to them showing up, ended up becoming violent in the sense where they started assaulting federal officers by, you know, throwing projectiles to our folks that were there to protect the buildings.

**Q.** When you submitted your requests for assistance, did you ever have an intent that Task Force 51 would deter lawful actors and citizens and members of the public from lawful activity?

**A.** What I was looking for was for -- to protect our -- my officers that were out conducting operations, because due to the increase of vehicle -- officer assaults that we were -- the frequency was so high at that time, and we needed to protect our workforce to continue to do their, you know, ERO mission. So my whole purpose was to protect -- provide protection for the folks that are conducting that work.

**Q.** You mentioned officer assaults. How frequently would you receive reports of officer assaults on at-large missions in

early June 2025, prior to the federalization of the National Guard?

**A.** Daily, multiple times a day, we would receive officer assault reports.

**Q.** Did the frequency with which you received those reports of officer assaults change after Task Force 51 began providing protection on at-large missions?

**A.** We still had officer assault situations, but they did reduce drastically after DOD were assigned to our teams.

**Q.** Now, in lieu of these officer assaults in early June 2025, did you believe ERO was able to carry out its federal functions at an acceptable level?

**A.** They were carrying out their functions, but I would not say that it was at an acceptable level due to the increase of violence towards our federal workforce. We had to pretty much pivot to combat that.

**Q.** Can you give an example of how an at-large operation was interrupted by officer assaults?

**A.** So one that comes off the top of mind is we do have federal partners that work together, ERO and federal partners, whether it be FBI, DEA, Marshals, any of the other federal partners that have Title 8 authority.

We did have an individual that was taken into custody, and the moment the handcuffs were put on him and he was being walked to the vehicle, members of the public, they pretty much

got outnumbered to the point where they ended up pulling the individual from the officers' grasp and they got overran. They became too dangerous, to where the public ended up helping the individual escape in handcuffs.

And the officers, due to the safety factor, had to vacate the scene because there was just an overwhelming presence of folks that were impeding not only their exit to leave in vehicles, but also affecting their ability to make arrests.

**Q.** Was that interference a factor in your decision to submit a request for assistance?

**A.** That was one of many instances that, yeah, a decision is that we needed to do something to help our workforce conduct its operations.

**Q.** Are you aware of any interference with your federal functions at federal property or federal buildings?

**A.** Yes.

**Q.** Please describe what comes to mind.

**A.** Well, early on, prior to DOD or after?

**Q.** Prior to the deployment of Task Force 51.

**A.** So prior to their arrival on June 6, for example, after that worksite enforcement that HSI, Homeland Security Investigations, conducted on June 6, that evening, later on at the Roybal Federal Complex, which also encompasses MDCLA, Metropolitan Detention Center there in Los Angeles, with the Federal Bureau of Prisons and the Federal Building, 300 North

Los Angeles, it's a three-building complex there where we had approximately 1500 protesters that late afternoon, and it became violent and they became -- they started assaulting the Federal Protective Service there.

That impeded our ability to be able to go in and out of that federal complex. And keep in mind it's not just ICE, ERO that's in that. You're talking about a federal building that has over 29 tenants there that could not safely vacate that premises on a Friday.

**Q.** So prior to the federalization of the National Guard, did you ever develop plans on how to address your concerns of officer safety?

**A.** In regards to?

**Q.** In general, did you ever take any action to try to address concerns about officer assaults or officer safety with respect to at-large missions before the National Guard was federalized?

**A.** So, yes. So we had to pivot and we had to pretty much condense teams to have a larger footprint, but that impacted obviously our ability to conduct our missions.

**Q.** How did it impact your ability to conduct missions?

**A.** Well, because we had to condense teams, collapse teams into other teams to have a larger footprint due to the spike of assaults on federal officers.

So that meant that if we had a certain amount of locations that we were conducting at-large operations, that it had to be

minimized or scaled down just so we wouldn't sacrifice officer safety.

**Q.** After the National Guard was federalized in California, did you pursue other plans to address your concerns of officer safety?

**A.** Other plans? So, I mean, yeah, when they got federalized, that's when I made that request. In a sense, we had that additional resources. I requested to have the National Guard assigned to our at-large teams to help out as a QRF, as a Quick Reaction Force, in the event of any potential assaults on federal officers.

