Steven A. Cash, Esq.
*Pro Hac Vice*
7707 MacArthur Boulevard
Cabin John, MD 20818
212-685-9660
cashs@thesteadystate.org

Jeremy Sugerman, Esq., SBN #146315
Gordon-Creed, Kelley, Holl & Sugerman LLP
50 California Street, 34th Floor
415-421-3100
San Francisco, CA 94111
Sugerman@gkhs.com

## IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS THE GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,<br><br>    Plaintiff,<br><br>vs.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS THE PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; US DEPARTMENT OF DEFENSE,<br><br>    Defendant. | Case No.: 3:25-cv-04870-CRB<br><br><br>AMICUS BRIEF<br>ON BEHALF OF<br>THE STEADY STATE |

**BRIEF OF THE STEADY STATE AS *AMICUS* CURIAE IN SUPPORT OF PLAINTIFFS REGARDING THE DOMESTIC DEPLOYMENT OF THE UNITED STATES MILITARY AND THE ENGAGEMENT OF MILITARY PERSONNEL IN CIVILIAN LAW ENFORCEMENT**

# TABLE OF CONTENTS

Page

I. INTERESTS OF *AMICUS* CURIAE.................................................................5

II. ARGUMENT.....................................................................................................6

    A. The Dangers of Military Intervention to Enforce Domestic Policy............................................................................................6

    B. Domestic Military Deployment to Suppress Civilian Dissent is a Hallmark and Indicator of Authoritarian Rule ...................................13

    C. The Domestic Deployment of Military Forces in Civilian Spaces Can Cause Intimidation and Fear .......................................................17

    D. The Use of Military Force Against Domestic Protest Undermines U.S. Democratic Credibility Abroad .............................19

III. CONCLUSION.............................................................................................19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................. 6

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977) ................................................................. 6

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................. 6

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) (Jackson, J., concurring) ........................................... *passim*

**Statutes**

10 U.S.C. § 12406 ................................................................... 10, 11

National Security Act of 1947, ch. 343, 61 Stat. 495 ................................................. 8

**Other Authorities**

Anne Flaherty, ABC News, https://abcnews.go.com/US/trump-
    merchandise-sold-army-base-presidents-speech-
    now/story?id=122764288) (June 12, 2025) ....................................................... 18

Anne Flaherty & Luke Barr, ABC News,
    https://abcnews.go.com/Politics/dc-wake-troops-deployed-national-
    mall/story?id=124629956 (Aug. 14, 2025, 3:34 PM) ....................................... 12

Donald J. Trump (@realDonaldTrump), Truth Social,
    https://truthsocial.com/@realDonaldTrump/posts/11466435060268
    6558 (June 11, 2025) ....................................................... 18

Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for
    Just., https://www.brennancenter.org/our-work/research-
    reports/posse-comitatus-act-explained (Apr. 27, 2022) ....................................... 10

Katrina Kaufman & Joe Walsh, CBS News,
    https://www.cbsnews.com/news/general-involved-in-trumps-l-a-
    military-deployment-testifies-he-didnt-hear-protests-described-as-
    rebellion-trump/ (Aug. 12, 2025)........................................................... 16

Laurel Rosenhall, Jesus Jiménez, and Hamed Aleaziz, New York
    Times, https://www.nytimes.com/2025/08/14/us/newsom-la-
    immigration-agents.html (August 14, 2025)....................................... 13

Magliocca, *The Untold Story of Robert H. Jackson's Youngstown
    Concurrence*, 50, J of S. Ct. Hist. No. 1 at 8 (2025)............................ 7

*Robert H. Jackson: A Perspective Twenty-Five Years Later*, 44 Albany
    L. Rev. 539 (1980) ............................................................................... 7

Secretary of Transportation Sean Duffy,
    https://x.com/SecDuffy/status/1934659228750188941; (June 16,
    2025 at 1:07 PM) ................................................................................ 15

Trevor Hunnicutt & Nandita Bose, Reuters,
    https://www.reuters.com/world/us/trump-takes-over-dc-police-
    extraordinary-move-deploys-national-guard-capital-2025-08-11/
    (Aug. 11, 2025) ................................................................................... 12

U.S. Const. amend. III........................................................................... 10

U.S. Const. amend. IV .......................................................................... 10

U.S. Const. amend. V............................................................................ 10

U.S. Const. amend. VI .......................................................................... 10

Non-party The Steady State, an unincorporated association, is a non-profit, advocacy organization comprised of more than 325 former senior U.S. government officials who served in positions of responsibility and trust within the Departments of State, Defense, Homeland Security, Justice, and in the Intelligence Community, on Congressional staff, and at other institutions. The Steady State respectfully offers this brief in support of Plaintiffs Governor Gavin Newsom and the State of California.

