1 | Michel Paradis (*pro hac vice* forthcoming)
2 | *mparadis@steptoe.com*
  | **STEPTOE LLP**
3 | 1114 Avenue of the Americas
  | New York, NY 10036
4 |
5 | Conor Tucker (SBN 318075)
  | *ctucker@steptoe.com*
6 | **STEPTOE LLP**
7 | 633 West Fifth Street, Suite 1900
  | Los Angeles, CA 90071-3033
8 | Telephone: (213) 439-9432
  | Facsimile: (213) 439-9599
9 |
10 | Attorneys for *Amici Curiae* Center for Ethics and Rule of Law,
   | National Institute for Military Justice,
11 | Lawyers Defending American Democracy, Prof. Claire Finkelstein,
   | Prof. Brenner Fissell, and Prof. Mitt Regan

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA; | Case No.: 3:25-CV-04870-CRB |
| Plaintiffs, | *Hon. Charles R. Breyer* |
| v. | **NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE*;** |
| DONALD J. TRUMP, in his official capacity as the President of the United States; PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, U.S. DEPARTMENT OF DEFENSE, | **BRIEF OF *AMICI CURIAE* CENTER FOR ETHICS AND RULE OF LAW, NATIONAL INSTITUTE FOR MILITARY JUSTICE, LAWYERS DEFENDING AMERICAN DEMOCRACY, CLAIRE FINKELSTEIN, BRENNER FISSELL, AND MITT REGAN** |
| Defendants. | |

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to the Court's "broad discretion to appoint amici curiae" (*Levin Richmond Terminal Corp. v. City of Richmond*, 482 F. Supp. 3d 944, 951 & n.1 (N.D. Cal. 2020)), proposed *amici curiae* Center for Ethics and Rule of Law (CERL), National Institute for Military Justice (NIMJ), Lawyers Defending American Democracy (LDAD), Professor Claire Finkelstein, Professor Brenner Fissell, and Professor Mitt Regan (collectively, "Proposed *Amici*") respectfully move the Court for leave to file the attached Brief of *Amici Curiae* in support of Plaintiffs in this case.

Plaintiffs have consented to the filing of this brief. Defendants indicated by email that they view the motion as "untimely" but "would likely have consented" to its filing had Proposed *Amici* moved sooner. Defendants did not cite, nor are Proposed *Amici* aware, of any rule or statute that would make the filing of this motion untimely.

This case presents issues of exceptional public importance. "District courts frequently welcome" *amici curiae* in cases "concerning legal issues that have potential ramifications beyond the parties directly involved." *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005). Indeed, the "classic role" for *Amici* is to "assist[] in a case of public interest" such as this one. *Funbus Sys. Inc. v. State of Cal. Pub. Utils. Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986).

Proposed *Amici* offer a unique and informed perspective on the rule of law in military operations and democratic governance. Their expertise is especially relevant here, where the President has deployed the military against civilians in peacetime on domestic soil. As organizations focused on and professors studying the rule of law, and as it particularly regards the military, Proposed *Amici* are well-positioned to discuss the implications of foundational constitutional principles and norms on this case.

**The Center for Ethics and the Rule of Law** is a nonpartisan national security organization located at the University of Pennsylvania. CERL is dedicated to preserving and promoting the rule of law in 21st-century national security and military operations. It holds conferences, publishes informational material, and seeks to educate students, professionals and

2

members of the public. Founded in 2012, its distinguished Executive Board includes retired military officers, lawyers, academics, and private practitioners, as well as prominent public servants formerly associated with federal government agencies. As part of the University of Pennsylvania, CERL is a registered 501(c)(3) entity with no political agenda or affiliation. CERL engages in no political lobbying, accepts no foreign funding, and has not been compensated in any way in connection with its filing of the current brief.

**The National Institute of Military Justice** is a private non-profit, 501(c)(3) organization, founded in 1991, and is the country's only non-governmental organization dedicated solely to the study and improvement of the military's justice system. NIMJ members include prominent law professors and practitioners, as well as leaders of think tanks and non-profits. Its leadership comprises former judge advocates, private practitioners, and legal scholars.

**Lawyers Defending American Democracy** is a non-profit, non-partisan 501(c)(3) organization that unites lawyers in a commitment to enforce and uphold democratic principles, demand accountability, identify attacks on legal norms, and prescribe redress. In this way, LDAD defends the constitutional values and political norms on which our democracy depends, including the rule of law, institutional checks and balances, separation of powers, press freedom, and the integrity of our system of justice. LDAD's Board of Directors includes a retired state supreme court justice, a former state attorney general, retired partners and managing partners of major law firms, past presidents of two state bar associations, business entrepreneurs, and legal academics.

**Claire Finkelstein** is the Algernon Biddle Professor of Law and Professor of Philosophy at the University of Pennsylvania and the Founder and Faculty Director of its Center for Ethics and the Rule of Law. She is a Senior Fellow at the Foreign Policy Research Institute and the co-editor of *The Oxford Series in Ethics, National Security and the Rule of Law*. She is a widely published author in criminal law, national security, military law, and democratic governance and a sought-after opinion writer and commentator in prominent news outlets including the *New York Times*, *Washington Post*, *The Hill, Lawfare* and others in the United States and abroad.

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1    **Brenner M. Fissell** is Professor of Law at Villanova University, and the former Class of

2    1964 Fellow at the U.S. Naval Academy. He served as an attorney-advisor for Chief Judge Scott

3    Stucky of the U.S. Court of Appeals for the Armed Forces and as appellate defense counsel at

4    the Guantanamo Bay Military Commissions. He is the Vice President of the National Institute

5    for Military Justice and a widely recognized expert in the Law of Armed Conflict and military

6    law more generally.

7    **Mitt Regan** is McDevitt Professor of Jurisprudence, Director of the Center on Ethics and

8    the Legal Profession, and Coordinator of the Program on Law, Ethics, and International Security

9    Georgetown University Law Center. His work focuses on international law, national security,

10   international human rights, legal ethics the legal profession and the rule of law, and ethical issues

11   relating to artificial intelligence. His Center on Ethics and the Legal Profession conducts an

12   annual Law Firm General Counsel Workshop in partnership with Legal Management Resources

13   that focuses on the wide range of issues that inside counsel for law firms must address.

14   Proposed *Amici* respectfully submit the attached brief and request the Court consider it.

15

16   Dated: August 21, 2025                STEPTOE LLP

17

18                                         */s/ Conor Tucker*
                                           Conor Tucker

19

20                                         Attorneys for Proposed *Amici Curiae*

21

22

23

24

25

26

27

28

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

Michel Paradis (*pro hac vice* forthcoming)
*mparadis@steptoe.com*
**STEPTOE LLP**
1114 Avenue of the Americas
New York, NY 10036

Conor Tucker (SBN 318075)
*ctucker@steptoe.com*
**STEPTOE LLP**
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-3033
Telephone: (213) 439-9432
Facsimile: (213) 439-9599

Attorneys for *Amici Curiae* Center for Ethics and Rule of Law,
National Institute for Military Justice,
Lawyers Defending American Democracy, Prof. Claire Finkelstein,
Prof. Brenner Fissell, and Prof. Mitt Regan

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California; STATE OF CALIFORNIA; <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as the President of the United States; PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, U.S. DEPARTMENT OF DEFENSE, <br><br> Defendants. | Case No.: 3:25-CV-04870-CRB <br><br> *Hon. Charles R. Breyer* <br><br><br> **BRIEF OF *AMICI CURIAE* CENTER FOR ETHICS AND RULE OF LAW, NATIONAL INSTITUTE FOR MILITARY JUSTICE, LAWYERS DEFENDING AMERICAN DEMOCRACY, CLAIRE FINKELSTEIN, BRENNER FISSELL, AND MITT REGAN** |

1

2

# <u>TABLE OF CONTENTS</u>

Page

3

IDENTITY AND INTEREST OF *AMICI*............................................................................ 1

4

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 2

5

ARGUMENT ......................................................................................................... 3

6

I.   The principle of federalism under the Tenth Amendment limits the federal protective

7       power and requires broad deference to gubernatorial control over the National Guard.......... 3

