IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GAVIN NEWSOM, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-04870-CRB

**OPINION GRANTING INJUNCTIVE RELIEF**

Congress spoke clearly in 1878 when it passed the Posse Comitatus Act, prohibiting the use of the U.S. military to execute domestic law. Nearly 140 years later, Defendants—President Trump, Secretary of Defense Hegseth, and the Department of Defense—deployed the National Guard and Marines to Los Angeles, ostensibly to quell a rebellion and ensure that federal immigration law was enforced. There were indeed protests in Los Angeles, and some individuals engaged in violence. Yet there was no rebellion, nor was civilian law enforcement unable to respond to the protests and enforce the law.

Nevertheless, at Defendants' orders and contrary to Congress's explicit instruction, federal troops executed the laws. The evidence at trial established that Defendants systematically used armed soldiers (whose identity was often obscured by protective armor) and military vehicles to set up protective perimeters and traffic blockades, engage in crowd control, and otherwise demonstrate a military presence in and around Los Angeles. In short, Defendants violated the Posse Comitatus Act.

Almost three months after Defendants first deployed the National Guard to Los Angeles, 300 National Guard members remain stationed there. Moreover, President Trump and Secretary Hegseth have stated their intention to call National Guard troops into

1  federal service in other cities across the country—including Oakland and San Francisco,

2  here in the Northern District of California—thus creating a national police force with the

3  President as its chief.  Because there is an ongoing risk that Defendants will act unlawfully

4  and thereby injure Plaintiffs, Governor Newsom and the State of California, the Court

5  **ENJOINS** Defendants from violating the Posse Comitatus Act as detailed below.

6  **I.    PROCEDURAL HISTORY**

7       On June 9, 2025, Plaintiffs filed this case, bringing three causes of action against

8  Defendants: (1) an ultra vires claim against all Defendants, (2) a Tenth Amendment claim

9  against all Defendants, and (3) an Administrative Procedures Act claim against Secretary

10  Hegseth and the Department of Defense.  Compl. (dkt. 1).  The next day, Plaintiffs moved

11  for a temporary restraining order.  TRO Mot. (dkt. 9).  After expedited briefing and a

12  hearing, the Court granted Plaintiffs' motion, holding that Defendants had acted ultra vires

13  and violated the Tenth Amendment when they federalized the California National Guard

14  without satisfying the statutory criteria of 10 U.S.C. § 12406.  See TRO (dkt. 64).  Though

15  Plaintiffs also sought a temporary restraining order based on the Posse Comitatus Act, the

16  Court held that Plaintiffs had not shown that Defendants had violated or were likely to

17  violate the Act.  Id. at 26–29.  The Court therefore entered an injunction requiring

18  Defendants not to deploy the California National Guard in Los Angeles and to return

19  control of the California National Guard to Governor Newsom.  Id. at 35–36.

20       Defendants appealed the Court's entry of a temporary restraining order, and the

21  Ninth Circuit administratively stayed the order.  See Newsom v. Trump, 141 F.4th 1032,

22  1039 (9th Cir. 2025) (per curiam).  The Ninth Circuit heard expedited argument and then

23  issued an order staying the temporary restraining order pending appeal, concluding that it

24  was likely that President Trump lawfully federalized the California National Guard under

25  § 12406(3).  Id. at 1040.  The Ninth Circuit explained that § 12406 affords the President

26  significant discretion such that courts can review only whether the president had a

27  colorable, good-faith basis for invoking that statute.  Id. at 1049–51.  The Ninth Circuit

28  declined to weigh in on Plaintiffs' Posse Comitatus Act arguments.  Id. at 1055.

With Plaintiffs' motion for a preliminary injunction (dkt. 77) still pending, this Court advanced the trial on the merits as to Plaintiffs' Posse Comitatus Act claim pursuant to Federal Rule of Civil Procedure 65(a)(2). Sched. Order (dkt. 109). The Court presided over the trial from August 11 to August 13, 2025. See Dkts. 155–57. The Court's findings of fact and conclusions of law follow. See Fed. R. Civ. P. 52(a).

## II.    FINDINGS OF FACT

### A.    ICE Activities in LA

In early June 2025, Immigration and Customs Enforcement initiated a series of immigration enforcement actions in Los Angeles, California. Olmstead Decl. (dkt. 8-2) ¶ 6. ICE targeted "several locations in downtown LA and its immediate surroundings" that are "known to have significant migrant populations and labour-intensive industries." Espíritu Decl. (dkt. 8-1) Ex. G. On June 6, the first day of the enforcement actions, ICE detained between 70 and 80 people and arrested 44. Id. The next day, Customs and Border Protection officers arrived from San Diego to assist with immigration enforcement operations. Santacruz Decl. (dkt. 22-1) ¶ 18.

Public protests quickly followed. At the site of one of the June 6 enforcement actions, a group of people gathered and tried to prevent ICE from leaving. Id. ¶ 7; Espíritu Decl. Ex. D. That evening, crowds of people in downtown Los Angeles protested against ICE's enforcement actions. Espíritu Decl. Ex. D; Santacruz Decl. ¶¶ 9, 10. At the Roybal Federal Complex—which houses the Metropolitan Detention Center—some protestors threw "concrete chunks, bottles of liquid, and other objects" at Federal Protective Service officers guarding a parking garage gate, while others tried "to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate." Santacruz Decl. ¶ 11; Trial Tr. Vol. I (dkt. 162) at 189:20–190:9. Protests continued downtown and in several nearby cities on June 7. At protests in Paramount and Compton, some protestors threw rocks and other objects (including mangos, fireworks, and a Molotov cocktail), burned a vehicle, barricaded a street with shopping carts, briefly trapped an ICE agent in a car, and vandalized property. Santacruz Decl. ¶ 20.

1    The Los Angeles Police Department and Los Angeles Sheriff's Department
2 responded to these protests and maintained control of the situation.  Even before the
3 protests downtown on the evening of June 6, LAPD had reassigned additional officers to
4 the area.  Olmstead Decl. ¶ 6.  When some protestors acted violently at the Roybal
5 Complex, LAPD officers successfully pushed the crowd away.  Santacruz Decl. ¶¶ 13, 15.
6 Shortly thereafter, LAPD declared an unlawful assembly, and most protestors departed the
7 area by 11:00 p.m.  Id. ¶¶ 16–17.  As for the June 7 protests, LASD dispatched 200
8 deputies to Paramount and Compton, including a team with specialized training in
9 handling civil unrest, and LAPD was "fairly in control" of the protests downtown.
10 Olmstead Decl. ¶¶ 7, 9.

11    As a result of the protests on June 6 and 7, two federal buildings were vandalized
12 and sustained minor damage, and a DHS fence and three government vehicles were also
13 damaged.  Santacruz Decl. ¶¶ 17, 21.  These protests led to one recorded injury to a law
14 enforcement officer—a CBP officer whose wrist was struck by a thrown object.  Id. ¶¶ 7–
15 22.  LAPD made 29 arrests on June 7.  Olmstead Supp. Decl. (dkt. 39-3) ¶ 14.

16    **B.    Deployment of the National Guard**

17    On June 7, President Trump issued a memorandum to the Secretary of Defense, the
18 Attorney General, and the Secretary of Homeland Security in which he called the National
19 Guard into federal service.  June 7 Presidential Memo (Trial Ex. 17).  President Trump's
20 memorandum cited 10 U.S.C. § 12406 as his legal authority for federalizing the National
21 Guard and stated as a factual basis that:

22       Numerous incidents of violence and disorder have recently
         occurred and threaten to continue in response to the enforcement
23       of Federal law by U.S. Immigration and Customs Enforcement
         (ICE) and other United States Government personnel who are
24       performing Federal functions and supporting the faithful
         execution of Federal immigration laws.  In addition, violent
25       protests threaten the security of and significant damage to
         Federal immigration detention facilities and other Federal
26       property.

27 Id. at 1.  President Trump did not invoke the Insurrection Act, 10 U.S.C. §§ 251–255.

28    President Trump's memorandum called the National Guard into federal service "to

temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur." June 7 Presidential Memo at 1. President Trump also authorized the Secretary of Defense to "employ any other members of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property." Id. at 1–2. He purported to authorize the military to "perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property." Id. at 2. The memorandum never specifically mentioned Los Angeles or California; to the contrary, it instructed the Secretary of Defense "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard." Id. at 1.

The same night, Secretary Hegseth issued a memorandum in which he implemented President Trump's direction. June 7 DOD Memo (Trial Ex. 18). Secretary Hegseth called 2,000 members of the California National Guard into federal service and instructed that they be placed under the command and control of U.S. Northern Command. Id. Two days later, Secretary Hegseth issued another memorandum in which he federalized an additional 2,000 California National Guard members, June 9 DOD Memo (Trial Ex. 3), and posted on social media that "approximately 700 active-duty U.S. Marines from Camp Pendleton are being deployed to Los Angeles to restore order" and "defend federal law enforcement officers," Eck Decl. (dkt. 8-3) ¶ 18. The 4,000 federalized National Guard troops, as well as the approximately 700 U.S. Marines, were placed under the control of Task Force 51, U.S. Army North's deployable contingency command post. Trial Tr. Vol. I at 15:12–16:4.

On June 7, a briefing took place at U.S. Army North with the Army North commanding general, chief of staff, operations officer, and deputy chief of staff William Harrington present. Id. at 18:17–19, 20:17–21:2. Mr. Harrington has over two years of experience in his role at Task Force 51, id. at 17:9–11, and he previously worked for two

United States District Court
Northern District of California

years as an instructor for U.S. Northern Command teaching a course titled "Defense Support to Civil Authorities," which included material on the Posse Comitatus Act, id. at 17:18–18:16. At the June 7 briefing, Mr. Harrington stated—based on his experience and training within the Department of Defense—that "if any National Guard troops were federalized as part of the deployment, they would lose the ability to conduct law enforcement activities because of the Posse Comitatus Act." Id. at 21:15–22:13. Everyone at the briefing agreed with Mr. Harrington's assessment, id. at 22:19–23, and the commanding general assured him that "federalized National Guard troops involved in the mission would not be performing law enforcement functions," id. at 22:14–18, 23:23–24:2. To Mr. Harrington's knowledge, everyone in U.S. Northern Command knew that the Posse Comitatus Act applied, and no one expressed a contrary view. Id. at 24:3–15.

### C.    Task Force 51's Training

Task Force 51 troops—both the federalized National Guard troops and the U.S. Marines deployed to Los Angeles—received training on the permitted scope of their activities under the Posse Comitatus Act. Id. at 24:17–20, 60:6–8 ("[T]he standing rules on the use of force brief that was given by our legal personnel [] was given to every soldier and Marine that went on the mission."); Task Force 51 Training Slides (Trial Ex. 10). The training materials for Task Force 51 provided that "active-duty military personnel may not provide 'direct, active assistance to civilian law enforcement authorities by performing law enforcement functions,' unless a Constitutional or an Act of Congress exception specifically permits it." Task Force 51 Training Slides at 5 (emphasis in original).

Major General Scott Sherman, the deputy commanding general support for U.S. Army North and commander of Task Force 51, oversaw the training of Task Force 51. Trial Tr. Vol. I at 50:14–17, 51:11–14. He testified that his number two priority (after troops' welfare and safety) was "to ensure that they followed the standing rules on the use of force exactly as was written." Id. at 120:2–6. Accordingly, he ensured that Task Force 51 troops knew that "they weren't allowed to do any law enforcement actions. Law enforcement had to do it themselves." Id. at 120:19–21. Among other instructions, Task

Force 51 troops were told that they could not impede vehicle or pedestrian traffic or block public roads, because these are law enforcement functions.  Id. at 27:16–28:1.

But Major General Sherman's instructions were not absolute.  For instance, the Task Force 51 training materials specified the law enforcement functions prohibited by the Posse Comitatus Act:

 

## Prohibited Law Enforcement <u>Functions</u>

> **PCA Prohibits Active, Direct:**
>   > **Pursuit**
>   > **Arrests**
>   > **Apprehension**
>   > **Search**
>   > **Seizure**
>   > <span style="color:red">**Security patrols**</span>
>   > <span style="color:red">**Traffic control**</span>
>   > <span style="color:red">**Crowd control**</span>
>   > <span style="color:red">**Riot control**</span>
>   > **Evidence collection**
>   > **Interrogation**
>   > **Informant**

**Additionally, the PCA prohibits any other activity where civilians are subjected to military authority that is regulatory, proscriptive, or compulsory.**

***USARNORTH***

Task Force 51 Training Slides at 6.  Although the training materials list twelve prohibited functions, Task Force 51 troops were orally instructed that the four functions listed in red—security patrols, traffic control, crowd control, and riot control—were subject to a so-called constitutional exception to the Posse Comitatus Act.  Id.; Trial Tr. Vol. II (dkt. 163) at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.  This instruction came "all the way from the top of [the Department of Defense] down to Task Force 51."[1]  Trial Tr.

