ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
BRENDAN HAMME
Deputy Attorneys General
  300 S. Spring St.
  Los Angeles, CA 90013
  Telephone: (213) 269-6598
  E-mail: Brendan.Hamme@doj.ca.gov
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA, | NO. 3:25-cv-04870-CRB |
| Plaintiffs, | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| v. | Date:        October 10, 2025 |
| DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE, | Time:        10:00 a.m.<br>Courtroom:  6<br>Judge:        Charles R. Breyer<br>Trial Date:  Not set<br>Action Filed: June 9, 2025 |
| Defendants. | |

1

# MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE that on October 10, 2025, at 10:00 a.m., Plaintiffs GAVIN NEWSOM, in his official capacity as Governor of the State of California, and the STATE OF CALIFORNIA (collectively, Plaintiffs) hereby move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants DONALD TRUMP, in his official capacity as President of the United States, PETE HEGSETH, in his official capacity as Secretary of the Department of Defense, and the United States Department of Defense (collectively, Defendants), and their officers, agents, servants, employees, and any other persons who are in active concert or participation with them.

Plaintiffs respectfully move the Court to enter a preliminary injunction that enjoins Defendants from effectuating Defendants' August 5, 2025 order federalizing and deploying 300 members of California's National Guard and orders Defendants to return control of the California National Guard to Governor Newsom. This Motion is based on the Complaint for Declaratory and Injunctive Relief (ECF No. 1), the accompanying Memorandum of Points and Authorities, the accompanying Proposed Order, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

1    Dated: September 2, 2025                   Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
NICHOLAS ESPÍRITU
LUKE FREEDMAN
BARBARA HORNE-PETERSDORF
LORRAINE LOPEZ
KENDAL MICKLETHWAITE
JANE REILLEY
MEGAN RICHARDS
MEGHAN H. STRONG
Deputy Attorneys General

*/s/ Brendan Hamme*
BRENDAN HAMME
Deputy Attorney General
  300 S. Spring St.
  Los Angeles, CA 90013
  Telephone: (213) 269-6598
  E-mail: Brendan.Hamme@doj.ca.gov

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Introduction .................................................................................................................. 1

Statement of Facts ........................................................................................................ 2

    I.     Defendants Federalize and Deploy the National Guard for 60 Days on June 7 and June 9, 2025. ................................................................................ 2

    II.    As Instances of Civil Unrest Abate, Federalized Troops Are Used for Routine Federal Law Enforcement Missions. ................................................ 3

    III.   Defendants Draw Down the Use of Troops Without Issue. ........................... 5

    IV.   Defendants Federalize 300 California National Guard Soldiers for an Additional 90 Days. ...................................................................................... 6

Procedural History ........................................................................................................ 6

Legal Standard ............................................................................................................. 7

Argument ..................................................................................................................... 8

    I.     This Court has Jurisdiction to Review Defendants' August 5 Order. .................... 8

    II.    Likelihood of Success on the Merits ............................................................... 9

    III.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ........................... 13

    IV.   The Remaining *Winter* Factors Favor Injunctive Relief. ..................................... 17

Conclusion ................................................................................................................... 19

# TABLE OF AUTHORITIES

CASES

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
   901 F.3d 1166 (9th Cir. 2018) ................................................................................ 7

*Adams v. City of Chicago*
   135 F.3d 1150 (7th Cir. 1998) ................................................................................ 8

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*
   458 U.S. 592 (1982) ............................................................................................. 15

*Ariz. Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014) .............................................................................. 18

*Bissonette v. Haig*
   776 F.2d 1384 (8th Cir. 1985) ....................................................................... 10, 17

*Bissonette v. Haig*
   800 F.2d 812 (8th Cir. 1986), aff'd, 485 U.S. 264, 108 S. Ct. 1253 (1988) .......... 10

*Bredesen v. Rumsfeld*
   2005 U.S. Dist. LEXIS 34876 (M.D. Tenn. Sept. 7, 2005) ................................... 14

*Burson v. Freeman*
   504 U.S. 191 (1992) ............................................................................................. 16

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*
   408 F. Supp. 3d 1057 (N.D. Cal. 2019) ............................................................... 14

*Coinbase, Inc. v. Bielski*
   599 U.S. 736 (2023) ............................................................................................... 8

*E. Bay Sanctuary Covenant v. Biden*
   993 F.3d 640 (9th Cir. 2021) .................................................................................. 7

*Gregory v. Ashcroft*
   501 U.S. 452 (1991) ............................................................................................. 11

*Hart Book Stores, Inc. v. Edmisten*
   612 F.2d 821 (4th Cir. 1979) ................................................................................ 15

*Kentucky v. EPA*
   2023 WL 11871967 (6th Cir. July 25, 2023) ........................................................ 15

*M.R. v. Dreyfus*
   697 F3d 706 (9th Cir. 2012) ................................................................................. 13

*Michigan v. U.S. Army Corps of Eng'rs*
   667 F3d 765 (7th Cir. 2011) ................................................................................. 13

*Newsom v. Trump*
    141 F.4th 1032 (9th Cir. 2025)............................................................................*passim*

*Newsom v. Trump*
    No. 25-3727 (9th Cir. July 11, 2025), Dkt. No. 43 ................................................ 7

*Perfect 10, Inc. v. Google, Inc.*
    653 F.3d 976 (9th Cir. 2011)................................................................................ 14

*Printz v. United States*
    521 U.S. 898 (1997)............................................................................................ 14

*Purcell v. Gonzalez*
    549 U.S. 1 (2006)................................................................................................ 18

*R.I.L-R v. Johnson*
    80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................................... 17

*Sammartano v. First Judicial Dist. Court*
    303 F.3d 959 (9th Cir. 2002)......................................................................... 17, 18

*United States v. Morrison*
    529 U.S. 598 (2000)...................................................................................... 11, 14

