**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| GAVIN NEWSOM, Governor of California, In his official capacity as Governor of the State of California; STATE OF CALIFORNIA, | No. 25-3727 |
| | D.C. No. 3:25-cv-04870-CRB Northern District of California, San Francisco |
| *Plaintiffs - Appellees*, | |
| v. | ORDER |
| DONALD J. TRUMP, in his official capacity as President of the United States; PETER HEGSETH, in his official capacity as Secretary of the Department of Defense; UNITED STATES DEPARTMENT OF DEFENSE, | |
| *Defendants - Appellants*. | |

Filed October 22, 2025

Before: Mark J. Bennett, Eric D. Miller, and Jennifer Sung, Circuit Judges.

Order;
Statement by Judge Marsha S. Berzon;
Dissent by Judge Ronald M. Gould

## SUMMARY[*]

## 10 U.S.C. § 12406

The panel denied rehearing en banc in a case in which the panel stayed pending appeal the district court's temporary restraining order (1) enjoining the President of the United States, the Secretary of Defense, and the Department of Defense from deploying members of the California National Guard in Los Angeles; and (2) directing defendants to return control of the California National Guard to California.

Regarding the denial of rehearing en banc, Judge Berzon, joined by Chief Judge Murguia and Judges Wardlaw, W. Fletcher, Gould, Paez, Christen, Hurwitz, Koh, Sanchez, and Mendoza, wrote that the panel opinion on the stay motion should have been reconsidered en banc because (1) neither 10 U.S.C. § 12406—which authorizes the President to federalize the National Guard when he is "unable with the regular forces to execute the laws of the United States"—nor precedent requires extraordinary judicial deference to a president's determination that he is authorized to federalize the National Guard; (2) the panel opinion's interpretation of the substantive requirements of § 12406(3) contradicts the statute; and (3) the panel opinion's judicial-review and substantive interpretations of § 12406(3) clash with the longstanding American tradition of resistance to the use of military forces for civil law enforcement except in the most exigent circumstances.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting from the denial of rehearing en banc, Judge Gould joined in full Judge Berzon's statement and wrote separately to express his additional perspectives. A case that determines when a President may federalize and deploy American troops into our own cities warranted a more extensive consideration. When Congress limits statutory grants of presidential power, its words must mean something if our constitutional design is to endure. The democratic ideals our nation has consistently promoted for the last quarter millennium will be gravely undercut by allowing military force and weapons of war to be deployed against American citizens on U.S. soil on the flimsy grounds asserted here for this use of Executive power. Because this Court should have imposed real limits on the statutory presidential power at issue here, he dissented from the denial of rehearing en banc.

---

**COUNSEL**

Samuel T. Harbourt (argued), Joshua Patashnik, and Christopher D. Hu, Deputy Solicitors General; Haley Amster and Cara Newlon, Associate Deputy Solicitors General; Michael J. Mongan, Solicitor General; Meghan H. Strong, Megan A. Schultz Richards, Jane Reilley, Barbara Horne-Petersdorf, Brendan M. Hamme, and Nicholas R. Green, Deputy Attorneys General; Robin L. Goldfaden, James E. Stanley, Anya Binsacca, Marissa Malouff, and John D. Echeveria, Supervising Deputy Attorneys General; Thomas S. Patterson and Michael L. Newman, Senior Assistant Attorneys General; Helen H. Hong, Principal Deputy Solicitor General; Samuel T. Harbourt, Solicitor General; Rob Bonta, California Attorney General; California

Department of Justice, Office of the California Attorney
General, San Francisco, California; Laura L. Faer, Acting
Senior Assistant Attorney General, Nicholas D. Espiritu,
Deputy Attorney General; California Department of Justice,
Office of the Attorney General, Oakland, California; Kendal
L. Micklethwaite, Deputy Assistant Attorney General,
California Department of Justice, Office of the California
Attorney General, Sacramento, California; Brendan
Hamme, Deputy Attorney General; Lorraine Lopez and
Marissa Malouff, Deputy Attorneys General, Public Rights
Division, Civil Rights Enforcement Section; California
Department of Justice, Office of the California Attorney
General, Los Angeles, California; for Plaintiffs-Appellees.

Eric D. McArthur (argued), Deputy Assistant Attorney
General; Sharon Swingle, Anna O. Mohan, Steven A.
Myers, J. Kain Day, and Mark R. Freeman, Attorneys;
Christopher D. Edelman, Trial Attorney; Brett A. Shumate,
Assistant Attorney General; United States Department of
Justice, Washington, D.C.; for Defendants-Appellants.

Mack E. Jenkins, Matthew J. Craig, and Susan Har, Hecker
Fink LLP, Los Angeles, California; Beau Tremitiere and
Kristy Parker, Protect Democracy United, Washington,
D.C.; for Amici Curiae Former U.S. Army and Navy
Secretaries and Retired Four-Star Admirals and Generals.

Valerie L. Flores, Michael J. Dundas, and Shaun D. Jacobs,
Attorneys; Hydee F. Soto, City Attorney; Los Angeles City
Attorney Office, Los Angeles, California; Norman L. Eisen,
Stephen A. Jonas, Joshua G. Kolb, and Diamond Brown,
Democracy Defenders Fund, Washington, D.C.; for Amicus
Curiae City of Los Angeles.

Nancy E. Harris and Karun A. Tilak, Attorneys; Sara J.
Eisenberg, Chief of Complex and Affirmative Litigation;

Mollie M. Lee, Chief of Strategic Advocacy; Yvonne R. Mere, Chief Deputy City Attorney; David Chiu, City Attorney; San Francisco City Attorney Office, San Francisco, California; Alexandra Kliger, Jonathan Miller, and Jenny Ma, Public Rights Project, Oakland, California; Cody S. Harris, Sophie Hood, Anjali Srinivasan, Ian Kanig, Cara R. Meyer, and Eliane Holmund, Keker Van Nest & Peters LLP, San Francisco, California; Yibin Shen, City Attorney, Alameda, California; Lauren Keefe, City Attorney, Albuquerque, New Mexico; Ebony M. Thompson, City Solicitor, Baltimore City Department of Law, Baltimore, Maryland; Megan B. Bayer, City Solicitor, Cambridge, Massachusetts; Mary B. Richardson-Lowry, Corporation Counsel, City of Chicago, Chicago, Illinois; David R. Gault, Deputy Corporation Counsel; Carlos Pabellon, Corporation Counsel; County of Dane, Madison, Wisconsin; Alexandra B. Ruggie, Corporation Counsel, City of Evanston, Evanston, Illinois; Leesa Manion, Prosecuting Attorney for Martin Luther King, Jr. County, Seattle, Washington; Kristyn Anderson, City Attorney, Minneapolis, Minnesota; John P. Markovs, Montgomery County Attorney, Rockville, Maryland; Patricia King, Corporation Counsel, Office of New Haven Corporation Counsel, New Haven, Connecticut; Krysia Kubiak, City Solicitor and Chief Legal Officer, City of Pittsburgh, Pittsburgh, Pennsylvania; Susana A. Wood, City Attorney, Sacramento, California; John D. Nibbelin, County Attorney for the County of San Mateo, Redwood City, California; Tonry Lopresti, County Counsel; Kavita Narayan, Chief Assistant County Counsel; Meredith A. Johnson, Lead Deputy County Counsel for the County of Santa Clara, San Jose, California; Douglas T. Sloan, City Attorney, Santa Monica, California; Lauren Langer, City Attorney for the City of West Hollywood, Best

Best & Krieger LLP, Los Angeles, California; for Amici
Curiae Local Governments and Local Government Leaders.

