ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN, SBN 222993
THOMAS S. PATTERSON, SBN 202890
Senior Assistant Attorneys General
ANYA M. BINSACCA, SBN 189613
MARISSA MALOUFF, SBN 316046
JAMES E. STANLEY, SBN 316288
Supervising Deputy Attorneys General
JESSE BASBAUM, SBN 273333
BRENDAN HAMME, SBN 285293
IRAM HASAN, SBN 320802
BARBARA HORNE-PETERSDORF, SBN 327738
JANE REILLEY, SBN 314766
DELBERT TRAN, SBN 323993
MEGHAN H. STRONG, SBN 324503
Deputy Attorneys General
 455 Golden Gate Ave.
 San Francisco, CA 94102
 Telephone: (415) 510-3877
 E-mail: Meghan.Strong@doj.ca.gov
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAVIN NEWSOM, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF CALIFORNIA; STATE OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; PETE HEGSETH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF DEFENSE,<br><br>Defendants. | NO. 3:25-cv-04870-CRB<br><br>**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Statement of Facts ...................................................................................................... 2

    I.     Defendants Federalize and Deploy the National Guard for 60 Days on June 7 and June 9, 2025. ............................................................................................ 2

    II.    Defendants Use the Federalized National Guard for Routine Federal Law Enforcement Missions. ........................................................................................ 3

    III.   Defendants Federalize the California National Guard for an Additional 90 Days Despite Acknowledging Any Violence Has Subsided. ............................... 4

    IV.   Defendants Expand Their Military Campaign to Oregon. ..................................... 5

    V.    Defendants Send California Troops to Portland. .................................................. 6

    VI.   Defendants Send National Guard Troops to Illinois. ........................................... 8

    VII.  Citizens of Los Angeles Continue to Protest Peacefully ..................................... 9

Legal Standard ......................................................................................................... 10

Argument ................................................................................................................. 10

    I.     Plaintiffs Are Likely to Succeed on the Merits of Their Argument That Further Federalization Orders of the California National Guard Were and Are Unjustified ................................................................................................. 10

    II.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ........................... 13

    III.   The Remaining *Winter* Factors Favor Injunctive Relief. .................................... 15

Conclusion ............................................................................................................... 15

PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

1

**CASES**

*A Woman's Friend Pregnancy Res. Clinic v. Becerra*
    901 F.3d 1166 (9th Cir. 2018) ................................................................ 10

*Advocate Health Care Network v. Stapleton*
    581 U.S. 468 (2017) .................................................................................. 12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982) .................................................................................. 13

*Ariz. Dream Act Coal. v. Brewer*
    757 F.3d 1053 (9th Cir. 2014) .......................................................... 13, 14

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ................................................................. 13

*Bond v. United States*
    564 U.S. 211 (2011) .................................................................................. 14

*Bowen v. Massachusetts*
    487 U.S. 879 (1988) .................................................................................. 14

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) ................................................................. 10

*Illinois v. Trump*
    2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ...................................... 11, 14

*Illinois v. Trump*
    2025 WL 2937065 (7th Cir. Oct. 16, 2025) ...................................... 9, 11

*Kentucky v. Biden*
    23 F.4th 585 (6th Cir. 2022) ................................................................. 14

*Laird v. Tatum*
    408 U.S. 1, 15 (1972) ............................................................................... 15

*Maryland v. King*
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................ 14

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ................................................................. 15

*Newsom v. Trump*
    141 F.4th 1032 (9th Cir. 2025) ......................................................2, 11, 13

*Newsom v. Trump*
    No. 25-3727, Dkt. 136.1 .......................................................................... 12

ii

*Newsom v. Trump*
    No. 25-5553, Dkt. 7.1 (9th Cir. Sept. 4, 2025) ........................................................ 4

*Oregon v. Trump*
    2025 WL 2817646 (D. Or. Oct. 4, 2025) .............................................................. 11

*Oregon v. Trump*
    2025 WL 3008050 (Graber, J., dissenting) ................................................. 12, 14

*Oregon v. Trump*
    No. 26-6268, Dkt. 61.1 ........................................................................................... 7

*Oregon v. Trump*
    No. 3:25-cv-01756, ECF No. 1 ...................................................................... 6, 8, 9

*Preston v. Thompson*
    589 F.2d 300 (7th Cir. 1978) .............................................................................. 14

*Printz v. United States*
    521 U.S. 898 (1997) .......................................................................................... 13

*Riley's Am. Heritage Farms v. Elsasser*
    32 F.4th 707 (9th Cir. 2022) .............................................................................. 15

*Trump v. Illinois*
    No. 25A443 ........................................................................................................ 11

*United States v. Morrison*
    529 U.S. 598 (2000) .......................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ........................................................................................ 10, 15

**STATUTES**

10 U.S.C. § 12406 ............................................................................................. *passim*

United States Code, Title 10
    § 12406(2) ........................................................................................................ 11
    § 12406(3) ...................................................................................... 8, 11, 12, 13

Posse Comitatus Act ......................................................................................... 4, 5

