BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General
MICHAEL G. GERARDI (DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
KATHLEEN C. JACOBS (TX Bar No. 24091154)
J. STEPHEN TAGERT (VA Bar No. 99641)
KIAN K. AZIMPOOR (DC Bar No. 90024613)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-8659
christopher.edelman@usdoj.gov
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., <br><br> *Defendants*. | Case No. 3:25-cv-04870-CRB <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................................. 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.       PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS........................4

       A.      Courts Lack Authority to Review the Continuation of a Valid
                 Federalization of the National Guard....................................................... 4

       B.      The Current, Narrow Deployment of California Guardsmen Easily
                 Satisfies the Ninth Circuit's Highly Deferential Standard of Review. ................... 9

       C.      Plaintiffs Cannot Meet the High Threshold Necessary for Relief on An
                 *Ultra Vires* Theory........................................................................... 11

       D.      Plaintiffs Cannot Seek Relief that Goes Beyond the Scope of the
                 Complaint Without Amending the Complaint. ........................................ 12

II.     PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM................13

III.    THE BALANCE OF THE EQUITIES CUTS AGAINST AN INJUNCTION............13

IV.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND
       ACCOMPANY A BOND……………………………………………………..15

CONCLUSION.................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Austin v. U.S. Navy Seals SEALs 1–26,*
    142 S. Ct. 1301 (2022) ............................................................................................ 7

*Brotherhood of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Emps.,*
    380 U.S. 650 (1965) .............................................................................................. 11

*Dalton v. Specter,*
    511 U.S. 462 (1994) .......................................................................................... 7, 13

*Department of Navy v. Egan,*
    484 U.S. 518 (1988) ................................................................................................ 7

*Fed. Express Corp. v. U.S. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) .............................................................................. 11

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .............................................................................................. 11

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) .................................................................................................... 7

*Glob. Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) ................................................................................ 12

*Illinois v. Trump,*
    155 F.4th 929 (7th Cir. 2025) .............................................................................. 15

*In re Excel Innovations, Inc.,*
    502 F.3d 1086 (9th Cir. 2007) ............................................................................. 13

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) ............................................................................... 3

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) ..................................................................... *passim*

*Newsom v. Trump,*
    No. 25-CV-04870, 2025 WL 2501619 (N.D. Cal. Sept. 2, 2025) ......................... 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 4, 15

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ............................................................................................ 11

*Oregon v. Trump*,
    154 F.4th 1161 (9th Cir. 2025) ........................................................................... 15

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ............................................................................. 12

*Perpich v. Department of Defense*,
    496 U.S. 334 (1990) ............................................................................................. 7

*Schlesinger v. Ballard*,
    419 U.S. 498 (1975) ............................................................................................. 8

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ........................................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................. 4

**Constitutional Provisions**

U.S. Const. art. II, § 2 cl. 1 ......................................................................................... 7

**Statutes**

10 U.S.C. § 10101 ........................................................................................................ 7

10 U.S.C. § 12406 ................................................................................................ *passim*

10 U.S.C. § 12407 ................................................................................................ *passim*

Act of Aug. 10, 1956, Pub. L. No. 84-1028, 70A Stat. 199 ....................................... 6

Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775 ........................................................ 6

Act of May 27, 1908, ch. 204, §§ 3, 4, 35 Stat. 400 .................................................. 6

National Defense Authorization Act, Fiscal Year 1989,
    Pub. L. No. 100-456, tit. XII, § 1234, 102 Stat. 1918 ......................................... 6

National Defense Authorization Act for Fiscal Year 2006,
    Pub. L. No. 109-163, tit. X, § 1057, 119 Stat. 3136 ............................................ 6

Reserve Officer Personnel Management Act,
    Pub. L. No. 103-337 Div. A, Tit. XVI, § 1662(f), 108 Stat. 2921 (1994) .............. 6

iii

**Rules**

Fed. R. Civ. P. 65(c) ................................................................................................ 15

### SUMMARY OF ARGUMENT

In June of this year, the President federalized 4,000 members of the California National Guard to respond to serious and substantial threats to federal law enforcement officers and federal property. The deployment is ongoing, as Guardsmen remain staged at various locations throughout Los Angeles to provide rapid response protection support to federal facilities, functions, and personnel. The deployment has succeeded. Both sides agree that risks to federal officers have improved since June. Consistent with that, Defendants have adjusted downward the number of federalized Guardsmen from California. More than 97 percent of the federalized California Guardsmen have been defederalized since June. And in light of recent guidance, only 100 Guardsmen will remain in Title 10 status.

