BRETT A. SHUMATE
Assistant Attorney General
ERIC J. HAMILTON (CA Bar No. 296283)
Deputy Assistant Attorney General
ALEXANDER K. HAAS (CA Bar No. 220932)
Branch Director
JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel
TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General
MICHAEL G. GERARDI (DC Bar No. 1017949)
Senior Trial Counsel
CHRISTOPHER EDELMAN (DC Bar No. 1033486)
Senior Counsel
JODY LOWENSTEIN (MT Bar No. 55816869)
KATHLEEN C. JACOBS (TX Bar No. 24091154)
J. STEPHEN TAGERT (VA Bar No. 99641)
KIAN K. AZIMPOOR (DC Bar No. 90024613)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 598-0860
kian.k.azimpoor@usdoj.gov
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| GAVIN NEWSOM, in his official capacity as Governor of the State of California, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, et al., <br><br> *Defendants.* | Case No. 3:25-cv-04870-CRB <br><br> **DEFENDANTS' MOTION TO DISMISS** |

**TABLE OF CONTENTS**

MOTION TO DISMISS ........................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

SUMMARY OF ARGUMENT .......................................................................................... 1

LEGAL BACKGROUND ................................................................................................... 3

PROCEDURAL HISTORY ................................................................................................ 4

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT ..................................................................................................................... 6

    I.      Plaintiffs Fail to State an Ultra Vires Claim Because the President's Action Under 10 U.S.C. § 12406 Was Within His Statutory Authority and, at a minimum, the President Had a Colorable Basis for Invoking the Statute. ................... 6

    II.      Defendants' Actions Are Consistent with the Tenth Amendment. ................................. 11

    III.      Plaintiffs' APA Claim Fails. ................................................................................. 12

CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Advanced Integrative Med. Sci. Inst., PLLC v. Garland,*
   24 F.4th 1249 (9th Cir. 2022) ...................................................................................14

*Air Brake Sys., Inc. v. Mineta,*
   357 F.3d 632 (6th Cir. 2004) ....................................................................................14

*Air Cal. v. Dep't of Transp.,*
   654 F.2d 616 (9th Cir. 1981) ....................................................................................14

*Am. Soc'y of Cataract & Refractive Surgery v. Thompson,*
   279 F.3d 447 (7th Cir. 2002) ......................................................................................6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................................5

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................................................5

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...............................................................................3, 12, 14, 15

*City and County of San Francisco v. Dep't of Transp.,*
   796 F.3d 993 (9th Cir. 2015) ....................................................................................15

*Dalton v. Specter,*
   511 U.S. 462 (1994) ..............................................................................................6, 12

*Dep't of Navy v. Egan,*
   484 U.S. 518 (1988) ...................................................................................................3

*Fed. Express Corp. v. U.S. Dep't of Com.,*
   39 F.4th 756 (D.C. Cir. 2022) ....................................................................................6

*Feds for Med. Freedom v. Biden,*
   581 F. Supp. 3d 826 (S.D. Tex. 2022) *aff'd,* 63 F.4th 366 (5th Cir. 2023), *vacated on other grounds,* 144 S. Ct. 480 (2023) ................................................................................13

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) .................................................................................................12

*Gilligan v. Morgan,*
   413 U.S. 1, (1973) ...................................................................................................15

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................................................15

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
  452 U.S. 264 (1981) ..................................................................................... 11

*Janda v. T-Mobile USA, Inc.,*
  378 F. App'x 705 (9th Cir. 2010) ................................................................. 5

*Jensen v. National Marine Fisheries Service,*
  512 F.2d 1189 (9th Cir. 1975) ....................................................................... 13

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ......................................................................................... 5

*Kreis v. Sec'y of Air Force,*
  866 F.2d 1508 ................................................................................................... 15

*Lawyers for Fair Reciprocal Admission v. United States,*
  141 F.4th 1056 (9th Cir. 2025) ....................................................................... 5

*Marsh v. Oregon Natural Resources Council,*
  490 U.S. 360 (1989) ......................................................................................... 16

*Martin v. Mott,*
  25 U.S. (12 Wheat.) 19 (1827) ....................................................................... 7

*Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................... 16

*New York v. United States,*
  505 U.S. 144 (1992) ......................................................................................... 11

*Newsom v. Trump,*
  141 F.4th 1032 (9th Cir. 2025) ................................................................. passim

*NFFE v. United States,*
  905 F.2d 400 (D.C. Cir. 1990) ....................................................................... 16

*NRC v. Texas,*
  605 U.S. 665 (2025) ...................................................................................... 1, 6

*NRDC v. U.S. Dep't of State,*
  658 F. Supp. 2d 105 (D.D.C. 2009) ............................................................. 13

