1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11

12

| GAVIN NEWSOM, et al., | Case No. 25-cv-04870-CRB |
|---|---|
| Plaintiffs, | |
| v. | **ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

13    The Founders designed our government to be a system of checks and balances.[1]

14  Defendants, however, make clear that the only check they want is a blank one.  Six months

15  after they first federalized the California National Guard, Defendants still retain control of

16  approximately 300 Guardsmen, despite no evidence that execution of federal law is

17  impeded in any way—let alone significantly.  What's more, Defendants have sent

18  California Guardsmen into <u>other states</u>, effectively creating a national police force made

19  up of state troops.  In response to Plaintiffs' motion to enjoin this conduct, Defendants take

20  the position that, after a valid initial federalization, all subsequent re-federalizations are

21  completely, and forever, unreviewable by the courts.  Defendants' position is contrary to

22  law.  Accordingly, the Court **ENJOINS** Defendants' federalization of California National

23  Guard troops.

24

25

26  [1] The Federalist No. 51 (James Madison) ("TO what expedient, then, shall we finally resort, for
    maintaining in practice the necessary partition of power among the several departments, as laid

27  down in the Constitution?  The only answer that can be given is, that as all these exterior
    provisions are found to be inadequate, the defect must be supplied, by so contriving the interior

28  structure of the government as that its several constituent parts may, by their mutual relations, be
    the means of keeping each other in their proper places.").

United States District Court
Northern District of California

## I.    BACKGROUND

The Court has chronicled the background of this dispute in previous orders, and so will not repeat it in detail here.  See Order Granting TRO (dkt. 64); Opinion Granting Injunctive Relief (dkt. 176).  Instead, the Court summarizes the circumstances of the temporary restraining order ("TRO") in this case, recounts the developments that occurred in California and elsewhere during the stay in this case, and outlines the present dispute.

### A.    TRO in This Case

On June 6, 2025, Immigration and Customs Enforcement ("ICE") began immigration raids across Los Angeles, at locations like Home Depot, a donut shop, and a clothing wholesaler.  Opinion Granting Injunctive Relief at 3; Espiritu Decl. Ex. G (dkt. 8-1) at 52.  Protests, some unruly, followed.  President Trump—despite quick responses from the Los Angeles Police Department ("LAPD") and the Los Angeles Sheriff's Department ("LASD")—responded by federalizing the California National Guard.  Opinion Granting Injunctive Relief at 4.  He did so by way of a June 7 memorandum invoking Section 12406, in which he stated that the Guardsmen's "duration of duty shall be for 60 days or at the discretion of the Secretary of Defense."  See June 7 Memo (Espiritu Decl. Ex. O at 108–09).  "The memorandum never specifically mentioned Los Angeles or California; to the contrary, it instructed the Secretary of Defense 'to coordinate with the Governors of the States and the National Guard Bureau in identifying and ordering into Federal service the appropriate members and units of the National Guard.'"  Opinion Granting Injunctive Relief at 5 (quoting June 7 Memo at 108).  Secretary Hegseth subsequently issued his own memorandum, stating that 2,000 members of the California National Guard would be "called into Federal service effective immediately for a period of 60 days."  June 7 DOD Memo (Trial Ex. 18).  Two days later, Secretary Hegseth issued another memorandum federalizing an additional 2,000 members of the California National Guard.  June 9 DOD Memo (Trial Ex. 3).

The federalized National Guard deployed in Los Angeles on June 8.  Opinion Granting Injunctive Relief at 9.  Plaintiffs filed suit the next day, arguing that Defendants'

1    actions exceeded the scope of their authority.  See Compl. (dkt. 1).  On June 12, this Court

2    issued a TRO holding that the June federalization did not satisfy Section 12406.  See Order

3    Granting TRO.  The Ninth Circuit stayed the TRO pending appeal, articulating a

4    deferential standard of review that courts in this Circuit must apply to federalization orders

5    under Section 12406.  See Newsom v. Trump, 141 F.4th 1032, 1040 (9th Cir. 2025).  The

6    Ninth Circuit recently held a hearing on Defendants' appeal of the TRO; it has not yet

7    issued a ruling.

## B.    Events in California Following the TRO

From the "No Kings" protests in mid-June through August, there were "only a few

immigration-related protests around [Los Angeles] with often just a few dozen protestors

at a time."  Hurtado Decl. (dkt. 183-5) ¶ 11; see also Duryee Decl. (dkt. 183-4) ¶ 9 ("I am

not aware of any large-scale, protest-related activities in the Los Angeles area since June

19, 2025, and therefore there have been no arrests resulting from such activities occurring

after June 19."); Opp'n (dkt. 214) at 1 ("The deployment has succeeded.").  The LAPD

was "well equipped to handle these protests and did so without mutual aid, the National

Guard, or even the Department's own specialized crime suppression units."  Hurtado Decl.

¶ 11.

### 1.    Draw Down of Troops

In a series of orders, Defendants released the majority of federalized members of

the California National Guard.  See Hamme Decl. Ex. 5 (dkt. 183-2) at 25 (July 1, 2025

press release: "Task Force 51 releases 150 members of the California National Guard");

Sauter Decl. (dkt. 214-1) at ¶ 5 (On July 30, 2025, Secretary Hegseth directed a draw down

of forces to approximately 300.); Kurland Decl. Ex. A.  (dkt. 190-1) ("August 15 Memo")

at 5 (memorializing directive on July 30, 20225 to release 1,350 members of the California

National Guard from federal service).[2]  In mid-August, Department of Homeland Security

Secretary Kristi Noem announced that the immigration enforcement mission had

---

[2] Secretary Hegseth signed the memo by hand, adding "Thanks Gavin!"  August 15 Memo at 5.

United States District Court
Northern District of California

succeeded: the administration had "Removed the Worst of the Worst Illegal Aliens," arresting "4,481 illegal aliens in the Los Angeles area" since June 6.  Hamme Decl. Ex. 8 (dkt. 183-2) at 37.

### 2. August Federalization Order

In the midst of that draw down, however, and despite the calm in Los Angeles, on August 5, 2025, Defendants issued a <u>new</u> federalization order.  That order, issued the day before the initial federalization was set to expire, federalized 300 members of the California National Guard for 90 days, through November 4, 2025.  Strong Decl. Ex. 1 (dkt. 212-2) ("August 5 Order") at 2 (calling Guardsmen into service for a "tour length" of 90 days).  The August 5 Order stated in part:

> [] The Secretary of Defense, pursuant to Title 10, US Code, Section 12406, authorizes the mobilization of units and members of the National Guard.  This mobilization is in response to direction from the President of the United States . . . to provide forces to protect federal functions, personnel, and property.
> [] This message implements SecDef's order to call units and members of the Army National Guard into federal service.  The National Guard unit(s) listed . . . below are called into federal service under Presidential Reserve Callup (Title 10, USC 12406). . . .
>
> [] The following unit(s) is/are hereby called into federal service under the provisions of 10 USC 12406 effective[.]

<u>Id.</u> at 1–2.  A subsequent letter from Secretary Hegseth on August 15, 2025 confirmed that "300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025."  Kurland Decl. Ex. B (dkt. 190-1) at 7.[3]

### 3. Filing of Motion for Preliminary Injunction

On September 2, 2025, Plaintiffs filed a motion for preliminary injunction, challenging the August 5 Order.  <u>See</u> First MPI (dkt. 183).[4]  This Court stayed that motion,

---

[3] Secretary Hegseth again added a handwritten "thanks!" to Governor Newsom.  Kurland Decl. Ex. B at 7.

[4] That same day, following a three-day bench trial, this Court granted injunctive relief for

United States District Court
Northern District of California

explaining: "[t]he complicated and fragmented procedural posture leaves the Court skeptical of its jurisdiction to consider Plaintiffs' motion."  Order re: Jurisdiction (dkt. 192) at 1.  The Ninth Circuit later clarified that "Plaintiffs' challenge to Secretary Hegseth's August 5 order extending the California National Guard's federalization through November 5 is not the subject of this appeal," and so held that this Court has jurisdiction over Plaintiffs' challenge to that order.  USCA Order (dkt. 204).

### C.    Events During Stay

While the case was stayed before this Court, a series of significant events occurred, all demonstrating Defendants' expansive view of President Trump's powers under Section 12406.