**Q.** So now thinking of after the National Guard has been federalized and at-large missions, are you aware of any safety threats to DHS personnel after that time period?

**A.** After that time period, it minimized it just because we knew -- or the officers also knew that they had a force multiplier out there; and just having their mere -- their mere presence out there, it was definitely a deterring factor for any potential bad actors that maybe in the past did act in a violent way but would definitely think twice having that additional support.

But not only that, it also was a huge relief for our workforce, knowing that they're not going to get blindsided if they are effecting an arrest and have someone, you know, necessarily intervene or try to assault them or impede their

ability to take someone into custody.

**Q.** I want to focus your attention specifically on the Camarillo operation. Are you familiar with that operation?

**A.** Yes, I am.

**Q.** Do you have a belief about whether there were any safety threats to officers on that operation?

**A.** There was actually some safety threats that I obviously -- a lot of that was televised live. Even though I was not on the ground personally, but I did see some threats towards federal officers.

**Q.** What did you see?

**MS. LOPEZ:** Objection. Speculation.

**THE COURT:** Let's take a break now. My court reporter has asked for it. So we will resume at 3:15. Resume at ten after 3:00.

(Recess taken at 2:53 p.m.)

(Proceedings resumed at 3:10 p.m.)

**THE COURT:** Let the record show all parties are present.

You may continue.

**MR. HARTLIEB:** Thank you, Your Honor. Again, Garry Hartlieb on behalf of the Department of Justice, United States Department of Justice.

**BY MR. HARTLIEB:**

**Q.** So, Mr. Santacruz, before we took a break, we were

beginning to talk about Camarillo. Are you familiar with the DHS operation in Camarillo, California?

**A.** Yes.

**Q.** Were you personally present at that operation?

**A.** I was not.

**Q.** How did you learn about the Camarillo operation?

**A.** We had discussions about it.

**Q.** Were those discussions before or afterwards?

**A.** Before.

**Q.** Did you receive any reports afterwards that described the Camarillo operation?

**A.** Yes.

**Q.** Was there any other way in which you learned about the Camarillo operation outside of your conversations and your reports?

**A.** No. It would be just basically after-action reports that were generated after the fact. We also did discuss it in meetings as well after.

**Q.** Did you watch anything about the operation on the television?

**A.** Yes.

**Q.** So that would be an additional way in which you --

**A.** An additional way, yes.

**Q.** -- you learned about it?

Do you have a belief about whether there were any safety

threats to officers of DHS and ERO at that operation?

**A.** There was.

**MS. LOPEZ:** Objection. Speculation.

**THE COURT:** Overruled.

**MR. HARTLIEB:** So I'll reask that question.

**BY MR. HARTLIEB:**

**Q.** Do you have a belief about whether there were any safety threats to officers at that operation?

**A.** There was.

**Q.** And to confirm, was ERO present at the Camarillo operation?

**A.** So we did have ERO presence there.

**Q.** What was the nature of the safety threats that were present at that operation?

**A.** So once the crowd started forming around the area of the operation, we had members of the public who were there and became violent. We had a lot of officers that were out there, especially transportation vans, that were assaulted by members of the public with projectiles, rocks, to include vans that actually carried detainees; and they were smashing the windows, throwing rocks at the security element that was there, to include -- we did witness, because we were watching it live from the command center, that was what was happening on the ground, where individuals were pretty much conducting deadly force situations on our federal officers.

**Q.** What do you mean by conducting deadly force situations on your officers?
**A.** So there was an individual there that actually had a weapon that appeared to look like he was shooting in the direction of our officers.
**Q.** How would gunshots during an operation impact your officers' ability to carry out their federal functions?
**A.** Well, you're talking about deadly force at that point; right? That's the worst possible threat that you can think of as a law enforcement officer, is being shot by someone. So it weighs heavily on the security of officer safety and the security of the operation.
**Q.** Notwithstanding the existence of these safety threats at Camarillo, are you aware of the National Guard ever taking any law enforcement activities in response?
**A.** I was not there on the ground to know exactly what the National Guard did. I would defer to the DOD. I know that they were there simply to -- they were assigned as a QRF, Quick Reaction Force, for that specific deployment, but I would defer to HSI.
**Q.** Now, you said that they were assigned as a QRF. Does that mean that they were assigned as security and intended to be at the operation in advance?
**A.** All I know is that they were assigned to play the role of a QRF. I would -- like I said, I would defer to DOD and HSI.