## I.      INTERESTS OF *AMICUS* CURIAE

The collective careers of *Amicus*' members span decades of service across Republican and Democratic administrations in the Executive, Legislative, and Judicial branches of government. Members have served as ambassadors, foreign service officers, intelligence officers, policy advisors, oversight officials, prosecutors, and senior defense officials. They have dedicated their professional lives to defending American democratic values and the rule of law at home and promoting those values abroad. *Amicus* and its members have extensive experience balancing national security imperatives with the constitutional and legal frameworks that protect individual rights. A key part of the *Amicus* members' training and professional ethos is a deep respect for the rule of law as a constraint on their activities. They understand how crucial oversight and adherence to laws are, and they welcome these constraints to ensure their unique skills are not misused by those in power.

*Amicus*' members have studied, reported on, and confronted the rise of authoritarian regimes across the globe—regimes that frequently misuse military, paramilitary, and intelligence elements to violate the law, suppress lawful dissent, and consolidate power in a political leader. The members of the Steady State have spent most of their careers focused on such threats abroad, dealing with autocracies, dictatorships, and tyrannies, as well as regions that have experienced democratic backsliding into authoritarianism. Members of the Steady State have served in or

worked with the very same military and security elements being deployed in California, and elsewhere in the United States, by the Government. They understand how dangerous these institutions can be when not constrained by the law and directed solely by the whim of a political leader. This gives them a unique perspective that should prove useful to the Court and is relevant to the disposition of this case. *Amicus*, in its submission, details for the Court how perilous it can be to democracy when these institutions are used domestically and outside the bounds of the law and for political purposes.

## II.    ARGUMENT

*Amicus* addresses only the conduct of military personnel during their deployment under the direct control of the Commander in Chief. The deployment of the National Guard or other uniformed armed forces either (a) under the command of state and local authorities, or (b) to provide personnel and technical assistance to state and local authorities are not addressed. Our observations on the deployment of the U.S. military domestically as indicators of authoritarian intent and deterrents to democratic activities relate solely to military forces under presidential control.

### A.    The Dangers of Military Intervention to Enforce Domestic Policy

In evaluating whether President Trump and his Defense Secretary's actions were legal here, this Court's order granting Plaintiff's Motion for Temporary Restraining Order naturally cited to Justice Jackson's renowned concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 649-50 (1952) (Jackson, J., concurring). That opinion was no ordinary concurrence. Unanimous Supreme Court opinions such as *United States v. Nixon*, 418 U.S. 683 (1974) and *Nixon v. Administrator of General Services*, 433 U.S. 425, 443 (1977) later embraced Justice Jackson's *Youngstown* concurrence, and it was expressly declared authoritative in an opinion written by Justice Rehnquist in *Dames & Moore v. Regan*, 453 U.S. 654, 661-62 (1981).

"Justice Jackson's 1952 concurrence in *Youngstown* … is [now considered] the founding constitutional text for separation of powers between Congress and the president," Magliocca, *The Untold Story of Robert H. Jackson's Youngstown Concurrence*, 50 J. of S. Ct. Hist. No. 1 at 8 (2025), and Chief Justice Rehnquist, who had clerked for Justice Jackson when the *Youngstown* concurrence was written, later called the opinion "[a] 'state paper' of the same order as the best of the Federalist Papers, or of John Marshall's opinions for the Court." Rehnquist, *Robert H. Jackson: A Perspective Twenty-Five Years Later*, 44 Albany L. Rev. 539 (1980).