8       A.  Absent true emergency circumstances threatening harm to federal assets or
            operations, use of the protective power is pretextual and must yield to the Tenth

9            Amendment.......................................................................................... 4

10      B.  Principles of federalism restrict mobilization of U.S. forces under 10 U.S.C. § 12406
            to cases in which there is a clear showing of "rebellion" or an indisputable inability

11           for the U.S. to enforce the laws in any other way. .......................................... 9

12

II.  A core foundation of democracy and the rule of law in the United States is the prohibition
     of military forces from engaging in civilian law enforcement without express

13   Constitutional or statutory authorization. ........................................................ 10

14      A.  Federal case law has long recognized the foundational nature of posse comitatus and
            the superiority of civil over military authority............................................. 11

15
        B.  The Department of Defense Instruction (DODI) 3025.21 implements and interprets

16           posse comitatus. .................................................................................. 12

17      C.  Federalized troops are subject to posse comitatus when called forth under the
            protective power.................................................................................. 13

18
        D.  Federalized troops are subject to posse comitatus when called forth under 10 U.S.

19           Code § 12406. ..................................................................................... 14

20

III. The deployment of federal troops in this case violates posse comitatus. ........................ 17

21

IV.  Where constitutional rights are at risk, courts must closely scrutinize government action.... 20

22

CONCLUSION.......................................................................................... 22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ............................................................5, 22

*Backcountry Against Dumps v. Fed. Aviation Admin.*,
77 F.4th 1260 (9th Cir. 2023) ...............................................................13

*Berman v. Parker*,
348 U.S. 26 (1954) ...................................................................................4

*Bissonette v. Haig*,
776 F.2d 1384 (8th Cir. 1985) ..............................................................20

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ..........................................................8

*City of Houston v. Hill*,
482 U.S. 451 (1987) ...............................................................................14

*In re Debs*,
158 U.S. 564 (1895) .................................................................................7

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .................................................................................5

*Houston v. Moore*,
18 U.S. (5 Wheat.) 1 (1820) ..............................................................5, 22

*Laird v. Tatum*,
408 U.S. 1, 15-16 (1972) ....................................................................11, 22

*Lopez v. U.S.*,
514 U.S. 549 (1995) .................................................................................3

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827) ................................................................4

*In re Neagle*,
135 U.S. 1 (1890) .....................................................................................6

*New York v. United States*,
505 U.S. 144 (1992) .................................................................................4

*Noble State Bank v. Haskell*,
219 U.S. 104, 111 (1911), *op. amended*, 219 U.S. 575 (1911) ...............4

*Printz v. United States*,
521 U.S. 898 (1997) .................................................................................4

ii

*See Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.,*
    347 U.S. 483 (1954) ..................................................................................6

*State v. Yuen,*
    555 P.3d 121 (Haw. 2024) .......................................................................19

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936) ................................................................................20

*United States v. Dreyer,*
    767 F.3d 826 (9th Cir. 2014) ...................................................................22

*United States v. Dreyer,*
    804 F.3d 1266 (9th Cir. 2015) (en banc) ...........................................6, 18

*United States v. Eleuterio,*
    No. 3:21-CR-0001,
    2024 WL 1620383 (D.V.I. Apr. 15, 2024) .............................................17

*United States v. Gerena,*
    649 F. Supp. 1179 (D. Conn. 1986) .......................................................19

*United States v. Hernandez-Garcia,*
    44 F.4th 1157 (9th Cir. 2022) .................................................................17

*United States v. Jaramillo,*
    380 F. Supp. 1375 (D. Neb. 1974) ...................................................17, 19

*United States v. McArthur,*
    419 F. Supp. 186 (D.N.D. 1975) ..................................................17, 19, 20

*United States v. Morrison,*
    529 U.S. 598 (2000) ..................................................................................3

*United States v. Red Feather,*
    392 F. Supp. 916 (D.S.D. 1975) ..................................................17, 18, 19

*United States v. Stouder,*
    724 F. Supp. 951 (M.D. Ga. 1989) .........................................................19

*United States v. Yunis,*
    924 F.2d 1086 (D.C. Cir. 1991) ..............................................................17

*United States v. Zubaydah,*
    595 U.S. 195 (2022) ..................................................................................8

*Younger v. Harris,*
    401 U.S. 37 (1971) ....................................................................................4

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 US 579 (1952) ..................................................................................20

iii

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

10 U.S.C. §§ 251 *et seq*................................................................5, 11, 12

10 U.S.C. §§ 271 *et seq*..........................................................................12

10 U.S.C. § 331.......................................................................................16

10 U.S.C. § 332....................................................................................4, 16

10 U.S.C. § 333.......................................................................................16

10 U.S.C § 12406............................................................................ *passim*

18 U.S.C. § 1385...........................................................2, 12, 13, 17

40 U.S.C. § 1315......................................................................................8

**Rules**

L.R.331 (2025)........................................................................................22

L. R. 1753 (2016)....................................................................................12

**Regulations**

32 C.F.R. § 215.4....................................................................................15

32 C.F.R. § 215.4(1)(ii)............................................................................6

32 C.F.R. § 215.4(c)(1)(ii)......................................................................10

32 C.F.R. § 215.4(c)(2)(i)(a)...................................................................16

32 C.F.R. § 215.4(c)(2)(i)(b)...................................................................16

Exec. Order No. 10730, 22 Fed. Reg. 7628 (Sept. 24, 1957)..................5

Exec. Order No. 11053, 27 Fed. Reg. 9693 (Sept. 30, 1962)..................5

Exec. Order No. 11118, 28 Fed. Reg. 9863 (Sept. 10, 1963)..................5

Exec. Order No. 11207, 30 Fed. Reg. 3743 (Mar. 20, 1965)...................5

Exec. Order No. 11364, 32 Fed. Reg. 10907 (July 24, 1967)..................6

Exec. Order No. 11403, 33 Fed. Reg. 5501 (Apr. 5, 1968).....................6

Exec. Order No. 11404, 33 Fed. Reg. 5503 (Apr. 7, 1968).....................6

Exec. Order No. 11405, 33 Fed. Reg. 5505 (Apr. 7, 1968).....................6

Exec. Order No. 12804, 57 Fed. Reg. 19361 (May 1, 1992)...................6

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1

**Other Authorities**

2

Akhil Reed Amar, *The Bill of Rights, Creation and Reconstruction* 55-56 (Yale
    University Press 1998)................................................................................5

3

Black's Law Dictionary (12th ed. 2024) ................................................20

4

Brenner M. Fissell, *The Military's Constitutional Role*, 103 N.C ...........22

5

C.J. Williams, *An Argument for Putting the Posse Comitatus Act to Rest* 85 Miss.
    L.J. 99, 138 (2016) ................................................................17

6

City News Service, Los Angeles Daily News, *City Council approved 5 million
    loan to cover LAPD overtime spurred by protests.* June 19, 2025 ..................7

7

8

Claire Finkelstein & Kevin Govern, *The Deployment of Federal Agents in
    Portland Is a Harbinger of Authoritarianism*, CERL Rule of Law Post (July
    2021) ................................................................8

9

10

Claire Finkelstein and Richard Painter, *Trump's Presidential-Immunity Theory Is
    a Threat to the Chain of Command, The Atlantic* (Apr. 15, 2024) ............22

11

Elizabeth Goitein & Angelo Pis-Dudot, *Three Fixes to Prevent Another Battle of
    Lafayette Square*, Brennan Ctr. for Just. (June 1, 2021)........................8

12

13

FBI Releases - *Officers Killed and Assaulted in the Line of Duty 2023 Special
    Report and Law Enforcement Employee Counts* (May 14, 2024) ............16

14

Henry P. Monaghan, *The Protective Power of the Presidency*, 93 Colum. L. Rev.
    1 (1993)................................................................13

15

16

Honored in the Breech: Presidential Authority to Execute the Laws with Military
    Force, 83 Yale L.J. 130 (1973) ................................................12

17

Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa.
    L. Rev. 1835 (2016) ................................................13