---

[1]  Defendants objected to this testimony as privileged.  Trial Tr. Vol. II at 280:12–13.  By introducing evidence regarding legal advice given by Department of Defense lawyers,

1  Vol. II at 283:1–3.  The Department of Defense instructed U.S. Northern Command and

2  Task Force 51 that the President and Secretary's June 7 memoranda created a

3  constitutional exception to the Posse Comitatus Act and thereby authorized Task Force 51

4  to engage in the four functions listed in red.  Id. at 235:17–236:14; 237:8–17.

5       This instruction was initially not put in writing.  Id. at 283:7–11.  Eventually,

6  Secretary Hegseth issued a memorandum that explained the scope of the alleged

7  constitutional exception to the Posse Comitatus Act.  June 23 DOD Memo (Trial Ex. 2);

8  Trial Tr. Vol. II at 275:5–276:5; see also Task Force 51 Training Slides at 7 (highlighting

9  an exception for "Protection of Federal property, functions, and personnel").  Secretary

10  Hegseth's memorandum, issued to U.S. Northern Command, directed Task Force 51 to:

11      • Deploy to Federal Government properties, including Federal
12        buildings and monuments.  When deployed to Federal Government
      properties, Service members will support Federal law enforcement
13        and may take reasonable measures to prevent the destruction or
      defacement of Federal Government property including crowd
14        control, temporary detention, cursory search (such as safety-related
      searches for weapons incident to temporary detention), measures to
15        ensure the safety of persons on the property, and the establishment
      of security perimeters reasonably necessary to protect the property.

16      • Deploy to support Federal law enforcement to protect Federal
17        functions and to protect Federal personnel from harm or threat of
      bodily injury, including Federal law enforcement officers and other
18        Federal Government officials and employees.  This may include
      measures for temporary detention, cursory search, and the steps
19        necessary to ensure the safety of Federal personnel.  For example,
      while other Federal personnel execute their duties, [Department of
20        Defense] Service members may provide perimeter protection
      against third parties and such crowd control measures as are
21        reasonably necessary to ensure the execution of Federal functions
      and the safety of Federal personnel.

22  June 23 DOD Memo.  This memorandum—in particular, the second bullet point—asserts

23  that wherever federal personnel go, Task Force 51 troops can accompany them and

24  establish perimeter control, engage in crowd control, and otherwise perform any functions

25  "necessary to ensure the execution of Federal functions and the safety of Federal

26  personnel."  Id.

27  _____

28  however, Defendants waived any assertion of privilege.  E.g., id. at 244:19–245:12; see
Weil v. Inv./Indicators, Rsch. & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir. 1981).

1    Defendants took the position at trial that there did not even need to be an actual

2    threat to federal property, personnel, or functions to deploy Task Force 51.  Trial Tr. Vol. I

3    at 122:20–23.  In fact, Defendants contend that the potential for unexpected threats to

4    develop would be sufficient to deploy Task Force 51, even where the military's own

5    assessment is that an operation is low- or no-risk.  Id. at 124:1–22.  Defendants go still

6    further, proposing that even where there is no threat to the safety or security of federal

7    personnel or property, the mere possibility that federal law enforcement agents might not

8    be able to do their job could justify deployment of Task Force 51 as "a preventative

9    measure."  Id. at 122:23–25.

10    Task Force 51 troops were trained to report violations of the Standing Rules for Use

11    of Force, including violations of the Posse Comitatus Act.  Trial Tr. Vol. II at 242:8–23;

12    Task Force 51 Training Slides at 42, 44.  There are no known reports by Task Force 51

13    troops of violations of the Standing Rules for Use of Force.  Trial Tr. Vol. II at 242:24–

14    243:7.  That said, in spite of troops' training to report violations, Task Force 51 troops

15    were openly instructed that they could, consistent with the Posse Comitatus Act, engage in

16    some law enforcement actions as long as they were doing so to protect federal property,

17    personnel, or functions.  Task Force 51 Training Slides at 7; Trial Tr. Vol. II at 236:25–

18    238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.

19    **D.    Task Force 51's Operations**

20    The first federalized Task Force 51 troops deployed to Los Angeles on June 8.  In

21    these early days of their deployment, "it was not clear what role they were to play."

22    Espíritu Decl. Ex. R.  Task Force 51 troops were initially stationed at the Roybal

23    Complex—specifically at the Metropolitan Detention Center—while protests against ICE

24    activity continued in downtown Los Angeles.  Olmstead Decl. ¶ 12.

25    On June 10, several days after the first Task Force 51 troops arrived in Los Angeles,

26    a representative of U.S. Army North sent an email "coach[ing]" federal law enforcement

27    agencies as to what language to use when submitting requests for assistance (which are

28    how federal agencies requested support from Task Force 51 troops).  RFA Email Thread

(Trial Ex. 39); Trial Tr. Vol. I at 155:5–8.  Specifically, law enforcement agencies were instructed to "[s]ubstitute 'protection' for 'security'" and "detect, monitor, and report" for "surveillance."  RFA Email Thread.  "If the requested activity cannot be converted to a 'protection' term," the email stated, "then we cannot perform it."  Id.  The Department of Defense did not explain what "protection" meant, nor did it clarify for federal agencies which functions troops could lawfully perform.  Trial Tr. Vol. I at 154:13–23.  Pursuant to the email instructions, though, federal law enforcement agencies' requests for assistance included requests for "protection" of federal property and for "force protection" of federal law enforcement agents who were conducting search warrant operations.  Id. at 31:14–25.

While on the ground in and around Los Angeles, Task Force 51 troops wore military uniforms, which were green or multicamouflage.  Id. at 88:15–18, 175:13–15.  At least some ICE agents wore camouflage uniforms too.  Id. at 174:22–175:11.  It is difficult, even for someone familiar with military uniforms and insignia, to differentiate between the uniforms from a distance or where there is a lot of commotion.[2]  Id. at 175:16–176:7.  Indeed, Major General Sherman and Ernesto Santacruz—the Los Angeles field office director for ICE's Enforcement and Removal Operations and a veteran himself—were both unable to determine whether multiple individuals in photographs of ICE enforcement actions were Task Force 51 troops or federal law enforcement personnel.  See id. at 72:3–6, 176:20–177:7, 177:15–178:6.  Task Force 51 troops were also armed, carrying weapons with live ammunition.  Id. at 32:5–8.

Task Force 51 responded to 64 requests for assistance in and outside of Los Angeles County.  Id. at 31:3–13.  These requests for assistance came from various federal law enforcement agencies, many (but not all) within the Department of Homeland Security.  Id.

---

[2]  Department of Defense regulations require federal troops to have their name displayed on their uniform.  Army Reg. 670-1 § 2-7, Dep't of the Army Pamphlet 670-1 § 21-25.  Yet some Task Force 51 troops wore body armor that obscured their names.  Trial Tr. Vol. I at 89:12–20.  Federal law enforcement personnel in Los Angeles did not display their names on their uniforms.  Id. at 90:4–25.  In fact, many wore plain clothes instead of a uniform that would identify them as law enforcement at all.  Id. at 98:22–25, 174:15–21.

United States District Court
Northern District of California

### 1.      Operations in Los Angeles County

Task Force 51 troops accompanied ICE officers on approximately 75% of their enforcement and removal operations in and around Los Angeles through mid-July.  Id. at 166:8–19; see also, e.g., ICE Twitter Posts (Trial Exs. 53, 54) (photographs of Task Force 51 troops standing next to ICE agents while the agents detained individuals).  The presence of Task Force 51 deterred engagement by the public, especially by those who might have attempted to hinder or protest an arrest by ICE agents.  Trial Tr. Vol. I at 170:24–171:17.

The Marines who were part of Task Force 51 were tasked only with protecting federal property in Los Angeles.  Trial Tr. Vol. II at 214:25–215:7.  One such facility was the Wilshire Federal Building, which houses the Veterans Affairs office.  Trial Tr. Vol. I at 64:6–10.  On June 12, a Marine briefly detained a veteran who twice attempted to enter the building but who did not stop when asked, provide identification, or state his business.  Id. at 64:11–13, 65:10–18.  The Marine restrained the veteran's hands in flex cuffs and detained him for approximately 25 minutes, after which point federal law enforcement arrived and took custody of him.  Id. at 68:13–20.  The Marine did not question the veteran or otherwise engage with him.  Id. at 68:21–69:4.

Not all of Task Force 51's deployments in Los Angeles were related to ICE or other DHS agencies.  For example, on the morning of June 13, Task Force 51 troops accompanied DEA and FBI officers on a joint DEA–FBI operation at a private residence in Long Beach.  June 13 Mission Debrief (Trial Ex. 38).  Task Force 51 troops and military vehicles, in conjunction with DEA SWAT teams, cordoned off Long Beach Boulevard in two directions from the residence while DEA and FBI agents approached the residence to look for an individual who had thrown rocks during one of the June 7 protests.  Id. ("National Guard soldiers established their blocking positions at approximately 0600."); see also Trial Tr. Vol. I at 119:9–13 ("[I]t was law enforcement in the lead, with our soldiers behind them.").  The record is unclear as to whether Task Force 51's blockades prevented any civilians from using Long Beach Boulevard, a public road, while the operation was ongoing.  Trial Tr. Vol I at 77:14–17.

United States District Court
Northern District of California

Nor was Task Force 51 deployed only in support of federal <u>enforcement</u> actions. On July 7, approximately 80 Task Force 51 troops participated in a DHS operation, titled Operation Excalibur,[3] at MacArthur Park in Los Angeles.  <u>Id.</u> at 35:3–24, 99:21–24; Operation Excalibur Slides (Trial Ex. 28).  This was DHS's third attempt at the operation, and Secretary Hegseth himself approved it.[4]  Trial Tr. Vol. I at 35:8–14, 103:19–24; Trial Tr. Vol. II at 261:24–262:3.  Operation Excalibur involved federal law enforcement officials marching across MacArthur Park while Task Force 51 remained stationed on the outside of the park in military vehicles—Humvees and tactical vehicles—including at two traffic control points to prevent vehicular traffic along a stretch of Wilshire Boulevard. Operation Excalibur Slides at 5; Trial Tr. Vol. I at 35:25–36:1.  DHS's mission in executing Operation Excalibur was "to demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles Joint Operations Area."  Operation Excalibur Slides at 4.  And the operation's purpose was to "enable and protect the execution of joint federal law enforcement missions in a high-visibility urban environment, while preserving public safety and demonstrating federal reach and presence."  <u>Id.</u>

Operation Excalibur was rated high-risk for DHS agents due to (among other things) likely crowds and concerns about an international gang presence.  <u>Id.</u> at 21. So Task Force 51 conducted "numerous rehearsals," which were "very large" and involved "all of the key leaders of the operation."  Trial Tr. Vol. II at 265:9–17.  Despite the risks

---

[3]  Excalibur is, of course, a reference to the legendary sword of King Arthur, which symbolizes his divine sovereignty as king.

[4]  Initially, Operation Excalibur was planned to take place on Father's Day and to have Task Force 51 military vehicles stationed on the section of Wilshire Boulevard that runs through MacArthur Park.  Trial Tr. Vol. I at 99:25–100:7.  Major General Sherman objected to that request for assistance, expressing concern that (1) there would be a large number of people in the park for Father's Day, (2) Wilshire Boulevard was in the middle of the Park (the operation's law enforcement area), and (3) the initial proposal to use helicopters would attract large crowds in opposition to the operation.  <u>Id.</u> at 100:8–10; Trial Tr. Vol. II at 263:22–264:15.  Chief Bovino of the Department of Homeland Security criticized Major General Sherman for his opposition to the initial plan, questioning Sherman's loyalty to the country.  Trial Tr. Vol. I at 103:5–8.  This is relevant because Chief Bovino's accusations of disloyalty go to the state of mind of decisionmakers who are tasked with ensuring that the Posse Comitatus Act is followed.

associated with Operation Excalibur and the numerous rehearsals, DHS planned to give LAPD only two hours' notice of the operation.  Operation Excalibur Slides at 4.  Further, the risk of inaction—that is, the risk of not performing the operation at all—was low due to the lack of any high-value targets or threats to federal functions at MacArthur Park.  Id. at 21.  The only identified risk to inaction was the hypothetical concern that "it could weaken the public's perception of federal responsiveness and reduce deterrence in other areas if the federal presence seems limited or absent."  Id.  Ultimately, federal law enforcement faced no resistance at MacArthur Park, and Task Force 51 did not need to provide any force protection.  Trial Tr. Vol. I at 39:18–25.

### 2. Operations Outside Los Angeles County

Task Force 51's assistance to federal law enforcement operations in southern California expanded beyond Los Angeles.  The evidence at trial showed that federal troops were deployed three times in support of federal law enforcement operations targeting marijuana farms: once in Mecca (Riverside County), once in Carpinteria (Santa Barbara County), and once in Camarillo (Ventura County).

**Mecca.**  On June 18, over 300 Task Force 51 troops were deployed to support a DEA operation with only about 200 federal law enforcement agents at a marijuana farm in Mecca, California—over 140 miles from downtown Los Angeles.  Trial Tr. Vol. I at 32:9–33:4, 80:19–23.  There was no specific threat or risk of riot in Mecca.  Id. at 80:13–18.