*United States v. Pitner*
    307 F.3d 1178 (9th Cir. 2002).............................................................................. 8

*Vasquez Perdomo v. Noem*
    2025 WL 1915964 (C.D. Cal. July 11, 2025) ...................................................... 2

*Washington v. Trump*
    145 F.4th 1013 (9th Cir. 2025)............................................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008).................................................................... 7, 13, 17, 19

**STATUTES**

10 U.S.C.
    § 12406 ........................................................................................................*passim*
    § 12406(2) .......................................................................................................... 9
    § 12406(3) .................................................................................................... 10, 12

Militia Act of 1903 ................................................................................................ 9

Posse Comitatus Act ............................................................................................ 7

**CONSTITUTIONAL PROVISIONS**

First Amendment.............................................................................................. 17, 18

Tenth Amendment............................................................................................. 11, 14

Cal. Const. Article V, § 7.................................................................................. 14

U.S. Constitution
    Article I, § 8, cls. 15-16............................................................................. 14

**OTHER AUTHORITIES**

146 Cong. Rec. H9595 (Oct. 10, 2000) ......................................................... 16

Exec. Order No. 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025)...................... 6, 13

*Rebellion*, Am. Dictionary of the English Language (1900) ......................... 9

*Rebellion*, Black's Law Dictionary (1st ed. 1891)......................................... 9

*Rebellion*, Black's Law Dictionary (12th ed. 2024) ...................................... 9

*Rebellion*, The Cyclopedic Dictionary of Law (1901).................................. 9

Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 157
    (2004) ....................................................................................................... 13

White House, "*President Trump Participates in Cabinet Meeting, Aug. 26, 2025*" ..................... 6

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In early June, Defendants took the unprecedented step of federalizing 4,000 members of California's National Guard and deploying those federalized troops to the streets of Los Angeles. Long before the 60 day timeframe for Defendants' deployment order expired, the sporadic episodes of civil unrest that Defendants used to justify the federalization abated and have not recurred. Defendants' spokesperson conceded on July 15, 2025—three weeks before the expiration of the original 60 day deployment—that "the lawlessness in Los Angeles is subsiding." Hamme Decl., Ex. 1. Even if there had been a valid justification for Defendants to federalize California's National Guard troops under 10 U.S.C. § 12406 in the first place—a distinct question pending before the Ninth Circuit—that justification has long since ceased to exist.

Yet on August 5, 2025, Defendants issued a new order deploying 300 federalized National Guard members for an additional 90 days. If allowed to stand, this new federalization order would ensure that California's residents will remain under a form of military occupation until early November—including while they vote in the Statewide Special Election on November 4, 2025, on whether to adopt new congressional maps pursuant to Proposition 50—an election with national attention and significance.

Defendants cannot establish—and have not even attempted to establish—that there was an invasion, rebellion, or inability to execute federal law anywhere in California on August 5, 2025. Because the factual predicates for invocation of 10 U.S.C. § 12406 did not exist when Defendants federalized the 300 National Guard soldiers, Defendants acted *ultra vires* of their statutory authority. This unlawful deployment irreparably injures the State of California by violating the State's sovereignty and Governor Newsom's rightful authority over the California National Guard, escalating tensions with civilians, harming California's economy, chilling participation in the upcoming election, and harming the morale of National Guard troops. By contrast, Defendants will suffer no harm if their illegal conduct is enjoined; they are more than capable of enforcing federal law without assistance from the federalized National Guard, which Defendants'

own witnesses testified was not actively being used in the field during the bench trial held last month.

Because Plaintiffs are likely to succeed on the merits of their claim that the deployment of the National Guard violates federal law, the deployment will cause irreparable harm to the State and the public interest, and Defendants will suffer no harm to their interests, this Court should issue preliminary injunctive relief returning control over the California National Guard to Governor Newsom.

## STATEMENT OF FACTS

### I.    DEFENDANTS FEDERALIZE AND DEPLOY THE NATIONAL GUARD FOR 60 DAYS ON JUNE 7 AND JUNE 9, 2025.

On June 6, 2025, ICE agents began carrying out aggressive and pervasive immigration enforcement operations across Los Angeles County. Espíritu Decl., Ex. F, ECF No. 8-1 at 47-48; Olmstead Decl., ECF No. 8-2 ¶ 6. These raids, which included "military-style" operations that engaged in conduct a district court has found to constitute unlawful racial profiling, *Vasquez Perdomo v. Noem*, 2025 WL 1915964, at *25 (C.D. Cal. July 11, 2025), and extended to places of business such as Home Depot parking lots, provoked anger and spurred protests. Espíritu Decl., Ex. G, ECF No. 8-1 at 51; Order Granting TRO, ECF No. 64 at 2. The protests were primarily peaceful, but there were instances of violence and other unlawful behavior. Olmstead Decl., ECF No. 8-2 ¶¶ 9-11. State and local law enforcement moved quickly to arrest lawbreakers, protect federal property and personnel, and quell violence. Order Granting TRO, ECF No. 64 at 4; Olmstead Decl., ECF No. 8-2, ¶¶ 6-7. Governor Newsom and other elected officials unequivocally condemned unlawful conduct. Order Granting TRO, ECF No. 64 at 3; Espíritu Decl., Exs. L, N. Q, ECF No. 8-1 at 70, 72, 87.

On June 7, 2025, President Trump issued a memorandum calling into "Federal service members and units of the National Guard under 10 U.S.C. § 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions," as well as "to protect Federal property, at locations where protests against these functions are occurring or are likely to occur. . . ." Espíritu Decl., Ex. O, ECF No. 8-1 at 108. Later that day, Secretary of

2

1  Defense Pete Hegseth called into service 2,000 members of the California National Guard for a

2  period of 60 days. *Id.* at 107. On June 9, 2025, Secretary Hegseth called into service an additional

3  2,000 members of the California National Guard for 60 days, as well as 700 U.S. Marines.