Valerie L. Flores, Michael J. Dundas, and Shaun D. Jacobs,
Attorneys; Hydee F. Soto, City Attorney; Los Angeles City
Attorney Office, Los Angeles, California; Norman L. Eisen,
Stephen A. Jonas, Joshua G. Kolb, and Diamond Brown,
Democracy Defenders Fund, Washington, D.C.; Ebony M.
Thompson, City Solicitor, Baltimore City Department of
Law, Baltimore, Maryland; Stephanie Vasquez, City
Attorney, Bell Gardens City Attorney's Office, Bell
Gardens, California; Adam Cederbaum, Corporation
Counsel, City of Boston Law Department, Boston,
Massachusetts; Mary B. Richardson-Lowry, Corporation
Counsel, City of Chicago Department of Law, Chicago,
Illinois; Dawn A. McIntosh, City Attorney, Office of the
City Attorney, Long Beach, California; Brigit G. Alvarez,
Deputy County Counsel; Liliana Campos, Assistant County
Counsel; Judy W. Whitehurst, Los Angeles County Chief
Deputy, Los Angeles, California; Karl H. Berger, City
Attorney, Monterey Park City Attorney's Office, Monterey
Park, California; Muriel Goode-Trufant, Corporation
Counsel, City of New York, New York, New York; Sonia R.
Carvalho, City Attorney, City of Santa Ana, Santa Ana,
California; Heidi von Tongeln, Santa Monica City
Attorney's Office, Santa Monica, California; Monica D.
Castillo, City Attorney, City of Santa Paula, Los Angeles,
California; Lauren Langer, City Attorney, City of West
Hollywood, West Hollywood, California; for Amici Curiae
The City of Los Angeles, The County of Los Angeles, The
City of Baltimore, The City of Bell Gardens, The City of
Boston, The City of Chicago, The City of Monterey Park,
The City of New York, The City of Santa Ana, The City of

Santa Monica, The City of Santa Paula, The City of Long Beach, and The City of West Hollywood.

Patricio A. Marquez, Emily Nelson, Andrew Hughes, and Alexia Diorio, Assistant Attorneys General; Nicholas W. Brown, Washington Attorney General; Office of the Attorney General, Seattle, Washington; Rose E. Gibson, Assistant Attorney General; Ian R. Liston, Director of Impact Litigation; Kathleen Jennings, Delaware Attorney General; Office of the Delaware Attorney General, Wilmington, Delaware; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Anne E. Lopez, Hawai'i Attorney General, Hawai'i Office of the Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Letitia James, New York Attorney General, Office of New York Attorney General, New York, New York; Jeff Jackson, North Carolina Attorney General, Office of the North Carolina, Raleigh,

North Carolina; Dan Rayfield, Oregon Attorney General, Office of Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Joshua L. Kaul, Wisconsin Attorney General, Office of the Wisconsin Attorney General, Madison, Wisconsin; Justin Whitten, Attorney for Governor Kelly, Office of the Governor of Kansas, Topeka, Kansas; for Amici Curiae Washington, Delaware, Arizona, Colorado, Connecticut, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Wisconsin, and the Office of the Governor of Kansas.

Brandon V. Stracener Sr. and David A. Carrillo, University of California, Berkeley School of Law, Berkeley, California, for Amicus Curiae California Constitution Scholars.

Andrew G. Watters, Redwood City, California, for Amicus Curiae Blue Eagle Coalition.

Martin Akerman, Arlington, Virginia, for Amicus Curiae Martin Akerman, Chief Data Officer of the National Guard Bureau.

Julia Spiegel, Governors Action Alliance, Washington, D.C.; Charanya Krishnaswami, Governors Safeguarding Democracy, Washington, D.C.; Carey R. Dunne, Kevin Trowel, Zack Goldberg, and Martha Reisner, Free and Fair Litigation Group Inc., New York, New York; Joseph T. Baio, Jospeh T. Baio LLC, New York, New York; for Amici Curiae Bipartisan Former Governors.

Robin B. Johansen and Margaret R. Prinzing, Olson Remcho
LLP, Oakland, California; Kathryn Londerberg, Chief
Deputy Legislative Counsel; Cara L. Jenkins, Legislative
Counsel; Office of the Legislative Counsel, Sacramento,
California; for Amicus Curiae Legislature of the State of
California.

Sarvenaz Bahar, Bahar Law Office PC, Los Angeles,
California; Robert S. Chang and Shaleen Shanbhag, Fred T.
Korematsu Center for Law and Equality, UC Irvine School
of Law, Irvine, California; for Amici Curiae the California
Unity Bar and the Fred T. Korematsu Center for Law and
Equality.

J. Andrew Boyle and Maithreyi Ratakonda, States United
Democracy Center, Brooklyn, New York; Christine P. Sun,
States United Democracy Center, Los Angeles, California;
for Amici Curiae Vet Voice Foundation and Retired Senior
Military Officers.

Brian A. Sutherland and Jocelyn Sperling, Complex
Appellate Litigation Group LLP, San Francisco, California,
for Amici Curiae the Chamberlain Network and Military
Veterans.

Elizabeth B. Wydra, Brianne J. Gorod, and Brian R.
Frazelle, Constitutional Accountability Center, Washington,
D.C., for Amicus Curiae Constitutional Accountability
Center.

Simon C. Brewer and Brian D. Netter, Democracy Forward
Foundation, Washington, D.C., for Amicus Curiae Interfaith
Alliance Foundation.

Donald K. Sherman, Nikhel S. Sus, and Alex M. Goldstein,
Citizens for Responsibility and Ethics in Washington,
Washington, D.C.; Drew E. Pomerance, Roxborough

Pomerance Nye & Adreani LLP, Woodland Hills, California; for Amicus Curiae Historian Mark A. Graber.

Peter Eliasberg, Victor Leung, and Adrienna Wong, ACLU Foundation of Southern California; Los Angeles, California; Hina Shamsi, Charlie Hogle and Sean M. Lau, American Civil Liberties Union Foundation, New York, New York; Shilpi Agarwal, Chessie Thacher, and Neil Sawhney, ACLU Foundation of Northern California, San Francisco, California; Julia A. Gomez, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Amici Curiae American Civil Liberties Union, ACLU of Southern California, ACLU of Northern California, ACLU of San Diego & Imperial Counties, The Knight First Amendment Institute at Columbia University, and the Rutherford Institute.

Gary S. Lincenberg and Marc E. Masters, Bird Marella Rhow Lincenberg Drooks & Nessim LLP, Los Angeles, California; Erwin Chemerinsky, University of California, Berkeley School of Law, Berkeley, California; for Amici Curiae Twenty-One Sitting Members of the United States Senate.

Jean-Claude Andre, Bryan Cave Leighton Paisner LLP, Santa Monica, California; Emma G. McEnery, Bryan Cave Leighton Paisner LLP, St. Louis, Missouri; Benjamin J. Hogan and Clark D. Seaman, Bryan Cave Leighton Paisner LLP, Denver, Colorado; Daniel C. Schwartz and Mark A. Srere, Bryan Cave Leighton Paisner LLP, Washington, D.C.; for Amicus Curiae National Security Leaders for America.

Neal Goldfarb, Dillsburg, Pennsylvania, for Amicus Curiae Neal Goldfarb.

## **ORDER**

A judge of this court sua sponte requested a vote on whether to rehear this case en banc. A vote was taken, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. *See* Fed. R. App. P. 40. Rehearing en banc is **DENIED**. Judge Berzon's statement regarding the denial of rehearing en banc and Judge Gould's dissent from the denial of rehearing en banc are filed concurrently herewith.

---

BERZON, Senior Circuit Judge, with whom MURGUIA, Chief Judge, and WARDLAW, FLETCHER, GOULD, PAEZ, CHRISTEN, HURWITZ, KOH, SANCHEZ, and MENDOZA, Circuit Judges, join, regarding the denial of rehearing en banc:

This case presents an issue of the gravest consequence: the peacetime deployment of military troops in American cities. For the first time in the nearly 250-year history of this country, the President claims extraordinary, unilateral powers to order state National Guard troops onto the streets of select cities in response to short-term, hyper-localized, domestic protests of federal policies. This claimed authority clashes directly with the traditional strong resistance of Americans to military intrusion into civil affairs. *See Laird v. Tatum*, 408 U.S. 1, 15 (1972). That venerable tradition traces to the British use of troops immediately preceding the American Revolution to enforce oppressive legal measures and is reflected in the Declaration of Independence and several provisions in the Constitution. *See generally* Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789–1878* (1988).