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Tenth Amendment ................................................................................. 8, 13, 14

**INTRODUCTION**

There have been soldiers deployed to the Los Angeles area for more than five months, with current orders for continued deployment at least until February 2026 (and subject to further extension). After using isolated incidents of violence in June as a pretext to federalize the California National Guard, Defendants have now implemented a months-long military occupation, without any justification, and with no apparent end in sight. Even if events in June justified the *initial* federalization and deployment of the military in Los Angeles, there is no lawful basis for keeping troops there now. The June violence has long since subsided. Yet still, troops remain in the Nation's second-largest city. Since Plaintiffs first challenged Defendants' renewed federalization of California National Guard troops in September, Defendants' unlawful orders have multiplied and expanded. In the span of just a few weeks, Defendants federalized and deployed National Guard troops to two additional states—Oregon and Illinois—including moving 214 of the federalized California National Guard from Los Angeles to Oregon (after initially planning to send all 300), then shuffling 14 of those troops from Oregon to Illinois. Meanwhile, Defendants continue to keep 101 federalized soldiers stationed in Los Angeles, despite the absence of any justification for doing so. Defendants' actions make clear that what Plaintiffs warned from the start has now come to pass: Defendants are treating the President's June 7 memorandum as a blank check that allows them to federalize state National Guard troops in any number and for any duration they please and to send those troops anywhere in the country, even to places that were not part of their justification for the original federalization. Whatever 10 U.S.C. § 12406 permits, it certainly does not authorize the sort of broad-ranging, never-ending federalization and military occupation of American cities that Defendants are perpetrating.

There was no colorable basis to again federalize the California National Guard in Los Angeles on August 5, and there remains no basis for keeping them in California now. The lack of any violence or other justifying events in Los Angeles and Defendants' choice to remove most of those troops from Los Angeles confirms it. The Court should grant Plaintiffs' motion, enjoin any continued federalization and deployment of National Guard troops in and around Los Angeles, and end this unlawful federalization now.

1

**STATEMENT OF FACTS**

**I.    DEFENDANTS FEDERALIZE AND DEPLOY THE NATIONAL GUARD FOR 60 DAYS ON JUNE 7 AND JUNE 9, 2025.**

On Friday, June 6, 2025, Department of Homeland Security (DHS) agents began carrying out aggressive and pervasive immigration enforcement operations across Los Angeles County. These operations included detentions and arrests at community locations including two Home Depot stores, a doughnut shop, and a clothing wholesaler, all in and around the Los Angeles area. Espíritu Decl., Ex. G, ECF No. 8-1 at 52.  In the course of these operations, DHS agents took actions that inflamed tensions and provoked protests.  *Id.* at 54.  These protests were primarily peaceful, but there were instances of violence and other unlawful behavior.  Olmstead Decl., ECF No. 8-2, ¶¶ 9-11.  State and local law enforcement moved quickly to arrest lawbreakers, protect federal property and personnel, and quell violence.  *Id.* at ¶¶ 6-9; Order Granting TRO, ECF No. 64 at 4.  Governor Newsom and other elected officials immediately and unequivocally condemned unlawful conduct.  Espíritu Decl., Exs. L, N. Q, ECF No. 8-1 at 70, 72, 87.

On June 7, 2025, President Trump issued a memorandum proclaiming that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion" and calling into "Federal service members and units of the National Guard under 10 U.S.C. § 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions," as well as "to protect Federal property, at locations where protests against these functions are occurring or are likely to occur."  Espíritu Decl., Ex. O, ECF No. 8-1 at 108.  Later that day, Secretary of Defense Pete Hegseth called into service 2,000 members of the California National Guard for a period of 60 days.  *Id.* at 107.  On June 9, 2025, Secretary Hegseth called into service an additional 2,000 members of the California National Guard for 60 days, as well as 700 U.S. Marines.  Espíritu Decl., Ex. P, ECF No. 8-1 at 111.

On June 12, 2025, this Court found Plaintiffs were likely to succeed on their claim that Defendants' actions violated § 12406 and issued a temporary restraining order, which Defendants immediately appealed.  Order Granting TRO, ECF No. 64.  Though the Ninth Circuit stayed the TRO pending appeal, *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), that court has not yet

2

decided the merits of that appeal.  This Court retains jurisdiction over all aspects of the case not subject to the appeal, including Plaintiffs' current challenge to Defendants' subsequent federalization orders.  ECF No. 204.