Despite Defendants' measured and proportionate response to the needs of the federal protection mission in Southern California, Plaintiffs have moved for a preliminary injunction to "enjoin Defendants' federalization and deployment of the National Guard in and around Los Angeles and [to] order the return of any members of the federalized California National Guard remaining in California to the command and control of the Governor." Plaintiffs' Renewed Mot. For Prelim. Inj., at 15, ECF No. 212 ("PI Mot."). In Plaintiffs' view, the facts on the ground no longer justify the presence of any National Guard member in Los Angeles.

Plaintiffs' arguments fail factually and legally. The Ninth Circuit has allowed highly deferential review of whether Section 12406's prerequisites exist at the time Guardsmen are "call[ed] into Federal service." 10 U.S.C. § 12406; *see Newsom v. Trump*, 141 F.4th 1032, 1040 (9th Cir. 2025) ("[O]ur review of [the] decision [to federalize members of the National Guard] must be highly deferential."). But Congress left it to the President's unreviewable discretion to decide the number of Guardsmen federalized and the length of time those Guardsmen must serve in the mission. Under Section 12406, the President may federalize Guardsmen "in such numbers as *he* considers necessary to repel the invasion, suppress the rebellion, or execute [] laws." 10 U.S.C. § 12406. This reading of Section 12406 is confirmed by its neighboring statute, Section 12407, entitled "period of service," which provides that Guardsmen remain federalized "during the term specified, unless sooner relieved by the President." *Id.* § 12407. This understanding is

further confirmed by Congress's prior amendment of Section 12406's predecessor statute to *remove* a nine-month time limit on federalization.

But even if the Court concludes that the federalization is subject to some form of ongoing judicial review, that review must be at least as deferential, if not more so, than the review given to the initial decision to federalize the National Guard outlined in *Newsom*. The continuation decision challenged here easily satisfies that highly deferential standard. There is at least a colorable basis to conclude that there remains an inability to execute the laws or a danger of rebellion in California. The Guardsmen's service remains necessary to ensure the continued success of the federal protection mission. Plaintiffs are therefore unlikely to succeed on their *ultra vires* theory, which does not extend relief in situations where violation of the law is merely arguable. The other factors for preliminary relief also weigh against the relief Plaintiffs seek here, just as they did in *Newsom*. And in any event, Plaintiffs' failure to amend the complaint to add their challenge to the continuation of the federalization precludes them from seeking the requested injunction relief.

Accordingly, the Court should deny Plaintiffs' renewed preliminary injunction motion.

## BACKGROUND

The Court's Order of September 9, 2025, summarizes the procedural history up to the present dispute over Plaintiffs' renewed request for another preliminary injunction. ECF No. 192 at 1–3. As pertinent here, Secretary Hegseth issued orders in July of 2025 continuing the federalization of 300 California Guardsmen and returning the remaining Guardsmen to state control. Decl. of Col. Edward Sauter ("Sauter Decl.") ¶ 5; *see also* Memo. for Commander, U.S. Northern Command, Re "Force Structure Decisions for the Presidentially Directed Mission to Protect Federal Law Enforcement Personnel and Functions in California," Aug. 15, 2025, Decl. of Benjamin Kurland ("Kurland Decl."), Ex. A, ECF No. 190-1 (memorializing directive given by Secretary Hegseth on July 30, 2025 to release 1,350 California National Guard personnel from Federal service); Letter from the Hon. Peter B. Hegseth to Maj. Gen. Matthew P. Beevers, Aug. 15, 2025, Kurland Decl. Ex. B, ECF No. 190-1-; DA Activation Order, Strong Decl. Ex. 1, ECF No. 212-2. Of the 300 individuals, 200 were deployed to Oregon in early October to conduct the federal protection mission in that state. Sauter Decl. ¶ 5. A further fifteen individuals were sent

to Oregon to provide civil disturbance and other training to the Guardsmen who would be conducting the federal protection mission. *Id.* ¶ 7. Later, fourteen of those fifteen individuals were sent to Illinois to provide that training to federalized Guardsmen in that state. *Id.* ¶ 8. All fifteen Guardsmen have now returned to California. *Id.*