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,*
  393 U.S. 233 (1968) ......................................................................................... 6

*Orloff v. Willoughby,*
  345 U.S. 83 (1953) ........................................................................................... 15

DEFENDANTS' MOTION TO DISMISS

*Perpich v. Dep't of Def.*,
   496 U.S. 334 (1990) .................................................................................................3, 4

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) ...........................................................................................................6

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ..........................................................................................16

*Sierra Club v. EPA*,
   955 F.3d 56 (D.C. Cir. 2020) ..........................................................................................14

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State*,
   659 F. Supp. 2d 1071 (D.S.D. 2009) ..............................................................................13

*Spencer Enters., Inc. v. United States*,
   345 F.3d 683 (9th Cir. 2003) ..........................................................................................16

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .......................................................................................................7, 12

*Trump v. Orr*,
   No. 25A319, 2025 WL 3097824 (U.S. Nov. 6, 2025) ....................................................16

*Tulare Cnty. v. Bush*,
   185 F. Supp. 2d 18 (D.D.C. 2001) *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). ..................13

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
   578 U.S. 590 (2016) ........................................................................................................14

*United States v. Armstrong*,
   517 U.S. 456 (1996) ..........................................................................................................7

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926) ...............................................................................................................7

*United States v. Comstock*,
   560 U.S. 126 (2010) ........................................................................................................11

*United States v. Hatch*,
   722 F.3d 1193 (10th Cir. 2013) ......................................................................................11

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 15 ...............................................................................................3, 11

U.S. Const. art. II, § 2, cl. 1 ....................................................................................................4

**Statutes**

5 U.S.C. § 701(a)(2) ..........................................................................................3, 12, 15

5 U.S.C. § 704 .......................................................................................................2, 12

5 U.S.C. § 706 ............................................................................................................4

10 U.S.C. § 10101 ......................................................................................................3

10 U.S.C. § 10106 ......................................................................................................4

10 U.S.C. § 12301(d) ...............................................................................................10

10 U.S.C. § 12406 .............................................................................................passim

Act of May 2, 1792, ch. 28, 1 Stat. 264 .....................................................................8

Cal. Mil. & Vet. Code Ann. § 163 ...........................................................................10

**Legislative Material**

Jennifer Elsea, Cong. Research Serv., The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law, R42659, at 8 (Nov. 6, 2018) ("CRS Report"). .................................8

**Rule**

Fed. R. Civ. P. 12(b)(1) ..........................................................................................1, 5

**Other Authorities**

Rebellion, Black's Law Dictionary (12th ed. 2024) ...................................................7

DEFENDANTS' MOTION TO DISMISS

**MOTION TO DISMISS**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), Defendants, the President of the United States, the Secretary of War, and the Department of War ("DoW"), will move this Court as soon as they may be heard for an order granting Defendants' motion to dismiss, with prejudice, all claims remaining in Plaintiffs' Complaint, ECF No. 1. The following are the points and authorities in support of this motion. A proposed order is attached.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**SUMMARY OF ARGUMENT**

In June of this year, the President invoked 10 U.S.C. § 12406 to federalize and deploy 4,000 members of the California National Guard to respond to serious and substantial threats to federal law enforcement officers and federal property, which Defendants have characterized as the Federal Protection Mission. Plaintiffs—the State of California and its Governor—sued, alleging *ultra vires*, Tenth Amendment, Administrative Procedure Act ("APA"), and Posse Comitatus Act ("PCA") claims. This Court has since entered partial final judgment on the PCA claim. Defendants now move to dismiss Plaintiffs' remaining claims. Fed. R. Civ. P. 12(b)(1), (6).

Plaintiffs' *ultra vires* claim based on 10 U.S.C. § 12406 (Count I) fails to state a claim because Plaintiffs cannot show that the President acted "entirely in excess of [his] delegated powers and contrary to a *specific prohibition* in a statute." *NRC v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation marks omitted). Indeed, an *ultra vires* claim "is essentially a Hail Mary pass . . . the attempt rarely succeeds." *Id.* at 681-682 (citation omitted). This is particularly the case here because—even assuming the President's determination is reviewable (which Defendants will not press here in light of the Ninth Circuit's binding, contrary ruling)—the Court must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists," *Newsom v. Trump*, 141 F.4th 1032, 1048 (9th Cir. 2025) (per curiam), and must uphold the determination if it "reflects a colorable assessment of the facts and law within a range of honest judgment," *id.* at 1051 (citation omitted). In light of the substantial threat to federal personnel and property in California as alleged in the Complaint, the President clearly had at least a colorable basis for determining that he "is unable with the regular forces to execute the laws of the United States[,]" 10 U.S.C. § 12406(3), and a

panel of the Ninth Circuit has also held that the President "likely acted within his authority [under § 12406(3)] in federalizing the National Guard[.]" *Newsom*, 141 F.4th at 1052.