#### 1.    Oregon

On September 28, 2025, after the Governor of Oregon declined to mobilize Oregon's National Guard, Secretary Hegseth called 200 members of the Oregon National Guard into federal service.  Compl. (dkt. 1) ¶¶ 57, 58 in Oregon v. Trump, 3:25-cv-01756-IM.  Secretary Hegseth asserted that the Oregon federalization was a "further implement[ation]" of the June 7 Memo in this case, which, as noted above, was justified based on events in Los Angeles but unlimited in its geographic scope.  Id. ¶ 58; June 7 Memo.[5]  On October 4, 2025, U.S. District Judge Karin J. Immergut granted a TRO in favor of the State of Oregon and the City of Portland, holding that Defendants' actions failed to satisfy Section 12406, and temporarily enjoining the federalization and deployment of the Oregon National Guard in Portland.  See Opinion and Order Granting Motion for TRO (dkt. 56) in Oregon v. Trump, 3:25-cv-01756-IM ("Portland TRO").  The next day, Defendants deployed 200 of the 300 remaining federalized members of the California National Guard to Oregon.  Sauter Decl. ¶ 5; Second Mot. for TRO (dkt. 59) at

---

Plaintiffs on their Posse Comitatus Act claim.  See Opinion Granting Injunctive Relief at 3.  The Posse Comitatus Act claim is not material to the pending motion.

[5] See also Order Granting TRO at 34 n.13 (noting that amici from other states argued in early June that they were "'impacted by the unlimited scope of' the June 7 Memo.") (quoting States Amici (dkt. 30-1) at 2).

United States District Court
Northern District of California

2 in <u>Oregon v. Trump</u>, 3:25-cv-01756-IM.  Defendants also federalized 400 members of the Texas National Guard to send to Portland and other cities.  Marshall Decl. Ex. 1 (dkt. 65-1) in <u>Oregon v. Trump</u>, 3:25-cv-01756-IM.  On October 5, Judge Immergut granted a second TRO, enjoining the deployment of <u>any</u> National Guard members in Oregon.  Second TRO (dkt. 68) in <u>Oregon v. Trump</u>, 3:25-cv-01756-IM ("Second Portland TRO").

Defendants appealed the first TRO but not the second.  Although the Ninth Circuit stayed the first TRO pending appeal, an en banc court has since vacated the panel's decision and granted rehearing.  <u>See</u> <u>Oregon v. Trump</u>, No. 26-6268 dkt. 61.1; 89.1.[6]  In the interim, Judge Immergut held a trial on the merits, and ultimately granted the plaintiffs a permanent injunction because "even giving great deference to the President's determination, the President did not have a lawful basis to federalize the National Guard under 10 U.S.C. § 12406."  Findings of Fact and Conclusions of Law (dkt. 146) at 2 in <u>Oregon v. Trump</u>, 3:25-cv-01756-IM ("Portland FOFCOL").  As of October 31, 2025, 200 federalized California National Guard members remain stationed in Portland "to perform infrastructure protection."  Eck Decl. (dkt. 212-3) ¶ 9.  At the motion hearing in this case, Defendants suggested that they are in the process of de-federalizing these 200 Guardsmen.

### 2.    Illinois

On October 4, 2025, Defendants again federalized a state's National Guard over its governor's objection.  Compl. (dkt. 1) ¶¶ 126–32 in <u>Illinois v. Trump</u>, 1:25-cv-12174.  Secretary Hegseth issued a memo calling up 300 members of the Illinois National Guard to protect ICE, Federal Protective Service (FPS), other U.S. personnel performing federal functions, and federal property.  <u>Id.</u> ¶ 130.  Defendants also stated that federalized Texas National Guard members would be sent to cities including Chicago.  <u>Id.</u> ¶¶ 133–34.  And on October 7, Defendants sent fourteen federalized <u>California</u> National Guard members from Oregon to Illinois to train the National Guard in that state.  Sauter Decl. ¶ 8; Eck Decl. ¶ 7.[7]

United States District Court
Northern District of California

---

[6] The en banc hearing has yet to take place at the time of this Order.
[7] Those individuals returned to Los Angeles by October 30, 2025.  Eck Decl. ¶ 8.

On October 10, 2025, U.S. District Judge April M. Perry granted a TRO in favor of the State of Illinois and the City of Chicago, holding that they were likely to succeed in demonstrating that Defendants' deployment of the National Guard violated Section 12406. Opinion and Order (dkt. 70) in Illinois v. Trump, 1:25-cv-12174 ("Chicago TRO"). The Seventh Circuit denied Defendants' motion to stay the TRO pending appeal. Illinois v. Trump, 155 F.4th 929, 933 (7th Cir. Oct. 16, 2025) ("[T]he facts do not justify the President's actions in Illinois under § 12406, even giving substantial deference to his assertions."). The case is currently before the Supreme Court after briefing concluded in November. See Jason Meisner, Illinois and Trump brief US Supreme Court over administration's National Guard deployment powers, Chicago Trib. (November 11, 2025 at 4:08 PM CST), https://perma.cc/9W3Q-372U.

### 3.    October Federalization Order

Meanwhile, despite the ongoing calm in Los Angeles, on October 16, 2025, a couple of weeks before the August 5 Order lapsed, Defendants again federalized 300 members of the California National Guard. Strong Decl. Exs. 4 and 5. Secretary Hegseth wrote:

> In response to a request for assistance from the Department of Homeland Security, and at the direction of the President, I direct the Secretary of the Army to extend the orders of all remaining California (CA) National Guard (NG) personnel called into Federal service under 10 U.S.C. § 12406, from November 4, 2025 to February 2, 2026, and I directed that Commander, U.S. Northern Command . . . redeploy 200 CA NG personnel to Oregon. . . .
>
> [T]hese individuals will temporarily protect [ICE] and other U.S. Government personnel who are performing Federal functions, including personnel enforcing Federal law, and will protect Federal property.

Strong Decl. Ex. 4 ("October 16 Order"); see also Strong Decl. Ex. 5 (Oct. 16, 2025 memo from Anthony C. Fuscellaro: "These 200 CA NG and 200 TX NG personnel, along with additional headquarters and support staff, will deploy to Oregon effective immediately to protect Federal functions, personnel, and property.").

As of now, 100 federalized California National Guard members remain "at various

locations throughout Los Angeles providing rapid response protection to federal facilities, functions, and personnel." Sauter Decl. ¶ 9. They also provide perimeter security at the Roybal Federal Building in Los Angeles. Id.

### D. Pending Motion

On November 4, this Court lifted the stay in accordance with guidance from the Ninth Circuit, and directed Plaintiffs to file an updated motion that included the relevant events that transpired during the stay. See Order Lifting Stay (dkt. 208). Briefing is now complete. See MPI (dkt. 212); Opp'n; Reply (dkt. 215). Plaintiffs challenge two orders under Section 12406: (1) the August 5 Order federalizing 300 members of the California National Guard for an additional 90 days, through November 4, 2025, and (2) the October 16 Order federalizing 300 members of the California National Guard through February 2, 2026.

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. DISCUSSION

Plaintiffs argue that they are entitled to a preliminary injunction because they have satisfied each of the Winter elements. The Court agrees.

### A. Likelihood of Success on the Merits

A party seeking a preliminary injunction must establish a likelihood of success on

United States District Court
Northern District of California

United States District Court
Northern District of California

the merits.  <u>Winter</u>, 555 U.S. at 20.  Plaintiffs argue that they are likely to succeed in arguing that the subsequent federalization orders are unjustified, because there was no colorable basis to federalize the National Guard on August 5 or October 16.  Defendants respond that Plaintiffs are unlikely to succeed, because (1) courts lack the authority to review a president's subsequent federalization orders; (2) Plaintiffs have failed to state an ultra vires claim; (3) the August 5 and October 16 Orders satisfy the highly deferential standard of review; and (4) Plaintiffs seek relief that goes beyond the scope of the complaint.  The Court addresses and rejects each of Defendants' arguments.

### 1.    Reviewability

Defendants first argue that the August 5 and October 16 Orders are not subject to judicial review.  But "[i]t is emphatically the province and duty of the judicial department to say what the law is."  <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803).  Deciding whether a party's "interpretation of [a] statute is correct" is a "familiar judicial exercise."  <u>Zivotofsky ex rel. Zivotofsky v. Clinton</u>, 566 U.S. 189, 196 (2012).  And every court to consider whether federalization under Section 12406 is reviewable has answered in the affirmative.  <u>See, e.g.</u>, <u>Newsom</u>, 141 F.4th at 1047 ("[W]e disagree with Defendants' contention that § 12406 completely precludes judicial review of the President's determination that a statutory precondition exists."); <u>Illinois</u>, 155 F.4th at 937 (same).  Undeterred, Defendants justify their recycled arguments by contending that <u>Newsom</u> was only "controlling" as to the President's June 7 Memo, and that the Orders now at issue require different consideration.  Opp'n at 4.

Defendants' second run at reviewability also falls flat.