I was not part of those discussions, as far as specific roles, other than the QRF.

**Q.** Is the assignment of a QRF different from general provision of protection on the at-large missions?

**A.** So almost the same concept in the sense that if something were to go in the wrong way, assaults on our officers or whatnot, but their role was there to protect federal officers.

**Q.** Staying on the topic of Camarillo, you were asked some questions about whether certain photographs looked like they depicted a perimeter. Do you recall that?

**A.** Yes.

**Q.** When you answered those questions generally, was that based on your personal knowledge and opinion or something else?

**A.** My personal knowledge and opinion.

**Q.** Do you know how Task Force 51 understands or defines the term "perimeter"?

**A.** I do not. I don't know their policies and procedures. I would defer to the DOD.

**Q.** With respect to the photographs at Camarillo that you were shown, do you know what was happening outside of the frames of any of the photographs that you looked at?

**A.** I do not. I've been -- I was shown various photos regarding that -- that operation, and it was hard to -- I only had a snapshot of what was in front of me, so it's hard to tell without seeing the whole scope or the layout of what was

actually going on.

**Q.** With respect to those pictures that appeared to show certain people in uniform in a line, do you know what any of those uniformed personnel were doing?

**A.** I was shown various pictures. To be specific as far as what they were doing, it's hard to tell. If they were standing in a line, that could have been a loose perimeter. But without seeing the whole scope and seeing what's in front or behind them, what's taking place, what does the perimeter consist of, it's hard to tell.

**Q.** Do you know why Task Force 51 members of the National Guard were present at Camarillo?

**A.** Well, like I said, I was not there on the ground to know why or how they ended up at -- if they were there, but I know that they were a Quick Reaction Force and called upon if needed.

**Q.** Do you recall a question earlier about the percent of at-large operations for ERO that had Task Force 51 support?

**A.** Yes.

**Q.** So when you testified that the National Guard assisted on 75 percent of at-large operations, was that opinion based on specific facts and data, or how did you come up with it?

**A.** It was a -- because if I remember that question, I said I'd be widely guessing, you know, what that percentage was. And I believe they -- plaintiffs' counsel said, "Would

75 percent sound accurate?" And based on everything in my experience and the amount of folks that were assigned to some of the at-large teams, which wasn't all of them, 75 percent seemed about accurate.

**Q.** Has that number changed since you testified that the National Guard was assisting on 75 percent of ERO's at-large operations?

**A.** Yes, it has.

**Q.** What is that number today?

**A.** It's zero.

**Q.** When did that number change?

**A.** That number had to have -- it's hard to say when that number changed. I know -- like I mentioned earlier, I was on annual leave, and that number had to change somewhere between that time frame where I was on annual leave.

**Q.** When were you on annual leave?

**A.** I took annual leave from June 28th until July 7th. So when I returned, that number had already decreased.

**Q.** So by July 7th, the 75 percent number was already decreasing?

**A.** Yes.

**Q.** Now, I asked you questions earlier about the specifics of your requests for support on the front end. What I want to ask about now is, thinking to all of the at-large operations where ERO received Task Force 51 support, did you ever receive

after-action reports of what actually happened on those at-large missions?

**A.** Not for every at-large mission. Keep in mind that we have quite a few at-large missions going on at the same time, multiple teams out there. Each team has multiple locations that they were targeting. The only thing that I would get were, like, anything that needed to be reported up.

**Q.** And can you clarify what types of things would need to be reported up?

**A.** So, for example, and I think I mentioned this earlier, on daily reports that show up would be the amount of teams that are currently out in the field, how many arrests were conducted, what federal agencies assisted or were involved, to include DOD and the number of personnel for each specific team.

**Q.** Of those reports that you reviewed, did you ever come to know that Task Force 51 was carrying out any of ERO's law enforcement operations?