The Steady State's members' collective experiences studying and often spending time in a variety of world environments, over the course of many decades, reveal that authoritarian regimes historically do not rise so often in sudden bursts as much as typically through creeping changes and erosions of democratic protections. In our experience, such losses of civil rights and civil liberties increasingly become difficult to reverse and eventually reach a point of no return. That is the far more typical experience of how authoritarian regimes are born and expand. Because of this, even if certain controversial developments in California had not occurred during the recent course of this litigation, this Court must ultimately focus not only on the potential ends, but also, the means. See *Youngstown*, 343 U.S. at 653 ("I am not alarmed that it would plunge us straightaway into dictatorship, but it is at least a step in that wrong direction.") (Jackson, J., concurring).

The strength of Justice Jackson's separation-of-powers analysis in Youngstown drew not merely from his earlier service as an Assistant Attorney General, Solicitor General, and U.S. Attorney General, but even more profoundly from his post-World War II role as the United States' Chief Prosecutor at the Nuremberg Trials. There, Jackson confronted, face-to-face and in open court, the inner machinery of a regime that had weaponized its military and security apparatus to crush lawful dissent, dismantle institutional constraints, and concentrate power in

the hands of a single leader. This direct encounter with the legal aftermath of authoritarian rule imbued his *Youngstown* concurrence with an urgency and moral clarity few judicial writings have ever matched. His warning that "comprehensive and undefined presidential powers" carry "grave dangers for the country" was informed by the hard proof he presented at Nuremberg that such powers, unchecked, can destroy a constitutional democracy from within. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring).

The Steady State's members have, in their own way, seen many of the same truths. Serving in the national security community created by the National Security Act of 1947, ch. 343, 61 Stat. 495 (codified as amended in scattered sections of 50 U.S.C.), an architecture deliberately designed in the shadow of World War II and tempered in the Cold War, they have worked in the very institutions whose integrity is essential to preserving democratic governance. Like Jackson, their professional lives have brought them into direct contact with regimes that deploy military and security forces to entrench political power, silence dissent, and bypass the rule of law. These experiences—rooted in decades of service as senior U.S. officials, intelligence officers, defense leaders, prosecutors, and diplomats—give *Amicus* a perspective uniquely suited to assist the Court in understanding the perils Jackson warned against and why the constitutional limits he championed remain vital to American democracy today.

In that same concurrence, Jackson emphasized "the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." *Youngstown*, 343 U.S. at 644 (Jackson, J., concurring). This principle—grounded in the lessons of Nuremberg and carried forward in the design of the postwar national security structure—remains a vital safeguard against the misuse of military and security institutions for domestic political purposes. It is through that lens, informed by the experience of those who have served at the highest levels of that very structure, that The Steady State offers

1  this brief in support of Plaintiffs.

2      As Justice Jackson cogently noted, "[t]he purpose of the Constitution was not

3  only to grant power, but to keep it from getting out of hand." *Id.* at 640. Justice

4  Jackson also went out of his way to stress the special risks of a President's military

5  powers being used internally for domestic policies. "Congress has forbidden him to

6  use the army for the purpose of executing general laws except when expressly

7  authorized by the Constitution or by Act of Congress." *Id.* at 644-45. While

8  conceding that "I should indulge the widest latitude of interpretation to sustain his

9  exclusive function to command the instruments of national force, at least when

10 turned against the outside world for the security of our society, … when it is turned

11 inward, not because of rebellion … it should have no such indulgence." *Id.* at 645.

12 And he made it clear that it is up to the Judicial Branch to preserve this distinction.

13 See also *id.* at 642 (Jackson, J., concurring) (warning that "no doctrine that the

14 Court could promulgate would seem to me more sinister and alarming than that a

15 President whose conduct of foreign affairs is so largely uncontrolled … [that he]

16 can vastly enlarge his mastery over the internal affairs of the country").

17      As this Court noted in its June 12, 2025, order granting Plaintiff's Motion for

18 a Temporary Restraining Order, Jackson's *Youngstown* opinion specifically cited to

19 historical "examples from Weimar Germany, the French Republic, and World

20 War II-era Great Britain." ECF 64. In France and Great Britain, he noted,

21 emergency powers given to the Executive in wartime had maintained legislative

22 controls, and such "parliamentary control made emergency powers compatible with

23 freedom." *Youngstown*, 343 U.S. at 652. In Germany, by contrast, despite the new

24 Weimar Constitution being

25

26      …designed to secure her liberties in the Western tradition, … the
   President of the Republic, without concurrence of the Reichstag, was

27   empowered temporarily to suspend any or all individual rights if
   public safety and order were seriously disturbed or endangered." *Id.* at

28

651 (Jackson, J., concurring). These temporal limits on the exercise of such powers proved utterly inadequate to stem the tide: "This proved a temptation to every government … and in 13 years suspension of rights was invoked on more than 250 occasions. Finally, Hitler persuaded President Von Hindenburg to suspend all such rights, and they were never restored." *Id.* at 651 (Jackson, J., concurring).