18

19

Jennifer K. Elsea, *The Posse Comitatus Act and Related Matters: The Use of the
    Military to Execute Civilian Law*, Cong Research Serv.  R42659, Nov. 6, 2018........12

20

21

Joseph Nunn, *The Insurrection Act Explained, Brennan Center for Justice
    Explainer* (April 21, 2022, last updated June 10, 2025)........................14

22

Lee Robinson and Joseph G. Amoroso, *Military Personnel Swear Allegiance to
    the Constitution and Serve the American People, Not One Leader or Party.*
    Military.com (April , 2024) ................................................21

23

24

Memorandum for the Robert E. Jordan III, General Counsel, Department of the
    Army, William Rehnquist, Assistant Attorney General, Office of Legal
    Counsel*, Authority to use troops to protect federal functions, including the
    safeguarding of foreign embassies in the United States* (May 11, 1970) ..........17

25

26

Mike Baker et al., *Federal Agents Push Into Portland Streets, Stretching Limits of
    Their Authority*, N.Y. Times, July 31, 2020 ................................8

27

28

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

*National Guard Bureau, Federalizations of the Guard for Domestic Missions through 2025* ...........................................................................................5

Patricia L. Bellia*, Faithful Execution and Enforcement Discretion* ...............................12

Roy E. Brownell II, *The Coexistence of United States v. Curtiss-Wright and Youngstown Sheet & Tube v. Sawyer in National Security Jurisprudence*, 26 J. L. & Pol. 1 (2020) ...............................................................................................20

Ryan Goodman, *159. The "Unwilling or Unable" Test for Sending U.S. Military to Los Angeles*, JUST SECURITY (June 16, 2025) ...............................................14

*Secretary of Defense Mark T. Esper Addresses Reporters Regarding Civil Unrest,* U.S. Dep't of Def. (June 3, 2020) ........................................................................21

Stephen I. Vladeck, *Emergency Power and the Militia Acts,* 114 Yale L. J. 149, 194 (2004) ...........................................................................................................11

Steve Vladeck & Ryan Goodman, *159. The Posse Comitatus Act Meets the President's "Protective Power"*, ONE FIRST (June 20, 2025, 7:00 AM) ..................6

Tara Copp & Damian Dovarganes, *Tensions rise as National Guard aids federal raid in Los Angeles*, Associated Press (July 7, 2025) ...........................................7

U.S. Immigration and Customs Enforcement, ICE Enforcement and Removal Operations Statistics (May 30, 2025) ...................................................................16

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

**IDENTITY AND INTEREST OF *AMICI***

The identities and interests of *Amici* are discussed in greater detail in the accompanying Motion for Leave to File Brief of *Amici Curiae*.  *Amici* reiterate here that they are three organizations and three law professors focused on the rule of law in their various capacities. The Center for Ethics and the Rule of Law is a nonpartisan national security organization located at the University of Pennsylvania dedicated to preserving and promoting the rule of law in 21st-century national security and military operations. The National Institute of Military Justice is a private non-profit, 501(c)(3) organization, founded in 1991, and is the country's only non-governmental organization dedicated solely to the study and improvement of the military's justice system. Lawyers Defending American Democracy is a non-profit, non-partisan 501(c)(3) organization that unites lawyers in a commitment to enforce and uphold democratic principles, demand accountability, identify attacks on legal norms, and prescribe redress. Claire Finkelstein is the Algernon Biddle Professor of Law and Professor of Philosophy at the University of Pennsylvania and the Founder and Faculty Director of its Center for Ethics and the Rule of Law. Brenner M. Fissell is Professor of Law at Villanova University, and the former Class of 1964 Fellow at the U.S. Naval Academy. Mitt Regan is Mitt Regan is McDevitt Professor of Jurisprudence, Director of the Center on Ethics and the Legal Profession, and Coordinator of the Program on Law, Ethics, and International Security Georgetown University Law Center.

The interest of all three *amici* organizations lies in promoting and preserving the rule of law in military operations, within the chain of command, and in democratic governance within the United States. The three professor *amici* are experts in national security law and military law and ethics and are the directors or senior leaders of their respective organizations. They are dedicated in their work individually as law professors through their scholarship and with their respective organizations to promoting and defending the ethics and legality of military practice and doctrine. The above bios are for identification purposes only and other organizations outside the *amici* organizations of which they are a part are not parties to the current amicus brief. None of the *amici* has received financial compensation for their participation in this brief. No party or

counsel for any party authored this brief in whole or in part and no one other than *amici* and their counsel contributed financially to its preparation or filing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The National Guard is fundamentally trained to be a military force. Its primary mission is to serve as a combat-ready reserve part of the U.S. Army and Air Force, where it engages in armed conflict against foreign enemies, operating within a military chain of command and viewing threats through a lens of neutralization, rather than constitutional rights. Even when deployed domestically, such as in cases involving natural disasters, the Guard's default posture is operational, not constitutional.  When deployed for protest related law enforcement, the military training that is appropriate for making the National Guard combat-ready in one context can be problematic when troops are unleashed into a predominantly civilian environment on U.S. soil.

*Amici* file this brief in support of Governor Newsom and the State of California because they view the federal government's deployment of the California National Guard as a grave threat to the rule of law. In particular, the current use of U.S. military troops in California violates two principles that are fundamental to democratic governance in the United States.  The first is the principle of federalism, which entails deference to a state's highest executive officer, namely the Governor, in the Governor's control over the state's National Guard. The second is the tradition of civilian control of the military, which requires the government to maintain a clear distinction between military operations and civilian law-enforcement, a principle that is codified by the Posse Comitatus Act, 18 U.S.C. § 1385 (PCA). Together, these two principles represent core values that help secure the rule of law in U.S. democracy.  Neither source of authority the government cites for deployment of the National Guard in this case, the federal protective power or 10 U.S.C § 12406, permits their violation.

Federal case law underscores the need for vigilance in reviewing the lawfulness of federal executive action under circumstances that call these two core values into play.  While the federal judiciary has repeatedly stressed the need for judicial deference in matters involving Commander-in-Chief authority and use of the U.S. military in protecting the country against foreign threats, domestic deployment of military forces, particularly when the mission touches on

the rights of U.S. persons, raises a wholly different set of concerns. Federal courts have taken care to support the vertical and horizontal separation of powers that have constrained executive authority in the United States since its founding. When federalized National Guard troops are deployed to assist with law enforcement functions, there is a risk not only that the principle of posse comitatus will be violated, but that First Amendment protection for speech and assembly as well as Fourth Amendment protection against unreasonable search and seizure will be infringed. Judicial deference to presidential authority where domestic deployment of the military is concerned is significantly more concerning. It is a fundamental responsibility, if not *the* fundamental, responsibility, of Article III courts to protect the rights of American citizens and lawful residents against governmental overreach, including the potential for executive overreach in the exercise of presidential Article II authority.

**ARGUMENT**

I.    **The principle of federalism under the Tenth Amendment limits the federal protective power and requires broad deference to gubernatorial control over the National Guard.**

The principle of federalism reflected in the Tenth Amendment of the U.S. Constitution is an essential part of the system of checks and balances designed by the Framers of American democracy and provides one of its core protections. In this case, this principle requires that primary control over the California National Guard remain with the governor of the State of California, absent extraordinary, emergency circumstances.  Under the U.S. Constitution and laws of the United States, the responsibility to protect life and property and to maintain public order resides primarily with state and local governments, which have the original authority to enforce the laws in the event of civil disturbance, violence, and disorder. Under principles of federalism, courts have rejected past attempts on the part of the federal government to ignore state and local authority, to expand federal law enforcement activities into traditional state realms of control, and to exert authority over general "police power over all aspects of American life." *Lopez v. U.S.*, 514 U.S. 549, 584 (1995) (Thomas, J., concurring); *United States v. Morrison*, 529 U.S. 598, 615 (2000).