The troops were stationed several hundred yards outside the farm itself, where they established a security perimeter with riot shields and military vehicles.  Id. at 44:22–45:10; DVIDS Mecca Photos (Trial Exs. 69–73).  The underlying DEA operation "target[ed] illegal narcotics activity," and the operation "resulted in the seizure of narcotics, approximately 87 suspected human trafficking victims, and disruption of illegal marijuana cultivation tied to organized criminal activity."  Mecca Storyboard (Trial Ex. 41).

**Carpinteria.**  On July 10, between 100 and 120 Task Force 51 troops were deployed to a cannabis farm in Carpinteria, California—over 80 miles from downtown Los Angeles.  Trial Tr. Vol. I at 83:22–84:1, 84:21–23.  There was no specific threat or risk of

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1  riot in Carpinteria, and DHS notified California Highway Patrol and the Santa Barbara

2  County Sheriff's Office only at the time of the operation. Carpinteria Slides (Trial Ex. 31)

3  at 2, 3, 11. Homeland Security Investigations requested Task Force 51 to help set traffic

4  control points because without the troops, federal law enforcement agencies would have

5  had to station more personnel at traffic control points, which would have slowed down the

6  operation. Trial Tr. Vol. I at 84:7–20. The risk of inaction was low "given the volume of

7  [HSI] personnel on scene." Carpinteria Slides at 11.

8        Task Force 51 troops and federal law enforcement officers together blocked traffic

9  on Casitas Pass Road on the outskirts of Carpinteria. DVIDS Carpinteria Photos (Trial

10  Exs. 75–76); Solorzano Photo (Trial Ex. 79); Solorzano Video (Trial Ex. 80); Trial Tr.

11  Vol. I at 86:19–24. In a photo taken by Carpinteria's vice mayor, Monica Solorzano,

12  troops stand several feet behind a federal law enforcement officer (whose clothing does not

13  indicate which agency he is affiliated with). See Solorzano Photo. In a photo published by

14  the Department of Defense, a Task Force 51 member is standing on a military vehicle on

15  Casitas Pass Road. See DVIDS Carpinteria Photo (Trial Ex. 75). And as shown in a video

16  taken by Ms. Solorzano, Task Force 51 troops physically turned away a woman with a

17  megaphone as she approached the traffic blockade. See Solorzano Video.

18        **Camarillo.** Also on July 10, approximately 80 Task Force 51 troops were deployed

19  to a cannabis farm in Camarillo, California—approximately 50 miles from downtown Los

20  Angeles. Trial Tr. Vol. I at 34:18–21. Though there was initially a request for assistance

21  from Task Force 51 in Camarillo, the lead agency canceled the request two days before the

22  operation. Id. at 34:4–11, 45:24–46:3, 129:22–130:1.

23        Once federal law enforcement began the operation in Camarillo, however, they

24  determined that they needed assistance from Task Force 51 to respond to crowds that had

25  gathered on the roads near the facility and that were throwing rocks and damaging federal

26  vehicles, including with a makeshift spike strip. Id. at 46:4–16; 130:2–17; 194:15–25.

27  Federal law enforcement agents were also overwhelmed by the number of undocumented

28

14

1  immigrants at the cannabis farm.[5]  Id. at 130:6–8.  Task Force 51 troops were deployed

2  and assisted with forming a perimeter to prevent individuals and vehicles from traveling on

3  roads near the law enforcement operation.  Id. at 99:9–13; 178:7–11; Flores-Haro Photos

4  (Trial Exs. 82–94); Flores-Haro Videos (Trial Exs. 95–96).

5        **E.**      **The Future of the National Guard in California**

6        As of August 11, 300 federalized California National Guard members remain part

7  of Task Force 51.  Trial Tr. Vol. I 107:8–11.  Those 300 troops are responding to four

8  requests for assistance: two requests for protection of federal property and two requests for

9  protection of federal personnel and functions.  Id. at 107:18–108:6.  Secretary Hegseth

10  extended the deployment of these troops in Los Angeles by 90 days.  Aug. 5 Activation

11  Order (Trial Ex. 97).

12        Los Angeles was the first U.S. city where President Trump and Secretary Hegseth

13  deployed troops, but not the last.  Following criticisms by President Trump of the crime

14  rate in Washington, D.C., Secretary Hegseth announced that National Guard troops would

15  be deployed there to "stand with their law enforcement partners"—which, he said, was the

16  "same thing" the National Guard did in Los Angeles.  August 11 Hegseth Video (Trial Ex.

17  114).[6]  President Trump has since raised similar criticisms about Oakland, Baltimore,

18  Chicago, and San Francisco, insinuating that he intends to send the National Guard or

19  military to those cities.  August 11 Trump Video (Trial Ex. 115); S. DiNatale, Trump Adds

20  San Francisco to List of Cities Where He Wants to Send Troops, S.F. Chronicle (Aug. 22,

21  2025), https://perma.cc/6Z8A-R2QH ("'Look at what the Democrats have done to San

22  Francisco,' Trump told reporters.  'They've destroyed it.  We could clean that up, too.

23  We'll clean that one up, too.'").

24

25

26  _____

[5]  In fact, a farmworker, Jaime Alanís, died after falling off the roof of a greenhouse during
27  the operation.  O. Rodriguez, California Farmworker Who Fell from Greenhouse Roof
During Chaotic ICE Raid Dies, AP News (July 13, 2025), https://perma.cc/GV83-L8Y2.
28  [6]  Defendants objected to the relevance of Secretary Hegseth's August 11 statements.
These statements go directly to the propriety of injunctive relief.

United States District Court
Northern District of California

### III.    CONCLUSIONS OF LAW

The Court begins with a discussion of the historical context in which the Posse Comitatus Act was passed.  Then, the Court addresses two of Defendants' threshold arguments—their challenge to Plaintiffs' standing and their contention that the Posse Comitatus Act does not apply to National Guard troops federalized under 10 U.S.C. § 12406(3)—before evaluating whether Defendants violated the Posse Comitatus Act. Finally, the Court considers the propriety of injunctive, ultra vires relief.  Before turning to the history and the parties' arguments, though, some observations are in order.

First, "[i]t is emphatically the province and duty of the judicial department to say what the law is."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).  Without question this principle applies to cases, like this one, where the Executive is accused of overstepping bounds set out by the Legislature.  "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so."  Trump v. United States, 603 U.S. 593, 608 (2024) (citation omitted).  Especially where the foundation of our constitutional system is at issue, "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 194 (2012) (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821)); cf. Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (discussing "[t]he allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department' can effectively be resisted"  (quoting The Federalist, No. 51 (J. Madison))).

Second, though courts have not yet squarely faced the issue of a President using the military domestically in violation of federal law, the Supreme Court has clarified that the courts are not powerless to stop such executive overreach.  After the assassination of Dr. Martin Luther King, Jr., President Johnson ordered federal troops to assist local authorities with domestic surveillance pursuant to the Insurrection Act.  Laird v. Tatum, 408 U.S. 1, 3–5 (1972).  A group of citizens concerned about this surveillance brought a class action

seeking declaratory and injunctive relief.  Id. at 2.  The Court found that the plaintiffs had not alleged injury in fact and therefore lacked standing, rejecting the plaintiffs' argument under the First Amendment that the government's surveillance chilled their speech.  See id. at 12–15.  Though the Court could have ended there, it did not; it went on to explain:

> The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint—reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs.  That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military.  Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime.  Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Id. at 15–16 (emphasis added).  The Supreme Court thus emphatically rejected the notion that the federal courts lack authority to respond to the President's unlawful domestic use of the military.

## A.    History of the Posse Comitatus Act

In 1878, Congress passed the Posse Comitatus Act, which as amended states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

10 U.S.C. § 1385.  To fully grasp the Posse Comitatus Act and its role in our constitutional system of government requires a historical perspective.

### 1.    Founding Era

The presence and role of British troops in the colonies gave rise to some of the first American criticisms of the domestic use of military troops in peacetime.  For instance,

British troops were stationed in Boston "as a force of uniformed peace-keepers, or policemen." J. Elsea, Cong. Rsch. Serv., RL 42659, The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law 4 n.17 (2018) (citing H. Zobel, The Boston Massacre 135 (1987)). "Public resentment of the use of the troops in such a manner sparked the [Boston Massacre], which led in turn to further heightened resentment." Id. at 4. Indeed, resentment of Britain's use of military troops as a police force was manifested in the Declaration of Independence, where one of the American colonists' grievances was that the King had "affected to render the Military independent of and superior to the Civil power." The Declaration of Independence para. 14 (U.S. 1776).[7]

Concerns about the domestic role of the military persisted into the drafting and ratification of the Constitution, where they came into tension with pragmatic realities surrounding the founding of a new Nation. On the one hand, many of the Founders recognized the dangers imposed by a centralized military force, and some advocated for significant (if not total) reliance on militias rather than federal troops. M. Bahar, The Presidential Intervention Principle: The Domestic Use of the Military and the Power of the Several States, 5 Harv. Nat'l Sec. J. 537, 545–46 (2014); 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 401 (1836) (quoting Edmund Randolph at the Virginia ratification convention: "With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution."). On the other hand, some Founders recognized that a standing army would be necessary to the security of the young United States. See Bahar, The Presidential Intervention Principle, supra, at 546; see also, e.g., The Federalist No. 24 (A. Hamilton) (arguing in favor of a standing army as a security force against Britain, Spain, and indigenous nations); The Federalist No. 41 (J. Madison) ("A standing force, therefore, is a dangerous, at the same time that it may be a necessary, provision.").

---

[7] Other grievances related to Britain's use of troops in the colonies were that the King had "kept among us, in times of peace, Standing Armies without the Consent of our legislatures" and "Quarter[ed] large bodies of armed troops among us." Id. paras. 13, 16.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The structure of the Constitution reflects these debates.  The Constitution granted to

2  the federal government significant authority over the military, but it split that authority

3  between the Executive and the Legislature.  The Constitution provided that the President

4  "shall be Commander in Chief of the Army and Navy of the United States, and of the

5  Militia of the several States, when called into the actual Service of the United States."

6  U.S. Const. art. II, § 2, cl. 1.  But the Constitution gave to Congress—not the President—

7  the bulk of the federal authority over the military, including the power to "declare War,"

8  id. art. I, § 8, cl. 11; to "raise and support Armies," id. art. I, § 8, cl. 12; to "provide for

9  calling forth the Militia to execute the Laws of the Union, suppress insurrections and repel

10  Invasions," id. art. I, § 8, cl. 15; and to "provide for organizing, arming, and disciplining,

11  the Militia, and for governing such Part of them as may be employed in the Service of the

12  United States," id. art. I, § 8, cl. 16.  Alexander Hamilton explained: "the whole power of

13  raising armies was lodged in the LEGISLATURE, not in the EXECUTIVE," and "this

14  legislature was to be a popular body, consisting of the representatives of the people

15  periodically elected."  The Federalist No. 24.

16    Focusing in on the Militia Clause's language permitting Congress to "provide for

17  calling forth the Militia to execute the Laws of the Union"—language that evokes the

18  principles at issue in the Posse Comitatus Act—reveals uncertainty in the Nation's early

19  years regarding whether and how the federal military (including the federalized militia)

20  could engage in federal law enforcement.  To start, this language was a subject of some

21  debate during the ratification process for the Constitution: Patrick Henry, for example,

22  worried that Congress would regularly use this provision to enforce federal law.  3 Elliot,

23  Debates, supra, at 387.  George Nicholas, a member of the Virginia House of Delegates,

24  responded that Congress's power to call forth the militia to execute the laws would be

25  exercised only if "found absolutely necessary."  Id. at 392.  James Madison explained that

26  the use of the militia for this purpose "would never be put in practice" where civil

27  authorities were able to execute the laws on their own.  Id. at 384.  Hamilton, too,

28  specifically rejected the idea that the Militia Clause would permit the militia to serve as a

19

posse comitatus to enforce domestic law unless necessary.  In response to criticisms that the Constitution provided no authority for the federal government to call out a posse comitatus to enforce the laws, Hamilton explained that <u>Congress's</u> right "to pass all laws NECESSARY AND PROPER to execute its declared powers" would necessarily "include that of requiring the assistance of the <u>citizens</u> to the officers who may be intrusted with the execution of those laws."  The Federalist No. 29 (A. Hamilton) (emphasis added).  He went on to explain why that the militia could not serve as a posse comitatus: "It being therefore evident that the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of color, it will follow, that the conclusion which has been drawn from it, in its application to the federal government over the militia, is as uncandid as it is illogical."  <u>Id.</u>

The Founders thus coalesced around a narrow interpretation of the Militia Clause—one which granted power to Congress, not the President.

### 2.    Reconstruction Era

Almost exactly 100 years after the original thirteen states ratified the Constitution, Congress passed the Posse Comitatus Act.  The historical context of Reconstruction is as important to interpreting the Act as the constitutional framework described above.