4  Espíritu Decl., Ex. P, ECF No. 8-1 at 111.

5       Since mid-June, the instances of civil unrest that purportedly gave rise to the deployment

6  have subsided. Indeed, following the "No Kings Day" protests on June 14, 2025, "there have been

7  only a few immigration-related protests around the City [of Los Angeles] with often just a few

8  dozen protestors at a time." Hurtado Decl., ¶ 11. Since July 1, 2025, LAPD "has had to deploy far

9  fewer resources in response to immigration-related protest activity, including in and around

10  federal property." *Id.* at ¶ 19. The Federal Protective Service has made some protest-related

11  arrests outside an immigration detention center. Hamme Decl., Ex. 2. A recent analysis found

12  only one instance of the Los Angeles County District Attorney's Office or the Los Angeles City

13  Attorney's Office bringing criminal charges for behavior at an immigration protest in July.

14  Hamme Decl., Ex. 3. Similarly, the California Highway Patrol has not seen any large-scale,

15  protest related activities in the area since June 19, and they are unaware of any requests from

16  another law enforcement agency for protest-related assistance. Duryee Decl., ¶ 4. And well over a

17  month ago, on July 15, 2025, a Pentagon spokesperson stated that the "the lawlessness in Los

18  Angeles is subsiding." Hamme Decl., Ex. 1.

19  **II.   AS INSTANCES OF CIVIL UNREST ABATE, FEDERALIZED TROOPS ARE USED FOR
        ROUTINE FEDERAL LAW ENFORCEMENT MISSIONS.**

20

21       After instances of civil unrest subsided and protest activity dissipated in Los Angeles,

22  National Guard troops were sent on routine federal law enforcement operations in Los Angeles

23  and communities over 100 miles away. Far from being deployed in response to threats to federal

24  personnel or property, federal law enforcement officials routinely requested and received the

25  assistance of federalized troops for operations as a "safety measure," even if the military's risk

26  assessment showed that there was not any threat that would require military support. Sherman

27  Test., Trial Tr. 137:5-18, ECF No. 162. In fact, Major General Scott Sherman, the Commander of

28  Task Force 51 (which includes the federalized National Guard troops), testified that the military

3

could be deployed anywhere federal law is being enforced, even in the absence of any threat at all, including to support the Internal Revenue Service, because a threat could always materialize. *Id*. at 124:1-128:18.

Los Angeles Enforcement and Removal Operations Field Office Director Ernesto M. Santacruz Jr. estimated that in the weeks following the deployment, federal troops accompanied ICE Enforcement and Removal Operations on approximately 75 percent of their routine at-large, in-the-field operations, Santacruz Test., Trial Tr. 197:17-25 - 198:1-21, ECF No. 162, and described the California National Guard as a "force multiplier" and a "security blanket" for federal immigration enforcement. *Id*. at 169:13-16, 191:15-17.

On June 18, over 300 troops and approximately 50 military vehicles were deployed to accompany law enforcement officers on a raid at a cannabis farm in Mecca, over 140 miles from downtown Los Angeles. Sherman Test., Trial Tr. 80:4-81:15, ECF No. 162. The 300 troops outnumbered the 200 federal officers participating, despite no specific threat being identified in advance of the mission. *Id*. at 80:13-23. No soldiers faced resistance or were required to provide force protection to law enforcement in Mecca. *Id*. at 81:10-18.

On July 7, 2025, federal troops were deployed to support dozens of armed federal agents who marched through MacArthur Park in Los Angeles in what a spokesperson for the Department of Homeland Security (DHS) described as an "immigration enforcement operation." Hamme Decl., Ex. 4. However, internal Task Force 51 documents describe the mission as "demonstrat[ing], through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles joint operations area." Harrington Test., Trial Tr. 37:16-18, ECF No. 162. Troops were deployed for this operation despite Defendants' assessment that the "[c]urrent intelligence does not indicate a high-value target or threat to federal functions at this location. No indication that failure to act would result in loss of life or significant property damage." *Id*. at 39:2-40:4.

Troops were also used in a July 10, 2025 operation in Carpinteria, California, where there was "[n]o indication that failure to act would result in loss of life or significant property damage to federal personnel . . . given the volume of" Homeland Security Investigations personnel.

4

1  Sherman Test., Trial Tr. 86:1-6, ECF No. 162. The mission could have been accomplished

2  without federalized troops, but federal agencies would have needed more of their own personnel

3  and the operation would have taken longer. *Id*. at 84:7-20.

4  **III.    DEFENDANTS DRAW DOWN THE USE OF TROOPS WITHOUT ISSUE.**

5        On July 1, 2025, Defendants released 150 National Guard members, Hamme Decl., Ex. 5,

6  on July 15 they released an additional 2,000 troops, Hamme Decl., Ex. 6, and on July 21 the

7  Marines were redeployed to base, Hamme Decl., Ex. 7. As of at least August 8, 2025, the

8  remaining National Guard troops were providing security for a federal building in Los Angeles

9  and an ICE facility in Paramount and serving in two Mobile Response Forces. *See* Sherman Test.,

10  Trial Tr. 107:21-22, 107:25-108:3, ECF No. 162. Per Director Santacruz, National Guard troops'

11  participation in at-large ICE Enforcement and Removal Operations missions dwindled around

12  July 7, Trial Tr. 198:5-21, ECF No. 162, with the National Guard no longer participating in

13  Enforcement and Removal Operations missions by July 24, 2025. Santacruz Dep. Tr. 62:10-13,

14  ECF No. 127-2 at 12. General Sherman, however, confirmed that there remained two mobile

15  response teams of federalized troops in Los Angeles ready to be deployed for at-large missions.