Critically, the authority the President now claims in the face of that tradition is granted to Congress, not the President, by the Constitution. *See* U.S. Const. art. I, § 8, cl. 15; *Newsom v. Trump*, 141 F.4th 1032, 1045–46 (9th Cir. 2025). In a series of statutes beginning in 1792, Congress has accorded the President limited authority to exercise Congress's constitutional authority to deploy state militias—now the National Guard—including where, as the statute now reads, he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3).

In accord with the courts' usual responsibility to interpret statutes and curb assertions of executive power inconsistent with statutory grants of authority, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386–87, 412 (2024), the panel in this case should have considered whether the President was likely to succeed in showing that he complied with the very specific terms of the purely statutory grant of authority when he ordered the California National Guard onto the streets of Los Angeles over the objection of state authorities. Absent judicial insistence on compliance with strict statutory limits on the use of the military for domestic purposes, this country could devolve into one in which the use of military force displaces the rule of law, principles of federalism, and the federal separation of powers, all fundamental precepts of our democracy long understood as protecting the liberties of individuals and the assurance of self-governance.

But the panel, confined to addressing the President's deployment authority on an aggressively expedited timeline, for the most part deferred to the President's own determination of the legality of his actions. It held that courts cannot review the President's determination that the statutory preconditions for calling out the National Guard have been met as long as his determination "reflects a

colorable assessment of the facts and law within a range of honest judgment." *Newsom*, 141 F.4th at 1051 (citation modified). In doing so, it invited presidents, now and in the future, to deploy military troops in response to the kinds of commonplace, short-lived, domestic disturbances whose containment conventionally falls to local and federal law enforcement units.

The Framers gave the police power to the states to guarantee that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed," to "protect[] the liberty of the individual from arbitrary power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (citation modified). Such essential protection should not be discarded, even in the short term—here, by lifting an injunction against the improper federalization and deployment of state National Guard troops. The panel's order, as it currently exists, states legal principles—fundamentally erroneous in my view— that are binding on courts in this circuit, which have already begun to confront additional deployments of National Guard troops by the President, invoking the same statute at issue here, *see Oregon v. Trump*, No. 25-cv-1756 (D. Or. filed Sept. 28, 2025); *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 20, 2025), and may influence courts across the country, *see, e.g.*, Memorandum of Law in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction at 34, 39, *Illinois v. Trump*, No. 25-12174 (N.D. Ill. Oct. 6, 2025); *Illinois v. Trump*, No. 25-2798 (7th Cir. Oct. 11, 2025).

The panel may have an opportunity to revisit its preliminary stance on the deference due the President, with the benefit of greater time and more extensive briefing, when

it addresses the merits of the President's appeal.[1] I certainly hope that it can and will do so, and that if it does not, the court will agree to en banc review at that juncture. But given the recent and ongoing rash of deployments of National Guard troops to city streets in response to localized protests, based on unsupported assertions about crime and disorder, this court should have addressed the legal principles governing such deployments now, not later.

## Background

Under § 12406(3), the President is authorized to federalize the National Guard when he is "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). The panel opinion recounts some of the facts underlying the President's claim that the situation in Los Angeles in June met that standard. As the reasons this case should have been heard en banc are primarily legal, not factual, I describe here only a few additional factual circumstances elided in the panel opinion.

On June 6, 2025, Immigration and Customs Enforcement ("ICE") "conducted immigration enforcement operations in several locations in the Los Angeles area." Declaration of Ernesto Santacruz, Jr. ("Santacruz Decl.") ¶ 7, *Newsom v. Trump*, No. 25-cv-4870 (N.D. Cal. June 11, 2025). The

---

[1] Whether the panel itself is bound by its own opinion as the law of the circuit is not entirely clear. *See Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015) (holding that legal rulings in a published opinion of a motions panel on a stay motion are binding on future panels, including later panels in the same case); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) (applying *Lair* but holding that an earlier motions panel's opinion is not binding on a later motions panel where "[t]he question presented to the motions panel is an additional step removed" from the question before the later merits panel).

record indicates that of these enforcement operations, only one faced any disruption. At the site of an effort in the Garment District to arrest and detain some undocumented persons, a group of individuals "tried to prevent ICE authorities from leaving in their official vehicles, and threw objects at the vehicles." *Id.* Despite these actions, ICE was able to detain the targeted individuals and take them to an ICE facility for processing.

That evening, protests against ICE operations began around the Metropolitan Detention Center in downtown Los Angeles. Declaration of Brian Olmstead ("Olmstead Decl.") ¶ 6, *Newsom v. Trump*, No. 25-cv-4870 (N.D. Cal. June 10, 2025); Santacruz Decl. ¶¶ 9, 10. Inside the building, ICE continued to process the approximately 130 individuals it had detained earlier that day. Santacruz Decl. ¶ 12; *see also* Declaration of Nicholas Espiritu ("Espiritu Decl.") Exs. G, H, *Newsom v. Trump*, No. 25-cv-4870 (N.D. Cal. June 10, 2025) (stating that ICE had successfully detained at least 44 individuals related to suspected immigration violations on June 6). Outside, protesters attempted to enter the complex's parking garage, which was guarded by Federal Protective Service ("FPS") inspectors. Santacruz Decl. ¶ 11. Additional Enforcement and Removal Operations ("ERO") and Homeland Security Investigations ("HSI") officers were called in to assist, and "[t]he combination of FPS, ERO, and HSI law enforcement officers successfully prevented a breach." *Id.* ¶ 13. Federal officers were assisted by local law enforcement. *Id.* ¶ 13. Approximately 150 additional Los Angeles Police Department ("LAPD") officers were reassigned to cover the protest site, and both the LAPD and the Los Angeles County Sheriff's Department ("LASD") informed the California Governor's Office of Emergency Services that no additional personnel or equipment was

necessary. Olmstead Decl. ¶ 6. The LAPD declared an "unlawful assembly." Santacruz Decl. ¶ 9. By 11:00 p.m. the protesters departed. *Id.* ¶ 17.

ICE arrests continued the following day, Olmstead Decl. ¶ 7; Santacruz Decl. ¶ 18, and over 100 Customs and Border Protection ("CBP") officers arrived that morning from San Diego to assist, Santacruz Decl. ¶ 18. Protesters again gathered at the Metropolitan Detention Center. Olmstead Decl. ¶ 7. That protest was "fairly in control with some incidents with protesters targeting the Metropolitan Detention Center." *Id.* ¶ 9. The majority of the protesters eventually dispersed without incident. *Id.*

On the same day, approximately 300 to 400 protesters gathered at a Department of Homeland Security ("DHS") office in Paramount, a city in Los Angeles County. *Id.* ¶ 10; Santacruz Decl. ¶ 20. The LASD dispatched 200 deputies to respond, including "a team with specialized training in handling civil unrest." Olmstead Decl. ¶ 7. "[F]ederal officers moved protesters away from federal property" while the "LASD deployed additional resources to assist with crowd movement and control." *Id.* ¶ 9.

The Paramount protest continued throughout the day, during which some individuals engaged in misconduct. Santacruz Decl. ¶¶ 20, 21; Olmstead Decl. ¶ 9. Ultimately, the LASD "was able to bring the situation under control" and by 4:00 a.m. the following morning the LASD "demobilized its teams, after it de-escalated the situation." Olmstead Decl. ¶ 9; Santacruz Decl. ¶ 21. "[A]t least 11 individuals were arrested for engaging in unlawful behavior that evening related to the protests in Los Angeles, Paramount, and Compton." Olmstead Decl. ¶ 10.

On the evening of June 7—the day after the protests started—President Trump issued a memorandum providing for federalizing at least 2,000 California National Guard members under 10 U.S.C. § 12406. Over the next two days, Secretary Hegseth called 4,000 members of the California National Guard into federal service and deployed them to Los Angeles.