## II.    DEFENDANTS USE THE FEDERALIZED NATIONAL GUARD FOR ROUTINE FEDERAL LAW ENFORCEMENT MISSIONS.

Though Defendants initially claimed that the military was needed to respond to violence in Los Angeles, that mission quickly pivoted and expanded to encompass broad-ranging immigration enforcement activities far beyond Los Angeles.  In the months that followed the June federalization orders, Defendants sent National Guard troops to accompany federal law enforcement on immigration raids in communities over 100 miles away from Los Angeles.  Far from responding to threats to federal personnel or property, federal law enforcement officials routinely requested and received the assistance of federalized troops for operations as a "safety measure," even if the military's risk assessment showed that there was not any threat that would require military support.  Sherman Test., Trial Tr. 137:5-18, ECF No. 162.  In fact, Major General Scott Sherman, the Commander of Task Force 51 and its federalized National Guard members, testified that the military could be deployed anywhere federal law is being enforced, even in the absence of any threat at all, including to support the Internal Revenue Service, because a threat could always materialize.  *Id.* at 124:1-128:18.  Los Angeles Enforcement and Removal Operations Field Office Director Ernesto M. Santacruz Jr. estimated that in the weeks following the deployment, federal troops accompanied ICE Enforcement and Removal Operations on approximately 75 percent of their *routine* at-large, in-the-field operations, and described the National Guard as a "force multiplier" and a "security blanket" for federal immigration enforcement.  Santacruz Test., Trial Tr. 169:13-16, 191:15-17, 197:17-198:21, ECF No. 162.

In June and July, troops were sent out of Los Angeles to places such as Mecca and Carpinteria, often in numbers that outnumbered the federal law enforcement officers present and even when there was "[n]o indication that failure to act would result in loss of life or significant property damage."  Sherman Test., Trial Tr. 80:4-81:18, 86:1-6, ECF No. 162.  Even within Los Angeles, soldiers were called on, not to provide actual protection, but to engage in mere "show[s]

of presence" in, for example, local parks.  Harrington Test., Trial Tr. 37:16-18, ECF No. 162.

In short, in the initial 60-day federalization of the California National Guard, the Guardsmen spent most of their time not responding to violence or protecting federal personnel or property, but as routine law enforcement officials.  On September 2, 2025, this Court held that those activities separately violated the Posse Comitatus Act and issued an injunction barring any further activities of the kind.  ECF No. 176.  That order is currently administratively stayed.  *Newsom v. Trump*, No. 25-5553, Dkt. 7.1 (9th Cir. Sept. 4, 2025).

### III.   DEFENDANTS FEDERALIZE THE CALIFORNIA NATIONAL GUARD FOR AN ADDITIONAL 90 DAYS DESPITE ACKNOWLEDGING ANY VIOLENCE HAS SUBSIDED.

Since mid-June, the instances of civil unrest that purportedly gave rise to Defendants' initial federalization and deployment of the California National Guard have subsided.  Following "No Kings" protests on June 14, 2025, for the remainder of June and all of July and August, there were "only a few immigration-related protests around the City [of Los Angeles] with often just a few dozen protestors at a time."  Hurtado Decl., ECF No. 183-5, ¶ 11.  In July and August, LAPD "had to deploy far fewer resources in response to immigration-related protest activity, including in and around federal property."  *Id*. at ¶ 19.  Similarly, the California Highway Patrol was not aware of any "large-scale, protest-related activity" and did not receive "reports or notification of any significant protest-related violence or property destruction in or around Los Angeles" between June 19 and the end of August.  Duryee Decl., ECF No. 134-4, ¶¶ 9-10.  On July 15, 2025, a Pentagon spokesperson stated that "the lawlessness in Los Angeles is subsiding."  Hamme Decl., Ex. 1, ECF No. 183-2 at 3.

On July 1, Defendants released 150 California National Guard members, then released an additional 2,000 on July 15.  Hamme Decl., Exs. 5 & 6, ECF No. 183-2 at 24-31.  Then, on July 21, Defendants withdrew the 700 Marines they had deployed to Los Angeles.  Hamme Decl., Ex. 7, ECF No. 183-2 at 35.  Even as Defendants began to withdraw troops, Los Angeles remained peaceful, and DHS continued to carry out arrests.  On August 14, 2025, Department of Homeland Security Secretary Kristi Noem boasted about the success of the administration's California immigration-enforcement operations, noting that since June 6, 2025, DHS had arrested 4,481

1    people in the Los Angeles area.  Hamme Decl., Ex. 8, ECF No. 183-2 at 37.

2          Such events could have been the end of this matter.  Defendants could—and should—

3    have returned all remaining federalized California National Guard members to the Governor's

4    command and control in August.  But they did not.  Instead, on August 5, 2025, Defendants

5    issued a new order federalizing 300 National Guard troops for an additional 90 days, through

6    November 4, 2025.  Decl. of Meghan H. Strong ("Strong Decl."), filed concurrently, Ex. 1.  The

7    order stated that the "mobilization is in response to direction from the President of the United

8    States . . . to provide forces to protect federal functions, personnel, and property," but provided no

9    further explanation for why the continued deployment was necessary.  *Id.*  A second order, this

10   one issued by Secretary of Defense Hegseth on August 15, clarified that the balance of the

11   remaining federalized Guardsmen would be released, but it still did not provide any justification

12   for the federalization of 300 Guardsmen through November 4.  Kurland Decl., Ex. A, ECF No.

13   190-1 at 5.

14         Plaintiffs challenged this August federalization order via a new motion for preliminary

15   injunction, ECF No. 183, which the Court initially stayed and which Plaintiffs now renew

16   following the lifting of that stay, ECF No. 208.