Therefore, since early October, there have been fewer than 100 members of the California Guardsmen performing the federal protection mission in the Los Angeles area. *Id.* ¶ 9. This is a substantial reduction from the initial federalization of the California National Guard in June of this year, when over 4,000 Guardsmen were called into service (in addition to some 800 Marines). In October the 300 Guardsmen's federalization was further extended to February 2, 2026. Memo. For Sec'y of the Army & Commander, U.S. N. Command, Re: Execution of Federal Protection Mission in Oregon, ECF No. 212-2, Ex. 4. Further, "in response to recent guidance" from the Department of War, 200 of these Guardsmen "will be released early," with the goal of having "a trained and ready task force of approximately 100 troops in the Los Angeles area to continue to perform the [federal protection mission]." Sauter Decl. ¶ 10.

Plaintiffs previously moved for a preliminary injunction to enjoin the July order continuing the federalization of 300 Guardsman, contending that the order violates 10 U.S.C. § 12406, the statutory authority under which the President called up the California National Guard into federal service in this case. On September 9, this Court stayed proceedings related to that motion, concluding it was without jurisdiction to consider the new motion until it received clear guidance from the U.S. Court of Appeals for the Ninth Circuit on that issue. ECF No. 192 at 4. Thereafter, the Ninth Circuit determined that this Court has jurisdiction to entertain Plaintiffs' motion. Ninth Circuit Order, ECF No. 204. This Court then directed the parties to brief the motion. ECF No. 208. Plaintiffs' renewed motion for preliminary injunction now further challenges the October 2025 order continuing the Guardsmen's federalization through January 2026.

## LEGAL STANDARD

To obtain the extraordinary and drastic remedy of a preliminary injunction, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012), Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary

relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

### A.    Courts Lack Authority to Review the Continuation of a Valid Federalization of the National Guard.

In staying preliminary injunctive relief granted by this Court, the Ninth Circuit has already held that the President "likely acted within his authority in federalizing the National Guard." *Newsom*, 141 F.4th at 1052. That holding is controlling as to the likely lawfulness of the June 2025 federalization order that authorized this deployment. Plaintiffs' instant motion for injunctive relief thus depends on the theory that the mission's continuation is also subject to judicial review and that Plaintiffs can show Defendants abused their discretion in continuing the federal protection mission with approximately 100 California Guardsmen.

The theory fails. To start, Plaintiffs cite nothing extending the review allowed by the Ninth Circuit in *Newsom* past the time when it is decided to federalize Guardsmen. Section 12406 provides: "Whenever" one of three prerequisites exists, "the President may *call into* Federal service members and units of the National Guard of any State in such numbers as he considers necessary . . . ." 10 U.S.C. § 12406 (emphasis added). *Newsom* allows some measure of review of Section 12406's prerequisites when Guardsmen are "call[ed] into Federal service," *i.e.*, at the time they are transitioned from civilian or state active-duty status to federal active-duty status. But nothing in Section 12406 permits the same judicial review on every day of the mission or if the federalization order is extended. In connecting Section 12406's prerequisites to the moment when Guardsmen are "call[ed] into Federal service," Congress decided against subjecting the continuation of a mission to further regulation by Section 12406.

Instead, Section 12406 gives the President unreviewable authority to manage Guardsmen's headcount once Guardsmen are federalized. He is authorized to federalize Guardsmen "in such numbers as *he* considers necessary to repel the invasion, suppress the rebellion, or execute those

laws." 10 U.S.C. § 12406 (emphasis added). And Section 12406's neighboring statute confirms that the duration of federalized Guardsmen's service is committed to the President's discretion:

> Whenever the President calls the National Guard of a State into Federal service, he may specify in the call the period of the service. Members and units called shall serve inside or outside the territory of the United States during the term specified, unless sooner relieved by the President. However, no member of the National Guard may be kept in Federal service beyond the term of his commission or enlistment.