The President's decision is also independently supported by § 12406(2), which authorizes him to call the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States[.]"  10 U.S.C. § 12406(2).  As the Complaint alleges, in the days leading up to the federalization, protesters were acting violently, throwing objects at law enforcement officers, damaging property, setting fires during the protests, and otherwise breaking the law, while local law enforcement had declared "an unlawful assembly" in certain protest sites to disperse the protesters. Compl. ¶ 35.  The President thus had at least a colorable basis to determine that there was, at minimum, a "danger" of rebellion, 10 U.S.C. § 12406(2), and that determination clearly survives the "highly deferential" standard of review under *Newsom*. 141 F.4th at 1052.

Because the President's invocation of § 12406 to federalize and deploy the California National Guard was proper, Plaintiffs' Tenth Amendment claim (Count II) must also fail.  Unsurprisingly, Plaintiffs previously acknowledged in the preliminary injunction stage that "[their] Tenth Amendment claim . . . rises and falls with their ultra vires claim based on § 12406." *Newsom*, 141 F.4th at 1044.  The analysis is the same here.  Moreover, Plaintiffs' Tenth Amendment claim of the Federal Protection Mission's purported interference with the State's police power cannot overcome the federal government's "uncontested interest in the protection of federal agents and property and the faithful execution of law." *Id.* at 1054.  Indeed, Plaintiffs do not allege that their police power extends to the protection of federal property and personnel—the sole focus of the Federal Protection Mission. Compl. ¶ 56 (Presidential memo directing federalized California National Guard to "perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property").  In fact, they cannot.

Finally, Plaintiffs' APA claim (Count III) must be dismissed for lack of jurisdiction and for failure to state a claim.  The President is not an "agency" under 5 U.S.C. § 704, and although Plaintiffs do not directly challenge the President's federalization and deployment decision under the APA, they seek to do so indirectly by challenging the Secretary of War's issuance of two deployment orders,

which implemented the President's decision.  The fact that the Secretary of War carried out the President's decision to deploy California Guardsmen to address the crisis in California does not change the Presidential character of those deployment orders.  They remain presidential actions because only the President can federalize and deploy troops under § 12406, and it defies common sense to suggest that the President must personally carry out his statutory authority.

Even assuming the Secretary of War's exercise of delegated Presidential authority in issuing the challenged deployment orders can be construed as agency action, it is not "final agency action" for purposes of APA review because it does not carry legal consequences (as opposed to practical ones) or determine the rights and obligations of any regulated parties.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  Instead, the legal consequences of issuing the deployment orders, if any, flowed from the President's decision to federalize and deploy the California National Guard.

Finally, the challenged DoW deployment orders are not subject to judicial review under the APA because they are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  There are no judicially manageable standards for this Court to judge the military's deployment decisions, which are quintessential professional military judgments that the Judiciary has no competence to review.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in the military and national security affairs.").

## LEGAL BACKGROUND

The Constitution authorizes Congress both to raise and support a national Army and to organize "the Militia."  *See* U.S. Const. art. I, § 8, cl. 15 (granting Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions").  Exercising that authority, Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members."  *Perpich v. Dep't of Def.*, 496 U.S. 334, 338 (1990) (citation omitted).  The National Guard is composed of both the state National Guard, under the command of the several States, and the National Guard of the United States, a federal entity under the federal chain of command.  *See* 10 U.S.C. § 10101.

Congress has granted the President several authorities, including 10 U.S.C. § 12406, under which he may call forth the National Guard.  Once ordered into federal service, "members of the

National Guard . . . lose their status as members of the state militia during their period of active duty," *Perpich*, 496 U.S. at 347, become federal soldiers, 10 U.S.C. § 10106, and serve under the President as Commander in Chief, *see* U.S. Const. art. II, § 2, cl. 1.

Here, the President has invoked § 12406 to federalize the California National Guard. That statute provides:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 9, 2025, ECF No. 1 ("Compl."), seeking declaratory and injunctive relief. Count I of the Complaint alleges that Defendants' federalization and deployment of the California National Guard under 10 U.S.C. § 12406 was *ultra vires*. Compl. ¶¶ 79-92. It further alleges a PCA claim. *Id.* ¶ 91. Count II alleges a violation of the Tenth Amendment on the basis that Defendants' actions purportedly deprived the Governor of command and availability of those mobilized units and infringed on the State's police power. *Id.* ¶¶ 93-101. Count III alleges that DoW Defendants' implementation of the President's federalization order was arbitrary and capricious and in excess of statutory authority in violation of the APA, 5 U.S.C. § 706. *Id.* ¶¶ 102-06. In addition, both Counts I and III allege that Defendants have failed to comply with the procedural requirements of 10 U.S.C. § 12406. *Id.* ¶¶ 79-92, 102-06.