### a.    Sections 12406 and 12407 on Reviewability

For starters, Defendants concede that "<u>Newsom</u> allows some measure of review of Section 12406's prerequisites when Guardsmen are 'call[ed] into Federal service.'"  Opp'n at 4 (quoting 10 U.S.C. § 12406).  That is explicitly what both challenged Orders here do.  August 5 Order ("The National Guard unit(s) . . . are called into federal service under Presidential Reserve Callup (Title 10, USC 12406)."); October 16 Order (California

9

1    National Guard personnel were "called into Federal service under 10 U.S.C. § 12406, from

2    November 4, 2025 to February 2, 2026").  By Defendants' own admission, then, these

3    orders are reviewable.

4         Defendants nevertheless attempt to circumvent the scope of Section 12406 by

5    characterizing the Orders as extensions of federalization, which they argue are outside the

6    statute's reach.  Opp'n at 4 ("Congress decided against subjecting the continuation of a

7    mission to further regulation by Section 12406.").  Indeed, at the motion hearing,

8    Defendants confirmed their position that, after an initial federalization, all extensions of

9    federalization orders are utterly unreviewable, forever.

10        That is shocking.  Adopting Defendants' interpretation of Section 12406 would

11    permit a president to create a perpetual police force comprised of state troops, so long as

12    they were first federalized lawfully.  Such a scenario would validate the Founders'

13    "widespread fear [of] a national standing Army," which they believed "posed an

14    intolerable threat to individual liberty and to the sovereignty of the separate States."

15    Perpich v. Dep't of Def., 496 U.S. 334, 340 (1990).  Defendants' argument for a president

16    to hold unchecked power to control state troops would wholly upend the federalism that is

17    at the heart of our system of government.  See Youngstown Sheet & Tube Co. v. Sawyer,

18    343 U.S. 579, 638 (1952) (Jackson, J., concurring) ("Presidential claim to a power at once

19    so conclusive and preclusive must be scrutinized with caution, for what is at stake is the

20    equilibrium established by our constitutional system.").

21        The statutory framework repudiates Defendant's position.  As Plaintiffs argue, and

22    as this Court discusses in greater detail below, Section 12406 "authorizes federalization

23    only when one of its factual predicates is presently satisfied."  Reply at 1 (emphasis in

24    original) (citing Portland FOFCOL at 37).  Accordingly, each affirmative order authorizing

25    federalization—whether a subsequent, distinct federalization or what Defendants call an

26    extension—must comply with Section 12406's exigency requirements at the time it is

27    effectuated.

28        Section 12407, the statute regarding the period of federal service, further confirms

the judicial authority for reviewability of the Orders.

Section 12407 establishes that federalization terminates at the end of a president's chosen period of service, or sooner. 10 U.S.C. § 12407(a) ("Members and units called shall serve inside or outside the territory of the United States during the term specified, unless sooner relieved by the President."). It necessarily follows that an order bringing the Guard back into service must again go through the President's vehicle for federalization: Section 12406. Moreover, there are <u>no</u> statutes specifically relating to continuation or extension; as Defendants admitted at the motion hearing, only Sections 12406 and 12407 apply.

The timeline in this case is also illustrative. The President's initial memorandum in June specified that "the duration of duty shall be for 60 days or at the discretion of the Secretary of Defense." June 7 Memo. Secretary Hegseth's memorandum carrying out the President's declaration then specified that the federalization was "for a period of 60 days." June 7 DOD Memo.[8] Then on August 5, the day before that initial period lapsed, Secretary Hegseth again called up National Guard troops for a 90-day period starting on August 8. August 5 Order. And then again, shortly before this new period ended, Secretary Hegseth issued his October Order for another 90-day period ending on February 2, 2026. October 16 Order. Clearly, Defendants' own conduct demonstrates their understanding that Sections 12406 and 12407 work in tandem, requiring a re-federalization when the service period is set to expire.[9] The August 5 Order and the October 16 Order are properly construed as calling Guardsmen into federal service and are thus reviewable under Section 12406.[10]

---

[8] As Defendants argue, it is possible to construe President Trump's June memorandum as not defining a closed period of service, since it is for 60 days or at Secretary Hegseth's discretion. June 7 Memo. But Secretary Hegseth's subsequent memorandum forecloses this possibility. <u>See</u> June 7 DOD Memo; <u>see also</u> 10 U.S.C. § 12407(a) (period of service is specified "in the call").
[9] Why else would Defendants continue to issue orders if the June 7 Memo alone was sufficient?
[10] During oral argument in the Ninth Circuit for this case, Judge Bennett raised this exact issue, asking, "Let's say the President's original call-up had a termination date. Would you agree that your argument [for nonreviewability] wouldn't apply to a subsequent order of the President extending the date?" Oral Argument at 5:27, <u>Newsom v. Trump</u> (No. 25-3727), https://perma.cc/A6Y5-L6LT.

1    The parties dispute the relevance of Section 12407.  Defendants assert that "the

2    duration of federalized Guardsmen's service is committed to the President's discretion."

3    Opp'n at 5.  During the motion hearing, Defendants insisted that there is no language in

4    Sections 12406 or 12407—or in the Ninth Circuit's decision in Newsom—that allows

5    judicial review for anything but the initial federalization.  On the other side, Plaintiffs

6    argue that Section 12407's "purpose is to limit the President's power over the duration of

7    federalization, not grant him absolute discretion."  Reply at 4 (emphasis in original).  In the

8    Court's view, Defendants have the better reading.  Section 12407 explicitly gives the

9    President the option to specify a period of service in the call.  Nowhere does it prescribe a

10   maximum period the President may authorize.  Further, Defendants correctly point out that

11   Section 12406's predecessor statute did have a nine-month maximum service period.

12   Opp'n at 6 (citing Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776).  This language was

13   removed in a later amendment and remains absent in the current iteration.  See Act of May

14   27, 1908, ch. 204, §§ 3, 4, 35 Stat. 400.

15   But that does not mean that the President's discretion over the service period is

16   absolute or that the service period can be infinite.[11]  Plaintiffs persuasively point to

17   legislative history indicating that Congress did not intend for the service period to last

18   forever—just long enough to address the present emergency.  See Reply at 6–7.  The

19   removal of the nine-month limitation was part of an effort to ensure the Guardsmen could

20   "respond to a call for troops issued by the President under the conditions of emergency."

21   H.R. Rep. No. 1067, at 5 (1908).  Then-Acting Secretary of War Robert Shaw Oliver made

22   clear that the limit was "generously waived" with the understanding that Guardsmen would

23   "render service in any theater of military activity to which they may be called, and to

24

25   _____

[11] During oral argument in the Ninth Circuit for this case, Judge Miller expressed concern about
26   this idea, asking if there was "any time limit on how long [the Guardsmen] can stay federalized."
     Oral Argument at 1:20, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT.  When
27   Defendants answered that there was no limit, Judge Miller asked if "the fact that [Section 12406]
     says the President is unable with the regular forces to execute the laws—not, you know, was some
28   distant time in the past when he decided to federalize them—doesn't that suggest that it has to be
     tied to what current conditions are?"  Id. at 1:30.

United States District Court
Northern District of California

1   continue in such service <u>until the necessity for their employment no longer exists</u>." <u>Id.</u> at 6

2   (emphasis added).

3          Consequently, if this were a case where the President had neglected to specify a

4   call-up period, it would still be reviewable under Section 12406's preconditions.  After all,

5   it is nonsensical to suggest that the law would permit a president to take advantage of an

6   exigency, omit a call-up period, and then send Guardsmen wherever he wanted for as long

7   as he wanted.  <u>See</u> <u>Youngstown</u>, 343 U.S. at 650 (Jackson, J., concurring) (explaining that

8   the Founders "knew what emergencies were" and "how they afford a ready pretext for

9   usurpation," including how "emergency powers would tend to kindle emergencies.").

10  Such a scenario would make a mockery out of the narrow preconditions Congress set forth

11  in Section 12406 when it delegated <u>its</u> call-up power.  <u>See</u> <u>Newsom</u>, 141 F.4th at 1045

12  ("Congress has delegated some of its power to call forth the militia to the President by

13  statute, including 10 U.S.C. § 12406, which authorizes the President to 'call into federal

14  service members and units of the National Guard of any state' under specified exigent

15  circumstances.").

16         Of course a president is not required to identify a service period when first issuing a

17  federalization order, because presidents cannot be expected to know at the start of an

18  exigency how long it will last.  But if the exigency is over and the President refuses to

19  relinquish control over a state's National Guard, the state may seek court review of

20  whether Section 12406's preconditions are still met, with all appropriate deference given

21  to the President.  Regardless, this scenario is not an issue here, where the President and the

22  Secretary of War <u>did</u> identify periods of service.  Those subsequent orders federalizing

23  troops are reviewable under Sections 12406 and 12407.