**A.** They were not carrying out our operations. They were just assigned.

**Q.** Based on those reports that you reviewed, did you ever see any indication that Task Force 51 members committed arrests?

**A.** No, they did not.

**Q.** Based on those reports that you reviewed, did you ever see that Task Force 51 members had committed any searches or seizures?

**A.** No, I did not.
**Q.** Mr. Santacruz, you are testifying here today based on your personal knowledge and the information that you've learned in connection with your role; correct?
**A.** That is correct.
**Q.** Are you presently employed by the military?
**A.** No, I'm not.
**Q.** Do you have any awareness of what the military's restrictions are on Task Force 51 members who assist DHS operations?
**A.** I don't know the specifics of those, what their orders are. I know that they're just here to protect federal property and to protect federal personnel.
**Q.** So do you have any specific knowledge of what instructions Task Force 51 members may have received about what they can and cannot do?
**A.** No, I have no knowledge of what their chain of command instructed them to do.
**Q.** Do you have any knowledge of what the Posse Comitatus Act allows or prohibits?
**A.** I do not.
**Q.** Do you know what DOD has instructed military members with respect to the Posse Comitatus Act?
**A.** I do not.
**Q.** Thinking of your entire involvement now with

Task Force 51, who had the authority to decide what activities DOD would permit its forces to conduct on a prospective operation?

**A.** I can't speak for DOD as far as what they were told. Like I stated before, the only information that we received, federal partners, they're there to protect federal personnel and federal property.

**Q.** Thinking to your entire involvement with Task Force 51, did DHS or DOD control the activities of what DOD forces actually did in assistance of at-large operations?

**A.** No.

**Q.** Let me rephrase the question. Which entity -- between DHS and DOD or some other entity, which entity controlled the activities of Task Force 51?

**A.** Well, the only ones -- I could speak for ERO. I'm the only one and some of my folks that may have made requests for the assistance of the at-large teams, for them to go out as a QRF, to include the federal property. So that was the only general ask that we made.

Now, as far as how their chain of command relayed that information to its soldiers, I would not have any knowledge of that.

**Q.** So I wanted to clarify that a little bit.

ERO did or did not control the activities of Task Force 51?

**A.** Well, to a certain point we only controlled the ask that we -- the general ask to have them come out with our specific teams and to protect federal property, the only instances that I -- the only one that I made, which was at the Adelanto facility. Beyond that, how they do it and how they were directed to do it is not within my scope.

**Q.** Whose scope would it be within?

**A.** That would be under DOD.

**MR. HARTLIEB:** No further questions. Thank you, Mr. Santacruz.

**THE COURT:** Anything further?

**MS. LOPEZ:** Nothing further, Your Honor.

**THE COURT:** Okay. Thank you. You're excused.

**THE WITNESS:** Thank you very much.

(Witness excused.)

**THE COURT:** Okay. Anything further from the plaintiff?

**MS. STRONG:** Nothing further, Your Honor.

**THE COURT:** Plaintiff rests?

**MS. STRONG:** Yes, Your Honor, the plaintiff rests.

**THE COURT:** Okay. So we will proceed tomorrow morning. You have one witness; is that right, who's already testified in this matter?

**MR. HAMILTON:** Yes, Your Honor.

**THE COURT:** Okay. Do you have an estimate as to how

long now, in light of the testimony that he's given and which won't be repeated, his testimony will be?

**MS. LIN:** Your Honor, we are hoping to be very efficient and two to two and a half hours at the maximum.

**THE COURT:** How long?

**MS. LIN:** Two to two and a half hours maximum, but we are going to go through and make sure that we avoid duplicates. So after tonight, maybe the estimate will change.

**THE COURT:** Okay. All right. Well, that would be useful.

So what I want to do is, at the conclusion of your witness's testimony, and assuming you rest at that point, then go into an argument as to the evidentiary aspects of the case. I want to do that tomorrow, reserving till Wednesday morning the legal issues that you've asserted. Okay?

**MS. LIN:** Understood, Your Honor, but can we clarify with plaintiffs that the two witnesses that have already testified today, whether they could be released. That would be Mr. Santacruz and Mr. Harrington.