The Steady State's members' own experiences in the ensuing decades only reinforce and confirm Justice Jackson's strong conclusion that "emergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them." *Id.* at 652 (Jackson, J., concurring).

Justice Jackson stressed "the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy." *Id.* at 644 (Jackson, J., concurring). Consistent with Justice Jackson's analysis in Youngstown, not only is there a necessary separation regarding the utilization of the war power as an instrument of domestic policy; that separation is a foundational tenet of American democracy with its roots in the protections provided by the Third, Fourth, Fifth, and Sixth Amendments and exemplified by the guardrails established by the Posse Comitatus Act which preclude, "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress," military participation in civilian law enforcement.[1]

Congress has, in fact, placed limits on the exercise of those war powers here. Congress, through 10 U.S.C. § 12406, allowed a President to federalize the National Guard only when one of the statute's three enumerated conditions was met. While not getting to the Government's assertion that deployment was necessary to quell "a rebellion against the authority of the Government of the United States," ECF No. 116 at 32; ECF No. 22 at 9, the Court of Appeals for the

---

[1] See Joseph Nunn, *The Posse Comitatus Act Explained*, Brennan Ctr. for Just. (Apr. 27, 2022), https://www.brennancenter.org/our-work/research-reports/posse-comitatus-act-explained.

Ninth Circuit gives great deference to the President's determination that he was "unable with the regular forces to execute the laws of the United States," following, as the Court of Appeals noted, the Government's presentation of evidence of "protestors *interference* with the ability of federal officers to execute the laws." ECF No. 116 at 33 (emphasis added). Similarly, the Posse Comitatus Act precludes military participation in civilian law enforcement absent a Constitutional or statutory exception, such as the Insurrection Act (which, notably, was not invoked here). The Government has consistently taken positions in matters before this Court to undermine the Congressional limits on the exercise of war powers to enforce domestic law or policy. In opposing Plaintiff's Motion for a Temporary Restraining Order, the Government claimed, in part, that a President's decision to deploy the National Guard is unreviewable; an argument rejected by the Court of Appeals. ECF No. 25 at 9-12 and ECF No. 116 at 31.

Now, when addressing Plaintiffs' ultra vires claims related to the Posse Comitatus Act, the Government claims that 10 U.S.C. § 12406 provides an exception to the Posse Comitatus Act, resulting in a President's largely unchecked authority to order military personnel to engage in civilian law enforcement. See ECFs No. 95 at 1 and No. 99 at 2-3. These efforts to frustrate or fully avoid the separation of powers regarding deployment of the military and its preclusion from engaging in civilian law enforcement activity illustrate and heighten the concerns of *Amicus* and its members.

If Congress' limits on executive power in these matters are either degraded or declared satisfied almost exclusively on the determinations or linguistic choices of a President, this Court would essentially establish the very Weimar Germany standard Justice Jackson decried. The challenges Justice Jackson faced may well have exceeded those of today, yet he strongly warned courts to reject any paradigm where "necessity knows no law." *Youngstown*, 343 U.S. at 646.

The Steady State's members' experiences, not only around the world but as members of the Executive Branch, in service at some of the very institutions that are most subject to abuse (and were the class of "security" institutions that Justice Jackson confronted at Nuremberg), lead us to strongly agree with Justice Jackson's conclusion that "men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations." *Id.* at 655 (Jackson, J., concurring). This principle grows even more critical day by day as not only does military personnel engage in civilian law enforcement in Los Angeles, but now also in Washington, D.C., where the President has deployed the National Guard to purportedly "address the epidemic of crime." "Restoring Law and Order in the District of Columbia," Presidential Memorandum for the Secretary of Defense, August 11, 2025. Not only has the President ordered the deployment of the D.C. National Guard, but he has also directed the Defense Secretary to "coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission." *Id.* This pointed presidential direction suggests that while nominally under the control of state governors, the President seeks to enlarge the federal force engaging in civilian law enforcement to quash political dissent in jurisdictions governed by members of the opposing political party. The President also suggested during a press conference to announce the deployment in Washington, D.C., that similar actions may be taken in other jurisdictions such as Chicago, and that "Hopefully, L.A. is watching." "Trump takes over DC police in extraordinary move, deploys National Guard in capital."[2,3]

---

[2] Trevor Hunnicutt & Nandita Bose, Trump Takes Over D.C. Police in 'Extraordinary' Move, Deploys National Guard to Capital, Reuters (Aug. 11, 2025), See https://www.reuters.com/world/us/trump-takes-over-dc-police-extraordinary-move-deploys-national-guard-capital-2025-08-11/.

[3] Even as this brief is drafted, in Washington, D.C., there are armored vehicles on the National Mall, and uniformed troops in the streets. Anne Flaherty & Luke Barr, National Guard troops have begun 24-hour operations in DC: Official, ABC News

1    The U.S. Government's actions demonstrate its belief that the President is

2    above the law regarding the domestic deployment of military personnel, a decision

3    it asserts is unreviewable and that may act without restriction in service of the

4    President. *Amicus* urges this Court to uphold its responsibilities and retain

5    America's steady state by granting the relief sought by Plaintiffs. See *Youngstown*,

6    343 U.S. at 655 (even if "[s]uch institutions may be destined to pass away … it is

7    the duty of the Court to be last, not first, to give them up.") (Jackson, J. concurring).

### B.    Domestic Military Deployment to Suppress Civilian Dissent is a Hallmark and Indicator of Authoritarian Rule

10    *Amicus* members, as national security, homeland security, and foreign policy

11    practitioners, understand the "indicators of autocracy." Indicators of intent are

12    observable facts that are correlated with and tend to show the reasoning behind the

13    action. One such indicator of illegitimate use of power is when leaders search for

14    reasons to stretch interpretations of the law. Another indicator is magnifying or

15    exaggerating events to justify an overreach of power. This occurred as recently as

16    December 2024, when South Korean President Yoon Suk Yeol declared martial law

17    to counter exaggerated accounts of anti-state activities and threats to national

18    security. The legislature was quick to respond by lifting martial law, impeaching

19    and removing the president from office to protect its democracy.

---

(Aug. 14, 2025, 3:34 PM) ("National Guard troops have begun 24-hour operations around Washington, D.C., as of Thursday morning, according to a Department of Defense official.") available at https://abcnews.go.com/Politics/dc-wake-troops-deployed-national-mall/story?id=124629956. See, https://abcnews.go.com/Politics/dc-wake-troops-deployed-national-mall/story?id=124629956 ("National Guard troops have begun 24-hour operations in DC: Official"). Additionally, as an indicator of the true mission of federal personnel in Los Angeles, in a video shared on social media by Mr. Newsom's press office shows the agents gathering outside the museum. In the video, Gregory Bovino, a Border Patrol chief who is leading the Trump administration's immigration crackdown in Southern California, says, "We're here making Los Angeles a safer place, since we don't have politicians who can do that. We do that ourselves." See, Laurel Rosenhall, Jesus Jiménez, and Hamed Aleaziz, "Border Patrol Agents Show Up in Force at Newsom Rally," New York Times (August 14, 2025) available at https://www.nytimes.com/2025/08/14/us/newsom-la-immigration-agents.html.

Authoritarian regimes frequently rely on military force to maintain political power in the face of civilian dissent. *Amicus* members have directly observed this phenomenon in countries such as:

- Russia, where military-style police suppress political protests under the guise of national security;

- China, where the People's Liberation Army has historically been deployed against student demonstrators, most notably during the crackdown at the Tiananmen Square massacre;

- Taiwan, where minor incidents of violence led to a state-run suppression of anti-government protests and became a pretense for decades of martial law;

- Turkey, where domestic military deployments have been used to crush opposition following attempted coups and mass protests;

- South Africa, where apartheid security forces repressed political opponents; after the end of the apartheid government, post-apartheid reform emphasized oversight to prevent military use for partisan political agendas;

- The Philippines, where armed forces are employed in campaigns against civil society actors under the pretext of anti-drug or anti-terror operations; and

- El Salvador, where US-trained military death squads terrorized the population during the civil war of the 1970s and 1980s. For the past several years, under the current Bukele administration, the security forces have been re-politicized and used to support human rights abuses against the general population.

In each of these examples, authoritarian leaders justified their actions as necessary for public safety, while, in fact, using military force to erode political freedoms and dismantle or corrode institutional checks on executive power. *Amicus*

members have witnessed the slippery slope from such conduct to authoritarian rule and are aware that there is eventually a point of no return as a nation moves towards autocracy. *Amicus* members further emphasize that in the authoritarian regimes they have studied—whether in Moscow, Beijing, Ankara, or Manila—the pattern is not one of local leaders requesting help, but of central governments deploying military force to override regional or municipal authority.

The current use of the military is a further indication of the President's intentions to commandeer the use of all of the nation's "security services," including the military and federal law enforcement, to eradicate dissent and use these "security services" to support authoritarian aims. Shortly after the initial deployment in Los Angeles, on June 16, 2025, Secretary of Transportation Sean Duffy, stated in a post on X that the Department of Transportation will not "fund rogue state actors who refuse to cooperate with federal immigration enforcement."[4] It is this centralized use of force—particularly to suppress dissenting political viewpoints—that serves as an early marker of democratic backsliding.

These global examples from the experience of *Amicus* members echo loudly through the actions of the U.S. Government. In Los Angeles, the stated National Guard mission to protect the safety of federal personnel and property is conflated by the Government with providing for the "safety of those conducting immigration enforcement operations in [the Los Angeles] area of responsibility." See Declaration of Ernesto Santacruz, Jr., dated June 11, 2025, ECF No. 22-1. In fact, Mr. Santacruz, the Acting Field Office Director for U.S. Immigration and Customs Enforcement in the Los Angeles Area of Responsibility, stated that National Guard personnel have served as a "security element" for U.S. Immigration and Enforcement officers and agents and other federal law enforcement personnel enforcing civil immigration laws by accompanying civilian law enforcement on

---

[4] Available on-line at https://x.com/SecDuffy/status/1934659228750188941; (June 16, 2025 at 1:07 PM).

most enforcement operations conducted in the Los Angeles area. See Supplemental Declaration of Ernesto Santacruz, Jr., dated June 18, 2025. ECF No. 84-1. While Mr. Santacruz believed that additional resources were necessary to ensure the safety of federal personnel engaged in immigration enforcement operations, *id.*, there is no requirement that such resources be military personnel who are largely untrained in the conduct of civilian law enforcement activity placing both the civil rights and civil liberties of citizens as well as the safety of all involved, at risk.

Further undermining that stated protection mission, Maj. Gen. Scott Sherman, who had been deployed as the commanding general of the National Guard Task Force in Los Angeles, testified before the Court on August 11, 2025, that military personnel could be deployed whenever local law enforcement was carrying out an operation because a threat could develop, even if an active threat was not assessed at the time of deployment. "General involved in Trump's L.A. military deployment testifies he didn't hear protests described as 'rebellion.'"[5] In the one instance where Maj. Gen. Sherman testified that he objected to the use of military personnel to support an immigration enforcement operation because he assessed the threat to federal personnel to be low, a DHS official questioned his loyalty to his country. *Id.* National Guard activities in support of civilian law enforcement and the President's domestic agenda, often framed as expressions of patriotism, not only raise questions about compliance with the Posse Comitatus Act but also echo the concerns of *Amicus* and its members about how authoritarian regimes justify military involvement in civilian affairs to suppress dissent and opposing political views.

---

[5] Katrina Kaufman & Joe Walsh, General Involved in Trump's L.A. Military Deployment Testifies He Didn't Hear Protests Described as Rebellion, CBS News (Aug. 12, 2025), https://www.cbsnews.com/news/general-involved-in-trumps-l-a-military-deployment-testifies-he-didnt-hear-protests-described-as-rebellion-trump/.

1
2

**C.    The Domestic Deployment of Military Forces in Civilian Spaces**
**Can Cause Intimidation and Fear**

3    When a state governor publicly invites federal support—whether in the form

4   of National Guard troops under U.S. Code Title 32 control or even Title 10

5   forces—it occurs within a framework of democratic accountability to the local

6   citizenry. The governor is elected by the state's residents and is generally attuned to

7   their needs, fears, and political culture. Requests for assistance are typically made

8   in the context of an urgent public safety concern, such as natural disaster response

9   or an utter breakdown in law enforcement capacity—not to stifle political

10   expression.

11   *Amicus* members have observed in both foreign and domestic contexts that

12   the legitimacy of military forces depends heavily on their perceived purpose and

13   affiliation. When soldiers arrive at the public request of a governor to restore order

14   or to provide essential services after a hurricane, wildfire, or highly destructive riot,

15   the population tends to see them as supportive, nonpartisan helpers. Precedent

16   shows that federalized National Guard and other domestic deployments are ordered

17   only after the governor requests relief. Those scenarios are legitimate uses of

18   power.

19   But when heavily armed military personnel arrive uninvited in moments of

20   political protest or social unrest—particularly when those protests involve criticism

21   of federal policy or federal officials—the public perception is unmistakably

22   different. The symbolism of federal uniforms and combat vehicles can evoke fear,

23   not reassurance, when involuntarily imposed and unnecessarily deployed

24   domestically. People do not need a legal education to know the difference between

25   the protection of federal buildings and personnel, and the military performing local

26   law enforcement activities against constitutionally protected activity by the public.

27   Even in the Government's response to Plaintiff's motion, it claims that "…protests

28   and acts of violence "constitute a form of rebellion against the authority of the

Government of the United States" to the extent they "directly inhibit the execution of the laws."" ECF No. 116 at 13. While local law enforcement and, under certain circumstances as provided by statute, the military can and should address acts of violence, the conflation of violence with constitutionally protected activity is a warning sign that the true intent of the Government's actions to unilaterally impose itself is to eliminate any political opposition to its policies and actions. Further amplifying this point is the President's post on Truth Social, where he labeled Governor Newsom as "incompetent" and claimed that lawful protestors had been paid and that they were an "out of control mob of agitators, troublemakers, and/or insurrectionists."[6] To add fuel to this fire, the President, on June 12, 2025, told military personnel during a 250th Birthday celebration for the Army at Fort Bragg, that the Governor and the Mayor of Los Angeles were "engaged in this willful attempt to nullify federal law and aid the occupation of the city by criminal invaders," as if to provide an insufficient post hoc justification for the deployment of military personnel. "Trump merchandise sold at Fort Bragg for president's speech now under review," Anne Flaherty, ABC News, (available at https://abcnews.go.com/US/trump-merchandise-sold-army-base-presidents-speech-now/story?id=122764288) (June 12, 2025). As stated above, the President's rhetoric was a precursor to his deployment of the National Guard in Washington, D.C., and his suggestion that more deployments, in cities run by his political opponents, were coming.

   *Amicus* members have studied how the presence of military personnel—armed, uniformed, and trained for combat—transforms the psychology of civilians. Unlike local police, military forces are trained to confront external enemies with the force necessary to subdue or extinguish the enemy threat, not to engage in proportionate, community-based responses to domestic unrest. Such deployments

---

[6] Donald J. Trump (@realDonaldTrump), Truth Social (June 11, 2025, 6:53 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114664350602686558.

cause fear, escalate tensions, and often provoke further unrest. Their appearance on city streets signals that political dissent is an existential threat to the state, not a protected right of the people. It emphasizes that conformity and silence are essential to living without harm from the government. The ultimate purpose of their presence is to instill fear in civilians who do not support the administration.

*Amicus* members recall how, during the 1970s in Latin America, militarized public spaces helped consolidate military juntas. In Egypt during the Arab Spring, the presence of soldiers in public squares cast a pall over efforts at democratic reform.

### D.    The Use of Military Force Against Domestic Protest Undermines U.S. Democratic Credibility Abroad

*Amicus* members have long advanced the values of liberty and self-governance in their diplomatic, defense, and intelligence careers. *Amicus* members were taught to use their skills and authority against Americans only when consistent with and constrained by the rule of law and U.S. democratic principles. They are gravely concerned that the use of U.S. military force against Americans exercising constitutional rights undermines the United States' credibility in advancing all of the United States' interests, including championing democracy, overseas.

Authoritarian governments have already begun pointing to domestic military deployments in the U.S. to justify their own crackdowns. When the United States fails to uphold democratic norms at home, it loses both moral authority and strategic influence abroad.

### III.    CONCLUSION

*Amicus* urges the Court to scrutinize with the utmost care any claim of executive authority to deploy the military in domestic contexts. The Court has a responsibility to scrutinize carefully the meaning of the relevant statutes, as it did initially with the Militia Act and does now in assessing the guardrails established by the Posse Comitatus Act. *Amicus* asks that the Court execute this duty in view of

the historical and experiential information this brief is providing to the Court. The historical record is replete with examples of regimes that have used such deployments in pursuit and implementation of authoritarianism. *Amicus* members have seen firsthand what happens when a country does not observe its constitutional protections. The United States must not follow that path. The preservation of democracy demands vigilant resistance to the normalization of military force in civil society. Based on the foregoing, *Amicus* urges the Court to uphold its responsibilities and retain America's steady state by granting the relief sought by Plaintiffs.

This 18th day of August 2025.

Respectfully submitted,

*/s/ Steven A. Cash*
Steven A. Cash, Esq.
*Pro Hac Vice*
7707 MacArthur Boulevard
Cabin John, MD 20818
212-685-9660
cashs@thesteadystate.org

*/s/ Jeremy Sugerman*
Jeremy Sugerman, Esq.
Gordon-Creed, Kelley, Holl & Sugerman LLP
50 California Street, 34th Floor
415-421-3100
San Francisco, CA 94111
Sugerman@gkhs.com

*Attorneys for Amicus Curiae The Steady State*

## CERTIFICATE OF COMPLIANCE

This BRIEF OF THE STEADY STATE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS REGARDING THE DOMESTIC DEPLOYMENT OF THE UNITED STATES MILITARY AND THE ENGAGEMENT OF MILITARY PERSONNEL IN CIVILIAN LAW ENFORCEMENT type size and typeface comply with Fed. R. App. P. 27(d) because this motion has been prepared using proportionately spaced typeface and uses 14-point, Times New Roman font in Microsoft Word.

I understand that a material misrepresentation can result in the Court's striking the motion and imposing sanctions.

This 18th day of August 2025.

/s/ Steven A. Cash
Steven A. Cash, Esq.
*Pro Hac Vice*
7707 MacArthur Boulevard
Cabin John, MD 20818
212-685-9660
cashs@thesteadystate.org

/s/ Jeremy Sugerman
Jeremy Sugerman, Esq.
Gordon-Creed, Kelley, Holl &
Sugerman LLP
50 California Street, 34th Floor
415-421-3100
San Francisco, CA 94111
Sugerman@gkhs.com

*Attorneys for Amicus Curiae The Steady State*

1

2                          **CERTIFICATE OF SERVICE**

3          I hereby certify that a copy of the foregoing BRIEF OF THE STEADY

4    STATE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS REGARDING

5    THE DOMESTIC DEPLOYMENT OF THE UNITED STATES MILITARY AND

6    THE ENGAGEMENT OF MILITARY PERSONNEL IN CIVILIAN LAW

7    ENFORCEMENT of The Steady State is being served automatically, via the

8    Court's ECF system, on all counsel of record.

9

10   This 18th day of August 2025.

11                                          */s/ Steven A. Cash*
                                            Steven A. Cash, Esq.
12                                          *Pro Hac Vice*
                                            7707 MacArthur Boulevard
13                                          Cabin John, MD 20818
                                            212-685-9660
14                                          cashs@thesteadystate.org

15

16                                          */s/ Jeremy Sugerman*
                                            Jeremy Sugerman, Esq.
17                                          Gordon-Creed, Kelley, Holl & Sugerman
                                            LLP
18                                          50 California Street, 34th Floor
                                            415-421-3100
19                                          San Francisco, CA 94111
                                            Sugerman@gkhs.com
20

21                                          *Attorneys for Amicus Curiae The Steady*
                                            *State*
22

23

24

25

26

27

28