3

1    Furthermore, the "anti-commandeering" doctrine, rooted in the Tenth Amendment and

2  the principle of federalism, prevents the federal government from forcing states to enforce

3  federal laws, limiting the federal government's power to command state executive officials to

4  enforce federal regulations and compel them to act as agents of the federal government. *New

5  York v. United States*, 505 U.S. 144, 202 (1992). Yet the federal government apparently believes

6  it is entitled to "commandeer" the State of California's own resources to help bolster its attempt

7  to take over the functions of state and local government and deprive Californians of various

8  individual constitutional rights.

9    In sum, federalism is not merely one value in play in this case to be weighed against

10  others; it is a structural principle of constitutional law recognized repeatedly by the U.S.

11  Supreme Court in many different contexts. *Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[T]he

12  National Government will fare best if the States and their institutions are left free to perform

13  their separate functions in their separate ways. This, perhaps for lack of a better and clearer way

14  to describe it, is referred to by many as 'Our Federalism' . . . .").

15    Respecting principles of federalism is particularly important in the realm of state police

16  power. Courts have repeatedly reaffirmed that only the states have the general power to police

17  the health, welfare, and safety of their citizens under the Tenth Amendment to the U.S.

18  Constitution. *Printz v. United States*, 521 U.S. 898 (1997); *Berman v. Parker*, 348 U.S. 26, 32

19  (1954); *see also Noble State Bank v. Haskell*, 219 U.S. 104, 111 (1911), *op. amended*, 219 U.S.

20  575 (1911). This broad power over internal affairs under the Tenth Amendment includes control

21  by state legislatures and governors over their state's militia, now evolved into the state's

22  National Guard.

23    **A.    Absent true emergency circumstances threatening harm to federal assets or**

24    **operations, use of the protective power is pretextual and must yield to the**

25    **Tenth Amendment.**

26    Under the U.S. Constitution and various acts of Congress, the instances in which the

27  president has the delegated power to call state militias into national service are few and far

28  between. Act of February 28, 1795, 1 Stat. 424 (1795) (codified at 10 U.S.C. § 332); *Martin v.*

4

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

*Mott*, 25 U.S. (12 Wheat.) 19, 32 (1827). In such exceptional circumstances, the president has the ability to supersede the governor's authority and federalize the state's National Guard. *Abbott v. Biden*, 70 F.4th 817, 821 (5th Cir. 2023). However, the decision to do so is a rare exception to the default condition of state legislative and gubernatorial control of a state's police powers, 32 C.R.F. 214(a). The limited ability of the federal government to assume state police powers through use of the military represents a historical compromise between calls for a strong central government and fear of concentrating power in the hands of the federal government at the expense of the states. *Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820); *see also* Akhil Reed Amar, *The Bill of Rights, Creation and Reconstruction* 55–56 (Yale University Press 1998). A rejection of federalism is ultimately a rejection of the value it protects; namely, individual liberty as articulated in the first eight amendments to the U.S. Constitution. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

Accordingly, exceptions to the authority of governors to control their states' National Guard are few and far between.[1] One rare circumstance is when the governor or the Adjutant General of the state's National Guard openly defies federal law and does not consent to the federalization of the national Guard. In this case, the president may federalize and deploy the state National Guard without the governor's consent. Exec. Order No. 10730, 22 Fed. Reg. 7628 (Sept. 24, 1957) (state governor's refusal to desegregate schools pursuant to Supreme Court order); Exec. Order No. 11053, 27 Fed. Reg. 9693 (Sept. 30, 1962) (refusal to integrate universities); Exec. Order No. 11118, 28 Fed. Reg. 9863 (Sept. 10, 1963) (refusal to integrate Alabama public schools); Exec. Order No. 11207, 30 Fed. Reg. 3743 (Mar. 20, 1965) (Civil Rights March of 1965). In *all* the instances cited above, the president's authority was based on the Insurrection Act, 10 U.S.C. §§ 251–255, which was not invoked in this case, and the

---

[1] On ten prior occasions since World War II, the president has mobilized National Guard troops for missions within the borders of the U.S. and retained them under federal authority. In nine instances, the authority was under Insurrection Act and on one occasion (with governor's consent) under 10 USC 12406.
*National Guard Bureau, Federalizations of the Guard for Domestic Missions through 2025*, https://www.nationalguard.mil/Portals/31/Documents/FEDERALIZATION-OF-GUARD-UP-TO-2025.pdf

5

1  president's federalization of the Guard was based on a definitive legal ruling by the U.S.

2  Supreme Court requiring states to end racial segregation in public schools. *See Brown v. Bd. of*

3  *Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483 (1954) (finding segregated secondary

4  schools a violation of the Fifth and Fourteenth Amendments).

5  In all other cases in which a state's National Guard has been federalized by the president,

6  the deployment has occurred with the consent or at the request of the state's governor and in

7  situations in which unrest led to loss of civilian life. Exec. Order No. 12804, 57 Fed. Reg. 19361

8  (May 1, 1992) (1992 Rodney King riots); Exec. Order No. 11364, 32 Fed. Reg. 10907 (July 24,

9  1967) (Detroit Riots of 1967); Exec. Order No. 11403, 33 Fed. Reg. 5501 (Apr. 5, 1968) (MLK

10 assassination riots); Exec. Order No. 11404, 33 Fed. Reg. 5503 (Apr. 7, 1968); Exec. Order No.

11 11405, 33 Fed. Reg. 5505 (Apr. 7, 1968). Unlike in the present case, in the foregoing instances,

12 the president invoked the Insurrection Act.  In the instant case, however, the governor is not

13 defying federal law; nor is he asking for federal troops to assist with civil unrest, and civil unrest

14 in California has not reached extraordinary levels. The president has therefore rightly declined to

15 invoke the Insurrection Act.

16 Yet even without the request of state authorities, on June 7, 2025, the president issued a

17 Presidential Memorandum entitled "Department of Defense Security for the Protection of

18 Department of Homeland Security Functions." In the Memorandum, the president referred to two

19 bases for calling the California National Guard into federal service.  The first was "to

20 temporarily protect ICE and other United States Government personnel who are performing

21 Federal functions," as well as to protect federal laws and federal property.

22 The memorandum reflected reliance on an implied Article II power to protect federal

23 personnel and buildings, otherwise known as the "protective power." *United States v. Dreyer*,

24 804 F.3d 1266 (9th Cir. 2015) (en banc). 32 C.F.R. § 215.4(1)(ii); *see also* Steve Vladeck &

25 Ryan Goodman, *159. The Posse Comitatus Act Meets the President's "Protective Power"*, ONE

26 FIRST (June 20, 2025 ), https://www.stevevladeck.com/p/159-the-posse-comitatus-act-meets. The

27 United States claims that invocation of the protective power authorizes federalization of the

28 California National Guard to protect federal property and federal functions (quoting *In re*

6

*Neagle*, 135 U.S. 1, 69 (1890)*; In re Debs*, 158 U.S. 564 (1895), and Authority to Use Troops, 1 Supp. Op. O.L.C. 343, 343 (1971)) and to use military force under the Task Force 51's Federal Protection Mission to protect federal personnel and property and "to execute the laws of the union." *See* Dkt. 22; Dkt. 84 at 24; Dkt. 136 at 19. The position of the United States is that a protective power mission is different from law enforcement in nature and origin and that use of the protective power in this instance means that there is no infringement of California's law-enforcement authority.

The present case, however, bears the hallmark of a pretextual invocation of the protective power. There is no evidence that state and local authorities were unable or unwilling to protect federal officers and the constitutional rights of their citizens. Since they were first deployed to Los Angeles on June 7, 2025, California National Guardsmen have mostly not been needed, given that civil unrest has been sporadic. What unrest has occurred has been well managed by the LAPD, which made over 575 arrests in the first eight days after June 6th , *City Council approved 5 million loan to cover LAPD overtime spurred by protests*, Los Angeles Daily News, June 19, 2025.   Yet that has not stopped the Trump administration from engaging in intimidating and theatrical displays of force in civilian environments in and around Los Angeles. For example, on July 7, the Trump administration ordered roughly 90 National Guardsmen to raid MacArthur Park, which is roughly two miles west of downtown Los Angeles, where children attempting to play or departing for summer camp encountered 17 Humvees, four tactical vehicles, two ambulances, and armed soldiers and federal officers, many of them on horseback. Tara Copp et al., *Tensions rise as National Guard aids federal raid in Los Angeles*, Associated Press, July 7, 202. The park contained no federal assets and no federal agents were attempting to conduct federal operations in the park.

In addition, federalized National Guard troops have executed search warrants on private property in Mecca, Camarillo, and Carpinteria, locations that are more than 50 miles away from downtown federal buildings and from the locations of the initial protests that gave rise to the federalization order. Pls.'s Suppl. Br. in Supp. of Mot. for  Preliminary Injunction at 7, 18, ECF No.127.

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

The pretextual use of federal agents or troops to consolidate federal power, using civil unrest as the thin edge of the wedge, is not without precedent. For example, in 2020, President Trump deployed federal agents to Portland, Oregon purportedly to protect federal courthouses and other federal buildings and monuments under 40 U.S.C. § 1315. Mike Baker et al., *Federal Agents Push Into Portland Streets, Stretching Limits of Their Authority*, N.Y. Times, July 31, 2020. The agents were found miles away from federal property engaging in law enforcement activities that appeared to have nothing to do with protecting federal property. Claire Finkelstein & Kevin Govern, *The Deployment of Federal Agents in Portland Is a Harbinger of Authoritarianism*, CERL Rule of Law Post (July 24, 2021), https://www.penncerl.org/category/the-rule-of-law-post/.

A similar incident occurred in Lafayette Square on June 1, 2020, when federal forces violently cleared the park near the White House to permit the president to cross the park for a photo-op in front of St. John's Church on the other side of the square. Elizabeth Goitein & Angelo Pis-Dudot, *Three Fixes to Prevent Another Battle of Lafayette Square*, Brennan Ctr. for Just. (June 1, 2021), https://www.brennancenter.org/our-work/analysis-opinion/three-fixes-prevent-another-battle-lafayette-square.  Several assault and battery claims are still being adjudicated as a result of that incident, and one court has denied the government's motion to dismiss the First Amendment violations. *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021)*.*

As Justice Neil Gorsuch wrote in his  dissent in *Zubaydah*, "[T]here comes a point where we should not be ignorant as judges of what we know to be true as citizens," *United States v. Zubaydah*, 595 U.S. 195, 238 (2022) (dissenting op.). The government's argument that National Guard troops in Los Angeles are protecting federal personnel and property rather than engaging in law enforcement appears disingenuous in light of the actual uses of National Guard troops to date. Considering what it knows about the pattern of deployment on the ground in California, the Court can easily make inferences about the Trump administration's purposes in federalizing and deploying the California National Guard. Given that the justification for federalization under the protective power itself references the U.S. government's purposes in calling forth federal troops,

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1  it is within the Court's discretion to inquire in the true purposes of the administration's actions to

2  make determinations about the legality and permissible scope of federal troop deployment. If it

3  determines that the deployment of the Guard was not in fact motivated by the purported intent to

4  protect federal assets and operations, as the Trump administration claims, it must not hesitate to

5  rule the deployment and ensuing federal activities in California unlawful.

6  **B.      Principles of federalism restrict mobilization of U.S. forces under 10 U.S.C. §**

7  **12406 to cases in which there is a clear showing of "rebellion" or an**

8  **indisputable inability for the U.S. to enforce the laws in any other way.**

9  In addition to the protective power, the president invoked 10 U.S.C. § 12406 to call forth

10  the National Guard. Under this statute, there are three possible grounds for federalization:

11  invasion, rebellion, and circumstances under which the president is unable "with the regular

12  forces to execute the laws of the United States." 10 U.S.C. § 12406 (3). The Trump

13  Memorandum of June 7 refers to the second of the three bases for federalizing the National

14  Guard, namely the danger of rebellion among the protesters. Yet there is no basis to believe that

15  either state and local authorities in California, or the citizens of California, are engaged in any

16  sort of rebellion. The protests that occurred in the face of extensive ICE and CBP deportations

17  and other activities against lawful and unlawful residences in California were largely peaceful,

18  with the exception of several days of violence which LAPD and Governor of California

19  determined could be effectively handled by local police and other law-enforcement officials.

20  From the days of the Rodney King riots, it is clear that state and local officials in California are

21  not reluctant to request federal assistance when they truly need it, and there is no reason to

22  suppose that Governor Newsom would have failed to request federal assistance under Title 32 in

23  case of a dire emergency stemming from civil unrest. On August 20, 2020, for example,

24  Governor Newsom requested an expedited major disaster declaration due to wildfires that began

25  on August 14 of that year. He did so again on March 1, 2025, in which he proclaimed a State of

26  Emergency to exist within the State of California due to wildfire risks, and again on July 3, 2024

27  in Butte County due to the Thompson fire, as well as on July 30, 2024 in Kern County and

28  September 29, 2024 in Lake County as well as on November 7, 2024 with regard to the fires in

9

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

Ventura County, and most recently on January 7, 2025 with regard to the fires in Southern California. The history makes clear that faced with true emergency circumstances, the Governor does not hesitate to declare a state of emergency and request federal assistance.

The authority of the president under 10 U.S.C. §12406 depends critically on the existence of a true emergency condition, such as a rebellion or another circumstance that would make sole reliance on state and local authorities imprudent or impracticable. That such circumstances failed to obtain here should also raise concerns about the true objectives of the federal government in engaging in the present deployment of federal troops.

In sum, *Amici* do not dispute the federal government's protective power or its ability to invoke it to protect federal assets in instances in which civil unrest threatens federal personnel or property. 32 C.F.R. § 215.4(c)(1)(ii*). Yet in the current instance, the invocation of the protective power is misplaced. There is no current threat to federal buildings, to federal officials or to any federal functions. That the federal government agrees with our assessment is manifested from the fact that the National Guard it has deployed has been operating far from any federal property, as detailed in the briefs filed by the State of California.

The exercise of that power, however, as well as activity conducted under 10 U.S.C. § 12406, is subject to the restrictions on the military acting as a *posse comitatus* to perform law enforcement functions.  As the next section describes, these restrictions constitute a second crucial foundation of democracy and the rule of law in the United States.

II.    **A core foundation of democracy and the rule of law in the United States is the prohibition of military forces from engaging in civilian law enforcement without express Constitutional or statutory authorization.**

The principle of *posse comitatus* provides guardrails similar to those of the principle of federalism. The Framers understood that the single greatest threat to the liberty of citizens would be an unchecked military, used to consolidate power by either the states or the federal government. Indeed, one of the grievances with the King enumerated in the Declaration of Independence was that "[h]e has affected to render the Military independent of and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776); Samuel Adams

(Vindex), Boston Gazette & Country J.,  Dec. 5, 1768 ("Will the spirits of people, as yet unsubdued by tyranny, unaw'd by the menaces of arbitrary power, submit to be govern'd by military force? No!"). For this reason, power over the military was spread out over several different authorities:  Congress was given the unique power of declaring war; the president was awarded the unique authority to command the armed forces in times of war upon a declaration of war by Congress, and state governors were awarded the authority to control their own state militias, to be taken over or "federalized" by the federal government only under the most dire and unusual set of emergency circumstances. Stephen I. Vladeck, *Emergency Power and the Militia Acts,* 114 Yale L. J. 149, 194 (2004).

## A.     Federal case law has long recognized the foundational nature of posse comitatus and the superiority of civil over military authority.

Once federalized or otherwise called into federal service, U.S. troops are normally forbidden from engaging in law-enforcement activities. In *Laird v. Tatum*, 408 U.S. 1, 15–16 (1972), the Supreme Court pointed to long-standing historical motivations behind the PCA:

> [C]oncerns of the Executive and Legislative Branches . . . reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military. . . .  [these] philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime.

The PCA functions as a reflection of the principle, which is articulated in the Constitution, that civil power should remain superior to military power, except when civil power is suspended, as in times of war or public danger, for which explicit statutory exceptions are made within the Insurrection Act. 10 U.S.C. §§ 251–255.

The separation between military operations and law-enforcement functions is critical for three structural and practical reasons.  First, the federal government blurs the line between warfighting and policing when it engages in law-enforcement activities. Second, federal troops are not well equipped or trained to interface with civilians in a law-enforcement context, which involves the safeguarding of constitutional rights and the protection of crime-scene evidence in

11

possible preparation for trial. Third, when U.S. military troops are deployed on U.S. soil against American citizens and lawful residents, it damages military readiness elsewhere in the chain of command and should only be undertaken under the rarest of circumstances.

The PCA prohibits any use of the armed forces as a posse comitatus except "under circumstances expressly authorized by the Constitution or an Act of Congress." 18 U.S.C. § 1385. This creates a prohibition which, while not absolute, is presumptive of illegality in the absence of express authorization. 10 U.S.C. §§ 251–255 & 10 U.S.C. §§ 271–284. *See also*, Jennifer K. Elsea, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, Cong Research Serv.  R42659, Nov. 6, 2018. Unlike the Insurrection Act, which explicitly recognizes presidential discretion to use the militia to "enforce the laws of the United States in any State," 10 U.S.C. § 12406 (3) references only the "execution" of laws. While "execution" and "enforcement" sometimes overlap, "execution" is a broader category and enforcement involves discretion. Patricia L. Bellia*, Faithful Execution and Enforcement Discretion*, 164 U. Pa. L. R. 1753 (2016). President Nixon's use of the Guard to execute postal service duties arguably fell well short of "law enforcement." *Note, Honored in the Breech: Presidential Authority to Execute the Laws with Military Force*, 83 Yale L.J. 130 (1973).

B.      **The Department of Defense Instruction (DODI) 3025.21 implements and interprets posse comitatus.**

Department of Defense Instruction (DoDI) 3025.21, Defense Support of Civilian Law Enforcement Agencies, acknowledges that posse comitatus restrictions apply to domestic deployment of military forces in the absence of express exceptions. It provides that in such deployments, forces "shall be prepared to support civilian law enforcement agencies consistent with the needs of military preparedness of the United States, while recognizing and conforming to the legal limitations on direct DoD involvement in civilian law enforcement activities". DoDI 3025.21(4)(a). DoDI 3025.21 gives as examples of non-restricted U.S. military activities those that are taken "for the primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civil authorities." DoDI 3025.21(1)(b)(1). DoDI 3025.21(1)(c)(1) identifies multiple categories of restrictions on direct assistance to civil

1  authorities, including search, arrest, and use of force. The DoDI restrictions include several other

2  categories, including "security functions; crowd and traffic control;" and "the use of deputized

3  State or local law enforcement powers by DoD uniformed law enforcement personnel." DoDI

4  3025.21(1)(c)(1).

5     The DoDI instruction comports well with decided cases and general principles of federal

6  law, and in any event functions as a binding executive branch interpretation. "A federal agency. .

7  . is 'obliged to abide by the regulations it promulgates,' including its own internal operating

8  procedures." *Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1267 (9th Cir.

9  2023) (citation omitted).

10     **C.  Federalized troops are subject to posse comitatus when called forth under**

11       **the protective power.**

12     As explained above, the protective power is an inherent, residual executive power "to

13  preserve, protect, and defend the personnel, property, and instrumentalities of the national

14  government." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L.

15  Rev. 1835 (2016*)*. *See also* Henry P. Monaghan, *The Protective Power of the Presidency*, 93

16  Colum. L. Rev. 1 (1993). As an inherent, not express or delegated power, the protective power is

17  circumscribed by instances in which Congress has expressly delegated—or limited—presidential

18  power. The Posse Comitatus Act, 18 U.S.C. 1385, is one such instance.

19     As the PCA itself makes clear, exceptions to that statue must be expressed, not implicit.

20  CITATIONS. It is black letter law, therefore, that any invocation of the protective power must

21  conform to the requirements of the PCA and that both the Rules for the Use of Force (RUF) and

22  the particular activities of federal troops must not stray into state law-enforcement domain. This

23  constraint was not observed in the present instance, in that federal troops were permitted to

24  engage in detentions and to hold American citizens in order to facilitate arrests. In addition, as

25  discussed above and detailed at greater lengths in California's briefs, the activities in which the

26  Guard has engaged while under federal control cannot be justified under the protective power,

27  and therefore can only be interpreted as acts of law-enforcement.

28

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

Federal courts, including the U.S. Supreme Court, have made clear that activities of federal troops are bound by other laws even when the protective power is invoked. Federal courts have recognized, for example, that police powers exercised to respond to protests must not violate the First Amendment. *City of Houston v. Hill*, 482 U.S. 451, 472 (1987) ("[A] certain amount of expressive disorder not only is inevitable in a society committed to individual freedom but must itself be protected if that freedom would survive."). This principle applies to law enforcement officers and to federal troops called forth to exercise police functions over mass demonstrations and protests. It would apply regardless of whether the authority for federalization was the protective power, 10 U.S.C. § 12406 (3), or any other basis for calling forth National Guard or any other federal troops.

The protective power may also be invoked if there is a need for protection and the state and civilian cannot or will not provide adequate protection. However, California has disputed the claim of the United States that the state and local authorities were unwilling or unable to give adequate protection. Ryan Goodman, *The "Unwilling or Unable" Test for Sending U.S. Military to Los Angeles*, Just Security (June 16, 2025), https://www.justsecurity.org/114698/unwilling-unable-protective-power/.

### D.    Federalized troops are subject to posse comitatus when called forth under 10 U.S. Code § 12406.

Like the protective power, the relationship of § 12406 to the PCA is not articulated expressly, and therefore there is every reason for federal courts to conclude that 12406 is not an exception to the PCA in the way that other express statutory delegations of presidential authority may be. Joseph Nunn, *The Insurrection Act Explained, Brennan Center for Justice Explainer* (April 21, 2022, last updated June 10, 2025), https://www.brennancenter.org/our-work/research-reports/insurrection-act-explained. No cases, scholarly analysis, or historical usage with respect to § 12406 provides a basis for articulating any exception to the PCA. Given the U.S.'s well-established aversion to the militarization of law enforcement, the most appropriate reading of that provision's relation to the PCA is a narrow one.

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

In its Supplemental Briefing, the United States argues that California's claim fails as a matter of law "because Section 12406 authorizes the Guard to engage in law enforcement." Suppl. Br. at 12, ECF No. 136  It maintains that such authorization is to be found in "the plain text of this provision and the Ninth Circuit precedent [that] establish that this language qualifies as an express authorization to conduct law enforcement for PCA purposes." *Id*. at 8.

The United States, however, misreads the statutory framework, Ninth Circuit precedent, and historical practice regarding the role of the militia and Armed forces in civil disturbances, acts of violence and disorder as codified at 32 C.F.R. § 215.4. The relevant section of § 12406—section 3—suggests a restriction: any executive activities undertaken by federalized Guard troops must be ones that are normally performed by "regular" federal forces. 10 U.S.C. § 12406 (3). In executing the laws, regular federal forces do not conduct arrests or detentions or regulate or control assembly rights or perform policing activities of any sort. By the very terms of 10 U.S.C. § 12406, then, federalized National Guard troops are not authorized to engage with civilians for the purpose of controlling civil unrest. Given that such functions are also impermissible under the protective power, they are not authorized under federal law given the *posse comitatus* constraints on federal troops in this domain.  Furthermore, the Department of Defense Instruction lists 14 sources of express statutory authority for military forces to participate in civilian law enforcement activity.  10 USC § 12406 is not one of them.  Encl. 3(1)(b)(5)(a)-(n).

 Past historical usage of § 12406 supports this interpretation. In 1970, for example, President Nixon used this provision to federalize the New York National Guard in response to impending postal service strikes to ensure the mail continued to be delivered. In this case, federal forces regularly involved in the execution of law (the federal postal workers) were refusing to execute those laws, and the Guard was nationalized to supplement or substitute for these executive workers. By contrast, because state and local law enforcement are responsible for handling minor crimes and violations that occur during civil unrest, there are simply no existing "regular" forces under federal control for the purposes of applying § 12406(3) to the situation in Los Angeles.

An express exception to the PCA that would be consistent with this reading of 10 U.S.C. 12406 can be found in 10 U.S.C. § 331, which authorizes use of the militia when "a State is unable to control domestic violence, and a request for Federal assistance has been made by the State legislature or governor to the President." 32 C.F.R. § 215.4(c)(2)(i)(a) . Exception two under 10 U.S.C. § 332, authorizes use of the militia to "enforce Federal law when unlawful obstructions or rebellion against the authority of the United States renders ordinary enforcement means unworkable." 32 C.F.R. § 215.4(c)(2)(i)(b). Exception three under 10 U.S.C. § 333, authorizes use of the militia "when domestic violence or conspiracy hinders execution of State or Federal law, and a State cannot or will not protect the constitutional rights of the citizens." 32 C.F.R. § 215.4(c)(2)(i)(b). The United States did not meet these requirements.

For example, the federal government continued to enforce immigration laws in California which had the highest number of deportation removal proceedings in June 2025 of the last two decades.  In California, the average daily population in detention facilities continued to increase through the protests and was up 28% year over year, from 2,571 to 3,284 individuals. Transactional Records Access Clearinghouse, Immigration Court Quick Facts: Closures, tracreports.org/phptools/immigration/closure/.  *See also*, U.S. Immigration and Customs Enforcement, ICE Enforcement and Removal Operations Statistics (May 30, 2025), http://www.ice.gov/statistics. Similarly, based on data collected and reported by the FBI, the current rate of assaults against federal immigration agents is ten times lower than assaults against police officers, an indication that federal agents face fewer challenges in the execution of their duties than local and state law enforcement.[2]

Furthermore, the plain language argument fails to address the constraints codified since the Nixon administration and accepted by all prior administrations. *See* Memorandum for the

[2] In the first six months of 2025, nationwide assaults against immigration agents increased to 79, from 10 in the same period of 2024 (9.3 assaults per 1.000 ICE ERO officers). For context, U.S. police agencies reported to the FBI that 79,091 out of 759,137 police officers were assaulted in 2023 (104.2 assaults per 1,000 officers). Press Release, Fed. Bureau of Investigation, FBI Releases - *Officers Killed and Assaulted in the Line of Duty 2023 Special Report and Law Enforcement Employee Counts* (May 14, 2024), https://www.fbi.gov/news/press-releases/fbi-releases-officers-killed-and-assaulted-in-the-line-of-duty-2023-special-report-and-law-enforcement-employee-counts.

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1    Robert E. Jordan III, General Counsel, Department of the Army, William Rehnquist, Assistant

2    Attorney General, Office of Legal Counsel, *Authority to use troops to protect federal functions,*

3    *including the safeguarding of foreign embassies in the United States* (May 11, 1970) ("The

4    authority should be exercised only in the extraordinary circumstances where normal measures

5    are insufficient....").

6    **III.    The deployment of federal troops in this case violates posse comitatus.**

7          The PCA prohibits an individual from "willfully us[ing] any part of the Army, the Navy,

8    the Marine Corps, the Air Force, or the Space Force as a posse comitatus." 18 U.S.C. 1385. To

9    violate the PCA, the use in question must be contrary to an authority established by "the

10   Constitution or Act of Congress." What the PCA does not define is what activities concerning

11   civilian law enforcement constitute "use" of the relevant military forces under the Act.

12         Although the U.S. Supreme Court has yet to address this fundamental issue, many other

13   courts have grappled with it and developed an approach for determining when federal military

14   personnel have violated the PCA. C.J. Williams, *An Argument for Putting the Posse Comitatus*

15   *Act to Rest* 85 Miss. L.J. 99, 138 (2016). After the Wounded Knee Occupation of 1973, where a

16   standoff between Native Americans and federal law enforcement authorities occurred, three main

17   tests were applied by the lower court: (1) the *Red Feather* test; (2) the *Jaramillo* test; and (3) the

18   *McArthur* test. *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991). As California

19   correctly claims, if any of these three tests are met, military conduct would be determined to

20   have violated the PCA. *United States v. Eleuterio*, No. 3:21-CR-0001, 2024 WL 1620383, at 6

21   (D.V.I. Apr. 15, 2024). In addition to these three tests, exceptions to the PCA must be express,

22   not implied, as discussed above. Therefore, a federal court interpreting the scope of PCA

23   constraints must also determine whether Congress has expressly authorized the activities in

24   question and thus authorized a PCA exception. *United States v. Hernandez-Garcia*, 44 F.4th

25   1157, 1213 (9th Cir. 2022).

26         The first test that federal courts have applied distinguishes between the "active role of

27   direct law enforcement" and the "passive role which might indirectly aid civilian law

28   enforcement." *United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975). Under this

17

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1    test, direct law enforcement would violate the PCA, but indirect or "passive" law-enforcement

2    assistance would not. In determining the boundaries of "direct active use," the *Red Feather* court

3    found that the activities of "arrest; seizure of evidence; search of a person; search of a building;

4    investigation of crime; interviewing witnesses; pursuit of an escaped civilian prisoner; search of

5    an area for a suspect and other like activities" all met the threshold for the test. *Id. at* 925.

6        The RUF under which the National Guard have been operating in California suggest that

7    the very deployment of the federal troops and their mission constitutes a violation of the PCA

8    under the *Red Feather* test. Most notably, the instruction that federal troops could "detain" short

9    of arrest easily constitutes direct participation in law enforcement under the foregoing precedent

10   and therefore would fall on the PCA side of the line.

11       This is confirmed by cases determining that when federal troop activities lack a military

12   purpose, such as activities outside of the scope of protecting federal buildings, the RUF violate

13   the PCA. *United States v. Dreyer*, 804 F.3d 1266, 1276 (9th Cir. 2015).[3] In view of the fact that

14   federal troops have not been deployed consistent with a true protective purpose, their activities

15   fail military necessity and therefore do not pass muster under the PCA. *See* Rehnquist OLC

16   Memorandum at 3 (May 11, 1970) ("[T]roops may be used when necessary to carry out and

17   protect federal functions. . . .  The reference to . . . 'when necessary' should be emphasized. . . .

18   The authority should be exercised only in the extraordinary circumstances where normal

19   measures are insufficient . . . .").

20       The second test applied by the lower courts is a more expansive one, and this requires

21   only that the "use" of military personnel must pervade the "activities of the United States

22   marshals and the Federal Bureau of Investigation agents," to be considered a violation of the

23   PCA. *United States v. Jaramillo*, 380 F. Supp. 1375, 1379 (D. Neb. 1974).

24

---

25   [3] In *Dreyer*, agents in the Naval Criminal Investigative Service (NCIS) unit conducted a criminal
     investigation of the distribution of child pornography on the internet, through software that
26   accessed files around the world. 804 F.3d at 1270. The Court held that the agents violated the
     PCA, finding that their investigation lacked a "legitimate independent military purpose" due to
27   its violation of DoD and naval policy by conducting searches on "mostly" civilian-owned
     computers. *Id. at* 1276. Although relating to a specialized unit within the Navy, this shows that
28   actions outside of a directed military purpose violate the boundaries set by the PCA.

18

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

According to the *Jaramillo* test, when military personnel act in place of civilian law enforcement, they usurp the civil authorities and violate the PCA. *State v. Yuen*, 555 P.3d 121, 134 (Haw. 2024). In *Yuen*, a military police officer initially engaged in actions that did not violate the PCA by investigating an accident 50 feet from the entrance of his base, but that investigation turned into a PCA violation when the officer proceeded to detain the civilian responsible for the accident. *Id.* at 124. The court held that the alcohol screening and detention of the civilian constituted an "intrusion into civilian matters." *Id.* at 134. Hence, detaining a civilian outside a military base is likely a PCA violation, notwithstanding exceptional circumstances.

The third test lies somewhere in between the *Red Feather* and the *Jaramillo* tests, namely that found in *United States v. McArthur.* In that case, the court required there to be action by military personnel that subjects citizens to: (1) regulations, (2) proscriptions, or (3) compulsions of their authority. *United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D. 1975). In defining the three potential ways the *McArthur* test can be met, the court found *first*, that a regulatory power is one that "controls or directs" the conduct of another, often seen through physical involvement or interdiction. *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986): *see also United States v. Stouder*, 724 F. Supp. 951, 953 (M.D. Ga. 1989) (where Air Force personnel assistance to FBI's agents were not considered regulation of defendants conduct). Threats of control or authority may also be seen as regulatory. *United States v. Gerena*, 649 F. Supp. 1179 at 1182. *Second,* a proscriptive activity is one that "prohibits or condemns" the actions of civilians. *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986) (Since defendants were being held in the custody of U.S. Marshals at all times, the military did not engage in a proscriptive activity). *Third,* a compulsory activity is considered one that "exerts some coercive force" on the civilian population. *United States v. Gerena*, 649 F. Supp. 1179, 1182 (D. Conn. 1986); *see also Compulsory*, Black's Law Dictionary (12th ed. 2024) ("Required or compelled; mandated by legal process or by statute").

Courts have found that activities such as military roadblocks and armed patrols violate the PCA. *See Bissonette v. Haig*, 776 F.2d 1384, 1390-91 (8th Cir. 1985). Accordingly, the conduct at issue in this case also satisfies the *McArthur* test, indicating that both with regard to

1   the RUF and with regard to their actual activities, the federal troop deployment in this case does

2   not pass muster under the constraints of the PCA.

3   **IV.      Where constitutional rights are at risk, courts must closely scrutinize government**

4   **action.**

5           Federal courts are reluctant to weigh in on executive branch decision-making involving

6   military operations outside the United States, for fear of unduly interfering with presidential

7   national security authority to protect the nation. While there is longstanding precedent to support

8   deference to presidential authority in the realm of foreign affairs, *United States v. Curtiss-Wright*

9   *Exp. Corp.*, 299 U.S. 304 (1936), deference in the domestic realm, where the constitutional rights

10  of Americans are at stake, is entirely another matter. *Youngstown Sheet & Tube Co. v. Sawyer*,

11  343 US 579 (1952). *See also* Roy E. Brownell II, *The Coexistence of United States v. Curtiss-*

12  *Wright and Youngstown Sheet & Tube v. Sawyer in National Security Jurisprudence*, 26 J. L. &

13  Pol. 1 (2020). Judicial deference to military operations in foreign jurisdictions is appropriate and

14  supported by longstanding federal precedent. However, this same deference with respect to

15  domestic use of the military is antithetical to basic rule of law principles in the U.S. democratic

16  system.

17          In the present matter, the government appears to be attempting to chill vocal opposition

18  to its policies, expressed by California citizens through protests and demonstrations on the streets

19  of Los Angeles. The right to voice dissent against the policies of one's government without fear

20  of legal or political repercussions is the essence of a democracy and is a right that is protected by

21  the First Amendment of the U.S. Constitution. Deployment of U.S. troops to chill or otherwise

22  interfere with constitutionally protected expression is one of the clearly identifiable purposes of

23  the Posse Comitatus Act, insofar as it permits the military to encroach on the domain of civil

24  rights protected by the first eight amendments to the U.S. Constitution. Under such

25  circumstances, when the constitutional rights of Americans are under threat by presidential

26  decision-making regarding use of the military, deference to presidential authority is not

27  warranted, and federal courts have a mandate, indeed a duty, to intervene.

28

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

In addition to First Amendment rights of speech and assembly, Californians have had their Fourth Amendment rights threatened by the RUF under which federal troops have been deployed to Los Angeles. As the discovery documented in California's Supplemental Brief in support of motion for preliminary injunction shows, federal troops have been empowered to detain civilians in Los Angeles whom they suspect of civil disturbances, holding them without arrest until LAPD can arrive. But as the above discussion of *posse comitatus* in Section III suggests, such detentions should be classified as part of "law enforcement activities," and should therefore not fall within the purview of active duty federal or federalized troops absent suspension of the PCA. As discussed above, because neither of the two authorities invoked—the protective power and 10 U.S.C. § 12406—constitutes an exception to the PCA, the power to detain should be considered a violation of that Act.

Members of the U.S. military all swear an oath to defend the Constitution of the United States. Lee Robinson and Joseph G. Amoroso, *Military Personnel Swear Allegiance to the Constitution and Serve the American People, Not One Leader or Party*. Military.com (April , 2024) https://www.military.com/daily-news/opinions/2024/04/04/military-personnel-swear-allegiance-constitution-and-serve-american-people-not-one-leader-or-party.html; *Secretary of Defense Mark T. Esper Addresses Reporters Regarding Civil Unrest*, U.S. Dep't of Def. (June 3, 2020), https://www.defense.gov/News/Transcripts/Transcript/Article/2206685/secretary-of-defense-esper-addressesreporters-regarding-civil-unrest/.

Unlike other militaries around the world that typically swear to defend their countries, the U.S. military views its mission as defending the rule of law. See Brief *Amici Curiae* of Claire Finkelstein and 14 National Security Professionals, *Trump v. United States* (No. 23-939) (filed Apr. 8, 2024), https://www.supremecourt.gov/DocketPDF/23/23-939/307065/20240408151425926_23-939%20Amicus%20Brief%20of%20Claire%20Finkelstein%20et%20al_.pdf; Claire Finkelstein and Richard Painter, *Trump's Presidential-Immunity Theory Is a Threat to the Chain of Command, The Atlantic* (Apr. 15, 2024), https://www.theatlantic.com/politics/archive/2024/04/presidential-immunity-supreme-court-trump/678050/.

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

1    Prior federal cases have recognized that violations of posse comitatus can constitute a

2 violation of the Fourth Amendment. In particular, in determining whether a search or seizure was

3 "reasonable," courts have considered whether the search or seizure violated the PCA. See *United*

4 *States v. Dreyer*, 767 F.3d 826 (9th Cir. 2014) (holding that the fact that a search of a computer

5 for child pornography by a Naval Criminal Investigative Services Agent violated *posse comitatus*

6 was relevant to determining whether the search violated the Fourth Amendment). The same

7 extends to the First Amendment. When the presence of federal troops chills the expressive rights

8 of speech and assembly of U.S. citizens, may be acting outside the scope of their official duties

9 from the standpoint of the PCA may also suggest that interference with the rights of assembly

10 and speech is not warranted, lending credence to the suggestion that federal intervention in civil

11 unrest constitutes an infringement of the First Amendment rights of Californians in this instance.

12                                        **CONCLUSION**

13    Time and time again the courts have held that "a traditional and strong resistance of

14 Americans to any military intrusion into civilian affairs... has deep roots in our history." *Tatum*,

15 408 U.S. at 15. Only in limited circumstances of invasion, insurrection, or breakdown in federal

16 law, can the federal government claim power over the state militia.  Civilian control of the

17 military is basic to our system of government. *See* Brenner M. Fissell, *The Military's*

18 *Constitutional Role*, 103 N.C. L.R.331 (2025).  This requires that the police, not the military,

19 remain in control of law enforcement in U.S. urban environments.  Use of military forces in

20 domestic civilian environments to suppress civil unrest has the potential to threaten vital First

21 and Fourth Amendment rights.  *Moore*, 18 U.S. (5 Wheat.) at 50 (Story, J., concurring)*; see also*

22 *Biden*, 70 F.4th at 829*.* Protection of these critical constitutional rights as well as preserving the

23 role of the U.S. military as a defender of the Constitution—an oath of all members of the military

24 took—is within the appropriate and necessary functions of federal courts. The U.S. military must

25 remain an apolitical defender of the country's vital national security interests, not a threat to it.

26 This is essential to the preservation of the rule of law.

27

28

Dated: August 21, 2025                    STEPTOE LLP

                                          /s/ Conor Tucker
                                          Conor Tucker

                                          Attorneys for *Amici Curiae*

MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* AND
BRIEF OF *AMICI CURIAE*

**CERTIFICATE OF SERVICE**

On the date below, the foregoing document was filed using the Court's electronic filing system which will electronically serve all counsel of record in this case.


Dated: August 21, 2025


                                                    */s/ Conor Tucker*
                                                    Conor Tucker

CERTIFICATE OF SERVICE