In the aftermath of the Civil War, federal troops remained stationed in southern states and continued to enforce federal law.  Elsea, <u>The Posse Comitatus Act and Related Matters</u>, <u>supra</u>, at 21.  This included federal voting law and the Reconstruction Amendments: in the 1876 presidential election, federal troops were stationed near polling places in Florida, South Carolina, and Louisiana to ensure that newly enfranchised former slaves could vote.  S. Harman-Heath, <u>The Quasi-Army Law Enforcement, Value Judgments & the Posse Comitatus Act</u>, 11 Cal. L. Rev. Online 367, 375 (2020); U. Grant, Special Message to the House of Representatives (Jan. 23, 1877), <u>in</u> 7 J. Richardson, <u>A Compilation of the Messages and Papers of the Presidents 1789-1907</u>, at 421 (1897).  When the election results came in with President Hayes (a Republican from Ohio) winning by a slim margin—and in dubious circumstances, following disputed wins in the three

states where federal troops were stationed—Southern Democrats promptly sought to remove federal troops from their states.  A. Buttaro, The Posse Comitatus Act of 1878 and the End of Reconstruction, 47 St. Mary's L.J. 135, 161 (2015); Elsea, The Posse Comitatus Act and Related Matters, supra, at 21.

In May 1878, Representative William Kimmel of Maryland introduced the Posse Comitatus Act in the House of Representatives.  7 Cong. Rec. 3579 (1878).  He began his support for the Act by stating:

> I have the deepest conviction that upon a proper adjustment of it depends the peace and, I fear, the liberties of the people.  I confess that the more deeply I inquire into the steady growth of the standing Army and the uses to which it has been applied, the stronger my conviction becomes that the highest patriotism demands the wisest precautionary measures.

Id.  Kimmel went on to discuss English, Roman, and early U.S. history, citing various Founders in support of his position.  Id. at 3579–81, 3583–84.  He then turned to the concern that deploying the military domestically to execute the laws would enlarge the power of the Executive:

> Governors, sheriffs, and other State and local officers, and United States district attorneys, assistant marshals, marshals, collectors of revenue, and other revenue officers, requested these generals, and these generals at the requests of these officers precipitated these troops upon the people.  If this may be done in one district may it not be done in all the districts?  If so, and the interest of a President demands, may he not use this power for his own purposes?  May he not by this means subject every reluctant commander to the order of any political miscreant he may choose to make an assistant collector of revenue, until the whole Army is under his control, and then provoke the resistance he seeks for the employment of force and in the name of order substitute his will for law?

Id. at 3782.  To be sure, Kimmel's high-minded principles were not Southern Democrats' only (or even their primary) motivation for passing the Posse Comitatus Act; the Act was in many ways a referendum on whether Black Americans would be able to vote in Southern states.  Buttaro, The End of Reconstruction, supra, at 174–81 (describing debates in the House and Senate).  But whatever political motivations lay behind Congress's vote on the Posse Comitatus Act, the fact remains that the Act was a response to systemic

federal military involvement in domestic law enforcement.

### B.    Standing

With the background of the Posse Comitatus Act in mind, the Court now turns to the question of Plaintiffs' standing to sue.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95, 102 (1998).  Article III of the Constitution requires that a plaintiff "have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit."  Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  Moreover, an injury in fact must be "legally and judicially cognizable."  United States v. Texas, 599 U.S. 670, 676 (2023) (citation omitted).

The parties focus on whether California (rather than Governor Newsom) has standing to pursue this action against Defendants.  That is sufficient for Article III purposes.  Id. (citing Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).  Defendants challenge (1) whether an injury exists and (2) whether any such injury is cognizable.  Supp. Opp. (dkt. 136) at 11–12.  Plaintiffs identify three potential injuries: (1) an injury to California's role in the federal system, (2) a fiscal injury to the state economy, and (3) an injury to the health and well-being of California citizens.  Supp. Reply (dkt. 140) at 4–7.  The Court considers these three proposed injuries to determine whether they are cognizable, redressable injuries.

#### 1.    Federal–State Relations

States have "an interest in securing observance of the terms under which [they] participate[] in the federal system."  Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 607–08 (1982).  So states have standing "when they believe that the federal government has intruded upon areas traditionally within states' control."  Kentucky v. Biden, 23 F.4th 585, 598 (6th Cir. 2022); see also Texas v. United States, 809 F.3d 134, 153 (5th Cir. 2015) ("[S]tates may have standing based on [] federal assertions of authority to regulate matters they believe they control.'"  (cleaned up) (citations omitted)).

United States District Court
Northern District of California

In this case, Plaintiffs alleged that Defendants have violated the Posse Comitatus Act and, in so doing, infringed on California's police power.  Supp. Reply at 6–7.  The police power is the quintessential power that the Constitution reserves to the states.  See United States v. Morrison, 529 U.S. 598, 618 (2000) (observing that the reservation of police powers to the states is "one of the few principles that has been consistent since the [Constitution] was adopted"); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203–04 (1824) ("No direct general power over these objects is granted to Congress; and, consequently, they remain subject to State legislation.").  Because Defendants' alleged violations of the Posse Comitatus Act include allegations that Task Force 51 troops have engaged in law enforcement—a domain traditionally within the state's control—California has suffered an injury that gives it standing to challenge those violations.[8]

Next is the question whether California's injury is legally and judicially cognizable—that is, whether the "dispute is traditionally thought to be capable of resolution through the judicial process."  Texas, 599 U.S. at 676 (citation omitted).  Defendants argue that there is no historical example of a litigant "obtaining a prospective injunction requiring federal governmental compliance with a federal criminal statute, with a willfulness requirement, that the Executive Branch is charged with enforcing."  Supp. Opp. at 11–12.  To the extent that this is a question of standing, as opposed to a merits question about whether injunctive relief is appropriate or available here,[9] it specifically

---

[8]  The Court earlier explained why Defendants' use of 10 U.S.C. § 12406 to federalize the California National Guard likely violated the Tenth Amendment.  See TRO at 29–31.  That analysis is different from the analysis here, which is whether—even if Defendants' federalization of the National Guard was lawful—Defendants separately injured California in an Article III sense by violating the Posse Comitatus Act.  Thus, this analysis is not affected by the Ninth Circuit's review of Plaintiffs' standalone Tenth Amendment claim.

[9]  Defendants get out over their skis in proposing that the Court parse the question more finely at the standing stage and ask now whether, in a one-of-a-kind scenario, a specific remedy can be had against a specific party.  That issue is better addressed after a thorough analysis of Plaintiffs' claims when determining what remedy, if any, is appropriate.  The Court will address Defendants' arguments about the propriety of injunctive relief at that point in its order.  This approach is perfectly consistent with United States v. Texas, where the Court found that a wholly novel form of relief was fundamentally at odds with well-established doctrines of prosecutorial and enforcement discretion and was not redressable as a matter of law.  599 U.S. at 677.

1    implicates redressability.  See Texas, 599 U.S. at 676 (asking whether "the asserted injury

2    is traditionally redressable in federal court" (emphasis added)).  No one disputes that

3    injunctive relief is available against the federal government and its agencies.  See

4    Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326–27 (2015).  And an

5    injunction preventing Task Force 51 troops from engaging in law enforcement activities

6    traditionally reserved to the states is likely to redress some of the harms discussed above.

7    Thus, for purposes of establishing standing, Plaintiffs have suffered a cognizable injury.

8            **2.        State Economy**

9            States have "a quasi-sovereign interest in the health and well-being—both physical

10   and economic—of [their] residents in general."  Alfred L. Snapp & Son, 458 U.S. at 607;

11   see also Biden, 600 U.S. at 490 (recognizing economic harm as an injury in fact).

12   Plaintiffs assert that the State and its residents have suffered various forms of fiscal harm

13   due to Defendants' alleged Posse Comitatus Acts violations.

14           As to the state's financial losses, Plaintiffs explain that the presence of the National

15   Guard in Los Angeles has led to increased state law enforcement expenses.  Supp. Reply at

16   5.  The problem with this argument is that California's alleged fiscal injury is not traceable

17   to a Posse Comitatus Act violation but to the National Guard's presence in Los Angeles in

18   general.  For instance, Plaintiffs state that their "largest expenditures" in response to

19   federal officers' and troops' presence in Los Angeles came on June 9, 10, and 11, id., but

20   their first specific example of a Posse Comitatus Act violation occurred on June 12, when

21   Marines briefly detained a veteran at the Wilshire Federal Building.  Because Plaintiffs do

22   not connect their increased expenditures to any Posse Comitatus Act violations, their fiscal

23   harms do not give them standing.

24           The same is true of the asserted economic harms to California residents.  See Supp.

25   Reply at 5–6.  ICE and Task Force 51's activity in Los Angeles has certainly sent

26   economic shockwaves through southern California.  See, e.g., J. Cowan & M. Dwyer,

27   Federal Agents March Through L.A. Park, Spurring Local Outrage, N.Y. Times (July 7,

28   2025), https://perma.cc/ZJQ8-B349; L. Sumagaysay & L. Hepler, From San Diego to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Bay Area, California Residents Are On Edge over Immigration Raids, CalMatters (Jun 19,

2    2025), https://perma.cc/KVV7-MWX4 (describing the impact across industries).  But it is

3    not apparent on this factual record which of these economic harms are traceable to alleged

4    Posse Comitatus Act violations, or even the presence of Task Force 51 troops; it instead

5    appears as though ICE operations generally have caused most of the economic impact to

6    California residents.  Once again, the alleged economic harm is not traceable to the

7    conduct being complained of, so it is not sufficient for standing purposes.[10]

8                    **3.    Citizens' Health and Welfare**

9            As explained above, states have a quasi-sovereign interest in the physical and

10   economic health and well-being of their residents.  Alfred L. Snapp & Son, 458 U.S. at

11   607; accord Pennsylvania v. West Virginia, 262 U.S. 553, 591–92 (1923) (state can sue to

12   ensure natural gas is available to residents).  At the same time, a state cannot assert an

13   action purely on behalf of its citizens.  Alfred L. Snapp & Son, 458 U.S. at 607.  The

14   Supreme Court has declined to draw clear lines as to how large a population must be

15   affected for a state's claim to be quasi-sovereign and not simply derivative of its citizens'

16   claims, but it has instructed that "[o]ne helpful indication in determining whether an

17   alleged injury to the health and welfare of its citizens suffices to give the State standing to

18   sue as parens patriae is whether the injury is one that the State, if it could, would likely

19   attempt to address through its sovereign lawmaking powers."  Id.

20           Plaintiffs claim that Defendants' alleged violations of the Posse Comitatus Act have

21   "escalat[ed] tensions within the city of Los Angeles" and "sow[n] chaos and fear daily

22   throughout Southern California."  Supp. Reply at 4–5.  This purported injury is not merely

23

24   _____

     [10]  The Court recognizes that the consolidation of Plaintiffs' motion for a preliminary
25   injunction with a trial on the merits expedited the timeline such that both parties had a
     limited opportunity to engage in discovery, including into issues of standing.  See Joint
26   Resp. to Consol. (dkt. 115) at 2.  It may be that, given time for more thorough discovery
     and fact development, Plaintiffs could identify harms that are traceable to alleged Posse
27   Comitatus Act violations.  Given the Court's determination that Plaintiffs have standing on
     other grounds, though, the Court concludes that Plaintiffs were not prejudiced by
28   consolidation.  See Glacier Park Found. v. Watt, 663 F.2d 882, 886 (9th Cir. 1981)
     (consolidation proper "so long as the procedures do not result in prejudice to either party").

1   derivative of California citizens' own potential claims; California as a state has an interest

2   in ensuring that its citizens have a productive, rather than a fearful, relationship with law

3   enforcement.  To that end, California (like many states) has passed legislation regulating

4   peace officers' use of force to achieve this end.  See Cal. Gov't Code § 7286.  That said,

5   Plaintiffs' generalized references to "tensions," "chaos," and "fear" are intangible harms

6   that are not concrete enough to establish Article III standing.  See Spokeo, Inc. v. Robins,

7   578 U.S. 330, 340–41 (2016).  The same goes for a few isolated references in the record to

8   the deterrent effect of Task Force 51's presence in and around Los Angeles, as it is not

9   clear who and what is being deterred.

10      Accordingly, the Court concludes that Plaintiffs have established standing for

11  injuries to federal–state relations but not for their own economic injuries or for injuries to

12  California residents' physical and economic health and welfare.

13      **C.    10 U.S.C. § 12406(3)**

14      With Plaintiffs' standing secure, one more preliminary question remains before

15  addressing whether Defendants have violated the Posse Comitatus Act.  Recall that

16  President Trump federalized the National Guard under 10 U.S.C. § 12406(3), which

17  provides that the President can do so "[w]henever … the President is unable with the

18  regular forces to execute the laws of the United States."  See also Newsom, 141 F.4th at

19  1052 (concluding that the President likely acted properly under § 12406(3)).  Defendants

20  argue that § 12406(3) is an exception the Posse Comitatus Act, so the Act does not even

21  apply to the federalized National Guard.  Supp. Opp. at 12–15; see also 10 U.S.C. § 1385

22  (providing an exception for "cases and [] circumstances expressly authorized by the

23  Constitution or Act of Congress").  The Court now addresses that contention.

24      To start, the Court is unaware of any person—government lawyer, military or

25  civilian official, court, or commentator—who has made this argument other than

26  Defendants' lawyers in this case.  The Department of Defense has not taken this position in

27  its publications on the Posse Comitatus Act.  See Dep't of Def. Instruction No. 3025.21,

28  encl. 3 ¶ 1.b(5) (Feb. 27, 2023) (listing statutory exceptions to the Posse Comitatus Act);

Ctr. for L. & Mil. Opers., Domestic Operational Law: 2024 Handbook for Legal Personnel 96–97 (2024) (same), available at https://perma.cc/E7BC-JKUZ.  Mr. Harrington and Major General Sherman, both of whom have extensive experience and training in contexts that involve domestic military operations, explained that they understood the Posse Comitatus Act to apply to National Guard troops federalized under 10 U.S.C. § 12406.  Trial Tr. at 21:15–22:13, 52:25–53:4.  As Mr. Harrington put it, "everyone knew that the Posse Comitatus Act applied."  Id. at 24:8–9.  Defendants, however, advocate for this novel reading of § 12406(3) and Posse Comitatus Act that would represent a marked shift in the balance of power between the Executive and the Legislature.

The impact of Defendants' argument is largely due to the Ninth Circuit's reading of § 12406(3) in its order staying this Court's temporary restraining order pending appeal.  In that order, the Ninth Circuit held that courts can review the President's invocation of § 12406 only to determine (1) if it has a colorable basis and (2) if it is made in good faith.  Newsom, 141 F.4th at 1050–51.[11]  The Ninth Circuit did not clarify these standards further.  For example, it did not explain how a plaintiff could challenge—or how a district court could evaluate, especially on an expedited basis in proceedings for preliminary injunctive relief—a presidential invocation of § 12406 for lack of a colorable basis or good faith.  Nor does the Ninth Circuit suggest that courts are well positioned to evaluate whether the President acted in good faith, rather than as pretext for federalizing the

---

[11]  This standard purportedly comes from the Supreme Court's decision in Sterling v. Constantin.  Id. (citing 287 U.S. 378, 399–400 (1932)).  In Sterling, the Court determined that the governor of Texas had acted lawfully when he restricted oil production across the state.  287 U.S. at 387.  Though the Court found that the governor had acted in good faith, it did not set forth any actual test for evaluating executive discretion.  Id. at 399–400.  Rather, it relied on earlier cases holding that the Executive has inherent discretion by virtue of his role as Commander-in-Chief and his obligation to "take care that the laws be faithfully executed."  Id. (citing Martin v. Mott, 25 U.S. (12 Wheat.) 19, 29–32 (1827), and Luther v. Borden, 48 U.S. (7 How.) 1, 44–45 (1849)).  Neither of those cases instructed courts to evaluate whether the Executive had a colorable basis for his actions or whether he acted in good faith.  Martin, 25 U.S. at 31; Luther, 48 U.S. at 43–44.  Furthermore, as explained below, Martin, Luther, and Sterling's reliance on the Commander-in-Chief and Take Care Clauses conflicts with the Supreme Court's more recent interpretation of those Clauses in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

United States District Court
Northern District of California

National Guard.[12]  The Ninth Circuit also suggested that the President can invoke § 12406(3) if his ability to execute federal law has been "significantly impeded," rather than the stricter statutory requirement that he be "unable with the regular forces to execute the laws."  Id. at 1052.  Thus, under the Ninth Circuit's test, the President could federalize the National Guard in any number of cases:

- The President, relying upon IRS data showing that a sizeable percentage of corporations and individuals are using tax shelters to avoid paying taxes, could claim that he is unable to execute the tax laws.[13]

- The President, relying upon EPA studies showing that pollution in a river cannot definitively be traced back to a specific manufacturing plant, could claim that he is unable to execute the Clean Water Act.

- The President, relying upon health data showing the number of individuals who present to hospitals with narcotic-related symptoms, could claim that he is unable to execute the federal drug laws.

- The President, relying upon anecdotes from state election officials that voting machines are glitching, or that fraud exists, could claim that he is unable to execute the election laws.

In each instance above, the President would have asserted a colorable, good-faith claim. Under the Ninth Circuit's test, that is all he would need in order to call the National Guard into federal service—and then, under Defendants' urged interpretation of § 12406(3), use those troops to execute domestic law.  Though Defendants initially did not disclose the implications of reading § 12406(3) as a grant of significant presidential discretion (those

---

[12]  For instance, the Ninth Circuit's test would likely enable a President to use federal law enforcement agents to stoke tensions and then use any resistance as justification to call forth the National Guard.  As long as the President actually believed that the resistance significantly impeded his ability to execute federal law, it is hard to see how a court could find that he acted in bad faith, especially under the Ninth Circuit's deferential standard of review.  See Good Faith, Black's Law Dictionary (12th ed. 2024).

[13]  Incidentally, when Congress debated the Militia Act of 1792—a distant predecessor to § 12406—Representative Abraham Clark posited in opposition that the law would make it "so that if an old woman was to strike an excise officer with her broomstick, forsooth the military is to be called out to suppress an insurrection."  3 Annal of Cong. at 575 (1792).

United States District Court
Northern District of California

1    implications being Defendants' current position that § 12406(3) is an exception to the

2    Posse Comitatus Act), they have now fully fleshed out their views.  In doing so, they make

3    plain the consequences of the Ninth Circuit's highly deferential reading of the statute.

4        It is unclear from Defendants' briefs and oral argument whether they believe that

5    § 12406(3) allows federalized National Guard troops to execute <u>any</u> laws or just those that

6    the President found he could not enforce under § 12406(3).  The former interpretation is

7    certainly extreme: Could the President, for instance, assert that he is unable to enforce

8    obscure tax or drug laws and then use the federalized National Guard to execute the

9    election laws?  But the latter interpretation is equally flawed.  Consider the context in

10   which Congress passed the Posse Comitatus Act.  There is little question that, without the

11   support of federal troops in southern states, the voting laws that enfranchised newly freed

12   Black men would not be enforced.  Buttaro, <u>A History of the Posse Comitatus Act</u>, <u>supra</u>,

13   at 178 (citing W.E.B. Du Bois, <u>Black Reconstruction in America</u> 391 (1935)).  So, in

14   Defendants' view, the federal government would have been authorized to invoke the

15   predecessor statute to § 12406 and circumvent the Posse Comitatus Act.  This reading

16   would have rendered the Posse Comitatus Act effectively useless at the time it was passed.

17   Courts should avoid statutory interpretation that leads to such absurd results.  <u>Abramski v.</u>

18   <u>United States</u>, 573 U.S. 169, 181–82 (2014) (rejecting interpretation that would render the

19   statute "utterly ineffectual"); <u>see also</u> <u>United States v. Castleman</u>, 572 U.S. 157, 178

20   (2014) (Scalia, J., concurring in part and concurring in the judgment) ("Congress

21   presumably does not enact useless laws."); A. Scalia & B. Garner, <u>Reading Law: The</u>

22   <u>Interpretation of Legal Texts</u> 63 (2012) ("The presumption against ineffectiveness ensures

23   that a text's manifest purpose is furthered, not hindered.").  Relatedly, Congress does not

24   "hide elephants [e.g., a sweeping grant of authority to use the military for domestic law

25   enforcement] in mouseholes [e.g., one subsection of a procedural statute]."  <u>Whitman v.</u>

26   <u>Am. Trucking Ass'ns</u>, 531 U.S. 457, 468 (2001).  The Court will not take Defendants'

27   invitation to create a brand-new exception to the Posse Comitatus Act that nullifies the Act

28   itself.

United States District Court
Northern District of California

Moreover, a close look at the recognized statutory exceptions to the Posse Comitatus Act counsels against, rather than in favor of, Defendants' position. Many of these statutes apply only in very specific circumstances. See, e.g., 16 U.S.C. § 23 (authorizing the Secretary of the Army to use troops to prevent trespassers or intruders in national parks); 25 U.S.C. § 180 (authorizing the President to use military force to remove persons unlawfully present on "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe"); 42 U.S.C. § 97 (authorizing the Secretary of Health and Human Services to use military officers to enforce quarantines). These exceptions are narrow; unlike Defendants' proposed exception, they do not undermine the whole act.

Nor does the Insurrection Act, 10 U.S.C. §§ 251–255,[14] support Defendants' position here. To be sure, the Insurrection Act is a recognized exception to the Posse Comitatus Act. Dep't of Def. Instruction No. 3025.21, encl. 3 ¶ 1.b(4). Yet the Insurrection Act, which provides three avenues for the President to deploy the National Guard (or other branches of the military), imposes meaningful guardrails on the President's authority. The President can invoke the Insurrection Act only if (1) the state legislature or governor so requests it, 10 U.S.C. § 251; (2) he determines that "unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings," id. § 252 (emphasis added); (3) he determines that "any insurrection, domestic violence, unlawful combination, or conspiracy … so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law" and that "the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection" to the State's citizens, id. § 253.

Under the Insurrection Act, then, the President's authority is restricted in some

---

[14] The Insurrection Act was, until recently, codified at 10 U.S.C. §§ 331–335.

way—either by a request by a state legislature or governor, by findings of the courts,[15] or by the inability or unwillingness of local officials to act. In other words, the Insurrection Act sets a default presumption that state and local officers will be able and willing to protect a right, privilege, or immunity secured to the people. But President Trump did not rely on the Insurrection Act when he federalized the California National Guard. See June 7 Presidential Memo. Defendants again disclaimed reliance on the Insurrection Act at trial. Trial Tr. Vol. III (dkt. 164) at 369:15–16. This is, perhaps, a tacit admission that President Trump would be unable to make the showing, required under the Insurrection Act, to rebut the presumption that state and local officials in Los Angeles were unable or unwilling to act. (Of course, neither the California Legislature nor Governor Newsom requested troops, and there is no court order to enforce here, so those provisions of the Insurrection Act do not apply.)

The Ninth Circuit's interpretation of § 12406(3) provides no similar limiting principle. While a straightforward reading of § 12406(3), which references "the regular forces," might suggest that it would apply only if civilian officials are unable or unwilling to execute federal law,[16] the Ninth Circuit indicated that it would not adopt such a view. Newsom, 141 F.4th at 1051–52. The Ninth Circuit's expansive view of presidential discretion to invoke § 12406(3) affects the viability of Defendants' argument that the statute operates as an exception to the Posse Comitatus Act. Their argument, when

---

[15] The earliest predecessor statute to 10 U.S.C. § 252 required that, before the President could invoke his statutory authority to call forth the militia, a court must make a finding that federal law could not be enforced by the ordinary course of judicial proceedings. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264. Though Congress later removed the requirement that courts make an ex ante finding, it is still clear that Congress understands this to be an area where the courts can exercise oversight as to the Executive's discretion. Cf. Exec. Order No. 10,730, Fed. Reg. 7628 (Sept. 24, 1957) (executive order by President Eisenhower invoking the Insurrection Act to authorize the Army to enforce federal court orders requiring the desegregation of the Little Rock School District).

[16] Such a reading of § 12406(3) would be most consistent with the Supreme Court's federalism jurisprudence, which counsels against "obliterat[ing] the distinction between what is national and what is local and creat[ing] a completely centralized government." United States v. Lopez, 514 U.S. 549, 557 (1995) (citation omitted). It would also respect the submissions of local law enforcement agencies that they were capable of handling the immigration-related protests without military assistance. See Amicus Br. of County of Los Angeles (dkt. 86-1) at 2–4; Supp. Amicus Br. of City of Los Angeles (dkt. 78-1) at 3–4.

31

combined with the Ninth Circuit's reading of § 12406(3), would create a loophole in the Posse Comitatus Act that would swallow the entire Act—and the Insurrection Act along with it, as § 12406(3) would place no meaningful guardrails on the federalization and use of National Guard troops and would thereby render the Insurrection Act redundant.

The Court therefore concludes that § 12406(3) is not an exception to the Posse Comitatus Act. If the President wants to avoid the Act's restrictions, he must invoke a valid exception—like the Insurrection Act, along with its requisite showing that state and local law enforcement are unable or unwilling to act.

### D.     Posse Comitatus Act Violations

Having determined that the Posse Comitatus Act applies to Task Force 51, the Court now turns to the troops' conduct in Los Angeles to determine whether the Posse Comitatus Act has been followed. Once again, the Posse Comitatus Act states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

10 U.S.C. § 1385. The Court approaches this issue in three steps: first by stating the test for evaluating an alleged Posse Comitatus Act violation; second by determining whether the Posse Comitatus Act's prohibition on using the military to execute domestic law permits the so-called constitutional exceptions to protect federal property, personnel, and functions; and third by reviewing Task Force 51's conduct.

### 1.     Posse Comitatus Act Test

Few courts have addressed the Posse Comitatus Act directly, but those that have tend to coalesce around several formulations of the same basic test for determining whether the Act has been followed. Under the Posse Comitatus Act, the military may not engage in activities that "constitute the exercise of regulatory, proscriptive, or compulsory military power," that "amount to direct active involvement in the execution of the laws," or that "pervade the activities of civilian authorities." United States v. Dreyer, 804 F.3d

United States District Court
Northern District of California

1266, 1275 (9th Cir. 2015) (en banc) (quoting United States v. Kahn, 35 F.3d 426, 431 (9th Cir. 1994)).  Though framed as three separate inquiries, the test is at its core the same: whether the military has executed domestic law or actively assisted with the execution of domestic law, which would violate the Act, or whether the military's involvement is so indirect as to not violate the Act.  Id.

The facts of earlier cases provide some guidance on the Court's inquiry here.  In Dreyer, for example, the NCIS initiated an operation to search for individuals sharing child pornography, and the officer's investigation formed the basis for a search warrant.  Id.  The Ninth Circuit found that the officer's activities "pervaded the actions of civilian law enforcement" and thereby violated the Posse Comitatus Act.  Id. at 1275–76.  In United States v. Yunis, by contrast, the Navy housed and transported a criminal defendant while he was in FBI custody; the D.C. Circuit found that this was "passive" involvement that did not exercise "regulatory, proscriptive, or compulsory military power," and accordingly did not violate the Posse Comitatus Act.  924 F.2d 1086, 1094 (D.C. Cir. 1991); see also Kahn, 35 F.3d at 432 (use of Navy ships and backup support not a Posse Comitatus Act violation); United States v. Hartley, 796 F.2d 112, 115 (5th Cir. 1986) (Air Force did not violate Posse Comitatus Act when it conveyed information to civilian authorities regarding unidentified aircraft); United States v. Bacon, 851 F.2d 1312, 1313 (11th Cir. 1988) (per curiam) (participation by a single army officer in a drug investigation did not "pervade the activities of civilian officials" and thus did not violate Posse Comitatus Act).  This limited case law—though a helpful starting point for what it means to "execute the laws"—does not provide clear answers for President Trump's unprecedented deployment of the military in Los Angeles.

## 2.    Constitutional Exceptions

Defendants contend that the Posse Comitatus Act harbors an exception beyond the framework that the case law establishes.  Supp. Opp. at 18; Trial Tr. Vol. II at 321:23–25.  Under this "constitutional exception," as Defendants call it, the President has inherent constitutional authority to protect federal property, federal personnel, and federal

1    functions, so any actions that can be construed as such "protection" are lawful in spite of

2    the Posse Comitatus Act.  This assertion is not grounded in the history of the Act, Supreme

3    Court jurisprudence on executive authority, or common sense.

4         Starting with history, there is little support in the Founding Era for an inherent

5    constitutional authority for the President to call forth the militia, or to use the military

6    generally, to execute the laws.  As discussed above, the Founders did not intend that the

7    Militia Clause be used to deploy the military to execute domestic law unless absolutely

8    necessary.  In the early nineteenth century, Congress did, on occasion, expressly grant the

9    President the authority to use the militia: in 1807, for example, Congress passed the

10   Enforcement Act, which allowed President Jefferson to use the militia to enforce a trade

11   embargo.  Bahar, The Presidential Intervention Principle, supra, at 585–86.  But such

12   authority came from Congress, not Article II of the Constitution.  As President Jackson

13   wrote during the Nullification Controversy, "until some act of force is committed or there

14   is some assemblage of an armed force … to resist the execution of the laws of the United

15   States, the Executive of the United States has no legal [and] constitutional power to order

16   the militia into the field to suppress it."  Letter from A. Jackson to J. Poinsett (Feb. 7,

17   1833), in The Statesmanship of Andrew Jackson as Told in His Writings and Speeches 25–

18   26 (Thorpe, ed. 1909).

19        President Fillmore was the first to expressly assert an inherent constitutional power

20   for the Executive to use the military to enforce federal law.  Id. at 595.  In the context of

21   deploying the military to enforce the Fugitive Slave Act, President Fillmore explained:

22   "[T]he power of the President under the Constitution, as Commander of the Army and

23   Navy, is general, and his duty to see the laws faithfully executed is general and positive."

24   Presidential Message to the Senate (Feb. 19, 1851), available at https://perma.cc/2KPW-

25   N2ZY.  Though President Fillmore did not identify a specific constitutional provision

26   providing for this inherent power, he appears to have drawn it from the Take Care Clause.

27   See U.S. Const. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed.").

28        Defendants likewise rely on the Take Care Clause as the basis for their supposed

constitutional exception to the Posse Comitatus Act.  Supp. Opp. at 18.  They contend that, because the Constitution tasks the President with taking care that the laws are faithfully executed, the President has an "inherent" protective power.  Id.  That power, Defendants argue, overrides the Posse Comitatus Act.  Id.

Defendants' argument lacks legal support.  For one, it ignores the actual text of the Posse Comitatus Act, which provides for exceptions only where the Constitution or Congress "expressly authorize[]" them.  10 U.S.C. § 1385 (emphasis added).[17]  For another, it adopts an expansive reading of the Take Care Clause that the Supreme Court confronted and rejected in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952).

Youngstown is instructive here, both on the facts and on the law.  In 1951, toward the beginning of the Korean War, President Truman ordered the Secretary of Commerce to seize and operate steel mills across the country after a series of strikes paralyzed steel production.  Id. at 582–83.  In taking this action, President Truman relied on his inherent authority stemming from two constitutional provisions—the Commander-in-Chief Clause and the Take Care Clause.  Id. at 587.  The Court rejected both arguments.  As to the Commander-in-Chief Clause, the Court explained that, even during wartime, it could not "with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production.  This is a job for the Nation's lawmakers, not for its military authorities."  Id.  The Court was equally dismissive of President Truman's Take Care Clause argument: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  Id.  President Truman's order did "not direct that a congressional

---

[17]  The word "expressly" was added as a compromise between the House version of the Posse Comitatus Act (which included no constitutional exception) and the Senate version (which included a constitutional exception without the word "expressly").  Elsea, The Posse Comitatus Act and Related Matters, supra, at 28–29.  Though Congress at the time was divided on whether the word "expressly" carried any weight, see id., modern canons of statutory interpretation instruct the Court to construe the statute to give full effect to every word.  See Chickasaw Nation v. United States, 534 U.S. 84, 93 (2001) ("'[E]very clause and word of a statute' should, 'if possible,' be given 'effect.'" (citation omitted)).

policy be executed in a manner prescribed by Congress"; it directed "that a presidential policy be executed in a manner prescribed by the President." Id. at 588.  This, the Court explained, exceeded the President's Article II authority and was unlawful.  Id. at 588–89.[18]

Several Justices wrote separately in Youngstown to explain their views as to why President Truman's actions violated Congress's command and, more fundamentally, the Constitution's separation of powers.  Justice Jackson, for instance, carefully explained that the latitude of President's constitutional authority necessarily depends on what, if anything, Congress has said on the matter:

- "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. … If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power."  Id. at 635–37 (Jackson, J., concurring).

- "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain."  Id. at 637.

_____

[18]  In rejecting President Truman's assertions of inherent executive authority, the Supreme Court undermined the exact precedent that the Ninth Circuit relied on in affording the President significant discretion under § 12406.  In Martin v. Mott, the Supreme Court cited both the Commander-in-Chief and Take Care Clauses to explain why the President "is necessarily constituted the judge of the existence of the exigency in the first instance."  25 U.S. at 31.  So too in Sterling v. Constantin, where the Court wrote: "By virtue of his duty to 'cause the laws to be faithfully executed,' the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen."  287 U.S. at 399.  Youngstown reframed the analysis, requiring that courts first determine whether the President's actions are within the scope of his Article II authority before determining what discretion, if any, he is entitled to.  343 U.S. at 587–89; id. at 635–38 (Jackson, J., concurring); see also Trump, 603 U.S. at 608 ("[O]nce it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." (emphasis added)).

United States District Court
Northern District of California

- "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id.

Justice Jackson concluded that President Truman's seizure of the steel mills fell into the third category—not because Congress had expressly legislated that he could not engage in such actions, but because Congress had already regulated the field and had not provided the President with the kind of power that President Truman sought to invoke. Id. at 639. Justice Jackson also took the opportunity to reject President Truman's argument that the Commander-in-Chief Clause granted him the power he sought, writing:

> It also was expressly left to Congress to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."  Such a limitation on the command power, written at a time when the militia rather than a standing army was contemplated as the military weapon of the Republic, underscores the Constitution's policy that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy.  Congress, fulfilling that function, has authorized the President to use the army to enforce certain civil rights.  On the other hand, Congress has forbidden him to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress.

Id. at 644–45 (cleaned up) (emphasis in original).[19]

Defendants' arguments mirror those that President Truman made in 1952, and they cannot be squared with Youngstown.  They contend that the President's implied executive authority to protect federal property, personnel, and functions supersedes a law duly passed by Congress pursuant to Congress's own express constitutional authority.  See U.S. Const. art. I, § 8, cl. 15.  That Defendants characterize this as an "exception" to the statute is mere wordplay; it does not change the fact that they seek to override Congress's legitimate

---

[19]  The Supreme Court has cited Justice Jackson's Youngstown concurrence in dozens of cases—at least twenty majority opinions as well as several high-profile separate opinions. Kristen E. Eichensehr, Courts, Congress, and the Conduct of Foreign Relations, 85 U. Chi. L. Rev. 609, 619 (2018); see, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 10 (2015) ("In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from Youngstown Sheet & Tube Co. v. Sawyer.").

exercise of its own authority.  See Bissonette v. Haig, 776 F.2d 1384, 1388–89 (8th Cir. 1985) ("Congress has acted to establish reasonable limits on the President's use of military forces in emergency situations, and in doing so has circumscribed whatever, if any, inherent power the President may have had absent such legislation.").  Congress was clear about what constitutes an exception to the Posse Comitatus Act: an express provision by either the Constitution or by Congress itself.  In doing so, Congress occupied the field and precluded the President from exercising all but his express constitutional authority.  Id. The President thus cannot declare an exception to the Posse Comitatus Act any more than he can refuse to follow it outright.  "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Youngstown, 343 U.S. at 638 (Jackson, J., concurring).

Defendants, for their part, point to two nineteenth-century cases in support of their assertion that the President has inherent authority to use the military to execute domestic law, at least within the context of protecting federal property, personnel, and functions. Neither is persuasive reason to cast aside Youngstown—which, of course, postdates both.

Defendants first rely on In re Neagle.  Supp. Opp. at 18 (citing 135 U.S. 1, 69 (1890)).  That case arising from as unique a factual situation as any.  Concerned about threats against sitting U.S. Supreme Court Justice Field, the U.S. Attorney General ordered David Neagle, a deputy marshal, to accompany Justice Field while he rode circuit in California. Neagle, 135 U.S. at 48–52.  In California, two individuals who had previously threatened Justice Field approached him, and one physically assaulted him.  Id. at 52–53. When the assailant reached into his pocket, Neagle shot and killed him.  Id. at 53.  Neagle was arrested and charged with murder in California state court; he then filed a federal petition for a writ of habeas corpus, which eventually made its way to the Supreme Court. Id. at 53–54.  The Court explained that the Supremacy Clause shielded Neagle from state criminal charges because "it was his duty" to protect Justice Field and he "did no more than what was necessary and proper for him to do" to carry out that duty.  Id. at 75–76.

In reaching this conclusion, the Court asked:

> So, if the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed and the mail carriers assaulted and murdered in any particular region of country, who can doubt the authority of the President or of one of the executive departments under him to make an order for the protection of the mail and of the persons and lives of its carriers, by doing exactly what was done in the case of Mr. Justice Field, namely, providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States, with a posse comitatus properly armed and equipped, to secure the safe performance of the duty of carrying the mail wherever it may be intended to go?

Id. at 65.  This hypothetical is the sole instance in the Court's seventy-five page decision where it referenced soldiers, the army, the military, the troops, or any possibility of the military executing of federal law.  Nor did the Court ever reference or acknowledge the Posse Comitatus Act, which had been passed twelve years prior.  That makes good sense, though: Neagle was a U.S. marshal, not a military officer, and the question presented to the Court was whether the Supremacy Clause barred state prosecutions of federal officials acting pursuant to lawful orders.  The Neagle Court did not purport to decide whether, when, or how the President could use military forces to execute domestic law.[20]

Defendants next point to In re Debs, which arose out of President Cleveland's response to the 1894 Pullman Strike.  Supp. Opp. at 18 (citing 158 U.S. 564 (1895)).  That railway strike effectively stalled train traffic (and with it, most interstate commerce) across the western United States.  See Nat'l Park Serv., The Strike of 1894 (updated Dec. 29, 2022), https://perma.cc/BQZ4-6YRD; D. Papke, The Pullman Case: The Clash of Labor and Capital in Industrial America 35 (1999); 2 J. Commons et al., History of Labour in the United States 502 (1918).  President Cleveland sent federal troops to Indiana, without first consulting the governor, to enforce a court order preventing strikers from obstructing mail

---

[20]  Recently, the Supreme Court rejected an expansive reading of Neagle, though in a slightly different context.  In Martin v. United States, the Court explained that "In re Neagle does not speak to a situation where, as here, Congress has entered the field and expressly bound the federal government."  145 S. Ct. 1689, 1702 (2025); see also id. at 1702 n.2 ("To date at least, this Court has also generally understood In re Neagle as providing federal officers a shield against only state criminal prosecution.").

delivery.  Bahar, <u>The Presidential Intervention Principle</u>, <u>supra</u>, at 618–19.  The Supreme Court was not asked to evaluate President Cleveland's deployment of the troops, but instead to consider two related questions: (1) whether the federal government can prevent obstructions to interstate commerce and mail delivery and (2) whether the federal courts have jurisdiction to issue injunctions in aid of such federal authority.  <u>Debs</u>, 158 U.S. at 577.  In other words, the Court's analysis focused on the power of the federal government writ large, not the power of the Executive.  To that end, the Court concluded that "it is within the competency of <u>Congress</u> to prescribe <u>by legislation</u> that any interferences with [interstate commerce and the transportation of the mails] shall be offenses against the United States, and prosecuted and punished by indictment in the proper courts."  <u>Id.</u> at 581 (emphasis added).  To be sure, the Court went on to say:

> The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care.  The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails.  If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation, to compel obedience to its laws.

<u>Id.</u> at 582.  The Court did not, however, indicate <u>who</u> would declare such an emergency, <u>what</u> such an emergency might look like, <u>whether</u> such a declaration would be reviewable, or <u>how</u> the military could respond to such an emergency.

No doubt <u>Neagle</u> and <u>Debs</u>, when read together, stand for principles of federal supremacy.  But the context of these decisions matter: <u>Neagle</u> arose from well-documented threats against a sitting Supreme Court Justice (one assailant had previously tried to brandish a knife at Justice Field in a courtroom, 135 U.S. at 45), and <u>Debs</u> involved a massive strike that effectively halted mail delivery across the country.  When the Court spoke about the federal military in these cases, it was in response to these circumstances, not the day-to-day execution of federal law.

Immediately following the Civil War, the Supreme Court provided a clear example of why context matters in cases like these.  The Court explained with respect to the

United States District Court
Northern District of California

imposition of martial law in Indiana:

> [T]here are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction.

Ex parte Milligan, 71 U.S. (4 Wall.) 2, 127 (1866) (emphasis in original). The Court thus explained that—even during the Civil War itself—martial law was "lawless violence" outside "the locality of actual war." Id. Milligan thus stands for the principle that that the exercise of federal power is always dependent on context.

So too here. It is improper to rely on suggestions of federal authority generally (not authority vested in the Executive specifically) made in response to historic threats[21] to grant the President a perpetual, atextual right to defy Congress if he determines it necessary to protect federal property, personnel, or functions.[22] Such an exception would

---

[21] No doubt the protests in Los Angeles were large, and in some instances violent. Local law enforcement is no stranger to such protests, though. See Amicus Br. of County of Los Angeles at 3–4 (describing LASD responses to the Occupy L.A. movement (which involved hundreds of protestors camped at public parks), Black Lives Matter protests (which closed a major public freeway downtown), and the "sometimes riotous" street parties following the Dodgers' and Lakers' World Series and NBA Championship wins). The June 6 and 7 protests were far more similar to these events than they were to the 1894 Pullman Strike, which crippled interstate commerce across the western United States.

[22] To be sure, troops protecting federal property are unlikely as a descriptive matter to execute federal laws in violation of the Posse Comitatus Act. This is illustrated by an Office of Legal Counsel memorandum from then–Assistant Attorney General Rehnquist addressing whether the President can use the military to prevent Mayday protestors from blocking federal employees from reaching their job posts. Authority to Use Troops, 1 Supp. Op. O.L.C. 343 (1971). Such use, Rehnquist correctly concluded, would not constitute law enforcement. Id. at 343. The Court disagrees with Defendants' implication, Supp. Opp. at 18, that the memorandum describes an inherent protective power that overrides the plain text of the Posse Comitatus Act. If the memorandum suggested such a power, the Court would decline to afford that suggestion any weight. See Crandon v. United States, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) (OLC opinions not entitled to deference); Ecological Rights Found v. Pac. Gas & Elec. Co., 874 F.3d 1083, 1097 n.5 (9th Cir. 2017) (same). Law enforcement activities are not insulated from the Posse Comitatus Act just because they can be framed as property protection.

41

be limitless in principle: it would allow the President to deploy troops to accompany any federal employee whose job puts them at some risk—as do the jobs of many federal employees, from OSHA inspectors to IRS agents to U.S. marshals.  There is no question that federal personnel should be able to perform their jobs without fearing for their safety.  But to use this as a hook to send military troops alongside federal agents wherever they go proves too much and would frustrate the very purpose of the Posse Comitatus Act.

### 3.    Task Force 51's Conduct

The Court now turns to the actual conduct of Task Force 51 in and around Los Angeles.  To start, the Court observes that Task Force 51 was expressly instructed that it could engage in certain law enforcement activities: setting up protective perimeters, traffic blockades, crowd control, and the like.  Task Force 51 Training Slides at 6–7; Trial Tr. Vol. II at 236:25–238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.  That instruction was incorrect.  There is no exception to the Posse Comitatus Act for such conduct, and neither President Trump's June 7 memorandum nor Secretary Hegseth's June 23 memorandum changed that.

The record is replete with evidence that Task Force 51 executed domestic law in these prohibited ways.  Task Force 51 set up traffic blockades on roads at a residential enforcement operation in Long Beach, as part of Operation Excalibur at MacArthur Park, and as part of the Carpinteria cannabis farm operation.  June 13 Mission Debrief; Trial Tr. Vol. I at 119:9–13; Operation Excalibur Slides at 5; DVIDS Carpinteria Photos; Solorzano Photo; Solorzano Video.  Task Force 51 similarly used riot shields and military vehicles to establish a perimeter at the DEA enforcement operation in Mecca.  Trial Tr. Vol. I at 44:22–45:10; DVIDS Mecca Photos.  Bystanders at multiple locations and even federal officials at trial were unable to distinguish Task Force 51 troops from federal law enforcement agents.  Trial Tr. Vol. I at 72:3–6, 176:20–177:7, 177:15–178:6.  All this points to Task Force 51 engaging in prohibited activities in Los Angeles.

Indeed, Task Force 51 troops' conduct clearly qualifies as Posse Comitatus Act violations under the tests that courts use to apply the Act.  Defendants' presence to bolster

DHS and DEA operations and shows of force exercises regulatory, proscriptive, and compulsory power on the surrounding public, and their participation in operations in numbers that match or outnumber law enforcement agents pervade the activities of those civilian agents.[23]  See Dreyer, 804 F.3d at 1275.  This was intentional—Defendants instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law.  Such conduct is a serious violation of the Posse Comitatus Act.

In fact, these violations were part of a top-down, systemic effort by Defendants to use military troops to execute various sectors of federal law (the drug laws and the immigration laws at least) across hundreds of miles and over the course of several months—and counting.  The instructions to train Task Force 51 on the purported constitutional exception and thereby excuse unlawful military conduct came "all the way from the top" of the Department of Defense.  Trial Tr. Vol. II at 283:1–3.  And as Major General Sherman testified at trial, federal law enforcement agencies "always wanted military there, and we had plenty of capacity to do that."  Trial Tr. Vol. I at 137:23–25.  Accordingly, Secretary Hegseth himself ordered troops to MacArthur Park as a "show of presence" and to "demonstrat[e] federal reach and presence."  Id. at 103:24; Operation Excalibur Slides at 4.  Troops drove over a hundred miles to Mecca, where they significantly outnumbered federal law enforcement agents, to support a drug enforcement operation.  Trial Tr. Vol. I at 32:9–33:4, 80:19–23; Mecca Storyboard.  Troops also drove nearly a hundred miles in a different direction to Carpinteria to set up traffic control points so that federal law enforcement agents could more efficiently execute their search warrant of a cannabis farm.  Trial Tr. Vol. I at 84:7–20.[24]

---

[23]  By contrast, some individual examples of Task Force 51's conduct, like the detention of a veteran at the Wilshire Federal Building, are too isolated to violate the Posse Comitatus Act.  The Marines stationed at the Wilshire Building minimized their interaction with the veteran, turning him over to law enforcement authorities at the first possible occasion.  Moreover, the record does not indicate that the military's presence at federal buildings in Los Angeles involved any impermissible law enforcement activity.

[24]  Even if there is a "constitutional exception" that authorizes the military to engage in law enforcement anywhere in the field under the label of "protection," these activities would

United States District Court
Northern District of California

That sets this case apart from others where courts have so far addressed the Posse Comitatus Act. Those cases involve military actions that are both passive and isolated in nature. See, e.g., Yunis, 924 F.2d at 1094 (Navy "housing, transporting, and caring for [a criminal defendant] while he was in the custody of the FBI" not a Posse Comitatus Act violation); Kahn, 35 F.3d at 432 (Navy provision of ships and backup support during a single search of a ship transporting illegal drugs not a Posse Comitatus Act violation); Hartley, 796 F.2d at 115 (Air Force communication of information regarding an unidentified aircraft entering the country not a Posse Comitatus Act violation); Bacon, 851 F.2d at 1313 (participation by a single army officer in a drug investigation not "aggravated or repeated," and thus not a Posse Comitatus Act violation). Where military conduct is more coordinated and systemic, by contrast, courts have found Posse Comitatus Act violations. E.g., Dreyer, 804 F.3d at 1275–76 (NCIS investigation was "systemic" and thus violated Posse Comitatus Act); see also Bissonette, 776 F.2d at 1385 (ten-week-long occupation at Wounded Knee violated the Posse Comitatus Act).

Yet another departure from those prior cases is Defendants' complete sidelining of state and local authorities here. Even though multiple federal agencies and Task Force 51 rehearsed Operation Excalibur several times, Trial Tr. Vol. II at 265:9–17, they provided LAPD and LASD with a mere two hours' notice of the operation, see Operation Excalibur Slides at 4. Likewise, federal agencies notified local law enforcement of cannabis farm raids only at the time of the raids, not beforehand. See Carpinteria Slides at 3. This is not typical. In those Posse Comitatus Act cases where state and local law enforcement had jurisdiction (i.e., not cases like Kahn, which involved events in international waters), federal troops generally worked alongside state and local officials. See, e.g., Bacon, 851 F.2d at 1313 (Army investigator worked jointly with local sheriff's office); Hartley, 796 F.2d at 113 (Customs and other non-military officials performed search based on

---

not fall under such an exception. Troops do not serve a protective function when they act as a force multiplier at a "show of presence" (as in MacArthur Park), when they outnumber federal personnel by 100 at a remote location with a low risk of resistance (as in Mecca), or when they are deployed merely to speed up federal operations (as in Carpinteria).

1   information provided by Air Force officer); <u>Dreyer</u>, 804 F.3d at 1270–71 (NCIS agent

2   shared findings with local police department).  Defendants' lack of cooperation with their

3   state and local counterparts raises red flags.  It also highlights the lack of any showing by

4   Defendants that state and local officials were unable or unwilling to execute the laws

5   before Defendants deployed troops to engage in typical law enforcement functions.

6          Moreover, Defendants violated the Posse Comitatus Act willfully.  <u>See</u> 10 U.S.C.

7   § 1385 (imposing a willfulness requirement); <u>Aaron v. SEC</u>, 446 U.S. 680, 701 (1980)

8   ("[W]hen scienter is an element of the substantive violation sought to be enjoined, it must

9   be proved before an injunction may issue.").  Defendants knowingly contradicted their

10  own training materials, which listed twelve functions that the Posse Comitatus Act bars the

11  military from performing.  Task Force 51 Training Slides at 6; Trial Tr. Vol. II at 236:25–

12  238:11; Trial Tr. Vol. I at 60:12–63:12, 63:17–25.  They did so while refusing to

13  meaningfully coordinate with state and local officials.  Operation Excalibur Slides at 4;

14  Carpinteria Slides at 3.  And they "coach[ed]" federal law enforcement agencies as to what

15  language to use when submitting requests for assistance in an attempt to circumvent the

16  Act.  RFA Email Thread.  These actions demonstrate that Defendants knew that they were

17  ordering troops to execute domestic law beyond their usual authority.  Whether they

18  believed that some constitutional or other exception applied does not matter; "ignorance of

19  the law is no excuse."  <u>Bryan v. United States</u>, 524 U.S. 184, 195 (1998).[25]

20         Defendants' systemic use of Task Force 51 troops to execute domestic law in and

21  around Los Angeles violated the Posse Comitatus Act.

---

24  [25] "The word 'willfully' is sometimes said to be 'a word of many meanings' whose
    construction is often dependent on the context in which it appears."  <u>Bryan</u>, 524 U.S. at
25  191 (citation omitted).  "As a general matter, when used in the criminal context, a 'willful'
    act is one undertaken with a 'bad purpose'"—or, "[i]n other words," "knowledge that his
26  conduct was unlawful.  <u>Id.</u> at 191–92 (citations omitted).  That definition fits here, as the
    constitutional concerns that sometimes demand a stricter reading of the statute are not
27  applicable where the statute is straightforward and criminal enforcement is not at issue.
    <u>See id.</u> at 194–95 (a stricter definition of willfulness applies where "highly technical
28  statutes," such as the Internal Revenue Code, is at issue); <u>Ratzlaf v. United States</u>, 510
    U.S. 135, 147–49 (1994) (ambiguous statutes construed in favor of a <u>criminal</u> defendant).

E.     **Injunctive Relief**

The Court now addresses what relief, if any, is appropriate for the Court to award in response to Defendants' Posse Comitatus Act violations.  Defendants argue that the Court cannot impose injunctive relief for three reasons: (1) Plaintiffs lack a historical analogue for enjoining the federal government to comply with a criminal statute like the Posse Comitatus Act, Supp. Opp. at 6–8; (2) Plaintiffs cannot pursue an ultra vires theory of relief, id. at 8–11; and (3) the equities weigh against injunctive relief, id. at 25.

1.     **Historical Analogue**

Defendants first assert that the Court's equitable power does not extend to enjoining them from violating the Posse Comitatus Act because there is no historical analogue for a court to enter an injunction against the federal government based on a criminal statute. Their argument principally relies on the Supreme Court's recent decision in Trump v. CASA, Inc., 145 S. Ct. 2540 (2025).  In CASA, the Court explained that the Judiciary Act of 1789, which "endowed federal courts with jurisdiction over 'all suits in equity,'" is limited to "only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception."  Id. at 2551 (citation omitted) (cleaned up). Accordingly, the Court found that universal (or nationwide) injunctions lack a sufficient historical analogue and therefore cannot be maintained in federal court.  Id.  The Court's holding in CASA does not require "an exact historical match," though, only a "founding-era antecedent."  Id. at 2554.

Defendants' position, which focuses on the nature of the Posse Comitatus Act as a criminal statute rather than the nature of the injunction that Plaintiffs seek, misapplies CASA's historical inquiry and demands too exact of a match.  CASA requires the Court to ask whether the form of its injunction—here, an injunction prohibiting the Secretary of Defense and Department of Defense from violating a federal statute—has a historical analogue.  Id. at 2551 (evaluating "form[s] of relief"); see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc., 527 U.S. 308, 322 (1999) ("We do not question the proposition that equity is flexible; but in the federal system, at least, that flexibility is

46

confined within the broad boundaries of traditional equitable relief.  To accord a type of relief that has never been available before … is to invoke a 'default rule' not of flexibility but of omnipotence."  (emphasis added)).  It does not require the Court to analyze the underlying statute to determine whether that statute permits equitable relief.

CASA itself explained that there is a historical analogue for an injunction against government officials: "Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct."  Id. at 2254 n.9 (favorably citing Ex parte Young, 209 U.S. 123 (1908), as an example of equitable relief supported by "a long line of cases" even though there was no exact remedy at English common law).  The Supreme Court has also explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  Armstrong, 575 U.S. at 327.  In fact, even in eighteenth-century England, though "personal injury from the king to a subject [was] presumed to be impossible," the courts "furnish[ed] various methods of detecting the errors and misconduct of those agents."  Marbury, 5 U.S. at 165 (citing 3 William Blackstone, Commentaries *255).  Surely any historical inquiry would recognize that the Founders did not break off from England to constrain the available judicial remedies against the Executive.  Precedent also recognizes the feasibility of injunctions against military departments and officials.  See, e.g., Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

Nor is Defendants' contention that injunctions cannot issue based on criminal statutes as absolute as they suggest.  Though "injunctions against criminalized conduct have historically been disfavored[,] … in keeping with the characteristic flexibility of equitable remedies, they have never been absolutely prohibited."  FTC v. Accusearch Inc., 570 F.3d 1187, 1202 (10th Cir. 2009).  Where a plaintiff can show "some separate injury to private interest," as California has shown here with respect to federal–state relations, an injunction prohibiting criminalized conduct can properly lie.  United States v. Dixon, 509 U.S. 688, 695 (1993).  This is especially true where "the party aggrieved has no other

adequate remedy for the prevention of the irreparable injury which will result from the failure or inability of a court of law to redress such rights." Debs, 158 U.S. at 593–94 (citation omitted).  That is the case here: without injunctive relief, California would lack any remedy against Defendants' unlawful use of the U.S. military in a way that infringes on California's police power and risks economic and other harms to California's residents.

To the extent that there remains any question as to the equitable power of the Court to enjoin Defendants from violating the Posse Comitatus Act, the history and purpose of the Act strongly weigh in favor of the availability of injunctive relief.  Recall that Congress passed the Posse Comitatus Act to prevent the federal government from deploying troops into the South to police polling places and thereby ensure that federal voting law was followed.  Buttaro, The End of Reconstruction, supra, at 161–62; Elsea, The Posse Comitatus Act and Related Matters, supra, at 21.  President Grant himself ordered federal troops into the three states that swung the 1876 for the Republicans.  See Grant, Special Message, supra.  It is ahistorical and illogical to think that Congress reacted to this by passing a statute that had as its sole enforcement mechanism federal prosecution of individual troops by the same federal government that would have ordered the troops to engage in domestic law enforcement.

Thus, the injunctive relief that Plaintiffs seek in this case is proper.

### 2.    Ultra Vires Relief

Defendants next contend that ultra vires relief—the vehicle by which Plaintiffs assert their claim for violations of the Posse Comitatus Act—is unavailable in this case.[26] An ultra vires theory of relief succeeds only if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute."  NRC v. Texas, 605 U.S. 665, 681 (2025) (emphasis in original) (citation omitted).  "Ultra vires review is also unavailable if … a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial

---

[26] No one disputes that the Posse Comitatus Act does not provide a cause of action for civil damages.  Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 40 (D.D.C. 2021).

United States District Court
Northern District of California

review,' or if a statutory review scheme forecloses all other forms of judicial review." Id. (citation omitted).

Defendants make much of how limited ultra vires review is. To be sure, as then-Judge Kavanaugh put it, ultra vires review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009). But emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory. As explained above, Plaintiffs have proven that Defendants—by improperly training Task Force 51 troops on the scope of the Posse Comitatus Act and then ordering them to engage in law enforcement activities in violation of the Act—exceeded the authority delegated to them by Congress and directly violated the Posse Comitatus Act's specific prohibition against domestic military law enforcement.[27] See Youngstown, 343 U.S. at 644–45 (Jackson, J., concurring) ("[T]he Constitution's policy [is] that Congress, not the Executive, should control utilization of the war power as an instrument of domestic policy. … Congress has forbidden [the President] to use the army for the purpose of executing general laws except when expressly authorized by the Constitution or by Act of Congress." (emphasis in original)). Defendants point to no other statute that provides Plaintiffs a meaningful and adequate opportunity for relief, nor is there any statute precluding judicial review of Posse Comitatus Act violations. See NRC, 605 U.S. at 681. If anything, given the lack of other avenues for Plaintiffs to seek to remedy their injuries and the Supreme Court's prior statements on the role of the Judiciary in addressing presidential overreach, this case presents a classic situation for an ultra vires claim. See Laird, 408 U.S. at 15–16 ("[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of

---

[27] Defendants appear to argue that, because any Posse Comitatus Act violations were committed by individual troops and not the Department of Defense writ large, an ultra vires claim cannot lie. Supp. Opp. at 10. That misconstrues the nature of the Posse Comitatus Act violations in this case. The violations were not one-off acts by individual servicemembers but were rather the function of systematic and willful orders to troops to execute domestic law.

United States District Court
Northern District of California

1  those asserting such injury."). As Chief Justice Marshall wrote: "The government of the

2  United States has been emphatically termed a government of laws, and not of men. It will

3  certainly cease to deserve this high appellation, if the laws furnish no remedy for the

4  violation of a vested legal right." Marbury, 5 U.S. at 163.[28]

5  Defendants again point to the fact that the Posse Comitatus Act is a criminal statute

6  and argue that ultra vires claims typically involve civil violations. Supp. Opp. at 6–7, 9. It

7  is counterintuitive, though, to think that the exceptional remedy of ultra vires relief is

8  available where Congress has imposed civil penalties but not where it has taken the more

9  severe step of imposing criminal penalties. In any case, Defendants' proposition that the

10  Posse Comitatus Act can only be enforced by federal criminal prosecution is remarkable,

11  as the same federal government that the Act limits would be tasked with enforcing it.

12  More specifically, the same branch of the federal government that the Act limits—the

13  Executive—would be tasked with enforcing the Act against itself. This raises obvious

14  concerns about conflicts of interest. See Morrison, 487 U.S. at 677. Surely the Act must

15  provide for some other enforcement mechanism, otherwise it would have been ineffective

16  when passed and would remain so today.

17  ### 3.    Balancing the Equities

18  Defendants' final argument is that the equities—specifically, the harm threatened to

19  federal property and personnel—weigh against an injunction. Supp. Opp. at 25. This does

20  not survive scrutiny given the scope of the issues presented. An injunction prohibiting

21  Task Force 51 troops from engaging in law enforcement activities would have no bearing

22  whatsoever on their ability to protect federal property. Nor is "protection," whether of

23  federal property or personnel, the talismanic word that Defendants seem to believe it is.

24  No doubt Defendants have an inherent interest in the safety of federal personnel, but they

25  can and must ensure this safety in a lawful manner—such as, for example, by coordinating

26  with state and local law enforcement. Defendants have no legitimate interest in violating

27

28  [28] The outcome in Marbury (dismissal for lack of jurisdiction) does not detract from the Supreme Court's holding that Marbury had a legal remedy for his claim. Id. at 168.

the Posse Comitatus Act, for protection or for any other reason.  See Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice.").

Defendants mention that only 300 National Guard troops remain stationed in Los Angeles, suggesting that injunctive relief is unwarranted because their footprint is smaller than it was in early June.  Their point is not well taken.  Those 300 National Guard troops are set to remain deployed through November, see Aug. 5 Activation Order, and they have already been improperly trained as to what activities they can and cannot engage in under the Posse Comitatus Act.  Further, President Trump's recent executive orders and public statements regarding the National Guard raise serious concerns as to whether he intends to order troops to violate the Posse Comitatus Act elsewhere in California.  See, e.g., Exec. Order No. 14,339, § 2(d)(ii), 90 Fed. Reg. 42121 (Aug. 25, 2025) (ordering the Secretary of Defense to ensure that state National Guard units are trained "in quelling civil disturbances and ensuring the public safety and order whenever the circumstances necessitate"); C-SPAN, President Trump Holds Cabinet Meeting at 3:12:29–40 (Aug. 27, 2025), available at https://tinyurl.com/bb6sa5bp (regarding deployment and use of the National Guard in Chicago: "I have the right to do anything I want to do.  I'm the President of the United States.  If I think our country is in danger, and it is in danger in these cities, I can do it.").  Injunctive relief is therefore appropriate.  See West Virginia v. EPA, 597 U.S. 697, 719–20 (2022) ("'[V]oluntary cessation does not moot a case' unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (citation omitted)).

Finally, the Court's injunctive relief in this case is narrowly tailored to address Defendants' statutory violations.  The injunction applies only to Defendants' use of the National Guard in California, not nationally.  Defendants are not required to withdraw the 300 National Guard troops currently stationed in Los Angeles, nor are they barred from using troops consistent with the Posse Comitatus Act.  In fact, the Court essentially just orders Defendants to follow the (unedited) training materials that they introduced in this

51

1    trial.  See Task Force 51 Training Slides at 6.  Thus, for example, federal troops can

2    continue to protect federal property in a manner consistent with the Posse Comitatus Act.

3    **IV.    CONCLUSION**

4         For the foregoing reasons, the Court **ORDERS** that Defendants[29] are enjoined from

5    deploying, ordering, instructing, training, or using the National Guard currently deployed

6    in California, and any military troops heretofore deployed in California, to execute the

7    laws, including but not limited to engaging in arrests, apprehensions, searches, seizures,

8    security patrols, traffic control, crowd control, riot control, evidence collection,

9    interrogation, or acting as informants, unless and until Defendants satisfy the requirements

10   of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus

11   Act.  The Court **STAYS** this injunction until 12:00 noon on Friday, September 12, 2025.

12        **IT IS SO ORDERED.**

13        Dated: September 2, 2025

14                                                    CHARLES R. BREYER
                                                      United States District Judge

---

[29]  The Court may lack jurisdiction to enjoin President Trump in the performance of his official duties.  See Franklin v. Massachusetts, 505 U.S. 788, 802–03 (1992) (plurality opinion); Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 501 (1866).  So this injunction applies only against Secretary Hegseth and the Department of Defense, which is sufficient to redress Plaintiffs' injuries.

52