16  Trial Tr. 108:4-6, ECF No. 162.

17        Throughout this period, ICE continued to carry out arrests in the Los Angeles area. In a

18  statement on August 14, 2025, Department of Homeland Security Secretary Kristi Noem boasted

19  about the success of the administration's California immigration-enforcement operations, noting

20  that since June 6, 2025, DHS had arrested 4,481 people in the Los Angeles area. Hamme Decl.,

21  Ex. 8. By August 27, 2025, Secretary Noem reported over 5,000 arrests in the Los Angeles area,

22  representing over 500 arrests in the two weeks since her prior statement. Hamme Decl., Ex. 9.

23  ICE's continued ability to carry out arrests is consistent with Director Santacruz's recent

24  testimony that in his over 20 years of experience with ICE, he could not recall the military ever

25  accompanying law enforcement on non-border immigration-enforcement missions. Santacruz

26  Test., Trial Tr. 178:7-179:1, ECF No. 162.

27

28

**IV.    DEFENDANTS FEDERALIZE 300 CALIFORNIA NATIONAL GUARD SOLDIERS FOR AN ADDITIONAL 90 DAYS.**

On August 5, 2025, Defendants issued a new order federalizing 300 National Guard troops for an additional 90 days—until November 5, 2025, the day after California's Statewide Special Election. Hamme Decl., Ex. 10; Strong Decl., Ex. 31, ECF No. 140-2. The order states that the "mobilization is in response to direction from the President of the United States . . . to provide forces to protect federal functions, personnel, and property," but provides no further explanation for why the continued deployment is necessary, nor any specific federal functions, personnel, or property that are in need of protection. Strong Decl., Ex. 31, ECF No. 140-2 at 1.

Additionally, President Trump has signaled his desire to send military troops to Oakland, San Francisco, and elsewhere across the country. ECF No. 161; Trial Tr. 288:18-25, ECF No. 163; Hamme Decl., Exs. 11-12. On August 25, 2025, President Trump issued an Executive Order requiring the "designation of an appropriate number of each State's National Guard members to be reasonably available for rapid mobilization" nationwide for the purpose of assisting "Federal, State, and local law enforcement in quelling civil disturbances and ensuring the public safety and order whenever the circumstances necessitate, as appropriate under law." Exec. Order No. 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025). And the next day, he remarked during a cabinet meeting: "I [have] the right to do anything I want to do. I'm the president of the United States. If I think our country's in danger – and it is in danger in these cities – I can do it." Hamme Decl., Ex. 13; *see* The White House, *President Trump Participates in Cabinet Meeting, Aug. 26, 2025*," available at: https://tinyurl.com/2kpzrsrw at 3:12:21-31 (last accessed Aug. 30, 2025).

**PROCEDURAL HISTORY**

On June 9, 2025, California Governor Gavin Newsom and the State of California brought suit challenging Defendants' federalization of the California National Guard, ECF No. 1, and, on June 10, 2025, moved for a Temporary Restraining Order (TRO). ECF No. 8. This Court ruled in Plaintiffs' favor, temporarily enjoining Defendants from deploying federal troops to Los Angeles and ordering that the California National Guard be returned to the Governor's control. ECF No. 64 at 35-36. Defendants appealed and sought an emergency stay from the Ninth Circuit, which

granted a stay pending appeal. *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025). The appeal on the merits of the TRO remains pending, as is an *en banc* call for reconsideration of the stay order. *Newsom v. Trump*, No. 25-3727 (9th Cir. July 11, 2025), Dkt. No. 43.

On June 25, 2025, this Court held that it retained jurisdiction over the claim as to whether Defendants were violating the Posse Comitatus Act and held a trial on that issue on August 11-13, 2025. ECF Nos. 101, 155-57. On September 2, 2025, shortly before the filing of this motion, the Court granted injunctive relief enjoining future violations of the Posse Comitatus Act. ECF No. 176. The Court found that "[t]he evidence at trial established that Defendants systematically used armed soldiers (whose identity was often obscured by protective armor) and military vehicles to set up protective perimeters and traffic blockades, engage in crowd control, and otherwise demonstrate a military presence in and around Los Angeles." *Id*. at 1. In emphasizing the narrowly tailored scope of relief, the Court noted that the injunction did not require the withdrawal of the 300 currently deployed troops. *Id*. at 52.

Plaintiffs now seek preliminary relief to enjoin the August 5, 2025 order federalizing and deploying 300 members of the California National Guard until November 5, 2025.

## LEGAL STANDARD

Plaintiffs "seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). When the government is a party, the last two *Winter* factors (the equities and public interest) merge. *E. Bay Sanctuary Covenant,* 993 F.3d at 668 (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)). In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor. *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (citing *Alliance for the Wild Rockies v. Cottrell*. 632 F.3d. 1127, 1135 (9th Cir. 2011); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

7

**ARGUMENT**

As an initial matter, the Court has jurisdiction to consider Plaintiffs' motion for preliminary injunction. And Plaintiffs are likely to succeed on the merits of their claim that Defendants' August order federalizing and deploying the California National Guard under 10 U.S.C. § 12406 is unlawful. Plaintiffs continue to suffer irreparable harm, and the balance of equities and the public interest support granting a preliminary injunction.

## I.    THIS COURT HAS JURISDICTION TO REVIEW DEFENDANTS' AUGUST 5 ORDER.

This Court has jurisdiction to consider the lawfulness of the August 5, 2025 order federalizing and deploying the National Guard because it is not the subject of the Ninth Circuit appeal.

An appeal only divests a lower court "of its control over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (citation omitted). The lower court "retains jurisdiction to address aspects of the case that are not the subject of the appeal," *United States v. Pitner*, 307 F.3d 1178, 1183 n.5 (9th Cir. 2002), including the authority to grant relief based on new facts and issues not involved in the appeal. *Adams v. City of Chicago*, 135 F.3d 1150, 1153 (7th Cir. 1998) (citing *Red Star Yeast & Products Co. v. La Budde*, 83 F.2d 394, 396 (7th Cir. 1936) ("Denial of an application for a temporary injunction does not prevent another application by the same party in the same suit, if new facts warrant it.")).

Defendants' August 5 order federalizing 300 National Guard troops is not at issue in the Ninth Circuit appeal, which is limited to Defendants' challenge to the June 12 TRO. The notice of appeal passing jurisdiction to the Ninth Circuit was filed on June 12, and that notice could not encompass a federalization order that was not issued until weeks later. Indeed, the Ninth Circuit specified when addressing Defendants' likelihood of success on appeal that its "decision addresses only the facts before us"—that is, the facts that gave rise to Defendants' original federalization orders in early June. *Newsom v. Trump*, 141 F.4th at 1055. This Court can and should rule on the lawfulness of Defendants' new order and enjoin its enforcement.

## II.    LIKELIHOOD OF SUCCESS ON THE MERITS

Neither the law nor the facts support the new deployment of federalized National Guard troops in California. 10 U.S.C. § 12406 allows for federalization of the Guard only in the case of 1) a foreign invasion or danger of foreign invasion; 2) a rebellion or danger of rebellion, or 3) an inability to execute the laws with regular forces. None of these conditions existed in California on August 5, 2025, when Defendants issued the new federalization order, nor does the order provide or cite to any justification purporting that such conditions exist. Strong Decl., Ex. 31, ECF 140-2.[1]

*Foreign invasion.* No foreign invasion was occurring or threatened when Defendants issued the August 5, 2025 order. Defendants have not claimed otherwise.

*Rebellion or danger of rebellion*. Defendants cannot show "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). The ordinary meaning of "rebellion" is "[o]pen, organized, and armed resistance to an established government or ruler" or "an organized attempt to change the government or leader of a country, usu[ally] through violence." *Rebellion*, Black's Law Dictionary (12th ed. 2024). Historical definitions, including those from the time period when Congress passed the Militia Act of 1903, accord with this definition. *E.g.*, *Rebellion*, Black's Law Dictionary (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject."); *Rebellion*, Am. Dictionary of the English Language (1900) ("An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt."); *Rebellion*, The Cyclopedic Dictionary of Law (1901) ("The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed.").

Together, these definitions make clear that a "rebellion" must be violent, armed,

---

[1] Nor was the August 5, 2025 order issued through the Governor. The order was transmitted directly to the Adjutant General of the National Guard with instructions for the Adjutant General to transmit the order to the Governor. Strong Decl., Ex. 31, ECF 140-2. The meaning of 10 U.S.C. § 12406's requirement that orders be issued through the governor of a state is currently before the Ninth Circuit Court of Appeals, and Plaintiffs reserve their right to challenge the August 5, 2025 order on this basis if the Ninth Circuit rules in Plaintiffs' favor.

9

organized, and in open defiance of the government as a whole, not merely isolated incidents of disruption. Rather than constituting an ongoing, violent, armed, and organized defiance of the government, protest activity since early June has fallen significantly and recent activity has been limited and mostly peaceful. Hurtado Decl., ¶ 11 ("there have been only a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time."); Duryee Decl., ¶ 4 (CHP not aware of any large-scale, protest-related activities in the Los Angeles area since June 19, 2025 or any requests for assistance, and have made no arrests resulting from such activities occurring after June 19); Hamme Decl., Ex. 3. Even at the protests' zenith and highest levels of violence, there was never an understanding or assertion by military commanders that activity in Southern California constituted a rebellion. Sherman Test., Trial Tr. 57:2-4, ECF No. 162. And, as of August 5, 2025, long after large protests had abated, Defendants cannot make a plausible argument that a rebellion or danger of rebellion existed.

*Unable with the regular forces to execute the laws.* Finally, there is no evidence that President Trump was "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3), anywhere in California on August 5, 2025. As the Ninth Circuit expressly stated, "we do not think that any minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." *Newsom v. Trump*, 141 F.4th at 1051. Indeed, the extreme conditions necessary to trigger the other two subsections—foreign invasion or rebellion—strongly suggest a similarly high bar as to an inability to execute the laws "because any invasion or rebellion renders the President unable to exercise some federal laws." *See id*. As explained below, the circumstances at the time of the August federalization were very different than conditions in the days immediately following the outbreak of protests on June 6 that the Ninth Circuit held provided only a "colorable" basis for the initial federalization. *See id*.

Moreover, the U.S. Constitution establishes a federal government of limited and enumerated powers and the fundamental principle of civilian—not military—law enforcement, reflecting the Founders' distrust for and fear of rule by military authority. *See, e.g. Bissonette v. Haig,* 776 F.2d 1384, 1387 (8th Cir. 1985), on reh'g, 800 F.2d 812 (8th Cir. 1986), aff'd, 485 U.S. 264, 108 S. Ct. 1253 (1988). 10 U.S.C. § 12406 must be construed narrowly against this

constitutional backdrop, including the explicit delegation of policing powers to the States—not the federal government—in the Tenth Amendment. *E.g., United States v. Morrison*, 529 U.S. 598, 618–19 (2000) (the reservation of police powers to the States is "one of the few principles that has been consistent since the [Constitution] was adopted"). It "is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" the "constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation omitted).

There is no evidence that Defendants were unable to execute federal law with regular forces on August 5, and there is no evidence that they are unable to do so today. As this Court asked at trial on August 13, 2025, "What's the threat today? What was the threat yesterday? What was the threat last week or two weeks ago…that allowed it? It's the absence of any limits to a national police force …" that is particularly concerning. Trial Tr. 399: 1-4, ECF No. 164.

By Defendants' own admission, the National Guard is no longer needed. On July 15, 2025, a spokesperson for the Department of Defense stated that "the lawlessness in Los Angeles is subsiding," Hamme Decl., Ex. 1, and the National Guard is currently assisting on "zero" ICE Enforcement and Removal field operations. Santacruz Test., Trial Tr. 198:19-21, ECF No. 162. Indeed, ICE has been more than capable of executing federal law using "regular forces" without National Guard support, as evidenced by the fact that DHS has arrested over 5,000 people since June 6, including 500 arrests in two weeks, when the National Guard's support for ICE Enforcement and Removal Operations' at-large missions was completely absent. Hamme Decl., Exs. 8; 9.

There have been only "a few immigration-related protests" since June 14, 2025, and only one protest-related criminal charge in July brought by the Los Angeles County District Attorney and Los Angeles City Attorney. Hamme Decl., Ex. 2; Hurtado Decl., ¶ 11. And although there were only isolated instances even then, there have been no recent reports of protests associated with ICE or other law enforcement functions that reached the level of unrest the Ninth Circuit found relevant in early June. *Newsom v. Trump*, 141 F.4th at 1041-42, 1052 (citing use of makeshift battering rams, Molotov cocktails, federal buildings being breached, mortar style

fireworks being launched, and vehicles being burnt). The Ninth Circuit concluded only that, as to the *June* federalization, the President had a "colorable" basis for invoking 10 U.S.C. § 12406(3) in response to the conduct of protestors on June 6 and 7. *Id*. at 1051. To the extent there ever was a valid justification for the June federalization based on the conduct of protestors, that justification has long since ceased to exist. Defendants have not made any attempt to provide justification for the *August* federalization—two months after the incidents identified by the Ninth Circuit—based on current conduct in Los Angeles, or anywhere else in California. The new federalization order references only "direction from the President of the United States to provide forces to protect federal functions, personnel, and property." Strong Decl., Ex. 31, ECF No. 140-2 at 1. Direction is no substitute for evidence to establish a factual basis that a condition required by Congress is met. And to the extent that there are future issues requiring a law enforcement response, local law enforcement and, if necessary, National Guard members under the Governor's control, can address the situation. Hurtado Decl., ¶ 11; Duryee Decl., ¶¶ 3-4.

In fact, there has been minimal risk to federal law enforcement functions or personnel during operations for some time, as borne out in evidence demonstrating that since the initial deployment, Defendants repeatedly used the National Guard on missions where the risk associated with the Guard not participating was assessed as "low" or where force protection by the National Guard was not necessary to execute federal laws. For example, in Mecca, 300 National Guard members were deployed, yet "federal agents did not require any force protection from the Task Force 51 troops." Harrington Test., Trial Tr. 33:18-21, ECF No. 162. Troops were also deployed in Carpinteria, despite there being "[n]o indication that failure to act would result in loss of life or significant property damage to federal personnel . . . given the volume of" Homeland Security Investigations personnel. Sherman Test., Trial Tr. 85:16-86:7, ECF No. 162. Likewise, in MacArthur Park, National Guard troops were deployed for a mission, the goal of which was not to enforce federal laws, but to "demonstrate, through a show of presence, the capacity and freedom of maneuver of federal law enforcement within the Los Angeles joint operations area" where there was no indication of a "threat to federal functions." Harrington Test., Trial Tr. 37:10-18; 39:2-40:4, ECF No. 162 ("Current intelligence does not indicate a high-

12

value target or threat to federal functions at this location. No indication that failure to act would result in loss of life or significant property damage."). And indeed, federal agents walked through the park uninhibited. *Id.* at 38:18-21. If the risk posed by the National Guard taking no action in these scenarios was low, the risk posed in the current situation is non-existent. There is simply no evidence that the federal government was unable to execute federal laws on August 5.

In sum, there is no support for any of the factors allowing federalization of the National Guard under 10 U.S.C. § 12406. And there must be *some* end to a federalization under 10 U.S.C. § 12406. Defendants themselves initially chose to federalize the National Guard for 60 days, suggesting they made a determination that 60 days would likely be sufficient to address the security risks they believed existed on June 6 and 7. The new federalization of the National Guard—for a period longer than its initial deployment and lasting through Election Day, based on no evidence whatsoever—is not a good faith response to a pressing emergency that would justify such an extreme measure. *See Newsom v. Trump*, 141 F.4th at 1051. Rather, it suggests an intent to use 10 U.S.C. § 12406 to create a permanent military force under presidential control for domestic use—the kind of "powerful standing army" the Framers would have "dreaded." Vladeck, Note, *Emergency Power and the Militia Acts*, 114 Yale L.J. 149, 157 (2004). Indeed, the President's recent executive order directs Secretary Hegseth to establish a new "standing National Guard quick reaction force" for "rapid nationwide deployment." Exec. Order No. 14339, 90 Fed. Reg. 42121 (Aug. 25, 2025).

Plaintiffs are, therefore, likely to succeed on the merits of their claim that Defendants' order is *ultra vires* of the authority provided by 10 U.S.C. § 12406.

**III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.**

Defendants' conduct has already injured Plaintiffs, and injuries resulting from the troops' August deployment will continue without an injunction. A party seeking preliminary injunctive relief must "demonstrate that irreparable harm is likely in the absence of an injunction," *Winter*, 555 U.S. at 22, but need not show that such irreparable harm is certain to occur. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). Nor must Plaintiffs show that Defendants' conduct is the exclusive cause of Plaintiffs' injury. *M.R. v. Dreyfus*, 697 F.3d 706,

13

728-29 (9th Cir. 2012). Instead, Plaintiffs may show a "sufficient causal connection" between Defendants' conduct and Plaintiffs' injury that can only be addressed by an immediate injunction. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,* 408 F. Supp. 3d 1057, 1121 (N.D. Cal. 2019) (citing, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018); *Perfect 10, Inc. v. Google, Inc.* 653 F.3d 976, 981-82 (9th Cir. 2011).

Here, the unlawful August federalization irreparably injures Plaintiffs in five distinct ways, by: (1) violating California's sovereignty and the Governor's authority as commander-in-chief of the Guard; (2) escalating tensions with civilians and undermining Plaintiffs' interest in maintaining stable communities; (3) harming California's economy; (4) chilling participation in the upcoming election; and (5) harming the morale of National Guard troops.

First, Defendants' wresting control of the Guard from the Governor directly violates Plaintiffs' sovereign rights as a State and the Governor's role as commander in chief of the California National Guard, respectively. Cal. Const. art. V, § 7; *see Bredesen v. Rumsfeld*, 2005 U.S. Dist. LEXIS 34876, at * 33-34 (M.D. Tenn. Sept. 7, 2005) (finding that Governor of Tennessee "made a strong showing of immediate and irreparable harm" based on Secretary of Defense's recommendation to remove eight aircraft from the National Guard resulting "in the loss of hundreds of National Guard positions in the State of Tennessee"). Indeed, if the federalization of California National Guard troops is not authorized by 10 U.S.C. § 12406, Defendants have unconstitutionally commandeered members of California's forces in contravention of the Constitution's Militia Clauses, *see* U.S. Const. art. I, § 8, cls. 15-16, and the Tenth Amendment, *see generally Printz v. United States*, 521 U.S. 898, 930 (1997). California plainly suffers irreparable harm when its own troops are depleted to serve an unlawful federal mission— including because those troops are diverted from critical work for the State. *See, e.g.,* Eck Decl., ¶¶ 47-50; ECF No. 8-3; Supp. Eck Decl., ¶¶ 3-15, ECF No. 39-2.

In addition, California's police power, guaranteed by the Tenth Amendment, is undermined by federalized troops usurping traditional law enforcement roles, such as crowd control and security. *See Morrison*, 529 U.S. at 618–19 (reservation of police powers to the States is "one of the few principles that has been consistent since the [Constitution] was adopted").

1    Violations of sovereignty are irreparable injuries because they "cannot be economically

2    quantified, and thus cannot be monetarily redressed." *Kentucky v. EPA*, 2023 WL 11871967, at

3    *4 (6th Cir. July 25, 2023) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611-12 n.19 (6th Cir.

4    2022)). Defendants' August federalization of the Guard, with no factual basis justifying the

5    deployment, interferes with Plaintiffs' sovereignty and the constitutional balance of power

6    between the federal and state governments.

7         Second, Defendants' new order deploying the National Guard for another 90 days

8    escalates tensions with civilians and irreparably harms Plaintiffs' interest in maintaining stable

9    communities. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607, 609 (1982);

10   *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821, 828 (4th Cir. 1979) (states have a "substantial"

11   interest in "maintaining a stable, healthful environment in its cities."). Defendants' ongoing use of

12   federalized troops to support federal law enforcement operations escalates tensions within

13   communities, sowing chaos and fear, and—as demonstrated in the Carpinteria operation—can

14   spur protests elsewhere. Sherman Test., Trial Tr. 130:2-4, ECF No. 162 ("after the operation that

15   happened at Carpinteria and all that being on the . . . news and with the helicopters there, that's

16   when a lot of people showed up" to the Camarillo operation); Olmstead Decl., ECF No. 8-2 ¶ 12;

17   Singer Decl., ¶ 7. Indeed, rather than quelling civil unrest, the presence of military troops on the

18   streets of Los Angeles became a flash point for protests. Tensions were heightened and arrests

19   increased after troops initially mobilized to Los Angeles, necessitating additional resources from

20   California Highway Patrol. Zizi Decl., ECF No. 77-3 ¶ 12; Singer Decl., ¶ 5. While protests have

21   subsided significantly since then, every time the troops are mobilized for these operations, the

22   risk of unrest is heightened again.

23        Third, California suffers economic harm from the ongoing deployment of the Guard. The

24   troops' participation in law enforcement operations has chilled economic activity because

25   civilians stay home out of fear, declining to report for work, shop at local businesses, or venture

26   into areas previously frequented by community members. Hamme Decl., Ex. 14 at 1, 4; Singer

27   Decl., ¶¶ 7-9; Alpuche Decl., ¶ 9. After the initial deployment, businesses in Los Angeles closed

28   or suffered a significant decline in business, and some will never recover from the disruption

15

caused by the Guard's presence. Singer Decl., ¶ 7; Alpuche Decl., ¶ 10 (noting a 40% drop in business by a downtown Los Angeles business owner since the federalization began). The fallout from the Guard's presence continues. The Executive Director of the annual DTLA Proud Festival—hosted on August 24, 2025 in a historic Latino area in downtown Los Angeles to support and bring together the Downtown Los Angeles LGBTQ+ community—reported a significant decline in attendance from prior years. Alpuche Decl., ¶¶ 4, 13-14 (reporting 2,000 fewer attendees at the festival from prior years). Los Angeles businesses are experiencing increased staffing shortages and incurring additional costs, including providing security, human resources, and supportive services for employees. Singer Decl., ¶ 8. The disruption to California's economy is evidenced by decreases in the number of people reporting to work in California's private sector by 3.1% in June 2025 and by 4.9% in July 2025, directly coinciding with the deployment of troops to Southern California. Hamme Decl., Ex. 14 at 1, 4. While "[e]conomic harm is not normally considered irreparable," it is "when monetary damages are unavailable." *Washington v. Trump*, 145 F.4th 1013, 1036 (9th Cir. 2025). Here, "[b]ecause Defendants are federal officials and federal agencies, money damages are unavailable in this case," *id.*, and the chill to California's economy is an irreparable injury that will persist absent an injunction.

Fourth, Defendants' standing army—which will remain deployed in California through early voting and Election Day in November absent this Court's intervention, Hamme Decl., Ex. 10; Strong Decl., Ex. 31, ECF No. 140-2—creates an imminent risk of harm to Plaintiffs' compelling interests in "protecting the right of its citizens to vote freely . . . in an election conducted with integrity and reliability" and "protecting voters from confusion and undue influence," *Burson v. Freeman*, 504 U.S. 191, 198-99 (1992). Military deployment during an election chills voter turnout and conflicts with the Department of Defense's long-standing policy "to avoid the possibility or the perception of voter coercion or intimidation by military personnel or a military presence, or the perception that the military has authority over the election process." 146 Cong. Rec. H9595 (Oct. 10, 2000). President Trump previously expressed his desire for the National Guard or military to "handle[]" last year's national election to save the election from "radical left lunatics." Hamme Decl., Exs. 15-16.  Given President Trump's statements and the

August deployment through the election this year, there is an imminent threat to Plaintiffs' interest in protecting the fairness and integrity of the elections it regulates. *See Bissonette*, 776 F.2d at 1387 (noting the chilling effect of military presence on "the rights to speak freely and to vote, and creat[ing] [an] atmosphere of fear and hostility which exists in territories occupied by enemy forces.").

Fifth, the Defendant's unlawful federalization harms troop morale. Jones Decl., ¶¶ 17-18. Marines staged at Weapons Station Seal Beach for deployment in Los Angeles were silent and visibly strained in contrast to the usual energy during deployment. *Id*. Troop morale has predictably suffered as members of the Guard have been ordered to do what they have long been trained to view as unacceptable: act as a police force on the streets of their own communities. Hamme Decl., Ex. 17-18. Negative troop morale impacts not only troops, but their families as well. Jones Decl., ¶ 19 (describing negative impact of deployment to Los Angeles on morale of military families).

Thus, Plaintiffs satisfy the second *Winter* factor.

## IV.    THE REMAINING *WINTER* FACTORS FAVOR INJUNCTIVE RELIEF.

The remaining *Winter* factors weigh heavily in favor of granting injunctive relief. A preliminary injunction is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). "The public interest inquiry primarily addresses impact on non-parties rather than parties [and] Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7.

Here, the balance of equities favors granting Plaintiffs' request for injunctive relief. As outlined above, Plaintiffs have and will suffer serious harm to their sovereign interests, community safety, law enforcement resources, economy, ability to ensure the fairness and

17

integrity of its elections, and the morale of its National Guard; these injuries will continue absent an injunction. By contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct. The current situation in Los Angeles poses no obstacle to enforcement of federal law and presents no risk to federal personnel or property. By August 8, 2025, the Guard was responding to only four remaining requests for assistance: protecting two federal buildings, and providing two Mobile Response Forces. Harrington Test., Trial Tr. 41:15, 107:21-22, 107:25, 108:1-3, ECF No. 162. In fact, ICE Enforcement and Removal Operations began decreasing the Guard's involvement in operations as of July 7, 2025, and by July 24, the involvement had ceased altogether. Santacruz Test., Trial Tr. 198:10, 198:19-21, ECF No. 162; Santacruz Dep. Tr., 62:10-13, ECF No. 127-2 at 12.

Because the August federalization of the Guard is not legally justified, there is no harm to Defendants in enjoining the deployment. Enjoining the Guard's deployment will not render the government unable to enforce federal law but will leave that task in the hands of federal agencies appropriately charged with enforcement. Hamme Decl., Ex. 9; Santacruz Test., Trial Tr. 188:13, ECF No. 162.

Additionally, entering an injunction would serve the public interest. When, as here, Plaintiffs establish a likelihood that Defendants' actions are unlawful, "Plaintiffs have also established that both the public interest and the balance of the equities favor [injunctive relief]." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Defendants' standing army in California, which can be deployed at Defendants' will, including anywhere they believe a protest could occur, chills First Amendment free speech and political activity. Arp Decl., ECF No. 77-4, ¶¶ 10-11; Strong Decl., Ex. 31, ECF No. 140-2. The public has a "strong interest in exercising the fundamental political right to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and "in upholding First Amendment principles." *Sammartano*, 303 F.3d at 974. Deploying the military in response to protests chills legitimate First Amendment expression, and now Defendants have guaranteed that chill will extend through Election Day in November. Enjoining Defendants from maintaining a standing army in California would allow the public to exercise fundamental rights without the fear of being subjected to a militarized presence.

1      Accordingly, the remaining *Winter* factors strongly favor injunctive relief.

2                                    **CONCLUSION**

3      For the foregoing reasons, the Court should grant Plaintiffs' motion and issue a

4  preliminary injunction enjoining implementation of Defendants' August 5 order and returning

5  control of the California National Guard to Governor Newsom.

6

7  Dated: September 2, 2025                    Respectfully submitted,

8                                             ROB BONTA
                                              Attorney General of California
9                                             MICHAEL L. NEWMAN
                                              THOMAS S. PATTERSON
10                                            Senior Assistant Attorneys General
                                              ANYA M. BINSACCA
11                                            MARISSA MALOUFF
                                              JAMES E. STANLEY
12                                            Supervising Deputy Attorneys General
                                              NICHOLAS ESPÍRITU
13                                            LUKE FREEDMAN
                                              BARBARA HORNE-PETERSDORF
14                                            LORRAINE LOPEZ
                                              KENDAL MICKLETHWAITE
15                                            JANE REILLEY
                                              MEGAN RICHARDS
16                                            MEGHAN H. STRONG
                                              Deputy Attorneys General
17
                                              */s/ Brendan Hamme*
18
                                              BRENDAN HAMME
19                                            Deputy Attorney General
                                                300 S. Spring St.
20                                              Los Angeles, CA 90013
                                                Telephone: (213) 269-6598
21                                              E-mail: Brendan.Hamme@doj.ca.gov
22
                                              *Attorneys for Plaintiffs*
23

24

25

26

27

28

19