## Discussion

**I. Neither § 12406 nor precedent requires extraordinary judicial deference to a president's determination that he is authorized to federalize the National Guard.**

### A. The statute authorizing the President to federalize the National Guard does not limit judicial review.

The Constitution provides that "Congress shall have Power . . . [t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8. In 10 U.S.C. § 12406, Congress delegates part of its power to call forth the militia to the President under certain carefully delineated circumstances.[2] The authority the President asserts here to federalize the National Guard is thus granted to him by Congress, not the Constitution. So, as the panel recognized, the question "[t]o what extent . . . Congress, in § 12406, [has] committed the challenged decision to the President's discretion" is "purely a matter of statutory interpretation." *Newsom*, 141 F.4th at 1046.

---

[2] No question concerning the validity of that delegation has been raised in this case.

I begin, as we must when interpreting statutes, with the language of the statute. Section 12406 states:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. So, before the President can federalize the National Guard, one of the three factual predicates— (1) a foreign invasion or danger of a foreign invasion, (2) a rebellion against the federal government or danger of such a rebellion, or (3) a situation in which the President is unable with regular forces to execute federal law—must be present. *Id.*

The panel held courts must review the President's determination that one of the preconditions is met under a "highly deferential standard," *Newsom* 141 F.4th at 1052, that asks only whether that determination "reflects a colorable assessment of the facts and law within a range of honest judgment," *id.* at 1051 (citation modified). That ruling does not comport with the statutory language or the court's responsibility to interpret and apply statutory language.

Generally, "executive determinations . . . are subject to judicial review." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). "The responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts." *Stark v. Wickard*, 321 U.S. 288, 310 (1944). This fundamental precept has been repeated over and over again, by this court and the Supreme Court: "The duty of the Judiciary . . . is to determine . . . whether the Executive branch has correctly applied the statute that establishes its authority." *Chadha v. Immigr. & Naturalization Serv.*, 634 F.2d 408, 430 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983). "[L]egal interpretation . . . has been 'emphatically,' 'the province and duty of the judicial department' for at least 221 years." *Loper Bright*, 603 U.S. at 412 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump v. United States*, 603 U.S. 593, 608 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring)). Thus, "[j]udges have always been expected to apply their 'judgment' *independent* of the political branches when interpreting the laws those branches enact," *Loper Bright*, 603 U.S. at 412 (citing The

Federalist No. 78, at 523), and "judicial review of executive action 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress,'" *Gutierrez de Martinez*, 515 U.S. at 424 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)).

The Supreme Court recently considered the judiciary's relationship to executive determinations at length in *Loper Bright*, underscoring courts' "solemn duty" to "say what the law is," while recognizing "that exercising independent judgment often include[s] according due respect to Executive Branch interpretations of federal statutes." 603 U.S. at 385 (citations omitted). But respect is "just that." *Id.* at 386. While "[t]he views of the Executive Branch [can] inform the judgment of the Judiciary" they "[do] not supersede it." *Id.* (citation omitted). Judges cannot be bound to accept executive constructions of statutes, "[o]therwise, judicial judgment would not be independent at all." *Id.* And so "in cases where a court's own judgment differ[s] from that of other high functionaries, the court [is] not at liberty to surrender, or to waive it." *Id.* at 386–87 (citation modified).

Here, the statutory text gives no indication whatever that Congress intended to curtail ordinary judicial review of executive action. Section 12406(3), the provision the President invokes here, does not mention judicial review nor does it delegate to the President's discretion the determination that a precondition for federalizing the National Guard exists. Section 12406 provides that the National Guard may be called into federal service "[w]henever" one of the three delineated situations arises, not "whenever the President determines" one of the three situations has arisen. While the statute explicitly gives the President discretion to decide how many National Guard members should be called into service *if* one of the

enumerated exigencies exists, it does not give the President discretion to decide *whether* an exigency exists in the first place.

"It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994) (citation modified). Section 12406's express grant of discretion to the President to determine the number of National Guard members to call into service *once* one of the preconditions is met indicates that Congress did not intend to give the President discretion to determine *whether* a precondition is met.

From the beginning, the President's delegated calling-forth power has been carefully circumscribed. In fact, the first statute authorizing the President to call forth the Militia "whenever the laws of the United States shall be opposed, or the execution thereof obstructed . . . by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or the powers vested in the marshals," required *pre-deployment* judicial authorization. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264. In 1795, the judicial pre-authorization requirement was removed, but the President's authority to assume control of and deploy military forces for domestic law enforcement purposes continued to be limited to extreme circumstances in which federal marshals and judicial proceedings could not protect execution of the law. Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424.

When Congress has intended to give the President discretion to decide whether federalizing the militia is appropriate, it has done so explicitly. In 1861, during the Civil War, Congress did precisely that, amending the Militia Act of 1795 to read: "whenever . . . it shall become

impracticable, *in the judgment of the President of the United States*, to enforce . . . the laws of the United States . . . it shall be lawful for the President of the United States to call forth the militia of any or all the States of the Union." Act of July 29, 1861, ch. 25 § 1, 12 Stat. 281, 281 (emphasis added). But in 1903, when Congress passed the legislation overhauling the previous militia system and creating the provision that would become § 12406(3), it excised the language delegating to the President the discretion to determine whether his law enforcement capabilities were sufficiently limited to justify calling up the National Guard. Section 12406 does not contain the phrase "in the judgment of the President of the United States" or any comparable authority-granting language, nor does it otherwise indicate that judicial review of the President's compliance with the statute should be restricted. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded . . . ." *Immigr. & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) (citation omitted). Congress's decision to jettison the deferential language in the 1861 Militia Act strongly indicates that it intended to preclude any such deference.

Although the statutory text and history are determinative here, § 12406's legislative history further indicates that Congress intended to establish enforceable limits on the President's authority. The provision that would become § 12406 was introduced in the Militia Act of 1903, which made numerous reforms to the National Guard system. Notably, the legislation was described as providing "for [the militia's] special employment by the General Government as a part of the constitutional military forces in time of war or public danger, *such use being made the subject of special*

*statutory limitations in respect to time, place, and occasion of its employment*." H.R. Rep. No. 57-1094, at 2 (1902) (emphasis added). Again, ensuring compliance with such statutory limitations is the role of the judiciary. Elsewhere, in its discussion of the President's authority to call forth the militia, the congressional Committee on Militia explained that the National Guard "was never designed to be a militia of the United States, nor under the control of the President," and that the President could not call the National Guard into federal service "at his arbitrary pleasure." *Id.* at 23. Importing unusual deference to the President into § 12406 not only defies the statutory text but also deviates from Congress's clear intent to carefully delimit its delegation of its constitutional calling forth power.

## B. *Martin v. Mott* does not limit judicial review of the President's powers under § 12406(3).

The panel opinion acknowledges that "if we were considering the text of § 12406 alone, we might conclude that the President's determination is subject to review like certain other factual findings that are preconditions for executive action under a statute." *Newsom*, 141 F.4th at 1047. But the panel thought *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), as well as later cases interpreting statutory delegations of Congress's calling forth power, "strongly suggest that our review of the President's determinations in this context is especially deferential." *Newsom*, 141 F.4th at 1047.

*Martin* cannot, and does not, change the meaning of a statute not in effect when *Martin* was decided and whose predecessor, the Militia Act of 1795 § 2, was distinct from and not considered in *Martin*. Read carefully, in fact, *Martin* did not address at all *courts'* authority to review the

President's exercise of his delegated power to call forth the militia. Further, *Martin* rests on considerations inapplicable here. Finally, it is no surprise that *Martin* has been narrowly interpreted in later cases, which take a much more robust view of the role of the judiciary in curtailing overreach by the executive branch. For all these reasons, the panel should not have invoked *Martin* as governing in any respect the current judicial application of the federal law enforcement aspect of § 12406. Its errors in this regard are having on-the-ground impact right now. *See* Oral Argument, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 9, 2025). I hope the panel can, and will, reconsider its invocation of *Martin* at the merits stage.

### 1. *Martin* does not address judicial review.

*Martin* concerned a militia member's efforts to recover a farm horse seized to pay a fine imposed by a court martial after he failed to serve as ordered in the War of 1812. *Martin*, 25 U.S. at 28; Joshua E. Kastenberg, *The Limits of Executive Power in the Early Republic:* Martin v. Mott—*An Old Gray Mare—Reexamined Through Its Own History*, 82 La. L. Rev. 161, 167 (2021). Mott, a private in the New York state militia, brought a replevin action to recover his horse. Martin, the defendant officer, responded with an "avowry" setting forth the justification for the seizure. *Martin*, 25 U.S. at 29. Mott challenged the avowry as deficient because it did not allege that the statutory preconditions for the president's "limited power [to call forth the militia], confined to cases of actual invasion, or of imminent danger of invasion," were met. *Id*. The question that reached the Court was whether a militia member could challenge the president's determination "in the first instance" that an exigency existed that authorized him to call forth the militia under the Militia Act of 1795. *Id.* at 31.

The Court in *Martin* held that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id*. at 30. In context, that holding did not concern judicial review. The context makes clear that "all other persons" refers not to the courts, but rather to subordinate military officers, like Mott. The Court in *Martin* framed the question presented as a dichotomy: "Is the President the sole and exclusive judge whether the exigency has arisen, or is it to be considered as an open question, upon which *every officer to whom the orders of the President are addressed*, may decide for himself, and equally open to be contested by *every militia-man* who shall refuse to obey the orders of the President?" *Id.* at 29–30 (emphasis added). So, in context, "all other persons" refers to the officers and soldiers to whom the President's orders are addressed.

Historical circumstances further illuminate the Court's concern in *Martin* with military hierarchy, not judicial review. *See* Brief of Constitutional Accountability Center as Amicus Curiae in Support of Appellees and Affirmance, *Newsom v. Trump*, No. 25-3727 (9th Cir. Sept. 9, 2025). The War of 1812 was deeply unpopular. Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L. Rev. 181, 188 (1940). Several states defied the President's orders and refused to call out their militias for federal service. Marcus Cunliffe, *Soldiers and Civilians: The Martial Spirit in America* 185 (1968); 1 James Kent, *Commentaries on American Law* 263 (4th ed. 1840); Kastenberg, *supra*, at 188. The nation's military capacity against Britain was hindered by the President's inability to employ the full militia forces of the states. Emory Upton, *The Military Policy of the United States* 96 (1917). The President and state governors disputed whether the authority

to determine that either of the wartime preconditions for the President to federalize the militia—an invasion or imminent threat thereof—lay with the federal or state executives. 3 Joseph Story, *Commentaries on the Constitution of the United States* 90 (1833); [3] Kent, *supra*, at 262. Many individual soldiers, like Mott, refused to serve and drew on arguments challenging the President's authority to defend themselves against courts martial. Kastenberg, *supra*, at 183, 192–95. When *Martin* reached the Court, the urgent, "much agitated" question about the President's authority to call out the militia was whether state governors and soldiers beneath him in the military chain of command could challenge his authority by defying his orders, not whether the courts could perform their normal duty of reviewing his compliance with a statutory grant of authority. Story, *supra*, at 90.

The Court's reasoning throughout *Martin* further clarifies that its holding was unrelated to judicial review. The Court observed that if any officer or soldier "has a right to contest the orders of the President upon his own doubts as to the exigency having arisen," the untenable result would follow that "any act done by any person in furtherance of such orders would subject him to responsibility in a civil suit" where his  defense would "rest upon his ability to establish the facts" of an actual or imminent danger of invasion. *Martin*, 25 U.S. at 30. Under such circumstances, disobedience of military orders would proliferate and the military chain of command would crumble. Further, "the legality of the orders of the President" might then depend upon a jury's finding of facts. *Id.* at 33. Such a result would be neither practically feasible nor consistent with Congress's

---

[3] Justice Story was the author of *Martin v. Mott*.

limited delegation to the President of some of its authority to call forth the militia.

It would be nonsensical, said *Martin*, to interpret a statute granting the President authority to order the militia into service to simultaneously provide that "any other person has a just right to disobey" that order. *Id.* at 31. *Martin* further explained that "[w]henever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts." *Id*. at 31–32. That does not mean that any statutory delegation of authority forecloses judicial review. Such a conclusion would run counter to the principle that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts." *Stark*, 321 U.S. at 310. Rather, *Martin* concerns the President's authority vis-à-vis his military subordinates. It does nothing to alter the court's authority and responsibility to ensure the President complies with any statutory grant of militia powers.

### 2. *Martin* does not address the statute at issue here.

In any event, *Martin* does not control here because it concerned an entirely different statute. *Martin* concerned the President's authority to order state militias into federal service under § 1 of the Militia Act of 1795, which permitted presidential deployment of state militias when the country was being "invaded" or was "in imminent danger of invasion from [a] foreign nation." Militia Act of 1795 § 1. Here, the President claims power to federalize the National Guard under § 12406(3), not the Militia Act of 1795, and due to a purported inability to execute the law, not because of any actual or threatened invasion.

Aside from addressing different triggering circumstances for deploying state militias, the language of § 1 of the Militia Act of 1795 is quite different from § 12406(3). Generally, when Congress uses "identical language" from a prior statute that has been authoritatively interpreted to have a certain meaning, we presume that it intends to import that meaning into the subsequent statute. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 695 (1979); *see also United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (en banc). But § 12406(3) does not use the same, or even similar, language to that of § 1 of the Militia Act of 1795. The provision at issue in *Martin* stated, "whenever the United States shall be invaded, or be in imminent danger of invasion . . . , it shall be lawful for the President of the United States to call forth such number of the militia . . . as he may judge necessary to repel such invasion." Militia Act of 1795 § 1. Section 12406(3), in contrast, covers situations in which "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). The only similarity between the two statutes is that they address the same general topic (federalization of the militia) and have a somewhat similar structure (starting with "whenever" and then listing conditions for federalization).

Moreover, § 12406(3) has limiting language not present in § 1 of the Militia Act of 1795, indicating the scope of the President's discretion under the former is narrower. Specifically, § 12406(3) requires that the President be "unable" to execute the law "with the regular forces" before he can call in the National Guard to enforce federal law. Section 1 of the Militia Act of 1795 contained no comparable constraints. Instead, it authorized the President to call in the militia whenever there is an invasion or even an imminent

risk of an invasion, with no requirement that "regular forces" be "unable" to repel the incursion. That § 12406(3) allows use of the National Guard only as a last resort specifies a limitation on the President's discretion not present in the provision at issue in *Martin*.

A separate section of the Militia Act of 1795 from the one at issue in *Martin* concerned situations in which "the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act." Militia Act of 1795 § 2. But, critically, neither *Martin* nor any subsequent case addressed that *entirely separate section* of the Militia Act, which, in any event, and, as I have explained, used different, narrowing language from the provision at issue in *Martin*.[4] We cannot presume that Congress intended to adopt a prior authoritative interpretation of a certain phrase when there (1) was no similarity of phraseology; (2) was no such interpretation of the earlier statute; and (3) were later changes in the earlier statute highly relevant to the meaning of the current one.

## C. *Luther v. Borden* does not support exceptional deference to the President under § 12406(3).

*Luther v. Borden*, 48 U.S. (7 How.) 1 (1849), the other case primarily invoked by the panel as to deference to the President, is inapposite here for many of the same reasons *Martin* is.

---

[4] I note that that section referred to "combinations too powerful to be suppressed by the ordinary course of judicial proceedings," confirming that only when there were extraordinary levels of civil disarray could the power be exercised. Militia Act of 1795 § 2.

*Luther* concerned the Dorr Rebellion, during which a group of Rhode Island residents took up arms in an effort to establish a new state government to replace the existing "charter" government. Luther, a participant in the rebellion, was arrested at his home by officers of the charter government. *Luther*, 48 U.S. at 34–35. He brought a common-law trespass suit against them. The resolution of that suit depended on whether or not the arresting officers were acting in service of a legitimate government. So the question before the Court was whether it had the authority to determine which was the legitimate government of Rhode Island. It held that it did not.

The Court determined that it was bound by the President's recognition of the charter government under § 1 of the Militia Act of 1795, which provided that:

> [I]n case of an insurrection in any State against the government thereof, it shall be lawful for the President of the United States, on application of the legislature of such State or of the executive (when the legislature cannot be convened), to call forth such number of the militia of any other State or States, as may be applied for, as he may judge sufficient to suppress such insurrection.

*Id*. at 43 (quoting Militia Act of 1795 § 1). The charter governor requested the President call out the militia, and the President prepared to do so. The Court held that by that act, the President recognized the charter government as the legitimate one. The Court explained that in the case of a domestic armed conflict in which "one of the parties [is] in insurrection against the lawful government," "the President

must, of necessity, decide which is the government . . . before he can perform the duty imposed upon him by the act of Congress." *Id.*

The portion of the Militia Act of 1795 that the Court considered in *Luther* has no analogue in § 12406. Nothing in § 12406 provides for federalizing the National Guard "on application of the legislature of such state or of the executive (when the legislature cannot be convened)" in cases of "an insurrection in any state against the government thereof." Militia Act of 1795 § 1. So there is no basis for importing into § 12406(3) *Luther*'s reading of a completely distinct statutory authorization.

Further, the key to the Court's reasoning in *Luther*—the President's delegated authority "to decide what government is the established one in a State" during contexts of armed insurrection—is absent here. *Luther,* 48 U.S. at 42. The Court emphasized that deference was required for the government's response to actual insurrections to be effective. "When citizens of the same State are in arms against each other . . . the interposition of the United States must be prompt, or it is of little value." *Id.* at 44. "Could the court, while the parties were actually contending in arms for the possession of the government, call witnesses before it and inquire which party represented a majority of the people?" *Id.* at 43. The Court answered in the negative, as "[t]he ordinary course of proceedings in courts of justice would be utterly unfit for the crisis." *Id.* at 44. But, again, a situation where armed factions are fighting for control of a state's government is utterly unlike the much more amorphous circumstances to which § 12406(3) potentially applies. If the statutory language is read as broadly as it was by the panel, circumstances involving interference with civil law enforcement officers' ability to execute the law arise

daily across the nation. So the rationale for giving deference to the President's determination under the statute at issue in *Luther* has little resonance here.

Not only did *Luther* involve an entirely different statutory provision and rely on purposive reasoning inapplicable here, it also implicated federalism principles, principles that in this case support judicial review. The Court was concerned that allowing Luther's common-law suit to proceed would have outsourced the political branches' traditional responsibility of recognizing state sovereignty. *Id.* at 42. The Court's analysis in this regard depended in part on the fact that Rhode Island state courts had already decided which government was legitimate. *Id.* at 40. "Upon such a question the courts of the United States are bound to follow the decisions of the State tribunals, and must therefore regard the charter government as the lawful established government." *Id*. Here, the question before the panel was not whether federal courts should defer to state courts' determinations, but whether we should allow to go unchecked the federal executive's assumption of a police power generally assigned to the states.

## D. Modern justiciability doctrine requires the court to check unauthorized assertions of presidential power.

Even if *Martin* and *Luther* did, when decided, stand for extreme judicial deference to the President's invocation of his power to deploy state forces for federal law enforcement purposes—which, for the many reasons surveyed, they did not—fundamental doctrinal developments in the more than 150 years since those cases were decided have displaced any such exaltation of executive authority over judicial responsibility.

*Baker v. Carr*, decided 135 years after *Martin*, abjured a deferential approach, even in the constitutional context, making clear that ordinarily the "Court is not at liberty to shut its eyes to an obvious mistake" in the political branches' decision making. 369 U.S. 186, 214 (1962) (quoting *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924)); *see* Tara Leigh Grove, *The Lost History of the Political Question Doctrine*, 90 N.Y.U. L. Rev. 1908, 1913–14 (2015). After *Baker*, courts no longer conclude that an issue is nonjusticiable simply because it implicates some realm in which the President has constitutional authority (which he does not here). *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195–96 (2012); *United States v. Nixon*, 418 U.S. 683, 693 (1974). Rather, "when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). Although the panel recognized this principle when it rejected the government's nonjusticiability argument, it effectively read that antiquated judicial doctrine into a statute whose text contained not a glimmer of it, through its readings of *Martin* and *Luther*. The panel's standard contradicts the modern principle that the courts have a "solemn duty" to "apply their judgment independent of the political branches." *Loper Bright*, 603 U.S. at 385, 412 (citation modified).

Today, the governing presumption is "that executive determinations generally are subject to judicial review." *Gutierrez de Martinez*, 515 U.S. at 434. Again, "judicial review of executive action 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.'" *Id.* at 424 (quoting *Abbott Lab'ys*, 387 U.S. at 140); *see also Kucana v. Holder*, 558 U.S. 233, 251 (2010). It is now commonplace for courts to assess whether the

statutory prerequisites for the President to exercise his authority in a given context have been met. *See, e.g.*, *Doe #1 v. Trump*, 957 F.3d 1050, 1066–67 (9th Cir. 2020); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc). This case should have been heard en banc to ensure that the court fulfilled its "responsibility of determining the limits of statutory grants of authority." *Stark*, 321 U.S. at 310.

## II. The panel opinion's interpretation of the substantive requirements of § 12406(3) contradicts the statute.

As to the substantive standard for triggering the President's authority under § 12406(3), the panel held that "interference" that "significantly impede[s] the ability of federal officers to execute the laws" is sufficient under the statute to permit sending state National Guard troops onto city streets. *Newsom*, 141 F.4th at 1052. But § 12406(3) says nothing about "interference" or "significant impediments." It requires that the President be "*unable* with the regular forces to execute the laws" before he is authorized to call in the National Guard. § 12406(3) (emphasis added). "Unable" requires something much closer to complete incapacity than a two-day minor disruption in a discrete location.

A situation does not render the President "unable" to enforce the law simply because it makes enforcing the law more difficult. "Unable" means "not able" or "incapable." Unable, Webster's Third New International Dictionary (2002); *see also* Unable, Oxford English Dictionary (2d ed. 1989) (defining "unable" as "not able, not having ability or power, to do or perform (undergo or experience) something specific"). We assume that Congress means what it says. Before the President can send in the National Guard under

§ 12406(3), circumstances must be severe enough to make him "incapable" of enforcing the law.

Further, the "with the regular forces" modifier confirms that Congress did not intend the federalization of the National Guard to be a routine response to protests or other disruptions, but rather a last resort when ordinary civil law enforcement and the courts are unable to address the situation. The panel opinion gives no role whatever to the "with the regular forces" requirement. Yet, beginning with the Militia Act of 1792, the law enforcement provisions of the militia acts have contained language requiring the breakdown of civil law enforcement capability before the President's deployment authority is triggered. Without that critical clause, the deployment authority could fundamentally undermine this nation's longstanding aversion to military intervention in civil law enforcement.

The history of the current statute also underlines that the statute means what it says. In formulating the provision that would become § 12406(3), Congress took out more permissive language in the 1861 amendment to the 1795 Militia Act and substituted "unable." The 1861 provision authorized federalizing the militia whenever it was "*impracticable*, in the judgment of the President of the United States, to enforce, by the ordinary course of judicial proceedings, the laws of the United States." Act of July 29, 1861 § 1 (emphasis added). In addition to excising the "in the judgment of the President" clause from the 1861 Act, Congress in 1903 strengthened the showing necessary for federalizing the National Guard. Now, enforcement of the law must be more than "impracticable"; the President must be "unable" to execute the law. Congress's rejection of the "impracticable" standard cannot be ignored. It shows that when Congress said "unable" it meant "unable," not

"impracticable" or some other more weaselly standard. We "presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

**III.  The panel opinion's judicial-review and substantive interpretations of § 12406(3) clash with the longstanding American tradition of resistance to the use of military forces for civil law enforcement except in the most exigent circumstances.**

As I've shown, the interpretation of § 12406(3) adopted by the panel clashes with well-established precepts of statutory interpretation and judicial responsibility. Although these considerations should have been sufficient to counsel en banc review, the resounding clash between the President's invocation of the deployment authority in this case and deeply rooted principles underlying our democracy made reconsideration, now, compelling.

The rejection of military involvement in civil law enforcement except upon the most exigent circumstances traces to the events immediately preceding the American Revolution. At that time, the British government used troops to enforce laws that American colonists widely considered oppressive and so inspired deep and enduring antagonism towards military involvement in domestic law enforcement. Coakley, *supra*, at 3. "The image of hated Redcoats shooting down innocent citizens in the Boston Massacre of 1771 was a vivid one" and animated much of the early American sentiment on this issue. *Id.*

With memories of these abuses fresh in their minds, the Framers sought to ensure that the federal government could use the militia in connection with civil law enforcement only when such measures were "absolutely necessary." 3 *The*

*Debates in the Several State Conventions on the Adoption of the Federal Constitution* 392 (Jonathan Elliot ed., 2d ed. 1836). As James Madison explained, "it was obvious" that "when the civil power was sufficient, this mode"— meaning use of the militia in connection with the execution of federal law—"would never be put in practice." *Id.* at 384. Put differently, "the use of federal military personnel in the context of law enforcement operations" has always been considered "a last resort." Brief of Former U.S. Army & Navy Secretaries & Retired Four-Star Admirals & Generals as Amici Curiae at 8, *Newsom v. Trump*, No. 25-3727 (9th Cir. July 18, 2025).

For centuries, this emergency power has remained a true last resort, invoked only under extreme circumstances in which concerted opposition entirely prevents the President from enforcing law through regular civil law enforcement, including court proceedings. Presidents have rarely resorted to this extraordinary power and have done so only to respond to sustained mass violence or organized, successful obstruction of the enforcement of certain laws. No American militia act has ever been understood to authorize the President to call forth the militia merely to address temporary, minor, hyper-localized impediments to federal law enforcement efforts.

Some examples: President Washington called forth the militia in response to the Whiskey Rebellion, which was "[t]he single largest example of armed resistance to a law of the United States between the ratification of the Constitution and the Civil War." Thomas P. Slaughter, The Whiskey Rebellion 5 (1986); *see* Proclamation of Sept. 25, 1794, https://tinyurl.com/523zrhfu. It involved several years of escalating violence in western Pennsylvania driven by opposition to a federal whiskey tax. *See* Coakley, *supra*, at

28–65. During much of that period, excise officers were unable to enter a single distillery in the region to collect the tax due to organized resistance. *Id.* at 32–33. But it was only after a group of 7,000 to 15,000 armed men gathered to resist the law that Washington summoned militia troops to put down the resistance. *Id.* at 35–36.

President Adams called forth the militia during Fries's Rebellion, which involved armed, organized resistance to tax laws in eastern Pennsylvania, after it became evident that the tax collectors would be unable to enforce the law without military intervention. *See* Proclamation No. 9 (Mar. 12, 1799), https://tinyurl.com/38xryz2f. President Madison federalized state militias during the War of 1812, when the United States faced invasion by Great Britain. *See Martin*, 25 U.S. at 19. President Lincoln similarly federalized state militias to fight during the Civil War. *See* Proclamation No. 80, (Apr. 15, 1861), https://tinyurl.com/nk78jw9s.

Presidents Eisenhower, Kennedy, and Johnson federalized the National Guard at various points during the civil rights era when state law enforcement made clear that it would not enforce federal orders, and, in some cases, openly tried to prevent enforcement.[5] *See* Proclamation No. 3204, 22 Fed. Reg. 7628 (Sept. 23, 1957); Proclamation No. 3497, 27 Fed. Reg. 9681 (Sept. 30, 1962); Proclamation No. 3542, 28 Fed. Reg. 5709 (June 11, 1963); Proclamation No. 3554, 28 Fed. Reg. 9861 (Sept. 10, 1963); Proclamation No. 3645, 30 Fed. Reg. 3739 (Mar. 20, 1965). For example, President Johnson federalized the Alabama National Guard to protect civil rights protesters marching from Selma to Montgomery from violent mobs. The President's

---

[5] These federalizations occurred under the Insurrection Act, 10 U.S.C. §§ 251-255, which has prerequisites different from those in § 12406.

intervention was required to enforce a federal court order permitting the march to proceed, as then Governor George Wallace had openly "refuse[d] to provide for the safety and welfare" of the protestors. Proclamation No. 3645, 30 Fed. Reg. 3739 (Mar. 20, 1965). President Kennedy likewise federalized the Alabama National Guard after Governor Wallace used the state's National Guard to prevent integration of public schools, again in violation of federal court orders mandating desegregation. *See* Proclamation No. 3554, 28 Fed. Reg. 9861 (Sept. 10, 1963); *see also* Proclamation No. 3542, 28 Fed. Reg. 5709 (June 11, 1963) (federalizing Alabama National Guard where Wallace and state police attempted to block Black students from enrolling in the University of Alabama in violation of court order); Proclamation No. 3497, 27 Fed. Reg. 9681 (Sept. 30, 1962) (federalizing Mississippi National Guard after the Mississippi Governor and state police attempted to block a Black student from enrolling in the University of Mississippi in violation of court order). Several years earlier, President Eisenhower federalized the Arkansas National Guard and ordered them to stand down after the Arkansas Governor had used the state National Guard to prevent desegregation following *Brown v. Board of Education*. *See* Proclamation No. 3204, 22 Fed. Reg. 7628 (Sept. 23, 1957). In each of these cases, because regular law enforcement refused to perform their duties, federalization of the National Guard was necessary to execute federal law.

Although § 12406(3) has been in existence for over 100 years, the only other time it has been invoked was when President Nixon federalized the National Guard to sort and deliver mail following a strike by over a quarter of all national postal workers, an event that "threatened to bring the nation to a standstill." Nancy Pope, Operation Graphic

Hand, Smithsonian Nat'l Postal Museum (Mar. 23, 2017), https://tinyurl.com/32z5reu4; *see* Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 23, 1970). "The strike's effect on government and businesses [was] devastating." The Great Postal Strike, The Postal Record, Vol. 133, No. 3, at 19 (Mar. 2020). It caused "the whole postal system" to become "inoperable." *Id.* As President Nixon explained, several provisions of the U.S. Code "require that the business of the Post Office Department, including the expeditious processing and delivery of the mail, be regularly carried on," and the strike rendered him "unable solely with the regular forces"—there, the postal employees—"to cause the aforesaid laws to be executed." Exec. Order No. 11,519, 35 Fed. Reg. 5003 (Mar. 24, 1970). *Id.*

Although President Nixon's use of the National Guard does not necessarily define the outer boundaries of the President's power under § 12406(3), it provides guidance as to how that section has traditionally been understood. *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550–54 (2025) (relying on historical uses of the Judiciary Act of 1789 to construe its scope). The 1970 invocation confirms that the text means precisely what it says: for the President to call forth the National Guard, he must actually and significantly lack the capacity to carry out certain laws through ordinary means, as is the case when the federal employees responsible for carrying out the essential governmental function of ensuring the mail is delivered are on strike nationwide such that the entire system is rendered inoperable.

That this provision has been invoked only once in its 122 years of existence is itself of great significance, as is the fact that it has never been interpreted to mean that the President may send in military forces to respond to short-term domestic protests, of which there have been many—

including many which involved some violence—since the statute's enactment. Congress does not "hide elephants in mouseholes" when granting authority to the President. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Had Congress granted the President such broad power— power that contravenes our traditional repudiation of the use of the military in domestic law enforcement—surely it would not have hidden that authority in this vague, almost-never-used provision.

The present situation is not remotely comparable to any other use of the calling forth power in our almost 250-year history. We deal not with an armed uprising, a foreign invasion, a civil war, a state government's refusal to enforce federal court orders, or a strike that threatens to bring the nation to a standstill. Instead, the President's purported basis for federalizing the National Guard is to respond to less than two days of sporadic protests involving low-level violence and property damage that state, local, and federal law enforcement was competently addressing. Never over the course of our long history has a President attempted to pass off such ordinary circumstances as an emergency justifying the domestic deployment of military forces.

Protests, including against federal policies, are foundational to our society and our democracy. They are protected by the First Amendment's speech and assembly clauses when peaceful and have been pivotal in shaping the path of our country. But because the inherent aim of protests is to temporarily disrupt the regular functioning of society to convey a message, it will often be the case that law enforcement resources are diverted to monitor or respond to such events. Even nonviolent protests often involve disruptive tactics, such as sit-ins, blockades, or walk-outs. *See generally* Dan Wang & Alessandro Piazza, *The Use of*

*Disruptive Tactics in Protest as a Trade-Off*, 94 Soc. Forces 1675 (2016) (summarizing protest tactics used at over 23,000 protests in the United States between 1960 and 1995).

Regrettably, it is often the case that a small subset of individuals take advantage of protests to engage in violence or property damage. *See, e.g.*, Ian Urbina, *Beyond Beltway, Health Debate Turns Hostile*, N.Y. Times (Aug. 7, 2009) (Tea Party protests); Gregory Krieg, *Police injured, more than 200 arrested at Trump inauguration protests in DC*, CNN (Jan. 21, 2017) (anti-Trump protests); Eric Lichtblau, *Tens of Thousands March Against Iraq War*, N.Y. Times (Mar. 16, 2003) (Iraq war protests). Such transient violence should not be sufficient to transform regular demonstrations into national emergencies justifying federal military intervention, with armed troops patrolling cities for weeks or months.

**Conclusion**

The panel opinion in this case was written in exigent circumstances with fairly perfunctory briefing and no knowledge as to what was coming next.

What came next was the deployment of American troops to three more American cities—Washington, Portland, and Chicago—over the objections of local authorities, and repeated threats to send National Guard troops to "get rid of" the "problems" in, and "clean up" many more cities— including Baltimore, San Francisco, Oakland, and New York—coupled with rhetoric about the law enforcement situations in those cities that does not square with reality. *Oregon v. Trump*, 25-cv-1756, 2025 WL 2817646, at \*6 (D. Or. Oct. 4, 2025); *Newsom v. Trump*, No. 25-CV-04870, 2025 WL 2501619, at \*9 (N.D. Cal. Sept. 2, 2025).

Federalized National Guard troops in California have been deployed far beyond the purpose of responding to extraordinary threats to the execution of federal laws. Over 300 troops and 50 vehicles were sent to raid a cannabis farm over 140 miles from downtown Los Angeles. *Newsom v. Trump*, No. 25-CV-04870, 2025 WL 2501619, at \*7 (N.D. Cal. Sept. 2, 2025). Approximately 80 troops were sent to "demonstrate . . . a show of presence" by marching, armed and in uniform, through a public park in Los Angeles, surrounded by military vehicles and soldiers on horseback. *Id.* Now, hundreds of California National Guard troops have been sent to Portland, several hundred miles from the Los Angeles sites of the protests that purportedly justified their federalization. *Oregon v. Trump*, No. 3:25-CV-1756, 2025 WL 2823653 (D. Or. Oct. 5, 2025); Motion for a Second Temporary Restraining Order, No. 3:25-CV-1756, 2025 WL 2823653 (D. Or. filed Oct. 5, 2025).

Hearing a case concerning a stay motion en banc is assuredly unusual. It may well be that those active judges who did not vote to hear this case en banc now are awaiting the merits opinion in this case (and perhaps in *Oregon v. Trump*, No. 25-6268) before deciding whether the panel's ruling is seriously wrong in its legal precepts and so merits en banc review. But I continue to think that the President's disregard for this country's deep-seated commitment to the principle that armed forces must not be used as civil law enforcers except where there is no alternative should have been headed off now, not later. The panel opinion on the stay motion should have been reconsidered en banc.

GOULD, dissenting from denial of rehearing *en banc*:

I join in full Judge Berzon's well-reasoned dissent and write separately to express my additional perspectives on this important case.

As background, President Trump federalized and then ordered deployment of California National Guard members on June 7, 2025.  California's Governor Newsom filed suit, alleging that the California National Guard was not needed to handle functions normally left in the hands of civilian law enforcement, and California gained a temporary restraining order (TRO) against enforcement of the President's order. After the TRO issued, the federal government filed for an emergency stay in our Court.  Twelve days after President Trump ordered deployment of the federalized National Guard, the panel in this case filed its order staying the TRO.

A case that determines when a President may federalize and deploy American troops into our own cities warranted a more extensive consideration.  When Congress places limits on the President's statutory powers, courts must enforce them.  Our Court's latest foray into the presidential powers arena abdicated that key responsibility.  Under the panel's decision in this case, when the President determines that 10 U.S.C. § 12406(3)'s statutory preconditions have been met, this exercise of Presidential power will be upheld so long as it "reflects a colorable assessment of the facts and law within a range of honest judgment." *Newsom v. Trump*, 141 F.4th 1032, 1051 (9th Cir. 2025).  This ill-considered rule in our Circuit gives the President an almost unfettered ability to deploy American troops into our cities.  Under this rule, it is difficult for me to conceive of a likely situation in which a court could determine a President did not meet this unprecedented and extremely deferential standard.

When Congress limits statutory grants of presidential power, its words must mean something if our constitutional design is to endure. The President may not exercise power merely by invoking the authorizing statute's words regardless of their application to the situation at hand. *See Chadha v. Immigr. & Naturalization Serv.*, 634 F.2d 408, 430 (9th Cir. 1980), *aff'd*, 462 U.S. 919 (1983) ("The duty of the Judiciary . . . is to determine . . . whether the Executive branch has correctly applied the statute that establishes its authority."). The President is not "unable with regular forces to execute the laws of the United States" merely because the President says so. 10 U.S.C. § 12406(3). The President must meet statutory preconditions for exercising a statutory power; the law cannot be properly determined by mere say-so. If those preconditions are met, then there is a broad Executive power to use the military. But preconditions are just that: conditions. If not met, there is no authority for the President to exercise. The Judiciary has a solemn duty to enforce congressionally imposed limits on presidential power.

Using military force to quell predominantly peaceful public protests as a first rather than a last resort may cause dissatisfaction of the citizenry and provoke civil unrest. To have an armed military faced off against civilian protesters, whatever the motivation of the President, threatens to produce another tragedy, such as that occurring at Kent State University in 1970.[1] Normalizing the deployment of American troops on American streets at a hint of civil unrest

---

[1] For more background on this shooting, the reader may wish to listen to a popular song that was released by Crosby, Stills, Nash & Young about one month after the tragic shooting. Crosby, Stills, Nash & Young, *Ohio* (1970), https://youtu.be/l1PrUU2S_iw?si=Bt6KyxRRGScMKTsH.

Case: 25-3727, 10/22/2025, DktEntry: 147.1, Page 46 of 46
ase 3:25-cv-04870-CRB   Document 211   Filed 11/05/25   Page 46 of 4

46                       NEWSOM V. TRUMP

will lead to profound consequences destructive to American society. Indeed, the President has already ordered deployment of American troops into Washington, D.C., Portland, Chicago, and Memphis, and threatened to deploy federalized troops to other American cities to "clean [them] up." *Newsom v. Trump*, 2025 WL 2501619 at *9 (N.D. Cal. Sept. 2, 2025). Even one of our history's most enthusiastic advocates for broad federal power likely could not fathom or endorse this state of affairs. *See* THE FEDERALIST NO. 29 (Alexander Hamilton) (stating that "it is impossible to believe [a President] would employ such preposterous means" as sending National Guard members from one state to another "to accomplish [the President's] designs").

The democratic ideals our nation has consistently promoted for the last quarter millennium will be gravely undercut by allowing military force and weapons of war to be deployed against American citizens on U.S. soil on the flimsy grounds asserted here for this use of Executive power. Because our Court should have imposed real limits on the statutory presidential power at issue here, I dissent from the denial of rehearing *en banc*.