17   **IV.  DEFENDANTS EXPAND THEIR MILITARY CAMPAIGN TO OREGON.**

18         Meanwhile, Defendants began to implement in other parts of the country the model of

19   military occupation that began in Los Angeles.  In August, as this Court was presiding over the

20   trial of Plaintiffs' Posse Comitatus Act claims in this action, the President announced he was

21   sending National Guard troops into the District of Columbia.  Later that month, the President

22   issued an Executive Order ordering "the Secretary of Defense [to] ensure the availability of a

23   standing National Guard quick reaction force that shall be resourced, trained, and available for

24   rapid nationwide deployment."  Strong Decl., Ex. 2.  By the end of September, just a few weeks

25   after this Court stayed consideration of Plaintiffs' preliminary injunction motion, the President

26   picked his next target: Portland, Oregon.

27         After months of criticizing Portland based on unsupported allegations of crime and

28   violence, on September 27, 2025, the President posted on his Truth Social account: "At the

5

1    request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete

2    Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE

3    Facilities under siege from attack by Antifa, and other domestic terrorists.  I am also authorizing

4    Full Force, if necessary.  Thank you for your attention to this matter!"  Strong Decl. Ex. 6.

5         On September 28, 2025, after the Oregon Governor declined to mobilize Oregon's

6    National Guard voluntarily, the Secretary of Defense issued a memorandum calling 200 members

7    of the Oregon National Guard into federal service for a period of 60 days, under 10 U.S.C.

8    § 12406.  *Oregon v. Trump*, No. 3:25-cv-01756, ECF No. 1, at ¶ 58.  Even though nearly four

9    months had passed since the President's June 7 memo, the Secretary of Defense claimed that this

10   new deployment to Portland was a "further implementat[ion]" of that memo.  *Id.*  In doing so, the

11   Secretary of Defense made clear that he viewed the June 7 memo, which was not limited in scope,

12   either geographically or temporally, as granting him a blank check to federalize troops anywhere,

13   in any number, for any length of time.

14        The State of Oregon and the City of Portland filed suit later that same day, challenging the

15   Trump administration's unlawful federalization and deployment of Oregon National Guard

16   troops, and seeking a temporary restraining order enjoining their conduct.  *Oregon*, ECF No. 6.

17   On October 4, 2025, the United States District Court for the District of Oregon held that Oregon

18   was likely to succeed on its claims and granted a temporary restraining order ("First Oregon

19   TRO") that enjoined "Defendants' September 28, 2025, Memorandum ordering the federalization

20   and deployment of Oregon National Guard service members to Portland."  *Oregon*, ECF No. 56.

21   **V.    DEFENDANTS SEND CALIFORNIA TROOPS TO PORTLAND.**

22        Blocked by the First Oregon TRO from federalizing or deploying the Oregon National

23   Guard, Defendants circumvented that order hours later by deploying the still-federalized

24   California National Guard stationed in Los Angeles to Oregon instead.  *Oregon*, ECF No. 59.  By

25   6:30 a.m. on Sunday, October 5, 2025, Defendants had already transported approximately 100

26   federalized California National Guard soldiers to Portland.[1]  *Id.*; *Oregon*, ECF No. 60, at ¶ 18.

27   ─────────────────
         [1] Earlier that week, Defendants had also sent an initial group of 14 federalized California
28   National Guard soldiers to train the federalized Oregon National Guard, Declaration of Paul S.
     Eck ("Eck Decl."), filed concurrently, at ¶ 5.

An additional 100 soldiers joined them soon after, and currently 200 members of the California National Guard that were initially deployed to Los Angeles are stationed in Oregon.[2]  *Id.*  Though Defendants initially planned to send all federalized California National Guard members to Oregon, they ultimately kept some stationed in Los Angeles, and there are 101 federalized California National Guardsmen still stationed in Los Angeles today.  *See id.*; Eck Decl. ¶¶ 6, 10.

Oregon and Portland, now joined by California in an amended complaint, filed a motion for a second TRO ("Second Oregon TRO") to block this second illegal attempt to deploy the military to Portland.  *Oregon*, ECF No. 59.  After a hearing held that same evening, in which the district court stated that Defendants' overnight movement of troops from California to Oregon appeared to be "in direct contravention" of its first order, the district court granted the Second Oregon TRO, this time enjoining Defendants from "deploying federalized members of the National Guard from any State into Oregon."  *Oregon*, ECF No. 68.  Though the Second Oregon TRO prohibited deployment of any National Guard in Portland, the 200 federalized California Guard members remained stationed in Oregon, drawing them away from California even though Defendants could not make use of them in Oregon.  On October 16, 2025, Defendants purported to further extend the federalization of all currently federalized members of the California National Guard, including those still stationed in Los Angeles, through February 2, 2026.  Strong Decl. Exs. 4 & 5.

Defendants appealed the First Oregon TRO, but not the Second.  On October 20, a Ninth Circuit panel stayed the First Oregon TRO pending appeal.  *Oregon v. Trump*, No. 26-6268, Dkt. 61.1.  On October 28, the en banc court vacated the panel's decision and granted rehearing en banc.  *Id.*, Dkt. 89.1.  Separately, the Ninth Circuit administratively stayed the First Oregon TRO to the extent it would require outright de-federalization of the Oregon National Guard members; that partial stay remains in effect pending the outcome of en banc proceedings.  *Id.*, Dkt. 90.1.

Meanwhile, the district court proceeded with the *Oregon* plaintiffs' claims and, on October 29 through 31, held a trial on the merits of the claim that any deployment to Oregon

---

[2] In addition to the California National Guard, on the evening of October 5, Defendants also federalized 400 members of the Texas National Guard to send to cities of Defendants' choosing, including Portland.  *Oregon*, ECF No. 65.

1   violates 10 U.S.C. § 12406.  On November 2, the court found the *Oregon* plaintiffs were likely to

2   succeed on their claims and issued a preliminary injunction order to replace the TRO that expired

3   that day.  *Oregon*, ECF No. 134.  And on November 7, the court issued Findings of Fact and

4   Conclusions of Law in which it concluded "that even giving great deference to the President's

5   determination, the President did not have a lawful basis to federalize the National Guard under 10

6   U.S.C. § 12406."  *Oregon*, ECF No. 146 at 2.  The court found Oregon's witnesses credible and

7   Defendants' witnesses not credible, concluded that Oregon had standing based on a sovereign

8   injury caused by the unlawful federalization and deployment of the National Guard, and held that

9   Defendants violated both § 12406 and the Tenth Amendment in calling forth the National Guard

10  without a legal basis to do so.  *Id.* at 20, 21 n.1, 25-26, 30, 34, 44, 57-61, 73-86, 99-103.

11          As to the California National Guard specifically, the court held that even if the California

12  National Guard was "validly federalized under 10 U.S.C. § 12406(3) for deployment *in*

13  *California*, the plain text of the statute only permits them to be deployed to 'execute those laws'

14  that the President was 'unable with the regular forces to execute,'" and therefore the California

15  National Guard "cannot proceed to enforce other laws in other states that have no connection to

16  their initial federalization." *Id.* at 86 n.22 (emphasis original).

17          Based on these findings, the court permanently enjoined Defendants from implementing

18  any memoranda federalizing and deploying members of the National Guard in Oregon based on

19  the same predicate conditions. *Id.* at 104-05.  The court stayed its judgment in part to the extent it

20  enjoined the federalization of any State's National Guard, allowing the Guard to remain

21  federalized without deploying and maintaining the status quo preserved by the Ninth Circuit's

22  administrative stay. *Id.* at 105.  With respect to the Oregon National Guard, that stay lasts

23  fourteen days and will expire on November 21. *Id.*

24  **VI.    DEFENDANTS SEND NATIONAL GUARD TROOPS TO ILLINOIS.**

25          In addition to Oregon, Defendants have also extended their use of the military to Illinois.

26  On October 4, 2025, Defendants once again federalized the National Guard over a state

27  Governor's objection. *Illinois v. Trump*, No. 25-cv-12174, ECF No. 1, at ¶¶ 126-30.  On the

28  evening of October 4, the Secretary of Defense issued a memorandum calling into service 300

1    members of the Illinois National Guard under 10 U.S.C. § 12406. *Id.* ¶ 130. The very next day,

2    Secretary Hegseth also issued the above-described order federalizing the Texas National Guard,

3    which designated Chicago as another city to which these Texas soldiers were to be sent. *Id.*

4    ¶¶ 133-34. In addition, on or about October 7, Defendants sent 14 of the same California

5    Guardsmen assigned to train the Oregon National Guard to Chicago for 10 days to train the

6    Illinois and Texas National Guards.[3] Eck Decl. ¶ 7.

7        Illinois, like California, the District of Columbia, and Oregon before it, challenged this

8    unlawful federalization in court. On October 9, 2025, the district court held Illinois was likely to

9    succeed on its claims and issued a TRO enjoining Defendants from federalizing and deploying

10    any members of the National Guard within Illinois. *Illinois*, ECF Nos. 67 & 70. On appeal, the

11    Seventh Circuit denied Defendants' motion for a stay pending appeal, and though it allowed

12    Defendants to keep troops federalized rather than returning them to their home States, it

13    maintained that Defendants could not deploy any members of the National Guard in Illinois,

14    concluding that "the facts do not justify the President's actions in Illinois under § 12406." *Illinois*

15    *v. Trump*, 2025 WL 2937065, at *1 (7th Cir. Oct. 16, 2025). Defendants sought further review

16    before the Supreme Court and have asked the Court for a stay pending appeal. Briefing on that

17    request is ongoing through November 17.

18    **VII.  CITIZENS OF LOS ANGELES CONTINUE TO PROTEST PEACEFULLY**

19        Throughout all of this, there have been no events in Los Angeles in recent months

20    resembling anything close to those that prompted the federalization in June. As described above,

21    the incidents of unrest that purportedly gave rise to the initial June deployment had already

22    subsided by July and August, leading Defendants to release approximately 3,700 of the 4,000

23    federalized California National Guard troops. That has remained the case ever since. In October,

24    "No Kings" protesters gathered across California to protest the Trump administration's policies,

25    including immigration enforcement operations. Strong Decl. Ex. 7. These protests were largely

26    peaceful, were successfully managed by state and local law enforcement, and resulted in no

27    significant violence or property destruction. Decl. of German Hurtado, filed concurrently, at

28    [3] Those California Guardsmen have since returned to Los Angeles. Eck Decl. ¶ 8.

¶¶ 13, 21; Decl. of Sean Duryee, filed concurrently, at ¶¶ 7-8.  Despite this, 101 soldiers remain in Los Angeles, with no apparent end in sight to their occupation.  Eck Decl. ¶ 10.  Defendants continue to keep soldiers federalized based on a remote and unsubstantiated risk that they *might* be needed at some point in the future, but that is simply not what § 12406 permits.

## LEGAL STANDARD

Plaintiffs "seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, a plaintiff may also obtain a preliminary injunction under a "sliding scale" approach by raising "serious questions" going to the merits of plaintiff's claims and showing that the balance of hardships tips "sharply" in plaintiff's favor.  *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (citation omitted); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

## ARGUMENT

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR ARGUMENT THAT FURTHER FEDERALIZATION ORDERS OF THE CALIFORNIA NATIONAL GUARD WERE AND ARE UNJUSTIFIED**

There was no colorable basis to federalize and deploy soldiers to Los Angeles under 10 U.S.C. § 12406 on August 5, there was no basis for extending their deployment on October 16, and there is still no basis for any military presence in Los Angeles today.  Defendants have not and cannot offer any justification for their repeated invocation of § 12406 in Southern California.  Even if there was a colorable basis to invoke § 12406 in Los Angeles in June, that does not authorize Defendants to keep soldiers deployed there indefinitely.  An exigency is not "a ghost that continues to persist once it has passed," and events in June may not be used to justify subsequent federalizations and deployments once those events have "qualitatively changed." *Oregon*, ECF No. 146 at 79.

Defendants must be able to justify the current federalization and deployment based on events as they stand in Los Angeles now.  But there is no evidence that Defendants are currently,

1    or were at any point during or since August, "unable with the regular forces to execute the laws of

2    the United States."[4]  10 U.S.C. § 12406(3).  There have been no events of violence like those that

3    occurred in June for months.  By mid-July, Defendants admitted that "the lawlessness in Los

4    Angeles [was] subsiding."  Hamme Decl., Ex. 1, ECF No. 183-2 at 3.  By August, the National

5    Guard was assisting on "zero" ICE Enforcement and Removal field operations.  Santacruz Test.,

6    Trial Tr. 198:19-21, ECF No. 162.  In October, Defendants removed 214 of the troops from Los

7    Angeles—more than two-thirds of those stationed there—and sent them to Oregon and Illinois.

8    And 200 of those troops have remained stationed in Oregon since, even after the district court

9    enjoined their deployment.  Indeed, at one point Defendants were prepared to remove *all* the

10   remaining federalized California National Guard troops from California, confirming there was

11   and is no need or colorable basis for any military presence there.

12        What's more, the October orders that federalize the California National Guard through

13   February, including those California soldiers still in Los Angeles, are based on events in *Oregon*

14   not California.  Strong Decl. Exs. 4 & 5.  Those events are not even sufficient to support

15   deployment of troops to Oregon, as the district court held in that case, *Oregon*, ECF No. 146, let

16   alone deployment to California.  And the *Oregon* decision does not resolve the issue of

17   federalization and deployment of National Guard troops in and around Los Angeles.  That issue

18   remains before this Court, and Defendants have provided no justification for the continued

19   military presence there and intrusion on the State's sovereignty.  In short, even if there was a

20

21        [4] The meaning of "regular forces" under § 12406(3) is currently the subject of briefing
     before the Supreme Court.  While Defendants have taken the position that "regular forces" means
22   federal law enforcement, as noted in Plaintiffs' amicus brief on this topic, it is also reasonable to
     construe "regular forces" to refer to members of the regular military.  *Trump v. Illinois*, No.
23   25A443, Amicus Br. of California and Oregon.  But whatever the proper meaning of "regular
     forces," Defendants cannot satisfy § 12406(3)'s requirements in Los Angeles.
24        Nor is there any colorable basis for concluding that there is a rebellion or danger of
     rebellion in Los Angeles under § 12406(2).  Though Defendants have attempted to rely on that
25   argument as a secondary justification for their actions across the country, no court that has
     substantively considered the argument has found any merit in it.  Order Granting TRO, ECF No.
26   64 at 16-22; *Oregon v. Trump*, 2025 WL 2817646, at *12-13 (D. Or. Oct. 4, 2025); *Oregon*, ECF
     No. 146 at 86-102; *Illinois v. Trump*, 2025 WL 2886645, at *15 (N.D. Ill. Oct. 10, 2025); *Illinois
27   v. Trump*, 2025 WL 2937065, at *6 (7th Cir. Oct. 16, 2025); *cf. Newsom*, 141 F.4th at 1051 (9th
     Cir. 2025) (declining to reach rebellion argument).  There is no rebellion in Los Angeles or
28   anywhere else Defendants have tried to federalize the National Guard under § 12406.

11

1    lawful basis for invoking § 12406(3) based on a legitimate need for troops in Los Angeles in

2    June, that need has long since ended.  The deployment of troops must end with it.

3        Instead of defending their actions under the law, Defendants continue to try to evade

4    judicial review entirely.  When Plaintiffs sought relief before the Ninth Circuit after this Court

5    stayed their original motion, Defendants argued that the President was exercising his discretion to

6    determine the number and duration of Guardsmen and advanced the remarkable claim that there

7    is "no time limit on federalization."  *Newsom v. Trump*, No. 25-3727, Dkt. 136.1 at 12-15.  But

8    the text, structure, and history of § 12406 show otherwise.  Section 12406 authorizes

9    federalization "[w]henever" one of its factual predicates is met, and only then.  Most relevant

10   here, the President may federalize the National Guard if he "*is* unable with the regular forces to

11   execute the laws of the United States."  10 U.S.C. § 12406(3) (emphasis added).  The use of the

12   present tense means that the federalization must be tied to a *present* inability, not a past one.  And

13   while the statute gives the President discretion to "call into Federal service" members of the

14   National Guard "in such *numbers* as he considers necessary" (emphasis added), that does not

15   assign discretion to the question of the federalization's *duration*.  Section 12406 is clear that the

16   President may federalize troops only "whenever" one of the factual predicates *is* met.

17       Nor does § 12406 permit Defendants to keep troops stationed in Los Angeles based on the

18   mere risk that events might arise that could pose a challenge to their execution of the laws.

19   Whereas subsections one and two of § 12406 "'permit deployment whenever there is an invasion

20   or rebellion *or a danger of those events*,' subsection three 'asks only whether the President is

21   presently unable to execute the laws; the subsection does not ask in the alternative whether the

22   President is in danger of being unable to execute the laws.'"  *Oregon*, ECF No. 146, at 80

23   (quoting *Oregon v. Trump*, 2025 WL 3008050, at * 27 (Graber, J., dissenting)) (internal citation

24   omitted, emphasis in original).  "Consequently, Defendants' attempt [in Oregon] to rely on

25   aberrational violence in June to establish the existence of an emergency in September 'runs

26   aground on the so-called surplusage canon—the presumption that each word Congress uses is

27   there for a reason.'"  *Id.* (quoting *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477

28   (2017)).

So too here. Defendants have conceded that events in Los Angeles have meaningfully changed since June and claim that they have responded by decreasing the number of troops there. *Newsom*, No. 25-3727, Dkt. 136.1 ("Protests are now less frequent, less violent, and generally pose a less significant risk to federal personnel and property . . . But that risk has not disappeared entirely."). They apparently seek to maintain troops in Los Angeles until any risk of violence "disappear[s] entirely," *id.*, but § 12406(3) does not authorize that kind of standing army. Some degree of risk is *always* present, which is why § 12406(3) does not authorize federalizing and deploying the National Guard based on a mere risk alone. Only when the President is *actually* unable to execute the laws may he invoke § 12406(3).

Because the President is not currently "unable with the regular forces to execute the laws"—and indeed, has had no colorable basis to reach that conclusion for some time (if he ever did)—he cannot continue to keep California's soldiers federalized and deployed in and around Los Angeles. He must return those soldiers to the command and control of the Governor unless and until new events arise that give him a colorable basis for invoking § 12406. Because he has not done so and continues to violate § 12406, he also violates the Tenth Amendment by continuing to unlawfully commandeer the State's militia to enforce a federal law enforcement program. *See Printz v. United States*, 521 U.S. 898, 935 (1997).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Plaintiffs have suffered and will continue to suffer irreparable harm every day that even a single California National Guard member is unlawfully federalized and deployed in Los Angeles. Prevailing on a constitutional claim "will almost always demonstrate [the plaintiff] is suffering irreparable harm." *Oregon*, ECF No. 146 at 104 (quoting *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023)). Here, Plaintiffs suffer constitutional harms resulting from the unlawful federalization and deployment of the National Guard for which "there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Defendants' wresting of control of the National Guard from the Governor and the State directly violates Plaintiffs' sovereign rights, and that harm will continue until the Guard is returned to the Governor's command and control. *See Alfred L. Snapp & Son, Inc. v. Puerto*

1  *Rico, ex rel., Barez*, 458 U.S. 592, 607-08 (1982) ("the State has an interest in securing

2  observance of the terms under which it participates in the federal system"); *Bond v. United States*,

3  564 U.S. 211, 225 (2011) ("action that exceeds the National Government's enumerated powers

4  undermines the sovereign interests of States"); *Oregon*, 2025 WL 1817646, at *14.  And because

5  Defendants' violation of § 12406 is also a violation of the Tenth Amendment, "[t]he existence of

6  [that] continuing constitutional violation constitutes proof of an irreparable harm."  *Illinois*, 2025

7  WL 2886645, at *23 (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)).

8       In addition, Defendants' unlawful commandeering of the National Guard interferes with

9  California's police powers and "interest in having only well-trained law enforcement officers

10  deployed" within its communities and borders.  *See id.* at *24; *cf. Maryland v. King*, 567 U.S.

11  1301, 1303 (2012) (Roberts, C.J., in chambers) (noting "ongoing and concrete harm to [State's]

12  law enforcement and public safety interests"); s*ee also United States v. Morrison*, 529 U.S. 598,

13  618 (2000) (reservation of police powers to the States "is one of the few principles that has been

14  consistent since the [Constitution] was adopted").  These violations of sovereignty are irreparable

15  injuries because they "cannot be economically quantified, and thus cannot be monetarily

16  redressed."  *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) (citing *Bowen v.*

17  *Massachusetts*, 487 U.S. 879, 905 n.42 (1988)); *see also Ariz. Dream Act Coal.*, 757 F.3d at 1068

18  ("Because intangible injuries generally lack an adequate legal remedy, intangible injuries may

19  qualify as irreparable harm." (internal quotation marks, citation, and alteration omitted)).

20  California also plainly suffers irreparable harm when its own troops are depleted to serve an

21  unlawful federal mission, including because those troops are diverted from critical work for the

22  State and harm the State's ability to rapidly respond to unexpected emergencies.[5]

23       Defendants' recent actions only exacerbate the State's harms.  Approximately 200

24  members of California's National Guard are currently hundreds of miles away, in another State,

25  hindering their capacity to respond to emergencies within California.  And there is no reason to

26

27       [5] As just one example of the important work the California National Guard performs for the State, on October 22, 2025, Governor Newsom deployed members of the California National Guard to support food banks in preparing and distributing meals to families in need, in anticipation of delays to federal food benefits.  Eck Decl. ¶¶ 11-16.

28

think that Defendants' actions will abate any time soon.  Defendants take the remarkable position that federalized troops may be "relocat[ed]" anywhere because, in their view, the federalization orders are "not limited in any way to the state" where the troops were initially federalized.  Strong Decl., Ex. 3, Oct. 5, 2025 Tr. 5:20-6:23.  The President has also made no secret of his desire to continue using the Nation's "cities as training grounds for our . . . National Guard."  Strong Decl. ¶ 9.  Nor has the President hidden his desire to have a "standing" National Guard force.  Strong Decl., Ex. 2.  Defendants' continued federalization and deployment of troops in and around Los Angeles thus threatens to allow California's National Guard—federalized in response to specific events in Los Angeles over five months ago—to be diverted indefinitely and dispersed across the country as part of the President's unprecedented experiment in militarized law enforcement.

### III.   THE REMAINING *WINTER* FACTORS FAVOR INJUNCTIVE RELIEF.

Plaintiffs have suffered and will continue to suffer grave sovereign injuries absent an injunction.  By contrast, Defendants will suffer no cognizable harm if the Court enjoins their conduct.  Defendants have already acknowledged they will suffer no harm through their willingness to send troops out of Los Angeles, to Oregon and Illinois.  And an injunction will serve the public interest by protecting the "traditional and strong resistance of Americans to any military intrusion into civilian affairs" and bringing an end to this unlawful occupation.  *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

### CONCLUSION

For the foregoing reasons, the Court should enjoin Defendants' federalization and deployment of the National Guard in and around Los Angeles and order the return of any members of the federalized California National Guard remaining in California to the command and control of the Governor.

Dated: November 13, 2025

Respectfully submitted,

**ROB BONTA**
Attorney General of California
MICHAEL L. NEWMAN
THOMAS S. PATTERSON
Senior Assistant Attorneys General
ANYA M. BINSACCA
MARISSA MALOUFF
JAMES E. STANLEY
Supervising Deputy Attorneys General
JESSE BASBAUM
BRENDAN HAMME
IRAM HASAN
BARBARA HORNE-PETERSDORF
JANE REILLEY
DELBERT TRAN
Deputy Attorneys General

*/s/ Meghan H. Strong*
MEGHAN H. STRONG
Deputy Attorney General
  455 Golden Gate Ave.
  San Francisco, CA 94102
  Telephone: (415) 510-3877
  E-mail: Meghan.Strong@doj.ca.gov

*Attorneys for Plaintiffs*

16

# CERTIFICATE OF SERVICE

Case Name:  _Newsom v. Trump_                    No.    **3:25-cv-04870-CRB**

I hereby certify that on <u>November 13, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF MEGHAN H. STRONG IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION (with Exhibits 1-7)**

**DECLARATION OF GERMAN HURTADO**

**DECLARATION OF PAUL S. ECK**

**DECLARATION OF SEAN DURYEE**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>November 13, 2025</u>, at San Francisco, California.

|  |  |
|---|---|
| M. Paredes | _/s/ M. Paredes_ |
| Declarant | Signature |

SF2025303707
44867483