10 U.S.C. § 12407(a). This statute, which bears the title "period of service," expressly addresses how long "[m]embers and units called shall serve," extending their service to "the term specified, unless sooner relieved by the President." *Id.* The only exception is the expiration of a Guardsmen's commission or enlistment. *Id.* Here, the June 7 Presidential Memorandum specified that "the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense" for the federal protection mission. ECF No. 25-2. All agree that the Secretary of Defense has extended the duration of duty through the present, and no one argues that the Guardsmen have been reassigned to tasks outside a Federal Protection Mission. *Id*. That is enough to meet the statute's requirements.

Against the text of Sections 12406 and 12407, Plaintiffs assert "Defendants must be able to justify the current federalization and deployment based on events as they stand in Los Angeles now." PI Mot. 10. Although Plaintiffs' entire argument hangs on this assertion, they cite *nothing* for this proposition. And Defendants are unaware of any statute, case law, or other precedent supporting it. Elsewhere, Plaintiffs argue that because Section 12406 contains the words "whenever" and "is," courts may review whether an initially valid Section 12406 federalization is "tied to a *present* inability." PI Mot. 12. But again, the statute ties these words to the time at which the President federalizes Guardsmen, saying that "the President may call" the National Guard into service "[w]henever" one of the three statutory conditions "is" satisfied. 10 U.S.C. § 12406. By the statute's terms, the words "whenever" and "is" do not apply to the duration of a valid Section 12406 federalization. On the permissible duration of federal service, the most significant textual clue is the total absence of any time limitation.

Once the President has lawfully federalized the National Guard, Sections 12406 and 12407 leave it to the President's discretion to manage the federalized Guardsmen's headcount.  Section 12406 contains no time limit for the federalization of the National Guard, and Plaintiffs do not claim otherwise.  This was a purposeful decision by Congress.  As initially enacted in 1903, Section 12406's predecessor statute authorized "the President to call forth, *for a period not exceeding nine months*," the state militia to repel invasions, suppress rebellions, or enable him to execute the laws. Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (emphasis added).  That statute further provided that the President "may specify in his call the period for which such service is required, not exceeding nine months." *Id.* § 5. Of course, even if that language remained in place, the continued deployment here would be lawful—the President federalized the California Guard approximately five months ago.  In any event, Congress amended that statute to remove the "for a period not exceeding nine months" language from § 4 of the statute and the "not exceeding nine months" language from § 5. *See* Act of May 27, 1908, ch. 204, §§ 3, 4, 35 Stat. 400.  Although Congress has amended the statute several times since then,[1] it has not reinserted a time limit on the President's federalization of the National Guard.

Because the duration of the federalization is committed to the President's discretion, courts lack authority to review whether any continuation of a valid Section 12406 federalization remains appropriate.  As the Supreme Court has held, judicial review of whether "the President has violated a statutory mandate . . . is not available when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994).  Here, the statute reflects Congress's deliberate decision that once the President validly determines that the conditions for federalization are met, the President has discretion to determine how long the federalization is necessary.  10 U.S.C. § 12407(a).  The statute is equally clear that the number of guardsmen needed at any time is a matter for the President's discretion, authorizing the President to call into federal

---

[1] *See* Act of Aug. 10, 1956, Pub. L. No. 84-1028, 70A Stat. 199, 525; National Defense Authorization Act, Fiscal Year 1989, Pub. L. No. 100-456, tit. XII, § 1234, 102 Stat. 1918, 2059; Reserve Officer Personnel Management Act, Pub. L. No. 103-337, Div. A, Tit. XVI, § 1662(f), 108 Stat. 2921, 2994 (1994); National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, tit. X, § 1057, 119 Stat. 3136, 3440–42.

service the National Guard "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws."  10 U.S.C. § 12406.  Thus, the statute "commits . . . to the discretion of the President," *Dalton*, 511 U.S. at 474, the determination whether, and when, to increase or decrease the number of federalized Guardsmen, including when to end the federalization by reducing the headcount to zero.  Judicial review of that determination "is not available."  *Id.*

Moreover, Plaintiffs' interpretation conflates the Guardsmen's distinct statuses and raises a significant constitutional question.  As Defendants have explained before, the National Guard is composed of both the State National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command.  *See* 10 U.S.C. § 10101.  Once called into federal service, "members of the National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich v. Department of Defense*, 496 U.S. 334, 347 (1990), and become federal soldiers, who serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.  That is, federalized Guardsmen function like any other federal soldier, and yet, Plaintiffs' interpretation would permit a court to continually review whether conditions on the ground justified continued federalization and deployment, after the President has validly called the National Guard into federal service.  They cite nothing establishing that sort of precedent.

The proposition that the Judiciary could intrude into the military chain of command is also an affront to separation of powers principles.  "Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Austin v. U.S. Navy SEALs 1–26*, 142 S. Ct. 1301, 1302 (2022) (mem.) (Kavanaugh, J., concurring). "In light of that bedrock constitutional principle, 'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.'"  *Id.* (quoting *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988)).  As the Supreme Court has long emphasized, moreover, the "complex, subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments," and it is "difficult to conceive of an area of governmental activity in which the courts have less competence."  *Gilligan v. Morgan*,

413 U.S. 1, 10, (1973); *cf. Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("The responsibility for determining how best our Armed Forces shall attend to [the warfighting] business rests with Congress [] and with the President." (internal citations omitted)).

Here, it is hard to imagine decisions more properly reserved for the Commander in Chief than how to allocate troops and when to draw down the troops or to deactivate them. Decisions of this sort are complex and must be made in real time, taking account of the developing situation on the ground. And here, the President and his delegee have considered recent developments by returning the overwhelming majority of the previously federalized Guardsmen to state control. Allowing courts to second-guess the Commander in Chief's determinations based on fluctuations on the ground would inject the Judiciary into the military chain of command, risk countermanding the President's orders to officers in the field, and in this case, threaten the safety of federal personnel and significant damage to federal property. Neither the Constitution, nor Sections 12406 and 12407, permits such micromanagement by the Judiciary.

Apparently recognizing these weaknesses in seeking to challenge any extension decision, Plaintiffs at times mischaracterize Secretary Hegseth's July decision to release some Guardsmen and continue the mission as to others. Plaintiffs call this decision "a new order federalizing 300 National Guard troops for an additional 90 days." PI Mot. 5. As Defendants explained twice in September, that description misstates the record. ECF No. 190 at 3-4; ECF No. 198 at 1 n.1. Secretary Hegseth's August 15, 2025, memorandum explained his July decision to "[r]elease approximately 1,350 California National Guard personnel from Federal service" and that "[a]pproximately 260 California National Guardsmen will remain in Federal service for an additional 90 days." ECF No. 190-1 at 5. Plaintiffs also ignore the fact that these 300 Guardsmen were already federalized. Plaintiffs have not identified any California Guardsmen who Defendants newly federalized after June.

In sum, the President's decision to continue the federalization of a relatively small number of California Guardsmen is not subject to Section 12406's conditions or to judicial review, even if the President's decision to federalize them in the first place were reviewable.

**B.** **The Current, Narrow Deployment of California Guardsmen Easily Satisfies the Ninth Circuit's Highly Deferential Standard of Review.**

Should the Court nevertheless conclude that if it could review the continuation of any valid federalization, review should, at most, take place under the highly deferential standard articulated in *Newsom*.  Under *Newsom*, a district court must uphold the President's judgment with respect to the federalization of the National Guard if "it reflects a colorable assessment of the facts and law." 141 F.4th at 1051.  The Ninth Circuit also variously calls the standard "significant deference," "highly deferential," and "especially deferential."  *Id.* at 1047, 1050, 1052.  And it was sufficient that Defendants had "presented evidence . . . of protesters' interference with the ability of federal officers to execute the laws, leading up to the President's federalization of the National Guard" in June—*i.e.*, that Defendants' law enforcement activities had been "significantly impeded" by the actions of protestors.  *Id.* at 1052.  It is now common ground between the parties that these conditions have now improved, *see* PI Mot. 13, which means that the federal protection mission has been a success.  But the conditions required for federalization under Section 12406 continue to exist in California.  Under these circumstances, Defendants reasonably could continue to calibrate their deployment to the observed conditions on the ground in the Los Angeles area, moving from having over 4,000 Guardsmen in June, to 300 Guardsmen in July, and to 100 Guardsmen in October.

Plaintiffs seek to hold these positive developments against Defendants, arguing that the improvement in the situation in the Los Angeles area means Guardsmen can no longer be deployed at all.  PI Mot. 10–11.  But while interference with federal immigration law enforcement has abated in the Los Angeles area, protests have persisted, and threats against federal officers carrying out their statutory duties have continued.  *See* Decl. of Roger Scharmen, *Newsom v. Trump*, No. 25-3727, Dkt. Entry 136.1, at SA18–20 (attached as Exhibit A to the accompanying declaration of Michael J. Gerardi).  Under the highly deferential standard of review, just as the President's conclusion in June that the federalization of the California National Guard was appropriate, so too is the President's decision to keep a very small number of Guardsmen—only roughly 2.5% of the initial 4,000 Guardsmen—to continue the federal protection mission in the Los Angeles area.  As

the declaration of Colonel Sauter explains, the remaining 100 California Guardsmen "continue to be staged at various locations throughout Los Angeles providing rapid response protection support to federal facilities, functions, and personnel." Sauter Decl. ¶ 9. And they continue to perform the federal protection missions. *Id.* ¶¶ 9–10. Moreover, withdrawing already federalized troops involves additional, context-specific military judgments that do not pertain to the initial federalization decision, including the deterrent effect that the federalization has had in the last few months and the potential impact of the withdrawal of the Guardsmen on the situation that prompted them to be called out in the first place.

Plaintiffs contend that past justifications for federalization cannot provide a basis for ongoing deployment, asserting that § 12406(3) requires an assessment of current conditions. PI Mot. 12–13. They also contend that any continued deployment under § 12406(3) cannot be based on "mere risk," as "some degree of risk" of interference with law enforcement "is *always* present." But in maintaining the federalization of a small number of Guardsmen in the Los Angeles area, Defendants judged that the Guardsmen's performance of the federal protection mission is still needed *now*. Such a decision is not based solely on any past justification for federalization but is a measured response to the continued threat of harm to federal personnel and property. The suggestion that Defendants cannot consider past conditions in assessing the present need, including the need to protect against any risk of rebellion, makes no sense because past experiences necessarily inform any analysis of whether, and to what degree, continued federalization is appropriate moving forward. Testimony adduced at trial in this matter indicates that the abatement in the unrest that roiled Los Angeles in June was due at least in part to the presence of Guardsmen in Los Angeles. Trial Tr., Aug. 11, 2025, at 171, ECF No. 162. Also established at trial is the critical protection that quick reaction forces continue to provide. The Court heard testimony about Guardsmen's response in Camarillo—50 miles from downtown Los Angeles and weeks after the initial June riots. ECF No. 176 at 14-15. After a request for assistance was cancelled, federal law enforcement completing an operation came under attack by a crowd "throwing rocks and damaging federal vehicles, including with a makeshift spike strip." *Id.* at 14. "Federal law enforcement agents were . . . overwhelmed" and "Task Force 51 troops were deployed and assisted with forming

1  a perimeter." *Id.* at 14-15.   Military decision-makers could reasonably rely upon such

2  considerations in concluding that a small deployment of Guardsmen is still required.

3      There remains an inability to execute the laws and a danger of a rebellion in California.

4  Because the President has more than a colorable basis to continue to maintain the small presence

5  of Guardsmen in Los Angeles, that decision easily survives the highly deferential standard of

6  review set forth by *Newsom*, even assuming such a decision is reviewable (it is not).

7      **C.    Plaintiffs Cannot Meet the High Threshold Necessary for Relief on An**

8          ***Ultra Vires* Theory.**

9      Plaintiffs' challenge in any event is not likely to succeed for yet another independent

10  reason.  Although Plaintiffs do not specify in the instant motion the cause of action on which they

11  contend they are likely to succeed on their challenge to the continuation of federalization for a

12  small number of California Guardsmen, they have previously acknowledged that their challenge

13  to the President's invocation of Section 12406 is an "*ultra vires* claim."  Pls.' Mot. for Prelim.

14  Inj.at 18, ECF No. 77.  That is because Section 12406 itself does not contain a cause of action to

15  challenge an allegedly unlawful federalization, *see* 10 U.S.C. § 12406, and the Administrative

16  Procedure Act does not authorize judicial review of the President's actions, *see Franklin v.*

17  *Massachusetts*, 505 U.S. 788, 801 (1992).  Similarly here, the only possible avenue for review is

18  an *ultra vires* claim, which Plaintiffs plainly cannot succeed.

19      As the Supreme Court has explained, *ultra vires* claims are highly disfavored "[b]ecause

20  ultra vires review could become an easy end-run around the limitations of . . . judicial-review

21  statutes . . . ."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).  As a result, an *ultra*

22  *vires* claim is not available "simply because an agency has arguably reached 'a conclusion which

23  does not comport with the law.'  Rather, it applies only when an agency has [acted] entirely 'in

24  excess of its delegated powers and contrary to a *specific prohibition*' in a statute."  *Id.* (quoting

25  *Brotherhood of Ry. & S.S. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660

26  (1965)).  Thus, an *ultra vires* claim "'is essentially a Hail Mary pass—and in court as in football,

27  the attempt rarely succeeds.'"  *Id.* at 681–82 (citation omitted); *see also Fed. Express Corp. v. U.S.*

28  *Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) ("[C]hallengers must show more than the type

of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review."); *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (the error must be "so extreme that one may view it as jurisdictional or nearly so" (citation omitted)).

Plaintiffs cannot make the above showing because as discussed above, Congress left it to the President's discretion to determine the duration of any federalization. Rather than contrary to a specific statutory prohibition, the President's action is fully authorized by statute. Moreover, for the reasons stated above, the President had at least a colorable basis in determining that a limited contingent of federalized National Guard troops remains necessary in California. Thus, in no event could this Court determine that Plaintiffs' challenge to the continuation of federalization satisfies the very high standard for *ultra vires* review.

### D. Plaintiffs Cannot Seek Relief that Goes Beyond the Scope of the Complaint Without Amending the Complaint.

Finally, although the Ninth Circuit held that this Court has jurisdiction to review Plaintiffs' challenge to the continued federalization of the California National Guard "while the appeal before the [Ninth Circuit] remains pending," ECF No. 204, it did not upset the longstanding principle that "[w]hen a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). The test "requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Id.* at 636. The complaint filed on June 9, of course, makes no mention of any decisions to extend the federalization. It does not identify those decisions as agency actions subject to review under the Administrative Procedure Act or one susceptible to review through any other cause of action. Plaintiffs must amend their complaint before the Court could possibly entertain their motion. Defendants identified this defect for Plaintiffs in September, and the absence of an amended complaint remains fatal to their claims. ECF No. 190 at 5; ECF No. 198 at 2-3.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

Plaintiffs have failed to show that injunctive relief is necessary to prevent irreparable harm, as required for a preliminary injunction.  Plaintiffs first argue that prevailing on a constitutional claim almost always demonstrates irreparable harm.  PI Mot. 13.  This argument fails because Plaintiffs' claim—that continued federalization of the National Guard exceeds the President's authority under Section 12406—is properly understood as statutory, not constitutional.  *See Dalton*, 511 U.S. at 473 ("claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims").  And alleged violations of a federal statute do not give rise to any presumption of irreparable harm. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024).  Further, any claim about upsetting the constitutional balance of power between federal and state government "is, in essence, a merits argument."  *Newsom*, 141 F.4th at 1055.

Plaintiffs also argue that the continued federalization "interferes with California's police powers" and could "harm the State's ability to rapidly respond to unexpected emergencies."  PI Mot. 14.  But even when the President had federalized 4,000 members of the California National Guard, a panel of the Ninth Circuit dismissed "California's concerns about escalation and interference with local law enforcement" as "too speculative."  *Newsom*, 141 F.4th at 1055; *see also id.* at 1055-56 ("And we do not know what emergencies may occur in California while the National Guard is deployed.").  Such "[s]peculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).  Those claimed harms border on the implausible now that Defendants have reduced the number of federalized guardsmen by roughly 97.5% of the original deployed force, releasing thousands of troops back to state control.  Equally speculative, and insufficient for preliminary injunctive relief, is Plaintiffs' contention that they may be harmed if the President deploys the National Guard on new missions across the country in the future.  *See* PI Mot. 15.

## III.    THE BALANCE OF THE EQUITIES CUTS AGAINST AN INJUNCTION.

In June, a panel of the Ninth Circuit held that "the public interest weigh[s] in favor of Defendants" and against an injunction barring federalization and deployment of the National Guard.  *Newsom*, 141 F.4th at 1054.  To the extent the conditions on the ground have changed

13

since then, the equities now weigh even more strongly against injunctive relief. In June, Plaintiffs contended that "the federalization of the National Guard 'impairs the Guard's ability to perform critical functions for the State,' including support for fighting forest fires and combatting drug trafficking." *Id.* at 1055. That contention did not sway the Ninth Circuit then. And it is even weaker now that the number of federalized California Guardsmen has been reduced by roughly 97.5 percent. The same is true with respect to Plaintiffs' prior claim of harm based on federalism; any intrusion is likely minimal, with only 100 Guardsmen still federalized. Sauter Decl. ¶¶ 10–11.

Plaintiffs nonetheless maintain that "Defendants have already acknowledged they will suffer no harm through their willingness to send troops out of Los Angeles, to Oregon and Illinois." PI Mot. 15. Not so. It is true that Defendants have dramatically reduced the deployment of Guardsmen in California, releasing most of the federalized guardsmen to state control and deploying some of them to other states where they are needed. However, since August, Defendants have continued to maintain approximately 100 federalized guardsmen in the Los Angeles area because they deem such deployment still necessary to protect federal personnel and property. *See* Sauter Decl. ¶ 10. *Newsom* already concluded that Defendants would be irreparable harmed by the inability to deploy the National Guard given the government's "uncontested interest in the protection of federal agents and property and the faithful execution of law." 141 F.4th at 1054. The fact that military decision-makers have now judged, based on current conditions in California, that they can protect this interest with roughly 100 federalized guardsmen (as compared to the 4,000 deployed in June) does not lessen the strength of the governmental and public interest in their continued presence or the harm that would result if this Court entered an injunction precluding the government from vindicating this interest through deployment of the National Guard.

Plaintiffs' position—that if the President *reduces* the number of federalized guardsmen in a state, that demonstrates that the government would not be harmed by *ending* the federalization— is untenable. By granting the President the authority to federalize the National Guard "in such numbers as he considers necessary," 10 U.S.C. § 12406, Congress authorized the President to adjust the number of federalized Guardsmen as conditions on the ground warrant. By reducing the number of federalized Guardsmen but maintaining a small contingent of them to protect federal

14

personnel and property, the President's measured approach in no way undermined the federal interest in continued federalization.  Rather, he acted exactly as Congress envisioned.

## IV. ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized, or, at least, administratively stayed for a period of 14 days to allow the United States to seek emergency relief if appeal is authorized. *See Newsom v. Trump*, No. 25-CV-04870, 2025 WL 2501619, at *29 (N.D. Cal. Sept. 2, 2025) (ten-day administrative stay).  Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken*, 556 U.S. at 434 (standard for obtaining a stay substantially overlaps with "the factors governing preliminary injunctions[]"). And the Court of Appeals' previous grant of an administrative stay underscores that court's view that the gravity of the relief granted by Court's previous TRO—like the injunction requested here—should be meaningfully reviewed by the Court of Appeals before it is allowed to go into effect.  At a minimum, this Court should stay any injunctive relief as it applies to *federalization*, as no court of appeals has allowed an injunction ordering defederalization to go into effect pending appeal.  *Oregon v. Trump*, 154 F.4th 1161, 1164 (9th Cir. 2025); *Illinois v. Trump*, 155 F.4th 929, 940 (9th Cir. 2025). The Defendants also respectfully request that any injunctive relief be accompanied by a bond as required by Fed. R. Civ. P. 65(c).

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' renewed motion for a preliminary injunction.


Date: November 18, 2025                     Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General
                                            Federal Programs Branch

(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director, Federal Programs Branch

JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel

TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI
(DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER EDELMAN
(DC Bar No. 1033486)
Senior Counsel
KATHLEEN C. JACOBS (TX Bar No. 24091154)
J. STEPHEN TAGERT (VA Bar No. 99641)
KIAN K. AZIMPOOR (DC Bar No. 90024613)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-8659
christopher.edelman@usdoj.gov
*Attorneys for Defendants*

16