On June 10, 2025, Plaintiffs moved for a temporary restraining order, which this Court granted, ECF No. 64, but the Ninth Circuit stayed that injunction pending Defendants' appeal from

the Court's injunction, *Newsom*, 141 F.4th at 1040-41. That appeal remains pending. In August, this Court held a bench trial on Plaintiffs' PCA claim and granted partial final judgment in Plaintiffs' favor on that claim. *See* ECF Nos. 176, 182. Defendants' appeal from that judgment is also pending in the Court of Appeals. And recently, Plaintiffs moved for a preliminary injunction, challenging the extensions of the California National Guard's federalization. *See* ECF No. 212. That motion is fully briefed. *See* ECF Nos. 214, 215.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction. As the party seeking to invoke this Court's jurisdiction, Plaintiffs have the burden to demonstrate that subject matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A failure to state a claim [under Rule 12(b)(6)] may result from the lack of a cognizable legal theory or from an absence of sufficient facts alleged to support a cognizable legal theory." *Lawyers for Fair Reciprocal Admission v. United States*, 141 F.4th 1056, 1065 (9th Cir. 2025) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up). Finally, "[i]n addition to the complaint itself, on a motion to dismiss, the district court may consider documents that are referenced by the complaint, are central to the plaintiff's claims, and the authenticity of which is undisputed." *Janda v. T-Mobile USA, Inc.*, 378 F. App'x 705, 707 (9th Cir. 2010).

# ARGUMENT

## I. Plaintiffs Fail to State an Ultra Vires Claim Because the President's Action Under 10 U.S.C. § 12406 Was Within His Statutory Authority and, at a minimum, the President Had a Colorable Basis for Invoking the Statute.

Plaintiffs' principal argument is that the President's invocation of 10 U.S.C. § 12406 was *ultra vires*. Because "[t]he actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994), Plaintiffs' only path to judicial review of the President's invocation of § 12406 is a non-statutory *ultra vires* claim—a "Hail Mary pass" that "rarely succeeds." *NRC*, 605 U.S. at 681-82 (citation omitted). And "[b]ecause ultra vires review could become an easy end-run around the limitations" Congress imposed in the APA and other judicial-review statutes, such review must be "strictly limited." *Id.* at 681. The extremely stringent standard for *ultra vires* review requires Plaintiffs to show not merely that the President "has arguably reached a conclusion which does not comport with the law" but that the President "has taken action entirely in excess of [his] delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (citation omitted). That is, Plaintiffs must show that Defendants have engaged in "blatantly lawless" action, *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968), or have "plainly and openly crossed a congressionally drawn line in the sand," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022); *see also Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002) (holding that *ultra vires* review only requires a "cursory look at the merits").

On top of the extremely stringent *ultra vires* review standard, review of the President's invocation of § 12406, if available at all, must also be "highly deferential." *Newsom*, 141 F.4th at 1040. Courts must, at a minimum, "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Id.* at 1048. So long as that determination "reflects a colorable assessment of the facts and law within a range of honest judgment," courts must defer. *Id.* at 1051 (citation omitted). "Affording the President that deference, [a panel of the Ninth Circuit] conclude[d] that it is likely that the President lawfully exercised his statutory authority under § 12406(3), which authorizes federalization of the National Guard when 'the President is unable with the regular forces to execute the laws of the United States.'" *Id.* at 1040 (quoting 10 U.S.C. § 12406(3)). Notably, the term "regular forces" is construed in "the specific context in which [it] is used, and the

broader context of the statute as a whole." *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341 (1997). Under *Newsom*, and in the specific context here, § 12406(3) refers to the civilian forces that regularly "execute the laws" at issue but whose "ability to execute the laws" was "significantly impeded" by the violent protests. *See Newsom*, 141 F.4th at 1051-52.

Here, Plaintiffs do not come close to satisfying the extraordinarily demanding standards discussed above. The Complaint itself alleges that there have been substantial protests against federal law enforcement operations in the Los Angeles area, and that some protesters were violent, including throwing objects at law enforcement; damaging property; and setting fires. Compl. ¶ 29. Not only did local authorities make an arrest, they also declared "an unlawful assembly" on more than one occasion, used tear gas canisters, and dispersed crowds in multiple locations across the Los Angeles area. *Id.* ¶¶ 27, 35-44. The protests spread across several sites over multiple days. *Id.* ¶¶ 25-29. Thus, Plaintiffs' own allegations confirm that the President had at least a colorable basis for his invocation of § 12406(3).

Indeed, under *Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827), and its progeny, courts must presume that the President made the required determination, and they cannot second-guess the Commander in Chief's judgment about the deployment of troops. The "presumption of regularity" also applies, and it sustains the President's decision to federalize the National Guard "in the absence of clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). And as discussed above, if review is available at all, courts must give extraordinary deference to the President in reviewing his exercise of Commander in Chief powers, akin to highly deferential rational-basis review, under which the President's determination should be upheld if there is any plausible basis for it. *Cf. Trump v. Hawaii*, 585 U.S. 667, 704 (2018). Such is the case here.

Apart from the President's authority under § 12406(3), his decision is independently supported by § 12406(2), which authorizes him to call the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States[.]" 10 U.S.C. § 12406(2). The term "rebellion" is properly understood to encompass violent resistance to lawful enforcement of federal law. Although Black's Law Dictionary defines rebellion to include

"[o]pen, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu. through violence," Congress has plainly used "rebellion" in a broader sense here.  *See* Rebellion, Black's Law Dictionary (12th ed. 2024). Otherwise, § 12406 would fail to encompass instances, both before and after its initial enactment in 1903, in which the President has called the militia into federal service to address defiance of federal authority in situations that fell short of organized efforts to overthrow the government.

Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion, a violent protest in western Pennsylvania targeted at tax assessors attempting to collect a federal excise tax on distilled whiskey.  *See* Jennifer Elsea, Cong. Research Serv., The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law, R42659, at 8 (Nov. 6, 2018) ("CRS Report").  President Washington took that action under a 1792 statute that did not, by its terms, refer to "rebellion."  *See* CRS Report at 7-8; *see also* Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264.  But when Congress later enacted statutes referring to a "rebellion," those statutes plainly extended to cover this original historical precedent of violent opposition limited to a particular federal law.  The Whiskey Rebellion, moreover, is only one example of a range of civil disorders that members of the militia and other federal military forces have long been called upon to address.  Throughout the early years of the Republic, Presidents routinely called out troops to suppress opposition to other federal revenue laws. *See* CRS Report at 9-12.  In the late 1800s and early 1900s, states frequently requested assistance from federal troops to address violence stemming from labor disputes and miners' strikes.  *See id.* at 13-14, 35-37.  And Presidents Eisenhower and Johnson used the federalized National Guard to ensure the enforcement of federal civil rights laws and to protect civil rights advocates in the 1950s and 1960s. *See id.* at 37-38.

The situation in California exhibits many of the same features as these historical precedents. At a minimum, the conditions created a "danger of a rebellion."  10 U.S.C. § 12406(2)-(3).  In response to law enforcement efforts, agitators have specifically targeted federal property and officials with violence, intimidation, and threats.  As the Complaint states, protesters threw objects at law enforcement officers, damaged property, and set fires during the protests.  Compl. ¶ 29.  Federal agents sent a request to the Los Angeles Police Department for assistance after protesters gathered at

the Roybal Federal Building, and another crowd gathered around agents in Chinatown, while the Los Angeles County Sheriff's Department likewise encountered "a significant number of individuals gathering to protest" in Paramount, California. *Id.* ¶ 42. These events occurred across several locations, mirroring the unrest that has historically prompted deployment of the National Guard. *Id.* ¶¶ 25, 41. Congress sensibly did not require the President to await an actual rebellion before federalizing National Guard members where a significant threat of rebellion exists. The existence of life-threatening dangers for federal officers enforcing federal law and the targeting of federal officials for performing their official duties surely amount to a dangerous risk of rebellion. The President was not required to wait for tragedy to occur before acting to protect federal officials and property. Given the coordinated events alleged in the Complaint—including multiple unlawful-assembly declarations by the Los Angeles Police Department and Los Angeles Sheriff's Department, *id.* ¶¶ 35-44, the violence targeting law enforcement officers and federal property, *id.* ¶ 29, and the escalating threat surrounding federal detention facilities, *id.* ¶¶ 25, 27, 54—the President had ample basis for determining that there is, at minimum, a "danger" of rebellion, 10 U.S.C. § 12406(2).

Not only is the President's invocation of 10 U.S.C. § 12406 proper, but Defendants also satisfied the statute's procedural requirement, and thus, Plaintiffs fail to allege that Defendants have violated the procedural requirements of 10 U.S.C. § 12406. Compl. ¶¶ 82-87, 105. Plaintiffs' claim also has no merit. Section 12406 specifies that the President's orders calling National Guard members into service "shall be issued through the governors of the States." 10 U.S.C. § 12406. That procedural mechanism reflects the dual control of the Guard and ensures that responsibility for the soldiers is clearly transferred from state to federal control.

The President and the Secretary of War satisfied this procedural requirement. As alleged in the Complaint, Governor Newsom was at least aware of the planned federalization because he publicly opposed the federalization the same day the President signed the June 7, 2025 Memorandum federalizing at least 2,000 National Guardsmen. Compl. ¶¶ 53-54. The President's Memorandum directed the Secretary of War "to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard under this authority." *Id.* ¶ 56. The Secretary of War then sent a memorandum to

California's Adjutant General calling forth 2,000 Guardsmen. ECF No. 22-2. The Adjutant General is a state cabinet-level official who is required under California law to perform "duties consistent with the regulations and customs of the United States Army, United States Air Force, and the United States Navy[,]" including "issu[ing] all orders *in the name of the Governor*." Cal. Mil. & Vet. Code Ann. § 163 (emphasis added). The Secretary's June 7 memorandum bore the label "THROUGH: THE GOVERNOR OF CALIFORNIA," as does his June 9 memorandum, which called forth an additional 2,000 Guardsmen, ECF No. 22-3.

The transmission of the order through the official who issues orders on behalf of the Governor was sufficient to satisfy Section 12406's requirement. Nothing in the statute supports Plaintiffs' contention that the Governor needed to issue the mobilization order himself. Section 12406 states that orders are issued "through," not "by," governors. 10 U.S.C. § 12406. There is a fundamental difference between orders being issued "by" a person (making them the decision maker) and orders being issued "through" that person (providing notice of and making them a conduit for a decision already made). The latter structure better aligns with the purpose of the procedural requirement: to effectuate the handover of command and control of the National Guard members from the state military commander to the federal military commander, thereby avoiding command confusion during an emergency. It is not surprising then that the Ninth Circuit determined in its stay decision that Defendants' actions "likely met the procedural requirement because the federalization order was issued through an agent of the Governor in the Governor's name," and "[n]othing in §12406 prevents the State from delegating to a subordinate, such as the Adjutant General, the Governor's authority to issue such orders." *Newsom*, 141 F.4th at 1052, 1053.

Plaintiffs are likewise incorrect to suggest that the President needed to obtain the Governor's consent prior to federalizing National Guard members. Compl. ¶¶ 82-86. When Congress wants to require gubernatorial consent in National Guard matters, it says so explicitly. *See, e.g.*, 10 U.S.C. § 12301(d) (members "may not be ordered to active duty . . . without the *consent* of the governor or other appropriate authority of the State concerned" (emphasis added)). Nor was the President required to consult with the Governor about the prudence and specifics of the order. When a commander issues an order "through" a subordinate, that is not an invitation for the subordinate to

debate whether the order should have been issued in the first place.    The Ninth Circuit confirmed this point, holding that "the text of § 12406 does not give governors any veto power over the President's federalization decision" and that the statute does not grant governors any "consulting" role. *Newsom*, 141 F.4th at 1053.

For those reasons, Plaintiffs' *ultra vires* claim should be dismissed.

## II.    Defendants' Actions Are Consistent with the Tenth Amendment.

Plaintiffs' Tenth Amendment argument rests on the flawed premise that the President's lawful exercise of statutory authority infringes on the State's police power.    The Supreme Court "long ago rejected the suggestion" that the federal government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority . . . in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). If a federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." (quoting *New York v. United States*, 505 U.S. 144, 156 (1992))).

Here, the text of the Constitution makes clear that Congress may "provide for calling forth the Militia[.]"    U.S. Const. art. I, § 8, cl. 15.    And § 12406 rests on that express grant of authority, authorizing the President to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws."    10 U.S.C. § 12406.    The President's invocation of § 12406 to protect federal officials and property, therefore, falls squarely within that constitutional and statutory framework.

The President's invocation of § 12406 is also plainly consistent with the Tenth Amendment. Plaintiffs do not contend that § 12406—some variant of which has existed since virtually the Founding—is unconstitutional.    So if the federalization and deployment are authorized by § 12406— which they are—the Tenth Amendment has no independent role to play here.    That is particularly so because, as the Ninth Circuit has recognized, the federal government has "an uncontested interest in

the protection of federal agents and property and the faithful execution of law." *Newsom*, 141 F.4th at 1054.

Plaintiffs' references to "policing" and "local control" do not alter that analysis. Plaintiffs ignore the "facially legitimate and bona fide" reason for the President's action as the Commander in Chief—namely, the protection of federal officials and property. *Cf. Hawaii*, 585 U.S. at 703 (in an area where the Executive has broad discretion, once the Executive has provided a "facially legitimate and bona fide reason" for his action, the Court "will neither look behind the exercise of that discretion, nor test it by balancing its justification" (citation omitted)). Indeed, Plaintiffs cannot claim any interest in the protection of federal personnel and property, and thus, the alleged intrusion by the National Guard's performance of the Federal Protection Mission into the State's exercise of police power rings hollow.

For these reasons, Plaintiffs' Tenth Amendment claim fails to state a claim.

## III. Plaintiffs' APA Claim Fails.

Plaintiffs also seek to subject DoW's June 7 and June 9 Orders, which implemented the President's directive to deploy the California National Guard, to APA review, by calling forth a total of 4,000 California National Guard personnel. Compl. ¶¶ 102-06. But not every action taken by the federal government is subject to the APA's strictures. First, as Plaintiffs appear to acknowledge, acts of the President are not reviewable under the APA. *See id.*; *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton*, 511 U.S. at 476 ("The actions of the President cannot be reviewed under the APA because the President is not an 'agency' under that Act."). Second, only "final agency actions" from which legal consequences flow to the regulated public can be challenged under the APA. 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177-78. Finally, the APA does not permit review of those questions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). All three restrictions apply to preclude APA review here.

Although Plaintiffs do not directly challenge the President's June 7, 2025 federalization and deployment decision under the APA, *see* Compl. ¶¶ 102-06, they seek an order holding invalid Secretary Hegseth's June 7 and June 9 Orders "implementing the June 7, 2025 Presidential Memorandum," *id.* ¶ 106. But the orders are not "agency" actions because they merely carried out

the President's exercise of his statutory authority under § 12406, including the authority to determine the number of troops to deploy at a given time. *See* 10 U.S.C. § 12406 ("the President may call into Federal service members and units of the National Guard of any State *in such numbers as he considers necessary* to repel the invasion, suppress the rebellion, or execute those laws" (emphasis added)). Because only the President can invoke § 12406 and deploy such numbers of Guardsmen as he deems appropriate under that statute, the fact that he delegated to the Secretary of War the task of implementing his directive does not change the fact that the deployments memorialized in the June 7 and June 9 Orders are Presidential actions.

The Ninth Circuit has endorsed the common-sense proposition that a President need not personally perform his statutory authority for the action to be Presidential action. In *Jensen v. National Marine Fisheries Service*, a case involving an APA challenge to the State Department's exercise of authority delegated by the President regarding the approval of regulations issued by a treaty-created commission, the court said that "[f]or the purposes of this appeal the Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable." 512 F.2d 1189, 1191 (9th Cir. 1975); *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022) (President's determination "not reviewable under the APA," and applying APA standards to the President's determination as implemented by an agency would be improper), *aff'd*, 63 F.4th 366 (5th Cir. 2023) (en banc), *vacated on other grounds*, 144 S. Ct. 480 (2023); *NRDC v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 113 (D.D.C. 2009) (holding that "the decision to issue a [cross-border] permit, whether made by the President himself or the State Department as the President's delegee, is a presidential action not reviewable" under the APA); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (APA review not available when agency "merely carr[ies] out" President's directives), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002). "Any argument suggesting that [the Secretary of War's] action[s] [are] agency action[s] would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 29 (D.D.C. 2001), *aff'd* 306 F.3d 1138 (D.C. Cir. 2002); *see also Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1081-82 (D.S.D. 2009).

For similar reasons, the Secretary's June 7 and June 9 Orders are not "final agency actions" under the APA. An agency action is "final"—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett*, 520 U.S. at 177-78). Not all consequences of agency action are "legal" in nature; merely practical effects of agency actions do not give rise to judicial review. For instance, a decision to "[i]nitiat[e] an enforcement proceeding against a company" might be viewed as the consummation of a decision-making process, and it "may have a devastating effect on the company's business, but that does not make the agency's action final." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (collecting cases); *see also Air Cal. v. Dep't of Transp.*, 654 F.2d 616, 621–22 (9th Cir. 1981) (holding that a legal interpretation contained in a letter from the general counsel of the FAA to a local airport was non-final, despite serious indirect effects on plaintiff's business). Moreover, the legal consequences must be felt by a "regulated party." *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1259 (9th Cir. 2022); *see also Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (challenged agency action not "final" because, among other things, it "imposes no obligations, prohibitions or restrictions on *regulated entities* [and] does not subject them to new penalties or enforcement risks") (emphasis added).

Plaintiffs' APA claim assumes that DoW's June 7 and June 9 Orders are final agency actions. *See* Compl. ¶¶ 102-06. Specifically, they argue that "Plaintiffs are entitled to a declaration that Secretary Hegseth's June 7 and June 9 Orders are invalid, and an injunction prohibiting DoW Defendants from implementing the June 7, 2025 Presidential Memorandum." *Id.* ¶ 106. But this contention ultimately challenges the President's federalization decision, not any separate final agency action. It is that Presidential act, as opposed to steps implemented by DoW, that arguably has legal consequences, even assuming the deployed troops subject to the Orders are "regulated" parties for purposes of determining finality under the second prong of the *Bennett* test. However, the troops are not "regulated parties;" they are soldiers who can be federalized under applicable law and subject to the federal chain of command. DoW's directives—such as assigning units, adjusting troop numbers, and deploying

personnel—are ongoing operational measures that do not themselves have legal consequences or represent the consummation of any discrete agency decision-making process. Rather, they are inherently interlocutory given that troop levels, for example, have fluctuated since the deployment. *See* ECF No. 214. Such fluid, implementation level judgments do not constitute "final agency action." *See Bennett*, 520 U.S. at 177-78.

Finally, DoW's June 7 and June 9 Orders are not subject to judicial review under the APA for another independent reason—they are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "[E]ven where Congress has not affirmatively precluded [judicial] review" of agency action, such review is not permitted "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *accord City and County of San Francisco v. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Heckler*, 470 U.S. at 830.

Here, the challenged DoW decisions are interlocutory military decisions for which no judicially manageable standards exist. After the President has made a decision to federalize and deploy the Guardsmen, courts have no legal standards or institutional competency to determine what the appropriate number of troops is, where they should be deployed, and what tasks they should perform. Indeed, as noted above, § 12406 specifically commits to the President's discretion the decision about the appropriate number of Guardsmen to federalize and deploy at any given time. Assessing such issues is precisely the type of military judgment committed to the Commander in Chief and his delegee, the Secretary of War. In particular, courts are not "given the task of running the Army" given that "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 93-94 (1953)). The absence of meaningful standards of review is particularly acute in areas involving military decisions as courts are ill equipped to "second-guess" decisions such as the "allocat[ion] [of] military personnel in order to serve the security needs of the Nation." *Id.*; *see also Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)

(the "complex, subtle, and professional decisions as to the . . . control of a military force are essentially professional military judgments," and it is "difficult to conceive of an area of governmental activity in which the courts have less competence"); *see NFFE v. United States*, 905 F.2d 400, 405-06 (D.C. Cir. 1990) (concluding that decisions about closure of military bases were committed to agency discretion by law because "the federal judiciary is ill-equipped to conduct reviews of the nation's military policy"). In sum, because the June 7 and June 9 orders are committed to the agency's discretion, this Court has no jurisdiction to review Plaintiffs' challenge to those orders. *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (the APA "withdraws jurisdiction to review agency decisions that are "committed to agency discretion by law").

Even if Plaintiffs can overcome the threshold hurdles for APA review (which they cannot), the challenged deployment orders are not arbitrary and capricious or in violation of any statute. "The arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). The review is a "narrow" one, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989), and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That is, "[i]t is not the reviewing court's task to make its own judgment about the appropriate outcome." *Locke*, 776 F.3d at 994 (citation and internal quotation marks omitted).

Here, the orders clearly meet this deferential standard of review. Again, the orders were issued to implement the President's valid exercise of statutory authority under § 12406, and the statute specifically commits to the President's discretion to "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . suppress the rebellion, or execute those laws." The Secretary of War complied with the President's directive, which required the Secretary to deploy at least 2,000 National Guard personnel. *See* ECF No. 22-2 (June 7, 2025 Presidential Memorandum). His action in following the Commander in Chief's directive clearly is not arbitrary and capricious. *Cf. Trump v. Orr*, No. 25A319, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025) (mem.) (plaintiffs "not likely to prevail in arguing that the State Department acted arbitrarily

and capriciously by declining to depart from Presidential rules").  Nor have Plaintiffs pointed to any

statute that DoW has violated beyond § 12406, which is a statute directed only at the President.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch
(CA Bar No. 296283)

ALEXANDER K. HAAS
(CA Bar No. 220932)
Director, Federal Programs Branch

JEAN LIN (NY Bar No. 4074530)
Special Litigation Counsel

TIBERIUS DAVIS (DC Bar No. 90020605)
JOHN BAILEY (Ohio Bar No. 104260)
Counsel to Assistant Attorney General

*/s/ Kian K. Azimpoor*
KIAN AZIMPOOR (DC Bar No. 90024613)
Trial Attorney
MICHAEL G. GERARDI
Senior Trial Counsel
CHRISTOPHER EDELMAN (DC Bar No.
1033486)
Senior Counsel
JODY LOWENSTEIN (MT Bar No.
55816869)
KATHLEEN C. JACOBS (TX Bar No.
24091154)
J. STEPHEN TAGERT (VA Bar No. 99641)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 598-0860
kian.k.azimpoor@usdoj.gov
*Attorneys for Defendants*

17
DEFENDANTS' MOTION TO DISMISS