24                          **b.    Other Arguments on Reviewability**

25          Defendants also raise other arguments opposing reviewability, which the Court

26  briefly addresses here.

27          First, Defendants attempt to characterize Plaintiffs' motion as being centered on the

28  quantity of Guardsmen federalized.  Opp'n at 4.  Because Section 12406 gives the

President the discretion to federalize the National Guard "in such numbers as he considers necessary," Defendants argue that his management of headcount is unreviewable. 10 U.S.C. § 12406; Opp'n at 4–5. But that is a red herring. Plaintiffs do not dispute the appropriate "number of federalized Guardsmen," but instead argue that "the federalization is wholly unlawful." Reply at 5. [12]

Second, Defendants argue that judicial review poses separation of powers concerns. They contend that review of the Commander-in-Chief's on-the-ground decision making "would inject the Judiciary into the military chain of command" and constitute improper "micromanagement." Opp'n at 8. "[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Department of Navy v. Egan, 484 U.S. 518, 530 (1988). But reluctance does not mean refusal. Courts have reviewed—albeit cautiously—military actions before. See, e.g., Sterling v. Constantin, 287 U.S. 378, 401 (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."). And the Judiciary's willingness to intrude into military affairs is greatest when the military is deployed domestically. The Supreme Court has emphasized:

> Indeed, when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied.

Laird v. Tatum, 408 U.S. 1, 15–16 (1972). In Sections 12406 and 12407, Congress has articulated the necessary preconditions for the President to exercise his delegated power; it is then up to the courts to review, with appropriate deference, whether those preconditions have been met.

---

[12] At the hearing, Defendants implied that Plaintiffs are in fact arguing about headcount, as Plaintiffs want zero federalized Guardsmen. That is too clever by half. Plaintiffs' core argument does not transform into one about headcount merely because it would result in a complete lack of Guardsmen in federal service.

Finally, Defendants' argument that reviewability would permit "judicial review on every day of the mission" is unsupported by the facts. Opp'n at 4. Plaintiffs certainly have not peppered the Court with frequent challenges to Defendants' federalizations, and the Court is not aware that Defendants have faced this issue in their other National Guard cases, either. Even if Defendants' fear did come to pass, courts have long been capable of handling vexatious litigants and meritless actions.

The Court determines that both the August 5 and October 16 Orders are reviewable.

### 2.    Ultra Vires

Defendants next argue that Plaintiffs are unlikely to succeed because they cannot meet the high threshold necessary for relief on an ultra vires theory. Opp'n at 11–12. But as the Court explained previously, "emphasizing the narrowness of the theory of relief does not answer whether Plaintiffs have asserted a claim that fits within that theory." Order Granting Injunctive Relief at 49. An ultra vires claim succeeds only if a plaintiff can show that "an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." NRC v. Texas, 605 U.S. 665, 681 (2025) (emphasis in original) (citation omitted). Such claims also apply to presidential actions that extend beyond delegated statutory authority. See Murphy Co. v. Biden, 65 F.4th 1122, 1129–31 (9th Cir. 2023). An ultra vires claim is unavailable "where a statutory review scheme provides aggrieved persons with an adequate opportunity for judicial review." NRC, 605 U.S. at 681.

Certainly, Section 12406 represents a delegation by Congress of its authority to call forth the militia. See Newsom, 141 F.4th at 1045 ("Congress has delegated some of its power to call forth the militia to the President by statute, including 10 U.S.C. § 12406."). If the Ninth Circuit had agreed with Defendants' contention that there can be no ultra vires claim based on a president's violation of Section 12406, it would presumably have said so when it ruled on Defendants' motion to stay the Court's grant of a TRO in June.[13]  Instead,

---

[13] The Circuit even referenced the ultra vires claim without raising any such concern. Id. at 1044.

it held that alleged violations of Section 12406 are judicially reviewable.  See id. at 1047.  "Section 12406 is nothing if not a delegation of authority, and so [the] Court's analysis of whether Plaintiffs are likely to succeed on the merits [of their ultra vires claim] will hinge on the degree to which Defendants' actions are in violation of Section 12406's command."  Chicago TRO at 30 n.13.  Accordingly, Plaintiffs can demonstrate that Defendants exceeded their delegated authority if they can show that Defendants federalized the National Guard on August 5 and October 16 without satisfying the narrow prerequisites of Section 12406.[14]

### 3.    Merits

Defendants also argue that Plaintiffs are unlikely to succeed because, even if the Court can review the August 5 and October 16 Orders, those Orders "easily" satisfy Section 12406.  Opp'n at 9–11.  Not so.  In rejecting Defendants' argument that a president's determinations under Section 12406 are entirely unreviewable, the Ninth Circuit instructed that "courts may at least review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'"  Newsom, 141 F.4th at 1051 (citation omitted).  Even under that "highly deferential standard of review," see id. at 1052, Plaintiffs are likely to succeed on the merits.[15]

Section 12406 provides that a president "may call into Federal service members and units of the National Guard" "[w]henever" one of three preconditions is met: "(1) the United States . . . is invaded or is in danger of invasion by a foreign nation," "(2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States," or "(3) the President is unable with the regular forces to execute the laws of the United States."  10 U.S.C. § 12406 (emphasis added).

---

[14] Defendants do not assert that Plaintiffs have some other opportunity for judicial review.  See Opp'n at 11 ("[H]ere, the only possible avenue for review is an ultra vires claim.").

[15] At the motion hearing, Defendants asserted that if the Court can review a federalization order after the initial federalization, it should apply an even "more deferential" standard of review.  They provided no support for that position.

Of these three preconditions to federalization, Defendants only truly advance one. Defendants do not argue that there was a foreign invasion (or danger thereof) that justified federalization.  And they make only a passing argument in their briefing—and perfunctorily asserted at the motion hearing—that there was a rebellion (or danger thereof) in Los Angeles that justified federalization, see Opp'n at 10 ("including the need to protect against any risk of rebellion"), id. at 11 ("There remains . . . a danger of a rebellion in California.").  But the suggestion that there was any danger of a rebellion was even more farfetched in August and October than it was in June, when this Court first rejected it.[16] As the Court explained then, "[w]hile Defendants have pointed to several instances of violence, they have not identified a violent, armed, organized, open and avowed uprising against the government as a whole."  Order Granting TRO at 20; see also id. ("Moreover, the Court is troubled by the implication . . . that protest against the federal government, a core civil liberty protected by the First Amendment, can justify a finding of rebellion.").[17] Other courts in recent months have reached a similar understanding.  See, e.g., Illinois, 155 F.4th at 939 ("[B]ecause rebellions at least use deliberate, organized violence to resist governmental authority, the problematic incidents in this record clearly fall within the considerable daylight between protected speech and rebellion."); Portland FOFCOL at 98–

---

[16] Defendants made the incredible argument at the motion hearing that there is a current danger of rebellion in Los Angeles.  The evidence they offered was the protests six months ago and the fact that, on December 1, 2025, a single individual—acting alone and having burned down his own apartment that morning—threw two unlit Molotov cocktails at a federal building, injuring no one. See Notice (dkt. 220) Ex. 1.  But the exigency of the June protests has long since passed, and the misconduct of a lone individual hardly represents "deliberate, organized violence to resist government authority."  See Illinois, 155 F.4th at 939.  The idea that there is a current danger of rebellion rings especially hollow in light of Defendants' ongoing draw down of federalized Guardsmen: if Defendants truly believed that there was such a danger, how could only 100 Guardsmen be the answer?

[17] At the motion hearing, Defendants again made the concerning argument that any demonstration against the policy of the Executive, if organized, can constitute a threat of rebellion.  But organized protest is not inherently violent, nor is it an "unusual and extreme" exigency.  See Newsom, 141 F.4th at 1051.  To the contrary, it is quite common and part of the fabric of our nation.  Indeed, "[p]ublic demonstrations and protests are clearly protected by the First Amendment."  Index Newspapers LLC v. United States Marshals Serv., 977 F.3d 817, 830 (9th Cir. 2020).  And the "Government is not free to disregard the First Amendment [even] in times of crisis."  Cf. Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 21 (2020) (Gorsuch, J., concurring).

102 (defining rebellion as "an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means").  Defendants point to no evidence that the scattered protesters in Los Angeles in August or October were organized, collectively armed, or determined to overtake the federal government.

Accordingly, the Court turns to the remaining precondition to federalization, and the one upon which Defendants primarily rely: that "the President is unable with the regular forces to execute the laws of the United States."  See Opp'n at 9.  Defendants fail to satisfy two different requirements of that precondition: "is unable" and "regular forces."

### a.    "Is Unable"

First, the Court turns to the requirement that the President "is unable" to execute federal law.

### i.    The Meaning of "Is Unable"

The Ninth Circuit has already defined "unable" in this context, holding that "unable . . . to execute the laws" does not actually mean not able to execute the laws.  See Newsom, 141 F.4th at 1051–52 (rejecting the notion that Section 12406 requires that the president "be completely precluded from executing the relevant laws").[18]  Rather, the Circuit held, it is enough that the president be "significantly impeded" in executing the laws.  Id. at 1052.  But see Newsom v. Trump, 158 F.4th 984, 999 (9th Cir. 2025) (Berzon, J., regarding the denial of rehearing en banc) ("But § 12406(3) says nothing about 'interference' or 'significant impediments.'  It requires that the President be 'unable with the regular forces to execute the laws' before he is authorized to call in the National Guard. . . . 'Unable' requires something much closer to complete incapacity than a two-day

---

[18] To be clear, in granting a TRO, this Court held that President Trump had not been "unable" to execute the laws because ICE had continued to detain and arrest people in Los Angeles despite the protests, Defendants provided no support for their argument that ICE could have detained more people in the absence of protests, the statute said "unable to execute the laws" and not "faces obstacles that cause him to underperform in executing the laws," and Defendants' showing compared unfavorably to the Postal Service Strike, when the mail system was "paralyzed."  Order Granting TRO at 22–24.

United States District Court
Northern District of California

minor disruption in a discrete location." (emphasis in original)); Chicago TRO at 43

("[T]he Court frankly does not agree that 'significantly impeded' is the same thing as

'unable.'"); id. at 35 (explaining that "unable" at the time of Section 12406's enactment

meant "not able").

The Ninth Circuit also explained the term "significantly impeded," holding that

"any minimal interference with the execution of the laws" is insufficient. Newsom, 141

F.4th at 1051–52. Because invasion and rebellion both involve "unusual and extreme

exigencies," which would render a president unable to execute some laws, the Ninth

Circuit indicated that the third precondition must mean something similarly unusual and

extreme, or else it would swallow the first two preconditions. Id. The Ninth Circuit

pointed to evidence of violent protests (including protesters throwing "objects at ICE

vehicles trying to complete a law enforcement operation") on the day before the June 7

federalization as colorably demonstrating an inability to execute the laws. Id. at 1052.

The Ninth Circuit did not address the meaning of the word "is" in Section 12406, as

there was no real dispute at the time of the TRO that the protest activity was ongoing. It is

clear to this Court, however, that the word "is" conveys the present tense.[19] See Portland

FOFCOL at 79 ("Section 12406(3) asks whether 'the President is unable with the regular

forces to execute the laws,' not whether the President was at some point in the past unable

to do so." (emphasis in original)); Oregon v. Trump, 157 F.4th 1013, 1046 (9th Cir. 2025)

(vacated opinion) (Graber, J., dissenting) (noting that "use of the present tense clearly

conveys congressional intent that the present state of affairs is the relevant time" and

collecting cases); see also Oral Argument at 1:30, Newsom v. Trump (No. 25-3727),

https://perma.cc/A6Y5-L6LT (Judge Miller asking about "the fact that [Section 12406]

says the President is unable . . . not . . . was at . . . some distant time in the past . . . doesn't

that suggest that it has to be tied to what current conditions are?").

Congress did not say "was unable with the regular forces to execute the laws," and

---

[19] The word "whenever" in Section 12406 also communicates a temporal limitation to the present
moment. See MPI at 12.

for good reason: the preconditions in Section 12406 are "specified exigent circumstances." See Newsom, 141 F.4th at 1045.  Presently existing exigent circumstances, like an invasion, may demand streamlined responses.  See Circumstance, Black's Law Dictionary (12th ed. 2024) (defining "exigent circumstances" as "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures, as when a neighbor breaks through a window of a burning house to save someone inside."); cf. United States v. James Daniel Good Real Property, 510 U.S. 43, 62 (1993) (exigent circumstances justify exception to Due Process requirements of notice and opportunity to be heard).  Past exigent circumstances do not.  See Portland FOFCOL at 79 ("Of course, an exigency does not exist only at a discrete point in time, but nor is it a ghost that continues to persist once it has passed."); see also Oregon, 157 F.4th at 1046 (Graber, J., dissenting) ("Nor would it make sense for this narrow statute, which focuses on extreme and unusual occurrences, to allow the President to call up the National Guard to address an exigency that no longer exists.").

Defendants reject this emphasis on the present tense, insisting that "past experiences necessarily inform any analysis of whether, and to what degree, continued federalization is appropriate moving forward."  Opp'n at 10.  True enough.  But there must be a colorable basis to conclude, based on past events, that there was an ongoing inability to execute the law at the time of federalization.  Common sense must guide that inquiry.[20]  In order to assess the facts, the Court must evaluate them holistically.  See Newsom, 141 F.4th at 1051 (Courts "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'").  A colorable basis

---

[20] As Judge Immergut asked, "could the President rely solely on the civil unrest in Portland, Oregon, in 2020, to justify his deployment of military troops to the Portland ICE facility in 2025?" Portland FOFCOL at 78; see also Oral Argument at 4:04, Newsom v. Trump (No. 25-3727), https://perma.cc/A6Y5-L6LT] (Judge Bennett: "So if . . . for example, this statute were in effect at the Founding, and President Washington had called up militia to deal with the Whiskey Rebellion, notwithstanding the Whiskey Rebellion having gone away, that they could be called up forever without judicial review."); Oregon, 157 F.4th at 1045 (Graber, J., dissenting) (rejecting the government's suggestion that "even if there is complete calm for weeks beforehand, we should look further back in time to assess whether a present exigency exists.").

1    requires evidence linking a past event to a present inability to execute the law, such as the

2    impact of any intervening events or the lack of attenuation to the time of the call-up.  It is

3    insufficient to simply point to a past event in and of itself.

4         Next, Defendants insist that Section 12406 permits federalization based on "'mere

5    risk.'"  Opp'n at 10 (quoting MPI at 12–13).  Defendants asserted to the Ninth Circuit that

6    "[p]rotests [in Los Angeles] are now less frequent, less violent, and generally pose a less

7    significant risk to federal personnel and property compared to before the Guard was

8    deployed[,] [b]ut that risk has not disappeared entirely."  Opp'n to Mot. to Vacate Stay

9    (dkt. 137) at 5 in Newsom v. Trump, No. 25-3727.  They similarly assert here that there is

10   a "continued threat of harm to federal personnel and property."  Opp'n at 10.  The Court

11   shares Defendants' concerns about public safety: all citizens in this country deserve to feel

12   safe, and it is a core function of government to ensure that safety.

13        Yet it is also a core right of the people to be able to gather in protest of their

14   government and its policies—even when doing so is provocative, and even when doing so

15   causes inconvenience.  See, e.g., Cohen v. California, 403 U.S. 15, 24–25 (1972) ("To

16   many, the immediate consequence of this freedom may often appear to be only verbal

17   tumult, discord, and even offensive utterance. . . . That the air may at times seem filled

18   with verbal cacophony is, in this sense not a sign of weakness but of strength."); Tinker v.

19   Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508 ("But, in our system,

20   undifferentiated fear or apprehension of disturbance is not enough to overcome the right to

21   freedom of expression.  Any departure from absolute regimentation may cause

22   trouble. . . Any word spoken . . . that deviates from the views of another person may start

23   an argument or cause a disturbance.  But our Constitution says we must take this risk.").

24   Every protest, and indeed any large gathering of people in public, carries with it a risk of

25   violence, however unlikely.  But the specter of a protest that is not a current impediment to

26   the President's ability to execute the laws becoming a future impediment is not adequate.

27   See United States v. Weekley, 24 F.3d 1125, 1125 (9th Cir. 1994) ("A risk is a risk.  But a

28   risk of a risk is not enough of a risk.").  It is profoundly un-American to suggest that

United States District Court
Northern District of California

21

people peacefully exercising their fundamental right to protest constitute a risk justifying the federalization of military forces.[21]  Such logic, if accepted, would dangerously water down this precondition for federalization and run headfirst into the First Amendment.  See Bise v. Int'l Bhd. of Elec. Workers, AFL-CIO Loc. 1969, 618 F.2d 1299, 1304 (9th Cir. 1979) ("First Amendment rights are among the most fragile possessions of a citizen." (citation omitted)).

Regardless, the applicable standard when reviewing a president's decision to federalize the National Guard is not whether there are some threats of harm or risks to personnel and property.  Those considerations are relevant to Section 12406(3) only insofar as they render the President presently unable to execute the laws.  Notably, the first two preconditions for federalization permit a president to call up the National Guard even if there is only a danger of an invasion or rebellion.  See 10 U.S.C. § 12406(1), (2).  The third precondition, in contrast, does not permit federalization when there is a "danger" that the president will be unable to execute the laws, but requires a present inability to do so. See 10 U.S.C. § 12406(3); see also Portland TRO at 22 ("[C]oncern about hypothetical future conduct does not demonstrate a present inability to execute the laws."); Portland FOFCOL at 80 (same); Oregon, 157 F.4th at 1046 (Graber, J., dissenting) ("[T]he text of subsection three contrasts with the text of the other two subsections in a way that removes any doubt about the relevant time frame. . . . [S]ubsection three exclusively concerns the present, not the past and not the future.").  Without a demonstration that the President's ability to execute the law is currently being impeded at the time of deployment, he lacks adequate grounds for federalization under Section 12406(3).

---

[21] See Cox v. State of La., 379 U.S. 559, 574 (1965) ("We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society."); cf. Snyder v. Phelps, 562 U.S. 443, 460–61 (2011) ("As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."); Hon. Thurgood Marshall, Civil Rights And Race Relations: A Seminar 18 (1966) ("[T]his government was founded on protest."); Theodore Roosevelt, Jr., Sedition, a Free Press and Personal Rule, Kansas City Star, May 7, 1918 ("To announce that there must be no criticism of the President, or that we are to stand by the President, right or wrong, is not only unpatriotic and servile, but is morally treasonable to the American public.").

### ii.    Application to the August and October Orders

The Court now turns to whether the President's determination on August 5, 2025 and October 16, 2025 that he "is unable with the regular forces to execute the laws" "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" See Newsom, 141 F.4th at 1051 (emphasis added).  Plaintiffs contend that "[e]ven if there was a colorable basis to invoke § 12406 in Los Angeles in June, that does not authorize Defendants to keep soldiers deployed there indefinitely."  MPI at 10.  Defendants concede that "conditions have now improved," and even declare that "the federal protection mission has been a success," yet still insist that "the conditions required for federalization under Section 12406 continue to exist in California."  Opp'n at 9.

The Court notes that Defendants focus on the current state of affairs.  See, e.g., id. ("[T]he conditions required for federalization under Section 12406 continue to exist in California.").  But the motion's focus, and therefore the Court's focus, is whether the President had a colorable basis for federalization at the time that he issued the challenged Orders, in August and October of 2025.  Nevertheless, Defendants point to no evidence currently justifying federalization either.  Their assertion that "[t]here remains an inability to execute the laws . . . in California" is not only unsupported, but actually borders on a misrepresentation.  See Opp'n at 11.[22]

**August Order.**  In August of 2025, the situation in Los Angeles was calm. Defendants, nonetheless, rely on two points to justify the August 5 Order.  First, they cite to the declaration of Roger Scharmen, Deputy Regional Director for FPS, see Opp'n at 9 (citing Scharmen Decl. (Opp'n Ex. A)), which mentions the violence at the Roybal

---

[22] As discussed above, see supra note 16, the December 1 incident fails to demonstrate a current inability to execute federal law.  While it no doubt represents an illegal and dangerous act of violence, that lone bad actor does not rise to the level of an "unusual or extreme exigenc[y]."  See Newsom, 141 F.4th at 1051.  Indeed, in their press release about the incident, the Justice Department states that it was able to manage this incident "immediately" and that the "FBI is investigating this matter with assistance from [FPS], the Bureau of Alcohol, Tobacco, Firearms and Explosives, Homeland Security Investigations, the [LAPD], and the Los Angeles Fire Department."  See Notice Ex. 1.  There was no mention of the need for, or involvement of, the California National Guard.  Defendants also fail to articulate any federal laws that the brief December 1 incident significantly impeded the President from executing.

23

United States District Court
Northern District of California

Building in "early June" and then no other incidents until October, see Scharmen Decl. ¶¶ 4–6.  Scharmen states that "continuing to the present, protests have continued, albeit in reduced numbers," adding that typically there are fewer than 100 protesters, "but protests that are attended by up to 500 people still occur." Id. ¶ 5.  He also states that "the smaller protests are for the most part peaceful." Id. ¶ 6.  Second, Defendants point to a July 10 incident in Camarillo, California at a cannabis farm.  Opp'n at 10–11.  In Camarillo, federal law enforcement initially requested assistance from the National Guard, then canceled that request, before coming under attack by a crowd throwing rocks.  Id.  Defendants reason that "[m]ilitary decision-makers could reasonably rely upon such considerations in concluding that a small deployment of Guardsmen is still required." Id. at 11.

But an incident on July 10, 50 miles from Los Angeles, is not a compelling reason in and of itself to federalize troops on August 5.  Even if there were exigent circumstances on July 10 in Camarillo, they had passed in the weeks thereafter, when there was no indication that ICE intended to return to Camarillo, when the National Guard was in fact assisting on "zero" ICE field operations like the one in Camarillo, see Santacruz Test. on 8/11/2025 (dkt. 162) at 198:5–21, and when Defendants had decided to release most of the Guardsmen, see Sauter Decl. ¶ 5.

Likewise, even if there were exigent circumstances in early June at the Roybal Building, two months thereafter that exigency had passed, as there were often just a few dozen protesters, no violent incidents, and no arrests at that location.  See Hurtado Decl. ¶ 11; see also Scharmen Decl. ¶¶ 4–6; Duryee Decl. ¶ 9.  "[A]n exigency [is not] a ghost that continues to persist once it has passed." Portland FOFCOL at 79.  Defendants reason that while the unrest in June subsided, that abatement "was due at least in part to the presence of Guardsmen in Los Angeles." Opp'n at 10; see also Scharmen Decl. ¶ 5 (crediting "the presence of the National Guard" for reduction in violence in protests at federal buildings).  But as Plaintiffs respond, "The point of federalization is to abate the exigency, so the claimed success of the federalization cannot be grounds for finding a further exigency."

1    See Reply at 8.  If federalization justified federalization, it would become a positive

2    feedback loop that perpetually rationalized federal control of state troops.  Defendants'

3    rank speculation regarding the effects of the Guardsmen's presence is insufficient as

4    Defendants have been unable to identify even "minimal interference with the execution of

5    the laws" in August 2025.  See Newsom, 141 F.4th at 1052.

6        The Court also rejects Defendants' argument that the risk of future impediments

7    was enough to federalize the National Guard in August.  Even accepting Defendants'

8    contention that future risk is relevant to Section 12406(3), Defendants have identified no

9    colorable basis for the August federalization based on such risk.  Defendants cannot

10   credibly assert that the National Guard is necessary to "keep most protests from becoming

11   violent," when they concede that protests since June now only occur "in reduced

12   numbers."  See Scharmen Decl. ¶¶ 5, 9.  The protests around that time specifically had

13   been small and peaceful.  Hurtado Decl. ¶ 12; Scharmen Decl. ¶ 6.  Again, peaceful

14   protests cannot be the sole justification for federalization.  See supra pp. 21–22.

15       Moreover, risk must be viewed in the context of what resources are available to

16   prevent, mediate, or manage it.  The risk that a handful of people could overtake a federal

17   building, for example, looks different if there is just one guard, as opposed to many,

18   protecting that building.  Consequently, it defies the record—and common sense—to

19   conclude that risks stemming from protests—in August, October, or even present day—

20   could not have been sufficiently managed without resorting to the National Guard.  After

21   all, local law enforcement like the LAPD, the LASD, and the California Highway Patrol

22   ("CHP") have not only been willing to manage the protests,[23] but have capably done so

23   since June.[24]  See Hurtado Decl. ¶ 12 (LAPD was "well-equipped" to handle the recent

---

[23] Defendants' suggestion at the motion hearing that because Los Angeles is a "sanctuary city," its law enforcement officers might be unwilling to assist with violence against federal personnel or property has absolutely no support in the record.  As the Court pointed out and Defendants agreed, many crimes against federal personnel and property would constitute both state and federal crimes that state law enforcement would have a sworn duty to address.  Nor is there any evidence that because Los Angeles is a "sanctuary city," its law enforcement officers are significantly impeding ICE's ability to execute the law in Los Angeles.

[24] While not pertinent to the August and October Orders, the LAPD and CHP were more than

United States District Court
Northern District of California

protests and did so "without mutual aid, the National Guard, or even the Department's own specialized crime suppression units."); Duryee Decl. ¶ 9 ("CHP stands ready to respond to any future significant protest activities anywhere in California, including in the Los Angeles area."). That is even before considering the resources of FPS, other federal civil law enforcement, or the military.[25] One cannot colorably conclude that these organizations were so unable to manage the then-existing risk that the National Guard was required to protect the city's federal buildings.

As this Court can attest, individuals protesting the federal government often gather outside federal buildings. There is always some risk that a protester will engage in violence. But, as the Court has explained, if the threat that a protester might engage in violence outside a federal building was all that it took for the President to federalize the National Guard, then the narrow preconditions of Section 12406 would be rendered meaningless. See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund, 583 U.S. 416, 431 (2018) ("Congress does not hide elephants in mouseholes." (internal quotation marks omitted)).

Based on a holistic evaluation, there is no colorable basis to conclude that the President was "significantly impeded" from executing federal law on August 5, 2025.

**October Order.** The Court's analysis of the October 16 Order differs from its analysis of the August 5 Order in only a few respects.

First, and most obvious, October is two months even further removed from the unrest in June that the Ninth Circuit held satisfied Section 12406(3), making that justification for federalization that much weaker.

Second, Defendants have identified two other incidents that occurred in October, apparently at the Roybal Building. On October 9, 2025, "a known gang member" verbally

---

capable of handling the "No Kings" protest in Los Angeles on October 18, 2025, which had between 75,000 and 100,000 participants. Hurtado Decl. ¶ 13 (only "normal operational resources" were required to manage the protest); Duryee Decl. ¶ 7 (no "direct deployment of [CHP] resources" was required for the protest).
[25] The Court holds that the term "regular forces" in Section 12406 refers to the federal military, rather than federal civilian forces. See infra pp. 28–30. For purposes of the present analysis, however, the Court determines that both kinds of forces would have been able to manage the risk stemming from protests in coordination with local law enforcement.

threatened ("watch out," "leave and [let] gangs run this," "you think I am playing?") an FPS Inspector. Opp'n at 9 (citing Scharmen Decl. as evidence that threats have continued); Scharmen Decl. ¶ 6. That threat did not escalate into any physical violence and the gang member apparently left on his own. See Scharmen Decl. ¶ 6. The next day, an immigration protestor shined "a high-power laser" in an FPS officer's eyes, "causing eye damage." Id. ¶ 7. Defendants provide no further information about whether any National Guard members or law enforcement intervened in those incidents or how long they lasted. In any case, while it is never acceptable to threaten or injure an FPS officer, Section 12406(3) does not ask whether there are threats to individual federal employees, but whether the President is presently unable to execute the laws. See supra p. 22. These isolated incidents do not show that.[26] Even if the two October incidents were enough to create a risk that the President would be unable to execute the laws, there is no indication that local law enforcement, FPS, other federal civil law enforcement, or the military were incapable of managing that risk.

Third, the October 16 Order is based on events in Oregon, not anything occurring in Los Angeles.[27] See Strong Decl. Exs. 4 & 5. In the same breath that the Order federalized the Guard, it immediately redeployed 200 federalized National Guards members from California to Oregon. Id. Indeed, in sending 200 of the 300 remaining federalized California National Guard members to Oregon, and keeping them there, Defendants signaled that there was no pressing need for them in Los Angeles. See Eck Decl. ¶ 9 (200 federalized California National Guard members remained in Portland as of 10/31/25). Judge Immergut held that the events in Oregon did not justify the deployment of the

---

[26] Scharmen also declares that "having the National Guard present at the federal facilities that FPS protects . . . has allowed FPS to reduce its staffing levels." Scharmen Decl. ¶ 9. He goes on to explain that "FPS is a small agency with a total of 776 law enforcement officers." Id. ¶ 11. But Section 12406(3) does not permit the President to federalize the National Guard to make up for staffing shortages in other agencies. As discussed elsewhere, the President has many other resources available to him. Only if the president is unable with the regular forces to execute the law may he federalize the National Guard pursuant to Section 12406(3).

[27] The August 5 Order did not actually reference events in California, but it at least did not explicitly concern events in any other state. See Strong Decl. Ex. 1.

1    National Guard there.  See generally Portland FOFCOL.  Those same events certainly do

2    not justify federalization in California.

3        Based on a holistic evaluation, there is no colorable basis to conclude that the

4    President was "significantly impeded" from executing federal law on October 16, 2025.

### b.    "The Regular Forces"

6        Next, the Court turns to the requirement that the President "is unable with the

7    regular forces" to execute federal law.

### i.    The Meaning of "the Regular Forces"

9        The Ninth Circuit has not addressed Section 12406(3)'s use of the term "the regular

10   forces."  See Newsom, 158 F.4th at 1000 (Berzon, J., regarding the denial of rehearing en

11   banc) (noting that "[t]he panel opinion gives no role whatever to the 'with regular forces'

12   requirement.").[28]  In addition, this Court's order granting a TRO paid the term little

13   attention, concluding that, "[i]n this case, the regular forces were and are still very much

14   on duty," as ICE continued to execute the federal immigration laws in Los Angeles

15   notwithstanding the protests.  Order Granting TRO at 24.  To the extent that this Court

16   assumed that "the regular forces" meant civilian workers or civilian law enforcement, that

17   assumption might have been in error.  A review of materials related to the statutory history

18   of Section 12406(3) not before the Court at the time of the TRO persuasively demonstrates

19   that "the regular forces" means the regular forces of the military.

20       When the predecessor to Section 12406(3) was enacted, "regular forces" meant "the

21   soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen

22   who did not make it their livelihoods to serve their country but instead took up arms only

23   when called forth in times of national emergency."  Chicago TRO at 35.  As Professor

24   Martin Lederman of Georgetown Law explained, in December of 1901, President

25   Roosevelt "implored Congress to [establish] a means by which the states' militia could be

---

[28] The parties also have not addressed this point in any detail before this Court.  See, e.g., MPI at
11 n.4 (asserting in a footnote that it is reasonable to construe "regular forces" as federal law
enforcement or members of the regular military); see Opp'n (not addressing).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  enhanced and effectively called into service."  Lederman Br. (dkt. 14) in <u>Trump v. Illinois</u>,

2  Case No. 25A443 (Oct. 21, 2025) at 9 (quoting <u>Perpich</u>, 496 U.S. at 341).  Congress

3  responded to Roosevelt's appeal by passing the Dick Act in 1903, which among other

4  things sought "to establish closer relations and better cooperation between the National

5  Guard and the Regular Army."  <u>Id.</u> at 9–10 (quoting S. Rep. 57–2129 at 2 (1902)).  When

6  Congress amended the Dick Act in 1908, it was "to ensure that in cases where the use of

7  the 'regular forces' was inadequate to execute federal laws, the President would have to

8  call upon the National Guard as the initial supplement to the standing army <u>before</u>

9  deploying any volunteer units."  <u>Id.</u> at 11 (emphasis in original); <u>see also</u> <u>id.</u> at 12 ("The

10  effect of the law was to prescribe the National Guard as the 'second line of defense' . . . as

11  a supplement to the regular army." (citation omitted)).  Professor Lederman recounted

12  plentiful references to "Regulars" and "the Regular Army" in the congressional reports

13  surrounding the 1903 and 1908 legislation, and in the over-hundred years leading up to it.

14  <u>Id.</u> at 12–14.  He concluded that "whenever anyone in one of the three branches discussed

15  'the regular forces' in relation to the militia, the National Guard or the volunteer forces,

16  they were referring to those persons serving within the standing U.S. military, particularly

17  the army."  <u>Id.</u> at 17.[29]  Indeed, he asserted that he was "unaware of any counterexamples."

18  <u>Id.</u>  Unsurprisingly, when asked at the motion hearing whether there is any historical basis

19  for believing that in 1908, "regular forces" meant anything other than the standing army,

20  Defendants were unable to point to any.[30]

21       This Court finds this historical review persuasive on the meaning of "the regular

22  forces."  But this Court is also well aware that the Supreme Court will soon rule on this

23

24  [29] <u>See also</u> Chicago TRO at 36–37 (noting that in <u>McClaughry v. Deming</u>, 186 U.S. 49, 56 (1902),
25  the Supreme Court distinguished between "the men composing the militia"—i.e., the Guard—and
     "the Regular Army"); Lederman Br. at 16–17 (noting, for example, that Secretary of State Luke
26  Edward Wright distinguished between the militia and the "regular forces" in an annual report to
     the President in 1908).
27  [30] Defendants argued instead that they believe from the context of Section 12406(3) that "regular
     forces" means the authorities normally charged with executing the laws.  That reading would be
28  more persuasive if the Court interpreted statutory language in a vacuum; here, the statutory history
     makes Congress's intent clear.

issue, and will have the last word.  Accordingly, the Court will apply both the "military"

meaning of regular forces and the Court's earlier understanding of that term.

###    ii.    Application to the August and October Orders

The Court now turns to whether the President's determination on August 5 and

October 16 that he "is unable with the regular forces to execute the laws" "reflects a

colorable assessment of the facts and law within a 'range of honest judgment.'"  See

Newsom, 141 F.4th at 1051.  Even if the evidence that Defendants point to in support of

the August and October Orders represented a significant impediment to executing federal

law in Los Angeles, Defendants do not even attempt to show that the President would have

had any difficulty executing federal law with the assistance of the significant available

military force at his command in California.[31]

The Court takes judicial notice that there are 34 military installations in California.

See California Installations, Military OneSource, https://perma.cc/N5NT-PDW5.  There

were 160,074 active members of the military in California as of June 2025.  See DoD

Personnel, Workforce Reports & Publications, Defense Manpower Data Center,

https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports.  And there are

7,319 active members of the Army in California.  See id.  The notion that such a

substantial military force, if otherwise permitted to execute the laws, see 18 U.S.C. § 1385

(Posse Comitatus Act), would have had any difficulty managing the small, ongoing,

peaceful protests in Los Angeles, or the two incidents at the Roybal Building in October,

each involving a single individual, has no merit.

Even under this Court's previous understanding of "the regular forces," there is no

colorable basis to conclude that civilian law enforcement alone would have had any

difficulty enabling the President to execute federal law in August or October.  See Illinois,

155 F.4th at 939–40 ("We need not fully resolve these thorny and complex issues of

---

[31] This fact is devastating not only as to the actual evidence that Defendants say demonstrates a present inability to execute the law, but also as to Defendants' speculative arguments about future risk, like violence only being abated due to the presence of the National Guard.

United States District Court
Northern District of California

statutory interpretation now, because we conclude that the administration has not met its burden under either standard.").  As discussed earlier, Plaintiffs submitted evidence that the LAPD was "well equipped to handle these protests and did so without mutual aid, the National Guard, or even the Department's own specialized crime suppression units." Hurtado Decl. ¶ 11.  And Defendants submitted no contravening evidence suggesting that civilian law enforcement was inadequate.  Defendants' hypothetical that the FPS "would not have the resources on hand to respond fully" "if the protests grow in size and become violent again," see Scharmen Decl. ¶ 12, does not mean that FPS did not have the resources available to deal with the altogether manageable circumstances in August and October, that the President could not employ support beyond FPS, or that local or state law enforcement would not also have been available to assist.

Accordingly, notwithstanding the highly deferential standard of review, Plaintiffs are likely to succeed in arguing that the August 5 and October 16 Orders fail to meet two requirements of Section 12406(3)—that the president "is unable" to execute the laws or that he is unable to do so with "the regular forces."  Because Plaintiffs are likely to succeed on the merits as to Section 12406, they are also likely to succeed on the merits of their Tenth Amendment claim.  See Bond v. U.S., 564 U.S. 211, 225 (2011) ("[A]ction that exceeds the National Government's enumerated powers undermines the sovereign interests of States."); see also Newsom, 141 F.4th at 1044 ("[P]arties agree that Plaintiffs' Tenth Amendment claim, at this stage, rises and falls with their ultra vires claim based on § 12406.").

### 4.    Amendment

Finally, Defendants argue that Plaintiffs are unlikely to succeed because Plaintiffs' motion seeks relief that goes beyond the scope of the complaint.  Opp'n at 12.  Defendants assert that the complaint, which Plaintiffs filed on June 9, made "no mention of any decisions to extend the federalization," and so "Plaintiffs must amend their complaint before the Court could possibly entertain their motion."  Id.  This argument is both impractical—as it would require Plaintiffs to return to court to amend their complaint

31

every time Defendants filed a new federalization order, unnecessarily slowing the adjudication of these issues—and wrong.

Although the complaint predates the August 5 and October 16 Orders, it anticipates them, asking the Court to declare that the June 7 Memo "and any future orders" that call the California National Guard "into service under the stated authority of the President's use of 10 U.S.C. § 12406 are unauthorized by and contrary to the laws of the United States." Compl. at 21.  The central claim in the complaint was that Defendants' June 7 Memo did not satisfy any of the preconditions in Section 12406, see id. ¶ 88, and the central relief sought in the complaint was the enjoining of the federalization, see id. ¶ 92. The motion now pending seeks to "enjoin any continued federalization and deployment of the National Guard troops in and around Los Angeles, and end this unlawful federalization now," MPI at 1, and turns entirely on Section 12406, id. at 10.  Of course there is a "sufficient nexus" between the two.  See Pacific Radiation Oncology, LLC v. Queen's Medical Center, 810 F.3d 631, 636 (9th Cir. 2015).  Indeed, it is Defendants who refer to the June 7 Memo and the August and October Orders as part of one big "mission."  See Opp'n at 4.[32]  Moreover, when this Court expressed caution about proceeding on this motion, the Ninth Circuit held that the Court had jurisdiction over Plaintiffs' challenge to that order, something it presumably would not have done if the motion sought relief beyond the scope of this case.  See USCA Order.

Plaintiffs therefore need not have amended the complaint for the Court to entertain this motion.

**B.    Irreparable Harm**

A party seeking preliminary injunctive relief must "demonstrate that irreparable

---

[32] Defendants' position is that the August 5 and October 16 Orders were not new orders "calling up" the National Guard but mere continuations of the June 7 Memo.  See Opp'n at 2 (distinguishing these orders, which they characterize as "[t]he continuation decision[s] challenged here," from "the initial decision to federalize."); see also id. at 9 (reiterating "continuation of . . . valid federalization" characterization).  By their own reasoning, then, there is all the more "relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint."  See Pacific Radiation Oncology, 810 F.3d at 636.

United States District Court
Northern District of California

injury is likely in the absence of an injunction." Winter, 555 U.S. at 22; see also Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 788 (7th Cir. 2011) (holding that harm need not be certain to occur for injunctive relief to issue). The moving party must show a "sufficient causal connection" between the defendant's conduct and their anticipated injury. Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014).

Plaintiffs have demonstrated the likelihood of irreparable harm in the absence of preliminary injunctive relief based on their "constitutional sovereign harms" under the Tenth Amendment. Reply at 9; see also Bond, 564 U.S. at 225. Defendants attempt to frame the harm as "statutory, not constitutional," because Plaintiffs bring "alleged violations of a federal statute." Opp'n at 13. But those statutory violations themselves give rise to constitutional, sovereign injury as federalization wrests control of the National Guard from the State. Indeed, the other courts with National Guard cases are in accord. See, e.g., Illinois, 155 F.4th at 940 ("[T]he administration's likely violation of Illinois's Tenth Amendment rights by deploying Guard troops in the state over the state's objections constitutes proof of an irreparable harm." (cleaned up)); Preliminary Injunction (dkt. 134) in Oregon v. Trump, 3:25-cv-01756-IM (granting a preliminary injunction based, in part, on a likelihood of irreparable harm to Oregon's sovereignty). Because Plaintiffs are likely to succeed on their constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." Baird v. Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023).

## C.    Balance of Equities and Public Interest

A party seeking injunctive relief must also demonstrate that the balance of equities tips in its favor, and that an injunction is in the public interest. See Winter, 555 U.S. at 20. "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. (quoting

Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).  Because the federal government is a party, the last two Winter factors merge.  E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 668 (9th Cir. 2021).

The balance of the equities and the public interest tip in Plaintiffs' favor.  Because Plaintiffs have demonstrated a likelihood of success on the merits of their Tenth Amendment injury claim, their showing "tips the merged third and fourth factors decisively in [their] favor."  Baird, 81 F.4th at 1042.  That is because it is "always in the public interest to prevent the violation of a party's constitutional rights."  Riley's Am. Heritage Farms v. Elsasser, 32 F.4th 707, 731 (9th Cir. 2022) (quoting Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)).  In contrast, the harm of denying Defendants access to California's National Guard members is minimal given that Defendants "have adjusted downward the number of federalized Guardsmen" because, as they say, the "deployment has succeeded."  Opp'n at 1.

The Court also notes that it is contrary to the public interest to have "militarized actors unfamiliar with local history and context" roaming the streets.  Chicago TRO at 24.  Rather, "the public has a significant interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in their neighborhoods."  Illinois, 155 F.4th at 940.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

- Defendants are temporarily ENJOINED from deploying members of the California National Guard in Los Angeles.[33]

- Defendants are DIRECTED to return control of the California National

---

[33] Plaintiffs asked the Court at the motion hearing to enjoin any future federalizations based on the same circumstances.  In light of the deference owed the President's determinations under Section 12406 and the Court's recognition that circumstances are always changing, the Court DENIES this request.  Plaintiffs may return to this Court to challenge any future federalization order that they believe violates the law.

United States District Court
Northern District of California

Guard to Governor Newsom.

- The Court STAYS this order until noon on Monday, December 15, 2025.

- Plaintiffs are ORDERED to post a nominal bond of $100 within 24 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.  If said bond is not posted by the aforementioned date and time, this Order shall be dissolved.

**IT IS SO ORDERED.**

Dated: December 10, 2025



CHARLES R. BREYER
United States District Judge