**THE COURT:** Well, that's up to them. They can -- you can have a discussion as to that. I mean, I -- it may be -- they may or may not want to have an issue as to rebuttal. I have no idea. They haven't heard -- they haven't heard the testimony -- the new testimony of the general. So you can have a discussion. It's whatever you agree to is fine with me, if

you can agree.

And then I will just see you tomorrow morning. We'll start -- let's see. Let's start at 9:30. Yes.

**MS. STRONG:** Your Honor, I just want to clarify --

**THE COURT:** Sure.

**MS. STRONG:** -- to make sure we understand what Your Honor is expecting for tomorrow afternoon versus Wednesday.

So is it Your Honor's expectation that the parties give closing arguments on the evidence presented so far tomorrow afternoon and that then we would then present arguments on the four legal issues you discussed this morning on Wednesday, or is it the reverse?

**THE COURT:** Exactly.

**MS. STRONG:** Okay.

**THE COURT:** That's exactly my --

**MS. STRONG:** Thank you.

**THE COURT:** The only thing is when you say "tomorrow afternoon," we don't know how long the general's testimony is going to be; and once its concluded, I want to move right into the argument. So that means tonight you should prepare whatever you want to say about the evidentiary features of the case.

**MS. LIN:** So, Your Honor, the reason I mentioned Mr. Harrington and Mr. Santacruz is that if there's expectation

that would go longer, so the timing would be affected by that. That's my only point.

**THE COURT:** Well, obviously, if they testify, if they're called back for some rebuttal, if they are, then that changes the timetable.

But, I mean, actually, this is all sort of simple, isn't it? There's nothing complicated about what I've said, is it?

**MS. LIN:** No.

**MS. STRONG:** No, Your Honor.

**THE COURT:** Great.

**MS. STRONG:** I just wanted to clarify: Evidentiary argument first; legal argument to follow. That's how you prefer our process.

**THE COURT:** Exactly.

**MS. STRONG:** Thank you, Your Honor.

**THE COURT:** Okay. Anybody here didn't get that?

**MS. LIN:** We got it, Your Honor, but we'd also like to be heard just a few more minutes today if that's possible.

**THE COURT:** Oh, sure. I've got time. Everybody's got time. Sure.

Okay. Well, anyway, that's where we are right now; and then if somebody wants to say something, please do.

**MR. HAMILTON:** Thanks, Your Honor.

I'm mindful of the fact that the Court --

**THE COURT:** You have to identify yourself for the

record.

**MR. HAMILTON:** I'm sorry, Your Honor. Eric Hamilton for defendants.

**THE COURT:** Sure.

**MR. HAMILTON:** -- mindful of the fact that the Court has set aside time on Wednesday for legal arguments. For the record, we just want to move for judgment as a matter of law under Rule 52(c) now that plaintiffs have closed their case based on the fact that plaintiffs have failed to prove a violation of the Posse Comitatus Act, as well as for all of the threshold defects that we argued in our opposition to the original motion for a preliminary injunction, as well as the supplemental opposition brief that we filed.

**THE COURT:** Great. I'll take that under submission.

**MS. STRONG:** I'm happy to respond to it, Your Honor, but I don't need to if you don't feel the need for a response.

**THE COURT:** Well, I think the federal government is right to raise it, and -- but I'm not going to decide it until we move ahead and see where we are, though it has to be decided on the record that's been adduced so far. In other words, the plaintiff put in their case, so it either succeeds or fails on that motion as of the conclusion of their case. And anything you do after doesn't affect that particular motion; right?

**MR. HAMILTON:** Yes. Yes, Your Honor.

**THE COURT:** That also is not complicated. Okay.

There we go.

Anything else?

**MS. STRONG:** Not from me, Your Honor.

**THE COURT:** So we're hopeful that the IT will all work tomorrow.

**MS. STRONG:** I think --

**THE COURT:** Hopeful. That's sort of an aspirational view.

**MS. STRONG:** I think we owe thanks to your IT Department for that, Your Honor. So thank you for that.

**THE COURT:** Oh, our IT Department is crack. Crack.

Okay. Great. See you all tomorrow. Thank you so much.

(Proceedings adjourned at 3:31 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, August 11, 2025

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter